```
                  UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION

    _____

    UNITED STATES OF AMERICA,

                    Plaintiff,
                                           DOCKET NO. 1:20-mj-416
    vs.


    BRANDON CASERTA,

                    Defendant.
    _____/


             TRANSCRIPT OF DETENTION HEARING

       BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

                    GRAND RAPIDS, MICHIGAN

                       October 13, 2020


    Court Reporter:           Glenda Trexler
                              Official Court Reporter
                              United States District Court
                              685 Federal Building
                              110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503


    Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.
```

```
 1   A P P E A R A N C E S:
 2   FOR THE GOVERNMENT:
 3       MR. NILS R. KESSLER
         UNITED STATES ATTORNEY'S OFFICE
 4       330 Ionia Avenue, N.W.
         P.O. Box 208
 5       Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
 6       Email:  Nils.Kessler@usdoj.gov
 7       MR. AUSTIN JACOB HAKES
         UNITED STATES ATTORNEY'S OFFICE
 8       330 Ionia Avenue, N.W.
         P.O. Box 208
 9       Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
10       Email:  austin.hakes@usdoj.gov
11   FOR THE DEFENDANT CASERTA:
12       MR. MICHAEL DARRAGH HILLS
         HILLS AT LAW, PC
13       425 South Westnedge Avenue
         Kalamazoo, Michigan 49007
14       Phone:  (269) 373-5430
         Email:  mhills@hillslawoffice.com
15
16                    *   *   *   *   *
17                              Grand Rapids, Michigan
18                              October 13, 2020
19                              3:55 p.m.
20                 P R O C E E D I N G S
21       THE COURT:  All right.  We are back on the record in
22   the matter of the bond hearing for Mr. Caserta.  Mr. Hills is
23   here with Mr. Caserta, as is the prosecutor, Mr. Kessler and
24   Mr. Hakes.
25           Mr. Kessler, are you ready to proceed?
```

1  *MR. KESSLER:* Yes, Your Honor. As with the other
2  defendants, Your Honor, we're going to rely on the evidence you
3  heard during the prelim. I'll just highlight a couple of
4  additional things here, evidence that is already in.
5  I do have one additional exhibit, which I don't think
6  we really need to call Agent Trask up unless defense counsel
7  asks. It's a video that Mr. Caserta posted himself. It's
8  pretty obvious it's him from just looking at the video. It's a
9  video of him, so . . .
10  I'll just open this up so I can pull them up for you,
11  Your Honor.
12  I focus your attention on Exhibit 20 in which the
13  defendant talks about -- or Defendant Caserta talks about being
14  accosted by two police officers which is when they wrote him
15  the ticket. And let's see, on page 2 -- I'll blow this up
16  here -- this goes to his motive as well. That he says he's
17  "tired of being coerced, robbed, and enslaved by pathetic
18  cowards." That would be the police. And he concluded the
19  sentence by saying "The end times are approaching for these
20  piece-of-shit cops. I mean that with every cell in my body."
21  On the next page --
22  *THE COURT:* Hang on just a second.
23  *MR. KESSLER:* Yes, Your Honor.
24  *THE COURT:* You may proceed.
25  *MR. KESSLER:* On the next page of that same exhibit,

1   Exhibit 20.  And this, again, is not that long ago.  This is
2   September 19th.  After being pulled over by two police officers
3   he says "I have these two guys' names.  I'm considering doing a
4   recon.  They work the night shift.  I could easily tap them and
5   dip and no one would know a thing.  Good practice."
6          Again, I'm sure he's going to say this was simply
7   talk, but we've seen all the training he's done, and he seems
8   to again be talking about tying up some loose ends if he were
9   to be out there free.
10         And on Exhibit 25 he talks about -- with Mr. Garbin
11  about wanting to get a suppressor himself, a silencer.  And
12  talks about wanting one for either a 556, which would be a
13  AR 15-style semiautomatic rifle, or a 9-millimeter
14  semiautomatic pistol.
15         And then I'm going to bring up Exhibit 29 if you're
16  ready, Your Honor.
17         *THE COURT:*  Give me just --
18         *MR. KESSLER:*  Mr. Hills, do you want us to call the
19  agent for this?
20         *MR. HILLS:*  Maybe.  I don't have a problem with the
21  foundation right now.  I don't have a problem with the
22  foundation.
23         *MR. KESSLER:*  I can proffer what it is.  Exhibit 29
24  is a video.
25         *THE COURT:*  Hang on.  Hang on just a second.  Let me

