```
 1        walked in the local police department.
 2   Q.   And when he -- and then I assumed then he was assigned to --
 3        to you specifically and your partner?
 4   A.   Yeah, so we went out and we opened him and then he was
 5        assigned to us.
 6   Q.   When he -- when -- when you first met Dan he was already in
 7        Wire and the Facebook group?
 8   A.   That's correct.
 9   Q.   But he went and joined this on -- on his own?
10   A.   Correct, he had done that on -- on his ow.
11   Q.   Okay.  So, he would be a part of the Wolverine Watchman at
12        that -- that point?
13   A.   Correct, he was already a part of the Wolverine Watchman when
14        I met him.
15   Q.   Okay.  And you said that he -- you said that Dan had to sell
16        his house and leave?
17   A.   That's correct.
18   Q.   And that was because you said that he was being threatened?
19   A.   That's correct.
20   Q.   Was that after the raid in October?
21   A.   That's correct.
22   Q.   Okay.  So there was some people who -- who found out who --
23        who he was?
24   A.   That's correct.
25   Q.   Did they find out before or after the raid?
```

```
 1  A.   Well they definitely found out after.  As we just read from
 2       this exhibit, there's people that had posited suspicions
 3       throughout the case of who informants might be.  But he -- my
 4       concern and everything I was testifying about was after the
 5       raid.
 6  Q.   And you said you gave him six thousand in reimbursement and
 7       twenty four thousand in payment, correct?
 8  A.   That's prior to the take down.
 9  Q.   So after the take down did he receive additional money or
10       assistance?
11  A.   So he received approximately twenty four thousand dollars in
12       reimbursement for witness relocation following the take down.
13  Q.   Okay, on top of the twenty four thousand payment?
14  A.   That's correct.
15  Q.   And on top of the six thousand?
16  A.   That's correct.
17  Q.   Okay.  Is there any other, did he receive any other assets
18       like a car?
19  A.   I mean all the other assets are included in the
20       reimbursement, so there's a you know there's a computer, a
21       phone, communication devices and accessories that go with
22       that, that were included in the six thousand dollar
23       reimbursement that -- that was accounted for.
24  Q.   Okay.  So that's a total, yesterday I had thirty thousand,
25       but it's more like fifty four thousand, in total
```

18

```
 1             compensation?
 2   A.   That's correct; fifty four thousand is what I had as my total
 3        payment.
 4   Q.   Okay.  And you testified yesterday he -- you -- he -- he was
 5        instructed, well let me back up. Well yeah, I'll ask the
 6        question.  He was instructed that he's not allowed to do
 7        anything illegal, correct?
 8   A.   Correct.
 9   Q.   Okay.  Wouldn't you agree none of us are allowed to do
10        anything illegal though, right?
11   A.   Well I have the ability to obtain otherwise illegal authority
12        and then actually provide him authorization to do any illegal
13        act without being charged.  And that's something that we
14        didn't do in this case.  So that's something that's I think
15        is outside the scope of what everybody else has the ability
16        to do.
17   Q.   So your -- your allowed to do illegal things?
18   A.   You could be I could have that authorized through the US
19        Attorney's office in rare circumstances.
20   Q.   Okay.  And you're also allowed to -- to lie?
21   A.   Are you talking about me?
22   Q.   Yes.
23   A.   I am allowed to lie, yes.
24   Q.   And you also trained Dan that he is also allowed to lie and
25        engage in deception?
```

19

| | | |
|---|---|---|
| 1 | A. | Well I didn't train him to lie, but he is allowed to engage |
| 2 | | in deception. |
| 3 | Q. | But you -- you did train him, correct? |
| 4 | A. | No, I didn't train him. |
| 5 | Q. | Does he have any prior FBI training or -- |
| 6 | A. | No. |
| 7 | Q. | Okay.  Do you know how Dan knew how to be confidential |
| 8 | | informant? |
| 9 | A. | Well I knew his; you know I assessed his skill set that he |
| 10 | | already had as a civilian, and that was one of the things |
| 11 | | that I looked for when I signed him up.  And I knew his |
| 12 | | background from the military and what kind of person he was. |
| 13 | Q. | And you would -- he would report to you daily? |
| 14 | A. | I mean multiple times a week I'm sure it's -- it's based on |
| 15 | | the -- the pace of the investigation, so sometimes it's |
| 16 | | multiple times a day, and then it's based on the pace of what |
| 17 | | was going on in the investigation.  But yeah, multiple times |
| 18 | | a week on average I would say at some weeks it was daily. |
| 19 | Q. | And your -- so your in charge of the plan where if you told |
| 20 | | Dan he's done, he's done, correct? |
| 21 | A. | That's correct. |
| 22 | Q. | And you -- you're in charge of the -- of the direction of the |
| 23 | | investigation, so you -- you tell them what -- what to ask, |
| 24 | | what information to find out, those types of things? |
| 25 | A. | Yes. |