```
 1  Q.   Okay. In fact there was a report that was generated with
 2       yourself and agent Chambers and the confidential human source
 3       where you were specifically on June 29th, this would be on the
 4       day after the first training that Adam Fox attended in
 5       Munith, correct?
 6  A.   That's correct.
 7  Q.   And that would have been the first training that Adam Fox
 8       attended with Mr. Bellar present, correct?
 9  A.   That's correct.
10  Q.   And so this conversation that you had with the members of the
11       Watchman Club was the following day from that training
12       session, correct?
13  A.   That's correct.
14  Q.   And your confidential human source advised you that Mr.
15       Bellar had a problem, that it revolved around him bringing
16       his girlfriend to the training, and that he was leaving the
17       Wolverine Watchman Club to start his own group.  Do you
18       recall that?
19  A.   Yes.
20  Q.   Is that a fair recitation of what happened?
21  A.   It is.
22  Q.   So as of June 29th he was leaving the Wolverine Watchman,
23       correct?
24  A.   No, that's not correct.
25  Q.   Okay, but -- that's not correct that he wasn't?
```

8

```
 1  A.   It's not correct that he was leaving the Watchman.
 2  Q.   But this is what your informant told you, correct?
 3  A.   What you stated on that day is a fact.
 4  Q.   Correct.
 5  A.   But the fact that he was leaving the Watchman is not correct.
 6  Q.   So he continued on with the Watchman after that date?
 7  A.   Absolutely.
 8  Q.   With the Watchman specifically?
 9  A.   Yes.
10  Q.   And that's your testimony?
11  A.   Absolutely.
12  Q.   Okay.  The other thing that we talked about yesterday I had
13       asked you if you were made aware of a time when members of
14       the Watchman club had claimed that Mr. Bellar was a fed or an
15       informant or something along those lines, do you recall me
16       asking you that?
17  A.   I do.
18  Q.   And your testimony was that you were not aware of anyone in
19       the Watchman club claiming that Mr. Bellar was in fact an
20       informant or a fed.  Do you recall that testimony?
21  A.   I do.
22  Q.   Is that still your testimony today?
23  A.   It is.
24            MR. KIRKPATRICK: May I approach, your Honor?
25            THE COURT: Yes.
```

9

```
 1  BY MR. KIRKPATRICK:
 2  Q.   Agent what I'm showing you is what's marked as defendants
 3       proposed exhibit Bellar 3.  Can you take a minute, look at
 4       that, and see if you recognize that exhibit?
 5  A.   Sure can you give me a sec here?
 6  Q.   Did you have an opportunity to review that document?
 7  A.   I have.
 8  Q.   Is this a document that you were involved in investigating?
 9  A.   I was.
10  Q.   Is this a private conversation with Pete Musico and the
11       confidential human source that you actually reviewed much as
12       you did the other conversation that you've read in open
13       court, and have become exhibits?
14  A.   I did.
15  Q.   Does it appear to be an accurate recitation of that
16       conversation?
17  A.   Yes.
18              MR. KIRKPATRICK: Your Honor, I'd move for admission
19       of Bellar exhibit 3, or proposed exhibit 3?
20              THE COURT: People?
21              MS. DODDAMANI: No objection.
22              THE COURT: Mr. Somberg?
23              MR. SOMBERG:  No objection, your Honor.
24              THE COURT: Mr. Johnson?
25              MR. JOHNSON: No objection, your Honor.
```