EXHIBIT 5



February 11, 2020

Stuart Platt, Assistant Director
Federal Bureau of Investigation
Office of Professional Responsibility
Internal Investigations Section
935 Pennsylvania Avenue, N.W.
Suite 3266
Washington, DC 20535

Re:   **FBI Special Agent Henrik Impola, Detroit Field Division**

Dear Assistant Director Platt:

My firm, Warner Norcross + Judd LLP, represents Sameer Gadola ("**Mr. Gadola**") in Case No. 1:17-cr-80 in the United States District Court for the Western District of Michigan. The purpose of this letter is to inform you of the serious misconduct of the lead case agent, Henrik Impola ("**SA Impola**"), a Federal Bureau of Investigation ("**FBI**") Special Agent in the Detroit Field Office. As explained in more detail below, SA Impola committed perjury in early 2018 when he testified under oath on a material matter and in a manner that was inherently inconsistent with his sworn testimony in affidavits supporting applications for numerous Federal warrants – at least three of which SA Impola had in hand when, on January 6, 2017, he solicited the assistance of Customs and Border Patrol ("**CBP**") personnel in a conspiracy to violate Mr. Gadola's Constitutional rights.

Your investigation will find that on January 4 and February 14, 2018, SA Impola violated 18 U.S.C. §1621 during two separate hearings regarding Mr. Gadola's motion to suppress evidence and un-Mirandized statements. At the early 2018 court hearings, the material issue before the Court was whether SA Impola, and the CBP personnel whose assistance SA Impola solicited on January 6, 2017, had probable cause to believe that Mr. Gadola had committed a crime when the CBP agents pulled Mr. Gadola out of primary inspection and into secondary inspection and questioned him without *Miranda* warnings. The CBP agents who testified on January 4, 2018, confirmed that there was no immigration, border security, or identification concern prompting a secondary inspection of Mr. Gadola. Indeed, the testimony established that the purpose of getting Mr. Gadola into secondary inspection, and away from his parents (both of whom are judges), was to question him <u>without</u> *Miranda* warnings and to obtain from Mr. Gadola the password to his mobile telephone – a device for which SA Impola had two Federal search warrants in hand. (*See* Attachments A & C.) The CBP agents testified that they pulled Mr. Gadola into secondary inspection at the request of SA Impola knowing SA Impola had at least one Federal search warrant with him at the time. Therefore, the question before the Court was whether, pursuant to well-established Federal law, Mr. Gadola should have been provided with *Miranda* warnings before

**Brian P. Lennon | Partner**
D 616.752.2089
E blennon@wnj.com
1500 Warner Building, 150 Ottawa Avenue, N.W.
Grand Rapids, MI 49503

Stuart Platt, Assistant Director
February 11, 2020
Page 2

being questioned by the CBP personnel. Consequently, <u>if and when</u> SA Impola had probable cause to believe Mr. Gadola violated Federal law on January 6, 2017, <u>was the material issue before the Court</u>.

As you know, under 18 U.S.C. § 1621, an individual commits perjury when he or she makes a material statement under oath that is inherently inconsistent with another statement that he or she has made under oath. SA Impola, while <u>twice</u> testifying under oath in early 2018, repeatedly stated that he did not, on January 6, 2017, have probable cause to believe that Mr. Gadola had committed a crime. Yet with three Federal search warrants in hand that day, SA Impola directed CBP agents to intercept Mr. Gadola at Detroit Metropolitan Airport ("**Detroit Metro**") as he was reentering the United States with his family after they had visited the orphanage in India where Mr. Gadola was born. This hearing testimony directly and unequivocally contradicted SA Impola's previous sworn statements to two different United States Magistrate Judges – <u>hours before CBP questioned Mr. Gadola</u> – that SA Impola had probable cause to believe that Mr. Gadola violated multiple Federal criminal statutes. (*See* Attachment B at ¶¶ 4 & 44; *see also* Attachments A & C.)[1]

We respectfully request that the FBI's Office of Professional Responsibility, Internal Investigations Section, investigate SA Impola and determine why such a clear violation of Federal law by SA Impola has not been referred to the United States Attorney in the Western District of Michigan for prosecution. As a former assistant U.S. attorney in that office, I have first-hand knowledge of perjury prosecutions by that office. Why has such a blatant violation of the Federal perjury statute by an eight-plus-year veteran of the FBI not been referred for prosecution? We also request some assurance that SA Impola has been subjected to some degree of administrative discipline and, at the very least, that he has been included on the FBI's *Giglio* list provided to all defense counsel on whose clients' cases SA Impola continues to work.

