THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

KALEB FRANKS,

    Defendant.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

---

## DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO PRETRIAL MOTIONS TO COMPEL

Defendant Mr. Kaleb Franks, through his attorney Scott Graham, has moved this Court for various forms of relief, including disclosure of materials related to confidential human sources and human-source phone records. *See* RE. 252: Motion to Join, PageID # 1376 (listing codefendant Caserta's motion to compel); RE. 258: Motion to Disclose CHS Records, PageID # 1400-17. The government responded to these motions on August 9, 2021. *See* RE. 260: Gov. Resp. to Motions to Compel, PageID # 1427-47. Mr. Franks now offers this reply to the government's response. He hopes it may flesh out a few key points and aid the Court's analysis.

### *Brief Procedural Background*

This case began with the government filing a criminal complaint on October 6, 2020, charging Mr. Franks and five others with conspiring to kidnap, in violation of 18 U.S.C. § 1201(c). *See* RE. 1: Complaint, PageID # 1. Authorities arrested Mr. Franks the following

day in Ypsilanti, Michigan. His initial appearance occurred October 8, 2020. *See* RE. 12: Minutes of First Appearance, PageID # 34. After litigation of the issue, the Court ordered Mr. Franks detained. *See, e.g.*, RE. 74: Order Affirming Detention Order, PageID # 437-38.

The government indicted Mr. Franks and his codefendants on December 16, 2020. RE. 86: Indictment, PageID # 573-78. This indictment included a single charge: conspiracy to kidnap Michigan's governor. *See id.* at 573. Only one codefendant has pleaded guilty (doing so on January 27, 2021), with the rest proceeding toward trial, which is scheduled to begin on October 12, 2021 (with a final pretrial conference on September 23, 2021). *See* RE. 143: Minutes of Garbin Change of Plea, PageID # 759. A superseding indictment, filed on April 28, 2021, added weapons counts against codefendants but did not modify the charge against Mr. Franks. *See* RE. 172: Superseding Indictment, PageID # 961-76.

The various defendants filed pretrial motions in July (namely July 11 through 13, and including motions to join codefendants' motions). The government has begun responding to these motions, and codefendants have begun seeking leave to reply to the government, as Mr. Franks does here.

*Legal Discussion*

The government now opposes disclosing the confidential-human-source records at issue, arguing that "the vast majority of the information sought is not discoverable—much of the information is not relevant to the case, and therefore the requests are overbroad—and some information that is relevant is protected from disclosure by the informant privilege." RE. 260: Gov. Resp. to Motions to Compel, PageID # 1427. It also argues that "[s]ome of the items are discoverable only in connection with trial and are dependent upon

2

the witnesses called by the government, and therefore are subject to disclosure only at a later date." *Id.*

The government attempts to make much of its early disclosure of "800 audio and video recordings that captured interactions with and among the defendants, confidential human sources, and undercover agents" and social-media messages. *See id.* at 1428. Yet by the government's own admission, these materials included defendant statements, which must be produced to the defense in accordance with Federal Rule of Criminal Procedure 16(a)(1)(B)(i). So this production did not constitute pure largesse. Nor did it constitute the whole story, leading to the motions in play here.

Essentially, even reading all evidence in a light most favorable to the government, this case involves a young man saying "no" to kidnapping in July and (in the government's view) changing his tone a month later . . . after government agents and informants have engaged in elaborate manipulation—entrapment. The defense should be allowed to review records of the government's diligent efforts to effect such an alleged change of heart.

> A. *Evidence shows that government actors assiduously choreographed interactions here, and that Mr. Franks disclaimed any interest in kidnapping and did not demonstrate any predisposition toward illegal conduct.*

Regarding the roles of certain confidential human sources (CHSs), the government conveniently glides over these CHSs' interactions with defendants. Mr. Franks will explore his own "story" further below, but he will start more generally by fleshing out a government agent's own testimony in state court.

