1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE WESTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4     UNITED STATES OF AMERICA,

5              Plaintiff,          No: 1:20cr183-1/2/4/5/6

6      vs.

7     ADAM DEAN FOX,
      BARRY GORDON CROFT, JR.,
8     KALEB JAMES FRANKS,
      DANIEL JOSEPH HARRIS and
9     BRANDON MICHAEL-RAY CASERTA,

10             Defendants.

11

12    Before:

13                  THE HONORABLE ROBERT J. JONKER
                       U.S. DISTRICT Judge
14                    Grand Rapids, Michigan
                   Thursday, September 17, 2021
15                     Motion Proceedings

16    APPEARANCES:

17                  MR. ANDREW BIRGE, U.S. ATTORNEY
                    By:  MR. NILS R. KESSLER
18                  MR. AUSTIN HAKES
                    The Law Building
19                  333 Ionia Avenue, NW
                    Grand Rapids, MI 49501-0208
20                  (616) 456-2404

21                       On behalf of the Plaintiff;

22                  MR. CHRISTOPHER M. GIBBONS
                    MS. KAREN M. BOER
23                  Dunn Gibbons PLC
                    125 Ottawa Avenue, NW, Suite 230
24                  Grand Rapids, MI 49503-2865
                    (616) 336-0003
25
                         On behalf of Defendant Fox.

JOSHUA ADAM BLANCHARD
Blanchard Law
309 South Lafayette Street, Suite 208
P.O. 938
Greenville, MI 48838-1991

        On behalf of Defendant Croft, Jr.

SCOTT G. GRAHAM
Scott Graham PLLC
1911 West Centre Avenue, Suite C
Portage, MI 49024-5399
(269) 327-0585

        On behalf of Defendant Franks.

JULIA ANNE KELLY
Willey & Chamberlain LLP
300 Ottawa Avenue NW Suite 810
Grand Rapids, MI 49503-2314
(616) 458-2212

        On behalf of Defendant Harris.

MICHAEL DARRAGH HILLS
Hills at Law PC
425 South Westnedge Avenue
Kalamazoo, MI 49007-5051
(269) 373-5430

        On behalf of Defendant Caserta.


REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

```
 1                      09/17/2021

 2            (Proceedings, 10:01 a.m.)

 3            THE CLERK:  The United States District Court for the

 4   Western District of Michigan is now in session.  The Honorable

 5   Robert J. Jonker, chief judge, presiding.

 6            THE COURT:  All right.  Please be seated everyone and

 7   welcome.  We're here on the case of the United States against

 8   Adam Fox and others, 1:20cr183.  And let's start with

 9   appearances, please.

10            MR. KESSLER:  Good morning, Your Honor.  Nils Kessler

11   and Austin Hakes for the United States.

12            THE COURT:  All right.

13            MR. HILLS:  Michael Hills on behalf of Brandon

14   Caserta, who is sitting to my right.

15            THE COURT:  All right.

16            MR. GRAHAM:  Good morning, Your Honor.  Scott Graham

17   on behalf of Kaleb Franks, who is present.

18            MR. GIBBONS:  Good morning, Your Honor.  Christopher

19   Gibbons on behalf of Adam Fox, who is seated to my left.  And

20   also present is my law partner, Ms. Karen Boer.

21            THE COURT:  All right.

22            MR. BLANCHARD:  Good morning, Your Honor.  Josh

23   Blanchard on behalf of Mr. Croft, who is seated to my right.

24            THE COURT:  All right.

25            MS. KELLY:  Good morning, Your Honor.  Julia Kelly on
```

1    behalf of Daniel Harris.  He is present and for the Court to my

2    right.

3            THE COURT:  Thanks.  Welcome everybody.  The matter

4    noticed for hearing is the joint Defense motion for an ends of

5    justice continuance, so that's what I certainly want to talk

6    about.  I do know that before that motion got filed and

7    scheduled for hearing Mr. Gibbons, I think it was, had

8    suggested a status conference that would allow the Court -- the

9    parties to work a little bit with the logistics of anticipated

10   trial presentations, and I had originally scheduled that

11   earlier this week for just counsel and the Court since I didn't

12   anticipate any substantive issues.  When this came up I

13   thought, well, maybe we'll just have everybody together anyway.

14   We have to talk about the motion, and if there are other things

15   that would be useful we can take that up as well.

16           When I think about the motion for ends of justice, you

17   know, obviously in a big case like this with lots of discovery,

18   lots of Defendants, lots of moving parts, we have to give

19   everybody time to be prepped.  On the other hand, and

20   especially when the Government says, well, we don't see any

21   prejudice to our case -- we don't think we are responsible for

22   it, but we don't see any prejudice, it's tough for the Court to

23   get out in front of that and say, yeah, but I want you all here

24   anyway.

25           At the same time, we've already been at this about a

1    year or so.  We've got five Defendants waiting in custody.

2    There is always a last minute push.  I get that.  You know, we

3    are a week away or so from final pretrial and about a month

4    away from trial.  I really need to understand what it is from

5    the Defense point of view that they see as actual material

6    prejudice, and I'm sure I'll hear about that today.

7            When I read the motion papers, most of the specific

8    paragraphs are focused on the need to get hours of tape

9    transcribed.  I think 25 hours or so, and I get that, though I

10   imagine people are moving forward on that.  There is one expert

11   issue that involves the expert that Mr. Hills had identified

12   who may not testify according to the motion papers.  When I

13   went back and looked at the details on the authorization it

14   wasn't clear to me from that that there was ever anticipated

15   testimony from that individual as opposed to consulting.  And

16   then I did get today another ex parte submission which would be

17   a proper way for the Defense to submit a different expert

18   issue.  I won't talk about that in open court.  So that's new

19   to the table, and I also saw last night that there was an

20   appeal filed from the Magistrate's decision on one of the

21   discovery motions.  So that's new.

22           But I want to make sure if we do have to move this,

23   that there is a clear understanding of why, what it is

24   specifically that we are trying to avoid so we don't just get

25   up to the next deadline and get another effort to reset the

1    clock.  That worries me.  I'm also worried that if we reset it

2    for 90 days we are in the middle of January, which is a

3    terrible time to start a four-week trial in Michigan.  We

4    always have weather disruptions and we have jurors that come

5    from as far as the bridge.  That's not an easy logistical

6    concern and it's not something we have to worry about typically

7    in October, and there is plenty of other things to worry about

8    in getting a fair jury seated in a case like this.  I really

9    don't want weather to be one of them, and so I worry that if we

10   do the ends of justice it can't really be to the middle of

11   January.  It's more likely, you know, till the end of February

12   at the earliest, and then we kind of cross our fingers and hope

13   from a weather point of view.

14          So those are the things that are turning around in my

15   mind.  I don't know who wants to start speaking on behalf of

16   the moving parties, but Mr. Graham, I think you signed the

17   motion.  I know everybody else will have their individual take

18   but why don't I start with you and go from there.

19          MR. GRAHAM:  Your Honor, the papers before the Court

20   essentially, I think, talk about kind of two issues.  One, what

21   do the Defendants need, and I guess a secondary point is does

22   the Government have any responsibility?  I am not worried about

23   the Government responsibility.  It's an incredibly difficult

24   case to provide discovery on.  I would note, the first specific

25   discovery request went to the Government in October of 2020,

outlining all the categories of things that we wanted.  I would note that, but that's not my, I guess from my perspective, was not the primary issue.  The primary issue is can the Defendants be prepared?

So at least from my perspective as a starting point you have noted transcription issues, and I think that those are not only very important, not only very challenging here, but there is a reason why they are especially challenging, and that is that the recordings in question fall into a number of different categories, but one category would be recordings where the audio quality is poor, recordings that occur may be in a car.

THE COURT:  Usually the Defense likes that, because the Government has the burden of proof, so if you can't hear anything on the tape it can't be very material evidence.

MR. GRAHAM:  I agree completely, and it's an unusual case where the things that are said are actually favorable to the Defense.

THE COURT:  Then you've got a different problem.

MR. GRAHAM:  Sure.

THE COURT:  Then you've got a hearsay problem depending on who the speaker is.

MR. GRAHAM:  Yes, and depending on who the speaker is, and then we've got, I think, a third problem, which is the unique aspect of when you -- when a Defendant raises the

1    defense of entrapment, Does that change, you know, the Rule 104

2    analysis?  So a lot of things, and there are a lot of moving

3    parts in that issue alone.  But the starting point seems to me

4    to be having a clear and stipulated version of what was said on

5    that transcript.  So you've got multiple speakers in moving

6    cars.  You've got -- and then another problem, let's say --

7    because you are going to hear this over and over again.  Say

8    you've got a number of people standing outside talking.  Maybe

9    10 or 12 people.  Some close to the -- you know, to the

10   recording device.  Some not.  And then often people talking

11   over each other.  So these are unique to me difficult

12   recordings in order to work on transcription on.

13        Now, there is another issue here, Your Honor, which is

14   in a normal case we would get the Government's transcripts and

15   we would determine whether they are accurate or whether we

16   think they are accurate, and then we would determine, well, do

17   we need to try to supplement those with a few -- a few

18   straightforward recordings?  That's not the case here.  We have

19   not received any substantial amount of transcription that we

20   could piggyback on.  So my point is simply that the transcript

21   problems are very, very significant and unique, I think,

22   compared to most cases, and so trying to get that done

23   becomes -- becomes a real problem.

