THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

    Plaintiff,

v.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
KALEB JAMES FRANKS,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

    Defendants.

Case No. 1:20-CR-183

Hon. Robert J. Jonker
Chief U.S. District Court Judge

## DEFENDANTS' MOTION TO DISMISS THE SUPERSEDING INDICTMENT BASED ON GOVERNMENT OVERREACHING AND MISCONDUCT AND MEMORANDUM IN SUPPORT

The defendants in this matter, through their attorneys, move this Court to dismiss the charges against them contained in the superseding indictment.[1] In support of this motion, they offer the following memorandum of law. Essentially, the evidence here demonstrates egregious overreaching by the government's agents, and by the informants those agents handled. The key to the government's plan was to turn general discontent with Governor Whitmer's COVID-19 restrictions into a crime that could be prosecuted. The government picked what it knew would be a sensational charge: conspiracy to kidnap the

---

[1] This motion focuses on the conspiracy charge contained in count one of the superseding indictment. If the defendants are successful here, the remaining charges would fail because these charges are either intertwined with and predicated on count one or it is clear that they would not have occurred without the entrapment.

governor. When the government was faced with evidence showing that the defendants had no interest in a kidnapping plot, it refused to accept failure and continued to push its plan. Eventually, the government initiated this case, despite the fact that it knew there was no plan to kidnap, no operational plan, and no details about how a kidnapping would occur or what would happen afterward. The facts show that there was no conspiracy. In the alternative, because the government overreached and committed serious acts of misconduct against defendants who had repudiated the government's suggested wrongdoing, the defense can establish entrapment as a matter of law.

## *Procedural Background*

This case began with the government filing a criminal complaint on October 6, 2020, charging the defendants with conspiring to kidnap Michigan Governor Gretchen Whitmer, in violation of 18 U.S.C. § 1201(c). *See* RE. 1: Complaint, PageID # 1. The government indicted the defendants on December 16, 2020. RE. 86: Indictment, PageID # 573-78. This indictment included a single charge: conspiracy to kidnap Michigan's governor. *See id.* at 573. Only one codefendant has pleaded guilty (doing so on January 27, 2021), with the rest proceeding toward trial. *See* RE. 143: Minutes of Garbin Change of Plea, PageID # 759. A superseding indictment, filed on April 28, 2021, added weapons counts against certain defendants but did not modify the charge against all defendants. *See* RE. 172: Superseding Indictment, PageID # 961-76. Trial currently stands set to begin on March 8, 2022, with a final pretrial conference on February 18, 2022. *See* RE. 347: Order, PageID # 2156.

## *Legal Discussion*

The Supreme Court has long held that government overreaching can constitute entrapment as a matter of law and can provide grounds for vacating a conviction. *See*

*Jacobson v. United States*, 503 U.S. 540, 542 (1992) ("Because the Government overstepped the line between setting a trap for the 'unwary innocent' and the 'unwary criminal,' . . . and as a matter of law failed to establish that petitioner was independently predisposed to commit the crime for which he was arrested, we reverse the Court of Appeals' judgment affirming his conviction."). When "it can be decided as a matter of law, the issue of whether a defendant has been entrapped" may be decided by a judge. *See Sherman v. United States*, 356 U.S. 369, 377 (1958) (implying that courts can decide these matters when they can "be decided as a matter of law"); *see also id.* at 378 (Frankfurter, J., concurring) ("Although agreeing with the Court that the undisputed facts show entrapment as a matter of law, I reach this result by a route different from the Court's.").

Courts in the Sixth Circuit have recognized these aspects of entrapment. *See, e.g.*, *United States v. McLernon*, 746 F.2d 1098, 1111 (6th Cir. 1984) (discussing how entrapment is established as a matter of law when undisputed evidence demonstrates government agents engaged in conduct which overbore an innocent person's will and induced them to commit an offense that they were not disposed to commit); *see also United States v. Odeesh*, 937 F. Supp. 637, 639 (E.D. Mich. 1996) ("Entrapment is generally a jury question; however, the court may find the defendant entrapped as a matter of law where the 'undisputed evidence,' taken in the light most favorable to the government, demonstrates a 'patently clear absence of predisposition.'" (citing *United States v. Tucker*, 28 F.3d 1420, 1426-29 (6th Cir. 1994))).

