| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | FOR THE WESTERN DISTRICT OF MICHIGAN |
| 3 | SOUTHERN DIVISION |
| 4 | UNITED STATES OF AMERICA, |
| 5 | Plaintiff,        No:  1:20cr183-1/2/4/5/6 |
| 6 | vs. |
| 7 | ADAM DEAN FOX,<br>BARRY GORDON CROFT, JR., |
| 8 | KALEB JAMES FRANKS,<br>DANIEL JOSEPH HARRIS and |
| 9 | BRANDON MICHAEL-RAY CASERTA, |
| 10 | Defendants. |
| 11 | |
| 12 | Before: |
| 13 | THE HONORABLE ROBERT J. JONKER |
| 14 | U.S. DISTRICT Judge<br>Grand Rapids, Michigan<br>Tuesday, January 18, 2022 |
| 15 | Motion Proceedings |
| 16 | APPEARANCES: |
| 17 | MR. ANDREW BIRGE, U.S. ATTORNEY<br>By:  MR. NILS R. KESSLER |
| 18 | MR. JONATHAN ROTH<br>The Law Building |
| 19 | 333 Ionia Avenue, NW<br>Grand Rapids, MI 49501-0208 |
| 20 | (616) 456-2404 |
| 21 | On behalf of the Plaintiff; |
| 22 | MR. CHRISTOPHER M. GIBBONS<br>MS. KAREN M. BOER |
| 23 | Dunn Gibbons PLC<br>125 Ottawa Avenue, NW, Suite 230 |
| 24 | Grand Rapids, MI 49503-2865<br>(616) 336-0003 |
| 25 | On behalf of Defendant Fox. |

```
 1              MR. JOSHUA ADAM BLANCHARD(Via Video)
                MS. MELISSA CORINNE FREEMAN
 2              Blanchard Law
                309 South Lafayette Street, Suite 208
 3              P.O. 938
                Greenville, MI 48838-1991
 4
                        On behalf of Defendant Croft, Jr.
 5
                MR. SCOTT G. GRAHAM
 6              Scott Graham PLLC
                1911 West Centre Avenue, Suite C
 7              Portage, MI 49024-5399
                (269) 327-0585
 8
                        On behalf of Defendant Franks.
 9
                MR. JULIA ANNE KELLY
10              Willey & Chamberlain LLP
                300 Ottawa Avenue NW Suite 810
11              Grand Rapids, MI 49503-2314
                (616) 458-2212
12
                        On behalf of Defendant Harris.
13
                MR. MICHAEL DARRAGH HILLS(Via Video)
14              Hills at Law PC
                425 South Westnedge Avenue
15              Kalamazoo, MI 49007-5051
                (269) 373-5430
16
                        On behalf of Defendant Caserta(Via Video)
17

18      REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

19

20

21

22

23

24

25
```

1    01/18/2022

2    (Proceedings, 11:00 a.m.)

3    LAW CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Robert J. Jonker, chief judge, presiding.

6    THE COURT:  Welcome everyone.  We are here on the case

7    of the United States against Fox and others, 1:20cr183.  We

8    have a number of motions that have been filed and fully briefed

9    with a particular focus on the parties' competing motions on

10   proposed hearsay or what the Government would consider hearsay,

11   the Defense would consider admissible, on a number of issues,

12   and some other related points in the evidentiary realm, and

13   that's really what I want to focus on today.

14        We have spent about an hour or so trying to get the

15   logistics lined up responding to COVID issues that have come up

16   and then two problems with our video system.  So I apologize to

17   everybody for those delays.  Why don't we start by getting

18   appearances of the people in the courtroom.  Then we'll

19   identify the people on video and make sure they can hear.  So

20   let's start with the courtroom presence.

21        MR. KESSLER:  Good morning, Your Honor.  Nils Kessler

22   and Jonathan Roth for the United States.

23        THE COURT:  Okay.  Thank you.

24        MR. GIBBONS:  Good morning, Your Honor.  Chris Gibbons

25   on behalf of Adam Fox, seated to my right, and also present

1    with me today is my law partner, Karen Boer.

2          THE COURT:  All right.  Thank you.

3          MR. GRAHAM:  Good morning, Your Honor.  Scott Graham

4    on behalf of Kaleb Franks, who is also present.

5          THE COURT:  All right.  Were they able to get the

6    other monitor working or you have a separate one that is

7    working?

8          MR. GRAHAM:  We have a separate one that's working.

9          THE COURT:  Okay.  Back row?

10          MS. FREEMAN:  Good afternoon, Your Honor.  Melissa

11    Freeman on behalf of Mr. Croft, who is seated next to me.

12          MS. KELLY:  Good afternoon, Your Honor.  Julia Kelly

13    on behalf of Daniel Harris.  He is present before the Court and

14    in custody.

15          THE COURT:  All right.  Thanks.  Let's go to the

16    people that we have on by video my understanding is, and let me

17    start with attorney Mike Hills.  Are you able to hear me,

18    Mr. Hills?

19          MR. HILLS:  Thank you, Your Honor.  I can.

20          THE COURT:  Okay.  We can only see you when you are

21    speaking, which includes now, but you'll just have to make sure

22    you let us know if for some reason you drop off, can't hear

23    anymore any way you can.  I think is somebody else in the

24    courtroom on your behalf?

25          MR. HILLS:  No.  We were going to do that if

1    Mr. Caserta was there, I believe, for communication purposes,

2    and we had that ready to go, but Mr. Caserta was not brought

3    down to Court.

4            THE COURT:  Okay.  Fair enough.  Let's do that second.

5    Mr. Caserta, who is still at Newaygo because of a COVID

6    exposure, are you able to hear us?

7            DEFENDANT CASERTA:  Yes, Your Honor.  I can hear you.

8    I was not exposed to COVID though.  I just didn't have

9    (inaudible) for COVID-19.

10           THE COURT:  Fair enough.  My understanding was that

11   because you had had a conversation with Mr. Hills, your

12   attorney, who did come back with a positive test, that the jail

13   was unwilling to bring you down.  Is that your understanding or

14   was there some other barrier from your perspective?

15           MR. HILLS:  Can I chime in, Your Honor, because I have

16   not been able to communicate with my client prior after I

17   tested positive?  I was up there on Sunday.  Spent three

18   and-a-half hours with my client after I tested negative, and

19   then yesterday I tested positive in the afternoon and in a

20   flurry of communication.  So my client is basically in the dark

21   to this I think.

22           THE COURT:  Okay.  All right.  Mr. Caserta, were you

23   able to hear your lawyer speaking a moment ago?

24           DEFENDANT CASERTA:  Yes, Your Honor.  I heard

25   everything.

1          THE COURT:  Okay.  Thank you.  And then I think we

2     also have Mr. Blanchard, whose colleague, Ms. Freeman, is here

3     in Court on behalf of Mr. Croft, but can you hear us all right,

4     Mr. Blanchard?

5          MR. BLANCHARD:  Yes.  I can hear you, Your Honor.

6          THE COURT:  Good morning.  Feeling all right?

7          MR. BLANCHARD:  Yeah.  I think the vaccine is doing

8     its job.

9          THE COURT:  All right.  Good.  Is there anybody else

10    on video that we haven't identified that needs to be

11    identified?  Okay.  So I think we have either in the courtroom

12    all of the Defendants or in Mr. Caserta's case his video

13    presence from Newaygo, and we have counsel for each of them

14    either here in Court or on video or in some cases both, and I

15    appreciate everybody's bearing with us to try to get the

16    logistics set up.  When we have this many people involved and

17    this much briefing it's hard to just put it over to another

18    day, and I do think that in this case the parties have done a

19    lot of briefing as well.

20          The point that I would like to get to today is to hear

21    the parties' summary on some key issues, some key evidentiary

22    issues.  I'll make a couple preliminary comments, and then the

23    main issues I want to hear about are the parties' positions on

24    the Defendants' own statements, which again, the Government

25    says are largely hearsay and excludable, or from the Defense

1   point of view admissible either as a non-hearsay purpose or on

2   some other grounds.

3          The other issue, a second related issue, is the

4   statements of the agents, and the third, closely related, the

5   statements of the confidential human sources that were made out

6   of court and that the Defense together has summarized at least

7   what they know so far on a spreadsheet attached to their

8   motion.  I certainly have a good feeling from the briefing on

9   all sides of where the parties stand on that, but I want to

10  give you a chance to highlight that, and then we'll talk as

11  well if there is time about predisposition evidence the

12  Government wants to admit under 404(b) if entrapment is in the

13  case, and the Defense desire to submit evidence regarding at

14  least some of the agents and bad conduct that they would like

15  to bring in front of the jury to attack the integrity of the

16  investigation.  There may be other issues that come up along

17  the way as well.

18         The other thing that nobody has really briefed that I

19  would like to hear perspectives on today, and it's really

20  interwoven with the evidentiary issues, is when and how the

21  parties envision the Court's ruling on whether entrapment is in

22  the case.  I know the Defense has pending motions to dismiss as

23  a matter of law under Rule 12.  We are closing it to briefing

24  on that, but what I've seen so far I'd have to say those are

25  stretch positions on the Defense part from my perspective.

1    I've looked at all the cases they have cited.  Not a single one

2    involved a dismissal as a matter of law under Rule 12.  There

3    were some statements about judgment as a matter of law on

4    entrapment, but Rule 12 as a mechanism, although perhaps not

5    automatically disqualifying, is a pretty hefty lift.  So

6    assuming that motion doesn't get granted, when does the call

7    get made from the perspective of the parties?

8         On the one hand we could simply assume it's in.

9    Everybody starts at ground zero with opening statements and

10   evidence on all of the issues of inducement and predisposition,

11   and maybe that's the way to go.  That's certainly the way the

12   parties have briefed things, but there is, unlike most

13   situations, at least some burden of production on the Defense

14   part to put entrapment at play, much as a self-defense

15   instruction would apply in analogous circumstances.  And

16   depending on what, if any, of the spreadsheet items come in, we

17   may not know for sure what the Defense has by way of evidence

18   to meet that burden until we see the Defense case, and in

19   particular whether we see any Defendant decide to take the

20   stand or whether the Defendants decide to stand on their right

21   not to testify.

22        So no predisposition myself about what to do with

23   that.  I think there are good reasons either to assume it's in

24   the case from the start, but there may also be reasons to

25   delay.  In particular it seems to me that much of the evidence

1    that's been identified on the spreadsheet by the Defense, if

2    it's admissible, could be bearing on not simply entrapment, the

3    inducement issue of entrapment, but also on whether there was a

4    conspiracy, and if so, whether this individual or that

5    individual joined.  So there is more overlap there.

6           In contrast, evidence of predisposition, particularly

7    things like what the Government wants to put in under 404(b),

8    there is no other purpose other than entrapment, and the

9    predisposition prong in particular for that.

10          So if we start at ground zero the Government is going

11   to get to bring that in in its case in chief to the extent it

12   is otherwise allowable in my view.  If not, it may never come

13   in.  So that's a question and a decision point that I have to

14   make and would like the parties' perspectives on.  And since I

15   don't have any perspective on that yet, that's really where I'd

16   like to start and then get into the more knitty gritty on the

17   evidentiary issues.  So let me start with the Government's

18   position on that.  And I know I am jumping you with it because

19   nobody had a chance to think about it.  Let me start with

20   either Mr. Kessler or Mr. Roth, whoever is speaking for the

21   Defendant.

22          MR. KESSLER:  Yes, Your Honor.  How would you --

23          THE COURT:  So stay close to a microphone, and that's

24   the key thing, and so if you want to pull that microphone on

25   the desk right close to you, just stay seated, that's fine.  If

1      you can't do that because you are so used to standing, just

2      come up to the podium.  Either way.  And make sure you speak as

3      clearly as possible.  I tend to mumble if I have a mask on so

4      when I am speaking I don't have myself masked.  I'll leave it

5      up to you how to decide.

6              MR. KESSLER:  If you can understand me better I'll

7      take it off.

8              THE COURT:  Thank you.  And I know Mr. Brandell will

9      have an easier time.  Go ahead.

10             MR. KESSLER:  All right.  Thank you, Your Honor.

11             I think we would probably -- the Government would go

12     with option No. 2, which would be not to assume that it all

13     comes in at ground zero.  I think the Defense, as the Court has

14     pointed out, it is an affirmative defense or at least they have

15     the burden of initial production to show that there was some

16     inducement.  I think they should have to do that first.  And I

17     agree with the Court.  It actually intertwines with one of the

18     motions we are talking about today, which is the 404(b) motion.

19     And I agree with the Defense to some extent that if this were

20     not an entrapment case some of the evidence that we are

21     proposing to get in would be inadmissible character evidence

22     normally under 404(b), but once they raise an entrapment

23     defense character becomes the critical issues.  That's the

24     Nelson case.  It's the No. 1 issue that we have to prove.  And

25     that would allow us to put the predisposition evidence in right

1   from the beginning. I don't think that's helpful to them

2   either to be honest with you. So I do think it's better that

3   nobody mention it in the opening statements. They have the

4   burden of the initial production, and if the Court determines

5   at some point that there has been enough of a showing, then

6   we'll start putting in our predisposition evidence, Your Honor.

7         THE COURT: All right. Let me go to the Defense side.

8   I don't know what order people have agreed on, if any, so I am

9   just going to go in the Defendant order unless there is a

10  reason to go otherwise, starting with Mr. Gibbons.

11        MR. GIBBONS: Thank you, Your Honor.

12        With respect to entrapment, the Defense has been

13  raised in pleadings to date. Recent authority in the Sixth

14  Circuit -- and I ran across this last night. I did not bring

15  the case. I don't have the cite, but I'd be happy to provide

16  it to the Court. There is an instance recently here within the

17  circuit where the trial court did find that entrapment had been

18  sufficiently raised in pretrial matters. That the trial

19  proceeded with a pretrial ruling that entrapment would be

20  allowed to be introduced as a Defense at trial and the

21  instruction would be given so that the parties did proceed with

22  that foreknowledge.

23        THE COURT: Do you have the name of the case?

24        MR. GIBBONS: I don't, Your Honor.

25        THE COURT: Okay. Go ahead.

1        MR. GIBBONS:  It is ultimately a question for the jury

2   whether or not entrapment is successful in the case as a

3   defense.  So I would say that.

4        We think -- and I would invite the Court to maybe

5   allow us to brief the issue.  I do have that case that I can't

6   recall the name of off the top of my head but I ran into last

7   night.  I was preparing for the out-of-court statements matter,

8   so I kind of put that to the side.  I do think that there

9   are -- is enough question with respect to entrapment on the

10  record as it exists.  I think we've made that showing already,

11  and we would be more than happy to provide the Court with more

12  specificity.

13        THE COURT:  All right.  What about the point that

14  Mr. Kessler raises and I guess that I suggest in my own

15  questions?  Do you really want it to be in from the start?  If

16  you get an evidentiary bridge to whatever is otherwise

17  admissible -- which I know we haven't talked about yet.  Not

18  just because inducement is in the case but because the

19  Government also has to prove a conspiracy and that these

20  individuals joined, why do you want to invite predisposition

21  from the opening statement?

22        MR. GIBBONS:  The defense in this case is, one, that

23  an agreement to kidnap Governor Whitmer was not reached between

24  the Defendants.  That's the first planning of the defense.

