UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                 Plaintiff,              No. 1:20-cr-183

        vs.                       Hon. Robert J. Jonker
                                     Chief United States District Judge

ADAM DEAN FOX,
BARRY GORDON CROFT JR.,
DANIEL JOSEPH HARRIS, and
BRANDON MICHAEL-RAY CASERTA,

                 Defendants.
_____/

## GOVERNMENT'S BRIEF REGARDING
## IDENTITIES OF UNDERCOVER AGENTS

As discussed at the Final Pretrial Conference, the government intends to call two FBI agents who participated in this investigation in an undercover capacity, and who are currently working undercover in other unrelated anti-terrorism investigations. This brief is submitted at the Court's request.

Notwithstanding the Court's protective order, defendant Croft has apparently disclosed discovery materials to the media and extremist associates. Those associates offered a cash bounty for the identity of informants, and have publicly called for violent retaliation against the FBI. The government requests the Court permit undercover agents to testify using the pseudonyms by which they were known to the defendants. The government further requests the court limit cross-

examination questions designed to disclose their actual names, and prohibit the sketching of their likenesses at trial.

The witnesses will testify live and undisguised before the jury, and the government will provide any *Giglio* and Jencks Act material to the defense prior to the testimony. Because the protective order already in place has not deterred Croft, the government requests permission to withhold the agents' true names from the defense. In the alternative, the true names could be provided for the defense attorneys' eyes only. The proposed safety measures are consistent with those permitted by other courts in similar cases, and do not constitutionally undermine the defendants' right of confrontation.

FACTS

1.     At trial, the government intends to call two FBI Undercover Employees ("UCEs") who investigated the charged offenses. One joined the group during the defendants' planning phase, and was known to the them as "Mark." UCE "Mark" posed as a resident of the Upper Peninsula, and was tasked by the defendants with (among other things) reconnoitering the Governor's official summer residence on Mackinac Island. The other, UCE "Red," was introduced as a demolitions expert a few weeks before the conspirators' arrests. The defendants had made several efforts to recruit independent bomb makers, and "Red" was offered to the group in that capacity to mitigate the likelihood of an actual bomb attack.

2

2.     The defendants were arrested and charged by criminal complaint on October 8, 2020. Their anti-government associates began efforts to identify and disclose informants the same day:



3.     In November 2020, this Court ordered that discovery material provided by the government was to be used solely for the preparation of the defense. (R. 72: Protective Order, PageID.536.) Defense counsel were ordered to disclose such material only to members of the defense team, experts and consultants, and potential witnesses. (*Id.*) The order was modified in May 2021, so defense counsel could provide the defendants unredacted copies of the discovery materials on un-networked laptop computers. (*See, e.g.*, R. 176: Croft Modified Protective Order, PageID.988.) The modified order reiterated that defense counsel were required to take all reasonable steps necessary to ensure the discovery materials were not improperly disclosed. (*Id.*)

4.     Notwithstanding the protective orders, Croft repeatedly communicated case details to the media and associates in the anti-government militia movement. Croft also discussed communicating the information indirectly through his

associates to avoid accountability. The following examples are from recorded jail calls that have been disclosed to the defense:

      a.     On February 17, 2021, Croft told Associate 1 that he was planning to speak with a reporter from ProPublica. He advised her, "You may want to get in touch with [the reporter], because from what my attorney said, he does good work. The only thing is, he scheduled a visit, which comes through the kiosk, and that gets recorded." He added, "But the thing of it is, is if I don't talk to him directly, he can't use anything against me in the case."

      b.     On March 7, 2021, Croft told his partner, "I'm probably going to be talking to the media soon," because "I think I'm gonna need some air support."

      c.     On July 2, 2021, Croft called Associate 2, who told him, "We even outed [a CHS[1]] as a rat." Croft said he had told Associate 3 the same thing. Associate 2 advised, "BuzzFeed called us. BuzzFeed called us—a journalist—and told us that [CHS] is a rat also." Croft replied, "Yeah, her name's [Reporter 1], right?" The next day, Croft told Associate 4 to watch out for the CHS, as well as CHS "Dan" and another individual identified in the discovery materials.

      d.     On October 6, 2021, Croft spoke with Reporter 1 at BuzzFeed. Croft complained of "the Court's lack of desire to grant anything for the defendants, if you've noticed that. But they have granted the suppression of the discovery evidence. You know they put the gag order on at the protection order." Reporter 1 asked if he was concerned "because there's stuff in the case, in the, in the discovery

---

[1] The defendants are aware of the source's identity, and have requested a trial subpoena for his testimony.

