```
 1                  IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3                          SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5                Plaintiff,          No:  1:20cr183-1/2/5/6

 6        vs.

 7      ADAM DEAN FOX,
        BARRY GORDON CROFT, JR.,
 8      DANIEL JOSEPH HARRIS and
        BRANDON MICHAEL-RAY CASERTA,
 9
                  Defendants.
10


11
        Before:
12
                        THE HONORABLE ROBERT J. JONKER
13                         U.S. DISTRICT Judge
                           Grand Rapids, Michigan
14                      Tuesday, March 22, 2022
                     Excerpt of Jury Trial Proceedings
15                       Testimony of Dan Chappel

16      APPEARANCES:

17                    MR. ANDREW BIRGE, U.S. ATTORNEY
                      By:  MR. NILS R. KESSLER
18                    MR. JONATHAN C. ROTH
                      The Law Building
19                    333 Ionia Avenue, NW
                      Grand Rapids, MI 49501-0208
20                    (616) 456-2404

21                          On behalf of the Plaintiff;

22                    MR. CHRISTOPHER M. GIBBONS
                      MS. KAREN M. BOER
23                    Dunn Gibbons PLC
                      125 Ottawa Avenue, NW, Suite 230
24                    Grand Rapids, MI 49503-2865
                      (616) 336-0003
25
                            On behalf of Defendant Fox.
```

```
 1                    JOSHUA ADAM BLANCHARD
                     Blanchard Law
 2                   309 South Lafayette Street, Suite 208
                     P.O. 938
 3                   Greenville, MI 48838-1991

 4
                              On behalf of Defendant Croft, Jr.
 5
                     JULIA ANNE KELLY
 6                   Willey & Chamberlain LLP
                     300 Ottawa Avenue NW Suite 810
 7                   Grand Rapids, MI 49503-2314
                     (616) 458-2212
 8
                              On behalf of Defendant Harris.
 9
                     MICHAEL DARRAGH HILLS
10                   Hills at Law PC
                     425 South Westnedge Avenue
11                   Kalamazoo, MI 49007-5051
                     (269) 373-5430
12
                              On behalf of Defendant Caserta.
13

14        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

1            03/22/2022

2            (Proceedings, 8:30 a.m.)

3            (Jury in, 8:30 a.m.)

4            LAW CLERK:  United States District Court for the

5    Western District of Michigan is now in session.  The Honorable

6    Robert J. Jonker, chief judge, presiding.

7            THE COURT:  Good morning everyone.  Welcome back.

8    It's always good to see everybody here safe, sound and healthy,

9    and I don't really want to start by rubbing too much salt in

10   the wounds of all those die hard Michigan State fans out there,

11   but some of you might have noticed that Michigan's women's team

12   won last night, too.  So we now have Michigan's men's team and

13   women's team in their respective Sweet 16 brackets and we'll

14   see how they go for the rest of the way.  Hopefully there's

15   some Michigan fans out there, too.

16           The other thing I found out, it's not just enough to

17   have cable by the way, harkening back to some of our voir dire.

18   Not only do you have to have cable you have to buy the right

19   package, which is apparently more expensive than the one I buy.

20   So I still have cable but still couldn't watch the game.

21           In any event, we're here for something much more

22   significant than NCAA basketball, as fun as that can be.  We

23   are here, of course, to test the government's theory against

24   our four fellow citizens who are on trial here.  We are in the

25   middle of Ms. Kelly's cross examination of Mr. Chappel, and we

1    will return to that to start this morning and continue on until

2    everybody has had their chance to examine Mr. Chappel.

3              So Ms. Kelly, we'll turn it over to you.

4              MS. KELLY:  Thank you, Your Honor.

5                        CROSS EXAMINATION

6      BY MS. KELLY:

7    Q    Good morning, Mr. Chappel.

8    A    Good morning.

9    Q    Yesterday we stopped off and we were talking about the

10   Second Amendment rally that you attended on June the 18th.  Do

11   you recall that?

12   A    I do.

13   Q    Okay.  If we could pull up the Government's Exhibit 59,

14   please?

15             THE COURT:  It's not actually one that I show as in

16   evidence yet, but I don't know that the government has any

17   objection.  I might have it wrong.

18             MR. KESSLER:  We have it as admitted, Your Honor.

19             THE COURT:  Then it's admitted in any event.  Go

20   ahead.

21             MS. KELLY:  Thank you, Your Honor.

22   BY MS. KELLY:

23   Q    Mr. Chappel, did you take this photograph?

24   A    I did not.  No.

25   Q    And you recognize Daniel Harris there in the middle of that

1   photograph?

2   A    I do.

3   Q    Okay.  It looks like you'd agree that what he is carrying

4   is his camera case?

5   A    Yes.

6   Q    Okay.  And there were times that folks from the Wolverine

7   Watchmen were going to other rallies where you did not attend,

8   right?

9   A    That's correct.

10  Q    Okay.  You talked about that yesterday.  The Black Lives

11  Matter rally in Lake Orion, correct?

12  A    Correct.

13  Q    Okay.  And there was also that haircut operation in May,

14  you didn't attend that rally either, is that right?

15  A    That's correct.

16  Q    And that was in Lansing, correct?

17  A    Correct.

18  Q    Okay.  And you have no information that at any of the

19  rallies the Wolverine Watchmen were committing any other acts

20  of violence, is that right?

21  A    Correct.

22  Q    Okay.  The June 20th meeting in the basement of the vacuum

23  shop, Daniel Harris was invited to go with you, correct?

24  A    He was.

25  Q    Okay.  He did not attend that with you, correct?

1    A    He did not.

2    Q    Okay.  And Mr. Garbin rode with you in your vehicle, is

3    that right?

4    A    Yes.

5    Q    And then Paul Bellar drove his separate vehicle, correct?

6    A    Correct.

7    Q    Okay.  After that meeting on June the 20th, you had several

8    conversations with the Wolverine Watchmen about Adam Fox, is

9    that fair to say?

10   A    I did.

11   Q    Okay.  And you had previously invited Adam Fox to come

12   train with the Wolverine Watchmen, correct?

13   A    On what day?

14   Q    That would have been on June the 14th when you called

15   Mr. Fox with the agents?

16   A    I said you should come to training some time.  Yes.

17   Q    And Mr. Fox accepted that invitation, right?

18   A    He knew about the training already.

19   Q    Okay.  So and that training was scheduled for June the

20   28th, right?

21   A    Correct.

22   Q    Okay.  And so you are talking to the Watchmen and getting

23   them prepared to have Adam at the training, is that right?

24   A    Joe was getting ready for a VIP person to show up.

25   Q    A VIP person?

1    A    Correct.

2    Q    Okay.  Is that -- is that the term that Joe used or are you

3    just using that today in court?

4    A    That's a term that Joe used that we had a VIP coming to

5    train.

6    Q    Okay.  Isn't it true that you were trying to encourage Joe

7    and Pete to allow Adam to come to their house?

8    A    No.  Joe and Pete had already spoke with Adam and brought

9    Adam up to the group.

10   Q    Okay.  That was on June the 14th, correct?

11   A    Correct.

12   Q    Okay.

13   A    And prior to that as well.

14   Q    Okay.  So what I am trying to focus you on is after the

15   meeting at the vacuum shop, right?

16   A    Correct.

17   Q    You had to have several other conversations leading up to

18   the June 28th meeting at Joe and Pete's about Adam Fox,

19   correct?

20   A    Yes.

21   Q    Okay.  And you said things like, Adam is Michigan's

22   representative, correct?

23   A    Correct.  That was echoing from Joe.  He told us that he

24   was Michigan's national contact.

25   Q    Okay.  Isn't it true that you told Joe that Adam was the

1    leader of Michigan because he had gone to Ohio and was rubbing

2    elbows with important people?

3    A    Correct.

4    Q    Okay.  It's also true that you called Adam and Amanda

5    Keller the power couple of Michigan, isn't that true?

6    A    They are a power couple.  They are like-minded individuals.

7    Q    But that's how you phrased it, right, they were the power

8    couple of Michigan?

9    A    They are power couples.  Yes.

10   Q    Okay.  And isn't it true that the Wolverine Watchmen were

11   kind of hesitant to have Adam at the property in Munith?

12   A    Jada expressed concerns about Adam.  Yes.

13   Q    Okay.  And that was the morning of that training on June

14   the 28th?

15   A    There was a phone call that Joe and Jada had made to myself

16   about wanting to black bag Adam before he showed up at the

17   residence.  Yes.

18   Q    And black bag means put a physical bag over his head?

19   A    Correct.

20   Q    Because they didn't want him to know where they lived?

21   A    Correct.

22   Q    Okay.  And you did not do that, correct?

23   A    No.  We met him at an offsite location and he followed us

24   in with his vehicle.

25   Q    Okay.  And that was you and Ty Garbin and Paul Bellar,

1    correct?

2    A    Correct.

3    Q    Okay.

4    A    Joe was with us as well.

5    Q    Joe went with you as well?

6    A    Yes.

7    Q    And then Adam followed you guys to the property?

8    A    Correct.

9    Q    Okay.  After these -- when you'd have these meetings or

10   these trainings, you would then meet with the agents

11   afterwards, is that right, or talk with them afterwards?

12   A    Correct.

13   Q    Okay.  And so part of your job, or one of your goals is to

14   provide that accessibility, right?

15   A    Yes.

16   Q    Okay.  And so you would report back to the special agents

17   and tell them what attendees that were on each training, right?

18   A    Correct.

19   Q    Because they wanted to know who was there, right?

20   A    True.

21   Q    And they are also listening in live as well, correct?

22   A    Correct.

23   Q    Did you do that after the training on June the 28th?

24   A    I know we had a phone call.  I always called them after I

25   got offsite.  I am not sure if we had a physical meeting or

1    not.

2    Q    Okay.  But you had some sort of discussion about who was

3    there, what happened, discussions that were held, correct?

4    A    Yes.

5    Q    Okay.  And it's true that we have no recording of that

6    training, correct?

7    A    I am not sure if there was a recording of that day or not.

8    Q    Okay.  It's true that Daniel Harris wasn't at the training

9    on June the 28th, correct?

10   A    He may or may not have.  I can't remember that specific

11   time.

12   Q    Would it refresh your recollection to look at the report

13   from Special Agent Chambers from that day?

14   A    It would.  Yes.

15   Q    Okay.

16        MR. KESSLER:  I am not sure about trying to refresh

17   his recollection with somebody else's report, Your Honor.

18        THE COURT:  Anything can refresh their recollection.

19   The question will be after he looks at it whether it's

20   refreshed.

21        MS. KELLY:  May I approach the witness?

22        THE COURT:  Sure.

23        THE WITNESS:  Thank you.

24   BY MS. KELLY:

25   Q    You are welcome.  Did you have a chance to review that

report?

A    I did.

Q    Did that refresh your recollection as to whether or not
Daniel Harris was present at that training?

A    It did.

Q    Okay.  And was Daniel Harris present at that training?

A    He was not.

Q    Now, after this training on June the 28th, you would agree
that there's kind of a falling out in the Watchmen, is that
right?

A    There was.  Yes.

Q    Okay.  And in fact, you talked to the -- your agents and
said, Joe is starting his own group, is that right?

A    That would have been Paul.

Q    Or Paul is starting his own group?

A    Correct.

Q    Thank you.  Okay.  And so on June the 29th you are doing a
lot of mediating between Joe and Pete and Paul, is that right?

A    Correct.

Q    Trying to bring them back together?

A    Trying to figure out what was occurring within the group.
Yes.

Q    Okay.  And there was some marital issues going on within
the group, right?

A    With Joe, yes.

1    Q    And Paul wanted to bring girls to the training, right?

2    A    He was bringing multiple women to the training.

3    Q    So you were acting as kind of a go-between between them?

4    A    To a degree.  Yes.

5    Q    Okay.  And you are also trying to, as we talked about

6    yesterday, solidify a plan for the Watchmen, right?

7    A    Trying to figure out what their motives were.  Yes.

8    Q    Okay.  And as we talked about yesterday was, you talked

9    about yesterday, Special Agent Impola wrote to you and said,

10   look at you bringing people together, right?

11   A    Correct.

12   Q    And that's what he was talking about was, you know, trying

13   to get these guys back together, right?

14   A    Not sure what the exact context.  It might have been with

15   Adam.  I am not sure.

16   Q    Okay.  And one of the things that you were working on,

17   again, one of the goals was getting a plan to bring to

18   Wisconsin, isn't that true?

19   A    That's what Adam wanted us to bring to Wisconsin was a

20   plan.

21   Q    Okay.  But you were working with the Watchmen to try to get

22   a plan from them to bring to Wisconsin, correct?

23   A    Per Adam, yes.

24   Q    For Adam?

25   A    He wanted us to get a plan to go to Wisconsin.  Yes.

1    Q    And on June the 30th, then you recall writing to your

2    agents and telling them that you are spearheading that plan?

3    A    I don't believe that was the content of that.  No.  I don't

4    recall that.  The only spearheading is, I remember is Daniel

5    Harris saying that if he was going spear -- or be the tip of a

6    spear it needed to be well thought out.

7    Q    Okay.  Would it refresh your recollection to take a look at

8    the text message you sent to the special agents?

9    A    It would.

10            MS. KELLY:  May I approach the witness, Your Honor?

11            THE COURT:  Sure.

12            THE WITNESS:  Thank you.

13   BY MS. KELLY:

14   Q    Did you have a chance to review that -- those text

15   messages?

16   A    I did.

17   Q    Okay.  And do you recall writing to the agents that you

18   were going to be spearheading things?

19   A    Yes.  I don't know what the contents was of what I would be

20   spearheading.

21   Q    I'm sorry.  I missed that?

22   A    I don't know what the context of what I would be

23   spearheading to on that specific day.

24   Q    On June the 30th you weren't sure what you were going to be

25   spearheading?

1    A    Correct.

2    Q    Something that Ty was reinforcing, right?

3    A    Yes.

4    Q    And something that Joe had you push it, correct?

5    A    Yes.

6    Q    But you don't know what that context is?

7    A    No.

8    Q    Okay.  The following message that was sent to you from the

9    agents said it was good to suggest a group conversation.  Do

10   you recall that?

11   A    I do.

12   Q    Okay.  On Wire with Adam as well, right?

13   A    Correct.

14   Q    And again, that harkens back to what we were talking about

15   yesterday about getting Adam into the leadership chat, it

16   right?

17   A    That was getting Adam into the leadership chat so I

18   wouldn't be the pivot point between him and Joe.

19   Q    That was one of your goals, to get Adam into the leadership

20   chat, right?

21   A    For communication, yes.

22   Q    Okay.  On July the 7th you attended a meeting at Paul

23   Bellar's house, correct?

24   A    Correct.

25   Q    Okay.  And there was a discussion of the training that was

1    held on June the 28th, right?

2    A    Yes.

3    Q    Okay.  And a discussion about movement away from the

4    Watchmen, correct?

5    A    Correct.

6    Q    Okay.  Could we pull up Exhibit 78?

7         At that meeting the code words were also listed out,

8    correct?

9    A    They were.

10   Q    Okay.  And I think they were passed out at a later date,

11   but this, on July the 7th, was the date that the group

12   discussed these code words, right?

13   A    Correct.

14   Q    Okay.  And you actually came up with the code word for the

15   feds, cops, right?

16        THE COURT:  If it's important for us all to read it

17   it's going to have to be blown up at least for me to read it.

18   BY MS. KELLY:

19   Q    So the code word ticks.  That was suggested by you,

20   correct?

21   A    I don't believe so.  No.

22   Q    Did you suggest any of those code words?

23   A    No.  I don't recall suggesting any.

24   Q    Okay.  Now, the code word for training was bonfire,

25   correct?

1    A    Correct.

2    Q    Okay.  And after this meeting on July the 7th, the

3    gentlemen that were there started a different group called the

4    bonfire chat, correct?

5    A    I believe so.  Yes.

6    Q    Okay.  Other than using the term bonfire chat, these code

7    words aren't really used, correct?  I didn't see any text

8    messages about a Ski-Doo or spaghettios or anything like that,

9    right?

10   A    No.

11   Q    So they are made this night but they are not really used

12   other than the bonfire chat, correct?

13   A    Correct.

14   Q    Okay.  On July the 7th you also continued to encourage the

15   boys in the bonfire chat about Adam Fox, correct?

16   A    We were talking about Adam.  Yes.

17   Q    Okay.  And you again said Adam was Michigan's

18   representative, correct?

19   A    Yes.

20   Q    Okay.

21   A    That was Adam putting that out that he was Michigan's

22   contact and Joe saying that he was Michigan's national contact.

23   Q    But Adam is not there, right?

24   A    No.  He is not.

25   Q    Joe is not there, right?

A    No.

Q    Okay.  So to the guys that are there you are saying Adam is Michigan's representative, correct?

A    Yes.

Q    And you said for a big movement that's going on in, like, 15 states.  Do you remember saying that to the boys?

A    I do.

Q    Okay.  You also made it very clear on July the 7th that you were going to Wisconsin, correct?

A    I said that I would be going to Wisconsin.  Yes.

Q    Okay.  And you wanted anyone else that was going to Wisconsin to keep an open mind, right?

A    I did not know it -- what would be going on in Wisconsin. If there would be illegal activities, drugs or what kind of weaponry would be there, so to keep an open mind of what would be there.  Yes.

Q    You were concerned about illegal drugs at Wisconsin?

A    I was saying what might be there and that that the discussion was from the meeting with Adam that it was a continuation of what went on with the first Ohio meeting, and that their planning, and Wisconsin was to develop an attack plan for that to be of mind that offensive measures might be taking place there.  Yes.

Q    So when you said keep an open mind, in your mind, all of that that you just described was going on in your head?

1    A    Yes.

2    Q    Okay.  You never said a word of that to the boys, correct?

3    A    I didn't.

4    Q    You just said keep an open mind?

5    A    I said keep an open mind, and later on in that discussion

6    that there might be belt fed weaponry there.  There might be

7    drugs there.  I don't know what would be there.  Just to keep

8    an open mind.

9    Q    You were concerned about drugs being around the boys?

10    A    I said I didn't know what would be there.  To keep an open

11    mind.

12    Q    You talked about different kinds of training that might be

13    going on, right?

14    A    I did.

15    Q    The MOUT training that we talked about yesterday, right?

16    A    Yes.

17    Q    On July the 7th, and you talked a little bit about this on

18    Friday, the Boogaloo movement, right?

19    A    Yes.

20    Q    Okay.  And you talked about what you took that to mean,

21    right?

22    A    Yes.  I learned of the Boogaloo movement after joining the

23    Wolverine Watchmen.  I had no idea what that meant.

24    Q    That wasn't something that you personally subscribed to,

25    right?

A     No.

Q     And your understanding of the Boogaloo movement was some

sort of civil war, right?

A     That was the group discussion.  Yes.

Q     Okay.  And kind of a talk about -- would you agree that --

and I guess I'll strike that.

          The government played you a clip of Daniel Harris from

July the 7th.  Do you recall that?

A     I do.

Q     Okay.  If we could pull up 80T, please?

          Okay.  So this is a conversation that you and

Mr. Harris had on July the 7th, right?

A     I believe so.  Yes.

Q     Okay.  And he is talking about his friend Devon Phelps'

girlfriend's brother, is that right?

A     Yes.

Q     And you never met that person, right?

A     No.

Q     Okay.  And he talks about what this guy can purportedly do,

right?

A     Yes.

Q     Okay.  And the -- can we highlight just the third one from

Mr. Harris starting with, he can make?

          Okay.  So Mr. Harris is saying that this brother of

this friend's girlfriend can make grenades, pressure cookers,

1   all that kind of stuff, right?

2   A    Yes.

3   Q    Okay.  But he says, if shit hits the fan, right?

4   A    Correct.

5   Q    Okay.  And that's meaning if something is going to go wrong

6   we can contact this guy, correct?

7           MR. KESSLER:  He can say what the words are, but I

8   don't think he can interpret it.

9           THE COURT:  I think that's right.  This isn't -- it's

10  for argument and inference and whatever the jury may make of

11  it, but it's not for this witness to interpret what Mr. Harris

12  means.

13  BY MS. KELLY:

14  Q    Mr. Harris didn't say that he could reach out to this

15  person to kidnap the governor, correct?

16  A    No.

17  Q    He didn't say, I can reach out to this person who can make

18  grenades to blow up a bridge, right?

19          MR. KESSLER:  Again, all the things that aren't in the

20  transcript aren't in the transcript.

21          THE COURT:  Right.  The point is, unless other people

22  are going to testify to other things that were part of the

23  conversation, this is what we have, and this is what all sides

24  will have to make of whatever they think it means.

25  BY MS. KELLY:

Q    Mr. Harris never gave you that person's contact
information, correct?

A    He did not.

Q    Okay.  You testified that you were concerned from the
beginning of the Wolverine Watchmen going after law enforcement
officers, correct?

A    Correct.

Q    Okay.  And that's why you reached out to law enforcement,
correct?

A    Yes.

Q    Okay.  The bonfire chat boys from July the 7th, you'd agree
that after that meeting you didn't have those concerns?

A    I always had those concerns.  I was --

Q    After that meeting?

A    What do you mean?

Q    After that meeting did they talk about law enforcement
officers or going after law enforcement officers?

A    It was a continuous threat against law enforcement.

Q    On July the 7th you are saying Daniel Harris made a threat
against law enforcement officers?

A    On that specific day, no.

Q    On July 11th and 12th you go to Cambria, Wisconsin,
correct?

A    Correct.

Q    Okay.  And you had rented the Suburban to bring the boys

1    over to Wisconsin, right?

2    A    I rented the Suburban so I wouldn't be putting miles on my

3    personal vehicle.

4    Q    Okay.  You were the driver of the boys, right?

5    A    I was.

6    Q    Okay.  And you had rented that Suburban July the 2nd?

7    A    I think it was either the day of or the day before we went

8    to Cambria.

9    Q    The day of or day before?

10   A    Yes.

11   Q    Okay.

12   A    Probably the day before.  We left early in the morning.

13   Q    And you met Daniel and Paul and Kaleb at a park and ride,

14   correct?

15   A    Correct.

16   Q    Okay.  And there was a bunch of gear in the back of the

17   Suburban, right?

18   A    Yes.

19   Q    You guys weren't sure if you were going to be camping or

20   staying at a hotel, correct?

21   A    Correct.

22   Q    So you had camping gear, right?

23   A    We did.

24   Q    Mr. Harris had several bags, is that right?

25   A    Yes.

