```
 1                 IN THE UNITED STATES DISTRICT COURT

 2               FOR THE WESTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5               Plaintiff,          No:  1:20cr183-1/2/5/6

 6        vs.

 7      ADAM DEAN FOX,
        BARRY GORDON CROFT, JR.,
 8      DANIEL JOSEPH HARRIS and
        BRANDON MICHAEL-RAY CASERTA,
 9
                 Defendants.
10


11        Before:

12
                          THE HONORABLE ROBERT J. JONKER
13                           U.S. DISTRICT Judge
                             Grand Rapids, Michigan
14                         Friday, March 18, 2022
                         Excerpt of Jury Trial Proceedings
15                          Testimony of Dan Chappel

16      APPEARANCES:

17               MR. ANDREW BIRGE, U.S. ATTORNEY
                 By:  MR. NILS R. KESSLER
18               MR. JONATHAN C. ROTH
                 The Law Building
19               333 Ionia Avenue, NW
                 Grand Rapids, MI 49501-0208
20               (616) 456-2404

21                         On behalf of the Plaintiff;

22               MR. CHRISTOPHER M. GIBBONS
                 MS. KAREN M. BOER
23               Dunn Gibbons PLC
                 125 Ottawa Avenue, NW, Suite 230
24               Grand Rapids, MI 49503-2865
                 (616) 336-0003
25
                           On behalf of Defendant Fox.
```

```
 1                    JOSHUA ADAM BLANCHARD
                     Blanchard Law
 2                   309 South Lafayette Street, Suite 208
                     P.O. 938
 3                   Greenville, MI 48838-1991
 4
                              On behalf of Defendant Croft, Jr.
 5
                     JULIA ANNE KELLY
 6                   Willey & Chamberlain LLP
                     300 Ottawa Avenue NW Suite 810
 7                   Grand Rapids, MI 49503-2314
                     (616) 458-2212
 8
                              On behalf of Defendant Harris.
 9
                     MICHAEL DARRAGH HILLS
10                   Hills at Law PC
                     425 South Westnedge Avenue
11                   Kalamazoo, MI 49007-5051
                     (269) 373-5430
12
                              On behalf of Defendant Caserta.
13

14        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

1                    03/18/2022

2          ************************************************************

3              MR. KESSLER:  The government calls Dan Chappel, Your

4     Honor.

5              DAN CHAPPEL, GOVERNMENT

6              having been first duly sworn, testified as follows:

7              (Witness sworn, 9:32 a.m.)

8                    DIRECT EXAMINATION

9       BY MR. KESSLER:

10    Q    Good morning, Mr. Chapel.

11    A    Good morning.

12    Q    How old are you?

13    A    Thirty-five.

14    Q    And do you live here in Michigan?

15    A    I do.

16    Q    You work for the U.S. Postal Service, correct?

17    A    That's correct.

18    Q    What did you do before you went to work for the postal

19    service?

20    A    I was a firearms instructor and prior to that I was in the

21    army.

22    Q    All right.  And what rank did you reach in the army?

23    A    I was a sergeant.

24    Q    What did you do while you were in the army?

25    A    I was a fire support specialist.

1    Q    Can you tell the jury just briefly what that means?

2    A    So as a fire support specialist I indirected or called for

3    close air support, either artillery, mortars or navel gunfire.

4    Q    Okay.  Now, sometimes that's just a description of what you

5    do, but did you actually do that in combat?

6    A    I did.  Yes.

7    Q    Tell us a little bit about your combat experience.  Where

8    did you go?

9    A    Southeast Bagdad, and then I was further up north in Sadr

10   City.  So we do a lot of room clearing, occupying rooftops for

11   overwatch positions, and then I called in three 500 pound

12   JDAMS --

13   Q    What's that?

14   A    Basically a 500 pound bomb off of an F18.

15   Q    Okay.  Were you wounded in combat?

16   A    I was.  Yes.

17   Q    All right.  What were the nature of your injuries?

18   A    So collectively I fractured the lower part of my spine, and

19   then I had a combat related injury to my knee where I had

20   titanium from my knee on down.

21   Q    All right.  IEDs have come up quite a bit here.  What do

22   you understand an IED to be?

23   A    They are an improvised explosive device.

24   Q    Okay.  Have you actually been wounded by an improvised

25   explosive device?

```
1    A    I have.  My vehicle sustained two of them.
2    Q    Okay.  So you are familiar with how they work in practice,
3    right?
4    A    I am.  Yes.
5    Q    All right.  So how long did you spend in combat overseas?
6    A    Close to 15 months.
7    Q    When you got back is that when you got out of the amy?
8    A    About a year later.  Yes.
9    Q    Okay.  And eventually, as everybody has heard already in
10   this trial, you ended up joining a militia, right?
11   A    I did.  Yes.
12   Q    Okay.  Let's talk a little bit about just first off why
13   were you interested in doing that?
14   A    The firearms training and they were a pro Second Amendment
15   group.
16   Q    All right.  Would you consider yourself a pro Second
17   Amendment person?
18   A    I am.  Yes.
19   Q    Okay.  Did you want to maintain your firearms proficiency?
20   A    I did.  Yes.
21   Q    Okay.  So tell us about how you searched out a -- just
22   looking for a militia or group to join?
23   A    Their group actually showed up through the algorithm on
24   FaceBook.  I was scrolling through it one day and it was under
25   one of the suggested pages that you might like.  So I clicked
```

1    on that and they had three questions to fill out for the group

2    and I was accepted into the group.

3    Q   Do you remember basically what the three questions were or

4    what the nature of them was?

5    A   I do not know.

6    Q   Okay.  I mean, do you remember what they were about?  Was

7    it -- just generally.  I am not asking you what the three were.

8    A   No.  Not offhand.  No.

9    Q   Okay.  So after you answered those couple of questions,

10   were you invited to meet with them?

11   A   About a day later an individual posted on their FaceBook

12   wall that if they were interested in doing some training they

13   should download an app called Wire.  So I downloaded that app

14   and they did a vetting process through there, and I was

15   accepted into the encrypted chat.

16   Q   So we've heard a bunch about what encrypted chap

17   applications are.  Is that what you understood Wire to be?

18   A   That is correct.

19   Q   Somebody send you a direct message over Wire?

20   A   For the vetting portion they did.  Yes.

21   Q   Explain what a vetting is?

22   A   So it's kind of like going through a job interview.  I had

23   no idea who was all in the process for it.  So they would ask

24   questions what my beliefs were.  I was a libertarian.  My

25   military experience.  Why I wanted to continue training.  And

1   then from there they accepted me into the group.

2   Q    Did they also ask how you felt about the government?

3   A    They did.  I said I was, again, a Libertarian and I swore

4   an oath to defend the constitution both foreign and domestic

5   enemies.

6   Q    Okay.  So after that were you then brought into their main

7   chat?

8   A    I was.  Yes.

9   Q    All right.  What do you remember about that chat?  What was

10  it called?  What kind of thing was it?

11  A    That was the Wolverine Watchmen --

12  Q    So what do you remember about that chat group?

13  A    That -- the main chat forum was the Wolverine Watchmen.  So

14  collectively everybody could be on that.  That was through the

15  vetting on that page.

16  Q    Okay.  Did you meet Mr. Harris and Mr. Caserta through the

17  Wolverine Watchmen?

18  A    I did.  Yes.

19  Q    And what about Ty Garbin?

20  A    He was there as well.

21  Q    And Kaleb Franks?

22  A    As well.

23  Q    Who were the founders of the Wolverine Watchmen?

24  A    Pete Musico and Joe Morrison.

25  Q    Are they related to each other?

1    A    They are.

2    Q    In what way?

3    A    Son-in-law.  Pete Musico is Joe Morrison's father-in-law.

4    Q    Gotcha.  Is anybody sitting in here in the courtroom a

5    member of, as you understood it, a member of the leadership of

6    the Wolverine Watchmen?

7    A    They are.  Yes.

8    Q    All right.  Who was in the leadership when you joined it?

9    A    Oh, in the -- when I joined?  Not here.  No.  Ty Garbin

10   was.

11   Q    How about Daniel Harris?

12   A    He was.  He got -- after I was in the group he became part

13   of the leadership.

14   Q    Okay.  Let's go back to March of 2020.  So this is pretty

15   much around the time you joined the Wolverine Watchmen?

16   A    What month was that again?

17   Q    March of 2020.

18   A    That is correct.

19   Q    So you mentioned Pete Musico being one of the founders?

20   A    Correct.

21   Q    All right.  Do you recall anything that he talked about?

22   A    When I first got into the group, so it was kind of like the

23   old yahoo messenger or AIM messengers where you had to talk

24   first before you seen the thread.  So hey guys thanks for the

25   group, and Pete Musico replied with, well as a conversation.

1          MR. BLANCHARD:  I'll object as to hearsay.

2          MR. KESSLER:  This is not offered for the truth of

3     matter, Your Honor, but only to show why he did what he did

4     next, the effect on the listener.

5          THE COURT:  All right.  Well, if it's simply some

6     background to set up what this witness heard that drew him into

7     the group I think it's okay.  But I don't know exactly where

8     you are going with it beyond that.

9          MR. KESSLER:  You'll find out in the next two

10    questions, Your Honor.

11    BY MR. KESSLER:

12    Q    What's a reverse red flag?

13    A    A red flag currently is where concerned citizens or family

14    members can notify law enforcement for the well-being of an

15    individual of the household to remove firearms from that

16    person.

17    Q    Okay.  Was there discussion about a reverse red flag?

18          MR. BLANCHARD:  I'm going to object as to hearsay.

19          MR. KESSLER:  Same answer, Your Honor.

20          THE COURT:  Well, yeah, I am not sure where this came

21    from.  Why don't you go to something else and we'll deal with

22    this later.

23    BY MR. KESSLER:

24    Q    Was there something that concerned you enough to call the

25    police?

1  A   They wanted to do a reverse red flag to target enforcement

2  and kill them.

3       MR. HILLS:  I'm going to object.  That's the hearsay

4  that Mr. Blanchard is talking about.

5       THE COURT:  Well, but if that's what it is, then it's

6  explaining simply what this individual heard that concerned him

7  enough to call the police, and then whether they actually meant

8  to do it or not is another question and irrelevant really for

9  that purpose.  So it's simply given to members of the jury so

10  that you can understand what this witness says he heard and how

11  he reacted to it, and you can't accept it for anything more

12  than that at this point.  Go ahead.

13  BY MR. KESSLER:

14  Q   What was a reverse red flag?

15  A   They wanted to target law enforcement and kill them.

16  Q   Did that concern you?

17  A   It did.

18  Q   And as a result of that what did you do?

19  A   I notified a friend who was in law enforcement and asked if

20  he could stop by the house so I could show him the

21  conversation.

22  Q   Did you do that?

23  A   I did.

24  Q   What happened next?

25  A   About a week later I was contacted by the FBI.

Q    Okay.  Specifically with this reverse red flag, we've heard
a lot in here about things that are just talk.  Was there
something specific that concerned you enough to make you go to
the police?

          MR. BLANCHARD:  Your Honor, I am going to object to
relevance at this point.  We have established why he reached
out, that he reached out, and the FBI contacted.  I don't know
where we're going.

          MR. KESSLER:  This is why he thought they were
serious, Your Honor.

          THE COURT:  I think it's in the same vein at this
point and you can answer if you are able or you can frame more
foundation if you wish.

BY MR. KESSLER:

Q    Okay.  Were they trying to go out and get anything in
particular that concerned you?

A    The addresses of law enforcement.  Yes.

Q    Okay.  Were you okay with that?

A    I was not.

Q    All right.  So you said you were interviewed by the FBI the
same week, is that right?

A    Correct.

Q    All right.  And what did they ask you to do?

A    If I would stay inside the group to monitor their activity.

Q    How did you feel about that?

1    A    Concerned.

2    Q    In what way?  What were you concerned about?

3    A    The safety of my daughter.

4    Q    How old is your daughter?

5    A    She will be five.

6    Q    Okay.

7    A    At the time she was two.

8    Q    Did you agree to do it anyway?

9    A    I did.

10   Q    And tell the jury why you agreed to do it?

11   A    That there was an active threat against law enforcement.

12   They were wanting to train -- that's why I joined the group was

13   to train, but now they are wanting target law enforcement.  So

14   now they are training to target law enforcement, and I thought

15   that is a concern for their safety.

16   Q    Did you do it for money?

17   A    No.

18   Q    Did the FBI offer to pay you money to stay in the group at

19   that point?

20   A    No.

21   Q    And it wasn't an ideological disagreement with them, right?

22   A    No.  Well, I didn't agree with them wanting to target law

23   enforcement.

24   Q    But you agreed with them about the second -- you agreed

25   with them about the second amendment?

1    A    I did.

2    Q    Libertarian values, that sort of thing?

3    A    I do.

4    Q    Okay.  How did you understand your role as a confidential

5    human source?

6    A    I would maintain accessibility for the FBI.

7    Q    Okay.  What does that mean by accessibility?

8    A    My position inside the group, so they can monitor their

9    involvement in what they are doing, communication.

10   Q    So gathering information?

11   A    Correct.

12   Q    Okay.  And besides just reporting back on what you heard,

13   were you asked to make recordings?

14   A    I was.  Yes.

15   Q    Did you -- were you instructed to play along?

16   A    I did.  Yes.

17   Q    Okay.  Explain what you mean by that?

18   A    Maintaining a like-minded role as the individuals in the

19   group.

20   Q    Okay.  Let's talk a little bit about the tools that you got

21   to do your job.  Did you get some equipment?

22   A    I did.  Yes.

23   Q    Did you get a recording device?

24   A    I did.  Yes.

25   Q    Did you get a new phone at one point?

1    A    I did.

2    Q    Tell us why you got a new phone?

3    A    The one that I had was constantly failing.  The battery was

4    not maintaining the charge, and these guys were communicating a

5    lot throughout the course of the day into the night.

6    Q    So your phone might be dead when you got a call or

7    something?

8    A    Correct.

9    Q    All right.  Did you get a computer?

10   A    I did.

11   Q    What was the purpose of that?

12   A    The amount of information that was being processed and then

13   I was involved with them giving land nav classes and the

14   battery on that as well -- land navigation.  So the battery on

15   that as well was failing.

16   Q    Okay.  Now, you said you didn't do it for money but did you

17   get compensated for expenses later on?

18   A    I did.  Yes.

19   Q    Did you sometimes have to leave your job at the postal

20   service to go be with the Wolverine Watchmen or these other

21   people?

22   A    I did.

23   Q    Did you lose wages as a result of that?

24   A    A lot.  Yes.

25   Q    Okay.  Were you compensated somewhat for that?

```
1    A    Somewhat.  Yes.

2    Q    And when you say somewhat, how much were you compensated?

3    A    Total for everything?

4    Q    I'm not asking you for exact numbers, but were you getting

5    dollar for dollar?

6    A    No.  I think I broke it down to $38 a day.

7    Q    Is that a lot less than you actually make in a full day's

8    work in the postal service?

9    A    I typically make about 230 a day.

10   Q    Okay.  Did you at one point have to move your residence?

11   A    I did.  Yes.

12   Q    And why did you have to do that?

13   A    One of the individuals in the group had found out where I

14   lived.

15   Q    And that concerned you why?

16   A    For the safety of myself and my daughter.

17   Q    Okay.  So when you moved were there expenses associated

18   with that?

