1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,

5              Plaintiff,          No:  1:20cr183-1/2/5/6

6    vs.                           VOLUME VI

7    ADAM DEAN FOX,
     BARRY GORDON CROFT, JR.,
8    DANIEL JOSEPH HARRIS and
     BRANDON MICHAEL-RAY CASERTA,

9
               Defendants.
10

11

12   Before:

                    THE HONORABLE ROBERT J. JONKER
13                       U.S. DISTRICT Judge
                      Grand Rapids, Michigan
14                    Monday, March 21, 2022
                      Jury Trial Proceedings
15

     APPEARANCES:
16

                    MR. ANDREW BIRGE, U.S. ATTORNEY
17                  By:  MR. NILS R. KESSLER
                    MR. JONATHAN C. ROTH
18                  The Law Building
                    333 Ionia Avenue, NW
19                  Grand Rapids, MI 49501-0208
                    (616) 456-2404
20
                         On behalf of the Plaintiff;
21
                    MR. CHRISTOPHER M. GIBBONS
22                  MS. KAREN M. BOER
                    Dunn Gibbons PLC
23                  125 Ottawa Avenue, NW, Suite 230
                    Grand Rapids, MI 49503-2865
24                  (616) 336-0003

25                       On behalf of Defendant Fox.

```
1              JOSHUA ADAM BLANCHARD
               Blanchard Law
2              309 South Lafayette Street, Suite 208
               P.O. 938
3              Greenville, MI 48838-1991

4                      On behalf of Defendant Croft, Jr.

5              JULIA ANNE KELLY
               Willey & Chamberlain LLP
6              300 Ottawa Avenue NW Suite 810
               Grand Rapids, MI 49503-2314
7              (616) 458-2212

8                      On behalf of Defendant Harris.

9              MICHAEL DARRAGH HILLS
               Hills at Law PC
10             425 South Westnedge Avenue
               Kalamazoo, MI 49007-5051
11             (269) 373-5430

12                     On behalf of Defendant Caserta.

13
      REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```

1          03/21/2022

2          (Proceedings, 8:29 a.m.)

3          LAW CLERK:  The United States District Court for the

4      Western District of Michigan is now in session.  The Honorable

5      Robert J. Jonker, chief judge, presiding.

6          THE COURT:  Well, welcome back everyone to the first

7      business day of spring 2022.  I hope you had a great first day

8      of spring yesterday as the sun was out and temperatures were

9      warm.  It was just beautiful.  Hopefully a promise of more to

10     come.  I did check the weather app today and when we are

11     scheduled to break for today between 2:00 and 3:00 it's

12     probably not as quite as warm as yesterday, but they are

13     predicting 50s and at least some sun, so we have something to

14     look forward to I hope.

15          I want to thank you all again for getting here,

16     getting here on time so we can get rolling.  I know you can't

17     always predict things like traffic delays, and despite some

18     surprising traffic delays this morning everybody made it and

19     here we are at an 8:30 start, and that's a tribute to your

20     ongoing dedication.  I really appreciate it.  I know the

21     parties do.  It was a really rough weekend for the Big 10.  I

22     don't know where you all are on that.  At least Michigan State

23     gave us a great show yesterday and a heart stopper on their

24     first game of the weekend.  Michigan is still alive of course

25     which from my perspective is good news.  That's a tribute to my

1    alma mater.  My sons though both went to Michigan State and for

2    them it has only added to the pain.  So my wife called them

3    right after the game last night, and I said, who are you

4    calling?  She said, well, I am calling The Boys.  I said, right

5    after the game?  Don't do that.  I am the last person they want

6    to talk to, which turned out to be true, but hopefully we'll be

7    back on speaking terms later this week.  It was an entertaining

8    weekend in any event if you didn't get too close to the game

9    loyalties.

10          You, I'm sure, remember that we were here last Friday

11   with a witness on the stand.  I don't see him on the stand

12   right now.  I take it he is ready to come.

13          MR. KESSLER:  Yes, Your Honor.

14          THE COURT:  Why don't we have him come on in.  When we

15   broke we were in the middle or hopefully beyond the middle of

16   the government's direct exam.  We had had some more to go

17   though.  So we know that Mr. Kessler is going to finish with

18   the witness this morning and then each of the lawyers, of

19   course, at the Defense table will have their chance to cross

20   examine.  We'll proceed until that's finished with CHS Dan.

21          Good morning.  How are you today, sir?

22          THE WITNESS:  Good.

23          THE COURT:  Good.  We're here from the Court's

24   perspective or the trial perspective just like we never left,

25   which means you are still under oath subject to penalty of

1    perjury as you testify.  You understand that?

2                THE WITNESS:  Yes, Your Honor.

3                THE COURT:  Okay.  And then I think we are ready to

4    go.  So let me turn it over to Mr. Kessler.

5                MR. KESSLER:  Thank you, Your Honor.

6                         DIRECT EXAMINATION

7      BY MR. KESSLER:

8    Q    All right.  Welcome back.

9    A    Good morning.

10   Q    So when we left off at the end of the week last week you

11   had just finished talking about your time in Luther, Michigan?

12   A    That's correct.

13   Q    You were there for two days, correct?

14   A    Correct.

15   Q    I'd like to just show you something before we get any

16   further.  If you would take a look behind tab 286?  Probably

17   that one.  All right.  Do you recognize that photograph?

18   A    I do.

19   Q    And do you remember seeing that in Luther, Michigan?

20   A    Yes.

21   Q    Is that an accurate representation of what you saw?

22   A    It is.

23                MR. KESSLER:  I'd like to post Government's Exhibit

24   286, Your Honor?

25                THE COURT:  Any objections?  It's admitted.

1    BY MR. KESSLER:

2    Q    All right.  Mr. Chappel --

3              THE COURT:  Hold on.  I am not sure why the protector

4    isn't coming up.  It's supposedly on.

5              MR. KESSLER:  It's on the small screen.

6              THE COURT:  I was playing with it this morning and

7    that's probably it.

8              MR. KESSLER:  There we go.

9              THE COURT:  When it doubt it's usually my

10   technological fault.  So go ahead.

11   BY MR. KESSLER:

12   Q    So Mr. Chappel, what are we looking at here?

13   A    A confederate flag.

14   Q    And where was that in Luther?

15   A    At the trailer that everybody stayed and sleeped in.

16   Q    Do you know whose trailer that was?

17   A    Ty Garbin.

18   Q    And we can see some names on there.  Do you recognize any

19   of those -- or I have another picture that's a little closer,

20   but do you recognize some of those?

21   A    I do.

22   Q    Okay.  If we can, I'd have you take a look behind tab 287.

23   Do you recognize that picture?

24   A    I do.

25   Q    Okay.  Do you recognize what you are looking at there, too,

1    as being accurate?

2    A    Yes.

3          MR. KESSLER:  I'd like to put up 287, Your Honor?

4          THE COURT:  Okay.  Hearing no objection we'll admit

5    287.

6    BY MR. KESSLER:

7    Q    We have it laid out here in a little better light.  If you

8    would, can we blow up just this area right here?  Let me get

9    that off the screen now.  All right.  Whose name is that?

10   A    That is mine.

11   Q    Okay.  And it says your handle, right, ETADIK?

12   A    Correct.

13   Q    And this here?

14   A    Adam Fox.

15   Q    This one here?

16   A    Kaleb Franks.

17   Q    Okay.

18   A    Daniel Harris.

19   Q    So why did you all end up signing that flag?

20   A    We were instructed to.

21   Q    By whom?

22   A    I believe Ty Garbin.

23   Q    Okay.  Just kind of a memento of being there?

24   A    Correct.

25   Q    Now, does this flag represent any particular beliefs to

1    you?

2    A    Hate.

3    Q    Why did you sign it?

4    A    To go along with the group.

5    Q    We've heard a lot of transcripts and we have seen some text

6    messages where you speak and you seem to be saying things that

7    agree with the group.  Was that the same thing?

8    A    Correct.

9    Q    Okay.  What would have happened if you had said no; that

10   represents hate; I don't want to sign it?

11        MS. KELLY:  Objection.  Calls for speculation.

12   BY MR. KESSLER:

13   Q    Why didn't you refuse to sign it?

14   A    Fear of being singled out and not going along with the

15   group.

16   Q    All right.  Is that what was behind the way you talked with

17   them as well?

18        THE COURT:  He has asked and answered that I think

19   already.

20        MR. KESSLER:  All right, Your Honor.

21   BY MR. KESSLER:

22   Q    So at the end of the FTX in Luther, when it broke up what

23   did you all agree to do?

24   A    That we'd be doing another field training exercise in

25   September for purchasing explosives.

1    Q    And where was that supposed to take place?

2    A    In Wisconsin.

3    Q    What did you guys all agree to do in the meantime?

4    A    Continue training and saving up funds to purchase the

5    explosives.

6    Q    So we saw a video earlier of Mr. Fox training in his

7    basement.  Do you recall that?

8    A    I do.

9    Q    Okay.  Let's fast forward to September 15th, which is a

10   couple of days after the Luther exercise ended.  Have you

11   reviewed a video that Mr. Caserta posted?

12   A    Yes.

13        MR. KESSLER:  I'd like to put up Government's Exhibit

14   265 if there is no objection.

15        MR. BLANCHARD:  One moment, please.

16        THE COURT:  Did I hear an objection?

17        MR. BLANCHARD:  I was just trying to figure out what

18   265 was.  No objection.

19        THE COURT:  All right.  It's admitted.

20        (Video started, 8:37 a.m.)

21        (Video stopped, 8:38 a.m.)

22   BY MR. KESSLER:

23   Q    You mentioned in your earlier testimony that you guys

24   posted these to critique each other?

25   A    That is correct.

1    Q    What was it that Mr. Caserta said at the end?

2    A    That he's engaging the safety.

3    Q    What was that related to?

4    A    For the magazine change itself.  So when he dropped the

5    magazine he was slipping the rifle from fire to safe, inserting

6    a new magazine, closing the bolt, and then going back to fire.

7    Q    Okay.  So this was the same sort of thing that we saw

8    earlier from Mr. Fox?

9    A    Correct.

10   Q    Now, let's go back to the beginning of your testimony for a

11   moment.  You said you had met some of these folks at a Second

12   Amendment protest at the Capitol.  Do you recall that?

13   A    Yes.

14   Q    Now, did some of the Wolverine Watchmen members other than

15   the Defendants continue to do that?

16   A    They did.

17   Q    Okay.  And how were you aware of that?

18   A    Through communication with them through Wire.

19   Q    Did you ever receive an invitation to participate in

20   something like that again or did the group?

21   A    We did.  Yes.

22   Q    Did you all discuss that on chat communications?

23   A    We did.

24   Q    So on September 17th, if you would like to look behind

25   Exhibit 266, did you communicate about that again?

1    A    Can you repeat the question?

2    Q    Do you recognize that chat?

3    A    I did.

4    Q    All right.  Is that an accurate representation of your

5    discussion about that?

6    A    Yes.

7         MR. KESSLER:  I'd like to publish Exhibit 266, Your

8    Honor?

9         THE COURT:  Okay.  Hearing no objection, 266 --

10        MR. BLANCHARD:  I've got the same Enright objection.

11        THE COURT:  Same ruling.  Go ahead.

12   BY MR. KESSLER:

13   Q    All right.  And we -- I think I want to read more than just

14   the bottom.  So let's --

15        MR. KESSLER:  Is it a little small for you, Your

16   Honor?  I know we had that issue.

17        THE COURT:  It's certainly small for me, but as I said

18   my eyes are old and decrepit.

19   BY MR. KESSLER:

20   Q    At the top, again, just to remind everyone, who is Alpha

21   Fuck You?

22   A    Adam Fox.

23   Q    So he says, so Grandpa wants us to meet at the Capitol this

24   Sunday, full kit at 3:00 p.m. for a meeting.  What you all

25   think?  So who was Grandpa again?

1    A    Pete Musico.

2    Q    And he was, you had testified, one of the founders of the

3    Wolverine Watchmen?

4    A    That is correct.

5    Q    So when he says he wants us to meet up at the Capitol this

6    Sunday in full kit.  What's full kit?

7    A    Body armor and rifles.

8    Q    Okay.  Kind of like we had seen from the previous

9    photographs?

10   A    That is correct.

11   Q    All right.  So Adam Fox continues, I'm going to go with the

12   consensus of the group, so please say your thoughts asap.  Who

13   is Squash?

14   A    Alex Davidson.

15   Q    And is he related to anybody in this case?

16   A    He is roommates with Ty Garbin.

17   Q    He says, our group has separated ourselves from Joe and

18   Pete for the most part.  I won't be going.  And then we have

19   Gunny, who is gunny?

20   A    Ty Garbin.

21   Q    He says negative.  We have agreed multiple times no

22   protests.  Do you recall discussions among the group about

23   attending protests?

24   A    I do.  Yes.

25   Q    Tell the jury the nature of those discussions?

A     That we would -- or not be going to anymore protests to

limit our social profile out there.  So every time we went the

media would be taking pictures because we are wearing the

Hawaiian shirts and body armor.  So we wanted to separate

ourselves from that to mitigate the exposure.

Q     Adam Fox goes onto say, copy that.  He says, an armed meet

up lol.  And then Ty Garbin goes on, I would highly advise

minimizing any communication with him.  Also, there needs to be

zero and I mean zero public interaction if we want to continue

with our plans.  Did you know what those plans were?

A     I do.

Q     What were they?

A     To kidnap the governor.

Q     And then who is Debased Tyrant again?

A     Brandon Caserta.

Q     He says, yeah, no more protests right now.  He is searching

for clout and it's too hot for us to be associating with him at

this moment in time.

      All right.  If we can go on down.  I think we go to

the next page.  Brandon Caserta goes on, yeah.  No more -- oh,

I'm sorry.  We read that one.  Adam Fox replies, copy that.

And Squach says, so another armed protest lol.  I have no idea

what he is trying to accomplish and 100 percent agree with

Gunny.

      And then we can skip over.  I don't think we can read

1    that.  Let's go to the bottom.  Adam Fox says, you guys know

2    I'll always be transparent with you.

3            And then we have one more page.  Brandon Caserta

4    replies, okay.  So you want to do an armed protest to strike

5    fear.  F-ing retards, man.  So then in the green, is that you?

6    A    Correct.

7    Q    You said, yeah, no go on the Capitol.  I agree Ty.  Brandon

8    Caserta replies, when the time comes there will be no need to

9    try and strike fear through presence.  The fear will be

10   manifested through bullets.  Do you recall talking with Brandon

11   Caserta like that?

12   A    I do.

13   Q    What other kinds of things like that did he say?

14           MR. HILLS:  I am going to object unless there is a

15   specific time that we are talking about.

16           THE COURT:  I think you need to limit that.  That's a

17   pretty wide open invitation to narrative.

18   BY MR. KESSLER:

19   Q    What type of things did he say about it at this time?

20   A    That he would kill law enforcement.  He would display

21   videos to the group that he would shoot officers after numerous

22   traffic stops that he -- claiming that they are stealing.  They

23   are road pirates.

24   Q    Okay.  Now, we had seen some testimony and some chats the

25   last time you were up here on the stand about going to live off

1    the grid or farming whatever after everything -- after the

2    Boogaloo kicked off.  Do you recall that?

3    A    I do.

4    Q    Do you recall some chat discussions about tying up lose

5    ends?

6    A    Yes.

7    Q    Let's go forward two days to September 19th.  Would you

8    take a look behind tab 272, please?  All right.  Do you

9    recognize that chat?

10   A    I do.

11   Q    And were you a part of that discussion as well?

12   A    I was.

13          MR. KESSLER:  Okay.  I'd like to publish Exhibit 272,

14   Your Honor?

15          MR. BLANCHARD:  Same objection.

16          THE COURT:  All right.  Same ruling and it can be

17   admitted.

18   BY MR. KESSLER:

19   Q    All right.  So again, this is the FAFO chat, and at the top

20   it says, Adam Fox says, Roger that.  And then Beaker -- again,

21   remind the jury who Beaker is?

22   A    Daniel Harris.

23   Q    He says, hey.  So who would want to go to Maine to kill an

24   ex cop for a friend of mine and get her shit from him?  Do you

25   remember this discussion?

```
1    A    I do.

2    Q    What was it about?

3    A    Targeting a police officer and killing him.

4    Q    For any particular reason?

5    A    The exact details I am kind of blurry on.

6    Q    Okay.  Now, did you guys talk about doing some continued

7    training?

8    A    Yes.

9    Q    All right.  How about indoor training?  You had done

10   something with the shoot house, but was there ever any

11   discussion about doing training inside a building?

12   A    There was.  Yes.

13   Q    Take a look behind tab 443, please.

14        MR. BLANCHARD:  Judge, I apologize for interrupting.

15   We need to address an issue on Rule 615.  We've got a witness

16   that needs to be excluded and won't leave.

17        THE COURT:  All right.  Take a look around all

18   counsel.  If you see somebody in the room who is on your

19   witness list prospectively they should be removed.

20        MR. BLANCHARD:  Special Agent Long.

21        MR. KESSLER:  You are going to call him again?

22        MR. BLANCHARD:  Yeah.  We'd ask him to leave.  Thank

23   you.

24        THE COURT:  Go ahead, Mr. Kessler.

25        THE WITNESS:  What tab was that again.
```

1          MR. KESSLER:  443.

2    BY MR. KESSLER:

3    Q    All right.  Do you recognize that chat conversation?

4    A    I do.

5    Q    Were you a part of that one as well?

6    A    I was.

7          MR. KESSLER:  I'd like to publish Exhibit 443, Your

8    Honor.

9          THE COURT:  Go ahead.  It's admitted without

10   objection.

11   BY MR. KESSLER:

12   Q    Okay.  All right.  So at the top we have Adam Fox says,

13   well, I am alone in the city so should I just plan on flying

14   solo.  And then Ty Garbin replies, if shit starts burning you

15   are more that welcome to pack out to my place.  Fox replies,

16   roger, and thank you brother.  Probably be the only place I can

17   get to anyway imagined N north.  Is that correct?

18   A    That's correct.

19   Q    North is the only direction to go.  Then Adam Fox says, I

20   am going to get the basement of this store cleared and if

21   anyone wants to we can do a CQC training here clearing this big

22   ass building upstairs and down.  What's CQC training?

23   A    Close quarter combat.

24   Q    Okay.  And then the next statement he makes is, work on

25   acquiring an asset and detaining for extraction.  What would

1    the asset be?

2    A    The governor.

3    Q    Okay.  And what would extraction mean exactly?

4    A    Taking her from her residence to the body of water to

5    Wisconsin.

6    Q    Okay.  Did he talk about what that practice would involve?

7    A    Yes.

8    Q    What would that be?

9    A    Black bagging her.  The gun fight initially with her

10   detail, taking her on a UTV, so side by side vehicle, to the

11   lake, put her on a boat and taking her from there.

12   Q    Okay.  And this would be the practice?

13   A    Yes.

14   Q    So he says, work on acquiring an asset and detaining for

15   extraction?  And Brandon Caserta replies, that sounds pretty

16   tight.  Adam Fox states, we will need all the reps we can get.

17   Have six weeks till election and one week is FTX, so let's

18   utilize those five weekends the best we can.  So the FTX, would

19   that be the one you discussed earlier in Wisconsin that was

20   planned?

21   A    Correct.

22   Q    Okay.  And what are reps?

23   A    Repetitions.  So drills.

24   Q    Practicing this extraction?

25   A    Correct.

Q    You mentioned a couple of minutes ago that Mr. Caserta had posted some things about law enforcement.  Do you recall seeing those videos?

A    I do.  Yes.

Q    And do those videos that you looked at, do those accurately reflect the videos that you saw back when he posted them in September?

A    They are.  Yes.

        MR. KESSLER:  So September 29th, let's take that first.  I'd like to show Government's Exhibit 274, Your Honor?

        THE COURT:  Okay.  Objections to 274?  It's admitted.

        MR. HILLS:  As noted.

        (Video started, 8:49 a.m.)

        (Video stopped, 8:49 a.m.)

        (Video started, 8:49 a.m.)

        (Video stopped, 8:49 a.m.)

BY MR. KESSLER:

Q    Did Mr. Caserta also talk about tyranny or tyrants?

A    He has.  Yes.

        MR. KESSLER:  I'd like to go forward to September 30th, the next day.  I'd like to show Exhibit 275, Your Honor?

        THE COURT:  Hearing no objections, 275 is admitted.

        (Video started, 8:50 a.m.)

        (Video stopped, 8:50 a.m.)

BY MR. KESSLER:

Q    Now, he said Gunny.  That's Ty Garbin, right?

A    That's correct.

Q    That Ty Garbin and them know way too much about what, do you know?

A    The firearms.

Q    And so what does he mean by the rest of it?

        MR. HILLS:  I'm going to object.  Calls for speculation.

        MR. KESSLER:  I agree.  I'll rephrase that.

BY MR. KESSLER:

Q    He was saying just go ahead and buy it.  Do you recall having a discussion like that with Mr. Caserta?

A    I do.

Q    What was he telling you?

A    Just go out and buy a normal gun.  Nothing fancy or crazy. You can get just a cheap pistol or a cheap AR.  It doesn't have to be a high end rifle like what Ty has.

Q    Okay.  Now, last week we talked about the conversation that you all had at the end of the training in Luther.  You said you needed to raise $4,000.  Do you remember that?

A    I do.

Q    And again, what was that for?

A    Explosives.

Q    Did you talk with Daniel Harris about that?

A    I did.

```
1    Q    Did you guys have a pool of money for anything in

2    particular?

3    A    We did.  Yes.

4    Q    What was that?

5    A    Ammunition, firearms, parts, training aids.

6    Q    All right.  And when the discussion about the $4,000 for

7    explosives came up, did you specifically talk with Mr. Harris

8    about that?

9    A    I did.

10   Q    What did he say about the pool money?

11   A    That we could use that for the explosives.

12   Q    Now, did you talk with Mr. Fox about that?

13   A    The pool money itself or --

14   Q    Just about the $4,000?

15   A    I did.  Yes.

16   Q    All right.  So you knew that this person who went by Red

17   was actually an FBI agent, correct?

18   A    I do.  Yes.

19   Q    All right.  Did you talk to Mr. Fox about meeting with Red?

20   A    Yes.

21   Q    What did you tell Mr. Fox?

22   A    That the meeting with Red was going to be for training

23   aids.  He was going to be in the state and that we would be

24   able to get some stuff off of him.

25   Q    Okay.  Did you talk with him about money for the
```

1    explosives?

2    A    That discussion was brought up.  Yes.

3    Q    Did you record that conversation?

4    A    I did.

5         MR. KESSLER:  I'd like to play Government's Exhibit

6    276, Your Honor.  Let me lay a little more foundation for that.

7    BY MR. KESSLER:

8    Q    Have you heard that recording before we came in here today?

9    A    I have.  Yes.

10   Q    And that and the transcript accurately reflect what you

11   heard?

12   A    Yes.

13        MR. KESSLER:  I'd like to play 276, Your Honor?

14        THE COURT:  Any objections?  Hearing none it's

15   admitted.

16        (Audio started, 8:52 a.m.)

17        (Audio stopped, 8:53 a.m.)

18   BY MR. KESSLER:

19   Q    Did you go onto talk with Mr. Fox about who else would be

20   coming up with money?

21   A    Yes.

22   Q    And have you listened to that recording and seen the

23   transcript before we came in here?

24   A    I have.  Yes.

25   Q    Accurate?

```
1    A    It is.
2              MR. KESSLER:  I'd like to play Government's Exhibit
3    277, Your Honor?
4              THE COURT:  All right.  Hearing no objections it's
5    admitted.
6                   (Audio started, 8:53 a.m.)
7                   (Audio stopped, 8:55 a.m.)
8    BY MR. KESSLER:
9    Q    All right.  So to be clear, when he was listing the people
10   who he said he expected to bring money, he said Barry.  Who is
11   that?
12   A    Barry Croft.
13   Q    Beaker?
14   A    Daniel Harris.
15   Q    And Brandon?
16   A    Brandon Caserta.
17   Q    Did you all talk about training again in the basement?
18   A    Yes.
19   Q    And was that conversation recorded between you and Mr. Fox?
20   A    It was.  Yes.
21   Q    Also the recording and the transcript accurate?
22   A    Yes.
23             MR. KESSLER:  I'd like to play Government's Exhibit
24   278, Your Honor?
25             THE COURT:  Objections?  Hearing none 278 is admitted.
```

1          (Audio started, 8:56 a.m.)

2          (Audio stopped, 8:58 a.m.)

3     BY MR. KESSLER:

4     Q    Now, we heard Mr. Fox talk about not wanting to waste flex

5     cuffs when you are practicing detaining somebody.  Can you

6     explain that to the jury?

7     A    With the flex cuffs it's not an easy on/off.  You have to

8     literally cut them off.  So by wasting them he would have to go

9     out and purchase more of them.

10    Q    And we also heard him earlier talking about doing reps.

11    Does that mean that if you kept doing reps you'd have to keep

12    wasting flex cuffs?

13    A    Correct.

14    Q    On October 2nd, do you recall some discussions about the

15    Michigan Supreme Court ruling against the governor's COVID

16    mandates?

17    A    I do.  Yes.

18    Q    Did the group discuss that on FAFO chat?

19    A    Yes.

20    Q    Can you take a look behind tab 279?  And do you recognize

21    that chat?

22    A    I do.

23    Q    Were you part of that chat group?

24    A    I was.

25          MR. KESSLER:  I'd like to put up Exhibit 279, Your

1    Honor?

2              THE COURT:  Objections?

3              MR. GIBBONS:  No.

4              THE COURT:  It's admitted.

5    BY MR. KESSLER:

6    Q    So we have at the top, Barricade.  Again, that was -- you

7    testified earlier that was Mr. Molitor, is that right?

8    A    That's correct.

9    Q    Says, you all hear Michigan Supreme Court has said that

10   Whitmer's EO -- is that executive order?

11   A    Emergency order.  Yes.

12   Q    Emergency order were unconstitutional as well as the law

13   she used to abuse her, quote-unquote, power.  She is still

14   governor for now but her mandates are Null and void.  Adam Fox

15   replies, F yes.  When's the lynching?  He then says, she should

16   be arrested now immediately.  Who wants to roll out?

17             See if we can go down a little.  Molitor replies,

18   think about this.  She was backed by our AG Nessel.  Who is

19   that?

20   A    The Attorney General.

21   Q    Which means that our AG was supporting unconstitutional

22   laws.  This isn't just Whitmer.  It's put our whole system in

23   Michigan on blast, bro.  Adam Fox replies, let's charge them

24   all.

25             Is there a second page?  Barricade -- and then he

says -- Adam Fox says, hold everyone accountable that should be from top to bottom.  Barricade replies, in process.  Then Adam says, they better get removed from office and charged to the fullest extent of the law.  Can you share link to article.  I'd like to read for myself.  And then Barricade says, it wasn't an article.

I think we have one more page, right?  Nope.  Okay. Do you recall this conversation?

A    I do.

Q    All right.  So Adam Fox, you testified earlier, he had also talked about getting a constitutional sheriff to go out and do an arrest?

A    Correct.

Q    Okay.  And did you discuss that with him?

A    Yes.

Q    Any luck getting anybody to agree to that?

A    No.

Q    All right.  Did this conversation go on talking about a citizens arrest?

A    Briefly.  Yes.

Q    Would you take a look behind tab 282, please?  Do you recognize that chat?

A    I do.

Q    Were you also a part of that one?

A    I was.

1            MR. KESSLER:  I'd like to put up 282, Your Honor?

2            THE COURT:  So without objection 282 is admitted.

3            MR. GIBBONS:  None, Your Honor.

4     BY MR. KESSLER:

5     Q    So Adam Fox goes on, so in light of all this and her saying

6     she's going to keep using executive powers she's now officially

7     a tyrant and we can make a citizens arrest on her.  Who is

8     down?  Take some balls but hey, she is in violation multiple

9     times of the constitution so it's game on.  I've got cuffs.

10    Just saying.  There is a long part from Barricade, but focus on

11    this part.  He says, I ain't going to jail over a dead bitch.

12    Governor Whitmer wasn't dead right then, was she?

13    A    No.  She was not.

14    Q    You were part of this conversation.  What did you

15    understand this to mean?

16    A    They would kill her.

17    Q    And did Barricade continue to meet with you all?

18    A    He did.  Yes.

19    Q    Adam Fox goes on, I still want to hog tie her ass in a

20    folding table while we all pose like we just made the biggest

21    drug bust of all time and take pics.  How can we allow the ones

22    breaking the law to uphold the law against us.  Seriously.

23           Earlier on we heard Adam Fox talking to you about

24    getting some additional equipment for the asset extraction.  Do

25    you recall that conversation.