1  just catch up with you here.
2           All right.  Exhibit 29, is that what you said?
3           *MR. KESSLER:*  Proposed Exhibit 29 is a video that I
4  will proffer that if called as a witness Agent Trask would
5  testify was sent by Mr. Caserta to the other members of the
6  chat group on October 7th.  I can bring him up here to say
7  that.
8           *MR. HILLS:*  No, that's okay.  I might have some
9  questions for him after I see the video.  I have not seen it
10 yet.
11          *THE COURT:*  Understood.
12          *MR. KESSLER:*  All right.  And this is a video that
13 was sent after he was pulled over by police again recently.  So
14 October 29.  Or Exhibit 29.  You know what, I'm going to do it
15 the other way.  It comes up sideways through this program.
16          *(Video playing)*
17          *THE COURT:*  What was the date that you had associated
18 with that?
19          *MR. KESSLER:*  October 7th, Your Honor.  Last Tuesday.
20 I have nothing further, Your Honor.
21          *THE COURT:*  All right.  Mr. Hills.
22          *MR. HILLS:*  I'm going to rely on the
23 Pretrial Services Report.  I'm going to make a comment about a
24 couple of family members in the court, but I don't have any
25 other evidence to show.

1            *THE COURT:*  All right.  All right.  I'll take
2     argument, Mr. Kessler.
3            *MR. KESSLER:*  Yes, Your Honor.  Again, as with the
4     other defendants, the crime he was involved in is serious
5     obviously.  I think this last video was the most disturbing of
6     all.  When you put it together with Exhibit 20, he obviously
7     has a problem with authority, and by asking to be let out on
8     bond, that is what he is talking about.  That he's going to
9     somehow obey a piece of paper that's issued by the state which
10    he says is enslaving him and is the enemy and that he's wanting
11    to take out as many as he can.
12           He pretty casually, like with the last defendant,
13    talks about killing people.  It's definitely concerning that
14    somebody pulls him over and he goes and finds out the names so
15    he can suggest doing a recon and then murdering them for
16    practice.
17           And then this last video obviously.  You know, the
18    whole notion of -- he seems extremely angry about being
19    so-called enslaved by the state.  I think it's hard to imagine
20    he's going to follow the Court's orders.
21           Besides the obvious thing that we see in the videos,
22    the Pretrial Services Report also points out some
23    anger-management type issues he has.  He's had some mental
24    health issues which he denies.  And actually it's more
25    concerning that he denies them than he would be acknowledging

1  them.  It's a dismissed charge, but he has a charge in the past
2  for assault and battery which suggests again the same
3  propensity towards violence.  And also the propensity for just
4  doing what he wants and disregarding authority, which
5  ordinarily I wouldn't highlight things like driving on a
6  suspended license, which underlies his hatred of the police,
7  but it's over and over again.  And we see that he has license
8  revoked and he keeps driving on a suspended license despite
9  being convicted for it over and over again.  And then if he
10 gets pulled over thinks that it's the cops' fault and they
11 deserve to die for it.  So I think under all those
12 circumstances, Your Honor, we really can't trust him to abide
13 by the Court's orders and letting him go would be not safe for
14 the public.
15         *THE COURT:*  Can you reference what you're telling me
16 about anger-management issues?  Other than the assault and
17 battery.
18         *MR. KESSLER:*  I am inferring from that, Your Honor.
19         *THE COURT:*  I'm sorry?
20         *MR. KESSLER:*  I'm inferring from that.
21         *THE COURT:*  I see.
22         *MR. KESSLER:*  And there's mental health issues and
23 the whole totality.
24         *THE COURT:*  Okay.  Thank you.
25         *MR. KESSLER:*  Yes, Your Honor.