### BACKGROUND

SA Impola's investigation of Mr. Gadola began in May 2016, when he learned that Mr. Gadola was having inappropriate sexual communications with an underage male in Shiawassee County, Michigan. (*See* Attachments A & B at ¶¶ 5-8.) In 2016, SA Impola sought and obtained two Federal search warrants in the Western District of Michigan seeking Mr. Gadola's account records from Verizon and Snapchat. (*See* Attachment A & B at ¶ 10; *see also* W.D. MI Case Nos. 16-MJ-253 and 16-MJ-254.)

On January 5, 2017, hours before SA Impola enlisted the assistance of CBP personnel at Detroit Metro, he submitted three search warrant applications to two Federal judges: two to U.S. Magistrate Judge Ray Kent in the Western District of Michigan for authorization to search Mr. Gadola's residence in the greater Lansing, Michigan area and Mr. Gadola's electronic devices; and a third application to U.S. Magistrate Judge Mona K. Majzoub in the Eastern District

---

[1] The paragraph numbers cited throughout refer to the paragraph numbers in SA Impola's sworn affidavits in each attachment.

Stuart Platt, Assistant Director
February 11, 2020
Page 3

_____

of Michigan, for Mr. Gadola's mobile telephone and other electronic devices presumed to be on Mr. Gadola's person when he arrived back in the United States at Detroit Metro the following day. (*See* Attachments A – C.) In the affidavits supporting these search warrant applications, SA Impola stated, under penalty of perjury, that: (1) "there is sufficient probable cause for the requested warrant;" (2) that "there is probable cause to believe that evidence, fruits, and instrumentalities of criminal offenses in violation of 18 U.S.C. § 2251(a) may be found in the location described in Attachment A;" and (3) he repeatedly tied Mr. Gadola to the evidence he was seeking for the crimes he was investigating. Indeed, SA Impola mentions no other target or subject – just Mr. Gadola – in all his sworn affidavits in this case.

SA Impola's affidavit in support of his application for a warrant to search Mr. Gadola's residence is particularly important. (*See* Attachment B.) In this affidavit, obtained from Judge Kent on January 5, 2017, SA Impola states:

> Based on my training and experience and the facts as set forth in this continuation, there is probable cause to believe that SAMEER GADOLA, who resides at [address redacted], East Lansing, Michigan, sexually exploited and attempted to sexually exploit children in violation of Federal law, including, but not limited to violations of Title 18, United States Code, Section 2251(a), production of child pornography; Section 2252A(b)(1), receipt of child pornography; Section 2422(b), coercion and enticement.

(*See id*. at ¶ 4.) SA Impola then concluded his affidavit with this statement:

> Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that SAMEER GADOLA violated federal law, including but not limited to violations of 18 U.S.C. 2251(a), 2252A(b)(1), and 2422(b) and that there is probably (sic) cause to believe that the residence at [address redacted], East Lansing, Michigan contains evidence of such criminal conduct . . . .

(*See id*. at ¶ 44.)

The following day, January 6, 2017, at Detroit Metro, SA Impola intended to execute the Eastern District search warrant for Mr. Gadola's phone – the Federal search warrant he obtained hours earlier from Judge Majzoub (Attachment C) – upon Mr. Gadola's imminent return to the United States with his family from their trip to India. Then, after Mr. Gadola was in custody, he planned to search Mr. Gadola's residence and any electronic devices therein, pursuant to the two Federal search warrants he obtained hours earlier from Judge Kent (Attachments A & B). With three Federal search warrants in hand, and while Mr. Gadola and his family were on their 22-hour return flights from India to Michigan, SA Impola coordinated with CBP personnel to intercept Mr.