The government states in its response that, "On July 3, 2020, Fox met for the first time with an undercover agent who had been introduced to the group, and advised him of the group's plans," but it fails to disclose that *the government's CHS* was the one who

3

brought Fox into the group in the first place, intentionally influencing the trajectory of the group. And a government agent testified to this fact in state court (this testimony bears citing in its entirety to demonstrate the agent's attempts to minimize the CHS's role in recruitment):

> Q. Special Agent you just testified under oath that your confidential informant did not invite Adam Fox to Joe Morrison to train, correct?
>
> A. That's what I previously testified.
>
> Q. Okay. Are—but that was—do you agree with me now that that is not true?
>
> A. Well I think this a fairly nuance [sic] issue since it's an extension of a phone call that your client was part of. And when this was previously discussed on a different phone call, so I agree, and I did not recall when you asked me the question my sources [sic] exact statement which I did hear and it's a fair and accurate statement. But the phone that you played is part of a greater contact, is part of a greater conversation which Wolverine Watchman had a conference call and agreed to engage with Adam Fox and basically rehashed the entire call on a individual call with my source.
>
> Q. Before that call?
>
> A. Yes, directly before that.
>
> Q. So my client was not on that call though?
>
> A. Your client initiated the initial call which basically a similar summary and repeat of the call you played in which your client was not on it.
>
> Q. And you're testifying that my—my client invited him first?
>
> A. Well I don't recall the exact statements your client made in a twenty minute call, the context to that conference call it is Voip [sic] call over Facebook and I could hear the Wolverine Watchman clearly, but the connection was muffled with Adam Fox more so than it was on this call. So they discussed many of the same things, the concept and they arranged meetings at a protest which you heard them reference in this call. They arranged how many men they needed to attack the capital, as a group, as a Wolverine Watchman. And then shortly following the because the connection was bad on the conference call Adam Fox contacted, or reached out to our source to

clarify what he had talked about. And so we rehashed the entire call over a clearer connection.

Q. Because the connection of the first wasn't clear with Joe Morrison he called [the CHS]?

A. He sent a Facebook message to [the CHS] and asked for his number and said hey can we—and I'm paraphrasing, and for the sake of impeachment this is all based on my memory and listening to the call he asked to talk to [the CHS] again and went over the things that they had already went over with Joe Morrison and the rest of the Wolverine Watchman leadership. So I—I can't recall exactly what Joe Morrison said in the initial call and I didn't recall the exact words that source said on the second call. But the recording was fair and accurate on the second call.

Q. And at the time of this call Adam Fox was not on the Wolverine Watchman Facebook and he was not on the wire chat, correct.

A. That's correct.

Q. But yet your confidential informant invited him onto both of those platforms?

A. Well he didn't invite him into Facebook.

Q. You invited him on—onto Wire?

A. He invited him on to, well I can't recall from the first call if he was already invited by Joe or the Wolverine Watchman, there's two similar calls, but he did I agree on the call that you played say that they were using Wire and asked if he was in conversation with Joe on Wire. Something to that effect.

Q. Okay. What—but you—so you agree that your CHS invited not just him but his wife also to joint he [sic] Wolverine Watchman Wire and they were not on before this phone call?

A. Not to join the Wolverine Watchman Wire, to use—that they said they're using Wire for encrypted communication. So the Wolverine Watchman their Wire channel is for only those who are vetted into the group and he wasn't invited to that, he was invited to use the application for sec—for secure communications, they had just had a overcall on Facebook in which the connection was bad and they didn't trust Facebook. So our source was saying if we're going to continue to keep communicating we need to use Wire or that's we do [sic] as the Watchman.

5

> Q. And you testified yesterday—you were actually investigating Adam Fox separately as an extremist and a leader of a continental army?
>
> A. So we didn't know of Adam Fox, or the Dublin meeting or the content of that until this phone call. So once—once we had this phone call I learned who Adam Fox was and I had learned that he had been in Dublin Ohio and we initiated investigations following these two phone calls.
>
> Q. Okay. I thought you said that you—you had assets at the Dublin meeting in Ohio?
>
> A. So when I say we there I mean the FBI generally speaking. Me, as an agent out of Detroit did not—did not have assets.

*See People v. Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 52-56.

Following this testimony, the agent again essentially (if reluctantly) affirmed the CHS's role in recruiting Fox:

> Q. And you don't, your confidential informant was in the leadership, the so called leadership structure of this, of the Wolverine Watchman, correct?
>
> A. Yes.
>
> Q. Okay. So and as we heard in the call earlier that it was your—that it was [the CHS] your you know confidential informant who actually, literally invited Adam to the training?
>
> A. Well I agree with the fact that he did say to Adam on the recorded call on the 14th why don't you come to training.