24        I think that the Defendants have been working

25   diligently on that, and I suspect -- I have no reason to doubt

1    that the Government -- I'm sure they have been working

2    diligently on their transcripts.  Things just haven't come to

3    fruition in terms of having those to offer to the parties, and

4    then ultimately the only thing that really matters is

5    ultimately offering those to the Court for use with

6    presentation to the jury.  So transcripts are certainly a very

7    significant issue.

8            Another issue that I would flag would be the fact that

9    there are many witnesses located -- I am not going to say

10   throughout the country.  That would be, I think, a bit

11   misleading.  Certainly throughout the midwest and then maybe

12   working more to the east.  Certainly the Court is aware that

13   there are a number of allegations regarding events occurring in

14   Delaware.  There are allegations about events occurring in, you

15   know, Wisconsin, Ohio, Indiana, obviously Michigan, trying to

16   find witnesses, all of whom seem to be identified primarily by

17   either nicknames or screen names or who aren't identified at

18   all, which, you know, led to the reason why we are trying to

19   get some discovery regarding those people, is a real challenge

20   and a unique challenge.  And again, we've been trying to obtain

21   that information -- the simple way is from the Government --

22   since October of 2020.  We are working as hard as we can on

23   that.  And so witness problems, I think, are somewhat unique in

24   this case.

25            I think that there are evidentiary problems that I

1    would have to admit to you, Your Honor, that we could resolve,

2    whether it's October 12th or, you know, whenever.  Problems

3    such as something the Court mentioned.  What happens when

4    statements are made by Defendants that normally would be

5    excluded under Rule 104 but might not be excluded where the

6    Defense is entrapment, statements made and tracked to FBI

7    handlers and confidential informants passed onto certain

8    Defendants?  What's the -- you know, what's the role of those?

9    We could get that done in the form of motions in limine, I

10   agree, but still it's a challenge, and one that I think

11   everyone wants to have a good -- you know, good handle on.

12        One of the things we are trying to do is evaluate all

13   of the electronic devices.  My understanding is that there are

14   electronic devices that have only been produced for the first

15   time this week.  I am not sure how that happens but it does,

16   and that certainly creates a significant challenge.

17        The -- I would note for the Court that the procedure

18   for processing all discovery is, I think, one that is very

19   effective and efficient, but in this case because the Court did

20   appoint -- no secret the Court appointed, if you will, a

21   coordinating discovery attorney to help with that.  That's been

22   very helpful, but it's a time consuming process, and it's time

23   consuming because, you know, discovery goes out to New York.

24   It gets processed.  The Court is aware from various filings,

25   you know, some of the discovery came through with duplication

1     of key events, maybe as many as 15 or 20 duplicate insertions

2     into the discovery with different file names.  Again, it's --

3     it's just kind of a unique situation.  And when I say unique,

4     because I think it's important to get -- really drill down into

5     what the real problems with -- it's unique when, in my

6     experience, in my opinion, when discovery -- okay.  An

7     investigation is going on, whether it's nationwide or parts of

8     the country or not, and agents are doing investigations.  They

9     are getting tapes.  They are doing reports.  They are doing

10    interviews of many people, many confidential informants and

11    others throughout, we'll just say the midwest, and then the

12    time comes for discovery.  There is a complaint and an

13    indictment, and I am assuming everything kind of gets pushed

14    into one spot and that's how you get 15 -- you know, 15 tapes

15    that are identical.  So a unique problem based upon the

16    logistics of the investigation and the scope of the

17    investigation.

18          Your Honor, I think it's a matter of public record

19    that when this case started the State Police indicated this was

20    the largest investigation that at least current officials could

21    recall in the history of the State Police.  That shows the

22    scope of just their -- you know, their investigation.  We

23    haven't even, you know, touched on federal authorities.  So

24    they are significant.

25          So we also have, Your Honor, a recent -- couple of

1    recent issues that have sprung up regarding what we think are

2    potential credibility issues for key Government witnesses that

3    we just learned about that we are trying to investigate, and we

4    are dealing with all sorts of hurdles in regard to the

5    production of information, documents, messages, posts, and so

6    we are attempting to deal with that.

7         In terms of -- in terms of experts, we have --

8         THE COURT:  And I should indicate on the experts I

9    realize under 3006(a) those kinds of items are normally ex

10   parte.  Obviously the Government is here.  When the motion

11   specifically raises an expert issue I think it's fair to talk

12   about.

13        MR. GRAHAM:  Sure.

14        THE COURT:  There is the second issue that I flagged

15   that Mr. Gibbons submitted.  It's still ex parte.  If you don't

16   want to talk about that one in open court I understand it, and

17   we can put that to one side.

18        MR. GRAHAM:  And I agree with you, Your Honor.  So the

19   point is I guess we have been looking for experts from the

20   beginning.  We've also, of course, tried to anticipate what are

21   the Government experts going to be because, you know, separate

22   issues about, if you will, affirmative experts and then, if you

23   will, rebuttal experts to the Government or whatever.  The

24   Government expert disclosure occurred this week.  I am not

25   quarrelling with that timing.  It's just in this particular

1    case --

2           THE COURT:  There hasn't been a Defense expert

3    disclosure yet?

4           MR. GRAHAM:  That's correct, Your Honor.

5           THE COURT:  Okay.

6           MR. GRAHAM:  And so you know, we are trying to get

7    that figured out, and I guess the one thing that I am

8    comfortable noting for the Court -- I hope I don't step on

9    anyone's toes -- is this.  As we talk with experts and we try

10   to get information about what we think happened here, why it

11   happened, what we can do about it from a defense perspective,

12   it is -- it's not so difficult to get experts to talk with us

13   but it's a real challenge to get experts who are willing to

14   testify, and I would just make that general statement just

15   because --

16          THE COURT:  I don't want to go too far down that road.

17          MR. GRAHAM:  Yeah.

18          THE COURT:  Because I am not privy to what you are

19   talking with your experts about.

20          MR. GRAHAM:  Sure.

21          THE COURT:  And you know, a quote, willingness, end

22   quote, to testify can range from, I'm scared, to, I just don't

23   agree with your theory of the case.

24          MR. GRAHAM:  Sure.

25          THE COURT:  And I don't want to get into that in open

1    court.

2         MR. GRAHAM:  Sure.  And I understand, Your Honor, but

3    I would say it's what's been communicated to us is just because

4    of the publicity.  Not, you know --

5         THE COURT:  Right.  But I mean, nobody has a way to

6    test that.

7         MR. GRAHAM:  Right.

8         THE COURT:  I can't test what you are telling me, and

9    the Government can't test what you are telling me.  All I can

10   say is that, I don't have an expert disclosure, and then if

11   there is an ex parte submission I can weigh whether or not the

12   Defense ought to have another run at a different expert.

13        MR. GRAHAM:  Sure.  Sure.

14        THE COURT:  But those are delicate issues.

15        MR. GRAHAM:  Understood.  And I won't say anything

16   more about them, but I said what I'm comfortable saying about

17   those and I understand -- I understand the Court's -- the

18   Court's point regarding that.

19        So as we look at -- as we look at transcription

20   relating, again, to audio -- and again, there is a problem, I

21   think, with audio that goes beyond mere transcription.  Let's

22   assume we have identified for the Court -- I think we have some

23   25 hours of audio that we would like to transcribe.  That comes

24   out of hundreds of hours of audio, and hundreds of hours of

25   difficult audio.  For example, assume people load up in a car

1    and they drive for five hours, and --

2              THE COURT:  Right.  I get that.  Is there a new point

3    on that?

4              MR. GRAHAM:  No.

5              THE COURT:  Because I think that's the one you started

6    with and I understand that.

7              MR. GRAHAM:  So the scope of that becomes an issue.

8              Those are the things that I would highlight in terms

9    of the reasons why I think, you know, an EOJ would be

10   appropriate.  As far as when -- at least my position on the

11   when, if -- you know, if the Court granted one is just whatever

12   the Court thinks is appropriate for the Court's schedule for,

13   you know, prospective jurors, et cetera.  So I don't have

14   anything to add on that.  So unless there are questions, I've

15   said what I wanted to say to the Court.

16             THE COURT:  All right.  Let me just drill down a

17   couple items that I am not totally clear on.

18             You said something about a new electronic device

19   disclosure this week, and I don't understand that.  I had

20   thought all of the discovery had been out by what, end of

21   August maybe?

22             MR. GRAHAM:  And I am going to have to defer to

23   Ms. Kelly on that.

24             MS. KELLY:  Would the Court like me to address that

25   right now?

1       THE COURT:  No.  Mr. Graham mentioned that, and we'll
2    get the details from Ms. Kelly.  It doesn't sound like you have
3    any new information on that.
4       MR. GRAHAM:  No, I don't.
5       THE COURT:  And the issue involving what we often get
6    under rule of completeness or otherwise with a statement of a
7    Defendant as hearsay if it's offered in support of the Defense,
8    how does the entrapment issue, if that's in play, change that?
9    Give me an example.
10       MR. GRAHAM:  Okay.  I'll give you an example.  If, in
11    fact, the Court were to say it's our burden to demonstrate a
12    lack of predisposition.
13       THE COURT:  Ultimately it's going to be the
14    Government's burden.  There might be a Defense burden of
15    production --
16       MR. GRAHAM:  Sure.
17       THE COURT:  -- to get the instruction, but if I think
18    the instruction is warranted then I think the law is pretty
19    clear the Government has to disprove the entrapment beyond a
20    reasonable doubt.  The question is, does the Defense have
21    enough evidence on both the agent push, so to speak, and lack
22    of predisposition?
23       MR. GRAHAM:  Right.  And regardless of what the
24    Court's ultimate ruling was, the example -- you asked me for a
25    specific example.  I used the one that I have been talking

1    about with regard to my client for some time.