In making the relevant inquiries, a court should not choose between conflicting witnesses, nor judge credibility. *Sherman*, 356 U.S. at 373. It should reach its conclusions from the evidence, like "undisputed testimony of the prosecution's witnesses." *Id.* In this

case, the undisputed evidence, as demonstrated in forty-four pages of statements already submitted to the Court, establishes that government agents and informants concocted, hatched, and pushed this "kidnapping plan" from the beginning, doing so against defendants who explicitly repudiated the plan. *See* RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2373-2418.

In *Jacobson*, the Court considered the circumstances of a defendant who had endured two and a half years of "repeated efforts by two Government agencies, through five fictitious organizations and a bogus pen pal, to explore petitioner's willingness to break the new law by ordering sexually explicit photographs of children through the mail." *Jacobson*, 503 U.S. at 543. Government agents sent that defendant materials related to "hedonism," sexual-interest surveys, and materials related to fictitious organizations supposedly advocating for sexual liberty. *See id.* at 543-45.

In that case, although the defendant "had responded to surveys and letters, the Government had no evidence that [he] had ever intentionally possessed or been exposed to child pornography," and "[t]he Postal Service had not checked [his] mail to determine whether he was receiving questionable mailings from persons—other than the Government—involved in the child pornography industry." *Id.* at 546. Ultimately, after the government's protracted efforts, postal-service agents sent the defendant a solicitation about child pornography and the defendant ordered a *Boys Who Love Boys* magazine containing child pornography. *See id.* at 547. Once he made that order, the government descended on him, searched his home, found the magazine, and indicted him on child-pornography charges. *See id.* At trial, the district court did instruct the jury on the defendant's entrapment defense, but the jury convicted him anyway. *Id.* And a divided

4

Eighth Circuit, sitting en banc, affirmed, concluding that the defendant had not been entrapped as a matter of law. *Id.* at 547-48.

Yet the Supreme Court saw things differently. In considering the case, the Court acknowledged that "there can be no dispute that the Government may use undercover agents to enforce the law," and government agents may use "[a]rtifice and stratagem" to apprehend "those engaged in criminal enterprises." *Id.* at 548. "In their zeal to enforce the law, however, Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.* at 548.

The Court in *Jacobson* made some key observations for purposes of the case at hand. In *Jacobson*, "[b]y the time [the defendant] finally placed his order, he had already been the target of 26 months of repeated mailings and communications from Government agents and fictitious organizations," so "although he had become predisposed to break the law by May 1987, it [was the Court's] view that the Government did not prove that this predisposition was independent and not the product of the attention that the Government had directed at petitioner since January 1985." *Id.* at 550. Basically, "[w]hen the Government's quest for convictions leads to the apprehension of an otherwise law-abiding citizen who, if left to his own devices, likely would have never run afoul of the law, the courts should intervene." *Id.* at 553-54.

Even the dissent in *Jacobson* would frown on the government's conduct here. In her dissent in the former case, Justice O'Connor emphasized that the *Jacobson* defendant had "needed no Government agent to coax, threaten, or persuade him; no one played on his sympathies, friendship, or suggested that his committing the crime would further a greater

5

good." *Jacobson*, 503 U.S. at 554 (O'Connor, J., dissenting). "In fact, no Government agent even contacted him face to face."

In the case at hand, in sharp contrast, informants, of course, not only contacted the defendants face to face but also coaxed, persuaded, cajoled, played on sympathies, cultivated friendships, took advantage of the defendants' financial conditions,[2] and suggested that the offense *they* proposed "would further a greater good." *Cf. id.* The defendants did not engage in any activity for profit—anything they did with respect to the CHSs was based on friendship and admiration and the CHSs' assiduous cultivation of a sense of patriotism and right-doing.