25  Alternatively, if the jury should decide that amongst

1    everything that is presented that it appears that an agreement

2    may have been made, then our backstop against that is

3    entrapment, Your Honor.

4         THE COURT:  All right.  Yeah.  Thank you.

5         MR. GIBBONS:  So I mean --

6         THE COURT:  Either way you would like it to come in?

7         MR. GIBBONS:  If you are going to bake the cake you

8    got to use flower, so predisposition I think necessarily comes

9    in whether we like it or not because I think that's just the

10   nature of our defense.

11        THE COURT:  All right.  Thank you.  Let me go to

12   Mr. Blanchard.  I know you are on.  Hopefully you are still on

13   the video.  Are you able to hear, and if so, can we get your

14   perspective?  Go ahead, Mr. Blanchard.

15        MR. BLANCHARD:  So you know, I guess my preference is

16   to have a ruling earlier so we know what the ground rules are.

17   I sort of think the Court can address this like in the pleading

18   and either -- and keep it on the Defendants of what we expect

19   to show or we can have a hearing outside of the presence of the

20   jury to see if we can convince you of what we are entitled to

21   in instruction on entrapment.  That may be a clear way to do it

22   so we know what the ground rules are going in.

23        It's a little bit tough when you have such a

24   substantial defense to hide that from the jury in opening, and

25   I am mostly concerned about what the trial looks like if the

1    Government is allowed to put on predisposition evidence but

2    that all comes in at rebuttal.  I don't know how fair it is to

3    make that in front of the jury when the Government comes in and

4    trots out here is some stuff these guys did 25 years ago.  They

5    are bad guys.  Convict them.  And I understand the argument

6    would be more nuanced, but that may be how it feels to a jury,

7    and so I would prefer to have it earlier at least and maybe the

8    Court can make that ruling in the course of trial --

9         THE COURT:  All right.

10        MR. BLANCHARD:  -- in the course of hearing this case,

11   but I am sort of thinking of, like, Enright --

12        THE COURT:  I think he said something like Enright in

13   the co-conspirator context.

14        MR. BLANCHARD:  Correct.

15        THE COURT:  All right.  Thank you.  The audio was

16   breaking up for us a bit, Mr. Blanchard.  I think we were able

17   to hear you, but if you have an ability to use the headphones

18   sometimes that helps, just for your information.

19        But let's go onto Mr. Graham then.

20        MR. GRAHAM:  Your Honor, it seems to me that the

21   parties would be in a better position to address the questions

22   you have posed after hearing your ruling on the motion to admit

23   the statements.  My gut would be to receive the ruling and then

24   brief for the Court, you know, a specific position regarding

25   that, because to be honest, I am just not certain right now.

1           THE COURT:  All right.  The briefing that at least I

2    read and understood of course identifies a whole bunch of

3    statements that the Defense wants to get in on a number of

4    grounds, but at least my reading of it was that maybe not

5    everyone but many of them, the Defense position would be it's

6    not just relevant to inducement but also to the first two

7    elements.  Namely, is there a conspiracy at all, and if so,

8    did -- did that or that Defendant join?

9           MR. GRAHAM:  I agree.

10          THE COURT:  I know you don't want to commit, and maybe

11   you can't, but if that's the case, and anything that's

12   otherwise admissible comes in, why would you want to invite

13   predisposition at the beginning of the case before you know for

14   sure if entrapment is in the case?

15          MR. GRAHAM:  Excuse me.  It seems to me that they are

16   so intertwined that it's going to be unavoidable not to have

17   all of the evidence come in.  That's at least my gut reaction.

18          THE COURT:  Okay.

19          MR. GRAHAM:  So whether I would want it or not I just

20   don't see how we're going to be able to cross examine

21   Government witnesses, talk about everything that happened,

22   without kind of opening the door to both.

23          THE COURT:  All right.  So if you are going to bake

24   the cake you need flower, to quote one of your co-counsel?

25          MR. GRAHAM:  Yes.

1        THE COURT:  Okay.  Ms. Kelly?

2        MS. KELLY:  Thank you, Your Honor.

3        And in listening to the Court's most recent

4   comments --

5        THE COURT:  You know what, that microphone isn't hot

6   for whatever reason.

7        MS. KELLY:  Is that better, Your Honor?

8        THE COURT:  As long as Mr. Brandell can hear you.  I

9   can hear you, so go ahead.

10        MS. KELLY:  Okay.  In thinking about the Court's most

11   recent statements, certainly from my perspective would not want

12   predisposition evidence to come in.  I have filed a brief on

13   that issue from the get-go.  I do believe, as I've stated in my

14   brief, I don't believe that evidence should come in anyway, but

15   the big if in the question is whether or not entrapment is used

16   as a Defense for Mr. Harris.  I would appreciate having that

17   answer sooner than later from this Court, knowing if the Court

18   is going to allow that defense from the get-go.  And I

19   certainly would also appreciate knowing the ruling on the

20   out-of-court statements and then having that opportunity to

21   brief it for this Court.

22        THE COURT:  All right.  And Mr. Hills?

23        MR. HILLS:  Frankly, I'd rather not have it come in at

24   the beginning, but the problem is, you know, from the beginning

25   the defense of the entrapment is going to proceed.  So then we

1    lose whatever momentum we have by not opening with it.  So that

2    causes a problem for me anyway.  Yeah.

3              THE COURT:  All right.

4              MR. HILLS:  I'd like to know before our opening, and I

5    think, Your Honor, it seems to me it's unavoidable with the

6    entrapment statements and the evidence coming in, but I sort of

7    would agree with Mr. Gibbons that we kind of need to know that

8    issue before going in the opening.

9              THE COURT:  All right.  Thank you.  And you have the

10   same issue sound wise that Mr. Blanchard had.  We were able --

11   at least I think I was able to understand you but with some

12   difficulty.  So if you have a headphone you might try it.  If

13   not, we'll just do the best we can.  Thank you.

14             All right.  Let's go to the issues that the parties

15   have briefed and that was really, I think, the launching point

16   for the hearing that we set up some time ago.  The Government,

17   of course, filed its motion to exclude what it talked about as

18   hearsay, the statements of the individual Defendants, and

19   that's really what I want to start with on the chart.  Not

20   going line by line.  I don't think we have time to do that.

21   Making sure I understand the Defense position, first of all,

22   on, you know, higher level theories, and I appreciate the

23   briefing the parties did on that.

24             I'll give you my incoming reactions after reading the

25   briefing.  And now talking about the statements of the

1    Defendants.  You know, the rule of completeness is something we

2    confront pretty routinely in lots of cases, and I don't really

3    see a rule of completeness basis that would be a basis for

4    admitting many, if any, of the Defendants' own statements.

5         This state of mind exception is something that isn't

6    as typically briefed, but I think at least in my view after

7    reading the spreadsheet a couple times, relatively few of the

8    Defendants' own statements would even arguably fall in that

9    bucket from my perspective.  I don't think you can stretch

10   state of mind to be broad enough to include statements of

11   preference, for example, or statements where the relevance of

12   what was said still depends on the underlying truthfulness or

13   context, and a lot of it seems to me falls within that kind of

14   a bucket.

15        The other related state of mind issue that comes up in

16   at least when I try to do the analysis is timing.  It's one

17   thing to have a statement about method or means, the ones that

18   come up about for a snatch and grab or something like that, but

19   I don't think that was one of the Defendants' own statements.

20   I think that was one of the other unindicted people, but there

21   were similar statements attributed to one or more of these

22   Defendants.

23        It's not so much, I think, within the state of mind

24   exception early in the process.  It's more that state of mind

25   when they are driving out on a reconnaissance or when they are

1    driving to what they thought was a meeting with Red, and

2    that's, I think, because state of mind has to be tightly tied

3    to the specific expression of intent or motive at the time, and

4    I don't see a lot on that chart that fits comfortably within

5    those ranges.

6           So my inclination is to think that most of those

7    statements are not going to come in as standalone statements.

8    Some of them might come in if a Defendant chooses to take the

9    stand.  There is impeachment or attack by the Government that

10   suggests they are making things up after the fact, and the

11   Defense wants to rehabilitate with an earlier statement that's

12   consistent, but as a matter of substantive evidence along the

13   way relatively few that fit the pattern in my mind.

14          So that's my ingoing or incoming point of view.  I

15   know everybody signed the brief.  I don't know if you have an

16   order.  Again, I would go in the order of the Defendants as

17   they are named unless there is a reason to do otherwise, and

18   we'll start with Mr. Gibbons.

19          MR. GIBBONS:  Thank you, Your Honor.

20          As the Court has indicated, there have been several

21   filings made with respect to the matters of out-of-court

22   statements, so I'll give you an overview of the things that --

23   from Mr. Fox's perspective that we're hopeful the Court agrees

24   with us.

25          As the Court has indicated, many of the statements

contained in the chart are not offered for the truth of the
matter asserted and therefore they would not qualify as hearsay
so I think those statements -- there are a fair number of those
indicated.

THE COURT:  Give me an example so that we can talk
concretely about something.

MR. GIBBONS:  There was a reference in the briefing to
Ty Garbin using a euphemism with respect to Adam Fox calling
him Captain Autism.

THE COURT:  Right.  But I mean, I don't even
understand the relevance of that unless it's tied to a broader
factual claim that none of us were willing to follow Fox
because he was a nut or an autistic operator, and that's part
of the problem when I see a statement like that.  To me there
is not much relevance unless it's tied to other statements
fundamentally underlying the truth of that statement that, in
fact, Mr. Fox was so autistic that he wasn't going to be able
to convince anybody to join in his scheme, if that's what it
was.  And you know, if a Defendant takes the stand and says
that subject to cross, that's one thing.  But just as a
standalone statement I don't see how you get that in in a way
that creates much relevance without the underlying truth of the
factual context.

MR. GIBBONS:  From my perspective, the circumstance in
which that statement was uttered involves the undercover CHS

1    Dan in a truck with Mr. Garbin.  The whole purpose is to prompt

2    a phone call between Mr. Garbin and Mr. Fox to put them

3    together in this attempt to build the conspiracy to kidnap

4    Governor Whitmer.  I think in the statement Mr. Garbin

5    expresses frustration with Mr. Fox because they are unable to

6    complete a simple phone call with Mr. Fox that doesn't take 10

7    minutes to get it straightened out and clarified.

8         Ty Garbin is -- has taken the position that he, in

9    fact, as the Government alleges, Mr. Fox had a plan to kidnap

10   the governor in a military style assault that would receive

11   fairly high level performance, skills, knowledge and planning.

12   It seems to me that Mr. Garbin's statement when he is

13   disparaging Mr. Fox is counter to the position he has taken

14   with respect to his plea and the Government's case.  I think

15   that is relevant.  My client doesn't have autism.  Doesn't

16   matter that he has autism or he doesn't have autism for the

17   purposes of this exercise.  What is important about this

18   exercise is it shows Mr. Garbin has little or no respect for

19   Mr. Fox.  Mr. Fox is allegedly his leader, and this seems to me

20   people don't follow people they don't respect.

21        THE COURT:  So pick a statement from somebody who is

22   actually on trial, not somebody who is presumably going to

23   testify and be subject to cross examination including on a

24   statement like that.

25        MR. GIBBONS:  Let me get my chart out, Your Honor.

1    THE COURT:  That's really what we are talking about

2    really, and there is so much about this case that gets, you

3    know, bent through the prism of high publicity and an alleged

4    target of the kidnapping plot that's high profile and a

5    politician, but the issues aren't all that different than we

6    confront in most conspiracy cases, and every Defendant wants to

7    put in their, you know, exculpatory statements, and the general

8    reaction is, you know, if you want to put that in, you take the

9    stand and testify.  You don't get to smuggle it in otherwise.

10   MR. GIBBONS:  I understand that, Your Honor.  I do

11   think, however, though, when the statements are not being

12   offered for the truth of the matter asserted and they are being

13   offered for --

14   THE COURT:  Give me an example of that, a statement

15   from a Defendant.

16   MR. GIBBONS:  An example could be, Your Honor, my

17   client, Adam Fox, made a statement about alternate plans and

18   saying he didn't want to pursue necessarily this kidnapping

19   that's being touted by the Government agent.

20   THE COURT:  But why does that have relevance -- let me

21   finish.  Why does it have relevance unless it's truthful that

22   he didn't want to do it?

23   MR. GIBBONS:  Because it goes to predisposition, and

24   it gets into the entrapment Defense, which is whose idea was

25   it?  Did the Defendant -- was he reluctant?  Was he overcome by

1    Government persuasion, et cetera?

2         THE COURT:  But all of that depends on the truth of

3    that statement, doesn't it?  I mean, he could have been making

4    the statement for play acting purposes.  He could have been

5    making the statement just because he didn't like the

6    particulars of a particular plan.  It seems to me truth is what

7    gives you the weight of the argument that followed, and if it's

8    truth dependent then I don't see how you get it in unless he

9    takes the stand and subjects himself to cross.

10         MR. GIBBONS:  I don't necessarily know that offering

11   it for the truth of the matter asserted is a default because it

12   can be offered that way, but if it is offered for another

13   legitimate purpose I think it can be saved, Your Honor.

14         THE COURT:  All right.

15         MR. GIBBONS:  Like, in this instance did Adam Fox

16   express reluctance?  That's a question that is contained within

17   the parameters of the predisposition jury instruction.  So I

18   think it does bear relevance.  Is it true?  Adam Fox is going

19   to say it's true.  The Government is going to say it's false.

20   He thought he was infiltrated by the feds and is just saying it

21   to look good.

22         So ultimately what I think it comes down to is this

23   something that Mr. Fox should be able to offer the jury in his

24   defense, allow the jury to do its job, which is to weigh the

25   credibility of the statement?  We are not necessarily offering

1    it for the truth of the matter asserted.  We are offering it

2    because it was said and it is relevant to the standards that

3    the jury is going to put -- be put to with respect to the

4    entrapment instruction.

5            THE COURT:  All right.  Anything else that you want to

6    address on the aspect of the motion involving prior Defendants'

7    statements, that's Defendants on trial?

8            MR. GIBBONS:  The only other thought on it, Your

9    Honor, and it's not necessarily raised in the pretrial filings,

10   is the idea that some of these statements might require some

11   foundation before a ruling is made in terms of an excited

12   utterance, present sense impression, where they were, what time

13   in the grand scheme of things, when was the statement made in

14   time as the Court has already indicated?  So when I was

15   breaking down what I thought I would present to the Court today

16   I looked at the Defendants' statements as being more

17   circumstantial in terms of a question, fact specific, a little

18   more fact dependent.  On the other side of the equation with

19   respect to anything said by Government agents be it CHSs,

20   special agents --

21           THE COURT:  We'll talk about that separately.

22           MR. GIBBONS:  -- I believe those to be more

23   categorical.

24           THE COURT:  Okay.  Fair enough.  And I don't mean to

25   cut you out, Ms. Freeman.  You are here and if you are speaking

on these issues of course it's fine, but otherwise I'd go to

Mr. Blanchard next for anything you want to add on the question

regarding proffered statements from the Defendants themselves.

MR. BLANCHARD:  Yes, Your Honor.  I think one example,

if you look on the chart, you know, there is a discussion there

where I think it comes in as an existent plan that --

THE COURT:  Let me ask you to go -- let me ask you to

go really slow because pieces of your words are not coming

through.  So we'll listen.  We'll just try to go

selfconsciously painfully slow and we'll hopefully be able to

hear you better.