4

that you think should come out?" Croft replied, "Yes ma'am. One hundred percent. One hundred percent."

      e.    On November 15, 2021, Reporter 1 asked Croft if she should attribute the information to him: "Like, do you want me to say 'said Barry Croft from an interview from his jail cell,' or do you want me to just say, you know, I, I know this according to sources?" Croft replied, "I'm going to leave it at your discretion."

      f.    On January 5, 2022, Croft told Associate 5, "But while all that shit was going on, I did an interview with [Reporter 1] … and that's where all these articles have been coming out lately about what's really going on."

      g.    On January 8, 2022, Croft told Associate 3, "Definitely call [Buzz Feed Reporter 2], because he is a media source and he may help you get the ear of the people you want. You know what I mean?" Associate 3 replied, "I hope so. I'm going to give him a call." Croft told Associate 3, "They may keep [information contained in the discovery materials] out of our trial because [a domestic terrorism subject identified in the discovery materials] is unindicted, but that needs magnified." He added, "So listen, it's going to bang out on us. Call [Reporter 2]. I think he'll be a great asset."

      h.    On January 30, 2022, Associate 3 broadcasted a video podcast in which he called the FBI and the prosecutor in the Kyle Rittenhouse case "the enemy of the American people." Associate 3 said, "And I'm going to tell you like I'm going to tell all of our enemies—I hope there's a day when we get to meet all you

motherfuckers in the streets." He added, "Some of you I'll hurt real goddamn bad if I ever get the chance. And I believe that America believes that violence is kind of a gold standard. You know, we're not supposed to talk about it."

i.     On February 7, 2022, a plea agreement was filed in which co-defendant Kaleb Franks agreed to plead guilty and to testify against the remaining defendants. On February 8, Croft discussed his plea with Associate 6. Associate 6 assured Croft, "I want to do as much to undermine Kaleb's fucking testimony as possible. I mean, to be honest, in the public, in the public eye." Croft replied, "Right."

## LAW AND ARGUMENT

The Confrontation Clause provides that a defendant in a criminal trial has the right to confront and cross-examine the government's witnesses who testify against him. *See* U.S. Const. amend. VI; *Maryland v. Craig*, 497 U.S. 836, 846 (1990). The Confrontation Clause does not, however, provide an absolute right for an accused to have a jury hear a witness' true name and address. *United States v. Rangel*, 534 F.2d 147, 148 (9th Cir. 1976); *United States v. Cosby*, 500 F.2d 405, 407 (9th Cir. 1974).

Courts have approved the use of pseudonyms in similar circumstances to those articulated here, finding that the government's interest in protecting the identities of undercover agents and informants can outweigh the defendants' interest in learning their true identities. *See Rangel*, 534 F.2d at 147 (no error in permitting witness to testify without divulging true name, address and phone

number where evidence showed the witness's life had been threatened and the witness and family had been relocated); *United States v. Ramos-Cruz*, 667 F.3d 487, 500 (4th Cir. 2012) (affirming decision "to allow two government witnesses to testify under pseudonyms and without revealing their names, home and work addresses, or dates and places of birth"); *United States v. El-Mezain*, 664 F.3d 467, 492 (5th Cir. 2011) (affirming use of pseudonyms where the "defendants' interest in obtaining the names of the witnesses is outweighed by the Government's need to keep the information secret"); *United States v. Celis*, 608 F.3d 818, 834 (D.C. Cir. 2010) (affirming protective order permitting government witnesses to use pseudonyms and holding that the order "involved a delicate balancing of interests necessitated by extraordinary circumstances warranting special measures to protect key witnesses"); *Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns permitted to testify using his badge number instead of his true name); *United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) ("[W]here there is a threat to the life of the witness the right of the defendant to have the witness' true name, address and place of employment is not absolute.").