```
 1    Q    Okay.  And most of you brought your firearms with you,
 2    correct?
 3    A    We all did.  Yes.
 4    Q    Okay.  And you talked a bit about on Friday one of
 5    Mr. Harris's rifles, right?
 6    A    Yes.
 7    Q    Okay.  Were you aware of how he disassembled his rifle for
 8    transportation to Wisconsin?
 9    A    I believe it was fully assembled.  I wasn't aware of how
10    they put it in the vehicle.  No.
11    Q    You didn't see it, right?
12    A    No.
13    Q    You didn't see the upper was in his gun bag, right?
14    A    No.
15    Q    You didn't see that his lower was in his backpack?
16              MR. KESSLER:  This is speculation, Your Honor.
17              THE COURT:  Yeah.  The problem is he said he didn't
18    see it.  So if you are starting to now suggest where, in fact,
19    things were without that foundation and without other evidence
20    it's not admissible.  So you'll have to live with he didn't see
21    it.
22    BY MS. KELLY:
23    Q    Okay.  I want to make sure the record is clear that when
24    you said you believed it was assembled, you never saw it
25    assembled, correct?
```

1    A    He said he was transporting an illegal SBR.

2    Q    That's not my question.  My question is, you didn't see it,

3    correct?

4    A    I did not.

5    Q    And you guys ended up staying in a hotel in Cambria,

6    correct?

7    A    Yes.

8    Q    The one that was attached to that Deno's restaurant?

9    A    Correct.

10   Q    Okay.  And got up early the next day, had breakfast, and

11   then went out to the property, correct?

12   A    Correct.

13   Q    And we've heard about some of the training that was

14   happening in Cambria.  You've seen the videos of the trainings?

15   A    I have.

16   Q    Okay.  Could we pull up for the witness only Defense

17   Proposed Exhibit 4028?  This will be muted.  Is that video up

18   for you, sir?

19   A    Yup.

20   Q    Do you recognize that video?

21   A    I do.

22   Q    Okay.  Is that a fair and accurate representation of a

23   video of a training in Cambria, Wisconsin?

24   A    Yes.

25              MS. KELLY:  I'd move for its admission?

1        THE COURT:  Any objections.

2        MR. KESSLER:  No objection, Your Honor.

3        THE COURT:  It's admitted.

4        (Video started, 8:55 a.m.)

5        (Video stopped, 8:56 a.m.)

6   BY MS. KELLY:

7   Q    Mr. Chappel, that's you in the foreground of the video,

8   correct?

9   A    Correct.

10  Q    And then do you know who is with you?

11  A    Kaleb Franks.

12  Q    Okay.  So this was the, at least the tail end of this

13  breaking contact training that was going on in Cambria,

14  Wisconsin, is that right?

15  A    Yes.

16  Q    Okay.  And the idea of the breaking contact is kind of

17  retreating -- one person would retreat to a barrel, the other

18  person would retreat, and guns would be shot, right?

19  A    Correct.

20  Q    Okay.  And that was going on, we understand, when you guys

21  arrived to the property at Cambria, is that right?

22  A    Yes.

23  Q    Okay.  There was also a medical tent at Cambria on the

24  property?

25  A    There was.

1    Q    Okay.  And then we have heard some about this shoot house

2    made of plywood in Cambria, right?

3    A    Correct.

4    Q    Okay.  When you arrived on the property, was the shoot

5    house assembled or did you watch that being assembled?

6    A    I believe it was already assembled.

7    Q    Okay.  And the shoot house on Saturday, was that dry fire

8    or live fire?

9    A    We did a combination of both.

10    Q    Okay.  The following day on Sunday, was there another shoot

11    house erected?

12    A    There was.

13    Q    Okay.  And did you and the boys help in assembling that

14    shoot house?

15    A    I don't know if they helped assemble it or not.  I did not.

16    Q    You did not?

17    A    I did not.

18         MS. KELLY:  Okay.  If we could play for the witness

19    Defense Proposed Exhibit 4032?

20            (Video started, 8:57 a.m.)

21            (Video stopped, 8:58 a.m.)

22    BY MS. KELLY:

23    Q    Did that play for you, sir?

24    A    It did.

25    Q    Okay.  Is that a fair and accurate representation of the

1    shoot house on Sunday?

2    A    Yes.

3            MS. KELLY:  Okay.  I'd move for its admission?

4            MR. KESSLER:  No objection.

5            THE COURT:  It's admitted.

6            (Video started, 8:58 a.m.)

7            (Video stopped, 8:58 a.m.)

8    BY MS. KELLY:

9    Q    Okay.  So a couple of questions.  Did you see the folks

10   that went into the shoot house?

11   A    I did.

12   Q    Okay.  Did you recognize any of those people?

13   A    I do.

14   Q    Okay.  Can you -- can you identify any of them in this

15   photograph or do you want us to rewind it so you can identify

16   them for the jury?

17   A    I can identify them from here.

18   Q    Okay.  If you want to just mark the screen?

19   A    Okay.  Ty Garbin, Sean Fix, Brandon Caserta.  The woman

20   behind him is Amanda Keller, and then Adam Fox.

21   Q    Okay.  And then in the foreground?

22   A    To the left or right?

23   Q    To the left.

24   A    That's myself.

25   Q    Okay.  And to the right?

| | | |
|---|---|---|
| 1 | A | That's Paul.  I am not sure of his last name. |
| 2 | Q | Okay.  Not Paul Bellar? |
| 3 | A | No. |
| 4 | Q | Okay.  Was he from Wisconsin? |
| 5 | A | He was.  Yes. |
| 6 | Q | Okay.  I notice there is some spray painted words on that |
| 7 | | tall plywood board.  Do you see that? |
| 8 | A | Yes. |
| 9 | Q | Okay.  It looks like it says safe, safety No. 1? |
| 10 | A | Correct. |
| 11 | Q | Do you know who did that writing? |
| 12 | A | No.  It was already on the building. |
| 13 | Q | It was already on the building? |
| 14 | A | When we got there, yes. |
| 15 | Q | Okay.  And there is also some smiley faces in green and |
| 16 | | some frowny faces in read.  Do you see those in this video? |
| 17 | A | I do. |
| 18 | Q | Do you know who made those? |
| 19 | A | I believe from the individuals at Wisconsin. |
| 20 | Q | Okay.  Now, I see this position that you are holding in |
| 21 | | this video, and I know we don't have sound on it.  Do you know |
| 22 | | what you are doing in this video? |
| 23 | A | I am explaining the pull.  Prior to that they had me |
| 24 | | explain how I would clear the building myself, and I had a |
| 25 | | malfunction on my platform so I was addressing as I cleared |

1      from left to right that I identified targets in there.  So I
2      went to a shoot position.  The weapon malfunctioned so I took a
3      knee, cleared the weapon, reinserted the magazine, chambered
4      around and then gained entry to the building.
5      Q    Okay.  So this is a conversation you are having with this
6      gentleman from Wisconsin?
7      A    Yes.
8      Q    Okay.  And it looks like there is one other person here.  I
9      see maybe just an elbow.  So there is several people watching
10     as this training is going on, right?
11     A    Correct.
12     Q    Okay.  And you said you had a malfunction with your -- what
13     was --
14     A    My rifle.  Yes.  It had a fail to fire so I pulled the
15     trigger.  Nothing went off, so I cleared the rifle, reinserted
16     the magazine, and then made entry to the building.
17     Q    And that was on a previous time that you were going through
18     the shoot house, is that right?
19     A    Correct.
20     Q    Okay.  Do you recall bringing up the idea of explosive
21     breaching at Cambria?
22     A    It might have been a topic of discussion.  I am not sure.
23     Q    Okay.  Do you remember pulling Daniel Harris into a
24     conversation about explosive breaching?
25     A    I don't recall.  No.

1   Q    Okay.  Do you recall asking him if he was a demo expert?

2   A    He knew of demolitions.  Yes.

3   Q    And that's from the time that we talked about with the

4   RDSIM, IEDs?

5   A    Yes.

6   Q    In Cambria you and Steve talked about future trainings, is

7   that right?

8   A    Yes.

9   Q    Okay.  And you set up a time to have a future training in

10  Luther, Michigan, right?

11  A    There was discussions of that.  Yes.

12  Q    Okay.  And initially it was going to be farther out in

13  Luther but because of deer season landed in September, right?

14  A    Correct.

15       MS. KELLY:  Okay.  If we could pull up Defense

16  Proposed Exhibit 4084 for the witness?

17  BY MS. KELLY:

18  Q    You were -- sorry.  Have you had a chance to review this?

19       THE COURT:  How does this differ from the things we

20  talked about with Mr. Gibbons?  You know, there is statements

21  that may come from A sworn agent which the Circuit has treated

22  as party admissions, but isn't the rest of this in the same

23  drill as getting the witness to either remember or not remember

24  and then refresh if he needs refreshing?  I am just trying to

25  understand the theory of admission.  You are going to offer

1    this?  You are not simply presenting it as an ability to

2    refresh recollection?

3              MS. KELLY:  Correct.

4              THE COURT:  Right.  And how do you get around those

5    things we have been talking about yesterday and in the pretrial

6    ruling?

7              MS. KELLY:  I suppose I could ask --

8              THE COURT:  You can ask him about it.  That's what we

9    did with Mr. Gibbons.

10             MS. KELLY:  Okay.  I will do that, Your Honor.  Thank

11   you.

12   BY MS. KELLY:

13   Q    Sir, do you remember talking to the agents while you

14   were -- or messaging with the agents while you were in Cambria?

15             MR. KESSLER:  I would ask that it be taken down while

16   we do this so he is not just reading off of it.  Again, it

17   should be shown to him to refresh if that's the intent.

18             THE COURT:  Right.  I think that's fair.  Go ahead.

19   BY MS. KELLY:

20   Q    Do you recall text messaging with the agents while you were

21   in Cambria, Wisconsin?

22   A    I do.

23   Q    Okay.  And do you recall informing the agents that Barry

24   was going to be coming to the FTX in Luther, Michigan?

25   A    That I had information that he would be coming.  Yes.

Q    Okay.  And you also expressed concerns that someone might
accuse you of being a federal agent, is that right?

A    Correct.

Q    Okay.  And it's true that the special agents told you to
blame somebody like Trent Newcomb, right?

A    Correct.

Q    And Trent Newcomb was a Wolverine Watchmen, correct?

A    He was.

Q    And he was one of those Wolverine Watchmen at the very
beginning of when you joined, right?

A    He was.

Q    Okay.  Did you follow that direction to blame somebody like
Trent Newcomb?

A    I don't think I put that out.  They had speculation that he
was -- they called him Fed Boy because he never showed up and
he always had high dollar in rifles.  So that's why the
deflection for Trent came up, but I never said anybody else
was.

Q    But Trent is a real person, right?

A    He is.

Q    Okay.  Do you recall texting the agents on that Sunday of
Cambria about bringing up an explosive's guy?

A    That I was going to bring up an explosives guy?

Q    Yes.

A    Possibly, yes.

1  Q    Okay.  Who would have that explosives guy been?  Is that

2  Red?

3  A    Red, correct.

4  Q    So you are asking the agents if you should bring Red up in

5  Cambria, correct?

6  A    Correct.

7  Q    Okay.  If we could bring up 93T, please?

8          This clip was played for you on Friday.  Do you recall

9  reviewing it on Friday with the government?

10  A    I do.

11  Q    Okay.  Just a couple of questions on it.  In the middle

12  where it says, CHS Dan, I am a tank, that's you talking,

13  correct?

14  A    Yes.

15  Q    You are saying, I am a tank?

16  A    Making fun of my body mass.  Yes.

17  Q    Okay.  And then Daniel Harris says, we got a tank, right?

18  A    He does.

19  Q    Okay.  And again, about the fifth line down, Mr. Harris's

20  long paragraph he talks about, if shit hits the fan, right?

21  A    He does.

22  Q    Okay.  Thank you.

23          July the 18th you go to Peebles, Ohio, correct?

24  A    We do.

25  Q    Okay.  And you went with Daniel Harris?

1    A    Yes.

2    Q    Ty Garbin?

3    A    Yes.

4    Q    Kaleb Franks?

5    A    Yes.

6    Q    Okay.  And this time you drove in Ty Garbin's truck, right?

7    A    I rode.  Ty drove.

8    Q    Sorry.  You rode in Ty Garbin's truck?

9    A    Right.

10   Q    You get to this meeting and different ideas are expressed

11   during the meeting, correct?

12   A    Yes.

13   Q    And as you spoke with Mr. Gibbons yesterday, you

14   championed -- when you stood up and talked you were talking

15   about trying to solidify a plan, right?

16   A    Yes.

17   Q    Okay.  Was Frank Butler at that meeting?

18   A    He was.

19   Q    He is from Virginia?

20   A    He is.

21   Q    After that meeting, you and Ty and Kaleb and Daniel drove

22   to Kentucky, right?

23   A    That's where our hotel was at.  Yes.

24   Q    That Ty Garbin rented, right?

25   A    I believe so.  Yes.

1    Q    Okay.  And you were wearing those recording devices that we

2    talked about, right, during Peebles?

3    A    I was.

4    Q    Okay.  You turned those recording devices off when you got

5    to Kentucky?

6    A    They should have been on.

7    Q    They should have been on?

8    A    Yes.

9    Q    Okay.  And you guys hung out at the hotel and got drunk,

10   right?

11   A    We did drink.  Yes.

12   Q    Okay.  I think you said you had six double Jack and Cokes,

13   right?

14   A    I might have.  Yes.

15   Q    Now, the government played Exhibit 113 for you, 113T.  If

16   you could just blow up the -- let's start with the names.

17   That's fine.  Do you recall this clip that was played for you?

18   A    I do.

19   Q    Okay.  And I see there is an unknown male.  You weren't the

20   unknown male talking in this clip, right?

21   A    I don't believe so.

22   Q    Okay.  This was a recording done by Steve Robeson, correct?

23   A    I believe so.

24   Q    Okay.  And also the unknown male isn't Daniel Harris,

25   right?

1    A    I am not sure.

2    Q    You are not sure.  Would listening to it again refresh your

3    recollection?

4    A    It would.

5              MS. KELLY:  If we may play it?

6              THE COURT:  Sure.

7              (Audio started, 9:10 a.m.)

8              (Audio stopped, 9:13 a.m.)

9    BY MS. KELLY:

10   Q    Did you hear Daniel Harris on that recording?

11   A    I did not.

12   Q    Okay.  Thank you.

13             On July the 23rd you attended a bonfire at Daniel

14   Harris's house in Lake Orion, correct?

15   A    I did.

16   Q    It was an actual bonfire, right?

17   A    It was.

18   Q    It wasn't a training, right?

19   A    Correct.

20   Q    Okay.  And that was -- it's actually Daniel Harris's

21   parent's house, right?

22   A    Yes.

23   Q    Had you been there before July the 23rd?

24   A    I think that was the first time.  I am not sure.

25   Q    That was the first time.  Okay.  At some point in that

1    summer you met some of his family members, correct?

2    A    I don't recall meeting them.  I might have.  I don't recall

3    though.

4    Q    Okay.  So did you go inside of the house?

5    A    The lower basement, yes.

6    Q    Okay.  And the lower basement is where Daniel's bedroom is,

7    right?

8    A    It is.

9    Q    It's got a kitchen, right?

10   A    Yes.

11   Q    Kind of a living, TV room, right?

12   A    It was.

13   Q    His bedroom is down there, right?

14   A    Yes.

15   Q    Bathroom is down there, right?

16   A    It is.

17   Q    And it connects to a sliding glass door to the backyard?

18   A    Correct.

19   Q    And that's where the bonfire was?

20   A    Correct.

21   Q    If I were to show you a photograph of the backyard where

22   this bonfire took place, would you be able to identify it?

23   A    Yes.

24   Q    If we could have 4033, Defense Proposed Exhibit 4033 shown

25   just to the witness?  Have you had an opportunity to look at

1    that photograph?

2    A    I did.

3    Q    Okay.  Is that a fair and accurate representation of the

4    backyard of Daniel Harris's parent's house where the bonfire

5    took place?

6    A    It is.

7            MS. KELLY:  Okay.  I'd move for its admission?

8            MR. KESSLER:  Object to relevance, Your Honor.

9            THE COURT:  It doesn't seem terribly relevant to me

10   but it's at least I think limited.  If that's the only

11   objection we'll admit it.

12           MS. KELLY:  Thank you, Your Honor.

13   BY MS. KELLY:

14   Q    So looking at Defense Exhibit 4033, Mr. Chappel, do you see

15   the area where the bonfire would have been taking place?

16   A    I do.

17   Q    Okay.  Could you circle that for the jury?  Okay.  And

18   that's where on July the 23rd you guys were sitting out,

19   standing around the campfire, right?

20   A    Yes.

21   Q    Okay.  And on that date it's kind of a discussion about the

22   last couple of trainings and meetings, right?

23   A    I believe so.

24   Q    Okay.  And it was on that date that you asked Mr. Harris

25   about his explosive's guy, right?

1    A    I believe so.  Yes.

2    Q    And he told you he wasn't there, right?

3    A    Yes.

4    Q    Couldn't come, right?

5    A    Correct.

6    Q    Okay.  July the 26th there was a training in Fowlerville at

7    Kaleb Franks's property, right?

8    A    There was.  Yes.

9    Q    Okay.  And the attendees at that training, yourself?

10   A    Yes.

11   Q    Ty Garbin?

12   A    Yes.

13   Q    Kaleb Franks?

14   A    Yes.

15   Q    Paul Bellar?

16   A    Yes.

17   Q    Daniel Harris?

18   A    Yes.

19   Q    Okay.  And have you reviewed footage of trainings from that

20   date?

21   A    I have.

22        MS. KELLY:  Okay.  If we could show the witness

23   Defense Proposed Exhibit 4041?  And this will be in mute.

24        (Video started, 9:17 a.m.)

25        (Video stopped, 9:18 a.m.)

BY MS. KELLY:

Q    Have you had an opportunity to review this exhibit, proposed exhibit?

A    I have.

Q    Okay.  Is this a fair and accurate representation of a training video from Fowlerville?

A    Yes.

        MS. KELLY:  Okay.  I'd move for its admission?

        MR. KESSLER:  No objection.

        THE COURT:  It's admitted.

        (Video started, 9:18 a.m.)

BY MS. KELLY:

Q    Okay.  So the video has stopped.  We see you on the right side of the PT Cruiser, correct?

A    Correct.

Q    Okay.  And then that's Ty Garbin on the left side?

A    Correct.

Q    So there is a training exercise you and Ty Garbin are participating in, correct?

A    It is.

Q    Does this training exercise have a name?

A    Not specific.  No.

Q    Okay.  From the start of the video it looked like you both were standing with your backs towards the PT Cruiser and then ran up to the PT Cruiser, correct?

1    A    Correct.

2    Q    And then you both are firing your weapons at a target?

3    A    Multiple targets.  Yes.

4    Q    Could you circle those targets for the jury?

5    A    I can.  There was one beyond Ty's head right there.

6    Q    Okay.  All right.  Are those steel targets?

7    A    There was.  There was a combination of steel and paper.

8    Q    Okay.  And after that Fowlerville training Paul Bellar left

9    the State of Michigan, correct?

10   A    He did.

11   Q    Do you recall testifying at a Jackson prelim that you were

12   acting as a range safety officer at these trainings?

13   A    I was.

14   Q    That was a position that the government put you in?

15   A    One of the tasks, yes.

16   Q    One of the tasks?

17   A    Yes.

18   Q    Okay.  You talked a bit about a meeting I believe at the

19   Vac Shack with Adam on July the 27th, is that right, or was

20   that a phone call?

21   A    I am not sure.

22   Q    But you had some sort of conversation with him, right?

23   A    Yes.

24   Q    Okay.  Do you recall having a conversation with Daniel

25   Harris on July the 28th?

1    A    I believe so.  Yes.

2    Q    Okay.  A 40-minute phone call, correct?

3    A    Yes.

4    Q    Okay.  And part of that discussion was, as we've talked

5    about, getting Adam into the leadership chat, right?

6    A    I believe so.  Yes.  I can't recall the exact contents of

7    the conversation.

8    Q    Okay.  And I think at this point because now we have the

9    bonfire chat so it's getting Adam into the bonfire chat, right?

10   A    Correct.

11   Q    And the bonfire chat boys didn't bring Adam into their

12   group, right?

13   A    Eventually they did.

14   Q    The chat room?

15   A    Correct.

16   Q    And that's when the fuck around and find out was started,

17   correct?

18   A    Yes.

19   Q    July 29th?

20   A    I believe so on that date.

21   Q    And you started that date?

22   A    On the direction of Daniel Harris I did, yes.

23   Q    The next training is Munith, August 9th, right?

24   A    Correct.

25   Q    Okay.  And on Friday you talked a little bit about who was

1    there, and I think you were talking about Luther.  So I just

2    want to make sure the record is clear about some of the

3    attendees.  So at that training in Munith, Barry Croft wasn't

4    there, right?

5    A    Correct.

6    Q    Brandon Caserta wasn't there, right?

7    A    I am not sure if he was or not.

8    Q    Were the Null brothers there?

9    A    No.

10   Q    Okay.  And in a similar fashion to I guess with the

11   exception of Fowlerville there were different stations set up

12   at Munith, right, on August the 9th?

13   A    There was.

14   Q    Okay.  And people were training on various things, right?

15   A    Correct.

16   Q    People are involved in various conversations, correct?

17   A    Yes.

18   Q    Okay.  And just like we talked about in Peebles, Daniel

19   Harris is not involved in every conversation that was played

20   for you on Friday, correct?

21   A    Right.

22   Q    Okay.  You testified on Friday about the bug out plan.  Do

23   you remember that?

24   A    I do.

25   Q    Okay.  And you testified -- and that was in relation to

1    Daniel Harris saying he needed to work on his farming skills or

2    something along those lines, right?

3    A    I believe so.  Yes.

4    Q    Okay.  So you testified on Friday that, and correct me if

5    I'm wrong, the bug out plan was for after the governor was

6    taken?

7    A    It could have been for pertaining to the governor was taken

8    or if the, quote-unquote, shit hit the fan.

9    Q    Okay.  And I guess that's an important distinction, right?

10    And that's what I want to talk with you about.  So the bug out

11    plan, as Daniel Harris was talking about in the farming and as

12    you brought up, that's if shit hits the fan, correct?

13    A    Correct.

14    Q    Okay.  And if we could bring up 217T, please?  And if you

15    could highlight the first CHS Dan?  So this is a conversation

16    that you had with Mr. Fox on September the 7th.  Do you recall

17    listening to this transcript?

18    A    I do.

19    Q    Okay.  And Mr. Fox is talking about this bug out plan,

20    correct?

21    A    Yes.

22    Q    Okay.  And you say, well, for you so we are talking like

23    marshal law is being implemented, mass rioting is going on,

24    stuff like that, correct?

25    A    Correct.

1    Q    And you would agree with me that this is talking about if

2    shit hits the fan bug out plan, right?

3    A    Correct.

4    Q    Thank you.  After that training at Munith, you went to

5    BW3s, right?

6    A    Say again?

7    Q    After the training at Munith on August the 9th you went to

8    BW3s, Buffalo Wild Wings?

9    A    Yes.

10   Q    And you went with Ty Garbin?

11   A    Yes.

12   Q    And you went with Daniel Harris?

13   A    Yes.

14   Q    And that's the -- you call it BWWs, is that right?

15   A    Correct.

16   Q    That's the one in Brighton?

17   A    I believe so.  Yes.

18   Q    Okay.  And do you recall at that -- let me back up.  You

19   guys got something to eat, right?

20   A    Yes.

21   Q    Had some drinks?

22   A    We might have.

23   Q    Okay.  Did you see Daniel Harris drinking a beer?

24   A    I can't recall if he did or not.

25   Q    Okay.  Is that the first time that you had been to a BWWs

1    with Daniel Harris?

2    A    I am not sure to be honest.

3    Q    Okay.  Do you recall bringing up Adam being fixated on

4    doing something at BWWs?

5    A    I don't remember the exact contents of the conversation

6    there.  It's been quite a while.

7    Q    Okay.  But it was recorded, right?

8    A    It was.

9    Q    And you didn't go home after you left BWWs, right?

10   A    I might have went to the FBI office.  I am not sure on that

11   exact day.

12   Q    Okay.  Well, you recall making a phone call to Adam Fox,

13   right?

14   A    I do.

15   Q    Okay.  And you were with the agents, right?

16   A    Yes.

17   Q    Both of them were there with you?

18   A    Yes.

19   Q    Would that have been at their office?

20   A    Yes.

21   Q    And that was recorded, correct?

22   A    Yes.

23   Q    Okay.  And you recall the agents telling you to ask Adam

24   certain things, right?

25   A    Yes.

1    Q    Okay.  You recall the agents telling you to bring B.Puff

2    into the FAFO chat group, right?

3    A    I believe so.  Yes.

4    Q    And B.Puff is Brian Puffenberger, right?

5    A    Correct.

6    Q    And he is one of these boys that's going to the trainings,

7    right?

8    A    He is.

9    Q    And you asked Adam about that, right, under direction of

10   the special agents, correct?

11   A    Yes.

12   Q    And then you had a conversation with Adam at the direction

13   of the special agents about a plan, right?

14   A    A plan?

15   Q    Yeah.

16   A    Yes.

17   Q    Okay.  And in fact, you were looking for a plan for Ty and

18   Daniel Harris, correct?

19   A    I believe so.  I am not really sure on the conversation.

20   Q    Okay.  Do you recall talking to them about a softer target?

21   A    I believe so.

22   Q    Okay.  And trying to find a softer target for Daniel and Ty

23   Garbin, right?

24   A    I am not sure on the exact conversation, no.

25   Q    Would it refresh your recollection to look at --

1    A    It would.

2              MS. KELLY:  May I approach the witness, Your Honor?

3              THE COURT:  Sure.

4              THE WITNESS:  Thank you.

5    BY MS. KELLY:

6    Q    Sorry.  I know that was lengthy.  Did you have a chance to

7    look at that?

8    A    I did.

9    Q    Okay.  So did that refresh your recollection on the

10   conversation from August the 9th?

11   A    Yes.

12   Q    Okay.  So you recall talking to Adam Fox about a softer

13   target, right?

14   A    I do.

15   Q    Okay.  And you recall talking to Adam Fox at the direction

16   of your handling agents about this softer target might be

17   better for Ty and Dan, right?

18   A    Correct.

19   Q    Okay.  And that's Daniel Harris, right?

20   A    Correct.

21   Q    Okay.  And that softer target is the governor's boat,

22   correct?

23   A    Correct.

24   Q    Okay.  So at the direction of the special agents, there

25   is --

1        MR. KESSLER:  Your Honor, maybe as a practice we can

2   retrieve the exhibit that's being used to refresh because I see

3   him looking at reading off of it.

4        THE COURT:  He said he was refreshed but you can

5   retrieve it if you want.  It's a long document.  I doubt he's

6   able to read through all of it in quick succession /

7   BY MS. KELLY:

8   Q    Okay.  So the softer target being the governor's boat,

9   correct?

10  A    Correct.

11  Q    Okay.  And again, that's something that might be more

12  appeasing to Daniel Harris and Ty Garbin, correct?

13  A    Possibly, yes.

14  Q    Taking her boat.  Is it taking her boat?  Is it blowing up

15  her boat?

16  A    Destruction of the boat.

17  Q    So destroying her property?

18  A    Correct.

19  Q    Okay.  So you talked about with Mr. Gibbons yesterday a

20  little bit about some other suggestions that were thrown out to

21  Adam Fox.  Now we have another one, right, destroying her

22  property?

23  A    Yes.

24  Q    And that's the softer target that maybe Daniel Harris will

25  buy into?

1          MR. KESSLER:  I --

2          THE COURT:  I mean, that's not what he said and that's

3    sliding into a different line, so I think I'll sustain the

4    objection on that.

5    BY MS. KELLY:

6    Q    At the end of that conversation you put out information

7    onto the FAFO chat, is that right?

8    A    Yes.

9    Q    Okay.  And that's kind of a recap of this conversation that

10   you had with Adam Fox, right?

11   A    Yes.

12   Q    About this softer target?

13   A    Correct.

14   Q    And so that's approximately 8:36 p.m. on August the 9th,

15   correct?

16   A    Correct.

17   Q    And there is some discussion on the FAFO chat group, right?

18   A    Yes.

19   Q    After you put that out, right?

20   A    There was.

21   Q    Okay.  And we saw on August the 10th in the early morning

22   hours, 12:32 a.m. approximately, Mr. Harris responds?

23   A    Correct.

24   Q    Correct?

25          THE COURT:  I am not sure we're seeing that, right?

1     Are you pointing him to something that's already been admitted?

2              MS. KELLY:  Yes, Your Honor.

3              THE COURT:  What is it just for purposes of keeping

4     track, which exhibit, do you know?

5              MS. KELLY:  That is Exhibit 145 I believe.

6              THE COURT:  I don't show that as in.

7              MR. KESSLER:  No, Your Honor.  We didn't offer it.

8              MS. KELLY:  If I may just have a moment, Your Honor?

9     141.  Thank you.

10             THE COURT:  I do show 141 in.

11             MR. KESSLER:  Yes, Your Honor.

12             THE COURT:  Okay.

13    BY MS. KELLY:

14    Q    So if we could enlarge the first speaker and the text

15    response, please?

16             So you recall looking at this on Friday?

17    A    I do.

18    Q    Okay.  And 12:23.  So I was off on the time.  And this is

19    who you've identified as Daniel Harris, correct?

20    A    Correct.

21    Q    Okay.  And this is on August the 10th, right?

22    A    Yes.

23    Q    And Tex -- the government didn't ask you this, but Tex

24    responds, and who is Tex?

25    A    Sean Fix.

1    Q    And his response is, lol?

2    A    Correct.

3    Q    And what does lol mean?

4    A    Laugh out loud.

5    Q    Okay.  Thank you.  You can bring it down.

6         Those messages on FAFO that were sent August 10th, you

7    never had another discussion with Mr. Harris about those,

8    correct?

9    A    I don't believe so.  No.

10   Q    Okay.  Moving forward to August the 17th.  You testified on

11   Friday that the bonfire chat boys were amped up on August the

12   17th.  Do you remember saying that?

13   A    They were.

14   Q    Okay.  And that's -- they were amped up because Paul

15   Bellar's house had just been raided, correct?

16   A    Correct.

17   Q    And you guys have a discussion about that on August the

18   23rd back at Daniel's parent's house, correct?

19   A    Correct.

20   Q    And this time you met outside Daniel Harris's house?

21   A    And then we went inside.  Yes.

22   Q    Okay.  And there was that discussion about switching over

23   to a different app?

24   A    Yes.

25   Q    Right.  The one that you had to pay $3 for?

1    A    Correct.

2    Q    The government also showed you or played for you and showed

3    a transcript, 162T -- you don't have to bring it up.  I'll see

4    if he can remember it -- saying Daniel had a contractor friend

5    that was going to come to the FTX.  Do you remember that?

6    A    I do.

7    Q    300 mags and got all his gear, right?

8    A    Correct.

9    Q    Nobody like that showed up at the Luther FTX, correct?

10   A    They did not.

11   Q    On August the 29th, that's the day trip that you went up

12   north, right?

13   A    That's correct.

14   Q    Okay.  And you were directed to try to get more people to

15   come with you on that day trip, right?

16   A    I was.

17   Q    Okay.  And to maximize attendance, is that right?

18   A    Yes.

19   Q    Okay.  You were directed to invite Daniel Harris on August

20   the 29th, correct?

21   A    I was.

22   Q    Okay.  And you did so, right?

23   A    Yes.

24   Q    Okay.  And initially he said he got to work on Saturday,

25   right?

1    A    Correct.

2    Q    And then he said what about Sunday?

3         THE COURT:  You talking about the back and forth?

4    Unless it's already in evidence those statements can't come in

5    on your side of the case.

6         MS. KELLY:  Okay.

7         THE COURT:  At least in this form.

8         MS. KELLY:  Thank you, Your Honor.

9    BY MS. KELLY:

10   Q    You asked him to go with you on Saturday, correct?

11   A    Yes.

12   Q    You asked him to go on Sunday, correct?

13   A    Correct.

14   Q    He did not go on that trip with you, correct?

15   A    He did not.

16   Q    Okay.  You'd agree that from August the 23rd through the

17   end of August there was a lot of kind of changeover in the chat

18   groups, right?

19   A    There was.

20   Q    Okay.  And kind of started with the August 23rd we are

21   going to switch to Threema, right?

22   A    Correct.

23   Q    The bonfire or The Boys is eventually named Brick Squad,

24   right?

25   A    Correct.

Q    And that's Brick Squad on Threema, correct?

A    Yes.

Q    Okay.  The photos that we saw of your day trip on August the 29th, those photos were sent from Adam to you, is that right?

A    They were.

Q    Okay.  And that was on Wire?

A    It might have been on Threema.

Q    That might have been on Threema.  Okay.  And there was a discussion between the two of you who is going to push those pictures out to the group, right?

A    There was.

Q    Okay.  You recall you telling Adam they are not downloading for me, right?

A    Correct.

Q    And so you asked him to push them out to the group, right?

A    I did.

Q    On August the 29th you asked Daniel if he would add Adam to Brick Squad, right?

A    I might have.

Q    Were you aware that there was a vote on Brick Squad whether or not to let Adam into the group?

A    We had votes on every person that was brought into a group, kind of like a vetting process.

Q    Do you know how that vote came out?

1          MR. KESSLER:  Calls for hearsay, Your Honor.

2          THE COURT:  If he knows from some personal knowledge

3    that he was involved in.  I think there is testimony that he

4    was involved in the group, he can answer.  If it's just because

5    other people told him, he can't.  So maybe you need to get more

6    foundation.

7    BY MS. KELLY:

8    Q    You were part of that voting?

9    A    I was.

10   Q    Did you actually vote?

11   A    I think I voted in favor for Adam to come over.

12   Q    You think so?

13   A    I can't recall.

14   Q    Okay.  Fair enough.  You do know that Adam was never added

15   to Brick Squad, right?

16   A    Correct.

17   Q    And so on August the 31st there is a new FAFO Threema group

18   created, correct?

19   A    Under the direction of Daniel Harris I made a FAFO chat.

20   Q    You made that one?

21   A    I did.

22   Q    Okay.  And so Adam is in that one, right?

23   A    Yes, sir.

24   Q    So again, we have two separate chat groups going on, right?

25   A    Correct.

1    Q    So the pictures that we saw in the Government's Exhibit 175

2    of the day trip, they were never sent to FAFO Wire, right?

3    A    I can't recall.  I don't think so.

4    Q    They are not sent to the Brick Squad, right, because you

5    didn't send them?

6    A    Correct.

7    Q    And they are not sent on FAFO Threema either, right?

8    A    No.

9    Q    You testified a little bit about The Boys or the Brick

10   Squad leaving the Watchmen.  Do you remember testifying about

11   that?

12   A    I do.

13   Q    Okay.  And there was also a vote about whether or not they

14   were going to leave the Watchmen, correct?

15   A    I believe so.  Yes.

16   Q    Okay.  And you recall encouraging The Boys to stay with the

17   Watchmen until at least the FTX.  Do you recall that?

18   A    I believe so.  Yes.

19   Q    Okay.  Because the people at the FTX were going to think

20   that they were Wolverine Watchmen, right?

21   A    For the one in July?

22   Q    For the one in September.

23   A    I am not sure what the persona was at that time.  I know in

24   Wisconsin they were understanding that they were the Wolverine

25   Watchmen.

1  Q    Okay.  I guess my question is, so we are talking August the

2  26th, right?  Just a couple of weeks before the Luther FTX,

3  right?

4  A    Correct.

5  Q    And the Wolverine Watchmen are -- or The Boys are upset

6  with Pete, correct?

7  A    Pete and Joe, yes.

8  Q    Okay.  And they want to leave the Watchmen, correct?

9  A    Paul created The Shadow Group, so that's what separated us

10 initially from the Wolverine Watchmen, and then we just

11 continued further onto the Threema.

12 Q    Okay.  So Paul created The Shadow Group.  That's that July

13 7th bonfire chat group, right?

14 A    Correct.

15 Q    And so do you recall the conversation in late August about

16 officially breaking up with the Watchmen?

17 A    I don't know if it was officially break up, because later

18 on they was wanting us to attend another protest in September

19 and to show up in full kit, and Ty was advising us not to go

20 and keep a low profile.

21 Q    Okay.  Do you recall encouraging The Boys not to leave the

22 Wolverine Watchmen in late August because the people at Luther

23 thought they were going to be the Wolverine Watchmen?

24 A    I don't recall that.  No.

25 Q    Would it refresh your recollection to look at something?

1    A    It would.

2    Q    Okay.  So if we could show the witness only 4046?  I am not

3    introducing this as an exhibit.  Did you have a chance to

4    review that?

5    A    I do.

6    Q    And does that refresh your recollection onto this

7    conversation that we've been discussing?

8    A    It does.

9    Q    Okay.  And do you recall advising the bonfire boys or the

10   Brick Squad the knee jerk is to punt that decision about

11   leaving the Watchmen?

12   A    Correct.

13   Q    Because again, we have an FTX coming up?

14   A    Correct.

15   Q    Do you recall reaching out to the special agents after this

16   discussion about maybe applying more pressure?

17   A    I do.

18   Q    To keep The Boys together with the Watchmen?

19   A    Possibly.  I am not sure of the exact contents of that

20   conversation.

21   Q    Okay.  Would it refresh your recollection to look at text

22   communication?

23   A    With the agents or with the people that was more pressure

24   to.

25   Q    With the agents?

1    A    I remember the conversation with the agents on applying

2    more pressure, but I don't know what the conversation -- I am

3    assuming you are referring to Pete, if it was him on with

4    regards to whether I was a fed or not.

5    Q    All right.  So my question was about your conversation with

6    the agents and whether or not you should apply more pressure to

7    keep The Boys with the Watchmen.  You recall that conversation?

8    A    I do.

9    Q    Okay.  And that was a question that you asked of the

10   agents, right?

11   A    I do.

12   Q    Okay.  And the agents suggested that you reach out to Paul

13   and -- sorry, Joe and Pete, correct?

14   A    I do.

15   Q    And you did that?