19   A    Quite a bit.  Yes.

20   Q    Hotel stays, that sort of thing?

21   A    That is correct.

22   Q    And did the FBI compensate you for that?

23   A    Partially.  Yes.

24   Q    Okay.  Did you eventually have to actually sell your house

25   and move?
```

1      A    I did.

2      Q    FBI didn't buy you a new house, did they?

3      A    They did not.

4      Q    All right.  So let's go to April 30th of 2020.  Did you

5      attend an event at the Lansing State Capitol with the Wolverine

6      Watchmen?

7      A    I did.  Yes.

8      Q    Did you actually go inside the building?

9      A    I believe that day we did.  Yes.

10     Q    Okay.  Have you looked at some photographs of that scene?

11     A    I have.

12     Q    And were they accurate representations of what you saw that

13     day?

14     A    They were.

15     Q    I am going to ask you to take a look in your book at

16     Exhibit 5?

17     A    Which one?

18     Q    Well, I can't tell from here.  It should be trial book one

19     probably, and it should be behind tab No. 5.

20     A    All right.

21     Q    Do you recognize that photograph?

22     A    I do.

23     Q    And that's an accurate representation of what you saw that

24     day?

25     A    That is.

1    MR. KESSLER:  Now, I'll offer Exhibit 5, Your Honor.

2    THE COURT:  Objections?

3    MR. GIBBONS:  None, Your Honor.

4    THE COURT:  All right.  It's admitted.

5    BY MR. KESSLER:

6    Q    Okay.  What are we looking at here?

7    A    That is a picture of Adam Fox.

8    Q    Okay.  Did you see him there that day?

9    A    I did.  Yes.

10   Q    Did you actually know him at that point?

11   A    No.  Not at that point.  No.

12   Q    So he wasn't a member of the Wolverine Watchmen --

13   A    No.

14   Q    -- when you met him, right?

15   Okay.  Now, we see some state troopers there.  Do you

16   remember seeing them, too?

17   A    I do.  Yes.

18   Q    Okay.  And he seems to be in the front.  Is that what you

19   remember from that day?

20   A    Correct.

21   MR. GIBBONS:  Objection.  Leading, Your Honor.

22   THE COURT:  It is leading but he said it's a fair and

23   accurate representation, and I am not sure it really adds a lot

24   to what we can all see from the picture.  Go ahead.

25   BY MR. KESSLER:

Q    So Mr. Chappel, we can see he is wearing body armor and a
rifle.  What was the purpose of this event at the Capitol?
What were you going there to do?

A    For that particular moment I think it was for the Second
Amendment rally for pro Second Amendment individuals.

Q    Okay.  And I'm going to ask you to flip to two tabs over to
Exhibit 7 for identification.  Do you recognize that
photograph?

A    I do.  Yes.

Q    Okay.  Is that an accurate representation of what you saw
that day?

A    It is.  Yes.

        MR. KESSLER:  And I would like to publish Exhibit 7,
offer that?

        THE COURT:  Objections?

        MR. BLANCHARD:  No.

        MR. GIBBONS:  None.

        THE COURT:  It's admitted.

BY MR. KESSLER:

Q    All right.  Mr. Chappel, who are these people?

A    The individual in the red flannel is Joe Morrison, in the
tan pants is Paul Bellar, and the far right is Pete Musico.

Q    Those are the members of the Wolverine Watchmen you talked
about earlier?

A    They are.  Yes.

1    Q    Where are they standing?

2    A    In front of the governor's chambers.

3    Q    Governor Whitmer?

4    A    Correct.

5    Q    All right.  Let me ask you a little bit how you guys

6    communicated when you weren't physically together.  You

7    mentioned encrypted chat applications.  Did you also talk on

8    the phone?

9    A    We did.  Yes.

10   Q    Okay.  And you mentioned that they were encrypted, right?

11   So only you and them could listen to the conversations or read

12   them?

13   A    Correct.

14   Q    All right.  But if you were gathering information from the

15   FBI, so how did you pass that information along to the FBI?

16   A    I had a recording device that I would use with the phone.

17   Q    Okay.  And specifically only the chats, the Wire chats for

18   example, how would the FBI get to read those?

19   A    I gave them the user name and password to the account.

20   Q    So they basically could look at whatever it was that you

21   saw in those chats, right?

22   A    They could.  Yes.

23   Q    Okay.  And let me specifically ask you about Wire.  You can

24   chat on it, right?

25   A    You can.

1    Q    Can you use it as a phone?

2    A    You can.

3    Q    Can you use it to share photographs?

4    A    Yes.

5    Q    Could you use it to share audio recordings?

6    A    Yes.

7    Q    And could the group also use it to share video clips?

8    A    They can.

9    Q    Do you recall any of the Defendants or anybody in the

10   Wolverine Watchmen talking about it being self-deleting?

11   A    Yes.

12   Q    And what does that mean?

13   A    That after a duration of time that the messages would all

14   delete off the form.

15   Q    Okay.  Let's go forward to May 1st.  If you can turn to tab

16   9, please, and that should be a chat conversation there.  Do

17   you recognize that conversation?

18   A    I do.

19   Q    And were you a member of that chat group at the time?

20   A    I was.

21   Q    Okay.  Is that an accurate representation of the chat you

22   saw?

23   A    Yes.

24              MR. KESSLER:  I'd like to publish Exhibit 9, Your

25   Honor?

1       MR. BLANCHARD:  I'd object on the basis of hearsay and

2    the Enright issue that I've raised.

3       MR. KESSLER:  All right.  Mr. Harris is a party

4    opponent, Your Honor.

5       THE COURT:  It's the same issue we had before.  Same

6    ruling.  The exhibit list dates this, but I don't see anything

7    on the exhibit that does.  Are you going to discuss that with

8    the witness?

9       MR. KESSLER:  I asked him if -- I asked him to focus

10   his attention on May 1st, Your Honor.

11      THE COURT:  So the specific date.  Okay.

12      MR. KESSLER:  Yes, Your Honor.

13      THE COURT:  Go ahead.  It can be admitted then.

14   BY MR. KESSLER:

15   Q   So let's go through this here.  And I'm going to read parts

16   of it out to the jury.  I know this is kind of far away so

17   maybe we'll have to blow up a piece at a time.  Why don't we

18   blow up the first couple of things.  Who is Grandpa?  Do you

19   remember people's on-line names?

20   A   That was Pete Musico.

21   Q   Okay.  And then Daniel Harris I assume is Daniel Harris?

22   A   Correct.

23   Q   Do you remember who Duck 1776.2 was?

24   A   That was Paul Bellar.

25   Q   Okay.  That's all the people in this segment.  So Grandpa

1    Musico says, I have an idea guys.  And Daniel Harris says,

2    what's that.  Grandpa says, can't we intercept her and arrest

3    her for treason.  Did you know who the her was at this point?

4    A    The governor of Michigan.

5    Q    1776.2 says, wouldn't end well with the media.  We would

6    need a crowd of people on our side of we're going to get shot

7    at by security teams.  Daniel Harris responds, stand outside

8    her office.  Grandpa says, again, I don't care what the media

9    spins it, it's always going to be bad of us.  Maybe we can --

10   okay.  Daniel Harris says, it's across the street.  Less people

11   are listening to the media though.

12        Can we look at the next part of it?  Let's take if

13   from -- okay.  And then Grandpa says, right.  Daniel Harris

14   responds, regardless of what we did the media would spin it in

15   a way that looks bad on us.  Personal opinion.  Shouldn't let

16   it stop us from doing what we think is right.

17        Then we have Ty.  Who is Ty?

18   A    Ty Garbin.

19   Q    He says, get a court summons and you are good to go.

20   Grandpa says, Ty, my man.  And someone named LeRoy Jenkins

21   says, what we think is right might not end well.  Let's say

22   they went with the arrest and did try her for it.  She'd file a

23   kidnapping counter charge.  At best I'm pretty sure both

24   charges would be dismissed.  Then we would be hit with a civil

25   suit.

1              Can we see the final part?  I think that's all we

2       have.  Is there a second page?  Okay.

3              So particularly I want to focus on Daniel Harris who

4       is the focus of this.  He was talking about focusing on the

5       governor already at this point?

6              MS. KELLY:  Objection, leading.

7              THE COURT:  It is leading.

8       BY MR. KESSLER:

9       Q   Was he talking about the governor at this point?

10             THE COURT:  We can all read it.  Let's get something

11      that we can't read from this witness if there is.

12      BY MR. KESSLER:

13      Q   All right.  Was he concerned about media?

14             MS. KELLY:  Objection, speculation.

15             THE COURT:  You know, he can ask him if he knows, but

16      don't ask him to just to interpret these words.

17             MR. KESSLER:  Right.

18             THE COURT:  Let's keep it open-ended and non-leading

19      if we can.

20      BY MR. KESSLER:

21      Q   So aside from just this, you've talked with Daniel Harris,

22      right?

23      A   I have.

24      Q   Was he concerned about how the media would take this?

25      A   Yes.

1    Q    In what sort of way?

2    A    Using them as -- just the overall attention that they were

3    showing up at the rallies all the time with body armor on.

4    They wanted to maintain a low profile from that because

5    pictures of them there were circulating and they wanted to

6    limit that profile.

7    Q    It was Daniel Harris saying they wanted to maintain a low

8    profile?

9    A    Yes.

10   Q    Take a look at tab 10, please.  Do you recognize that chat

11   message?

12   A    I do.

13   Q    Accurate representation of what you recall?

14   A    Yes.

15           MR. KESSLER:  I'd offer Exhibit 10, Your Honor?

16           THE COURT:  Want to get the date.

17           MR. KESSLER:  Also May 1st, I'm sorry.

18           THE COURT:  Well, let's see if that's what the witness

19   agrees with or disagrees yet or doesn't know.

20   BY MR. KESSLER:

21   Q    Do you remember the date?

22   A    I do.

23   Q    Was that the same day we were just talking about?

24   A    It was.  Yes.

25           THE COURT:  All right.  Objections?

1          MR. BLANCHARD:  I've got the same objection as to

2    Grandpa or Musico.  I think it's hearsay.

3          THE COURT:  Same ruling, go ahead.

4    BY MR. KESSLER:

5    Q    In this message Daniel Harris begins, I can make things go

6    boom if you give me what I need.  I think I have the algorithm

7    for timing dead cord somewhere in my office.  Stick up for your

8    rights, dude.  Grandpa responds, dude, keep it going and tell

9    him this is a constitutional republic.  Daniel Harris replies,

10   we started out that way.  Pretty sure if the founding fathers

11   saw how shit was being run they'd look at us like WTF.  Kill

12   them.  What does WTF stand for?

13   A    What the fuck.

14   Q    Grandpa says at Daniel Harris says, you are so right.

15   Daniel Harris replies, each day we keep drifting from the

16   original government we establish in my opinion.

17          So I am not going to ask you to interpret anything

18   that you see here, but again, you spoke with Daniel Harris

19   personally, right?

20   A    I have.  Yes.

21   Q    Did he talk about explosives?

22   A    He has.  Yes.

23   Q    Okay.  And in the context of action against the government?

24   A    Yes.

25   Q    Let's fast forward then to May 22nd.  Do you recall a text

1    that day?  Let's look behind tab 21.  You recognize that one?

2    A    I do.

3           MR. KESSLER:  I'd offer Exhibit 21?

4           THE COURT:  Where did it come from?  I mean, do we

5    know?

6           MR. KESSLER:  Yes.  I mean, it says it in there but I

7    can ask him now.

8    BY MR. KESSLER:

9    Q    Do you recall who sent that?

10   A    Pete Musico.

11   Q    And you received this, correct?

12   A    On Wire.  Yes.

13          MR. KESSLER:  Okay.  I'd now offer it, Your Honor?

14          THE COURT:  All right.  Objections?

15          MR. BLANCHARD:  Yeah.  I am not sure how a Pete Musico

16   statement to CHS Dan does anything here, and I think it's

17   hearsay.

18          MR. KESSLER:  It's not the statement, Your Honor.

19   It's the picture.

20          THE COURT:  Well, right, but I mean, his point --

21   Mr. Blanchard's point I think is it came from somebody who is

22   not on trial here to a FaceBook post.  In fact, it was his

23   FaceBook.  So what's the relevance of that for these people on

24   trial?

25          MR. KESSLER:  It's the governor's house, Your Honor.

1      THE COURT:  Well, but the point is, there is words

2   here but none of those words are attributed to any of these

3   Defendants and there is no foundation that any of these

4   Defendants looked at it.  Is there?  I haven't hear any.

5      MR. KESSLER:  Well, let me close that up then.

6      THE COURT:  All right.

7   BY MR. KESSLER:

8   Q   You weren't the only person on this, correct?

9   A   No.  I was not.

10  Q   Who else was on this text chain?

11  A   Everybody on the Wolverine Watchmen main page.

12  Q   Okay.  Including the Defendants here today that were in the

13  Wolverine Watchmen, correct?

14     MR. GIBBONS:  Objection.

15     MR. HILLS:  Object.

16     MR. BLANCHARD:  Object.  It is leading.

17     THE COURT:  Well, it is leading, and you can ask how

18  he knows and that sort of thing, but let's see if there is a

19  foundation or if there isn't.

20  BY MR. KESSLER:

21  Q   How do you know who else was on that text chain?

22  A   Through the -- there is a pull down on the portion of that

23  Wire chat where you can see everybody that is allowed to view

24  the messages on there.

25  Q   Okay.  And so everybody then would have been able to see

1    that message?

2    A    They would.  Yes.

3              MR. KESSLER:  I think it is relevant now, Your Honor.

4              THE COURT:  All right.  Yeah.  Other objections?

5              MR. BLANCHARD:  I don't think he has established -- he

6    said the Wolverine Watchmen.  He hasn't established who those

7    people are.  He just says everyone.

8              THE COURT:  He said earlier he identified the

9    individuals.  Not Mr. Croft.  He didn't identify Mr. Croft.  He

10   identified the others, so I think it can come in with this

11   foundation, and the jury will have to make a decision of

12   whether they think it's persuasive as a matter of foundation or

13   not, but at least it can be considered.

14             MR. HILLS:  I would like a further objection.  My

15   client wasn't even involved with the Wolverine Watchmen at this

16   time.

17             MR. KESSLER:  I don't disagree with that.

18             THE COURT:  We'll admit it.  It's okay, and then the

19   parties can expand on who it applies to, if any, but at least

20   there is a foundation to permit the inference that it applies

21   to at least some of the people here.  Go ahead.

22   BY MR. KESSLER:

23   Q    So Exhibit 21.  Okay.  And I'm not going to bother reading

24   the actual text here.  But who is the picture that we have over

25   there on the top right of those five pictures?

1    A    That is the governor.

2    Q    And the picture to the left of her is what?

3    A    Her residence.

4    Q    And do you recognize that as being her residence?

5    A    I do.

6    Q    From personal experience?

7    A    Yes.

8    Q    How do you know?

9    A    I physically drove past her house.

10   Q    With whom?

11   A    Adam Fox.

12   Q    That was much later.  We'll get to that, right?

13   A    Correct.

14   Q    The picture that's below the governor, what's that?

15   A    The address of her residence.

16   Q    It looks like a Google map?

17   A    Correct.

18   Q    On the picture on the bottom left, what's that?  It

19   actually says the address?

20   A    It does.  Yes.

21   Q    Okay.  Now, you had discussions with members of the

22   Wolverine Watchmen about their organization and logistics?

23   A    Yes.

24   Q    Were you wearing a recorder during many of those

25   conversations?

1    A    I was.

2    Q    Have you listened to those recordings and looked at the

3    transcripts of them before we came in here to trial?

4    A    I have.

5    Q    Do you recognize the voices of the people that were

6    recorded?

7    A    I do.

8    Q    How do you recognize them?

9    A    I spent a substantial amount of time with them.

10   Q    Okay.  And from looking at the transcripts, those are

11   accurate transcriptions of what you heard?

12   A    They are.

13   Q    Let's focus on June 3rd, and I'd like you to -- I'm going

14   to focus your attention on what's been marked as Government

15   Exhibit 26 for identification.  Was there a discussion during

16   one of your meetings with Mr. Harris about the rank structure

17   for the Wolverine Watchmen?

18   A    There was.

19           MR. KESSLER:  I'd offer Government Exhibit 26, Your

20   Honor?

21           THE COURT:  Objections?

22           MS. KELLY:  No.

23           MR. BLANCHARD:  Nothing additional.

24           THE COURT:  That's admitted.

25           (Audio started, 9:59 a.m.)

1                 (Audio stopped, 9:59 a.m.)

2    BY MR. KESSLER:

3    Q   Now, when you say a company, you weren't talking about like

4    a corporation?

5    A   No.

6    Q   What were you talking about?

7    A   Daniel Harris and myself were both in the military.  He was

8    in the marines.  I myself in the army.  So a company consists

9    of four platoons that make up that company.

10    Q   So in the military sense?

11    A   Correct.

12    Q   People -- did people start talking -- this is June 3rd,

13    right?

14    A   Yes.

15    Q   There was a meeting in Dublin on June 6th?

16    A   There was.

17    Q   And did people among the Wolverine Watchmen start talking

18    about whether or not they should attend that meeting?

19    A   Yes.

20    Q   All right.  Was there a discussion that Mr. Harris

21    participated in?

22    A   Yes.

23         MR. KESSLER:  Okay.  I'd now offer Government Exhibit

24    27, Your Honor.

25         THE COURT:  Any objections?

```
 1              MR. BLANCHARD:  Just the same hearsay.

 2              THE COURT:  Same ruling.  Go ahead.

 3              (Audio started, 10:00 a.m.)

 4              (Audio stopped, 10:00 a.m.)

 5    BY MR. KESSLER:

 6    Q    So we heard Mr. Harris say the downside to that is if the

 7    feds are there our entire leadership is gone?

 8    A    Correct.

 9    Q    You talked with these guys about that, right?

10    A    Yes.

11    Q    What was their concern?

12    A    That they would get killed.

13    Q    So not arrested but killed?

14    A    Correct.

15    Q    Now, why were they saying they thought they'd get killed?

16    A    Their involvement with what they are wanting to do and they

17    are wanting to target law enforcement.

18    Q    So shoot out?

19    A    Yes.

20    Q    Did this conversation continue to talk about whether it

21    might be a trap?

22    A    It did.  Yes.

23              MR. KESSLER:  I'd like to play Government Exhibit 28?

24              THE COURT:  Any objections.  If not it can be

25    admitted.
```

1              (Audio started, 10:01 a.m.)

2              (Audio stopped, 10:01 a.m.)

3    BY MR. KESSLER:

4    Q   Again, you mentioned that Mr. Harris had talked about using

5    bombs or explosives in this plan?

6    A   He has.  Yes.

7    Q   Did you talk to him about it that same day, June 3rd?

8    A   We did.  Yes.

9              MR. KESSLER:  I'd like to offer Government Exhibit 29,

10   Your Honor?

11             THE COURT:  All right.  Subject to same rulings,

12   admitted.

13             (Audio started, 10:02 a.m.)

14             (Audio stopped, 10:02 a.m.)

15   BY MR. KESSLER:

16   Q   He used -- Mr. Harris used a term early on there that you

17   might be familiar with from your time in the army.  What's RD

18   Sim?

19   A    It's an artillery simunition.  So during training exercises

20   we would have these simunition rounds to simulate artillery

21   rounds impacting.

22   Q   Is that a giant blank like a canon?

23   A   Yeah.

24   Q   Okay.  And so can you use that to make other things; is

25   that the discussion?

1    A    Yes.

2    Q    What kind of things?

3    A    IEDs.

4    Q    You mentioned you had some personal experience with IEDs.

5    I'd like to play the next one, but first I want to ask you

6    what's an MRAP?

7    A    It's an up armored vehicle.  A Humvee but up higher with

8    more armor.

9    Q    Okay.  Do you know what it stands for?

10   A    The acronym?  No.  Not offhand.

11   Q    Were you familiar with those personally from your time in

12   Iraq?

13   A    I was.  Yes.

14   Q    Did you ride in them?

15   A    I have.  Yes.

16   Q    What was the purpose of them?

17   A    They have a V-shaped hull so it's used to deflect IED's

18   from going off to protect the personnel inside the vehicle.

19   Q    Did Mr. Harris discuss that in this same conversation on

20   June 3rd?

21   A    He did.  Yes.

22         MR. KESSLER:  I'd like to play Government Exhibit 30,

23   Your Honor.

24         THE COURT:  All right.  New objections?  If not,

25   admitted.  Go ahead.

1                    (Audio started, 10:04 a.m.)

2                    (Audio stopped, 10:04 a.m.)

3      BY MR. KESSLER:

4      Q     And let me follow up on the MRAP.  When you were in Iraq

5      who was in the MRAPs?

6      A     Coalition forces.

7      Q     When you say coalition you mean United States and its

8      allies?

9      A     Correct.

10     Q     So we just talked a minute ago about the meeting in Dublin,

11     Ohio on June 6th.  Did you attend that?

12     A     In Dublin?  No.

13     Q     Okay.  We heard Mr. Harris talking about how he thought it

14     might be a trap.  Did Mr. Harris attend that?

15     A     He did not.

16     Q     Okay.  From talking to Mr. Fox, did you learn whether

17     Mr. Fox did attend it?

18     A     I did.  Yes.

19     Q     And what did he tell you?

20     A     That he did attend the meeting.

21     Q     Did he reach out to the Wolverine Watchmen afterward to

22     talk about it?

23     A     Yes.

24     Q     Were you on a call with him and Mr. Morrison?

25     A     I was.  Yes.

1    Q    Okay.  Now, let's focus on June 14th, the week after the

2    meeting in Dublin.  Did you actually hear, record some audio

3    from talking with Mr. Fox?

4    A    Yes.

5            MR. KESSLER:  Okay.  I'd like to play Government

6    Exhibit 57?

7            THE COURT:  Same ruling.  If there is no new

8    objections, go ahead.

9            (Audio started, 10:05 a.m.)

10           (Audio stopped, 10:06 a.m.)

11   BY MR. KESSLER:

12   Q    All right.  So this is as we can see a call between you,

13   Mr. Fox and Mr. Morrison, right?

14   A    Correct.

15   Q    Had you met Mr. Fox personally other than seeing him at the

16   Capitol before?

17   A    No.

18   Q    Okay.  So he's talking about wanting to train together?

19   A    He was.  Yes.

20   Q    And did that, in fact, happen later?

21   A    It did.

22   Q    Okay.  Let's move forward a couple days to June 18th.  All

23   right.  Was there a Second Amendment rally outside the Lansing

24   State Capitol that day?

25   A    There was.  Yes.

```
 1    Q    Did you attend that?

 2    A    I did.

 3    Q    Did you see Mr. Fox there?

 4    A    Yes.

 5    Q    Take a look at what's behind tab 58 there, please.  Do you

 6    recognize that photograph?

 7    A    I do.

 8    Q    Is that an accurate representation of what you saw there

 9    that day?

10    A    It is.

11    Q    All right.  Is that Mr. Fox?

12    A    Yes.

13         MR. KESSLER:  I'd like to put up Government Exhibit

14    58, Your Honor?

15         THE COURT:  Objections?

16         MR. GIBBONS:  None.

17         THE COURT:  It's admitted.

18    BY MR. KESSLER:

19    Q    All right.  Mr. Chappel, we see Mr. Fox there, correct?

20    A    Yes.

21    Q    Let's just point out a couple of things on this picture.

22    What kind of shirt is he wearing?

23    A    A Hawaiian shirt.

24    Q    What's that associated with from what you learned at your

25    time in the militia?
```

```
1     A     The Boogaloo movement.

2     Q     Which we've heard a little bit about what that is already.

3     What did you understand it to be?

4     A     Trying to kick off a civil war.

5     Q     Okay.  And let's take a look at a couple of details here.

6     Hanging around Mr. Fox's neck we see a little orange thing on

7     a -- two little orange things on a string around his neck.

8     What's that?

9     A     Hearing protection.

10    Q     What do you use hearing protection for?

11    A     When you are shooting a rifle.

12    Q     Do you know what Mr. Fox was planning to do that day from

13    your discussion with him?

14              MR. GIBBONS:  Objection.  Speculation, Your Honor.

15              THE COURT:  You said from a discussion with him, so if

16    he had that and he knows that's fine.  If he didn't he can tell

17    us.

18    BY MR. KESSLER:

19    Q     What did Mr. Fox tell you he was planning to do that day,

20    if anything?

21    A     If there was large enough people there for the militia

22    movement to kick off the Boog.

23    Q     So start the civil war?

24    A     Yes.

25    Q     So we notice the ear plugs.  I'd like you to take a look at
```

1    the detail on the rifle right here.  What part of the rifle is

2    that?

3    A    That's the bolt carrier and the dust cover.

4    Q    What's the dust cover?

5    A    It's a piece of material that you keep closed to keep

6    debris or dust from getting inside of the rifle.

7    Q    You were familiar with that from your time in Iraq?

8              MR. GIBBONS:  Objection.  Leading, Your Honor.

9              THE COURT:  It is leading.  It's not an especially big

10   point.  It's simply foundational.  Go ahead.  But generally

11   let's hear this witness's story.  That's usually our purpose on

12   direct.  Go ahead.

13   BY MR. KESSLER:

14   Q    From your time in Iraq what did you know the purpose of

15   that to be?

16   A    Just with it being open I knew there was a round inside the

17   chamber so the rifle is loaded at that time.

18   Q    So not just a magazine loaded but a bullet in the actual

19   barrel in the chamber?

20   A    Correct.

21   Q    Okay.  Take a look at what's behind Exhibit 59.  I'm sorry.

22   Tab 59 there.  Do you recognize that photograph?

23   A    I do.  Yes.

24   Q    Also an accurate representation of what you saw there on

25   June 18th?

1    A    Yes.

2              MR. KESSLER:  I'd like to publish that, Your Honor?

3              THE COURT:  Any objections?  If not it's admitted.

4    BY MR. KESSLER:

5    Q    Who are we looking at here, Mr. Chappel?

6    A    Joe Morrison has the Red Hawaiian shirt on with his hand

7    raised.  Daniel Harris in the blue T-shirt and Paul Bellar.

8    Q    So they were there as well, right?

9    A    They were.  Yes.

10   Q    Okay.  Now, we heard the conversation between you and

11   Mr. Fox and Mr. Morrison talking about uniting the militias.

12   Did Mr. Fox later propose a meeting at his place?

13   A    He did.  Yes.

14   Q    Okay.  Now, let's move forward to June 20th.  First I'd

15   like to show you what's already been admitted as Exhibit 60.

16   If you can put that up?  All right.  We are looking at a photo

17   of the outside of the Vac Shack.  Is that where you actually

18   met Mr. Fox?

19   A    Yes.

20   Q    Okay.  And what's already been admitted as Exhibit 61.  All

21   right.  We see here inside a stairwell going down it looks like

22   a little trap door over the stairwell.  Do you recognize this?

23   A    I do.  Yes.

24   Q    Did you go down there?

25   A    I did.

1    Q    I'm sorry, what?

2    A    I did.  Yes.

3    Q    You did.  Okay.  Who was down there?

4    A    Myself, Ty Garbin, Adam Fox, Amanda Keller, an individual

5    last name McIntosh, and Paul Bellar.

6    Q    Now, when you went downstairs did Mr. Fox ask you to do

7    anything before you went into the basement?

8    A    We all had to dump our cell phones inside of a box.

9    Q    Did Mr. Fox tell you why?

10   A    In case anybody was monitoring.

11   Q    To make sure nobody was recording?

12   A    Correct.

13   Q    Okay.  Take a look behind tab 62.  Do you recognize that

14   photograph?

15   A    I do.  Yes.

16   Q    Is that an accurate depiction of what you saw on June 20th?

17   A    Yes.

18        MR. KESSLER:  Okay.  I'd like to publish Exhibit 62.

19        THE COURT:  No objections.  It's admitted.

20   BY MR. KESSLER:

21   Q    All right.  We're looking at a picture of a bed it looks

22   like.  Do you remember this room?

23   A    I do.  Yes.

24   Q    Where was this exactly?

25   A    That was in the basement of the Vac Shack.  So after you

1    went down the stairs it was right there.

2    Q    Okay.  Is that pretty much how it looked when you had the

3    meeting?

4    A    It was.  Yes.

5    Q    Were you guys all sitting on the bed or what?

6    A    Adam Fox and Amanda Keller were sitting on the bed along

7    with Paul Bellar.  I was at the right corner of the bed where

8    the rifle is at in a chair next to Ty Garbin.

9    Q    Is that the same rifle we saw around Mr. Fox's neck in the

10    earlier picture?

11    A    It is.  Yes.

12    Q    While you were down there, what did Mr. Fox talk about?

13    A    Taking the Capitol.  He thought that idea was a little

14    crazy so he wanted to funnel it down more to be more precise.

15    Q    All right.  Did he talk about when he wanted to do it?

16    A    Before the election.

17    Q    All right.  So this is June 20th.  Are we talking about the

18    election coming up in November?

19    A    We are.  Yes.

20    Q    Okay.  Did you record Mr. Fox's statements down there?

21    A    I did.  Yes.

22            MR. KESSLER:  I'd like to play Government Exhibit 64?

23            THE COURT:  Objections?

24            MR. GIBBONS:  None, Your Honor.

25            MR. BLANCHARD:  Has it been admitted?