```
 1    A    I do.

 2    Q    And do you remember what equipment it was?

 3    A    Tasers, more flex cuffs.

 4    Q    Okay.  Do you recall seeing a video of Mr. Fox showing some

 5    of that equipment?

 6    A    I do.

 7         MR. KESSLER:  All right.  I'd like to play

 8    Government's Exhibit 283, Your Honor?

 9         THE COURT:  Any objections?  All right.  283 is

10    admitted.

11         (Video started, 9:03 a.m.)

12         (Video stopped, 9:04 a.m.)

13         MR. KESSLER:  No sound.

14         (Video started, 9:04 a.m.)

15         (Video stopped, 9:04 a.m.)

16    BY MR. KESSLER:

17    Q    Do you remember actually seeing that live?

18    A    Yes.

19    Q    When did you see that taser live?

20    A    October 7th in my vehicle on my way to meet Red.

21    Q    All right.  Tell us what happened on October 7th?

22    A    I drove out to Grand Rapids.  I picked Adam up from the Vac

23    Shack.  We then went to Ty Garbin's residence and picked up

24    him, Kaleb Franks and Daniel Harris, and then we made our way

25    to what they thought was Buffalo Wild Wings and we met up
```

1    with -- going to meet up with Red for the arrest.

2    Q    All right.  And you knew what was supposed to happen?

3    A    I did.

4    Q    What did you know was going to happen?

5    A    That the FBI's HRT team would be showing up and doing a

6    takedown.

7    Q    Do you know what HRT is?

8    A    Hostage rescue team.

9    Q    Is that sort of like a SWAT team?

10   A    A built up one.

11   Q    When you say a built up one?

12   A    The -- like the next tier up.  It's like their best of the

13   best.

14   Q    So when you got to Ypsilanti, Michigan, what happened?

15   A    At the actual takedown place?  We pulled the vehicle in in

16   front of, like, a large warehouse building.  Myself --

17   everybody exited the vehicle except for Adam Fox.  We got to

18   the rear of my truck, and that's where I was bringing out a

19   lower receiver for Kaleb Franks, and that was a sign for the

20   HRT team.  About 15 seconds later Ty Garbin says, we are going

21   to jail.  Maybe 10 seconds after that numerous flash bangs were

22   thrown out and then the HRT team showed up.

23   Q    And arrested everyone?

24   A    They did.

25           MR. KESSLER:  I have nothing further, Your Honor.

1    THE COURT:  All right.  So we're at the end of the

2    government's direct exam and we'll go to cross now.  We'll

3    follow the same order that we have starting with Mr. Gibbons

4    for Mr. Fox, and give you a second to get organized.  I know

5    you knew this was coming so you had some weekend time but

6    there's still always a bit of time you need to get situated,

7    and let me start with the Defense system.  It looks like I've

8    got that on line.  So to the extent you need that, that's ready

9    to go.

10                        CROSS EXAMINATION

11    BY MR. GIBBONS:

12    Q    Good morning, Mr. Chappel.

13    A    Good morning, sir.

14    Q    You testified that you encountered the Watchmen first in

15    mid-March of 2020, is that correct?

16    A    That is correct.

17    Q    And you did that through an interaction on a FaceBook page,

18    correct?

19    A    Correct.

20    Q    And things that you saw on that page concerned you so you

21    reached out to law enforcement, true?

22    A    Correct.

23    Q    And shortly thereafter law enforcement responded to your

24    concerns via the FBI, correct?

25    A    Correct.

Q    You were asked by the FBI to participate as an informant, correct?

A    Correct.

Q    Participating as an informant from your perspective meant that you were to provide access?

A    That's correct.

Q    And by access that means that you were to engage with the Watchmen, correct?

A    Correct.

Q    Be accepted into the group?

A    Correct.

Q    Engage with members socially and in the context of their group, correct?

A    That's correct.

Q    The FBI asked you to report back to them about things you were seeing and hearing during your interaction with the Watchmen, true?

A    True.

Q    As you move forward into the spring the Watchmen were going to a number of events, correct?

A    That's correct.

Q    And you were going with the Watchmen to these events, true?

A    True.

Q    One of those events -- can I have Exhibit 5?

        THE COURT:  Which one?

1          MR. GIBBONS:  Government's Exhibit 5.

2          THE COURT:  All right.  Already in.  Very good.

3     BY MR. GIBBONS:

4     Q    One of the events that you went to was on April 30th,

5     correct?

6     A    That is correct.

7     Q    And I believe that Exhibit 5 here is a photograph that was

8     taken by someone on April 30th in the rotunda at the Capitol in

9     Lansing, true?

10    A    Correct.

11    Q    And this depicts Adam Fox, does it not?

12    A    It does.

13    Q    You were not aware of Adam Fox individually on April 30th,

14    were you?

15    A    I was not.  No.

16    Q    Adam Fox on April 30th was not associated with the

17    Watchmen, true?

18    A    True.

19    Q    He was not a member?

20    A    Correct.

21    Q    He was not in their FaceBook group?

22    A    Correct.

23    Q    And he was not on their Wire chats?

24    A    That is correct.

25    Q    By April 30th, you were on the Wire chats with the members

1    of the Watchmen, correct?

2    A    I was.  Yes.

3    Q    Were you in their leadership chat?

4    A    I was.

5    Q    And then did they have another broader chat of their

6    members?

7    A    They did.  Yes.

8    Q    And so that was the Watchmen chat, I guess is that what you

9    would call it?

10   A    Yeah.  Correct.

11   Q    And then there was a tighter more insular group of leaders

12   and there was a leadership chat, true?

13   A    True.

14   Q    This was on a platform called Wire?

15   A    That is correct.

16   Q    Wire is supposed to be encrypted, correct?

17   A    True.

18   Q    But it's available really to anyone, true?

19   A    It is.

20   Q    You can download it in the app store on your phone,

21   correct?

22   A    Correct.

23   Q    I think it's free, isn't it?

24   A    It is.

25   Q    Pam, can I have Exhibit 7 for the government?

1      This Exhibit 7, you can -- this is taken on, again, on

2   April 30th, correct?

3   A    I believe that was the date.  Yes.

4   Q    All right.  And there are six individuals standing there in

5   front of what I guess is the governor's office, true?

6   A    True.

7   Q    You were there with this group, correct?

8   A    I took the photo.  Yes.

9   Q    You took the photo?

10  A    I did.

11  Q    So you were a part of the group because you were part of

12  the Watchmen, correct?

13  A    I was.

14  Q    And you were providing access to the FBI?

15  A    I was.

16  Q    And this is kind of evidence of that participation, right?

17  You were there, so you took the photo, so now they have access,

18  correct?

19  A    Correct.

20  Q    You would agree that Adam Fox is not depicted in that

21  picture?

22  A    He is not.  No.

23  Q    You would also agree that with respect to the Watchmen who

24  you were tasked to be with that day, they did not violate the

25  law, correct?

1    A    They did not.  No.

2    Q    They entered the building lawfully, true?

3    A    On that day, yes.

4    Q    Yes.  They subjected themselves to COVID protocols that

5    were in place at the Capitol that day?

6    A    Correct.

7    Q    They subjected themselves to temperature checks?

8    A    They did.

9    Q    They maintained open carry at all times here as you see in

10   this picture, correct?

11   A    On the temperature check, that was on April 15th, and that

12   was when the storming the Capitol took place.  They were not

13   allowed to go into the Capitol on that day.  There was talks of

14   storming it, and I was relaying back to the FBI through a live

15   feed device.  So I believe in mitigation of violence that the

16   FBI let them go through there following the COVID procedures.

17   Q    And so there was talk, that was on April 15th, amongst the

18   Watchmen?

19   A    Correct.

20   Q    Adam Fox was not a part of that, correct?

21   A    With the Watchmen, no.

22   Q    Okay.  And on April 15th specifically, too, correct?

23   A    Correct.

24   Q    And on April 15th, the Watchmen did not break the close of

25   the Capitol against the law, right?

1    A    Can you say again?

2    Q    On April 15th the Watchmen that you were with, no one

3    breached the Capitol, true?

4    A    We did.  Yes.  We gained entry to the building.

5    Q    Lawfully?

6    A    Lawfully.  Yes.

7    Q    Well, okay.  No one trespassed on that day, did they?

8    A    No.

9    Q    No one broke the law on that day, did they?

10   A    I feel by deescalation of my presence there.

11   Q    I didn't ask you that, sir.  I asked you very specifically,

12   none of the Watchmen you were with broke the law that day, did

13   they?

14   A    They did not.  No.

15   Q    Thank you.  So that's two events you are providing access

16   now to the FBI.  We are through the end of April.  You've gone

17   to at least two events with them, correct?

18   A    Yes.

19   Q    And you've been on their chats?

20   A    I was.

21   Q    You are making all that known to the FBI?

22   A    Correct.

23   Q    And they have not yet broken the law, correct?

24   A    No.

25   Q    Moving forward in time, I think you went on a QRF to a

1    Black Lives Matter event?

2    A    In Detroit, correct.

3    Q    And you were with the Watchmen -- and what date was that,

4    do you recall?

5    A    The date I am not sure.  No.

6    Q    Towards the end of May, early June, was it not?

7    A    That could be it.

8    Q    Okay.  And the idea for the Watchmen there was that they

9    were going to go to a Black Lives Matter protest, Lake Orion;

10   isn't that where it was?

11   A    For that one I was not present with in the Lake Orion.

12   Q    They did go there, though, too?

13   A    They did.

14   Q    Nothing happened there that would amount to a violation of

15   criminal laws, correct?

16   A    I was not present there so I am not sure.

17   Q    And then you went on an event to Detroit, is that right?

18   A    I did.  Yes.

19   Q    And what was the point of going to Detroit?

20   A    Paul Bellar had some friends that was going to be inside

21   some movement protesting against law enforcement, so we were

22   going to be a QRF, a quick reaction force for the individuals

23   that was inside there if police were to start shooting rubber

24   bullets at them or tear gassing, and then we would out flank

25   the police and come up to them and engage with law enforcement.

```
 1    Q    Okay.  And that was the plan, correct?

 2    A    That was the plan.

 3    Q    And that amounted to the Watchmen going to a parking lot

 4    and staging, true?

 5    A    Yes.

 6    Q    Okay.  And sat there for a couple hours?

 7    A    Several hours.  Yes.

 8    Q    And then they went home, right?

 9    A    Correct.

10    Q    Never really left the parking lot; hung out and chatted

11    around the truck, correct?

12    A    Fortunately, yes.  They -- at one point they exited the

13    vehicle.  They doned body armor, retrieved their rifles from

14    the bed of the vehicle, and loaded them and waited inside the

15    truck.

16    Q    And then they went home?

17    A    After several hours, yes, we then left.

18    Q    No crimes?

19    A    Say again?

20    Q    No crimes?

21    A    Fortunately none.

22    Q    Okay.  Who -- you reported to two FBI agents, is that

23    correct, for the most part?

24    A    That is correct.

25    Q    And your contact agents would have been Jayson Chambers?
```

1   A    Correct.

2   Q    And is Jayson Chambers seated in the courtroom today?

3   A    He is.

4   Q    Can you point him out, please?  Seated here at counsel

5   table?

6   A    Yes, sir.

7   Q    With a suit and a blue striped tie, correct?

8   A    That's correct.

9   Q    Closest to the jury box.  And then there was another agent,

10  correct, that you would have contact with?

11  A    Correct.

12  Q    And his name was Henrik Impola, is that true?

13  A    That's correct.

14  Q    Okay.  As this spring progressed into early summer, you

15  assumed a number of roles with the Watchmen within the group,

16  correct?  You were on their leadership chat, true?

17  A    I was.

18  Q    So you were considered one of the guys that kind of had a

19  little more to offer, correct?

20  A    Fair to say.

21  Q    And that's because you had tactical experience with

22  firearms and training, true?

23  A    Correct.

24  Q    You assumed the role of trainer for the organization, did

25  you not?

1     A     I did not.  No.

2     Q     You did not provide tactical training?

3     A     I provided training for them with Paul Bellar.  I did not

4     take the leadership role of that.  I was just an assistant

5     instructor to him.

6     Q     Okay.  You did provide training with regard to exiting

7     vehicles and protecting yourselves in ambush.  We saw some of

8     those videos already?

9     A     After them requesting me to do it, yes.

10    Q     So if they asked you, you would do that?

11    A     After clearing it with the FBI.  Yes.

12    Q     Okay.

13    A     I would not provide specialized training.  It was all open

14    source.  You could find it on YouTube.

15    Q     Were you instructed not to go out of your way to volunteer

16    to take the lead on training?  Was that something you were not

17    supposed to do?

18    A     That's correct.  I advised for safety measures, as well.

19    Q     Okay.  And so your role was to provide access, correct?

20    A     Correct.

21    Q     And to participate to the extent you were asked to?

22    A     Correct.

23    Q     Right.  Because it shouldn't be your idea, correct?

24    A     Correct.

25    Q     I mean, I think the thing you are getting at is if I say to

1    you, you are training the Watchmen, you mean, I was doing what

2    the Watchmen wanted me to do, correct?

3    A    Correct.

4    Q    You weren't taking the lead and suggesting different ways

5    to train?

6    A    I was not.  No.

7    Q    Unless they asked you for that?

8    A    Correct.

9    Q    Then given safety protocols you could make those decisions,

10   right?

11   A    Correct.

12   Q    But you'd have to be invited first to do it?

13   A    Correct.

14   Q    There was a meeting on June 3rd of 2020 with the Watchmen,

15   correct, or a training?

16   A    June 3rd, yeah, that was at Ty Garbin's house.

17   Q    The Watchmen wanted to put you in charge and make you CO of

18   the Watchmen group, is that correct?

19   A    It brought up.  Yes.

20   Q    Yes.  You declined to take that leadership position, true?

21   A    I did.

22   Q    And that -- because that leadership position, if you took

23   it, could present problems for you as an informant, could it

24   not?

25   A    It was not my group to begin with.  It was Pete Morrison's

1    group, and they were just wanting to put titles to it.  So it

2    was always Joe's group.

3    Q    Right.  Well, and as a tasked informant you are really not

4    supposed to be in charge, true?

5    A    True.

6    Q    So it would make sense that you would decline that

7    invitation, correct?

8    A    Correct.

9    Q    And you did?

10   A    But it was Joe's group to begin with.

11   Q    Right.  And you did; you stepped back; you said, I am not

12   going to do that, right?

13   A    Correct.

14   Q    Did you agree to serve as XO?

15   A    Correct.

16   Q    And you talked to Agent Impola and Agent Chambers about

17   that circumstance, correct?

18   A    I did.

19   Q    You advised them that's -- and let's maybe just step back

20   just a little bit.  As an informant working for the FBI and

21   with these two handling agents, you have an obligation to

22   communicate with them, true?

23   A    I did.

24   Q    So you just can't go running around doing what you want?

25   A    Never.

```
 1    Q    Right?  So when this meeting and this opportunity arose for

 2    you to become XO, you discussed that with them, correct?

 3    A    With?

 4    Q    With your handling agents, with Mr. Impola and

 5    Mr. Chambers?

 6    A    It might have been brought up, but with the discussion at

 7    the group there with the Watchmen that was all on the fly.

 8    Q    Correct.  Correct.  But then did you get -- you did -- you

 9    did advise your handling agents that this position had been

10    offered to you and you took it?

11    A    Yes.

12    Q    Okay.  And they didn't have a problem with that, did they?

13    A    As the XO?  No.

14    Q    No.  They gave you authority to do that and they said go

15    forth and do your work and keep being a fly on the wall for us,

16    correct?

17    A    Correct.

18    Q    But you were given some admonishments at that time?

19    A    As far as?

20    Q    Pardon?

21    A    As far as?

22    Q    Well, Henrik Impola says that he told you that in your role

23    as the XO for the Watchmen that you were not to initiate any

24    ideas.  Do you recall him advising you of that?

25    A    I do.
```

1    Q    Do you recall that he told you that you were not to help

2    develop any attack plans?

3    A    I do.

4    Q    And do you recall that you were not to help Joe Morrison

5    maintain control of the group as a leader?

6    A    I am not sure on that part.

7              MR. GIBBONS:  May I approach the witness, Your Honor?

8              THE COURT:  Yeah.  Actually, do you have it in your

9    system?  I can -- figured this out over the weekend, so if you

10   want to put it on -- you don't?

11             MR. GIBBONS:  No.  I just have this for just for

12   reminders for him.  So I didn't plan to introduce it.

13             THE COURT:  Go ahead.  Sure.

14   BY MR. GIBBONS:

15   Q    Take a look at that.  This is Henrik Impola's report, and

16   I've highlighted narrative.  Does that help?

17   A    Okay.  All right.

18   Q    Thank you, sir.

19   A    Thank you.

20   Q    Having looked at Henrik Impola's report, would you agree

21   that it appears that he did advise you that you were to not

22   help Joe Morrison maintain control of the group as a leader?

23   A    That's correct.

24   Q    So those are the three things that you have to do in this

25   new role, correct, or not do I guess is the best way to put it?

1    A    Correct.

2    Q    So don't initiate ideas, don't help develop attack plans,

3    and don't help Joe Morrison maintain control of the group,

4    correct?

5    A    Correct.

6    Q    Adam Fox is still not really on your radar as of June 3rd,

7    is he?

8    A    No.

9    Q    Okay.  You first encounter or become aware of Adam Fox

10   towards the middle of June, is that right?

11   A    That's fair to say.  Yes.

12   Q    Okay.  And we saw the recent exhibit that just came up with

13   the confederate flag?

14   A    Correct.

15   Q    You remember?  And this kind of relates to the Watchmen.

16   The Watchmen were not a white supremacist group, were they?

17   A    No.

18   Q    Okay.  And Adam Fox had a group called the Michigan Patriot

19   III% Militia.  That was not a white supremacist organization

20   either, was it?

21   A    No.

22   Q    And Adam Fox's Michigan III% Patriot Militia was part of a

23   broader coalition of related state militias, is that true?

24   A    I believe so.

25   Q    Okay.  Because you went to Cambria, and we are going to

1    talk in detail about all of that, but at one point you went to

2    Cambria, Wisconsin, correct?

3    A    I did.

4    Q    And you met a guy named Steve Robeson, true?

5    A    I did.

6    Q    And then you went to another meeting in Peebles, Ohio in

7    the middle of July, correct?

8    A    Correct.

9    Q    And Steve Robeson was there, true?

10   A    He was.

11   Q    Steve Robeson maintained a role as an III% Patriot Militia

12   leader, correct?

13   A    I believe so.  Yes.

14   Q    Okay.  He was the president of the national board, do you

15   know?

16   A    I believe that to be Barry Croft.

17   Q    Barry Croft was the president of the national board?

18   A    Correct.  He was a national contact.

19   Q    Okay.  Steve Robeson was the commanding officer for the

20   state of Wisconsin, correct?

21   A    I believe so.

22   Q    And he had a group there, true?

23   A    He did.

24   Q    He hosted the event at Cambria, correct?

25   A    I believe so.  Yes.

1    Q    Okay.  In any event, nothing about anything you ever

2    learned about the III% Patriot Militia led you to believe that

3    it was a group that espoused white supremacy as a part of its

4    function?

5    A    Not.  Not for white supremacy.

6    Q    Okay.  The flag that we saw, that you signed?

7    A    I did.

8    Q    That belonged to Ty Garbin's grandfather, correct?

9         MR. KESSLER:  Asks for speculation, Your Honor.

10        THE COURT:  If he knows he can say it.  If he doesn't

11   he can say he doesn't know.

12   BY MR. GIBBONS:

13   Q    You were at Luther, right?  The boys were all hanging out

14   and you guys.  You were part of that event, true?

15   A    I was.

16   Q    So generally speaking, isn't it true that that flag just

17   hangs in the trailer that's up there, correct, on the wall?

18   A    Ty Garbin's trailer, yes.

19   Q    And that's his family's property, true?

20   A    That's his property.

21   Q    Ty Garbin owns that property?

22   A    That's what he said to us.  Yes.

23   Q    That's what he told you?

24   A    Yes.

25   Q    It's not his family's property?

1    A    It's his property.

2    Q    Okay.  And he didn't say anything to you --

3                MR. KESSLER:  Hearsay.

4                THE COURT:  Yeah.  I mean, it is if you are going to

5    get to say -- if his only basis to know or not know whether Ty

6    Garbin's grandfather owned the flag is what Ty Garbin told him

7    it would be hearsay it seems to me.

8                MR. GIBBONS:  That's fine, Your Honor.

9                THE COURT:  I don't think it's a significant point in

10   any event.

11   BY MR. GIBBONS:

12   Q    So you have no reason to believe it is Ty Garbin's

13   grandfather's flag, correct?

14   A    I thought it was Ty Garbin's.

15   Q    Okay.  You first met Adam Fox in Lansing at a face to face

16   at an event, is that true, on June 18th?

17   A    That's correct.

18   Q    Adam Fox was there with his girlfriend?

19   A    Correct.

20   Q    Amanda Keller?

21   A    That's correct.

22   Q    He was otherwise unattached, correct?  He didn't come with

23   a crew?

24   A    I don't believe so.

25   Q    Okay.  You came to know Adam Fox over the course of the

1      summer, correct?

2      A    I did.

3      Q    You were tasked to eventually -- and we are going to talk

4      about that in a minute.  You were tasked to maintain contact or

5      access to the goings on of Adam Fox, correct?

6      A    That is correct.

7      Q    And that's with regard to his militia and his expressed

8      intentions, true?

9      A    Correct.

10     Q    I am going to ask you a couple questions about Adam Fox,

11     and I would like you to think not just about what you knew on

12     June 18th but what you learned over the course of the summer.

13     Do you understand what I'm saying?

14     A    I do.

15     Q    So it's your scope of knowledge as you sit here today

16     having experienced everything you have with regard to this

17     case.  You would agree that Adam Fox on June 18th was not very

18     experienced with firearms, correct?

19     A    What's your expectation of experience?

20     Q    Well, you met with him on July 27th, true, at the Vac

21     Shack?

22     A    I did.

23     Q    Do you remember that?  You had about a four-hour meeting

24     there with him, did you not?

25     A    But on June 18th I had no idea what his level of experience

1    was, so it could have been parallel with mine.  It could have

2    been more than mine.  I had no idea.

3    Q    True.  I understand that.  But I am asking you from your

4    scope of knowledge now, looking back and evaluating what you

5    know -- and we could talk a little bit about this meeting on

6    July 27th.  And you stopped buy the Vac Shack that day,

7    correct?

8    A    I did.

9    Q    You had a recording device on your person?

10   A    I did.

11   Q    It was provided to you by the FBI?

12   A    It was.

13   Q    It was operable?

14   A    Yes.

15   Q    You checked it before you went into the meeting to make

16   sure it worked?

17   A    I did.

18   Q    The batteries were charged?

19   A    Yes.

20   Q    You had an opportunity to review the recording that

21   resulted from that meeting, correct, that were taken?

22   A    I have.

23   Q    And they appear to be accurate and functional, correct?

24   A    Correct.

25   Q    Reflect what was said during the meeting?

1    A    Yes.

2    Q    So there are times when people move, because it was a key

3    fob that you had, correct?

4    A    Correct.

5    Q    So that looks like a key chain, but it's actually a

6    recording device, right?

7    A    Correct.

8    Q    It's digital, true?

9    A    Correct.

10   Q    So if it's sitting on the table it works really well,

11   right?

12   A    Right.

13   Q    And then sometimes if it's in your pocket or it gets bumped

14   it can interfere with the audio, true?

15   A    True.

16   Q    So sometimes things are kind of hard to hear, but this Vac

17   Shack meeting that you had on the 27th, the recording is pretty

18   good, would you agree?

19   A    I would.

20   Q    And you've had an opportunity to review it?

21   A    I have.

22   Q    And you would agree at the end of the meeting Adam Fox

23   asked you to take a look at his rifle?

24        MR. KESSLER:  Hearsay.

25        THE COURT:  I mean, if we are going to get to putting

1   your client's words in his mouth through this process we're in

2   my in limine ruling.

3           MR. GIBBONS:  I understand, Your Honor.  That was a

4   misplaced question and I apologize.

5           THE COURT:  Okay.  Go ahead.

6   BY MR. GIBBONS:

7   Q    At the conclusion of the meeting you showed Adam Fox how to

8   set up the sight on his rifle, did you not?

9   A    Yes.

10  Q    Okay.  And at the conclusion of the meeting you also showed

11  Adam Fox how to break his gun down and put it back together so

12  the safety would still function, correct?

13  A    Correct.

14  Q    And you demonstrated for him how to make sure that gets

15  done in a safe manner, correct?

16  A    Correct.

17  Q    On June 18th in Lansing, you would agree that Adam Fox did

18  not have the Michigan III% Patriot Militia charter under his

19  command, did he?

20  A    I am not sure if he did or not.

21  Q    Okay.  And then one last point.  If we can have Exhibit 21,

22  Pam?  Exhibit 21 was a FaceBook post.  Do you remember this?

23  A    I do.

24  Q    This was put out on Pete Musico's FaceBook post or page I

25  guess?

1    A    I think this was on Wire.

2    Q    This was on Wire; this was not a FaceBook post?

3    A    I believe so.  I am not sure.

4    Q    Because it says, please share.  Could it be a FaceBook

5    post?

6    A    It might have been.

7    Q    Okay.  And Pam, if you can go up to this little corner?

8    It's kind of hard to read there, but would you agree that the

9    address of the governor's cottage there in Elk Rapids is in

10   this post?

11   A    It is.

12   Q    Okay.  To the best of your knowledge, this occurred on May

13   22nd, true?

14   A    Correct.

15   Q    Adam Fox was not in the Watchmen on May 22nd, correct?

16   A    No.

17   Q    And Adam Fox wasn't on Wire on May 22nd, was he?

18   A    He was not with the Wolverine Watchmen on that date.  No.

19   Q    And he wasn't on Wire with the Wolverine Watchmen at all?

20   A    On line with that, no.

21   Q    So there is no way he could have seen this, correct, to the

22   best of your knowledge?

23   A    Possibly.  I don't know who he had direct contact with

24   outside of the Wolverine Watchmen.

25   Q    Okay.  If it was on FaceBook he could have seen it,

1      correct?

2      A    If it was an open forum page.  If it was a private page.

3      Q    And your testimony is this was from a private page, though,

4      I think?

5      A    Correct.

6      Q    Okay.  So Adam Fox didn't see it in May of '20, did he?

7      A    No.

8      Q    Okay.  Thank you.

9            I want to turn your attention moving forward a little

10     bit into June.  You had a phone call with Adam Fox on June

11     14th, did you not?

12     A    I did.

13     Q    Okay.  You actually had two phone calls with Adam Fox,

14     correct?

15     A    Yes.

16     Q    You called him on both occasions, right?

17     A    No.

18     Q    You didn't initiate those calls?

19     A    The second I did.  The first I did not.

20     Q    The second one you did.  And that second phone call was

21     made in the presence of your handling agents, is that true?

22     A    That's true.

23     Q    Did you do that at their office or did they come to where

24     you were?

25     A    Their office.