1            *THE COURT:*  Mr. Hills.
2            *MR. HILLS:*  Thank you, Your Honor.  Well, the assault
3    and battery was when my client was 19 years old and the case
4    was dismissed.
5            As far as driving on a revoked license, it's a no ops
6    on person, operating without a license on person.  It's not
7    driving without.  And they are very, very minor cases.  And the
8    last one was six years ago.  I don't think criminal history is
9    really an issue for the Court.  I don't think it will consider
10   that weighing very heavily at all.
11           As far as mental health issues, it looks like he may
12   have been diagnosed with attention deficit hyperactivity
13   disorder, excessive compulsive disorder, and Tourette's when he
14   was a child, and he was prescribed medication and it resolved.
15   That's the only thing I see regarding that.
16           Regarding other characteristics, his history and
17   characteristics, I don't think he has any mental health issues.
18   He's got strong family ties.  He's got his aunt in the
19   courtroom today.  He's got his stepbrother in the courtroom
20   today.  I've been in contact with his mother who is very
21   supportive of him.
22           He has solid long-term employment for two years
23   nine months I believe it indicates.  With a nice job.  A very
24   good job, stable job.  He's been in the same I believe
25   apartment for three years, I believe.  Since 2007.  He's lived

1  in Michigan all his life.  His criminal history is negligible.
2  He's not on parole or probation at all.
3           Regarding the incidents that we -- I guess spurred
4  this video and some comments on the encrypted chat came from a
5  stop by the police.  There was no incident on the road.  No
6  offensive behavior on the road.  There was no follow-through.
7  I think it was September 19th, I believe, the stop was, so
8  there's plenty of time to do what he's talking about.  Recon,
9  try and find out where these officers lived.  Try and do
10 something.  He did none of that, right?  He's just sort of this
11 inflammatory, clearly, rhetoric is what I would call it.
12          And I believe that that kind of leads into what the
13 Court has been considering the more important issue for bond
14 which is dangerousness and the offense itself.  So when I look
15 at it, it's the same pattern throughout, and I'll go through
16 some of it, but it's inflammatory rhetoric with no
17 follow-through.  Especially in this.
18          In this case if you look at the Complaint, my client
19 doesn't -- Mr. Caserta does not show up until June 28th.
20 That's at the Munith training.  And that's what it is.  It's an
21 FTX, completely legal.  I'm not sure which training that video
22 was from, but it was my client doing the training.  And that's
23 about it.
24          He went next to Wisconsin.  The big thing about
25 Wisconsin was the balloon with the BBs in it as an IED, which

1   my client wasn't a part of that at all.  He's there to do the
2   training.
3           After that I believe it's Lake Orion, and that's not
4   a training.  That's where they get together.  And again my
5   client makes a statement.  It's inflammatory rhetoric is what I
6   would call it.  It's not any aspect of planning for kidnapping
7   the governor.
8           And then finally, the last place my client was in the
9   Complaint was Luther.  September, I think, 12th and 13th was
10  that event.  And that again is a training.  And the big thing
11  at that particular event was a second surveillance.  There was
12  one before that which my client wasn't a part of.  And then at
13  that Luther event there was a three-car surveillance that they
14  did with multiple people that my client wasn't a part of.  My
15  client wasn't a part of any of the specific planning.  He
16  wasn't a part of any of the surveillance.  None of the recon.
17  None of the map making.  None of the IEDs.  He didn't
18  contribute any money.  He was not a leader, I guess, as they
19  testified.  So when you take all of that together, and his
20  history and characteristics, I don't think the dangerousness
21  applies to my client as far as the conspiracy to kidnap charge.
22  So I would ask the Court to take all that together and the fact
23  that my client wasn't there on October 7th.  He didn't bring
24  money to that final meeting, I suppose.  And he was
25  cooperative.  There's no indication that he has anything