Gadola at Detroit Metro, and to question him about the FBI's ongoing child pornography/exploitation investigation of him.

When Mr. Gadola arrived in Detroit, CBP took Mr. Gadola out of the line for primary inspection and into secondary inspection, not for any legitimate immigration, identity, or border security reason, but instead at the request of SA Impola to question him about the FBI's criminal investigation, which commenced in or about May 2016. (*See* Attachment D, 28-30, 60-64; *see also* Attachment E, 13-19.) SA Impola knew that both of Mr. Gadola's parents are lawyers/judges; his father, Michael, is a Michigan Court of Appeals judge, and his mother, Preeti, is a judge of the Michigan Tax Tribunal. Part of SA Impola's plan to separate Mr. Gadola from his parents for questioning was his concern that if the FBI were to approach Mr. Gadola while in the company of his parents, his parents would advise him to request counsel and not submit to law enforcement questioning. (*See* Attachment E, 14-16.)

CBP knew that the FBI had obtained multiple search warrants for Mr. Gadola's electronic devices and his home, and that a warrant requires a finding of probable cause that a crime has been committed. Despite this knowledge, CBP proceeded to conduct an un-Mirandized interrogation of Mr. Gadola. SA Impola knew that CBP would address the child pornography investigation during their interrogation without administering *Miranda* warnings. (*See id.* at 13-17.) Likewise, SA Impola knew that there was probable cause to believe Mr. Gadola had committed a crime because SA Impola had himself obtained the Federal search warrants for Mr. Gadola's electronic devices and residence, all requiring a finding of probable cause in order to be issued. Moreover, SA Impola <u>twice</u> explicitly stated that he had probable cause that Mr. Gadola had violated Federal law in his affidavit in support of the search warrant for Mr. Gadola's residence. (*See* Attachment B at ¶¶ 4 & 44.)

After his indictment, Mr. Gadola filed a motion to suppress his oral and written statements made to CBP and the FBI during the Detroit Metro interrogation and later that evening at a Federal building in Detroit. On January 4 and February 14, 2018, the Honorable Janet T. Neff, U.S. District Judge for the Western District of Michigan, held hearings regarding Mr. Gadola's motion to suppress. At the hearing on January 4, 2018, the following exchange occurred between Thomas Cranmer, a member of our defense team, and SA Impola, who was under oath:

> Q (Mr. Cranmer): Did you talk about Miranda or advising, having the agents advise Mr. Gadola about his rights?
>
> A (Special Agent Impola): No.
>
> Q: At that point there is no question, no question in your mind that you had probable cause to believe that he had committed a crime, right?
>
> A: We -- I didn't have an arrest warrant in hand.

Stuart Platt, Assistant Director
February 11, 2020
Page 5

_____

> Q: That's not the question I asked. And I respect that. Listen to my question. There is no question in your mind on January 6, 2017, that you believe, you, as an FBI agent had probable cause to believe that Sameer Gadola had committed a crime.
>
> A: I could not meet the legal probable cause standard necessary.
>
> Q: Wow.
>
> A: Now I had –
>
> Q: Wait, wait, wait.
>
> A: -- an idea.
>
> Q: I heard your answer. You mean after you had reviewed all of this - his Instagram account, his Facebook account, his Snapchat account, his Verizon account back in August of 2016 you didn't have probable cause at that point to believe that he had committed a crime; is that what you're telling us?
>
> A: That's correct.

(*See* Attachment D, 115-16.) The hearing was adjourned with SA Impola on the witness stand and still subject to cross examination.