*See People v. Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 196-97.

Thus, as the government's own agent has admitted under oath, the government's CHS recruited Fox (an "extremist" to the FBI), inserted him into the group, and turned him loose to propose kidnapping (with the prodding of the CHS), an idea which the group *shot down*:

> Q. Correct. And that at—at the training, at that training Adam, he tells the group, he basically brings up well hey who—whose down with kidnapping, right?
>
> A. That was the a [sic] August 9th training.
>
> Q. Yes, and that was the August, August 9th training and the group shot him down, correct, do you agree?
>
> A. Yes.

*Id.* at 197.

As to Mr. Franks specifically, and as he has cited multiple times, the government's own complaint acknowledges:

> On July 7, 2020, FRANKS attended a meeting at the residence of another militia group member, and CHS-2 was in attendance. FRANKS said that he was "not cool with offensive kidnapping" and added that he was "just there for training," or words to that effect.

RE. 1-1: Continuation of Complaint, PageID # 6 n.4. Recordings of the relevant July 7 exchange also have others in the group disclaiming any interest in kidnapping and saying they are only interested in "defending" and "protecting." A CHS, in turn, tells people to keep an "open mind" with regard to training activities.

In a call referred to in the complaint at paragraph 20 (a call from August 9, 2020), recorded material provided to the defense reveals a government agent whispering to a CHS and directing him on what to say and propose. The CHS suggests bringing certain people into the plan/group chat, and Adam Fox cannot remember who a certain nickname

7

belongs to; he defers to the CHS on making these decisions. Later in the call, the CHS talks about the governor's boat going into the water, and Adam Fox says something about torching the boat. The government's agent whispers something to the CHS, who then says that "Ty and Dan might be more on board" if they go that route. Fox then says the new plan/goal is to find the boat.[1] Even in the government's screen shots in its response to the motions, Mr. Franks says "Hard pass on anything in the public." *See* RE. 260: Gov. Resp. to Motions to Compel, PageID # 1431. While the parties will obviously debate at trial the possible meaning of "in the public," Mr. Franks's does say "hard pass."

From another angle (and Mr. Franks makes no concessions on this point), one could see in the "Hard pass on anything in the public" message a shift from a July statement of not being "cool" with "offensive kidnapping" to a slightly more open perspective on such action—a shift precipitated by the government agents' and informants' undeniable influence and concerted efforts.

On October 7, 2020, the "takedown" date, a CHS arranged a trip to Ypsilanti to supposedly purchase explosives for $4,000. Mr. Franks went, thinking the group would "pick up gear," and he embarked with all of $25 in his pocket. The others carried very little cash as well. Clearly, everyone had relied on and followed the Pied Piper of the CHS, who called the shots, directed the group, and made all arrangements (which Mr. Franks did not even fully understand and was not prepared to participate in, as evidenced by his lack of financial resources despite a supposed $4,000 bill looming).

---

[1] Codefendant Adam Fox makes similar references to CHS overreaching on August 9, 2020. *See* RE. 262-1: Fox Proposed Reply, PageID # 1464.

So according to the government's own complaint and discovery materials (as supported by agent testimony), government actors pressured a young man with a troubled history (with the government fully aware of Mr. Franks's drug history and admirable successes in moving away from that method of self-medicating) in an effort to secure a highly political indictment and one that would have far-reaching media significance. They did so literally by whatever means necessary, including falsely accusing others of acting as government informants (and thereby perhaps exposing innocent people to problems) and even lying under oath. *See, e.g.*, RE. 264-1: Caserta's Proposed Reply, PageID # 1474-75. The defense should be allowed to review relevant records of agent and CHS activity here.

> B. *The government cannot be left to determine what evidence is material to an entrapment defense in this situation. And the government's protests related to the possible volume of the disclosure requested hardly ring sincere.*

The government played puppet master throughout the investigation here. And now, its agents have intentionally obfuscated with regard to discovery, taking pains to make the *voluminous* discovery provided to the defense extraordinarily difficult for counsel to navigate (actions that are costing taxpayers thousands and thousands of additional dollars, as defense-team members must unknot the government's messy macrame of tangled duplicative materials). *See, e.g.*, RE. 217: Croft Motion for Early Designation of Witnesses and Exhibits, PageID # 1164-65 (citing Agent Impola's statements related to sending "everybody into disarray and chaos" with regard to discovery and calling defense counsel "paid liars," and discussing the excessive duplication and disorganization in the government's production so far).