2         THE COURT:  Okay.

3         MR. GRAHAM:  The Government in its original complaint

4    cites specific language where in July of 2020 Mr. Franks says,

5    I am not into aggressive kidnapping.  I am just here for the

6    training.  So the question --

7         THE COURT:  Well, the Government doesn't put that.

8    You are saying that's the statement you want to offer --

9         MR. GRAHAM:  Yes.

10        THE COURT:  And why shouldn't that be, if you use it

11   in evidence, subject to cross examination?  How does that

12   change the hearsay analysis?  It's still hearsay, isn't it?

13        MR. GRAHAM:  I don't -- as we attempt to set a stage,

14   if you will, or show a circumstance or an event, I don't think

15   it's the same as mere, I didn't do it.  The statements we

16   normally run into where we try to put something in where a

17   Defendant makes an admission and then as part of that statement

18   says, I didn't do it, I didn't do it, and of course, that's not

19   allowed.  Admission by the Defense is not allowed.  Here where

20   a predisposition through entrapment may fall in terms of the

21   burden of the Defendant, I think the starting point is for us

22   to evaluate and offer to the Court every statement of that type

23   that we want to make.

24        THE COURT:  But every admissible statement.  I mean,

25   that's the question, right?  Is it admissible?  And if it's

offered, you know, for the truth, then we'd be in the same
hearsay land we'd always be in it seems to me.

MR. GRAHAM:  And I think from my perspective in an
entrapment case I don't think so.

THE COURT:  All right.  And I take it you have
authority you can present on that?

MR. GRAHAM:  I believe so, yes.  And I'm saying that
would be briefed whether we had an October 12th date probably
in the form of motion in limine.

THE COURT:  All right.

MR. GRAHAM:  You know, whether it -- whatever the date
was.

THE COURT:  Okay.  All right.  Thanks.

MR. GRAHAM:  Thank you.

THE COURT:  Why don't we just go around.  Ms. Kelly,
since we already touched on one of the items you are going to
provide additional information on, why don't we go to you next
and get your perspective on the EOJ and go around the table.

MS. KELLY:  Thank you, Your Honor.

With respect to my client's phone, I had a
conversation with Mr. Kessler back in July that my client's
phone still had not been produced.  That was prior to the
motion deadline filing date.  Mr. Kessler assured me that I
would receive my client's phone records and that I need not
file a motion, so I did not file a motion.  I received notice,

1   I think, two weeks ago that my client's phone had been

2   extracted -- the files had been extracted and that they would

3   make every effort to get my client's extracted phone records to

4   me.  A hard drive was made available to me yesterday.  I did go

5   over to the U.S. Attorney's Office.  I picked that up.  I tried

6   to load it onto my computer and it was approximately 25

7   gigabytes of discovery information.  It was taking 91 percent

8   of my computer's memory just to try to load the program.  So I

9   contacted the discovery coordinator.  I sent that to her

10  overnight, and she's going to put it in a format where I can

11  search it.

12        I did speak to Mr. Hakes about the issues that I was

13  having.  I can't imagine why it took this long to get my

14  client's phone to me.  My client was arrested on October the

15  7th.  He voluntarily provided his password to the Government

16  and they've had it.  And I know that in April of this year they

17  looked through approximately 25 other devices that they took

18  from my client's home, finding no content.  So I don't know why

19  it took until yesterday for me to receive that information.

20        So I do not have -- I don't have those in my

21  possession.  I have not been able to review them.  I do think

22  it would be material information that I would want to look at

23  and that my client has a right to look at in preparation for

24  trial, and so that was part of my joining of the EOJ, and I

25  have made my co-counsel aware that that is coming.

1    When I contacted the discovery coordinator she also

2    made me aware that on August the 30th the Government requested

3    another padlocked drive to be sent to them so they could

4    produce another set of discovery to us.  She was out of the

5    country for two weeks.  She did send that on Monday of this

6    week to the Government.  That was received on Tuesday.

7    Mr. Hakes informed me he was not aware of the size of that

8    discovery but did believe that it contains information related

9    to other state defendants, other witnesses that were present at

10   these meetings, at these trainings, including Facebook records.

11   So I don't know what that is.  I don't know how much that is.

12   That is discovery that is coming to us that we still do not

13   have.  So I think those both would materially prejudice my

14   client given that I don't have it and next week is our final

15   pretrial conference.

16   The third and the fourth production that were sent to

17   us in August -- the third production I received on August the

18   18th.  I personally was in a trial, a week long trial in state

19   court during that time.  Reviewing that third production there

20   were something to the tune of 10,000 pages of e-mails from my

21   client from Newaygo County Jail to his family that I have to

22   sift through, and those were just two files on that third

23   production.  So taking the time to review those is certainly a

24   lengthy process, and again, with the discovery still coming

25   that we don't know how big it is, on top of the 25 gigs of my

1      client's own extracted files.

2              The expert issue I just wanted to touch on.

3              THE COURT:  And same caution to you.

4              MS. KELLY:  Sure.

5              THE COURT:  I don't want you to feel compelled to

6      discuss in open court anything you think would be compromising.

7              MS. KELLY:  Sure.  I think just to point out to this

8      Court, my client is charged in all four counts, and there are

9      certainly issues that we have been talking with experts and

10     trying to have someone available to talk about certain issues.

11     To have an expert say that they are no longer willing to be

12     able to testify certainly puts us back to square one and kind

13     of in reaching out to different experts who would be willing to

14     come forward and testify.

15             THE COURT:  All right.  Let me just follow.  That is

16     the -- you are talking about the expert that is referenced in

17     the public motion?

18             MS. KELLY:  That's correct, Your Honor.

19             THE COURT:  At least when I went back to look at the

20     statements, it was at least by my reading a consulting expert.

21     You can always have a consulting expert I suppose develop into

22     a testifying one, but that wasn't clear to me from the original

23     request.

24             MS. KELLY:  And I think with this budgeting case,

25     because the case is in phases, the idea was to retain someone

1    that can consult with us to turn into a testifying witness that

2    we would then in our phase two budgeting apply for that.

3            THE COURT: I see. Okay.

4            MS. KELLY: And just briefly, Your Honor, with respect

5    to the Government's response not objecting to our motion, and I

6    spoke to Mr. Kessler about this issue. Mr. Kessler brought up

7    in his filing about the missing media files, and that no

8    Defendant had made an appointment to look at certain pole

9    camera videos, that other media files were related to CHS, and

10   that files 80 and 119 were produced on May 3rd. I actually did

11   e-mail Mr. Kessler prior to the Defenses' joint filing

12   requesting information about these specific files. On January

13   25th, 2021, I was not even appointed on this case. I wasn't

14   appointed until February, and the first discovery that I

15   received on this case was in April. So from April until

16   whenever I received my client's extracted phone files I have

17   gone through about 3.4 terabytes I think is what we are looking

18   at right now. So it's an incredible amount of discovery. And

19   with that I would submit to the Court. Thank you.

20           THE COURT: All right. Thanks, Ms. Kelly.

21           We need some assistance to make sure the audio bridge

22   is working. We do have a number of people who are

23   participating via audio bridge. Something we've been able to

24   do since the pandemic, really, and so you just saw Mr. Van Dyke

25   walk in because he's got to do some troubleshooting. That's

1     what is happening.

2           Before we go to the other Defense counsel, let me just

3     shift over to Mr. Kessler on this issue of where we are in the

4     discovery, and particularly the recent phone submission that

5     Ms. Kelly just talked about.  Can you give me your perspective

6     on that and what, if any, discovery -- I am not talking about

7     Jencks and all of that, but true discovery, do you think is

8     left to go, if any?

9           MR. KESSLER:  Yeah.  On the phone issue, that was one

10    particular phone that -- the Court is probably familiar with

11    the term CART.  That's the FBI experts who extract these

12    things.  They weren't able to do an extraction from that

13    particular phone.  And the reason why this came up later than

14    the other phones is they finally got some software that enabled

15    them to do the extraction, which is -- which we notified them

16    about.  So they have gone ahead and done that extraction.  We

17    have now provided that to the Defense.  It would not take that

18    long to go through it, honestly.  There is not much on there

19    that is all that pertinent to the case other than some text

20    messages which wouldn't take that long to read.  I understand

21    that's a large file because that's everything that was on the

22    Defendant's phone.  People keep a lot of things on their phone.

23    But I think Ms. Kelly and anybody else who was in that

24    situation could sit down with their client whose phone it was

25    and with their assistance -- it's not like starting completely

1      from scratch.  There is just not that much on it that's

2      pertinent to the case.

3              THE COURT:  Are there other phones or devices like

4      that that you haven't been able to extract yet for whatever

5      reason?

6              MR. KESSLER:  That's the only one I am aware of.

7              THE COURT:  Okay.  So other than that which apparently

8      Ms. Kelly got yesterday or earlier this week, are there other

9      anticipated discovery submissions you see coming yet or do you

10     feel like you have everything handed over?