In looking at other cases, the *Jacobson* dissent cited decisions where courts pointed to defendants' "evidenced reluctance to engage in criminal activity," and the government overcoming that reluctance through repeated inducement, as "the most important factor." *See id.* Unsurprisingly, the *Jacobson* Court reviewed earlier decisions to support its conclusions, one such preceding opinion being *Sherman v. United States*. *See Jacobson*, 503 U.S. at 542. In *Sherman*, a government informer met the defendant at a doctor's office, as someone who, like the defendant, was being treated for drug addiction. *Sherman*, 356 U.S. at 371. Several chance meetings followed, either at the doctor's office or at the pharmacy

---

[2] The government was not going to be deterred by the fact that the defendants did not have the money to travel throughout the Midwest in order to play along with the CHSs and undercover agents. CHS Dan, while often claiming poverty, always had the resources to drive, feed, and house others whom he hoped to pull into the government plan. Another CHS convinced many that he would finance operations through a 501(c)(3) charity and would even provide debit cards to others, drawing on his accounts. So while the defendants had no interest in profit, a factor weighing in their favor here, as discussed below, the government's exploitation of its virtually unlimited resources, poured into its investigation, *further* underscores entrapment as a matter of law. Compare *McLernon*, 746 F.2d at 1113 (with the court noting it was "mindful of the fact" that the government, unlike a typical offender, could "offer as much as it wished to any potential defendant" (citation omitted)).

where both men filled their prescriptions from the doctor. *Id.* "From mere greetings, conversation progressed to a discussion of mutual experiences and problems, including their attempts to overcome addiction to narcotics." *Id.* Finally, the informant asked the defendant if the defendant knew of a good drug source. *Id.* He asked the defendant to supply him with a source "because he was not responding to treatment." *Id.* From the beginning, the defendant had tried to avoid the issue, and "[n]ot until after a number of repetitions of the request, predicated on [the informant's] presumed suffering, did [the defendant] finally acquiesce." *Id.*

Statements like those explored in the instant defendants' motion to allow introduction of out-of-court statements demonstrate the congruence of the instant case with *Sherman* and *Jacobson*. *See* RE. 366: Motion to Admit Statements, PageID # 2350-2371. On June 6, 2020, a CHS admonished, "You can't just grab brick and mortar. Without a fucking human to go with it, you've done nothing but grab brick and mortar." *See id.* at 2370. No one had broached the idea of kidnapping; the *government informant* raised the idea.

The Sixth Circuit found entrapment as a matter of law in *United States v. McLernon*, which parallels this case in many respects. *See McLernon*, 746 F.2d at 1114, 1126 (finding entrapment as a matter of law for a defendant). The *McLernon* court presented certain "factors relevant to determining a defendant's prior disposition," including: (1) the character or reputation of the defendant (including a relevant prior criminal record);[3] (2) whether the government made the initial suggestion to engage in criminal activity; (3)

---

[3] Individual defendants will explore this factor more deeply in separate filings, which should be read in conjunction with this motion when they are filed in the very near future.

7

whether the defendant engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated government inducement/persuasion; and (5) the nature of the inducement/persuasion provided by the government. *See McLernon*, 746 F.2d at 1112. These factors all point toward entrapment as a matter of law in this case.

Regarding the initial suggestion of wrongdoing and an expression of reluctance, on July 7, 2020, multiple defendants and others were together when someone apparently raised the subject of kidnapping, and someone in the group immediately said that they were "not cool with offensive kidnapping" while others, including defendants Franks and Harris, echoed this sentiment. *See id.* at 2367-68. This incident shows that there was no predisposition to kidnap Governor Whitmer or anyone else. On July 18, 2020, at a "national" milia meeting held by the government, Ty Garbin rebuffed a CHS's suggestion of kidnapping of a public official; Garbin said, "so I think an objective to go for is not the kidnapping . . . ." RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2417.

Three weeks later, on August 9, 2020, defendant Daniel Harris told the lead CHS and others: "No snatch and grab. I swear to f...ing God." *See* RE. 366: Motion to Admit Statements, PageID # 2354 n.4. Ty Garbin even seconded Mr. Harris's repudiation of the notion of kidnapping when he stated "kidnapping is just as bad as going into the capitol." RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2418.

Even FBI Special Agent Impola has testified regarding August 9, confirming that defendants reacted negatively to the idea of kidnapping:

8

> Q. Can we call it that, all right? And what's the reaction of the group when Adam Fox talks about this idea?[4]
>
> A. Well there was a negative reaction, people were surprised, and they didn't take to it kindly. There was [sic] a lot of questions being asked.

*See People v. Musico, et al.*, Nos. 2003171, 2003172, 2003173 (12th Dist. Ct., County of Jackson, MI), Trans. of Probable-Cause Hrg., Vol. I, 3/3/21, at 209. After that meeting, later (in the evening) on August 9, 2020, Special Agents Chambers and Impola participated in a phone call with CHS Dan and Adam Fox:

> CHS Dan: Right. What you think about with everybody where they're at? Like—
>
> Adam Fox: Definitely divided.
>
> CHS Dan: Like your plan and all.
>
> Adam Fox: I mean we're divided.

RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2411.[5]

These defendants had no desire whatsoever to kidnap anyone. Yet the government wouldn't drop the idea, and the CHSs continued to broach plans—despite official government admonitions barring the suggestion of such plans. Phone calls like the one above represent a mere appetizer. The CHSs' handlers pulled the puppet strings the entire time. On August 28, CHS Dan asked SA Chambers, "Would you want 2 trips or wait till we get more guys?" as part of his attempts to "get it right" for the government. *See id.* at 2400. In state court, SA Impola affirmed his direct role in telling CHSs what to say to people. He told a CHS what to say to Adam Fox—he was communicating with the CHS during the

---

[4] It was the agents and informants who first induced Fox to consider the idea at all, as explored here and in the motion related to the statements.

[5] On July 27, CHS Dan suggested putting "a round into a window" (ostensibly of the governor's cottage) and "mail[ing] the casing to the news." He made these remarks while recording his conversation with Adam Fox. *See* RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2397.

CHS's conversation with Fox; his directions included suggesting that Fox come train at Joe Morrison's property in Munith and urging Fox to do so. *See Musico, et al.*, Nos. 2003171, 2003172, 2003173, Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 40 (conceding, "I was, we were talking about it, we were talking about what he was saying"), 52-53, 60-61; *see also id.* at 197.

Interestingly, given SA Chambers's role in directing activities here, and in a company that tweeted about the investigation, as explored in earlier filings, on October 29, 2021, SA Chambers dissolved the company (Exeintel), filing papers with the New Mexico Secretary of State. *See* RE. 315: Joint Supp., PageID # 1865) (discussing Chambers's interest in an intelligence company tweeting about the investigation). The timing seems more than coincidental, given the issues raised in this case and also presented in the media. The commercial behavior only compounds the overreaching and emotional manipulation and the government's strategic planning, planning that ultimately came up short. (It bears noting that in an analogous context—one involving an agent's prior coercive schemes—the Sixth Circuit has said evidence related to an agent's tactics/motivations is admissible and that trial courts abuse their discretion in excluding it. *See McLernon*, 746 F.2d at 1117.)

The defendants never agreed to the government's kidnapping plan, a repudiation even the government implicitly recognizes: in response to the defendants' rejection of the plot, government agents prompted CHS Dan to propose alternative, less violent, property crimes, which have been previously identified to the Court. The government and the CHS proposed these ideas in an effort to hang on to something to justify their work.

For example, the government suggested the idea of firing rounds into the governor's cottage and sending the shell casings to her. Notably, the government's actors made the

10

first effort to find the address for the cottage (much like the agent in *McLernon*, where the court found entrapment as a matter of law when the agent "initiated the unlawful activity" by doing things like telling the defendant to keep his eyes open for possible drug connections). *See McLernon*, 746 F.2d at 1112. The defendants put so little thought into the idea of kidnapping the governor that, on September 13, 2020, when the FBI, the CHSs, and the defendants reached Elk Rapids in the late evening hours, they failed to find the governor's cottage because they had the wrong address. That incorrect address was provided by Special Agent Chambers at 10:14 p.m., as people were making their way from Cadillac to Elk Rapids. Special Agent Chambers provided a street number beginning with 7 and ending in 5, when the actual number began with 6 and ended in 5. *See* RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2416.

The government's "ride-along" itinerary was lost to this error. Apparently, the FBI and the CHSs had planned to drive their targets to the governor's cottage, so these targets could be captured on a pole cam (that had been installed in advance for the purpose of acquiring evidence). *Id.* None of the targets knew that the government intended to have them actually go to the cottage as a part of the ride-along or enter upon the governor's private property.

The government conceived and controlled every aspect of the alleged plot. On September 5, 2020, FBI Special Agent Jayson Chambers texted CHS Dan: "Mission is to kill the governor specifically:"

> 12:02 PM  Mission is to kill the governor specifically

RE. 366: Motion to Admit Statements, PageID # 2363. Three months after the government proposed kidnapping, and two months after the defendants' strident repudiation of the idea, and a month after the defendants' reiteration of their repudiation, the government's agents continued to push to shape a kidnapping plan, even trying to elevate it to murder.