MR. BLANCHARD:  I will try to do that.  I note that I

can hear Mr. Hills fine so I think it may be the audio

connection in the courtroom.

THE COURT:  Okay.

MR. BLANCHARD:  In any case, on number, I believe it

was 6 on the chart, there is a conversation that Mr. Croft is a

party to.

THE COURT:  But that's not his statement.  Let me cut

you off.  I want not conversations that somebody was party to

but the actual statements of the Defendant as examples.  That's

what I want to talk about now.

MR. BLANCHARD:  Sure.  So No. 10 I think is a

statement of Mr. Croft talking about his plan related to this

group.  When prompted by a CHS he states its then existing plan

1    is to rebuild and restore the country to what was intended.

2    And I think, you know, that's not much different if you were to

3    ask someone where you are headed?  I am on my way to Utah.

4    Leaving today for Utah.  I think that would be an existing

5    condition.

6         THE COURT:  Stay slow.  Stay slow.  Go ahead.

7         MR. BLANCHARD:  Sorry.  Slow is not my strong point.

8         So I think that, you know, that's the example of the

9    statement made by Mr. Croft that shows his then existing mental

10   condition that is inconsistent with the Government's theory.

11   And I think -- I understand the Court's view on rule of

12   completeness.  It is very narrow.  In a case like this I think

13   this could also come in under rule of completeness because we

14   have -- the Government intends to introduce other statements

15   that they are going to argue show he had a different than

16   existing intent, and the jury ought to be able to see all of

17   the evidence on Mr. Croft's intent.

18        THE COURT:  Okay.

19        MR. BLANCHARD:  So I think most of my issue as to

20   Mr. Croft where I don't believe are part of the admission or

21   otherwise, other people, I think most of the statements as to

22   Mr. Croft were that he is listing mental condition state of

23   mind type basis to come in.

24        THE COURT:  All right.  Thank you.

25        Mr. Graham?

1              MR. GRAHAM:  Your Honor, the example I would turn to

2      would be at page 17 of the chart, entries 68, 69, 70.

3              THE COURT:  What's the line item number?

4              MR. GRAHAM:  It is 68.

5              THE COURT:  Thank you.

6              MR. GRAHAM:  69 and 70.

7              THE COURT:  Okay.

8              MR. GRAHAM:  I don't want to cut in front of

9      Ms. Kelly, but the audio shows that there is a discussion going

10     on, and during the discussion Mr. Harris says things like, they

11     are shutting down discussion of kidnapping.  We shut it down

12     very quickly.  There is a question about kidnapping.  He says

13     no, shut up, we are not Frank, meaning Frank Butler.  And then

14     most specifically item 70, during the discussion with where

15     somebody is apparently talking about kidnapping, Mr. Harris

16     says, no snatch and grab.  I swear to God.  I'll leave out the

17     expletive.

18             It seems to me those -- and what I would suggest is

19     under Rule 803(1)(2)(3) that statement would be admissible to

20     show his state of mind and his present sense impression of what

21     was said.  So that would be the example that I would use as

22     well as anything else that might be said during a discussion

23     when a Defendant or someone else says something like, no, I

24     don't want to do what has been suggested.  I think that

25     evidence is relevant both as it relates to the establishment of

1    conspiracy and the -- and the question of predisposition as

2    well as other statements that might be a speaker might speak

3    negatively about a plan, and then others like Mr. Franks and

4    others would say that they agreed with those statements.  So

5    statements occurring -- I guess the bottom line for me,

6    statements occurring during a discussion about kidnapping, for

7    example, where someone says immediately, no, I am not involved

8    or no snatch and grab, I swear to God, 803(1)(2)(3) are the

9    basis for my position there as well as other statements.

10           THE COURT:  All right.  So if you read the state of

11   mind exception that broadly, you know, how do you draw the

12   limits?  I guess what's troubling to me on a statement like

13   that, and I think I summarized it in my opening comments, it

14   seems to me more like a statement of preference.  You know, it

15   would be a statement of intent to say, you know, I want to go

16   for ice cream and then somebody, oh, I hate chocolate.  And if

17   we are talking about a particular debate about means and

18   methods, I am not sure I understand how that fits within the

19   803 exception without basically allowing a lot of statements,

20   not just in a case like this but in other cases, to come in

21   that a Defendant would offer as exculpatory without the ability

22   of the other side to cross examine.

23           MR. GRAHAM:  And Your Honor, my response would be

24   this, and maybe we need a more detailed transcript, because in

25   light of your comment, it's a matter -- it's not a matter of

1    preference in my opinion if someone says we need to kidnap her.

2    We need to perform a snatch and grab, and then they are

3    immediately confronted with a specific statement saying, no, no

4    way, not talking about some other -- something else that might

5    be done, some other action or activity.  If they specifically

6    confront someone saying what you just suggested is -- I won't

7    do it, no snatch and grab, or something comparable, then my

8    response is I don't see that as a statement of preference.  I

9    see that as a statement, a state of mind saying, no, you say

10   this and I say no.

11          THE COURT:  Okay.  And the other aspect of the state

12   of mind exception that I was focusing on in my comments was

13   timing.  It's one thing to have that early in the process.

14   It's another thing to have it later in the process at the time

15   of the evening reconnaissance mission, for example, or the time

16   they go to meet Red and get arrested instead.  When you are

17   talking about relevance, I am not sure that the earlier

18   statements are relevant unless you have so much more context

19   that you basically are putting in all kinds of hearsay to

20   explain a statement that would normally be a hearsay

21   exculpatory statement.  I mean, I don't have all of the

22   transcripts.  As you say, you did a nice job trying to

23   summarize the context, but without the context, relevance is

24   pretty hard to understand, and if we have to have all the

25   context to demonstrate the relevance it seems to me we are

1      going to have trial by hearsay instead of trial by sworn

2      witnesses.

3               MR. GRAHAM:  Your Honor, my response to that would be

4      that if we did have the full transcript it might be a simple

5      half page exchange.  Someone says, we should kidnap, and then

6      one of the Defendants says, no.  I don't know that we need a

7      whole lot of extra information.  I understand the point that

8      you are making, but I think that may be one of the things that

9      the Court needs to evaluate is that very point of looking at

10     exactly what the exchange was and what the response was to see

11     if it's too large in terms of quantity to make sense or if it's

12     just a simple bang bang showing the state of mind of a

13     Defendant.  I just am not in a spot on these statements to do

14     that right now.

15               THE COURT:  All right.  Fair enough.

16               Ms. Kelly?

17               MS. KELLY:  Thank you, Your Honor.

18               And Mr. Graham did steal a lot of my statements that I

19     was going to talk about just to give the Court some examples.

20     I do think the statements as identified by Mr. Graham, 67

21     through 70, of my client were present sense impression.  I see

22     an example to differentiate for the Court in 65 also a

23     statement by Mr. Harris which I think may fall into that

24     preference category.  Mr. Harris is talking about, hey, let's

25     go see if we can go take over a CNN tower, when others may be

talking about a kidnapping plan.  That may be preference.  I
see those as different for 68, 69, 70, which he is specifically
confronted with a request about a snatch and grab, about a
kidnapping, and he continues to say no.

As the Court may have seen in other briefings that I
have filed, Mr. Harris was not invited on the Government
ride-along on September the 12th, so he had no opportunity to
talk about it that day.  He was not told about this Government
sponsored ride-along.  So what we have are the times that he
was confronted or the times that he was proposed an idea and he
immediately shoots it down.  He doesn't have time to recollect
or think about it, and it's continuous.  In the Government's
response to our motion they talk about, well, he is just saying
that because he was skeptical that the plan was going to work
or that he was afraid of infiltration of a law enforcement
officer and that's why he is making these statements and they
are not reliable in that fashion.  There is zero evidence that
Mr. Harris was changing his tune or changing a reaction to the
idea of kidnapping, and those statements as identified by
Mr. Graham show that that's his present sense impression each
and every time that he is confronted with this idea.

And again, as far as the timing, and I know the Court
has brought up the reconnaissance and then the driving down on
October the 7th to meet with Red.  What we provided to this
Court are statements of what Mr. Harris and others were told of

1    the purpose of going to meet Red was for tactical gear, and

2    that's been briefed.  It had nothing to do with explosives.  It

3    was to get tactical gear.  So of course there is not going to

4    be any conversations about a proposed kidnapping or conspiracy

5    to kidnap during that car ride because they think they are

6    going to get tactical gear and then they are going to BW3s

7    afterwards for beer and chicken wings.

8              So the timing portion I understand, but if Mr. Harris

9    is not involved in either of those timings, all we can look at

10   is his present sense impression as the summer progresses

11   starting from May the 14th when he is on the chat group saying

12   hopefully we never have to point our guns at any other American

13   because then our country is over, and that it's continuing

14   through the summer, and each time that should fall under the

15   category for present sense impression, but I understand the

16   Court's position about the difference between preference.  I

17   see these statements in particular as a reaction to a statement

18   without any kind of changing that idea.

19             THE COURT:  Okay.  Thank you.

20             Mr. Hills, I am going to ask you to use the same slow

21   pacing that Mr. Blanchard did and hopefully we will be able to

22   understand you and anything you'd like to add.

23             MR. HILLS:  Okay.  Yes.  If I am going too fast just

24   let me know.

25             I would pick up on what the Court indicated that --

1    the timing of this.  I would note that Mr. Caserta did not go

2    on the ride-along on September 12th that the Court mentioned.

3    There was another one on August 29th that my client did not go

4    along on.  The October 7th, when CHS Dan picked everyone up and

5    they were arrested, my client wasn't there either.

6           The statement that I would point the Court to, and

7    there aren't many in this, is item No. 26 on page 10 of our

8    chart.  The misstatement of my client comes on August 23rd at

9    the Lake Orion meeting is that it is of the subject -- I

10   believe it was in the complaint and it's definitely in the

11   superseding indictment I believe on item No. 7 in their

12   superseding indictment, and my client, I don't think you can --

13   putting this in context, there are several statements right

14   before and after my client's statement by CHS Dan, and CHS Dan

15   is vouching -- I know the Court doesn't want me to talk

16   necessarily about the CHSs right now or the agents, but that's

17   the context of this is right before it CHS Dan is vouching for

18   CHS Steve, and then he comes down and he talks about Adam Fox's

19   plan, which Adam Fox is not at this meeting.  But he says, Adam

20   Fox, so he is all about fucking killing her, right?  That's why

21   we want to go on a recon.  Recon this shit.  And my client

22   pushes right back on that statement.  Going right now.  If we

23   went, like, next week I don't know if that would be a good

24   idea.  I think we should wait a little bit because they, the

25   Government, are going to initiate massive aggression.

1          So my client is pushing back immediately on this.  And

2    CHS Dan comes right back, we are doing this stuff now.  So

3    that's the context of my client pushing back on it, and I know

4    that there are a couple other statements that are made in this

5    chart and it's the same thing of my client pushing back.

6          THE COURT:  So why isn't that a statement of

7    preference?  I am not sure I see the, you know, mental intent

8    unless you stretch mental intent to be, you know, anything that

9    is exculpatory.  I have the mental intent of being exculpated,

10   but it just seems like he is debating whether it was a good

11   tactic or not, and I am not sure that fits within a state of

12   mind exception.

13         MR. HILLS:  Well, I guess I would have to disagree

14   with the Court.  I think that's an 803 -- probably more an

15   803(3) as opposed to a present sense impression, but I would

16   think -- I would also argue present sense impression that, you

17   know, going and killing her right now is a dramatic event and

18   also under the then existing mental, emotional and physical

19   condition I believe is intent.  It's his intent not to go along

20   with CHS Dan's plan.

21         THE COURT:  All right.

22         MR. HILLS:  I am sorry.  Are you picking me up?

23         THE COURT:  I can.  Slower is better.

24         MR. HILLS:  Okay.  All right.  Sorry.

25         THE COURT:  All right.  Anything else on that?

1        MR. HILLS:  Not of my client's statements, Your Honor.

2        THE COURT:  Okay.  Let me go to Mr. Kessler and just

3   get the Government's overall position on admitting the

4   statements of the individual Defendants.

5        MR. KESSLER:  Yes, Your Honor.  I would just start

6   with I think the primary case which we cited, the McDaniel

7   case, which talks about the fact that the whole premise behind

8   the hearsay rule is that out-of-court declarations are not --

9   are not inherently trustworthy, and the real test for that is

10  cross examining, and it talks about it here as when somebody

11  tries to get their own self-exculpating statements in through

12  this rule.  It's not allowed specifically because it's an end

13  run around the test of cross examination.  We've heard some

14  talk here about the why that some of these statements would not

15  be offered for the truth of the matter asserted, and I think as

16  the Court has pointed out, they are not relevant then.

17       So just to take a typical example that everybody has

18  been using these guys sitting around the campfire, whatever, a

19  few months before the nighttime surveillance saying something

20  like, I'm not down for kidnapping.  So if they said that it has

21  no independent relevance.  The fact that it was said doesn't

22  mean anything other than the truth of the matter asserted.

23  They are asking the jury to believe that they didn't intend to

24  go kidnap her at the time.  So if it is for the truth of the

25  matter asserted then it's hearsay and it has to fall within a

1    specific exception. I think the main one we have been talking

2    about here is the state of mind or present sense impression.

3          I think present sense impression we can dismiss pretty

4    quickly. That's for something like I'm cold, oh, I am not

5    hungry, like, I'm not guilty or I don't intend to commit a

6    crime. That's a state of preference, a statement of

7    preference.

8          As far as state of mind, I think the case that's

9    really instructive on this is the Duka case, which I briefed.

10   It's almost exactly like our case here, and as the Duka case

11   pointed out, allowing people to import their own

12   self-exculpating statements in through the state of mind

13   exception would devour the hearsay rule. It just basically

14   completely does away with the ability to cross examine

15   somebody. In that case you had something very similar, where

16   you had a terrorism Defendant who said to somebody who turned

17   out to be an informant that he thought Jihad was impractical in

18   the United States at the time, which is pretty much like these

19   statements that we are hearing here. I don't want to snatch

20   and grab politicians or that that's a bad idea. You have the

21   same kind of circumstances going on where in Duka the person

22   was afraid that they may be talking to FBI informants, and in

23   this case you have the same thing. We would need to be able to

24   cross examine the declarant with facts like the fact that they

25   constantly changed encrypted apps specifically like Mr. Harris

1    told them to change to an encrypted app that would allow them

2    to delete everything if the FBI got a hold of it.  They

3    constantly talked about they got together to make sure they

4    showed each other's ID to make sure nobody was an FBI

5    informant.  The Defense tries to distinguish it in one of their

6    briefs by saying, no, it's different here because they actually

7    trusted the CHS Dan.  But I'd point out their own pleadings

8    belied that whole argument.  They actually plead in R383 at

9    page ID 2571, they have been raising recently that they are

10   claiming it's FBI misconduct.  That they told Dan that if you

11   are accused they should -- that he should deny that he is an

12   FBI informant and accuse somebody else because Dan was being

13   accused of being an FBI informant just like everybody else was.