There are compelling reasons to allow the witnesses to testify using pseudonyms, and limit cross-examination intended to disclose their personal information to the public. Disclosing the true names of the UCEs to the defendants and the public risks their safety, the safety of their families, and the integrity of ongoing investigations. Croft has demonstrated a desire to provide such information

to the media and his associates, who will widely disseminate their identities in an attempt to harass them, tamper with or undermine their testimony. Public disclosure of the witnesses' true names will have no bearing on defendants' ability to prepare their defense or to cross-examine the witnesses.

In *Smith v. Illinois*, 390 U.S. 129, 131-32 (1968), the Supreme Court held that the true name of a particular witness was necessary to allow the defense to show that he had a possible criminal history, which went to the credibility and reliability of the witness. In that case, "[t]he only real question at trial . . . was the relative credibility of the [defendant] and this prosecution witness." *Id.* at 130. But that is not the case here. Consistent with the Government's usual discovery obligations, defense counsel will be provided any known criminal histories, *Giglio* material, and statements falling within the Jencks Act (18 U.S.C. § 3500) for the Government's witnesses, including the undercover witnesses. Any such impeachment information will be disclosed using the witnesses' designated pseudonyms and will be available for use by defense counsel at trial. Thus, defendant will have the same opportunity to impeach the credibility of a witness testifying under a pseudonym as any other witness at trial. *See Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992) (distinguishing *Smith*, where the "witness adopted a pseudonym for the sole purpose of testifying," from cases where the witness interacted with the defendant using the pseudonym, such that "the use of a fictitious name will be no more than a mere curiosity, possessing no constitutional significance").

8

In a recent terrorism trial, an FBI UCE was permitted to testify under even stricter security protocols, including the use of a pseudonym. *United States v. Hendricks*, 950 F.3d 348, 355-56 (6th Cir. 2020) (affirming partial closure of courtroom during undercover agent's testimony by moving public to different room with real-time audio and display of exhibits but not video or image of witness). In this case, the witnesses will testify live in the courtroom with the public present. The use of a pseudonym will have no effect on the jury's ability to observe and assess the witnesses' demeanor and appearance at trial.

Trial judges "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986); *see also United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983) ("The rule is that once cross-examination reveals sufficient information to appraise the witness's veracity, confrontation demands are satisfied.").

The proposed restrictions will not hinder the defendants' ability to cross-examine the witnesses because they will be in possession of any known impeachment information and Jencks Act material for each witness. *See United States v. Ellis*, 468 F.2d 638 (9th Cir. 1972) (affirming decision to prohibit cross-examination on undercover agent's name and address where there were "substantial reasons" for withholding the information and the witness's testimony

9

was of marginal significance); *United States v. Contreras*, 602 F.2d 1237, 1239-40 (5th Cir. 1979) (affirming decision to preclude cross-examination as to home address and other background information of federal agent where there was reasonable fear that disclosure of such information would endanger him and his family).

Finally, the government requests the Court prohibit sketch artists and other observers of the trial from recording the UCEs physical appearances. The Court already prohibits audio and video recording of its proceedings, and this restriction will not affect the four elements of confrontation identified in *Maryland v. Craig*: "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." 497 U.S. at 846.

The measures proposed are narrowly tailored to protect the safety of the witnesses and the integrity of ongoing anti-terrorism investigations. They impose minor, if any, burdens on the defendants' right of confrontation.

WHEREFORE, the government requests the Court allow the UCEs to testify under the pseudonyms they used during the investigation, limit cross-examination

intended to disclose their personal identifying information, and prohibit sketching or capturing their physical appearances.

<div style="margin-left:40%">

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

</div>

Dated:February 24, 2022

<div style="margin-left:40%">

*/s/ Nils R. Kessler*
NILS R. KESSLER
JONATHAN ROTH
Assistant United States Attorneys
P.O. Box 208
Grand Rapids, MI 49501-0208
(616) 456-2404
*nils.kessler@usdoj.gov*

</div>