16   A    Yes.

17   Q    Okay.  And then we have the Luther weekend that's up at

18   Ty's property, correct?

19   A    Correct.

20   Q    Okay.  Had you been to that property prior to September

21   2020?

22   A    That was my first time.

23   Q    Okay.  You were aware that Ty Garbin and Daniel Harris,

24   Kaleb Franks and Solomon Clark had been building a backstop on

25   the property?

A    They were constructing a shoot house and a backstop for us.
Yes.

Q    Okay.  And the backstop we heard is there was some -- a
tire wall, right?

A    Correct.

Q    And then there is another part that's plywood?

A    Correct.

Q    Okay.  Because they were sending photographs of that,
correct?

A    They were.

Q    Okay.  So you got to Ty's property late on Friday night,
right?

A    Yes.

Q    Okay.  And who did you arrive with?

A    I can't recall.  Maybe just myself.  I might have had Adam.
I am not sure.

Q    Okay.  You talked about a trailer.  That's Ty Garbin's
trailer, right?

A    Correct.

Q    And there were a bunch of guys that slept in that trailer,
right?

A    There was.

Q    Okay.  And that confederate flag that we saw was hanging on
the wall in the trailer, right?

A    Correct.

1    Q    And you said that Ty Garbin asked you to sign it?

2    A    Yes.

3    Q    Were there other signatures on that flag that you didn't

4    recognize?

5    A    There was.

6    Q    Okay.  Were there dates on that confederate flag?

7    A    I don't know if there was dates or not.

8    Q    Okay.  The morning, on Saturday morning, you drove up to

9    that Walmart in Cadillac to kind of meet with people to bring

10   them back to the property, right?

11   A    Yes.

12   Q    Okay.  And you rode with Adam?

13   A    Yes.

14   Q    And Brian Puffenberger, right?

15   A    I believe so.  Yes.

16   Q    Okay.  Do you recall what time you left?

17   A    Not offhand.  No.

18   Q    Okay.  Sometime in the morning, though?

19   A    I believe so.

20   Q    Okay.  You began the discussions about going on a night

21   ride-along on that drive up to Cadillac and back.  Do you

22   recall that?

23   A    There was discussion of that.  Yes.

24   Q    Okay.  You recall saying a rainy night was a perfect time

25   to do it?

1    A    Yes.

2    Q    You also started the conversation about who was going to go

3    on the night ride-along, right?

4    A    There was discussion of that.  Yes.

5    Q    Okay.  There was continued discussions about that

6    throughout the day, right?

7    A    Yes.

8    Q    Okay.  And you recall one person that you knew was not

9    going to go and that was Daniel Harris, right?

10    A    I believe so.  Yes.

11    Q    Okay.  And you told that to Adam, right?

12    A    I believe so.  I can't really recall that exact day.

13    Q    Okay.  When you got back to the campsite, or to the

14    property, were the tarps already set up?

15    A    Yes.

16    Q    Were they -- were the tarps set up when you left that

17    morning?

18    A    I don't believe so.

19    Q    Okay.  But when you got back they were assembled, is that

20    fair?

21    A    They were.

22    Q    Okay.  So you didn't actually watch the assembly take

23    place?

24    A    No.

25    Q    Okay.  And you had your phone with you, right?

1    A    I did.

2    Q    Okay.  And you had that realtor app on your phone, right?

3    A    Yes.

4    Q    Okay.  As with the other trainings, there were different

5    stations at Luther, right?

6    A    Correct.

7    Q    Okay.  And we heard about a weapons manipulations station,

8    right?

9    A    There was.

10   Q    That was run by Kaleb Franks?

11   A    I believe so.  Yes.

12   Q    Okay.  Then there was a medical tent, right?

13   A    There was.

14   Q    Run by Daniel Harris?

15   A    I believe so.

16   Q    Okay.  And then there is this shoot house or tarp house,

17   right?

18   A    Correct.

19   Q    That's where you were?

20   A    I was there on and off.  Yes.

21   Q    Do you recall providing instruction or direction at the

22   shoot house?

23   A    I assisted.  Yes.

24   Q    Okay.  And you recall telling folks that were going through

25   the shoot house that you were treating it like a single room?

1    A    At that point, yes.

2    Q    Okay.  During the day on Saturday you never talked to

3    Daniel Harris about going on a ride up north, right?

4    A    I can't recall.

5    Q    It would have been recorded, right?

6    A    It would have.

7    Q    Because you were wearing your recording device?

8    A    I was.

9    Q    Okay.  You testified on Friday that you -- he was

10   monitoring his dog?

11   A    He had his dog up there.  Yes.

12   Q    Ollie?

13   A    Yes.

14   Q    Okay.  And did you notice that he left the property a

15   couple of times on Saturday?

16   A    There was a lot of people there.  I wasn't really paying

17   attention to who was coming and going.

18   Q    A lot of moving parts?

19   A    There was.

20   Q    Okay.  Fair enough.  And you watched some videos with Red,

21   right, on Saturday?

22   A    I believe so.  It might have been Sunday was when he showed

23   everybody.

24   Q    You don't recall watching the Red videos with Adam and Mark

25   and Red and Steve Robeson on Saturday?

1    A    I know we watched some videos.  I am not sure which day it

2    was.

3    Q    Okay.  Do you recall telling folks that you were going to

4    go on this -- not -- night ride-along when it turns dark?

5    A    Yes.

6    Q    Okay.  Do you recall what time you left the property for

7    the ride-along?

8    A    Later that evening.

9    Q    When it was dark?

10   A    Yes.

11   Q    Okay.  And you drove your truck?

12   A    Yes.

13   Q    Okay.  Prior to you leaving was there people grilling out

14   food?

15   A    They were.

16   Q    Drinking beer?

17   A    They may have been.

18   Q    Listening to music?

19   A    Yes.

20   Q    You see Daniel Harris drinking beer that night?

21   A    I am not sure what he was drinking.

22   Q    But you saw him by the bonfire talking with people?

23   A    Yes.

24   Q    Okay.  Did you see him drinking alcohol?

25   A    He was drinking.  I don't know what he was drinking,

1    though.

2    Q    Okay.  So you get in your truck, and who was in your truck

3    with you when you left the property?

4    A    Red, and I am not quite sure on the other individuals that

5    might have been in there.  We drove to the south to pick up

6    some more individuals.

7    Q    Okay.  But you know for sure Red was in your truck?

8    A    He was.

9    Q    Okay.  And this is the truck that we saw in those videos of

10   you guys driving out to the lake?  Same truck?

11   A    Same truck.

12   Q    Okay.  Plenty of room in the back?

13   A    Yes.

14   Q    And you went south first because that's where Barry Croft

15   was?

16   A    Correct.

17        MS. KELLY:  Okay.  Sorry, Your Honor.  If I may have

18   just one moment?

19        THE COURT:  Sure.

20   BY MS. KELLY:

21   Q    Do you recall having a conversation with Red when you guys

22   got in the truck about who was going and who knew what?

23   A    I believe so.

24   Q    Sorry.  What was that?

25   A    I believe so.

1    Q    Okay.  And you recall Red asking if -- if you knew if other

2    people knew what was going on?

3              MR. KESSLER:  Calls for hearsay, Your Honor.

4              THE COURT:  Well, Red is a sworn agent, is he not?

5              MR. KESSLER:  You are right.  I'll withdraw it, Your

6    Honor.

7              THE COURT:  So it's overruled.  Go ahead.

8    BY MS. KELLY:

9    Q    Do you recall that?

10   A    I do not.

11   Q    I know I didn't ask it in a very meaningful way, but do you

12   recall Red asking you, when we leave are the folks that are

13   going, do they know what's happening?

14   A    I can't recall.  No.

15   Q    Would it refresh your recollection to take a look at a

16   transcript?

17   A    Yes.

18             MS. KELLY:  Okay.  May I approach, Your Honor?

19             THE COURT:  Sure.

20             THE WITNESS:  Thank you.  All set.

21   BY MS. KELLY:

22   Q    Thank you.  Have you had an opportunity to review that

23   transcript?

24   A    I have.

25   Q    Did that refresh your recollection as to a conversation you

1    had with Red when you guys were leaving the property?

2    A    It does.

3    Q    Okay.  And do you recall Red asking you about whether or

4    not people knew what was actually happening?

5    A    I do.

6         MS. KELLY:  Okay.  And sorry, may I approach to

7    retrieve the item, Your Honor?

8         THE COURT:  Sure.

9         THE WITNESS:  Thank you.

10   BY MS. KELLY:

11   Q    And you recall telling Red that you had tasked Adam to talk

12   to people during the day, right?

13   A    He went up through the day and talked to people.  Yes.

14   Q    And you also told Red that you went and brought people in,

15   correct?

16   A    That I brought people in?

17   Q    Correct.

18   A    That they knew what was going on.  Yes.

19   Q    Okay.  And you said you brought in people like Ty, right?

20   A    He was aware of what was going on.

21   Q    I'm asking what you said to Red.

22   A    Yes.

23   Q    Okay.  And you recall Red also asking you if the guys were

24   actually into this, right?

25   A    Yes.

Q    And you said yes?

A    Yes.

Q    Okay.  You testified on Friday that you talked to Daniel Harris about raising funds, $4,000, for explosives, right?

A    Yes.

Q    That was your specific statement is that you talked to Daniel Harris for explosives, right?

A    That's what the $4,000 was for, yes, was for explosives.

Q    And my question is your testimony under oath is that you talked to Daniel Harris about $4,000 being for explosives?

A    Yes.

Q    Okay.  Was that in a phone call?

A    That was at the circle of trust meeting that happened on Sunday.

Q    So you are saying at the circle of trust meeting that Sunday morning at Luther?

A    Correct.

Q    Okay.  That you talked to -- you personally talked to Daniel Harris, correct?

A    He was part of the group that was shown the video of explosives.  Yes.

Q    Okay.  So my question is, you -- your testimony was that you had a conversation with Daniel Harris and he approved pool money to use for explosives, correct?

A    Yes.

1    Q    Okay.  And you are saying that was at the circle of trust?

2    A    That was later on in a text message for when we were going

3    to have gear to meet up with Red.

4    Q    Got it.  Okay.  So the pooled money was in a text message,

5    correct?

6    A    I believe so.

7    Q    A private message between you and Daniel Harris, correct?

8    A    I believe so.  Yes.

9    Q    Okay.  Isn't it true in those text messages, those private

10   messages between you and Daniel Harris ahead of October the

11   7th, that you specifically said it was for free gear?  Do you

12   recall that?

13   A    That was what the meeting for Red was.  Yes.

14   Q    Was for free gear?

15   A    Yes.

16   Q    Okay.  Med kits, right?

17   A    Yes.

18   Q    Plate carriers, right?

19   A    Correct.

20   Q    Drop legs, correct?

21   A    Correct.

22   Q    Never said the word explosives, right?

23   A    No.

24   Q    Okay.  And you also said, we can meet up with him, get this

25   free gear, and get some BWWs, right?

1    A    Correct.

2    Q    Because you knew that Daniel Harris liked BWWs?

3    A    That was to get everybody together in one location.  Yes.

4    Q    Did you tell Daniel Harris to bring money?

5    A    I told him I would be bringing money.  Yes.

6    Q    You said you'd bring a hundred bucks or something?

7    A    I did.

8    Q    As kind of good faith for Red for driving there?

9    A    Correct.

10    Q    And again, you never said it was for explosives, correct,

11  to Daniel Harris?

12    A    No.

13    Q    Okay.  In Government's Exhibit 276, you went back to Adam

14  Fox and said, Beaker said we could use the pool money, right?

15    A    I do.

16    Q    And on October the 7th, you met at Ty's house, right?

17    A    Yes.

18    Q    Okay.  And you testified on Friday that the boys thought

19  they were going to BWWs, right?

20    A    They did.

21    Q    Okay.  And when you -- that's a BWWs in Ypsilanti, right?

22    A    Correct.

23    Q    Right off the highway?

24    A    Correct.

25    Q    You pull off and the BWWs is right there off the exit,

1    right?

2    A    It is.

3    Q    Drove past that and went to what's now an abandoned

4    warehouse, correct?

5    A    Correct.

6    Q    And you testified there was a sign where you grabbed a

7    lower out of the back seat of your car?

8    A    That was to indicate to the HRT team that I was ready.

9    Q    Okay.  And that's when they came and arrested all The Boys?

10   A    Briefly.  Yes.

11        MS. KELLY:  I have nothing further.  Thank you.

12        THE COURT:  All right.  Why don't we take our morning

13   break unless you are going to be real quick?  So why don't we

14   take our morning break now since it's a pretty natural time and

15   we'll come back in 20 minutes.

16        LAW CLERK:  All rise, please.

17        (Jury out, 10:06 a.m.)

18        THE COURT:  Okay.  We'll break in 20 minutes.  You

19   know, I know everybody needs to cover with their own exams what

20   they think is critical to their client's case, and I understand

21   that.  It helps, I think, all of you to remember how long and

22   how much time you've put into all the details and remember that

23   nobody, not me, not any member of the jury, is ever going to

24   know even a fraction of what you know.  And it's very easy to

25   lose a narrative on either side of the V in too much detail and

certainly in repetition, which is a challenge when you have multiple parties.  I know.

So that's an observation I'll leave you with.  And you know, we have a witness who has already been basically on the stand for two days.  He is on his way to finishing another full day.  There is a lot of people to hear from, and sometimes less is more.  So with that, 20 minutes.

LAW CLERK:  Court is in recess.

(Recess taken, 10:07 a.m.)

(Resume Proceeding, 10:33 a.m.)

LAW CLERK:  All rise, please.

(Jury in, 10:33 a.m.)

LAW CLERK:  The United States District Court for the Western District of Michigan is now in session.  The Honorable Robert J. Jonker, chief judge, presiding.

THE COURT:  All right.  Welcome back.  You all in the jury box got the liturgy of the courtroom pretty fast.  It usually takes juries a while to figure out what we are doing, standing up, sitting down, and all of that, and I think you have been doing it like pros from the very first time.

And the other thing I see is that some of you are experiencing what I think I told you about, that the temperature swings in here can get pretty strong.  So I see a couple winter jackets on and I kind of understand that. Hopefully things will start to even out and warm up again.  And

1    as I think I said the first day you were all here, about the

2    only defense is layers because I have been unable to get even

3    temperatures.  They'll deliver the average over time but not

4    even temperatures necessarily.  So glad you have been paying

5    attention to that as well.

6              We are now ready to go to Mr. Hills' exam on behalf of

7    Mr. Caserta, and turn it over to you, sir, whenever you are

8    ready.

9              MR. HILLS:  Thank you, Your Honor.

10                        CROSS EXAMINATION

11     BY MR. HILLS:

12   Q    Good morning, Mr. Chappel.

13   A    Good morning, sir.

14   Q    Brandon Caserta, he came into the Wolverine Watchmen in

15   June of 2020, is that correct?

16   A    Sounds about right.  Yes.

17   Q    And at that point you were fully engaged with the FBI,

18   correct?

19   A    I was.

20   Q    The routine that you have built up to that point, at least

21   you were recording lots of events, is that right?

22   A    I was.

23   Q    You would report back to your handlers?

24   A    Correct.

25   Q    And you would report back to events that you would go to to

1   them?

2   A    Correct.

3   Q    You would advise them of the attendees, correct?

4   A    I would.

5   Q    So that they could catalog these events, is that correct?

6   A    Correct.

7   Q    And during the course of your testimony over these past

8   days, you have been -- your memory has been refreshed with

9   their reports, correct?

10  A    Correct.

11  Q    And I'd like to walk through with you if I could, so we can

12  establish where Mr. Caserta was, and a couple of places he

13  wasn't, okay?

14  A    Correct.

15  Q    All right.  June 14th, 2020, that was -- there was an FTX

16  at Munith, correct?

17  A    Correct.

18  Q    At that FTX Mr. Caserta was there, is that right?

19  A    I believe so.  Yes.

20  Q    And then moving forward there was another one.  The next

21  exercise was on June 28, is that right?

22  A    Correct.

23  Q    And Mr. Caserta was at that one, is that right?

24  A    I believe so.  Yes.

25  Q    And on July 7th, you have testified about this event.  This

1      was an event at Paul Bellar's house, is that correct?

2      A    Correct.

3      Q    Now, Mr. Caserta was not at that one, correct?

4      A    Correct.

5      Q    All right.  Now, moving forward from there is Cambria,

6      Wisconsin.  That's, I think you drove July 10th and were there

7      11th, 12th and then came back on the 13th, is that right?

8      A    That's right.

9      Q    And Mr. Caserta was there, is that right?

10     A    He was.

11     Q    Then from there, July 26th, there was an exercise at

12     Fowlerville, is that correct?

13     A    That's correct.

14     Q    And Fowlerville, that's Kaleb Franks' parent's house,

15     correct?

16     A    Correct.

17     Q    And Mr. Caserta was there, is that right?

18     A    Correct.

19     Q    And on August 9th, there was an FTX at Munith, correct?

20     A    Correct.

21     Q    And at that one Mr. Caserta was not at that one?

22     A    I don't believe he was.  No.

23     Q    Okay.  And then on August 16th you had a meeting with

24     Mr. Caserta, is that right?

25     A    I did.

Q    And that was at his house?

A    It was.

Q    And he was there?

A    Yes.

Q    Okay.  From there, August 23rd there was a meeting at Lake Orion.  That's Daniel Harris's house, is that correct?

A    That's correct.

Q    And Mr. Caserta was there?

A    Correct.

Q    And then lastly, Mr. Caserta was at Luther, that's September 12th and 13th -- 12th and 13th, correct?

A    Correct.

Q    And that's the sum total of where Mr. Caserta was at, correct?

A    Correct.

Q    I won't go through all of them, but there were a lot of protests that have been talked about, correct?

A    That's correct.

Q    And Mr. Caserta was not at any protest?

A    No.

Q    You talked about some QRFs.  Mr. Caserta was not at any QRFs?

A    He was not.

Q    Never been to the -- Mr. Caserta was never at the Vac Shack with you?

1      A    No.

2      Q    And you testified about chats.  There were several chats

3      that come along with the Wolverine Watchmen, correct?

4      A    There was.

5      Q    All right.  And one of them was a leadership chat?

6      A    Correct.

7      Q    And you were in that one?

8      A    I was.

9      Q    And Mr. Caserta was not in that one?

10     A    He was not.

11     Q    He was not in any leadership position at any time, correct?

12     A    No.

13     Q    That's -- I'm sorry?

14     A    He was not.

15     Q    These -- Mr. Fox was not in any of these Wolverine Watchmen

16     chats except for FAFO, correct?

17     A    I believe so.  That's correct.

18     Q    All right.  And it gets a little confusing because there

19     were two FAFOs, correct?

20     A    Correct.

21     Q    There is kind of a long form FAFO, fuck around find out, on

22     Wire, correct?

23     A    Correct.

24     Q    That had some of the people from the Wolverine Watchmen in

25     it, correct?

1    A    Correct.

2    Q    And that FAFO on Wire also had Adam Fox in it, is that

3    correct?

4    A    Correct.

5    Q    But that FAFO Wire did not have Brandon Caserta in it,

6    correct?

7    A    I don't believe so.  No.

8    Q    Okay.  And so then up until FAFO Threema Mr. Caserta and

9    Mr. Fox were not on any group chats together, correct?

10   A    The group ones, no.

11   Q    Okay.  And the -- I think you already testified that the

12   FAFO Threema started August 31st, correct?

13   A    Correct.

14   Q    And you were the administrator on that one, correct?

15   A    I was.

16   Q    And then that one Mr. Caserta is on and Mr. Fox is on,

17   correct?

18   A    They are.

19   Q    So moving towards June 14th.  Let's go back to June 14th.

20   This is the first FTX that Mr. Caserta is at, correct?

21   A    Correct.

22   Q    And at this point I think you testified earlier that in

23   your service you were a sergeant, correct?

24   A    I was.

25   Q    And there were other military people in the -- in the

1    group, is that correct?

2    A    There is.

3    Q    But you out ranked them all?

4    A    At that time I was just a civilian.  My prior status in the

5    military, yes, I was a sergeant.

6    Q    Well, they were all civilians at that point, right?

7    A    Correct.

8    Q    So the last rank that you all had you out ranked them?

9    A    Correct.

10   Q    And you don't have any information that Mr. Caserta was in

11   the military?

12   A    I do not.

13   Q    Okay.  But on June 14th you had been in and you are the XO

14   at this point, is that correct?

15   A    Yes.

16   Q    And in charge of training and you indicated with Paul

17   Bellar?

18   A    Correct.  I assisted training with him.

19   Q    And the June 14th training, this is at Munith, and mostly

20   dry fire at Munith?

21   A    Towards the end it became live fire.  Yes.

22   Q    On June 14th mostly dry fire?

23   A    Mostly.  Yes.

24   Q    All right.  And same on June 28th, mostly dry fire?

25   A    Correct.

1    Q    There is some -- there is a small range out behind it and

2    you can go shoot your gun, correct?

3    A    Correct.

4    Q    And that would be live fire?

5    A    Correct.

6    Q    But for the most part it's weapons manipulation training,

7    that type of thing, correct?

8    A    Correct.

9    Q    And we saw some videos of, I think -- well, I know we saw a

10   video of Mr. Caserta changing his mag in his gun, correct?

11   A    Correct.

12   Q    And that's the dry fire training that you were teaching?

13   A    One of the forms of training that we were doing.  Yes.

14   Q    One of them?

15   A    Yes.

16   Q    And after that there were a couple, lots of phone calls

17   with Adam Fox and Joe Morrison, correct, that you've testified

18   about?

19   A    Correct.

20   Q    None of those involved Mr. Caserta, is that right?

21   A    Correct.

22   Q    He didn't -- he wasn't -- you never had a phone call with

23   Mr. Caserta, correct?

24   A    I don't believe so.  No.

25   Q    And leading up to the June 28th FTX, there was, I guess,

1    the Vac Shack meeting on the 20th, correct?

2    A    Correct.

3    Q    And a protest on the 18th where you met Mr. Fox?

4    A    Correct.

5    Q    All right.  And Mr. Caserta didn't go to those?

6    A    No.

7    Q    On the 28th at Munith -- now, Munith -- Munith is around

8    Jackson, Michigan, is that correct?

9    A    That's correct.

10   Q    So that's kind of south Central Michigan down at the kind

11   of your palm?

12   A    Correct.

13   Q    All right.  And you were in Flint at that time, correct?

14   A    I was.

15   Q    Hour and-a-half to get from your place to Munith roughly?

16   A    Roughly.

17   Q    So three-hour round trip?

18   A    Correct.

19   Q    In regarding your -- well, there was discussion about you

20   inviting Mr. Fox to this meeting, is that correct?  You

21   remember that?

22   A    I do.

23   Q    Okay.  And you had a telephone call from Jada Morrison and

24   Joe Morrison, correct?

25   A    Correct.

Q    All about getting Mr. Fox into this meeting, correct?

A    Correct.

Q    And you were, I think, kind of the middleman for this, is
that right?

A    I was.

Q    All right.  Mr. Caserta didn't have anything to do with any
of those calls?

A    No.

Q    He didn't have anything to do with Mr. Fox getting there?

A    No.

Q    All right.  And this would have been the first time that
you know about that Mr. Caserta would have ever seen Mr. Fox,
correct?

A    Correct.

Q    All right.  Now, Mr. -- there was a training again mostly
dry fire on the June 28th event, correct?

A    Correct.

Q    And then after all that training, subsequent to that,
Mr. Fox spoke, is that correct?

A    He did.

Q    And Pete Musico, who lived on the property, he spoke, too,
is that right?

A    He did.

Q    All right.  And prior to them speaking do you remember that
Kaleb Franks had left?

1    A    I do.

2    Q    Okay.  So Mr. Franks had left before these speeches were

3    made, correct?

4    A    Correct.

5    Q    So from there, July 7th, we have established that

6    Mr. Caserta was not there, right?

7    A    Correct.

8    Q    And this is where code words were discussed, is that right?

9    A    That's correct.

10   Q    And Mr. Caserta didn't have any input on any code words, is

11   that right?

12   A    He did not.

13   Q    And I looked at these code words.  There is no code word

14   for governor, correct?

15   A    Correct.

16   Q    Or kidnapping, correct?

17   A    Correct.

18   Q    Or politician, correct?

19   A    Correct.

20   Q    So from there, July 10th, 11th, 12th, 13th is Cambria, is

21   that right?

22   A    That is correct.

23   Q    Cambria, Wisconsin.  Well, let me -- I have got a map I

24   believe.  Let's see if you can -- if you recognize this.  Just

25   for the witness if we can.  5208 I believe it is.  All right.

1       I thought it would come on mine, too.  Can you see it?

2       A    I do.

3       Q    All right.

4               THE COURT:  It should be on yours.

5               MR. HILLS:  It's not.

6               THE COURT:  Is it on counsel's?

7               MR. KESSLER:  We can see it, Your Honor.

8               THE COURT:  Somebody must have turned it off.

9               MR. HILLS:  Let me come over and look.  That's fine.

10      Yeah, 5208.

11              THE COURT:  Is the monitor on?

12              MR. HILLS:  I don't know.  I can push the button.

13              THE COURT:  Try it.

14              MR. HILLS:  If the tech guy isn't going to shoot me.

15              THE COURT:  Not working.  Maybe it timed out.  All

16      right.

17              MR. HILLS:  Well, maybe I should wear my glasses to

18      see.  Oh, that helps.

19              THE COURT:  Vanity.

20              MR. HILLS:  Yeah.  Well, I got -- all right.  Well,

21      the blue light went on.

22              THE COURT:  That's a good start.

23              MR. HILLS:  There we go.  Okay.  Got it.

24      BY MR. HILLS:

25      Q    All right.  Does this accurately reflect a map of Michigan

1    and Wisconsin and the route you would have gone?

2    A    It does.

3              MR. HILLS:  Okay.  I'd ask if we can publish 5208?

4              THE COURT:  Any objections?

5              MR. KESSLER:  No objection.

6              THE COURT:  It's admitted.

7    BY MR. HILLS:

8    Q    All right.  So you testified prior to this you had rented a

9    Suburban?

10   A    I did.

11   Q    And a Suburban is a big truck, correct?

12   A    Correct.

13   Q    SUV I guess you'd call it?

14   A    Yes.

15   Q    And so it could fit a lot of people in it, right?

16   A    People and equipment.  Yes.

17   Q    People and equipment.  And you testified, I believe, that

18   you picked up Dan Harris, Kaleb and Kaleb Franks and Paul

19   Bellar first, is that right, in a park and ride?

20   A    Correct.

21   Q    And from there you went to Ty Garbin's?

22   A    Correct.

23   Q    And picked up Ty Garbin and Brandon Caserta, correct?

24   A    Correct.

25   Q    And then you would have driven from Michigan all the way to

1    Cambria, Wisconsin?

2    A    That is correct.

3    Q    And that's maybe seven hours or so?

4    A    Correct.

5    Q    And you had been recording -- you were recording

6    everything, correct?

7    A    Correct.

8    Q    You can put it down.

9         So you came to find out that Mr. Caserta --

10   Mr. Caserta's car was not very reliable, correct?

11   A    Correct.

12   Q    And we'll get to it a little bit later, but you had helped

13   him fix his car, correct?

14   A    I did.

15   Q    Okay.  All right.  So Mr. Caserta didn't have to drive to

16   Cambria?  You drove the whole way?

17   A    I did.

18   Q    Paid for the gas?

19   A    I did.

20   Q    And the hotel room was paid for as well, is that right?

21   A    I am not sure who paid for the hotel room.

22   Q    All right.  Mr. Caserta didn't pay for the hotel room?

23        MR. KESSLER:  Speculation, Your Honor.

24   BY MR. HILLS:

25   Q    If you know?

1          THE COURT:  Pardon?

2          MR. KESSLER:  It's speculation.

3          THE COURT:  If he knows he can say it.  He said he is

4   not sure who did, but he may know some people who didn't, so I

5   think you can ask and if the witness knows he can answer.

6   BY MR. HILLS:

7   Q    I'll just move onto a different question.  You started

8   out -- you started out this adventure not knowing if you were

9   going to be sleeping in tents or a hotel or what, correct?

10  A    Correct.

11  Q    It ended up that you were in a hotel, is that right?

12  A    The first night, yes.

13  Q    And the first night you were in a hotel you were with the

14  whole group?  Well --

15  A    The whole group.  Yes.

16  Q    With the people you went with, right?

17  A    Correct.

18  Q    And slept the night with all of them in there, right?

19  A    Correct.

20  Q    Mr. Caserta went eventually and got a different hotel room,

21  is that right?

22  A    He did.

23  Q    So he slept the second night separate from you guys?

24  A    Correct.

25  Q    Okay.  And throughout this, Mr. -- there were several

trainings.  The barrel training, correct, going from barrel,

one barrel, breaking contact, going to another barrel, right?

A    Correct.

Q    And then we saw some pictures of this shoot house, is that

right?

A    Correct.

Q    All right.  And it wasn't Mr. Caserta's idea to set up the

shoot house, is that right?

A    No.

             MR. KESSLER:  Speculation.

             MR. HILLS:  All right.  If he knows.

             THE COURT:  Speculation is one thing, and it's -- also

it gets really close to the line of where he gets the

information or knowledge, and we can easily tread into hearsay

territory.  So go ahead.

BY MR. HILLS:

Q    All right.  Mr. Caserta didn't create an itinerary for this

event, is that right?

A    No.

Q    And it was hosted by somebody else, Steve Robeson I

believe, correct?

A    I believe.

Q    Okay.  And now you know Steve Robeson was a CHS, correct?

A    Correct.

Q    And Jenny Plunk was there as well, is that right?

1    A    Correct.

2    Q    And now you know Jenny Plunk was a CHS, is that right?

3    A    Correct.

4    Q    And UCE undercover employee Mark was there also, is that

5    right?

6    A    He was.

7    Q    Multiple people apparently recording the event, correct?

8    A    They were.

9          MR. HILLS:  And the -- let's -- if we can throw up

10   105.1?  I believe you got that in there.

11         MR. KESSLER:  I believe so.

12         MR. HILLS:  I want to make sure it's in first.

13         THE COURT:  I show it in.

14         MR. HILLS:  105.1.

15   BY MR. HILLS:

16   Q   You don't have to -- I don't care about the audio.  Keep it

17   muted.  We are on mute I guess over here.  All right.  So you

18   can just stop it right there.  There was -- there was a

19   cameraman in the film, is that right?

20   A    There was.

21   Q    All right.  Taking it looked like still pictures; is that

22   what he was doing?

23   A    Yes.

24   Q    And then obviously there is another camera person taking a

25   video, is that right?

1    A    Correct.

2    Q    And so there is -- nobody is complaining -- that's out in

3    the open, right?

4    A    Right.

5    Q    So nobody is trying to restrict video taking or picture

6    taking, is that right?

7    A    That is correct.

8    Q    It's -- if this is a secret it's not very good OPSEC,

9    right?

10   A    That's correct.

11   Q    Okay.  Thank you.  You can take that down.

12         Now, I guess it probably goes without saying, after

13   Cambria you were the driver.  You chauffeured them all back

14   home, correct?

15   A    That's correct.

16   Q    I just want to touch on just a moment Ms. Kelly brought up

17   this issue about blame Trent.  Do you recall that testimony?

18   A    I do.

19   Q    Okay.  And that was regarding you thought you might be

20   compromised, is that right?

21   A    Correct.

22   Q    And the FBI directed you to was to blame somebody else like

23   Trent, correct?

24   A    Correct.

25   Q    And now, Trent, he wasn't an undercover, is that right?

1    A    No.

2    Q    Okay.  And you didn't actually -- well, let me ask this.

3    If you were compromised you could have gotten out of the

4    situation, correct, pulled out completely, is that right?

5    A    Correct.

6    Q    But the reaction from the FBI is to blame an innocent

7    person as being an undercover fed, right?

8    A    He was going on the name of Fed Boy to begin with, and a

9    lot of people were making assumptions that he was, and I did

10   not say that Trent was a fed.

11   Q    So they might actually believe it, right?  That's the

12   point?

13   A    It would continue on the conversation that they were

14   already having.  Yes.

15   Q    And supposedly this is a dangerous organization, correct?

16   A    Correct.

17   Q    All right.  So blaming an innocent person who they already

18   might think is a fed?

19   A    Right.  But I did not do that.

20   Q    I am not asking whether you did it.  I'm asking whether the

21   FBI encouraged you to blame an innocent person who the

22   Wolverine Watchmen already think is an undercover fed?

23   A    Correct.

24   Q    July 26th, Fowlerville.  This is at Kaleb Franks' place,

25   correct?

1    A    Correct.

2    Q    Again, recording everything, is that right?

3    A    Correct.

4    Q    And at this location, this is where we saw the PT Cruiser,

5    is that right?

6    A    That is correct.

7    Q    And I happened to catch it.  I don't know if you did.

8    There is a big propane tank, like a house propane tank at the

9    end of your range there, correct?

10   A    Off to the left side.  Yes.

11   Q    Yeah.  And your crisscrossing shooting metal targets?

12   A    The propane tank was at a further distance.  It wouldn't

13   have been hit.

14   Q    That's not necessarily safe, is it, to have a propane tank

15   down range?

16   A    Nothing is really safe when you are doing live fire

17   techniques.  That's why we were practicing with dry fire.

18   Q    There aren't any ranges with big propane tanks down range

19   that you've been to?

20   A    No.

21   Q    But in any event, this event was fully recorded, is that

22   right?

23   A    Sporadically, yes, with video.

24   Q    Video.  Fair enough.  Video recording.  There were several

25   video recordings made, is that right?

1    A    There was.

2    Q    And it wasn't hidden.  It was out in the open and you could

3    see you frankly recording people, correct?

4    A    Correct.

5    Q    And you were directing the exercises, is that correct?

6    A    For safety, yes.

7    Q    All right.  Well, you were directing them telling them what

8    to do?

9    A    To continue moving, yes.

10   Q    All right.  And in other words, Mr. Caserta wasn't the one

11   saying, sit in the car --

12          MR. KESSLER:  Hearsay.

13          THE COURT:  Whenever you put it that way you are

14   definitely going to draw an objection.

15   BY MR. HILLS:

16   Q    Yup.  Mr. Caserta didn't do an itinerary for this event, is

17   that true?

18   A    No.

19   Q    All right.  August 16th, this is the date that you go and

20   meet my client at his house, is that right?

21   A    Correct.

22   Q    And prior to that, my client had invited several people, is

23   that true?

24   A    That is correct.

25   Q    And you were the only one that came, is that right?

1    A    Yes.

2    Q    Okay.  And you had a discussion with a few other people

3    about whether to go or not, is that right?

4    A    Correct.

5    Q    And you knew that others were not going, true?

6         MR. KESSLER:  Calls for hearsay.  I know it's

7    disguised now.

8         THE COURT:  Pardon?

9         MR. KESSLER:  I said it's better disguised now but

10   he's still asking how other people reacted.

11        THE COURT:  I think the only way he'd know that,

12   unless you have other foundation, is because people told him

13   and those people would be speaking hearsay if we hear it from

14   him here.  I think you have to reframe the question.

15   BY MR. HILLS:

16   Q    August 16th was a Sunday afternoon, do you recall that?

17   A    I do.

18   Q    All right.  And you showed up at my client's house?

19   A    I did.

20   Q    And it's a small apartment, is that correct?

21   A    It is.

22   Q    And you were the only one that showed up?

23   A    Yes.

24   Q    You brought your recording device and you recorded the

25   whole thing, is that right?

1    A    I did.

2    Q    And you testified, I believe, that you were nervous or

3    scared of my client, is that right?

4    A    I was nervous.  Yes.

5    Q    And you testified that my client had posted some videos

6    about being robbed by the police?

7    A    He has.

8    Q    And over some traffic tickets, is that what you testified

9    to?

10   A    Yes.

11   Q    And that's what made you nervous about going in to see my

12   client, is that right?

13   A    I am not sure of the exact timeline when he posted them,

14   but his overall character and demeanor made me nervous around

15   him, yes.

16   Q    All right.  Well, that's what you testified on direct to,

17   that those postings regarding his traffic ticket and his

18   statements, that's what made you nervous, is that correct?

19   A    Correct.

20   Q    All right.  And as I think you just alluded to now, those

21   videos hadn't come out yet, is that right?  It was a month

22   later?

23   A    Correct.

24   Q    So that couldn't be it, right?

25   A    The videos, no.

1    Q    Okay.  So when you testified about that originally that

2    wasn't exactly accurate?

3    A    For the videos, no.  But his character, yes.

4    Q    Okay.  And at this point in time, August 16th, you had been

5    with him at June 14th at Munith, is that right?

6    A    Correct.

7    Q    And even though it was live -- or dry fire, mostly dry

8    fire, my client had guns, is that correct?

9    A    He did.

10   Q    Had ammo, correct?

11   A    He did.

12   Q    He never pointed his guns at you in anger, correct?

13   A    No.

14   Q    He never yelled at you, did he?

15   A    No.

16   Q    He never raised his voice to you, correct?

17   A    No.

18   Q    And you were with him on June 28th, is that right?

19   A    I was.

20   Q    He was armed?

21   A    Yes.

22   Q    Correct?  He never raised his voice to you there?

23   A    No.

24   Q    At any time frankly, right?

25   A    No.