```
 1              THE COURT:  No, and that's what I'm asking for.
 2              MR. BLANCHARD:  I'm sorry.  I got the same objection.
 3              THE COURT:  Same ruling.  It's admitted.
 4              (Audio started, 10:12 a.m.)
 5              (Audio stopped, 10:13 a.m.)
 6      BY MR. KESSLER:
 7      Q    Did Mr. Fox talk about the meeting he had had in Ohio on
 8      June 6th?
 9      A    He did.  Yes.
10              MR. KESSLER:  I'd like to play Government Exhibit 65?
11              THE COURT:  Same rulings.  It's admitted.
12              (Audio started, 10:13 a.m.)
13              (Audio stopped, 10:14 a.m.)
14      BY MR. KESSLER:
15      Q    So during this same conversation down in the basement of
16      the Vac Shack on June 20th, did Mr. Fox also talk about using
17      bombs?
18      A    He did.  Yes.
19              MR. KESSLER:  I'd like to play Government Exhibit 66?
20              THE COURT:  Same ruling.  Admitted.
21              (Audio started, 10:14 a.m.)
22              (Audio stopped, 10:15 a.m.)
23      BY MR. KESSLER:
24      Q    Let me ask you a couple things.  From your discussions with
25      Mr. Fox, did you learn what a baker was?
```

1    A    Yes.

2    Q    What's that?

3    A    An explosives expert or demolitions.

4    Q    Did you hear this kind of talk a lot about cupcakes and

5    cakes?

6    A    We did.  Yes.

7    Q    Were there ever actually cupcakes or cakes produced?

8    A    No.

9    Q    Okay.  We heard him talking about Mr. Keepers being an

10   explosives guy.  Did you know Matt Keepers?

11   A    No.  I did not.

12   Q    Okay.  Now, we've heard about a training exercise in

13   Cambria, Wisconsin.  So I want --

14             THE COURT:  Before you go to that, this is probably a

15   good time to break since you are going to a new topic and we

16   need to take a morning break.  So if it's convenient --

17             MR. KESSLER:  Yes, sir.

18             THE COURT:  -- we'll take a 20-minute break now and

19   we'll come back and see you after the first morning break.

20             LAW CLERK:  All rise.

21             (Jury out, 10:16 a.m.)

22             THE COURT:  Okay.  20 minutes.

23             LAW CLERK:  Court is in recess.

24             (Recess taken, 10:17 a.m.)

25             (Resume Proceeding, 10:40 a.m.)

1          (Jury in, 10:40 a.m.)

2          LAW CLERK:  Court is in session.

3          THE COURT:  Please be seated.  And we will go right

4    back to Mr. Kessler with our witness and continue the direct

5    exam when you are ready.

6          MR. KESSLER:  Thank you, Your Honor.

7    BY MR. KESSLER:

8    Q    So Mr. Chappel, when we left off just before the break we

9    were about to talk about the field training exercise in

10   Cambria, Wisconsin?

11   A    Correct.

12   Q    All right.  So let's focus on July 10th through the 12th.

13   Do you recall attending that?

14   A    I do.  Yes.

15   Q    And if you would take a look behind tab 89 in your book?

16   Do you recognize that photograph?

17   A    I do.  Yes.

18   Q    Is that an accurate depiction of what you saw at Cambria?

19   A    Yes.

20          MR. KESSLER:  Offer Exhibit 89?

21          THE COURT:  Any objections?

22          MR. BLANCHARD:  No.

23          THE COURT:  It's admitted.

24   BY MR. KESSLER:

25   Q    So Mr. Chappel, what are we looking at here?

1    A    A group photo of the participants of training.

2    Q    And do you recognize anybody who is in the courtroom here

3    today in this photograph?

4    A    I do.  Yes.

5    Q    You can actually -- if you touch the screen there a little

6    dot will appear wherever you put your finger.  Can you put a

7    dot above some of the people who are involved?

8    A    Yes.  That's Adam Fox, Daniel Harris, Brandon Caserta.

9    Q    Can you see Ty Garbin anywhere in there?

10   A    Ty Garbin.

11   Q    How about Kaleb Franks?

12   A    Kaleb Franks.

13   Q    And are you in the picture?

14   A    I am.

15   Q    Where are you?

16   A    Right there.

17   Q    Okay.  Do you see Barry Croft?

18   A    I do.

19   Q    So he has got the three-cornered hat on?

20   A    He does.  Yes.

21   Q    Did you see some other photographs of Mr. Croft?

22   A    I did.  Yes.

23   Q    Take a look behind Exhibit 91, please?  Is an accurate

24   representation of something you saw at Cambria?

25   A    It is.  Yes.

1           MR. KESSLER:  I'd like to publish Exhibit 91, Your

2   Honor?

3           MR. BLANCHARD:  No objection.

4           THE COURT:  Okay.  It's admitted.

5   BY MR. KESSLER:

6   Q    Let's see if we can clear all those dots off of here.  What

7   are we looking at here?

8   A    It's Barry Croft holding a Boogaloo flag.

9   Q    What makes you say it is a Boogaloo flag?

10  A    The Hawaiian pattern.

11  Q    Do you recognize that hat?

12  A    I do.

13  Q    How often did you see Mr. Croft wearing that hat?

14  A    All the time.

15  Q    Is this the first time that you had met Mr. Croft?

16  A    That weekend.  Yes.

17  Q    Did you make audio recordings in Cambria as well?

18  A    I did.  Yes.

19  Q    Do you recall an audio recording of Mr. Caserta and

20  Mr. Croft talking about the use of force?

21  A    Yes.

22          MR. KESSLER:  I'd like to play Government Exhibit 92,

23  Your Honor?

24          THE COURT:  Any objections?

25          MR. BLANCHARD:  Just the -- nothing new.

1              MR. GIBBONS:  Same.

2              THE COURT:  It's admitted.  Same rulings.

3            (Audio started, 10:43 a.m.)

4            (Audio stopped, 10:44 a.m.)

5    BY MR. KESSLER:

6    Q    Let's move to July 11th, the first day of training there.

7    Do you recall that?

8    A    I do.  Yes.

9    Q    That was Saturday?

10   A    Yes.

11   Q    Take a look behind tab 95, please.  Do you recognize that

12   photograph?

13   A    Yes.

14   Q    Also an accurate depiction of something you saw in Cambria

15   on July 11th?

16   A    Yes.

17            MR. KESSLER:  I'd like to publish Exhibit 95, Your

18   Honor?

19           THE COURT:  Okay.  Any objections?

20           MR. BLANCHARD:  No.

21           THE COURT:  It's admitted.

22   BY MR. KESSLER:

23   Q    What are we looking at here?

24   A    It's Barry Croft holding a shotgun.

25   Q    Is there anything special about that shotgun?

1     A    It's a pump action but it also has a cylinder tube so it

2     can hold more rounds in there, and the muzzle device on it is

3     jagged for breaching doors.

4     Q    Can we bring up the muzzle, the tip of the shotgun there.

5     So are we talking about this right here where you say it's

6     jagged?

7     A    Yes.

8     Q    Have you done breaching before in Iraq, for example?

9     A    I have.  Yes.

10    Q    Can you explain what that is?

11    A    Gaining entry to a structure, so either a room or a

12    building.

13    Q    All right.  How would something like this be used in

14    breaching a structure?

15    A    With that specific one you could forcibly ram it into a

16    door or the hinges and then pull the trigger and it would

17    explode the locks off.

18    Q    Okay.  We've heard some talk in here about a shoot house or

19    a kill house.  Have you trained in that sort of thing?

20    A    I have.  Yes.

21    Q    What for?

22    A    Gaining entry to buildings in Iraq.

23    Q    And did you actually have to gain entry into buildings in

24    Iraq?

25    A    Yes.

```
1     Q     For what?

2     A     Enemy combatants.

3     Q     All right.  Have you viewed a video of the training in the

4     kill house in Cambria?

5     A     Yes.

6     Q     Did you accurately reflect what you all trained on there?

7     A     Yes.

8     Q     On July 11th?

9     A     Right.

10               MR. KESSLER:  I'd like to play Exhibit 93?

11               THE COURT:  Any objections?

12               MR. BLANCHARD:  Is that the video he viewed?

13               THE COURT:  Pardon?

14               MR. BLANCHARD:  I wasn't clear from the testimony if

15    we are -- he said, did you view a video?  I just don't know --

16    BY MR. KESSLER:

17    Q     Did you view -- I tell you what.  All the videos that we

18    are going to show here today, have we showed them all to you?

19    A     You have.  Yes.

20    Q     Do you recognize all of them?

21    A     I do.

22    Q     Exhibit 103 in particular, did you view a video of the kill

23    house exercise at Cambria?

24    A     Yes.

25               MR. KESSLER:  I'd like to publish that, Your Honor.
```

1          THE COURT:  All right.  It's admitted.

2          (Video started, 10:46 a.m.)

3          (Video stopped, 10:47 a.m.)

4     BY MR. KESSLER:

5     Q    Mr. Chappel, we heard someone say, you can commence firing,

6     and at the end say, cease.  Do you recognize that voice?

7     A    I do.  Yes.

8     Q    Who is that?

9     A    Daniel Harris.

10    Q    And do you recognize any of these other people here?

11    A    I do.

12    Q    All right.  Who else is in this exercise?

13    A    Do you want me to point?

14    Q    Sure.

15    A    So this is Ty Garbin, Kaleb Franks, Paul Bellar and Brandon

16    Caserta.

17          MR. KESSLER:  All right.  I'd like to now show another

18    video, same thing, Exhibit 105.1.

19          THE COURT:  All right.  So I think 105.1 is the one we

20    admitted earlier, is that right?

21          MR. KESSLER:  I believe we did already.

22          THE COURT:  All right.  Go ahead.  It's admitted.  Go

23    ahead.

24          (Video started, 10:47 a.m.)

25          (Video stopped, 10:48 a.m.)

BY MR. KESSLER:

Q    Mr. Chappel, I want to ask you specifically, these things here -- these things here we see green smiley faces and red Xs. What did those represent in the training?

A    A shoot/no shoot individual.

Q    Are you familiar with this kind of training?

A    Yes.

Q    What do you do that for?

A    To either neutralize or detain hostile threats.

Q    Okay.  Would you take a look at Exhibit 105.2?  It should be behind tab 105 in your book.

A    There is nothing there.

Q    Okay.  Have you --

        THE COURT:  105.2 is another video, right?

        MR. KESSLER:  Okay.  Yes.  Sorry.  That's why it's not behind your tab.

BY MR. KESSLER:

Q    Do you recall seeing a video of a short-barreled rifle?

A    Yes.

        MR. KESSLER:  I'd like to play 105.2?

        THE COURT:  All right.  No new objections, admitted.

        MR. GIBBONS:  No, Your Honor.

        (Video started, 10:49 a.m.)

        (Video stopped, 10:49 a.m.)

BY MR. KESSLER:

1    Q    Can you tell us which one of these individuals was Daniel

2    Harris, if he is in there?

3    A    That individual.

4    Q    Okay.  And the rifle he's got there, anything significant

5    about it?

6    A    The barrel length is shorter than 16 inches.

7    Q    All right.  Why would someone use a short-barreled rifle in

8    your experience in the army?

9         MS. KELLY:  Objection, speculation.

10        THE COURT:  I think there is foundation from what the

11   witness's experience has been and he can use that or tell us he

12   don't have enough experience.  You can answer if you are able.

13        THE WITNESS:  It's a shorter platform, a rifle to

14   manipulate.  So inside tight spaces or gain entry in doors you

15   have less overall length in inches to maneuver around so you

16   won't be hitting up against objects.

17   BY MR. KESSLER:

18   Q    Did you actually ride to the Cambria training with any of

19   the people in this room?

20   A    I did.  Yes.

21   Q    Who was in the car with you?

22   A    Everyone.

23   Q    Okay.  Including Daniel Harris that you just pointed out

24   there?

25   A    Yes.

1    Q    Did he talk about that rifle?

2    A    He mentioned that he had an illegal SBR in the vehicle.

3    Q    All right.  Now, when you got up to Cambria, Wisconsin on

4    July 11th that we are still talking about, did you all have

5    dinner that night at the hotel you were staying at?

6    A    The first night?  No.  Saturday night we didn't.

7    Q    Okay.  It was the next night?

8    A    Yes.

9    Q    Take a look behind tab 88, please.  Do you recognize that

10   photograph?

11   A    I do.

12   Q    Is that an accurate representation of the place where you

13   were?

14   A    It is.

15        MR. KESSLER:  I'd like to publish Exhibit 88, please?

16        THE COURT:  Any objections?  It's admitted.

17   BY MR. KESSLER:

18   Q    What is this place, Mr. Chappel?

19   A    It's the Deno's restaurant attached to the hotel that we

20   stayed in.

21   Q    So this is the hotel over here where you stayed?

22   A    Yes.

23   Q    Okay.  Who went to that dinner?

24   A    Barry Croft, myself, Adam Fox, Paul Bellar, Kaleb Franks,

25   Ty Garbin, Brandon Caserta, and several other individuals.

1    Q    Did you record the conversation that you all had inside

2    Deno's restaurant?

3    A    I did.  Yes.

4              MR. KESSLER:  I'd like to play Exhibit 88?

5              THE COURT:  Objections?

6              MR. BLANCHARD:  My Exhibit 88 --

7              THE COURT:  Is a picture.

8              MR. KESSLER:  I'm sorry.  I meant 93.

9              THE COURT:  Objections to 93?

10             MR. BLANCHARD:  One moment, please.  No.

11             THE COURT:  That's admitted.

12             (Audio started, 10:52 a.m.)

13             (Audio stopped, 10:53 a.m.)

14   BY MR. KESSLER:

15   Q    So we just heard Mr. Harris talking about different states

16   and groups coming together.  Did the conversation go onto talk

17   about Governor Whitmer in particular?

18   A    It did.  Yes.

19             MR. KESSLER:  I'd like to play Government Exhibit 106?

20             THE COURT:  No objections.  It's admitted.

21             (Audio started, 10:53 a.m.)

22             (Audio stopped, 10:54 a.m.)

23   BY MR. KESSLER:

24   Q    Mr. Caserta said she'd be a good example and Mr. Croft was

25   talking about hanging her.  Who did you understand her to be?

1    A    The governor of Michigan.

2    Q    Did they go onto talk more about what governors are

3    supposedly doing to the nation?

4    A    They did.  Yes.

5              MR. KESSLER:  I'd like to play Government Exhibit 109,

6    Your Honor?

7              THE COURT:  All right.  That's admitted.

8              (Audio started, 10:55 a.m.)

9              (Audio stopped, 10:57 a.m.)

10   BY MR. KESSLER:

11   Q    Did Mr. Fox specifically talk to you about bombs that

12   night?

13   A    He did.  Yes.

14             MR. KESSLER:  I'd like to play Government's Exhibit

15   100?

16             THE COURT:  Objections?  If not, that's admitted.

17             (Audio started, 10:57 a.m.)

18             (Audio stopped, 10:58 a.m.)

19   BY MR. KESSLER:

20   Q    Did Mr. Fox go onto talk about growing the group?

21   A    He did.  Yes.

22             MR. KESSLER:  I'd like to play Government's Exhibit

23   101?

24             THE COURT:  Hearing no objections it's admitted.

25             (Audio started, 10:58 a.m.)

1        (Audio stopped, 10:58 a.m.)

2        MR. KESSLER:  We'll try that again, Your Honor.  The

3    audio didn't start.

4        THE COURT:  All right.

5        (Audio started, 10:58 a.m.)

6        (Audio stopped, 10:58 a.m.)

7        (Audio started, 10:58 a.m.)

8        (Audio stopped, 10:58 a.m.)

9        MR. KESSLER:  Give us just a second, Your Honor.  Why

10   don't we just play the audio?  Can we play just the audio?

11   We'll see if we can loop back to this again later, Your Honor.

12        Are we going to have the same issue with other ones or

13   just this one?  We are just testing something with an exhibit

14   that's already admitted to see if it was just that one.

15        THE COURT:  All right.

16        MR. BLANCHARD:  I don't show 109 as being in.

17        THE COURT:  I do.

18        MR. BLANCHARD:  Okay.  Sorry.  Oh, I'm sorry.  I

19   missed it just a minute ago.  My apologies.

20        MR. KESSLER:  Do we need a minute?  I think we might

21   need a minute, Your Honor.

22        THE COURT:  All right.

23        MR. KESSLER:  I apologize.

24        THE COURT:  We'll see -- did you say you had an audio

25   option that doesn't have a tracking transcript?

```
 1              MR. KESSLER:  It looks like --

 2              THE COURT:  So that was 109.  Let's see if we can get

 3      101 to work.

 4              (Audio started, 11:01 a.m.)

 5              (Audio stopped, 11:01 a.m.)

 6      BY MR. KESSLER:

 7      Q    So Mr. Chappel, let me move you ahead to the next day, July

 8      12th.  Did the training continue that day?

 9      A    It did.  Yes.

10      Q    Did you continue to record audio?

11      A    I did.

12      Q    And did Mr. Croft talk about voting?

13      A    Yes.

14              MR. KESSLER:  I'd like to play Exhibit 110?

15              THE COURT:  Objections?  If not, 110, it's admitted.

16      If you don't get the little --

17              (Audio started, 11:02 a.m.)

18              (Audio stopped, 11:02 a.m.)

19              MR. KESSLER:  Can we maybe -- I don't think we caught

20      the beginning of it.  I want to make sure that's in evidence.

21              (Audio started, 11:02 a.m.)

22              (Audio stopped, 11:03 a.m.)

23      BY MR. KESSLER:

24      Q    Mr. Chappel, we've heard some talk about a meeting in

25      Peebles, Ohio on July 18th.  Did you attend that meeting?
```

1    A    I did.  Yes.

2    Q    What was the purpose of that meeting?

3    A    To iron out plans for an actual assault on the Capitols.

4    Q    Okay.  And was there a sign in log?

5    A    There was.  Yes.

6    Q    Could you take a look behind tab 111?  Do you recognize

7    that picture?

8    A    I do.

9    Q    Is that an accurate representation of what you saw?

10   A    It is.  Yes.

11        MR. KESSLER:  I'd like to put up Exhibit 111, Your

12   Honor?

13        THE COURT:  Any objections?

14        MR. BLANCHARD:  No.

15        THE COURT:  It's admitted.

16   BY MR. KESSLER:

17   Q    Mr. Chappel, is that the sign in log?

18   A    It is.  Yes.

19   Q    Okay.  Just focus -- there is a lot of other people, but

20   let's focus on the bottom of page 1 here.  Who are those three

21   people?  What are those nicknames?

22   A    Gunny is Ty Garbin.  Harris for Daniel Harris, and Dan for

23   myself.

24   Q    And can we go -- let me clear that.  Can we go to the

25   second page, please?  And who do we have at the top there?

1    A    Barry Croft.  Adam Fox.

2    Q    Okay.  And then Keller, who is Keller?

3    A    Amanda Keller.  It was Adam's girlfriend.  And then Sean

4    Fix.

5    Q    Did you talk to Mr. Croft on the phone about governors on

6    July 18th?

7    A    I did.  Yes.

8           MR. KESSLER:  I'd like to play Government's Exhibit

9    112?

10          THE COURT:  Why don't you lay the foundation that he

11   recorded it first if he did.

12   BY MR. KESSLER:

13   Q    Yes.  Were you recording in Peebles, Ohio like you were at

14   the other places?

15   A    I was.  Yes.

16   Q    And have you listened to those recordings?

17   A    I have.  Yes.

18   Q    Are they accurate representations of what you heard and

19   recorded?

20   A    They were.

21   Q    Is the transcript accurate?

22   A    It is.

23          THE COURT:  All right.  Objections?  112 is in.

24          (Audio started, 11:05 a.m.)

25          (Audio stopped, 11:06 a.m.)

BY MR. KESSLER:

Q    So we heard Mr. Croft talking about interrogating a governor, and he referred to the governor in this recording as he.  Do you know who he was talking about?

A    I believe at that point it was the governor of Virginia.

Q    Okay.  Did Mr. Fox in a recorded conversation with you talk about an attack on Governor Whitmer specifically?

A    He did.  Yes.

         MR. KESSLER:  I'd like to play Exhibit 113?

         THE COURT:  Objections?

         MR. GIBBONS:  None, Your Honor.

         THE COURT:  It's admitted.

         (Audio started, 11:07 a.m.)

         (Audio stopped, 11:11 a.m.)

BY MR. KESSLER:

Q    All right.  Mr. Chappel, we heard Mr. Fox talking about needing to do recon to snatch and grab her.  Did you have a specific date already that had been discussed among the group?

A    A date yet set?  No.

Q    Did Mr. Fox talk about when you want to try and go?

A    He did.  Yes.

Q    All right.  Was that recorded as well?

A    It was.  Yes.

Q    Same conversation?

A    Yes.

1          MR. KESSLER:  I'd like to play Government's Exhibit

2     115?

3          THE COURT:  Okay.  No objections, it's admitted.

4          MR. GIBBONS:  None.

5          (Audio started, 11:12 a.m.)

6          (Audio stopped, 11:12 a.m.)

7     BY MR. KESSLER:

8     Q    So we heard Mr. Fox talk about doing it when the

9     opportunity arises.  Do you recall those conversations?

10    A    I do.  Yes.

11    Q    What was Mr. Fox generally proposing?

12    A    Kidnapping the governor.

13    Q    Okay.  Do you recall during this conversation Mr. Harris

14    being concerned about being discovered?

15    A    Yes.

16    Q    And that was recorded?

17    A    It was, yes.

18         MR. KESSLER:  I'd like to play Government's Exhibit

19    116?

20         THE COURT:  Okay.  Hearing no objections it's

21    admitted.

22         (Audio started, 11:13 a.m.)

23         (Audio stopped, 11:14 a.m.)

24    BY MR. KESSLER:

25    Q    So we heard Mr. Harris telling Mr. Graham to get off of

1    social media.  Do you recall being cautioned the same way?

2    A    Yes.

3    Q    And what was the purpose of being told to be get off of

4    social media?  What did they tell you?

5    A    So nobody could monitor our activities or movement.

6    Q    Okay.  And when it says -- when Mr. Harris said, call signs

7    only, you and he were both in the military as you've said.

8    What does call signs mean?

9    A    It's our identifier that we would use across the radio.

10   Q    So not your real name?

11   A    Correct.

12   Q    Over the next couple of days did Mr. Fox and Mr. Harris

13   discuss explosives with you?

14   A    They did.  Yes.

15   Q    Let's focus on July 19th.  Did you have a recorded

16   conversation with Mr. Fox on that day?

17   A    Yes.

18           MR. KESSLER:  I'd like to play Government's Exhibit

19   118?

20           THE COURT:  Hold on, 118 is not an audio at least

21   according to my list.

22   BY MR. KESSLER:

23   Q    I'm sorry.  Yup.  That's a chat.  Did you talk about it on

24   the -- on Wire or on your encrypted communications?

25   A    We did.  Yes.

1    Q    Can you take a look at 118, please?  Do you recognize that

2    communication?

3    A    I do.  Yes.

4         MR. KESSLER:  I'd like to offer 118, Your Honor?

5         THE COURT:  Any objections?

6         MR. GIBBONS:  None, Your Honor.

7         THE COURT:  It's admitted.

8    BY MR. KESSLER:

9    Q    Okay.  Let's blow up just the first box but also what's

10   right above that.  Okay.  ETADIK, that's you, right?

11   A    That is.  Yes.

12   Q    Who came up with that name?

13   A    I did.

14   Q    And what does it mean?

15   A    Eat a dick.

16   Q    All right.  Why did you come up with that name?

17   A    To maintain the humor within the group.

18   Q    Okay.  You said, center has been of interest.  As a matter

19   of fact, let's make this smaller for a second.  Let's go to the

20   very top, the very beginning of that conversation.  It says

21   Deanzy.  Who is Deanzy?

22   A    Adam Fox.

23   Q    And he says one, and you one right in the center talking

24   about sending a message we'll write it on the cake.  What's the

25   center in this conversation?

1    A    For the number preference or just --

2    Q    All right.  Well, maybe it'll be more clear if we see the

3    whole thing.  Okay.  You say center has been of interest.  We

4    heard some recordings just over the last few minutes where they

5    are talking about three possible routes.  What were the three

6    possible routes?

7    A    So the three were one being the Capitol, two being her

8    residence in Traverse City, and three being the house up on

9    Mackinaw Island.

10   Q    Okay.  So which of those is the farthest south?

11   A    Say again?

12   Q    Which of those is the farthest south?

13   A    The furthest south would be the Capitol.

14   Q    Okay.  And which one is the furthest north?

15   A    The one in Mackinaw.

16   Q    So which one would be the center?

17   A    Her house is Traverse City.

18   Q    Is that what you were talking about here?

19   A    It is.  Yes.

20   Q    Let's blow up the box then in the middle.  So Deanzy says,

21   talk to the chef, should be -- it looks like it should read

22   able.  Should be able to meet possibly this coming weekend.

23   Next at latest.  I am ready.  Start baking.  Scoping out some

24   shit this week, too.  Okay.  Close that.  Okay.  You said, let

25   me know that day?

1    A    Correct.

2    Q    And let's blow up the bottom part.  Mr. Fox says, we gonna

3    date day recon lol.  We got this bro.  I'll pass the intel

4    along.  You know what he was talking about?

5    A    I do.  Yes.

6    Q    What was it?

7    A    Gathering information on the locations and the address of

8    her residence.

9    Q    The one in the center?

10   A    Yes.

11   Q    Okay.  Did Mr. Fox post things on FaceBook to your closed

12   group occasionally?

13   A    He did.  Yes.

14   Q    Can you take a look at what's behind tab 120?  Do you

15   recognize that post?

16   A    I do.

17        MR. KESSLER:  I'd like to publish Exhibit 120, Your

18   Honor.

19        THE COURT:  Well, do you have anymore foundation?  You

20   are saying he is posting it on what group?

21   BY MR. KESSLER:

22   Q    On your FaceBook group, is that right, or was that on Wire?

23   Tell us where that's from?

24   A    That was on FaceBook.  Yes.

25   Q    On FaceBook.  Were you a member of that group?