```
1    Q    Okay.  During that phone call you learned that there was
2    going to be a meeting at the Vac Shack, correct?
3              MR. KESSLER:  Hearsay, Your Honor.
4              MR. GIBBONS:  I think he testified to it.
5              THE COURT:  I think he can at least address that.  I
6    think that's a fair question.  Go ahead.
7    BY MR. GIBBONS:
8    Q    True?
9    A    Stemming from the first call it was when he called Joe it
10   was to set up a meeting with him, and then the second phone
11   call was to kind of iron stuff out.
12   Q    Okay.  And ironing things out, this meeting was going to
13   occur on the 20th of June at the Vac Shack, correct?
14   A    That one was, yes.  We were also meeting up on the 18th.
15   Q    Which we just talked about?
16   A    Correct.
17   Q    Right.  And on the 18th it was -- you were able to confirm
18   that there was going to be a meeting at the Vac Shack?
19   A    At the Capitol we discussed having a meeting at the Vac
20   Shack.  Yes.
21   Q    And there was supposed to be multiple militias coming to
22   discuss ideas?
23   A    At the Vac Shack?
24   Q    Yes.
25   A    No.  That was going to be happening at the Capitol.  That's
```

1    what the protest was about was mult -- or militias meeting up

2    for that.

3    Q    Okay.  Jayson Chambers was aware that this meeting was

4    going to occur, correct?

5         MR. KESSLER:  Calls for speculation.  I know the

6    particular answers on some of these might not be terribly

7    important, but I object to the way these questions are being

8    asked.

9         THE COURT:  Well, if this witness informed the special

10   agent or if that's what came up in the call, I think it's fine

11   to set the stage for where he's going, but --

12        MR. GIBBONS:  Yes.  If I may --

13        THE COURT:  I understand both sides want to police the

14   line carefully.  Go ahead.  I think it sets up foundation at

15   this point.

16        MR. GIBBONS:  Yes.  May I approach the witness, Your

17   Honor?

18        THE COURT:  Sure.  And is that in the exhibit packet,

19   too, or is it another refresh?

20        MR. GIBBONS:  I do not believe any of these are in the

21   exhibits.

22        THE COURT:  Okay.  Fair enough.  Go ahead.

23   BY MR. GIBBONS:

24   Q    Sir, you may keep that for your records.

25   A    Okay.  Thank you.

1    Q    Did you have a chance to look at that?

2    A    I did.

3    Q    You would agree on 6-17 you sent a text to -- and what I

4    showed you was text messages between yourself and Special Agent

5    Chambers, correct?

6    A    Correct.

7    Q    Prior to today you had an opportunity to review the

8    materials associated with your participation in the

9    investigation, have you not?

10   A    I did.  Yes.

11   Q    Okay.  You would agree on June 17th you texted Special

12   Agent Chambers, everything is a go for Saturday 4:15 Vac Shack?

13   A    Correct.

14   Q    Okay.  And what that means is I guess that's a reference to

15   the meeting we were just talking about, correct?

16   A    Correct.

17   Q    Then Agent Chambers responds to you with a text back

18   saying, boom, true?

19   A    Correct.

20   Q    Because this was part of your tasking is to engage and to

21   provide access, correct?

22   A    Correct.

23   Q    And you are doing that?

24   A    I am.

25   Q    And you are fulfilling the role and the expectation of

1    Special Agent Chambers and he says, boom, right?

2    A    Correct.

3    Q    He also says, you are the man?

4    A    Correct.

5    Q    In the next text to you, correct?

6    A    Correct.

7    Q    And you want to recognize that complement and you do so by

8    texting him back, if you guys need it to happen I'll make it

9    happen.  True?

10   A    That was in regards to me getting time off from work.  I

11   was still having a life outside of this, and everything was

12   very --

13        MR. GIBBONS:  That's not responsive, Your Honor.  I

14   just asked him if he made the statement.

15        THE COURT:  All right.  Well, part of the problem is

16   if we are offering the out-of-court statement is -- even his in

17   isolation we tread on the pretrial order.  If you want to ask

18   him about that kind of a statement, did he make a statement

19   like that, you can do it, but then under 613 you got to give

20   him an opportunity to explain.

21   BY MR. GIBBONS:

22   Q    So this was about your work schedule?

23   A    Yes, and in order to get time off to go to the meeting.

24   Q    Very good.  Saturday, correct?

25   A    Yes.

Q    You did end up at the Vac Shack on that Saturday, true?

A    I did, yes.

         THE COURT:  Actually, I guess I do have it in.  Never mind.  Go ahead.

BY MR. GIBBONS:

Q    Exhibit 61, this is the entryway to the basement at the Vac Shack, correct?

A    Correct.

Q    It's not a hidden door, true?

A    That piece of plywood off to the right there by the cooler was closed, and the door to the structure was closed as well.  So you open the regular door, and then he would have to pull the plywood up off the floor so you couldn't walk to the stairs, right.

Q    Right.  But it would be obvious and apparent that there was a door there if you opened the hallway door there, right?  There is nothing hidden about it?

A    They have the objects and the boxes moved around because the door was opened.  If the door was closed and the boxes were spread across of it it would appear it would be hidden, yes.

Q    Right.  Adam Fox lived in that basement, correct?

A    He stayed there off and on.  Yes.

Q    Okay.  He had a bedroom down there, right?

A    Correct.

Q    Can I have Exhibit 62?  This is the condition of his place,

1    true?

2    A    Correct.

3    Q    And did it look -- did you take this photograph?

4    A    I did not.  No.

5    Q    Do you know when this photograph was taken?

6    A    I believe after the arrest.

7    Q    And was the condition of his bedroom much different on the

8    date that you went there on June 20th?

9    A    It was much like that.

10   Q    Okay.  Did he have a rifle out like that on -- against the

11   wall or whatever that is when you were there?

12   A    No.

13   Q    Okay.  You went down into this basement with Adam Fox on

14   June 20th, correct?

15   A    On the 20th?

16   Q    Yes.

17   A    Yes.

18   Q    Of June.  You went down there.  And you brought Ty Garbin

19   with you, correct?

20   A    He rode with me.  Yes.

21   Q    And Paul Bellar, he is a Watchmen?

22   A    Correct.

23   Q    And he was there?

24   A    Yes.  He drove separately.

25   Q    And then there was one other individual there, correct?

1    A    There was two other, Amanda Keller and then a Macintosh was

2    his last name.

3    Q    Amanda Keller is Adam's girl, true?

4    A    Correct.

5    Q    And then there was a guy named Jim McIntosh?

6    A    Correct.

7    Q    Can I have Exhibit 64?  This meeting was recorded as well,

8    right?

9    A    It was.

10   Q    And you had an opportunity to review the recording of this

11   meeting?

12   A    I have.

13   Q    You did that with a key fob provided to you by the FBI?

14   A    I had two devices.  Yes.

15   Q    Yes.  And well, and in particular the device you used this

16   day would have been provided to you by the FBI, correct?

17   A    Both of them were.  Yes.

18   Q    Okay.  Have you had an opportunity to review that recording

19   since it was made?

20   A    I have.  Yes.

21   Q    Okay.  And you would agree that it turned out pretty good?

22   It's audible.  You can hear what people are saying, et cetera,

23   correct?

24   A    Correct.

25   Q    And I'm showing you a transcript of Exhibit 64.  Can I have

the last paragraph?  So this meeting lasted a couple hours, is that true?

A    It did.

Q    So it wasn't exceedingly long, correct?  I mean, you have had longer meetings with Adam Fox or even Barry Croft, right?

A    Correct.

Q    And as it indicates here, Adam Fox had said during that meeting, at some point I think we are in the very, very beginning stages.  We are just brainstorming, correct?

A    Correct.

Q    And you would agree that as you came out of that meeting there really wasn't too much of a plan?

A    The initial plan going into that was storming the Capitol.

Q    Okay.  And so that was generally the discussion, storming the Capitol?

A    Taking hostages, locking the door, executing people and burning the Capitol down was what he wanted to do when we went into this meeting.  Yes.

Q    That's your testimony?

A    That's what he wanted to do.  Yes.  When we opened up with that meeting he addressed that my initial plan is kind of out there, because he wanted to recruit 200 people.  So then we were dialing it down figuring it out what we can -- or what he can do from there.

Q    And your testimony is that was setting the Capitol on fire

1    with people in it?  That's your testimony today?

2    A    That he wanted to execute people inside the Capitol.  Yes.

3    Q    Okay.  Because it is recorded, right?

4    A    It is.

5    Q    Thank you.  And you would agree that towards the end of

6    that meeting, it was a brainstorming session, that Adam Fox had

7    to have a focus needed to work on a focus because you could

8    train for everything I think you said?

9    A    Correct.

10   Q    But what's the point if you don't have an endgame?

11   A    Correct.

12   Q    Do you recall saying something to that effect?

13   A    I do.

14            MR. GIBBONS:  Your Honor, may I approach the witness?

15            THE COURT:  Sure.

16            THE WITNESS:  Thank you.

17   BY MR. GIBBONS:

18   Q    Have you had a chance to look at that?

19   A    I did.

20   Q    All right.  After the Vac Shack meeting you left, correct?

21   A    Correct.

22   Q    You transmitted or transferred the audio over to -- of that

23   meeting, that audio recording, that digital file went to

24   Special Agent Chambers or Impola, correct?

25   A    Correct.

1    Q    And they reviewed it, true?

2    A    They did.

3    Q    And they were satisfied that everything was in good order

4    with respect to that audio, correct?

5    A    Correct.

6    Q    And you confirmed that in some texts and then Agent

7    Chambers followed up with you with a text to you saying, got to

8    get Adam focused, true?

9    A    On the 23rd, yes.

10   Q    And then he also tasked you with something to do, correct,

11   which is get him in a leadership chat?

12   A    Correct.

13   Q    And that's Adam?

14   A    Correct.  Because he was -- go ahead.

15   Q    Adam wasn't in a leadership chat with the Wolverine

16   Watchmen, was he?

17   A    No.

18   Q    And this is a reference to the leadership chat of the

19   Wolverine Watchmen, true?

20   A    I believe so.  Yes.  Because he was -- Adam was talking to

21   me to have it relayed over to Joe.  So to bring him in it would

22   remove me from echoing what Adam is wanting to put out to the

23   group.

24   Q    Okay.  And you would agree -- I think that's fine.  Thank

25   you.

1          Moving forward, there was a training in Munith on the

2     28th with the Wolverine Watchmen, correct?

3     A    Correct.

4     Q    There was discussion about Adam Fox attending that training

5     amongst the Watchmen, is that true, and yourself?

6     A    There was.  Yes.

7     Q    And that was to happen on June 28th, correct?

8     A    Correct.

9     Q    And you would agree that on June 27th, you were engaged on

10    a Wolverine Watchmen leadership chat?  And here, I can --

11         MR. KESSLER:  Well, Your Honor, I mean, I am not sure

12    he said he couldn't remember anything yet, so --

13         THE COURT:  Right.  I mean, would typically refresh

14    only if he forgets things, but it's not necessarily a bad

15    courtesy to give it to the witness in advance and it may speed

16    things along.  So if there is something that's more -- I'll let

17    Mr. Gibbons decide how he wants to proceed on some of it as we

18    are proceeding.

19         MR. GIBBONS:  Yeah.  Your Honor, if I could just speak

20    to that?  I have prepared in a manner to try to expeditiously

21    plow through this stack so I can sit down as soon as possible.

22         MR. KESSLER:  And I am all for speed, Your Honor.  I

23    am just going to object to him handing documents to him and

24    asking him to read off of them.  That's not the way.

25         THE COURT:  He hasn't asked him to read off of them.

He has asked him to read through it so it gets his memory in

the right place.  At least that's my interpretation of why you

are giving it to him.

MR. GIBBONS:  That is correct, Your Honor.  I just

don't want to educate him one point at a time.

THE COURT:  Right.  So I think it's working pretty

well for that purpose.

BY MR. GIBBONS:

Q    On June 27th you were engaged in a leadership chat with

members of the Watchmen leadership group, correct?

A    I was.  Yes.

Q    And you would agree that you had to vouch for Adam Fox with

respect to his attendance at the June 28th training that was

coming up the next day, correct?

A    I wouldn't go as far as vouching.  Joe brought him into the

group.

Q    Well, correct me if I'm wrong, but it says here you texted

the group, I don't think we should boot him.  In a way we are

already tied to him from at the rally.  We all dress alike?

MR. KESSLER:  This is what I object to, Your Honor.

THE COURT:  He has now set it up.  He said, I wouldn't

say vouch, and so he can confront him.  You are going to

disagree on what the word vouch means.  I think it's fair to

have him present this witness with the words and the witness

may say, oh, yeah, that's right, or no, that's not vouching.

1   And you can redevelop that on redirect if you want to, but he

2   set it up I think properly and in his view this is an

3   inconsistent statement and I think he can confront him with it.

4   Go ahead.

5   BY MR. GIBBONS:

6   Q   I'm going to start over so that we have a clear record.

7   You wrote a text at 8:08 in the morning to the Wolverine

8   Watchmen leadership, I don't think we should boot him.  In a

9   way we are already tied to him.  From at the rally we all

10  dressed alike.  I know he's not tactically sound but he is

11  wanting to learn.  I think that's why he just came with guns

12  blazing.  Pun intended.  Woo, the crazy idea could it work.

13  Maybe.  We'd have to really sit down and think about it.

14  Correct?

15  A   Correct.

16       MR. GIBBONS:  Your Honor, I am going to present

17  materials to keep things moving.

18       THE COURT:  All right.

19       THE WITNESS:  Thank you.

20       MR. GIBBONS:  You are welcome.

21  BY MR. GIBBONS:

22  Q   Let's take a step back just a little bit and talk about

23  your relationship with your handling agents.  Okay.  And going

24  forward, when I say handling agents or handling agent I mean

25  Mr. Chambers or Mr. Chambers and Impola collectively,

1    understand?

2    A    Understood.

3    Q    When you were able to gain access to the Watchmen and you

4    were allowed access into their Wire chats, the leadership chat

5    and the Wolverine Watchmen chat, you provided information to

6    those agents so that they could monitor the chats in real time,

7    correct?

8    A    Correct.  I was full transparent with them.

9    Q    Pardon?

10   A    I was fully transparent with them.

11   Q    Of course.  So this effort that we just discussed that was

12   made on the morning of June 27th, right, that we just talked

13   about?

14   A    With him not being tactically trained as us?

15   Q    Yes.  Him not being tactically sound.

16   A    So within the group, like, Joe Morrison was a current

17   marine at the time.  Daniel Harris was a marine.  Ty Garbin was

18   a three gun competition shooter.  Myself, I was in the army.

19   So our tactical training is a little bit more up to par than a

20   civilian would be.

21   Q    Right.  My point is, and the point I am getting to, is that

22   Special Agent Chambers is aware that this text has been made,

23   correct?

24   A    Correct.

25   Q    And later that day on the 27th, Jayson Chambers let you

```
1    know that he appreciates your effort.  He texts, you did a

2    great job with both the leadership and Adam today, correct?

3    A    On that specific day I'd have to look at that, but there

4    was a lot of communication going on over the course of that.

5    We had several windows open within the Wolverine Watchmen.  So

6    I was funneling what was going on with the Watchmen and with

7    Adam.

8    Q    I handed you a three-page document, sir.  And if you look

9    at the third page, and I've highlighted for you to make it

10   easy.  This is the spreadsheet from the Excel program that puts

11   everything in order.  It orders the data.  It's a computer

12   program.

13   A    Okay.

14   Q    And so you can see there, so if you have a question about

15   how these chats were sent or received you can look right there

16   and see it.  Do you see that?

17   A    With myself and Agent Chambers?

18   Q    Yup.  So he said to you, you did a great job with both

19   leadership and Adam today.  And he sent that to you on the 27th

20   of June, did he not?

21   A    Correct.

22   Q    Thank you.  And you responded, correct?

23   A    I did.

24   Q    And you responded with, awesome.  Building my resume, true?

25   A    True.
```

1    Q    You are not an FBI agent, are you?

2    A    I am not.

3    Q    You are a truck driver, right?

4    A    I work for the post office.  Yes.

5    Q    You work for the post office?

6    A    I do.

7    Q    You are an employee of the United States Postal Service?

8    A    Yes.

9    Q    How long have you been an employee of the United States

10   Postal Service?

11   A    Nine years.

12   Q    Nine years?

13   A    I am a contractor through them.  Yes.

14   Q    And -- can you restate that answer, please, sir?

15   A    Through the postal.

16   Q    I didn't hear what you just said.  I kind of missed it.

17            THE COURT:  He said, I am a contractor.

18   BY MR. GIBBONS:

19   Q    You are a contractor?

20            THE COURT:  Through them

21   BY MR. GIBBONS:

22   Q    For the United States Postal Service, correct?

23   A    Correct.

24   Q    But they are not your employer, true?

25   A    The post office?

1    Q    Correct.  When you get a paycheck it doesn't say Federal

2    Government United States Postal Service on it, does it?

3    A    No.

4    Q    Your paycheck comes from an account owned and managed and

5    held by Palmer & Sons, true?

6    A    That's correct.

7    Q    That's a trucking company, correct?

8    A    Correct.

9    Q    They haul -- they haul postal bulk mail?  That's some of

10   the things they do?

11   A    We move mail for the post office.  Yes.  I move mail for

12   the post office.  Yes.

13   Q    For Palmer & Sons?

14   A    Correct.

15   Q    Palmer & Sons tells you where to go and what to do,

16   correct?

17            MR. KESSLER:  Relevance, Your Honor.

18            THE COURT:  I don't know.  It seems like we know what

19   the situation is and I don't know how important it is to your

20   overall case, but you have certainly covered it in a way that I

21   think explains his position.

22            MR. GIBBONS:  Very good.  Thank you, Your Honor.

23   BY MR. GIBBONS:

24   Q    You did go to the training as XO on June 28th at the

25   property belonging to Mr. Morrison, correct?

1    A    I did.

2    Q    Adam was there, true?

3    A    He was.

4    Q    Okay.  And after that meeting you had contact with your

5    supervising agent, correct?

6    A    Correct.  Thank you.

7    Q    You are welcome.  You sent him some updates by text, did

8    you not?

9    A    I did.  Yes.

10   Q    And one of those updates was, Doc left starting his own

11   group.  Correct?

12   A    Correct.

13   Q    And that's something that you learned at the meeting, true?

14   A    True.

15   Q    And Doc, that's Paul Bellar, true?

16   A    Correct.

17   Q    That's the Mr. Bellar we were talking about earlier?

18   A    Correct.

19   Q    Agent Chambers responds by indicating that he's tracking?

20   A    Correct.

21   Q    He's, gotcha, right, he understands.  You have a

22   suggestion, though, right?  Have him get with Adam, correct?

23   A    True.

24   Q    Because Adam has a new group, right?

25   A    He has his group.  Yes.

1   Q    Okay.  And Agent Chambers says, that's a good idea, and

2   then sends you another text, excellent work, correct?

3   A    Correct.

4   Q    There was some other texts, but on that same afternoon

5   shortly thereafter Jayson Chambers texts you, look at you.

6   Bringing people together.  Correct?

7   A    Correct.

8   Q    Let's talk about Adam's militia for just a second.  He has

9   the Michigan Patriot III% page on FaceBook, is that what he

10  had?

11  A    Correct.

12  Q    You joined it, right?

13  A    Yes.

14  Q    You became a member?

15  A    I did.

16  Q    At this June 28th training that we just talked about, there

17  was a point in that meeting where Adam Fox was going to take an

18  oath to assume the role of commanding officer, is that true?

19  A    No.  He took his oath in his group along with Amanda Keller

20  and Sean Fix.

21  Q    You didn't give him the oath?

22  A    He had me read the oath to them so they could swear in.

23  Q    He had you read the oath?

24  A    He presented me the paper with his oath on it to read to

25  them so they could swear in his group.

1    Q    Okay.  So the way that worked then is you had the paper?

2    A    That Adam gave me.  Yes.

3    Q    He gave you the paper?

4    A    He did.

5    Q    And you read the oath to him line by line and he would

6    repeat it the way you traditionally do that?

7    A    Correct.

8    Q    And that oath then was applied to Adam, correct?  He took

9    it?

10   A    Correct.

11   Q    And Sean Fix took the oath, did he not?

12   A    His XO, yes.

13   Q    Okay.  Sean Fix was a navy seal as you understood?

14   A    As I understood it he was a navy seal, yes.

15   Q    And he had done four tours in Iraq?

16        MR. KESSLER:  Objection to hearsay, Your Honor.

17        THE COURT:  If he wants to lay foundation how he knows

18   this other than him telling him who is not here we can do it,

19   otherwise it sounds like he is recycling other people's

20   information.

21   BY MR. GIBBONS:

22   Q    You had text communication on more than a couple occasions

23   with the FBI handlers about Sean Fix and his background,

24   correct?

25   A    I did.  Yes.