1  illegal in his apartment.  There are conditions that can be
2  met.  Obviously no weapons, electronic monitoring I think would
3  be appropriate, and I would ask the Court to follow
4  Pretrial Services' recommendation in that regard.  Thank you.
5          *THE COURT:*  Mr. Kessler.
6          *MR. KESSLER:*  Yes, Your Honor.  This is a minor thing
7  I would just point out.  While he was convicted of operating
8  without a license on the person, both of those times the
9  charge -- it says the charges were reduced from driving while
10 license was suspended or revoked.  Again, I'm not suggesting
11 those are the most serious crimes in the world, they just go to
12 his attitude towards conditions that are placed upon him by the
13 court or by the law in general.
14         I would also -- I'm going to go ahead and agree with
15 Mr. Hills that it doesn't appear to me either that he's a
16 leader of this group.  And, again, you don't need to be a
17 leader to be dangerous.  You don't need to be a leader to be
18 part of a conspiracy, and you don't need to be a leader to be
19 dangerous.  Sometimes the followers can be the most dangerous.
20         I think just from what we've seen of Mr. Caserta's
21 attitude towards the state, towards law enforcement, it may be
22 inflammatory rhetoric, but it seems pretty sincere that it's
23 coming from the heart that he feels he's being enslaved by the
24 state.  He may be the most motivated of all these people.  Not
25 so much by any high-fluting political ideas about the

1   Constitution but just hatred for the police and the state and
2   he wants to use the firearm skills he's been training on.  I
3   just don't think it's a great idea to let him out, Your Honor.
4                *THE COURT:*  Thank you.
5                All right.  Mr. Caserta, this matter is governed by
6   the Bail Reform Act of 1984.  Under the Bail Reform Act I have
7   to release you on bond unless I find either by a preponderance
8   of the evidence that you are a risk of flight or nonappearance
9   or by clear and convincing evidence that you're a danger to the
10  community.  I'm required to consider the least-restrictive
11  condition or combination of conditions that will reasonably
12  assure your appearance and the community's safety.  And I have
13  considered each of the possible conditions set out in the
14  statute as well as in particular those suggested by the
15  Pretrial Services Report.
16               In determining whether there are sufficient
17  conditions to reasonably assure your appearance and the safety
18  of the community, I have to consider a number of factors:  I
19  have to consider the nature and circumstances of the offense
20  charged here, a very serious and violent offense; I also have
21  to consider the weight of the evidence of dangerousness; and
22  your history and characteristics; and the nature and
23  seriousness of danger to any person or the community that would
24  be posed by your release.
25               So in going through what is in front of me, the

1   defendant is 32 years old.  He is a life-long Michigan
2   resident.  He has apparently very solid housing and employment.
3   Strong family ties.  I don't see a current mental health issue.
4          And while I take Mr. Kessler's note regarding prior
5   offenses related to licensing and operating without a license,
6   that kind of offense, the criminal history here is not so
7   serious that I would give it a lot of weight in terms of a bond
8   decision.
9          In addition, Mr. Hills is correct that unlike some of
10  the other folks involved or alleged to be involved in the
11  conspiracy, there is less in the way of involvement, of taking
12  independent steps, I guess, is the best way to put it with
13  regard to Mr. Caserta as compared to some of the other
14  defendants.
15         The evidence as I see it involves starting on
16  June 28th Mr. Caserta is in attendance at this tactical
17  training exercise in Munith.  Others, including Mr. Caserta --
18  or there are folks that stay there.  Mr. Franks leaves but
19  others stay.  And everyone is told to leave if they are not
20  willing to participate in attacks against the government and in
21  kidnapping politicians.
22         Mr. Caserta is next present at a field training
23  exercise in Wisconsin on July 10 through 12.  There is an
24  attempt by others, not Mr. Caserta, to construct an IED which
25  failed.  And there is nothing, at least nothing that has been