The hearing continued on February 14, 2018, with SA Impola back on the witness stand and under oath being questioned again by Thomas Cranmer:

> Q (Mr. Cranmer): And do you recall telling me at our last hearing that as of January the 6th, 2017, after having been involved in this investigation for seven or eight months, and reviewing all of the evidence that you obtained from the various accounts we just referenced, that you did not believe that you had probable cause to believe that Sameer Gadola had committed a crime; do you recall that testimony?
>
> A (Special Agent Impola): I do recall that testimony.
>
> Q: Okay. Now, prior to January the 6th, the day before, January the 5th, you were involved in obtaining a couple of more search warrants, right?
>
> A: That's correct.

. . .

> Q: Special Agent Impola, I'm going to direct your attention to the second page of your affidavit, and the fourth paragraph. And I'm going to ask you if you would, please, to read paragraph 4 out loud to us.
>
> A: Sure. So page 2, paragraph 4. Says here, "Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. 2251(a) (production of child pornography), and 18 U.S.C. 2252 large A, little a, 2, (receipt of child pornography), 18 U.S.C. 2422(b), (online coercion and enticement of minors) have been committed by Sameer Gadola (hereafter referred to as Sameer), who uses an iPhone 6 Plus with International Mobile Equipment Identity, IMEI—" sorry, I'll slow down, number then there's followed by a long series of digits.
>
> Q: So Special Agent Impola, if I'm reading your affidavit correctly, and if I heard you read it correctly, aren't you telling a Federal judge on January the 5th, 2017, that you actually do have probable cause to believe that Sameer Gadola had committed an offense just as you said in your sworn affidavit?
>
> A: I'm telling a Federal judge that I've got probable cause to search a specific device that I believe is used by Sameer Gadola.
>
> Q: Well, let's, let's go back through your words a little bit more carefully, okay, as we look at paragraph 4.
>
> . . .
>
> Q: So aren't you saying that you have probable cause to believe that he had committed a crime?
>
> A: I have probable cause that he is using these devices to commit a crime. This is a search warrant for a device. This isn't an arrest warrant or putting any of the devices in his hands.

(*See* Attachment E, 6-10.)

Another important exchange between SA Impola and Thomas Cranmer also occurred on February 14, 2018:

Q: All right. I'm a little confused by the testimony you just gave about not knowing whether or not these potential victims were adults, and that they were children or not, et cetera. Did you lay that all out in the search warrant affidavit that you presented to the Federal judge on January the 5th, these, the fact that you didn't quite have enough evidence?

A: Yes, yes.

Q: But you still said, did you not, in paragraph 4, that you believed that he had committed a Federal crime, right?

A: That's correct.

Q: All right. And I've looked just quickly here, I didn't expect this, but let's take a look at paragraph 9 for a minute.

A: Okay. I'm on page 4 of Exhibit B here, paragraph 9.

Q: Paragraph 9, the second sentence reads, does it not, "A review of Instagram messages between Sameer and Victim 1 determined that Sameer appeared to know the victim's age and attempted to entice the victim for the purposes of sex." That's what it says, right?

A: Yes.

Q: Okay. And if we jump ahead a little bit to paragraph 15, tell me when you're there.

A: I have it here. I'm on page 8, paragraph 15.

Q: Right. The first sentence reads, does it not, "In this case, a detailed review of Sameer's Instagram, Facebook and Snapchat search warrant results determined that he engaged in many online relationships with boys and girls who appeared to be under the age of 18 for the purpose of sex." That's what you said, right?

A: Yes.

Q: Was that truthful when you said it?

A: Yes.

Stuart Platt, Assistant Director
February 11, 2020
Page 8

_____

> Q: Okay. If we look at paragraph 16, the first sentence says, "Sameer frequently discussed engaging in an older brother mentorship of children." That's what you said, right?
>
> A: Yes.
>
> Q: And then if we continue a little bit further, see if I can find it, just bear with me here, in paragraph 28, on page 19.
>
> A: Yes, I'm there on page 19.
>
> Q: Look at the first sentence. It says in paragraph 28, "Based on analysis of Facebook profile ID sameer.gadola, Instagram profile ID meerkatgadola@Spartan4life, and Snapchat profile, it appears that Sameer has a continual sexual interest in young boys who participate in sports." That's what you wrote, right?
>
> A: That's correct.
>
> Q: And that would be at least under your investigation potentially that was a Federal crime, right, this child enticement that you talked about?
>
> A: That's correct.