With this background in mind, the government's current cries of "voluminous" as a reason not to produce the CHS materials ring out of tune. Likewise, the cases the

government cites in support of its position come up wanting. For example, the government appeals to the supposed "informant privilege," but the government's case law fails to support its arguments. In *United States v. Sierra-Villegas*, 774 F.3d 1093, 1098 (6th Cir. 2014), a case this Court may remember intimately, the Sixth Circuit underscores the limited nature of the privilege: "The privilege is qualified; even where it would typically apply, information about a confidential informant (or the informant's testimony itself) may be admitted if the revealing evidence 'is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause.'" The *Sierra-Villegas* court found that the trial court had correctly "ruled that the privilege applied and that the evidence [the defendant] sought to produce was not so essential to his defense as to overcome the privilege." *Sierra-Villegas*, 774 F.3d at 1098. In an entrapment case, of course, the equities balance quite differently.

Mr. Franks's case does not qualify as one in which the defense has failed "to identify how the informant's testimony could be relevant or helpful." *Id.* at 1099. Mr. Franks has easily carried any burden of demonstrating how disclosure of these CHS materials would "substantively assist" in his defense. *See id.* In this context, courts "frequently refer to the degree of a CI's involvement," and even if "this factor does not have independent significance," ultimately, the key consideration lies in whether the informant's involvement was such that their testimony would be helpful to the defendant at trial, and that is the case here for Mr. Franks. *See id.* at 1101.

With regard to the privilege, things turn even more tenuous for the government when one considers that a CHS has already testified in state court, appearing in person and revealing at least his first name. *See People v. Musico, et al.*, Nos. 2003171, 2003172,

10

2003173 (12th Dist. Ct., County of Jackson, MI) (*see* Trans. of Probable-Cause Hrg., 3/4/21). And another CHS stands indicted in another district (the following section will address those proceedings).

In relation to its *Brady* obligations, the government's arguments fall short in two ways: (1) the government seems to forget that *Brady* covers any evidence material to preparation of a defense—materials that could *change a trial outcome*; and (2) the government cannot sit as arbiter of what evidence may be material to such preparation. A key question with regard to *Brady* is: does a "reasonable probability" exist that disclosure of materials to the defense could result in a different trial outcome. *See, e.g.*, *United States v. Stamper*, 91 F. App`x 445, 451 (6th Cir. 2004). A "reasonable probability" of a different outcome exists if the government's nondisclosure of evidence later undermines confidence in the trial outcome. *Id.*

Trial courts order exactly the kind of disclosures requested here with admonishments that their orders for "disclosure appl[y] regardless of whether the government believes the document, object, or information is not 'material to preparing the defense.'" *See United States v. Hamzeh*, No. 16-CR-21 (E.D. Wisc. July 25, 2018) (RE. 150: Order on Motion to Compel, at 2-4) (requiring disclosure of things like texts between CHSs and agents, government payments to CHSs, admonishment documents related to CHS conduct, and even a list of agents' trainings with regard to interrogation techniques).

The government even implicitly concedes that agent notes inconsistent with reports (such as 302 reports of interviews) may be discoverable, and even fall under *Brady*. *See* RE. 260: Gov. Resp. to Motions to Compel, PageID # 1446 (citing case law with parenthetical acknowledgment). Basically, the government is just hedging now. It understands requests

like those related to records of investigation into Mr. Franks and findings related to a lack of wrongdoing. *Cf. id.* (arguing vagueness). The idea seems self-evident that—if the government acknowledged a lack of wrongdoing on Mr. Franks's part and continued to put pressure on him and target him—evidence demonstrating the government's appreciation of a lack of predisposition or wrongdoing is material to an entrapment defense.[2]