11             MR. KESSLER:  There is never really an end, honestly,

12     because we are continuing to investigate the case, and the

13     longer it goes on the more people -- you know, as we prepare

14     for trial we are running down loose ends.  We are interviewing

15     new witnesses, tracking down additional things.  And we

16     understand we have a continuing Rule 16 discovery obligation,

17     so we are going to turn those things over as they come in.  I

18     don't anticipate much more after -- there is this last batch

19     that will go to them, and then we have just the Jencks and

20     Giglio type of stuff that we have discussed with the Court.

21     And then, again, like I said, if we go out and interview a

22     witness they prepare a 302 of that interview.  We'll turn it

23     over.  All right.  We are going to continuing investigating.

24             THE COURT:  All right.  Hold on just a second.  Okay.

25     We'll take a little break now so Mr. Van Dyke can get the audio

bridge working.

(Off the record, 10:33 a.m.)

(On the record, 10:34 a.m.)

THE COURT:  All right.  Thank you, Mr. Van Dyke.  It always makes me grateful I don't make my living on technology because somebody that can do that under pressure is wonderful.  Thanks very much.

Okay.  Did you get a chance to finish what you were going to say?

MR. KESSLER:  Yes, Your Honor.

THE COURT:  Why don't we move over to the next Defense lawyer who wants to be heard.

MR. GIBBONS:  I can do that, Your Honor.

THE COURT:  Go ahead, Mr. Gibbons.

MR. GIBBONS:  Thank you.

Your Honor, without trying to cover ground that's already been covered, with respect to myself and the joint Defense team I have kind of taken the lead in organizing and controlling the transcript issue.  Like Ms. Kelly, I was appointed in February.  Effectively the discovery was produced the first week of April to my office.  I made it my point that the sizable amount of discovery was not going to be an impediment to an October 12 trial date.  We have spent as much time as we possibly could digesting, analyzing and sifting through the discovery.  It became apparent to me early in the

1     case that the transcripts were going to be an absolutely

2     critical item for any presentation of a defense, entrapment or

3     otherwise.  If the defense is simply this didn't happen, there

4     wasn't a plan, transcripts are still an issue for the Defense.

5           As the Court is aware and has probably heard until

6     your ears are ringing, there has been over a thousand hours of

7     audio to sift through.  We did get through that audio by

8     midsummer.  We had attempted to use an economical attempt at

9     using a computer web-based transcription service.  That was

10    becoming problematic.  My concern is, I just want to see things

11    done.

12          We are in a position now, as the Court is aware, with

13    having a certified court reporter who is assisting us.  She is

14    working her way through that material.  I see no way that that

15    material can be accumulated -- can be transcribed prior to the

16    trial date at the current rate.  I do know that the court

17    reporter has dedicated pretty much most of her effort

18    professionally to this project.

19          In order to enhance the effectiveness of the

20    transcripts, my partner and I again are going through the audio

21    that we've already gone through and identified and clipped,

22    plus the audio of joint Defense counsel.  So we are trying to

23    par it down.  We are trying to keep it effective and

24    economical, but from my perspective, I don't see us having

25    usable transcripts.

1          I understand the Court's concern about hearsay.  There

2     are exceptions to the hearsay rule that would allow some of the

3     statements made by my client that I would be interested in off

4     these audio clips if there are exceptions that remove it from

5     the hearsay rule.  It could be advanced either in response to

6     the Plaintiff's case in chief or during my client's case in

7     chief.  Certainly prior consistent statements are an exception

8     to the hearsay rule.

9          THE COURT:  If the person is testifying.  If the

10    person is testifying.

11         MR. GIBBONS:  If the person is testifying.  My client

12    may well testify at trial.  Obviously that decision hasn't been

13    made, but given the nature of the proceeding, that's something

14    that may happen.

15         THE COURT:  All right.  And no one disputes that if

16    there is an exception to the hearsay rule, that it applies to a

17    piece of evidence, the piece of evidence comes in.  I am just

18    trying to imagine what kinds of exceptions there would be in

19    your mind other than, of course, a testifying expert who is

20    impeached and then a prior consistent statement.

21         MR. GIBBONS:  A statement as to then existing state of

22    mind, present sense impression.  So there are any number of

23    exceptions I think that could be satisfied that would allow the

24    affirmative use of a transcript.  And of course, there is

25    always impeachment, Your Honor, which as you are entirely

1    probably aware at this point the Defense intends to focus a lot

2    of its energy on the conduct of the undercover agents and the

3    investigators in this case.  So hearsay would not necessarily

4    be an issue if it comes to challenging someone for impeachment

5    purposes.

6            And the other thing that I wanted to make -- to say to

7    the Court is in looking at all of the discovery that has -- we

8    have two drives that came in August.  I have a drive on my desk

9    that we received on August 30th.  In all frankness, haven't

10    really had a chance to even open it.  I mean -- and we are

11    working every day, full days.  We have -- we are preparing for

12    trial and attempting to wrap up the little bit of audio that

13    still remains to be heard and everything else.  It's just

14    gotten to the point, I think, from my perspective as counsel

15    for Mr. Fox, that we can go to trial on October 12th.  We can

16    try anything with any type of preparation I suppose.  I have

17    been a lawyer for 30 years.  I have tried cases with just a

18    folder and five minutes notice from a court who has asked me to

19    step in.  I don't want to do that in this case.  I want to give

20    Mr. Fox a presentation that is full and fit.  I think we can do

21    that.

22            I understand the Court's concern about a January

23    restart and I would not argue with that idea.  My client

24    understands that this adjournment comes at his expense.  He has

25    to sit in the Newago County Jail until this trial occurs.  This

1    is not light duty for my client at this point.  He is

2    willing -- and I have counseled him, hey, if you want to go,

3    we'll go, but I have given him some reasons why I think it

4    would be in his best interest that we seek additional time to

5    prepare and to have a fully fleshed out Defense presentation.

6    My client is in agreement with that opinion and is supportive

7    of the ends of justice continuance, and so that's all I have to

8    say.

9          THE COURT:  All right.  Thanks, Mr. Gibbons.  One

10   followup.  You say there is no way you believe at the current

11   rate you could have your transcripts ready by the current trial

12   date.  When do you think they'd be ready?

13         MR. GIBBONS:  Based on the current rate I think that

14   they would be done in mid-December.

15         THE COURT:  I see.

16         MR. GIBBONS:  They will be finished and ready to be

17   put in our trial presentation stack.

18         THE COURT:  All right.  Thank you.

19         MR. GIBBONS:  Thank you.

20         THE COURT:  Mr. Hills, go ahead.  We'll go with

21   Mr. Blanchard.  That's fine.  He was first up.

22         MR. BLANCHARD:  So I suppose I got into this case in

23   between some of the other lawyers.  Mr. Croft was in the, you

24   know, October 7 arrest, but it took a long time to get him to

25   the district and so that slowed my preparation a little bit.

1    There is, I think the Court is aware, a tremendous

2    volume of discovery.  I put it at a little over 150,000 pages

3    of documentary discovery that's split over about 24,000

4    documents.  We are making good progress on the Croft team on

5    that.  We are not through all of it, and I don't know how much

6    more is in this dump that I learned about yesterday that's

7    working its way through the coordinator of discovery.

8         THE COURT:  Just so we're clear about what the dump

9    is, we're talking about the Harris phone?

10        MR. BLANCHARD:  I think included with that.  The

11   Harris phone was produced directly to Ms. Kelly.  Apparently in

12   August the Government asked the coordinating discovery attorney

13   to send back an encrypted drive to the Government, a two

14   terabyte encrypted drive.  We don't know the size of what they

15   are putting on it.  My understanding is this is sort of a

16   telephone game, but what I'm hearing through my Co-Defendants'

17   counsel is that it's Facebook records related to some state

18   co-defendants and some other stuff primarily I think related to

19   uncharged in-state defendants.  But I don't know the volume of

20   that, and so that's separate from Ms. Kelly's client's phone,

21   and that I understand the drive is with the Government and

22   hasn't been returned to the CDA yet.

23        My view is the coordinating discovery attorney has

24   saved us quite a lot of time overall in putting the discovery

25   together in a way that allows us to efficiently review it.

1    There are just some logistical challenges because every piece

2    of discovery she has to send a drive to the Government.  It

3    goes back.  She has to process it and push it back to us, and

4    it takes some time.  I expect we are going to get another drive

5    from the discovery attorney once she receives it back from the

6    Government that's going to have more content on it that will

7    have to be reviewed.

8          I think for me the issues -- we have the transcript

9    issues for Mr. Croft.  I think that's primarily an impeachment

10    matter.  I think we have far less substantive evidence we are

11    going get in through transcripts, but we do need to have those

12    prepared for impeachment purposes as we go to trial.

13          I think the expert issue that's been publicly flagged,

14    you know, I understand the Court's view that it started out a

15    consulting expert.  And you know, based on my conversations I

16    think it turned into needing to be a testifying expert and we

17    have to find someone on that front and so that's taking some

18    time for us.

19          I think additionally we have some witness issues that

20    I don't think anyone has flagged, that one of the Government's

21    informants yesterday -- so one of the Government's informants

22    was indicted by the Government in the Western District of

23    Wisconsin, and yesterday he filed a notice that he has resolved

24    the case by plea.  They don't have a plea agreement on file.

25    Something about mail issues.  But in any case, that case is

1    resolving.  I think we are going to have very sticky Fifth

2    Amendment issues with that witness that may just resolve as a

3    result of his case having resolved in Wisconsin, and so an EOJ,

4    I think, will help us to avoid some of those issues at trial.

5         And then, of course, we are still -- like the

6    Government said, they are still doing witness interviews.  At

7    least for Team Croft we are actively out interviewing witnesses

8    still, and we have some work to be done on that, and so I think

9    an EOJ is appropriate because I think at bottom we are just not

10   at a place, despite everyone's best efforts, where we're able

11   to try the case in an efficient and effective manner right now.