With regard to "inducement" and "persuasion," the government's emotional manipulation abounded. Its approach was persistent *and* emotional from the outset. Agents and informants used ties related to friendship, being role models, and acting as father figures to develop trust and reliance in the defendants. *Cf. Jacobson*, 503 U.S. at 554 (O'Connor, J., dissenting). The CHSs used military veterans as informants, having these people pose as patriotic Americans concerned with preserving the principles enshrined in the U.S. Constitution.

Examples of these emotional tactics are everywhere in this case. On June 22, 2020, an undercover government employee-agent texted Adam Fox: "Hey brother. This is Mark using my gfs account. Elise was talking to your fiancé Amanda about getting more involved and Amanda suggested I contact you." RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2393. From the get-go, the government manufactured ties to loved ones (like Fox's fiancée) to gain acceptance and trust in the group. On July 11, 2020, CHS Dan reported, "Going good here. Just burnin [sic] rounds. Lending out MPX *making friends*." *Id.* (emphasis added).

On September 30, 2020, CHS Dan told Adam Fox that Dan could not afford food or medical care, citing an inability to purchase a pizza that cost less than $6. RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2406. While Dan received tens of

thousands of dollars for his cooperation with the government, sometimes in envelopes filled with cash, he fostered a bond with the defendants by claiming poverty and deprivation.

Dan used his untreated hernia as a device to gain sympathy with Fox and others. He claimed that the V.A. would not provide him proper treatment after his years of combat service in the Army. At the Luther FTX in September, Dan would tell Adam Fox that he was "waiting to die." Feeling the emotional pull of such a confession, Adam Fox told Dan that Dan needed to get surgical treatment as a priority over any of the "mission plans" Dan, in his CHS role, was pushing.

The government coordinated and brought unrelated participants (otherwise unknown to one another) together for meetings, where government actors would attempt to radicalize them. The meetings at Dublin and Peebles, Ohio, provide pellucid examples. As touched on above, a CHS first raised the specter of kidnapping at the Dublin meeting. At the "national" militia meeting in Peebles, this CHS attempted to motivate the targets into anger, with rousing speeches featuring Antifa, mask mandates, and similar topics. For example:

> And this right here, is why the fuck I'm telling you, its being allowed by DeWine here, fucking shit face Whitface or whatever her name is there, Blackface fucking there…why are we not returning the same measure that we are being given? Why are we giving quarter when no quarter is being given? Motherfuckers are going to throw shit at us, why aren't we throwing shit back? Why are we not fucking…This is why I am saying I agree with you 100%. This has to happen. I agree 100% with you guys. That shit has to fucking happen. Because if not, this shit right here, is going to continue to kill us in our back fucking yards.

RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2395.

Efforts like these, at "national" meetings, came from multiple CHSs and FBI agents, who coordinated their work within the meetings to create an atmosphere of crisis and

impending social unrest, all in an effort to motivate the targets to work with CHS Dan, to join him in his plot to kidnap Governor Whitmer. CHS Dan's (and his handlers') efforts to coordinate a group to initiate his "attack planning" did not bear fruit, however, despite the government's investment of time, money, and manipulation. On September 3, 2020, Adam Fox responded to CHS Dan's inquiry as to the CHS's proposal about "acting on" the governor at Elk Rapids; Fox replied:

> No. Let's keep that to us but throw out maybe taking the cap or gunning down Antifa or even say arresting the Governor or maybe even charging politicians and then we can float the idea of cops enforcing constitutional laws.

*Id.* at 2411-12. Continuing in this vein, on September 7, 2020, he sent this chat message to CHS Dan:

> Listen our main direction atm is prepare for possible bugout plan Ty wanted to do we need have that in line set up make sure everyone's perspective families are safe and then we have our assault.

*Id.* at 2412. In a telephone conversation on September 8, 2020, Fox said:

> Listen, this is what I want to do for now, right. Like I want to do everything we talked about bro, I really do. I want to fucking follow up on the order, but for now we've got to do ghosts on it right. We can't talk about it we can't—it's ixnay on the plan-eek. Well like even with all our guys like I would put her on the back burner in their minds okay?