14            Now, my point isn't to argue this whole thing here.

15   We would do that at trial.  My point is these are all things

16   that we would have to be able to cross examine the declarant

17   about for the jury to get that real sense as to whether that's

18   a reliable statement.  So any one of these Defendants, if they

19   could just smuggle in the statement which could not be tested

20   months before the nighttime surveillance that, oh, I wasn't

21   down for kidnapping, doesn't allow us to confront them with it

22   with the jury watching their demeanor like the Court has

23   pointed out is important.

24            When they answer questions like, well, isn't it true

25   that you thought you were talking to an FBI informant because

1    of these things or isn't it true that you changed your mind

2    four months later when we see you saying that you want to find

3    the Governor's house or you are sitting in front of her house

4    with a night vision scope at night?  They would need to see

5    that person's reaction to that to judge whether or not they --

6    their state of mind was truly what they are saying it was.

7            THE COURT:  All right.  So focus on the, I think it's

8    line 68 to 70, that a couple of lawyers have pointed out, the

9    Harris statements about, you know, no snatch and grab reaction

10   to, you know, they want to kidnap politicians, no, shut up, we

11   are no Frank Butler -- or Butler wasn't said out loud.  And I

12   hear what you are saying.  As I said in my opening comments, I

13   am inclined to agree with you that a lot of that depends on

14   truth, and if it does, it may not fit comfortably in any of

15   those exceptions, and yet, you know, the Defense theory, if I

16   understand it, it's multilayered, but one is there never was a

17   kidnapping plot other than in the minds of some Government

18   agents and their confidential human sources.  And you know, at

19   the end of the process maybe some of these people were in the

20   car or on the way to meet Red or were in the car for

21   surveillance or not.  But why isn't it germane and why isn't it

22   at least on the surface of things a statement of their

23   intention maybe to say when kidnapping is coming up, you know,

24   no, I mean, forcefully no.  Don't snatch and grab.  We are not

25   going to do that.  And how does the -- you are saying what, the

1    only way the jury gets to hear that is if Harris takes the

2    stand and gets subject to cross examination?

3         MR. KESSLER:  Yeah.  That's exactly what I'm saying,

4    Your Honor.  I don't disagree at all that it by itself is

5    germane, and I understand why they want to put it in.  So

6    that's not really the question.  We are not saying that it

7    doesn't prove anything about their intent.  What I'm saying is

8    that there is a way for them to do it, which is they have to

9    testify so that the jury can actually judge their credibility

10   as to whether they meant it as to whether they were saying it

11   for some other reason like because they were afraid about who

12   they were talking to or whether they changed their mind later.

13        THE COURT:  All right.  So I pushed the Defense on if

14   you stretch 803(3) too far on state of mind you get the

15   truckload of hearsay, and like the Duka case talks about on the

16   other hand, what does come in then?  803(3) is an exception

17   that allows statements that would otherwise be hearsay to come

18   in for truth in certain occasions, and why isn't that a

19   statement without prompting immediate reaction to they want to

20   kidnap politicians?  No snatch and grab.  Maybe you have an

21   explanation for it that removes the exculpatory nature of the

22   statement, but doesn't 803(3) provide that narrow pathway for

23   at least some statements?  In other words, how do I make 803(3)

24   real without reading it out of the code?

25        MR. KESSLER:  Well, I think it has -- it can't be

1    going to the ultimate issue, which is, you know, it's one thing

2    for somebody to say what typically comes in under state of

3    mind, something like somebody saying, you know, I'm headed to

4    California, as evidence that they later are going to go to

5    California.  But for somebody to basically go right to the

6    ultimate issue and basically say, I lacked the intent to commit

7    this crime, that's not really the kind of thing that is

8    supposed to get smuggled in here.  It's the ultimate issue.

9         THE COURT:  All right.  I mean, I guess, you know, I

10   don't see them saying that directly.  It is exculpatory in the

11   sense that it's an expression that this individual at least at

12   that time is expressing words about, you know, not being down

13   for it or not being in on what the Government says was the main

14   point of the conspiracy.  But I am not sure there is a case

15   that says, you know, just because it embraces an issue

16   ultimately for the jury that you don't get to put the statement

17   in under 803(3).

18        MR. KESSLER:  I do think the case that really

19   addresses it the best is Duka, where it says there has to be no

20   suspicious circumstance to suggest a motive to misrepresent

21   their state of mind, and I think the jury needs to hear them

22   answer those questions on cross examination that isn't it true

23   that you thought you were sitting around the campfire or

24   whatever with people who might be Government informants?

25        THE COURT:  All right.  Let me move onto the other big

issue in the briefing on this chart, the statements that are
attributed to informants or confidential human sources and the
statements that are attributed to the agents, and to me they
fall into somewhat of a different bucket.

I think the argument to admit statements from the FBI
agents as a party admission is a stronger one than the one to
admit the confidential human source statements as a party
admission.  I know Branom is a case that's out there for the
circumstance.  I know the Defense relies heavily on it.  It
certainly stands for the proposition that, you know, you can't
automatically exclude the statements of an informant, and that
in fact, at least in the case where the Government admitted
that was a possibility, you could bring it in.  But I have to
say informants all have their own agendas and strike me much
more as independent contractors, which in the civil side, you
know, who never come in under a party admission.  They have a
contractor.  They have their own agenda, and if they break it
they may be in breach of contract but they are not saying
something that can fairly bind a party to them.  They are
contracted.

On the other hand, an officer of a company for sure
acting within the scope of what the officer is doing for the
company would ordinarily have party admission, and you know,
the statements of an FBI agent who is running the
organization's approach to this, if it's otherwise relevant,

1   would seem to be something that the Government might be fairly

2   called to account for. And I think I'll start with Mr. Kessler

3   on this.

4           I know your position, if I understand the briefing

5   right, is really neither category should come in as a party

6   admission, not the statement of an FBI agent or confidential

7   human source, but then you also touched in some of your

8   briefing on, well, some of the statements aren't relevant

9   anyway, but let me start with you and on the agents themselves.

10  Why shouldn't the Government have to account for what, not

11  every FBI agent is saying, but what the FBI agent charged with

12  this investigation is actually saying in the course of the

13  investigation?

14          MR. KESSLER: Well, first off, it falls under the

15  hearsay -- the definition of hearsay because it is an

16  explanation of how of court declarant --

17          THE COURT: Unless it's a statement of a party

18  opponent. Then it's not hearsay.

19          MR. KESSLER: Right. And I am not necessarily arguing

20  with whether they are an agent at this point, but just to take

21  the FBI agents, and I know we are mixing up terms of art when

22  we talk about agency in terms of Rule 801, but that -- what the

23  agent says to the CHS really isn't relevant.

24          THE COURT: Well, that's a different question. I am

25  talking about the hearsay issue first. It may or may not be

relevant, but why shouldn't the Government be, you know,

obliged to account for it as a statement of the Government

that -- the plaintiff in the case?

MR. KESSLER:  I mean, I guess that's a different

question.  Even --

THE COURT:  That's the starting question.

MR. KESSLER:  Right.

THE COURT:  The Defense says under Branom it's not

just the FBI agent.  It's also the CHSs that come in.  The

Government is accountable because it's a party admission.  And

relevance is another question.  And I just want to tease out

whether you agree or disagree that the statements attributed to

the FBI agents here, you know, fall within the party admission

definition or not?

MR. KESSLER:  So speaking only of the FBI agents

themselves, I think our position would be that is a much closer

case to say that they are agents of the Government because they

actually work for the Government, but those statements aren't

relevant, and the reason I say they aren't relevant is what an

FBI agent says to a confidential informant in the field can't

by itself actually influence the Defendants to do anything.  I

mean, just to take a wild hypothetical, even if you assumed

that an FBI agent said to a CHS directly, I want you to entrap

Mr. Fox and I'll give you a million if you do it, that doesn't

actually induce Mr. Fox to do anything because he doesn't know

1    about that.  It's only what the informant actually said to him

2    or did with him that's relevant, not the actual motive of the

3    agent behind it, and the case on that is Makhlouta,

4    M-a-k-h-l-o-u-t-a.  It spells out pretty succinctly that the

5    FBI's agent's motivation is not relevant.  So yeah, to answer

6    your questions as to hearsay, Your Honor, I think that's a

7    closer call than with the informants.  You want me to hit the

8    informants now?

9         THE COURT:  Yes, please.

10         MR. KESSLER:  With the informants I think that's a

11   much bigger stretch to say they are an agent of the Government.

12   I understand what Branom says there, but a lot of the other

13   cases the Defendants have cited are cases that are totally

14   distinguishable where it's something like, for example, an AUSA

15   going into court --

16         THE COURT:  Stick with Branom, because after all, I am

17   bound by the Sixth Circuit and that's a Sixth Circuit case.

18         MR. KESSLER:  Right.  I think the big distinction with

19   Branom -- first, you are really talking about two particular

20   informants, and I think it's worth separating those two.  The

21   first one is CHS Dan, who is going to testify.  So I don't

22   think it's really an issue with Dan at all.  The ones that they

23   really want to get in are the ones for Steve Robeson, which

24   from their own pleadings we can see they are concerned that he

25   either won't show up to testify or he'll take the fifth or

1    something like that.  I think that one is totally

2    distinguishable from Branom because Branom premised the idea

3    that the informant's statements come in on Rule 801(d)(2)(D),

4    which says that the statements have to be within the scope of

5    the agency relationship.

6         Now, the Defendants have undermined that argument

7    themselves in a later pleading, ECF 399 at page ID 2785, and

8    that's not the only time they do it, where they throw out an

9    internal report saying that the FBI had commented that

10   Mr. Robeson was doing too much talking and not enough

11   listening, and he wasn't following their directions.  So it's

12   really impossible to bind the United States with the statements

13   of somebody like Steve Robeson who they actually were saying

14   internally wasn't following directions.  He wasn't doing his

15   master's bidding in any sense.

16        And as the Court is going to hear at the trial,

17   Mr. Robeson actually was on their side all along.  Actually

18   tried to get another informant to destroy evidence.  Tried to

19   tell them that the boogaloo was still on after the arrests had

20   gone down.  So clearly he wasn't on the United State's team.

21   He wasn't following the master's direction.  So there is no way

22   the United States should be held responsible for his statements

23   as the statements of a trusted agent.

24        THE COURT:  All right.  Thank you.  Let me go to the

25   Defense on these issues.  I'll just take the same order until

1    the Defense tells me they want to go in a different one and

2    we'll start with Mr. Gibbons.

3           MR. GIBBONS:  Thank you, Your Honor.

4           With respect to the agency theory with respect to the

5    CHSs I'll predominantly hit on that.

6           CHS Dan, CHS Steve were tightly controlled by the FBI

7    at all times.  I have in front of me, and we attached a summary

8    of Agent Chamber's supervisory work over CHS Dan.  I think we

9    attached that in a response brief to issues involving Agent

10   Chambers.  He had contact with CHS Dan daily, often times

11   multiple times a day as evidenced by the 1023s that he

12   submitted, and the 1023s he documents the statements of CHS

13   Dan.  He documents the statements that CHS Dan relates that he

14   has heard the Defendants make and others in detail.  So --

15          THE COURT:  Let me interrupt you a second.  I did

16   interrupt you, Mr. Kessler, to say you don't really object to

17   what is on the chart coming in as to CHS Dan if it comes in in

18   the context of his witness examination?

19          MR. KESSLER:  It would still have -- you know, the

20   regular hearsay rules are still going to apply.  They can ask

21   him about those things, but they can just sit here and say, for

22   example, during the Defense case in chief sit down with a tape

23   recorder and play all these things Dan said.  I think they can

24   ask him whether he said it, and then if he denies it they could

25   play it, for example, as a, you know, as a prior inconsistent

1    statement.

2         THE COURT:  Okay.  And going to you, Mr. Gibbons, if

3    you are allowed to use the statements attributed to CHS Dan in

4    cross examining his direct testimony, does that get you where

5    you want to be or are you asking for the ability to do sort of

6    a substantive presentation and reading of it in your own case

7    in chief as well?

8         MR. GIBBONS:  I think we would also want to use the

9    statements in and of themselves.

10        THE COURT:  Go ahead and finish what you were going to

11   say on CHS Dan.

12        MR. GIBBONS:  With respect to Dan, also, as Your Honor

13   is aware, there are screen shots that CHS Dan had contact with

14   his handling agent, Special Agent Impola and Chambers.

15   Mr. Kessler had indicated that the activities or the statements

16   of the agents that are handling the CHS are not relevant

17   because their mindset doesn't have anything to do with what may

18   have been going on with Adam Fox.  I wish that were true.

19        The agents were giving CHS Dan specific instruction

20   and giving him guidance and giving him things to do.  One of

21   those screen shots references the goals that the agents had for

22   CHS Dan in terms of prompting him to talk to Adam about making

23   maps, prompting him to contact Adam about the CHS, CHS Dan

24   seeking direction at one point on a screen shot asking Agent

25   Chambers how many ride-alongs do you want?  So -- and that's

1    responded to.  He is given specific direction.

2         And looking at the jury instruction for entrapment and

3    predisposition, the jury instruction clearly reflects the

4    Branom decision and the idea that the Government acts through

5    its agents.  In paragraph 4 of the entrapment instruction the

6    indication here to the jury would be that it is sometimes

7    necessary for an investigation -- during the investigation for

8    a Government agent to pretend to be a criminal and to offer to

9    take part in a crime.  And ultimately the question in a

10   entrapment case is whether the Government persuaded a Defendant

11   who is not already willing to commit a crime to go ahead and

12   commit it.  And the way that would happen, if it did happen, if

13   the Defense were successful, it would have to happen through

14   the CHSs.  They are the tools of the special agents.  They do

15   what they tell them to do.  In this case we do know that the

16   FBI was aware of CHS Steve and his activities as we have

17   indicated in our reply brief as of August 9th.  That's in the

18   middle of this investigation.  That August 9th phone call makes

19   it clear that CHS Steve and his activities were disclosed and

20   known to the FBI, and they were known to CHS Dan, who took

21   those activities forward and touted those to Adam Fox.

22        CHS Steve, as far as I am aware -- who is not

23   admonished or otherwise disciplined until after the conclusion

24   of the case when the Government decided, hey, CHS Steve creates

25   problems for us on an entrapment analysis.  We need to do

1    something about it.  CHS Steve started and invited people to

2    national militia meetings, this three percent patriot militia

3    that he told everyone he was the president of and the president

4    of the national board.  He invited them to Dublin and Peebles,

5    Ohio.  He invited the individuals in this case and others to

6    Cambria, Wisconsin, for training.  All of this is documented

7    extensively in FBI reporting, real time reporting.  All of

8    these events are recorded.

9              THE COURT:  What I really want to get focus on,

10   though, from all the parties, is not so much on what their

11   arguments are going to be about the case generally, but the

12   evidentiary issues of what does that mean, if anything, for the

13   statements of these individuals that can come in despite the

14   hearsay rule or under an exception or as a party admission.

15   That's really want what I want to get focused on.

16             MR. GIBBONS:  I think what it means to me from an

17   evidentiary standpoint, Your Honor, is Steve Robeson is an

18   agent of the Government and the agent is responsible for the

19   statements and his activity, and with respect to the

20   evidentiary rule at issue, 801(d)(2)(D), Steve Robeson

21   qualifies as an agent of the Government, and I think his

22   statements come in as standalone statements because they are

23   not hearsay as defined by the rule.