```
1    Q    Okay.  And June -- or July -- well, I guess the same goes

2    for July 26 Fowlerville, is that correct?

3    A    Correct.

4    Q    And then July 11th, or 10th through the 13th, you picked

5    him up, put him in the back of the Suburban, right?

6    A    Correct.

7    Q    And you drove and you had your back to him for 14 hours,

8    seven hours there, seven hours back, correct?

9    A    With other people in the vehicle.  Yes.

10   Q    All right.  With other people in this group, correct?

11   A    Correct.

12   Q    All right.  And he would have been armed, correct?

13   A    We all were.  Yes.

14   Q    And my client had a CPL, is that correct?

15   A    Correct.

16   Q    And now, you indicated that you --

17   A    No.  He did not have a CPL.

18   Q    I'm sorry?

19   A    He did not have a CPL.

20   Q    All right.  You weren't aware if he had a CPL?

21   A    When I went to his place, when he went inside of an Auto

22   Zone he couldn't take his firearm in there so he left it in the

23   vehicle.

24   Q    All right.  Well, let me ask you this.  Do you know if my

25   client had a CPL?
```

1    A    No.

2    Q    Okay.  So if he had one that's unknown to you?

3    A    Correct.

4    Q    All right.  So if he did have a CPL he could have carried

5    it on his person in the back of the Suburban?

6    A    He could have.

7    Q    Okay.  And in Wisconsin, you stayed the night in a hotel

8    with him?

9    A    Yes.

10   Q    Okay.  And then a few weeks later, now you go over to his

11   house and you are scared of him?

12   A    I was nervous the entire time I was with the -- I too was

13   armed.  The only reason I was participating in this group was

14   because they were wanting to do violence against law

15   enforcement.  That's why I notified the FBI.  And given that

16   I --

17   Q    Asked and answered.  I appreciate it.  My client's

18   apartment is small, is that right?

19   A    It is.

20   Q    All right.  Organized kind of neat?

21   A    Yes.

22   Q    All right.  He -- so when you went over there, you

23   pretended to be his friend, correct?

24   A    I did.

25   Q    And he did not ask you to produce any form of

1   identification -- you didn't produce any identification?

2   A    At that time, no.

3   Q    You didn't have to put your phone in a box?

4   A    No.

5   Q    Okay.  You didn't have to leave your gun in a truck?

6   A    No.

7   Q    So when you went in and talked to my client, he had a green

8   notebook.  Do you remember the green notebook?

9   A    Vaguely.  Yes.

10           MR. HILLS:  Let's put up just for the witness Exhibit

11   5037 if we can?  5037.

12   BY MR. HILLS:

13   Q    Does this picture accurately represent my client's kitchen

14   area?

15   A    It does.

16           MR. HILLS:  I move for the admission of 5037?

17           MR. KESSLER:  I am not sure I see the relevance but I

18   don't object, Your Honor.

19           THE COURT:  I think the relevance is in part what he's

20   been talking about to respond to the witness's statement about

21   his concern and keeping a door between him and that sort of

22   thing.  So go ahead.

23   BY MR. HILLS:

24   Q    And I am going to circle that.  Is that the green notebook

25   that you remember?

1    A    That is a green notebook.  Yes.

2    Q    Does that look like the one that my client had?

3    A    Yes.

4    Q    Okay.  All right.  And let's go to 5036 just for the

5    witness if we can?

6         Does 5036 accurately reflect my client's apartment?

7    A    It does.

8         MR. HILLS:  Okay.  Let's -- I move for the admission

9    of 5036?

10        MR. KESSLER:  No objection.

11        THE COURT:  It's admitted.

12   BY MR. HILLS:

13   Q    All right.  Again, as you testified to, my client, this is

14   my client's apartment, small, kind of neatly kept apartment?

15        MR. KESSLER:  Actually, Your Honor, I do have a

16   question about this.  This is a foundation question.  I should

17   have noticed.  I am not sure when this picture was taken.

18        THE COURT:  No, but he said it's a fair and accurate

19   representation of what it looked like when he was there and

20   that's all we need.

21   BY MR. HILLS:

22   Q    Fairly Spartan, not much furniture, correct?

23   A    Correct.

24   Q    Let's put that down.  If we can put up 5060 just for the

25   witness?

1          At some point my client also showed you his equipment

2     and his gear, is that correct?

3     A    He did.

4     Q    Okay.  Did you view my client's gear in his closet?

5     A    I did.

6     Q    All right.  Does this picture accurately reflect what you

7     saw on that day?

8     A    It does.

9          MR. HILLS:  I'd move for the admission of 5060?

10         MR. KESSLER:  No objection, Your Honor.

11         THE COURT:  All right.  It's admitted.

12    BY MR. HILLS:

13    Q    Publish.  And here, my client, he showed you, did he not,

14    his MREs and his food stores, that kind of thing, is that

15    correct?

16    A    Correct.

17    Q    And that's located -- is that this stuff right here?

18    A    Yes.

19    Q    Okay.  And he also showed you his guns, is that right?

20    A    He did.

21    Q    And he showed you -- basically went through his equipment,

22    is that right?

23    A    He did.

24    Q    Okay.  Thank you.  That's fine.

25         Now, sum total, you were with my client for four hours

1    10 minutes.  Does that sound about right?

2    A    That's fair to say.

3    Q    It was a very long afternoon, correct?

4    A    It was.

5    Q    You traveled with him -- you spent some time originally in

6    my client's apartment, is that right?

7    A    Correct.

8    Q    All right.  And out the gate that's when my client brings

9    out his green notebook, correct?

10   A    I believe so.

11   Q    And he wants to talk to you about that type of thing,

12   whatever was in his notebook, correct?

13   A    Correct.

14   Q    Okay.  And this conversation looks like maybe a half an

15   hour for that first portion of it.  About right?

16   A    That's fair to say.

17   Q    Okay.  And then in that time you are doing your thing with

18   about Fox being Michigan's representative, correct?

19   A    Correct.

20   Q    That there is an Ohio representative, Wisconsin

21   representative, Missouri representative, correct?

22   A    That's correct.

23   Q    Trying to give credibility and validity to Mr. Fox, is that

24   right?

25   A    That's correct.

Q    And you testified that there was this, I guess they put it

in a text message, this was kind of I think a one-on-one text

between Mr. Fox and Mr. Caserta.  Do you remember that?

A    I do.

Q    And that they were not -- Mr. Caserta and Mr. Fox were not

on the same page, correct?

A    With the chain of command.  Yes.

Q    And you told Mr. Fox that Mr. Caserta was on, what did you

call it, like-minded, correct?

A    Yes.

Q    Like he, Mr. Caserta was just like Fox, right?

A    Yes.

Q    And then at this meeting you told Mr. Caserta that he was

just like Mr. Fox, is that right?

A    Correct.

Q    Trying to bring them together because they were kind of

drifting apart, is that right?

A    For the ideas of a command structure, yes.

Q    And so you are using your credibility because you were in

the military, right?

A    I was.

Q    In combat, right?

A    I was.

Q    You are instructing people on tactics, correct?

A    I have.

Q    And you had now been with Mr. Caserta on several events, is that right?

A    I have.

Q    And you were default leader of this group, right?

A    No.

Q    Okay.  And you are using your credibility, your stature to now try and bring these two together, correct?

A    They had been communicating and I was just highlighting that they are not that different.

Q    Okay.  You could have said nothing, right?

A    I could have.

Q    You could have said, no, you guys are different.  You guys have different views.  Go your separate ways.  You could have done that, right?

A    They both were asking myself about one another.

Q    You could have let them go?  You could have said, no, you guys are different, couldn't you?

A    I could have.

Q    Okay.  But you didn't.  You decide to try and be the group glue, correct?

A    For the command structure, yes.

Q    All right.  And you also told them about Fox's XO Sean Fix being an navy seal operator, correct?

A    I did.

Q    Okay.  And by this time you knew full well that he was not

1    a navy seal operator?

2              MR. KESSLER:  Objection, Your Honor.

3              THE COURT:  Well, I think at this point the way it's

4    been framed he can answer if he's able, if he knows.

5              MR. KESSLER:  My only objection would be if he knew it

6    from hearsay.

7              THE COURT:  Well, right, but -- well, if you want to

8    lay a little more foundation.

9    BY MR. HILLS:

10   Q    Sure.  You saw Mr. Fix in Wisconsin, correct?

11   A    I did.

12   Q    You saw him fumbling his 1911, correct?

13   A    I seen him moving and clearing a room with his 1911, yes.

14   Q    And you saw him fumbling?

15   A    I wouldn't say fumbling, but I seen him moving it through

16   there.  Yes.

17   Q    All right.  And what is an navy seal?

18   A    It's a special warfare community within the navy.

19   Q    High level operator?

20   A    They are.

21   Q    All right.  And you've been in the military, obviously,

22   yeah?

23   A    I have.

24   Q    All right.  And at this point do you know Sean Fix is a

25   truck driver?

1    A    Yes.

2    Q    All right.  And with what you observed, you knew full well

3    that Sean Nix was no navy seal operator?

4    A    He told me that he was a navy seal.  We went back and forth

5    on the conversation and he said he was a lieutenant with Seal

6    Team 4.

7    Q    Right.  I am not asking you what he told you.  You knew

8    full well he was no navy seal operator?

9    A    After the FBI told me that he was not.  Up to that point I

10   was taking him for his word.

11   Q    Okay.  And you had seen navy seals according to you?

12   A    I have.

13   Q    Okay.  So this is at the beginning of this four-hour and 10

14   minute adventure, first half an hour or so, correct?

15   A    Correct.

16   Q    All right.  And Mr. Caserta talks to you about what's in

17   his green book or green notebook, correct?

18   A    Yes.

19   Q    And then you tell him about Adam being Michigan's guy, and

20   Sean Fix, right?  You also -- also run the rap that he can get

21   free stuff through this 501c(3)?

22   A    Who can?

23   Q    Caserta or the Wolverine Watchmen, whoever is with you?

24   A    For Wisconsin, yes.

25   Q    All right.  And clearly Mr. Caserta, from your

observations, is not a wealthy man?

A    No.

Q    He prizes his possessions that he is showing you obviously, correct?

A    He does.

Q    But he never takes you up on trying to get money from this 501c(3), is that correct?

A    No.

Q    And putting that 501c(3) out there repeatedly to these folks, this is what you have been tasked to do actually by the FBI, correct?

A    No.  It was brought up in Wisconsin that we could use the 501 to get training aids.

Q    Right.  But then you repeated again and again and again, correct?

A    I mentioned it.  Yes.

Q    Several times, correct?

A    Yes.

Q    And that was because the FBI wanted you to, correct?  They wanted somebody to take the money, correct?

A    They instructed me to.  I don't know what their motivation was.

Q    Right.  They instructed you to throw that out to these gentlemen, correct?

A    Correct.

1    Q    And so you did?

2    A    Yes.

3    Q    So after this conversation, the beginning of the

4    conversation, you did not leave my client, correct?  You stayed

5    there after the first half hour, right?

6    A    I did.

7    Q    Well, you didn't have to.  You could have left, correct?

8    A    Correct.

9    Q    If you were scared you could have left?

10   A    I was gathering information for the FBI.  Yes.

11   Q    Right.  Well, you already gathered some, right?

12   A    I did.

13   Q    It was recorded, right?

14   A    Yes.

15   Q    You could have left, right?

16   A    I could have.

17   Q    You didn't?

18   A    No.

19   Q    You went with him I think you said to Auto Zone?

20   A    Yeah.  We needed to get, like, a battery or something for

21   his vehicle.

22   Q    Because his car broke, right?

23   A    Yes.

24   Q    And you drove him there, is that right?

25   A    No.  We took his vehicle.

Q    Okay.  So you got in my client's vehicle and you let him

drive you to Auto Zone?

A    Yes.

Q    All right.  Then you went to McDonald's?

A    Yes.

Q    And you bought him a burger and yourself a burger?

A    I got a meal so yes I paid for it.

Q    And then you went back to his apartment, is that right?

A    We did.

Q    You tried to fix his car, correct?  You did actually get it

started, correct?

A    I believe so.  Just replaced the battery.  Yes.

Q    All right.  I'm sorry.  That was obvious because you just

said you drove it, right?

A    Yes.

Q    Okay.  So then you go into the last, say, 30 minutes of

your time there.  You have a conversation with my client.  And

you are telling him to give you a plan, correct?

A    I believe so.

Q    You tell him that you can put a dent in something but you

need to train these guys up, meaning Mr. Caserta and the other

people that are with the Watchmen, correct?

A    Correct.

Q    You tell him, you can give them anything tactically

speaking, correct?