```
 1    A    Yes.

 2    Q    Did you see that post when it was posted on July 19th?

 3    A    I did.  Yes.

 4    Q    Or I'm sorry, July 22nd.  Okay.

 5            THE COURT:  All right.

 6            MR. KESSLER:  120, Your Honor?

 7            THE COURT:  Any objections?  It will be admitted.

 8    BY MR. KESSLER:

 9    Q    It says, Adam Dean Fox, and he posted, if we can't have our

10    world then they can't have theirs.  Do you recall him

11    expressing those kind of sentiments before?

12    A    Yes.

13    Q    What kinds of things did he say to you along these lines?

14    A    Burning it down.  Making the world glow.

15    Q    The next day on July 23rd did you have a discussion with

16    Mr. Harris about a bomb maker?

17    A    I did.  Yes.

18            MR. KESSLER:  I'd like to play Government's Exhibit

19    121?

20            THE COURT:  Why don't you confirm the foundation on

21    recording.

22    BY MR. KESSLER:

23    Q    Did you record that conversation?

24    A    Yes.

25    Q    Have you had a chance to listen to that before we came into
```

1    court today?

2    A    I have.  Yes.

3    Q    Does it accurately reflect the recording that you made?

4    A    It does.

5    Q    And the transcript is accurate?

6    A    Yes.

7              THE COURT:  All right.  Any objections?

8              MR. BLANCHARD:  No.

9              THE COURT:  If not, 121 is admitted.

10             (Audio started, 11:19 a.m.)

11             (Audio stopped, 11:20 a.m.)

12   BY MR. KESSLER:

13   Q    All right, Mr. Harris is talking here about a brother of

14   his friend Phelps's girlfriend.  Did you ever meet that person?

15   A    I did not.  No.

16   Q    Okay.  On July 24th, the next day, did Mr. Fox talk to you

17   again about Governor Whitmer specifically?

18   A    He did.  Yes.

19   Q    Was it recorded?

20   A    Yes.

21   Q    Have you reviewed that recording before you came to Court

22   today?

23   A    I have.

24   Q    Is it accurate?

25   A    It is.

```
1    Q    And the transcript also?

2    A    It is.

3              MR. KESSLER:  I'd like to play Government's Exhibit

4    122?

5              THE COURT:  Hearing no objections it's admitted.

6              (Audio started, 11:21 a.m.)

7              (Audio stopped, 11:23 a.m.)

8    BY MR. KESSLER:

9    Q    Now, when we saw the FaceBook posts a couple of exhibits

10   ago where Mr. Fox said if they can't have their world -- if we

11   cannot have our world they can't have theirs.  You mentioned

12   that he had said something about making the world glow?

13   A    Correct.

14   Q    Did he say that to you in a recording?

15   A    He has.  Yes.

16   Q    Have you reviewed that recording?

17   A    Yes.

18   Q    Is it an accurate representation of what you heard?

19   A    Yes.

20   Q    Is the transcript accurate?

21   A    It is.

22             MR. KESSLER:  I'd offer Government's Exhibit 123 Your

23   Honor?

24             THE COURT:  Hearing no objections it's admitted.

25             (Audio started, 11:23 a.m.)
```

```
 1              (Audio stopped, 11:24 a.m.)
 2     BY MR. KESSLER:
 3     Q    Let's move forward two days from there to July 26th.  We've
 4     heard some testimony about a field training exercise in
 5     Fowlerville.  Did you attend that?
 6     A    I did.  Yes.
 7     Q    Whose residence is that?
 8     A    Kaleb Franks.
 9     Q    What was the purpose of that meeting?
10     A    Training, vehicle assault maneuvers.
11     Q    Have you done training on vehicle assault before?
12     A    I have.  Yes.
13     Q    What's the purpose of that training?
14     A    Overtaking vehicles that might have an enemy combatant or
15     you are in an ambush and you are trying to get out of the
16     vehicle and either assault on the attacking element or what
17     would be called breaking contact or so maneuvering off of that
18     element.
19     Q    Okay.  And we've also talked some about what's called
20     OPSEC.  What's that mean to you?
21     A    Operational security.
22     Q    Okay.  And was something passed out to all of you having to
23     do with operational security at a meeting?
24     A    It was.  Yes.
25     Q    Can you take a look behind tab 78, please?  Do you
```

1    recognize that photo?

2    A    I do.

3    Q    Is that an accurate representation of what you saw that

4    day?

5    A    Yes.

6              MR. KESSLER:  Offer Exhibit 78?

7              THE COURT:  No objections.  It's admitted.

8    BY MR. KESSLER:

9    Q    Okay.  It says at the top and I'll read this.  Destroy

10   after memorizing.  Training, bonfire.  In parentheses, hey Jim,

11   when's the bonfire.  Then kit/ammo/weapons, schmores, (should

12   we bring schmores).  Next line, NFA items, spaghettios, hey I

13   need to get some spaghettios.  Next line.  Full auto, can

14   opener.  Hey, can I get a can opener?  Next line, tail, fed,

15   cop, ticks, hey my dog's got ticks.  QRF, Ski-Doo, want to help

16   me work on my Ski-Doo?  Next line, unwanted eyes -- or ears

17   eyes, in-laws.  Are the in-laws in town today?  And then at the

18   bottom it says, OPSEC is a must.  Call signs are a requirement.

19   Please abide by this to keep our team and yourself safe.

20             So let me get a little context from you about this.

21   What's the bonfire reference?

22   A    Just to getting together for like a training exercise.

23   Q    Okay.  Is it a code word for that or were you actually

24   having a bonfire every time you had a training exercise?

25   A    That was a code word for it.

Q    Okay.  What are NFA items?

A    Items under the National Firearms Act.  So it could be short-barreled rifles, anything that you need an additional licensing to own or operate that item.

Q    And why would you need a code word for that?

A    Because they would have it illegally.

Q    Okay.  Full auto.  This may be obvious to some people, but what are we talking about?

A    Full auto weaponry.  So the rifles and pistols they had are semiautomatic, so one round per trigger pull.  With full auto you just pull the trigger back and it'll continuously fire until you let off the trigger.

Q    Is that what most people would call a machine gun?

A    Yes.

Q    Okay.  Tail, fed or cop referred to as ticks.  During your conversations with the people who are at this meeting, did they talk about being concerned about that?

A    They did.  Yes.

Q    What kinds of things did they say?

A    Just with the -- we had one individual that had a blue tooth device that had undercover FBI.  That was on the tag name for it.  So they were just wanting to maintain operational security and maintain code words throughout interactions with one another.

Q    Let me clarify that with you then.  Was that an actual

1    undercover FBI person?

2    A    No.  It was not.

3    Q    So it was a joke?

4    A    Yeah.  Kind of -- go ahead.

5    Q    How did everybody react when they saw that?

6    A    A few people were concerned, but after kind of washing that

7    out they moved on from it.

8    Q    Okay.  What's QRF?

9    A    It's quick reaction force.

10   Q    And what does that mean?

11   A    So if you have an element that's out and they get into,

12   like, a gun fight and you need reinforcements to come, you

13   would call for a QRF so more personnel come to your aid.

14   Q    And was there a QRF in this group?

15   A    There was.

16   Q    Okay.  Now, at this same training in Fowlerville on July

17   26th, did Mr. Harris talk to you about the explosives contact

18   again?

19   A    He did.

20   Q    Is that recorded?

21   A    Yes.

22   Q    Have you reviewed that recording?

23   A    I have.

24   Q    Is it accurate?

25   A    It is.

1    Q    Also the transcript?

2    A    Yes.

3         MR. KESSLER:  I'd like to play Exhibit 80, Your Honor.

4         THE COURT:  All right.  Any objections?  If not

5    Exhibit 80 is admitted.

6         (Audio started, 11:29 a.m.)

7         (Audio stopped, 11:29 a.m.)

8         THE COURT:  Now, your foundation said this was the

9    training in Fowlerville, but the actual transcript does not

10   have that date.  It has an earlier date.

11        MR. KESSLER:  I'm sorry.

12        THE COURT:  If I am looking at it correctly.

13        MR. KESSLER:  Do I have a date at the top of that?

14   Can we go scroll to the top there?  Thank you.  Okay.  It looks

15   like this was July 7th.

16   BY MR. KESSLER:

17   Q    Do you recall the exact day when this conversation

18   happened?

19   A    That exact date.  No.

20   Q    But you do recall the conversation?

21   A    I do.

22   Q    Okay.  On July 27th did you have a recorded conversation

23   with Mr. Fox about what we heard before, a snatch and grab?

24   A    I did.  Yes.

25   Q    And have you reviewed that recording?

```
1    A    I have.

2    Q    Okay.  Is it accurate?

3    A    Yes.

4    Q    And the transcript as well?

5    A    Yes.

6              MR. KESSLER:  I'd like to offer Exhibit 127, Your

7    Honor.

8              THE COURT:  All right.  It's admitted without

9    objection.

10             (Audio started, 11:31 a.m.)

11             (Audio stopped, 11:31 a.m.)

12   BY MR. KESSLER:

13   Q    On August 2nd, a couple days later, did you have a phone

14   call with Mr. Croft?

15   A    Yes.

16   Q    Did you record that?

17   A    I did.

18   Q    Reviewed the audio recording?

19   A    Yes.

20   Q    It's accurate?

21   A    It is.

22   Q    And the transcript?

23   A    Yes.

24             MR. KESSLER:  I'd like to play Government's Exhibit

25   132?
```

```
 1              THE COURT:  All right.  With no objection that's
 2    admitted.
 3              (Audio started, 11:32 a.m.)
 4              (Audio stopped, 11:32 a.m.)
 5    BY MR. KESSLER:
 6    Q    Did Mr. Croft tell you what he meant by wherever we can
 7    amass first?
 8    A    Say again?
 9    Q    We heard Mr. Croft saying, go wherever we can amass first.
10    A    Yes.
11    Q    Did you talk to him about that?
12    A    I have.
13    Q    What did that mean?
14    A    Pertaining to which governor we can take.
15    Q    Okay.  Two days later on August 4th, did you have a talk
16    with Mr. Fox about leadership?
17    A    Yes.
18    Q    Was that recorded?
19    A    It was.
20    Q    You reviewed that recording?
21    A    Yes.
22    Q    Is it accurate?
23    A    It is.
24    Q    And also the transcript?
25    A    It is.
```

1          MR. KESSLER:  I'd like to play Government's Exhibit

2     133.

3          THE COURT:  Hearing no objections it's admitted.

4          (Audio started, 11:33 a.m.)

5          (Audio stopped, 11:34 a.m.)

6     BY MR. KESSLER:

7     Q    All right.  Now, it occurs to me that I have skipped over

8     one so I'd like to just go back to July 27th for a moment.  We

9     heard a recording you made with Mr. Fox on that day, which was

10    Exhibit 127.  Did that recording go on that day?

11    A    It did.

12    Q    Okay.  Same thing, recorded that conversation and reviewed

13    the recording?

14    A    Yes.

15    Q    And the transcript as well also accurate?

16    A    It is.

17         MR. KESSLER:  I'd like to play Government's Exhibit

18    128, Your Honor?

19         THE COURT:  Hearing no objections it's admitted.

20         (Audio started, 11:34 a.m.)

21         (Audio stopped, 11:35 a.m.)

22    BY MR. KESSLER:

23    Q    Was that one of the three routes that you were talking

24    about earlier?

25    A    It is.  Yes.

1    Q   Did you attend another FTX or field training exercise in

2    Munith, Michigan on August 9th?

3    A   I did.

4    Q   Who was there?

5    A   I myself.  Well, Adam Fox, Ty Garbin, Daniel Harris,

6    Brandon Caserta, Barry Croft, Null brothers, Sean Fix.  No.

7    Not Sean Fix.  And several others.

8    Q   Okay.  What kind of training did you do in Munith?

9    A   Room clearing, breaching.

10   Q   Did you train on shooting from vehicles?

11   A   In Munith or in Luther?

12   Q   Munith?

13   A   What was the date again?

14   Q   August 9th?

15   A   Oh, I'm sorry.  I was getting further ahead.  Yes.  August

16   9th we did a vehicle take over vehicle assault.

17   Q   Okay.  And at that meeting did Mr. Fox talk about his

18   plans?

19   A   He did.  Yes.

20   Q   Were those discussions recorded?

21   A   Yes.

22   Q   And you have reviewed those recordings?

23   A   I have.

24   Q   And the transcripts?

25   A   Yes.

1          MR. KESSLER:  Okay.  I'd like to play Government's

2     Exhibit 138?

3          THE COURT:  All right.  Hearing no objections it's

4     admitted.

5          (Audio started, 11:36 a.m.)

6          (Audio stopped, 11:36 a.m.)

7     BY MR. KESSLER:

8     Q    Did you know what he meant by asset and target from your

9     discussions with him?

10    A    I did.  Yes.

11    Q    What did he mean?

12    A    The governor.

13    Q    That same conversation did he talk about going on offense?

14    A    Yes.

15    Q    Also recorded.  You have reviewed the recording and the

16    transcript?

17    A    I have.

18         MR. KESSLER:  I'd like to play Government's Exhibit

19    139?

20         THE COURT:  Hearing no objections it's admitted.

21         (Audio started, 11:37 a.m.)

22         (Audio stopped, 11:38 a.m.)

23    BY MR. KESSLER:

24    Q    So later that night, August 9th, did Mr. Harris chat to you

25    about his -- about alternate plans?

1    A    He did.

2    Q    Would you take a look behind tab 141, please?  Do you

3    recognize that chat?

4    A    I do.

5    Q    Accurate representation of what you received that day?

6    A    Yes.

7          MR. KESSLER:  I'd like to publish Exhibit 141, Your

8    Honor?

9          MR. BLANCHARD:  Object as to hearsay.

10          THE COURT:  All right.  Same ruling, but if you want

11   to lay more foundation as to what it is that's involved here

12   first, Mr. Kessler, that might be appropriate.

13          MR. KESSLER:  Sure.

14   BY MR. KESSLER:

15   Q    Does Mr. Harris talk in this chat?

16   A    He does.  Yes.

17          MR. KESSLER:  He is a party opponent, Your Honor.

18          THE COURT:  But there are others.  Are there others

19   but is that it?

20          MR. KESSLER:  This is for Mr. Harris, Your Honor.  The

21   rest is content.

22          THE COURT:  It can be admitted for that purpose.

23   BY MR. KESSLER:

24   Q    Okay.  We will begin where it says, today, 12:23 a.m.  Who

25   is Beaker?

A    Daniel Harris.

Q    He says, laying in bed, craziest idea.  Have one person go to her house, knock on the door and when she answers it just cap her.  At this point fuck it.  What does cap her mean?

A    Shoot her.

Q    And Tex, who is Tex?

A    Sean Fix.

Q    Text says, lol, if only it would be that easy.  Then Mr. Harris says, I mean, fuck, catch her walking into the building and act like a passers by and fixing dome her and yourself, whoever does it.  Why create a manhunt.  Do it in broad daylight and then end it.  What does dome her mean?

A    Shoot her in the head.

Q    This being your dome?

A    Yes.

Q    Okay.  Text says, good point or could recon the house and snipe her.  Reach out and touch.  Mr. Harris replies, or just mug the pizza guy and take his shirt.  Either way if you all want to go after her just do it that way.  Pass your shit off and just take a pistol and like three rounds.  Do you recall that conversation?

A    I do.

Q    Do you recall any other conversations with Mr. Harris where he advocated just shooting here?

A    Yes.

1    Q     Tell us about that?

2    A     He had several of those conversations.

3    Q     Just where he was talking to you as opposed to chatting?

4    A     Yes.

5    Q     Did everybody agree with that idea?

6    A     It was mixed.  A lot of people were wanting to go towards

7    the governor so he was just throwing ideas out there for him.

8    Q     Okay.  On August 10th, did Mr. Caserta chat to you about

9    his motivations?

10   A     He did.

11   Q     Okay.  I'd like you to take a look behind Exhibit 142.  Do

12   you recognize that chat?

13   A     I do.

14   Q     And you were on that?

15   A     I was.

16          MR. KESSLER:  I'd like to publish Exhibit 142, Your

17   Honor?

18          THE COURT:  All right.  Hearing no objections it's

19   admitted

20   BY MR. KESSLER:

21   Q     Who is Wayward?

22   A     Brandon Caserta.

23   Q     Okay.  And it starts, Wayward says, I think some medical

24   fascists are going to need a vibe check real fucking soon.  How

25   about we find out who is shipping the vaccines and then accost

1  them and destroy the shipment.  Can you explain to us what a

2  vibe check it?

3  A    So police officers wearing their bullet proof armor.  When

4  you shoot a round you are going kinetic energy.  So when that's

5  hitting it it is going to make a vibration.  So by saying a

6  vibe check you are going to shoot somebody.

7  Q    Then someone named Track Star says, yes.  Mr. Caserta goes

8  on, doctors who advocate mandated vaccines, bullet to the face

9  right in their own home.  Buildings manufacturing vaccines,

10  blow them up.  I'm not kidding about any of this.

11          I can skip over the other people and go down to

12  Wayward again.  Mr. Caserta says, right, and that's where they

13  are going to do it.  Through employment.  So once they mandate

14  that we need to have a plan in place to take them out, once

15  they realize people are getting picked off for passing this

16  shit they'll ride it back really fucking quick.  Track Star

17  says, sounds like that's when we bring the fight.  Mr. Caserta

18  replies, cops who are assisting in finding people to get them

19  vaccinated against their will, bullet to the brain.  Lawyers

20  fighting in courts to get mandated vaccines passed into law,

21  decapitation in their own home.  Bill Gates called it the final

22  solution.  This is what everything is leading up to.

23          Mr. Chappel, you have talked to Mr. Caserta before,

24  right?

25  A    I have.

1   Q    Did he express these kinds of sentiments to you orally as

2   well?

3   A    He has.

4   Q    What kinds of things did he say?

5   A    His line in the sand or what was my line in the sand and

6   acting out in violence to those people across those lines.

7   Q    Okay.  Line in the sand being what exactly?

8   A    Like the breaking point.

9        MR. KESSLER:  Okay.  Was that 142, Your Honor?

10       THE COURT:  That's my note.

11       MR. KESSLER:  Yup.

12  BY MR. KESSLER:

13  Q    Okay.  Did you also record a conversation you had with

14  Mr. Caserta that same day, August 10th?

15  A    I did.

16  Q    Have you reviewed that and the transcript?

17  A    Yes.

18       MR. KESSLER:  I'd like to play Government's Exhibit

19  152?

20       THE COURT:  All right.  What date did you say that is?

21       MR. KESSLER:  August 10th, Your Honor.

22       THE COURT:  Okay.  That's not what shows up on my

23  exhibit list.

24       MR. KESSLER:  Do I have one wrong again?

25       MR. BLANCHARD:  I've got the 9th.

1          MR. HILLS:  16th.

2          MR. KESSLER:  Okay.  My typo.  16th?

3          THE COURT:  All right.  But it's still the

4    conversation with Mr. Caserta that he recorded and reviewed?

5          MR. KESSLER:  Correct.

6    BY MR. KESSLER:

7    Q    You recall talking to Mr. Caserta about contract tracers?

8    A    I do.

9          THE COURT:  All right.  Hearing no objections then

10    it's admitted, 152.

11          (Audio started, 11:44 a.m.)

12          (Audio stopped, 11:46 a.m.)

13    BY MR. KESSLER:

14    Q    So Mr. Chappel, in your discussions with Mr. Caserta, did

15    he say who he thought would be pushing contact tracing?

16    A    The government.

17    Q    Did he talk about deterring that in a recorded

18    conversation?

19    A    He did.  Yes.

20    Q    Have you reviewed that call and the transcript?

21    A    I have.

22    Q    All right.  Same day, right?

23    A    Same day.

24          MR. KESSLER:  Okay.  I'd like to play Exhibit 153.

25          THE COURT:  Hearing no objections it's admitted.

1          (Audio started, 11:46 a.m.)

2          (Audio stopped, 11:46 a.m.)

3     BY MR. KESSLER:

4     Q    Okay.  Around that same time, did you and Mr. Fox have a

5     discussion about a discussion Mr. Fox had with Mr. Caserta?

6     A    Yes.

7     Q    Okay.  And how did you become aware of that?

8     A    Through screen shots through Wire of the conversation that

9     the two of them had.

10    Q    And who sent the screen shot of their conversation to you?

11    A    Adam Fox did.

12    Q    Why did he do that?

13    A    He was concerned about Brandon's commitment to the group

14    and how he was challenging the chain of command structure

15    within the group.

16    Q    So what was he saying about that challenge?

17    A    That Adam -- or that Brandon wasn't really following how

18    Adam is at the top of the order.

19    Q    Okay.  And did you respond to him?

20    A    I did.  Yes.

21    Q    And what did you tell him?

22    A    That he is similar like-minded with him.  He just doesn't

23    believe in government structure.  He is an anarchist.

24    Q    Okay.  Do we have -- have you had a chance to look at that

25    chat?

1    A    I have.

2    Q    Okay.  Take a look behind Exhibit 154, please.  Do you

3    recognize that chat?

4    A    I do.

5    Q    Is that the screen shot that was sent to you or your

6    discussion with Mr. Fox?

7    A    This conversation is on Wayward's account.

8    Q    And Wayward was who again?

9    A    Brandon.

10            MR. KESSLER:  Okay.  I'd like to put up Exhibit 154,

11   Your Honor.

12            THE COURT:  All right.  Hearing no objections it's

13   admitted.

14   BY MR. KESSLER:

15   Q    Okay.  So again, Deanzy is who?

16   A    Adam Fox.

17   Q    And Wayward?

18   A    Brandon Caserta.

19   Q    Okay.  Why don't we blow up the part right above the box.

20   It starts with Deanzy.  It says, you get with Dan?  And then

21   Mr. Caserta replies, he is coming tomorrow.  That's you, right?

22   A    Correct.

23   Q    Okay.  And Mr. Fox says, no line.  Just doing some recon

24   ATM.  What's ATM?

25   A    At the moment.

Q    We organizing pieces to the puzzle and we are going to put
the bitch together, tear it apart and repeat this process until
we can't tear apart our puzzle anymore, but we are looking at
sending a message.  So what's tearing something apart and
putting it back together?

A    He wants to gather everybody's ideas and then we can kind
of break that down to find the falls or the pitfalls where we
might not succeed and then rebuild it back up.  So getting
everybody's input, playing it out how it may or may not work,
where it won't work, how can we reinforce it to work.

Q    Okay.  Now he is asking Wayward, Mr. Caserta here, what's
your rank in WW.  Is that what you were referring to a moment
ago?

A    Correct.

Q    Okay.  Let's take a look at the part in the box.  Okay.  So
he begins by saying, okay, good.  Let's continue to recon.  In
the meantime I'm running through scenarios and creating action
plans for these scenarios.  He goes on, rank, lol, free men
don't get ranked by other men.  Legitimate hierarchies are
formed naturally and voluntarily in the free market.  Is this
what you were referring to a moment ago?

A    It is.  Yes.

Q    So he was resistant to ranks?

A    Correct.

Q    August 17th, the next day, how would you describe

1    everybody's state of mind?

2    A    Amped up.

3    Q    Amped up.  Okay.  Did you all have a chat about that?

4    A    Yes.

5    Q    Okay.  Would you take a look behind tab 156?  Do you

6    recognize that chat?

7    A    I do.

8    Q    And you were a part of that chat conversation?

9    A    Yes.

10   Q    Accurate representation?

11   A    Yes.

12          MR. KESSLER:  I'd offer Exhibit 156, Your Honor?

13          THE COURT:  All right.  Hearing no objections it's

14   admitted.

15          MR. BLANCHARD:  I will object as to the hearsay issue

16   with Track Star.

17          THE COURT:  All right.  So same ruling as earlier.  Go

18   ahead.

19   BY MR. KESSLER:

20   Q    Okay.  I'd like to just focus on the part that is -- that's

21   in black.  Can we blow that up?  So Beaker again is Mr. Harris?

22   A    Correct.

23   Q    He says, yeah, just get your shit ready.  Keep training

24   yourself at home, learning new farming tricks and stuff.  Make

25   sure your vehicles are ready to go.  Sharpen the spikes on your

1    bats.  Do you recall this conversation about farming tricks?

2    A    Yes.

3    Q    All right.  And did you talk to them about it?  Not in

4    chats, like in person?

5    A    We did.  Yes.

6    Q    What's that a reference to?

7    A    Like, falling back to Ty Garbin's property and we can have

8    a community there where we can self-sustain.

9    Q    After what?

10   A    After we take the governor.

11   Q    And why would you need to start farming your own food or

12   whatever?

13   A    Because we will not be able to go back to normal life and

14   activities.

15   Q    Okay.  And then Mr. Caserta, that's Wayward, right?

16   A    Correct.

17   Q    Says, come to the meeting next time and we can focus this

18   aggression into a legitimate plan instead of waiting around for

19   someone else or the state to enact slavery 2.0.  Did you hear

20   Mr. Caserta talking like this a lot?

21   A    I did.  Yes.

22   Q    Particularly the word slavery.  Did that come up much

23   talking with Mr. Caserta?

24   A    It did.  Yes.

25   Q    What did he say slavery was to him?

1    A    The government having control over us.

2    Q    Okay.  Also on August 17th did you record a conversation

3    you had with Mr. Fox about recon on the governor's house?

4    A    I did.

5    Q    You have reviewed that recording and the transcript?

6    A    Yes.

7    Q    They are accurate?

8    A    Yes.

9            MR. KESSLER:  I'd like to play Government's Exhibit

10   158?

11           THE COURT:  All right.  158.  Very good.  It's

12   admitted then.

13               (Audio started, 11:52 a.m.)

14               (Audio stopped, 11:53 a.m.)

15   BY MR. KESSLER:

16   Q    So at the very top you were -- you suggested going with a

17   light profile or something like that?

18   A    Correct.

19   Q    What were you talking about?

20   A    De-escalating Adam so we are not bringing any kind of

21   firearms with us or body armor.

22   Q    And we saw him talking about checking out Pure Michigan.

23   He sounded kind of like he was laughing about it.  What was the

24   Pure Michigan reference?

25   A    The old commercials that we used to have for having people

1    come to Michigan.  Pure Michigan.  We'd always see it on the

2    billboards traveling.

3    Q    How would that relate to your recon?

4    A    As a reason that we were up in Traverse City just checking

5    it out as tourists.

6    Q    And seeing the roads -- he says, seeing the roads, you

7    know, because she's fixing them.  What was that a reference to?

8    A    That was one of the things that she ran was as fixing the

9    roads.

10   Q    The governor?

11   A    Correct.

12   Q    And the same conversation did Mr. Fox talk about his

13   inspirations?

14   A    He did.

15   Q    Same thing, you've reviewed those recordings as well and

16   the transcript?

17   A    I did.

18        MR. KESSLER:  I'd like to play Government's Exhibit

19   159, Your Honor?

20        THE COURT:  All right.  Hearing no objections it's

21   admitted.

22        (Audio started, 11:54 a.m.)

23        (Audio stopped, 11:55 a.m.)

24   BY MR. KESSLER:

25   Q    In that same conversation did Mr. Fox also talk to you

1    about meeting Mr. Croft?

2    A    He did.  Yes.

3    Q    All right.  Also reviewed the recording and the transcript?

4    A    Yes.

5            MR. KESSLER:  I'd like to play Exhibit 160?

6            THE COURT:  All right.  Hearing no objections it's

7    admitted.

8            (Audio started, 11:55 a.m.)

9            (Audio stopped, 11:56 a.m.)

10   BY MR. KESSLER:

11   Q    On August 18th, did you have a conversation with

12   Mr. Harris -- or did you see a post on your group chat from

13   Mr. Harris about supplies?

14   A    Yes.

15   Q    Actually, you mentioned earlier that you can also post

16   audio on that, right?

17   A    We can.

18   Q    Have you listened to that audio before you came into court

19   today?

20   A    I have.

21   Q    Do you recognize that conversation?

22   A    Yes.

23   Q    And did you recognize the voice?

24   A    I did.

25            MR. KESSLER:  I'd like to play Exhibit 162, Your