```
1    Q    And they ultimately advised you that he didn't have any
2    military service?
3                THE COURT:  I mean, that's --
4                MR. GIBBONS:  That's not hearsay, Your Honor.
5                THE COURT:  All right.  So the problem is, if -- in
6    order for it to be relevant you have to have the hearsay first.
7    So it seems to me you got to get first of all the predicate
8    that I haven't seen a foundation for it yet before what you
9    just covered is relevant.
10               MR. GIBBONS:  Actually, I have it in one of my folders
11   here, Your Honor.  I am going to keep it in order.  I am going
12   to move on and we may touch on it in the future if I feel like
13   I have the foundation.
14               THE COURT:  All right.
15   BY MR. GIBBONS:
16   Q    You recall just a little bit ago we talked about the
17   admonitions that Mr. Impola applied to you when you assumed the
18   role of XO, correct?
19   A    Correct.
20   Q    And you were not to suggest ideas?
21   A    Correct.
22   Q    You were not to originate ideas, correct?
23   A    Correct.
24   Q    But you did make suggestions of ideas and crimes over the
25   course of the summer to Adam Fox and others, didn't you?
```

1    A    I may have keeping my role within the group.

2    Q    Okay.  Well, what suggestions did you make?

3    A    I think at one point I echoed back what Ty said in Ohio,

4    that we should put a round through a window.  So it wasn't my

5    idea coming up with that.  I was simply saying what Ty had

6    already said as a form to de-escalate Adam.  He was wanting to

7    kidnap and kill the governor, so I was trying to tone it down

8    echoing what Ty said on putting a round through a window and

9    mailing the case into them.  So they were wanting to get

10   multiple states on board with a coordinated attack.

11   Q    Ty Garbin made that statement in a -- in your truck,

12   correct?

13   A    He made that in Peebles, Ohio.

14   Q    In Peebles, Ohio?

15   A    He did.

16   Q    At the meeting?

17   A    He did.

18   Q    Specifically Ty Garbin?

19   A    Yes.

20   Q    You would agree that on 8-9 there was an FTX?

21   A    There was.  Yes.

22   Q    In Munith for the Watchmen, true?

23   A    Correct.  Correct.

24   Q    Adam Fox was there?

25   A    He was.

1    Q    The Watchmen generally were there?

2    A    Yes.

3    Q    Sean Fix was there?

4    A    He was.

5    Q    You would agree that at some point after the training -- so

6    there was, like, a training where you guys kind of did whatever

7    it is you do with the guns and run around, right?

8    A    That it was a vehicle assault and ambushes.  Yes.

9    Q    Okay.  And then there was a meeting afterwards, correct?

10   A    Yes.

11   Q    And you attended that meeting?

12   A    I did.

13   Q    You recorded that meeting?

14   A    Yes.

15   Q    You had an opportunity to review and listen to that

16   recording?

17   A    If there was one present, yes.

18   Q    It's in fair order, correct?

19   A    Correct.

20   Q    You would agree that on 8-9 you suggested to Adam Fox and

21   others that they could blow up the governor's summer home with

22   Tannerite and blow up her boat?

23   A    I believe so.

24   Q    Okay.  Thank you.  You would agree that on 8-9 you

25   suggested to Adam Fox and others that they could ambush the

1    governor on her way to her place near Traverse City catching

2    her in transit?  Do you recall saying that?

3    A    I don't recall the context that was leading up to that.

4    Q    The context for ambushing the governor on the way to her

5    cottage?

6    A    No.

7    Q    Why would you say that?

8    A    In regards to the conversation that was taking place.  I

9    mean, if we have the audio.

10   Q    We can't play the audio, sir.

11        MR. KESSLER:  See, Your Honor, this is why I object to

12   this style of questioning.  His prior statement is hearsay

13   under Rule 801, and the only way he can actually just read him

14   some statement is if he doesn't recall it, and he's going -- or

15   he disagrees with it and he is going to play him a prior

16   inconsistent statement.

17        THE COURT:  I mean, he's indicated -- the witness has

18   indicated something like he may have.  If you have something to

19   refresh his recollection you can give it to him and see if it

20   refreshes his recollection but not by reading it to him.

21        THE WITNESS:  Thank you.

22   BY MR. GIBBONS:

23   Q    Are you done reading those?

24   A    I am.

25   Q    Okay.  Did you indicate to Adam Fox and others at the

1    meeting --

2          THE COURT:  Start off if does it refresh his

3    recollection?

4    BY MR. GIBBONS:

5    Q    Does this refresh your recollection?

6    A    Yes.

7    Q    Okay.  No. 2, that's the governor's cottage in the

8    nomenclature of the group for Elk Rapids, correct, or Birch

9    Lake?

10   A    Correct.

11   Q    And you would agree that you suggested that they could find

12   out No. 2, get some Tannerite, put a dent in her house or her

13   driveway.  Fix your fucking roads.  How about that?

14         MR. KESSLER:  Again, Your Honor, he is just --

15         THE COURT:  You are just reading it now and I don't

16   know that it's properly in front of us for that kind of thing.

17         MR. GIBBONS:  I can shorten that up, Your Honor.

18         MR. KESSLER:  It's not the length I object to.  He is

19   just reading it.  He's got to ask him now does it refresh your

20   recollection?

21         THE COURT:  And he did and he said it does refresh his

22   recollection.  So he can go back to the main question about

23   whether he made a suggestion to, I think the words were

24   something like ambush the governor on her way to the cottage or

25   something like that.

1          MR. GIBBONS:  Thank you.  Your Honor.  I can do that.

2     BY MR. GIBBONS:

3     Q    Additionally, sir, you made a second suggestion to blow her

4     door down with Tannerite, correct?

5     A    Right.

6     Q    With respect to the suggestion you indicated that you made

7     about firing a round into the governor's cottage or her home

8     and the multistate approach that you had heard I guess from Ty

9     Garbin?

10    A    Correct.

11    Q    In particular, you had suggested in that context that they

12    would use a large caliber rifle like a 50 cal, true?

13    A    I was asking if they had any large calibers.  I was going

14    twofold trying to figure out what kind of platforms the

15    individuals had so that the FBI was aware of what they were

16    working with.

17    Q    Well, actually, I think your words, sir, were one person --

18         THE COURT:  It's the same problem.

19         MR. GIBBONS:  Your Honor, he just said that someone

20    else suggested it and he didn't.

21         THE COURT:  He said he was twofold.  If you are just

22    going to read it on the backside where he has essentially given

23    up the point that you brought it up or you talked about it,

24    then I don't think it's proper.  You can confront him with

25    things like you did in one of the early rounds that in your

view was inconsistent, you know, said, well, then you have to

vouch for Adam Fox.  He said, well, I wouldn't say vouching,

and then you presented him with a prior statement that you

thought in your view was vouching, and it will be up to the

jury to sort that out.  But you have to establish that, you

know, there is some predicate for inconsistency or other reason

to confront with a statement, and I am not hearing that in this

particular round.

          MR. GIBBONS:  Understood, Your Honor.

BY MR. GIBBONS:

Q   I am going to refresh on July 27 again.  There is two

statements there.

A    Okay.  Thank you.

          MR. KESSLER:  Before we get started, Your Honor, I

hate to keep doing this, but he's just going up and asking him

to refresh his recollection before he's even asked him a

question.

          THE COURT:  Why don't you ask him the question you

have first and then we'll see if he may remember things without

being refreshed.  The idea is to find out what his statements

here today are that in your view I presume support one prong of

the Defense.  You know, if he denies it and you have something

to confront him with you can.  If he says he doesn't remember

then you have something to refresh him with you can.  But to

avoid too much risk of simply using it as a platform to read

1    things that aren't in evidence, you know, I think you should

2    set up the predicate first, especially as we are getting into

3    more difficult...

4    BY MR. GIBBONS:

5    Q    Did you make other suggestions on the 27th?  Having looked

6    at this does this refresh your recollection about things that

7    you may have said at that meeting on July 27th?

8    A    Yes.

9    Q    And did you make other suggestions at that meeting?

10   A    Yes.

11   Q    What were they?

12   A    The stray bullet.

13   Q    Pardon?

14   A    With a stray bullet.

15   Q    And tell me what that means, stray bullet?

16   A    Like, just be in the wood and a stray round goes off

17   implying like, again, like what Ty said, a round through a

18   window.

19   Q    Okay.  And you would have suggested that in an effort to

20   de-escalate?

21   A    As putting just a round through a window and mailing the

22   case in as a message compared to Adam wanting to kidnap and

23   kill the governor, yes.

24   Q    Did you make another suggestion there that day?

25   A    Yes.

1    Q    What was that?

2    A    Just again with a stray bullet.

3    Q    If you look at the top of page 1?  What did you say?

4    A    Sports resorts, and then again, put a round through a

5    window.

6    Q    You thought that was deescalation to fire rounds into an

7    area sports resort?

8    A    Again, with Adam wanting to kidnap and kill the governor I

9    was echoing what Ty said, put a round through the window.

10   Q    That wasn't Ty's idea though to attack a sports resort, was

11   it?

12            MR. KESSLER:  Speculation or hearsay.

13            THE COURT:  It is to some extent the same problem, I

14   think, but I think you have covered the issue in any event, and

15   both sides will be able to make their arguments from what

16   they've heard.

17            MR. GIBBONS:  Very good.  Yeah.  I am concluded with

18   that little aspect of it, Your Honor.

19   BY MR. GIBBONS:

20   Q    I have a question for you about this deescalation and

21   suggesting these things that we just talked about.  Did your

22   handling agents, Jayson Chambers and Henrik Impola, know that

23   you were making these kinds of suggestions?

24   A    This was all on the fly with him, with myself and Adam.

25   Q    It was on the fly.  You did this on your own?

1   A   Yes.  I was maintaining my role with Adam.  If I am telling

2   Adam we shouldn't be doing any of this, that's running fear

3   being kicked out of the group.  So I am wanting to continue

4   dialogue with him and seeing where his mind-set is at.  Yes.

5   Q   I see.  There are other ways to de-escalate other than

6   suggesting crimes of violence?

7   A   I am not a professional law enforcement.  I am just an

8   average guy with somebody who is wanting to kidnap and kill the

9   governor.  I had no playbook to go up against.  This was all

10  fluid every day.

11  Q   And it's your testimony in particular on July 27, it was

12  the planning and the state of planning that you were

13  encountering in that meeting that was causing you to make a

14  decision to apply these methods of de-escalation, correct?

15  A   I was maintaining a role of like minded with Adam with

16  trying to get him to or an idea out there to de-escalate from

17  wanting to kidnap and kill the governor.

18  Q   Okay.  So let me ask you this.  You suggested these crimes

19  to de-escalate, correct?

20  A   Correct.

21  Q   What were you trying to de-escalate specifically?

22  A   Kidnapping and killing the governor.

23  Q   Tell me more about that, because there had been talk about

24  that all summer, right?

25  A   There had been.

1    Q    But in this particular day you decided to de-escalate,

2    correct?

3    A    I was -- he was wanting me to present ideas to him so I was

4    not going to -- I am not agreeing with him that we should

5    kidnap and kill the governor.  So I'm saying, hey, put a round

6    through the window where no one is going to be there and mail a

7    casing.  There would be no harm to anybody.  Throughout the

8    time of this we were in COVID lockdown, so sports places aren't

9    open.

10    Q    So he was asking you what else can we do?

11    A    He was brainstorming for ideas at the Vac Shack meeting.

12    He was wanting to take input.

13    Q    And this was your contribution to the brainstorming

14    session?

15    A    Yes.

16    Q    People can go to Lansing and take a poster board with them

17    and stand out in front of the Capitol, correct?

18    A    They didn't feel that was doing enough.

19    Q    I didn't ask you that.  I asked you that's a legitimate

20    form of protest, is it not?

21    A    And if I presented that to him -- again, we had the

22    discussion before where how many Novembers have happened.  We

23    have been here before.  We have been to all these protests.

24    Adam was not satisfied with that.

25    Q    But you didn't say that to him, did you?

1    A    Because I knew what his response would be.  He is not

2    satisfied with doing all that.  He wasn't satisfied with me

3    wanting to suggest --

4    Q    So let's wind --

5    A    -- putting a round through a window.

6    Q    Let's wind that back for a second.  You never suggested

7    anything else to him that would be a lawful protest, correct,

8    at that meeting?

9    A    Correct.

10   Q    Okay.  You only suggested these types of crimes, correct?

11   A    Compared to his crimes, yes.

12   Q    Did you advise Jayson Chambers when you left the Vac Shack

13   that you had suggested these crimes to Adam Fox?

14   A    They could hear it all live feed.

15   Q    They could hear it live feed?

16   A    Yes.

17   Q    To the best of your knowledge, when you left the Vac Shack

18   Adam Fox was left there unattended, correct?

19   A    Correct.

20   Q    To the best of your knowledge, true?

21   A    True.

22   Q    He could get in his car and go anywhere, true?

23   A    True.

24   Q    But that's just one person, Adam Fox at the Vac Shack,

25   right?

1    A    Correct.

2    Q    But in Munith, on 8-9, these same types of suggestions we

3    just talked about were made and you testified to that?

4    A    Correct.

5    Q    But that's not just Adam Fox, true?

6    A    Correct.

7    Q    That's Adam Fox, Ty Garbin.  Musico was there I think that

8    day, was he not?

9    A    I am not sure if he left the state already or not.

10   Q    Morrison was there?

11   A    Correct.

12   Q    Franks was there.  Harris was there.  There is a guy name

13   Dan Jones there that's not in anybody's militia, correct?

14   A    Correct.

15   Q    So there is all kinds of people there, true?

16   A    Correct.

17   Q    More than 10, right?

18   A    Fair so say, yes.

19   Q    The FBI isn't watching all of those ten people, are they?

20        MR. KESSLER:  Speculation.

21        THE COURT:  I don't know how he would know that.

22        MR. GIBBONS:  I'm satisfied, Your Honor.

23        THE COURT:  We'll need a morning break soon.  I don't

24   know how much time you have.  I was hoping maybe we'd be able

25   to get you through.

1          MR. GIBBONS:  This is a 30 pager, Your Honor.

2          THE COURT:  So you got a ways to go.  So we are going

3     to need to take a break before you are finished in any event,

4     so why don't we take our break now as you are resetting into a

5     new topic and we'll come back in 20 minutes.

6          LAW CLERK:  All rise.

7          (Jury out, 10:22 a.m.)

8          THE COURT:  Okay.  So we'll take 20 minutes.  Just for

9     presentation purposes, conceptually, this is a difficult

10    problem.  I tried to address it in the pretrial order, and I

11    did go back to the Exhibit A statements, and I think at that

12    time anyway all of these statements from what was then labeled

13    CHS Dan, with one exception, were presented as party admissions

14    and I rejected that.  The argument now shifted a bit to say,

15    well, it's really not offered for truth, and the response to

16    that also at least anticipated in the earlier order was, well,

17    the problem is in the abstract the statement or a particular

18    statement that was at issue didn't have much meaning, and so it

19    needed more meaning for relevance to have a bunch of other

20    context that really was inadmissible hearsay.

21         Where we go with the witness on this side, I think,

22    particularly because you are in a sense opening a door to

23    inducement whereas in the government's side, you know, it was

24    mostly predisposition, the other side of entrapment, in some

25    ways this is you would normally say you should be presenting

this on direct exam in some fashion, but we are merging it
altogether, and I think that adds to the confusion.

So what I think of those tapes as is, you know,
analogous to agent reports or analogous to a deposition
transcript or something like that, and we'll never admit the
agent reports in total.  That's why we ask the agent on the
stand, well, didn't you say or didn't you omit, you didn't say
that in your report, and you can present the report for
refreshing or something like that.  You know, just reading from
the statement after the fact I don't think is particularly
effective or proper.

But conceptually, I think the same kind of process
works here.  You confront or you ask the witness the statement
that you want for your case.  I mean, obviously you'd love him
to say it was all my idea and I pushed the guys to do that.  He
is not going to say that.  And then, you know, if you have it
broken down into some subset you present him with, well, didn't
you say, you know, X, or didn't you suggest the bullet through
the house?  And you have to give him a chance to explain that.
And the government, of course, can do redirect.

But that's the process I am trying to hue.  Because of
that Sixth Circuit case, an actual statement from a sworn agent
probably is an admission, and if it's relevant probably can
come in directly, but on these other things when we are
confronting what this witness said conceptually, if you think

1    as all counsel but Defense counsel doing the questioning, well,

2    how would I do this if I had an agent report in my hand, I

3    think the same things works, because in some ways the

4    tape-recording is just a literal real time report.  It's that

5    kind of questioning that I think works.  It gives you,

6    Mr. Gibbons, or from the other Defense counsel the opportunity

7    to plant -- plant your flags on what I expect will be an

8    inducement argument, and I think you can do it properly that

9    way, but I don't think it's just to read these things into the

10   record after the fact.

11       MR. GIBBONS:  I will leave that for, like, step 3 when

12   he says I didn't say that.  Then I think it's fair game and

13   I'll hold off until I get to step 3 before I do that.

14       THE COURT:  As it would be with the deposition

15   transcript or anything else, exactly.

16       MR. GIBBONS:  And I am doing --

17       THE COURT:  All that notwithstanding it's going

18   reasonably well for a difficult area of evidentiary policing,

19   but I'll just say that in my own mind that's what the

20   conceptual approach I am trying to use, so hopefully that'll

21   work as we reconvene in about 20 minutes.

22       MR. GIBBONS:  Thank you, Your Honor.

23       LAW CLERK:  Court is in recess.

24       (Recess taken, 10:26 a.m.)

25       (Resume Proceeding, 10:50 a.m.)

1        LAW CLERK:  All rise.

2        (Jury in, 10:50 a.m.)

3        LAW CLERK:  The United States District Court for the

4   Western District of Michigan is now in session.  The Honorable

5   Robert J. Jonker, chief judge, presiding.

6        THE COURT:  Welcome back everyone.  We continue to

7   Mr. Gibbons's cross whenever you are ready.

8        MR. GIBBONS:  Thank you, Your Honor.

9   BY MR. GIBBONS:

10  Q    Pam, can I have Government's Exhibit the 90?

11       MR. KESSLER:  This isn't admitted, Your Honor.

12       MR. GIBBONS:  That is not admitted yet?

13       MR. KESSLER:  No.

14       MR. GIBBONS:  My apologies.

15       THE COURT:  Do you have any objections to your

16  exhibit?

17       MR. KESSLER:  We are not going to use it, Your Honor.

18       THE COURT:  That's different than whether you have

19  objections.  Do you have objections to it?

20       MR. KESSLER:  Yeah.

21       THE COURT:  It's not in the exhibit book.  So what's

22  the objection?

23       MR. KESSLER:  That's why we used the one that was just

24  the picture.  It has hearsay all over it.

25       MR. GIBBONS:  Which one is the picture, Nils, because

1     the picture is really the point, not the page.

2               MR. KESSLER:  89, Your Honor.

3               THE COURT:  So if we have 89 in, do you have that on

4     your system, too?

5               MR. GIBBONS:  Yes, Your Honor.

6               THE COURT:  All right.  Let's put that in.

7     BY MR. GIBBONS:

8     Q    There we go.  You recall Exhibit 89 here?

9     A    I do.

10    Q    Okay.  And this is in Cambria, true?

11    A    True.

12    Q    And you were there?

13    A    I was.

14    Q    As a Watchmen?

15    A    Yes.

16    Q    XO of the Watchmen, correct?

17    A    Correct.

18    Q    You identified some people in this photograph the first

19    time around, right?

20    A    I did.

21    Q    And let's see if I can do this.  That's you right there

22    where that green dot is, correct?

23    A    Correct.

24    Q    And who is this person?  I am putting a dot over the head.

25    Do you know?

1    A    That was one of the Wisconsin individuals.  I am not sure

2    of his name.

3    Q    Yup.  You are right.  Who is this guy?

4    A    That's Steve Robeson.

5    Q    Okay.  Who is this gal right here?

6    A    Sean Fix.

7    Q    No.  The gall with the tank top on.

8    A    That might be -- I am not sure.

9    Q    Can you blow that up just a little bit, Pam?  Is that Jenny

10   Plunk?

11   A    That could be Jenny.  Yes.

12   Q    Okay.  All right.  This is Sean Fix, the XO for Adam's

13   militia?

14   A    Which one?

15   Q    This guy here, two dots over his head?

16   A    No.

17   Q    Who is that guy?

18   A    He is a Wisconsin individual.

19   Q    Oh, yeah.  Sean Fix is up in the back row, isn't he?

20   A    Correct.  Behind Steve.

21   Q    Right here, that guy?

22   A    No.

23   Q    No?

24   A    Would you like me to point to Sean Fix?

25   Q    Yeah.  Okay.  There you go.  Let me ask you a couple

1    questions.  Steve is the Wisconsin -- the CO for the Wisconsin

2    Patriot III% Militia, correct?

3    A    Correct.

4    Q    And Jenny standing next to him, she was the CO for

5    Tennessee, is that correct?

6    A    I believe so.  Yes.

7    Q    Okay.  And then Adam is in the middle here, right?

8    A    Correct.

9    Q    He is the CO for Michigan, true?

10   A    Correct.

11   Q    And all of these individuals -- is this all the individuals

12   that were at the FTX or is this just some?

13   A    That's some of them.

14   Q    Okay.  So there was a much broader array of people there?

15   A    Yes.

16   Q    There was children there, correct?

17   A    There was.

18   Q    Amanda Keller, she brought her kids, did she not?

19   A    I don't know if they were -- I am not sure.  She might

20   have.

21   Q    She -- she brought her boy, didn't she?

22   A    She might have.  I know there was a few kids running

23   around.  Yes.

24   Q    Mr. Croft brought his girls?

25   A    He did.

1   Q   Okay.  There was a pool?

2   A   Say again?

3   Q   There was a pool there, right?

4   A   Yes.

5   Q   And there was barbecue, too, right?

6   A   For food, yes.

7   Q   So it was a social event for people who were into militia

8   and Second Amendment rights?

9   A   This was a training event that went on from following the

10  first Ohio meeting.

11  Q   Yes.

12  A   Yes.

13  Q   And there was -- there was some meeting type portion of

14  this during this weekend, right?

15  A   There was.  Yes.

16  Q   And you were there and you were part of that meeting?

17  A   I was.

18  Q   Do you recall receiving a text message from Jayson Chambers

19  on the 13th of July?

20  A   I believe so.  Yes.

21  Q   And he said to you the specific question, who handed you

22  the 501(c) pamphlet?

23  A   Correct.

24  Q   Okay.  Did someone hand you the 501c(3) pamphlet?

25  A   Yes.

1    Q    How did that happen, tell me about that?

2    A    We were in a meeting before training was conducted and

3    Steve Robeson handed me the 501.

4    Q    Okay.  I am showing you what's -- can we put up, Pam, just

5    for the witness, 22 -- our exhibit but not on the screen?  All

6    right.  So it should be up on your screen, Mr. Chappel.

7              THE COURT:  So what's your number, 2220?

8              MR. GIBBONS:  2238, Your Honor.

9              THE COURT:  All right.

10             MR. KESSLER:  I will object to relevance, Your Honor.

11             THE COURT:  I am not sure I see it yet on the witness.

12   All right.  So what is the relevance of this?  I mean, I saw

13   the 501c(3) reference and I am not clear on the relevance.

14             MR. GIBBONS:  Correct.  One of the things that the

15   Defense would like to show is that there was inducement on the

16   part of the government agent.

17             THE COURT:  What does 501(c) good, bad or otherwise

18   have to do with it?

19             MR. GIBBONS:  It was offered to the Defendants at

20   various times as an opportunity to receive a credit card that

21   would be given to them that would have money on it that they

22   could spend to buy munitions, weapons, and to assist them in

23   their --

24             MR. KESSLER:  Your Honor, now he's testifying.

25             MR. GIBBONS:  Well, the Judge asked me.

1    THE COURT:  I am trying to understand the relevance,

2    but to me that doesn't really help me very much, and if we are

3    going to chase down every interaction that everybody had I

4    think we'll never be done.  So unless I have a better

5    understanding of the relevance, at a minimum any relevance

6    seems to me swamped by 405.

7    MR. GIBBONS:  Can I say one more thing?

8    THE COURT:  What?

9    MR. GIBBONS:  If the government felt that the offer of

10   the 501(c), if it had been taken they would be here saying it

11   would be an indication of guilt, and I am offering it as an

12   indication of innocence, Your Honor.

13   THE COURT:  I just don't see that.  I don't see the

14   relevance.  I don't see how it fits, and certainly don't see it

15   after application of 403.  And we are not here to try a case on

16   whether or not somebody was involved in tax actions that they

17   shouldn't have been.

18   MR. GIBBONS:  Okay.

19   BY MR. GIBBONS:

20   Q    You did go to a meeting that was sponsored by the III%

21   militia in Peebles, Ohio, correct?

22   A    I did.

23   Q    And what was the point of that meeting, sir?

24   A    Barry Croft was putting out more ideas, and the individuals

25   from each state representing, they were bringing more ideas to

1    the table to solidify a plan for action.

2    Q    Okay.  And you would agree that at the conclusion of the

3    meeting there had been no specific direction determined by the

4    group?

5    A    Correct.

6    Q    That meeting was about four hours again?

7    A    Around about, yes.

8    Q    But the interaction of the individuals was all day, true?

9    A    Say again?

10   Q    The interaction of the individuals was not just at the

11   meeting.  There was before, there was a breakfast, and then

12   there was meetings in hotel rooms after, true?

13   A    Correct.

14   Q    Can you play exhibit -- the audio for exhibit --

15   Government's Exhibit 113?

16          THE COURT:  113?

17          MR. GIBBONS:  Yes.

18          THE COURT:  All right.  I'm showing that already in

19   so...

20          (Audio started, 11:01 a.m.)

21          (Audio stopped, 11:01 a.m.)

22   BY MR. GIBBONS:

23   Q    Who is that that was speaking?  Do you recognize that

24   voice?

25   A    That was Steve Robeson.

```
1    Q    Okay.  These are the types of conversations that would

2    occur at Peebles?

3    A    Yes.

4    Q    You did speak at Peebles, did you not?

5    A    I did.

6    Q    You implored the group for a direction.  We have to leave

7    here with a direction.  Did you say words to that effect?

8    A    Correct.

9    Q    That was towards the end of the meeting?

10   A    Fair to say.  Yes.

11   Q    You have challenged the group, did you not, with the idea

12   that you could have FTXes but what's the point if we don't have

13   anything to train for, correct?

14   A    Correct.

15   Q    And after that meeting was over you returned to the

16   Michigan area, correct?

17   A    Correct.

18   Q    You are located on the east side of the state, true?

19   A    Yes.

20   Q    I don't want to know where you live or anything like that.

21   A    Right.

22   Q    But you are generally on the east side between -- in the

23   Flint/Detroit corridor, correct?

24   A    Correct.

25   Q    Okay.  For you to come to -- you have been to the Vac
```

1    Shack, right?

2    A    I have.

3    Q    And when you leave from your home, it's how long of a drive

4    is that?

5    A    About two hours.

6    Q    Okay.  Pam, can I have the transcript for the Government's

7    Exhibit 100?

8              THE COURT:  1 what?

9              MR. GIBBONS:  100.

10             THE COURT:  100.

11   BY MR. GIBBONS:

12   Q    If you know, Adam had, back in June and into July, a

13   possible source for explosives for his militia, is that true?

14   A    Correct.

15   Q    And the individual's name was Matt Keepers?

16   A    I believe so.  Yes.

17   Q    Okay.  And Adam talked to you about Matt Keepers, correct?

18   A    Yes.

19   Q    And in this transcript here we heard the audio the other

20   day.  And Pam, if you can highlight here the Fox paragraph?

21             In this recording this is Adam telling you that he

22   talked to his -- and the nomenclature would be baker, right?

23   A    Correct.

24   Q    And you understood that to be Matthew Keepers, true?

25   A    Yes.

Q    Okay.  He says he talked to him on the phone, correct?

A    Correct.

Q    And he said that at the bottom there, he felt like Mr. Keepers was telling him he could provide him with some explosives, right?

A    Yes.

Q    And that's what he told you?

A    Yes.

Q    And Pam, can we have the transcript for the Government's 122?

        So the -- 7-11 -- the one we just looked at occurred on July 11th, correct?

A    Correct.

Q    Was July 11th, does that sound true?

A    Yes.

Q    And now we are looking at T122, that's July 24th?

A    Correct.

Q    Right.  Okay.  So about a week later or so.  Pam, if you can get this paragraph here?  Thank you.

        This is another phone call that you are having about the possibility and Adam's attempts to work something out with Mr. Keepers, right?

A    Correct.

Q    And you would agree that he says here that Adam hasn't heard from the guy?

1    A    Right.

2    Q    And it's been a number of days and he has been trying to

3    get a hold of him and it's not happening, right?

4    A    Right.

5    Q    And then Adam then says he might have to go another route.

6    He needs to talk to his XO?

7    A    Correct.

8    Q    That's Sean Fix?

9    A    Yes, sir.

10   Q    Can you go to the second page?

11          And here Adam says that in terms of Sean Fix, he

12   mentioned a go box that he has buried, right?

13   A    Correct.

14   Q    Do you have an understanding of what that is?

15   A    He had a Conex.  He said he had a Conex filled with

16   ammunition and various rifles.

17   Q    Okay.  And the indication there at the bottom is that Adam

18   Fox described that he had, like, 140 guns, 40,000 rounds of

19   ammunition, and C-4, and that they took this stuff from the

20   navy, correct?

21   A    Correct.

22   Q    And the notion there is that Sean Fix was in the navy and

23   when he was in the navy he was helping himself --

24          MR. KESSLER:  Asking him to interpret a document, Your

25   Honor.

1          THE COURT:  Yeah.  I mean, the words are there.  If

2    you have a question for him about it, I don't think he can

3    interpret it, but -- and if you want to get, you know, into

4    things that we addressed and excluded before I'd exclude them

5    again.

6          MR. GIBBONS:  No.  I'm fine, Your Honor.

7          Pam, can we go back to page 1, the first paragraph?

8    BY MR. GIBBONS:

9    Q    This is Adam Fox at the beginning of that conversation.  He

10   is referencing looking for her office, correct?

11   A    Correct.

12   Q    That's the governor?

13   A    Correct.

14   Q    That's not -- that's not her cottage, true?

15   A    No.  That was at the Capitol.

16   Q    Okay.  You had a meeting and we talked a little bit about

17   that meeting with Adam on July 27th at the Vac Shack?

18   A    Correct.

19   Q    Right?  And at that meeting we saw a prior exhibit.  There

20   was discussion I think you testified to already of this plan or

21   planning or ideas about potentially kidnapping the governor,

22   correct?

23   A    Correct.

24   Q    Did you ever volunteer to assist in that effort to develop

25   those plans?  Did you ever say, hey, I can help, this is what

1    I'll do for you?

2    A    I might have.

3    Q    Okay.  Do you recall on August 3rd volunteering to start

4    digging on two; doing some research on where the governor's

5    cottage might be?

6    A    I can't say for certain.

7    Q    Okay.

8    A    Thank you.

9    Q    Okay.  Have you had a chance to look at that?

10   A    I did.

11   Q    Okay.  Did you volunteer to start digging on location two

12   to get information?

13   A    Yes.

14   Q    Okay.  And you communicated that to Adam Fox?

15   A    I did.

16   Q    And your screen name in this Wire platform is ETADIK,

17   correct?

18   A    Correct.

19   Q    And Adam at this point was Deanzy?

20   A    Yes.

21   Q    And so this was made in a private conversation between you

22   and Adam, correct?

23   A    Yes.

24   Q    I think there is also a reference here to -- did you make

25   an indication about when you could have that information

1    available?  Like, on -- did you make an indication?

2    A    I can't recall.  No.

3    Q    Okay.  If you look at the paper it's probably right there?

4    A    For Sunday, possibly.

5    Q    Yeah.  Would that be the FTX that occurred on 8-9 in

6    Munith?

7    A    It might have been.  I know we were planning to do a route

8    recon of the governor's house on a Sunday.

9    Q    Okay.  So possibly could have been Munith, correct?

10    A    It could have been.

11    Q    On the 9th?  We discussed you were at Munith; your key fob

12    was working; everything was recorded; you have listened to it,

13    true?

14    A    Yes.

15    Q    You did suggest to the group as an idea that they might

16    want to find out information on the second location, which

17    would be the governor's home in Elk Rapids, is that true?

18    A    It could have been, yes.

19    Q    Pardon?

20    A    Yes.

21    Q    So it wasn't it couldn't have been --

22    A    I can't recall.

23    Q    Okay.

24    A    Thank you.

25    Q    Have you had a chance to look at that?

1    A    I did.

2    Q    Does that refresh your recollection?

3    A    It does.

4    Q    What was the suggestion you had?

5    A    For finding the location of the second location.

6    Q    Okay.  And did you provide any other information with that

7    suggestion?

8    A    That we should check out routes, roads, traffic

9    construction, highway stop signs, traffic lights, overhead

10   bridges and shit like that.

11   Q    Okay.  And check routes, check roads, that would be road

12   recon, is that what you just said?

13   A    Yeah.  Route recon.  Yes.

14   Q    Okay.  After that FTX concluded you went back to Special

15   Agent Chambers' office and met with Agent Chambers and Impola,

16   correct?

17   A    I did.

18   Q    Do you recall having a phone call with Adam Fox?

19   A    I believe we did.

20   Q    Pardon?

21   A    I believe we did.

22   Q    Okay.  And would you agree that you indicated to Adam Fox

23   that you had been talking to a guy named Mikey?

24   A    That was one of -- that was one of Adam Fox's members of

25   his group.  Yes.