1   demonstrated to me, that is illegal about these field training
2   exercises.  Although, of course, they go to the background of
3   later discussions.  They also appear to be the situation or the
4   scene for the discussions that take place about this larger
5   plot.
6               Next, September 12 through 13, there is another field
7   training exercise in Luther where an IED is constructed and
8   detonated.  At that exercise Mr. Fox takes a number of the
9   defendants, including Mr. Caserta, aside to brief them on the
10  plot.  Mr. Caserta does not, however, go on the surveillance
11  mission that evening and remains at the camp.
12              There was more discussion of the plot to kill or --
13  excuse me -- plot to kidnap Governor Whitmer on September 13th
14  and the group agrees to discuss a field training exercise.  Or
15  to conduct a field training exercise, excuse me, in
16  late-October.
17              I skipped over a statement that Mr. Caserta made on
18  August 23 which is a little bit difficult to interpret, and so
19  I'm not going to place a lot of weight on that one.  There are
20  other statements, unfortunately, that are more serious.
21              On September 17 in an encrypted group chat that
22  Mr. Caserta is in there's this discussion about whether or not
23  to participate in the protest at the Capitol.  And Mr. Caserta
24  rejects that idea altogether and says essentially that it's
25  dumb because when the time comes -- "When the time comes, there

will be no need to try and strike fear through presence, the fear will be manifested through bullets."

Mr. Hills argues that that is just rhetoric, inflammatory rhetoric, but that there's no follow-through. It is not clear at this point whether or not the lack of follow-through was a result of -- at least to me from Mr. Caserta's point of view -- well, what the reason for the no follow-through was. And it may well be that it is simply the FBI's intervention that prevented follow-through in each of these cases. Or for each of these threats.

Mr. Caserta, as also noted by the government, in Exhibit 20 there is the discussion of the police officers and that he says "The end times are approaching for these piece-of-shit cops. I mean that with every cell in my body. Our time is coming soon, boys, and it's going to be satisfying."

He talks about he has their names. He talks about doing a recon. "They work night shift. I could easily tap them and dip and no one would know a thing. Good practice."

Exhibit 25 discusses getting a suppressor. And while that may be done legally, I would note that the government has introduced that, I don't put a lot of weight on that particular piece of evidence.

And then there is Exhibit 29 which is the video, and that is, unfortunately, sufficiently threatening to police

1    officers.  I mean really very chilling.  "I'm taking out as
2    many of those motherfuckers as I can.  Don't give them a
3    chance."  That discussion really makes it impossible to require
4    a probation officer to supervise Mr. Caserta when there is that
5    overt threat to law enforcement officers.  And I cannot take --
6    or I cannot credit Mr. Harris's [sic] argument that this is all
7    simply inflammatory rhetoric and that no follow-through is
8    intended when it appears based on the testimony that we've
9    heard over the course of today that follow-through is exactly
10   what was intended but for intervention.
11           So considering all of that, and in particular the
12   specific threats to law enforcement officers, I find by clear
13   and convincing evidence that there is no condition or
14   combination of conditions that will reasonably assure the
15   safety of the community or of other persons.
16           I have considered, of course, what Mr. Hills argues
17   regarding no weapons, electronic monitoring, but I just do not
18   think in this circumstance that that is sufficient to overcome
19   the threats that Mr. Caserta has made repeatedly.  So it will
20   be my order that Mr. Caserta be held in custody pending the
21   trial in this matter.
22           Now, Mr. Caserta, I expect that you don't agree with
23   my decision, but did you understand everything that happened in
24   court today?
25           *DEFENDANT CASERTA:*  Yeah, I did.

1           *THE COURT:* All right.  What will happen next is
2   there will be continued hearings on Friday, and from there the
3   Court -- or the case will progress.
4           Mr. Kessler, anything else we have to take up today?
5           *MR. KESSLER:* No, Your Honor.  Thank you.
6           *THE COURT:* Mr. Hills?
7           *MR. HILLS:* No.  Thank you, Your Honor.
8           *THE COURT:* Then we'll be adjourned.
9           *THE CLERK:* All rise, please.  Court is adjourned.
10      *(Proceeding concluded at 4:20 p.m.)*
11                       *   *   *   *   *
12                           CERTIFICATE
13          I certify that the foregoing is a transcript from the
14  Liberty Court Recording System digital recording of the
15  proceedings in the above-entitled matter, transcribed to the
16  best of my ability.
17          I further certify that the transcript fees and format
18  comply with those prescribed by the court and the Judicial
19  Conference of the United States.
20
21  October 28, 2020
22
23                          /s/ Glenda Trexler
                            Glenda Trexler, CSR-1436, RPR, CRR
24
25