(*See* Attachment E, 43-45.) This exchange occurred immediately following SA Impola's statement to Assistant U.S. Attorney Alexis Sanford that he did not have probable cause to arrest Mr. Gadola because he "wasn't able to confirm that the recipient or the potential victims were in fact children." (*See id.* at 39.)

On the witness stand on two separate occasions in early 2018, SA Impola stated that he <u>did not</u> have probable cause to believe that Mr. Gadola had committed a crime when he enlisted the help of CBP personnel to question Mr. Gadola without *Miranda* warnings at Detroit Metro, testimony that directly and unequivocally contradicted his sworn statements in the search warrant affidavits he swore to the day before CBP's encounter with Mr. Gadola. And because the issue before the Court at the early 2018 hearings was to determine <u>if and when</u> SA Impola had probable cause that Mr. Gadola committed a crime, SA Impola's inherently inconsistent sworn testimony was material to the proceedings, in violation of 18 U.S.C. § 1621.

### ANALYSIS

Under 18 U.S.C. § 1621, an individual is guilty of perjury if he or she:

> [H]aving taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true.

Special Agent Impola twice testified under oath in early 2018 that as of January 6, 2017, he did not have probable cause to believe that Mr. Gadola had committed a crime. And, therefore, the un-Mirandized CBP interrogation of Mr. Gadola on January 6, 2017, was proper. This testimony is in direct conflict with the statements SA Impola made, under oath, in support of the search warrant application he submitted to U.S. Magistrate Judge Ray Kent for Mr. Gadola's residence (*see* Attachment B at ¶¶ 4 & 44), and other probable cause statements contained in other search warrant applications to Judge Kent and Judge Mona K. Majzoub on January 5, 2017, wherein Mr. Gadola was the only target of the investigation identified. (*See* Attachments B & C.)

These sworn statements by SA Impola in multiple Federal search warrant affidavits in January 2017 directly contradict his subsequent sworn hearing testimony on January 4 and February 14, 2018, where the material issue to the court proceeding was when law enforcement, to include CBP, had probable cause to believe that Mr. Gadola had committed a crime, which in turn would require *Miranda* warnings that he did not receive. As of January 5, 2017, SA Impola appeared before two different U.S. Magistrate Judge, raised his right hand and swore under oath and penalty of perjury that he had probable cause to believe Mr. Gadola violated several Federal criminal statutes. Both U.S. Magistrate Judges agreed with him, based on SA Impola's sworn statements, as both issued the requested search warrants. SA Impola's subsequent sworn testimony on both January 4 and February 14, 2018, directly contradicted his sworn statements in the affidavits; the unequivocal example of which is the affidavit in support of the application for a search warrant for Mr. Gadola's residence. (*See* Attachment B at ¶¶ 4 & 44.) This criminal conduct by an eight-plus-year veteran of the FBI cannot stand, as it undermines both the integrity of the FBI and the confidence of the public in law enforcement. The Rule of Law is meaningless if the perjury committed by SA Impola is ignored because of his status as an FBI special agent.

### CONCLUSION

SA Impola's conduct violated Federal law and is inconsistent with the high standards of ethics and professionalism that the Department of Justice and the FBI expect of their employees. Therefore, we respectfully request that the FBI's Office of Professional Responsibility, Internal Investigations Section, investigate SA Impola's actions in this matter, and if your office

Stuart Platt, Assistant Director
February 11, 2020
Page 10

_____

agrees that his conduct violates Federal law, you refer the matter for prosecution to the United States Attorney for the Western District of Michigan, whom I have copied.

If you require any additional information related to this complaint, please do not hesitate to contact me. Thank you for your time and assistance in this matter.

Very truly yours,

Brian P. Lennon

BPL/aec

cc: Sameer Gadola
    Andrew Byerly Birge, U.S. Attorney WDMI
    Steven M. D'Antuono, SAC, Detroit Field Office
    Henrik Impola, Special Agent



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.