Here, evidence shows that Mr. Franks was not interested in anything like kidnapping in July 2020. Even the government concedes this point in its complaint. So assuming *arguendo* (and again, Mr. Franks makes no concessions on this point) Mr. Franks later got involved in a kidnapping conspiracy, the issue of his change of heart is critical at trial . . . and a jury's conclusions on this point could certainly be swayed by hearing that remarkably well-paid government actors were directed by government agents to build friendships, take on father-figure roles, and exert strong emotional pressures to make Mr. Franks fall into line, so the government could bring a case with huge political and media significance. It could be very interesting to a jury to hear that government agents reviewed Mr. Franks's personal and criminal background, summarized his emotional vulnerability to CHSs, and directed a CHS (who might later, as a reward for his efforts, receive an envelope containing thousands of dollars) to target Mr. Franks as someone susceptible to influence. The testimony from the state preliminary hearing, and recordings like those cited above, with government agents directing CHSs to say things and target individuals, make the existence of such evidence very likely—and its disclosure essential.

---

[2] Codefendant Fox has implicitly raised the same issue. *See* RE. 262-1: Fox Proposed Reply, PageID # 1463. The concept is simply too basic and intuitive to be vague.

Co-counsel has already cited for the Court materials provided to the defense that represent government instructions to CHSs, asking CHSs not to lead the group or propose actions. *See, e.g.*, RE. 262-1: Fox Proposed Reply, PageID # 1462. But the recordings cited above show that the agents and CHSs did not honor these limits on CHS participation. Instead, agents directed CHSs to propose plans (as with targeting the governor's boat). The disconnect between instructions and actions goes right to the issue of government overreaching here.

> C. *The government has already turned over much material related to one CHS, who is currently charged in a federal case in another district, and much will be/has been revealed in those proceedings. The government's reluctance to turn over materials related to other CHSs thus raises issues of agent and informant credibility and reliability, especially in the context of the untruths and off-color agent tactics discussed above.*

While the government is balking about turning over certain CHS records, it has already provided the defense with voluminous records related to a CHS who now faces criminal proceedings in another district. Counsel can provide a case number for that matter should the Court wish; trial in those proceedings stands set to begin in October. In a letter filed on the docket in that case, offering a status update to that court, the defense has asserted it "will raise the public authority or estoppel defense." The CHS has admitted he "possessed the firearm charged in the indictment," but has argued that, "[o]n that day, he had authorization from the FBI to otherwise engage in illegal conduct." The parties in that case "dispute how the form must be read and whether any behavior beyond its parameters nullify it, and have addressed "discovery that would speak to [the CHS's] understanding and pattern of dealing with the FBI and the authorizations to engage in illegal conduct."

13

Earlier, the defense in that case anticipated the possibility of "a lot of discovery (upwards of 100,000 pages)," but it might "be a manageable amount—no one knows yet." The government has filed four "Government Discovery Letters" in that case (as separate record entries), indicating Bates-stamped materials provided to the defense and 25 (total) discs of material also provided to the defense. Additionally, the defense in that case has contemplated a motion to vacate or dissolve the protective order.

The cat is out of the bag with regard to this CHS, including through release of materials to the defense here in Mr. Franks's case—by the government itself. The government's reluctance to turn over materials related to other CHSs must raise eyebrows in the context of the untruths and unethical/illegal agent conduct touched on above.

### *Conclusion*

Trial in this matter will boil down to showing that government actors fomented discord and radical discussion in a group of young men displeased with the government. These government actors pressed these young men to go further, orchestrating a situation in which CHSs, who assumed the roles of friends, mentors, and even father-figures, pushed for "action" to back up the words.

Evidence already proves the government paid CHSs significant amounts of cash for their efforts. The government's role in guiding the CHSs, structuring their interactions with people, and admonishing them related to their behavior is thus a key issue for trial preparation, so materials related to this role constitute *Brady* material essential for preparation of a defense as very likely to affect the outcome of trial.

For all the reasons explored above, and those in the original filings on these matters, Mr. Franks asks the Court to order disclosure of the CHS materials at issue.

                                        Respectfully submitted,

Date: August 17, 2021         **SCOTT GRAHAM PLLC**

                                        By:   /s/ Scott Graham
                                                Scott Graham
                                                Attorney for Defendant
                                        Business Address:
                                                1911 West Centre Avenue, Suite C
                                                Portage, Michigan 49024
                                                (269) 327.0585