12   I think with some time we can have a tighter, more efficient

13   trial, which is my preference.  I was going to propose, you

14   know, a late January, early February trial date.  I frankly

15   hadn't considered the Court's observations about weather.  I

16   suppose since Mr. Graham's change of venue motion was denied a

17   Florida trial is out of the cards, but -- so I can appreciate

18   the weather issues I hadn't thought about, but I think pushing

19   the trial some period of time is appropriate.

20             THE COURT:  Okay.

21             MR. BLANCHARD:  Thank you.

22             THE COURT:  Thank you.

23             Mr. Hills, the last seven-defendant trial we were in

24   you were always at the end of the line, too.  I don't know what

25   it is.

1      MR. HILLS:  I think it was eight actually.  I think it

2    as eight.

3      THE COURT:  Was it?  I can remember seven.

4      MR. HILLS:  It was eight then.  It's okay.  What's

5    left for me to say I am not sure.  I would agree with

6    everything that's been said.  I think that Team Fox over there

7    is working through their transcripts and their cue and so Team

8    Caserta is kind of at the bottom of that after they get through

9    their's.  I have got some we're working on overlap there to

10    make sure we get done, so I am kind of at the back of that.  If

11    they are done in December, mine might be done late December I

12    guess.  So that's a big problem for us.

13      Problems for us are the discovery that keeps coming.

14    I think everybody on the Defense team, we've tried to work

15    together as much as we can.  We all, I think, were focused on

16    an October trial date and came together just before we filed

17    this, and I think we all kind of came to the realization that

18    in the interests of our clients we cannot be ready for trial

19    with the amount of discovery that we have, with the preparation

20    that we have, with the investigators out running down witnesses

21    that's going on.  Everybody is working together, working hard.

22    I don't feel like I can be ready October 12th.

23      THE COURT:  Okay.  Yeah.  Thank you.

24      Let me go over to the Government and get your overall

25    sense of these things, Mr. Kessler, and then I am also going to

1    have some questions for you, the kinds of things we talk in

2    detail about at final pretrial next week, but just to get sort

3    of a preview.  You know, how long do you think your proofs are

4    going to take based on what you know now?  That kind of thing.

5    Because that will also inform how difficult it's going to be if

6    we move it to find another block of time.  I think we got the

7    October block when we were anticipating three to four weeks,

8    for example.  That's not easy to slot in with a trial court's

9    schedule, but you can either talk to me about that in your

10   initial presentation here or just wait and I'll have questions

11   for you, but go ahead.

12          MR. KESSLER:  I would really rather just answer

13   whatever questions you have, Your Honor.  As I mentioned, we

14   are not opposing -- we are not opposing their motion for a

15   continuance.  I don't know, you know, that months and months is

16   really necessary.  As you pointed out, a lot of what they, you

17   know, might intend to use by way of transcripts is going to be

18   inadmissible because it simply doesn't qualify as admissions of

19   a party opponent.  You can't put in self-serving statements

20   that way.  I leave that up to them, you know, what they think

21   they are going to be able to try to use.

22          THE COURT:  Well, if there is something on there that

23   amounts to a present sense impression.

24          MR. KESSLER:  It would still -- obviously we are going

25   to end up briefing this, but you can't shoehorn in your own

1    basically -- Mr. Graham tries to draw a distinction between

2    saying, I didn't do it, and basically saying, I didn't have the

3    intent to do the kidnapping, which is saying, I didn't do it.

4    And the case law is very clear that you can't shoehorn in your

5    own self-exculpating statement under Rule 802.

6              THE COURT:  Right.  And I am not even focused on that

7    so much, and if it's what Mr. Gibbons was referencing then

8    probably we'll probably be in a similar place to where we often

9    are, but I haven't listened to these tapes so I don't know

10   exactly what they are talking about.

11             MR. KESSLER:  Right.  You know, one thing to throw out

12   there for what it's worth, we maybe took a little different

13   approach than it seems like they are taking in terms of trying

14   to figure out what we needed to transcribe, because if you

15   started from the beginning and tried to transcribe all the tape

16   anybody ever made you are wasting a lot of time then.  You

17   know, there are hours and hours of tape where somebody might

18   have a recording device on them and attend a six-hour meeting

19   where there is nothing but scrunchy pocket noises and

20   occasional discussions about things unrelated to the case for

21   hours.  And it makes sense to listen to the tapes first, figure

22   out what it is you want to use, and then have those people

23   transcribe only that, rather than, you know, try to transcribe

24   everything and then read it to decide what you want to use.

25             THE COURT:  All right.  Well, on the questions, then,

1    in round numbers, what do you think we are looking at in terms

2    of trial days or weeks for your case?

3            MR. KESSLER:  Yeah.  My best guess would be three

4    weeks.  It could be less.  Again, you know, the length of our

5    presentation is actually going to depend somewhat on how much

6    cross examination we have.  And if you have five Defense

7    attorneys covering the same ground over and over again it's

8    going to take a long time.  My experience, and I'm sure yours

9    as well, that that tends of speed up after a little while.  So

10   it's, you know, possible it could be shorter than that.

11           THE COURT:  All right.  Well, you know, I will say

12   this.  At both tables, the Government table with you,

13   Mr. Kessler, and then every one of the Defense lawyers have

14   been in here on trial matters with me including most of the

15   Defense lawyers on some fairly extended ones.

16           MR. KESSLER:  Yeah.

17           THE COURT:  Whether it was seven or eight defendants,

18   I don't remember, Mr. Hills, but a lot, and I was really

19   worried about exactly what you talked about that we are going

20   to have seven or eight cross exams that were basically the

21   same, and to their credit in that group they didn't do that.

22   It was quite an effective overall joint presentation, and I

23   think that an experienced group of lawyers on both sides is

24   likely to facilitate that.  I hear what the Defense is

25   concerned about in terms of trying to marshal the proofs they

1    believe they need or at least want to be -- probably to proffer

2    whether it gets admitted or not.  So you know, every estimate

3    is a bit of a guess, but thinking in the three-week range is a

4    reasonable judgment from where you sit?

5         MR. KESSLER:  Yes, Your Honor.  I think optimistically

6    I am hoping to be able to do it in less, maybe two.  That would

7    be if everybody is doing what you said, not asking the same

8    stuff over and over again.  I think it would be safer to go

9    with three rather than run into something where we have to

10   split it up and come back.

11        THE COURT:  Okay.  I know final pretrial isn't until

12   next week, and I know final pretrial is always a deadline, and

13   try as each side might -- and even a normal case rarely is

14   everything ready or at least as ready as I'd like it to be.  I

15   get that.  But has there been any progress?  In other words,

16   have you -- have you tendered any subset of exhibits yet or are

17   we still basically, you know, at ground zero on preparation for

18   next final pretrial?

19        MR. KESSLER:  No, no, no.  As far as preparation,

20   there is a difference between preparation and tendering,

21   because as we've discussed in that last motion hearing we had,

22   we do not intend to tender a witness or exhibit list until --

23   definitely don't want to do it now if the trial is in February.

24        THE COURT:  Well, I didn't mean to suggest you weren't

25   preparing, but in terms of what the Defense has seen it's

1        nothing yet?

2                MR. KESSLER:  Right.

3                THE COURT:  In other words, they won't see it until

4        next Friday if we have the final pretrial?

5                MR. KESSLER:  Whenever the final pretrial conference

6        is, yes, sir, we are ready.  We are prepared to do it for next

7        Thursday.

8                THE COURT:  And round numbers, how many exhibits are

9        we looking at?

10               MR. KESSLER:  Probably around 200.

11               THE COURT:  Okay.  In terms of Jencks disclosures,

12       have the parties talked about timing on that?  Obviously, the

13       law doesn't require you to do it until after direct exam.

14       That's certainly not my preference because that's going to have

15       a lot more interruption than Mr. Van Dyke walking in on the

16       audio bridge, but has there been discussion?  Is there an

17       agreement on what you anticipate?

18               MR. KESSLER:  We don't have an agreement on a date

19       because we don't know what the date of the trial is going to

20       be.

21               THE COURT:  It could be T-minus three days or it can

22       be two days before the witness testifies or whatever else you

23       haven't --

24               MR. KESSLER:  What I'd like to do is do it after the

25       final pretrial conference.  If we were to go on October 12th,

1     we are planning to turn over most of that after the final

2     pretrial conference.

3              THE COURT:  But before trial actually?

4              MR. KESSLER:  Oh, yeah.  We are talking, like,

5     probably two weeks before the trial.

6              THE COURT:  All right.  And in terms of volume, I

7     mean, roughly how much do you think we have in terms of Jencks

8     material that you'll be handing over?

9              MR. KESSLER:  That's always a hard question to answer

10    because I can't do it in terabytes or think that way, but

11    transcripts as to testifying witnesses who have been in trial.

12    There is stuff from there -- there is Giglio materials from --

13    like, they've asked for files of confidential informants that

14    haven't been disclosed.  I don't think any of it is stuff

15    that's going to, you know, you'd have to sit there and need a

16    month to read it.  A couple days.  Day or two.  I couldn't tell

17    you the size, weight, you know, in terms of gigabytes.