*Id.* Later in the same call, Fox continued to repudiate Dan's plans:

> Because it's not until next fucking spring or fucking summer okay. We know we can't do that until then let's put that on the back burner for now let's focus on something more tangible for the coming future and everything. What we should do is go with Ty and his bug out plan.

*Id.*

Adam Fox's priority in September 2020 was to be prepared for what he believed would be a social crisis at the time of the election . . . and to have a plan to retreat to a

14

secure location, so that those involved, and their families, would have a place to go that would be safe and removed from any impending social unrest that could occur. (As an aside, while no conspiracy occurred, even if one might be tempted to consider whether a conspiracy existed between anyone and a CHS, the law has long been settled on the point that proof of an agreement between a defendant and a government agent/informer cannot support a conspiracy charge/conviction. *See, e.g.*, *United States v. Nunez*, 889 F.2d 1564, 1569 (6th Cir. 1989).)

Simply, the government pushed its agenda, ignoring the disapproval of the defendants and their lack of support for the government's suggestions. The government sponsored, coordinated, and produced "trainings," such as the one in Cambria, Wisconsin. A June 22, 2020 Facebook announcement, posted by a CHS, proclaimed an "FTX Cross Train Multi-State" on July 11 and 12 at a location on Forge Road in Cambria, Wisconsin. This event would:

> include medical…live fire…range…kill house/with breach and entry stack…close quarters weapons protection…if time knife and hand to hand…lunch and dinner sat. and breakfast/lunch sun will be provided we are a family/community-oriented org. kids are welcome we have a huge pool and activities for them and day care on site…guns up long live the republic…or you can come the night before and set up camp or drive down sat early your choice…bring what you want to run with if you don't have weapons or want to train and run on something else we do have plenty but you have to pay for whatever ammo you run through

*Id.* at 2393. The tone of this announcement established a family-oriented, friendly, community-based atmosphere that would build relationships between participants.

While the defendants could not afford to travel to this event, Dan made it easy for them: he paid for the entire trip. He drove and paid for gas and tolls. He paid for rooms and meals. At the direction of agents, he set out to get the defendants to this meeting—no

15

matter the hurdles—a meeting arranged by another CHS. These CHSs provided all of the "military-style" training for that weekend in Wisconsin (and elsewhere). None of the other participants had the qualifications or specialized knowledge to do so (a fact that held for the trainings in Munith and Luther, Michigan, as well).

These trainings helped the government succeed in its aim to make the defendants look up to and admire its informants. On September 12, 2021, as touched on above, Adam Fox exclaimed of CHS Dan's hernia: "We need to get Dan some medical attention. Yeah his intestines are fucking hanging out. He's one of the most level-headed and professional people I have ever met. He's a good teacher." *Id.* at 2413.

Beyond admiration for its CHSs, the government even bolstered Adam Fox's credibility with others, publicizing an announcement that Fox was the "commanding officer" of the Michigan 3%ers. This was a complete government fabrication, designed to further the government's plan.

No one questions that "[t]he function of law enforcement is the prevention of crime and the apprehension of criminals." *Sherman*, 356 U.S. at 372. "Manifestly, that function does not include the manufacturing of crime." *Id.* While criminal activity may require "stealth and strategy" to appear in an investigation as "necessary weapons in the arsenal of the police officer," a "different question" presents itself "when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." *Id.* In such circumstances, "stealth and strategy become as objectionable police methods as the coerced confession and the unlawful search"; "Congress

16

could not have intended that its statutes were to be enforced by tempting innocent persons into violations." *Id.*

Nor are the defendants asking the Court to rule based only on the government's overreaching here (though a defense on that basis *may* exist). *Cf. United States v. Tucker*, 28 F.3d 1420, 1422 (6th Cir. 1994) ("To this point, therefore, it was absolutely clear that a defendant, whose predisposition to commit a particular crime was proved beyond a reasonable doubt, could not defend against prosecution on the basis that the government induced him to commit that crime, no matter how strong the inducement or 'outrageous' the government's conduct."); *see also id.* at 1424-25, 1428 (noting jurisprudence that has left open the door to an "objective defense" while later rejecting it) *and id.* at 1429-30 (Martin, J., concurring) (finding viable an "objective" entrapment defense, one based solely on police conduct and due-process violations).[6]