24             THE COURT:  Okay.  And Branom would be your lead case

25   on that I take it?

        MR. GIBBONS:  Branom would be the lead case on that,
Your Honor.  And if you take a step out of the circuit for sake
of argument and look at districts where the Branom case doesn't
necessarily carry the day, I think the distinction is in those
cases they have found and relied in saying that the CHS isn't
of a sufficient quality or quantity to establish agency.  They
call it a tenuous relationship, and I think the point of what I
have been trying to make sure is that the relationships between
the FBI handling agents and these CHSs is anything but tenuous.
These CHSs had an intimate knowledge of the broader case, their
position within the investigation and what their roles were.
They had specific defined roles.  So these aren't like most CHS
cases.  And most entrapment cases involve drugs, and the idea
is that the informant goes into a house and buys drugs for
somebody who he has already bought drugs from.  It's just not
complicated.  It's very simple.  And maybe that person says
something and their relationship with the Government at that
point is tenuous.  That's not the case here.  These people have
signed agreements.  They have been admonished.  They have
received significant cash payments from the Government for
their participation.  As they move along they get progress
payments apparently.  So all of that, I think, brings them
clearly within the agency ambit and allows for their statements
to be excluded definitively as hearsay and they should be
allowed to be admitted.

1          THE COURT:  All right.  Thank you.

2          Mr. Blanchard, we'll go to you next and ask you again

3     to speak slowly.

4          MR. BLANCHARD:  So I just have one point I want to

5     make and then I'll defer to Mr. Graham on the balance.  He did

6     the heavy lifting on the briefing here.

7          I think on the confidential human source issue, the

8     thing that makes the sources the agents in my view is the level

9     of monitoring, knowledge and the ratification of their actions

10    by the FBI agents.  By way of example, CHS Steve was working as

11    a confidential human source.  The way that Mr. Croft became

12    involved with this group is that with the knowledge of the FBI

13    CHS Steve went back east, invited my client on a vacation with

14    his family.  The FBI knew that he was going to do that, told

15    him not to do that, found out that he violated the rules, and

16    then kept using him.  I don't think the FBI can employ people

17    that they know are off the reservation, ratify that behavior,

18    and then step away from it by claiming they are unreliable and

19    not agents.

20         I think it would be a different animal if this was a

21    one off agent, went off the reservation, snitch went off the

22    reservation and did something.  But here the Government was

23    fully aware of all of their actions.  Continued to use them.

24    It paid to try to benefit from them and now they are trying to

25    run from their misconduct, and so I think because of how

1    closely they were involved and how closely the agents monitored

2    and what they knew, I think that weighs in favor of finding

3    that they are admissions of party opponents.  And I would defer

4    to Mr. Graham for the balance of the argument on the Headley

5    case because he did the heavy lifting on the briefing.

6              THE COURT:  All right.  Thank you, Mr. Blanchard.

7              We'll go to Mr. Graham next.

8              MR. GRAHAM:  Your Honor, you posed the question before

9    about what was the authority the Defense relied on.  Of course,

10   part of that is Branom, that decision affirmed by the Sixth

11   Circuit in Reid, and the other point I would make is when the

12   out of circuit courts talk about what happened in the Sixth

13   Circuit in Branom and Reid, they specifically recognize that

14   the Sixth Circuit has taken a different position than they

15   would take.  Okay.  Well, whether they are right or not, as the

16   Court has already noted, it's the Sixth Circuit law that

17   controls, so Branom, Reid, and then the distinction described

18   by the other courts.

19         The thing that I think makes the CHS issue here very

20   different than most is this.  We know how the control over --

21   we'll just use CHS Dan.  The control by the FBI was so great

22   over CHS Dan that on one occasion we know of they sat with him,

23   and as he talked with Adam Fox, and they whispered in his ear

24   what he should say to Fox.  That is an undisputed point.

25         So this is not a matter of someone being out in the

field such as CHS Dan doing what he thought maybe he should do
in coming back and reporting.  This is a matter of explicit
direction, and that's probably the best example.  How often --

THE COURT:  Do you really think it's that unusual?
I've had a lot of cases where agents have been in contact with
the person that they are using in the field to monitor a
conversation in real time.  Drug cases that happens a lot.

MR. GRAHAM:  Well, if, in fact, an agent in a drug
case sat with an informant and whispered, you know, set up a
kilo, set up 10 kilos, whatever it may be, the question --
whether that's unusual or not, the question is, then, is the
informant acting independently or not?  And I'd say whether
it's a drug case or not they are not acting independently.
They are acting at the explicit direction and so they become an
agent.

THE COURT:  All right.

MR. GRAHAM:  At page 18 of our briefing, in ECF 383,
we talk about some of the explicit direction that the FBI gives
CHS Dan telling him to, you know, put a brain to certain
things, who to make suggestions to.  And then, of course, you
have heard reference already to the question of the FBI coming
up with a plan to help Dan convince others he wasn't an
informant.  But again, that's page 18 of ECF 383 where we've
kind of already briefed the best that we can pull out of the
statements to date.  So in light of the specific facts of this

1     case apply to Branom, Reid and the contrary position, I think

2     the CHSs are, in fact, agents here.

3            On the question of relevance, well, that may be a

4     different matter, but as the Court has noted, if we don't get

5     over -- from the Defense perspective if we don't get over the

6     first hurdle the rest of it doesn't really matter.  So those

7     would be my thoughts.  Thank you.

8            THE COURT:  All right.  Let me cut back to Mr. Kessler

9     a minute on this point of control.  I don't know if anybody

10    else has seen the movie The Truman Show.  Anybody seen the

11    Truman show?  That's a Jim Carey movie, and you know, the basic

12    setup is Jim Carey's character, Truman, from his infancy on is

13    basically planted in this artificial community that the

14    producer, who is somewhat godlike in the role, is monitoring,

15    and Truman is growing up thinking he is having a normal life

16    but he is really just this character in a massive advertisement

17    campaign.  It's a fun movie that's an interesting movie as

18    well, and there is a section at the end where Truman is

19    starting to break out where you start to see the producer

20    speaking directly to, you know, the other actors unbeknownst to

21    Truman.  He just thinks they are friends, the other actors.

22    And it's almost literal word for word the producer is laying

23    out the words.  They are then spoken through this other actor

24    to Truman.

25            Why shouldn't the Government have to account for that

1    in this case if, in fact, the agent is telling the confidential

2    human source exactly what to say almost to script?  Why

3    wouldn't -- and I know the Truman show isn't authority, but why

4    isn't that a case where effectively it's a cat's paw?  The

5    Government agent may not be saying the words but he might as

6    well because the confidential human source is just repeating

7    them.

8              MR. KESSLER:  Well, let's split that into two things

9    then, Your Honor.

10             THE COURT:  All right.

11             MR. KESSLER:  So first, if you are talking about a

12   scenario where the agent is actually, as in your Truman show

13   example, taking a CHS, whispering in their ear and saying, now

14   say this to Truman or now say this to Mr. Fox, that's

15   different.  In that scenario I would say the -- you ask should

16   the Government not be able to be held to account for that?  My

17   argument would be that this isn't the way.  There is a way for

18   them to do that through the rules of evidence, which is call

19   that FBI agent as a Defense witness and ask them about it.  You

20   don't get it in by just playing hearsay that's not within any

21   exception.  That's just not the way to do it.  So there is a

22   way for them to get that in and inform the jury if they want

23   to.  They just have to do it the way that the rules

24   contemplate, which is call the witness and ask him the

25   questions.

1          THE COURT:  So which witness would you say the Defense

2     has to call here?

3          MR. KESSLER:  If they want to call, for example, an

4     FBI agent who handled one of the informants to say, isn't it

5     true that you said, you know, to CHS Steve or CHS Dan that you

6     should go do this?  They can call that agent to the stand and

7     ask them questions about it.

8          THE COURT:  All right.

9          MR. KESSLER:  Now, to take the other side of it, I

10    would point out that the vast majority of the things that they

11    have identified are nothing close to being somebody sitting

12    there whispering in the ear.  They are trying to say that CHS

13    Steve, for example, is not independent because they check up on

14    him from time to time.  But that's completely false, as is the

15    idea that he was removed as a Government informant because he

16    was problematic in an entrapment scenario.  He was removed as a

17    Government informant when the Government found out he was

18    playing both sides.  This whole idea that the Government should

19    be held accountable for his statements as an agent speaking on

20    behalf of the Government, they are saying it's because he had

21    intimate knowledge of the investigation.  That's entirely not

22    true because the reason he got caught is because he didn't know

23    who the other confidential informants were.

24          We have been talking about CHS Dan.  The reason CHS

25    Steve got caught was he told CHS Dan to destroy the evidence of

1    Kaleb Franks and Ty Garbin driving around with his friend Steve

2    Higgins in a car looking for the Governor's house.  So it's

3    kind of hard to imagine how he was acting within the scope of

4    his employment as a Government agent when he tells another

5    Government CHS, thinking he is also a bad guy, that he should

6    destroy evidence of the crime.

7        They also point out the fact that he received

8    admonishments from the FBI agents -- CHS Steve received

9    admonishments as a way of showing that he had control.  That

10   doesn't show he had control.  That shows that he wasn't under

11   their control because he was admonished not to commit any

12   crimes, and as the Court is aware, he was prosecuted for

13   continuing to buy and sell firearms when he was prohibited from

14   doing so as a felon, and he just pled guilty to a 10-year

15   federal felony because he deviated from their admonishments.

16       They also are trying to say that the Government

17   continually ratified everything that he did.  There was not

18   ratification.  That's prosecution.  When he committed a crime

19   he was removed as a Government informant and prosecuted.

20       So my whole point isn't so much -- I know they have

21   tried to apply this and say, well, you can't just disown this

22   guy because he was unreliable.  The point isn't that he was

23   unreliable.  The point is that Branom is explicitly

24   conditioned, calling somebody an agent of the Government for

25   the purposes of the party opponent exception requires, under

801(d)(1)(D), that they be acting within the scope of their employment.  Now, maybe somebody who has got an agent whispering in their ear, say this, who then repeats it, is acting within the scope of their employment, but somebody who is a maverick like this who is breaking the rules and doing whatever they want to do against Government instructions is not acting within the scope of their employment.  That's the distinction from Branom.

THE COURT:  All right.  Thank you.

And I'll go back to Mr. Graham in case you'd like to respond to that.

MR. GRAHAM:  I would, Your Honor.  A couple of points I would make.

THE COURT:  Go ahead.

MR. GRAHAM:  No. 1, I think if we are going to distinguish CHS Dan from CHS Steve, let me go back to Dan. Certainly we know was under closer control not only what I've already mentioned but receiving messages from agents such as the mission is to kill the Governor specifically.  I mean, explicit instructions that he would act on.

Shifting over to CHS Steve, I don't want to move to any other issues, but it bleeds over into a discovery issue. The Government talks about what it did in regard to CHS Steve. We, of course, have asked for his informant file so we can verify and investigate.  The Government has refused to turn

1    that over.  What they are saying about Steve may or may not be

2    accurate.  I don't know.  But certainly I don't think the Court

3    should make a ruling based upon things that are offered about

4    Steve without having us -- without giving us a chance to

5    verify.  So again, in regard to Dan, I think it's just clearly

6    as can be.

7            In regard to Steve, we are a little bit in the dark

8    because we haven't been given the information about him.  So

9    that would be my response.  Thank you.

10           THE COURT:  All right.

11           MR. KESSLER:  Your Honor --

12           THE COURT:  I know the Government wants to respond to

13   the screen shot point which is a potentially inflammatory item,

14   so go ahead.  We'll give the Government a chance to put its

15   position on that.

16           MR. KESSLER:  Yes, Your Honor.

17           And I'll keep it relatively brief here, but I think

18   that counsel is misleading the Court here and knows it because

19   we have raised this before and litigated it.  The Court has

20   seen that screen shot and they put it in there as evidence.  I

21   think they say that Special Agent Chambers is acting as a

22   Government agent directing the Government's plan, and they say

23   specifically directing a Government informant to kill the

24   Governor.  That's not just that it's inflammatory.  It is

25   completely misleading.  As we pointed out in a previous

1   briefing answering this they cut out the very next line which

2   shows that there is a question.  The question is, the mission

3   is to kidnap -- is to kill the Governor specifically?  And the

4   answer to that question is, that's on the first call, i.e., use

5   of drones or any means.  So this is Agent Chambers asking the

6   informant for information about what the mission is, and he's

7   answering the question.

8        And as further proof that they have this completely

9   wrong and they know it, that call -- I went back and checked

10  what that call was, and it says, that's on the first call use

11  of drones or any means.  I have it cued up and can play it for

12  the Court if you want.  But the confidential informant Dan is

13  talking to a person by the name of Frank Butler in another

14  state in Virginia about Frank Butler's plan to set fire to the

15  house of the Governor of Virginia.  They don't even have the

16  right Governor here, Your Honor.  So this whole idea that

17  Special Agent Chambers of the FBI is specifically directing

18  Dan -- CHS Dan to tell these Defendants to kill Governor

19  Whitmer is completely misleading.  They have the wrong state,

20  the wrong governor, the wrong informant.  None of this is

21  correct, Your Honor, and it's inflammatory.

22        THE COURT:  All right.  You want to respond for the

23  Defense, Mr. Graham?

24        MR. GRAHAM:  Your Honor, I think that it's clear that

25  the statement is sent from --

1          THE COURT:  You got to keep the microphone close.

2          MR. GRAHAM:  Sorry.  The statement is sent from

3   Chambers to Dan.  We can argue about what the meaning is at

4   trial.  My point was simply the level of control from Chambers

5   to Dan is very clear and it just adds to that.  That's all I

6   would say.

7          THE COURT:  All right.  Let's go to Ms. Kelly, then,

8   on the evidentiary issue.

9          MS. KELLY:  Thank you, Your Honor.  I'll join with my

10  colleagues and try to keep my comments brief.

11         I appreciate Mr. Kessler in giving this Court some

12  more background information about who my client was saying he

13  was distancing himself from and Frank Butler.

14         I agree that the agency is so tightly wound in this

15  case that the CHSs should be government actors and are

16  government actors.  The recording that Mr. Graham spoke of

17  that's on line item 57 that's on August the 9th where the group

18  has met as we've talked about, Mr. Harris makes certain

19  statements about no snatch and grab.  And this is an effort and

20  this is the reason why it's different than a typical drug case.

21         THE COURT:  Can you remind me of the line item again?

22  I'm sorry.

23         MS. KELLY:  Yes, 57.

24         THE COURT:  Thank you.  Go ahead.

25         MS. KELLY:  The agency -- that the group is divided.

1    That no one is joining a conspiracy, and the agents have CHS

2    Dan come in.  There is whispering.  They direct him what to say

3    to try to commit some sort of property crime involving a boat

4    because maybe Ty and Daniel Harris would be more apt to go

5    after a softer target.  Again, some sort of property crime

6    involving a boat.  So you have the agents whispering directly

7    to CHS Dan who is whispering it or saying it to Adam Fox, and

8    that's the conversation.  So that's the close agency that they

9    have with CHS Dan.