```
 1    A    Correct.
 2    Q    You tell him, give me something you hate and this is what
 3    we're going after, right?
 4    A    I was seeing what his ideology and what his motivation was.
 5    Yes.
 6    Q    You told him, give me something you hate, right?
 7    A    Correct.
 8    Q    And you also go into you're from the military Plan B is
 9    reinforcing Plan A, Plan C is changing the mag, right?
10    A    Correct.
11    Q    Give me a target, right?
12    A    Correct.
13    Q    And we are going to stay on that target, right?
14    A    Correct.
15    Q    No diverting from that target.  We run out of bullets, Plan
16    C is changing the mag, right?
17    A    Correct.
18    Q    And that's from you, correct?
19    A    Correct.
20    Q    And then after four hours my client gives you contact
21    tracers, right?
22    A    I am not sure on the timeline when that discussion was
23    brought up.
24    Q    Well, it was after the beginning.  It wasn't at the
25    beginning, right?
```

1    A    Right.

2    Q    It was after you go to Auto Zone, correct?

3    A    Correct.

4    Q    And after McDonald's, correct?

5    A    Correct.

6    Q    Then you go back out and go to another store, correct, in

7    your truck?

8    A    His vehicle.

9    Q    Okay.  In his vehicle.  You go back out in his vehicle, is

10   that right?

11   A    Correct.

12   Q    And then you work on his vehicle, right?

13   A    We do.

14   Q    All right.  And then after all that you go back into his

15   apartment, correct?

16   A    We do.

17   Q    And then that's when you start applying the plan objective,

18   correct?

19   A    For his meeting that's what the day was.  Yes.

20   Q    All right.  And so this is at the end of it, correct?

21   A    Fair to say.

22   Q    And at that time that's when we have this clip that's

23   played from this four-hour long event of contact tracers,

24   correct?

25   A    Correct.

Q    And nowhere in there does it talk about Governor Whitmer, correct?

A    No.

Q    So after August 16th, a couple weeks later, or August 23rd, this is this meeting at Lake Orion, correct?

A    Correct.

Q    And several individuals at this meeting, right?

A    Yes.

Q    And this meeting is a long meeting as well.  This one is with the three hours and 15 minutes; sound about right?

A    That's fair to say.

Q    And my client shows up with his green notebook again, doesn't he?

A    I believe so.

Q    And you made fun of him when he pulled out his green notebook, do you remember that?

A    No.

Q    Okay.  But fair to say he brought his green notebook, correct?

A    Fair to say.

Q    Okay.  And he starts going through green notebook stuff again, correct?

A    Correct.

Q    All right.  And then about two hours into the meeting you start with the 501c(3) again, correct?

1    A    Possibly.  Yes.

2    Q    All right.  And I've got the transcript if it would help

3    refresh your recollection or do you remember going into it

4    again?

5    A    Vaguely.

6    Q    All right.  You did it so much you can't remember where you

7    did it and where you didn't?

8              MR. KESSLER:  That's argumentative, Your Honor.

9              THE COURT:  It is.  He said he did it several times.

10   If there is something independently important to a particular

11   disclosure you can get to it, otherwise, it's a little

12   redundant.

13   BY MR. HILLS:

14   Q    Okay.  And at this time you go through the same thing

15   again, the routine the 501(c), and then Adam's Michigan's guy.

16   There is Steve, Wisconsin guy.  There is an Ohio guy.  This

17   same rap, correct?

18   A    Correct.

19   Q    Then after a couple hours into this meeting and you go

20   through this, you are the one that brings up Governor Whitmer,

21   correct?

22   A    I don't recall.

23   Q    Would it help refresh your recollection if I showed you a

24   transcript of that event?

25   A    It would.

1    Q    Let's see if I can find it.

2              MR. HILLS:  May I approach, Your Honor?

3              THE COURT:  Sure.

4    BY MR. HILLS:

5    Q    There you go.

6    A    Thank you.

7    Q    I'll direct you to some pages.

8    A    Okay.

9    Q    All right.  Give me a moment and I'll get to the pages.

10   Page 3 of 7 I think in the middle there.  If you take a look

11   there.

12   A    Okay.

13   Q    All right.  So you bring up -- so he is wanting to go up

14   and check out where the governor stores her boat, is that

15   right?

16             THE COURT:  Hold on, set the target.  And as I recall,

17   the question that led to you refresh him was whether he

18   remembered being the one that brings up Governor Whitmer.  If

19   you are going somewhere different, okay.

20             MR. HILLS:  I'm sorry.

21   BY MR. HILLS:

22   Q    Does that refresh your recollection?

23   A    It does.

24   Q    And you brought up the governor, is that correct?

25   A    We were supposed to go up and do a day recon that day with

1    Adam.  Yes.

2    Q    And you brought it up?

3    A    It was in the discussion about Adam.  Yes.

4    Q    Okay.  So you said he was wanting to go up and check out

5    where the governor stores his boat -- stores the boat.

6           MR. KESSLER:  Your Honor, I can see that he's reading

7    it.

8           THE COURT:  He is reading.  You may want to retrieve

9    it as well.  If he remembers the conversation now you can ask

10   him about it, but it's not an invitation to simply read a

11   transcript.

12          MR. KESSLER:  And I understand Mr. Hills is going to

13   ask him about a few things in that so maybe you can just set it

14   aside.  I'm fine with that.

15          MR. HILLS:  Just, it's closed up there I think.

16   BY MR. HILLS:

17   Q    All right.  So you are telling the group he was wanting to

18   go up and check out where the governor stores his boat,

19   correct?

20   A    On that day, yes.

21   Q    And the he is you are talking about Adam, is that correct?

22   A    Correct.

23   Q    And Adam is not here at this meeting, is that right?

24   A    He is not.

25   Q    All right.  And you want to know where the -- he wants to

1   know where the residence is up there and so on, correct?

2   A   He does.

3   Q   All right.  And that's what you are telling these people,

4   correct?

5   A   Yes.

6   Q   And this shit mandatory vaccines go down, now we are

7   building a plan, correct?

8   A   Correct.

9   Q   And this as we have seen this mandatory vaccines in the

10  exhibits, my client, that's one of his issues, correct?

11  A   Yes.

12          MR. KESSLER:  Hearsay.

13          THE COURT:  Well, it's in the exhibits already so go

14  ahead.

15  BY MR. HILLS:

16  Q   So that's one of my client's issues, correct?

17  A   One of his.  Yes.

18  Q   So this is directed at my client, correct, mandatory

19  vaccines go down --

20          THE COURT:  Well, the question is not to repeat

21  everything.  Is it directed at your client?

22  BY MR. HILLS:

23  Q   Is it directed at my client?

24  A   It is at the group.

25  Q   Okay.  And you talk about wanting to go up the next

Saturday, correct?

A    Yes.

Q    Wanting to go up to the residence, is that what you are

talking about?

A    Yes.  Adam was wanting us to go up and do a day recon.

Q    I get it, but that's what you are talking about going up to

the residence, correct?

A    Correct.

Q    And again, you say Adam, but Adam is not here, so this is

you communicating it, is that right?

A    Correct.

Q    And didn't you tell this group that he is all about fucking

killing her point-blank?  That's what he's about.  You remember

that?

A    Correct.

Q    Okay.  You remember saying, he wants to go -- he wants to

start doing that shit now?  You remember that?

A    Yes.

Q    Okay.  Now, between those two last statements that you met,

my client made some statements.  Do you remember that?

A    He made some.  I don't remember what they were.

Q    Would it help refresh your recollection to look on page

4 -- to look at the transcript?

A    It would.

           THE COURT:  I don't know where you go with it because

1    you can't get his statements in.

2            MR. HILLS:  I am not going to try and get his

3    statements in.

4            THE COURT:  Well, that's what it sounded like.  So why

5    don't you lay a foundation for where you're going so we know

6    what he's asked to refresh.  So you said he made statements.

7    He doesn't remember what they are.

8            MR. HILLS:  Right.  I want to know how many statements

9    my client made in between those two statements.

10           THE COURT:  Maybe he knows.  Maybe he doesn't.

11           MR. HILLS:  I don't know.

12           THE COURT:  And I don't even know how you number them.

13   So you know.  That's a difficult question to frame and answer.

14   Is it supposed to be one clause and we are all going to go to

15   grammar school and figure out how many clauses?  Is it a number

16   of minutes?  So I don't even understand how you frame an answer

17   to that question like that.

18           MR. HILLS:  Well, my client makes three distinct

19   statements.

20           THE COURT:  So that's what you are suggesting, and

21   let's ask if the witness remembers a number of distinct

22   statements or a paragraph.  I mean, I am still not sure where

23   you are going with it all, because who cares how many

24   statements he makes if we are not getting into the content?

25           MR. HILLS:  I do.

THE COURT:  All right.  We'll find out if he knows how many statements he made.

MR. HILLS:  Okay.  I appreciate it.

THE COURT:  And help me understand the relevance, because we're just taking a lot of time to find a number to attach to something that I am not really clear on anyway.

MR. HILLS:  The government plays two of the statements.  They don't play the third statements in that clause, and they are all in the same breath.

THE COURT:  Well, okay.  But that depends on carving up the assertions and that's part of the problem.  That's part of the problem.  So it's not as clear, the hearsay problem, as others, but it's clear that the government isn't playing all eight hours of tape on the way to Cambria or back or any of the other places mercifully because then we'd be here for six years instead of six weeks.  So I don't know what more you need.  It's clear that not everything is taped and not everything from the tapes is in evidence.

MR. HILLS:  Well, I am not asking for all three hours and 15 minutes.  This is about a 15-second clip.

THE COURT:  The content is not going to come in anyway.  So I don't see how there is more relevance to go down this path based on what I've heard here because fundamentally whether it's significant or not depends on the content that we are not going to hear.

BY MR. HILLS:

Q    After August 23rd we go to August 29th.  This is the
ride-along where you are trying to get people to go up to the
governor's residence, correct?

A    Correct.

Q    Okay.  So leading up to that, you put out on FAFO Wire
that, let me see, that you are doing a road trip north Sunday,
correct?

A    Correct.

Q    All right.  And this is about going on this ride-along up
north to the governor's cottage, correct?

A    Correct.

Q    And Mr. Caserta is not on FAFO Wire; we have established
that, correct?

A    I don't believe he was.  No.

Q    And so this call, Mr. Caserta would not have seen it, is
that right?

A    Correct.

Q    Okay.  Then you have conversations with your agents, your
handling agents specifically, Special Agent Chambers, is that
right?

A    I did.

Q    And Special Agent Chambers is directing you to get as many
people to go as possible, is that right?

A    Yes.

Q    And I think one of those exhibits came in yesterday, but he
says it to you, frankly, multiple times, is that correct?

A    Yes.

MR. HILLS:  And I have 5215.  To expedite this I think
I've got an agreement with the government to put in 5215, 5217,
and 5218.

MR. KESSLER:  Agreed, Your Honor.

THE COURT:  All right.  Thank you.  They are admitted.

BY MR. HILLS:

Q    All right.  Let's just start with 5215 if we can.  So
again, this is from Special Agent Chambers to you, are we on
Saturday or Sunday, and I default to getting as many guys as
possible so whatever maximizes attendance, correct?

A    Correct.

Q    Okay.  And 5217 -- so at this time, this is on 8-28, so the
day before, Mr. -- you'd already sent out the FAFO Wire chat,
correct?

A    Yes.

Q    All right.  So you need to specifically ask Mr. Caserta in
a different method, correct?

A    Correct.

Q    All right.  So Special Agent Chambers is asking you do you
think Caserta would be down for a recon, too, correct?

A    Correct.

Q    All right.  And in response to this -- well, this is on

1    8-28 at 11:19:29.  Let's go to 5217.  Or I'm sorry, what is the

2    next one?  5218.  I'm sorry.  And this is hours later, try

3    Beaker or Brandon, correct?

4    A    Correct.

5    Q    All right.  That's good.  Thank you.  So the special agent

6    is prompting you to contact Mr. Caserta, correct?

7    A    He does.

8    Q    And then you say, chain of command.  I got to talk to Adam

9    Fox first, correct?

10   A    Correct.

11   Q    You call Adam Fox, correct?

12   A    Yes.

13   Q    Or send a chat to him, is that right?

14   A    Correct.

15   Q    And he says, yeah, that's fine, correct?

16   A    Correct.

17   Q    And then you reach out to Beaker, who is Dan Harris, and

18   Brandon Caserta, correct?

19   A    I do.

20   Q    All right.  And neither one of them go, correct?

21   A    They do not.

22   Q    Let's -- let's put Government's 213 up if we can?

23        So this is on -- you testified about this exhibit.  I

24   believe this was an exhibit that occurred on September 4th, is

25   that right?

1    A    Correct.

2    Q    All right.  And this is after you told Caserta that Mr. Fox

3    wanted to kill her, meaning the governor, correct?

4    A    Correct.

5    Q    And if we can just maybe highlight the top here where it

6    says, Ms. Whitty is an order follower.  She is a servant.

7            Yeah.  That's good.

8            I am going to kind of cut to the middle.  Mr. Caserta

9    says, politicians are puppets and the puppet master has plenty

10   to take their place.  I don't think we should waste our time

11   chasing puppets, bro.  In other words, we shouldn't waste our

12   time chasing Governor Whitmer, right?

13   A    Correct.

14   Q    All right.  Let's go to the next page.  Right there if we

15   can.

16           So Mr. Caserta goes on, if we can disconnect from the

17   banks and coercive taxation --

18           THE COURT:  Hold on just a second, because I am not

19   sure, was all of this in 213?  Yes.  It is.  Go ahead.

20   BY MR. HILLS:

21   Q    Okay.  If we can disconnect from the banks and coercive

22   taxation it will be logistically impossible for them to force

23   us to give them money.  I'd like ti, t-i, but I think it's to,

24   to eventually get the movement on board with ending all forms

25   of taxation completely and cutting the energy supply of the

state and freeing us from economic bondage, correct?

A    Correct.

Q    Okay.  Now, okay.  Thank you.  From there we go to Luther,
September 13th and 14th.  If we can put up Government's 220,
probably T, but -- yeah.

          And then this is at the beginning of Luther there
Mr. Croft gave a speech; several people gave speeches, correct?

A    They did.

Q    All right.  Mr. Croft gave one, is that correct?

A    He did.

Q    Okay.  And that's fine if we can read it.  And my client's
contribution is absolutely that is one of the main things is
the international Zionist bankers, correct?

A    Correct.

Q    And then Mr. Croft goes onto talk about other stuff,
correct?

A    Correct.

Q    So now Luther.  I forgot to bring it in, but on that I'll
call it the Dan date, August 16th, when you were with my
client, correct?

A    Correct.

Q    You invited my client to Luther on that date, correct?

A    I think the training came up on that date.

Q    Okay.  You invited my client to Luther on August 16th,
correct?

1   A    I don't recall inviting him.

2   Q    All right.  Let me refresh your recollection.  If I pointed

3   you to the transcript?

4   A    It would.

5        THE COURT:  You can do it.  You may want to find out

6   if you are just quarrelling with each other what the word

7   invite means and whether he agrees it came up as a topic, and

8   depending on that, you may or may not have anything to refresh.

9   BY MR. HILLS:

10  Q    All right.  The topic of Luther came up at the August 16th

11  meeting?

12  A    It did.

13  Q    Okay.  Did you, maybe not invite, or encourage him to come?

14  A    I might have mentioned it.  Luther came up in Wisconsin.

15  Ty was hosting that property, and he also put out the dates and

16  times to be up there.

17  Q    But you didn't mention it to my client at Wisconsin,

18  correct?

19  A    No.

20  Q    Okay.  But at Luther -- on August 16th you would have?

21  A    Possibly.  Yes.

22  Q    Okay.  In any event, my client is at Luther, Michigan.

23  This is Ty Garbin's spot, right?

24  A    Correct.

25  Q    And Ty Garbin and others created this berm for a range, is

1    that right?

2    A    They did.

3    Q    And that was before Luther started, is that correct?

4    A    It was.

5    Q    And they put up the blue tarp that we've seen, is that

6    right?

7    A    Yes.

8    Q    And my client wasn't up there for that?

9    A    He was not.

10   Q    Now, you slept -- I think you testified you slept in a

11   trailer that night, camper or whatever?

12   A    I did.

13   Q    And that was with I think Harris and Ty Garbin, Kaleb

14   Franks, correct?

15   A    Correct.

16   Q    Puffenberger?

17   A    Yes.

18   Q    There were a lot of people in the trailer?

19   A    There was.

20   Q    And Adam Fox I think?

21   A    Yes.

22   Q    Brandon Caserta was not in that trailer?

23   A    I am not sure where he slept.

24   Q    All right.  Well, he didn't sleep in the trailer?

25   A    I am not sure.  There was a lot of people in there.

1    Q    My client didn't -- there was that flag, right, the

2    confederate flag?

3    A    Correct.

4    Q    And that was in the trailer?

5    A    It was.

6    Q    People in the trailer signed the flag, correct?

7    A    They did.

8    Q    My client didn't sign that flag, correct?

9    A    I don't believe he did.

10   Q    Okay.  Do you remember my client having a tent and sleeping

11   in a tent?

12   A    I don't remember.  No.

13   Q    Okay.  But you don't have any recollection of him being in

14   the trailer with you?

15   A    No.

16   Q    Okay.  Now, the undercover Red, he is the one that had the

17   bomb video, correct?

18   A    He did.

19   Q    So now this video -- all right.  So there is a video that

20   the FBI created, is that right?

21   A    Yes.

22   Q    And Red brought it to the -- to Luther on his phone, as a

23   video on his phone?

24   A    That's correct.

25   Q    And then on Saturday there was a select group of people

1    that watched this video, correct?

2    A    I am not sure if that was on Saturday.  They watched it on

3    Sunday.

4    Q    Okay.  We'll get to that.  And when you are talking about

5    Sunday, you are talking about this circle of trust meeting?

6    A    Correct.

7    Q    Okay.  So outside of that -- I am not talking about that

8    right yet -- was there another showing that you were a part of?

9    A    There might have been.  I can't recall now.

10   Q    Would it help refresh your recollection if you saw the

11   transcript of that showing?

12   A    It would.

13   Q    Okay.  I think Government's 226, I believe, is that --

14            MR. KESSLER:  I don't believe that's in.  We have not

15   offered that.

16            MR. HILLS:  You have not offered that?

17            MR. KESSLER:  No.

18            MR. HILLS:  Okay.  Must be something different.

19            May I approach, Your Honor?

20            THE COURT:  Sure.

21            THE WITNESS:  Thank you.

22   BY MR. HILLS:

23   Q    Does that help refresh your recollection?

24   A    It does.

25   Q    Okay.  So was there a viewing of the video outside of this

circle of trust meeting?

A    There was.

Q    All right.  And you were involved with it?

A    I was.

Q    And there were a number of other people involved with it?

A    There was.

Q    Mr. Caserta was not involved with it?

A    I don't believe so.

Q    All right.  So Luther Saturday, after the trainings there is going to be this ride-along up to the governor's cottage, correct?

A    Correct.

Q    All right.  And you have testified, I believe, that undercover Mark and Fox went to Loggers Landing, is that right?

A    Correct.

Q    All right.  And Robeson, Croft and others, Higgins, I believe, went south to the Super 8 in Big Rapids, correct?

A    That's correct.

Q    Okay.  And then eventually made it up to the governor's cottage, correct?

A    That's correct.

Q    If we can have you look at, just the witness, 5210?

     Does this map accurately reflect where you went to that night and where Adam Fox and Mark would have gone to?

A    Yes.

1        MR. HILLS:  Okay.  Move to admit 5210?

2        MR. KESSLER:  No objection.

3        THE COURT:  It's admitted.

4   BY MR. HILLS:

5   Q    All right.  So Fox and Mark leave before you do, correct?

6   A    Correct.

7   Q    You are looking for them but you can't find them, right?

8   A    That's correct.

9   Q    Then the other parties leave and they go to Loggers

10  Landing, which is right over here, is that right, on this side?

11  A    That's correct.

12  Q    So they kind of go the opposite direction of where you need

13  to go for the recon, right?

14  A    True.

15  Q    Okay.  And then you leave and you head out to 131, correct?

16  A    Correct.

17  Q    And Croft and Roby and Plunk, those guys have already left

18  and you are kind of going after them, correct, to bring them

19  back?

20  A    To meet up with them.  Yes.

21  Q    Okay.  And so then you head down to the Super 8 motel, is

22  that right?

23  A    Correct.

24  Q    And you make it all the way down there eventually and have

25  some, I think, Wendy's, correct?

1   A    That is correct.

2   Q    And as you are going, that's when there is this phone call

3   to redirect Mark and Fox back to Luther, correct?

4   A    That's correct.

5   Q    And they are specifically instructed to pick up Caserta and

6   the Null brothers, right?

7            MR. KESSLER:  Your Honor, hearsay.

8   BY MR. HILLS:

9   Q    By you?

10           THE COURT:  We have covered this, and I think if you

11  are going into the instruction word, No. 1, it doesn't really

12  add anything to what we know and to get the actual words we'd

13  be into hearsay.  We've gone over it with at least two or three

14  people it seems to me.

15           MR. HILLS:  We have.

16           THE COURT:  So unless there is something new.

17           MR. HILLS:  There is something else to it.

18  BY MR. HILLS:

19  Q    So this is when you instruct him over the phone, correct?

20  A    Correct.

21  Q    Okay.  And in the vehicle, this is on speaker phone, is

22  that correct?

23  A    Correct.

24  Q    And in the vehicle you have Red, right?

25  A    I do.

1    Q    You have Franks and Garbin in the back?

2    A    That's correct.

3    Q    Okay.  So they would have heard this conversation, correct?

4    A    They would have.

5    Q    All right.  And from there we've heard you meet up and

6    Mr. Caserta is not there?

7    A    Correct.

8    Q    Then you come back and we get into Sunday and this, as you

9    say, circle of trust meeting, correct?

10   A    That's correct.

11   Q    And there are several people involved with this meeting, is

12   that right?

13   A    There was.

14   Q    Obviously you are there, correct?

15   A    I am.

16   Q    And you've got your recording device on, correct?

17   A    I do.

18   Q    Red is there as well, yeah?

19   A    He is.

20   Q    And he's got his recording device on, yeah?

21   A    He does.

22   Q    Steve is there?

23   A    He is.

24   Q    Do you know if he had his recording device on?

25   A    I am not sure.

1    Q    Okay.  Fox is there, is that right?

2    A    He is.

3    Q    Croft is there?

4    A    He is.

5    Q    Garbin, correct?

6    A    Yes.

7    Q    Higgins?

8    A    Yes.

9    Q    Franks?

10   A    Yes.

11   Q    And Bill Null, correct?

12   A    Correct.

13   Q    There is a lot of talking going on, speaking back and

14   forth, correct?

15   A    There is.

16   Q    And Mr. Caserta is not there, correct?

17   A    At one point he does come up.  I leave the group as well.

18   Q    Okay.  So he may have come up briefly and left, is that

19   what you are saying?

20   A    He was present there, yes.

21   Q    Okay.  But not for long?

22   A    I am not sure on the exact duration.

23   Q    He didn't have any speaking part in any of this, correct?

24   A    If it was seeing the videos, no.

25   Q    And you didn't call out for him in this recording, is that

1    correct?

2    A    No.

3    Q    You didn't ask his opinion about anything, correct?

4    A    That meeting was put on by Adam Fox for the circle of

5    trust.

6    Q    I am not asking about that.  I am asking about Mr. Caserta.

7    No one even acknowledges him during this meeting, is that

8    correct?

9    A    No.

10   Q    Okay.  For October 7th, you created with the FBI this rouse

11   about getting free gear from Red, is that right?

12   A    I did.

13   Q    Okay.  And you asked Mr. Caserta to go, is that correct?

14   A    I did.

15   Q    But he did not go?

16   A    He did not.  He had to work.

17   Q    Okay.  He had to work, correct?

18   A    Correct.

19   Q    And for this takedown, there was no fake bomb or anything

20   like that for this rouse?

21   A    That was just to get everybody together at one location for

22   the takedown.

23   Q    But there was no, like, fake bomb, here is this, whatever,

24   Play-Doh fake bomb?

25   A    No.

1    Q    Nothing like that, correct?

2    A    Nothing.  No.

3    Q    All right.  Throughout this Mr. Caserta was not in charge

4    of any training, correct?

5    A    No.

6    Q    Never trained -- he never trained anyone?

7    A    I don't believe so.  No.

8    Q    No itinerary created by my client?

9    A    No.

10   Q    Okay.  Neither shoot house was his idea?  He didn't create

11   it?

12           MR. KESSLER:  Objection, Your Honor.

13           THE COURT:  This is a compound question.  He didn't

14   create it is okay, if he knows.

15           MR. HILLS:  Okay.

16           THE WITNESS:  No.

17   BY MR. HILLS:

18   Q    All right.  As far as these shoot houses go, as far as you

19   know, my client was only in it twice, once in Cambria and the

20   other in Luther, correct?

21   A    For the shoot house?

22   Q    Yes.

23   A    Yes.

24   Q    My client didn't create any code words?

25   A    No.

1            MR. KESSLER:  Asked and answered as well, Your Honor.

2    BY MR. HILLS:

3    Q    My client is not in the III% -- I'm sorry?

4            THE COURT:  It is asked and answered.  I was simply

5    sustaining it.  Go ahead.

6    BY MR. HILLS:

7    Q    My client is not in any III% group, true?

8    A    I don't think he was.  No.

9    Q    I think there was talk about some covert gun sales.  My

10   client never went on any covert gun sale as far as you know?

11   A    No.

12   Q    You never saw my client with any illegal weapon, illegal

13   gun?

14   A    I don't think so.  No.

15   Q    My client never contributed any money to any fund pooled

16   money that you know about?

17   A    That I know about, no.

18   Q    Mr. Caserta never went to any of these Ohio meetings that

19   you are talking about?  I think Peebles?

20   A    No.

21   Q    Okay.  Have no information that my client ever went to

22   Mackinaw Island for any operation?

23   A    No.

24   Q    Not even the State Capitol, correct?

25   A    I don't think so.  No.

Q    We talked about the governor's residence.  Not that, correct?

A    Correct.

Q    My client never made a map of anything, correct, for you?

A    No.

Q    And we've talked about these two ride-alongs to the governor's residence.  He didn't go on either of them even though you tried to get him to go on both, correct?

A    That is correct.

MR. HILLS:  Thank you.

THE COURT:  All right.  Well, we are at a good stopping point for the afternoon break, so why don't we do that before we get to Mr. Blanchard's cross, and we'll be back in 20 minutes.

LAW CLERK:  All rise.

(Jury out, 11:58 a.m.)

THE COURT:  Okay.  20 minutes.

LAW CLERK:  Court is in recess.

(Recess taken, 11:59 a.m.)

(Resume Proceeding, 12:23 p.m.)

LAW CLERK:  All rise, please.

(Jury in, 12:23 p.m.)

LAW CLERK:  The United States District Court for the Western District of Michigan is now in session.  The Honorable Robert J. Jonker, chief judge, presiding.

<table>
<tr><td>1</td><td>THE COURT:  Thank you, and welcome back for our third</td></tr>
</table>

1          THE COURT:  Thank you, and welcome back for our third

2     segment of the day, and we will begin that with Mr. Blanchard's

3     cross.

4          MR. BLANCHARD:  Thank you.

5                    CROSS EXAMINATION

6       BY MR. BLANCHARD:

7     Q    Good afternoon.

8     A    Good afternoon, sir.

9     Q    Did you do anything to prepare for your testimony today?

10    A    I did.

11    Q    What did you do?

12    A    I had several prep sessions with the prosecutor.

13    Q    When were those prep sessions?

14    A    A week before the case started.

15    Q    Okay.  Anything else?

16    A    We had state level court.

17    Q    Okay.  Now, I understand that you became a confidential

18    source for the FBI back in March of 2020, correct?

19    A    That's correct.

20    Q    And the FBI wanted you to record your interactions with

21    people, correct?

22    A    That he did.

23    Q    That was in part to help you remember what happened, right?

24    A    Correct.

25    Q    In part to capture evidence?

1    A    Correct.

2    Q    Because you have some memory issues, right?

3    A    I do.

4    Q    You suffered a traumatic brain injury?

5    A    I did.

6    Q    And that causes you to sometimes fail to remember things,

7    right?

8    A    It does.

9    Q    And you did record your interactions with people, correct?

10   A    I did.

11   Q    Both in person, yes?

12   A    Yes.

13   Q    And on the phone?

14   A    Yes.

15   Q    You recorded really almost every interaction you had, true?

16   A    Yes.

17   Q    You had what, one malfunction with a recording device?

18   A    I did.

19   Q    Amongst all of the people that are charged here and other

20   people you recorded hundreds of hours of audio, fair?

21   A    I did.

22   Q    And for your efforts as a source you were paid by the FBI?

23   A    I was compensated.  Yes.

24   Q    You were paid money by the FBI, correct?

25   A    I was.

Q    That was for your time in part?

A    Yes.

Q    You testified last week that you earn around $230 a day as a truck driver, correct?

A    Correct.

Q    That's what, about 55, $60,000 a year?

A    Correct.

Q    And you were paid $54,000 by the FBI, correct?

A    Correct.

Q    That was for a time period between April and November, true?

A    Half of that came after the takedown.  Yes.

Q    Okay.  So working for the FBI you earned almost as much as you do in a year as a truck driver?

A    It was reimbursements and compensation.  Yes.  I took 15 weeks off from work.

Q    And so you said reimbursements and compensation, right?

A    Yes.

Q    So there were some things that you were paid for that was just for your time, right?

A    Correct.

Q    And there were sometimes you were paid for items that you spent money on, right?

A    Correct.

Q    If I could show just the witness Exhibit 1001, please?  Do

```
1    you recognize this document?