```
1    Honor?
2              THE COURT:  All right.  Hearing no objections.  It's
3    admitted.
4              (Audio started, 11:56 a.m.)
5              (Audio stopped, 11:58 a.m.)
6    BY MR. KESSLER:
7    Q    You mentioned at the beginning of your testimony that in
8    addition to being an infantry man you were a firearms
9    instructor?
10   A    I was.  Yes.
11   Q    When you are just training with a gun practicing your
12   marksmanship about how many magazines would you need?
13   A    It depends on the level, of course, of fire that you are
14   going to be doing.  Typically two or three.
15   Q    Okay.  Not 300?
16   A    No.
17   Q    Did you have those kind of quantities of magazines in the
18   army?
19   A    As a reserve unit.  Yes.  Standard assault load so that we
20   could go out on patrol with is seven magazines, so that's 210
21   rounds.
22   Q    And why do you need those magazines in combat?
23   A    Self-sustainment.  In case a fire fight erupts you have
24   adequate ammunition to return fire with.
25   Q    Mr. Harris also talked about getting an AR-10 lower
```

receiver.  What's that?

A    It's -- compared to an AR-15 which shoots the 556 or 223 round, an AR-10 is a 308 caliber, so it's a larger slug that can shoot further out.

Q    And he said he wanted to get one to use for a DM gun. What's that?

A    It's a designated marksman, so like a sniper.

Q    Okay.  On August 19th, the next day, did Mr. Fox post something on your chat group about his FaceBook page?

A    Yes.

Q    All right.  And take a look behind tab 163, please.  Do you recognize that chat?

A    I do.

Q    You were part of that chat as well?

A    I was.

        MR. KESSLER:  Okay.  I'd like to put up Exhibit 163, Your Honor?

        THE COURT:  All right.  Hearing no objections it can be admitted.

BY MR. KESSLER:

Q    Okay.  Now, we have a new name here.  It says Alpha Fox. Who is that?

A    Adam Fox.

Q    Okay.  He says, A, I may need to -- I may have to make a new Wire account.  Got a new iPhone and a new number, switching

1    it up on the alphabet soup.  Who is the alphabet soup?

2    A    The FBI or ATF.  Any three letter acronym agency.

3    Q    Okay.  And then he says, NVM.  Is that never mind?

4    A    Correct.

5    Q    I think I can do it.  Let's get this plan executed boys.

6    And then we have you say, when man, what you thinking?  Mr. Fox

7    replies, I'll get some notes around tonight.  My Patriot III%Er

8    page got axed.  We under attack.  There is an M in there.  We

9    under attack boys.  Fucking FB.  Is that FaceBook?

10   A    Correct.

11   Q    Fucking FB can burn Adam to the list.  We are going to need

12   more supplies.  Like that lot more.  We going to need multiple

13   teams.  And then you ask what things you need and Mr. Fox

14   replies, lots of boom and burn.  Locations of targets.  I'll

15   get on that.  We about to go to fucking war.  It's time to

16   FAFO.  What's boom and burn?

17   A    Make an explosion or detonate something and burn it down.

18   Q    And what's FAFO?

19   A    Fuck around and find out.

20   Q    On August 21st, two date later to Mr. Fox post something

21   about the governor's address?

22   A    Yes.

23   Q    All right.  Would you take a look behind tab 164, please?

24   Do you recognize that chat?

25   A    I do.

1    Q    Were you included in that one as well?

2    A    I was.

3         MR. KESSLER:  I'd like to put up Exhibit 164, Your

4    Honor?

5         THE COURT:  All right.

6         MR. BLANCHARD:  Object as to hearsay for all the

7    statements from Michael.

8         THE COURT:  Right.  It's the same ruling.  This is a

9    fairly long one.  Are you -- you are offering it all at this

10   point and feel you have a foundation for all of it?

11        MR. KESSLER:  Yes, Your Honor.  It's mostly Mr. Fox

12   and then the rest would be context.

13        THE COURT:  All right.  Yeah, right.  So you can

14   proceed and we'll admit it subject -- based on the same prior

15   rulings.  Go ahead.

16   BY MR. KESSLER:

17   Q    Okay.  Now, if you can blow up the part in the box there on

18   164?  Alpha Fox, again, is Mr. Fox, right?

19   A    Correct.

20   Q    And he says, I agree, the problem is the legal route will

21   never succeed.  Did you have that discussion with him orally as

22   well?

23   A    We have.  Yes.

24   Q    What was the nature of what he was saying?

25   A    To try securing a Boogaloo judge that could issue an arrest

warrant for the governor.

Q    So what -- you said he wanted to try to get a Boogaloo judge?

A    Correct.

Q    What is that?  What does that mean?

A    Who was pro with the Boogaloo movement, the civil war movement.

Q    Okay.  And did he give up on that idea, is that what this is?

A    He did.  Yes.

Q    What did Mr. Fox say he should do instead?

A    He always referred to violence.

Q    Okay.  Let's take a look at the next page, please.  Is it only one page?

        MR. KESSLER:  Your Honor, you said it was relatively lengthy.

        THE COURT:  Well, mine is, but if that's the only page you've got then it's easier and it's just the first page.  We can deal with the other pages later and see why --

        MR. KESSLER:  I don't think there are additional pages, Your Honor.

        THE COURT:  There are in mine.

        MR. KESSLER:  Okay.  This is all I wanted to use, Your Honor.

        THE COURT:  All right.

BY MR. KESSLER:

Q    Two days later on August 23rd, did you attend a meeting in Lake Orion, Michigan?

A    Yes.

Q    And whose house is that?

A    Daniel Harris.

Q    What was the purpose of that meeting?

A    I believe that was to bring identification to verify who you are.

Q    What was the reason why you would have to bring identification to that meeting?

A    When Paul Bellar left the state he left several documents at his house and law enforcement showed up and questioned his roommate, and the list of code words that we discussed earlier was present at that.

Q    From your discussions with people in this room, who, if anyone, was most concerned about that?

A    Adam Fox.

Q    Okay.  How about Daniel Harris, was he concerned about it?

A    He was concerned as well.

Q    Okay.  Now, you all had been using Wire as your encrypted platform, correct?

A    That's correct.

Q    What, if anything, did Mr. Harris suggest?

A    That we download and move over to the app called Threema.

Q     What was Threema?

A     It was another encrypted chat from outside the U.S., and
you had to pay for this app.  It wasn't a free one.

Q     All right.  Did he say why getting an application that was
hosted outside the U.S. would be important?

A     Extradition.  They wouldn't give up the information that
was on there.

Q     Okay.  Did you record a conversation with Mr. Harris about
switching to this Threema?

A     I did.

Q     And have you listened to that recording and reviewed the
transcript?

A     I have.

          MR. KESSLER:  I'd like to play Government Exhibit 168,
please?

          THE COURT:  All right.  Hearing no objection.

          MR. BLANCHARD:  Object as to Mr. Beauchesne's
significant statements as to hearsay.

          THE COURT:  Well, do you want to further address that
or not, Mr. Kessler?

          MR. KESSLER:  Again, it's just context, Your Honor.
We are looking for Mr. Harris's statements.

          THE COURT:  The same -- I think the same ruling
applies here as well because the statements are contextual to
make what Mr. Harris says meaningful.  So go ahead.  Same

1    ruling.

2              (Audio started, 12:05 p.m.)

3              (Audio stopped, 12:07 p.m.)

4    BY MR. KESSLER:

5    Q    And in this same recorded conversation did Mr. Harris urge

6    people to switch?

7    A    He did.

8    Q    And you have reviewed that transcript and the recording as

9    well?

10   A    I have.

11             MR. KESSLER:  Play Government's Exhibit 169, please,

12   Your Honor?

13             MR. BLANCHARD:  Same objection.

14             THE COURT:  Same ruling.

15             (Audio started, 12:07 p.m.)

16             (Audio stopped, 12:08 p.m.)

17   BY MR. KESSLER:

18   Q    All right.  Did Mr. Harris create a new group page?

19   A    He did.

20   Q    Do you remember what that one was called?

21   A    That might have been the Brick Squad.

22   Q    Okay.  Take a look behind tab 170, please.  Do you

23   recognize that?

24   A    I do.

25   Q    Okay.  And is that an accurate representation of a screen

1    shot you've seen?

2    A    It is.

3        MR. KESSLER:  All right.  I'd like to show Exhibit

4    170?

5    BY MR. KESSLER:

6    Q    Do you remember what sent it to you?

7    A    Say again?

8    Q    Do you remember who sent it to you?

9    A    I believe Daniel Harris.

10       THE COURT:  All right.  It's admitted.

11   BY MR. KESSLER:

12   Q    So at the top it says Threema.web, and then it says, The

13   Boys.  What's The Boys?

14   A    That was the name of that chat group.

15   Q    And it says group creator, Beaker.  Who is Beaker again?

16   A    Daniel Harris.

17   Q    Okay.  We have a couple of new names here.  I won't bother

18   with all of them, but we have Beaker and then at the bottom of

19   the page it says, Debased Tyrant.  Do you know who Debased

20   Tyrant is?

21   A    I do.

22   Q    Who is that?

23   A    Brandon Caserta.

24   Q    Is there a second page?  Yes.  Can we go to the second

25   page, please?  All right.  And here is some discussion.  Again,

1    Beaker, Mr. Harris, right?

2    A    Correct.

3    Q    He says, right, whatever you put your call sign is I just

4    put your regular names.  Nice thing with this app is with a

5    click of a button you can empty everything out and if feds try

6    to see what you or anyone else said they can't find anything as

7    if you were never in the app.  Do you recall that?

8    A    I do.

9    Q    Did you talk to Mr. Harris or anybody else about that

10   feature on Threema?

11   A    He just put that out there as that statement.  Yes.

12   Q    Okay.  And would you take a look behind the tab 171,

13   please?  Do you recognize that chat?

14   A    I do.

15   Q    Were you also a party to this conversation?

16   A    Yes.

17   Q    Okay.  If we can -- is that also sent to you by the same

18   person?

19   A    Yes.

20   Q    Can we pull that one up, 171?

21        THE COURT:  Any objections?  If not 171 is admitted.

22   BY MR. KESSLER:

23   Q    And Beaker says, if you still haven't switched please do it

24   today.  If you don't have the cash someone to include myself

25   can spot you.  But once we get everyone in the new chat we will

delete this one.  Just send me your ID.  Thanks boys.  Below

that there is someone named Red Hot who says, I will be signing

up tonight.  I was exhausted last night.  Do you know who Red

Hot is?

A    I do.

Q    Who is that?

A    That's Kaleb Franks.

Q    And then Beaker replies, you good.  It's no rush but I'd

like us to get away from Wire by tomorrow.  Do you recall being

urged by Mr. Harris to get off of Wire?

A    I do.

Q    All right.  Earlier in your testimony you look at a picture

of a blue house and you said you knew it from personal

experience you'd been there, right?

A    Correct.

Q    And whose house was that again?

A    The governor's.

Q    So I'd like to focus your attention on August 29th.  Is

that the day you actually went there?

A    Yes.

Q    Who did you go there with?

A    Myself, Adam Fox and Eric Molitor.

Q    Are those the only people who were invited on that

reconnaissance?

A    There was several others invited but due to scheduling the

1    three of us were the only ones to go.

2    Q    Okay.  Do you remember who else from those conversations,

3    who else Mr. Fox invited?

4    A    Daniel Harris, Brandon Caserta.  Ty Garbin was interested

5    in going but he was doing work at his house up north and we'd

6    already passed his exit when he got back with us.

7    Q    Okay.  So all those other folks couldn't make it?

8    A    Correct.

9    Q    Did Mr. Fox ask you for a ride?

10   A    He did.

11   Q    Did you have a chat on the encrypted chat message about

12   that?

13   A    I did.

14   Q    Okay.  Take a look behind tab 436, please.  It looks like

15   you found it.  Do you recognize that?

16   A    I do.

17   Q    That was a chat between you and Mr. Fox?

18   A    Yes.

19          MR. KESSLER:  Okay.  I'd like to put up 436, please,

20   Your Honor?

21          THE COURT:  All right.  Hearing no objections it's

22   admitted.

23   BY MR. KESSLER:

24   Q    So Alpha Fox is Mr. Fox again?

25   A    That is.

1  Q    He says, okay, so you want to come this way and head north

2  I'll chip in gas, bro.  And you replied, I can do that.  Be a

3  push but fuck it.  Buy me a Sprite and a Snickers.  He says,

4  all right, bet.  You replied, I'll shoot for tenish, heavy on

5  the ish lol.  He says, it's only 12 minutes longer lol.  You

6  said LMAO for you.  And he replies, lol, I got you.  I'll be

7  ready to roll.  Well, this route we can snag Barricade on the

8  way and it'll be more scenic.  Who is Barricade?

9  A    Eric Molitor.

10  Q    That's the third person that went with you?

11  A    Correct.

12  Q    How long of a drive was that?

13  A    From?

14  Q    From your place.

15  A    To Adam Fox or to the governor's?

16  Q    Let's go from you to Adam Fox first?

17  A    Hour and-a-half, two hours.

18  Q    And then once you picked him up where did you go next?

19  A    Up to Cadillac where Eric lives, so another hour

20  and-a-half.

21  Q    And then even further from there?

22  A    Correct.

23  Q    All right.  Did you talk with Mr. Fox on that drive?

24  A    We did.

25  Q    Okay.  Did he talk to you about where the house was?

1    A    Yes.

2    Q    What did he say about how he found out the location?

3    A    Using news articles where she was put out from people

4    protesting outside their house and just kind of going through

5    different news articles through Google.

6    Q    Did he use anything else to find the house?

7    A    Eventually we found the house on the realtor app.

8    Q    Do you recall what app that was?

9    A    The realtor app.

10   Q    Oh, it's just called the realtor app?

11   A    Yes.

12   Q    And who was using the realtor app to find the house?

13   A    Adam was.

14   Q    All right.  Did you record him talking about finding the

15   governor's address?

16   A    I did.

17   Q    So you had a recording device on you during this ride,

18   correct?

19   A    Correct.

20   Q    Have you listened to that audio?

21   A    I have.

22   Q    And reviewed the transcript?

23   A    Yes.

24        MR. KESSLER:  I'd like to play Government's Exhibit

25   195, Your Honor?

1    THE COURT:  All right.  Hearing no objections it's

2    admitted.

3    (Audio started, 12:15 p.m.)

4    (Audio stopped, 12:15 p.m.)

5    BY MR. KESSLER:

6    Q    So you already testified that you went to the house.  Is

7    that █████████████ Drive, Elk Rapids?

8    A    That is.

9    Q    Whose vehicle were you driving in?

10   A    We are in mine.

11   Q    And can you describe the vehicle?

12   A    It was a shadow gray Silverado crew cab.

13   Q    That's a pickup truck, right?

14   A    Correct.

15   Q    A Chevrolet?

16   A    Yes.

17   Q    Who was driving?

18   A    I was.

19   Q    Who was in the passenger seat?

20   A    Adam.

21   Q    And how about Barricade, Mr. Molitor?

22   A    The passenger rear.

23   Q    Okay.  Were you aware at the time of whether anybody was

24   doing surveillance in the woods?

25   A    There would be a surveillance team up there.  Yes.

1    Q    Okay.  And have you seen photographs of the surveillance?

2    A    I have.

3    Q    All right.  I'd like you to take a look behind tab 173.  Do

4    you recognize that photograph?

5    A    I do.

6    Q    Does that accurately depict the scene that day?

7    A    Yes.

8         MR. KESSLER:  Okay.  I'd like to show Exhibit 173?

9         THE COURT:  All right.  Hearing no objections it's

10   admitted.

11   BY MR. KESSLER:

12   Q    Okay.  You mentioned you had a shadow gray Chevy Silverado?

13   A    Correct.

14   Q    Do you recognize this truck?

15   A    I do.

16   Q    Whose truck is that?

17   A    That is my truck.

18   Q    Okay.  And what's behind your truck?

19   A    The governor's house.

20   Q    So that's actually you passing it?

21   A    Correct.

22   Q    Okay.  What was Mr. Fox doing while you were driving past

23   the governor's house?

24   A    Taking pictures.

25   Q    Okay.  Do you know if he also took a video?

1     A    We also did a slow motion video.

2     Q    All right.  Have you reviewed that video before we came

3     into court today?

4     A    I have.

5     Q    Does it accurately reflect what happened that day?

6     A    Yes.

7          MR. KESSLER:  All right.  Let's take a look at

8     Government's Exhibit 174 if there is no objections.

9          THE COURT:  All right.  Hearing no objection it's

10    admitted.

11         (Video started, 12:17 p.m.)

12         (Video stopped, 12:17 p.m.)

13    BY MR. KESSLER:

14    Q    All right.  So we just saw the blue house pass by?

15    A    Correct.

16    Q    All right.  And what do we see right here?

17    A    The mirror of my truck, the passenger side.

18    Q    Okay.  So is this video shot from where in your car?

19    A    The passenger seat.

20    Q    All right.  So you would be driving and you said Mr. Fox

21    was in the passenger seat?

22    A    Correct.

23    Q    Okay.  Were you recording this part of the trip as well on

24    audio?

25    A    I was.

1    Q    And did you capture the part where he saw the house here?

2    A    Yes.

3    Q    And you reviewed that and the transcript?

4    A    I have.

5         MR. KESSLER:  I'd like to play Government's Exhibit

6    196.

7         THE COURT:  All right.  Hearing no objection it's

8    admitted.

9         MR. BLANCHARD:  I'm sorry.  Never mind.

10        THE COURT:  Go ahead.

11        (Audio started, 12:18 p.m.)

12        (Audio stopped, 12:18 p.m.)

13   BY MR. KESSLER:

14   Q    So we heard Mr. Fox telling you to turn around and surveil

15   the whole area.  Did you, in fact, turn around?

16   A    We did.

17   Q    You mentioned a slow mow video.  Do you recall Mr. Fox

18   asking you to do that?

19   A    He did not ask myself to do it.  He asked Eric to record

20   the video.  Yes.

21   Q    And was that also recorded on audio?

22   A    It was.

23   Q    Have you reviewed that recording and the transcript?

24   A    Yes.

25        MR. KESSLER:  I'd like to play Exhibit 198, please?

1          THE COURT:  All right.  Hearing no objection it's

2    admitted.

3               (Audio started, 12:19 p.m.)

4               (Audio stopped, 12:20 p.m.)

5    BY MR. KESSLER:

6    Q    So we just heard Mr. Fox instructing Mr. Molitor to take a

7    slow motion video.  Does he talk while you are taking the slow

8    motion video?

9    A    I don't believe so.

10   Q    Okay.  Do you recall that you continued to record?

11   A    Yes.

12   Q    All right.  You didn't turn it off during this at all?

13   A    No.

14   Q    Have you listened to the recording of the whole trip?

15   A    Yes.

16   Q    Okay.  And you've seen the transcripts we've made from

17   those recordings?

18   A    I have.

19   Q    Also accurate?

20   A    Yes.

21          MR. KESSLER:  I'd like to play Exhibit 199.

22          THE COURT:  All right.  Hearing no objection it's

23   admitted.

24          MR. GIBBONS:  None.

25               (Audio started, 12:20 p.m.)

1          (Audio stopped, 12:23 p.m.)

2     BY MR. KESSLER:

3     Q    Mr. Chappel, did you have a chance to actually look at the

4     slow motion video taken from Mr. Fox's phone?

5     A    I did.  Yes.

6     Q    Okay.  Does it accurately depict the video that was shot

7     that day?

8     A    It does.

9          MR. KESSLER:  I'd like to play Government 190?

10          THE COURT:  All right.  Hearing no objections it's

11     admitted.

12          (Video started, 12:23 p.m.)

13          (Video stopped, 12:24 p.m.)

14     BY MR. KESSLER:

15     Q    Did Mr. Fox later share pictures with you on the chat

16     application?

17     A    He did.

18     Q    Would you take a look behind tab 175, please?  Do you

19     recognize that photograph?

20     A    I do.

21     Q    Does that accurately depict what was sent to you?

22     A    Yes.

23          MR. KESSLER:  I'd like to put up Exhibit 175, please,

24     Your Honor.

25          THE COURT:  All right.  Hearing no objections it's

1    admitted.

2    BY MR. KESSLER:

3    Q    Okay.  This is part of the chat, right?

4    A    Yes.

5    Q    And who is on the right and who is on the left?

6    A    Adam would be on the left and I am on the right.

7    Q    So yours are the green ones?

8    A    Correct.

9    Q    Okay.  So let's take a look at the picture at the top here.

10   Whose head is that?

11   A    Mine.

12   Q    All right.  So this photograph is taken from behind your

13   right ear kind of?

14   A    The passenger seat, yes.

15   Q    And again, who was in the passenger seat?

16   A    Adam Fox.

17   Q    So by this time you had the actual pictures.  He had sent

18   them to you, is that right?

19   A    Not until he sent them on that chat.  I did not have them.

20   Q    All right.  And who else is on this chat?

21   A    This is just between me and him.

22   Q    Okay.  Did he send other photographs of the surveillance?

23   A    Yes.

24   Q    And if you take a look at Exhibits 178 -- and just you can

25   flip through 178 through 185.

1      THE COURT:  So all I have is 178 and 181.

2      MR. KESSLER:  I'm sorry.  I may have combined those

3   into a multipaged exhibit.  It's just 175.  175.  Okay.  They

4   are all attached to this one.  I am sorry.  We made a change

5   here to make it less exhibits.  They are all just multiple

6   pages.

7   BY MR. KESSLER:

8   Q    When you were on that last one, 175, you recognized all

9   those photographs?

10  A    Yes.

11  Q    Okay.  It's already in.  So let's go ahead and just flip

12  through them.  Let's go to the next page.  Okay.  So what's at

13  the top there?  Is that the house again?

14  A    Correct.

15  Q    Okay.  And you said it was you in the green on the right?

16  A    Yes.

17  Q    And you say, did we have two videos.  Mr. Fox replies,

18  yeah.  Slow motion.  One going down and one coming back.  And

19  you relied, nice.

20      Let's go to the next page.  You asked, you pushed

21  these to text or gonna do group.  Who is Tex again?

22  A    Sean Fix.

23  Q    What did Mr. Fox tell you to do next?

24  A    He told me to go ahead and push them out.

25  Q    Okay.  Was that your idea?

1    A    No.

2    Q    All right.  So he says, to the group and Tex, and then you

3    ask, to FAFO.  Who is that?

4    A    The fuck around find out chat.

5    Q    Okay.  Does that include the rest of the Wolverine

6    Watchmen?

7    A    Correct.

8    Q    Okay.  And then, well, not all of them.  Is it all of the

9    Wolverine Watchmen or who?

10   A    Select members that left from the Wire to the Threema app.

11   Q    Did that include Mr. Harris?

12   A    Correct.

13   Q    And Mr. Caserta?

14   A    Yes.

15   Q    He said, copy.  What does copy mean?

16   A    Like, understand.

17   Q    Okay.  Let's take a look at the next page.  That's it.

18   Okay.  Now, after you had done this recon with Mr. Fox where

19   did you go next?

20   A    To a diner.

21   Q    Do you remember the name of it?

22   A    Not offhand.  No.

23   Q    Okay.  Let's go ahead and take a look behind tab 187,

24   please.  Do you recognize that?

25   A    I do.

1    Q    All right.  Who took that picture?

2    A    I did.

3    Q    Okay.  Accurately reflects what you saw then?

4    A    Yes.

5            MR. KESSLER:  I'd like to offer Exhibit 187, Your

6    Honor.

7            THE COURT:  All right.  Hearing no objection it's

8    admitted.

9    BY MR. KESSLER:

10   Q    Okay.  So you mentioned you were at a diner.  Who is that?

11   A    Adam Fox.

12   Q    All right.  And it looks like you took the picture from

13   pretty close, huh?

14   A    Yes.

15   Q    How did you manage to do that?

16   A    We were all on our phones so I acted like I was scrolling

17   through my phone like on FaceBook and took a picture.

18   Q    What's Mr. Fox doing there?

19   A    He is drawing a map.

20   Q    Of what?

21   A    This surrounding area and the governor's house.

22   Q    Did he tell you why he was doing that?

23   A    For recon.

24   Q    Okay.  Let's take a look behind tab 188.

25           MR. BLANCHARD:  I don't have a 188.

1      MR. KESSLER:  That's not a physical one.  Do we have

2  188 up here?  Okay.  Let's skip over to 189.

3  BY MR. KESSLER:

4  Q    Can you take a look behind 189?  Do you recognize that?

5  A    I do.

6  Q    Okay.  What's that a picture of -- I'm sorry.  You

7  recognize that photograph?

8  A    Yes.

9  Q    Okay.  And does it accurately depict what you saw that day?

10  A    Yes.

11      MR. KESSLER:  I'd like to show 189, Your Honor?

12      THE COURT:  All right.  Hearing no objections it's

13  admitted.

14  BY MR. KESSLER:

15  Q    Okay.  So in 187 you said it was a picture of Mr. Fox

16  drawing a map?

17  A    Correct.

18  Q    Is this it?

19  A    It is.

20  Q    Can you point out for the jury some of the features of this

21  map?

22  A    Interstate 31, ████████ Drive, the lake that her house is

23  off of, Elk Rapids Police Department, and the duration that it

24  would take to and from to get there and down here.  We were

25  looking up County and State Police posts and their reaction

1     time to where it would take them to get to the governor's

2     house.

3     Q    So 131, is that the major highway there?

4     A    Correct.

5     Q    You say ▇▇▇▇▇▇ Drive, is that what's on ▇▇▇▇▇▇

6     Drive?

7     A    The governor's house.

8     Q    We have a line across the lake here.  Did he explain what

9     that was?

10    A    That was from kind of giving the distance from shoreline to

11    shoreline for the lake.

12    Q    And now you said, this says Elk Rapids PD, three miles, 2.5

13    min.  What exactly did he mean by that?

14    A    For the reaction time for how long it would take them

15    responding from the police department to her residence.

16    Q    So Elk Rapids PD is the police department?

17    A    Correct.

18    Q    And then says, everything else, 20 plus miles out.  How did

19    he know that other law enforcement was that far out?

20    A    We got on Google Maps and looked up the nearest sheriff's

21    office and the nearest State Police post.

22    Q    Whose idea was that to look those things up?

23    A    I am not sure at this point.

24    Q    I mean, could it have come from you?

25    A    No.

1    Q    Take a look behind tab 202, please.  All right.  Do you

2    recognize that?

3    A    I do.

4    Q    And is that an accurate representation of the scene that

5    day?

6    A    Yes.

7              MR. KESSLER:  Okay.  I'd like to put up 202?

8              THE COURT:  All right.  Hearing no objection it's

9    admitted.

10   BY MR. KESSLER:

11   Q    All right.  What are we looking at?

12   A    That is a picture of myself, Eric and Adam at the diner.

13   Q    The same one we just saw the inside of?

14   A    Correct.

15   Q    And who is who?  I know they are a little small.  So who is

16   who?

17   A    That's myself, Eric, and Adam.

18   Q    Okay.  That's your truck again?

19   A    Correct.

20   Q    Now, we saw in that map there was a line drawn from

21   ███████████ Drive where you said the governor's house was, to

22   the other side.  Did you go to the other side of the lake from

23   the governor's house?

24   A    We did.

25   Q    Okay.  Take a look behind tab 191.

1          MR. BLANCHARD:  I'm sorry, what number?

2          MR. KESSLER:  191.

3          MR. BLANCHARD:  Thank you.

4    BY MR. KESSLER:

5    Q    Okay.  Do you recognize that?

6    A    I do.

7    Q    All right.  And who took that photograph?

8    A    I did.

9    Q    Is it an accurate representation of what you saw that day?

10   A    Yes.

11         MR. KESSLER:  Offer 191, Your Honor?

12         THE COURT:  All right.  Hearing no objections it's

13   admitted.

14   BY MR. KESSLER:

15   Q    So what did you take a picture here of?

16   A    Adam looking towards the south toward the direction of the

17   governor's house.

18   Q    So where on the other side of the lake would that be?

19   A    In this area.

20   Q    Did he know you were taking that picture?

21   A    No.

22   Q    Take a look behind 192, please.  Do you recognize that

23   photograph?

24   A    I do.

25   Q    Who took that one?