```
1    Q    Okay.  And so you had been having direct contact with

2    Mikey, correct?

3    A    I have.

4    Q    And on August 9th you had -- some time prior to August 9th

5    you had had direct contact, true?

6    A    Yes.

7    Q    Okay.  And didn't you indicate to Adam Fox that you had

8    already talked to Mikey, and Mikey would be willing to go up

9    north and check things out?

10   A    He said he worked with an individual that had a boat where

11   the governor had her boat stored at.

12   Q    Right.  I understand why you may have said what you said,

13   but did you say, he said he would go up north and check stuff

14   out for us?

15   A    Yes.

16   Q    Okay.  And you made that call to Mikey, correct?

17   A    We were talking on Wire.  Yes.

18   Q    Okay. Adam Fox didn't ask you to do that, did he?

19   A    No.

20        MR. KESSLER:  Your Honor --

21        THE COURT:  It's --

22        MR. GIBBONS:  I apologize.  I withdraw the question.

23        THE COURT:  It's in --

24        MR. GIBBONS:  That was not supposed to be asked.

25   BY MR. GIBBONS:
```

Q    Mikey is not a Wolverine Watchmen, is he?

A    No.

Q    He is a Patriot III$er in Adam's militia, right?

A    Yes.

Q    And this is August 9th, true?

A    Yes.

Q    On August 16th you had a text -- private text communication with Adam Fox.

MR. GIBBONS:  And Your Honor, I am just going to refresh his recollection because I don't know that he can --

THE COURT:  Well, let's find out what the topic is and maybe he'll remember it.

BY MR. GIBBONS:

Q    Do you recall on 8-16 in a text asking Adam Fox --

THE COURT:  Not to read from it.  I mean, what do you want to ask him about?

BY MR. GIBBONS:

Q    Do you recall discussing the doing a recon of the governor's residence at Birch Lake with Adam Fox on the chat?

A    We discussed that.  Yes.

Q    You did that on 8-16, correct?

A    I believe so.  Yes.

Q    Okay.  And in that chat did you ask Adam Fox if he wanted to do intel on the residential two?

A    I believe so.  I am not sure on the content of it.

1          MR. GIBBONS:  Okay.  Your Honor, in light of that

2    answer I'd like to provide him --

3          THE COURT:  Pardon?

4          MR. GIBBONS:  He said he is not sure.

5          THE COURT:  You can see if it refreshes him if you

6    want to go and see.  It's not just for your purposes,

7    Mr. Chappel, so that you can read from it.  When you read it,

8    the question is, oh, yes, now I remember.  Does it pop back in

9    your memory?  And if it does you can ask -- or Mr. Gibbons can

10   ask about it.

11   BY MR. GIBBONS:

12   Q    Did you ask him that question?

13   A    Yes.

14   Q    Do you want to get intel on the residence two?

15   A    Yes.

16   Q    On that date in respect to getting intel on the residence,

17   did you make any statements about why that would be necessary

18   to go up?

19   A    To get an eyes on.

20   Q    Okay.  And how many times did you tell him that?

21   A    I believe it was two.

22   Q    Okay.  And then did you make an indication to him about

23   that you could do this after a workday or before a workday?

24   A    Yes.  I mean, I am -- what I'm taking this as is it's after

25   the training that we would be up there for the FTX.

1   Q    Okay.  And this exchange occurred on 8-16?

2   A    Correct.

3   Q    So it was important and it was something that you were

4   moving forward with in terms of your tasking with Special Agent

5   Chambers that this recon -- that you continued to provide

6   access, correct?

7   A    Yes.

8   Q    So that -- so that the FBI can know what the plans are and

9   they can do things to make things safe, correct?

10  A    Yes.  That if Adam is going to be checking out the area

11  that I would be with him.  Yes.

12  Q    Okay.  And this is two days later on August 18th you

13  received a message from Special Agent Chambers, did you not, on

14  your cell phone?

15  A    Yes.

16  Q    And he texted you, might need to eventually start bugging

17  people to find the locations for Sunday.

18  A    Okay.

19  Q    What does that mean to you?

20  A    That we need to start getting the location for Sunday.

21  Q    Yes.

22  A    That we should start looking for the area.

23  Q    That's for the recon up in Elk Rapids, Birch Lake?

24  A    Correct.

25  Q    That's what you understood it to be?

1    A    Yes.

2          MR. GIBBONS:  Can I have Exhibit 2289 put up in or

3    proffered to the -- how do you want to do this.

4          THE COURT:  2289 should be -- did you put it on the

5    screen for the witness?

6    BY MR. GIBBONS:

7    Q    Does this appear to be the text message you received?

8    A    Yes.

9          MR. GIBBONS:  Okay.  Your Honor, I would move for the

10   admission of 2289?

11         THE COURT:  Objections?

12         MR. KESSLER:  Is this one of the new ones?  We got a

13   couple of new shipments of exhibits.

14         THE COURT:  They gave me the set this morning.

15         MR. GIBBONS:  These were in Jenks material, Your

16   Honor.  So they were located late.

17         MR. KESSLER:  No objection, Your Honor.

18         THE COURT:  It's admitted.

19   BY MR. GIBBONS:

20   Q    So this is on the 18th of August, correct?

21   A    Yes.

22   Q    And did you try to act on that tasking that you had

23   received?

24   A    I put a feeler out for if we need to find the address for

25   Sunday.

1    Q    Okay.  By put a feeler out you mean you put a text out to

2    the group, correct?

3    A    Yes.

4    Q    That would be the fuck around find out group?

5    A    Yes.

6    Q    And that's on Wire?

7    A    We had one on Wire and on Threema.

8    Q    But in August, let's just talk about that.  There was one

9    on Wire, correct, like you said?

10   A    There was.

11   Q    And then there was one on Threema?

12   A    Yes.

13   Q    True?  And the Wire FAFO group.  I am just going to call

14   them all FAFO.

15   A    That's fine.

16   Q    There is FAFO on Wire.  However it happened, all of the

17   boys, the group moved to Threema, correct?

18   A    Correct.

19   Q    So there may have been a day or two where there would be

20   Threema and Wire operating, correct?

21   A    Correct.

22   Q    But for the most part, you have, like, chapter one Wire,

23   correct?

24   A    Correct.

25   Q    June, July and August, true?

1    A    True.

2    Q    And then you have chapter two, which is Threema, right?

3    A    Correct.

4    Q    And that's basically September, a couple days in August,

5    September and October, correct?

6    A    Correct.

7    Q    In that same construct you have your private chats with

8    Adam Fox, true?

9    A    True.

10   Q    And those are -- and that private chat means that's a text

11   from you to Adam and Adam back to you, correct?

12   A    Correct.

13   Q    And nobody else sees those, true?

14   A    Unless he take screen shots and shares them, yes.

15   Q    Right.  But as a general rule they are called private chats

16   because they are private, right?

17   A    Correct.

18   Q    As opposed to, like, FAFO, which is a group chat?

19   A    Correct.

20   Q    If you make a text in FAFO, it's like texting whoever is on

21   the group, right?  Everybody sees it?

22   A    Correct.

23   Q    And again, FAFO consists of people who are members of the

24   Wolverine Watchmen, true?

25   A    On Wire, yes.

1    Q    Well, Wire and Threema, correct?

2    A    We eventually started splitting from the Wolverine Watchmen

3    and joining Adam's group.

4    Q    Joining Adam's group?

5    A    Yes.

6    Q    The militia, the Patriot III% Militia?

7    A    Yes.

8    Q    In any event, let's just stick to Wire.  In August when

9    this tasking is made to you, we might eventually need to start

10   bugging people, right, to find location, that goes out to a

11   large group of people, a larger group?

12   A    Yes.

13   Q    And the people in that group, some of them are Watchmen?

14   A    Correct.

15   Q    A few of them are III%ers with Adam's group?

16   A    True.

17   Q    And then there are people that aren't in either group,

18   correct, just friends of friends?

19   A    No.  The ones on the FAFO are in the group.

20   Q    Is it your testimony then -- well, what about, like, Eric

21   Molitor?

22   A    He was with Adam.

23   Q    Did he take the oath?

24   A    He -- I'm not sure if he got sworn in or not but he was one

25   of Adam's individuals.

1    Q    You consider him an III%er then with Adam, correct?

2    A    I consider him with Adam's group.  Yes.

3    Q    Okay.  So you put this feeler out, and you would agree from

4    your testimony on Friday it's the 18th.  Let's fast forward in

5    time.  Adam had this information available to him that you were

6    looking for intel on the governor's cottage, correct?

7    A    Adam was wanting the intel on the cottage.  Yes.

8    Q    Well, not -- you say he wanted it, but he was aware at

9    least of your feelers that you were putting out there, right?

10   A    Yes.

11   Q    Because he was in FAFO?

12   A    Correct.

13   Q    And you would agree that on the 29th, fast forward to early

14   afternoon, late morning --

15             THE COURT:  Got to stay by a microphone.

16             MR. GIBBONS:  Sorry.

17   BY MR. GIBBONS:

18   Q    Late morning, Adam Fox didn't know what the governor's

19   address was, did he?

20   A    He found it.

21   Q    Well, that's not what I asked you.  I asked you, when you

22   got to Elk Rapids he didn't know what the governor's address

23   was?

24   A    None of us did.  No.

25   Q    Pardon?

1    A     None of us did.  No.

2    Q     In order to facilitate the scheduling of the trip for

3    Sunday the 29th, I think it was actually a Saturday is when you

4    went, right?

5    A     I am not sure of the exact day.

6    Q     I think it was.  It was a Saturday.  But in any event, it

7    was the 29th of August, true?

8    A     Sounds correct.  Yes.

9    Q     And you told Adam that the trip would be going on the 29th,

10   correct?

11   A     We were coordinating it.  Yes.

12   Q     Pardon?

13   A     We were coordinating it.  Yes.

14   Q     And in that coordination, you told him that it was going to

15   happen on the 29th, correct?

16   A     I am not sure on the exact details of it now.

17           MR. GIBBONS:  May I approach?

18           THE COURT:  Sure.

19           THE WITNESS:  Thank you.

20   BY MR. GIBBONS:

21   Q     Have you had a chance to look at that?

22   A     I do.

23   Q     Okay.  Did you raise the issue -- the subject of got a trip

24   up north; we are going to go at some point?

25   A     Yes.

Q    And Adam Fox -- well, I can't say -- and then you told Adam

Fox, correct, that it would be Saturday the 29th?

A    Yes.

Q    Okay.  Pam, can I get 2290?

And let's just go back to this chat for a second so we

can get that.  That was on August 23rd of 2020, correct?

A    This is saying 8-23.

Q    Okay.  Subsequent to that you learned that Adam Fox was

actually not going to be in town, correct?

A    I believe so.  Yes.

Q    He had decided to go to Virginia?

A    Correct.

THE COURT:  Well, I mean, if you are asking him -- we

don't know enough about the foundation of the source.  So okay,

you got the general point that he may be out of town.  Let's

move to the next question that doesn't call for information

from him.

MR. GIBBONS:  Okay.  That's fine, Your Honor.

Can you show the witness Exhibit 2290?

THE COURT:  It should be on your screen now.

BY MR. GIBBONS:

Q    You received a text message on the 25th from Agent

Chambers, is that correct?

A    Yes.

Q    And you would agree that --

1       THE COURT:  Are you offering this at this point?

2       MR. GIBBONS:  Yes, Your Honor.

3       THE COURT:  Do you have any objection?

4       MR. KESSLER:  No objection, Your Honor.

5       THE COURT:  All right.  It's admitted.

6   BY MR. GIBBONS:

7   Q    This is the text message you received from Agent Chambers,

8   correct?

9   A    Yes.

10  Q    And he says to you in a text, if Adam is out of town this

11  weekend we should reschedule the trip, the north trip, right?

12  A    Correct.

13  Q    We is not you, Special Agent Chambers and Adam, correct?

14  A    Correct.

15  Q    We would be you and Agent Chambers, true?

16  A    True.

17       MR. KESSLER:  I think this is a little confusing, Your

18  Honor, and he is asking --

19       THE COURT:  The first time I thought you'd object but

20  you didn't so we'll let it stand, but the point is, here is the

21  statement of the special agent.  Under the Sixth Circuit case

22  law that stands as a party admission.  What it means isn't for

23  this witness to interpret or anybody else except the jury.

24  BY MR. GIBBONS:

25  Q    Can I have Exhibit 2291 for just the witness?

1    A couple days later, you, on the 27th, get more

2    tasking with regard to this trip north from Special Agent

3    Chambers, correct?

4    A    Yes.

5    Q    And you are looking at 2291, Defendant'S exhibit.  Does

6    that appear to be the text you received from him?

7    A    Yes.

8    MR. GIBBONS:  Your Honor, I would move for the

9    admission of 2291?

10    MR. KESSLER:  No objection, Your Honor.

11    THE COURT:  All right.  It's admitted.

12    BY MR. GIBBONS:

13    Q    And there you are tasked with, try to get as many as

14    possible to go with for Saturday?

15    A    Yes.

16    Q    Okay.  2292, please.  Thereafter you received another text

17    from Agent Chambers, more tasking, correct?

18    A    Yes.

19    Q    And in this tasking --

20    THE COURT:  Any objections?

21    MR. GIBBONS:  Any objections to 2292?

22    MR. KESSLER:  No objection.

23    THE COURT:  All right.  It's admitted.

24    BY MR. GIBBONS:

25    Q    In this tasking you are advised to also include a drive-by

1    on location one if possible?

2    A    Correct.

3    Q    So you are being tasked with attempting to make sure that

4    the trip includes a trip also by location one, correct?

5    A    If Adam is wanting to go that route, yes, for me to be

6    present with him and the FBI aware that he is going by the

7    Capitol.  Yes.

8    Q    Okay.  Can I have Exhibit 2292?

9             THE COURT:  Did you say 2292?

10            MR. GIBBONS:  That's correct, Your Honor.

11            THE COURT:  Okay.  I already show that in.  I could be

12   wrong.

13            MR. KESSLER:  I think that's what just came down off

14   the screen.

15            MR. GIBBONS:  I'm sorry, 2293.

16            THE COURT:  Any objections to that, Mr. Kessler?

17            MR. KESSLER:  92, no, we did not.

18            THE COURT:  But what about 93?  He is offering that

19   now.

20            MR. KESSLER:  No objection, Your Honor.

21            THE COURT:  Or 94?

22            MR. KESSLER:  No, Your Honor.

23            THE COURT:  95?

24            MR. KESSLER:  No, Your Honor.

25            THE COURT:  Okay.  That completes the particular day.

```
1    So consider 93, 4 and 5 in without objection.  You can proceed
2    to publish those, Mr. Gibbons.
3             MR. GIBBONS:  Thank you, Your Honor.
4    BY MR. GIBBONS:
5    Q    2293, you then receive a reminder on the tasking, correct?
6    A    Yes.
7    Q    And then 2294, the next day you were advised by Jayson
8    Chambers that he has a few goals for today, correct?
9    A    Correct.
10   Q    And 95.  Backwards.  I'm sorry.  At one point you thought
11   you had quite a few gentlemen coming on this trip, correct?
12   A    Yes.
13   Q    And you were concerned that there wouldn't be enough room
14   in your -- the truck -- in your truck to get everybody up there
15   who wanted to go, right?
16   A    Correct.
17   Q    You asked -- and did you make that indication to Special
18   Agent Chambers?
19   A    Yes.
20   Q    And in doing so, did you also ask him a question if would
21   he want two trips or wait until you get more guys?
22   A    That sounds familiar.
23   Q    Okay.  You did say that, correct?
24   A    Yeah.  For multiple trips.  Yes.
25   Q    You did get to Elk Rapids and Birch Lake with Adam Fox and
```

1    Eric Molitor on the 29th, right?

2    A    We did.  Yes.

3    Q    Okay.  At lunch you stopped at the Red Bull Tavern, is that

4    what it is?

5    A    That sounds about right.  I am not sure of the name of the

6    tavern.

7    Q    There in Kewadin?

8    A    Yes.

9    Q    On the backside of Birch like?

10   A    Correct.

11   Q    Can I have Exhibit 189?  This is the map that Adam drew?

12   A    Yes.

13   Q    You handed him the pad of paper to draw the map on,

14   correct?

15   A    When we were in the vehicle he wanted to have pad and paper

16   for writing stuff down.  Yes.

17   Q    And you gave him that pad of paper, right?

18   A    I did.

19   Q    So when he came out of the Vac Shack in your truck that

20   morning he didn't have a pad of paper with him, correct?

21   A    No.

22   Q    He didn't have binoculars, true?

23   A    No.

24   Q    He didn't have a range finder?

25   A    No.

Q    He didn't have a professional grade camera?

A    No.

Q    Didn't have an electronic note pad to take notes on?

A    I mean, in essence your phone could be all of those.  It could be a range finder for measuring the length of the lake off of Google maps.  It has a high lens resolution camera on there that are compatible with most high performance cameras.

Q    So did he have a Samsung Galaxy phone?

A    I think he had an Apple phone.

Q    Well, it doesn't matter in any event.  You provided Adam Fox with a pen to make the map?

A    Say again?

Q    You provided Adam Fox with the pen to make the map?

A    Yes.

Q    True?  You made suggestions to Adam about what to put on the map, is that true?

A    I am not sure to be honest.

Q    Okay.  I would like to -- would it help if I showed you a transcript, maybe refresh your recollection about that specific matter?

A    It would.  Yes.

          MR. GIBBONS:  Approach, Your Honor?

          THE COURT:  Sure.

          THE WITNESS:  Thank you.

          MR. GIBBONS:  You are welcome.

1     BY MR. GIBBONS:

2     Q     Ready?

3     A     Ready.

4     Q     Thank you.  Did that help refresh your memory, sir?

5     A     It did.  Yes.

6     Q     Okay.  You did make indications for things for Adam to mark

7     on the map, true?

8     A     Yes.

9     Q     Thank you.  And specifically, you would have helped him

10    calculate speeds and driving times, true?

11    A     Correct.

12    Q     And then gave indication to mark that on the map, correct?

13    A     Yes.

14    Q     If you can pull up 189 one more time, Pam, please?

15          Looking at that map, you would agree the governor's

16    house isn't drawn on there, is it?

17    A     Her road is, yes.

18    Q     Right.  But she doesn't live on the road, right?

19    A     No.

20    Q     But her house, correct, not there?

21    A     On that slide, no.

22    Q     And not on the map that's depicted on the slide, correct?

23    A     No.  But we had found her address.

24    Q     So let's just try to make this really simple.  On that map

25    that you are looking at that's depicted on that screen,

1    wouldn't you agree the governor's house is not depicted there?

2    A    On that map.  No.

3    Q    Thank you.  You took that pad of paper with you when you

4    left the restaurant?

5    A    I did.

6    Q    Pardon?

7    A    I did.

8    Q    Yes.  So you had the map?

9    A    Yes.

10   Q    Adam didn't take the map back to the Vac Shack, did he?

11   A    No.  He said he was going to make maps.

12   Q    Okay.  He did?

13   A    He did.  He drew that map with Google Maps so he was going

14   to make more maps and have them laminated.

15   Q    Let me talk to you about that for a second.  If you can

16   pull up 187?  And there is Adam, right?

17   A    Yes.

18   Q    And that's him with your pad of paper, right?

19   A    Correct.

20   Q    And your pen?

21   A    Yes.

22   Q    And that's his phone?

23   A    Yes.

24   Q    You told him to pull up Google Maps, did you not?

25   A    With our conversation because he wanted to mark everything

down.  Yes, I said you can pull up Google Maps.

Q    So it was your idea for him to get out the phone and pull up what was on maps for where you guys were at?

A    He wanted to mark everything down, so with continuation of the conversation it might have been brought up like that.

Q    Right.  Who paid for the drinks on the table there?

A    I might have.

Q    Yeah.  You paid for the lunch, correct?

A    Possibly.

Q    You paid for the gas, true?

A    We were in my vehicle.  Yes.

Q    You picked him up in -- at the Vac Shack in the morning, correct?

A    I did.

Q    You drove all the way up?

A    Yes.

Q    Met with Eric Molitor, right?

A    Yes.

Q    On the way there?

A    Correct.

Q    Eric Molitor was also at this lunch, was he not?

A    He was.

Q    Eric Molitor was with you until you guys got done up in Elk Rapids and you took him back to his home?

A    Correct.

1    Q    Because he lives up near Antrim County, correct?

2    A    Correct.

3    Q    Let me talk to you a little bit about that experience.

4    When you picked Adam up in the morning, did he appear as though

5    he had already been smoking marijuana?

6    A    I am not sure.

7    Q    Okay.

8    A    To be honest.

9    Q    All right.  Well, when you get to Eric Molitor's house,

10   Erik and Adam smoked marijuana, did they not?

11   A    They did.

12   Q    They did that in your presence, true?

13   A    Yes.

14   Q    You did not smoke marijuana?

15   A    I did not.

16   Q    And then they smoked marijuana at lunch before they went in

17   the restaurant out in the parking lot, right?

18   A    They did.

19   Q    And that was around noon, right?

20   A    Correct.

21   Q    And then after the lunch you guys went to the boat launch,

22   right?

23   A    Correct.

24   Q    And you met a woman there, correct?

25   A    Yes.

1    Q    I think her name was Patricia?

2    A    Correct.

3    Q    And you guys said hello to her, correct?

4    A    We did.

5    Q    You engaged her?

6    A    Yes.  We did.

7    Q    And Adam smoked marijuana with Patty from Elk Rapids,

8    correct?

9    A    I believe they did.  Yes.

10   Q    At the boat launch?

11   A    Correct.

12   Q    And then you would agree that after you got back to Eric's

13   place to drop him off, before -- when you dropped him off you

14   guys went in the house, right?

15   A    We did.

16   Q    And Adam Fox and Eric smoked yet again, true?

17   A    Yes.

18   Q    At the boat launch -- can I have Exhibit 191, Pam?

19   Actually, can I have 192, first?  And can you blow up Adam?

20        That's Adam Fox, correct?

21   A    Correct.

22   Q    And he's wearing a hat, is he not?

23   A    He is.

24   Q    Okay.  Can I have Exhibit 191?  Can you zoom in on Adam's

25   head.

1          Okay.  This is Adam looking out over the lake,

2     correct?

3     A    Correct.

4     Q    Isn't that his hat in his hand, would you agree?

5     A    Yes.

6     Q    He was looking through his hat, correct?

7     A    Yes.

8     Q    Okay.  And specifically that's because the sun is in his

9     eyes that way?

10    A    Correct.  He was using the little -- the hole in the hat as

11    like a periscope.

12    Q    Okay.  And those are his sunglasses in his hand, right?

13    A    Correct.

14    Q    Correct?

15    A    Correct.

16    Q    When you got back to the Vac Shack, you went into the Vac

17    Shack with Adam, correct?

18    A    I did.

19    Q    And you were wired, right -- or you had the key fob on,

20    correct?

21    A    Yes.

22    Q    You weren't wired so the agents aren't listening to you,

23    too?

24    A    There should have been a live feed device.  Yes.

25    Q    So you are just recording.  So one of the things you'd like

1    to do when you record is in terms of accomplishing your tasking

2    is you want to get people to talk and to share, correct?

3    A    Correct.

4    Q    And would you agree that when you got back to the Vac Shack

5    you went down into the basement where Adam lives, right?

6    A    We may have.

7    Q    Okay.  And you had Adam -- you talked to Adam about the

8    type of gear he had, correct?

9    A    Yes.

10   Q    And you guys -- Adam was all too willing to show you all

11   his stuff, wasn't he?

12   A    Correct.

13   Q    I mean, he went through his bag in detail, true?

14   A    True.

15   Q    Because I have listened to it more than once.

16              THE COURT:  Well, it's not for you to testify,

17   Mr. Gibbons.

18              MR. GIBBONS:  I'm sorry, Your Honor.

19   BY MR. GIBBONS:

20   Q    He went through each item in his go bag with you, did he

21   not?

22   A    He did.

23   Q    And you would ask him what it is and he would identify it,

24   true?

25              MR. KESSLER:  Your Honor, he is getting very close to

1    hearsay.

2            THE COURT:  He is, but he is not there yet, so go

3    ahead.

4    BY MR. GIBBONS:

5    Q    While Adam is unpacking all of his things, tuna fish?

6    A    Correct.

7    Q    Crackers?

8    A    Correct.

9    Q    String?

10   A    Correct.

11   Q    A pair of flex cuffs, right, for his go bag?

12   A    Correct.

13   Q    He had those in there.  Bandages, tourniquets, flashlight?

14   A    Correct.

15   Q    He had a set of binoculars in there, didn't he?

16   A    He did.  I believe so.

17   Q    But he didn't bring those on the trip up to Elk, right?

18   A    No.  We were making a low profile when we went up there.

19   Tourists.

20   Q    Right.  There are birds in Northern Michigan, aren't there?

21   A    Yes.

22   Q    And there are hobbyists who like to watch birds and

23   document it, correct?

24   A    Correct.

25   Q    And when you run into those people they have binoculars

1    around their neck, true?

2    A    True.

3    Q    I want to go back.  I am almost done with this ride-

4    along -- when you were in the restaurant -- I guess it wasn't

5    in the restaurant.  When did he download the app?  You said he

6    downloaded an app that day?

7    A    Yeah.  The realtor app.

8    Q    Yeah.  When did that happen?  What time of day?

9    A    I am not sure what time of day.

10   Q    But some time during that day he definitely downloaded an

11   app on his phone?

12   A    He said we could download it.  I had the app on my phone as

13   well.

14   Q    The realtor app?

15   A    The realtor app.

16   Q    And you have one on your phone?

17   A    I have one on my phone.  Yes.

18   Q    And you watched Adam Fox download that on his phone?

19   A    I am not sure if he downloaded it or not.

20   Q    Maybe he didn't then?

21   A    I am not sure.

22   Q    You testified he did.  So are you backing off that?

23   A    He may have downloaded it.  I know we were using our phones

24   to look at it.  Mine was already on there.  He did not want to

25   do a lot of research on his device for fear of the tracking.

1    Q    Anyway, after you leave the Vac Shack, the next day you

2    have a text exchange with Ty Garbin.  Do you recall that?

3    A    I believe so.  Yes.

4    Q    Okay.  Do you recall making a text exchange with Ty Garbin

5    where you indicated to Ty that in Elk Rapids you could cut off

6    the police at the bridge to create a delay?

7              MR. KESSLER:  Your Honor, I object to hearsay.

8              THE COURT:  All right.  Well, it's an out-of-court

9    statement by this witness.  I think you can ask it in a generic

10   way that asks if he reported to other people about what the

11   results of that outcome were, but when you are getting into the

12   actual words he is using you'll have a chance to talk to Ty

13   Garbin.  He'll be here.  So that's the place --

14             MR. GIBBONS:  Your Honor, my concern is -- I can

15   rephrase the question, Your Honor.

16             THE COURT:  Go ahead and try to rephrase it.

17             MR. GIBBONS:  I kind of went to step 3.

18   BY MR. GIBBONS:

19   Q    You did make an indication to Ty Garbin about delaying the

20   police in Elk Rapids, did you not?

21   A    Yes.

22   Q    Do you recall how you did that in the text?

23   A    With emojies.

24   Q    And what emojies did you use?

25   A    I believe a pair of scissors and a bridge.

1    Q    Any others?

2    A    Possibly a police cruiser.

3    Q    What did the scissors mean?

4    A    To cut off.

5    Q    Okay.  And what did the bridge mean?

6    A    The bridge.

7    Q    Which bridge?

8    A    The one on 31.

9    Q    Okay.  And was there -- there was a police emoji?

10   A    Yes.

11   Q    And that meant local law enforcement?

12   A    Correct.

13        MR. GIBBONS:  Can you put Exhibit 2252 up just for the

14   witness, please?

15   BY MR. GIBBONS:

16   Q    Do you see that?

17   A    I do.

18   Q    Do you recognize that area?

19   A    I do.

20   Q    You've been there twice, right, at least?

21   A    I have.

22   Q    Actually three times, true?

23   A    Correct.

24   Q    Okay.  Is that a fair and accurate depiction of what Elk

25   Rapids probably looks like on a map?

1    A    It is.

2         MR. GIBBONS:  Your Honor, I would move for the

3    admission of 2252?

4         MR. KESSLER:  No objection.

5         THE COURT:  Do you have any objection?

6         MR. KESSLER:  No.

7         THE COURT:  It's admitted.

8    BY MR. GIBBONS:

9    Q    Is this -- correct me if I'm wrong.  This is the bridge

10   that you were making reference to, correct, when you were

11   sending the emojies about cutting off the police?

12   A    Yes.

13   Q    And you would cut the police off with explosives, correct?

14   Blow the bridge?

15   A    Correct.

16   Q    Is that your thought?

17   A    That would be the thought.  Yes.

18   Q    And then you would agree -- so if this bridge is gone,

19   right, the police station is in the town?

20   A    Yes.

21   Q    All right.  So I am making an X here.  It's kind of in that

22   area, right?

23   A    It is.

24   Q    So if the bridge is gone, you can't get -- and the

25   governor's place is up here, right, up the road a fair bit,

1    right?

2    A    Correct.

3    Q    So the police would be cut off because of the bridge, true?

4    A    True.

5    Q    But they could turn around and go right up over the Dexter

6    Street bridge, couldn't they?

7    A    They could.  Yes.

8    Q    So this is the delay that you were talking about?

9    A    We found that Dexter bridge when we did the night recon.

10   Yes.  So on the initial delay was for 31.  Yes.

11   Q    So you found it -- you found it on September 12th, right?

12   Is that what you just told me?

13   A    Yes.  We drove over it on the 12th.  Yes.

14   Q    But this bridge was here on August 29th, wasn't it?

15   A    Yes.

16   Q    It's not brand new?

17   A    No.

18   Q    It's been there for years, true?

19   A    Yes.

20   Q    But the existence of the bridge was not known to the group

21   or to yourself until September 12th, correct?

22   A    No.  We knew of it on the map there.  We drove over it on

23   the 12th, over both bridges.

24   Q    I thought you said that's when you learned of it?

25   A    Well, when we drove over it the second time.  We drove over

1    31 just there, but seeing the screen shot we knew that there

2    was multiple bridges there.

3    Q    So the testimony you just offered that you didn't know

4    about it until the 12th is incorrect, to make sure the record

5    is clear?

6    A    I probably phrased my words wrong that we didn't drive over

7    that secondary bridge until the 12th.

8    Q    Let's talk a little bit about the chats again.  There was a

9    Wire chat to FAFO, correct?

10   A    Correct.

11   Q    And moved into Threema, right?

12   A    Right.

13   Q    And at that point in time, isn't it true that another group

14   arose in the chats?

15   A    Yeah.  We had multiple.

16   Q    Can I have Exhibit 170?  All right.  The Boys, right?

17   A    That's the one we initially started with.  Yes.

18   Q    Pardon?

19   A    That's the one that we initially started with.  Yes.

20   Q    And then they changed the name eventually very shortly

21   thereafter, did they not?

22   A    They might have.

23   Q    To Brick Squad, correct?

24   A    Correct.

25   Q    You were a member of Brick Squad, weren't you?

1    A    I was.

2    Q    Okay.  And the members in this group, Beaker, that's Daniel

3    Harris, right?

4    A    Correct.

5    Q    And then me, that's you, correct?

6    A    Correct.

7    Q    And then LeRoy Jenkins, who is that?

8    A    Another individual with the group.

9    Q    Do you remember what his first name is?

10    A    No.

11    Q    Okay.  Debased Tyrant, that's Mr. Caserta?

12    A    Correct.

13    Q    Okay.  These are all Wolverine Watchmen, correct?

14    A    Yes.

15    Q    None of these individuals in this group are III% Patriot

16    Militias from Michigan, correct?

17    A    No.

18    Q    Adam is not in that group, correct?

19    A    Correct.

20    Q    Any communication being made by Adam in FAFO isn't getting

21    into this chat form, is it?

22    A    Only through me.  Yes.

23    Q    So you might bring it in, right?

24    A    Yes.

25    Q    You could be the conduit for -- if Adam said something and

1   it could get to the group but you'd have to do it?

2   A   Correct.

3   Q   Right?  Now, you had private chats with Adam, correct?

4   A   I did.

5   Q   You had nearly daily contact with Adam from the end of June

6   until the 7th of October, isn't that true?

7   A   Yes.

8   Q   And you would have multiple contacts with him in private

9   chats almost every day?

10  A   Correct.

11  Q   You would talk to him on the phone, correct?

12  A   We would.

13  Q   Some of those phone calls are recorded, true?

14  A   They all should be.  Yes.

15  Q   Some didn't make it, isn't that true?

16  A   Correct.

17  Q   You would stop by -- you stopped by to see him on the 27th.

18  You would see him at trainings?

19  A   Yes.

20  Q   You were in Adam's orbit all the time?

21  A   I am.

22  Q   With respect to the private chats, do you have any reason

23  to disagree that the number of times you texted Adam Fox is

24  about 275?

25  A   That sounds correct.

1    Q    Okay.  And about 250 in August?

2    A    Possibly.  I wasn't keeping track.

3    Q    Okay.  Now, just in terms of frequency.  And in September

4    it's 400.  Any reason to disagree with that?  Does that sound

5    like a fair number?

6    A    That's fair.

7    Q    Okay.  Thank you.  You would also agree with The Boys --

8    like, Sean Fix wasn't in The Boys, was he?

9    A    No.

10   Q    Mikey Notso or whatever his name is that we talked about

11   earlier?

12   A    No.

13   Q    Those were Adam's guys, right?

14   A    Correct.

15   Q    So you get -- we get through this day recon, right?  That's

16   basically the end of August, the 29th, right?  So we are into

17   September now, true?

18   A    Correct.

19   Q    And we have this FTX coming up in mid-September, correct?

20   A    True.

21   Q    Okay.  Pam, can I have 2296?

22        THE COURT:  22 what?

23        MR. GIBBONS:  96, Your Honor.

24        THE COURT:  Thank you.  From the agent to this

25   witness?

1    MR. GIBBONS:  Yes.

2    THE COURT:  Do you have any objections?

3    MR. KESSLER:  No objection.

4    THE COURT:  It's admitted.

5  BY MR. GIBBONS:

6  Q    Jayson Chambers tasked you to start talking details of the

7  night op with Adam Fox, correct?

8  A    Correct.

9  Q    And can I have Government's Exhibit 208?  This is the next

10  day, right?  Because the text message in 2296 was made on 9-3.

11  Let's start talking details with Adam, right?

12  A    Correct.

13  Q    And you do what you are told, true?

14  A    True.

15  Q    So you do that, right?

16  A    Correct.

17  Q    You bring it up?

18  A    Yes.

19  Q    And in 208, maybe we can go to the second page of that

20  exhibit.  You start -- this is you talking to him.  You ask

21  him, we doing extraction of a target, correct?

22  A    Correct.

23  Q    That's your question to Adam Fox, right?

24  A    Yes.

25  Q    How long we holding another team for that?  That's your

1     question, right?

2     A    Correct.

3     Q    Wisconsin boys can probably hold it --

4          THE COURT:  Just so you know, I don't see any better

5     on your side of the case than on the government's.  If it's

6     important to your questions then you may want to have it blown

7     up.

8          MR. GIBBONS:  It is, Your Honor.  Just do them in

9     thirds or something.  Just a third of the page is fine.  Does

10    that help, Your Honor?

11         THE COURT:  It helps me.  Thank you.

12         MR. GIBBONS:  All right.

13    BY MR. GIBBONS:

14    Q    And I am not going to repeat it.  Can you go to the second

15    portion of that?  There we go.

16         And those are texts in green, correct?

17    A    Yes.

18    Q    Like I said, these two screens are all done in one day,

19    right?

20    A    Yes.

21    Q    And there is -- and actually, this is just a piece of that

22    chat conversation, correct?

23    A    Correct.

24    Q    It was bigger than this, right?

25    A    Yes.

1    Q    It started before the first page on 208 and it ended after

2    the second page of 208, Exhibit 208, right?

3    A    Correct.

4    Q    Did you ask Adam about the FTX?

5    A    Yes.

6    Q    How did you do that?

7    A    Like, what would be pertaining to the training?

8    Q    Yeah.  What did you say?

9    A    What are we going to be doing for the FTX, what kind of

10   training?

11   Q    Did you say to him, name the mission and I'll build it?

12   A    Yes.

13   Q    And this is on September 4, correct?

14   A    I believe so.  Yes.

15   Q    Did you encourage Adam to speak about the recon and the FTX

16   in the chat?

17   A    To put it out to the guys?

18   Q    No.  No.  Did you just encourage him to reply to you and to

19   egg him on to talk about it?

20   A    I don't -- I can't remember.

21   Q    Do you recall?

22   A    No.

23   Q    Would it refresh your recollection if I showed you the

24   screen?

25   A    Yes.  Thank you.

Q    Did you egg him on at the bottom of the page?

A    Basically I'm just turning the mission prep switch on.

Q    Correct.  And then continuing that conversation, you asked him a question, I think this is not your --

       This is a question, Your Honor.

       Any kayaks?  Do you recall saying that?

A    Saying what?

Q    Texting him, any kayaks?  A question.

A    Yeah, because we seen kayaks when we did the initial day recon up there and he said that we could use the Kayaks to get up to her cottage.

Q    Okay.  And then you texted him on that same day in the same conversation, want to get eyes on it, on foot, question mark?

       MR. KESSLER:  Again, I am going to object to him just reading him stuff.  Ask him a question.

       THE COURT:  When we start to read it we are really not doing anything more than hearsay.  We want to try to get his recollection.  If it needs to be refreshed, give him the item that can refresh it and if he's able to explain he can explain if he has a current memory of it.

       MR. GIBBONS:  My only understanding, Your Honor, is that maybe questions are not considered hearsay under the rule?

       THE COURT:  It's embedded with the whole pretrial idea that these things in the abstract, somebody who says, got kayaks, that doesn't mean anything in the abstract.  It only

means things in the context of a whole bunch of other
information, and so I think, you know, if your point is he's
trying to get at Adam to talk about ideas for the ops, he said
he may have.  If you want to get a little bit more focused I
think you can, but we can't just simply read from stuff that's
not in evidence.  So why don't you rephrase your question and
maybe you can get to what you want the witness to testify to
from his memory, assuming he has one.

BY MR. GIBBONS:

Q    Did you make any suggestions to Adam Fox about physically
reconning or surveilling the residence that date on September 4
in the chat?

A    Yes.

Q    Okay.  And would you agree you specifically asked him on
foot, correct?

A    Correct.

Q    That would mean someone entering onto her property or being
around her property not in a vehicle, not on a public roadway,
correct?

A    Correct.

Q    Let's get this out of the way.  That -- the tour of Birch
Lake and the environs in Elk Rapids, your truck was on public
roadways at all times?

A    Yes.

Q    It was in areas accessible to the public at all times?

1   A    Yes.

2   Q    Your truck did not enter onto the governor's property,

3   true?

4   A    True.

5   Q    The truck did not stop and come to a complete stop in front

6   of the governor's home, did it?

7   A    No.  It did not.

8   Q    Anybody can go to that public boat launch across the other

9   side of the lake, correct?

10  A    Yes.

11  Q    And anyone with a lawful license and the ability to drive

12  can park in the Red Bull Tavern parking lot?

13  A    That is correct.

14  Q    The point of Luther was to do two things, correct?

15  A    Yes.

16  Q    One, train, right?

17  A    Correct.

18  Q    And two, get this night recon off the ground and

19  accomplished, right?

20  A    Yes.

21  Q    The training bit isn't that big of a deal, true?  People

22  train all the time?

23  A    Not for kidnapping and killing the governor.

24  Q    But people have militias.  There was people at the training

25  that had no idea about you or anything else, correct?