18             THE COURT:  All right.  My last question, and I'd like

19    to get the Defense input on this, too, as I hear everybody

20    talking today, I can sense that we are going to have more than

21    the usual amount of evidentiary issues that, you know, a

22    regular pretrial would flag and largely resolve.  For example,

23    if we are going to have a lot of proffered statements of a

24    Defendant substantively, affirmatively from one theory or

25    another, and the Government is going to object on hearsay, is

1    that the kind of thing that we can and should have deadlines in

2    advance of whatever our final pretrial is for briefing and

3    argument?  Is that useful, helpful to the parties?

4         Similarly, experts.  I saw the Government did their

5    expert disclosures earlier this week.  If the Defense is going

6    to have affirmative experts they have the same discovery

7    obligation.  If you've made the request, and I think you did,

8    you know, do we need to put some deadlines out there so that

9    everybody at both sides of the table know when the expert

10   disclosures are coming in case there is a basis to challenge?

11   Do you have a view on that one way or the other, and if so, how

12   much time in advance of a final pretrial?

13        MR. KESSLER:  I think it's a good idea, Your Honor, so

14   yes.  I think it should be sufficiently in advance of the final

15   pretrial to give us a chance to respond, because I don't want

16   to be getting motions to either exclude or introduce evidence

17   that are controversial a week before the final pretrial and

18   then we are spending, you know, the last couple of -- or we're

19   having to ask for a continuance because we need more time to

20   brief an issue right before the trial.  So you know, maybe in a

21   couple weeks or a month before the final pretrial.  We normally

22   would get 30 days to respond to a dispositive motion.

23        THE COURT:  You get 14 days for a motion in limine

24   presumably.

25        MR. KESSLER:  You know, the problem the last time

1    around when we had to ask for a continuance to respond is we

2    got 12 motions all at once.  So that's what I am a little leery

3    about is we get 12 motions a week or two before the final

4    pretrial, and 14 days is fine if we got to respond to one

5    motion, but it becomes very difficult if I have to respond to a

6    dozen.

7              THE COURT:  That's what Mr. Hakes is there for.

8              MR. KESSLER:  A half a dozen.  Right.

9              THE COURT:  All right.  Anything else from the

10   Government perspective?

11             MR. KESSLER:  The only thing I would just put on the

12   record as far as our expert disclosures, to the extent you are

13   considering that, are very very basic.  It's basically an ATF

14   agent saying the barrel is ten inches or someone saying the gun

15   powder is explosive.  Things like that.  I don't think those

16   should enter into the consideration.

17             THE COURT:  Okay.

18             MR. KESSLER:  Thank you, Your Honor.

19             THE COURT:  Let me go -- let's go to the same order.

20   Mr. Graham, anything you want to follow up, and in particular

21   your view of whether it would be useful to have some

22   incremental deadlines for briefing some of these issues?  And

23   then the last thing I am going to ask every Defense lawyer is

24   just to confirm for me right now with your client that if I

25   grant this ends of justice, you know, they are on board.

1          MR. GRAHAM:  Sure.

2          THE COURT:  Because as one of you said, I don't

3     remember who, it's coming out of their hide in part.  They are

4     all sitting here today in orange jump suits, and they are all

5     staying in Newaygo until we start this thing.  And you know, I

6     am confident that all of the experienced Defense lawyers have

7     given their best advice and judgment, but it's also true that,

8     you know, we are all lawyers or judges or recovery lawyers

9     basically.  There is never enough time.  We always want more

10    until finally we have to show up at trial and do it, so...

11         MR. GRAHAM:  Understood, Your Honor.  In regards to

12    the question of should there be briefing?  Yes.  I think there

13    should be.  If the Court -- well, whether the Court grants the

14    EOJ or not there should be a briefing schedule, I think, so we

15    can get all of these things hammered out.  The question of the

16    Government receiving 10 or 12 motions at once -- I mean, I

17    understand the problems that come in.  It's not only Mr. Hakes.

18    It's the other 15 people in that office that would jump in and

19    help.  I guess I just feel compelled to say that.  They can

20    respond.  They'll find the resources to respond.

21         The only question I had was I think you were asking

22    Mr. Kessler about is there anymore discovery?  And he was

23    saying, well, as we continue interviews there will be, and of

24    course there will be, but I don't know if I heard an answer, at

25    least I didn't understand, about the basic question of current

Rule 16 discovery.  Has that all been, you know, produced?  Not a question of whether there will be more.  I guess I'd be more comfortable if we were rock solid that whatever is required under Rule 16 has, in fact, been produced, and so maybe I missed it and I apologize if I did.

THE COURT:  All right.  I don't know if I specifically asked that or not or if you are able to say one way or the other.

MR. KESSLER:  All I can say is, you know, we are going -- we're always in this catch 22, more in this case than I've ever been in before, where we've had multiple pleadings from the Defense basically accusing us of withholding stuff, and we have litigated that last week.  If we look at something, whether it's coming from the state or wherever, and we go, you know, what -- let's just give it to them.  We want to make sure that they have everything, and so we are in that catch 22 of we look at something, I don't think this is really relevant, but we are -- you know, in the interest of caution we are going to give it to them, and then we find ourselves back here being accused of, like, having sandbagged or held onto that for a long time.  So we have given them the vast majority of everything, and we have little scraps here and there like that we are going to keep giving them.  I don't want to say we are done.  I don't, really don't, because if I stand here and tell the Court we are done, then as soon as I give them something

1   else that I think they should have we are going to be back here

2   being accused of having held onto it.

3       THE COURT:  Well, you know, I guess one person's scrap

4   is another person's, you know, smorgasbord.  Is there anything

5   on the shelf that you are saying, you know, the day before

6   final pretrial this is what we are going to have or is it

7   really just continuing to see things flow across your desk that

8   are new and say, you know what, I should pass this on?

9       MR. KESSLER:  I can say that for the vast majority of

10  it.  This next production, what they're calling a dump, we are

11  doing them in tranches as we get everything together will be

12  the last really substantive one other than Jencks and Giglio,

13  which we are going to do later and just things that come across

14  our desk.

15      THE COURT:  So vast majority, and for the most part

16  those are always the words that make me nervous if I am

17  standing where Mr. Graham is.  I mean, are you able to -- give

18  me an example of something you are talking about other than the

19  new information that might come from one of the state

20  defendants for example?

21      MR. KESSLER:  That's really pretty much it is going to

22  be.  This next bunch has a bunch of things that there is that

23  parallel state investigation and we wanted to make sure they

24  have all of that.  So that's that one that will have, you know,

25  a little bit of meat to it.  But now if we're talking about

1    pushing this thing off, it's not the kind of thing that's going

2    to take months to review.  And then after that, like I said,

3    it's Jencks and Giglio and new stuff.

4            THE COURT:  All right.  Okay.  I am not sure you are

5    going to get a more direct answer than that, but that gives

6    you --

7            MR. GRAHAM:  It gives me an understanding.  It doesn't

8    answer my question at all.  My question was simply -- I am not

9    worried about new stuff.  Whatever they think as of this moment

10   in time have they fulfilled their obligations under Rule 16?  I

11   mean, that was my question.  This thing about there is going to

12   be a new production, I wasn't aware that a new production --

13   that's not -- that's not Jencks?

14           THE COURT:  Well, it sounds like that's what

15   Mr. Blanchard was referring to as the dump that's -- or either

16   at or about to be at your coordinating counsel's office.

17           MR. GRAHAM:  If that's the one, I understand.

18           THE COURT:  Is that what you are talking about?

19           MR. KESSLER:  Yes.

20           MR. GRAHAM:  If it's one that's coming, okay,

21   understood.  My question was simply have you complied with Rule

22   16?  Of course new stuff is going to come up.  I got my answer.

23   I just want to be sure on that.

24           And then if I could, Your Honor, I'd ask --

25           THE COURT:  Sure.

1    MR. GRAHAM:  -- a couple of questions of Mr. Franks if

2  I could?

3    MR. KESSLER:  Can I sit, Your Honor?

4    THE COURT:  Go ahead.

5    MR. GRAHAM:  If you can stand up and get as close as

6  you can to that microphone?

7    THE COURT:  Or you can stay seated if it's easier.

8  The microphone is more down at sitting level.

9    MR. GRAHAM:  Kaleb, do you understand that we are here

10  today because we've asked for additional time moving the trial

11  off from the October 12 date; do you understand that?

12    DEFENDANT FRANKS:  Yes.

13    MR. GRAHAM:  And do you understand that you have a

14  right to have us go to trial on October 12th or at least tell

15  the Court we want to go to trial on October 12th?

16    DEFENDANT FRANKS:  Yes.

17    MR. GRAHAM:  And do you understand that if, in fact,

18  the trial date is moved, then you remain in custody and the

19  Court would set a date that was convenient for the Court's

20  schedule and the Court's decision about when the trial should

21  occur?

22    DEFENDANT FRANKS:  Yes.

23    MR. GRAHAM:  And that could be 90 days, 120, 150 days.

24  Do you understand that?

25    DEFENDANT FRANKS:  Yes.

1      MR. GRAHAM:  Do you understand you'll be in custody

2   during that time?

3      DEFENDANT FRANKS:  Yes.

4      MR. GRAHAM:  Based upon every -- I don't want to go

5   into what we've talked about.  Based upon everything that you

6   know and your understanding of the situation, are you asking

7   the Court to go ahead and adjourn or move the trial date to

8   whatever date the Court finds appropriate?