Given the long list of statements the defense has already provided to the Court showing a lack of predisposition on the part of the defendants (and the separate filings that will address issues like the lack of relevance of the defendants' criminal histories), and the government's concentrated, assiduous efforts to initiate a scheme and offense, one can hardly say that this investigation did not involve *creative activity* on the part of the government. *See Sherman*, 356 U.S. at 372; *see also* RE. 366-2: Attachment to Motion to Admit Statements, PageID # 2373-2418. And it involved *repeated* efforts to overcome the

---

[6] Defendants believe the facts in this case support a finding of entrapment under either an objective or a subjective standard. The government's conduct here was egregious. But because the defendants can establish entrapment as a matter of law under the more "popular" standard, focused on a lack of predisposition being overcome by government actions, they focus on this aspect of the jurisprudence, while not relinquishing "objective" arguments, should the Court be disposed to view the case through that lens.

17

defendants' aversion to the government's plans. *Compare Sherman*, 356 U.S. at 373 (condemning government's multiple attempts to overcome the defendant's reluctance).

The Sixth Circuit has been clear: "no conviction may be had against one who was induced by the government to commit a crime unless the government proves, beyond a reasonable doubt, that the defendant was predisposed to commit that crime." *Tucker*, 28 F.3d at 1428. All the evidence here points to that lack of "*subjective* predisposition" at the center of the inquiry. *See id.*

The government cannot "disown" its informants' actions and their dogged efforts to overcome this lack of predisposition. In *Sherman*, interestingly, the Court commented that, "[a]lthough he was not being paid, [the informant] was an active government informer who had but recently been the instigator of at least two other prosecutions." *Id.* at 373-74. Here in this case, of course, as SA Impola has testified to in state court (and as brought up briefly above), CHS Dan, for one, earned over $50,000 for his work as an informant. *See, e.g.*, *Musico, et al.*, Nos. 2003171, 2003172, 2003173, Trans. of Probable-Cause Hrg., Vol. II, 3/4/21, at 17-18; *see also* Vol. I, 3/3/21, at 75-76 *and* Vol. III, 3/5/21, at 216.

Interestingly, courts willing to grant motions similar to this one have done so even when the defendant "was never ready to do the 'deal' today" but still suggested he would do it "tomorrow or at some later time." *See Odeesh*, 937 F. Supp. at 640 (granting a Rule 29 motion). And in *Odeesh*, where the court granted a Rule 29 motion on entrapment grounds, the personal and relationship aspects of the case matched many aspects of the case at hand: "the nature of the government's inducement was to prey on the defendant's sense of honor; he was unwilling to offend the agent, who he perceived to be rich, powerful and a potential

friend, and having repeatedly accepted the agent's hospitality, [the defendant] was ultimately unable to say 'no.'" *Id.*

## *Conclusion*

As in *Odeesh*, *Jacobson*, and *Sherman*, the defendants in this case exhibited a "patently clear absence of predisposition" to commit the criminal acts charged. *See Odeesh*, 937 F. Supp. at 641. The defendants thus ask the Court to find entrapment as a matter of law and dismiss the case. As the *Odeesh* court put it, "[i]f the defense of entrapment is to be meaningful in our jurisprudence, it must be available to" defendants such as these. *See id.*

Respectfully submitted,

Date: December 25, 2021          By:   /s/ Scott Graham
                                       Scott Graham
                                       Attorney for Defendant Franks

Date: December 25, 2021          By:   /s/ Christopher Gibbons
                                       Christopher Gibbons
                                       Attorney for Defendant Fox

Date: December 25, 2021          By:   /Joshua Blanchard
                                       Joshua A. Blanchard
                                       Attorney for Defendant Croft

Date: December 25, 2021          By:   /s/ Julia Kelly
                                       Julia Kelly
                                       Attorney for Defendant Harris

Date: December 25, 2021          By:   /s/ Michael Hills
                                       Michael Hills
                                       Attorney for Defendant Caserta

## **CERTIFICATE OF COMPLIANCE**

In accordance with Local Criminal Rule 47.1(b)(ii), counsel asserts that this brief contains 5,539 words, as counted by Microsoft Word, version 16.54.

Respectfully Submitted,

Dated: December 25, 2021

By: /s/ Scott Graham
SCOTT GRAHAM
Attorney for Defendant
Business Address:
1911 West Centre Avenue, Suite C
Portage, Michigan 49024
(269) 327.0585
sgraham@scottgrahampllc.com