10            With respect to CHS Steve, for the Government to use

11   CHS Steve to pull people in to go to meetings or trainings or

12   different places and then to stand in front of this Court and

13   say, well, he wasn't on the U.S.'s team so we can't present

14   those statements, certainly CHS Steve was not playing both

15   sides on the Government's position for over a year.  I think he

16   was involved back in 2019, and to now say that he was not on

17   the U.S.'s team seems completely contradictory.

18            The other issues that CHS Steve has is the 501c(3), is

19   the fake, forged 501c(3) that they are going to offer to these

20   gentlemen here in order to have free money.  CHS Dan is also

21   repeating that to these gentlemen.  No one takes either of them

22   up on a free credit card to purchase ammunition, but the

23   Government knows that CHS Steve is using this fake, fraudulent

24   forged 501c(3), and that's continuing through CHS Dan.  So --

25   and the statements there are riddled with 501c(3) statements

1    throughout the Defense exhibits.  So I think it does show that

2    these are agents of the Government.  They shouldn't now not

3    be -- they shouldn't be able to now say, well, we don't like

4    some of the things he was doing even though we knew about it

5    and say he wasn't on the U.S. team so we can't be attributed to

6    these comments.

7         Thank you, Your Honor.

8         THE COURT:  Thank you.

9         Mr. Hills?

10        MR. HILLS:  I guess I'll just pick up on where

11   Ms. Kelly left off.  I think that CHS Dan and CHS Steve are

12   intertwined, and the Government, if they see that CHS Steve

13   didn't know that CHS Dan was kind of an undercover agent, well,

14   it certainly appears that CHS Dan knew about CHS Steve because

15   I'm again referring back to the August 23rd Lake Orion meeting

16   and the statement.

17        THE COURT:  Try to slow down a little.  Go ahead.

18        MR. HILLS:  On page 8, I believe it's line 23 or item

19   No. 23.  Leading up to this particular statement I'd like the

20   Court to look at, my client, Mr. Caserta, was pushing back on

21   this 501c(3) item, and I think -- I can't remember -- either

22   Harris or Franks was pushing back on that, and then CHS Dan

23   goes into vouching for CHS Dan and indicating that this 501 was

24   under a charity event.  It is a quick way to crowd fund.  And

25   I'll speak for Mr. Caserta who doesn't have any money.  Like,

they are here and he is talking about we can get $5,000 to
purchase NIVEs.  I can't remember what the acronym is, but
night vision equipment that's very expensive.  And I think this
is important to show that CHS Dan, who, I mean, had had daily
contact with that, multiple times a day contact with Special
Agent Chambers and Special Agent Impola, was in his own way
coordinating and vouching for CHS Steve who was promoting this
fake 501c(3) to get these guys enticed to purchase equipment
and to believe in CHS Steve, who CHS Steve hosted the Wisconsin
event wherein CHS Dan through I assume the FBI went to in a big
suburban, paid for the gas, drove my client and several others
all the way from Michigan to Cambria, Wisconsin, to have these
XTFs hosted by CHS Steve and come all the way back for -- I
can't speak to the others, but my client, who didn't have any
money, he couldn't really afford to do something like that.
And then CHS Steve comes back to Luther, the Luther event in
September, and is helping coordinate this ride-along to gather
up as many people as possible to go on this ride-along to see
the Governor's place.

          So they are deeply intwined, Your Honor, and involved
with their handlers.  And CHS Steve -- I wasn't the one that
briefed it, but he I think had at least four quarterly
check-ins from October 2019 to October 2020 with the FBI as a
CHS.  He was deeply intwined with the FBI.

          Thank you.

THE COURT:  All right.  Thank you.  We have been going about an hour and-a-half, and I'd like to shift to a different evidentiary issue that the parties have briefed.  The Government's motion was 369, your motion regarding what they call improper impeachment.  I think the Defendants all responded to that in one form or another, and it really covers, you know, multiple issues, including whether one of the agents, I think it was Impola, had another -- or Chambers rather, had another business he was trying to promote, things regarding a domestic violence charge, and I think eventual conviction involving Agent Trask and statements that one of them may have made to a public outlet about the politics of the past president.  I think there was one other issue as well, but what I'd like to do is get the parties to just summarize their positions on it.  At least as I read, it didn't seem like the Defense was necessarily planning to pursue the domestic violence issue regarding Trask, but I might be wrong about that, but let me go to, Mr. Kessler is the moving party on it, and get the Government's summary first.

MR. KESSLER:  Yes, Your Honor.  And that was basically a good summary of it.

It's really a two-part thing.  It's first we are moving under Rule 403 to exclude evidence that has a substantial danger of confusing the issues or misleading the jury.  As the Court said in the Roberts case, evidence that is

1    intended to convince the jury to acquit on an improper basis

2    should be excluded under 403, and I think that the Court has

3    seen it in all the pleadings here.  And what they are

4    apparently trying to put on at trial to try to convince a jury

5    not to weigh this case based on whether the Government has

6    proved the Defendants were conspiring to kidnap, but on the

7    alternative and improper basis of whether or not they approve

8    of the way the FBI has handled things.  And they have tried to

9    call the entire U.S. justice system into question through the

10   press, and this evidence would be imported into -- into the

11   trial for that same purpose, to try to convince the jury to

12   punish the FBI or punish the federal government rather than

13   weigh the facts.

14          I don't know if the Court is aware of it, but over the

15   weekend Mr. Croft in some recorded phone calls in calling into

16   a podcast admitted that that's what he was trying to do, and I

17   have those calls.  All three of them are less than 30 seconds

18   if the Court would indulge me, Your Honor.

19          THE COURT:  We've got enough materials in the briefing

20   already that I don't think we need to introduce something new.

21   If the parties feel like there needs to be more added, you

22   know, that's one thing, but Mr. Croft is just one of the

23   Defendants and the others are here, too.

24          MR. KESSLER:  I can very briefly summarize, then, Your

25   Honor.  Basically what he was saying is he is not going to get

1    a fair shake from this Court, from you.  I don't know if you've

2    seen it, Your Honor.  He's called for your impeachment.  And

3    it's been picked up by the Detroit News.  They have been

4    constantly alleging FBI misconduct which has been picked up by

5    BuzzFeed, particularly a reporter by the name of Jessica

6    Garrison.

7           THE COURT:  Let me cut you off.  I don't want either

8    side to spend a lot of time making statements that will get

9    picked up in the press.  I want to hear the evidentiary

10   argument.  It's, of course, a given that you can't, either

11   table, introduce things that would create unfair surprise when

12   measured against probative value.  On the other hand, it's not

13   unfair for a Defendant in a general way to challenge the

14   integrity of the investigation.  That's often a strategy.

15          So what about these particular evidentiary points, the

16   domestic violence conviction and charge for one of the agents,

17   statements about the past president, the other business,

18   Exeintel I think it is, and a alleged perjury?  Let's focus on

19   that's because that's really the decision point framed by the

20   motion.

21          MR. KESSLER:  Yes, Your Honor.

22          I'll take those one at a time, and maybe they weren't

23   going to raise it but the one, this Agent Trask.  There just

24   isn't any other -- and I challenge them to come up with any

25   relevant reason to put in the fact that Agent Trask pled guilty

recently to assaulting his wife. What that possibly would add
to the relevance under 401, how it possibly would make that
more likely that they did or did not conspire to kidnap the
Governor is beyond me.

As far as whether he had put out opinions on social
media that he didn't like former President Trump, again,
totally irrelevant. I mean, if it were true and that's the
allegation, how a particular agent felt about the president has
absolutely nothing to do with whether these Defendants here
were entrapped by anybody or whether they formed a meeting of
the minds to commit the crime. I don't think the Trask ones
make any sense at all but I'll leave it to them to address
those.

The other ones, they have repeatedly brought up the
issue of Special Agent Chambers having a side job as they call
it with this Exeintel company. There is -- there were no facts
on that other than the fact that he -- which is uncontested,
that he tried to start a business, didn't make any money off of
it, but they have raised all kinds of innuendo about which is
completely unsupported that somehow this entire investigation
was started up so that Agent Chambers could make money off of
it through predicting it through Exeintel. That may be their
theory, but it's -- again, and I think Judge Berens brought it
up in our last hearing. This is nothing but a BuzzFeed article
that they've been feeding to them to support that. There just

1     isn't any evidence of that and there isn't any reason to get

2     into that other than to try to inflame people on the jury.

3     Again, you know, FBI doesn't like Trump or this person was

4     breaking rules about not having a second job or trying to get a

5     second job or whatever, there just isn't any real evidence of

6     relevance there.

7         And I think the same thing goes for the allegations

8     they are making against Special Agent Impola.  That's even more

9     far afield because it has nothing to do with this case.  The

10    allegation that they keep throwing out there is that another

11    defense attorney in another case made some allegations of

12    perjury against Agent Impola, and there has been no resolution

13    of that in any forum.  The judge didn't make a finding that he

14    had perjured himself or anything like that.  So at most all

15    that gives them is the ability, if Agent Impola were to testify

16    as a Government witness, a good faith basis for asking him

17    about it.  That's all it is.

18        But what they want to do, again, as with Trask and as

19    with Agent Chambers, is just throw out these things to put it

20    together with this narrative that's been in the news, that for

21    example, the people who assaulted the Capitol were just

22    patriots who were being purged or that somehow they were on the

23    right side of the law here and appealing to the jury to make

24    their decision based on something like politics or what cable

25    news channel they watch as opposed to deciding it based on the

evidence they hear in court.  That's why it should be kept out

under 403, Your Honor.

The second part of the motion really is just related

in that we are asking the Court not to allow them to call any

of those agents -- if they have some other reason to call them,

that's fine, but not for the purpose of putting them up there

on the stand so that they can import this improper impeachment

material in.

THE COURT:  All right.  Thank you.

So let's go to the Defense position on these issues

and I'll go in the same order.  Mr. Gibbons?

MR. GIBBONS:  Thank you, Your Honor.

Mr. Blanchard framed the response so I will defer to

him in large part to speak to some of the details, but I would

just say offhand with respect to Agent Trask, I would agree

that the aggravated assault conviction misdemeanor, I don't

think that has anything to do with anything if Mr. Trask were

to be here at trial.  I do have an issue with respect to the

Facebook posts in that I don't know what they are.  So the

Government has filed a motion to preclude us from making

reference to Mr. Trask's Facebook posts.  The only reference I

have to Facebook posts were furnished to me by the U.S.

Attorney's Office who received an inquiry with a selection of

some posts, which I think the Court is aware.

Now, one of those posts, however, is not about Donald

1    Trump per se, but rather it's about poor white people with guns

2    in Lansing demonstrating for the right to get a haircut or

3    something along those lines.  Some of the Defendants in this

4    case were at that demonstration involving the Owosso barber.

5    That would be a direct reference to our clients I would think,

6    but I don't know that because I really just have TV 8's version

7    of what Mr. Trask's Facebook posts were.  It seems to me that

8    the Government -- I asked the Government for their agent's

9    Facebook posts and I was told that that would not be made

10   available to me.

11        MR. KESSLER:  For the record, we don't have that

12   either.  That's why we said we are not turning it over.  We are

13   not hiding it.

14        THE COURT:  Go ahead.

15        MR. GIBBONS:  I think there is some DOJ regulations or

16   suggestions of best practices that require that they should

17   step forward and secure that material if it's -- I mean --

18        MR. KESSLER:  That's wrong.

19        THE COURT:  Don't talk over each other.  All right.

20   You know, you have been respectful.  It's been a long sit.  I

21   get that.  Let people state their positions and we'll deal with

22   the response.  Go ahead, Mr. Gibbons.

23        MR. GIBBONS:  The U.S. Attorney is responsible for the

24   FBI agents, they are agents for the Government, for information

25   they know or don't know.  They have an independent obligation

1    to go find the information when it comes to their attention and

2    to avoid spoliation.  We have not been able to find a way to

3    recover Mr. Trask's Facebook posts.  So I am just making the

4    point, Your Honor, I don't know exactly what it is that they

5    wish to exclude so it's difficult for me to form an opinion on

6    it, and the same would be true with respect to --

7              THE COURT:  Well, I guess it would be difficult for

8    you to be a proponent of anything you don't have either, right?

9              MR. GIBBONS:  Yes, it would, Your Honor.

10             THE COURT:  Let's go onto something you do have a

11    chance to be a proponent of.

12             MR. GIBBONS:  And the same thing with Agent Impola.  I

13    don't know what happened in this complaint.  I do know it was

14    made.  That is somewhat, I guess, a matter of public record.

15    What the resolution is, I don't know.  It might be helpful if

16    the Government let us know.  I mean, obviously, if he were

17    cleared of any type of perjury charge internally,

18    administratively or otherwise, it would certainly put a short

19    end to the matter in my opinion, but I don't know.  The

20    Government has refused to tell us if there is an outcome and if

21    there was what that outcome is.

22             And with respect to Mr. Kessler's assertion that the

23    only thing that exists out there with regard to Exeintel is

24    unsubstantiated material contained in a BuzzFeed article, we

25    did attach a business proposal that Agent Chambers prepared and

1    sent in an attempt to money advertise or otherwise expand his

2    business opportunity.  We have -- Exhibit B is another e-mail

3    that we were able to obtain, and we have his resume as Exhibit

4    C.  And Exhibit D we do have a certificate of dissolution, and

5    I think as well as the articles of incorporation for the LLC I

6    think have already been provided to the Court.  So there is

7    something other than just a BuzzFeed article with respect to

8    these matters.

9         I will defer to Mr. Blanchard for the balance of my

10   presentation, but I did want to make a point that I think there

11   is a little more to this than just unsubstantiated allegations

12   found in a newspaper.

13        THE COURT:  All right.  So Mr. Blanchard, we'll give

14   you a chance to proceed, and I know speaking slow might be

15   tough if you are the main presenter on these issues, but do

16   your best because I want to make sure I can understand you.

17        MR. BLANCHARD:  I think I made it clear in my brief I

18   don't see how the aggravated assault, while very disturbing, is

19   relevant to what we are trying here.  The Facebook post for

20   Mr. Trask I don't know.  Like the Court said, it's hard to be a

21   proponent of something one doesn't have.  I have concerns about

22   whether there is a Brady and Giglio issue in the offing, but I

23   understand that is the Government's burden to comply with at

24   this point.

25        Regarding Agent Impola and the perjury allegations,

which the Government refers to in passing as unfounded, the
issue could be resolved if the Court would ask the Government
to tell us what happened today, because I think if he was
cleared it becomes a very easy issue for everyone.

In any case, I think the Rule 608(b) permits us to
inquire a specific consensus of conduct which would bear on
truthfulness, and I think a prior incidence of perjury would
bear on truthfulness.  Now, there are limitations, and we may
be stuck with the answers, and we may have to approach it
carefully, but I think there is good reason to believe that he
testified untruthfully in front of Judge Neff, and so I think
it's something that we can inquire into when he testifies
whether the Government calls him or we do.