2    A    I do.

3    Q    Is it a fair and accurate copy of a receipt you submitted

4    to the FBI for reimbursement?

5    A    It was.

6              MR. BLANCHARD:  I move the admission of 1001?

7              MR. KESSLER:  No objection.

8              THE COURT:  All right.  It's admitted.

9    BY MR. BLANCHARD:

10   Q    If we could zoom in on top of the receipt on the left?  You

11   went out and purchased a surface laptop while you were working

12   for the FBI, correct?

13   A    I did.

14   Q    That cost $3,399.99, right?

15   A    It did.

16   Q    You asked the FBI to reimburse you for that?

17   A    They asked for the receipt for it.  Yes.

18   Q    You asked the FBI to reimburse you for that?

19   A    No.

20   Q    You didn't.  So you never sent this to them?

21   A    I did send this to them.  Yes.

22   Q    So you went out and bought the laptop, right?

23   A    I did.

24   Q    And you sent the receipt to them?

25   A    I did.
```

1   Q    The purpose of sending the receipt to them was so they

2   could justify paying you, right?

3   A    Correct.

4   Q    You wanted to be paid back for the laptop, right?

5   A    Yeah.

6   Q    So you sent the receipt to them so you could be reimbursed,

7   correct?

8   A    I did.

9   Q    Okay.  You also purchased a dock for that laptop, right?

10  A    I did.

11  Q    That was $189.99, true?

12  A    True.

13  Q    If we could go down?  Zoom in on the next couple.

14       And a mouse for about $20?

15  A    Correct.

16  Q    And a surface pen to write on the laptop, correct?

17  A    Correct.

18  Q    That was $85?

19  A    Correct.

20  Q    And then you also bought yourself a warranty on it,

21  correct?

22  A    I did.

23  Q    And extended warranty?

24  A    Yup.

25  Q    It was another $205, right?

1    A    Correct.

2    Q    You can take that down.

3         So you asked the government to reimburse you for all

4    of those items, correct?

5    A    I did.

6    Q    That's not the only thing you asked the government to

7    reimburse you for, correct?

8    A    No.

9    Q    If I could show just the witness 1002, please?

10        Do you recognize what's depicted in 1002?

11   A    I do.

12   Q    Is that a fair and accurate depiction of a reimbursement

13   request you sent to the FBI?

14   A    It is.

15        MR. BLANCHARD:  Move the admission of 1002?

16        MR. KESSLER:  The only objection I've got is he's got

17   some personal information on here that's unredacted.

18        THE COURT:  All right.  Well, there's probably not an

19   easy way to redact that out right now.  But what portion do you

20   want to include or redact?

21        MR. KESSLER:  It says he's got his personal e-mail on

22   that below the watch.

23        MR. BLANCHARD:  Sure.  Maybe I can ask him some

24   questions about that and --

25        THE COURT:  Well, is there -- can you -- can you get

1    what you need off it just by -- do you have --

2            MR. BLANCHARD:  I was going to ask him about that

3    e-mail address.

4            THE COURT:  All right.  Maybe there is some foundation

5    you can go with it.  So start with that and we'll see.

6    BY MR. BLANCHARD:

7    Q    So under the watch there is an e-mail address, correct?

8    A    Correct.

9    Q    Is that your personal e-mail address?

10   A    Yes.

11   Q    Your personal e-mail address includes the word Fox?

12   A    One of my e-mails.  Yes.

13           THE COURT:  Don't start talking about the personal

14   e-mail address if that's not what we are ultimately going to

15   redact.  I mean, how much -- how much -- what evidentiary value

16   to you does the e-mail address have?

17           MR. BLANCHARD:  If it includes one of the target's

18   names I think is of interest.

19           THE COURT:  I'd exclude that on 403, particularly if

20   what we have from the witness's testimony that the e-mail is

21   his personal e-mail.  So you'll have to wait to show the jury

22   unless you have a redacted copy, but we'll admit it with that

23   redaction.

24   BY MR. BLANCHARD:

25   Q    So what was depicted in 1002 was a request to be reimbursed

1     for a smart watch, correct?

2     A    Correct.

3     Q    A Samsung Galaxy smart watch, correct?

4     A    Correct.

5     Q    And the FBI did, in fact, reimburse you for that, correct?

6     A    They did.

7     Q    So I want to turn your attention to early 2020.  You've

8     testified that you had discovered this group called the

9     Wolverine Watchmen on FaceBook, correct?

10    A    I did.

11    Q    And it didn't take you long to develop into a leadership

12    role with the Wolverine Watchmen, correct?

13    A    No.

14    Q    In fact, you became a leader at the first face-to-face

15    meeting you had with the Wolverine Watchmen, correct?

16    A    I believe so.  Yes.

17    Q    And that first meeting with the Watchmen was within about

18    two weeks of you discovering them on FaceBook, correct?

19    A    Correct.

20    Q    And so you discover the Watchmen on FaceBook and you reach

21    out to Sergeant Ramirez, correct?

22    A    Yes.

23    Q    And Sergeant Dave Ramirez, he is your friend, right?

24    A    Yes.

25    Q    Spends a lot of time at your house?

1    A    No.

2    Q    You asked him to come by, right?

3    A    I asked if he was working and he said he was, so I asked if

4    he would stop by my house so I could show him the conversation

5    that was taking place.

6    Q    So you asked him to come by?

7    A    I did.

8    Q    And he did?

9    A    He did.

10   Q    And he connected you up with the FBI?

11   A    Yes.

12   Q    That took about a week, right?

13   A    It did.

14   Q    And then they reached out to you via text message, right?

15   A    They did.

16   Q    And they signed you up as a source?

17   A    They did.

18   Q    So we're about a week into this two-week period when you

19   are signed up as a source, right?

20   A    Correct.

21   Q    And about a week later you are at your face-to-face meeting

22   with the Watchmen, right?

23   A    Fair to say.

24   Q    And so within a week of being signed up by the FBI you are

25   in a leadership role in the Wolverine Watchmen, correct?

1    A    Roundabouts, yes.

2    Q    Now, to be clear, Mr. Croft is not part of the Wolverine

3    Watchmen, correct?

4    A    He is not.

5    Q    As far as you know, he has never been part of the Wolverine

6    Watchmen?

7    A    No.

8    Q    And as far as you know -- well, you are aware of a group

9    called the Michigan Home Guard, right?

10   A    I am.

11   Q    As far as you know, Mr. Croft has never been involved with

12   the Michigan Home Guard?

13            MR. KESSLER:  Relevance.

14            MR. BLANCHARD:  There was testimony about Michigan

15   Home Guard on direct.

16            MR. KESSLER:  Doesn't make it relevant.

17            THE COURT:  Well, I think it can be something that you

18   go into here to just try to explain where Mr. Croft fits in

19   where he doesn't as long as we don't get too far afield.  Go

20   ahead.

21   BY MR. BLANCHARD:

22   Q    You testified on direct examination about the Michigan

23   Liberty Militia, correct?

24   A    I believe so.  Yes.

25   Q    You are familiar with that group, yes?

A     Right.

Q     As far as you know, Mr. Croft has never been involved with MLM, correct?

A     Correct.

Q     And then there was talk about the Michigan Patriot III%ers, Adam's group, correct?

A     Correct.

Q     And as far as you know, Mr. Croft was never sworn into that group, right?

A     As far as I know.

Q     You talked about a lot of different events on your direct examination with Mr. Kessler, right?

A     I did.

Q     There was one you talked about on April 30th at the Capitol.  Do you remember that?

A     I do.

Q     There was a rally at the Capitol?

A     Yes.

Q     There was a lawful rally?

A     It was.

Q     People were protesting?

A     They were.

        MR. BLANCHARD:  Could I have Exhibit 7, please? Judge, can I have Exhibit 7 on the big screen?

        THE COURT:  Sorry.

1           MR. BLANCHARD:  Thank you.

2    BY MR. BLANCHARD:

3    Q    Exhibit 7 was taken at that April rally, correct?

4    A    In April.  Yes.

5    Q    Okay.  The people depicted here, Mr. Croft isn't one of

6    them, correct?

7    A    He is not.

8    Q    As far as you know, Mr. Croft wasn't at the April 30 rally,

9    correct?

10   A    Correct.

11   Q    You testified about a June 14 telephone call that you had

12   with Fox, Harris, Garbin, Musico, Morrison and Keller.  Do you

13   remember that?

14   A    I do.

15   Q    Mr. Croft didn't participate in that telephone call,

16   correct?

17   A    No.

18   Q    He wasn't conferenced in?

19   A    No.

20   Q    He wasn't briefed on it?

21   A    He was not.

22   Q    And then there was a field training exercise in Munith on

23   June 14 as well, right?

24   A    There was.

25   Q    You were at that, right?

1    A    I was.

2    Q    Mr. Croft was not at the Munith FTX, right?

3    A    No.

4    Q    And he didn't call in, you know, to talk to people on the

5    phone, right?

6    A    He had spoken with Joe previously.  That's how he got

7    connected with Adam.

8    Q    He didn't call into that FTX and talk to people, right?

9    A    No.

10   Q    And he didn't join by zoom or anything like that, right?

11   A    He did not.

12   Q    There was another rally at the Capitol on June 18, right?

13   A    Yes.

14   Q    Another lawful protest?

15   A    Yes.

16   Q    Citizens were upset with their government?

17   A    They were.

18   Q    Far more people than are in the courtroom here today?

19   A    Right.

20   Q    Mr. Croft wasn't at the June 18 rally, fair?

21   A    Fair.

22   Q    You talked about a June 20th meeting at the Vac Shack,

23   true?

24   A    I did.

25   Q    Down in the basement of the Vac Shack, right?

1    A    Yup.

2    Q    And Mr. Fox was there, right?

3    A    He was.

4    Q    Because that was his home?

5    A    That's where he stayed periodically.  Yes.

6    Q    It was the only place that he had a bed that you knew of,

7    right?

8    A    He was going back between that and his girlfriend Amanda

9    Keller.

10   Q    Okay.  So he stayed there?

11   A    He did.

12   Q    And then also Ms. Keller was present at that meeting?

13   A    Yes.

14   Q    Mr. Bellar was there?

15   A    He was.

16   Q    McIntosh?

17   A    Yes.

18   Q    You were there?

19   A    I was.

20   Q    Mr. Croft wasn't present, was he?

21   A    He was not.

22   Q    There was a July 7 meeting at Paul Bellar's house, true?

23   A    True.

24   Q    Max Wyckoff was there?

25   A    He was.

1    Q    Garbin was there?

2    A    He was.

3    Q    Bellar was there?

4    A    He was.

5    Q    Harris was there?

6    A    Yes.

7    Q    Solomon Clark was present?

8    A    Yes.

9    Q    Jerad Boshenae was there?

10   A    Yes.

11   Q    Kaleb Franks was there?

12   A    Yes.

13   Q    Was Mr. Croft there?

14   A    He was not.

15   Q    So there was -- we talked about Cambria, Wisconsin, right?

16   A    Yes.

17   Q    Mr. Croft showed up to that?

18   A    He did.

19   Q    A lot of other people were there?

20   A    There was.

21   Q    People that are charged here in the room?

22   A    Yes.

23   Q    Lots of people who weren't charged?

24   A    Say again?

25   Q    Lots of people who weren't charged, correct?

1     A    Yes.

2     Q    And we saw that big picture of the people, you know, posed

3     you were in.  Some had weapons, right?

4     A    Yes.

5     Q    Most of these people aren't charged with a crime, right?

6     A    Correct.

7     Q    And there were children at the Cambria event, right?

8     A    There was.

9     Q    Including Mr. Croft's children?

10    A    Yes.

11    Q    And there were -- there is a swimming pool for the kids?

12    A    There was.

13    Q    And family type activities for the kids?

14    A    At times.

15    Q    You talked to the jury about a phone call on July 14,

16    right?

17    A    Yes.

18    Q    It was a phone call with Mr. Croft, true?

19    A    True.

20    Q    And that's the one where Mr. Croft refers to a governor as

21    a he, correct?

22    A    Yes.

23    Q    As far as you know, Governor Whitmer identifies as a

24    female, correct?

25    A    I do.  Yes.

1    Q    She uses pronouns like she and her, correct?

2    A    She does.

3    Q    That's not a secret.  Everyone knows that, right?

4    A    Correct.

5    Q    And then there was a meeting at Peebles, Ohio, right?

6    A    There was.

7    Q    On July 18?

8    A    Yes.

9    Q    Mr. Croft was at that, right?

10   A    He was there.

11   Q    Were you there?

12   A    In Peebles?  Yes.

13   Q    Okay.  That's the meeting where Mr. Croft left early,

14   right?

15   A    I am not sure when he left.

16   Q    He left before the meeting was over, right?

17   A    He might have.  I am not sure.

18   Q    Okay.  And the meeting -- you remember the meeting

19   continuing after he left, fair?

20   A    The meeting went on for several hours.  Yes.

21   Q    Okay.  After that there was a July 23rd bonfire at

22   Mr. Harris's house, right?

23   A    There was.

24   Q    Do you recall was there alcohol at that bonfire?

25   A    I am not sure if there was or not.

1    Q    Was there a bonfire where there wasn't alcohol?

2    A    Say again?

3    Q    Was there a bonfire at Mr. Harris's house where there

4    wasn't alcohol?

5    A    I am not sure what the contents was there.

6    Q    Okay.  So at this bonfire at Mr. Harris's house, Mr. Croft

7    isn't present, right?

8    A    He is not.

9    Q    Neither was Mr. Fox?

10   A    No.  That one was -- no.  He was not there.

11   Q    Nor was Mr. Caserta, right?

12   A    No.

13   Q    Okay.  And then the next day after that bonfire you called

14   Mr. Fox, right?

15   A    Yes.

16   Q    And you testified about that?

17   A    I did.

18   Q    You didn't join Mr. Croft into that phone call, right?

19   A    No.

20   Q    Then a couple days later there was this event out in

21   Fowlerville, right?

22   A    Yes.

23   Q    I think that's where we saw the videos of the PT Cruiser

24   and you guys are ducking around it shooting, right?

25   A    We were.

1    Q   And that's also the event where we got the code words like

2    bonfire and can opener, right?

3    A   Correct.

4    Q   Mr. Wyckoff was present at that?

5    A   He was.

6    Q   Mr. Boshenae was there?

7    A   Yes.

8    Q   Mr. Bellar was there?

9    A   Yes.

10    Q   Was Mr. Croft there?

11    A   He was not.

12    Q   So he didn't get these code words, right?

13    A   No.

14    Q   And you have never seen him use these code words, right?

15    A   No.

16    Q   Frankly, you've never seen these guys use these code words,

17    right?

18    A   No.

19    Q   So these code words don't really tell us much, is that

20    fair?

21    A   Just that they made them.

22    Q   The day after Fowlerville there is another meeting in the

23    basement of the Vac Shack, right?

24    A   Yes.

25    Q   You were present for that?

1    A    I was.

2    Q    Mr. Fox was present for that?

3    A    He was.

4    Q    Mr. Croft was not present?

5    A    No.

6    Q    You didn't get him on the phone to help talk about whatever

7    you were working on, right?

8    A    No.

9    Q    You didn't get him on zoom to join you?

10   A    No.

11   Q    On August 2nd, you had a phone call with Mr. Croft, right?

12   A    I believe so.  Yes.

13   Q    And you recorded that phone call, right?

14   A    I did.

15   Q    Okay.  We'll come back to that in a minute.  After August

16   2nd, there was another event in Munith, is that right?

17   A    Yes.

18   Q    And Joe Morrison was at that?

19   A    Yes.

20   Q    Fox was there?

21   A    Yes.

22   Q    Garbin and Franks were there?

23   A    Yes.

24   Q    A guy with the last name of Puffenberger was there, right?

25   A    Correct.

1    Q    Solomon Clark was there?

2    A    Yes.

3    Q    Steve Schleme was there?

4    A    Yes.

5    Q    Sean Fix was there?

6    A    Yes.

7    Q    Amanda Fix was there?

8    A    Yes.

9    Q    Mike Morais was there?

10   A    Correct.

11   Q    Who wasn't there?

12   A    Barry Croft.

13   Q    On August 16, that's where you had that contact tracer

14   meeting with Mr. Caserta, right?

15   A    Correct.

16   Q    Was Mr. Croft present for that?

17   A    He was not.

18   Q    Did you get him on the phone to talk about what he hated?

19   A    No.

20   Q    Did you get him on the phone to ask him for a plan?

21   A    No.

22   Q    Didn't participate in that at all, right?

23   A    He did not.

24   Q    On August 17, you had another phone call with Mr. Fox,

25   true?

1    A    True.

2    Q    Was Mr. Croft on that call?

3    A    No.

4    Q    And to be clear, you have the ability to do three-way

5    calls, right?

6    A    Yes.

7    Q    Because you did them with other people, right?

8    A    We did.

9    Q    But you didn't join Mr. Croft into the August 17 call,

10   true?

11   A    Correct.

12   Q    I think you talked about a FAFO chat from August 19.  Do

13   you remember talking about that?

14   A    I do.

15   Q    Mr. Croft wasn't involved in the FAFO chat on August 19,

16   true?

17   A    He was not.

18   Q    You also talked about a chat with Mike Morais I think on

19   August 21.  You remember that?

20   A    Correct.

21   Q    No Mr. Croft, right?

22   A    No.

23   Q    There was another Lake Orion meeting at Mr. Harris's house

24   on August 23rd, is that right?

25   A    That's correct.

1    Q    And there were people present at that, right?

2    A    There was.

3    Q    Yourself included, right?

4    A    I was.

5    Q    How about Mr. Croft, was he there?

6    A    He was not.

7    Q    We talked I think in some detail about this day

8    reconnaissance trip up to Elk Rapids, right?

9    A    We did.

10   Q    And that was the one where you got in your truck and you

11   drove to Grand Rapids, right?

12   A    Correct.

13   Q    And you picked up Mr. Fox from the basement of the Vac

14   Shack, right?

15   A    I did.

16   Q    And he got in your truck and you drove him up to Eric

17   Molitor's place, right?

18   A    Correct.

19   Q    And if I remember correctly, he was smoking pot when you

20   picked him up?

21   A    I don't know if he was smoking when we got there, no.

22   Q    He smoked when he got to Molitor's place?

23   A    He did.  I did not.

24   Q    You never smoked pot, right?

25   A    Never.

Q    Never in your life?

A    Never in my life.

Q    You didn't smoke but you were around when these guys did, right?

A    That's correct.

Q    And so you could tell whether they were getting high based on their behavior because you weren't high, right?

A    They were smoking.

Q    Okay.  And so you get you up to Molitor's.  That's where Adam smokes with Molitor, right?

A    Correct.

Q    And then you drive him up near Elk Rapids, right?

A    Correct.

Q    They smoke a couple more times that day, right?

A    They do.

Q    Okay.  And the people that were involved in that trip were you, right?

A    Correct.

Q    As the driver?

A    Correct.

Q    And then we had the passenger, Adam Fox, right?

A    Correct.

Q    And then we had the passenger in the back, Eric Molitor, right?

A    That's correct.

1    Q    Which seat in the car was Barry Croft in?

2    A    He was not there.

3    Q    He didn't go at all, right?

4    A    On that trip, no.

5    Q    As far as you know he didn't even know that that trip was

6    coming?

7    A    That's correct.

8    Q    I think you testified about a chat you had with Mr. Fox on

9    September 4.  Do you recall that?

10   A    I do.

11   Q    Was Mr. Croft involved in that private chat with Mr. Fox?

12   A    He was not.

13   Q    And then we have the Luther event that we've talked a lot

14   about, right?

15   A    We do.

16   Q    Barry was present for that, right?

17   A    He was.

18   Q    Lots of other people were present for that, right?

19   A    They were.

20   Q    So at the Luther event we had you working on behalf of the

21   government, right?

22   A    Yes.

23   Q    We had Jenny Plunk working on behalf of the government,

24   right?

25   A    Correct.

1     Q    We had Steve Robeson working on behalf of the government,

2    right?

3    A    Correct.

4    Q    We had UCE Mark working on behalf of the government, right?

5    A    Correct.

6    Q    We had UCE Red working on behalf of the government, right?

7    A    Correct.

8    Q    Do you know of any other confidential sources or undercover

9    agents who were present?

10    A    No.

11    Q    So on that night trip that we've talked so much about, on

12    the drive up I understand from Big Rapids to Cadillac Mr. Croft

13    was in your truck, right?

14    A    He was.

15    Q    And from the ride from Big Rapids to Cadillac in the truck

16    you were the driver, right?

17    A    I was.

18    Q    And in the front passenger seat -- wait a minute.  You are

19    still working as a confidential source, right?

20    A    Yes.

21    Q    Still working for the government, right?

22    A    Right.

23    Q    So the government is driving the car, right?

24    A    Correct.

25    Q    And in the front passenger seat we have a sworn FBI agent?

1    A    Correct.

2    Q    We've got Red in the front passenger seat?

3    A    Yes.

4    Q    And then in the back seat behind you we've got Steve

5    Robeson, right?

6    A    He was behind Red in the passenger side.

7    Q    Back seat behind Red.  Passenger side back seat we've got

8    Steve Robeson, correct?

9    A    Correct.

10    Q    He is still working as a confidential source that weekend,

11    right?

12    A    Yes.

13    Q    And then we have in the back driver's side passenger seat

14    Mr. Croft, right?

15    A    I am not sure if he was in the middle or on the driver's

16    side.

17    Q    In the back seat somewhere, right?

18    A    Yup.

19    Q    The only person in that car that night that wasn't working

20    for the government on the drive from Big Rapids to Cadillac was

21    Mr. Croft?

22    A    I believe so.  I am not sure when we all paired up.

23    Q    You don't think Mr. Croft was working for the government?

24    A    No.  He was not working for the government.  No.

25    Q    Okay.  Now, you've also talked about different chat groups,

1      right?

2      A     Yes.

3      Q     Well, different chat platforms and groups, right?

4      A     Yes.

5      Q     We've talked about these platforms or these apps called,

6      like, Threema and Wire, correct?

7      A     Correct.

8      Q     Those were both chat applications that were used by people

9      charged here, right?

10     A     They were.

11     Q     Well, used by some of the people charged here, right?

12     A     Yes.

13     Q     Okay.  In Wire there was something called the Wolverine

14     Watchmen, the vetting chat, right?

15     A     There was.

16     Q     Barry Croft was never in the Wolverine Watchmen vetting

17     chat, right?

18     A     He was not.

19     Q     And then there was something that we called the Wolverine

20     Watchmen main chat, right?

21     A     Correct.

22     Q     Barry Croft was never in the Wolverine Watchmen main chat,

23     correct?

24     A     He was not.

25     Q     And then there was something called the QRF chat, right?

1    A    Correct.

2    Q    Stands for, like, quick reaction force?

3    A    That's correct.

4    Q    Mr. Croft, was he in that one?

5    A    He was not.

6    Q    There was the bonfire chat, right?

7    A    There was.

8    Q    Is that the one that got a different name later?

9    A    That was on Threema, so yes.

10   Q    Okay.  And so the bonfire chat had people from the

11   Wolverine Watchmen, right?

12   A    It did.

13   Q    Didn't have Mr. Croft?

14   A    It did not.

15   Q    Because as far as you know, Mr. Croft never had the Wire

16   app?

17   A    I don't know if he did or not.

18   Q    You never saw him use it, right?

19   A    I communicated with him just through the phone application

20   talking.

21   Q    Right.  You never saw him use it, right?

22   A    I did not.

23   Q    Over in Threema there was something called the Brick Squad

24   chat, right?

25   A    There was.

1    Q    Now, Threema is another one of these apps like Wire, right?

2    A    It is.

3    Q    It's another one of these apps that you can just download

4    off the app store?

5    A    You pay for that one.  Yes.

6    Q    We keep hearing of it as an encrypted app, right?

7    A    That's how they pronounce it.  Yes.

8    Q    But it's not -- I mean, it's publicly available, right?

9    A    It is.

10   Q    It's kind of like WhatsApp or Signal, right?

11   A    True.

12   Q    And so in Threema I think we -- I asked there is the Brick

13   Squad chat, right?

14   A    Correct.

15   Q    Mr. Croft wasn't on the Brick Squad chat, right?

16   A    He was not.

17   Q    And then there was something called the FAFO chat?

18   A    Correct.

19   Q    I think that's the fuck around find out chat, right?

20   A    Correct.

21   Q    Was Mr. Croft on that one?

22   A    He was not.

23   Q    So he didn't find out anything from that chat, huh?

24   A    On -- just on the chat specifically, no.

25   Q    As far as you know, Mr. Croft didn't have Threema, fair?

1    A    Fair.

2    Q    So you'd agree that Mr. Croft was not involved in any of

3    these chats with any of these guys or the rest of the Watchmen,

4    is that fair?

5    A    On the main chats?  No.  I don't know what kind of side

6    conversations they were having.

7    Q    Well, you don't have any evidence that he ever had those

8    apps, correct?

9    A    No.

10    Q    You don't have any evidence that he ever had side

11    conversations with these guys on those apps, correct?

12    A    On the app specifically, no.

13    Q    So we've talked about the September 11, 12, 13 Luther FTX,

14    right?

15    A    We do.

16    Q    And that's we talked about that's where that night ride

17    happened, correct?

18    A    Correct.

19    Q    And I think you testified yesterday that Adam didn't tell

20    people other than the Nulls what the plan was until they got in

21    the cars, right?

22    A    Correct.

23    Q    And that's where you drove Mr. Croft in the back seat of

24    your car up near Whitmer's cottage, correct?

25    A    Correct.

1    Q    Now, you got -- if I understand the organization correctly,

2    you go down to Big Rapids; you pick Barry up, right?

3    A    Correct.

4    Q    And that's where we went through there were a bunch of

5    government people in the car, right?

6    A    Right.

7    Q    And then you got all the way up to Walmart in Cadillac,

8    right?

9    A    Correct.

10   Q    And that's where you first see Adam, right?

11   A    Yes.

12   Q    Okay.  So Adam wasn't in your car until long after Barry

13   was underway with you, correct?

14   A    I am not sure if he rode with us or if he rode with Brian

15   Higgins from the hotel up to the Cadillac area.

16   Q    When you use the pronoun he, who are --

17   A    Barry Croft.

18   Q    So now you don't remember if Barry Croft was in your

19   vehicle?

20   A    He rode in my vehicle from Walmart to the governor's house.

21   I don't know if it was from the hotel to Walmart.  I am not too

22   sure on that portion.

23   Q    If Mark testified that he was in the car you wouldn't have

24   any reason to quibble?

25        MR. KESSLER:  Objection, Your Honor.

1          THE COURT:  Well, I mean, I don't think he should be

2    commenting on other people's testimony.  That'll be for the

3    jury to remember what was said and what wasn't, and he is here

4    to tell us what he remembers and what he doesn't.

5    BY MR. BLANCHARD:

6    Q    You are not saying that you remember him not being in the

7    car, correct?

8    A    Correct.  Just from the hotel to Walmart I am not sure if

9    he was in it at that time.

10   Q    I just want to be clear, though.  What you are saying is

11   you are not sure, right?

12   A    Correct.

13          THE COURT:  How big of a deal is this?

14          MR. BLANCHARD:  It's a very big deal.

15          THE COURT:  From -- from the hotel to Walmart?

16          MR. BLANCHARD:  Yes.

17          THE COURT:  Tell me why it's a big deal.

18          MR. BLANCHARD:  Because he has testified that Adam

19   didn't explain what the plan was until after they got underway,

20   and Adam didn't get in the car until he was up at Walmart, and

21   so they drive Mr. Croft from the Super 8 up to Walmart he

22   doesn't know what's going on.

23          THE COURT:  I think we've got more than enough to make

24   conclusions and arguments about that particular issue, all

25   right?  I don't think we need to beat it any further.

BY MR. BLANCHARD:

Q    After that weekend you didn't see Mr. Croft again in person until we were in this courtroom, correct?

A    Correct.

Q    You had a couple phone calls with him after that weekend, though, right?

A    We did.

Q    You had a phone call with him on September 22nd?

A    I believe so.

Q    It was a pretty short phone call, right?

A    I believe.

Q    Like, about nine minutes?

A    Sounds good.

Q    And you had another phone call with him on October 4, correct?

A    I believe so.

Q    That was a longer phone call, correct?

A    Yes.

Q    And you recorded both of those?

A    I did.

Q    We haven't heard anything from those phone calls in this courtroom, right?

A    I don't believe so.  No.

        MR. KESSLER:  Well, Your Honor, and I object to those kind of questions.  He's only here for his own testimony.  He

1    doesn't know anything by heart.  He has been excluded at their

2    request.

3              MR. BLANCHARD:  I'm sorry.  That's fair.

4    BY MR. BLANCHARD:

5    Q    You haven't testified about those phone calls, correct?

6    A    I have not.

7    Q    Can I have 287, please?

8              This is the confederate flag that you said was hanging

9    within Ty Garbin's trailer up in Luther, is that right?

10   A    Correct.

11   Q    Okay.  And it has signatures from people on it, correct?

12   A    It does.

13   Q    Is Mr. Croft's signature on here?

14   A    I don't believe so.

15   Q    Okay.  And then could I have you blow up the upper

16   right-hand corner.  Perhaps you could even zoom in more on one

17   of those in the upper corner.

18             It appears in the upper right-hand corner that it is

19   signed Ty several times, correct?

20   A    It is.

21   Q    And it appears that there are dates on this, correct?

22   A    There is.

23   Q    Do you know why that is?

24   A    No.

25   Q    Okay.  So on your direct examination you talked about a

1    number of audio recordings, correct?

2    A    Correct.

3    Q    And we heard clips from them, right?

4    A    Yes.

5    Q    Like, for example, on September 7, you put in or you talked

6    about a number of clips from a phone call with Adam Fox, right?

7    A    Correct.

8    Q    And those were, like, Exhibits 215, 216, 217 and 218,

9    right?

10   A    Correct.

11   Q    Now, that phone call with Mr. Fox was longer than just

12   those four exhibits, right?

13   A    Yes.

14   Q    And you can't tell the jury from those clips which order

15   the statements came in the phone call, is that fair?

16   A    No.

17   Q    Okay.  And so what I'm saying is you can't say 215 came in

18   the phone call before 217 or vice versa, right?

19   A    No.

20   Q    Okay.  And you'd agree that there were things talked about

21   in between those clips, right?

22              MR. KESSLER:  Asked and answered, Your Honor.

23              THE COURT:  Yeah.  I think that particular one hasn't

24   so you can go ahead and ask it.  It seems like an obvious

25   conclusion from the reality that we were talking about clips.

BY MR. BLANCHARD:

Q    You would agree that things were said in between those clips that weren't included, right?

A    Yes.

Q    So we've talked about a number of events that Mr. Croft wasn't at, right?

A    Correct.

Q    And we talked about Cambria where he was, right?

A    Correct.

Q    In fact, that's the first time you met Mr. Croft, correct?

A    Yes.

Q    And you know Mr. Croft to be an excitable guy?

A    Yes.

Q    Easily so?

A    Fair to say.

Q    He gets worked up and rants pretty quickly, right?

A    Yes.

Q    Says some crazy stuff when he is worked up?

A    He says things.

Q    Some of the things are crazy, right?

A    Sure.

Q    Sometimes it's nonsense, right?

A    Depends on who is saying them and who he is saying them to.

Q    Some of the things Mr. Croft -- you've heard Mr. Croft say are just absolutely --

1          MR. KESSLER:  Hearsay, Your Honor.

2          THE COURT:  I think we ought to focus on something in

3     particular.  But the bigger point is, the words that he said

4     that are in evidence it's going to be for the jury to decide

5     after they hear your arguments about what's nonsense, what's

6     not nonsense, if anything.  I don't think it's really for this

7     witness to characterize.

8     BY MR. BLANCHARD:

9     Q    One of the recordings you made in Cambria was included in

10    Exhibit 109, correct?

11    A    Correct.

12    Q    If I could have 109T, page 2, please, and if you would blow

13    up Mr. Robeson's quote there?

14         And you see in Exhibit 109, Mr. Robeson says, we, we

15    were stopped by MRAPS, right?

16    A    Correct.

17    Q    And MRAPS are those mine resistant vehicles, personnel

18    carriers that the army uses, right?

19    A    Yes.

20    Q    And in context here, Mr. Robeson is talking about when he

21    and Mr. Croft tried to go into Columbus during the riots?

22         THE COURT:  We have the context right.

23         MR. BLANCHARD:  The context is above.  I think he

24    remembers.  If he doesn't I can go back to it.

25    BY MR. BLANCHARD:

1    Q    Do you remember the context?

2    A    Yes.

3    Q    Okay.  And was the context that Mr. Robeson and Mr. Croft

4    tried to go into Columbus the week after the riots?

5    A    During the riots.  Yes.

6    Q    During the riots?

7    A    But they had explosives and a 300 Blackout in the vehicle

8    with them.  Yes.

9    Q    They got stopped by an MRAP?

10   A    They got stopped by the national guard.

11         MR. KESSLER:  Your Honor, I don't think that's in the

12   admitted exhibit.

13         THE COURT:  It isn't.  That's what I'm trying to get

14   at.

15         MR. BLANCHARD:  We were stopped by MRAPS.  Right

16   there.

17         THE COURT:  We have the whole admitted exhibit.  That

18   is the context, and I think that's -- I am not sure where

19   you're going with it.  If you want to -- so let's get to it as

20   opposed to trying to recreate a conversation that's not in

21   evidence.

22         MR. BLANCHARD:  That was my next question.

23   BY MR. BLANCHARD:

24   Q    So you would agree that this conversation happened in

25   Cambria, right?

A     Yes.

Q     And Croft is talking about pulled out explosives, and he is

worked up, blow mother fuckers directly up he says, right?

A     Very passionately speaking.  Yes.

Q     Yeah.  And this is in July he's very passionate and worked

up, right?

A     Yes.

Q     About the riots, right?

A     Yes.

Q     That happened back in June?

        MR. KESSLER:  Your Honor, again.

        THE COURT:  Yeah.  You are just interpreting it for

him and the words are what they are, and it's not for this

witness to interpret them or for you to reinterpret him through

his words.  So you can show him the words, and I think beyond

that we're asking him to characterize and we're effectively

inviting him to put other words into evidence if there are any.

        MR. BLANCHARD:  I guess what I'm trying to be clear

about is just the -- Mr. Croft's behavior when he is saying

these words.  How he is behaving.

        THE COURT:  Well, he has already said that, that he

was excited.  I forget the exact words, but I don't think we

need to hear the full thesaurus of possible descriptions.

BY MR. BLANCHARD:

Q     Okay.  But the thing he is talking about happened over a

1    month prior, right?

2             MR. KESSLER:  That's the --

3             THE COURT:  That's the point.  I mean, that's exactly

4    the issue, so I sustain the objection.  What he's talking about

5    is to be argued and eventually gleaned by the jury from what's

6    in evidence, which is the transcript or the actual tape.  So I

7    mean, you are going to make your argument, and fine, make the

8    argument, but you don't have to argue with this witness about

9    it and it's not for him to interpret it.

10   BY MR. BLANCHARD:

11   Q    You testified that before taking the guys you took to

12   Cambria there, that you told them to keep an open mind, right?

13   A    I did.

14   Q    One of the things you were concerned about was that there

15   might be belt fed weapons present, right?

16   A    Correct.

17   Q    Belt fed weapons, there is nothing wrong with them, right?

18   A    No.

19   Q    Okay.  In fact, we saw a picture of you holding a Browning

20   1919.  That's belt fed, right?

21   A    Correct.

22   Q    Nothing illegal about that, right?

23   A    Correct.

24   Q    The other thing you said you wanted them to keep an open

25   mind about is there might be illegal drugs at Cambria, right?

1    A    There might be.  Yes.

2    Q    Marijuana is an illegal drug, right?

3    A    It is.

4    Q    It was present at Cambria, right?

5    A    It was.

6    Q    In fact, you knew Barry to smoke marijuana at Cambria,

7    right?

8    A    He did.

9    Q    You knew Barry to smoke marijuana everywhere you saw him,

10   right?

11   A    Yes.

12   Q    Including at Peebles?

13   A    I don't know if he smoked at Peebles or not.

14   Q    Luther?

15   A    I am not sure if he did or not.

16   Q    Now, do I understand correctly that you thought that

17   Peebles was to be a planning meeting, correct?

18   A    Yes.

19   Q    And it was your goal, you wanted to leave Peebles with a

20   plan, correct?

21   A    If they were consolidating a plan.  Yes.  I wanted to echo

22   back to the FBI what was being discussed.

23   Q    But you wanted to leave there with a plan, correct?

24   A    Yes.

25   Q    And you didn't leave Peebles, Ohio with a plan, correct?