```
1    A    I did.

2    Q    Also an accurate representation?

3    A    Yes.

4              MR. KESSLER:  I'd like to publish 192, Your Honor.

5              THE COURT:  All right.  Hearing no objections it's

6    admitted.

7    BY MR. KESSLER:

8    Q    All right.  Same lake?

9    A    Same lake.

10   Q    I'd like to focus your attention on this on the right side

11   of the picture.  What's that?

12   A    A boat launch.

13   Q    All right.  A place where you can put boats in and out of

14   the lake?

15   A    Correct.

16   Q    And you were with Mr. Fox there, right?

17   A    Yes.

18   Q    And how did he -- how did he react on seeing the boat

19   launch there?

20   A    He was excited.

21   Q    Did you record your conversation with Mr. Fox about that?

22   A    I did.

23   Q    Have you listened to that recording and seen the

24   transcript?

25   A    I have.
```

1    Q    Accurate?

2    A    Yes.

3              MR. KESSLER:  I'd like to play Exhibit 197?

4              THE COURT:  All right.  It's admitted.

5              (Audio started, 12:33 p.m.)

6              (Audio stopped, 12:34 p.m.)

7    BY MR. KESSLER:

8    Q    All right.  We just heard Mr. Fox say local police, that's

9    what we need to look into.  Let's do that before we go right

10   now.  Did you do that?

11   A    We did.

12   Q    Did you know the FBI was following you?

13   A    I know there was a surveillance team in the area.  I did

14   not know if they were following us or not.

15   Q    Take a look behind tab 193.  Do you recognize that

16   photograph?

17   A    I do.

18   Q    Is that an accurate depiction of that day?

19   A    Yes.

20             MR. KESSLER:  I'd like to publish 193?

21             THE COURT:  All right.  Hearing no objections it's

22   admitted.

23   BY MR. KESSLER:

24   Q    Whose truck is that?

25   A    That is my truck.

1    Q    And can we blow this up?  What does it say there?

2    A    Police department.

3    Q    And which police department was that?

4    A    The Elk Rapids Police Department.

5    Q    While you were on that ride, still recording?

6    A    Still recording.

7    Q    Did Mr. Fox talk again about inspiring other people?

8    A    Yes.

9    Q    You heard that recording and reviewed the transcript?

10   A    I have.

11          MR. KESSLER:  I'd like to play Exhibit 194, Your

12   Honor?

13          THE COURT:  All right.  It's admitted.

14          (Audio started, 12:35 p.m.)

15          (Audio stopped, 12:36 p.m.)

16   BY MR. KESSLER:

17   Q    On that same conversation you are still recording, right?

18   A    Yes.

19   Q    Did he talk about what he wanted to do with the governor?

20   A    Yes.

21   Q    Have you reviewed that recording and the transcript?

22   A    Yes.

23          MR. KESSLER:  I'd like to play Government's Exhibit

24   200?

25          THE COURT:  All right.  It's admitted.

1          (Audio started, 12:36 p.m.)

2          (Audio stopped, 12:37 p.m.)

3     BY MR. KESSLER:

4     Q    Now, we heard some testimony from you and others about how

5     one of the earlier plans had been or one of the alternate plans

6     had been Mackinaw Island?

7     A    Correct.

8          THE COURT:  If you are going to a new topic, this

9     might be a good place to take a break.  We have been going two

10    hours or so.

11         MR. KESSLER:  Sure, Your Honor.

12         THE COURT:  So we'll take our second break of the day.

13         LAW CLERK:  All rise, please.

14         (Jury out, 12:37 p.m.)

15         THE COURT:  All right.  About how much time do you

16    expect on the rest of your direct?

17         MR. KESSLER:  Let's see.

18         MR. HILLS:  Got another hour.

19         MR. KESSLER:  Maybe an hour.

20         THE COURT:  So you'll probably be on direct for the

21    rest of the day.

22         MR. KESSLER:  Yes, Your Honor.  We will be finished

23    before two o'clock.

24         THE COURT:  You will, okay.  All right.  Well, we'll

25    see how close we are when we get that far.  At one point in the

1      exam you were talking about the Fowlerville training, and there

2      are on your lists some FTX videos from that, but you are not

3      planning to put those in with this witness?

4              MR. KESSLER:  No, Your Honor.

5              THE COURT:  Okay.  All right.  So let's take 20

6      minutes and see where we can go.

7              LAW CLERK:  Court is in recess.

8              (Recess taken, 12:39 p.m.)

9              (Resume Proceeding, 1:03 p.m.)

10             (Jury in, 1:04 p.m.)

11             LAW CLERK:  The United States District Court for the

12     Western District of Michigan is now in session.  The Honorable

13     Robert J. Jonker, Chief Judge, presiding.

14             THE COURT:  All right.  Welcome back everybody for our

15     third and last segment of the day and the week for that matter.

16     We are in the process with the government's direct exam for our

17     current witness and I will turn it back to you, Mr. Kessler, to

18     continue that exam.

19             MR. KESSLER:  Thank you, Your Honor.

20     BY MR. KESSLER:

21     Q    So Mr. Chappel, when we left off before the break you were

22     driving around in the car with Mr. Fox and Mr. Molitor, right?

23     A    Correct.

24     Q    You are still in Elk Rapids.  One of the earlier plans that

25     you had discussed of those three routes was Mackinaw Island,

1      right?

2      A    Correct.

3      Q    And while you were driving around in the car with Mr. Fox,

4      did he express an opinion on the feasibility of that plan?

5      A    Yes.

6      Q    And have you listened to that recording?

7      A    I have.

8      Q    And seen the transcript?

9      A    Yes.

10          MR. KESSLER:  Okay.  I'd like to play Exhibit 201,

11     Your Honor?

12          THE COURT:  Hearing no objections, 201 is admitted.

13          (Audio started, 1:05 p.m.)

14          (Audio stopped, 1:06 p.m.)

15     BY MR. KESSLER:

16     Q    All right.  So where did you go from there from Elk Rapids?

17     A    Back to Eric's place and dropped him off.

18     Q    And then where next?

19     A    Back to the Vac Shack for Adam.

20     Q    And then where did you go next?

21     A    I went from there back to the Lansing, Flint area.

22     Q    All right.  So you went back to where you were living at

23     the time?

24     A    Correct.

25     Q    All right.  August 30th, the very next day, did Mr. Fox

1    send you a video of himself?

2    A    Yes.

3    Q    And using what application?

4    A    We might have been on the Threema or the Wire.  We probably

5    hadn't fully transitioned from Wire to Threema.

6    Q    All right.  Do you remember seeing the video, though?

7    A    Yes.

8    Q    Was it an accurate reflection of what he sent you at the

9    time?

10    A    Yes.

11          MR. KESSLER:  I'd like to play Exhibit 204, Your

12    Honor?

13          THE COURT:  All right.  It's admitted hearing no

14    objection.

15          (Video started, 1:06 p.m.)

16          (Video stopped, 1:07 p.m.)

17    BY MR. KESSLER:

18    Q    So from your discussions with Mr. Fox and your interactions

19    with everyone else here, do you know why he sent you this?

20    A    A lot of the guys were showing videos of them doing dry

21    fire drills, weapon manipulation, magazine changes,

22    transitioning from the rifle to their pistol.

23    Q    And why were you sending those to each other?

24    A    To critique on how we can improve our skill set.

25    Q    Okay.  Do you recognize the place where he was doing it?

1    A    I do.

2    Q    Where is it?

3    A    That was in the Vac Shack.

4    Q    On September 4th, a couple of days later, did Mr. Fox

5    discuss extracting a target with you?

6    A    Yes.

7    Q    Was that over a chat -- over the chat application?

8    A    Yes.

9    Q    Can you take a look behind tab 208, please?  Do you

10   recognize that chat?

11   A    I do.

12   Q    And were you a party to that conversation?

13        MR. KESSLER:  I'd like to put up Exhibit 208, Your

14   Honor?

15        MR. BLANCHARD:  Is there a date for this?

16        MR. KESSLER:  September 4th.

17        THE COURT:  All right.  It's admitted.

18   BY MR. KESSLER:

19   Q    So who is on the right and who is on the left here?

20   A    I am on the right, so the green, and Adam Fox is on the

21   left in the white.

22   Q    Okay.  So Adam Fox begins with, you want to stick it in her

23   pooper.  You responded, when I work I don't fuck.  I just fuck

24   it up, lol.  He responds, okay, add these to equipment list,

25   flash bangs.  What are flash bangs?

A    It's a concussion device that military and law enforcement use when they gain entry to a house to disrupt people's audio and visual impairment.

Q    You replied, personal, depends on threat list?

THE COURT:  I know my eyes are old and blurry, but I can't read that.  If it's important for us to read it you may need to blow it up.

MR. KESSLER:  Okay.  Is that --

THE COURT:  I can read that so if it works for me it probably works for everybody else.

MR. KESSLER:  We will do that.  Thank you, Your Honor.

BY MR. KESSLER:

Q    Okay.  So you replied, personal, depends on threat list. And he said, and we need a hood for our asset.  I have flex cuffs.  Will there be security -- well, there will be security detail obviously.  So what's the hood for the asset?  What discussions did you have with Mr. Fox about that?

A    Kind of black bagging her and putting a hood over her head so she couldn't see anything.

Q    And the asset is who?

A    The governor.

Q    Okay.  And flex cuffs, what are flex cuffs?

A    Heavy grade material for -- they work in regards to like handcuffs but you can't break them.

Q    So are we talking about metal handcuffs like a police

1    officer would have on their belt normally?

2    A    No.  They are plastic.

3    Q    Okay.  But are they made particularly for that purpose?

4    A    Yes.  Yes.

5    Q    All right.  Let's close that down.  Okay.  Is there another

6    page?  Yup.  Let's go to the next page.  All right.  He is

7    saying, four and four.  And you say can, daisy it, draw and

8    flank.  What does that mean, daisy and draw and flank?

9    A    So for him saying four on four that might be her security

10   detail.  And by daisying it there might be multiple people so

11   we can draw them out by fire and flank them so go to either

12   their left or right sides and engage them in an ambush.

13   Q    He replies, fuck yeah.  So maybe let's roll teams of four,

14   FTX.  That's field training exercise?

15   A    Correct.

16   Q    Do drills.  Send two teams out and do that on a set target

17   there.  Use someone as an actual target.  Take them the entire

18   thing.  Lol.  Great idea brother.  What was he talking about

19   here?

20   A    The governor, taking her out, simulate training as an FTX

21   of kidnapping the governor.

22   Q    Okay.  And let's blow up the lower half then.  So you

23   replied, we doing extraction of target.  What were you asking

24   him?

25   A    If we are going to be taking the governor from her house.

1    Q    Okay.  And he says yes, sir.  Extract out to a specified

2    designation.  And you said, how long we holding another team

3    for that?  He replies, run two four man teams.  You stated, WI.

4    Is that Wisconsin?

5    A    Correct.

6    Q    WI boys can probably hold it.  What were you talking about

7    here?

8    A    The extraction element that we would get from her house to

9    the boat that would be waiting.

10   Q    So are you talking about involving the Wisconsin guys in

11   that aspect?

12   A    Correct.

13   Q    All right.  He says, PRY.  Is that -- what is that short

14   for?

15   A    Probably.

16   Q    Probably just do that for us and let the other guys hang

17   out and drink.  Yeah.  Let's definitely include them.

18   Absofuckinglutely.

19          The next page.  Oh, that's it.  Okay.

20          Did Mr. Fox discuss this with the whole FAFO chat

21   group?

22   A    Yes.

23   Q    Do you recall some things Mr. Caserta posted on there?  Was

24   he a part of that conversation?

25   A    He was part of it.  Yes.

1    Q    I'd like you to take a look at tab 213.  Do you recognize

2    that chat conversation?

3    A    I do.

4    Q    Were you a party to that?

5    A    I was.

6         MR. KESSLER:  Okay.  I'd like to put up Exhibit 213,

7    Your Honor.

8         THE COURT:  All right.  Hearing no objections it's

9    admitted.

10   BY MR. KESSLER:

11   Q    Okay.  Let's blow up the part in the square and actually

12   get the part in the bottom, too.  Actually, can we -- can we do

13   the square and then the one part right below the square?

14        All right.  Who is Debased Tyrant again?

15   A    Brandon Caserta.

16   Q    So he says, Mrs. Whitty is an order follower.  Who is

17   Mrs. Whitty?

18   A    The governor of Michigan.

19   Q    The Mrs. Whitty is an order follower and she is not fully

20   autonomous.  She is not acting based on her own free will.  She

21   is acting on behalf of someone else's agenda.  She is a

22   servant.  Politicians are puppets and the puppet master has

23   plenty to take their place.  I don't think we should waste time

24   chasing puppets, bro.  Although they are morally culpable for

25   their actions and it could be totally justified they are the

1    lowest hanging fruit in the power structure.  Find out who her

2    handlers are and go for them instead.  That will do way more

3    damage and send a serious message that we know who is in

4    control.  If you fuck with Whitty her handlers are going to

5    laugh at the peasants who keep attacking the disposable house

6    slaves instead of the master himself, but if you get her

7    handlers she'll back down and maybe even quit and her handlers

8    would fully understand there is a group somewhere out there

9    that knows who they are.  Fear.  The media will be less likely

10   to report and get public attention towards this scenario as

11   well, but Whitty, lots of media coverage will be part of her

12   scenario.  Would it be justified to do something to her?  Yes.

13   But I am thinking we can do more.

14         And then who is Alpha Fuck You?

15   A    Adam Fox.

16   Q    Adam Fox responds, making people disappear is instilling

17   fear.  Brandon Caserta replies, I definitely agree.  He goes

18   on, I am not saying I don't support that choice.  I am just

19   interested in possibly going a little higher up.  I want

20   Zionist banker blood.  You recall this conversation?

21   A    I do.

22   Q    Have you had discussions like this with Mr. Caserta off

23   of -- in person?

24   A    I have.  Yes.

25   Q    What was the nature of the beliefs he was expressing to

```
1    you?