```
1    A    There was some.  Yes.

2    Q    With respect to what we are talking about in this

3    courtroom?

4    A    There was some.  Yes.

5    Q    Let me get a little water.

6         But the night recon, that's totally a different game,

7    right?

8    A    Agree.

9    Q    You had a phone call with Adam Fox on September 7th.  Do

10   you recall that?

11   A    I believe we did.

12   Q    And that's what, four days before the -- before the FTX,

13   five days before the recon, right?

14   A    Correct.

15   Q    Okay.  And you were talking to Adam Fox about the FTX and

16   the recon, true?

17   A    Fair to say.  Yes.

18   Q    Do you remember that?

19   A    Vaguely.

20   Q    Do you remember giving Adam some advice on how to reveal

21   the recon to people so they could decide to go or not go?

22   A    No.

23   Q    Okay.  If I showed you a transcript of that phone call

24   would that help?

25   A    It would.
```

1    Q    Just the top half of the page.

2    A    Good.

3    Q    You did make a suggestion to Adam Fox, did you not?

4    A    About with the phones?

5    Q    About with the phones and about how to reveal the plan,

6    correct?

7    A    Yes.

8    Q    And isn't it true you told Adam Fox that he should vet

9    people during the day and then tell them about the plan after

10   they are in the truck, correct?

11   A    Correct.

12   Q    And that when they are in the truck they could put their

13   phones away for OPSEC, right?

14   A    Correct.

15           MR. GIBBONS:  Can I have Exhibit 2297?

16           THE COURT:  Do you have any objections to this one?

17           MR. KESSLER:  What is the number again?

18           THE COURT:  2297.

19           MR. KESSLER:  No objection, Your Honor.

20           THE COURT:  All right.  It's admitted.

21   BY MR. GIBBONS:

22   Q    So that's September 7 that this happens, right, that we

23   just talked about this conversation where you make this

24   suggestion, right?

25   A    Yes.

1    Q    But three days before, you would agree you received this

2    tasking from Special Agent Chambers, right?

3    A    Correct.

4    Q    And he says to you in a text, is Adam going to be telling

5    people about the night recon ahead of time?

6    A    Correct.

7    Q    Right?

8         And September 4, I mean, that was a hot day for chats

9    on the private chat between you and Adam Fox.  Do you recall

10    following up on tasking in that chat with Agent Chambers, that

11    you received from Agent Chambers?

12    A    I can't say for certainty.

13    Q    Okay.  If I showed you one of those chat screens from

14    September 4 would that refresh your recollection?

15    A    Yes.  Thank you.

16    Q    You are welcome.

17         Has your memory been refreshed?

18    A    Yes.

19    Q    Did you ask Adam if he was going to debrief the guys on the

20    night recon?

21    A    I did.

22    Q    And then you would agree you offered a suggestion to him on

23    September 7th, correct, in a phone call that we just talked

24    about, right?

25    A    Yes.

1   Q   Let's go to the weekend, and specifically Saturday.   There

2   was a lot going on that day, right?

3   A   Yes.

4   Q   You were there, correct?

5   A   I was.

6   Q   Steve Robeson was in from Wisconsin, true?

7   A   Yes.

8   Q   He is a CHS as you know now, correct?

9   A   Yes.

10   Q   When did you learn that?

11   A   After the arrest, the takedown.

12   Q   All right.  And Jenny Plunk was there from Tennessee?

13   A   Yes.

14   Q   And Jenny Plunk is a CHS, too, right?

15   A   Yes.

16   Q   And when did you learn that?

17   A   The same day.

18   Q   Okay.  Do you remember another individual that was back at

19   the Ohio meetings, CM Phillips?

20   A   I remember him.  Yes.

21   Q   What was his role in the militia, do you know?

22   A   He was out of Missouri.

23   Q   He was the CO from Missouri, right?

24   A   I did not know.

25   Q   Okay.  You told Adam that on August 9th, did you know that?

1    A    That he is a CO?

2    Q    Yeah.  That he was a CO.  He was the guy that was running

3    the Missouri III%ers?

4    A    My bad.  That he was the CO out there.

5    Q    Thank you.  He was not at this FTX, right?

6    A    No.

7    Q    Was he an informant do you know now?

8         MR. KESSLER:  Object to relevance, Your Honor.

9         THE COURT:  Well, I am not sure of the relevance

10   either since he wasn't there.  We just heard that.

11        MR. GIBBONS:  I'll move on, Your Honor.

12   BY MR. GIBBONS:

13   Q    For the night recon, that started kind of coalescing in the

14   afternoon on Saturday, is that true?

15   A    I believe so.

16   Q    And you would agree that by the -- say, 6:00 or 7:00

17   o'clock Adam Fox left to go get dinner, right?

18   A    Correct.

19   Q    And he left with CHS Mark?

20   A    Correct.

21   Q    Undercover employee Mark, right?

22   A    Yes.

23   Q    And they went to Loggers Landing I believe?

24   A    I believe so.

25   Q    Yes.  But before he left Adam really didn't communicate

1    with you about the recon, when it was going to go, when you

2    were going to leave, did he?

3    A    No.

4    Q    So when he is gone you have no idea where he is?

5    A    Correct.

6    Q    To the best of your knowledge no one else knows where the

7    recon is either, right?

8              MR. KESSLER:  Speculation, Your Honor.

9              THE COURT:  Well, the question is to the best of his

10   knowledge.  I think the question is whether he has any

11   knowledge or not, and if he does he can say so.  If he doesn't

12   he can say that.

13             THE WITNESS:  We just knew that he went to go get food

14   BY MR. GIBBONS:

15   Q    Okay.  He wasn't responding to your texts while he was

16   gone, correct?

17   A    I don't believe so.

18   Q    Pardon?

19   A    I don't believe so.  No.

20   Q    And he wasn't answering your phone calls, right, on

21   Threema?

22   A    That sounds about right.

23   Q    You ended up calling Steve Robeson; he was headed to the

24   hotel, right?

25   A    Correct.

1    Q    And so you called him to see if he knew how to get a hold

2    of Adam, didn't you?

3    A    Yes.

4    Q    Because it's after 7:00 and the recon is supposed to be

5    going, right?

6    A    I am not sure what the timeline was for it, but yes, it was

7    after 7:00.

8    Q    But Adam has left and he is incommunicado?

9    A    Correct.

10   Q    You take your truck, right, after -- during this dinner

11   break, true?

12   A    Yes.

13   Q    You take your truck and you start heading to Big Rapids?

14   A    Yes.

15   Q    That's south of Luther, correct?

16   A    Correct.

17   Q    Quite a bit actually, isn't it?

18   A    Yes.

19   Q    And CHS Jenny and CHS Robeson are down there at a hotel or

20   motel?

21   A    Right.

22   Q    A Super 8?

23   A    I believe so.

24   Q    And there's other individuals there as well from the group,

25   correct?

1    A    Yes.

2    Q    And on the way there you get a phone call finally from

3    Adam, right?

4    A    Yes.

5    Q    And you would agree that you told Adam that he and Mark

6    should head to Big Rapids and hook up with them at the hotel,

7    right?

8    A    Correct.

9    Q    But then would you agree that you and Mr. Robeson and Jenny

10   Plunk and USC Red is there, right?

11   A    Correct.

12   Q    They are all down in Big Rapids now, right?

13   A    Correct.

14   Q    You guys agree that doesn't make sense for people to come

15   all the way down to Big Rapids to only go all the way up back

16   past where everybody -- where Adam and Mark are at, correct?

17   A    Correct.

18   Q    And you would agree that Mr. Robeson worked a third vehicle

19   into the mix?  You were only planning on taking two, right?

20   A    I believe so.  Yes.

21   Q    But then Mr. Higgins -- when you were in this meeting down

22   in Big Rapids, Mr. Higgins -- he is an associate of

23   Mr. Robeson?

24   A    Correct.

25   Q    So Mr. Higgins, his vehicle now has become available as a

1    driver for this recon that's going to happen, correct?

2    A    Correct.

3    Q    So you call Adam and turn him around to tell him to go back

4    to Luther to the training place to the Garbin property?

5    A    Either to Luther or up to Cadillac by the Walmart.

6    Q    But you instructed him to go back and get the Null brothers

7    and Brandon Caserta, right, because that's what they did?

8    A    Possibly.  I am not really sure.

9    Q    Well, you had previously directed him to come to the hotel,

10   right, motel?

11   A    Correct.  I didn't know where he was at location wise.

12   Q    You are doing all this by phone, correct?

13   A    Correct.

14   Q    You are working the phone.  Well, you called him and told

15   him to turn around, right?  How else would he know?

16   A    If he is out to dinner, I didn't know if he was closer to

17   us down there or he would be closer up by the Luther residence.

18   Q    All right.  I think we are talking past each other.

19          THE COURT:  I think it's the form of your question.

20   If you say turn around you have him placed somewhere and this

21   witness is saying I didn't know where he was.  If your point

22   is, you are the one, Mr. Chappel, who told Adam Fox where next

23   to meet, I am not sure you'll have the same problem.

24          MR. GIBBONS:  Do you think it might be a good time for

25   a break, Your Honor?

1        THE COURT:  How much time do you have left?

2        MR. GIBBONS:  I have a little bit to go yet.  Another

3   half an hour, 45 minutes.

4        THE COURT:  We'll need a break before that, so that's

5   fine.  We can take a break and come back for the last segment

6   after 20 minutes.

7        LAW CLERK:  All rise, please.

8        (Jury out, 12:23 p.m.)

9        THE COURT:  Did you want to say more about that now?

10       MR. GIBBONS:  Pardon?

11       THE COURT:  Did you want to say more about that now or

12   do you have guidance and ready to go?  Are you ready to go or

13   did you have more to say about that now?

14       MR. GIBBONS:  No.  No.  I just -- I am getting old,

15   Your Honor.  It's just going on two hours of nonstop jamming

16   here.  I just need five minutes to take a break and get my

17   stuff organized and then I'll wrap it up.  I am not far from

18   being done.

19       THE COURT:  20 minutes.

20       LAW CLERK:  Court is in recess.

21       (Recess taken, 12:25 p.m.)

22       (Resume Proceeding, 12:51 p.m.)

23       LAW CLERK:  All rise.

24       (Jury in, 12:51 p.m.)

25       THE CLERK:  The United States District Court for the

1    Western District of Michigan is now in session.  The Honorable

2    Robert J. Jonker, chief judge, presiding.

3              THE COURT:  Welcome back.  We are here for a final

4    segment of the day.  I know that it's a long day for everybody

5    when you are trying to go through lots of information and lots

6    of material, and I appreciate everybody's time and attention.

7              I just want to let people now, one of the jurors is

8    starting to feel not well, and I am not going to attribute it

9    to your cross exam, Mr. Gibbons.  I am not going to blame you

10   for that.  It's not a communicable problem, I'll tell you that.

11   So it's not like we have to worry about that.  But if something

12   happens and the juror is, you know, unable to proceed, that

13   person is going to let me know if it isn't obvious to everybody

14   and we'll do what we need to do in response, but I wanted to

15   let people know about that.

16             I appreciate everybody continuing to try to focus.

17   Even in the best of circumstances sitting through trial

18   materials is tedious.  You know, there is always high points in

19   every trial, and that's, of course, what you see when you watch

20   television dramas, because that's all they show you are the

21   high spots.  The problem is, you know, real trial, along with

22   all the high spots, you have to go through all of the bricks

23   and mortar one at a time to set up the case that you believe

24   you need to make for your client, and sometimes that can seem

25   incredibly elaborate and detailed, especially to somebody who

1    is not working with the material every day, and even for people
2    who have great facility with the material in the trial it can
3    become, especially as we get to the last segment of the day, a
4    sense of drudgery, and that's part of the reason why at least
5    in my practice is to do trials that end at two o'clock, because
6    I think, at least for me, you know, I have absorbed about as
7    much information as I can by that time anyway, and then I can
8    go get some fresh air, work on some other cases, do some other
9    things.  And all of these lawyers, you know, they need time to
10   prepare because there is, and you can tell this already, a
11   massive amount of information that they have to digest,
12   understand, and then present in a way that they believe will be
13   convincing and that complies with the rules of evidence.  And
14   you know, that's one of the things that happens in every trial,
15   and when we get to instructions about the law I'll have an
16   instruction on this for you, too.  That it's the duty of every
17   lawyer here to stand up and object when they think something is
18   going on that isn't allowed by the rules of evidence.  That's
19   true for the lawyers at every table.  Sometimes the rules are
20   pretty clear.  Sometimes they are open to debate and argument.
21   It's my job to do the best I can to draw the right lines.  And
22   we go back and forth, and you've heard a lot of the back and
23   forth already.  And I want you, and I'll emphasize this in the
24   instructions, too, to try to just let that all drop by the
25   wayside.  It's probably not all that interesting to you anyway.

1    But what ultimately matters for you is the evidence, which is

2    what you hear from the witness stand from the witness

3    testifying as to that witness's knowledge as they sit here

4    under oath, any exhibits that I do allow you to see, and then

5    anything that the parties agree on.  That's why we are going

6    through what sometimes seems like painful detail.

7            And I want to make one comment about that, because

8    you've already heard from both sides that there are a lot of

9    tapes of conversations in the case, and you've heard some and

10   not others, and the law generally -- this is like a high level

11   idea of evidence.  The law generally says the gold standard of

12   evidence is what you hear from a witness testifying from that

13   witness's memory under oath right in front of you.  That's what

14   we are all trying to present.  And when something is out there,

15   when something is stated out there, it's generally hearsay if

16   somebody wants to submit it to you to become a reliable basis

17   for your decision.

18           Now, there are lots of exceptions, and one very big

19   exception is when one of the parties in the case makes a

20   statement out there, whether it's a special agent of the

21   government or whether it's one of the Defendants on trial, we

22   call those party admissions.  Not because they are necessarily

23   admitting anything wrong, but because there are statements out

24   there that the law says, well, it's fair in a contest like this

25   for each side to have to live with the words they said out

1    there.  And that's why sometimes words can come in on a tape
2    outside and sometimes they can't.  Because what the law doesn't
3    want, what I don't want, is simply to come into court and have
4    everybody play the tapes of what happened out there and then
5    make your decision on that basis.  That's not the way the trial
6    process works.  The trial process says, it's really what these
7    witnesses say, supplemented by the exhibits, some of which may
8    be in the form of that party admission as I said it and other
9    things, and then for you to deliberate at the end of the case.
10   Navigating all that sometimes adds to the tedium of the
11   presentation, and we are doing our best as lawyers and the
12   Court to limit that so that you don't have to go through and
13   hear anymore of that than is necessary, but to the extent that
14   hangs things up from time to time I wanted you to have a little
15   more background.
16        The main instruction to remember is all that stuff
17   between the lawyers and me on objections and responses
18   ultimately you get to lay at the side of the door and you don't
19   have to worry about it.  In fact, you shouldn't worry about it,
20   but we have to still do it in real time, and I don't like to
21   take a break every time we need to have an issue.
22        That's probably more than you wanted to know already,
23   but at least we have one more hour or so to go today of actual
24   testimony, and I know Mr. Gibbons is in the middle of his cross
25   and we'll turn it back to you.

1        MR. GIBBONS:  Thank you, Your Honor.

2    BY MR. GIBBONS:

3    Q    Dan, when we took our break we were at the position in this

4    event, this circumstance where Adam Fox is in UCE Mark's truck

5    headed towards the Super 8 motel where you are with the

6    individuals we talked about, right?

7    A    Correct.

8    Q    Okay.  You would agree that Adam is moving in the direction

9    of the motel, right?

10   A    Yes.

11   Q    From near Luther, true?

12   A    Correct.

13   Q    You called Adam, do you recall that?

14   A    Yes.

15   Q    Okay.  And after that phone call, Adam turns around and

16   goes back to the camp, does he not?

17   A    Correct.

18   Q    And you indicate that you will provide him with the address

19   to get back to the camp, do you remember that?

20   A    Yes.

21   Q    You didn't remember where he came from, correct?

22   A    Correct.

23   Q    At the camp, UCE Mark and Adam, they pick up -- they pick

24   up the Null brothers, true?

25   A    Correct.

1    Q    And that's it?

2    A    I believe so.  Yes.

3    Q    Okay.  Right?

4    A    Yes.

5    Q    Okay.  And Brandon Caserta didn't go?

6    A    Correct.

7    Q    And then they proceed to Walmart?

8    A    Correct.

9    Q    All right.  And everybody is going to go to Walmart that's

10   out in the truck that's headed north later, right?

11   A    Correct.

12   Q    So Walmart is kind of the rally point, true?

13   A    True.

14   Q    And you had another phone call after -- after Mark and Adam

15   leave the camp with the Null brothers you had another phone

16   call with Adam, is that right?

17   A    Sounds familiar.

18   Q    And you told him that the rally point was going to be the

19   Walmart in Cadillac?

20   A    Correct.

21   Q    And you directed him there, correct?

22   A    Yes.

23   Q    And you advised Mr. Higgins, who was driving one of the

24   trucks, to go to Walmart, too, because you were with him,

25   right?

1    A    Correct.

2    Q    And you knew to go to Walmart, right?

3    A    Through Google Maps.  Yes.

4    Q    Yes.  And through your own decision making.  I mean, you

5    understood you are the one that decided the Walmart was going

6    to be the rally point, right?

7    A    Correct.

8    Q    Adam Fox didn't make that decision, did he?

9    A    Correct.

10   Q    Everyone meets at the Walmart and then the motorcade heads

11   towards Elk Rapids, true?

12   A    Correct.

13   Q    It's dark and it's raining for the most part, true?

14   A    Correct.

15   Q    By the time you get to Elk Rapids it is raining, right?

16   A    Misting on and off.  Yes.

17   Q    You have listened to the recordings, correct?

18   A    True.

19   Q    Especially when you are at the boat launch, it's raining

20   pretty good?

21   A    Fair amount.  Yes.

22   Q    When you get to the AmVets, UCE Mark is in the parking lot

23   with the Null brothers?

24   A    At Walmart?

25   Q    No, no.  In Elk Rapids.

1    A    Yes.

2    Q    And did he go to the AmVets parking lot, is that where you

3    reconned with him?

4    A    No.

5    Q    Where did you meet him?

6    A    We staged up to the VFW hall.

7    Q    There you go.  I'm sorry.

8    A    Okay.

9    Q    I think he testified it was AmVets.  That's how I got that

10   in my head.  It was the veterans hall?

11   A    Yes.

12   Q    All right.  Would you agree that you gave directions to

13   Mark about where to go and what to do, did you not?

14   A    His vehicle was just to monitor the area.

15   Q    Yes.

16   A    Correct.

17   Q    But you are the one that told him that, correct?

18   A    Echoing back from what Adam was wanting us to do.  Yes.

19   Q    You had instructions from Adam and you are the one that

20   gave them to Mark?

21   A    Yes.  Correct.

22   Q    Adam didn't give Mark those directions did he personally?

23   A    No.

24   Q    Okay.  The Null brothers then were in Mark's truck,

25   correct?

1    A    Correct.

2    Q    And they were basically just kind of rolling around in the

3    area, correct?

4    A    Monitoring for any law enforcement.  Yes.

5    Q    Okay.  And they didn't have a scanner with them, did they?

6    A    I don't know what their capabilities that they had in the

7    vehicle were.  No.

8    Q    Okay.  You didn't provide them with a scanner, did you?

9    A    No.

10   Q    You are aware of some of the capabilities you gentlemen had

11   up there that evening, right?

12   A    Yes.

13   Q    What type of capabilities did you have?

14   A    We had night vision goggles IR illuminators, an RF scanner.

15   I believe those were the ones.

16   Q    So you had radios, right?

17   A    Two way radios, yes.

18   Q    FBI paid for and provided the radios, correct?

19   A    Correct.

20   Q    Not Adam Fox?

21   A    No.

22   Q    Not Ty Garbin; not anybody in the group, right?

23   A    No.

24   Q    And then the illuminator?

25   A    Yes.

1    Q    You testified about that on Friday.  That was brought by

2    the government, correct?

3    A    No.  That was Brian Higgins.

4    Q    Brian Higgins?

5    A    Yes.

6    Q    And Brian Higgins is a friend of Steve Robeson, correct?

7    A    Correct.

8    Q    Brian Higgins is not in Adam's Michigan Patriot III%

9    Militia, is he?

10   A    No.

11   Q    And he's not a Wolverine Watchmen, right?

12   A    He is not.

13   Q    And let me talk to you about the Null brothers.  They are

14   not in Adam's Michigan III% Patriot Militia, are they?

15   A    I am not sure if they were or not.  They were part of the

16   Michigan Home Gard.  That's where they met Adam.

17   Q    Right.  They are not Wolverine Watchmen, right?

18   A    They are not.

19   Q    And so you do understand that they are from Allegan,

20   Michigan, is that right?

21   A    I am not sure of their exact location.  No.

22   Q    Okay.  In any event, is there a question in your mind about

23   whether they are Michigan Patriot III% Militia members?

24   A    They are down with Adam with what he wants to do from Adam

25   told me that.