9      DEFENDANT FRANKS:  Yes.

10      MR. GRAHAM:  Those are the questions I have.

11      THE COURT:  Yeah.  Thank you.  Anything else from your

12   perspective, Mr. Graham?

13      MR. GRAHAM:  No, Your Honor.  Thank you.

14      THE COURT:  Let's go to Ms. Kelly.

15      MS. KELLY:  Thank you, Your Honor.  I would also agree

16   with the briefing deadline.  I think that would be a great idea

17   to help us organize.  I didn't have any additional information

18   to add.  I can certainly have my client go on record at this

19   time.

20      THE COURT:  And your client is Mr. Harris, right?

21      MS. KELLY:  Correct.

22      THE COURT:  And if you want to do the same thing that

23   Mr. Fox -- Mr. Graham did, I would appreciate that, because as

24   I said, I have never met these men before.  This is the first

25   time I've had a chance to be in the same room with them, and so

1    I want to make sure they are tracking and are on board with

2    what the Defense group wants to do here.

3            MS. KELLY:  Okay.  Mr. Harris, you and I had a

4    conversation prior to the Defense counsel filing a motion to

5    adjourn the trial date.  Do you recall that?

6            DEFENDANT HARRIS:  Yes, ma'am.

7            MS. KELLY:  Okay.  And you understand that you have a

8    right to have that trial -- your trial begin on October the

9    12th?

10           DEFENDANT HARRIS:  Yes.

11           MS. KELLY:  And you and I discussed reasons why we may

12   want to adjourn that, is that right?

13           DEFENDANT HARRIS:  That's correct.

14           MS. KELLY:  Okay.  And you have heard the Court talk

15   about there may be issues.  We have asked for 90 days.  There

16   may be issues with weather, and the trial with the Court's

17   convenience might be moved past that 90-day time period?

18           DEFENDANT HARRIS:  Correct.

19           MS. KELLY:  Are you in agreement in consenting to our

20   request to adjourn that trial date?

21           DEFENDANT HARRIS:  Yes, ma'am.

22           MS. KELLY:  Thank you, Your Honor.

23           THE COURT:  Anything else, Ms. Kelly?

24           MS. KELLY:  No, Your Honor.

25           THE COURT:  I think you were next, Mr. Gibbons.

1      Anything else you want to address, talk to me about what you

2      think of a briefing schedule, and then let's hear from Mr. Fox

3      on his point of view.

4             MR. GIBBONS:  I strongly would encourage and support

5      the idea of a briefing schedule, especially with respect to the

6      evidentiary issues that I think are inevitably going to arise

7      in trial, and I think much -- the only other thing I wanted to

8      say is in response, Mr. Kessler had indicated that maybe we

9      were just sending audio unheard to the court reporter.  I can

10     assure you we've listened to it all, unfortunately.  And we

11     have --

12            THE COURT:  All those scratching pocket hours.

13            MR. GIBBONS:  You have no idea, Your Honor.  But we

14     have reduced those to clips, so we are not sending wholesale

15     audio over to the transcriptionist.  I wanted to make that is

16     clear.  I don't want to have diminished I think the work that

17     everyone has done to get to that point, and then I will

18     continue with my client --

19            THE COURT:  Sure.

20            MR. GIBBONS:  -- Mr. Fox.  Mr. Fox, I have come to see

21     you on September 8th?

22            DEFENDANT FOX:  Yes, that's correct.

23            MR. GIBBONS:  And we talked about the prospect of a

24     continuance at that time, is that true?

25            DEFENDANT FOX:  Yes, sir.

1    MR. GIBBONS:  And we have -- we were able to discuss

2  your concerns and my concerns regarding that?

3    DEFENDANT FOX:  Yes, sir.

4    MR. GIBBONS:  And you've heard everything that was

5  said here today?

6    DEFENDANT FOX:  Yes, I have.

7    MR. GIBBONS:  And you are willing to consent to the

8  Court --

9    DEFENDANT FOX:  Yes.

10    MR. GIBBONS:  -- on continuing this case?

11    DEFENDANT FOX:  Yes.  I agree to that.

12    MR. GIBBONS:  And do you understand that you will be

13  lodged in the county jail up in Newaygo until that happens?

14    DEFENDANT FOX:  Yes, I do.

15    MR. GIBBONS:  And you are willing to do that?

16    DEFENDANT FOX:  I am willing to do that, yes, sir.

17    MR. GIBBONS:  Thank you.

18    THE COURT:  Thank you, Mr. Gibbons.

19    Mr. Blanchard?

20    MR. BLANCHARD:  I guess as to the question of briefing

21  deadline I think it's a good idea.  I don't know that a

22  month -- I can appreciate the Government wants time.  I am just

23  thinking about as these things normally come up they get closer

24  to final pretrial and so I think maybe something a little bit

25  shorter than a month, but I think having a briefing deadline

1   would be helpful to keep the trial on track and efficient so

2   that we don't spend, you know, four weeks in the Government's

3   case fighting over evidentiary issues that are coming up at

4   trial.  So I think that's a great idea.  And then I can inquire

5   of my client --

6           THE COURT:  Okay.

7           MR. BLANCHARD:  Mr. Croft, I came to the jail and met

8   with you to discuss the issue of the EOJ before we filed the

9   motion, is that right?

10          DEFENDANT CROFT:  Yes.

11          MR. BLANCHARD:  And I gave you my advice on what I

12  thought we ought to do with the motion and whether it was in

13  your best interests?

14          DEFENDANT CROFT:  Yes.

15          MR. BLANCHARD:  After having that conversation, you

16  gave me permission to consent to the EOJ and to seek it,

17  correct?

18          DEFENDANT CROFT:  Yes, sir.

19          MR. BLANCHARD:  After hearing everything that happened

20  here today, do you still support a continuance?

21          DEFENDANT CROFT:  Yes, sir.

22          MR. BLANCHARD:  You understand that you will continue

23  to be detained during the period of the continuance?

24          DEFENDANT CROFT:  Yes, sir.

25          MR. BLANCHARD:  I have nothing else, Your Honor.

1        THE COURT: All right. Thank you.

2        We'll go to Mr. Hills.

3        MR. HILLS: Thank you, Your Honor. I think a briefing

4    schedule is a good idea. No objection. Whether it's 30 days

5    or whatever the Court sets I am good with that.

6        THE COURT: Okay.

7        MR. HILLS: And I would ask of my client.

8    Mr. Caserta, before we filed the EOJ motion, I came to speak

9    with you at the Newago County Jail, is that right?

10       DEFENDANT CASERTA: That is correct.

11       MR. HILLS: We discussed the issue of continuing the

12   case. Do you recall that?

13       DEFENDANT CASERTA: Yes.

14       MR. HILLS: You understand that the trial and you know

15   that the trial is currently scheduled for October 12th?

16       DEFENDANT CASERTA: That is correct.

17       MR. HILLS: And are you in agreement, after discussing

18   the issues with me, to a continuance to have the trial reset at

19   a date that's convenient for the Court?

20       DEFENDANT CASERTA: Yes. I am in agreement with the

21   continuance.

22       MR. HILLS: Okay. And you understand that you are

23   going to be held in Newago County Jail during that time until

24   the Court sets the trial date we have for trial?

25       DEFENDANT CASERTA: Yes, I understand that.

1          MR. HILLS:  Okay.

2          THE COURT:  All right.  Well, thank you.

3          Anything else, Mr. Kessler?

4          MR. KESSLER:  Just one additional thought on the

5     timing, and this isn't about giving us sufficient time to

6     respond.  One other thing tends to happen towards the end.  I

7     know everybody in this room, including the Court, has seen this

8     pattern play out.  And I don't expect anybody in this room to

9     say anything other than my client intends to go to trial, but

10    sometimes people are making a decision about whether they want

11    to go to trial or they want to cut a deal based on whether or

12    not -- how those motions go, and I think if somebody finds out

13    or is, you know, at the very last minute that all the evidence

14    they thought was going to exculpate them or allow -- you know,

15    allow them to make a defense is inadmissible, that's pretty

16    late for them to have that information to make that decision.

17    So there is an additional benefit to them knowing how those

18    things are going to come out earlier rather than later.

19         THE COURT:  All right.  Well, thank you.  And I don't

20    have any other questions for the Government.

21         MR. KESSLER:  Thank you.

22         THE COURT:  On the last point, the only thing I am

23    thinking about, and I think the only thing I should properly

24    think about in terms of the schedule is a deadline -- series of

25    deadlines that will facilitate the smoothest possible trial

1    presentation at both tables, and the Defendant always has the

2    right to decide not to go to trial and to try to cut a deal,

3    but that's not something I am going to get in the middle of.

4    That's between Defense Counsel, Defendant, and the Government.

5    What is my responsibility is to make sure that if we go to

6    trial with this array of people, which is what we have right

7    now, I am doing it all odds in favor of smoothness, success and

8    obviously fairness to all sides.  So that's really where I want

9    to start.

10         As I said, you know, a three, four-week trial block is

11   not easy for a trial court to carve out, and I know all of us

12   have been focused on that October block for quite some time

13   now, and I really hate to give it up.  With that said, you

14   know, I've got five experienced defense lawyers, all of whom

15   have a lot of experience in this Court and other -- my

16   colleagues' courts, and they are telling me to a person they

17   don't feel like they'll be ready, but -- to provide the defense

18   that they need by October 12, and that carries significant

19   weight.  Whether I agree or disagree with every particular

20   reason articulated, I trust the judgment of these five lawyers,

21   and I have seen them tell me straightaway in other situations

22   when they think they need more time or when they think that

23   they'd like it but they can proceed, and today I am hearing

24   from every one of them and now their clients we think there is

25   good reason to wait.