Turning to Mr. Chambers, I think it's important to
understand from the beginning Mr. Chambers played a very large
role in this investigation.  He was the primary handler for the
Government's star witness.  He prepared 227 different reports
regarding the actions of their star CHS, and we learned that he
incorporated an LLC in New Mexico in 2019.  That LLC is
Exeintel.  And we learned through our own investigation that in
the late fall of 2019, Mr. Chambers was pitching this new
business to individuals in Michigan and elsewhere to provide
sort of a private side version of what he does for the FBI
intelligence services.  One of those contracts we attached as
an exhibit included a bid of up to six million dollars that he

1    hoped to earn from it.  And I think why it's important is

2    because at the same time he is sending around his resume to

3    these potential purchasers, and the resume touts the other

4    cases including the Musa case, which was pending in front of

5    this court at the time that Agent Chambers was touting his

6    involvement in it.  He was effectively telling people, I did

7    really good work on this case.  You should hire me.  This was a

8    case that had not yet been resolved.  I think very clearly in

9    Musa he had a financial motive to make sure Musa was convicted

10   because he was bragging about his involvement.

11           It is not much of a stretch to believe that if he did

12   this in November of 2019, he was still doing it in the spring

13   of 2020 when he targeted our clients.  That we don't have the

14   e-mails, that we haven't found the people he pitched to in

15   2020, doesn't make it inadmissible.

16           I think it's also very telling that the Government,

17   when they say he never made any money and he chose to get out

18   of this business, they didn't provide any timeline for that.

19   We then found out that Agent Chambers dissolved Exeintel in

20   October of 2021.  So he didn't move to get out of this business

21   until after it became public that he had this inappropriate

22   business.

23           There is no question that Agent Chambers created

24   Exeintel.  There is no question that Agent Chambers was trying

25   to make money in the months leading up to our clients being

1    targeted.  There is no question that he used his other

2    investigations to try and sell his services and make money, and

3    so I think it's reasonable to conclude that it happened here.

4    I don't think the Government can run from their agent's

5    misconduct by announcing that they no longer intend to call the

6    case agent because he has done bad things and they send out

7    agents to do interviews to try and clean it up.  I think we are

8    entitled to attack the good faith of the investigation.  I

9    think -- I think that's a legitimate defense, and we are

10   allowed to put in front of the jury evidence that would cause

11   them to consider the motives of the agents and whether they

12   were acting in bad faith when they went out and engaged

13   confidential sources to entrap our clients.

14           I also -- the Government makes a significant argument

15   about he never actually earned any money, and I don't think

16   that earning money matters at all.  That Agent Chambers was no

17   good at the business he was trying to start doesn't bear at all

18   to the expectancy.  He very clearly had an enormous expectancy

19   when he sent out a bid for six million dollars, and so I think

20   what his motivations were is what matters, not what he actually

21   got out of it, and so for those reasons I think that the

22   Chambers' issues are fair game.  I think the Impola issue is

23   fair game subject to the limitations that we may be stuck with

24   his answer, and I think the Trask DV charge probably doesn't

25   come in.

1       THE COURT:  All right.  Thank you.

2       We'll go to Mr. Graham.

3       MR. GRAHAM:  Nothing to add, Your Honor.

4       THE COURT:  All right.  Ms. Kelly?

5       MS. KELLY:  Thank you, Your Honor.

6       I will again join with my colleagues, and just to add

7       onto what Mr. Blanchard was saying, in scenario two on page 8

8       of 12 on our exhibits Mr. Chambers specifically is highlighting

9       that he is involved in terrorism related events, so he is

10      specifically highlighting that he is very good at investigating

11      terrorist related events.  And as Mr. Blanchard put in our

12      brief, it's his pervasive narrative that continues throughout

13      this case, throughout this investigation where he is pushing,

14      where he is trumping up things to make it look in a certain

15      way, which is not in an effort, the Defense believes, to sell

16      his business.  And to give the Court a very quick example,

17      Agent Chambers writes a 1023 on October the 4th, and he talks

18      about that some of the Defendants are going to bring money for

19      a good faith payment for explosives, knowing full well that

20      none of the Defendants were told that they were going to be

21      getting explosives, which is clear from the text messages, but

22      that good faith payment for explosives makes it into the

23      superseding indictment, paragraph 19, so it's taken directly

24      from Agent Chambers to the superseding indictment.

25      So this pervasive narrative that he is trying to sell

his company for terrorist related events makes it into a
superseding indictment, and again, I think it's in an effort to
sell his business.  He talks about -- as early as May 31st when
CHS Dan is complaining that these gentlemen here before this
Court are wasting his time because they are not wanting to
engage in any violent activity, Agent Chambers is talking
about, well, people feel safe because we are here.  So again,
he is talking in the community about this investigation, about
his involvement.  He is out there trying to sell his business
in an active manner, and with that I would defer to the Court.

THE COURT:  All right.  Mr. Hills?

MR. HILLS:  Thank you.

I would also concur in everybody's arguments here, and
I would also just -- I'd like to reemphasize that in the fall
of 2019, when Special Agent Chambers failed to obtain his
contract, he did not right then dissolve Exeintel and then this
case came about and fell in his lap, and again, he was the
special agent, along with Impola, involved with the main CHS
Dan throughout the whole thing.  And I would add another 1023
that Chambers authored that would have misled other people, and
that's regarding the Lake Orion meeting on 8-23, 2020, wherein
the Court can read the excerpts regarding what was said, and in
the 1023 that Chambers authored he indicates that the group
agreed with Adam Fox's position, which is not what happened.

So I would just add that, Your Honor, and thank you.

1          THE COURT:  All right.  Mr. Kessler, there was one

2    response you wanted to make that -- something that Mr. Gibbons

3    stated.  So I'll give you a chance to complete the record from

4    your perspective.

5          MR. KESSLER:  I was just disagreeing with their

6    reading some internal DOJ policy that we have to go out and

7    find information like that for them, and I apologize for

8    talking over Mr. Gibbons.

9          THE COURT:  All right.

10          MR. KESSLER:  If I could mention one thing, Your

11    Honor?  I do think that Ms. Kelly and Mr. Blanchard just made

12    my point when they focused extensively on this allegation that

13    Agent Chambers was trying to sell his business.  They are

14    making the point that they want to make this trial about Agent

15    Chambers.  And the fact that he might have looked for a job or

16    put some other case on his resume, those things aren't related

17    to whether or not and they don't make it any more or less

18    likely that these Defendants conspired to commit kidnapping,

19    which proves my point.  The only reason to import this into the

20    case is to mislead the jury, which is what's prohibited by 403,

21    Your Honor.

22          THE COURT:  All right.  Let me just check with

23    Mr. Brandell a minute.  We have been going two hours.  Are you

24    able to go maybe another 15 to 20 minutes?

25          COURT REPORTER:  Yes, Your Honor.

1          Let's go to the 404(b) issue, predisposition issue.

2     The Government has offered a number of things that it says it

3     would want to admit on predisposition if that's in the case

4     regarding Mr. Croft, Mr. Franks in particular, and some

5     criminal behavior in the case of Mr. Croft that goes back quite

6     a while and for which he was eventually pardoned.  And in the

7     case of Mr. Franks, which I think is the other situation, the

8     Defense position is, you know, that was while he was still an

9     addict and he recovered from that and it's not close enough to

10    the kinds of activity here to fit within the fair use or

11    predisposition.

12         So why don't we do this.  Mr. Kessler, if you want to

13    briefly summarize what you would intend to use on the 404(b) I

14    think it's your motion at 370, and then we'll get the Defense

15    response.  Again, both sides briefed it pretty thoroughly but

16    I'd like to get a summation at this point.

17         MR. KESSLER:  Yes, Your Honor.

18         Yeah.  Basically, as we brought up earlier, I would

19    concede that if we weren't talking about entrapment that these

20    things would probably not come in.  But if they are going to

21    put entrapment in as their Defense, then predisposition is

22    directly at issue, and as the Sixth Circuit held in the Nelson

23    case, the character or reputation of the Defendant is the No. 1

24    factor for the jury to consider as to whether the person was

25    predisposed.

Their own case that they cite repeatedly, the McLernon case, actually said the court was able to find entrapment as a matter of law in that case because the Government presented no evidence of the character or reputation of the Defendant, and that's what these things are, Your Honor.  I would have to disagree with the Defense in their briefing that these crimes are too dissimilar, because as the Court is well aware from all the pleadings and from the indictment, the plot was to break into the Governor's house and snatch her, and they were going to do it with guns.  They trained for it with guns.

Mr. Croft has a conviction for burglary.  I know he's raised issues about how that might be different, but the issue isn't that it's like a typical 404(b) case where we are just trying to say, well, the guy did a crime just like this before so he's likely to do it again.  Basically, when he says he's being entrapped he's basically saying, I am the kind of innocent person who would not have been misled into doing something like this, but in fact, it is similar.  Burglary and going into somebody's home is exactly what he is being charged with intending to do in this case.

Same thing with his prior conviction for shooting at somebody, the felony firearms conviction.  Again, he quibbles about whether the person deserved to be shot at, which he is probably going to argue Governor Whitmer deserved to be kidnapped, but he quibbles about that and whether it was over

1    quarters or whether it was over his sister or whatever it was.

2    The issue isn't whether the crime was exactly similar.  It's is

3    he the kind of guy who would shoot at somebody?  And he pled

4    guilty to doing that in the past.  He did shoot at somebody,

5    and that's uncontested.  So he is going to sit here and say, I

6    am the kind of innocent guy who would never be involved in

7    something like this but for the Government pushing it so hard.

8    That's just not true, and we are entitled to push back on it.

9         THE COURT:  So the timing is the other obvious issue.

10   It's so long ago, and it was at a time when he was, I think, a

11   teenager barely out of his teens if he was, and he is now a

12   much older man and he doesn't have anything that the Government

13   is proffering of like kind between then.  In fact, he's got a

14   pardon.  And I don't think that's automatically disqualified

15   for 404(b), but that's pretty long even when you look at some

16   of your better cases.

17        MR. KESSLER:  I acknowledge that, Your Honor, with

18   Mr. Croft it is a long time ago and think that should factor

19   into the Court's decision.  I don't deny that.

20        As to Mr. Franks, it's a little different.

21        THE COURT:  Any more you want to say on Croft?

22   Otherwise, let's go to Franks.

23        MR. KESSLER:  Just as to the pardon, Your Honor.  The

24   fact that he was pardoned I think shouldn't make any

25   difference.  People routinely use 404(b) evidence of crimes

1    where people have been acquitted, and this is much more

2    telling.  It's something where he was convicted.  He pled

3    guilty, and the Governor of Delaware can't waive a magic wand

4    and change his character.  They might be able to change whether

5    his civil rights can be restored, but they can't change the

6    evidence of character.

7              THE COURT:  All right.  On Franks?

8              MR. KESSLER:  On Mr. Franks, Your Honor, again, it is

9    similar.  He's got two things that we would want to introduce.

10   First, there is the home invasion, which is, again, is similar

11   to what they have alleged to be accused of being -- wanting to

12   do in this case.  But then there is also the very recent, as a

13   matter of fact, it was going on at the same time as this, crime

14   of manufacturing illegal weapons to sell to a known drug

15   dealer.  And I know one of the Defendants, I believe it was

16   Mr. Harris, took issue with whether the guns were actually made

17   or whether it was a drug dealer, but I attached to our briefing

18   a transcript of them talking about it, and Mr. Franks and

19   Mr. Harris specifically talked about that the intent was to

20   sell the guns to a drug dealer that Mr. Franks had done time

21   with because they knew that he couldn't possess a weapon.  He

22   couldn't buy one legally, and that they could charge him three

23   times as much.  I think the willingness to do that -- and as

24   you can tell from the transcript they actually went to the

25   person's house.  Very similar to what they did in this case,

1    where they did a surveillance to scope out the route that they

2    would take.  You can see it from the transcript.  They did the

3    same thing.  And actually, Ty Garbin was with them and will

4    testify about it, that they went to the house of the felon that

5    they were going to sell the gun to and they looked for the ways

6    to go in there and the way -- the place to park and which

7    direction to park and how they could get away quickly if things

8    went sideways.

9           And those guns were manufactured.  Two of them were

10   finished and were seized from Ty Garbin's house.  He will

11   testify about that.  One of them was not finished because it

12   was actually given to CHS Dan who was instructed not to finish

13   it and give them an AR-15.  So they did everything that they

14   were accused of there.  I will be able to establish that for

15   Rule 104 purposes no problem, Your Honor.  I think that is

16   highly probative of whether or not he is the kind of person who

17   has the character who would do something like this, was

18   predisposed.

19          THE COURT:  All right.  And those were the three main

20   items, right?

21          MR. KESSLER:  Yes, Your Honor.

22          THE COURT:  The Croft criminal history, the Franks

23   criminal history, and then the Franks and Harris guns?

24          MR. KESSLER:  Yes, Your Honor.

25          THE COURT:  Let's go over to the Defense.  Your

1    client, Mr. Gibbons, isn't directly implicated in this.  Do you

2    have any position you want to articulate?

3              MR. GIBBONS:  I take no position, Your Honor.  It does

4    not affect my client.

5              THE COURT:  Mr. Blanchard?

6              MR. BLANCHARD:  Calling the first conviction of

7    burglary I would say is a gross mischaracterization of what

8    actually happened.  From the police reports it appears that

9    Mr. Croft's involvement was driving some folks who stole some

10   quarters from a laundry machine.  That's not similar in any way

11   to the allegations here, and it's something that is alleged to

12   have been done in --

13             THE COURT:  Let me ask you to get back on the slow

14   wagon.  I know it's hard, but we were hearing you talk and I

15   think you were mentioning age as opposed to -- not being the

16   same kind of activity stealing quarters from a coin laundry in

17   a building, and then when he was 19, if I heard you correctly.

18   But just clarify that so we have a clean record if you would.

19             MR. BLANCHARD:  Yes.  So it's not sufficiently similar

20   because the conduct is just wildly different.  Obviously, this

21   is stuff that is -- that occurred when he was around the age of

22   19 and a few years later on the other event, and it's not

23   temporally close enough to be helpful to the jury.

24             I also think the Court needs to consider the fact that

25   the pardon is some evidence that he has been rehabilitated

1     during intervening times.  I don't think that the pardon

2     probably necessarily precludes abuse of evidence in a case like

3     this, but I think the passage of time and the pardon is some

4     evidence that it shouldn't be used.

5          Similarly, on the other event which the Government

6     called a drive-by shooting, it was actually Mr. Croft parked in

7     front of his girlfriend's house and his girlfriend's brother

8     came out to confront him.  During an argument he fired a round

9     in the direction of that person.  That is not anything like the

10    allegation here.  It's not a drive-by shooting.  It's 25 years

11    ago, and there is an intervening pardon.  For those reasons I

12    don't think that either of those events should come in with an

13    attempt to show predisposition.

14          THE COURT:  All right.  Thank you.

15          Mr. Graham?

16          MR. GRAHAM:  Your Honor, in regard to -- obviously

17    there are two instances involved here.  In regard to the first

18    one relating to the home invasion, the crime is that, in fact,

19    Mr. Franks, when he was a drug addict, when he was actively a

20    drug addict broke into his step-uncle's house and took his

21    piggy bank or his change jar or whatever it was.  That's the

22    crime.  He also does not have a conviction at this time for the

23    crime because the case was dismissed under the Holmes Youthful

24    Trainee Act, demonstrating that he showed to the Court that, in

25    fact, he deserved to have the charge dismissed.