```
1    A    No.

2    Q    So that's when you said, well, we need to start working on

3    something, right?

4    A    Yes.

5    Q    I think you talked a little bit with Mr. Hills about having

6    proposed a plan to these guys where you could get them credit

7    cards to fund purchases, right?

8    A    That was discussed at Wisconsin, yes, that we could have

9    that option.

10   Q    And the option involved giving credit cards to the guys,

11   right?

12   A    We would receive credit cards.  Yes.

13   Q    You'd get them and then you'd get them to the guys, right?

14   A    No.  We would receive them.  I don't think we'd be

15   distributing out amongst each other.

16   Q    So you were going to get the credit card?

17   A    Yes.

18   Q    And then --

19   A    To give to the FBI.

20   Q    I'm sorry?

21   A    To give to the FBI.

22   Q    But the purpose of the credit cards was to be able to buy

23   things, right?

24   A    That was the purpose of it.  Yes.

25              MR. KESSLER:  Objection, relevance.  He's already
```

1    testified that this never happened.

2              MR. BLANCHARD:  It goes to inducement.

3              MR. KESSLER:  But he testified it didn't actually

4    happen.

5              MR. BLANCHARD:  But pitching the plan --

6              THE COURT:  It's also not what -- it may be the same

7    topic that Mr. Hills was talking about but it's not what he

8    covered.  He talked about 501c(3), and so if there is something

9    else you can set the context.

10             MR. BLANCHARD:  Yeah.  Sure.

11   BY MR. BLANCHARD:

12   Q    These credit cards that you were going to get, they were

13   going to be funded by a charity, correct?

14   A    That was our understanding.  Yes.

15   Q    The charity was called The Race to Unite the Races,

16   correct?

17   A    That sounds familiar.  I can't really remember.

18   Q    That was a charity created by Steve Robeson, right?

19             THE COURT:  So now we are getting afield because now

20   we are talking about what Steve Robeson did or didn't do.  He

21   is not here to testify, and that's why I cut off the earlier

22   discussion, and I don't think we're getting anymore relevant as

23   we go, and we're just getting more astray.  So I think you got

24   to bring it home to something new or to a quick point on this

25   if you want to finish it because I just don't see the

1    relevance.

2    BY MR. BLANCHARD:

3    Q    You had a conversation with Mr. Fox about these credit

4    cards on July 27, correct?

5    A    We did.

6    Q    Okay.  And you proposed on that day that you could get

7    Mr. Fox a credit card with $5,000 on it, correct?

8    A    It was discussed in Wisconsin that we can get the credit

9    cards with money on them.  Yes.

10   Q    Wisconsin, though, was July 11 and 12, right?

11   A    Correct.

12   Q    Do you recall having a conversation with Mr. Fox about it

13   also on July 27?

14   A    Yes.

15   Q    Okay.  So you also, on July 27, tried to get Mr. Fox to

16   take your free money, right?

17   A    It wasn't my free money.  No.

18   Q    You tried to get him the take the free money?

19   A    It if it was offered from Steve.

20   Q    Okay.  He didn't take that free money, correct?

21   A    I don't believe so.  No.

22   Q    Now, July 27 isn't the only time that you pitched this

23   idea?

24        THE COURT:  Okay.  So I mean, now we're cumulative.

25   Let's end it and move on.  I think 403 tells me we've had more

1   than enough and you can make your arguments and points from

2   what's in the order already.

3   BY MR. BLANCHARD:

4   Q   As of August 2020, there was no plan to kidnap the governor

5   that you were aware of?

6   A   No.

7   Q   I want to be clear on that.  Sometimes when I ask the

8   question in a negative and you respond no it gets confusing.

9   Is it correct that as of August 2020 there was no plan you were

10  aware of to kidnap the governor?

11  A   We were forming a plan to kidnap the governor.

12  Q   There was no plan as of August, correct?

13       MR. KESSLER:  Asked and answered, Your Honor.

14       THE COURT:  Well, it's a matter of argument because

15  both sides are going to argue what the meaning of plan is, and

16  I'll give instructions about what it means to have a conspiracy

17  and where the lines are.  So I don't know, clearly you are

18  going to disagree on where those lines are, and so what the

19  witness is saying is we were forming something.  I don't know

20  what you mean, Mr. Blanchard, by no plan, because that's in

21  some sense what the issue is.  So you can try to focus it more

22  than that, but he doesn't have to accept your word if he

23  doesn't want to, and he has indicated he doesn't want to.

24       MR. BLANCHARD:  I understand.  Let me try to focus it

25  further.

1    BY MR. BLANCHARD:

2    Q    Up until the first part of August of 2020, there might have

3    been a little talk or chatter, but there has been no plans put

4    in place prior to that to kidnap the governor, correct?

5    A    Well, there was discussion of storming the Capitol, but as

6    a formed plan, no.

7    Q    Okay.  Now, we have talked or you spoke with the

8    government's lawyer about a phone conversation with Mr. Croft

9    on August 2nd of 2020, correct?

10   A    Yes.

11   Q    And that was via telephone?

12   A    Yes.

13   Q    And you recorded it?

14   A    I did.

15   Q    And a small portion of that call was included in Government

16   Exhibit 132, correct?

17            MR. KESSLER:  I am going to object to all the

18   questions that say small portion or the part you didn't hear,

19   because if there is admissible evidence they can play it.

20            THE COURT:  Yeah.  There is no need to characterize.

21   I think the point is it's a clip that should be clear and

22   obvious from what we've all talked about.  If you want to

23   layout how long the call was and he remembers it, then we'll

24   know how long this clip is and people can draw their own

25   conclusions about how to characterize it.

BY MR. BLANCHARD:

Q    Sure.  This was the clip where Mr. Croft is quoted as saying, we'll go wherever we have the ability to amass first. You remember that one?

A    Briefly.  Yes.

Q    Could we put 132T up, please?

Do you recall how long the entirety of the phone call was?

A    No.

Q    Okay.  Did you sometimes when you were on the phone calls with people text your handling agents that -- what you were doing, that you were on phone calls with people?

A    Yes.

Q    Do you recall if you texted your handling agent about this particular phone call?

A    I might have.

Q    Would it refresh your recollection to review your text messages with your handling agent --

A    Yes.

Q    -- from that day?

A    It would.

MR. BLANCHARD:  Can I approach the witness, please?

THE COURT:  Sure.

MR. KESSLER:  What part?  This is huge.

MR. BLANCHARD:  I'll direct.  Page 83.  There were a

1    lot of text messages.

2          THE WITNESS:  Thank you.

3    BY MR. BLANCHARD:

4    Q    You can look at any part but I think it might help your

5    recollection to look at page 83 in that booklet.  Is your

6    recollection now refreshed?

7    A    Yes.

8    Q    Did you text your handling agent about being on a phone

9    call with Mr. Croft on August 2nd?

10   A    Yes.

11   Q    Did you text him at 15:51 hours?

12         THE COURT:  If he remembers.  It's not for him to read

13   what's on the exhibit, so...

14         MR. BLANCHARD:  That's fair.

15         MR. KESSLER:  Can I ask that the witness put that

16   down?

17         THE COURT:  Sure.

18   BY MR. BLANCHARD:

19   Q    Did you text him how long you had been on the call?

20   A    I did.

21   Q    How long had you been on the call when you texted the

22   agent?

23   A    Fifty minutes.

24   Q    Okay.  Did you text him when you got off the call?

25   A    Yes.

1    Q    Was that some time later?

2    A    It was.

3    Q    About an hour and-a-half later?

4    A    Yes.

5    Q    So in total, the call with Mr. Croft on August 2nd was

6    about two and-a-half hours?

7    A    It was.

8    Q    You would agree that as of August 2nd, 2020, you had no

9    reason to believe that Mr. Croft knew of any plan to kidnap

10   Governor Whitmer, correct?

11        MR. KESSLER:  Speculation, Your Honor.  The only way

12   he could know would be hearsay from Mr. Croft.

13        THE COURT:  Well, I think -- I think he can answer if

14   he is able, and I think he could have a basis of information

15   beyond hearsay.  So if he knows he can answer and if he doesn't

16   he can say he doesn't know.

17        THE WITNESS:  Can you repeat the question?

18   BY MR. BLANCHARD:

19   Q    You would agree that as of August 2nd, 2022, you had no

20   reason to believe that Mr. Croft knew of any plan to kidnap

21   Governor Whitmer, correct?

22   A    He knew we were targeting the governor.  Yes.

23   Q    My question is, did you have any reason to know of a plan

24   to kidnap the governor?

25   A    Of a plan, no.

1          THE COURT:  Then we're back to the same issue of

2     characterizing, and so he doesn't like your word and he doesn't

3     have to accept it, and you'll have to argue about it.  If you

4     want to try to rephrase and narrow, you can.

5     BY MR. BLANCHARD:

6     Q    So this phone call --

7          Can I have 132T again?

8          This call where Mr. Croft talks about, we'll go

9     wherever we have the ability to amass first.  You testified

10    that he was talking about kidnapping a governor, right?

11    A    Yes.

12    Q    Okay.  That was your testimony last week, right?

13    A    Yes.

14    Q    Okay.  After you got off this call with Mr. Croft, you had

15    a conversation with Special Agent Chambers, right?

16    A    Yes.

17    Q    And Special Agent Chambers asked you if there was anything

18    of substance in this call, correct?

19    A    I believe so.

20    Q    You didn't tell him anything about kidnapping a governor,

21    right?

22    A    No.

23    Q    You didn't tell him anything about kidnapping anyone,

24    right?

25    A    No.

1    Q    Because it wasn't mentioned in the phone call?

2    A    No.

3             MR. KESSLER:  Objection, Your Honor.

4             THE COURT:  Well, that's the argumentative piece of

5    it, but he answered.

6    BY MR. BLANCHARD:

7    Q    So when it said that, we'll go wherever we amass first was

8    about the governor, when you said that last week, that wasn't

9    really accurate, was it?

10   A    I feel it is.  Yes.

11   Q    Well, you didn't tell your -- the agent asked you if there

12   was --

13            THE COURT:  Now you are just arguing with him, okay?

14   He feels it was.  You have given the evidentiary basis for you

15   to argue that that can't possibly be right.  So the argument

16   eventually is for the jury, not to beat up the witness.

17   BY MR. BLANCHARD:

18   Q    On the phone calls you've had with Mr. Croft, you've talked

19   about a number of topics, correct?

20   A    We did.

21   Q    You've talked about things that didn't involve governors,

22   right?

23   A    Yes.

24            MR. KESSLER:  We're getting --

25            THE COURT:  Now we're getting into just -- you have to

1    focus and narrow, otherwise we are just going to be backdooring

2    the things that I excluded.

3    BY MR. BLANCHARD:

4    Q    Without telling me anything Mr. Croft said, what sorts of

5    topics did you discuss?

6         THE COURT:  Even the topics are part of the

7    discussion.  If somebody else wants the topics in then the

8    other party to the conversation can do it, but this isn't an

9    invitation to approach, you know, part of the statements.  So I

10   don't think you can go into that based on rulings I had

11   earlier.

12        MR. BLANCHARD:  To be clear, just so that the record

13   is complete, I was not intending to ask for any statements made

14   by Mr. Croft nor anything that included a true statement or

15   declaration.

16        THE COURT:  I ruled.  Move on.

17        MR. BLANCHARD:  I will.  Thank you.

18   BY MR. BLANCHARD:

19   Q    You were aware -- you became aware at some point that

20   Mr. Robeson was a confidential source, correct?

21   A    Yes.

22   Q    And you had suspicions about him being a confidential

23   source before you confirmed it, correct?

24   A    I -- he seemed as a person of interest for the FBI and

25   that's how I was treating him.  I was relaying the information

1    that he was putting out to the agents in charge of me.

2    Q    But you also saw how he behaved with other people, right?

3    A    I did.

4    Q    And that caused you to wonder if he was cooperating with

5    the FBI, correct?

6    A    No.

7    Q    Jenny Plunk you learned also was a confidential source,

8    right?

9    A    You did.

10   Q    You had suspicions about her being --

11        MR. KESSLER:  Relevance, Your Honor.  It's uncontested

12   that they are human sources.

13        THE COURT:  I am not sure what the relevance is but

14   we'll let him set a little foundation first and we'll see.

15   BY MR. BLANCHARD:

16   Q    You had suspicion that Jenny Plunk was cooperating with the

17   government, right?

18   A    No.

19   Q    If I could have 138T, please?  Just blow up the --

20        The government talked to you about this recording from

21   August 9 last week, right?

22   A    Yes.

23   Q    And in this Mr. Fox is talking about needing a little

24   seven, eight-man team of absolute operators, right?

25   A    Correct.

1    Q    And your reply was we got about four now, correct?

2    A    Yes.

3    Q    And when you said we've got about four now, you were

4    referring to four people, right?

5    A    Yes.

6    Q    You were one of those four?

7    A    Yes.

8    Q    Mr. Fox was one of those four?

9    A    Yes.

10   Q    Mr. Fix was one of those four?

11   A    Yes.

12   Q    And UCE Mark was one of those four, correct?

13   A    Correct.

14   Q    So you were working with -- when we are talking about the

15   team of four, you are working for the government, right?

16   A    Yes.

17   Q    UCE Mark is working for the government, right?

18   A    Yes.

19   Q    We got Adam, right?

20   A    Correct.

21   Q    And then we got Sean Fix.  He is the fake navy seal, right?

22   A    We thought he was a navy seal.  Yes.

23            MR. KESSLER:  Your Honor, I am going to object to the

24   argument.

25            THE COURT:  The question is argumentative and contrary

1    to what we've heard earlier about how this witness viewed it.

2    So, you know, let's save the argument for later and just get

3    information.

4    BY MR. BLANCHARD:

5    Q    On the daytime surveillance up in Elk Rapids there came a

6    time where you ended up at a restaurant, right?

7    A    Yes.

8    Q    Now, that wasn't just by happenstance that you ended up

9    having lunch at that restaurant, right?

10    A    We were hungry.

11    Q    The only reason you went there was because you were hungry?

12    A    I don't know what else would bring us to there.  To map out

13    the location.

14    Q    There wasn't a plan to go there in advance?

15    A    There might have been.  I can't really recall what the

16    discussion was.

17    Q    Well, there were FBI agents already in the restaurant,

18    weren't there?

19    A    No.

20    Q    There weren't FBI agents in the restaurant who took a photo

21    of you guys?

22    A    I wasn't aware who was and was not inside the restaurant.

23    Q    You talked to the FBI about going there before you went,

24    right?

25    A    I did.

1    Q    So it wasn't just that you went there because you were

2    hungry; you went there because you planned it, right?

3    A    We went to the governor's house.  That's why they had

4    surveillance teams out there.

5    Q    You went to the governor's house, right?

6    A    We did.

7    Q    And then after that you went to lunch, right?

8    A    We did.

9    Q    And you had planned with the FBI where you were going to go

10   to lunch with Adam, right?

11   A    No.  We found that on our way from the governor's house.

12   We didn't know what kind of restaurants were up there.

13   Q    You talked last week about August 30th videos or a video

14   from Mr. Fox doing weapons drills.  Do you remember that?

15   A    Yes.

16   Q    So where he's standing there I think in the basement of the

17   Vac Shack?

18   A    He might have been.

19   Q    You can tell because there is all that clutter around,

20   right?

21   A    Correct.

22   Q    And he is standing there with his rifle, right?

23   A    Yes.

24   Q    And he is pulling the trigger a bunch, and then he drops a

25   magazine and switches to a pistol, right?

1    A    Correct.

2    Q    All dry fire drills, right?

3    A    Yes.

4    Q    That's something to improve your speed or something?

5    A    Proficiency.  Yes.

6    Q    And then we also talked about, I think we saw one of those

7    from Mr. Caserta, right?

8    A    Yes.

9    Q    Same kind of thing?

10   A    Yes.

11   Q    You've never seen one of those videos of Mr. Croft, right?

12   A    No.

13   Q    Can I have 215, please, 215T?

14        You had this phone call with Mr. Fox on September 7,

15   right?

16   A    Yes.

17   Q    And this is where you testified that, you know, Mr. Fox was

18   getting concerned with Mr. Croft, correct?

19   A    Yes.

20   Q    There was a concern he might be a fed?

21   A    Yes.

22   Q    Might not be down with the things Mr. Fox wanted to do?

23   A    Yes.

24   Q    That was in September?

25   A    Yes.

1    Q    The September training in Michigan was discussed at the

2    Cambria training in Wisconsin, correct?

3    A    Yes.

4    Q    And it was you who invited Mr. Croft to come to the

5    Michigan training, correct?

6    A    Not exactly sure how the conversation was brought up.

7    Q    So I want to be clear.  Was it you who arranged for

8    Mr. Croft to come to -- whether it was at Cambria or some other

9    time that you asked, was it you who asked Mr. Croft to come to

10   the Luther training?

11            MR. KESSLER:  Your Honor, he said he didn't know.

12            MR. BLANCHARD:  He said he didn't know how the

13   conversation went down.

14            THE COURT:  I think he can clarify.  The witness's

15   answer was a little equivocal.  Go ahead.

16   BY MR. BLANCHARD:

17   Q    Was it you who invited Mr. Croft to come?

18   A    I might have asked him how he felt about coming to Michigan

19   for training.  I don't really remember the specific

20   conversation.

21   Q    You testified previously in a related case in Jackson

22   County, Michigan, correct?

23   A    I did.

24            MR. KESSLER:  Your Honor, I think he's got to ask him

25   a question before he starts trying to impeach him or refresh

1       him.

2                    THE COURT:  Probably the way he's going to try to

3       impeach on this particular answer.  Is that what you are trying

4       to do?

5                    MR. BLANCHARD:  Yes.

6                    THE COURT:  All right.  So go ahead and set it up and

7       we'll see.

8                    MR. BLANCHARD:  Thank you.

9       BY MR. BLANCHARD:

10      Q    You testified in Jackson County on a related case, correct?

11      A    I did.

12      Q    Back on February 28, just a couple weeks ago, right?

13      A    Yes.

14      Q    And you told -- you were under oath there, right?

15      A    I was.

16      Q    And you told the truth?

17      A    I did.

18      Q    And at that --

19                   MR. KESSLER:  Your Honor, before he starts reading

20      from this it has to be inconsistent.

21                   THE COURT:  And he just has to tell you what he's

22      looking at to start.

23                   MR. BLANCHARD:  Yeah.  I'm sorry.

24                   THE COURT:  You have to tell the lawyers.

25                   MR. BLANCHARD:  I'm sorry.  I am looking at the prelim

transcript you provided me from February 28th, page --

MR. KESSLER:  Do you know exactly what you're --

MR. BLANCHARD:  No.

MR. KESSLER:  Well, we may need to --

THE COURT:  Let him tell you what he's looking at and maybe I'll find out the same thing, because I don't know what he's looking at.

MR. KESSLER:  I didn't mean to interrupt, Your Honor. He is quoting me a page and I don't have it in front of me so I don't know.

THE COURT:  So can you give us a page?  Is it in the exhibit binders?

MR. BLANCHARD:  I don't know if the government put it in.  They supplied this to us in Jenks here.  It's page 78 of that.

THE COURT:  All right.  Page 78.

MR. BLANCHARD:  Starting at line 23 and continuing onto page 79, line 5.

THE COURT:  All right.  So why don't you show it to Mr. Kessler a minute.

MR. KESSLER:  Which line?

MR. BLANCHARD:  Starting at 23 on 78.  May I approach the witness, Your Honor?

THE COURT:  Have you seen it?

MR. KESSLER:  I've seen it, Your Honor.

1              THE COURT:  All right.  Yes.

2     BY MR. BLANCHARD:

3     Q    Do you recall being asked the question, remember chatting

4     with Agent Impola on a day saying, quote, I had Croft coming to

5     the Michigan -- coming to the Michigan train?  Do you remember

6     that?

7     A    I do.

8     Q    Was your answer, that sounds correct, yes?

9     A    Yes.

10    Q    So is it fair to say that you had Mr. Croft coming to the

11    Michigan training?

12    A    I was meaning in that text message that I had information

13    that he was coming to training.

14    Q    Now, you say you are referring to a text message, correct?

15    A    Correct.

16    Q    And the text message that you were referring to was what

17    now?

18    A    The text that I have Croft coming to training, that was

19    meaning that I had information that he is coming to training.

20    That text was sent out in Cambria while we were training up

21    there, and I was trying to just let the FBI know what was going

22    on.

23    Q    So when you say you said, I have Croft coming to training,

24    you mean you learned that he was coming to training or you

25    heard it?

1    A    I was letting him know that Croft would be coming to Luther

2    for training that Ty would be hosting.

3    Q    So we talked about the car that you drove on the night of

4    September 12, right?

5    A    Yes.

6    Q    There were other cars involved, true?

7    A    There was.

8    Q    There was a car that was driven by Mark, right?

9    A    Yes.

10   Q    Mark is an undercover FBI agent, right?

11   A    He is.

12   Q    There was a car that was driven by Brian Higgins, right?

13   A    Correct.

14   Q    He was associated with Steve Robeson, correct?

15   A    Correct.

16   Q    Sort of Roby's right-hand man, fair?

17   A    That would be fair to say.

18   Q    And he was brought to this by Robeson, right?

19   A    Yes.

20   Q    And Robeson was, as far as you know, working for the

21   government that evening, right?

22   A    No.  I thought he was just --

23   Q    As you sit here now?

24   A    Oh, now, yes.

25   Q    You know he was working for the government, right?

1    A    Now I do, yes.

2    Q    There -- do you recall if there came a time at the Luther

3    FTX where you came into possession of a 300 Blackout rifle with

4    a launcher on it?

5    A    I did.

6    Q    Okay.  And this was a rifle that you thought belonged to

7    Mr. Croft?

8    A    Yes.

9    Q    And you got it from Ms. Plunk?

10   A    I got it from Barry himself.

11   Q    You say Barry handed it to you?

12   A    Yes.  I asked him if I could have it to outfit it with an

13   optic and I would bring it back to the next FTX, and he said I

14   could.

15   Q    Okay.  Did there come a time where you had a

16   conversation -- and don't tell me what, where you had a

17   conversation with Ms. Plunk about this rifle?

18   A    There might have been one.

19   Q    And did you -- did you agree to take that rifle away from

20   the Luther FTX?

21   A    Barry gave it to me to outfit with an optic.  Yes.

22   Q    Right.  Did you take it away from Luther?

23   A    I did.

24   Q    Okay.  You said you had a conversation about it, right?

25   But you don't remember all of the conversation, is that fair?

1  A    No.  It has been quite a while.

2  Q    Would it refresh your recollection to look at a transcript

3  of that conversation with Ms. Plunk?

4  A    Yes.

5         MR. KESSLER:  I object, Your Honor.

6         THE COURT:  I don't know where we're going to if it's

7  a conversation between him and Ms. Plunk.  What does he need to

8  be refreshed about and where are we going other than to a

9  statement that's not in evidence and not admissible?

10  BY MR. BLANCHARD:

11  Q    Do you remember raising the name Corey?

12         THE COURT:  So you are just trying to backdoor

13  information that needs to come in through another witness, if

14  it comes in at all.

15         MR. BLANCHARD:  I want to know who Corey is.  That's

16  what I want to know.

17  BY MR. BLANCHARD:

18  Q    Do you remember talking about a Corey?

19  A    No.

20  Q    Okay.  Would it refresh your recollection to look at the

21  transcript?

22  A    Yes.

23         THE COURT:  But what's the relevance?  Who cares who

24  Corey is?

25         MR. BLANCHARD:  Can I have two questions on Corey?

1    MR. KESSLER:  It's inadmissible.

2    THE COURT:  You know, being held over is a good thing

3    if you are on Broadway or you are in the movies, but being held

4    over for another day for a witness, you know, it's tedious, and

5    yes, it's important to get everybody's relevant information on

6    the table, but you know, tell me why it's relevant because it

7    doesn't seem very relevant on the face of things given

8    everything else we've been talking about.

9    MR. BLANCHARD:  I can tell you why it's relevant.

10   THE COURT:  But I mean, if you are going to tell me

11   that in a way that if your theory is it's not really your

12   client's rifle.

13   MR. BLANCHARD:  That's not --

14   THE COURT:  So I just don't see it, and I think if you

15   can't give me a quick capsule of relevance then you need to

16   move on.

17   MR. BLANCHARD:  He tells the other confidential source

18   that he received a direction --

19   THE COURT:  No, no, no, no, no.  I don't think that's

20   where we can go with it.  If you've got something through --

21   filtered through another person who's not here from a statement

22   from another person who is not here through this witness, no.

23   That's not the way to get to it.

24   MR. BLANCHARD:  But what I'm proposing --

25   THE COURT:  If it's relevant there is a better way to

1    get to it.

2              MR. BLANCHARD:  What I'm proposing is that he would --

3    that I could lay the foundation for a statement under Branham

4    from a sworn agent to him that was a direction made to him, and

5    that's what I want to talk about.  But we got -- he doesn't

6    remember the name and so I got to cross the name bridge first.

7              THE COURT:  I still don't see it, but...

8              MR. KESSLER:  I don't either, Your Honor.  He can just

9    ask him what the sworn agent said to him.

10             THE COURT:  Why can't you do that?

11   BY MR. BLANCHARD:

12   Q    Do you know anyone in this case named Corey?

13   A    No.

14             MR. BLANCHARD:  Can I now refresh his recollection?

15             THE COURT:  Why don't you follow Mr. Kessler's

16   suggestion that you just ask him if he remembers a direction

17   from a special agent, and if you are telling us the special

18   agent is Corey and he doesn't remember it then we're done.

19   BY MR. BLANCHARD:

20   Q    Did you receive a direction related to the firearm from a

21   special agent named Corey?

22   A    No.

23   Q    Did you receive any directions regarding team building from

24   a special agent named Corey?

25             THE COURT:  So we are done.  He doesn't know Corey.

1    He didn't receive direction.  It's time to move on.

2             MR. BLANCHARD:  My last question was not whether he

3    knew Corey, but --

4    BY MR. BLANCHARD:

5    Q    So we talked yesterday about de-escalation, right?

6    A    Yes.

7    Q    And some of the ways that you try to de-escalate the

8    situation here was by suggesting that these guys fire live

9    ammunition into the governor's home, right?

10   A    I echoed back what Ty Garbin recommended.

11   Q    Sorry?

12   A    I echoed back what Ty already referenced to do.  Yes.

13   Q    Your purpose in suggesting that these people fire guns into

14   the governor's home was to de-escalate.  That's your testimony?

15   A    Compared to them kidnapping and killing the governor, yes.

16   Q    Or blow up her cottage with Tannerite, right?

17   A    I think maybe just putting some Tannerite around.  That is

18   not explosives like C-4 like they were wanting to acquire, but

19   yes, deescalation from the kind of explosives that they wanted

20   to attain.

21   Q    How do you blow up Tannerite?

22   A    I think you shoot it.

23   Q    So the Tannerite plan required that you go put an explosive

24   next to her house and shoot at it, right?

25   A    Yes.  While she was not there.

1    Q    And that was your idea of de-escalation?

2    A    Compared to what they were wanting to do, yes.

3    Q    Did you run these ideas by Mr. Chambers before you pushed

4    them out?

5    A    A lot of them were on the fly.  Just --

6    Q    So did you -- sorry.

7    A    No.  Keeping the flow of the conversation.  If I had time

8    to run everything by them we would -- who knows where we'd be.

9    Q    You said a lot of it was on the flow.  I want to be real

10   clear.  The shooting into the governor's house, did you run

11   that by Mr. Chambers before you pushed it out there?

12           MR. KESSLER:  Your Honor, I know it hasn't been by

13   this counsel, but we've gone over this exact same thing.

14           THE COURT:  We have covered it.

15   BY MR. BLANCHARD:

16   Q    What about the Tannerite?  Did you run that by Mr. Chambers

17   before you --

18           MR. KESSLER:  Same.

19   BY MR. BLANCHARD:

20   Q    -- proposed it?

21           THE COURT:  It is the same thing.  And he said both at

22   the first time it came up that most of this was on the fly.  So

23   I don't know that we're getting anything new.

24           MR. BLANCHARD:  That's fine.

25           THE COURT:  That's the point.

1      MR. BLANCHARD:  My issue is he said of most of it was

2  on the fly.  I'm trying to figure out if any of this was run by

3  Agent Chambers.

4      THE COURT:  Let's ask him if he remembers running any

5  of it by Agent Chambers.  Just ask him that.

6      MR. BLANCHARD:  I did and I got the answer most of it

7  was on the fly.  I'll try again.

8  BY MR. BLANCHARD:

9  Q    Did you run any of these by Agent Chambers?

10  A    No.

11  Q    So it was all on the fly?

12  A    The entire time I was with them, yes, was on the fly.

13  Q    You testified yesterday regarding a plan where you

14  suggested a Kiowa helicopter as part of the plan, right?

15  A    I was asking what kind of helicopters there was, yes.

16  Q    Wasn't it your testimony that you suggested the Kiowa?

17  A    I think Sean Fix said that he can get his hands on a

18  helicopter.

19      MR. KESSLER:  Relevance, hearsay, Your Honor.

20      THE COURT:  I am not sure where we're going with this.

21  It is hearsay, but what the relevance is I'm not sure either.

22  It did come up.  Do we need to go over it again?  Nobody is

23  suggesting that was what evolved into anything.

24      MR. BLANCHARD:  We are here about a supposed plan to

25  kidnap the governor.  I'm trying to figure out what the

1    supposed plan involved.

2          THE COURT:  I think it's pretty clear from the

3    government's theory that it didn't involve helicopters.

4    BY MR. BLANCHARD:

5    Q    So what was the plan as you understood it involving a

6    helicopter?

7    A    That Sean Fix could obtain a Black Hawk.

8          MR. KESSLER:  Again, relevance, Your Honor.

9          THE COURT:  It's something that came up obliquely

10   before.  It's tactical differences or options.  It's not the

11   government's theory that that had anything to do with what they

12   are charging these individuals with.  So it doesn't need very

13   much, if anything, and we've already covered at least something

14   on it.  I don't know what more we can get to.

15   BY MR. BLANCHARD:

16   Q    Do you know where the helicopter was to come from?

17         THE COURT:  That's the same point.  I mean, you know,

18   we went down that whole avenue with you at an earlier cross on

19   the boats and things like that that were germane to what the

20   government's theory is.  But let's not go down the road on

21   everything that's never going to be argued anyway.  You know,

22   we've got enough to make your arguments that there wasn't a

23   meaningful plan.  And it gets back to the same point I made

24   earlier, the jury is going to hear my instructions on what it

25   means to be part of a conspiracy.  They are going to have to

1    draw the lines based on your arguments, but putting words into

2    this witness's mouth about plans, would be plans, or options I

3    don't think it really advances the pole very much.

4    BY MR. BLANCHARD:

5    Q    So we talked the other day about the boat plan, right, or

6    maybe you are not aware of the boat plan.  Are you aware of the

7    boat plan?

8    A    Yes.

9    Q    Okay.  Do you know how many boats would be involved in the

10   boat plan?

11   A    I believe at least two.

12   Q    At least two.  Maybe three?

13   A    Potentially.

14   Q    Okay.  Regarding the helicopter plan, do you know how many

15   were to be?

16            MR. KESSLER:  Your Honor, oh my gosh.

17            THE COURT:  I mean, we are never going to go home if

18   we keep talking about that.

19            MR. BLANCHARD:  I have, like, five questions.

20            THE COURT:  Pardon?

21            MR. BLANCHARD:  I've only got like five questions.

22   What's going slow is the objections.  It's relevant -- our

23   Defense is --

24            THE COURT:  You know what?  It's not relevant anymore

25   certainly with 403 and with everything else we have.  We have a

1    massive amount of information yet to get through and this isn't

2    meaningfully advancing, and it risks distracting from the

3    issues that the jury does have to decide, and I don't see it as

4    significantly probative.  And whatever probative value there

5    is, is in my mind significantly outweighed by the extra time

6    it's taking, and I am going to direct you to move on.

7    BY MR. BLANCHARD:

8    Q    You testified regarding a plan that involved a UTV?

9              THE COURT:  Same ruling.  You know, let's get to --

10             MR. BLANCHARD:  That was part of the government's

11   theory on direct they talked about.

12             THE COURT:  You can move on.  Okay.  You've got other

13   options to deal with rulings that you don't like, but we're

14   never going to finish with the case and we need to focus on the

15   probative values in the case which I don't think we're moving

16   toward right now.

17   BY MR. BLANCHARD:

18   Q    Tell me -- on direct examination you described a plan that

19   you thought was going to occur and that you reenacted in a

20   video drive, correct?

21   A    Correct.

22   Q    Okay.  What kind of implements were involved in that plan

23   or that you described for the jury?

24   A    After a gun fight would arise we would take the governor by

25   a side-by-side vehicle.