2    A    As far as?

3    Q    Did he want to go after Governor Whitmer?

4    A    Yes.

5    Q    All right.  And he told you that personally?

6    A    He did.

7    Q    And so what's this stuff about Zionist bankers and her

8    handlers?  Do you recall him talking about that?

9    A    I do.

10   Q    What did he say about it?

11   A    That he just wanted to, I think, drink their blood from

12   their skulls and he just would go on tangents.

13   Q    I'm sorry, what?

14   A    He would go on long tangents about just being a complete

15   anarchist.

16        MR. HILLS:  I am going to object at this point if --

17   he go on long tangents.  When, where, what are we talking

18   about?  Right now we've got an exhibit.

19        THE COURT:  Well, I mean, he is entitled to talk about

20   conversations he had with him.  If you want to lay a foundation

21   about more specificity you can do that, Mr. Kessler.

22        MR. KESSLER:  Sure.

23   BY MR. KESSLER:

24   Q    Did he talk about the beliefs that animated him?

25   A    He did.
```

1    Q    What did he say?

2    A    I can't quite recall them.  I mean, just in his nature of

3    speaking of them.  Kind of irked me the wrong way, I mean, he

4    would -- he had a lot of emotion in this.  I was concerned

5    being around him.

6    Q    And why were you concerned?

7    A    For impulse if he wanted to target law enforcement for

8    pulling him over.  He just had violence in him.

9    Q    All right.  Did you do anything to avoid being with him?

10   A    We were with the group so I was with him when the group was

11   present.

12   Q    Okay.  How about alone with him?

13   A    I tended to meet -- I attended a meeting at his house where

14   it was just him and I.

15   Q    And how would you describe his demeanor during that

16   meeting?

17   A    He would get very animated when he spoke.  Hostile in his

18   voice.  I made sure the door was behind me when we were

19   talking.

20   Q    Why did you do that?

21   A    Fearful for how impulsive he might be.

22   Q    What does the door have to do with that?

23   A    To get out of the house or the apartment.

24   Q    Okay.  On September 7th did Mr. Fox talk to you about his

25   plans and the future?

1    A    He did.  Yes.

2    Q    Did you record those conversations?

3    A    Yes.

4    Q    Or that conversation.  All right.  Have you reviewed the

5    recordings in 215, 216, 217 and 218 all from the same

6    conversation?

7    A    Yes.

8    Q    Okay.  And the transcripts?

9    A    Yes.

10         MR. KESSLER:  I'd like to offer all of those, Your

11   Honor?

12         MR. BLANCHARD:  Could we have just a moment?

13         MR. KESSLER:  I can do them one at a time if that's

14   easier.

15         MR. GIBBONS:  Numbers again?

16         MR. KESSLER:  215 through 218.  They are just clips

17   from the same conversation.

18         MR. BLANCHARD:  I don't have an objection.

19         THE COURT:  All right.  Yeah.  Hearing no objection

20   they are admitted.

21         MR. KESSLER:  Okay.

22         (Audio started, 1:17 p.m.)

23         (Audio stopped, 1:19 p.m.)

24   BY MR. KESSLER:

25   Q    So we just heard Mr. Fox talking about operational security

1   and vetting people.  He mentioned that he was concerned about

2   Mr. Croft.  Did he talk to you about that on other occasions as

3   well?

4   A    He did.  Yes.

5   Q    What was his worry about Mr. Croft?

6   A    That he might be not down with everything.  That he might

7   be a fed.

8   Q    Did he tell you why he thought he might be a fed?

9   A    He did, but I can't recall what the --

10  Q    Okay.  Let's play 216, which is already admitted.

11              (Audio started, 1:19 p.m.)

12              (Audio stopped, 1:19 p.m.)

13          MR. KESSLER:  And 217.

14              (Audio started, 1:20 p.m.)

15              (Audio stopped, 1:21 p.m.)

16  BY MR. KESSLER:

17  Q    So we hear Mr. Fox talking about going to camp out and live

18  up on Mr. Garbin's property.  Did you have those discussions

19  with him outside of this as well?

20  A    We did.

21  Q    What was he talking to you about?

22  A    Self-sustaining up at his property.

23  Q    And why would you need to do that?

24  A    Rioting, government is collapsing.

25  Q    All right.  And did he say what he thought would trigger

1    the government's collapse?

2    A    Taking the governor.

3    Q    Okay.  Let's play 218.

4         (Audio started, 1:22 p.m.)

5         (Audio stopped, 1:22 p.m.)

6    BY MR. KESSLER:

7    Q    All right.  So you still had another training session

8    coming up soon, right?

9    A    We did.  Yes.

10   Q    So that last one, that call was on September 7th, right?

11   A    Correct.

12   Q    Were you about to go to Luther?

13   A    Yes.

14   Q    And we just heard Mr. Fox saying, don't tell anybody what

15   we're doing.  Who did he not want you to tell what you were

16   doing?

17   A    People that weren't down with kidnapping the governor.

18   Q    Okay.  So did you know there would be other people at

19   Luther who weren't part of the plan?

20   A    Yes.

21   Q    And are those the people he didn't want you to tell?

22   A    They were.  Yes.

23   Q    And when he was saying, let's run this shit at night, you

24   have talked to Mr. Fox.  What was he talking about?

25   A    Kidnapping the governor.

1    Q    Okay.  So let's just fast forward a couple days now to

2    September 12th and 13th.  Did you attend the field training

3    exercise in Luther, Michigan?

4    A    I did.

5    Q    And whose property was that?

6    A    Ty Garbin's.

7    Q    We've already seen video of a shoot house.  Was there one

8    there?

9    A    There was.  Yes.

10   Q    Okay.  Now, what was that supposed to be in this -- in this

11   case?

12   A    A replication of the governor's house.

13   Q    Did you know what the governor's house looked like on the

14   inside at this point?

15   A    I did not know.

16   Q    Do you know if anybody knew?

17   A    No.

18   Q    Okay.  So how were you going to replicate or what were you

19   trying to accomplish?

20   A    On the realtor app you can see how many rooms are in the

21   house so they were just kind of gauging the main room of the

22   house off the sizes that were off of that app.

23   Q    All right.  So it was kind of a best guess?

24   A    Correct.

25   Q    What kinds of things did you all train for in the shoot

1      house?

2      A    For that one in particular, door entering, hallway, going

3      around corners.

4      Q    And what's significant about going around corners?

5      A    Every house has a hallway in it.  Every corner -- or every

6      hallway has a corner.  So even though we didn't have the exact

7      measurements of the governor's house implicating multiple rooms

8      and hallways and corners we were getting that training in.

9      Q    Okay.  At some point on September 12th did Mr. Fox get

10     people together to explain the plan?

11     A    Yes.

12     Q    All right.  And did you all go up to the governor's house

13     that night?

14     A    A group of us.  Yes.

15     Q    What did Mr. Fox say to the select group you were going to

16     do?

17     A    In our vehicle that we were going to the governor's house.

18     Q    All right.  Who was in the select group that he told?

19     A    In all the vehicles?

20     Q    Um-hum.

21     A    So in my vehicle we had Red, Adam Fox, Barry Croft and

22     Steve Robeson, and one of the vehicles was Mark and the Null

23     brothers, and then in a third vehicle was Brian Higgins, Ty

24     Garbin and Kaleb Franks.

25     Q    Before that group of you left, did you hear Mr. Fox talking

1      to Mr. Harris or Mr. Caserta?

2      A    He went around throughout the day talking to individuals.

3      Yes.

4      Q    Okay.  So did they know what you were going there for?

5            MS. KELLY:  Objection, speculation.

6            MR. BLANCHARD:  Foundation.

7            THE COURT:  I don't know that he would know that.  You

8      can certainly ask him if he was witness to conversations where

9      Mr. Fox said things to him.

10     BY MR. KESSLER:

11     Q    Did you hear conversations like that?

12     A    I did.  Yes.

13     Q    Okay.  And they didn't come with you, though, right?

14     A    They did not.  No.

15     Q    Did you see them that night before you left?

16     A    We did.  Yes.

17     Q    Can you describe what kind of state they were in,

18     Mr. Harris and Mr. Caserta?

19     A    Fine.  Harris had his dog up there so he was monitoring his

20     dog.

21     Q    Okay.  Did you have any conversations with him, either one

22     of them, about why they didn't go?

23     A    Harris wanted to go.  He said because we didn't get in

24     contact with him before we left.  But that's kind of it from

25     what I recall from that.

Q    So when you all left Luther, the three cars that went,
where did you go first?

A    We went south to a hotel to pick up Barry Croft and Brian
Higgins, and then from there we went north to Walmart and then
we restaged in the vehicles, went into Traverse City and staged
at the VFW.

Q    We are going real fast.  Let me break it down.  One part an
a time.  You just went south to a hotel.  Did you pick up Barry
Croft and Brian Higgins?

A    We met up with them.  Brian Higgins drove his own vehicle
but yes?

Q    Did you know Brian Higgins before this?

A    No.

Q    And who was he?

A    An IT individual from Wisconsin.

Q    So a member of some other group?

A    Correct.

Q    And Mr. Croft, did you recognize him there?

A    I did.  Yes.

Q    Okay.  And did he drive in your car or which car did he go
in?

A    From the Walmart in Traverse City he rode in my vehicle.  I
am not sure which vehicle he was in when we left.

Q    Okay.  So you went from that hotel.  Do you remember what
city it was in?

1    A    No.  I don't.

2    Q    Okay.  You went from there you said to a Walmart.  Do you

3    know where the Walmart was?

4    A    I think Cadillac.

5    Q    Who did you meet up with in Cadillac?

6    A    Mark and -- yeah.  Mark is who we were meeting up with.

7    Q    What did you know Mark as?  Did you know his last name?

8    A    No, just that he was part of the group with Adam.

9    Q    All right.  Did you know at the time that he was an

10   undercover FBI agent?

11   A    I became aware of that.  Yes.

12   Q    Okay.  So you were briefed on that?

13   A    Yes.

14   Q    Do you know why were you briefed about that?

15   A    That -- well, we had a large gathering of people that

16   wanted to go up and look at the governor's house and that there

17   would be agents with me.

18   Q    Okay.  So everyone gathered at the Walmart, is that right?

19   A    Correct.

20   Q    Did you have to wait there for a while?

21   A    For a brief amount of time.  Yes.

22   Q    Do you remember why you were waiting?

23   A    I think it was something to do with food or just a third

24   vehicle to show up for moving people around.

25   Q    Once you all got together there, did anybody tell you what

1    the plan was next?

2    A    Adam told Red that the plan was to go up to the governor's

3    house.

4    Q    Did you know that Red was a government agent at the time?

5    A    I did.

6    Q    You were briefed on that as well?

7    A    I was.  Yes.

8    Q    So Adam told you that the plan was to go to the governor's

9    house you just said?

10   A    Correct.

11   Q    Who else was standing around when you said that?

12   A    That was inside of our vehicle.  So Barry Croft was there

13   and Steve Robeson.

14   Q    All right.  All pretty close together in this car?

15   A    We were inside the moving vehicle.  Yes.

16   Q    Okay.  How far away was Mr. Croft when Mr. Fox said, we're

17   going to the governor's house?

18   A    I believe he was in the middle of the back seat.

19   Q    Okay.  So closer than the court reporter?

20   A    Yes.

21   Q    Where did you go from the Walmart?

22   A    From the Walmart we went to the VFW hall in Traverse City.

23   Q    Did you get out of the cars there?

24   A    We did.

25   Q    All right.  And what, if anything, did Mr. Fox say to

1      everybody there?

2      A    I don't know if it was at that spot or on the drive up

3      there, but he thought we were going to take the governor that

4      night so he wanted to get a nap in.

5      Q    I was asking about Mr. Fox?

6      A    Fox.  I thought Barry Croft.

7      Q    We'll get to that.

8      A    Sorry.

9      Q    Mr. Fox, do you remember what he said to you or other

10     people while you were at the VFW?

11     A    No.

12     Q    Okay.  Who walked out and gave assignments to the other

13     cars?

14     A    Adam Fox designated who to be in what vehicles.

15     Q    And who communicated that to the other people in the other

16     cars?

17     A    He verbally told everybody which vehicles to get into.

18     Q    Did he also ask you to tell other people?

19     A    Yes.

20     Q    And what were the assignments for the three cars?

21     A    That my vehicle would go up to the boat launch.  Brian

22     Higgins' vehicle, who has Ty Garbin and Kaleb Franks, would go

23     past the governor's house, and then the third vehicle with Mark

24     and the Null brothers would be kind of monitoring for law

25     enforcement.

Q    All right.  So the car that had you and Mr. Fox and

Mr. Croft and Red, when you left there did you go straight to

the governor's house, or to the boat launch I mean?

A    No.  We did not.

Q    Where did you stop, if anywhere?

A    We stopped at a main bridge on 31 and Adam and Red got out

to inspect the underneath for explosives.

Q    Was there discussion about that in the car before you did

it?

A    Yes.

Q    Who was talking on what did they say?

A    Adam was talking to the group about getting explosives for

the bridge.

Q    All right.  So the group being all the people in the car

including you and Mr. Croft?

A    Yes.

Q    And what did he say about the explosives for the bridge?

A    That we could delay or disrupt the police trying to react

to the governor's house.

Q    Okay.  Again, Mr. Croft was sitting right there?

A    He was.

Q    And did you, in fact, stop at a bridge on highway 31?

A    We did.

Q    What happened?

A    Adam Fox and Red got out of the vehicle.  We continued on

1    after they got out.  Went south again and through the downtown

2    portion of there giving them time to get underneath the bridge,

3    and then we came back and picked them up.

4    Q    All right.  And did Mr. Fox show you a picture of what he

5    had -- that he had taken under the bridge?

6    A    He did.  Yes.

7    Q    Would you take a look behind tab 233, please?  Do you

8    recognize that picture?

9    A    I do.

10   Q    Is that the same one you saw that night?

11   A    It is.

12          MR. KESSLER:  Offer Exhibit 233, Your Honor?

13          THE COURT:  All right.  Hearing no objection it's

14   admitted.

15   BY MR. KESSLER:

16   Q    What is this that we are looking at?

17   A    That is the underneath of the bridge on 31.

18   Q    What did Mr. Fox say when he showed you this picture?

19   A    His exact quote I can't remember but he was excited about

20   getting the photo.

21   Q    Okay.  And was he talking about it in front of Mr. Croft?

22   A    He was.

23   Q    Where did you go from the bridge?

24   A    From there we continued north and went up to the boat

25   launch.

1    Q    All right.  What was the purpose of that?

2    A    To see if we can get eyes on the Brian Higgins' vehicle.

3    They had an IR illuminator.  So infrared.  And we had night

4    vision goggles to see if we could see their vehicle driving

5    down █████████ Drive from the boat launch.

6    Q    I want to break down a couple those terms for the jury.

7    What is an IR illuminator?

8    A    It's an infrared illuminator.  It is kind of like a flash

9    light with a filter you cannot see with a naked, only if you

10   have night vision.

11   Q    So on one side of the lake would be this IR illuminator and

12   the other side would be the night vision?

13   A    Correct.

14   Q    Who had which?

15   A    Brian Higgins' vehicle had the illuminator and then at the

16   boat launch we had the night vision goggles.

17   Q    And so did you actually go to the boat launch and look for

18   that?

19   A    We did.

20   Q    Tell us what happened?

21   A    We were communicating through walky-talky with the vehicle

22   going down █████████ Drive.  We had them flashing their high

23   beams so we could try seeing them.  The weather was not

24   favorable conditions, so the illuminator was not projecting a

25   strong enough beam for us to see it with the night vision, but

1    at one point they did get eyes on the vehicle.

2    Q    When you say they got eyes on the vehicle, who got eyes on

3    the vehicle?

4    A    From the boat launch we could see the vehicle driving past

5    the governor's house.

6    Q    Okay.  And was Mr. Croft part of that group that was

7    watching for the signals from across the lake?

8    A    He was.  Yes.

9    Q    Did you record him talking about it that night?

10   A    I did.

11   Q    Have you reviewed that recording and reviewed the

12   transcript?

13   A    I have.

14            MR. KESSLER:  I'd like to play Exhibit 248, Your

15   Honor?

16            THE COURT:  All right.  Hearing no objection, 248 is

17   admitted.

18            (Audio started, 1:33 p.m.)

19            (Audio stopped, 1:34 p.m.)

20   BY MR. KESSLER:

21   Q    Sounds like we could hear some rain in the background?

22   A    Correct.

23   Q    Was it raining then?

24   A    It was.

25   Q    And Mr. Croft said, she should be right around those three

1    lights dead ahead.  Who is she?

2    A    The governor of Michigan.

3    Q    And the three lights were what?

4    A    I think they were just house lights emitting from the

5    shoreline.

6    Q    All right.  So you were looking across the lake at this

7    point?

8    A    We were.

9    Q    Okay.  All right.  Did you go -- after this was all over

10   did you go with some FBI agents back out to try and show them

11   what you had seen that night?

12   A    I did.  Yes.

13   Q    Okay.  And did you -- have you reviewed a video that was

14   made of that same scene, that recreation?

15   A    I did.  Yes.

16   Q    Is it an accurate representation of what you saw the night

17   of September 12th and 13th?

18   A    Yes.

19            MR. KESSLER:  I'd like to play Exhibit 239, Your

20   Honor.

21            THE COURT:  All right.

22            MR. BLANCHARD:  I'm sorry, 239.

23            THE COURT:  All right.  Hearing no objections.

24            MR. BLANCHARD:  I don't think there is an adequate

25   foundation that the conditions were the same when this video

1    was shot versus that night.

2          THE COURT:  All right.  The witness has said it

3    reflected what he remembered the same scene, and I think that's

4    enough for foundational purposes, and you can certainly cross

5    examine on conditions that may have been different.  So we'll

6    admit it.

7    BY MR. KESSLER:

8    Q    So are these the house lights you are talking about?

9    A    That's correct.

10   Q    And what's that flashing there?

11   A    That's myself standing on the governor's boat dock with a

12   flashlight.

13   Q    Okay.  So this is viewed from the other side of the lake,

14   is that right?

15   A    This is from the boat launch.  Yes.

16   Q    Okay.  Is this a night vision goggle?

17   A    Correct.

18   Q    Similar to what you used that night?

19   A    The same ones.  Yes.

20   Q    Okay.  We see a sign here that says, boating information

21   and recreation passport required.  So where are we?

22   A    The Birch Lake, the mouth of it at the boat launch.

23   Q    Okay.  We see another sign here that says, help, stop

24   aquatic hitchhikers.  That's also there at the boat launch?

25   A    Correct.

1  Q    So after this signalling exercise that you all did, where

2  did you go next?

3  A    That night with Adam Fox?

4  Q    Um-hum?

5  A    From there we circled around and went back to by the diner

6  that we had previously went to on the day recon.

7  Q    Did you go to the VFW post first?

8  A    I can't recall if we went there first or if we waited for

9  the vehicles at the diner.

10 Q    Okay.  And were you riding with Adam Fox?

11 A    I was.  Yes.

12 Q    Did he -- did he show you a route to the big lake?

13 A    Yes.

14 Q    Okay.  How -- tell us about that?

15 A    So from the governor's house as an extraction if we had

16 her, we would take her by a UTV or an ATV side by side vehicle

17 and cross over 31, and there was an auxiliary road that ran

18 parallel with the lake and 131, and there was a side foot path

19 that we could take the governor, where they could take the

20 governor up on the side by side to the extraction of the boat.

21 Q    On the big lake?

22 A    On the big lake.  Lake Michigan.  Yes.

23 Q    Okay.  And how if at all did he say that he knew about this

24 route?

25 A    Through Google Maps.

1          MR. KESSLER:  Okay.  I'd like to put up Exhibit 238.

2     Before we do, that's just a map, Your Honor, from Google Maps.

3          THE COURT:  All right.  Any objection?

4          MR. GIBBONS:  None.

5          MR. BLANCHARD:  All for pages?

6          MR. KESSLER:  Yeah.  This way -- we are going to use

7     other pages of it for other purposes but they are all just

8     Google Maps.  There is four pages.

9          THE COURT:  All right.  Well, the Google Maps with

10    boxes representing certain things here.  I take it you are

11    going to link up those boxes with somebody who can tie those

12    together?

13         MR. KESSLER:  Right.  And I think it's page 3 that we

14    are going to look at here.

15         THE COURT:  All right.  All right.  Well, I think

16    subject to linking up those boxes of information it can be

17    admitted.

18    BY MR. KESSLER:

19    Q    Let's go to the next page, and the next one.  Go back to

20    the first one then.  Okay.  Here we go.  Let's take a look at

21    the second one to see if it's even closer.  There we go.

22    That's the one I am looking for.

23         All right.  Mr. Chappel, we were just looking at the

24    boat launch, right?  We saw it through the night vision

25    goggles.  Is this accurately represented here where it says

1    boat launch?

2    A   That's correct.

3    Q   And then we have the dot in the middle.  This one right

4    here is tagged governor's residence.  Is that where you recall

5    that being?

6    A   Correct.

7    Q   And then you were just starting to talk about this Lake

8    Michigan access.  Is this the place you were talking about

9    here?

10    A   That's correct.

11    Q   The lower of the three markers.  All right.  So you can use

12    your finger to draw if you'd like.  Can you show us what the

13    plan was that Mr. Fox was describing to you?

14    A   So we pick up the governor from her house, take her down

15    ████████ Road and then cross over the main 31, and then

16    continue on with the side by side.  And then once we get to,

17    like, the mouth of the stairwell there is a steep kind of cliff

18    with stairwells, and then we would take her down the steps to

19    where a waiting boat would be and then extract her from there.

20    Q   And that boat would be here on the shore of Lake Michigan?

21    A   That is correct.

22    Q   So again, after this was all over did you get together with

23    FBI agents and show them this route that Mr. Fox was proposing

24    to you?

25    A   I did.  Yes.

1   Q    All right.  Have you reviewed the video of that?

2   A    I have.

3   Q    There is no audio in this video; it's just you sitting with

4   agents, correct?

5   A    Correct.

6   Q    Okay.  And did you drive the same route that you did that

7   night with Mr. Fox?

8   A    Yes.

9        MR. KESSLER:  I'd like to play Government Exhibit 247.

10       MR. GIBBONS:  Your Honor, I am going to object.

11  Nobody drove from the governor's driveway as described by

12  Mr. Kessler and laying the foundation that evening.

13       THE COURT:  Yeah.  I am not sure about that either.

14  If that is a part of your question then I am not sure if there

15  was a foundation that the route was simply described that night

16  or actually driven that night.  So you may want to clarify

17  that.

18  BY MR. KESSLER:

19  Q    Sure.  So did you drive around this area with Mr. Fox?

20  A    We did.  Yes.

21  Q    All right.  And not just that night.  Let's go back a

22  little bit.  Did you drive around this area with him during

23  that daytime reconnaissance that we discussed earlier?

24  A    That is when we found it.  Yes.

25  Q    Okay.  And does the video that we are about to show

1    accurately depict the route that Mr. Fox showed you during the

2    daytime reconnaissance?

3    A    It does.  Yes.

4         THE COURT:  All right.  Further objections?

5         MR. GIBBONS:  I am satisfied, Your Honor.  Withdrawn.

6         THE COURT:  It's admitted.

7         (Video started, 1:41 p.m.)

8    BY MR. KESSLER:

9    Q    So where are you in the car?

10   A    I am driving.

11   Q    Okay.  Give it a moment.  There is another agent in the

12   back seat taking the video?

13   A    That is correct.

14   Q    What do we see out the back window?

15   A    The governor's house.

16   Q    So you are departing from there?

17   A    Correct.

18   Q    Do you know what road this is?

19   A    ██████████  Drive.

20   Q    We are reaching an intersection and the road sign says

21   Williams.  It looks like you are taking a right?

22   A    Correct.

23   Q    And we are approaching a stop sign here.  What's this road

24   that we are about to cross?

25   A    This is 31.