```
1    Q    That's not what I asked you.  They are not in his militia,

2    though, are they?

3    A    I don't believe so.  No.

4    Q    Thank you.  Were they in the Capitol last spring and at the

5    protests with open carried rifles?

6    A    They were.

7    Q    Okay.

8              MR. KESSLER:  Relevance, Your Honor.

9              THE COURT:  I don't know either, but you are the one

10   who introduced the picture initially so I think it's fair for

11   him to go into it a little.

12   BY MR. GIBBONS:

13   Q    So the recon is commencing in Luther that evening, correct?

14   A    Correct.

15   Q    And you get on the phone and Ty Garbin is in Brian Higgins'

16   truck, correct?

17   A    Yes.

18   Q    And they are having trouble locating the governor's actual

19   residence on ███████████ Trail, correct?

20   A    Correct.

21   Q    They don't have the right address?

22   A    Correct.

23   Q    You get on the phone with Ty Garbin and try to straighten

24   that out?

25   A    I do.
```

1    Q    Correct?  Not Adam?

2    A    No.

3    Q    And then you make indication to Ty Garbin, you give him

4    directions to meet back up near the Red Bull Tavern by the

5    tennis courts, is that right?

6    A    Correct.

7    Q    And that's you that's giving that direction, right?

8    A    Say again?

9    Q    That's you giving that direction, true?

10   A    Yes.

11   Q    Not Adam?

12   A    Ty was getting very impatient, and there was a sense of

13   urgency in his voice, so I was trying to get him out of the

14   immediate area and create distance from the residence of the

15   governor.

16   Q    Because he was stressed?

17   A    He was stressed.

18   Q    You would agree that on that night, to the best of your

19   knowledge, no one left the public roadways or the public

20   accessible areas, correct?

21   A    Correct.

22   Q    No one went on the governor's property?

23        THE COURT:  This has been asked and answered before

24   the break.

25        MR. GIBBONS:  That was for the daytime recon.

1        THE COURT:  I see.  All right.  Go ahead.

2   BY MR. GIBBONS:

3   Q    For the nighttime ride along?

4   A    No.  They did not.

5   Q    Okay.  You would agree that no one parked a truck in her

6   driveway?

7   A    They did not.

8        MR. GIBBONS:  Okay.  Pam, Exhibit 417?  Government's

9   417.

10       THE COURT:  I show a 417.1 and a 417.2.

11       MR. GIBBONS:  I'm looking for the governor's -- the

12   video of governor's house.

13       MR. BLANCHARD:  I think that's 417.1.

14       MR. GIBBONS:  417.1.  Sorry.  I apologize.  I guess we

15   don't have it.  Can you play it?

16       THE COURT:  Go ahead from the government's.

17       MR. KESSLER:  We are going to do it for them, Your

18   Honor.

19       MR. GIBBONS: .1.

20   BY MR. GIBBONS:

21   Q    Have you seen this video before, sir?

22   A    I have.

23   Q    Okay.  This purports to be the governor's cottage, correct?

24   A    Correct.

25   Q    And this is a fly over?

1     A    Yes.

2     Q    True?  No one ever had drones in this enterprise and flew

3     over the property with a camera like that, correct?

4     A    No.

5     Q    Okay.  And you would agree that Adam Fox at no time ever

6     did anything but drive by this portion of the property on the

7     roadway, correct?

8     A    Correct.

9     Q    I'm good.  Thank you, ma'am.

10         Do we have 247?  247 I had as September video.  There

11    we go.

12    BY MR. GIBBONS:

13    Q    This is you driving the truck, correct?

14    A    It is.

15    Q    And the truck is facing out the governor's driveway here?

16    A    Correct.

17    Q    I know you've already answered this, but no one in this

18    group or in this enterprise ever sat in this position in a

19    truck, correct?

20    A    This specific position, no.

21    Q    Right.  Well, any position on the governor's property

22    period, right?

23    A    Correct.

24    Q    And 131 -- this is facing 31, correct?

25    A    Correct.

1    Q    And these are all the trees?

2    A    Yes.

3    Q    And 31 is just on the other side of these trees, is it not?

4    A    Yes.  It is.

5    Q    And this is proceeding down her street towards, is it West

6    Harbor Drive is on the other side, correct?

7    A    I believe it's Williams.

8    Q    This is Williams here, and then it'll turn into West Harbor

9    Drive?  So this is 31, right?

10   A    To our right that main road over there.

11   Q    All right.  You agree no one has ever driven that

12   particular route from the driveway to this spot like that,

13   correct?

14   A    From the driveway?

15   Q    Yes.

16   A    But from the road, yes.

17   Q    And no one has driven from the driveway across 31 like

18   this, correct?

19   A    From the driveway, no.

20   Q    Thank you.  This is a public access for the neighborhood to

21   get to the beach?

22   A    I believe for the neighborhood.

23   Q    I guess it's not public but it's private.  It's a communal

24   access.  It's not a boat launch, correct?

25   A    No.

1    Q    And you would agree that neither Adam Fox or anyone else

2    affiliated with his militia or the Wolverine Watchmen except

3    for yourself have ever walked down that path?

4         MR. KESSLER:  You know, he's asking him to speculate.

5    He can only answer what he knows.

6         THE COURT:  That's certainly true.  Why don't we give

7    you a chance to rephrase it and maybe break it down.  There

8    were multiple compound sections in it and no limitation on

9    timeframe.

10        MR. GIBBONS:  Yes.  I can do that, Your Honor.

11        THE COURT:  Let's focus the information a little bit

12   more.

13   BY MR. GIBBONS:

14   Q    We're seeing the drop to the lake here, right?

15   A    We are.

16   Q    Okay.  That's good, Pam.

17        You would agree on August 29th, Adam Fox, when he was

18   in your truck, you never went down West Shore Drive at all,

19   correct?

20   A    We did.

21   Q    Pardon?

22   A    We did.

23   Q    Right.  Did not?

24   A    No.  We did travel down there.

25   Q    You did?

1    A    Yes.

2    Q    On the 29th?

3    A    Yes.  During the day.  That's how we found that service.

4    Q    Okay.  And you didn't stop and get out and walk down that

5    path, did you?

6    A    No.

7    Q    And didn't walk down the stairs?

8    A    No.

9    Q    And on September 12th, in the late evening hours, early

10   morning hours, no one got out of a truck and walked down that

11   path through the woods, right?

12   A    No.  We did not.

13   Q    And nobody walked down the stairs and checked out the

14   shore, correct?

15   A    No.

16   Q    I am going to move forward from Luther.  The government put

17   up a picture that Adam Fox had texted to you.  Do you remember

18   that, of the bridge?

19   A    Yes.

20   Q    Adam went under the bridge with Red?

21   A    Correct.

22   Q    And took a picture?

23   A    He did.

24   Q    And he then later posted that on your private chat,

25   correct?

1    A    Correct.

2    Q    And that was just between you and Adam?

3    A    Yes.

4    Q    That did not go to FAFO?

5    A    I am not sure if it did or not.

6    Q    Okay.  Exhibit 2298, please?

7         THE COURT:  Do you have any objections to this one,

8    Mr. Kessler?

9         MR. KESSLER:  No objection, Your Honor.

10        THE COURT:  All right.  It's admitted.

11   BY MR. GIBBONS:

12   Q    So on the 19th of September you received this tasking from

13   Agent Chambers, right?

14   A    Correct.

15   Q    Hey, quick thought.  We should bug Adam for pictures from

16   last weekend's surveillance, bridge and such.  That would be

17   the pictures that we're talking about, right?

18   A    Yes.

19   Q    And that would be from Luther, right?

20   A    Correct.

21   Q    And Luther was on the 12th?

22   A    Yes.

23   Q    And this is now the 19th, correct, a week later?

24   A    Correct.

25   Q    Adam hadn't done anything with the picture he took of the

bridge, correct?

A     Correct.

Q     He had not shared it with anyone to that point, true?

A     I believe so.

Q     Would you agree on that same day, did you ask Adam if he could share his picture with you?

A     Yes.

Q     Okay.  Did he do that?

A     He did.

Q     Pardon?

A     He did.

Q     Okay.  I want to take you back to July 27th, a meeting at the Vac Shack.  You had a one-on-one meeting we talked about with Adam Fox, correct?

A     Correct.

Q     During that meeting -- and this is the meeting where you felt the need to de-escalate Adam a little bit, right?

A     Correct.

Q     Correct?

A     Correct.

Q     And your tasking from Agent Impola back in June indicated that you are not to participate in attack planning.  Do you remember that?

A     I do.

Q     Would you agree that on July 27th you did participate in

1    attack planning with Adam?

2    A    To a degree, yes.

3    Q    Did you discuss the viability of different types of

4    equipment that might be necessary in an assault that would

5    occur on Mackinaw Island?

6    A    Yes.

7    Q    Okay.  What types of equipment did you talk about with

8    Adam?

9    A    Different caliber rifles.  I think helicopters came up in

10   the discussion.

11   Q    Okay.  And what -- with regard to helicopters, what did you

12   suggest to him?

13   A    I didn't suggest.  Sean Fix had --

14        MR. KESSLER:  I object to hearsay, Your Honor.

15        THE COURT:  When you give the answer --

16        MR. GIBBONS:  I don't want to hear about Sean Fix.

17        THE COURT:  -- if you are able just to talk about what

18   you had suggested without bringing in the words of others.

19        MR. GIBBONS:  Yes, sir.  I'm just trying to talk to

20   you just about what comes out of your mouth.  I don't want to

21   hear about -- so this is not about what Adam said and it's not

22   about what anyone else said.  It's about what you said.

23   BY MR. GIBBONS:

24   Q    Okay.  Did you talk to Adam Fox about different

25   helicopters?

1    A    I did.

2    Q    Okay.  What did you talk to him about the helicopters?

3    A    What kind of different variations there might be, kiowas or

4    Black Hawks.

5    Q    What's a Kiowa?

6    A    It's a small surveillance or scout helicopter.

7    Q    Is that a military grade vehicle?

8    A    It is.

9    Q    Okay.  And that's a smaller helicopter then, right?

10   A    It is.

11   Q    It's smaller than a Black Hawk helicopter?

12   A    Significantly, yes.

13   Q    A Black Hawk helicopter, what kind of helicopter is that?

14   A    It could be used for medical personnel, for troop

15   personnel, overwatch, surveillance.  They were big in

16   Mogadishu.  So Black Hawk Down.

17   Q    Right.

18        MR. KESSLER:  I am going to object to relevance to

19   this whole line, Your Honor.

20        MR. GIBBONS:  He is not to participate in attack

21   planning, and I think he is violating his admonitions.  I think

22   it's relevant on those points, Your Honor.

23        THE COURT:  Okay.  It's got some limited relevance,

24   but I don't think there is going to be any evidence that anyone

25   ever acquired helicopters for use in any kind of planning and

1    so I think, you know --

2            MR. GIBBONS:  I'm satisfied with the extent of the

3    record, Your Honor.  I can move on from that.

4    BY MR. GIBBONS:

5    Q    Just a couple final finish up questions.

6            You were discharged from the military in 2009?

7    A    I separated in 2010.  Yes.

8    Q    Okay.  And because you are a veteran you have medical

9    services available to you at the VA clinic, is that correct?

10   A    That's correct.

11   Q    Okay.  And you avail yourself of those services?

12   A    Say again?

13   Q    You avail yourself of those services?

14   A    Yes.

15   Q    Okay.  When you seek treatment, you provide the VA with

16   accurate information regarding whatever your situation might

17   be, correct?

18   A    I do.

19   Q    And you testified that you had a back injury that you

20   experienced during your service, correct?

21   A    Correct.

22   Q    And you also had a combat related knee injury, true?

23   A    True.

24   Q    And I think, you know, I was looking at your testimony in

25   Jackson County.  You remember testifying there March of last

1    year?

2    A    I do.

3    Q    And do you recall testifying that you had a combat related

4    injury in your right knee?

5         THE COURT:  He just said he did.  I don't know

6    what's --

7         MR. GIBBONS:  Well, that is a --

8         THE COURT:  Yeah, but I mean, he said he had a combat

9    injury in the knee.  What does it matter if he ever testified

10   about it before or not?

11        MR. GIBBONS:  Because --

12   BY MR. GIBBONS:

13   Q    Did you inform the VA in the course of treatment that you

14   received your knee injury in an ATV accident after you were

15   discharged from service?

16   A    Yes.  It was a combat related injury.

17   Q    Okay.  Your records say that you told the VA physician that

18   you received -- you were in an ATV accident severely injuring

19   your right leg that required the installation of rod and

20   screws?

21   A    Correct.

22   Q    Do you remember that?

23   A    I do.

24   Q    Is that a separate injury from your combat injury?

25   A    So the leg breaking was a relation from the injuries that I

1    sustained from Iraq.  So it was a combat related injury.  The

2    ligaments and muscles were torn in my leg, and I was waiting

3    through orthopedic through the VA to get surgery on that.

4    During that wait process I broke my leg on an ATV accident.

5    Q    So the ATV was a subsequent injury?

6    A    Correct.

7    Q    Of an existing injury?

8           MR. KESSLER:  Relevance, Your Honor.

9           MR. GIBBONS:  Thank you.

10           THE COURT:  I am not sure, but if you have more we'll

11    talk about it.  If that's it we can move on.

12           MR. GIBBONS:  I think I am finished, Your Honor, for

13    now.  If I can, I would like to move a few things in that we

14    put -- Your Honor, I had furnished 2286, 87 and 88.  I had

15    proposed those early in the exam.  I did not publish them.

16    They are admissible.  I can go through the process of cleaning

17    that up with the witness but I invite Mr. Kessler to just

18    allow.

19           MR. KESSLER:  Your Honor, I don't know what those are

20    and I might have lodged an objection had he offered them

21    contemporaneously.

22           THE COURT:  They are the same kind of, what

23    Mr. Gibbons refers to as tasking information, and the witness

24    testified about the content, 286, got to get at them, focus.

25    287, get them in a leadership chat.  288, intel with -- which

1    ones did you want in, 286 and 287?

2            MR. GIBBONS:  286, 287 would be fine, Your Honor.  The

3    other one is irrelevant.

4            MR. KESSLER:  The attachment I was handed has 286, 287

5    and another page.

6            MR. GIBBONS:  That's not part of it.

7            MR. KESSLER:  Okay.  If that's not part of it then we

8    don't object.

9            THE COURT:  So 286, 287 the single page can both come

10   in.

11           MR. GIBBONS:  Thank you, Your Honor.  I am done.

12           THE COURT:  All right.  Thank you.

13           We'll move to the next cross for -- or from Ms. Kelly

14   on behalf of Mr. Harris.

15           MS. KELLY:  Thank you, Your Honor.

16                         CROSS EXAMINATION

17     BY MS. KELLY:

18   Q    Good afternoon, Mr. Chappel.

19   A    Good afternoon.

20   Q    I want to talk about the tools that you were provided by

21   the FBI in your -- related to this case.  You were provided

22   some recording devices, correct?

23   A    Correct.

24   Q    Okay.  And those are devices that you would wear on your

25   person?

1    A    Yes.

2    Q    Okay.  What kind -- where would you put those devices?

3    A    Attached to my belt loop or in my pocket.

4    Q    Okay.  You also talked about a key fob, correct?

5    A    Correct.

6    Q    And that went on the keys to your truck, right?

7    A    Correct.

8    Q    Okay.  Were you also provided other recording devices so

9    you could record phone calls, say, if you were at home, talking

10   to somebody on the phone so you could record that phone call?

11   A    I was.  Yes.

12   Q    Okay.  Any other devices that we haven't covered?

13   A    I believe that's it.

14   Q    Okay.  You talked about this phone.  You got a new phone

15   because you said it was -- one broke, is that right?

16   A    Correct.  Mine wasn't holding a proper battery charge and

17   we were communicating a lot throughout the days.

18   Q    A lot of communication was going on and a lot of different

19   chat groups, right?

20   A    Correct.

21   Q    When did you get that new phone?

22   A    Maybe July, August.  I am not exactly sure.

23   Q    Okay.  So you were communicating via text message, correct?

24   A    Correct.

25   Q    Via FaceBook Messenger, correct?

1    A    Correct.

2    Q    Via Wire, correct?

3    A    Correct.

4    Q    And then later in the summer in Threema, correct?

5    A    Correct.

6    Q    And you provided the agents with your user name and

7    password so they could watch these chats in real time, correct?

8    A    Correct.

9    Q    All right.  Were you also then going to the agents and

10   handing your phone to them so they could, you know, get

11   information off of your phone?

12   A    In the early stages when they didn't have access to the

13   accounts, yes.

14   Q    Okay.  You also had certain conversations with the agents

15   both over the phone and in person, correct?

16   A    Correct.

17   Q    All right.  You talked a little bit on Friday about

18   briefings that you received, and particularly you mentioned a

19   briefing that you received prior to Luther.  Do you remember

20   that?

21   A    Correct.

22   Q    Okay.  And you were briefed about undercover agents that

23   were going to be at Luther with you, correct?

24   A    Correct.

25   Q    Okay.  And did you have briefings prior to the other

1    events, like Cambria, Fowlerville?

2    A    There was one for Cambria that there would have been an

3    undercover there.

4    Q    So any time that there was an undercover at one of these

5    events you had a briefing with --

6    A    Those were the only two times that I was aware that there

7    would be any.

8    Q    Okay.  Okay.  But you met was it a couple of days before

9    these events took place or a week before?

10   A    With actual Red I met a couple days prior just to get

11   acquainted with him.  Yes.

12   Q    Okay.  And then for Cambria you met Mark?

13   A    I never met him, no.  Only at the training as Mark.

14   Q    Okay.  But you knew him to be an undercover agent?

15   A    I knew there was going to be one there, and then out of

16   people that I was socializing with I figured out what he was.

17   Q    Okay.  Because he was only the person that you hadn't met?

18   A    Well, a lot of Wisconsin people hadn't been there, so just

19   by kind of going and interacting with people I was able to

20   figure out who -- potentially who he might be.

21   Q    Okay.  And then you talked about a text message that you

22   received.  From time to time you were -- you were provided

23   goals that the agents wanted you to work on, is that right?

24   A    Correct.

25   Q    Okay.  So thinking about this early spring of 2020, you

1    would have been 33 years old, right?  You are 35 now?

2    A    Correct.

3    Q    So you are 33.  You were working at Palmer & Sons, right?

4    A    Right.

5    Q    Still are, correct?

6    A    Yeah.

7    Q    Yes.  Okay.  Were you also a firearms instructor at that

8    time?

9    A    I was.

10   Q    And that's through this Institute of Protection Specialists

11   and Security Contractors?

12   A    A long time ago I was affiliated with them.  I still

13   interact with the instructors through there, but it's been

14   predominantly just by myself.

15   Q    Okay.  But you held yourself out to be, when you joined the

16   Wolverine Watchmen, to be a firearms instructor, is that right?

17   A    Yes.

18   Q    Okay.  Where did you -- where were you providing firearm

19   instruction?

20   A    I was mobile, so if people want to get a CPL license and

21   they had property and a proper backstop I would go to their

22   property, and in exchange for them allowing me to use their

23   property they got the class for free.

24   Q    So somebody would call up and say, yeah, you want to come

25   to my private property?  I want to get a CPL.  I need to take

1    the class.  That was something that you could offer?

2    A    Correct.

3    Q    So you are familiar with kind of this training world and

4    firearms training, is that right?

5    A    Correct.

6    Q    And you are -- obviously through your experience you are

7    familiar with CQB training, is that right?

8    A    I am.

9    Q    Okay.  Did you ever provide that kind of training for folks

10   that would call you in and have private properties?

11   A    Through the IPSSC, yes, we have done that.

12   Q    That's the Institute of Protection?

13   A    Correct.

14   Q    Okay.  And you said that a lot of times would you provide

15   that instruction for free so you could also shoot your firearms

16   at their property, is that right?

17   A    Correct.  For CPL stuff I would provide that for free for

18   the individual hosting the site.

19   Q    And then what about this other training that you were doing

20   through the institute, were you charging a fee for that?

21   A    We had a training area that would be held and that was in

22   Big Rapids I believe.

23   Q    Okay.  And how much would something like that run?

24   A    It varied depending on how long the course may go, but

25   around $500.

1    Q    Okay.  And that's for, like, a day's worth of training, is

2    that right?

3    A    Correct.

4    Q    Okay.  So you first -- you testified on Friday that you

5    first became aware of the Wolverine Watchmen through an

6    algorithm on FaceBook, is that right?

7    A    Correct.

8    Q    So something pops up on your computer screen and says, hey,

9    you might like this group, is that right?

10   A    Correct.

11   Q    Okay.  And you were initially interested in them because of

12   your pro Second Amendment, correct?

13   A    Correct.

14   Q    All right.  It's true that Joe Morrison a Pete Musico had

15   started that page; that was your understanding?

16   A    Correct.

17   Q    And you said you wanted to join the Wolverine Watchmen for

18   training, right?

19   A    For the initial joining of the Watchmen was more of a

20   content on FaceBook.  Seeing what was out there for individuals

21   like me in the group posting.  Another person made a post on

22   the page a couple days later saying if you wanted to do some

23   training you should download the app Wire.  That's what I was

24   wanting to do for training.

25   Q    And that person would have been Paul Zacharias?

```
 1    A    Zacharias, Paul Bellar, correct.

 2    Q    That's Paul Bellar that we refer to?

 3    A    Correct.

 4    Q    And that would have been on March 7th, does that sound

 5    accurate?

 6    A    Correct.

 7    Q    March 7th, Paul says, if you want to get involved with some

 8    training --

 9              MR. KESSLER:  Hearsay, Your Honor.

10              THE COURT:  Say again?

11              MR. KESSLER:  I will withdraw it.  I know we've

12    covered this.

13              THE COURT:  We have.  Exactly.  This is somewhat

14    redundant, but go ahead.