1          At the Government table I hear we don't see any
2     prejudice to our case in waiting.  You know, we don't think we
3     are responsible.  We don't think that everything the Defense
4     has said about the disclosure sequences is entirely accurate,
5     but we acknowledge there is a lot of material, and we don't
6     feel like we'll be prejudiced, at least until they have to
7     start making the disclosures that would be a part of final
8     pretrial.  And when I put those two things together, and third,
9     I think about what is necessary, potentially anyway, from an
10    evidentiary sifting point of view to make the trial smooth,
11    whether that's through motions in limine or otherwise on some
12    of the transcription issues we talked about, and what
13    affirmative statements of individual Defendants might be
14    admissible or not as substantive evidence, we just don't have
15    time anymore between now and next Friday or even October 12 to
16    meaningfully process that if the transcripts themselves aren't
17    going to be available until mid-December, at least for some of
18    the Defendants.  Not until the end of December for others.

19         So I think that -- I guess the final thing is I did
20    reference and we didn't talk specifically about all the expert
21    issues.  There is one that was submitted ex parte today, and
22    another one that we talked about on the record.  To the extent
23    the Defense believes in good faith that they need affirmative
24    testimony on some issues and haven't been able to line up
25    experts, even though they were able to get consulting experts,

1     it seems to me we ought to give them a chance to do that.  It's

2     not an indefinite time.  If you can't get it lined up between

3     now and the next time we set trial maybe that's not another

4     good reason for yet a further extension, but it does augur in

5     favor of some additional time now.

6          Finally, we didn't talk anything specifically about

7     it, but the Court did note that on the record there was an

8     appeal of the Magistrate's order on one of the issues that got

9     filed late yesterday.  So I'll have to have time to take that

10    into account, and obviously, depending on what I do with it --

11    lawyers all know the standard of review is very differential to

12    what the Magistrate Judge decides on that, but if there are any

13    changes, that would certainly affect what gets disclosed or

14    not.

15         Lastly, there is at a minimum for one of the

16    Defendants, Mr. Harris, recent disclosure of his own phone

17    contents, and although it's not anybody's fault in

18    particular -- sometimes some phones are hard to decrypt or

19    extract and harder than others.  The reality is for Ms. Kelly,

20    you want to know what's on your client's phone and what could

21    be used either to exculpate or what the Government could use in

22    an affirmative way.

23         So I think there is, all told, reason to support an

24    ends of justice continuance as requested by the Defense, even

25    though I am not glad to give up that October date.  What I'll

1    do -- and I don't know what the dates will be today as I sit

2    here.  What I'll do is I'll go back to the calendar, try to

3    sort out what I think would be some meaningful briefing

4    deadlines, taking into account the Defense experts to get their

5    transcripts by mid-December, which would be, I think, essential

6    to frame meaningful briefing on the issue, and then we'd do

7    final pretrial far enough down the line to allow resolution of

8    most of those issues in advance or not too long into a final

9    pretrial, and then finally we'd put the trial date on in the

10   same roughly three-week period or so following final pretrial.

11   As I said, I don't think that trial date is likely to be before

12   mid-February, maybe end of February or maybe even early March,

13   and I'll put that all out there for the parties in an order if

14   not today then early next week so you all know what to figure

15   out, but at least you know you won't have the final pretrial

16   next Friday.  That doesn't mean you can't spend time working

17   together, but you won't have final pretrial next Friday.  We

18   won't have trial starting October 12.  We will grant the ends

19   of justice continuance and assorted other deadlines to

20   facilitate some meaningful briefing on the evidentiary issues.

21        That's the motion for today.  Are there other things

22   that would be useful to take up for the parties, just practical

23   logistics or otherwise?

24        MR. KESSLER:  Just a thought on that when the Court

25   comes up with the timing for when things need to be done.  I

1    noticed that there was some discussion about ex parte requests

2    for experts.  The earlier we can find out who those experts are

3    and what they are expected to testify about, that'll help us be

4    able to brief those issues.

5           THE COURT:  Sure.  Anything else that would be helpful

6    from the Defense point of view today?

7           MR. GRAHAM:  No, Your Honor.

8           MR. GIBBONS:  Satisfied, Your Honor.

9           MR. HILLS:  No.

10          THE COURT:  You had filed, Mr. Gibbons, the request

11   for a status conference to address, at least my memory is I

12   think it would be logistic issues but -- or logistical issues,

13   how to present the transcripts, but I take it there is nothing

14   ready.  We couldn't do a demo today anyway because it's not

15   ready.

16          MR. GIBBONS:  No.  We couldn't, Your Honor.  Primarily

17   my interest was just making sure that they are exchanged in a

18   timely fashion before so that we have -- you know, I am just

19   envisioning we are in the middle of a trial and Mr. Kessler and

20   I don't agree on a transcript.  You know, mine is right.  He

21   says his is right.  I can't imagine we are going to give it to

22   you with a clip and say, here, we need you to figure that out.

23          THE COURT:  Typically not.

24          MR. GIBBONS:  It may be a process -- because it's an

25   unusual case with the amount of audio that's present -- that

1    may be we disclose and exchange these in advance of trial and

2    as we have them.  Obviously, if the Government has transcripts

3    I would gladly relieve Ms. Rozema of the obligation to do that

4    if we have any from the Government and it's fine.  There is

5    just no reason to do it twice.  Really, it's a time saving and

6    economic issue.

7         THE COURT:  I think your plan at this point is to hand

8    over with the overall set of trial exhibits, the transcripts

9    that you think --

10        MR. KESSLER:  Yes, Your Honor.

11        THE COURT:  -- accurately -- so we are talking final

12   pretrial from your perspective?

13        MR. KESSLER:  Yes, Your Honor.

14        THE COURT:  Okay.  All right.  Well, if there is

15   nothing else today I am glad we were able to have an

16   opportunity to see everybody.  Does the Defense group, as you

17   sit here today, you feel like you have enough room to set up

18   and will you have at trial the need for a separate table for

19   whoever is going to present your forensics?

20        MR. GRAHAM:  Your Honor, we are going to definitely

21   need a separate table for whomever is going to present --

22        THE COURT:  Okay.

23        MR. GRAHAM:  -- from my perspective.  Unless we feel

24   we need someone else up here with us it seems that from my

25   perspective there is enough room.

1        MR. BLANCHARD:  If there is a way to add another

2   table, because I expect some of us will have someone with us at

3   trial, and we're tight right now.

4        THE COURT:  Right.  When we had the group of seven or

5   eight -- and I don't -- I know you were there, Mr. Hills.  Was

6   anybody else at that one?

7        MR. HILLS:  No.

8        THE COURT:  A number of you -- I know you,

9   Mr. Blanchard, and Mr. Gibbons, were in a three-defendant

10  trial.

11       MR. BLANCHARD:  Mr. Hills was also there.

12       THE COURT:  You were there, too?  Were you the last

13  one to go in that one?

14       MR. HILLS:  No.  I was the driver.

15       THE COURT:  Okay.  And we did manage, but that was

16  preCOVID and people were snug and we did manage to get seven or

17  eight groups of clients, lawyers and techies on that side of

18  the well of the Court.  There is room behind the Government,

19  but you'll probably have your own person, right?

20       MR. KESSLER:  Yes, Your Honor.

21       THE COURT:  Okay.  So we'll see if we can figure out a

22  better way to do it.  We also have, since you all have been

23  here, I think, an upgrade, quote-unquote, on the tech.  I hope

24  it's an upgrade.  Certainly the screens present a much tighter

25  resolution.  The projector a little better resolution but not

1   great.  And then that big thing right in front of the

2   Government table is an experiment.  What it does when it's on

3   is has a camera shot facing forward so you can see the witness,

4   the Court and then you can have inset whatever is displayed on

5   the evidence at the time.  And you know, the AO --

6   Administrative Office's idea is sometimes it's hard for the

7   jury to always be looking at one direction if they want a

8   chance to see what the witness is looking at, like, along with

9   the evidence, and keep themselves facing forward they could

10   conceivably do that.  So I don't know whether it's a good idea

11   yet or not.  We are still kind of playing with it.  You can

12   think about that as part.  If we don't do that, we could

13   convert that to another stand-up monitor and either show it to

14   the jury or show it to the back of the room or show it to all

15   of you at Defense table who don't really have a great view of

16   the screen behind you.  So think about some of those things as

17   well.  Otherwise, I don't have anything on my list and we'll

18   see each other at whatever the next hearing is.

19             THE CLERK:  Court is adjourned.

20             (Proceeding concluded, 11:23 a.m.)

21

22

23

24

25

REPORTER'S CERTIFICATE


　　　　I, Paul G. Brandell, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of the
proceedings had in the within entitled and numbered cause on
the date hereinbefore set forth; and I do further certify that
the foregoing transcript has been prepared by me or under my
direction.



　　　　　　　　　　　　/s/ Paul G. Brandell

　　　　　　　　　　　　Paul G. Brandell, CSR-4552, RPR, CRR

　　　　　　　　　　　　U.S. District Court Reporter

　　　　　　　　　　　　399 Federal Building

　　　　　　　　　　　　Grand Rapids, Michigan  49503