1          Now, Your Honor, I would note that Mr. Franks, at the

2     time of his arrest, was working for the same court as a

3     counselor, if you will, for people who had drug cases.  So his

4     rehabilitation from what led to the piggy bank robbery or

5     burglary is we think complete at this point.  It doesn't prove

6     anything, and it's -- there is no evidence whatsoever that

7     Mr. Franks was not completely clean of any drug use.  Again, he

8     worked for a hospital as a rehab assistant and counselor.  He

9     worked for the Court.  So the thing that triggered what

10    happened in 2013, even though that charge was dismissed,

11    ultimately is no longer the case.

12         In regard to what is alleged to be a ghost gun or a

13    partially manufactured firearm, again, I don't see how that is

14    probative at all of the alleged conspiracy.  If the Government

15    wants to prove that there was a plan to manufacture and sell a

16    partially manufactured firearm that's turned into a completed

17    firearm, all that does is -- all that does is throw mud at

18    Mr. Franks without proving anything, and as a result we think

19    that neither instance should be used.  If, in fact, the Court

20    gave any consideration to allowing the Government to introduce

21    the partially manufactured firearm incident, I ask the Court to

22    rule that there be no reference to the fact that Mr. Franks

23    knew the alleged buyer from having, as the Government says,

24    done time.  So that's a small little kind of segment of that,

25    but that would be my request of the Court.  Thank you.

1          THE COURT:  All right.  Let's go to Ms. Kelly.  Again,

2     your client is implicated at least on the ghost gun piece of

3     it.

4          MS. KELLY:  Yes, Your Honor.

5          I was provided by the government that if Mr. Harris

6     does claim entrapment it would be introducing two items, two

7     other acts.  One is a sawing off the barrel of his 12-gauge

8     shotgun as well as the personally manufactured firearms or

9     ghost guns.

10          I have briefed the issue with respect to the sawing

11     off the shotgun.  The Government attached a photograph, and --

12     between Mr. Harris and Mr. Garbin.  The reports from the FBI

13     say that the shotgun was not seized.  It was shortened to an

14     unknown length.  So for this Court the first step is to see if

15     there is sufficient evidence that a jury can conclude that the

16     other act actually happened and that Mr. Harris was the one

17     that committed it.  I have not seen any other report that it

18     was seized as proffered in the Government's position.  I am

19     still working through discovery, so it may be in there.  I am

20     not sure.

21          With -- even if this Court finds that there is

22     sufficient evidence for the sawing off or shortening a barrel

23     on a shotgun, certainly that's not substantially similar to

24     trying to kidnap the Governor.  This incident allegedly took

25     place on August the 14th, 2020.  There is no evidence or no

proffer from the Government that Mr. Harris was going to use
this gun in any kind of conspiracy to kidnap the governor.
There is no evidence that he brought that shotgun to Luther,
which is the property here in the Western District of Michigan.
So I don't think that that evidence should come in for
propensity.

With respect to the ghost guns or the personally
manufactured firearms, I join with Mr. Graham that those
incidents are not substantially similar.  It appears that the
Government wants to use that evidence to corroborate other
expected testimony that Mr. Harris was left behind on the night
sponsored drive by the Government by happenstance.  So because
he went on a drive a week after September the 12th, and was
looking at someone's house, they want to use that to show that
he was left behind by mistake, not because he opposed looking
at her house.  So I think that is an improper purpose under
this -- under 404 and 403, not substantially similar incidents.
We would ask the Court to exclude them.

THE COURT:  All right.  Let me just ask you, and I
should have asked Mr. Graham this as well on the similarity
issue.  I know Mr. Blanchard mentioned it, too, but
particularly on the ghost gun issue or even the sawed off
barrel of a shotgun, assuming there is enough evidence under
104 to get those in, you know, 404(b), we are also used to
dealing with similarity.  Was it close enough, which is

1    typically key?  And it's partly what is involved here, but if

2    we are talking about the predisposition for entrapment, you

3    know, in the words of the Sixth Circuit, quote, the key

4    question in determining predisposition is whether law

5    enforcement planted a criminal design in the mind of an

6    otherwise law-abiding citizen or whether the Government merely

7    provided an opportunity to commit a crime to one who was

8    already predisposed to do so, end quote.  And you can find

9    other similar language.  And I guess what I wonder, if

10   predisposition is in the case, whether there is evidence of

11   other criminal activity almost of any kind, but certainly of a

12   kind that would involve firearms would seem to be fair bearing

13   on that issue.  How do you -- I mean, even if it isn't exactly

14   the same thing as kidnapping.  Do you want to respond to that?

15          MS. KELLY:  Your Honor, I believe the case law, as

16   cited in my brief, it doesn't have to be exactly, but it has to

17   be substantially similar.  The shortening of a barrel on a

18   shotgun or going on a drive, you know, or dealing in firearms

19   certainly has no bearing on wanting to kidnap or being involved

20   with kidnapping of the Governor.  So I think those are

21   dissimilar enough that the Sixth Circuit would find that they

22   should not be introduced.

23          THE COURT:  Let me ask you if there is anything you

24   want to add on that?

25          MR. GRAHAM:  No.  I agree with Ms. Kelly and have

1    nothing else to add.

2         THE COURT:  All right.  Do you have anything you want

3    to add on that issue, Mr. Hills?

4         MR. HILLS:  No, Your Honor.  There has been no 404(b)

5    lodged against my client.

6         THE COURT:  Do you have something you want to respond

7    to, Mr. Kessler?

8         MR. KESSLER:  Just very briefly.  The one thing I just

9    don't want to be overlooked with the sawing off of the shotgun

10   is that it's very similar to a crime that only Mr. Harris is

11   charged with, which is not the kidnapping.  He is also charged

12   with having a short-barreled rifle.  So this under 404(b), even

13   if predisposition were not an issue, it would clearly be

14   admissible to show that he had the intent to have a

15   short-barreled rifle.  It's the same offense.  It's a

16   short-barreled shotgun, and the actual length of it isn't as

17   important.

18        THE COURT:  Let me interrupt you a second because that

19   introduces a whole different layer of complexity that we

20   haven't talked about.  It's one thing to say we are pleading

21   entrapment on the Count 1 conspiracy.  I am not sure anybody is

22   pleading entrapment, for example, on the charge that you just

23   made, and you know, that's a different question.  If not,

24   predisposition isn't in on that issue, and you know, then some

25   similarity is much more important and 404(b) might allow that,

1    but also the prejudice weighing is different.

2            MR. KESSLER:  Right.

3            THE COURT:  Because the scope is -- I mean, it's a

4    tighter scope of inquiry.

5            MR. KESSLER:  Yes, Your Honor, and I think it's

6    admissible maybe under a different rubric for each of those

7    things.  What's important with regard to it coming in as to

8    predisposition, it's not so much the length of the shotgun

9    but -- and we attached this to the pleading.  As you can see,

10   he took pictures of them sawing it off and was talking with Ty

11   Garbin about it, and the caption that's attached to that is

12   something from a cartoon called Beavis and Butt-head, and the

13   quote is, break the law, while they were sawing off the

14   shotgun.  So the fact that they are laughing about breaking the

15   law while doing this, that goes to the predisposition angle for

16   the case in general if they claim entrapment.

17           But then I think it's a different question if you are

18   talking about just regular straight up 404(b) with regard to

19   the sawed off shotgun was demonstrating intent with regard to

20   the short-barreled rifle that he later had.  I think that's

21   just your traditional 404(b) analysis.  I think it comes in

22   under both, but it could come in under either.

23           THE COURT:  All right.  Well, we've covered a lot of

24   ground and I appreciate it.  The main point in setting the

25   hearing way back when was to get some parsing and more specific

terms on these evidentiary issues that we had generally talked about at the last hearing, and certainly you have all given me a lot more information today and in the briefing.  You know, there are a lot of other motions pending, including some recently filed ones.  Don't intend to introduce or entertain argument on those today.  Some I expect to be able to decide on papers.  Some might need to wait until we get to final pretrial, for example, the recent one on transcripts.  I don't know how I can address that or frankly even the parties until they see each other's transcripts, but I haven't forgotten about those, and I will address them, but I don't think I need any argument on it.

Let's just go around the table and give everybody a minute or two, and I mean that, just a minute or two if there is something someone didn't get a chance to respond to that you want to make sure I hear.  Let's do that before we break. Mr. Kessler?

MR. KESSLER:  This is unrelated but it's a housekeeping matter that I think --

THE COURT:  All right.  Before we get to housekeeping, anything else you want to add on these issues?

MR. KESSLER:  No, Your Honor.  Thank you.

THE COURT:  All right.  How about Mr. Gibbons?

MR. GIBBONS:  Yes, Your Honor.

Going all the way back to the beginning, you had asked

1   for specific instances of

2   the -- of my client's conduct or statements.  I wasn't really

3   necessarily prepared, but in looking now through the binder and

4   looking through the chart, my client, on August 9th, was asked

5   by CHS Dan, where do you think the guys are at?  This is after

6   CHS Dan had prompted a discussion about kidnapping earlier in

7   the day.  Adam Fox responds, divided.  Definitely divided.  So

8   that is, I think, a present sense impression that would qualify

9   under the rules regarding what we kind of beat that to death.

10          The other thing that I wanted to state is ultimately

11  the hearsay rule as indicated in -- the government brought up a

12  case, McDaniel, indicating that 802, the hearsay rule, is

13  premised on the theory that out-of-court statements are subject

14  to particular hazards that the client could be lying.  He could

15  have misperceived the events.  The memory could be faulty.

16  Things of that nature.  I think it does bear some relevance in

17  this case that the statements we are all talking about were

18  picked up mechanically by a recorder, and so we are not

19  necessarily in a position where people are saying, well, I

20  remember somebody said this.  We are playing an audiotape of

21  what somebody actually said.  I mean, there is no question --

22  or there shouldn't be any question in the large measure as to

23  what words are actually being used and what words are being

24  referenced from out of court because they are mechanically

25  captured.

1           And so I think in -- I think when you move that

2     forward, stepping back and trying to see the forest through the

3     trees, if the entrapment instruction is at play, I think it

4     gives the Court some latitude that we are dealing with

5     mechanically captured statements when they are being offered in

6     support of entrapment factors of predisposition, and so I think

7     I would just leave the Court with that final thought.

8           THE COURT:  All right.  Mr. Blanchard?

9           MR. BLANCHARD:  I have nothing to add.

10          THE COURT:  All right.  Mr. Graham?

11          MR. GRAHAM:  Nothing to add, Your Honor.

12          THE COURT:  Ms. Kelly?

13          MS. KELLY:  Thank you, Your Honor.

14          I do have one bit of information, and it involves the

15    Government's argument about hearsay statements, and

16    specifically about the CHSs.  The Government cited to Duka, the

17    case, and mentioned that Defendant thought he was already

18    talking to a federal informant and so had changed his

19    statements.  And the Government brought up the fact about dad.

20    There are statements in our exhibit where Mr. Harris is

21    referring to CHS Dan as dad.  That's who he thought he was

22    talking to, someone that was trusted.  That's quite opposite to

23    the Duka case.  Just wanted to put that on the record.

24          THE COURT:  All right.  Thank you.

25          Mr. Hills?

1          MR. HILLS:  Nothing further.  Thank you, Your Honor.

2          THE COURT:  All right.  Okay.  Thank you.  You had a

3     housekeeping matter?

4          MR. KESSLER:  Yes, Your Honor.  I just thought it

5     would probably be a good time to do it before we get too close

6     to the trial.  There is the normal issue when we have jury

7     questionnaires that come out later, the Court normally does not

8     allow us to share those with anybody.  I didn't know if anybody

9     on the other side was intending to engage jury consultants to

10    have them analyze those.  The same thing with open source

11    resource on the jurors, whether they can go check, you know,

12    whether somebody is, you know, putting stuff they've put out

13    there publically on Google or whatever.  I want to make sure we

14    are all on the same playing field and we don't consider

15    ourselves bound to not doing something that everybody else on

16    the other side is doing or vice versa.

17         THE COURT:  I don't have any ability, I think, to

18    police what you may do in public source searching on somebody

19    who is named in a questionnaire.  I can prevent you from doing

20    it in the courtroom just by not giving you Internet access,

21    which is what I do, but I am not there to watch what's

22    happening when you are not here.

23         In terms of sharing it with others, my understanding

24    is, you know, I don't think anybody has ever had to get

25    permission to share it with a retained jury consultant, but

1    then, you know, not to get too close to the other agency

2    issues, I mean, you are responsible for your consultant if you

3    use one and you got to make sure that a consultant doesn't

4    misuse them and gets them back to you because we destroy them

5    after we are all done.  But you know, maybe I am missing an

6    operating procedure that people generally use, but my thought

7    is if you have a consultant, just like any other expert on your

8    team, you can use that person or those people.  It's got to be

9    somebody, you know, that you are responsible for.  That's my

10   understanding.

11            MR. KESSLER:  Understood, Your Honor.  Thank you.

12            THE COURT:  Any Defense clarifications on that or is

13   that the same general understanding you all have?

14            MR. GRAHAM:  Yes, Your Honor.

15            THE COURT:  All right.

16            MR. HILLS:  I would have a question to that

17   housekeeping realm as well, Your Honor, if I may?

18            THE COURT:  Sure.

19            MR. HILLS:  How much time are we going to get,

20   attorneys going to get to address the jury in voir dire?

21            THE COURT:  Well, we're way too early for that.  We'll

22   talk about that when we get to final pretrial and we have in

23   front of us what the actual evidentiary proffers are and where

24   we're going, whether entrapment is in or not or whether I

25   haven't decided yet.  Those kinds of things will all bear on

1    that.  Too early to talk about that.

2         And there is actually another series of trial

3    management issues.  There is a motion for filing for additional

4    peremptoriness.  The transcript issues I already talked about

5    compelling use immunity.  Those things are too early.  I am not

6    ready to deal with those now.  Other things?

7         MR. GRAHAM:  No, Your Honor.

8         MR. KESSLER:  No, Your Honor.

9         THE COURT:  Thank you.  Thank you for your patience in

10   getting started.  I know it was difficult, and I apologize to

11   Mr. Caserta especially that you were stuck listening in from

12   jail.  I hope you were all able to hear.  And counsel,

13   Mr. Hills and Mr. Blanchard, thank you for making

14   accommodations so that we could proceed today.  I'll try to get

15   you decisions on the motions that are ripe as soon as I can so

16   everybody can start planning going forward.

17        And I think final pretrial is the next official thing

18   we have scheduled.  If when I get into the rest of the motions

19   and responses I think there needs to be a hearing on another

20   issue or of course, if counsel thinks there does, you can let

21   me know that, too.  I'll evaluate that, but if we don't get

22   together before then, we will get together at final pretrial.

23        Hopefully by that time Omicron or whatever other

24   variant we have will be in serious decline.  I would say, you

25   know, two years ago if you were telling me we'd still be

1    worried about these issues and have numbers on the COVID that

2    are worse than we had at other times, and frankly, this is the

3    most disruption we've had in our own schedule just this week,

4    and I had hearings this afternoon that had to be cancelled on

5    unrelated matters because either a lawyer or another

6    participant was positive or exposed, I would never have

7    believed we'd still be here dealing with it.  So thank you for

8    all bearing with it.  Please stay healthy and well to the

9    extent you can, and we'll see you at least at final pretrial if

10   we don't need anything before this.

11            LAW CLERK:  Court is adjourned.

12            (Proceeding concluded, 1:30 p.m.)

REPORTER'S CERTIFICATE


I, Paul G. Brandell, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, Michigan  49503