```
1    Q    Okay.  A side-by-side vehicle?

2    A    Correct.

3    Q    Okay.  Whose side-by-side vehicles was that?

4    A    Ty Garbin's.

5    Q    Where was that going to come from?

6    A    The Luther residence.

7    Q    How was it going to get to the governor's house?

8    A    We have trucks.

9    Q    It was going to be driven there?

10   A    It would be probably on the trailer or the bed of a

11   vehicle.

12   Q    So you were going to drive a UTV on the bed of a trailer?

13   A    Stationary on a trailer as in transporting up there.  Yes.

14   Q    So who was it that was going to drive this?

15   A    It was still in the development plans.

16   Q    And there was also going to be a boat involved in this

17   plan?

18   A    Ty recommended that we could paint his boat black.

19   Q    So there was going to be a boat that comes across the lake

20   in this plan, right?

21   A    It will be staged at the shoreline after we use the

22   side-by-side with the governor to take her to the boat.

23   Q    So wait, in the plan you described you are going to use the

24   side-by-side to get to the governor's house initially?

25   A    Yes.
```

Q    So you weren't going to come across the lake to the
governor's house initially?

A    No.

Q    Okay.  And so then you were going to boat away from the
governor's house?

A    It could -- yes.

Q    With the governor in the boat?

A    Yes.

Q    So that video you showed driving from the governor's house
over to Lake Michigan, that was never going to happen, right?

A    On a side-by-side it would take the governor from her house
to Lake Michigan where she would be put on a boat and taken
from the shoreline away.

Q    So I thought you just said she was going -- you were going
to take her on Ty's boat back across the lake?

A    How can we drive a boat across land?

Q    You said you were going to have it staged on the shoreline
after you got in the UTV, right?

A    Yes.

Q    Okay.  So you're going to have Ty's boat over on the
shoreline of Lake Michigan?

A    Yes.

Q    So there is no boating involving Governor Whitmer's lake,
is that right?

A    No.

1    Q    Okay.  So that stuff on the boat launch, that wasn't about

2    scoping out a way to get a boat across the lake?

3    A    There could be -- a boat could be staged there.  Kayaks

4    could be staged there.  It was just looking for an avenue of

5    approach to her residence.

6    Q    So you understood the plan just to go in on a UTV, take her

7    on a UTV over to Lake Michigan, right?

8    A    I understood the plan is we were going to show up there

9    with extreme violence, kill the detail, receive the governor,

10   take her by side-by-side to the shoreline and extract her from

11   there via boat.

12   Q    And that boat was going to be Ty Garbin's painted black

13   boat?

14   A    Yes.

15   Q    On Lake Michigan?

16   A    Yes.

17   Q    And that painted black boat was the only boat that was

18   going to be on the shoreline of Lake Michigan, right?

19   A    At that spot, yes.

20   Q    And then there were going to be some guys to get in the

21   boat?

22   A    There would be.

23   Q    And they are wearing body armor, right?

24   A    We all would be.

25   Q    And so you get out into the middle of Lake Michigan, right?

1    A    I'm not sure where they were going to take her from there.

2    Q    You don't know what the plan was after you got in Ty's

3    boat?

4    A    It was going to take her to Wisconsin for a kangaroo trial

5    and hang her.

6    Q    You were going to take the governor to Wisconsin in Ty

7    Garbin's fishing boat?

8    A    That's what they were wanting to do was by a boat.

9    Q    Did you say buy a boat?

10   A    By.  Via boat.

11   Q    Yeah.  So in Ty Garbin's boat?

12   A    Yes.

13   Q    Painted black?

14   A    Yes.

15   Q    Across Lake Michigan?

16   A    That's what they were recommending.

17   Q    At night?

18   A    Yes.

19   Q    With a whole crew of guys?

20   A    I am not sure how many would be on the boat.  There was

21   multiple assault teams.  You would have one for the initial

22   contact of the house, one for the extraction, and one for the

23   boat.

24   Q    So there wasn't -- there was no rally point on the lake to

25   move to another boat?  That wasn't part of the plan?

1    A    It was early discussion, but no.

2    Q    So there was or wasn't part of the plan to rally with

3    another boat on the lake?

4    A    There was a plan to have two boats to offload her onto

5    another boat.

6    Q    Who was going to run the other boat?

7    A    More people.

8    Q    Which people?  We got what, four people?

9    A    They were wanting to recruit more individuals.  That's why

10   Adam was wanting to make three, four, five, six, seven assault

11   teams and have his kill squad.

12   Q    So you are saying Adam wanted more people, right?

13   A    He did.

14   Q    He didn't have more people?

15   A    Initially he wanted 200 people to take the Capitol.

16   Q    Right.  But you talked about you have conversations with

17   Adam a month earlier on August 9 where you agreed there are

18   only four people in Adam's team, right?

19   A    For his kill squad, yes.

20   Q    And those four people were you, an undercover fake navy

21   seal, and Adam, right?

22   A    Yes.

23            THE COURT:  Well, we've been over that including the

24   objection to your characterization of Mr. Fix, so come on.  Get

25   to something that we haven't already addressed or that I

1    haven't already excluded and that's germane.

2    BY MR. BLANCHARD:

3    Q    There came a time where the FBI tasked you with giving out

4    a recipe to make a bomb, correct?

5    A    I don't recall that.  No.

6    Q    Do you recall being tasked with giving a recipe to Frank

7    Butler?

8    A    Yes.

9    Q    And it was a recipe to make a bomb, right?

10   A    Yes.

11   Q    And the FBI tasked you with giving him the recipe to make

12   the bomb, right?

13   A    Ingredients for one, yes.

14   Q    Was that also part of de-escalation?

15            MR. KESSLER:  Relevance, Your Honor.  This is not even

16   the same plot.

17            THE COURT:  Well, I mean, I was not sure if it linked

18   up or not, but it's -- at this point whatever information is in

19   is in.  I don't know that there is anything that links up

20   Mr. Butler or Ms. Butler or whoever it is.

21            MR. BLANCHARD:  Could I have 282, please?  The top --

22   the top thing from Mr. Fox, please?  If you could blow that up?

23   BY MR. BLANCHARD:

24   Q    You remember Exhibit 282, correct?

25   A    I do.

1   Q    This was a chat conversation, a group chat conversation you

2   had on FAFO with a number of people, right?

3   A    Yes.

4   Q    And this was in early October of 2020, correct?

5   A    I believe so.  Yes.

6   Q    And that was when the executive orders from the governor

7   were struck down by the Michigan Supreme Court, right?

8   A    Correct.

9   Q    And that's what's being talked about in this chat that the

10  government has admitted, right?

11  A    Yes.

12  Q    And specifically in early October of 2020, Mr. Fox notes

13  that you can make a citizens arrest, right?

14  A    Correct.

15  Q    And he asked who is down to make a citizens arrest in early

16  October of 2020, right?

17  A    Yes.

18  Q    It is your position there is already a plan to do something

19  in early October of 2020, right?

20  A    Yes.

21  Q    Well, why would Adam be asking who wants to arrest her?

22          THE COURT:  That's argumentative.  That's not

23  something for this witness to address.  That's now in evidence.

24  You can make your argument.

25  BY MR. BLANCHARD:

1    Q    You were tasked with developing this rouse on October 7,

2    2020, correct?

3    A    I was.

4    Q    And your job was, in part, to get people over to Ypsilanti

5    on October 7, correct?

6    A    Correct.

7    Q    And the rouse was that Red had free stuff to give away?

8    A    He did.

9    Q    And that they would have beer and hot wings afterwards?

10   A    Yes.

11   Q    And in the free stuff there were, like, cool tactical items

12   like drop leg holsters, right?

13        MR. KESSLER:  Your Honor, not only have we already

14   covered this, Mr. Croft wasn't there and it had nothing to do

15   with his client.

16        THE COURT:  I agree.  I'll give him a short while to

17   go on it, but we certainly have covered it, and if there is

18   more that you want to get to from it, go ahead.

19   BY MR. BLANCHARD:

20   Q    You had text messages from Agent Chambers tasking you on

21   this, correct?

22   A    Yes.

23   Q    I'd show just the witness Exhibit 3061.  It's a three-page

24   exhibit, and if you would, maybe page through so my colleagues

25   can see the three pages, and the witness?

1          Are those fair and accurate representations of the

2   messages that Agent Chambers sent regarding setting up the

3   rouse?

4   A    They are.

5          MR. BLANCHARD:  I'd move the admission of 3061?

6          MR. KESSLER:  I think -- they are not hearsay within

7   the Court's ruling but they are not relevant, especially not to

8   his Defendant.  Mr. Croft is in Delaware at the time.

9          THE COURT:  I think his point is to try to show that

10   the FBI was tasking specific things, including a rouse.  It

11   doesn't directly pertain to Mr. Croft on October 7, but it has

12   a more generic application to his theory, so I think it can be

13   admitted for that.

14          MR. KESSLER:  No other objection, Your Honor.

15          THE COURT:  Go ahead.

16   BY MR. BLANCHARD:

17   Q    Can you blow up.

18          Essentially the first message on the 29th he talking

19   about this rouse.  He told you to try to keep it as generic as

20   much as possible, right?

21   A    Correct.

22   Q    He's talking about the details.  You understood him to be

23   talking about the details of what they would get, right?

24          MR. KESSLER:  What he understood the agent to be,

25   that's outside.  He can say what the words are.

1          THE COURT:  What this witness understood by receiving

2     it is one thing.  I don't think he can interpret what the agent

3     meant.

4     BY MR. BLANCHARD:

5     Q    Can I have the next page, please?

6          The next message Agent Chambers told you is to save

7     the details about the October 7 meet up for later, right?

8     A    Correct.

9     Q    Okay.  Next page.

10         And then he told you that doing that will help

11    motivate the guys to come in person, right?

12    A    Correct.

13    Q    And I think my colleagues pointed this out, but Mr. Croft

14    wasn't present on October 7, right?

15         MR. KESSLER:  Stipulated, Your Honor.

16         THE COURT:  We have one stipulation.  Maybe that's the

17    beginning of something.

18         MR. BLANCHARD:  How about that.  Judge, to be

19    expedient here, Exhibits 2300, 2301 and 2302 were all testified

20    to yesterday but they didn't get moved to be admitted, and so I

21    would move their admission.

22         THE COURT:  2300?

23         MR. BLANCHARD:  2300, 2301 and 2302.  They are three

24    messages from Agent Chambers.

25         THE COURT:  Any objection?

```
 1              MR. KESSLER:  No objection, Your Honor.

 2              THE COURT:  All right.  Those are admitted.

 3              MR. BLANCHARD:  If I could have just one moment,

 4      please?

 5              THE COURT:  Sure.

 6              MR. BLANCHARD:  I'll pass the witness, Your Honor.

 7      *************************************************************
                                 INDEX
 8
```

```
 9      Government Witnesses:                       Page

10      DAN CHAPPEL

11       Cross Examination(Continuing) by Ms. Kelly    4
         Cross Examination by Mr. Hills               75
12       Cross Examination by Mr. Blanchard          140

13

14       Exhibits:                              Admitted

15       Defendant's Exhibit 1001                   143
          (Receipt, Laptop)
16       Defendant's Exhibit 1002                   146
          (Receipt, Watch)
17       Defendant's Exhibit 2300                   223
          (Text, Chambers)
18       Defendant's Exhibit 2301                   223
          (Text, Chambers)
19       Defendant's Exhibit 2302                   223
          (Text, Chambers)
20       Defendant's Exhibit 3061                   221
          (Tasks on Takedown)
21       Defendant's Exhibit 4028                    25
          (Video, Training, Cambria)
22       Defendant's Exhibit 4032                    27
          (Video, Shoot House, Cambria)
23       Defendant's Exhibit 4033                    38
          (Photograph, Harris Back Yard)
24       Defendant's Exhibit 4041                    40
          (Video, Training, Fowlerville)
25       Defendant's Exhibit 5036                   102
          (Photograph, Caserta Apartment)
```

| | | |
|---|---|---|
| 1 | Defendant's Exhibit 5037 | 101 |
| | (Photograph, Caserta Kitchen) | |
| 2 | Defendant's Exhibit 5060 | 103 |
| | (Photograph, Caserta Equipment) | |
| 3 | Defendant's Exhibit 5208 | 87 |
| | (Map, Route to Cambria) | |
| 4 | Defendant's Exhibit 5210 | 132 |
| | (Map, Route, Elk Rapids) | |
| 5 | Defendant's Exhibit 5215 | 123 |
| | (Text, August 28) | |
| 6 | Defendant's Exhibit 5217 | 123 |
| | (Text, August 28) | |
| 7 | Defendant's Exhibit 5218 | 123 |
| | (Text, August 28) | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

REPORTER'S CERTIFICATE

     I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


                 /s/ Paul G. Brandell

                 Paul G. Brandell, CSR-4552, RPR, CRR

                 U.S. District Court Reporter

                 399 Federal Building

                    Grand Rapids, Michigan  49503