```
1    Q    And we're stopping here in front of a red house.  Did you

2    get out of the car to show the agents where this spot was?

3    A    I did.  Yes.

4    Q    We're passing a sign that says, private beaches, owners

5    only please, no parking.  And a sign that says, private beach.

6    And what are we looking at?

7    A    Lake Michigan.

8              (Video stopped, 1:45 p.m.)

9    BY MR. KESSLER:

10   Q    All right.  Is this where Mr. Fox said the boat would be

11   waiting?

12   A    Correct.

13   Q    Okay.  When you got back to the camp that night, September

14   12th into 13th, did you all discuss tactics?

15   A    We did.  Yes.

16   Q    Okay.  And specifically the governor's security detail?

17   A    Yes.

18   Q    Did you record Mr. Croft talking about it that night?

19   A    I did.  Yes.

20   Q    Have you reviewed that recording?

21   A    I have.

22   Q    And the transcript?

23   A    Yes.

24            MR. KESSLER:  I'd like to play Exhibit 249?

25            THE COURT:  Hearing no objections, 249 is admitted.
```

1          (Audio started, 1:45 p.m.)

2          (Audio stopped, 1:46 p.m.)

3     BY MR. KESSLER:

4     Q    We heard Mr. Croft say if you have something shoulder fired

5     you can go on a lead vehicle.  From all your discussions with

6     him that night, lead vehicle of what?

7     A    The lead vehicle of the security detail of the governor.

8     Q    Okay.  And he says that's what you got, that 37.  Did you

9     know what he was talking about?

10    A    Yes.

11    Q    What was it?

12    A    The rifle that he had.  It had a 37 millimeter grenade

13    launcher on it.

14    Q    Okay.  Did he talk about needing to get the target's

15    habits?

16    A    Yes.

17    Q    Recorded in the same conversation?

18    A    I did.  Yes.

19    Q    Okay.  You also reviewed that one and the transcript?

20    A    I have.

21          MR. KESSLER:  I'd like to play Exhibit 250?

22          THE COURT:  Any objections?  If not it's admitted.

23          (Audio started, 1:47 p.m.)

24          (Audio stopped, 1:47 p.m.)

25    BY MR. KESSLER:

```
1    Q    And we just saw the big lake extraction area.  Did

2    Mr. Croft talk about that?

3    A    He did.  Yes.

4    Q    You also reviewed that recording and the transcript?

5    A    I have.

6           MR. KESSLER:  I'd like to play Exhibit 251.

7           MR. BLANCHARD:  I would object, Your Honor.  Under the

8    rules of completeness the Government's Exhibit 251 starts up in

9    the middle of Mr. Croft's statement.  The exact -- 262 captures

10   Mr. Croft's whole opening thought.  I think they should play

11   262 rather than 251.

12          THE COURT:  All right.  Do you want to show both of

13   them?

14          MR. KESSLER:  No, Your Honor.  We selected this part.

15   If they want to try to get it in later I suppose we could sit

16   there and look that over, but I think I'd like to select our

17   own exhibits.

18          MR. BLANCHARD:  I think the jury ought to be able to

19   hear it.

20          THE COURT:  I'm trying to look at 262.  It doesn't

21   look like it lines up.  You are saying 262 is the full

22   statement that you wanted?

23          MR. BLANCHARD:  Sure.  Yeah.  If you look -- this --

24   in Mr. Croft's statement in 262.

25          MR. KESSLER:  I'm going to object to him reading.
```

1          MR. BLANCHARD:  I am going to point the Court to where

2     it's at.  The last sentence is where 251 picks up.  Where it

3     starts with water.

4          THE COURT:  All right.  Well, you know, to me it

5     doesn't much matter.  I am not sure there is anything in the

6     other statements that materially detracts from the significance

7     or meaning of what's in 251, and I don't know about the

8     government -- 262 is a Government Exhibit.  If you are going to

9     get to it anyway I am not sure why you wouldn't use it now, and

10    honestly, I am not sure why you'd want the earlier statements

11    in anyway.

12         MR. KESSLER:  I wasn't the one offering to play them

13    now but I can offer them both and we can just play them both

14    back to back.

15         THE COURT:  That's what I'm thinking.  Does anybody

16    else have an objection to 262?

17         MR. GIBBONS:  No, Your Honor.

18         THE COURT:  All right.  Let's just do them in order.

19    We'll do 251 and then you can do 262 and hear the added

20    language.

21         MR. KESSLER:  Okay.  262 is the one earlier in time so

22    let's play that one.

23         (Audio started, 1:49 p.m.)

24         (Audio stopped, 1:50 p.m.)

25         MR. KESSLER:  I think we actually cover 251 in there.

1      THE COURT:  Right.  I mean, the only thing 251 doesn't

2   include are the first three sentences or so of Mr. Croft.

3      MR. KESSLER:  They are both in, and I don't see any

4   need to play the other one, so we'll proceed and save some time

5   that way.

6   BY MR. KESSLER:

7   Q    Did you all go to sleep then that night?

8   A    We did.

9   Q    Tell us about the next day?

10  A    We had a circle of trust meeting that happened out during

11  the day.

12  Q    Can you tell the jury what you mean by circle of trust?

13  A    Everybody that Adam believed would -- is down for the

14  kidnapping, he believes to be trusted with it, was going to be

15  showed videos of demolition and explosives.

16  Q    Okay.  And this is the morning of Sunday, September 13th,

17  right?

18  A    That's correct.

19  Q    Did Mr. Croft talk at that meeting again about the

20  governor's security detail?

21  A    Yes.

22  Q    And you recorded that?

23  A    I did.

24  Q    You reviewed that and the transcript?

25  A    I have.

                    MR. KESSLER:  Play Exhibit 254?

                    THE COURT:  Any objections?  It's admitted.

                    (Audio started, 1:51 p.m.)

                    (Audio stopped, 1:52 p.m.)

BY MR. KESSLER:

Q    So at the time you went up there she was the governor,

right?

A    That's correct.

Q    From all the discussions you had that day, what was the

concern?

A    That if now President Biden got elected that she might be

in a position to be on the cabinet.

Q    And then how would that affect your security detail?

A    They think it would upgrade from the State Police to

potentially secret service.

Q    All right.  Did Mr. Harris have an opinion during this

conversation about what that would mean for your plans?

A    He did.  Yes.

Q    Did you record that?

A    I did.

Q    And have you reviewed that and the transcript?

A    I have.

                    MR. KESSLER:  I'd like to play Exhibit 255, Your

Honor?

                    THE COURT:  All right.  Hearing no objection it's

1    admitted.

2                 (Audio started, 1:53 p.m.)

3                 (Audio stopped, 1:53 p.m.)

4    BY MR. KESSLER:

5    Q    Did Mr. Fox contribute to that discussion as well?

6    A    He did.

7    Q    Same thing.  Reviewed the recording and the transcript?

8    A    I have.

9              MR. KESSLER:  I'd like to play Exhibit 260?

10             THE COURT:  All right.  Hearing no objections, 260.

11             (Audio started, 1:53 p.m.)

12             (Audio stopped, 1:54 p.m.)

13   BY MR. KESSLER:

14   Q    Now, during this discussion did Kaleb Franks talk to

15   Mr. Fox in front of you?  Did the two of them talk about the

16   night recon the night before?

17   A    He did.

18   Q    What was the nature of their discussion?

19   A    The mixup on the address.  The nomenclature of how it was

20   spelled out.

21   Q    Okay.  And was anybody upset about that?

22   A    Kaleb was.

23   Q    Why?

24   A    The fact that it was, I believe, 78 I believe instead of

25   68, and the fact that they went out there -- when Adam, myself

1    and Eric had went out there during the day and had already

2    gotten eyes on the house.

3    Q    And you were with Adam, right?

4    A    I was.

5    Q    Did Adam give him the right address numbers or what?

6    A    No.  It was a mixup.  Instead of the 68 it was 78.

7    Q    All right.  And they had a discussion about that the next

8    morning?

9    A    They did.

10   Q    Was that recorded?

11   A    It was.

12   Q    All right.  And you also reviewed the recording and the

13   transcript?

14   A    I have.

15            MR. KESSLER:  I'd like to play Government Exhibit 263,

16   Your Honor?

17            THE COURT:  Hearing no objections it's admitted.

18            (Audio started, 1:55 p.m.)

19            (Audio stopped, 1:56 p.m.)

20   BY MR. KESSLER:

21   Q    So you are saying Mr. Fox should have been in the car.

22   What were they concerned about?

23   A    Finding the correct address.

24   Q    All right.  And driving around for that long time, what

25   would that -- what kind of problem would that cause?

1    A    Raising concerns, suspicious vehicles going by the

2    governor's house.

3    Q    Okay.  Did Mr. Fox get everybody together to talk about the

4    plan going forward?

5    A    He did.

6    Q    And that was recorded as well?

7    A    It was.

8    Q    All right.  And you have reviewed that recording and the

9    transcript?

10    A    I have.

11          MR. KESSLER:  I'd like to play Government's Exhibit

12    264.

13          THE COURT:  All right.  Any objections?  If not it's

14    admitted.

15          (Audio started, 1:56 p.m.)

16          (Audio stopped, 1:57 p.m.)

17    BY MR. KESSLER:

18    Q    So Mr. Fox was just saying, you all know our intentions.

19    Mr. Harris and Mr. Caserta you testified were not with you on

20    the nighttime recon of the governor's house, right?

21    A    That's correct.

22    Q    Were Mr. Harris and Mr. Caserta here for this conversation?

23    A    They were.

24    Q    Where Mr. Fox said, you all know our intentions?

25    A    Yes.

1    Q    He said, what we want to do is going to have a price tag.

2    It's four grand.  What was that for?

3    A    To purchase the explosives.

4    Q    And how do you know that?

5    A    That is what Red told Adam how much it would be for it, and

6    then Adam told the group that we need to get $4,000 for it.

7    Q    And were you there for that conversation?

8    A    I was.

9    Q    He also talked about being opportunistic.  We have heard

10   that once before.  What was Mr. Fox talking about there?

11   A    So he had a target of opportunity, so it might present

12   itself -- even though we are planning for it, the occasion may

13   arise where it just presents itself for us to do it.

14   Q    So like, if the governor just showed up?

15   A    Correct.

16   Q    What, if anything, did he say he would need to do in order

17   to be ready for that opportunity?

18   A    Train.  Continuously live it, breathe it.

19   Q    Okay.  How about reconnaissance?  Did he talk about that?

20   A    Yes.  We needed to make more trips up there, check out the

21   local areas, get rooms, stay overnight.

22   Q    This training in Luther, Michigan, was that supposed to be

23   your final training or were there supposed to be more?

24   A    There was going to be one more training.

25   Q    And when was that supposed to be?

1    A    I believe in October some time in Wisconsin.

2    Q    Okay.  And October is before the election, right?

3    A    That is correct.

4    Q    All right.  Did Mr. Fox talk about that timing?

5    A    He did.

6    Q    What did he say about that?

7    A    That we needed to do it before the election.

8    Q    Did everybody agree?

9    A    They did.

10   Q    Okay.  And after the field training exercise in Luther

11   broke up, did everyone go home?

12   A    They did.

13   Q    Did you continue training and discussing after that?

14   A    Yes.

15   ****************************************************************

```
 1                               INDEX

 2
        Government Witnesses:                        Page
 3
        DAN CHAPPEL
 4
         Direct Examination by Mr. Kessler            3
 5

 6
        Exhibits:                                  Admitted
 7
        Government's Exhibit 5                         17
 8        (Photograph, Adam Fox)
        Government's Exhibit 7                         18
 9        (Photograph, Morrison, Bellar & Musico)
        Government's Exhibit 9                         21
10        (Chat, May 1)
        Government's Exhibit 10                        24
11        (Chat, May 1)
        Government's Exhibit 21                        28
12        (Text, May 22)
        Government's Exhibit 26                        30
13        (Audio, June 3)
        Government's Exhibit 27                        32
14        (Audio, June 3)
        Government's Exhibit 28                        33
15        (Audio, June 3)
        Government's Exhibit 29                        33
16        (Audio, June 3)
        Government's Exhibit 30                        34
17        (Audio, June 3)
        Government's Exhibit 57                        36
18        (Audio, June 14)
        Government's Exhibit 58                        37
19        (Photograph, Adam Fox)
        Government's Exhibit 59                        40
20        (Photograph, Morrison, Harris & Bellar)
        Government's Exhibit 62                        41
21        (Photograph, Bed)
        Government's Exhibit 64                        42
22        (Audio, June 21)
        Government's Exhibit 65                        43
23        (Audio, June 21)
        Government's Exhibit 66                        43
24        (Audio, June 21)
        Government's Exhibit 78                        71
25        (Photograph, Code Words)
```

| | | |
|---|---|---|
| 1 | Government's Exhibit 80<br>  (Audio, July 7) | 74 |
| 2 | Government's Exhibit 88<br>  (Photograph, Diner) | 54 |
| 3 | Government's Exhibit 89<br>  (Photograph, Cambia) | 45 |
| 4 | Government's Exhibit 91<br>  (Photograph, Croft, Flag) | 47 |
| 5 | Government's Exhibit 92<br>  (Audio, Cambria) | 48 |
| 6 | Government's Exhibit 93<br>  (Audio, Diner) | 55 |
| 7 | Government's Exhibit 95<br>  (Photograph, Croft, Shotgun) | 48 |
| 8 | Government's Exhibit 100<br>  (Audio, Diner) | 56 |
| 9 | Government's Exhibit 101<br>  (Audio, Diner) | 56 |
| 10 | Government's Exhibit 103<br>  (Audio, July 11) | 51 |
| 11 | Government's Exhibit 105.2<br>  (Audio, July 11) | 52 |
| 12 | Government's Exhibit 106<br>  (Audio, Diner) | 56 |
| 13 | Government's Exhibit 109<br>  (Audio, Diner) | 56 |
| 14 | Government's Exhibit 110<br>  (Audio, July 12) | 58 |
| 15 | Government's Exhibit 111<br>  (Photograph, Sign In Sheet) | 59 |
| 16 | Government's Exhibit 112<br>  (Audio, July 12) | 60 |
| 17 | Government's Exhibit 113<br>  (Audio, July 12) | 61 |
| 18 | Government's Exhibit 115<br>  (Audio, July 12) | 62 |
| 19 | Government's Exhibit 116<br>  (Audio, July 12) | 62 |
| 20 | Government's Exhibit 118<br>  (Chat, July 19) | 64 |
| 21 | Government's Exhibit 120<br>  (Chat, July 22) | 67 |
| 22 | Government's Exhibit 121<br>  (Chat, July 23) | 68 |
| 23 | Government's Exhibit 122<br>  (Chat, July 24) | 69 |
| 24 | Government's Exhibit 123<br>  (Chat, FaceBook) | 69 |
| 25 | Government's Exhibit 127<br>  (Audio, July 27) | 75 |

| | | |
|---|---|---|
| 1 | Government's Exhibit 128<br>(Audio, July 27) | 77 |
| 2 | Government's Exhibit 132<br>(Audio, August 2) | 76 |
| 3 | Government's Exhibit 133<br>(Audio, August 4) | 77 |
| 4 | Government's Exhibit 138<br>(Audio, August 9) | 79 |
| 5 | Government's Exhibit 139<br>(Audio, August 9) | 79 |
| 6 | Government's Exhibit 141<br>(Chat, August 9) | 80 |
| 7 | Government's Exhibit 142<br>(Chat, August 10) | 82 |
| 8 | Government's Exhibit 152<br>(Audio, August 16) | 85 |
| 9 | Government's Exhibit 153<br>(Audio, August 16) | 85 |
| 10 | Government's Exhibit 154<br>(Audio, August 16) | 87 |
| 11 | Government's Exhibit 156<br>(Audio, August 17) | 89 |
| 12 | Government's Exhibit 158<br>(Audio, August 17) | 91 |
| 13 | Government's Exhibit 159<br>(Audio, August 17) | 92 |
| 14 | Government's Exhibit 160<br>(Audio, August 17) | 93 |
| 15 | Government's Exhibit 162<br>(Audio, August 18) | 94 |
| 16 | Government's Exhibit 163<br>(Chat, August 19) | 95 |
| 17 | Government's Exhibit 164<br>(Chat, August 21) | 97 |
| 18 | Government's Exhibit 168<br>(Audio, August 23) | 100 |
| 19 | Government's Exhibit 169<br>(Audio, August 23) | 101 |
| 20 | Government's Exhibit 170<br>(Chat, The Boys) | 102 |
| 21 | Government's Exhibit 171<br>(Chat, Threema) | 103 |
| 22 | Government's Exhibit 173<br>(Photograph, Surveillance) | 109 |
| 23 | Government's Exhibit 174<br>(Video, Elk Rapids, August) | 110 |
| 24 | Government's Exhibit 175<br>(Photograph, Elk Rapids, August) | 114 |
| 25 | Government's Exhibit 187<br>(Photograph, Adam Fox) | 117 |

```
 1        Government's Exhibit 189              118
            (Photograph, Fox Map)
 2        Government's Exhibit 190              113
            (Video, Elk Rapids, August)
 3        Government's Exhibit 191              121
            (Photograph, Fox at Lake)
 4        Government's Exhibit 192              122
            (Photograph, Boat Launch)
 5        Government's Exhibit 193              123
            (Photograph, Elk Rapids, August)
 6        Government's Exhibit 194              124
            (Photograph, Elk Rapids, August)
 7        Government's Exhibit 195              108
            (Audio, August 29)
 8        Government's Exhibit 196              111
            (Audio, Elk Rapids, August)
 9        Government's Exhibit 197              123
            (Audio, Elk Rapids, August)
10        Government's Exhibit 198              112
            (Audio, Elk Rapids, August)
11        Government's Exhibit 199              112
            (Audio, Elk Rapids, August)
12        Government's Exhibit 200              124
            (Audio, Elk Rapids, August)
13        Government's Exhibit 201              127
            (Audio, Elk Rapids, August)
14        Government's Exhibit 202              120
            (Photograph, Chappel, Fox & Molitor)
15        Government's Exhibit 204              128
            (Video, August 30)
16        Government's Exhibit 208              129
            (Chat, September 4)
17        Government's Exhibit 213              133
            (Chat, September 4)
18        Government's Exhibit 215              137
            (Audio, September 7)
19        Government's Exhibit 216              137
            (Audio, September 7)
20        Government's Exhibit 217              137
            (Audio, September 7)
21        Government's Exhibit 218              137
            (Audio, September 7)
22        Government's Exhibit 233              148
            (Photograph, Bridge)
23        Government's Exhibit 238              154
            (Google Maps)
24        Government's Exhibit 239              151
            (Video, Elk Rapids, FBI)
25        Government's Exhibit 247              157
            (Video, Elk Rapids, FBI)
```

```
 1      Government's Exhibit 248                    150
            (Audio, September 12)
 2      Government's Exhibit 249                    159
            (Audio, September 13)
 3      Government's Exhibit 250                    159
            (Audio, September 13)
 4      Government's Exhibit 251                    161
            (Audio, September 13)
 5      Government's Exhibit 254                    163
            (Audio, September 13)
 6      Government's Exhibit 255                    164
            (Audio, September 13)
 7      Government's Exhibit 260                    164
            (Audio, September 13)
 8      Government's Exhibit 262                    161
            (Audio, September 13)
 9      Government's Exhibit 263                    165
            (Audio, September 13)
10      Government's Exhibit 264                    166
            (Audio, September 13)
11      Government's Exhibit 436                    105
            (Chat, August 29)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE


I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, Michigan  49503