15              BY MS. KELLY:  Thank you, Your Honor.

16    BY MS. KELLY:

17    Q    Download the Wire app, which you did, right?

18    A    I did.

19    Q    And so you wanted to continue your training, is that right?

20    A    Correct.

21    Q    And you are familiar with the term of using your training

22    or you are going to lose it, is that right?

23    A    It is a perishable skill set, Yes.

24    Q    That's what brought you into the group, right?

25    A    Yes.
```

1    Q    Okay.  And generally, you held yourself out to be a

2    firearms instructor and that you may have some assets to

3    provide to the group, right?

4    A    Correct.

5    Q    All right.  So you joined -- you download the app March the

6    7th.  Daniel Harris is not part of the Wolverine Watchmen at

7    that point, right?

8    A    He is not.  No.

9    Q    Okay.  It's going to be about two months before you meet

10   Daniel Harris, is that about right?

11   A    Fair to say.  Yes.

12   Q    And about three months before you meet Brandon Caserta,

13   correct?

14   A    Fair to say.

15   Q    Okay.  Adam Fox was never a Wolverine Watchmen, right?

16   A    No.

17   Q    Okay.  And Barry Croft was never a Wolverine Watchmen,

18   correct?

19   A    Correct.

20   Q    Okay.  And when you download that Wire app, there are

21   different chat groups within the Wolverine Watchmen, right?

22   A    Yes.

23   Q    Okay.  So you have the main Wolverine Watchmen page, right?

24   A    Correct.

25   Q    You have a vetting chat group, correct?

1    A    Correct.

2    Q    Okay.  You have a leadership chat group, correct?

3    A    Correct.

4    Q    And then there is this armory chat group?

5    A    Correct.

6    Q    Right.  And the armory chat group is talking about various

7    weapons, various firearms, right?

8    A    Correct.

9    Q    And you have access to all of those, correct?

10   A    Correct.

11   Q    All right.  And were you vetted in the Wolverine Watchmen?

12   A    I was.

13   Q    Okay.  And do you remember the questions that you were

14   asked?

15   A    What my views of the government were, what my skill set

16   was, and that was kind of it.  There wasn't really a whole lot

17   of in-depth at that time.

18   Q    Okay.  And you have testified that you saw some things that

19   were troubling to you and you reached out to a friend in law

20   enforcement, correct?

21   A    Correct.

22   Q    And that was David Ramirez at Mt. Morris Police Department?

23   A    Correct.

24   Q    And he came over to your house you said?

25   A    I sent him a text and asked if he was working.  He said he

1    was.  I asked him if he could stop by the house and he did and

2    I showed him the conversations that was happening.

3    Q    And then one week later approximately Special Agent

4    Chambers reached out to you?

5    A    Correct.

6    Q    Okay.  And you had never met Special Agent Chambers or

7    Special Agent Impola before?

8    A    I had not.  No.

9    Q    Okay.  Did you have any information that the Wolverine

10   Watchmen were on their radar prior to you meeting with them?

11   A    No.

12   Q    And you spoke with Mr. Gibbons about the admonitions that

13   you received from Mr. Impola or Special Agent Impola and

14   Special Agent Chambers, right?

15   A    Correct.

16   Q    And you were allowed to tell kind of your military history,

17   right?

18   A    Right.

19   Q    Okay.  And -- but to act more of a sounding board, right?

20   A    Yes.

21   Q    Okay.  So prior to March 6, when you download -- or March

22   7th, when you download that Wire app, had you met any of the

23   Wolverine Watchmen in person?

24   A    No.

25   Q    And the first time that you met the Wolverine Watchmen in

1    person, was that at Munith or was that in Lansing?

2    A    It was in Munith.

3    Q    Okay.  And so from the very first time that you met the

4    Wolverine Watchmen you were acting as a confidential human

5    source, correct?

6    A    Correct.

7    Q    And you went to various places with the Wolverine Watchmen

8    throughout that summer, right?

9    A    I did.

10   Q    Okay.  Started out going to rallies and protests in

11   Lansing, right?

12   A    Correct.

13   Q    Okay.  QRS during the riots, correct?

14   A    Correct.

15   Q    Okay.  Various meetings that were held, right?

16   A    Yes.

17   Q    Okay.  And then these trainings at Pete and Joe's house in

18   Munith, right?

19   A    Correct.

20   Q    Fowlerville?

21   A    Correct.

22   Q    Cambria?

23   A    Correct.

24   Q    And then Luther, correct?

25   A    Correct.

Q    Okay.  The photo that has been shown to you from April the

30th inside the Capitol, do you remember that photo?

A    I do.

Q    Okay.  And you said you took that photo?

A    The group one, yes.

Q    Okay.  Daniel Harris is not in this photograph, right?

A    He is not.

Q    Okay.  First time you had heard of Daniel Harris would have

been on May the 1st, 2020; does that sound about right?

A    Yeah.  It does.

Q    Okay.  And he was vetted into the Wolverine Watchmen,

right?

A    He was.

Q    Okay.  Provided some background information about himself,

correct?

A    Correct.

Q    All right.  And then we saw on Friday a later chat message

where Daniel Harris is talking about, I can make things go

boom, and I think I have the det core algorithm somewhere this

my office.  Do you remember that message?

A    Yes.

Q    He never showed you that algorithm, correct?

A    No.  He did not.

Q    He never brought that algorithm to training, right?

A    No.

| | |
|---|---|
| 1 | Q    Didn't bring it to any of the rallies, right? |
| 2 | A    No. |
| 3 | Q    Didn't post it to you on Threema or Wire or FaceBook, |
| 4 | right? |
| 5 | A    He did not. |
| 6 | Q    Okay.  You have been to his house before, right? |
| 7 | A    Yes. |
| 8 | Q    He didn't call you into his office and show you this |
| 9 | algorithm, right? |
| 10 | A    No. |
| 11 | Q    The first time that you met Daniel Harris would have been |
| 12 | on May the 14th at a rally in Lansing, is that right? |
| 13 | A    That's fair to say.  Yes. |
| 14 | Q    Okay.  That was a rainy day.  Do you remember that day? |
| 15 | A    Yes. |
| 16 | Q    Okay.  And when you met Mr. Harris it's true that the two |
| 17 | of you exchanged your military background? |
| 18 | A    Correct. |
| 19 | Q    Okay.  And you were a sergeant in the army, correct? |
| 20 | A    I was. |
| 21 | Q    Who had seen combat? |
| 22 | A    I have. |
| 23 | Q    Okay.  Do you know what rank Mr. Harris was? |
| 24 | A    I can't remember.  Maybe a corporal.  I am not sure. |
| 25 | Q    Okay.  Is a sergeant a higher rank than a corporal? |

1    A    It is.

2    Q    Okay.  After that training or after that rally on May the

3    14th, you went out with Pete Musico and Joe Morrison, correct?

4    A    I believe so.  Just --

5    Q    I think Jada was there for a little bit, right?

6    A    Yeah.

7    Q    You guys went out and got something to eat after the rally

8    ended?

9    A    A fast food joint.  Yeah.

10   Q    Okay.  And you talked with them about the finding a purpose

11   for this group.  Do you remember that?

12   A    Vaguely.

13   Q    Okay.  And you wanted to know what kind of training that

14   these guys wanted, is that right?

15   A    Correct.

16   Q    Okay.  And one of the training was, and I am not sure how

17   to pronounce it, m-o-u-t training, do you remember?

18   A    Oh, MOUT, yes.

19   Q    Can you explain what that is?

20   A    That's CQC's on gaining entry into houses, urban clearing.

21   Q    And you offered that training to them, is that correct?

22   A    They were seeking it.  Yes.

23   Q    They were seeking that, is that right?

24   A    Correct.

25   Q    Okay.  Is it true that they were interested in defensive

1    training?

2    A    Defensive and offensive training, yes.

3    Q    Is it true that they wanted to -- they wanted to have you

4    look at their house and find problem areas?

5             MR. KESSLER:  Your Honor, this is all calling for

6    hearsay.

7             THE COURT:  Yeah.  I mean, if -- I am also not really

8    clear of the relevance, but unless you can establish a

9    foundation for what they wanted him to do apart from what they

10   told him, I guess you are going to run into the same hearsay

11   problem.

12            MS. KELLY:  Thank you, Your Honor.

13   BY MS. KELLY:

14   Q    You recall testifying on Friday that the concern was the

15   Wolverine Watchmen wanted to go after law enforcement officers;

16   do you remember saying that?

17   A    I do.

18   Q    And so on May the 14th you are having a discussion with the

19   founding members of the Wolverine Watchmen about MOUT training

20   and clearing rooms, defensive and offensive training, is that

21   fair?

22   A    Yes.

23   Q    Okay.  Is it true that you were placed in a position of

24   authority for training on May the 14th?

25   A    I was part of the leadership group, yes.

1    Q    Okay.  So were you already kind of the head of training the

2    training department for lack of a better term?

3    A    I was never the head of it.  I worked in conjunction with

4    Paul.  He did all their tactical training.

5    Q    Okay.  Paul is also formerly in the military, is that

6    right?

7    A    He was.

8    Q    Are you aware of what position he held in the military?

9    A    No.

10   Q    Okay.  Was he a sergeant?

11   A    No.

12   Q    Okay.  Do you recall on May the 14th that you suggested

13   that the group should have a mandatory training?

14   A    Possibly.

15   Q    Okay.  Because you were tired of the slinky effect of

16   different people coming in and out and so you wanted to set a

17   date with the no shit guys, right?

18   A    Correct.

19   Q    You remember having that conversation?

20   A    I do.

21   Q    Okay.  The next time that you are with the Watchmen by my

22   estimate is on May the 30th when you do a QRF in Detroit, is

23   that right?

24   A    That sounds about right.

25   Q    Okay.  I take that back.  There was a training in Munith on

1   May the 17th, right?

2   A    Okay.  The timeline there is kind of murky.  A lot of stuff

3   was going on.

4   Q    Absolutely.  So May the 14th was at a rally in Lansing; May

5   the 17th you are back at Pete and Joe's, right?

6   A    True.

7   Q    And you are doing some of these trainings that you had just

8   talked to them about on May the 14th, right?

9   A    Correct.

10  Q    Okay.  And so then on May the 30th, you are doing a QRF in

11  Detroit, correct?

12  A    We are.

13  Q    Okay.  And Daniel Harris was there, correct?

14  A    Yes.

15  Q    Ty Garbin is there?

16  A    Yes.

17  Q    Paul Bellar is there?

18  A    Correct.

19  Q    You are there?

20  A    I am.

21  Q    Okay.  And that's the first time that you learned about

22  that meeting in Dublin on June the 6th.  Do you recall that?

23  A    I believe that was the timeframe.  Yes.

24  Q    Okay.  And you were concerned because you wanted more intel

25  about it?  You remember that?

1    A    Yes.

2    Q    Okay.  The following day, May the 31st, you do another QRF

3    in Flint, is that right?

4    A    We do.

5    Q    Okay.  And that's with Daniel Harris, right?

6    A    Yes.

7    Q    And Paul Bellar, right?

8    A    Correct.

9    Q    And some girlfriend of Paul's, right?

10   A    Yes.

11   Q    Okay.  And both trips, on May the 30th and May the 31st,

12   you are driving, right?

13   A    I am.

14   Q    Okay.  And you would agree on May the 30th, May the 31st,

15   riots are going on, correct?

16   A    There is.

17   Q    Okay.  And you are up in Flint because somebody knew

18   someone that might be up there, right?

19   A    I believe that's why we were up there, yes.

20   Q    Okay.  Most of the time you just sat just like on May the

21   30th when you talked to Mr. Gibbons, May the 31st you are also

22   just kind of sitting in the car, correct?

23   A    Correct.

24   Q    And you again talk about Ohio in this meeting on June the

25   6th in Dublin, right?

1    A    Right.

2    Q    And you again talk about, we don't know anything about that

3    meeting.  We are not going to go to that meeting.  Do you

4    recall that?

5    A    That happened at June 3rd --

6    Q    Okay.

7    A    -- when that was brought out about the Dublin meeting.

8    Q    Okay.  Do you recall opining that the group was wasting gas

9    by driving to these different QRF's instead of training?

10   A    Fair to say.  Yes.

11   Q    Okay.  And then do you recall after May the 31st nothing

12   happens?  You drive Daniel and Paul back to their houses, is

13   that right?

14   A    In Flint.

15   Q    In Flint.

16   A    No.  They drove their own vehicles up there.  I met them in

17   Flint.

18   Q    Okay.  And then you had a call with Special Agent Chambers

19   and Special Agent Impola after you departed from Daniel Harris

20   and Paul Bellar.  Do you recall that?

21   A    Correct.

22   Q    Okay.  And do you recall, when you were speaking with

23   Special Agent Chambers and Special Agent Impola, the agreement

24   between the three of you that these guys don't have a plan?  Do

25   you remember saying that?

1    A    At that point, yes.

2    Q    Okay.  I think you said that they were wasting your time.

3    Do you remember that?

4    A    At that day, yes.

5    Q    Okay.  And do you recall talking to the special agents on

6    May the 31st about your beliefs about Paul Bellar and his

7    potential dangerousness?

8    A    Yes.

9    Q    Okay.  And do you recall the special agents talking to you

10   about because we don't have a plan if you need to take action

11   then you can do so?

12   A    Yes.

13   Q    And you took that as you could take deadly force against

14   Paul Bellar if something happened?

15            MR. KESSLER:  Relevance, Your Honor.

16            THE WITNESS:  Correct.

17            THE COURT:  I am not sure either but we'll give her a

18   little room.

19            MS. KELLY:  Thank you.

20   BY MS. KELLY:

21   Q    Mr. Chappel, the next time I have you, then, is June the

22   3rd as you've mentioned, right, and that's at Ty Garbin's

23   house?

24   A    Correct.

25   Q    Okay.  And we heard some conversation and there have been

1    some audio played about rank structures, right?

2    A    Correct.

3    Q    Okay.  And when you listened to that audio on Friday you

4    said, you and Daniel Harris, because you had military

5    experience, that's where you thought that was coming from, is

6    that right?

7    A    Correct.

8    Q    Okay.  And you recall that the group wanted to make you the

9    commander of the group on June the 3rd?

10   A    Correct.

11   Q    Okay.  And you declined that position, right?

12   A    I did.

13   Q    Okay.  You said you didn't have a big enough social media

14   presence?

15   A    Correct.

16   Q    Okay.  But you did say you would be in charge of training

17   the tactical side?

18   A    I agreed to help.  Yes.

19   Q    Okay.  We also heard a clip of Daniel Harris talking about

20   an arti sim on June the 3rd.  Do you remember that?

21   A    Yes.

22   Q    Okay.  And you knew what he was talking about when he said

23   an arti sim, is that right?

24   A    I do.

25   Q    And that's something that you did have experience with when

1    you were going through basic training in the army?

2    A    Yes.

3    Q    Okay.  Simulating an IED, correct?

4    A    Simulating artillery, incoming artillery rounds or mortar

5    rounds, and it could be used as an IED, yes.

6    Q    Okay.  When you were going through it in basic training

7    they weren't using them as IED's against you, correct?

8    A    They were, yes.  They could use them as simunitions.

9    Q    They were using IED's against you?

10   A    Artillery simunitions.  They were.  They weren't actually

11   using full-on IEDs, no.

12   Q    Okay.  And the group consensus after June 3rd is you guys

13   were not going to go to Dublin, is that right?

14   A    Correct.  It was too short of a notice.

15   Q    Okay.  When you were communicating with the agents it was

16   important for you to share information about each of the

17   individual members of the Wolverine Watchmen, is that right?

18   A    Yes.

19   Q    Okay.  On June the 12th, you shared information about a

20   Garda e-mail.  Do you recall that?

21   A    I believe so.

22   Q    Okay.  What is Garda?

23   A    I am not sure on the name.  I remember the conversation but

24   I am not sure what Garda is.

25   Q    Okay.  Is Garda a contracting company?

1     A    I believe so.

2     Q    Okay.  And do you recall sending a text message to the

3     agents that you got Mr. Harris to post an e-mail about a

4     recruiter?

5     A    I think he was reaching out to do contract work overseas

6     and I was able to get the contact info of who he was talking

7     about.

8     Q    You thought that was important enough to share it with the

9     agents, is that right?

10    A    Yes.

11    Q    Okay.  So these trainings, June the 14th, 2020, is in

12    Munith, right?

13    A    It is.

14    Q    Okay.  And you were -- I believe your testimony is that you

15    were assisting Paul Bellar in training, is that right?

16    A    Correct.

17    Q    But you were the XO of this group, is that right?

18    A    Correct.

19    Q    So the second in command?

20    A    Correct.

21    Q    Behind Joe Morrison?

22    A    Correct.

23    Q    All right.  And at this training on June the 14th, it was

24    set into different stations, right?

25    A    Yes.

Q    Okay.  And was there a vehicle involved in one of these
stations on June the 14th?

A    There was, yes.  Paul Bellar tasked me out with doing
vehicle maneuvers with that.

Q    Okay.  And so you are standing by a vehicle, different
groups are coming to you and you are providing them some
instruction?

A    Myself and Ty Garbin, yes.

Q    Yourself and Ty Garbin, okay.  Do you know whose vehicle it
was you were using?

A    One of the members.  I am not sure whose.

Q    Okay.  And so as these groups are coming and working
through your station, for lack of a better term, you are
talking to them; you are getting to know them, is that right?

A    I am.

Q    And you are sharing the information about your experience
in the military?

A    Yes.

Q    Okay.  From time to time you'd show them a video of Sadr
City, right?

A    I did.

Q    Okay.  And told them that you had rescued Chris Kyle.

A    I was part of a QRF element that went in there and helped
him.  Yes.

Q    You are sharing these stories and these guys are coming and

1    getting instruction from you and Ty Garbin?

2    A    Yes.

3    Q    Okay.  And that June the 14th training, that was the

4    mandatory training that we talked about, is that right?

5    A    I believe so.  Yes.

6    Q    Okay.  And so you talked about making a roster or you know,

7    having people sign in so you knew who was there, right?

8    A    I don't know if there was -- if that actually got put out

9    or not, but there was -- we did a purge, Joe and Pete had done

10   several of those.

11   Q    So the people that didn't show up, they got kicked out of

12   the chat group?

13   A    Correct.

14   Q    And at some point during that day on June the 14th, you

15   have a conversation with Pete and Joe about Adam Fox, right?

16   A    Yes.

17   Q    Okay.  And it's conveyed to you that there is some sort of

18   meeting that's going to happen on June the 20th?

19   A    Correct.

20   Q    Okay.  And you listened to a FaceBook message from Adam

21   Fox, is that right?

22   A    We did.  Yes.

23   Q    Okay.  And that -- in that conversation it was just you,

24   Pete and Joe, correct, when you were listening to the message?

25   A    I believe so.  Yes.

1    Q    Okay.  And it's true that you said, I am committed to going

2    on June the 20th?

3    A    For myself, yes.

4    Q    Okay.  And you were committed and down for going because

5    you wanted to find out what happened in Ohio, is that correct?

6    A    Correct.

7    Q    Okay.  And again, you were expressing to Pete and Joe, we

8    need to come up with a plan, right, on June the 14th?

9    A    Possibly.

10   Q    Okay.  Something that you might have said that day, Plan A,

11   Plan B is reinforcing Plan A?  Do you recall saying that?

12   A    Yes.

13   Q    You said that a lot of times that summer, right?

14   A    Correct.

15   Q    Trying to get some plan, trying to get some direction, is

16   that right?

17   A    Correct.

18   Q    At some point after you, Pete and Joe listened to a message

19   from Adam, you make the decision -- not you personally, but the

20   three of you make a decision you are going to call Adam, is

21   that right?

22   A    Correct.

23   Q    After you have had this discussion about you being

24   committed to going on June the 20th, you call Daniel Harris

25   over to the group, is that right?

1    A    It was either him or Ty.

2    Q    Is it possibly that you called them both over?

3    A    Possibly.  I am not really sure.

4    Q    Okay.  You also then order a cease fire.  So you ordered

5 everybody to stop shooting their firearms, do you recall?

6    A    Correct.  Because we couldn't hear the conversation on the

7 phone.

8    Q    Okay.  And then you guys call Adam and talk about the 18th

9 and you talk about the 20th, right?

10    A    Correct.

11    Q    And there is kind of an agreement, hey, we'll see you at

12 the 18th at the rally, right?

13    A    Right.

14    Q    And that's that Second Amendment rally, right?

15    A    Sounds right.

16    Q    Okay.  And you also say to Adam during that phone call on

17 June the 14th, the first one, that, hey, I got five years in

18 the military.  Can we maybe not go in your basement as a sign

19 of an olive branch?  Do you remember saying that?

20    A    I do.

21    Q    And that was the first time that you had talked to Adam?

22    A    Yes.

23    Q    And you testified that after -- after the Munith training

24 you then went and called Adam separately, is that right?

25    A    I did.

1    Q    And you were with the agents at that time?

2    A    I was.

3    Q    And you were confirming that June the 20th meeting?

4    A    Yes.

5    Q    Okay.  When the Watchmen or when these trainings would

6    happen from time to time folks would bring different kinds of

7    firearms to these trainings, right?

8    A    Yes.

9    Q    Okay.  And people would share their firearms, let each

10   other shoot their firearms, right?

11   A    They did.

12   Q    Okay.  Can we show this witness Exhibit 4016?

13          THE COURT:  Any objections from the government?

14          MR. KESSLER:  No objection, Your Honor.

15          THE COURT:  Okay.  It can be admitted then and I'll

16   not worry about further foundation.

17   BY MS. KELLY:

18   Q    Mr. Chappel, in looking at this photograph this is you and

19   Daniel Harris, is that right?

20   A    It is.

21   Q    Would this be a fair and accurate photograph taken at the

22   Munith training on June the 14th?

23   A    Yes.

24   Q    Okay.  And can you tell the jury what you are holding and

25   that Mr. Harris is holding?

1    A    I believe that's a Browning 1919.  It's a belt fed.  That

2    one right there is a semiautomatic, and it shoots, I believe, a

3    .30-06 round and then Daniel Harris is holding the tripod where

4    the weapon would sit on itself.

5    Q    Okay.  And this was brought by a Watchmen member by the

6    name of Curtis King, correct?

7    A    That's correct.

8    Q    And he let you guys all fire it off at the end of the

9    training, right?

10   A    Correct.

11   Q    And did you fire it off?

12   A    Yes.

13   Q    So did Daniel Harris?

14   A    He did.

15   Q    Anybody else that wanted to?

16   A    Correct.

17   Q    It's kind of an fun way to end a training?

18   A    Yeah.

19   Q    Okay.  Okay.  So then on June the 18th, you go to the

20   Second Amendment rally in Lansing, right?

21   A    We do.

22   Q    Okay.  And you meet Adam Fox there?

23   A    Yes.

24   Q    Right?  And you -- I believe you testified that there were

25   multiple militias meeting at the Second Amendment rally?

1    A    Yes.

2    Q    Okay.  But you said that Mr. Fox was there with just his

3    girlfriend, is that right?

4    A    I believe so.  Yes.

5    Q    But there were members of the Wolverine Watchmen there?

6    A    There was.  Yes.

7    Q    Okay.  We saw a photograph of Daniel Harris.  If we could

8    pull up 59?

9            THE COURT:  Why don't we do this.  I don't think you

10   are going to be done in the next three minutes, right?

11           MS. KELLY:  I don't think so, Your Honor.

12           THE COURT:  Right.  So you are on a new topic.  It's a

13   good time to take a break.  Getting toward the end of the day

14   anyway with a few minutes left.

15           Please, folks, continue to honor the instructions I

16   have given you before.  I won't repeat them to you because you

17   know them all by now and you don't need to hear me say them

18   again.  Hopefully we'll all stay healthy and well and be able

19   to continue the full week this time so you get to hear

20   sequential days of testimony.

21           We are going to pick up tomorrow with Ms. Kelly's

22   continued cross exam of this witness, finish with this witness,

23   and then we'll just move forward with the proofs once we get

24   through everybody's questioning.

25           So I hope that the weather is good.  I didn't actually

1    check on the break what the current prediction is, but it's

2    getting hot in here in any event.  So maybe you'll get a little

3    fresh air and we will look forward to seeing you tomorrow at

4    8:30.  Thank you very much for your ongoing attentiveness.

5              LAW CLERK:  All rise.

6              (Jury out, 1:56 p.m.)

7              THE COURT:  Okay.  8:30 tomorrow.  Good.  See you.

8    Have a good night all.

9              LAW CLERK:  Court is adjourned.

10             (Proceeding concluded, 1:56 p.m.)

```
1                               INDEX

2
        Government Witnesses:                    Page
3
        DAN CHAPPEL
4
         Direct Examination(Continuing) by Mr. Kessler   5
5        Cross Examination by Mr. Gibbons              30
         Cross Examination by Ms. Kelly               181
6
                              ^
7
        Exhibits:                             Admitted
8
        Government's Exhibit 265                  9
9         (Video, September 17)
        Government's Exhibit 266                  11
10        (Chat, September 17)
        Government's Exhibit 272                  15
11        (Chat, September 19)
        Government's Exhibit 274                  19
12        (Video, September 29)
        Government's Exhibit 275                  19
13        (Video, September 30)
        Government's Exhibit 276                  22
14        (Audio, September 30)
        Government's Exhibit 277                  23
15        (Audio, September 30)
        Government's Exhibit 278                  23
16        (Audio, September 30)
        Government's Exhibit 279                  25
17        (Chat, October 2)
        Government's Exhibit 282                  27
18        (Chat, October 2)
        Government's Exhibit 283                  28
19        (Video, Fox, Taser)
        Government's Exhibit 286                  5
20        (Photograph, Confederate Flag)
        Government's Exhibit 287                  7
21        (Photograph, Confederate Flag)
        Government's Exhibit 443                  17
22        (Chat)
        Defendant's Exhibit 2218                  111
23        (Text, August 18)
        Defendant's Exhibit 2252                  135
24        (Map, Elk Rapids)
        Defendant's Exhibit 2286                  181
25        (Task)
```

Case 1:20-cr-00183-RJJ   ECF No. 624,  PageID.6417   Filed 04/12/22   Page 214 of 215

214

| | | |
|---|---|---|
| 1 | Defendant's Exhibit 2287 | 181 |
| | (Task) | |
| 2 | Defendant's Exhibit 2290 | 118 |
| | (Text, August 25) | |
| 3 | Defendant's Exhibit 2291 | 119 |
| | (Text, August 27) | |
| 4 | Defendant's Exhibit 2292 | 119 |
| | (Text, August 27) | |
| 5 | Defendant's Exhibit 2293 | 121 |
| | (Text, August 27) | |
| 6 | Defendant's Exhibit 2294 | 121 |
| | (Text, August 28) | |
| 7 | Defendant's Exhibit 2295 | 121 |
| | (Text, August 28) | |
| 8 | Defendant's Exhibit 2296 | 135 |
| | (Text, September 3) | |
| 9 | Defendant's Exhibit 2297 | 141 |
| | (Text, September 4) | |
| 10 | Defendant's Exhibit 2298 | 148 |
| | (Text, September 19) | |
| 11 | Defendant's Exhibit 4016 | 209 |
| | (Photograph, Chappel & Harris) | |

REPORTER'S CERTIFICATE


I, Paul G. Brandell, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of the
proceedings had in the within entitled and numbered cause on
the date hereinbefore set forth; and I do further certify that
the foregoing transcript has been prepared by me or under my
direction.



                              /s/ Paul G. Brandell
                              Paul G. Brandell, CSR-4552, RPR, CRR
                              U.S. District Court Reporter
                              399 Federal Building
                              Grand Rapids, Michigan  49503