```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF MICHIGAN

 3                     SOUTHERN DIVISION

 4     UNITED STATES OF AMERICA,

 5              Plaintiff,        No:  1:20cr183-1/2/5/6

 6      vs.

 7     ADAM DEAN FOX,
       BARRY GORDON CROFT, JR.,
 8     DANIEL JOSEPH HARRIS and
       BRANDON MICHAEL-RAY CASERTA,
 9
                Defendants.
10

11

12     Before:

13                   THE HONORABLE ROBERT J. JONKER
                          U.S. DISTRICT Judge
14                        Grand Rapids, Michigan
                       Tuesday, March 23, 2022
15                  Excerpt of Jury Trial Proceedings
                       Testimony of Ty Garbin

16     APPEARANCES:

17                   MR. ANDREW BIRGE, U.S. ATTORNEY
                     By:  MR. NILS R. KESSLER
18                   MR. JONATHAN C. ROTH
                     The Law Building
19                   333 Ionia Avenue, NW
                     Grand Rapids, MI 49501-0208
20                   (616) 456-2404

21                        On behalf of the Plaintiff;

22                   MR. CHRISTOPHER M. GIBBONS
                     MS. KAREN M. BOER
23                   Dunn Gibbons PLC
                     125 Ottawa Avenue, NW, Suite 230
24                   Grand Rapids, MI 49503-2865
                     (616) 336-0003
25
                          On behalf of Defendant Fox.
```

```
 1                    JOSHUA ADAM BLANCHARD
                      Blanchard Law
 2                    309 South Lafayette Street, Suite 208
                      P.O. 938
 3                    Greenville, MI 48838-1991

 4                         On behalf of Defendant Croft, Jr.

 5                    JULIA ANNE KELLY
                      Willey & Chamberlain LLP
 6                    300 Ottawa Avenue NW Suite 810
                      Grand Rapids, MI 49503-2314
 7                    (616) 458-2212

 8                         On behalf of Defendant Harris.

 9                    MICHAEL DARRAGH HILLS
                      Hills at Law PC
10                    425 South Westnedge Avenue
                      Kalamazoo, MI 49007-5051
11                    (269) 373-5430

12                         On behalf of Defendant Caserta.

13
```

14   REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15   ***************************************************************

16        MR. KESSLER:  The Government calls Ty Garbin, Your

17   Honor.

18        THE COURT:  Unless we have him already down, in a

19   little while you'll see Mr. Garbin is in custody, and so it's

20   going to take a little while to make sure we can get him moved

21   into the chair.  He'll come through that door just like all the

22   other witnesses.  Sometimes it takes a little longer when we

23   have a witness in custody.  It's possible that they are still

24   getting them unloaded and situated in lockup.

25        There is no other short witness you have?  Maybe not.

1          Okay.  They got it all set.  Very good.  Mr. Garbin,

2     before you sit down, just stay right there and we'll have you

3     sworn in.

4          TY GARBIN, GOVERNMENT

5          having been first duly sworn, testified as follows:

6          (Witness sworn, 8:53 a.m.)

7          THE COURT:  And please step up and get yourself

8     situated.  I know it's a little more difficult given the

9     configuration you've got, and we'll ultimately want that

10    microphone between you and whoever is asking you the questions

11    that you're responding to.  Okay.

12                        DIRECT EXAMINATION

13     BY MR. KESSLER:

14    Q    Good morning, Mr. Garbin.

15    A    Good morning.

16    Q    How old are you?

17    A    Good.

18    Q    How old are you?

19    A    Sorry.  26.

20    Q    I'm glad you are doing well.  Where are you from?

21    A    Originally from Wyandotte, Michigan.

22    Q    Okay.  And where have you lived most recently?

23    A    When I was arrested I was living in Hartland, Michigan.

24    Q    And what did you do for a living around that time?

25    A    I was working as an aircraft mechanic for Pentastar

1    Aviation.

2    Q    And where is that at?

3    A    They are based out of Pontiac, but I was working out of

4    Detroit Metro Airport.

5    Q    So you were fixing airplanes?

6    A    Correct.

7    Q    We can all see what you are wearing here.  You pled guilty

8    to conspiring to kidnap Governor Whitmer?

9    A    That's correct.

10   Q    With these Defendants?

11   A    That's correct.

12   Q    So you are serving time right now, correct?

13   A    Correct.

14   Q    I just want to get this out of the way.  You had a plea

15   agreement with the government, right?

16   A    Correct.

17   Q    And that plea agreement required you to coop --

18            MR. BLANCHARD:  I am going to object on the leading

19   nature of the questions, Your Honor.

20            THE COURT:  It is leading but it's also fairly

21   foundational, and I am not sure that there is anything so

22   controversial, but if you want to be more traditional you can,

23   but I think as long as we are staying on foundational issues

24   you can go ahead.

25            MR. KESSLER:  Thank you, Your Honor.

BY MR. KESSLER:

Q    What did your plea agreement require you to do?

A    My plea agreement required me to continue to provide cooperation with the government agencies and local state agencies.

Q    All right.  And let me ask you about what that cooperation entailed.  Did you testify in the grand jury?

A    I did.  Yes.

Q    Did you receive a motion from us to reduce your sentence at your sentencing?

A    I did.  Yes.

Q    Did the Court reduce your sentence?

A    They did.  Yes.

Q    Okay.  And because of your grand jury testimony?

A    Correct.

Q    And are you hoping to get a further sentence reduction for testifying here today?

A    Yes.

Q    Has anybody made you any promises about that?

A    No.  I have not been made any promises.

Q    All right.  I want to take you back to February and March 2002.  Can you tell us how you first became involved with the Wolverine Watchmen?  I don't mean 2002.  You would have been a boy at the time.  2020.

A    I was in contact with Joe Morrison through a mutual page we

1    were on.  Joe Morrison had invited me to join the Wolverine

2    Watchmen group.

3    Q    When you say a mutual page, are you talking about on a

4    particular application?

5    A    We were using FaceBook at the time.

6    Q    Okay.  What, if anything, attracted you to the Wolverine

7    Watchmen?

8    A    Joe had said that they shared the same Libertarian mind-set

9    that I shared as well.

10   Q    Is that how you consider yourself?

11   A    Yes.

12   Q    Okay.  And what do you mean by libertarian?

13   A    I like limited government oversight.  Not a fan of taxes.

14   Some other things but mostly libertarian.

15   Q    All right.  Second Amendment important to you?

16   A    Very important.  Yes.

17   Q    Okay.  Tell us about how the process of becoming a member

18   of the Wolverine Watchmen was for you?

19   A    When I originally joined it was a FaceBook group.  I was

20   part of the FaceBook for maybe a week or so.  Then Joe invited

21   me to join a private encrypted chat called Wire.  When I got

22   onto the Wire page I was vetted by Joe Morrison, asked a series

23   of questions about my background, what I knew about firearms,

24   if I had military or law enforcement experience, things like

25   that.

1    Q    Were there any other questions that you were asked as part

2    of that vetting?

3    A    Joe Morrison also asked if I was okay with being labeled as

4    a domestic terrorist.

5    Q    But you joined anyway?

6    A    I joined anyway.

7    Q    At some point did you get elevated to the leadership of the

8    Wolverine Watchmen?

9    A    Correct.  I was part of the group for maybe a month, two

10   months, and then I was put into a position of leadership with

11   Joe Morrison.

12   Q    Okay.  Can you tell the jury why you were elevated to

13   leadership?

14   A    Joe Morrison liked my way of thinking.  He liked my

15   firearms experience, and then someone else had left the

16   leadership position so there was kind of an open spot, so I

17   filled that spot and helping him vet other members into the

18   group.

19   Q    What kind of firearms experience did you have?

20   A    I grew up shooting guns.  As I got a little bit older I

21   started doing some shooting competitions.  Mostly self taught.

22   Q    All right.  What's a three gun shooting competition?

23   A    A three gun shooting competition, it's a combination of

24   rifle, pistol and shotgun.  You are shooting paper targets or

25   clay targets, and they have set up houses, or you know,

1    alleyways or things for you to run through.  It's usually

2    movement and shooting.

3    Q    Okay.  When you joined the Wolverine Watchmen, did you know

4    Adam Fox?

5    A    I did not.

6    Q    So let's fast forward a little bit to June 14th.  Did the

7    Wolverine Watchmen have a mandatory meeting on that date?

8    A    We did.  Yes.

9    Q    What was the reason for the mandatory meeting?

10   A    Joe had been upset that the turnout for prior training

11   events wasn't very good.  So we decided as Watchmen leadership

12   to make a mandatory training so everybody that showed up got to

13   stay in the group.  Everybody that did not show up would be

14   removed from the group.

15   Q    All right.  I want to ask you about some other people in

16   the Wolverine Watchmen, particularly with that mandatory

17   meeting.  Do you remember who was there?

18   A    It was myself, Kaleb Franks, Dan Harris, Brandon Caserta,

19   Joe Morrison, Pete Musico, and then some other members of the

20   Wolverine Watchmen group.

21   Q    Was Dan Chappel there?

22   A    Dan Chappel was there as well.  Yes.

23   Q    Okay.  Now, we've heard some testimony here about people

24   calling him dad or a father figure.  Did you ever refer to him

25   as a father figure or as dad?

A    As dad, yes.  It was kind of just an inside joke.  Some people looked up to him, and then other people, you know, he would make remarks that sounded more like a parent, so sarcastically we started calling him dad.

Q    He was older than you, correct?

A    Correct.

Q    All right.  Let me focus on Daniel Harris in particular. Did you ever hear Daniel Harris refer to him as dad?

A    Yes.

Q    What was the nature of his referring to him as dad?

          MS. KELLY:  Objection, calls for speculation.

          MR. KESSLER:  I'm asking him what he said and what the context was.

          THE COURT:  I think he can answer.  Go ahead.

          THE WITNESS:  He was using it in a joking manner.  It wasn't in a serious manner.

          MS. KELLY:  Again, same objection, Your Honor.

          THE COURT:  He answered and I overruled the objection, so go ahead.

BY MR. KESSLER:

Q    How did you know he was joking?  What did you observe?

A    I could tell by the tone in his voice.  It wasn't serious. It was at a time where everybody else was laughing and joking around.

Q    Okay.  So at the mandatory meeting what did you all

discuss?

A    At the start of the meeting it was just an introduction.
There was some new members that we introduced.  Pete had
mentioned something about politicians we weren't -- I wasn't
really exactly paying attention to that.  We went through the
training, which was, like, a makeshift shoot house, some
vehicle training, some medical training, and then towards the
end we had another conversation in which Joe Morrison and Pete
Musico brought up that there was an upcoming --

            MR. BLANCHARD:  I would object as to hearsay on
Morrison and Musico statements.

            MR. KESSLER:  This isn't offered for the truth of it
but just to explain why they did what they did next.

            THE COURT:  Well, is it your -- are you going to seek
Enright findings on these or not?

            MR. KESSLER:  No.  It's not a co-conspirator
statement.  It's just not offered for the truth, so it wouldn't
be hearsay.

            THE COURT:  All right.  Well, I think you should lay a
little bit more foundation.  What that might support is things
that this witness drew conclusions about, but so far he's
talking mostly about two people that aren't here on trial and
their words and I think getting closer to hearsay concerns
unless your position is that they were part of the overall
conspiracy.  Then it's a different question.

1          MR. KESSLER:  Right.  I am not alleging that.

2          THE COURT:  All right.  So then I think you need to do

3     a little more foundation or move to something else.

4          MR. KESSLER:  I'll do the foundation, Your Honor.

5     BY MR. KESSLER:

6     Q    Did the group after this meeting reach out to other groups?

7     A    Yes.

8     Q    Why?

9     A    We were looking for more groups to basically bring our

10    numbers up.  Our group was small, so we were looking at

11    reaching out to other groups that had the same mind-set.  That

12    way we could have a larger foundation of numbers.

13    Q    And who, if anyone, in this room did the group reach out

14    to?

15    A    Adam Fox was reached out.

16    Q    Okay.  And why was Adam Fox reached out to?

17    A    Adam Fox was said to have similar ideologies, the

18    libertarian mind-set.

19    Q    All right.  So we've been talking about the mandatory

20    meeting on June 14th.  Let's fast forward a couple days from

21    there to June 18th.  Was there a rally on that day?

22    A    Yes.

23    Q    What was the nature of the rally?

24    A    The rally was for Second Amendment purposes.

25    Q    When you say it was for Second Amendment purposes, what do

1    you mean exactly?

2    A    I don't know what they were protesting exactly.  I think it

3    was just more of a gathering to exercise Second Amendment

4    rights.

5    Q    Publicly?

6    A    Publicly.  Yes.

7    Q    And where was that rally?

8    A    It was held at the Lansing Capitol.

9    Q    Did you meet anybody in this room for the first time there?

10   A    I did.  I met Adam Fox there for the first time.

11   Q    All right.  Did you talk with Mr. Fox about meeting again

12   in the future?

13   A    I did.  Yes.

14   Q    And what was the nature of that discussion?

15   A    The nature of the discussion was to talk in private about

16   basically our ideologies and what we wanted to basically do

17   going forward when it came to the use of the group.

18   Q    What, if anything, did Mr. Fox say he wanted to do?

19   A    Adam Fox at the protest had mentioned storming the Capitol

20   building.

21   Q    What did he say about that?

22   A    That we should storm the Capitol building and take

23   politicians hostage and put them on trial for treason.

24   Q    Did he suggest doing anything else with the hostages?

25   A    He mentioned executing them for treason as well.

1    Q    Did he say how?

2    A    By hanging on national television.

3    Q    Did he say what he was upset about?

4    A    Not particularly.  A lot of it had to do with how the

5    COVID-19 pandemic was being handled along with our

6    constitutional rights being encroached on.

7    Q    So were you the only one who met with Mr. Fox or did other

8    members of Wolverine Watchmen meet him at the rally?

9    A    Other members were there as well.

10   Q    After that rally, did you and the Wolverine Watchmen

11   discuss meeting with Mr. Fox again in the future?

12   A    I did with Joe and Pete.  Joe and Pete asked me --

13        MR. BLANCHARD:  I'd object as to hearsay for what Joe

14   and Pete said.

15        MR. KESSLER:  Let me skip to what you did next.  Okay.

16   BY MR. KESSLER:

17   Q    After that discussion did you decide to meet with Mr. Fox?

18   A    Yes.  That following weekend I met with Fox at the Vac

19   Shack.

20   Q    Okay.  And among the Wolverine Watchmen -- don't tell me

21   what Joe or Pete said, but among the Wolverine Watchmen who

22   agreed to meet with Mr. Fox, was Dan Chappel involved in that?

23   A    Yes.  He was.

24   Q    Was it his idea?

25   A    No.  It wasn't.

Q    Somebody else proposed it?

A    Yes.

Q    Okay.  So where did you guys meet with Mr. Fox next?

A    We met with him in the basement of the Vac Shack.

Q    Okay.  And who proposed that?

A    Upon entering the Vac Shack --

Q    Who proposed meeting at the Vac Shack?

A    Oh, it was agreed upon by Wolverine Watchmen leadership to go to the Vac Shack and have an in-person discussion with Adam Fox about pretty much his ideology and what he was thinking.

Q    Who extended the invitation to come to the Vac Shack?

A    Adam Fox invited us to come to the Vac Shack for the meeting.

Q    Okay.  So who went with you on June 20th to meet with Adam Fox?

A    I rode in a vehicle with Dan Chappel.  And Paul Bellar also came but he drove separately in his vehicle.

Q    And when you got there, what did you do?

A    Entering the Vac Shack we introduced ourselves.  Adam Fox had asked for our phones for operational security before leading us into the basement into the Vac Shack to have the discussion.

Q    When you say he asked for your phones, what did he ask you to do with them?

A    He had us put them in a box so he could keep them upstairs.

Q     So they were separated from you?

A     Correct.

Q     Did you give him a phone?

A     I gave him my personal phone but I kept my work phone on me.

Q     Why did you keep your work phone on you?

A     I was unsure of basically how Adam Fox was going to act in the basement.  I didn't want to be left without, you know, an emergency contact.

        MR. KESSLER:  Can we put up Exhibit 61, please?

        THE COURT:  I don't think it's admitted yet.

        MR. KESSLER:  It is, Your Honor.

        THE COURT:  You have 61 in.  Oh, it does.  Yeah.  I'm sorry.  Go ahead.

BY MR. KESSLER:

Q     Mr. Garbin, do you recognize this?

A     I do.  Yes.

Q     What are we looking at?

A     That is the entrance to the basement of the Vac Shack.

Q     All right.  So did you go down those stairs?

A     I did.  Yes.

Q     That's where you didn't want to go --

A     Correct.

Q     -- without your phone?  How would you describe that space?

A     Dark, dirty, smelled like mold.  It wasn't a very clean

1      space.

2      Q    Who went down there with you?

3      A    Adam Fox, his girlfriend, one of his friends from the

4      Michigan Home Guard, myself, Paul Bellar and Dan Chappel.

5      Q    And in what capacity were you attending this meeting?

6      A    I was attending it as a member of Wolverine Watchmen

7      leadership.

8      Q    And what did you all discuss downstairs?

9      A    We discussed further a little bit in more detail the plan

10     to storm the Capitol building.  Fire bombing Michigan State

11     Police cars were also talked about, and then obtaining

12     explosives were also talked about.

13     Q    When you say they were talked about, who talked about --

14     first off, who talked about attacking Michigan State Police

15     cars?

16     A    Adam Fox had mentioned fire bombing the Michigan State

17     Police cars.

18     Q    Okay.  And who talked about getting explosives?

19     A    Adam Fox as well.

20     Q    Did you talk about when or did Mr. Fox talk about when he

21     wanted to do this?

22     A    The grand plan to complete anything was before the November

23     presidential election.

24     Q    Now, you mentioned something about storming the Capitol.

25     Did Mr. Fox raise that again in the basement?

1    A    He did.  Yes.

2    Q    Did he talk at all about a meeting in Dublin, Ohio?

3    A    He did.  Yes.

4    Q    What did he tell the Wolverine Watchmen representatives

5    about that meeting?

6    A    That he had met with leaders of other like-minded militia

7    groups to come together and form a common goal of a plan of

8    action of some sort, and he also mentioned that he met Barry

9    Croft there.

10   Q    Okay.  Did you know Barry Croft at the time?

11   A    I did not.  No.

12   Q    You mentioned that Mr. Fox talked about explosives.  Did he

13   refer to them in a particular -- did he use any particular

14   words to explain what those were?

15   A    He used cakes or cake to refer to the explosive itself.  He

16   referred to the manufacturer as a baker.

17   Q    Okay.  After that meeting did you have another training

18   coming up later in June?

19   A    We did.  Yes.

20   Q    So let me focus on June 28th.  Did you actually attend a

21   field training exercise in Munith, Michigan?

22   A    I did.  Yes.

23   Q    And whose residence was that?

24   A    It was at Joe Morrison's and Pete Musico's.

25   Q    Do you remember who was there?

1    A    If I remember correctly Adam Fox was there.  He brought

2    Sean Fix and another member of his inner circle.  It was

3    myself, Dan Harris, Dan Chappel, Brandon Caserta, Kaleb Franks,

4    and the other members of the Michigan Wolverine Watchmen group.

5    Q    All right.  Layout the scene for the jury, if you would?

6    Where did you first meet everybody in Munith?  Did you go

7    inside or was it outside?

8    A    It was outside.  Everybody had initially parked their cars

9    off to the right of Joe and Pete's house.  We collected

10   ourselves and moved to the left of the house to an open field

11   space where the training ground is.  We conducted our training,

12   and then after training was over we gathered again on the right

13   of the house near the vehicles to have a discussion.

14   Q    Okay.  What, if anything, did Mr. Fox say at that

15   discussion?

16   A    Storming the Capitol was mentioned again.

17   Q    By Mr. Fox?

18   A    By Mr. Fox, yes.  And then it was at this time as well that

19   training in Cambria, Wisconsin was upcoming and we were looking

20   for volunteers to go to Cambria, Wisconsin.

21   Q    Did Mr. Fox say anything about the governor?

22   A    Not in the sense of kidnapping.

23   Q    Okay.

24   A    At that time we were looking at the governor but it wasn't

25   quite a formed plan yet.

1   Q    When you say looking at the governor, what did Mr. Fox say?

2   A    I don't recall exactly, but at that time it was to

3   basically make the governor the prime target of whatever

4   operation we were going to go forth with.

5   Q    That's what Mr. Fox said?

6   A    Correct.

7   Q    Do you recall Mr. Fox saying anything about constitutional

8   judges or sheriff's?

9   A    Yes.  Originally we were forming kind of a plan to try and

10  get a county sheriff, a judge and some sort of attorney to make

11  a citizen's arrest of the governor.

12  Q    Was Mr. Harris there for this conversation?

13  A    He was.

14  Q    Was Mr. Franks there for this conversation?

15  A    He was.

16  Q    And Mr. Caserta?

17  A    Yes.

18  Q    Did any of them object?  Did you hear any of them object to

19  this plan to arrest the governor?

20  A    No.

21  Q    Did you watch how they reacted to it?

22  A    Everybody I could see was nodding in agreement.

23  Q    Including Mr. Harris and Mr. Caserta?

24  A    Correct.

25  Q    Did anyone object?

1   A   Jerad Beauchesne was the only person I heard object to

2   anything pertaining to the governor.

3   Q   So you mentioned that there was discussion about a next

4   field training exercise in Wisconsin.  Did you talk about in

5   this group what the nature of that training would be for?

6   A   The nature of the training was to take the same groups that

7   were at the original Ohio meeting, along with people from more

8   groups, including our group, the Wolverine Watchmen, to come

9   together and train as one.

10  Q   All right.  And was there any discussion about training for

11  this plan about the arrests?

12  A   Not there.  It wasn't talked about until we arrived in

13  Wisconsin.

14  Q   Okay.  So before we get to Wisconsin, in between I want to

15  ask you about July 7.  Did you all have a meeting at

16  Mr. Bellar's house in Milford?

17  A   We did.  Yes.

18  Q   What was the nature of that meeting?

19  A   The nature of the meeting was to form a side chat called

20  the QRF chat, and formulate some sort of kind of code word

21  system to avoid detection from law enforcement.

22  Q   So let me break that down.  What's QRF mean to you?

23  A   QRF means quick reaction force.

24  Q   And who was at that meeting?

25  A   This was Paul Bellar, Dan Harris, Dan Chappel, Kaleb

1    Franks, Max Wyckoff, Josh Miller, and I believe that was

2    everybody.

3    Q    Did Josh Miller ever go by a nickname?

4    A    Purple J.

5    Q    Okay.  Now, you said that you met to establish code words,

6    is that correct?

7    A    Correct.

8    Q    We've seen those here.  Can you tell us as a reminder what

9    the nature of the code words was?

10   A    The code words are words similar to everything that would

11   have to do with a bonfire.  So bonfire, marshmallow, schmores.

12   And they had to do with weapons, body armor and whatever else

13   we needed to bring to training or where the training was going

14   to be.

15   Q    Did you discuss why you would need code words?

16   A    Yes.

17   Q    Why?

18   A    That was to avoid detection from law enforcement.

19   Q    Okay.  So a couple of days later, July 10th, 11th and 12th,

20   is that when the field training exercise in Cambria took place?

21   A    Yes.

22   Q    So let's start on July 10th.  Is that the day that you

23   drove there?

24   A    Yes.

25   Q    Now, you mentioned that you were living in Hartland at the

1    time.  That's on the east side, correct?

2    A    Correct.

3    Q    Who else drove with you?

4    A    In the vehicle was myself, Dan Chappel, Dan Harris, Kaleb

5    Franks, Brandon Caserta and Paul Bellar.

6    Q    And whose vehicle was that?

7    A    It was a rental vehicle that Dan Chappel had acquired.

8    Q    Okay.  Did you drive through Grand Rapids on the way to

9    Cambria?

10   A    Yes.

11   Q    You didn't know that Dan Chappel was an informant at the

12   time, did you?

13   A    No.

14   Q    Have you listened to a recording that he made of that trip?

15   A    I have not.

16   Q    Okay.  Would you recognize -- would you recognize Dan

17   Harris's voice if you heard it again?

18   A    I would.  Yes.

19          MR. KESSLER:  I am not sure how I can best do this

20   when he just said he has not heard it before.  I can play it

21   for him separately or if there is no objection we can go ahead

22   and play it.

23          THE COURT:  It's not in evidence yet, is that it?

24          MR. KESSLER:  Correct, Exhibit 87.

25          THE COURT:  Exhibit 87?

1            MS. KELLY:  I would object on foundation, Your Honor.

2            THE COURT:  It's not in yet.  So I think we'll either

3       have to wait or --

4            MR. KESSLER:  I can cover the nature of it first and

5       then --

6            THE COURT:  We can see if he -- from your position who

7       is on the recording?  It's a recording on the car ride with the

8       people that he's just mentioned?

9            MR. KESSLER:  Yes, Your Honor.  And it's Dan Harris's

10      statement in particular.

11            THE COURT:  All right.  Yeah.  So I think you can see

12      if he remembers anything about it, and if he does maybe you

13      don't even need the recording, but if you do, I think you are

14      going to have to find a time to let this witness hear it first,

15      and then otherwise, it's basically in everybody's memory and

16      it's easier to wait with that.  So we'll have to wait for a

17      break for that.

18      BY MR. KESSLER:

19      Q    You don't remember us playing this for you during prep?

20      A    I might have.  Yes.

21      Q    Okay.  Let me lay out the nature of it and then we'll see

22      if you remember listening to this recording.

23            Do you recall any discussion about an SBR?

24      A    Yes.

25      Q    What is an SBR?

1    A    SBR stands for short-barreled rifle, which is basically a

2    regular rifle, just has a shortened barrel.

3    Q    Okay.  And you are pretty familiar with firearms, right?

4    A    Right.

5    Q    Did you understand that to be an issue at all?

6    A    Without the proper tax stamp and documentation it would be

7    illegal to possess.

8    Q    Okay.  And was there a discussion about an SBR on the

9    ride --

10            MS. KELLY:  Objection, leading.

11            THE COURT:  It is, but he already answered and said

12   there was.  So go ahead.

13   BY MR. KESSLER:

14   Q    What was the nature of the discussion?

15            THE COURT:  Yeah.  If he remembers, go ahead.

16            THE WITNESS:  The discussion was that basically

17   everybody in the vehicle was a felon because there was an

18   illegal SBR in the back.

19   BY MR. KESSLER:

20   Q    All right.  Do you remember listening to a recording of

21   this conversation?

22   A    I do.  Yes.

23            MR. KESSLER:  I'd like to play Exhibit 87, Your Honor?

24            MR. BLANCHARD:  I object as to hearsay.  There is a

25   lot of Mr. Bellar's statements in there.

1          MR. KESSLER:  They are context, Your Honor.

2          THE COURT:  Why don't you find out if he remembers

3     what you said you were concerned about Mr. Harris's statement.

4     Let's see if he remembers that, and if he does he can testify

5     to that.  If he doesn't then we'll deal with the issue.

6          MR. KESSLER:  All right.  I'd like to jury the hear

7     to --

8          THE COURT:  Start with what I suggested.  I know you

9     want the jury to hear.  I'm trying to give you a pathway to get

10    the information out and prevent needlessly presenting something

11    that may or may not ultimately come in.

12    BY MR. KESSLER:

13    Q    Mr. Garbin, do you remember Mr. Harris talking about an

14    SBR?

15    A    Yes.

16    Q    You remember hearing that in the recording?

17         THE COURT:  Well, why don't you ask him does he

18    remember what he said?  There is nothing objectionable about

19    that in this context.

20         MR. KESSLER:  I understand, Your Honor.

21    BY MR. KESSLER:

22    Q    Mr. Garbin, what did he say?

23    A    Mr. Harris was the one that said that everybody in the

24    vehicle was a felon because there was an illegal SBR in the

25    back.

1    Q    And who had -- who was he saying had an SBR?

2    A    Himself.

3    Q    How do you know that?

4    A    I watched him put it in the vehicle himself.

5    Q    And how did you know it was a short-barreled rifle?

6    A    Because I could tell that it had a shortened barrel and it

7    had a fixed stock on it, which would classify it as a

8    short-barreled rifle.

9         THE COURT:  All right.  How long is the recording?

10        MR. KESSLER:  It's pretty short, Your Honor.  It's

11   under a minute.

12        THE COURT:  All right.  So I think with that

13   foundation for -- and you're relying on the Harris statement

14   that you contend is on there, is that right?

15        MR. KESSLER:  Yes, Your Honor.

16        THE COURT:  Then you can play it and it's admitted for

17   that purpose.

18        MR. BLANCHARD:  I just want to be clear that I object

19   as to hearsay.

20        THE COURT:  I have no doubt.  Go ahead.

21        MR. BLANCHARD:  Thank you.

22        (Audio started, 9:20 a.m.)

23        (Audio stopped, 9:20 a.m.)

24   BY MR. KESSLER:

25   Q    Now, Mr. Garbin, you mentioned something about him having a

1    fixed stock on the rifle.  What difference did that make?

2    A    The fixed stock --

3              MR. BLANCHARD:  Calls for a legal conclusion.  He's

4    asking him to testify as to the law on firearms.

5              THE COURT:  I don't think anybody is going to be

6    confused that this witness is not going to tell anybody what

7    the law is, but he can tell what his understanding of

8    requirements are for firearms since he's talked about some of

9    the experiences he's had with that.  Whether he is right or not

10   he can talk about his understanding.  Go ahead.

11             MR. KESSLER:  Thank you, Your Honor

12   BY MR. KESSLER:

13   Q    What is your understanding of the significance of having a

14   fixed stock on the rifle?

15   A    So the fixed stock just provides a little bit more

16   stability when it's firing.  There is a pistol brace available

17   for AR-15s with a shortened barrel, but they are flexible.  So

18   putting a fixed stock on there, while making it illegal it also

19   provides more stability when firing the weapon.

20   Q    Have you ever seen Mr. Harris switch out the fixed stock

21   for a pistol brace?

22   A    I have.  Yes.

23   Q    Did he tell you why he was doing that?

24   A    He would keep the pistol brace on it in case he was pulled

25   over and law enforcement searched the vehicle there wouldn't be

1    anything illegal to see since it was in a pistol configuration,

2    and then he would later place the stock on it to make it more

3    sturdy for firing.

4    Q    And you saw -- you said you saw the rifle this time?

5    A    Correct.

6    Q    And which configuration was it in this time?

7    A    It was in the rifle configuration.

8    Q    Okay.  When did you see it?

9    A    When it was being placed in the vehicle.  The vehicle was

10   full when they arrived at my house so we had to empty

11   everything out and rearrange things as I placed it in.  His

12   case wasn't zipped up or anything so I was able to see the

13   rifle in the open case.

14   Q    Now, you said you had a discussion with him about the

15   stock -- the fixed stock versus pistol grip.  Did you ever talk

16   with him about doing anything else to modify a gun?

17   A    We also had a conversation about making a sawed off

18   shotgun.

19   Q    Who was making the sawed off shotgun?

20   A    Dan Harris.

21   Q    Did you talk with him about this in a chat?

22   A    Yes.

23   Q    Would you take a look behind tab 146 in the book in front

24   of you, please?

25              THE COURT:  It's only a page.  You can also put it up

1    like the Defense did yesterday and we'll just mute.

2            MR. KESSLER:  Can we do that from there?  Okay.

3    BY MR. KESSLER:

4    Q    Do you see that in front of you Mr. Garbin?

5    A    I do.  Yes.

6    Q    All right.  Do you recognize this chat communication?

7    A    I do.  Yes.

8    Q    And you were a part of it?

9    A    Yes.

10   Q    Is it an accurate representation of the conversation you

11   had?

12   A    Yes.

13           MR. KESSLER:  I'd like to publish Exhibit 146, Your

14   Honor.

15           THE COURT:  Any objections?

16           MS. KELLY:  No, Your Honor.

17           MR. GIBBONS:  None.

18           THE COURT:  Admitted.

19   BY MR. KESSLER:

20   Q    Can we just blow up this upper right hand quadrant there,

21   or upper left, I'm sorry.

22           So who is Beaker?

23   A    Beaker is Dan Harris.

24   Q    And he says, today is the day the shotgun gets chopped.

25   Gunny is who?

A    Myself.

Q    And what did you respond?

A    With a GIF that says breaking the law.

Q    It says Beavis and Butthead?

A    Correct.

Q    From the cartoon?

A    Yes.

Q    Let's see the whole thing, please.  And can you describe what we see in the pictures that follow?

A    The picture on the left is the barrel separate from the shotgun.  There is a piece of tape on it marking where he's going to cut the barrel, and then in the picture to the right it's the barrel reattached to the shotgun with a shortened barrel.

Q    And we see here above both of those pictures it says Beaker?

A    Yes.

Q    So Mr. Harris posted them?

A    Yes.

Q    All right.  Let's actually talk about what happened --

        We can take it down.  Thanks.

        About what happened on July 11th and 12th at the Cambria training.  Do you remember who attended that?

A    Everybody from my vehicle, so Paul Bellar, Dan Chappel, Dan Harris, Kaleb Franks and Brandon Caserta.  Adam Fox came as

1    well with his girlfriend, and Barry Croft attended, and then

2    there were also members of the Wisconsin group hosting the

3    training, and then some individuals from other groups, other

4    groups from other states.

5    Q    Can we put up Exhibit 89, please?  Do you recognize this

6    photograph?

7    A    I do.  Yes.

8    Q    And can you just -- you can touch the screen.  It'll make a

9    little dot.  Can you show us where you are?  Okay.  It looks

10   like you put the dot right on your belly, is that right?

11   A    Right.

12   Q    So there was some people there who are not in this

13   courtroom today, correct?

14   A    Correct.

15   Q    Were there some kids and a barbecue, et cetera, going on?

16   A    Yes.

17   Q    Did everybody there know what you all had been discussing

18   about the governor?

19   A    No.

20   Q    How do you know that?

21   A    Our conversations were held in private with no other

22   individuals around to hear.

23   Q    So nobody told that you heard or told the kids or the

24   Wisconsin people who weren't involved?

25   A    No.

1    Q    Okay.  Can we put up Exhibit 103?

2         It's pretty short, and we don't have to actually play

3    it.  I think we can just see the picture here.  Are you in the

4    this picture?

5    A    Yes.  I am.

6    Q    Which one are you?

7    A    So I am on the right-hand side.  I am the person closest to

8    the entry of the door.

9    Q    Okay.  And who is this?

10   A    That is Brandon Caserta.

11   Q    All right.  So just generally, we've already heard some

12   testimony about this here, but other people besides the people

13   in the courtroom here today went through this shoot house,

14   right?

15   A    Right.

16   Q    Okay.  When you went through there, what did you understand

17   your purpose to be?

18   A    Our purpose was to use the shoot house to simulate

19   basically an indoor space.  At this time we haven't narrowed

20   down the vacation home as being the final spot, so this was

21   basically just to simulate an inside room inside the Capitol or

22   any room inside of a house.

23   Q    So when you say you hadn't narrowed down the vacation home

24   as the final spot, first off, whose vacation home?

25   A    The governor of Michigan, Gretchen Whitmer.

Q    And when you say the final spot, what do you mean by that?

A    As the location where we're going to commit the kidnapping.

Q    So other options were on the table at this point?

A    They were, and as time went on we weeded them out.

Q    Okay.  There was also a medical tent there?

A    Yes.  There was.

Q    And who was running that?

A    Dan Harris and Paul Bellar were running the medical tent, and there was also some individuals from the Wisconsin group helping as well.

Q    Was it to teach people what?  What was the focus of that medical tent?

A    The medical tent was to teach combat first aid.

Q    So not just, like, sprained ankles?

A    No.

Q    What sorts of things are combat first aid?  What was Mr. Harris teaching there?

A    How to treat gunshot wounds or wounds caused by shrapnel from explosives or lost limbs or anything that could be a result of a gun fight.

Q    Are those the kind of wounds you were expecting to receive?

A    Yes.

Q    Let's show -- have you had a chance to view video of yourself and Mr. Harris doing drills at this training?

A    Yes.

1    Q   Is that an accurate representation of the training you did?

2    A   Yes.

3          MR. KESSLER:  I'd like to show Government's Exhibit

4    104, Your Honor?

5          THE COURT:  Any objections?  If not it's admitted.

6          MR. KESSLER:  If I can get these off.  Here.

7          (Video started, 9:29 a.m.)

8          (Video stopped, 9:29 a.m.)

9    BY MR. KESSLER:

10    Q   The first person who ran back, who was that?

11    A   That was myself.

12    Q   And the second one?

13    A   Dan Harris.

14    Q   Now, we've talked about other people being at this.  When

15    you were doing this training, what did you and Mr. Harris

16    discuss this being for?

17    A   This training was to simulate cover-to-cover running.  So

18    basically shooting and then running somewhere to take cover and

19    then shooting some more.

20    Q   And who, if anyone, did you discuss that you would be

21    shooting?

22    A   It would have been law enforcement or anybody who tried to

23    stop us in the process of the kidnapping plot.

24          MR. KESSLER:  Can we put up Exhibit 105.2, please?

25          (Video started, 9:30 a.m.)

```
 1                    (Video stopped, 9:30 a.m.)
 2     BY MR. KESSLER:
 3     Q    This rifle right here -- who is this by the way?
 4     A    It's a little blurry.  I can't quite tell.
 5     Q    Okay.  Do you see Dan Harris in this picture or did you see
 6     him in the video?
 7     A    Yes.  That's Kaleb Franks there at the back, and then Paul
 8     Bellar would be the second one, and then I am the lead person
 9     out front.
10     Q    So you?
11     A    Correct.
12     Q    Paul Bellar?
13     A    Correct.
14     Q    Who is that?
15     A    Dan Harris.
16     Q    And that's?
17     A    Kaleb Franks.
18     Q    Is this the rifle you were discussing?
19     A    Yes.
20     Q    Okay.  That's the SBR?
21     A    Correct.
22     Q    Did you meet Barry Croft at that training?
23     A    I did.  Yes.
24     Q    Was that the first time that you had met Mr. Croft in
25     person?
```

```
1    A    The first time was at the hotel before arriving at the

2    training, but prior to Cambria I have not met Barry Croft.

3    Q    Okay.  Did Mr. Croft bring anything to the training in

4    Cambria?

5    A    Barry Croft had his own rifle he brought with him.

6    Q    Can you describe that rifle?

7    A    The rifle was a short-barreled rifle as well.  It had a

8    silencer on it, a grenade launcher, and Barry Croft also

9    claimed that the rifle was fully automatic.

10   Q    You didn't see him firing it fully automatic, did you?

11   A    No.

12   Q    Did he bring anything else?

13   A    Barry Croft also had a bag filled with explosive materials

14   to manufacture an explosive device.

15   Q    Can you describe the bag?

16   A    The bag was Red.  It had a couple different containers of

17   gun powder in it.  It had some containers that put gun powder

18   in glass jars.  Had some tape, some fuses and then some copper

19   head BBs which you would use for, like, a Red Rider BB gun were

20   in there as well.

21   Q    What kind of a red bag was it?

22   A    It was a like a red duffle bag.

23   Q    Fabric?

24   A    Fabric.  Yes.

25   Q    Did Mr. Croft say what the purpose of these materials was?
```

1    A    The purpose was to make an explosive device.

2    Q    And did he say what that explosive device was for?

3    A    The explosive device was to take out vehicles or injure

4    persons.

5    Q    Did he say what kind of persons?

6    A    It would be everybody or anybody who tried to stop the

7    kidnapping plot, so it would have been law enforcement or

8    anybody responding to it.

9    Q    Okay.  I'd like to put up Exhibit 97, please?

10             Do you recognize the people in this photograph?

11   A    Yes.

12   Q    Who do we have here?

13   A    So Dan Harris is in the center.  I am to the left, and that

14   is Barry Croft to the right.

15   Q    And do you recognize some of the items on the table?

16   A    I do.  The black container is the container holding gun

17   powder.  To the left of that slightly is one of the glass jars.

18   On the other side there was more gun powder and then the copper

19   head BBs as well.

20   Q    And what were you doing here in this picture?

21   A    This was the initial stage of manufacturing the explosive

22   device.

23   Q    Can you describe how the device was constructed?

24   A    So the one I assisted in helping, we had dumped gun powder

25   into that jar filling it almost up to the top.  I put the cap

1    on it, poked a hole in the top, stuck a wick inside of it and

2    then wrapped it up in duck tape to keep everything together.

3    Q    And what did you do with it?

4    A    We stuck it inside of a dryer that was at the end of the

5    shooting range, lit the fuse and tried to detonate it.

6    Q    Did it work?

7    A    It didn't work.  It just made a gigantic smoke cloud.

8    Q    Afterward -- after that first try did you discuss why it

9    might not have worked?

10   A    Because there wasn't enough --

11   Q    Well, first off, who did you discuss that with?

12   A    With Croft and Harris.

13   Q    Okay.  What was the nature of the discussion?

14   A    We discussed that there wasn't enough strength in the

15   container to build up enough pressure to make a sizable

16   explosion.

17   Q    Did you try again?

18   A    We did.  Yes.

19   Q    And have you looked at video of yourselves trying to make

20   this device?

21   A    I have.  Yes.

22   Q    Did that accurately represent what you saw that day and

23   what you did?

24   A    Yes.

25                MR. KESSLER:  I'd like to play Government's Exhibit

1    98.1, Your Honor.

2            THE COURT:  Objection?

3            MR. BLANCHARD:  No.

4            THE COURT:  It's admitted.

5            (Video started, 9:35 a.m.)

6            (Video stopped, 9:35 a.m.)

7            (Video started, 9:35 a.m.)

8            (Video stopped, 9:35 a.m.)

9    BY MR. KESSLER:

10   Q    And 98.2, you reviewed another video of what happened a

11   little bit later?

12   A    Yes.

13   Q    Okay.  Also an accurate representation of what you were

14   doing right there?

15   A    Yes.

16           MR. KESSLER:  I'd like to play 98.2, Your Honor.

17           THE COURT:  All right.  It's admitted.

18           (Video started, 9:36 a.m.)

19   BY MR. KESSLER:

20   Q    And who is that walking down the road?

21   A    That's Barry Croft and Dan Harris walking down to place the

22   device in the washer.

23           (Video stopped, 9:37 a.m.)

24   BY MR. KESSLER:

25   Q    Okay.  Now, by this time in the training had you heard

1     Mr. Fox talking to other people about the kidnapping plot

2     again?

3     A    Yes.

4     Q    And tell us what he said and to whom?

5     A    It was the remainder of the group.  So it would have been

6     Brandon Caserta, Kaleb Franks, Dan Harris, Dan Chappel, myself,

7     Paul Bellar.  It was our group.  There was some Wisconsin

8     individuals around as well, but it was at the time when we were

9     setting up the shoot house he said that, you know, we were

10    making this shoot house to simulate the inside of a building

11    and that we need to prepare ourselves for basically a plan of

12    action.

13    Q    So you mentioned Mr. Caserta and Mr. Harris.  Was he also

14    talking to Mr. Croft?

15    A    Croft was there as well.

16    Q    Did any of them object?

17    A    Nobody objected.

18    Q    Did you see their reaction?

19    A    Everybody was still nodding in agreement.

20    Q    Okay.  Now, you mentioned earlier about the plan being

21    storming the Capitol.  Was there a discussion about the

22    feasibility of actually pulling that off?

23    A    There was.  We talked about the feasibility of it a couple

24    times, and in the end we all came to the same agreement, that

25    it wasn't really feasible to use the Capitol as a site for the

1    kidnapping or anything like that.  That we'd have to find

2    another location.

3    Q    Okay.  Now, you mentioned that the first time you actually

4    met Mr. Croft was at the restaurant before the training, is

5    that right?

6    A    That's right.

7    Q    Can we put up Exhibit 88?

8         Do you recognize the restaurant here?

9    A    I do.  Yes.

10   Q    Is that the place where you met Mr. Croft for the first

11   time?

12   A    Yes.

13   Q    Were you there for the conversation inside?

14   A    Yes.

15   Q    And do you recall who was sitting at the table with you?

16   A    It was myself, Dan Harris, Dan Chappel, Kaleb Franks, Paul

17   Bellar, Brandon Caserta.  Fox was at the table directly behind

18   us with his girlfriend.

19   Q    And have you listened to a recording of that conversation?

20   A    I have.  Yes.

21   Q    Did you recognize the voices?

22   A    I did.  Yes.

23   Q    As a matter of fact, this one is already in.  So I'd like

24   to play Exhibit 93, Your Honor.

25        I am going to ask you to comment on it.

1      THE COURT:  All right.

2      (Audio started, 9:39 a.m.)

3      (Audio stopped, 9:40 a.m.)

4  BY MR. KESSLER:

5  Q    So we just heard Mr. Harris talking about being ready when

6  the shit hits the fan.  Are you familiar with the term

7  Boogaloo?

8  A    Yes.

9  Q    What's the Boogaloo?

10 A    The Boogaloo is a movement that consists of multiple

11 political ideologies.  The foundation of it is basically we

12 need a second civil war, another revolution.

13 Q    Okay.  And did you all talk about things that might kick

14 off the Boogaloo?

15 A    Yes.

16 Q    How does the plan to kidnap the governor fit into that, if

17 at all?

18 A    The plan was for us to basically be the ignition to it, and

19 hopefully other states or other groups would follow suit.

20 Q    Is that the shit hitting the fan?

21 A    Correct.

22 Q    All right.  So this training was over on July 12th, right?

23 A    Right.

24 Q    And you all went back home afterwards?

25 A    Yes.

1    Q    Did you attend a meeting on July 18th in Peebles, Ohio?

2    A    Yes.

3    Q    What was the purpose of that meeting?

4    A    The Peebles, Ohio meeting was a followup of things that

5    were discussed at the first Ohio meeting and things discussed

6    in Cambria, Wisconsin.

7    Q    Do you remember who was there?

8    A    It was myself, Kaleb Franks, Dan Harris, Dan Chappel.  Fox

9    had showed up later.  Barry Croft was there, along with some

10   other groups from other states.

11   Q    Okay.  Can we put up Exhibit 111, please?  And if you can

12   just blow up the bottom four there?

13          Is says here, Gunny?

14   A    Correct.

15   Q    Is that you?

16   A    That's me.

17   Q    And then Harris?

18   A    Harris.

19   Q    That is Dan Harris?

20   A    Dan Harris, correct.

21   Q    Okay.  What did you discuss at this meeting?

22   A    The kidnapping the governor came up.  Some other plots were

23   discussed, one of them including fire bombing Michigan State

24   Police cars again.

25   Q    Who brought that up?

1    A    Barry Croft.

2    Q    What specifically did he say about fire bombing Michigan

3    State Police cars?

4    A    Barry Croft had wanted to attack the State Police

5    headquarters or wherever they kept the vast majority of the

6    State Police cars.  He wanted to attack that facility, fire

7    bomb it and destroy as many police cars as possible to stop,

8    you know, a quick response from State Police.

9    Q    And what else, if anything, did Mr. Croft propose to fund

10   the cause?

11   A    At that meeting Croft had proposed committing a series of

12   robberies to generate funding for firearms or whatever else we

13   needed to use in the plot.

14   Q    Now, you mentioned earlier in your testimony that you all

15   had proposed a couple of different things, vacation home, the

16   Capitol.  What did Mr. Fox at this meeting talk about?

17   A    Fox had mentioned that the vacation home out of all the

18   other places we discussed would be the easiest to go for.  It

19   was in a lesser populated area.  It was kind of isolated.

20   There were multiple ways to get to it and multiple ways to get

21   away from it.

22   Q    And was he discussing that at the meeting in front of

23   Mr. Harris and yourself?

24   A    Correct.

25   Q    And Mr. Croft?

1    A    Correct.

2    Q    Okay.  And how did they react?

3    A    Everybody was nodding in agreement.  There aren't any

4    objections.

5    Q    Okay.  Did you attend a meeting on July 23rd at

6    Mr. Harris's house in Lake Orion?

7    A    I did.  Yes.

8    Q    And what was the purpose of that meeting?

9    A    The purpose was to touch base with some of the other more

10   committed members of the group to bring them up to speed on

11   what had transpired the last couple of weeks in Cambria and in

12   Peebles.

13   Q    And do you remember who attended that meeting with you?

14   A    Yes.  It was Dan Harris, Kaleb Franks, Dan Chappel, Jerad

15   Beauchesne, Max Wyckoff, Josh Miller, Alex Davidson and myself.

16   Q    And Josh Miller again was the one who went by what?

17   A    Purple J.

18   Q    Purple J.  Okay.  What did you discuss at the meeting?  Or

19   actually, I'm sorry, did you discuss the plans you discussed

20   earlier in Cambria?

21   A    Yes.

22   Q    Okay.  Did Mr. Harris give anybody any warnings there?

23   A    The warning was that at some point we are going to reach

24   the point of no return, meaning that once we went through with

25   whatever we were going to go through there was no turning back.

1    We wouldn't be able to return to our families.  There wouldn't

2    be living a normal life or anything like that.

3    Q    Did he ask anybody to leave the meeting or suggest anybody

4    should?

5    A    He suggested that if people didn't want to be a part of it

6    they could leave.

7    Q    Did anyone actually leave?

8    A    Nobody actually left.

9    Q    Did anybody object at all?

10   A    Jerad Beauchesne was the only one that objected to any of

11   the discussions.

12   Q    Okay.  Did you all discuss feds?

13   A    Yes.

14   Q    And who -- when you talked about feds, who were you talking

15   about?

16   A    Federal law enforcement.

17   Q    Okay.  What was the nature of the discussion?

18   A    The discussion was our growing concern that there may be an

19   informant in the group or we may be under some sort of

20   surveillance by federal law enforcement.

21   Q    Okay.  Do you remember from the discussion why people were

22   concerned about that?

23   A    Because we realized if we were caught doing what we were

24   doing that we would be arrested and prosecuted for it.

25   Q    Did Mr. Harris talk about explosives at all?

1    A    He did.  Yes.

2    Q    And particularly did he talk about anyone in particular in

3    that regard?

4    A    He did.  During a discussion about the explosives, we were

5    looking for someone to manufacture them for us, someone outside

6    of the group.  Harris had mentioned that he did have a bomb

7    maker he knew, and he identified the person as someone that was

8    missing three of their fingers because they were lost during

9    making an explosive device.

10   Q    Did he say how he knew this person?

11   A    I don't recall exactly how he knew him.  He just said he

12   knew him.

13   Q    Okay.  Do you remember the name of anybody involved in

14   that?

15   A    No.

16   Q    Okay.  Did you attend a field training exercise a few days

17   later on July 26th in Fowlerville, Michigan?

18   A    I did.  Yes.

19   Q    And whose residence is that?

20   A    It would have been Kaleb Franks' father's house I believe.

21   Q    Okay.  Who attended that one?

22   A    It was Dan Harris, Dan Chappel, Kaleb Franks, Brandon

23   Caserta, myself, Max Wyckoff, Josh Miller and Jerad Beauchesne.

24   Q    And can you describe the nature of that meeting?

25   A    At that meeting we performed some vehicle training using

1    Kaleb Franks' PT Cruiser to practice getting out of a vehicle

2    and shooting from a vehicle or running from cover to a vehicle

3    or vice versa, running from a vehicle to cover.

4    Q    Have you watched videos of that training?

5    A    I have.  Yes.

6    Q    Did they accurately reflect what you did that day?

7    A    They did.  Yes.

8         MR. KESSLER:  I'd like to offer 124, 125 and 126, Your

9    Honor.

10        THE COURT:  All right.  Any objections?

11        MR. BLANCHARD:  Are these the PT Cruiser videos?

12        MR. KESSLER:  Yes.

13        MR. BLANCHARD:  No objection.

14        THE COURT:  All right.  They are admitted.

15        (Video started, 9:48 a.m.)

16        (Video stopped, 9:49 a.m.)

17   BY MR. KESSLER:

18   Q    Okay.  If we can leave it up there for a second.

19        Is that you?

20   A    Yes.  It is.

21   Q    And who is this?

22   A    Kaleb Franks.

23   Q    And what was the purpose of this training?

24   A    The purpose was -- of this training was to sharpen our

25   skills on exiting a vehicle and shooting.

1    Q    Okay.  And why would you train for that?

2    A    In case law enforcement engaged us we wanted to be able to

3    get out of the vehicle and fire back or return fire if we were

4    being fired upon.

5    Q    And we all just saw you doing something where you kneeled

6    down but Mr. Franks was standing up.  What were you doing while

7    you were kneeling down?

8    A    I was kneeling down to reload.

9    Q    Why did you do it that way where you are kneeling down and

10   he is standing up?

11   A    So I could be covered and Kaleb Franks could be covering

12   me.

13   Q    By covering, what do you mean?

14   A    He is returning fire and I am reloading, and once Kaleb

15   Franks had to reload I would stand up, Kaleb Franks would go

16   down to reload, and I would cover him by returning fire.

17   Q    And why would you do it that way?

18   A    To make sure we had a constant stream of fire going at

19   whoever we were engaged with.

20   Q    And who did you plan to be engaged with again?

21   A    Law enforcement.

22   Q    Okay.  Can we play Exhibit 125, please?

23        Who was that, the last person we saw there?

24   A    There was Dan Harris in the background recording, and

25   then --

1                    (Video stopped, 9:51 a.m.)

2                    THE WITNESS:  And in the last shot it was Brandon

3      Caserta firing.

4      BY MR. KESSLER:

5      Q    Okay.  And you were there with Mr. Caserta?

6      A    I was there.  Yes.

7      Q    Training for the same thing as you?

8      A    Yes.

9                    MR. KESSLER:  And 126, please.

10                   (Video started, 9:51 a.m.)

11     BY MR. KESSLER:

12     Q    Is that Mr. Caserta again?

13     A    Yes.  It is.

14     Q    And who is on the other side?

15     A    That's Paul Bellar that got of the driver's side.

16                   (Video stopped, 9:52 a.m.)

17     BY MR. KESSLER:

18     Q    Mr. Caserta is also practicing that same skill, the

19     reloading while someone else covers?

20     A    Yes.

21     Q    Mr. Garbin, you also own property near Luther, Michigan,

22     right?

23     A    I do.  Yes.

24     Q    And around this same time in late July, what, if anything,

25     were you doing at your property in Luther?

1  A    In late July I began building a berm with some tires to

2  make a firing range.

3  Q    What was the purpose of that?

4  A    The firing range was for an upcoming training, somewhat

5  like the one in Cambria, Wisconsin.

6  Q    What was the purpose of the training supposed to be?

7  A    The purpose of the training was to further our skills in

8  preparation for kidnapping the governor of Michigan.

9  Q    Who helped you build the range on your property?

10  A    Kaleb Franks and Dan Harris helped me construct it.

11  Q    Okay.  Were you working on that on August 1st?

12  A    Yes.

13  Q    Have you watched a video of yourself working on that?

14  A    I have.  Yes.

15  Q    Did it accurately reflect what you were doing that day?

16  A    It did.  Yes.

17          MR. KESSLER:  Your Honor, I'd like to play

18  Government's Exhibit 130.

19          THE COURT:  All right.  Any objection?  Hear none it's

20  admitted.

21          (Video started, 9:53 a.m.)

22          (Video stopped, 9:53 a.m.)

23  BY MR. KESSLER:

24  Q    Who is that?

25  A    That's myself.

1    Q    And what are you driving?

2    A    My backhoe.

3    Q    Are you on that?

4    A    I do.  Yes.

5    Q    And why did you need to use a backhoe?

6    A    To level the dirt since where I was building the range it

7    was on a slight slope.

8    Q    Okay.  The range is pretty large then?

9    A    It was probably 30 feet by 30 feet.

10   Q    Okay.  We are going to continue with building in a second,

11   but on that same day, August 1st, did you go for a hike with

12   Mr. Harris?

13   A    I did.  Yes.

14   Q    All right.  Have you seen a photograph of yourself on that

15   hike that you and him took?

16   A    Yes.

17   Q    All right.  Did you recognize that as being from that trip?

18   A    Yes.

19   Q    Accurate representation?

20   A    Yes.

21          MR. KESSLER:  I'd like to put up Exhibit 462, Your

22   Honor?

23          THE COURT:  Any objections?

24          MS. KELLY:  No objection.

25          THE COURT:  All right.  It's admitted.

1     BY MR. KESSLER:

2     Q    Who is that in the hike there?

3     A    That is Dan Harris.

4     Q    Okay.  Who took in a picture?

5     A    I believe I may have taken the picture.

6     Q    Do you recall what you discussed on that hike?

7     A    No.  I don't think so.

8     Q    Okay.  Let's get back to the range you were constructing.

9     Were you still working on it August 7th and 8th?

10    A    Yes.

11    Q    Have you seen a picture of the range you had constructed?

12    A    Yes.

13    Q    Those are accurate?

14    A    Yes.

15         MR. KESSLER:  I'd like to put up Exhibits 135 and 136,

16    Your Honor?

17         THE COURT:  All right.  Any objections?

18         MR. BLANCHARD:  I'm sorry?

19         THE COURT:  135 and 136.

20         MR. BLANCHARD:  No.

21         THE COURT:  Okay.  It's admitted, or they are

22    admitted.

23    BY MR. KESSLER:

24    Q    All right.  Who is that?

25    A    That's me in the picture.

Q    And you are pointing at a bunch of tires.  What was the
purpose of the tires?

A    The tires we filled with sand.  So as we were shooting they
wouldn't fly off and injure an innocent bystander that might be
nearby.

Q    Where did you get them?

A    Kaleb Franks had a friend that worked at some sort of auto
repair shop.  They had a whole bunch of used tires out back.
So I used a U-Haul trailer to take them up a couple truckloads
at a time.

Q    And who helped you do that?

A    Dan Harris helped me.  Kaleb Franks helped when we were
loading the tires, and Solomon Clark helped one of the
afternoons when we were unloading the tires at my property.

Q    Can we put up 136, please?  All right.

     We are a little farther back now.  Can you describe
what we're looking at in this picture?

A    So that's the right side of the range, the left side of the
range, and then there is a retaining wall there at the back
that I had pushed dirt up to.

Q    So is that what you used the front-end loader for?

A    Correct.  I used the front-end loader to push that dirt and
level the ground in front of it as well.

Q    Okay.  And that was as a backstop?

A    Yes.

Q    All right.  So on August 9th, did you attend a field
training exercise in Munith?

A    I did.  Yes.

Q    So again, that was Joe Morrison and Pete Musico's place?

A    Correct.

Q    Who was at that meeting?

A    Kaleb Franks, Dan Harris, Dan Chappel, Adam Fox, myself and
Brandon Caserta.

Q    Okay.  What kind of training did you do there?

A    The training was to continue our vehicle -- vehicle
training.  So getting in and out of vehicles.  We constructed a
shoot house, and we did some medical training as well.

Q    Did Mr. Fox discuss kidnapping the governor again?

A    He did.  Yes.

Q    Was Dan Chappel there when he discussed kidnapping the
governor?

A    He was.  Yes.

Q    How about Steve Robeson?

A    Steve Robeson was not.

Q    Okay.  Can we put up Exhibit 141?

        So after the training on August 9th, did you have a
discussion and chat?  Do you recognize this?

A    I would have seen it.  Yes.

Q    Okay.  You are part of this group, right?

A    Correct.

1    Q    All right.  Can we blow up this statement first?

2         So who is Beaker?

3    A    Beaker is Dan Harris.

4    Q    And it says, laying in bed craziest idea.  Have one person

5    go to her house, knock on the door, and when she answers it

6    just cap her.  At this point fuck it.  Had you heard him

7    talking like that?

8    A    I've heard him talk like that prior.  Yes.

9    Q    All right.  Was anybody else suggesting something like that

10   or just Mr. Harris?

11   A    Just Mr. Harris.

12   Q    What did he say in the other discussions you had with him?

13   A    He just -- it was suicidal, kind of just someone or a group

14   of people just go kill her and then kill themselves afterwards.

15   Q    And did you have a chance to -- this is a discussion in

16   person, right?

17   A    Right.

18   Q    And you could observe his demeanor?

19   A    Yes.

20   Q    How would you describe it?

21   A    Calm.  He wasn't really showing a lot of emotion.  He

22   wasn't angry or happy about it.  He was just kind of -- kind of

23   a blank face when he was talking about it.

24   Q    Was he laughing?

25   A    No.

Q    Did he appear to be joking to you?

A    No.  He wasn't joking.

Q    Let's blow up this part down here.  He says, or just mug the pizza guy and take his shirt.  Either way if you all want to go after her just do it that way.  Pass your shit off and just take a pistol and like three rounds.  Had he discussed that plan, the pizza guy plan with you as well?

A    Not prior.  That was the first time he brought it up.

Q    Did you discuss it with him on any other occasions?

A    No.

Q    Okay.  On August 18th did something happen that caused people to get concerned about security?

A    Paul Bellar had moved, and when he had moved he had left a whole bunch of personal belongings behind.  One of the personal belongings being a notebook he kept all the group notes in along with code words we used.  When he left it behind Paul Bellar's old roommate had reached out to him and informed --

        MR. BLANCHARD:  I am going to object to foundation to all of this.  I think we are hearsay on hearsay.

        THE COURT:  So the question was setting up whether something happened that made people concerned about security I think was the word.  So why don't you break it down.  He said yes or really started talking about this.

        MR. KESSLER:  Yes was what I was looking for, Your Honor.

1          THE COURT:  Let's break it down so that we don't get

2     things in that shouldn't.

3          MR. KESSLER:  Yup.

4     BY MR. KESSLER:

5     Q    Did you discuss with the other Defendants about these

6     security issues?

7     A    We did.  Yes.

8     Q    Okay.  What was the nature of that discussion?

9     A    The discussion was that we needed to form a new group chat.

10    Q    Okay.  Why exactly did -- who did you talk with

11    specifically who is in the courtroom today?

12    A    Caserta, Fox and Harris.

13    Q    All three of them?

14    A    All three of them.

15    Q    And what did they say about their security concerns?

16    A    We were all concerned of being infiltrated by a federal

17    agent or a confidential informant.

18    Q    Okay.  And was there a discussion about having a meeting?

19    A    There was.  Yes.

20    Q    Tell us about that?

21    A    The discussion was to have a meeting at Harris's parent's

22    residence where we would all bring some form of identification

23    to prove basically who we actually were and that we weren't

24    some federal agent or a confidential informant.

25    Q    Did that meeting actually take place?

1    A    It did.  Yes.

2    Q    So let's move forward to August 23rd.  You mentioned

3    Harris's parent's place.  Is that Lake Orion?

4    A    Yes.

5    Q    And who actually attended the meeting?

6    A    Caserta, Kaleb Franks, Dan Harris, Dan Chappel, myself,

7    Alex Davidson and Solomon Clark were there as well.

8    Q    Was Adam invited?

9    A    I don't exactly recall if he was invited or not.

10   Q    Did he attend?

11   A    No.

12   Q    Okay.  And who actually brought forms of identification?

13   A    Everybody brought something of some sort.  I just brought

14   my driver's license.  Kaleb Franks had brought his old

15   identification wrist band from when he was incarcerated.

16   Caserta had brought pay stubs and his birth certificate, and

17   Dan Chappel had brought his DD214s from when he was discharged

18   from the military.

19   Q    From your discussions with the other Defendants, who was

20   the most concerned about being infiltrated by the federal

21   government?

22        MR. HILLS:  I would object.  Calls for speculation.

23        THE COURT:  He asked him from discussions, so if he

24   formed a conclusion about that he can say.  If he didn't I'm

25   sure he'll say he didn't form a conclusion about comparative

1    concern.

2    BY MR. KESSLER:

3    Q    Who was the most vocal about being concerned about this?

4    A    I would say at that meeting Caserta was the most vocal

5    about being concerned.

6    Q    What did he say?

7    A    He was very afraid of being infiltrated by FBI agents, and

8    then he also talked of basically --

9          MR. HILLS:  I am going to object.  I think he is

10   beyond the question.

11         MR. KESSLER:  I asked him what did he say?

12         THE COURT:  He can go forward.

13   BY MR. KESSLER:

14   Q    What did Mr. Caserta say?

15   A    He said that we need to shed the blood of tyrants.

16   Q    What did he want people to bring to prove their

17   identification?

18   A    He wanted a lot of things.  He originally asked for pay

19   stubs, driver's license, birth certificate, basically as much

20   as we could bring.  I wasn't going through all that.  I just

21   brought my driver's license with me and figured that would be

22   good enough.

23   Q    Did you all have a discussion about all those things at

24   this meeting?

25   A    We all reviewed each other's documents that were brought

1    and made sure that they looked real to us.

2    Q    And was there a discussion about accepting responsibility

3    for what you were doing?

4    A    There was.  Yes.

5    Q    Have you listened to a recording of that?

6    A    I have.  Yes.

7    Q    Do you recognize the voices?

8    A    I do.  Yes.

9    Q    The transcript was accurate?

10   A    Yes.

11        MR. KESSLER:  I'd like to play Government's Exhibit

12   167, Your Honor?

13        THE COURT:  Object?

14        MR. BLANCHARD:  I would object on the basis of

15   hearsay.  There is quite a lot from Mr. John Beauchesne.  I'm

16   not sure how to pronounce his name.

17        THE COURT:  I think it's the same ruling we had

18   earlier, so you can go ahead and admit.

19        (Audio started, 10:03 a.m.)

20        (Audio stopped, 10:04 a.m.)

21   BY MR. KESSLER:

22   Q    All right.  At the conclusion of this meeting did you all

23   discuss your electronic communications?

24   A    We did.  Yes.

25   Q    Tell the jury about that?

1    A    Dan Harris had brought up moving to an encrypted chat

2    called Threema.  He said that he's used it in the past and that

3    it's more secure than the Wire chat we were using at the time.

4    Q    Do you recall him saying it had any particular special

5    features?

6    A    One of the special features was Threema had some bounty out

7    that was $100,000 or something like that for anybody who could

8    crack their encryption.  Nobody had done it yet.

9    Q    Did he mention the ability to delete?

10   A    Yes.  We could also delete messages and prevent people from

11   taking screen shots inside the chats as well.

12   Q    So on August 27th, a few days later, did you continue to

13   work on the camp at Luther to prepare it?

14   A    I did.  Yes.

15   Q    Okay.  And on August 29th, do you recall learning about a

16   daytime surveillance trip?

17   A    I did.  Yes.

18   Q    Who invited you, if anyone, to go on that trip?

19   A    Adam Fox had extended the invitation to me to go on it, and

20   initially I declined.

21   Q    Was that a one-to-one thing?  Was he talking just you or

22   you and other people?

23   A    No.  It was the other people inside the group chat.

24   Q    Okay.  Which included who?

25   A    Kaleb Franks, Dan Harris, Brandon Caserta and the couple

1    other people that were close to Adam Fox.

2    Q    You say you declined?

3    A    I declined.  Yes.

4    Q    All right.  Was it because you weren't down with the idea?

5    A    No.

6    Q    All right.  Why did you decline?

7    A    I was busy.  Was going to be up north that weekend working

8    and I didn't have the time or the opportunity to go with them.

9    Q    Do you recall what the other people said?

10   A    No.

11   Q    Okay.  What did you learn from Mr. Fox about that daytime

12   surveillance?

13   A    I learned that the goal was to check out the marina, the

14   bridge where local law enforcement was, and how easy it would

15   be to get to and from the house.

16   Q    All right.  And did he tell you that he actually went?

17   A    He did.  Yes.

18   Q    And do you recall him talking about Mr. Chappel going on

19   that trip, too?

20   A    Yes.

21   Q    Okay.  Did you have a text or an e-mail -- I'm sorry, a

22   chat exchange with Mr. Chappel about that?

23   A    I did.  Yes.

24   Q    All right.  What was the nature of that?

25   A    I had reached out to Dan Chappel the next day or the day

1    after to ask him how the surveillance had went.  We exchanged

2    some chat messages about the possibility of taking out the

3    bridge to slow law enforcement.

4    Q    Okay.  And you had talked with Mr. Fox about that, right?

5    A    Right.

6    Q    Was Mr. Fox talking about that before you got that emoji

7    chat from Dan Chappel?

8    A    Yes.

9    Q    All right.  What exactly did Mr. Fox say to you about

10   taking out the bridge?

11   A    That it would slow the law enforcement response since the

12   police station was just on the other side of the bridge.  There

13   was no other local law enforcement nearby.  So taking out the

14   bridge would give us as much time as we needed to perform the

15   kidnapping.

16   Q    All right.  The daytime surveillance, what did Mr. Fox say

17   about it?

18   A    That it went -- it went well.  And that we do need to

19   follow up and do another one at some point.

20   Q    So Mr. Fox said you needed to do it again.  Did he talk

21   about doing it in the daytime or the nighttime?

22   A    At that time he hadn't specified.  Just said there needed

23   to be another surveillance.

24   Q    Okay.  So let's just fast forward to September 11th and

25   12th when everybody went up to your property.  Why did you

1    offer your property for the training?

2    A    It goes back to Cambria, Wisconsin.  We were looking for

3    the next place to host an event similar to the one that went on

4    in Cambria.  They had suggested someone's property in

5    Minnesota.  I came out and recommended that we use my property.

6    Q    Okay.  And we saw you guys training on a house that was

7    built out of the plywood, right?

8    A    Right.

9    Q    Did you do that again at your property?

10   A    We did, but I had modified it a little bit using fence

11   posts and tarps.

12   Q    And what was the purpose of this shoot house?

13   A    This shoot house was to again simulate entering a home, and

14   then I had added a couple more rooms onto it to simulate going

15   through the rest of a house.

16   Q    Okay.  Now, you had testified previously that the first

17   shoot house was kind of all purpose.  Could be for a Capitol or

18   anywhere else, right?

19   A    Right.

20   Q    Was this one more specific?

21   A    Yes.  This one was to be as close to an actual home

22   residence as we could get without having the blueprints.

23   Q    All right.  Did you discuss that with the Defendants here,

24   Mr. Caserta, Mr. Harris, Mr. Fox?

25   A    Yes.

Q    All right.  So you all talked about that?

A    Yes.

Q    And you all talked together about it being for what?

A    For the plan to kidnap the governor.

Q    So no question in your mind that everybody knew?

A    No question.

Q    Now, you had not actually seen the inside of the governor's house, right?

A    No.

Q    All right.  So how did you come up with the layout for the shoot house?

A    I was kind of just ballparking it.  I knew every house had a front door.  Every house had a living room.  Every house had a hallway, and then every house had a back door.  So I kind of set it up to where there was an entry, a large open space to simulate a living room, a doorway to one side to simulate a hallway, and then an exacted out the back to simulate a back door.

Q    Now, everybody -- we talked before about Cambria how there were other people there who were not part of your group?

A    Correct.

Q    Were there also people at your property at Luther who were not part of this plot?

A    Yes.

Q    Okay.  And what were they doing there?

A    They were just going through the motions with us.  A couple

of them did the shoot house.  Couple of them did the medical

training.  Some were involved with the conversations, but they

were more or less just hanging out.

Q    Okay.  Did you tell them about the actual purpose of what

you were doing?

A    I did not.  No.

Q    Did you hear Mr. Fox, Mr. Caserta, Mr. Croft or Mr. Harris

talk to them about the actual purpose?

A    I did not.  No.

Q    Did you discuss keeping it to yourselves?

A    Yes.

Q    Was there a discussion about going up north from there for

a nighttime surveillance?

A    Not at that time, but it was brought up later that Fox had

wanted to conduct a nighttime surveillance.

Q    Okay.  When you say it was brought up, did Mr. Fox tell you

that?

A    No.  Dan Chappel had approached me and said that Fox was

looking for some people to do a nighttime surveillance.  At

that time we hadn't discussed what it was for.

Q    All right.  Just to be clear, did you talk to Mr. Fox about

it later?

A    I did.  Yes.

Q    Okay.  And what did he say?

1    A    Fox had said later after we were all gathered together that

2    the plan was for one vehicle to go down the street to get

3    actual eyes on the house itself.  Another vehicle was going to

4    be a security car to patrol, and then the third vehicle we had

5    was going to go take a look at the bridge and the marina.

6    Q    Okay.  Let's talk about who knew that you were going to the

7    governor's house.  From your discussions that you heard among

8    the group here, who knew that you were going to the governor's

9    house?

10   A    Barry Croft, Adam Fox, Dan Chappel, myself, Kaleb Franks,

11   and Brian Higgins and Steve Roby.

12   Q    And in that discussion did you discuss why you were going

13   to the governor's house?

14   A    To perform a nighttime surveillance to see what the house

15   and the local area seemed like at night to prepare ourselves if

16   we had to perform the kidnapping in the dark.

17   Q    And why would it be important to see it at night versus

18   during the day?

19   A    The surroundings change at night.  It's a little bit harder

20   to see.

21   Q    Okay.  So before you all left Luther to actually go on this

22   nighttime reconnaissance, did you talk to Daniel Harris?

23   A    I did.  Yes.

24   Q    And was he invited to go on the nighttime surveillance?

25   A    He was.  Yes.

1    Q    All right.  Did you talk to him just you and him?

2    A    Yes.

3    Q    Tell us about what he looked like when you talked to him?

4    A    At the time I had talked to him Dan Harris had been so

5    drunk that he could barely stand up.

6    Q    Okay.  Did he go along on the trip?

7    A    He did not.  No.

8    Q    Did you ask him if he wanted to go?

9    A    I did.

10    Q    What did he say?

11    A    He said he wasn't feeling it.

12    Q    Okay.  By not feeling it did he expand on that?  Did he say

13    anything like, I don't agree with this?

14    A    No.

15    Q    All right.  What did he say exactly?

16         MS. KELLY:  Objection.  Asked and answered.

17         THE COURT:  Well, we can see if this witness

18    remembers.  I think the first time around it was more what

19    Mr. Kessler thought.  So let's see if he remembers what

20    Mr. Harris said.

21    BY MR. KESSLER:

22    Q    You recall exactly what he said?

23    A    He said, I am not feeling it.  I asked him if he wanted to

24    go on a nighttime surveillance and he said, no, I'm not feeling

25    it.

1    Q    Okay.  How about Mr. Caserta, did you talk to him?

2    A    No.

3    Q    Had he been invited?

4    A    He wasn't invited by myself.  I went looking for him when I

5    was inviting Harris, but I couldn't find Caserta anywhere.

6    Q    All right.  Did you see him at all?

7    A    Not until the next morning.  No.

8    Q    So before you all left Luther to go do the nighttime

9    surveillance, did you change clothes?

10   A    I did not.  No.

11   Q    Did you see anybody else change clothes?

12   A    Not that I saw.  No.

13   Q    Okay.  I mean, I am not asking if you actually saw them

14   change clothes, but did you see anybody -- what had you been

15   wearing up until then?

16   A    I had been wearing my plate carrier and T-shirt, some jeans

17   and some hiking shoes.  I had just taken my plate carrier off

18   and put a sweatshirt on.  Nobody else had their bullet proof

19   vests or anything on.

20   Q    Okay.  Let me stop you for a second.  You said you were

21   wearing a T-shirt and jeans and your plate carrier, your

22   armored vest?

23   A    Yes.

24   Q    So when you took that off you are just wearing a T-shirt

25   and jeans, yes?

1    A    Yes.

2    Q    Were other people wearing camouflage outfits like combat

3    gear?

4    A    Not that I recall.  No.

5    Q    Okay.  When you left Luther do you remember anybody wearing

6    combat gear?

7    A    No.

8    Q    Did you have a discussion about that?

9    A    No.

10   Q    Okay.  Do you remember did Mr. Fox have a gun on him when

11   you left Luther?

12   A    He did.  Yes.

13   Q    What kind?

14   A    It was a Taurus I knew for sure.  I couldn't tell if it was

15   a G2 or a G3 model.

16   Q    Those are just two different varieties of pistol?

17   A    Correct.

18   Q    Are they both semiautomatic pistols?

19   A    Yes.  They were.

20   Q    Where did you go from Luther?

21   A    At Luther we went to a hotel in Big Rapids where we were

22   supposed to meet with Barry Croft and Steve Robeson.

23   Q    Did you meet with them there?

24   A    We did.  Yes.

25   Q    And where did you guys go from there?

1    A    From there we took two vehicles.  In my vehicle was myself

2    and Kaleb Franks and Brian Higgins.  In the second vehicle it

3    was Barry Croft, Steve Robeson, Dan Chappel and Red.  We took

4    those vehicles to a Walmart parking lot in Cadillac.

5    Q    Did you wait there for a while?

6    A    Yeah.  We were there for some time.  I am not sure how long

7    exactly.

8    Q    Okay.  And do you know why you were waiting?

9    A    We were waiting for Adam Fox to show up with the Null

10   brothers.

11   Q    When he showed up with the Null brothers, did you depart

12   from there?

13   A    We did.  Yes.

14   Q    Where did you go?

15   A    We went from there to a gas station and then to what looked

16   like a church parking lot next to the gas station.

17   Q    In what town?

18   A    The town was Elk Rapids.

19   Q    Okay.  Do you recall Mr. Fox talking to everybody then?

20   A    Yes.

21   Q    And what did he say?

22   A    At that time that's when Fox began giving the orders on

23   which vehicle was to perform which aspect of the recon.

24   Q    Okay.  What you mentioned earlier?

25   A    Yes.

1    Q    All right.  Did Mr. Fox say anything about a bridge?

2    A    He did.  Yes.

3    Q    What did he say?

4    A    He said that they were going to inspect the bridge for

5    proper placement for explosives.

6    Q    Did he leave first?

7    A    His vehicle left first.  Yes.

8    Q    All right.  What did he ask -- what, if anything, did he

9    ask the rest of you to do when he left?

10    A    He asked my vehicle specifically to wait 10 to 15 minutes

11    before leaving, that way they could inspect the bridge and then

12    make it to the other side of the lake the vacation home was on

13    so they could see if they could see us on the other side.

14    Q    Okay.  Now, the car that you were in when you finally left

15    there, who was in the car with you?

16    A    It was myself, Kaleb Franks and Brian Higgins.

17    Q    Do you recall anyone having a dash camera?

18    A    Brian Higgins had a dash camera.  Yes.

19    Q    And was it turned on?

20    A    Yes.

21    Q    Okay.  Why did you have a dash cam in the car?  Why did

22    Brian Higgins turn on the dash cam?

23    A    We had him turn on the dash camera so we could record what

24    we were doing.

25    Q    And why did you want to do that?

1    A    For future use.  That way we had a reference to go back and

2    see what the neighborhood looked like and what the surrounding

3    area looked like.

4    Q    All right.  You later learned that that recording came into

5    government hands, correct?

6    A    Correct.

7    Q    Have you had a chance to review that recording since then?

8    A    I have.  Yes.

9    Q    Did that accurately reflect what you all did that night?

10   A    It did.  Yes.

11        MR. KESSLER:  I'd like to introduce Government

12   Exhibits 242 and 243, Your Honor?

13        THE COURT:  All right.  Any objections?  Hearing none

14   they are admitted.  And before you play that, I don't know

15   where you are in terms of timing.  If there is any chance you'd

16   finish before a morning break within the next 10 minutes or so

17   I'll let you go.  If you are going to need a break anyway then

18   find a good one and let me know when it is.

19        MR. KESSLER:  We could take this break right now if

20   you'd like, Your Honor?

21        THE COURT:  Go ahead.  And you've got the dash cam set

22   up.  Go ahead and play that, and then if -- bring that to a

23   close and then maybe that's a good time for a morning break.

24        MR. KESSLER:  Yes, Your Honor.

25        242, please.

```
 1                       (Video started, 10:19 a.m.)

 2                       (Video stopped, 10:19 a.m.)

 3      BY MR. KESSLER:

 4      Q    Who is this?

 5      A    That is Brian Higgins.

 6      Q    And this?

 7      A    Kaleb Franks.

 8      Q    And this?

 9      A    In the back, myself.

10      Q    We heard ███.   What was ████?

11      A    ████ was supposed to be the address of the governor's

12      vacation home.

13                  MR. KESSLER:  Okay.  Can we play 243, please?

14                       (Video started, 10:20 a.m.)

15                       (Video stopped, 10:22 a.m.)

16      BY MR. KESSLER:

17      Q    So we heard you call -- the people in the car calling out a

18      bunch of different numbers.  Were you reading off the houses as

19      you passed them?

20      A    Yes.

21      Q    Were you having some trouble finding it?

22      A    We were.  Yes.

23      Q    Were you getting nervous?

24      A    A little bit.  Yes.

25      Q    What were you nervous about?
```

1    A    Law enforcement detecting us.

2             MR. KESSLER:  I think this is a good time to stop,

3    Your Honor.

4             THE COURT:  All right.  So we'll take our morning

5    break and come back, then, in 20 minutes.

6             LAW CLERK:  All rise.

7             THE COURT:  You know what, before we do that, why

8    don't we let the marshals take Mr. Garbin out first and that'll

9    be easier for us to disembark on our own after that.  Okay.

10   Now we can go ahead.

11            LAW CLERK:  All rise.

12            (Jury out, 10:23 a.m.)

13            THE COURT:  About 20 minutes.  Okay.  See you in 20.

14            LAW CLERK:  Court is in recess.

15            (Recess taken, 10:23 a.m.)

16            (Resume Proceeding, 10:49 a.m.)

17            (Jury in, 10:49 a.m.)

18            LAW CLERK:  Court is in session.

19            THE COURT:  All right.  Welcome back everyone.  We are

20   all set with Mr. Garbin back on the stand and Mr. Kessler

21   continuing his direct.  Whenever you are ready.

22            MR. KESSLER:  Thank you, Your Honor.

23   BY MR. KESSLER:

24   Q    So Mr. Garbin, when we left off before the break we saw the

25   dash cam video?

1    A    Correct.

2    Q    Do you recall that?  Okay.  Now, again, what was your car

3    tasked with doing?

4    A    My car was tasked with finding the vacation home first, and

5    then once it was located we were supposed to flash a light into

6    the sky.  That way Fox's vehicle on the other side of the lake

7    could locate it.

8    Q    And where exactly did Mr. Fox say he was going to be to

9    look for that?

10   A    There was supposed to be a boat launch or something on the

11   other side of the lake he was going to be at.

12   Q    Did you, in fact, flash your lights?

13   A    I did.

14   Q    And were you in communication with Mr. Fox?

15   A    I was.

16   Q    Okay.  And could you hear who was on the other end of that

17   line?

18   A    Yes.

19   Q    Who was it?

20   A    I could also hear Barry Croft and Steve Robeson in the

21   vehicle as well.

22   Q    Okay.  And when you flashed the lights what, if anything,

23   did Mr. Fox say?

24   A    They said they couldn't see it, so we continued to flash

25   our lights.  He still couldn't see it.  I stuck a flashlight

1    out the window and shined it in the sky, and he said that was

2    good enough.  So we continued to the end of the street and

3    turned around and went back to the original meeting place.

4    Q    When you say the original meeting place, where was that?

5    A    It was the VFW hall or church right next to the gas

6    station.

7    Q    Back in Elk Rapids?

8    A    Correct.

9    Q    Okay.  And where did you go from there?

10   A    From there Fox climbed into -- well, I climbed into the

11   vehicle with Fox, Dan Chappel and Red.  Kaleb Franks was with

12   me.  That vehicle returned to my property in Luther.  Barry

13   Croft got back into my original vehicle with Steve Robeson.

14   They went back to Big Rapids.

15   Q    Okay.  Now, let's just talk about back at Luther, because

16   that's where you are, right?  Did you talk with some other

17   people back at the camp at Luther?

18   A    We did.  Yes.

19   Q    And you talked about this nighttime recon specifically?

20   A    Yes.

21   Q    Who did you talk with?

22   A    When we approached there was some people drinking under the

23   tent.  It was Dan Harris, Alex Davidson, and a few other people

24   that were there at the training that day.

25   Q    Now, Dan Harris didn't go on the nighttime recon with you,

1    correct?

2    A    No.

3    Q    Did he talk about it when you guys met back up there?

4    A    When we met back up there we told him where we were and

5    what we were doing, and Dan Harris said that he wished he would

6    have went.

7    Q    How about Brandon Caserta, did you see him that night?

8    A    I did not see him the rest of the night.

9    Q    Okay.  Did you see him the next morning?

10   A    I did.  Yes.

11   Q    Did he tell you what he was doing that night?

12   A    He was also excessively drinking and had passed out

13   somewhere.

14   Q    Okay.  So now you guys talked about the surveillance, you

15   and Fox, is that right?  Do you recall some of the conversation

16   being recorded?

17   A    Yes.

18   Q    Okay.  Have you listened to a recording of that

19   conversation between you and Mr. Fox that night?

20   A    Yes.

21   Q    Was it accurate?

22   A    Yes.

23         MR. KESSLER:  I'd like to play Government's Exhibit

24   244?

25         THE COURT:  All right.  Any objections?  Hearing none,

1    244 is admitted.

2              (Audio started, 10:53 a.m.)

3              (Audio stopped, 10:53 a.m.)

4              THE COURT:  You are going to have to reboot.

5              (Audio started, 10:53 a.m.)

6              (Audio stopped, 10:53 a.m.)

7    BY MR. KESSLER:

8    Q    We can leave that up for a moment.  We see Mr. Fox said,

9    anymore would be compromising, dude.  The neighbors will start

10   something.  Do you recall that conversation?

11   A    I do.  Yes.

12   Q    What were you worried about?

13   A    We were worried that our multiple trips down the road would

14   get noticed by the neighbors and that they would call the

15   police on us.

16   Q    And we hear Mr. Croft say, but I would say if they are

17   masking the address it's definitely her.  Do you recall that

18   conversation?

19   A    I do.  Yes.

20   Q    What did you all mean by mask the address?

21              MR. BLANCHARD:  I would object as to speculation as to

22   what my client --

23              MR. KESSLER:  I'm asking if he understood.

24              THE COURT:  Let him finish his objection.

25              MR. BLANCHARD:  I think that words are -- the

1    interpretation is for the jury.

2          THE COURT:  All right.  So I think you can ask him if

3    he had an interpretation of what it meant at the time and if

4    so, what it was.

5    BY MR. KESSLER:

6    Q    What did it mean to you at the time?

7    A    So the address we were given by Fox started with a 7.  We

8    couldn't locate any address that started with a 7 on that

9    street.  So we were talking about the possibility that someone

10   had altered the address because they had caught on to us and

11   they were trying to mask it for security reasons for the

12   governor.

13   Q    To hide her actual address?

14   A    Correct.

15   Q    Do you recall hearing Mr. Fox and Mr. Croft talk about Lake

16   Michigan?

17   A    Yes.

18   Q    All right.  Tell us the nature of that discussion?

19   A    The nature of that discussion was it was mentioned that we

20   could take the governor, take her out on a boat, out in the

21   middle of Lake Michigan, remove the engine and leave her

22   stranded for someone to have to go rescue her.

23   Q    Do you recall listening to a recording of yourself and that

24   includes Mr. Croft talking about the big lake?

25   A    Yes.

1    Q    Is that an accurate rendition of what you heard that night?

2    A    It is.  Yes.

3    Q    And the transcript as well?

4    A    Yes.

5         MR. KESSLER:  Okay.  Actually, I think this one is

6    already in so I'd like to play Government Exhibit 251.

7         THE COURT:  Right.  I show it as admitted.  Go ahead.

8         (Audio started, 10:55 a.m.)

9         (Audio stopped, 10:56 a.m.)

10   BY MR. KESSLER:

11   Q    We heard you at the beginning of that recording saying that

12   it would be loud?

13   A    Yes.

14   Q    What were you concerned about?

15   A    I was concerned that using a smaller boat on the little

16   lake that the vacation home was seated on would make too much

17   noise and it would alert the surrounding residents.

18   Q    Okay.  And in the middle here Mr. Robeson says, I'm just

19   going to say this now then, too, because -- and he says pretty

20   loud, because now that everybody is paying attention to this.

21   You saw everybody there.  You were altogether.  Right?

22   A    Correct.

23   Q    Was anybody paying attention to Mr. Robeson?

24   A    No.

25   Q    All right.  So let's go to the next morning, Sunday,

1   September 13th.  Did the exercise continue that day?

2   A    They did.  Yes.

3           MR. KESSLER:  We are going to do this, Your Honor.

4   Because he is handcuffed I am going to try and do just showing

5   him something on the screen here.

6           THE COURT:  All right.

7   BY MR. KESSLER:

8   Q    I am going to show you what's been marked as Government's

9   Exhibit 134 for identification.  It's going to show up on the

10  screen.  Do you recognize that photograph?

11  A    I do.  Yes.

12  Q    And the next page.  There is four pages.  That one as well?

13  A    Yup.

14  Q    And the next one?

15  A    Yes.

16  Q    And the next one?

17  A    Yes.

18  Q    Okay.  Are those all accurate renditions of your property

19  in Luther?

20  A    Yes.

21          MR. KESSLER:  I'd offer Government's Exhibit 134, Your

22  Honor?

23          THE COURT:  Any objections?  Hearing none, 134 is

24  admitted.

25  BY MR. KESSLER:

1    Q    Let's go to the first page.  Okay.  So you had some actual

2    training on Sunday?

3    A    Yes.

4    Q    Okay.  What part of your property are we looking at here?

5    A    This would be one of the low areas.  From right here it

6    looks like it's taken from near the neighbor's camper trailer.

7    So I have three separate parcels.  Two are connected, and then

8    I have a neighbor in between my two parcels and my third

9    parcel.

10   Q    Okay.  We see a trailer over here.  Whose is that?

11   A    That would be the neighbor's trailer.

12   Q    And what's over here?

13   A    That looks like the neighbor's trailer as well.

14   Q    So yours is in the middle?

15   A    Mine would be further up the road to the right.

16   Q    Okay.  Up this way?

17   A    A little bit more to the right.

18   Q    That one?

19   A    Up that road is where my trailer would be located.

20   Q    All right.  Can we go to the next page, please?  What are

21   we looking at here?

22   A    Here is a picture of it's right about the property

23   boundary.  Those shipping containers are my neighbors as well,

24   and then if you go further down the path to the left that's

25   where I have my shipping containers, my tractor and a sawmill.

1    Q    So down this path here?

2    A    Yup.  Right down that path.

3    Q    All right.  Can we go to the next page, please.

4         And what's this?

5    A    This is a view of the shooting range after it was used.

6    Q    Okay.  And then the last page, please?

7    A    This is a view of where the explosive device was set off on

8    Sunday.

9    Q    Okay.  Now, is this parcel -- we've heard about the

10   explosive device already, so let me just ask about this.  Is

11   this what we are looking at actually part of your parcel?

12   A    No.  It is not.  This is state land.

13   Q    All right.  And do you know why the explosive device was

14   set off on state land instead of your parcel?

15   A    I had told Croft that I didn't want any explosive devices

16   to be set off on my property, and that if he wanted to do it

17   that he would have to go somewhere else, so they decided to go

18   back onto the state land.

19   Q    Okay.  And you've seen where this was where the explosion

20   was set off?

21   A    Yes.

22   Q    Can you show us by touching the screen, like, where on that

23   property the explosion was set off?  So that's the yellow dot

24   right there by that broken tree?

25   A    Right.  So it was originally set inside the tree, but it

1     had fallen to the ground directly below the tree where it

2     finally went off.

3     Q    All right.  Now, let's talk about the live fire exercises

4     and your discussion before this.

5            THE COURT:  Before you go to that, my exhibit list

6     shows 134 as a video, and we just saw still pictures.  I want

7     to make sure --

8            MR. KESSLER:  We originally -- I'm sorry.  We

9     originally had a video fly through like we've seen before.  It

10    was a little unwieldy.

11           THE COURT:  I wanted to make sure for my records then.

12           MR. KESSLER:  Yes, Your Honor.  Thank you.

13           THE COURT:  Go ahead.

14    BY MR. KESSLER:

15    Q    So around noon did you all gather up to talk?

16    A    We did.  Yes.

17    Q    All right.  And do you remember where it was on the

18    property?

19    A    It would have been maybe 30 yards down the path from my

20    trailer.  Just far enough it would be out of hearing of anybody

21    else that wasn't a part of the conversation.

22    Q    Why did you go somewhere else to be outside of some

23    people's hearing?

24    A    We didn't want anybody not in our inner circle of the plan

25    to be eavesdropping on any of the conversations we were having.

1    Q    So who was included in the conversation?

2    A    The conversation was Brian Higgins, Barry Croft, Adam Fox,

3    Brandon Caserta, Dan Harris, Kaleb Franks, myself and Steve

4    Robeson, and then there was Dan Chappel and Red.

5    Q    Okay.  And at the time you didn't know Red was an FBI

6    agent?

7    A    I did not.  No.

8    Q    Did you discuss the nighttime reconnaissance from the last

9    night?

10   A    We did.  Yes.

11   Q    Mr. Caserta we heard did not go along with you, correct?

12   A    Correct.

13   Q    Did he ask for anything?

14   A    We gave him a rundown of what went on the night prior.

15   Everything that went on and what we were able to find around

16   the vacation home and what we came up with plan wise.

17   Q    Was he asking for -- was he asking any questions?

18   A    Not any particular questions that I recall.

19   Q    Okay.  But you weren't talking directly to him, correct?

20   A    Correct.

21   Q    Did he say anything like, I don't want to be any part of

22   this?

23   A    No.

24   Q    How did he react?

25   A    He was nodding in agreement with what we said, but there

1    weren't any objections.

2    Q    Okay.  Did you discuss the possibility of Governor Whitmer

3    becoming a part of the cabinet, President Biden's cabinet?

4    A    We did.  Yes.

5    Q    Tell us about that discussion?

6    A    There was a concern that Joe Biden would have selected

7    Gretchen Whitmer as one of his cabinet members, and we were

8    discussing that if that was done whether her security detail

9    would increase from being State Police Troopers and state law

10   enforcement to being federal secret service agents.

11   Q    And we listened to a recording yesterday of you all talking

12   about that.  Do you recall that discussion?

13   A    I do.  Yes.

14   Q    Okay.  What was your contribution?

15   A    My take on it was I had said that I had encountered a lot

16   of secret service details while being at the airport and that

17   they normally arrive six to eight people in a black SUV, and

18   there is multiple SUVs.

19   Q    Do you recall Mr. Croft adding anything about how to deal

20   with those kind of convoys?

21   A    He did.  Yes.

22   Q    What did he say?

23   A    He had said that in his job as a trucker that he has driven

24   some of those details off the road.

25   Q    Okay.  And did he talk about using weapons at all?

1    A    He did.  Yes.

2    Q    What did he say?

3    A    He said that we'd have to use some sort of antipersonnel

4    device because the vehicles would be armored.

5    Q    What sort of antipersonnel device?  Was he specific?

6    A    He was referring to the grenade launcher he had attached to

7    his AR-15.

8    Q    All right.  So do you recall being shown a video of

9    explosives by Red?

10   A    I do.  Yes.

11   Q    All right.  And who was sitting there with you when that

12   was showed to you?

13   A    It was myself, Dan Chappel, Kaleb Franks, Dan Harris and

14   Adam Fox.  I don't recall if Barry Fox was nearby when I

15   watched the video.

16   Q    I think you just said Barry Fox?

17   A    I'm sorry.  Barry Croft.

18   Q    Croft.  Okay.  And what was everyone's reaction?

19   A    Adam Fox was very excited with the result of the video.  I

20   was impressed myself with the size of the explosion, too.

21   Q    Do you recall Red saying something about how much it would

22   cost?

23   A    He gave us a price range, which was somewhere around three

24   or four thousand dollars for a device big enough to destroy the

25   bridge.

1    Q    And do you recall Mr. Fox addressing the rest of the group

2    about that later?

3    A    Yes.

4    Q    Okay.  I'd like to play Exhibit 264, and then I'm going to

5    ask you a couple of questions about it.

6             (Audio started, 11:05 a.m.)

7             (Audio stopped, 11:06 a.m.)

8    BY MR. KESSLER:

9    Q    All right.  So we hear Mr. Fox there saying, we need four

10   grand to be able to do what we want to do?

11   A    Correct.

12   Q    You understood what you wanted to do?

13   A    Yes.

14   Q    What was it?

15   A    That was purchasing an explosive to destroy the bridge.

16   Q    All right.  And you mentioned some of the people who were

17   there, including Mr. Harris and Mr. Fox.  How did they react to

18   that?

19   A    They were in agreement.

20   Q    We also hear Mr. Fox talking about being opportunistic.

21   What do that mean?

22   A    At that point we had realized that we couldn't set a

23   specific date to carry out the kidnapping plot because we

24   didn't know when she would be at her residence, so we needed to

25   make ourselves available to carry it out at any time.

Q    And we hear Mr. Fox say to that, it's going to be when the
asset arrives there.  Boom.  We got to go.  Who is the asset?

A    The asset would be the governor.

Q    And you just mentioned that you didn't know when she'd be
there.  Mr. Fox said, that's another key reason why we need
f-ing, like, local intel.  What kind of local intel did you all
discuss getting?

A    He wanted to try and get just neighborhood people to kind
of tell us when people would come and go.  One of the plans
that came up was us posing as realtors looking for investment
properties to have a reason to go from, you know, door to door,
talk to locals without looking suspicious.

Q    And we hear Mr. Fox talking about pooling money for
explosives.  Did you all have an exact agreement on how much
each person would chip in?

A    No.  We didn't have an exact agreement on each person.  We
just knew that we'd have to come together and raise the money
some way somehow.

Q    From your discussions with everybody who was up there that
weekend, let's take them individually.  From your discussions
with Mr. Harris, was he in agreement?

A    He was in agreement to raise funds.  Yes.

Q    And Mr. Croft?

A    Yes.

Q    And Mr. Caserta?

1    A    Yes.

2    Q    All right.  So let's move onto after the training a little

3    bit later.

4            Can we bring up Exhibit 266?

5            I want to focus your attention on September 17th, a

6    few days after your training.  Do you recall being invited by

7    Pete Musico to participate in a protest?

8    A    Yes.

9    Q    Okay.  You recall this conversation?

10   A    I do.  Yes.

11   Q    Okay.  Would you just blow up the box, please?

12           So Gunny is you, right?

13   A    Correct.

14   Q    And you said, I would highly advise minimizing any

15   communication with him.  Also, there needs to be zero, and I

16   mean zero, public interaction if we want to continue with our

17   plans.  You recall that?

18   A    I do.  Yes.

19   Q    Okay.  What were your plans?

20   A    The plan was to kidnap the governor of Michigan.

21   Q    What did you think would happen if you went out and did

22   armed protests?

23   A    Draw too much attention to ourselves.

24   Q    Okay.  And we see Debased Tyrant.  Who is that?

25   A    That is Brandon Caserta.

1   Q    He says, no more protests right now.  He is searching for

2   clout and is too hot for us to be associating with him at this

3   moment in time.  So the he is who that he is referring to?

4   A    He is referring to Pete Musico.

5   Q    And what did you see Pete Musico doing around this time?

6   A    Pete was live streaming on FaceBook whether just in his

7   vehicle or going to multiple protests trying to generate

8   awareness.

9   Q    Okay.  And being on somebody's live FaceBook thing to

10  generate awareness, would that interfere with your plans?

11  A    It would.  Yes.

12  Q    Two days later, on September 19th, did Mr. Fox propose

13  additional training?

14  A    Yes.

15  Q    Where did he want to do it?

16  A    He wanted to do it at the Vac Shack.

17            MR. KESSLER:  Can we bring up Exhibit 443, please?

18            THE COURT:  I don't show this as in yet.

19            MR. KESSLER:  It's not?  Okay.  I thought it was.  Can

20  we bring it up for just the witness, please?

21            MR. GIBBONS:  I'll stipulate.

22            MR. BLANCHARD:  I show it as admitted.

23            THE COURT:  All right.  Maybe I missed it.  If there

24  is no objections it's easy.  We'll just admit it.

25            MR. GIBBONS:  It was not yet.

1          MR. KESSLER:  Okay.  We can bring it up for everyone

2     then.  Thank you.

3     BY MR. KESSLER:

4     Q    If we can just blow up just -- maybe down to here.  Let me

5     clear that now.  Okay.

6          And Alpha F You is who?

7     A    That's Adam Fox.

8     Q    He says, I am going to get the basement of this store

9     cleared, and if anyone wants we can do a CQC training here

10    clearing this big ass building upstairs and down, work on

11    acquiring an asset and detaining for extraction.  Did you

12    understand what the asset was?

13    A    Yes.

14    Q    And what was extraction?

15    A    Extraction is removing that person from the building.

16    Q    Okay.  And Debased Tyrant, Mr. Caserta says, that sounds

17    pretty tight.  Slang maybe.  What did you understand tight to

18    mean?

19    A    Cool.

20    Q    Okay.  And then Mr. Fox says, we'll need all the reps we

21    can get.  Have six weeks till election and one week is FTX.  So

22    let's utilize these five weekends as best we can.  Did you all

23    in this group have discussions about the timing for the

24    extraction?

25    A    Yes.  The goal was to complete it before the presidential

1    election.

2    Q    And why was that?

3    A    We wanted to cause as much of a disruption as possible to

4    prevent Joe Biden from getting into office.

5    Q    Did it have to be before the election?

6    A    It didn't have to be.  It was just preferred.

7    Q    Okay.  And what about after the election?  What did you all

8    discuss about your chances after that?

9    A    That they would be slimmer because we had talked about the

10   governor possibly joining Joe Biden's cabinet staff.

11   Q    Okay.  So in the meantime, while you are doing reps and

12   getting ready, did you plan to make money?

13   A    Yes.

14   Q    Okay.  And did you and Mr. Harris and Mr. Franks also have

15   a plan to make some money on the side?

16   A    Yes.

17   Q    Tell us about that plan?

18   A    Kaleb Franks had a friend that he had served some time in

19   jail or prison with some time ago.  He said that friend was

20   looking for some weapons to make a quick buck.  We had bought

21   some AR-15 and Glock parts kits and completed manufacturing the

22   weapons at my house so we could sell them to this individual at

23   a marked up price to have some extra cash laying around.

24   Q    Okay.  I want to explain -- have you explain a couple of

25   things.  Why did you think that you'd be able to sell these

1     guns in a marked up price?

2     A     Because they had no serial numbers.

3     Q     Okay.  And you said this person was someone who had been in

4     jail with Kaleb Franks?

5     A     Correct.

6     Q     All right.  Did you understand it to be a felon?

7     A     Yes.

8     Q     And you seem to know a lot about guns.  Would that be a

9     problem?

10    A     It would.  It's illegal for a felon to possess or buy a

11    firearm.

12    Q     Did you all discuss how much you would be able to charge

13    this person?

14    A     We were looking for, it was, like, right around $4,000

15    total.

16    Q     Okay.  Now, you talked about guns without a serial number.

17    Did you refer to those with any specific shorthand?

18    A     Shorthand they are called ghost guns.

19    Q     Okay.  And why ghost guns?

20    A     Because they are not detectable so they would be considered

21    invisible like a ghost.

22    Q     Okay.  So not traceable --

23    A     Correct.

24    Q     -- with the serial number?  Gotcha.

25          Can we get Exhibit 297, please?

1          THE COURT:  I don't show that as in either.

2          MR. KESSLER:  It's a physical exhibit, Your Honor.

3          THE COURT:  Okay.  Thanks.

4          MR. KESSLER:  Maybe I can have Agent Chambers open the

5     evidence tag.  I can do it myself.

6          THE COURT:  Either way.  Do you have scissors?

7          MR. KESSLER:  May I approach, Your Honor?

8          THE COURT:  Sure.

9     BY MR. KESSLER:

10    Q    I understand you have your hands cuffed, Mr. Garbin.  I

11    will ask you to do the best you can.

12    A    Okay.

13    Q    I am handing him the bag, Your Honor.

14         Mr. Garbin, what do we have inside the bag?

15    A    So inside the bag is two postal boxes that contained the

16    lower portion of the Glock handguns we manufactured.

17    Q    Can you pull those out?  One will probably do for these

18    purposes.  Do you recognize that box?

19    A    I do.  Yes.

20    Q    And how do you recognize?

21    A    I had ordered the boxes, and then I had manufactured the

22    handguns once they were delivered in the mail.

23         MR. KESSLER:  I'd now offer Exhibit 297?

24         THE COURT:  Any objections?  Hearing none it's

25    admitted.

BY MR. KESSLER:

Q    Are there other items in the bag?  There is the actual thing that was inside the box, correct?

A    Yes.  So these items are the jigs used to drill the final holes into the lower portion of the handgun to make it a fireable firearm.

Q    Now, does it say something on the box about 80 percent?

A    Yes.

Q    Can you explain that to the jury?

A    So an 80 percent kit, whether it's for a handgun or an AR-15, by definition it's not considered a firearm yet, so it's not complete.

Q    Eighty percent complete?

A    Yes.

Q    Is that the idea?

A    Yes.  So you can order them on-line without any background check and then you do the remaining 20 percent of the manufacturing yourself to make it a usable firearm.

Q    Using those jigs for drilling?

A    Correct.

Q    So you mentioned two pistols.  What were you doing for part of this plan to raise money?

A    I was just doing it for some extra money and Kaleb Franks needed the know how, and I was usually the go-to one in the group for anything firearm related.

```
 1     Q    Was Daniel Harris involved in this plan?

 2     A    He was.

 3     Q    Can you tell the jury how he was involved?

 4     A    Daniel Harris was supposed to provide security for when the

 5     transaction was done.

 6     Q    And tell us how that was supposed to go down?

 7     A     It wasn't set in stone yet, but the idea was Kaleb Franks

 8     was more than likely going to pose as a pizza guy with the

 9     firearms in a pizza box.  He was going to go up to the door,

10     knock, step inside, exchange the box for money, and come out

11     and get in his vehicle and leave.  There would be one person

12     out back behind the apartment building and one person out front

13     to provide security if anything went wrong with Kaleb inside.

14     Q    And Daniel Harris was supposed to get how much of the money

15     from the profits?

16     A    We were going to split it equally three ways.

17     Q    Okay.  And were you there when this plot was discussed?

18     A    Yes.

19     Q    And was it discussed in front of Mr. Harris what the

20     purpose of it was?

21     A    Yes.

22     Q    So he knew it was to sell a firearm to a convicted felon?

23     A    Correct.

24     Q    A ghost gun?

25     A    Yes.
```

1    Q    Okay.  And on September 19th, did the three of you actually

2    go to Detroit?

3    A    Yes.

4    Q    What was the purpose of that trip?

5    A    The purpose was to get a layout of the area where the

6    transaction was going to be made.  That way we can figure out

7    who was going to be where when it came to the security detail.

8    Q    And Mr. Harris went with you, correct?

9    A    He did.  Yes.

10   Q    What did he do while you were on that trip?

11   A    Proposed different places to put somebody to watch the

12   apartment building.

13   Q    Did he talk about cameras at all?

14   A    Not exactly that I recall.

15   Q    Okay.  And September 21st did you have a chat discussion

16   with Mr. Harris?

17   A    Yes.

18            MR. KESSLER:  Okay.  Can we bring up Exhibit 272?

19            THE COURT:  It's in already?

20            MR. KESSLER:  It is, Your Honor.

21            THE COURT:  All right.

22   BY MR. KESSLER:

23   Q    I just want to bring up this part right here.

24            So Beaker was Mr. Harris, correct?

25   A    Yes.

Q    And he said, hey, so who would want to go to Maine to kill
an ex cop for a friend of mine and get her shit from him?  Did
you talk with Mr. Harris separately about killing a cop in
Maine?

A    Yes.

Q    What was that discussion about?

A    The discussion was that the friend of his had been dating
the cop or was married to the cop.  They had a bad break up.
He was abusive, and that he took most of her belongings with
him.  He wanted to go get retaliation for whatever he had done
to his friend and then get her belongings back from him.

Q    Okay.  Did you have a chance to observe his demeanor when
he said that to you?

A    Yes.

Q    Did he seem serious or joking?

A    He seemed serious.

Q    Murdering somebody is a pretty serious step.  Do you know
the context of why he would propose that?  Did he say why?

A    Just that it was because it had something to do with a
friend of his.

Q    Okay.  But he hadn't talked about murdering anybody
earlier, right?

A    No.

Q    Why was he saying it would be okay now?

A    It became a theme in the group that once we got further

1    along with the plot to kidnap the governor, we realized that we

2    were already breaking the law so it didn't matter if we broke

3    any other further laws.

4    Q    Did you all expect society to be intact at that point?

5    A    No.

6    Q    On October 2nd did you see a video that Mr. Fox posted of

7    himself with a taser?

8    A    Yes.

9             MR. KESSLER:  Can I play Exhibit 283 quickly?

10            (Video started, 11:20 a.m.)

11            (Video finished, 11:21 a.m.)

12   BY MR. KESSLER:

13   Q    Do you remember seeing that video?

14   A    I do.  Yes.

15   Q    Did you talk with Mr. Fox about this?

16   A    Yes.

17   Q    What did he say the taser was for?

18   A    The taser was for our kidnapping plot to help subdue the

19   governor when we actually got to her residence.

20   Q    Did he also talk about zip ties at all?

21   A    Yes.

22   Q    What did Mr. Fox say the zip ties would be for?

23   A    The zip ties would be for restraining the governor or

24   anybody else we had to restrain along the process.

25   Q    Okay.  Now, on October 7th you all were supposed to go pick

1    up some gear from someone named Red, is that correct?

2    A    Correct.

3    Q    Where was that going to take place?

4    A    That was going to take place in Ypsilanti, Michigan.

5    Q    That same day before you left for Ypsilanti, do you recall

6    Mr. Caserta posting videos about the police?

7    A    Yes.

8    Q    All right.  Do you recall from those videos what had

9    happened?

10   A    Yes.

11   Q    What did he say had happened to him?

12   A    He had said that he had been pulled over for some reason

13   and that he was basically robbed by the police because he was

14   fined.

15   Q    Have you had a chance to review those videos before we came

16   here to Court?

17   A    I have.  Yes.

18   Q    Are they the same videos that you saw back then on October

19   7th?

20   A    They are.  Yes.

21            MR. KESSLER:  Offer Government Exhibits 284 and 285,

22   Your Honor?

23            THE COURT:  Any objections?  They are admitted.

24            MR. KESSLER:  Play 284, please.

25            We'll just do 285, Your Honor.

1      THE COURT:  You are not offering 284?

2      MR. KESSLER:  No, Your Honor.

3      THE COURT:  All right.

4      (Video started, 11:22 a.m.)

5      (Video stopped, 11:22 a.m.)

6      (Video started, 11:22 a.m.)

7      (Video stopped, 11:24 a.m.)

8   BY MR. KESSLER:

9   Q   All right.  At the very beginning of that recording we

10  heard Mr. Caserta say, if this shit goes down.  Do you know

11  what he was referring to?

12  A   He was referring to whatever would happen after the

13  Boogaloo kicked off.

14  Q   And what was supposed to kick off the Boogaloo in your

15  plan?

16  A   The kidnapping plot.

17  Q   And he said, if we are doing a recon and we run into the

18  police, what kind of recon was he talking about?

19      MR. HILLS:  I am going to object.

20      THE COURT:  I think the same thing we had earlier.

21  You can ask him what he thought it meant if he formed a

22  conclusion about it at that point, not what Mr. Caserta had in

23  his mind since he didn't know.

24  BY MR. KESSLER:

25  Q   What did you think he meant?

1   A   I thought he meant that it would be another recon conducted

2   of the governor's vacation home.

3   Q   So later on October 7th you actually took a trip to

4   Ypsilanti, correct?

5   A   Correct.

6   Q   And what was your purpose in going on this trip?

7   A   My purpose was just tagging along to get some free gear

8   from Red.

9   Q   Okay.  And did you discuss this trip with Mr. Harris?

10   A   I did.  Yes.

11   Q   He actually rode to Ypsilanti with you?

12   A   Yes.

13   Q   And did you have a discussion about using group cash?

14   A   Yes.

15   Q   Tell the jury about this group cash.  Did you have a pool

16   for some reason?

17   A   Yes.  The group cash originally started for training

18   purposes.  Everybody that was going to be at the training, we

19   were trying to get everybody to chip in so we could buy

20   ammunition to use at training.  So he kept a constant pool of,

21   you know, a small amount of money.  That way we can buy

22   ammunition whenever we needed it.

23   Q   And we heard Mr. Fox saying earlier that everybody was

24   going to have to pitch in towards the $4,000?

25   A   Correct.

1  Q    What did Mr. Harris say about the group cash in that

2  regard?

3  A    He suggested using it, but the only problem he was running

4  into is that he wanted to get permission from everybody that

5  had contributed to the group cash before using it.

6  Q    But Mr. Harris said he wanted to use it for that?

7  A    Yes.

8  Q    All right.  And you all were arrested in Ypsilanti,

9  correct?

10  A    Correct.

11  Q    After your arrest where were you taken?

12  A    Initially Kent County Jail and then the next day we were

13  taken to Newago County Jail.

14  Q    And who, if anyone in this room, did you share a pod with

15  when you were first arrested?

16  A    Adam Fox.

17  Q    All right.  So you and him.  Was it just you and him of the

18  people in this room?

19  A    Correct.

20  Q    Did you talk with him about what had happened?

21  A    Yes.

22  Q    Now, specifically, I want to talk about the cash for the

23  bomb.  What did he say about that?

24  A    Adam Fox had informed me that he brought a couple hundred

25  cash with him as a good faith payment to Red, and that he had

1    another couple hundred dollars stashed away in a plastic gun

2    case in the basement in the Vac Shack.

3    Q    And did he tell you what he intended that money for?

4    A    The money was good faith payment towards the explosive

5    device we needed.

6    Q    Now, you are aware that after your arrest the FBI searched

7    your residence, your car, and your property in Luther, correct?

8    A    Correct.

9         MR. KESSLER:  Okay.  I'd like to show the Defendant

10   what's been marked as Government 296 for identification, Your

11   Honor.  I'm sorry.  I'd like to show the witness that.

12        THE COURT:  Oh, it's a physical exhibit?

13        MR. KESSLER:  Yes, Your Honor.

14        THE COURT:  I see.

15        MR. KESSLER:  The next five are physical exhibits.

16        THE COURT:  All right.

17        MR. KESSLER:  May I approach, Your Honor?

18        THE COURT:  Sure.  And why don't you recover the other

19   exhibit from him while you are at it, too.

20        MR. KESSLER:  I'll take that from you.

21   BY MR. KESSLER:

22   Q    Have a quick look at this, Mr. Garbin.  I am going to hand

23   it to you if you can hold it.  Do you recognize that?

24   A    I do.  Yes.

25   Q    What is it?

1      A    This is my personal AR-15.

2              MR. KESSLER:  Okay.  Offer that into evidence, Your

3      Honor.

4              THE COURT:  All right.  That's admitted.

5              MR. KESSLER:  And if I can publish this to the jury?

6      I'd like you to just explain a few of the features to them.

7              Can you hear me, Mr. Brandell?

8              THE WITNESS:  Okay.

9      BY MR. KESSLER:

10     Q    What do we have here?

11     A    That's just a red dot site.

12     Q    And what does that mean?

13     A    A red dot sight is just a type of scope.  So you have iron

14     sights, which were more mechanical.  The red dot sight has just

15     a little tube with a red dot in the middle for aim.

16     Q    Why would you use something like that?

17     A    For a blind person like me it makes it easier to aim and

18     shoot.

19     Q    Does it make anything else easier during a tactical

20     situation?

21     A    It makes your -- makes your shot placement more accurate.

22     Q    Okay.  And what do we have here on the front?

23     A    It's a forward pistol grip.

24     Q    What does that do?

25     A    Just makes the shooting of the rifle more stable.

1    Q   Okay.

2    A   It's easier to control.

3    Q   We have here a little squeeze button and it seems to be

4    attached by wire to a flashlight here.  How does that work?

5    A   The flashlight allows me to see when it's dark or in low

6    illuminated places.

7    Q   And why would you need that on your rifle?

8    A   If you are going through a house or outside in the dark

9    it's hard to see with your naked eyes.

10    Q   Okay.  And at the very end, if we look, we have something

11    here that's got threads on it like for screws.  Can you tell us

12    what that's for?

13    A   That's so I can attach a suppresser to the end of my rifle.

14    Q   And now you say a suppresser.  Everybody might not be

15    familiar with that.  What do you mean?

16    A   It's a silencer.

17    Q   Does it make it completely silent?

18    A   No.

19    Q   Does it make is more silent?

20    A   It does.  Yes.

21    Q   Why would you want to have a silencer on this rifle?

22    A   It reduces the noise so you can hear what's going on.  It

23    reduces noise so it's harder to detect where a shot is coming

24    from.  And it also almost eliminates the muzzle flash, so there

25    is no bright flashing light in front of you to make yourself

1    detectable.

2    Q    Would you say you spent a fair amount of money on making

3    these modifications to this rifle?

4    A    I have.  Yes.

5    Q    What was the purpose of this rifle?  What were you going to

6    use it for?

7    A    That rifle was going to be used in the kidnapping plot.

8         MR. KESSLER:  Okay.  I'd like to show the witness

9    what's been marked as Government's Exhibit 455 for

10   identification.

11        THE COURT:  455?

12        MR. KESSLER:  May I approach, Your Honor?

13        THE COURT:  Sure.

14   BY MR. KESSLER:

15   Q    I am now handing the exhibit to the witness.  Do you

16   recognize that, Mr. Garbin?

17   A    I do.  Yes.

18   Q    What is it?

19   A    This is my personal Glock 19 handgun.

20   Q    It is a semiautomatic pistol?

21   A    Yes.

22        MR. KESSLER:  Offer that into evidence, Your Honor?

23        THE COURT:  Hearing no objections it's admitted.

24   BY MR. KESSLER:

25   Q    I am now publishing to the jury.

1          What was the purpose of carrying a second gun, a

2     handgun, with you?

3     A    In case my AR-15 malfunctioned or I ran out of ammunition

4     for my AR-15 I would have a second firearm to use.

5          MR. KESSLER:  Okay.  I'd now like to show the witness

6     what's been marked as Government's Exhibit 300 for

7     identification.  Thank you.  Approach, Your Honor?

8          THE COURT:  Sure.

9     BY MR. KESSLER:

10    Q    This is pretty heavy, and the witness is handcuffed, so

11    I'll just hold it up.  Do you recognize this, Mr. Garbin?

12    A    I do.  Yes.

13    Q    What is it?

14    A    That is my bullet proof vest.

15    Q    Okay.  You recognize this as being yours?

16    A    I do.  Yes.

17         MR. KESSLER:  Okay.  I offer that into evidence.

18         THE COURT:  Hearing no objections that's admitted.

19    BY MR. KESSLER:

20    Q    I'll publish that to the jury.

21         I'd like to ask you about a couple of details.  Can

22    you see it from where you're sitting?

23    A    Yes.

24    Q    It's very heavy.  What's inside of it?

25    A    Inside of the front and back there are two armor plates

1    that are supposed to stop bullets from penetrating you.

2    Q    I'm going to do this quickly because I can't hold it up

3    anymore.  What are those made out of?

4    A    The ones I have right there are made out of some sort of

5    carbon ceramic mixture.

6    Q    Okay.  We see three pouches here in the front.  What are

7    these for?

8    A    Those are for carrying extra AR-15 magazines.

9    Q    So if you have one in your rifle -- in your experience with

10   your rifle, how many bullets would you have in your rifle and

11   the one loaded in the magazine?

12   A    Thirty.

13   Q    So this would be another 30, making 120 bullets?

14   A    Correct.

15   Q    And then we have this item here in the last pouch.  Do you

16   recognize that velcro?

17   A    Yes.  That's a tourniquet.

18   Q    And what would you would be carrying a tourniquet for?

19   A    In case you were shot or severely wounded in one of your

20   extremities you wrap it around it and cut off the blood flow.

21   Q    As I mentioned, this is very heavy.  Is it comfortable to

22   wear?

23   A    It takes a total on you after a while.

24   Q    Okay.  What did you intend to use this for?

25   A    In the process of the kidnapping.

1    Q    For what exactly?

2    A    In case we were shot at it would protect my vital organs,

3    like my lungs and heart, so it would help me survive better in

4    a fire fight.

5    Q    And be able to reload quickly?

6    A    Yes.

7    Q    And the tourniquet in case you were shot so that you

8    wouldn't bleed out?

9    A    Yes.

10        MR. KESSLER:  Okay.  I'd like to show the witness

11   what's been marked as Government's Exhibit 301 for

12   identification.  May I approach, Your Honor?

13        THE COURT:  Sure.

14   BY MR. KESSLER:

15   Q    Do you recognize that item, Mr. Garbin?

16   A    I do.  Yes.

17   Q    And I am going to show you over on this side.  On the

18   headphone what does it say in handwriting?

19   A    Gunny.

20   Q    Okay.  What is this item?

21   A    The helmet is a bullet proof helmet.

22   Q    Is it yours?

23   A    It is.  Yes.

24        MR. KESSLER:  I'd offer this into evidence, Your

25   Honor?

1           THE COURT:  Hearing no objections, 301 is admitted.

2    BY MR. KESSLER:

3    Q    And now I'll publish this to the jury.

4           You said this is a bullet proof helmet?

5    A    Yes.

6    Q    I'd like to ask you about some of the features on this.  We

7    see it's got a headset here that says Gunny?

8    A    Yes.

9    Q    What's the purpose of the headset?

10   A    The headset, if I were to hook a microphone up to it, would

11   allow me to communicate with other people that had the same

12   setup, and also will eliminate all the outside noise.  So

13   gunshots, explosions, anything like that, it would protect my

14   hearing.

15   Q    So with that wired hookup you'd be able to talk to the

16   other Defendants?

17   A    Yes.

18   Q    What's this rack on the front?

19   A    That is for attaching night vision goggles.

20   Q    Did you have night vision goggles?

21   A    I do.  Yes.

22   Q    And what's this thing strapped to the front?

23   A    Those are just a set of goggles.

24   Q    Okay.  Just eye protection?

25   A    Yes.

1          MR. KESSLER:  And I'd like to show the witness what's

2     been marked as Government's Exhibit 299 for identification.

3     Can you open this?  Actually.  I got it.  I'm trying not to

4     mess up the bag, Your Honor, which I've done.  May I approach?

5          THE COURT:  Sure.

6     BY MR. KESSLER:

7     Q    Do you recognize this item, Mr. Garbin?

8     A    I do.  Yes.

9     Q    What is it?

10    A    This is one of the night vision binoculars I would have

11    attached to my helmet.

12    Q    Do you recognize this as yours?

13    A    I do.  Yes.

14         MR. KESSLER:  I now offer that into evidence, Your

15    Honor?

16         THE COURT:  Hearing no objections it's admitted.

17    BY MR. KESSLER:

18    Q    And I'll publish this to the jury.

19         You said it's a night vision binocular?

20    A    Correct.

21    Q    How does this work?

22    A    It uses a chemical process to basically illuminate pitch

23    black.

24    Q    Okay.  And we see it has a clip at the bottom.  What's that

25    for?

1    A    That clip is to attach it to the helmet itself.

2    Q    So that bracket that we just saw on the helmet?

3    A    Yes.

4    Q    Would that allow you to flip this up and away from your

5    head?

6    A    Yes.

7    Q    Okay.  The other Defendants here, Mr. Caserta, Mr. Harris,

8    Mr. Fox, Mr. Croft, did they have similar gear?

9    A    Similar.  Fox had a bullet proof helmet as well.  Harris

10   had a bullet proof helmet, and Kaleb Franks, he had ordered a

11   bullet proof helmet and night vision goggles.

12           MR. KESSLER:  May I have one moment, Your Honor?

13   BY MR. KESSLER:

14   Q    Mr. Garbin, do you remember having chat conversations with

15   Mr. Fox about what kind of weapons he should get?

16   A    Yes.

17   Q    So did you give him advice?

18   A    I did.  Yes.

19   Q    If we can put up just for the witness Exhibit 465, please?

20           Do you recognize this chat?

21   A    I do.  Yes.

22   Q    It says Gunny there at the top, so you were a part of this?

23   A    Yes.

24           MR. KESSLER:  Now, I'll offer this into evidence, Your

25   Honor.

1          MR. GIBBONS:  No objection.

2          THE COURT:  465.  All right.  It's admitted.

3   BY MR. KESSLER:

4   Q   So at the top, Alpha F You, who we've heard is Mr. Fox,

5   says, I'm dropping like three K today on some shit.  Got some

6   new boom boom on the way.

7          THE COURT:  This is like the others for droopy old

8   eyes like mine.

9          MR. KESSLER:  I'm sorry.  Can we blow that up, please?

10         THE COURT:  Thank you.

11  BY MR. KESSLER:

12  Q   It says, got some new boom boom on the way.  Did you

13  understand what he meant by boom boom?

14  A   I did.  Yes.

15  Q   Okay.  And this is on October 1st of 2020, correct?

16  A   Correct.

17  Q   All right.  All right.  At the bottom, let's blow up those

18  bottom two parts.

19         All right.  You said, scratch the shotguns.  Sell the

20  PSA, then buy a BCM or -- I'm going to pronounce this wrong

21  probably Geissele upper and slap a good ass optic on it.  What

22  did you mean by that?

23  A   He was wanting to purchase a shotgun.  He already owned a

24  Palmetto State Armory AR-15.  I was telling him to not buy the

25  shotgun, sell his current AR-15 and buy a BCM or a Geissele

1    upper receiver and then put a good optic on it.  An optic is

2    just a scope.

3    Q    And why did you tell him he should get those things?

4    A    I told him to get those because those two brands are

5    substantially more reliable than the current rifle he had.

6    Q    And he responds, already bought and paid for bro.  So he

7    had already gotten them?

8    A    Yes.

9    Q    Okay.  I'd like you to take a look --

10           MR. KESSLER:  Have I offered it, Your Honor?  It's in,

11   right?

12           THE COURT:  Yes.  It's in as far as I know.

13   BY MR. KESSLER:

14   Q    I'd like to show you what's been marked as 466 for

15   identification, just the witness, please?

16           Do you recognize this chat?

17   A    I do.  Yes.

18   Q    Okay.  Also the same as the conversation you had that day?

19   A    Yes.

20           MR. KESSLER:  Now, I'll offer 466, Your Honor?

21           THE COURT:  Hearing no objections it's admitted.

22   BY MR. KESSLER:

23   Q    Mr. Fox says, I woke up and spent $3200.  You said, Jesus

24   Christ lol.  Why were you surprised?

25   A    I wasn't thinking that he was that willing to shell out

1    that much money.

2    Q    Okay.  And he says, later here I got a hard on waiting for

3    these new bang bangs guns again?

4    A    Yes.

5    Q    All right.  I'd like to show you, just the witness, please,

6    what's been marked as Government's Exhibit 466 for -- 467 for

7    identification.

8         Do you recognize this chat?

9    A    I do.  Yes.

10   Q    Okay.  Again, accurate version of what you -- the

11   discussion you had that day?

12   A    Yes.

13        MR. KESSLER:  I'd offer it into evidence, Your Honor?

14        THE COURT:  All right.  Hearing no objections it's

15   admitted.

16   BY MR. KESSLER:

17   Q    Mr. Fox says, so yeah, I spent like probably 3500 today.

18   Good news.  I strengthened a lot of weak areas.  Got pretty

19   much everything I think I need ATM, which we heard earlier is

20   at the moment.  There is more but I'll stack some back up first

21   because we got a big bill coming up.

22        I want to ask you about that.  Stack some back up.

23   What did you understand that to mean?

24   A    Money.

25   Q    Save up more money?

1    A    Save up more money.

2    Q    And what's the big bill?

3    A    That big bill would be the explosive device we were

4    intending to buy.

5    Q    And what did you understand weak areas to be?

6    A    The weak areas were the reliability of the current firearms

7    he had.

8    Q    Okay.  Can we look at the bottom of this, please?  And

9    let's get this here.

10        Debased Tyrant, again, we've heard is Mr. Caserta.  He

11   says, nice.  I'm stoked you got that Canik.  I want to shoot it

12   lol.  What's a Canik?

13   A    The Canik is just the manufacture of the pistol that Fox

14   had bought.

15   Q    Okay.  And Adam Fox says, just trying to get closer to

16   y'all level lol.  I didn't get the Canik.  Is the Canik

17   considered a very good gun?

18   A    It's middle of the road, but he ended up getting a gun with

19   something a little bit better.

20   Q    Okay.  And just the witness please, Exhibit 468 for

21   identification.  Let me clear this.

22        Do you recognize this text?

23   A    I do.  Yes.

24   Q    Okay.  And who did you receive this from?

25   A    Adam Fox.

1    Q    And that's an accurate representation of what you saw?

2    A    Yes.

3              MR. KESSLER:  I now offer 468, Your Honor?

4              MR. GIBBONS:  No objection.

5              THE COURT:  All right.  It's admitted.

6    BY MR. KESSLER:

7    Q    Okay.  It looks like this is a receipt for items ordered it

8    says.  This first thing it says FN 509 Tactical 4.5 inch nine

9    millimeter pistol, 17/24 round.  What is that?

10   A    So the manufacturer is FN Tactical.  The 509 is the model.

11   The 4.5 inch is how long the barrel is.  The nine millimeter is

12   what caliber it is, and then the 17/24, it means it comes with

13   17-round magazine and then an extended 24-round magazine.

14   Q    That would allow you to shoot 24 rounds without reloading?

15   A    Correct.

16   Q    And it says price $899.

17              Let's take a look at the second item.  It says Panzer

18   Arms AR-12 semiauto 12-gauge shotgun, black, price $549.  What

19   kind of a weapon is this?

20   A    It's a shotgun but it's built to look and act like an

21   AR-15.

22   Q    Let's take a look at the next page, please.

23              And act like an AR-15 in what sense?

24   A    In how it operates.  It's a semiautomatic shotgun so it's

25   not like a normal pump action or a double barreled shotgun you

1    would see for hunting or something like that.

2    Q    So it fires one shotgun shell per pull of the trigger?

3    A    That's correct.

4    Q    And it looks like on the next part it says the order total

5    $1,573.

6              Let's take a look at the next page.

7              And there's also $367.81.

8              Next page, please.

9              And we see here it says, thank you, Adam.  So Mr. Fox

10   sent you this.  Showed you what he'd bought?

11   A    Yes.

12   Q    All right.  So just to wrap up here.  You mentioned at the

13   beginning of your testimony that you pled guilty to conspiring

14   with all these Defendants to kidnap the governor.  Did anybody

15   make you join this conspiracy?

16   A    No.

17   Q    Did anybody talk you into it?

18   A    No.

19   Q    Did Dan Chappel convince you to join this conspiracy?

20             MR. GIBBONS:  Objection, hearsay, Your Honor.

21             THE COURT:  Well, I think that the question isn't

22   asking what, if anything, he said.  It's whether this witness

23   was convinced in some way by Dan Chappel, and I think it's fair

24   for that purpose.

25   BY MR. KESSLER:

1    Q    Were you in any way convinced by Dan Chappel to join this

2    conspiracy?

3    A    I was not.  No.

4    Q    How about Steve Robeson?

5    A    No.

6    Q    You've had plenty of discussions with all of these

7    Defendants, right?

8    A    Right.

9    Q    Did you ever hear Mr. Fox say that he was convinced by Dan

10   Chappel?

11   A    No.

12   Q    Did you ever hear Mr. Caserta say that he was convinced by

13   Dan Chappel?

14   A    No.

15   Q    Did you ever here Mr. Harris say that?

16   A    No.

17   Q    Did you ever hear any of the three of them say they were

18   convinced to join this conspiracy by Steve Robeson?

19   A    No.

20   Q    Or by anyone else?

21   A    No.

22   Q    And I am not talking about Wolverine Watchmen or Michigan

23   Home Guard or anything like that, but in this plot that you

24   pled guilty to, who did you consider the leader?

25   A    Adam Fox and Barry Croft.

Q    And what were your role -- what was your role?

A    My role?  I was a firearms expert.  I had --

Q    Well, I mean, for the actual kidnapping that you said you were planning, what was your role going to be?

A    I would have been with the team or the group entering the home and performing the actual kidnapping itself.

Q    Is that an operator?

A    Yes.

Q    How about Mr. Harris, what was his role supposed to be?

A    Operator.

Q    And Mr. Caserta?

A    Operator.

          MR. KESSLER:  I have nothing further, Your Honor.

          THE COURT:  All right.  So I know we've only been going about an hour, but we are going to switch to cross, and at some point between now and 2:00 o'clock we are going to need a break, so let's take our break now.  We'll let Mr. Garbin get out first again and then come back and I think the logistics will be easier.  We'll have a little longer bite, then, in our third and final segment.  So when we come back after about 20 minutes we'll go for whatever is left to do on the day.  Probably about an hour and 45, but at least I think it will be a smoother transition.  So we'll take our break now.

          LAW CLERK:  All rise, please.

          (Jury out, 11:48 a.m.)

1           THE COURT:  All right.  We'll see you in 20.

2           LAW CLERK:  Court is in recess.

3           (Recess taken, 11:48 a.m.)

4           (Resume Proceeding, 12:16 p.m.)

5           LAW CLERK:  All rise, please.

6           (Jury in, 12:16 p.m.)

7           LAW CLERK:  The United States District Court for the

8    Western District of Michigan is now in session.  The Honorable

9    Robert J. Jonker, chief judge, presiding.

10          THE COURT:  All right.  Welcome back everyone.  I

11   didn't hear any sirens going off at noon so I think we will

12   probably be treated to those tornado sirens at 1:00.  Just

13   remember that we are not going to get up and leave.  But we

14   will move now to the Defense side for cross exam starting with

15   Mr. Gibbons.

16          MR. GIBBONS:  Thank you, Your Honor.

17                     CROSS EXAMINATION

18    BY MR. GIBBONS:

19   Q    Good afternoon, Mr. Garbin.

20   A    Good afternoon.

21   Q    I want to take you back to the early spring months of 2020.

22   You were in the Watchmen, correct?

23   A    Correct.

24   Q    After -- you were in the Watchmen, and then in March

25   contact was made by a guy named Dan to the group, correct?

1    A    Correct.

2    Q    And it was Dan's desire to potentially join the

3    organization and hang out with you guys?

4    A    Yes.

5    Q    And that guy was Dan Chappel, right?

6    A    Correct.

7    Q    And after a little bit of back and forth on FaceBook and

8    whatnot, it was agreed that Dan would be allowed into the

9    group, true?

10   A    True.

11   Q    And you were aware of that?

12   A    Yes.

13   Q    Shortly thereafter you had a training, is that right?

14   April?

15   A    Yes.

16   Q    And that's where you first met Dan face to face, correct?

17   A    Correct.

18   Q    And at that time people seemed to be pretty enthused with

19   having Dan around?

20   A    That's correct.

21   Q    Dan brought quite a bit to the table for the Watchmen, did

22   he not?

23   A    Yes.

24   Q    He was a former experienced military combat veteran, true?

25   A    True.

1    Q    You yourself had not been in the military, correct?

2    A    Correct.

3    Q    Dan touted his skill set on top of his combat experience,

4    correct?

5    A    Correct.

6    Q    And he was a firearms instructor?

7    A    Correct.

8    Q    Dan brought equipment that he had had or acquired over the

9    years; he brought some of that to the trainings to use,

10   correct; firearms and things like that?

11   A    Correct.

12   Q    He had nice equipment, did he not?

13   A    He did.  Yes.

14   Q    Really expensive stuff?

15   A    Correct.

16   Q    At that first meeting Dan made a fairly significant

17   impression upon everyone that was present, true?

18   A    True.

19   Q    That's Mr. Musico, Mr. Morrison, Paul Bellar, correct?

20   A    Correct.

21   Q    There were others.  Mr. Beauchesne I think you said his

22   name was, was he there?

23   A    I don't recognize that last name.

24   Q    Jerad?

25   A    Jerad Beauchesne.

1    Q    There you go.  Was he there?

2    A    He was there.  Yes.

3    Q    Is it also true that Dan was -- assumed kind of a

4    leadership role?  He wasn't in charge, but he was going to be

5    considered leadership right from the get-go in that first

6    meeting, correct?

7    A    It wasn't right away but he was later added to the Watchmen

8    leadership.

9    Q    To the leadership chat?

10   A    Yes.

11   Q    And that was in pretty fair order, though, correct?

12   A    Correct.

13   Q    As you progressed into early summer, though, Watchmen were

14   looking to develop their ranks I think you testified?

15   A    Yes.

16   Q    And people were watching social media for prospects, true?

17   A    True.

18   Q    And Adam Fox kind of came to the fore in terms of a

19   prospect, right?

20   A    Correct.

21   Q    When you met Adam Fox he was not a Watchmen, true?

22   A    True.

23   Q    And isn't it also true that Adam Fox never became a

24   Watchmen?

25   A    That is correct.

Q    Adam Fox trained occasionally with the Watchmen, correct?

A    He did.  Yes.

Q    Over the course of the summer, Adam Fox trained at Munith -- a couple times, a few times with the Watchmen, is that right?

A    That's right.  Yes.

Q    June 28th, that's the first time that he came out to the place to train?

A    Correct.

Q    Prior to that you had had a little bit of involvement with him at a rally in Lansing on the 18th?

A    Correct.

Q    That was not a long exposure to Adam Fox, was it?

A    I'm sorry?

Q    You were with him for about 45 minutes tops?

A    I don't recall how long we were at the protest but we were at the protest for a couple hours.

Q    Okay.  And that was a social event?

A    Correct.

Q    For the most part, right?

A    Correct.

Q    You had the opportunity to go to the Vac Shack where Adam Fox lives, true?

A    True.

Q    That was on June 20th?

1    A    Yes.

2    Q    Moving forward in time into June, you were in the presence

3    of Mr. Fox at Cambria, correct?

4    A    Correct.

5    Q    There was Watchmen events that were occurring and meetings

6    in June and in July that were Watchmen only, is that right?

7    A    That's right.

8    Q    And Adam Fox did not attend those, correct?

9    A    That's correct.

10   Q    There was a bonfire at Mr. Harris's parent's home, correct?

11   A    Correct.

12   Q    And Adam Fox wasn't included in that, was he?

13   A    No.  He was not.

14   Q    There was a training at Fowlerville that we've seen videos

15   of.  Adam Fox wasn't included in that, was he?

16   A    No.

17   Q    There was a Lake Orion meeting in August.  Do you remember

18   that?

19   A    Yes.

20   Q    That was I think August 23rd?

21   A    That sounds right.

22   Q    The line in the sand meeting I think is what people started

23   calling it, is that right?

24   A    Correct.

25   Q    Adam Fox was not at that meeting, correct?

1    A    No.  He was not.

2    Q    So the Watchmen had their own separate events because they

3    were an organization, true?

4    A    That's true.

5    Q    And Adam Fox, he ended up with an identification with a

6    militia, is that right?

7    A    That's right.

8    Q    To the best of your understanding, that was the Michigan

9    Patriot III%ers?

10   A    That sounds right.

11   Q    That was his militia?

12   A    Yes.

13   Q    That III% militia had ties to a broader group, did it not?

14   A    It did.  Yes.

15   Q    And there were a number of states that belonged to this

16   III% confederation I guess I'll call it.  Does that make sense

17   to you?

18   A    Yes.  It does.

19   Q    So there was Wisconsin, right?

20   A    Right.

21   Q    And that was headed by Steve Robeson?

22   A    Yes.

23   Q    And there was Tennessee?

24   A    Yes.

25   Q    True?

A     True.

Q     And you were at -- you were at a meeting in Cambria where a
lot of these people were, correct?

A     Correct.

Q     And a lot of those people were at the Peebles meeting,
true?

A     True.

Q     And then some of these people made their way to Luther in
the fall, correct?

A     Correct.

Q     So after Tennessee there was a guy -- there was Missouri.
Do you remember Missouri being represented at Peebles?

A     I do.  Yes.

Q     And that was represented -- the representative was Chris
Phillips?

A     I don't remember the individual's name exactly but I
remember Missouri being there.

Q     Okay.  Virginia was there, correct?

A     Correct.

Q     And that was headed by a guy named Frank?

A     Yes.

Q     Ohio had a representative?

A     Correct.

Q     Indiana?

A     I believe Indiana as well.

1   Q     And of course, Adam was Michigan's guy?

2   A     Yes.

3   Q     In terms of Adam Fox and his militia, did he have trainings

4   that you were aware of independent for his III% Patriot

5   Militia?

6   A     I don't know if they actually took place, but he did talk

7   about hosting trainings for his own militia group.

8   Q     Okay.  Is it fair to say that you never attended a training

9   hosted by Adam Fox and his group?

10  A     I did not.

11  Q     And to the best of your knowledge, none of the Watchmen did

12  either?

13  A     Not to my knowledge.  No.

14  Q     The Watchmen had a series of chats, encrypted chats,

15  correct?

16  A     Correct.

17  Q     You guys operated on a platform called Wire?

18  A     Correct.

19  Q     There was a leadership chat, correct?

20  A     Correct.

21  Q     The leadership chat was kind of an insular group within the

22  Watchmen of people who had esteem and kind of the respect of

23  everybody else?

24  A     Correct.

25  Q     Kind of maybe the next level guys, right?

1 A Right.

2 Q You were one of those guys?

3 A Yes.  I was.

4 Q Looking at your experience, you are a marksman, correct?

5 A Correct.

6 Q Certified?

7 A Not certified, but a marksman.

8 Q Competition grade marksman, though?

9 A Yes.

10 Q You have nice equipment?

11 A I do.  Yes.

12 Q You customize your equipment?

13 A I do.  Yes.

14 Q As we saw, you spend a lot of money on your equipment?

15 A I do.  Yes.

16 Q Mr. Kessler asked you about your equipment.  I think we

17 saw, I mean, your basic requirements, the helmet the plate

18 protectors, the kit and the rifle and the pistol?

19 A Correct.

20 Q Those are kind of like the base stuff you got to have?

21 A Yes.

22 Q If you are going to be in a militia, true?

23 A True.

24 Q Those are also things you'd want to have if you were

25 prepping, correct?

1    A    Possible.  Yes.

2    Q    If you are worried about the end of social order or natural

3    disasters, the world kind of crashing, that's what preppers are

4    concerned about, right?

5    A    They'd be more concerned about food, medical supplies and

6    shelter before they'd be concerned about, like, body armor and

7    things like that.

8    Q    Personal security would be lower on their ranks as to how

9    you see it?

10   A    It would be.  Yes.

11   Q    Okay.  I think you testified that you were going to use

12   that equipment that you had in your attempt or the attempt with

13   this group to kidnap the governor, correct?

14   A    That's correct.

15   Q    Okay.  When did you buy the kit?

16   A    The body armor I had originally purchased some time around

17   when I joined the Wolverine Watchmen group.

18   Q    Okay.  So you would have bought that in late winter or

19   early, early spring?

20   A    Correct.

21   Q    Or would it even have been in '19?  Did you join the

22   Watchmen in November of '19?

23   A    No.

24   Q    When did you join?

25   A    It was after the new year.

1    Q    So in January?

2    A    Correct.

3    Q    So you bought the kit in January?

4    A    Correct.

5    Q    COVID had not hit yet, right?

6    A    No.  Not yet.

7    Q    When did you buy that rifle you have?

8    A    The rifle I've had since I was 18.

9    Q    Okay.  The helmet?

10   A    The helmet I got some time in the summer.

11   Q    Okay.  You would agree that when you bought that rifle, you

12   did not buy it with the intention of eventually developing a

13   plot to kidnap the governor, correct?

14   A    No.  That was not my intention at the time.

15   Q    All right.  And would you agree that when you bought the

16   kit you did not buy that to protect yourself in your attempt to

17   kidnap the governor, correct?

18   A    When I originally purchased it it didn't contain any

19   plates.  It was just the vest.

20   Q    Right.

21   A    I bought the bullet proof plates later on once the plot

22   started.

23   Q    Okay.  You wore that kit to the Second Amendment rally, did

24   you not?

25   A    I did not.

1   Q   Did you wear it when you went to the -- did you go to the

2   Capitol on April 30th?

3   A   I did not.

4   Q   Okay.  In terms of these chats, so we have the leadership

5   chat for the Watchmen, correct?

6   A   Correct.

7   Q   Adam Fox was never in that chat, was he?

8   A   No.  He was not.

9   Q   There was a QRF chat?

10  A   Correct.

11  Q   That was a Watchmen?

12  A   It was Watchmen members but it wasn't a direct Watchmen

13  chat.  It was for the Watchmen members that were in close

14  proximity to each other.

15  Q   Okay.  Were there people in it that were not Watchmen?

16  A   Paul Bellar later when he was no longer with the Watchmen

17  was still in the chat.

18  Q   Okay.  Was he a Watchmen when he got in that chat?

19  A   He was.  Yes.

20  Q   So he was just kind of a left over?

21  A   Correct.

22  Q   All right.  Adam Fox was never in the QRF chat, correct?

23  A   He was not.

24  Q   Then the bonfire chat, that was Wolverine Watchmen members?

25  A   It was a mixture of Wolverine Watchmen members.

1    Q    And mixed with who?  What would be the other associations?

2    A    Former members, and then individuals that were no longer

3    members of the Wolverine Watchmen group.

4    Q    Okay.  So Wolverine Watchmen and people associated with the

5    Watchmen directly?

6    A    Correct.

7    Q    Former members?

8    A    Correct.

9    Q    Adam Fox was not in that chat group, correct?

10   A    Not that I recall.

11   Q    Kind of talking about the chats and your relationship to

12   the Watchmen and Adam Fox, towards the end of August isn't it

13   true that you became kind of dissatisfied with the leadership

14   of the Watchmen with respect to Mr. Musico?

15   A    Correct.

16   Q    And I think you concluded that it would be better if you

17   weren't in the Watchmen anymore, correct?

18   A    Correct.

19   Q    And it wasn't just you.  There was a number of Watchmen all

20   kind of your age, right?

21   A    Correct.

22   Q    Daniel Harris wanted to go with you, correct?

23   A    Yes.

24   Q    Mr. Franks?

25   A    Yes.

1    Q    And there was some others, correct?

2    A    Correct.

3    Q    That aren't charged in this case, true?

4    A    True.

5    Q    When you decided to leave the Watchmen, you stayed on --

6    and that was -- you moved to Threema, is that correct, at about

7    that time?

8    A    It was right around after that.  Yes.

9    Q    So I am not saying they are related, but just in terms of a

10   function of time, right?

11   A    Right.

12   Q    You started a new chat, correct?

13   A    Correct.

14   Q    Because you were disassociating with the Watchmen stuff,

15   correct?

16   A    The Threema chat was created to have a more secure bonfire

17   QRF chat.  So the Threema started up before we had our break

18   away with the Wolverine Watchmen group.

19   Q    No.  Yeah.  And I understand that.  But once you had a --

20   so when you broke away you were with Threema, true?

21   A    Correct.

22   Q    Right.  Okay.  Now, within that context and in that

23   timeframe when you broke away, you formed another group, right,

24   of the people that were leaving with you, true?

25   A    There was a group I already formed, and then there was four

1 or five individuals that also left the Watchmen.  We brought

2 them to the Threema chat as well.

3 Q And that was called The Boys originally?

4 A It was originally The Boys.  Yes.

5 Q Okay.  Adam Fox was not in The Boys, correct?

6 A No.  He was not.

7 Q The Boys, that name kind of got changed, correct?

8 A It did.  Yes.

9 Q But the function of that chat did not change?

10 A Correct.  It remained the same.

11 Q And the personnel in the chat did not really change,

12 correct?

13 A Correct.

14 Q So it wasn't a move to do something different; it was just

15 hey, let's get a cooler name, right?

16 A For the name change?

17 Q Yes.

18 A Yeah.  It was just a cooler name when we changed the name.

19 Q Okay.  And the new name is the Brick Squad, correct?

20 A Correct.

21 Q And you would agree that generally speaking, when people

22 were added it was added by -- people were added to -- they

23 could be added to that group, correct?

24 A They could be.  Yes.

25 Q And that was done by consensus, is that true?

1    A    That's true.

2    Q    Group consensus?

3    A    Group consensus.

4    Q    You could call votes, true?

5    A    True.

6    Q    And it came to pass that Adam Fox was proposed as a

7    potential member of the Brick Squad, correct?

8    A    I believe so.  Yes.

9    Q    Suffice it to say group consensus was sought, true, with

10   respect to his admission into that chat forum?

11   A    The group consensus was that we would keep him in a

12   separate chat.

13   Q    Correct.  So he was not allowed in that chat, was he?

14   A    No.

15   Q    So Brick Squad does not include Adam Fox, true?

16   A    True.

17   Q    I want to go back to Brick Squad, that name, right?

18   A    Right.

19   Q    It doesn't have a particular purpose; you just thought it

20   was cooler?

21   A    Yeah.  It's just a name.

22   Q    Where does it come from?

23   A    Music.

24   Q    Okay.  Where does Watchmen come from?

25   A    It was the name that Joe Morrison had come up with.

1    Q    Is that a comic book?

2    A    I have no idea.

3    Q    Okay.  Going back to the spring, did you attend any

4    training events with the Watchmen prior to Dan's joining the

5    group?

6    A    I would say two, maybe three.

7    Q    Okay.  And can you describe for me, like, you'd have a

8    meeting, which I'm not too concerned about right now, but you

9    would have trainings when you had these meet ups or not?

10   A    I wouldn't really consider them trainings.  At the time

11   when I first joined, the group was still super small so there

12   were maybe 10 total members, and out of those 10 members maybe

13   six showed up to what we called a training.

14   Q    Okay.  Did any of those trainings involve getting in and

15   out of automobiles effectively with a rifle?

16   A    Not automobiles.

17   Q    And firing at targets?

18   A    Not automobiles, but we did have live fire with regular

19   targets, and we did do some movement inside of Joe and Pete's

20   house.

21   Q    Inside the house?

22   A    Inside the house.

23   Q    All dry fire?

24   A    Dry fire.

25   Q    You would agree that before Mr. Chappel showed up, there

1    were no kill houses set up in any backyards, correct?

2    A    Correct.

3    Q    You would agree that one of the things that made Dan

4    attractive was his tactical skills and knowledge, true?

5    A    True.

6    Q    Dan assumed responsibility for designing trainings, is that

7    right?

8    A    That's not correct.  As a group the Watchmen leadership

9    would kind of have a group poll on what was going to go on for

10   the training, so you know, a small vote before the training

11   actually happened.  Once we determined that we kind of stuck

12   with the same plan every weekend.  That way there was no

13   confusion with the other members.

14   Q    Dan would provide that training?

15   A    It would be myself doing training.  Joe Morrison would lead

16   training.  Dan Chappel would lead training occasionally.  It

17   was all of Wolverine Watchmen leadership that were running the

18   specific training events at these FTXes.

19   Q    Okay.  And just so that we're clear, these different

20   individuals that were providing training, those would be for

21   different things?

22   A    Different things.  So we would have maybe reloading drills

23   where we're reloading our rifles and pistols.  We would have a

24   simulated kill house which started with just pipes laid on the

25   ground.  We would have medical training.  Those were usually

1      the big three.

2      Q    Okay.  And who did the tactical training then?

3      A    It was usually me with Dan's assistance.

4      Q    Dan was your helper?

5      A    Yes.

6      Q    Mr. Bellar, was he involved in that at all?

7      A    He was.  Yes.

8      Q    Okay.  You remember Peebles, Ohio, going there?

9      A    I do.  Yes.

10     Q    That was a meeting, correct?

11     A    Correct.

12     Q    Like we discussed, all of those Patriot III% groups were

13     there, true?

14     A    Yes.

15     Q    These meetings -- this meeting in particular involved kind

16     of a round table, is that right?

17     A    Yes.

18     Q    Where different representatives from different states would

19     be encouraged to speak and share their ideas, correct?

20     A    Correct.

21     Q    And the topic or at least the subject matter would be

22     concerns by these individuals and these groups for governmental

23     control and concerns about government overreach generally

24     speaking, correct?

25     A    The first Ohio meeting would have been concerns.  The one I

1    attended in Peebles, that was arranged to be what we're going

2    to do about it.  So what we were going to take actions to, you

3    know, solve our concerns.

4    Q    So the Peebles meeting was about kind of developing a

5    series of options for what could be done, correct?

6    A    Correct.

7    Q    And the first meeting in Cambria that you went to, you

8    perceived to be just kind of a general discussion of what types

9    of issues need to be addressed, right?

10   A    Correct.

11   Q    Identify the problem?

12   A    Yes.

13   Q    And then come back to Peebles and discuss possible

14   solutions?

15   A    Yes.

16   Q    You were in that meeting in Peebles and you heard the

17   different suggestions for solutions, correct?

18   A    Correct.

19   Q    And at some point in that meeting the talking stick comes

20   to you, so to speak, right?

21   A    Right.

22   Q    And you have the opportunity to offer your opinion about

23   the options that have been raised, correct?

24   A    Yes.

25   Q    Isn't it true that one of those options was kidnapping a

1     governor or taking a Capitol?

2     A    Those were two separate options.  Yes.

3     Q    Okay.  And they were discussed, correct?

4     A    Correct.

5     Q    And you expressed your opinion about those two options, did

6     you not?

7     A    Yes.

8     Q    And what was your opinion in Peebles, Ohio on July 18th?

9     A    I was not a fan of any Capitol storming.  I brought it up

10    in the past I wasn't a fan of the Capitol storming.  When we

11    got to the governor kidnapping solution I was much more open

12    ears to it.

13    Q    At Peebles you were?

14    A    Yes.

15         MR. GIBBONS:  Your Honor, may I approach and show the

16    witness a transcript?

17         MR. KESSLER:  I think it's a little early right now.

18    He hasn't been asked a question.

19    BY MR. GIBBONS:

20    Q    Let me ask you this question.  Did you tell the group that

21    you thought that kidnapping was not a good objective?

22    A    Yes.

23    Q    Thank you.  Did you tell them that going to house floors

24    was not a good objective?

25    A    Yes.

1    Q    And that meant storming the Capitol, correct?

2    A    Correct.

3    Q    You did have a suggestion for where things should start

4    though, did you not?

5    A    I did.

6    Q    And what was that?

7    A    I had suggested more or less causing an inconvenience,

8    cutting down trees and blocking roadways and such.

9    Q    Okay.  So that's not kidnapping the governor, correct?

10   A    Correct.

11   Q    And that's July 18th?

12   A    Correct.

13   Q    Did you suggest to the group on that date that someone

14   could fire a bullet through the governor's window, a live round

15   into her home?

16   A    I did.  Yes.

17   Q    You did.  When did you do that?

18   A    That was in the car ride leaving the meeting going to our

19   hotel.

20   Q    So that was in the car ride that you said that?

21   A    Yup.

22   Q    Did you further suggest that that message could be

23   amplified by having a large caliber live round fired into the

24   homes of multiple governors in different states taking

25   advantage of the confederation of militias?

A    I had mentioned that back at the meeting, but it wasn't firing a single round.  It was that if we were to storm a Capitol building we needed to do it all at once.  So if there were going to be four states to storm a Capitol, the four states needed to storm their respective capitals at the same time.

Q    And you said that during the meeting?

A    I did.

Q    You are certain?

A    I am certain.

Q    Let me ask you this question, and I know these are really small details, so I want you to try to reach back to when you suggested that kidnapping and taking a Capitol was not a good objective.  Can you kind of remember when you said that in the meeting?

A    It would have been earlier in the meeting.

Q    Okay.  And when did you suggest in relation to that statement, at what point in the movie -- in the meeting did you suggest these two ideas of firing rounds to send a message?

A    The firing the round I had not mentioned at the meeting at all.  That was on the car ride home.  The storming the multiple Capitol buildings at the same time, I had mentioned that after Barry Croft got done giving his speech.

Q    I thought that -- I thought what you had testified is that you said at the meeting that you came up with the idea or

1    suggested the idea of firing high caliber rifles into

2    governors' homes in five different states at the meeting.  Did

3    you say that at the meeting?

4    A    I don't recall saying that.

5    Q    Thank you.  And I want to make this clear.  Adam Fox wasn't

6    present in the vehicle when you would have made that type of

7    suggestion, correct?

8    A    No.  He was not.

9    Q    Of firing the rounds?

10   A    He was not present in the vehicle.

11   Q    Okay.  Let me also get this on the record and clear.  At no

12   time did you ever directly suggest those types of activities to

13   Adam Fox as ideas of things that the group could do, correct?

14   A    The only one I mentioned directly to him was the cutting

15   down of trees to block roads to cause an inconvenience.

16   Q    Okay.

17            MR. KESSLER:  I didn't want to be too quick about

18   this, Your Honor, but I am not sure the relevance of any of

19   this.  He was not a government informant, so if he is pursuing

20   inducement it's not relevant what he thought.

21            THE COURT:  I am not sure either.  Do you want to

22   preview the overall relevance or going to a new topic in any

23   event?

24            MR. GIBBONS:  I am at the end, Your Honor.

25            THE COURT:  All right.  Let's go on then.

1    BY MR. GIBBONS:

2    Q    I'd kind of like to take you back to Cambria.  Go back just

3    another week.

4    A    Okay.

5    Q    I think you testified on direct that the shoe house in

6    Cambria was built to design -- it was designed to replicate

7    either like a Capitol office or a residence, is that right?

8    A    That's right.

9    Q    And that would be of Governor Gretchen Whitmer?

10   A    Gretchen Whitmer, whatever politicians would have been at

11   the Capitol building.

12   Q    So it wasn't specifically related to the plot that is at

13   issue in this case, correct?

14   A    Not directly related to it.  No.

15   Q    Okay.  And that was on July 6 and 7 that weekend?

16   A    That sounds right.

17   Q    Right?  There was a meeting in -- at June 28th there was a

18   training with Adam Fox, correct?

19   A    Correct.

20   Q    And I think you testified that at that training and

21   meeting, storming the Capitol was what people were discussing,

22   Adam Fox's idea, right?

23   A    Right.

24   Q    But it was generally perceived to not be feasible, true?

25   A    True.

1   Q    The other Watchmen were talking about a citizen's arrest,

2   correct?

3   A    Correct.

4   Q    Finding a constitutional sheriff and a judge?

5   A    Correct.

6   Q    And a piece officer to serve the warrant, correct?

7   A    Correct.

8   Q    Now, whether that's legal or not legal, it isn't the same

9   as breaking into somebody's home and kidnapping them, correct?

10   A    Right.  But that's what fueled the beginning of the

11   kidnapping plot.

12   Q    Okay.  So let's just take this one step at a time.  When

13   you say a constitutional sheriff, you are talking about a

14   legally elected official?  That's what you're trying to find,

15   correct?

16   A    Correct.

17   Q    So we are not talking about somebody who just says, hey, I

18   am a constitutional sheriff; you are looking for somebody who

19   holds an official office of authority, correct?

20   A    That's correct.

21   Q    Same thing with a judge.  You are looking for a duly

22   elected sitting judge exercising state authority, correct?

23   A    Correct.

24   Q    Adam Fox is at that meeting, isn't he, June 28th?  He is

25   there, true?

1    A    Yes.

2    Q    The Watchmen have another meeting in between before you go

3    to Cambria, correct?  Is there another meeting or not?

4    A    I don't think so.  No.

5    Q    Okay.  The next time you see or interact with Adam Fox

6    after the 28th is at Cambria?

7    A    That's correct.

8    Q    The shoot house is erected early when you get there, right?

9    It's one of the first things that gets done?

10   A    No.  It was done probably mid-afternoon.

11   Q    Okay.  So I am clear on your testimony and your position

12   is, is from the very beginning during all of this, from the Vac

13   Shack forward, June 20th into July, into August, you never

14   thought storming the Capitol was a good idea?

15   A    I didn't.  No.

16   Q    You thought it was a bad idea actually, right?

17   A    I did.  Yes.

18   Q    Take a lot of men, right?

19   A    I'm sorry?

20   Q    It would take a lot of men to do that?

21   A    It would.  Yes.

22   Q    More than you guys could ever hope to acquire or

23   accumulate, true?

24   A    True.

25   Q    You went to a training event for the Watchmen that included

1    Adam Fox and his little crew, right?

2    A    Correct.

3    Q    On August 9th.  And after the training portion of that

4    event there was a meeting, do you remember that?

5    A    I do.  Yes.

6    Q    The idea of a kidnapping was proposed, was it not?

7    A    Yes.

8    Q    Everyone had their kind of chance to weigh in, true?

9    A    True.

10   Q    Not everybody did, right?

11   A    No.

12   Q    Some people just stood there?

13   A    Right.

14   Q    You weighed in, did you not?

15   A    Yes.

16   Q    And in front of your Watchmen fellows, right?

17   A    Yes.

18   Q    And then in the presence of Adam Fox and the III%ers that

19   he brought -- who were they, do you remember?

20   A    It was Sean Fix I believe.

21   Q    Okay.

22   A    I think Sean Fix had his girlfriend or wife with him.

23   Q    All right.  Well, in any event, they are there.  You trust

24   them, right?  You don't think they are feds, do you?

25   A    No.  I don't think so.

1    Q    Okay.  You think they are part of the whole kind of -- they

2    are the crew that you guys are associating with, right?

3    A    Right.

4    Q    Partnership?

5    A    Right.

6    Q    So when it comes to your turn to express your ideas about

7    the proposal of kidnapping as an enterprise for these two

8    militias, your opinion is that it's not a good idea?

9    A    No.  I said it would -- it would be almost as bad as

10   storming the Capitol.

11   Q    Right.  Kidnapping is just as bad as going into the

12   Capitol, correct?

13   A    Right.

14   Q    Going into the Capitol is a bad idea, right?

15   A    Right.

16   Q    Not feasible?

17   A    Not feasible.

18   Q    Kidnapping in your mind is just as bad as going into the

19   Capitol?

20        MR. KESSLER:  This has all been asked and answered

21   many times.

22        THE COURT:  He has gone over it already, so I don't

23   know that we need to hear it again.

24        MR. GIBBONS:  Thank you, Your Honor.

25   BY MR. GIBBONS:

1    Q    With respect to Adam Fox and -- he talked a lot, did he

2    not?

3    A    He did.  Yes.

4    Q    Dan Chappel in June was offered the opportunity to actually

5    lead the Watchmen, just take it over, correct?

6    A    I don't exactly recall that.

7    Q    Okay.  He ended up being XO, correct?

8    A    We never formed formal ranks.  It was talked about.  We

9    talked about who was going to be in what rank but it was never

10   actually done.

11   Q    So he didn't have a rank with the Watchmen, is that what

12   your testimony is?

13   A    Yes.  He was just in the Watchmen leadership.

14   Q    All right.  But he is in the leadership group, true?

15   A    True.

16   Q    Okay.  He vouched for Adam Fox, did he not?

17   A    Yes.

18   Q    Adam Fox seemed to enjoy Dan's attention, did he not?

19          MR. KESSLER:  Speculation, Your Honor.

20          THE COURT:  Well, it's the same kind of thing you

21   asked about.  If he formed an opinion based on what he could

22   see and observe, not what he heard, he can answer, and if he

23   didn't he can say so.

24          THE WITNESS:  I would say that he liked his attention.

25   BY MR. GIBBONS:

1    Q    Okay.  And let's talk about Adam for a second.  You went to

2    the Vac Shack meeting on June 20th, correct?

3    A    I did.  Yes.

4    Q    And you went to the Vac Shack?

5    A    Yes.

6    Q    And you went to his living quarters, correct?

7    A    Correct.

8    Q    Is it fair to say it could be described as squalor?

9    A    Yes.

10   Q    Kind of sad?

11   A    Yes.

12   Q    No furniture really, right?

13   A    No.

14   Q    A bed?

15   A    Right.

16   Q    The walls of his bedroom defined by hanging blankets?

17   A    Correct.

18   Q    In terms of his equipment that he had at the time, you saw

19   what kind of -- you saw him in Lansing, true?

20   A    True.

21   Q    So you saw him with a kit and his guns and whatever, right?

22   A    Correct.

23   Q    He had kind of lousy equipment, is that right?

24   A    I wouldn't say bottom of the barrel.  It was probably

25   middle of the road equipment.

1    Q    Okay.  Certainly not as nice as yours?

2    A    No.

3    Q    Certainly not as nice as Dan's?

4    A    No.

5    Q    Adam Fox wouldn't be operating on your level, correct?

6    A    Correct.

7    Q    You got to watch him in trainings, true?

8    A    True.

9    Q    You saw him fire his weapon?

10   A    True.

11   Q    You saw him manipulate his weapon?

12   A    True.

13   Q    You saw him physically maneuver through the shoot house in

14   Cambria?

15   A    True.

16   Q    Adam Fox isn't somebody you thought was real experienced

17   and on his game, correct?

18   A    I was impressed for it being his first time in a shoot

19   house, but I would say his skills weren't top notch or anything

20   like that.

21   Q    You were quite a bit better than he was, weren't you?

22   A    Yes.

23   Q    So Adam, in your mind, you see where he lives, you see his

24   skill set and his equipment and he talks a lot, right?

25   A    Right.

1    Q    And you don't really endorse his ideas when it comes to

2    storming the Capitol, true?

3              THE COURT:  How many times do we have to hear him say

4    that?

5              MR. GIBBONS:  I'm sorry, Your Honor.

6              THE COURT:  It's like half a dozen.

7              MR. GIBBONS:  All right.

8    BY MR. GIBBONS:

9    Q    You consider Adam your leader?

10   A    My leader?

11   Q    Yes.

12   A    No.

13   Q    Was he the leader of this conspiracy in your opinion?

14   A    Yes.

15   Q    Okay.  Do you recall being at a BWW parking lot with

16   Mr. Chappel on July 24?

17   A    Yes.

18   Q    And what was your purpose in being in the truck at -- in

19   the BWW's parking lot with Mr. Chappel after dinner?

20   A    To have a phone conversation with Adam Fox.

21   Q    Okay.  And initially, Mr. Chappel attempted to initiate

22   that call on his phone, correct?

23             MR. KESSLER:  We are going to get into hearsay, Your

24   Honor.

25             MR. GIBBONS:  No we are not, Your Honor.

1          THE COURT:  Well, let's see where you go with it.

2    You've already had lots of testimony from Mr. Chappel.  So

3    let's see if we go to cover something new.

4    BY MR. GIBBONS:

5    Q    Correct, Mr. Chappel tried to dial on his phone?

6    A    He did.  Yes.

7    Q    But his phone died, right?

8    A    I don't recall exactly.

9    Q    Okay.  In any event, you ended up dialing Mr. Fox, correct?

10   A    Correct.

11   Q    And you were going to talk on speaker with Mr. Fox,

12   correct?

13   A    Yes.  Through the blue tooth.

14   Q    Yes.  And Mr. Chappel was going to participate in the

15   conversation as well, true?

16   A    True.

17   Q    You made the call to Adam Fox, right?

18   A    Right.

19   Q    But there was some OPSEC issues so you were going to have

20   to call him back in a minute, correct?

21   A    Correct.

22   Q    And then more than a few minutes passes, true?

23   A    True.

24   Q    And you are getting frustrated with this situation, right?

25   A    Right.

1    Q    You actually wanted to just leave, correct?

2    A    Correct.

3    Q    But you ended up staying, true?

4    A    We did.  Yes.

5    Q    And in that course of interaction, you were frustrated with

6    Mr. Fox, were you not?

7    A    I would say so.  Yes.

8    Q    And do you recall calling him Captain Autism?

9    A    I do.  Yes.

10   Q    You didn't have a lot of respect for Adam or his skill set

11   or his person, is that correct?

12   A    I had respect for him.  I respected his skill set for what

13   it was, even though it wasn't -- it wasn't perfect, but I

14   respected him.

15   Q    Okay.  And I wanted to kind of take you forward in time to

16   October 6, the day before your arrest.  Do you recall Adam Fox

17   posting a picture of himself with his new helmet?

18   A    I do.  Yes.

19   Q    Okay.  And he did that in this FAFO chat, right?

20   A    If I recall, yes.

21   Q    So that's the big chat with everybody in it, right?

22   A    Yes.

23   Q    And you saw the picture of Adam that he posted, correct?

24   A    Correct.

25   Q    And he has kind of a goofy look on his face, correct?

1    A    Correct.

2    Q    And he has this, it looks like kind of undersized helmet

3    strapped to his head, correct?

4    A    Right.

5    Q    And that's his new helmet, right?

6    A    Right.

7    Q    And he is proud of it, true?

8    A    True.

9    Q    And he is showing it to everyone, correct?

10   A    Yes.

11   Q    You had a reaction to that photo, a thought about that, did

12   you not?

13   A    I did have.

14   Q    And what did you post to the group?

15        MR. KESSLER:  What's the relevance, Your Honor?

16        THE COURT:  Pardon me?

17        MR. KESSLER:  Relevance.

18        THE COURT:  Well, I guess he's trying to respond to

19   some of your direct where you showed things that Adam Fox

20   purchased toward the end and tried to suggest that, in fact, it

21   wasn't at the time a significant show of force or skill, but

22   that if this witness remembers what he said and had an opinion

23   I guess he can express it at the time.  I think it's okay for

24   that purpose.

25   BY MR. GIBBONS:

1    Q    Do you recall what you said?

2    A    I don't recall my exact words.  No.

3    Q    If I show you your chat would that refresh your memory?

4    A    Yes.

5         MR. GIBBONS:  I'd like to refresh his memory, Your

6    Honor?

7         THE COURT:  All right.

8    BY MR. GIBBONS:

9    Q    There is the picture and the chat.  Thank you, sir.

10        MR. KESSLER:  This is his prior statement.  It's

11   hearsay.  I also don't think it's particularly relevant.

12        THE COURT:  Well, we'll see if this refreshes his

13   recollection about any of it, and then we'll give Mr. Gibbons a

14   chance to ask his question.

15   BY MR. GIBBONS:

16   Q    You posted it --

17        THE COURT:  Let's find out if he is refreshed.

18   BY MR. GIBBONS:

19   Q    Are you refreshed?  Do you remember making that chat now?

20   A    I do.  Yes.

21   Q    Okay.  And would you agree that -- well, and what was your

22   response to that photograph to Adam Fox in that public forum?

23   A    Would you like me to read it?

24        THE COURT:  No.  Don't read it.

25   BY MR. GIBBONS:

Q     Just what do you recall having been refreshed?

A     I was -- compared him to a special needs person.

Q     And what else?

A     That he looked like --

        THE COURT:  If you remember, go ahead.

        THE WITNESS:  He looked like he'd be the kind of
person to use the bathroom in his pants in public.

BY MR. GIBBONS:

Q     And there is another point, too, that you had to make there
at the end?

A     That's what I recall from reading it.

Q     Okay.  You didn't use the word go in your pants.  You said
shit yourself in public, correct?

A     Correct.

Q     And you told him somebody who shits himself in public --

        THE COURT:  Well, I think you made the point, and I
think he has made the point, and he told you what he remembers,
and I don't think there is much additional relevance to the
exchange at this point.

BY MR. GIBBONS:

Q     It's your testimony today that Adam Fox and his ideas
inspired you to join his desire to kidnap the governor,
correct?

A     Correct.

Q     Mr. Kessler talked to you a little bit about the idea that

1    you received a deal from the government, a plea agreement, in

2    return for your cooperation?

3    A    I did.  Yes.

4    Q    And in fact, your testimony today is some of that

5    cooperation, right?

6    A    That's right.

7    Q    Your plea agreement allowed you to plead guilty to just a

8    conspiracy to kidnap the governor, correct?

9    A    Correct.

10   Q    A single count, true?

11   A    Yes.

12   Q    You resolved your case early, right?

13   A    Right.

14   Q    And you avoided some of the other charges that could have

15   been filed against you, correct?

16   A    Correct.

17   Q    You avoided a weapons of mass destruction conspiracy count,

18   correct?

19   A    Correct.

20   Q    You had gun issues, correct?

21   A    I don't recall.

22   Q    There would be no other charges brought against you for

23   firearms or anything else, true?

24   A    Correct.

25   Q    Or acquiring explosives or anything like that, correct?

1    A    Correct.

2    Q    The weapons of mass destruction carries very, very, very

3    significant penalty, does it not?

4    A    From what I recall, yes.

5    Q    Up to life in prison, true?

6    A    True.

7    Q    Because this is alleged to be domestic terrorism, correct?

8    A    Correct.

9    Q    There is a domestic terrorism enhancement that can be

10   applied at sentencing by the Court, true?

11   A    True.

12   Q    And that's in the sentencing guidelines?

13   A    Correct.

14   Q    That was explained to you I suppose?

15   A    Correct.

16   Q    That also imposes a significant penalty of life in prison,

17   does it not?

18   A    It does.

19   Q    You were involved in all of these activities with gun

20   powder and the balloons at Cambria of trying to make an IED,

21   correct?

22   A    Correct.

23   Q    You testified to all that.  All that would have justified

24   you -- if you had not resolved this case, you could be sitting

25   here charged with these offenses, right?

1    A    That's correct.

2    Q    And after all of the cooperation and acknowledging what you

3    perceived to be your wrongdoing you received a 76-month

4    sentence in this case, true?

5    A    Seventy-five months.

6    Q    Seventy-five months?

7    A    Yes.

8    Q    And you are getting credit for every day that you've sat

9    since the day you were arrested, right?

10   A    Correct.

11   Q    So you have been in jail for 18 months?

12   A    Correct.

13   Q    That comes off the tally kind of from where we're sitting

14   today from when you are going to go home, right?

15   A    That's right.

16   Q    And then there is another thing called Rule 35, a

17   procedural rule under the criminal rules of procedure.  You are

18   aware of that, right?

19   A    Yes.

20   Q    And that says if you cooperate after you are sentenced the

21   government can ask the Judge to reduce your sentence even more,

22   correct?

23   A    Right.  But it's not guaranteed.

24   Q    It's -- nothing is guaranteed in life, right?

25   A    No.

1    Q    But you certainly are hoping that that happens?

2    A    Yes.  I would say so.

3    Q    I mean, you don't want to sit in jail or prison any longer

4    than you have to, right?

5    A    No.

6    Q    I would like to go over a few things that you testified to

7    here today this morning.  An audiotape was played from a

8    recording that was captured at the breakfast.  Was that Neno's

9    or whatever it was?

10   A    It was the diner that was connected to the hotel we were

11   staying at.

12   Q    Right.  And you were sitting at a table with -- I am not

13   sure.  I can't recall exactly.  Dan was there.  Mr. Harris,

14   right?  You guys were having breakfast, correct?

15   A    That's correct.

16   Q    And there was a conversation --

17   A    Yes.

18   Q    -- true?  Adam Fox was not sitting at that table, was he?

19   A    He was sitting directly behind us at the next table.

20   Q    And he was already there when you got there for breakfast,

21   was he not, right?

22   A    He was.  Yes.

23   Q    He was at breakfast with his girlfriend and her son?

24   A    Correct.

25   Q    And they left early.  They finished breakfast and left,

1    correct?

2    A    No.  We all stayed the same time.

3    Q    Okay.  There were two contacts I wanted to talk to you

4    about that you indicated you had with Adam Fox.  You said that

5    you talked with Adam about what happened on the day recon?

6    A    Yes.

7    Q    You recall that?

8    A    Yes.

9    Q    How did you talk to Adam about that?

10   A    Through the group chats.

11   Q    Okay.  So there wasn't a phone call?

12   A    No.

13   Q    And the group chat would be FAFO, correct?

14   A    Yes.  Or one of the smaller side chats we have.  We often

15   made smaller chats to discuss something real quick, and then we

16   would delete them when we were done.

17   Q    I see.  You don't know which one, though?

18   A    No.

19   Q    You also stated that Adam Fox invited you to go on that, I

20   call it the daytime ride-along, right, August 29th?  You

21   testified Adam Fox invited you to do that?

22   A    Yes.

23   Q    When did he do that?

24   A    I think he started inviting everybody in the group chat

25   probably about a week prior.

1    Q    So around the 22nd?

2    A    I would say somewhere around there.

3    Q    Do you recall having a phone call with Mr. Chappel and

4    Mr. Harris, a three-way call on the 19th of August?

5    A    It doesn't ring any bells.  No.

6    Q    Okay.  If I provide you with a transcript might that

7    refresh your memory?

8    A    It might.

9    Q    Does that refresh your recollection?

10   A    Not entirely.  I still don't remember the call itself.

11   Q    Okay.  Do you remember the subject matter?

12   A    I remember talking about going on the surveillance multiple

13   times.

14   Q    Okay.  And you don't recall having that conversation on the

15   19th?

16   A    No.

17   Q    Okay.  And this hasn't helped you?

18   A    No.

19   Q    You testified this morning that when the trucks arrived,

20   because all the trucks left -- there were three trucks, right,

21   on -- and I'm talking about Luther, I'm sorry.  So let me give

22   you some context so you can actually answer the question.  On

23   September 12th, everyone is at Walmart, correct?

24   A    Yes.

25   Q    In the evening?

1    A    In the evening.

2    Q    For the three trucks that go on the recon you guys rally at

3    the Walmart, correct?

4    A    Correct.

5    Q    You came up with Mr. Higgins I think you testified and you

6    came up following Mr. Chappel in his truck, correct?

7    A    Correct.

8    Q    And you testified that you then had to wait a while for

9    Adam to get there, is that right?

10   A    Correct.

11   Q    You then testified that the three trucks proceeded to Elk

12   Rapids, true?

13   A    True.

14   Q    That's just short of Birch Lake where the governor's

15   cottage is, right?

16   A    Right.

17   Q    A few miles south of where Birch Lake is, right?

18   A    Right.

19   Q    And you said that the trucks all kind of parked in a

20   parking lot at a church?

21   A    Yes.  We all --

22   Q    At AmVets?

23   A    We all parked side-by-side.

24   Q    Okay.  At that point Adam got out and told everybody what

25   to do?

1    A    Correct.

2    Q    Did anyone else give instructions?

3    A    Not that I heard.  No.

4    Q    Okay.  Just Adam?

5    A    Just Adam.

6    Q    Now, I want to make sure we are clear about this.  Red is

7    there, correct?

8    A    Correct.

9    Q    Mark, right?  You know Mark from the warden of the north?

10   A    I had only met him at Luther.  I didn't know him

11   personally.

12   Q    Right.  Okay.  That was the first time you had met Mark?

13   A    I think so.  Yes.

14   Q    Okay.  But you recall he was -- he was on the ride, right?

15   A    Yes.  He was with the Null brothers.

16   Q    Yes.  He drove the Null brothers, true?

17   A    True.

18   Q    Okay.  So he was present and given instructions by Adam

19   then, too, right?

20   A    Right.

21   Q    And then Dan Chappel has a truck, right?

22   A    Right.

23   Q    And he would have been given instructions by Adam, correct?

24   A    Correct.

25   Q    And Steve Robeson is there, right?

1    A    Right.

2    Q    And he would have been in the presence of Adam when he was

3    giving these instructions, right?

4    A    Right.

5    Q    There was -- I am going to jump ahead because that's here

6    in my notes.  There was a series of screen shots from FAFO

7    where Adam was sharing with the different things that he bought

8    there in early October.  Do you remember those screen shots?

9    A    Yes.

10   Q    And those specific items that he bought?

11   A    Yes.

12   Q    Any reason to believe that those -- and you know a lot

13   about guns, right?

14   A    Right.

15   Q    And you were trying to get a firearms license, a dealer

16   license, right?

17   A    I was.  Yes.

18   Q    Yes.  So you know how all the rules work for the most part?

19   A    Right.

20   Q    Okay.  You would agree that there isn't anything illegal

21   about anything that Adam bought?

22   A    No.

23   Q    I think you testified -- I am going to go back to that

24   night in Luther.  You testified that Adam gave you directions

25   when you were out on the road with the, I think it was the

illuminator light?

A    Right.

Q    That was Adam that was directing you up and down ▮▮▮▮▮▮

Trail?

A    Before leaving where we were rallied together Adam Fox had

given me the address, instructed me the wait 10 to 15 minutes

before leaving.  Then he instructed me to go down the road once

and then on the way back flash my light so he could attempt to

see it from the other side of the lake.

Q    Okay.  Did you have any contact with Adam Fox after leaving

that parking lot?

A    I did.  Yes.

Q    So when you were driving up and down the road, you guys

can't find the governor's cottage, correct?

A    Right.

Q    You had the wrong address, true?

A    Yes.

Q    Okay.  While you are driving up and down the road, did you

have any communication with Adam Fox at all?

A    Towards the end I made a phone call to him to inform him we

couldn't find the address that he had given me.

Q    You talked to him on the phone?

A    I talked to him on the phone.

Q    Did you call his phone?

A    I don't recall whose phone I called exactly.  I just know

1      that I spoke to Adam Fox.

2      Q    Okay.  There was this meeting I guess is coined a term that

3      happened on Sunday, the circle of trust meeting, is that right?

4      Do you know what I'm talking about?

5      A    I haven't heard it called that, but yes.

6      Q    Okay.  Well, there was a -- there was -- there was a

7      meeting in the afternoon -- after -- before live fire or after

8      live fire, do you remember?  The meeting you were talking

9      about.

10     A    It might have been before.  I can't remember if it was

11     before or after.

12     Q    Okay.  But you know what meeting I'm talking about, right?

13     A    I do.

14     Q    The one you said where you guys were kind of down the road

15     there away from everybody else, right?

16     A    Right.

17     Q    Okay.  And that was supposed to be a meeting of just the

18     operators, correct?

19     A    Correct.

20     Q    And Red is one of those people, right?

21     A    Yes.  He was there.

22     Q    Because he is the guy that apparently has access to

23     explosives, true?

24     A    True.

25     Q    Is Jenny Plunk at that meeting?  She isn't, is she?

1    A    I don't -- I don't recall seeing any female in that circle.

2    Q    Okay.  Because it was just you guys, right?

3    A    Right.

4    Q    The Watchmen, Daniel Harris, Caserta?  I think you named

5    them all, right, Adam Fox?

6    A    We were no longer Watchmen at that point.

7    Q    Brick Squad?

8    A    Right.

9    Q    So Brick Squad is there.  Adam Fox is there.  Red is there,

10   Dan Chappel, Steve Robeson?

11   A    And Brian Higgins as well.

12   Q    And Brian Higgins?

13   A    Yeah.

14   Q    Brian Higgins isn't in the Brick Squad, is he?

15   A    No.

16   Q    And he is not in -- he is not in Adam's Michigan III%

17   Patriot Militia, is he?

18   A    No.

19   Q    Okay.  And it's your testimony that the video of what Red

20   can do or offer the group is played at that meeting, correct?

21   A    I had seen it before that, and then it was played again at

22   the meeting for anybody who had missed it the first time it was

23   shown.

24   Q    Okay.  It was played on Sunday?

25   A    Yes.

1   Q   That's your testimony?  And when else was it played?

2   A   I had seen it earlier.  It wasn't on Sunday.  So it would

3   have been some time on Saturday, too, the first time I saw it.

4   Q   Okay.  And in the meeting on Sunday, Red is there, correct?

5   A   Correct.

6   Q   And Dan Chappel?

7   A   Correct.

8   Q   And Steve Robeson?

9   A   Correct.

10  Q   There was talk about group cash.  Do you remember that?

11  A   I do.  Yes.

12  Q   Okay.  Group cash was something that the Brick Squad was

13  doing?

14  A   Yes.

15  Q   Adam Fox wasn't part of the group cash, was he?

16  A   I don't think he contributed.  No.

17  Q   Can I have Government's Exhibit 282, please?  Can you

18  highlight the first text?

19          You were in FAFO, correct?

20  A   Correct.

21  Q   You saw this text that Adam Fox put up on October, I think

22  it's October 3rd?  Do you recall seeing that?

23  A   Yes.

24  Q   Okay.  And would you agree that that's about doing a

25  citizen's arrest, true?

1    A    True.

2    Q    And do you remember making a comment following that chat

3    about what you thought about the citizen's arrest?

4    A    No.  I don't recall a comment I made.

5              MR. GIBBONS:  May I approach, Your Honor?

6              THE COURT:  Sure.

7    BY MR. GIBBONS:

8    Q    I can try to refresh your recollection, sir.

9    A    Okay.  Okay.

10   Q    Does that refresh your recollection?

11   A    It does.

12   Q    And what was your reaction to the idea that a citizen's

13   arrest could be affected?

14   A    I had said that we had already covered it and that it's not

15   covered by the constitution.

16   Q    It's a bad idea, right?

17   A    Not that it's a bad idea.  I just said that it wasn't

18   covered by the constitution.

19   Q    And so this occurs at the end of the -- at the end of the

20   case, right?  This event you agree is the end of October, four

21   months after the Vac Shack?

22   A    Right.

23   Q    Where you had already covered this ground, true?

24   A    True.

25             MR. GIBBONS:  Thank you.

1          THE COURT:  All right.  Ms. Kelly?

2          MS. KELLY:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4    BY MS. KELLY:

5    Q    Good afternoon, Mr. Garbin.

6    A    Good afternoon.

7    Q    My name is Julia Kelly.  I represent Daniel Harris.  I have

8    some followup questions for you, okay?

9    A    Okay.

10   Q    All right.  You were arrested on October the 7th, correct?

11   A    Correct.

12   Q    Okay.  And you were interviewed by two special agents from

13   the FBI, correct?

14   A    Correct.

15   Q    Okay.  And you voluntarily spoke with them that evening?

16   A    I did.  Yes.

17   Q    Did you know that you were being recorded that evening?

18   A    Not at the time, no.

19   Q    Okay.  And you also participated in what are called

20   proffers, is that right?

21   A    That's right.

22   Q    Okay.  And a proffer is where you sit with your attorney

23   and you sit with the government attorneys and you talk to them,

24   right?

25   A    That's correct.

1   Q    Okay.  And you submitted to several proffers, correct?

2   A    Correct.

3   Q    Okay.  You submitted to one on December the 7th of 2020,

4   correct?

5   A    That sounds correct.

6   Q    Okay.  And you were there with your three attorneys, right?

7   A    Correct.

8   Q    Okay.  Mr. Kessler was there?

9   A    That's correct.

10  Q    Okay.  And there was a special agent there, correct?

11  A    Yes.

12  Q    Okay.  Had you seen any of the discovery prior to December

13  the 7th?

14  A    Very little.

15  Q    Okay.  Had you heard any of the audio prior to December the

16  7th?

17  A    I think just one or two clips that my attorney had let me

18  listen to.

19  Q    Okay.  Your next proffer was on December the 23rd of 2020,

20  correct?

21  A    That sounds right.

22  Q    Okay.  And that was over the telephone?

23  A    Yes.

24  Q    All right.  The following one was on February 24th, 2021,

25  correct?

1    A    That sounds right.

2    Q    All right.  And that was a zoom call, right?

3    A    Right.

4    Q    And you were with your attorney, right?

5    A    Yes.

6    Q    Okay.  And then the last one was February 26th of 2021,

7    correct?

8    A    That sounds correct.

9    Q    All right.  And that was here in the courthouse, right?

10   A    I believe so.  Yes.

11   Q    Okay.  You also testified in front of a grand jury two

12   times, correct?

13   A    That is correct.

14   Q    Okay.  And that was the first time was on December the 15th

15   of 2020, right?

16   A    That sounds right.

17   Q    And the second one was on February the 23rd of 2021,

18   correct?

19   A    I believe February 23rd was when I changed my plea.

20   Q    That was your change of plea.  Okay.  When you testified in

21   front of the grand jury it was just like today and they swore

22   you and you were placed under oath, correct?

23   A    That's correct.

24   Q    And you told the truth, right?

25   A    I did.  Yes.

1   Q    Okay.  And you were told that there would be some sort of a

2   transcript of that, correct?

3   A    That is correct.

4   Q    All right.  And in preparation for today you met with

5   Mr. Kessler, correct?

6   A    I didn't meet with anybody this morning before I came into

7   the courtroom.

8   Q    Okay.  Did you meet with anyone in the last month?

9   A    Yes.

10  Q    How many times?

11  A    I can't recall exactly off the top of my head.

12  Q    More than once?

13  A    More than once.  Yes.

14  Q    More than five times?

15  A    I don't know about more than five times.

16  Q    Okay.  And were you provided transcripts of what you

17  previously said?

18  A    No.  I was not.

19  Q    Were you provided any reports?

20  A    No.  I was not.

21  Q    Were you shown any videos?

22  A    I seen some videos.

23  Q    Okay.  Did you listen to any audio?

24  A    I listened to a few audio clips.

25  Q    Okay.  And those were provided by the government to you?

1    A    That's correct.

2    Q    Okay.  And your attorneys were present with you each time

3    that you were preparing for today's testimony?

4    A    Yes.  They were present.

5    Q    Okay.  So in looking at your transcript from October the

6    7th, the day that you were arrested, a lot of different

7    statements then you've made today, is that fair to say?

8         THE COURT:  Well, you are going to have to focus on

9    the statement so that if you are going to try to impeach we go

10   one by one, get into his statement and move.  Otherwise, it's a

11   difficult question to frame.

12        MS. KELLY:  Thank you.

13   BY MS. KELLY:

14   Q    So October the 7th, taking you back to the day you were

15   arrested, you were interviewed in an interview room, correct?

16   A    Correct.

17   Q    Okay.  And you talked to the special agents about your

18   involvement in the Wolverine Watchmen, correct?

19   A    I really don't recall much of anything I said during that

20   time.

21   Q    Okay.  Do you recall telling the special agent --

22        THE COURT:  You start by setting up what he said today

23   that you think is inconsistent with what he said on October 7

24   so we can follow and Mr. Kessler knows what the proposed

25   impeachment is.

1          MS. KELLY:  I'm sorry, Your Honor.

2          THE COURT:  So we need to know what you think he said

3    today that's inconsistent with what you are going to approach

4    here.  So get in -- first get in front of us the statement you

5    are referencing and see if he agrees that he made it here today

6    and then we can proceed with the impeachment.

7    BY MS. KELLY:

8    Q    Do you recall testifying here today that you voluntarily

9    joined a conspiracy to kidnap the governor of Michigan?

10   A    I did.  Yes.

11   Q    Okay.  Do you recall on October the 7th telling the

12   investigators when you heard about a kidnapping plan it was a

13   complete turn off?

14   A    No.  I don't recall that.

15   Q    Okay.  Would it refresh your recollection to review a

16   transcript of that interview?

17   A    It might.

18         MR. KESSLER:  For what it's worth if the point is he

19   denied his guilt when he was first --

20         THE COURT:  That's part of your redirect.  She can

21   present the statement and see if it refreshes.

22         MS. KELLY:  May I approach the witness, Your Honor?

23         THE COURT:  Sure.

24         THE WITNESS:  Thank you.

25         MS. KELLY:  You are welcome.

1          THE WITNESS:  Okay.  I've read it.

2     BY MS. KELLY:

3     Q    You have reviewed that transcript?

4     A    Yes.

5     Q    Did that refresh your recollection as to your response to

6     the special agents?

7     A    Not quite.  I still don't recall myself saying it exactly,

8     but I know since it's on a transcript it's something I said.

9     Q    Okay.  Do you recall testifying today that you knew what

10    was going on and the night recon in September of 2020?

11    A    I did.  Yes.

12    Q    Okay.  And do you recall telling the special agents on

13    October the 7th that when you went up on that night recon

14    everybody except for a couple people were immediately turned

15    off by the idea?

16    A    I don't recall that.

17    Q    Would it refresh your recollection to look at a transcript?

18    A    It might.  Yes.

19          MS. KELLY:  May I approach the witness, Your Honor?

20          THE COURT:  Sure.

21          MR. KESSLER:  Just before we get any further, I have

22    no problem if he recalls it, but if he is going to give another

23    answer like that where he says if it's in a transcript it must

24    be true, I think that's getting into the same hearsay problem.

25          THE COURT:  It's 613 impeachment at that point.  I

1    think it's fair enough.

2              THE WITNESS:  Okay.  I've read it.

3    BY MS. KELLY:

4    Q    Have you had a chance to review that transcript of your

5    interview?

6    A    Yes.

7    Q    Does that refresh your recollection as to telling the

8    special agents that people were turned off by the idea?

9    A    No.  It does not.

10   Q    You recall testifying today under oath that you offered

11   your boat as part of this conspiracy plan?

12   A    I don't know if I testified to offering my boat.

13   Q    Okay.  Do you recall telling the special agents when you

14   were --

15             THE COURT:  If you are going to say -- he doesn't

16   recall the testimony here today, and I don't either.  So I

17   don't think that sets up a proper impeachment unless I am

18   mistaken.  I don't remember that coming up with this witness's

19   testimony today.

20   BY MS. KELLY:

21   Q    Do you recall testifying today that when the Wolverine

22   Watchmen would get together and train it was for the purpose of

23   training for kidnapping the governor?

24   A    Yes.

25   Q    Okay.  And do you recall when the special agents asked you

1    on October the 7th about when you guys would get together you

2    said it was just to drink and hang out?

3    A    I don't recall it.

4    Q    Would it refresh your recollection to review a transcript?

5    A    Yes.

6              MS. KELLY:  May I approach, Your Honor?

7              THE COURT:  Sure.

8    BY MS. KELLY:

9    Q    Did that refresh your recollection?

10   A    No.  Not exactly.

11   Q    Not exactly?

12   A    Um-hum.

13   Q    So you don't remember saying it was just to hang out and

14   drink beer?

15   A    No.

16   Q    You recall testifying today that you knew what the plan was

17   of going up on that night ride-along?

18   A    Yes.

19   Q    Okay.  And do you recall Special Agent Rich Larance asking

20   you what the long-term plans were and you saying, I have no

21   idea what the long-term plans were?

22   A    I don't recall that.  No.

23   Q    Okay.  Would it refresh your recollection to look at a

24   transcript of your interview?

25   A    Yes.

1          MS. KELLY:  May I approach the witness, Your Honor?

2          THE COURT:  Sure.

3    BY MS. KELLY:

4    Q    Have you had a chance to review that transcript of your

5    interview from October the 7th?

6    A    I have.

7    Q    And does that refresh your recollection that you were not

8    aware of the long-term plans?

9    A    No.

10   Q    I'll try one more.  You recall talking or testifying today

11   under oath that when you got back to the property in Luther you

12   continued having discussions about this conspiracy to kidnap?

13   Do you remember that?

14   A    Yes.

15   Q    Okay.  And do you recall when you were arrested on October

16   the 7th and asked about what happened when you got back, you

17   told the special agents that you flipped out on Adam Fox and

18   you were really upset with him?  Do you recall that?

19   A    No.

20   Q    Would it refresh your recollection to review a transcript?

21   A    Yes.

22         MS. KELLY:  May I approach the witness, Your Honor?

23         THE COURT:  Sure.

24   BY MS. KELLY:

25   Q    Have you had a chance to review that transcript of your

1    interview from October the 7th?

2    A    Yes.

3    Q    And does it refresh your recollection about saying that you

4    were upset when you got back because of the night ride-along?

5    A    No.

6    Q    Okay.  So you've never seen this transcript before?

7    A    No.

8    Q    The government didn't provide you with a copy of it prior

9    to your testimony today?

10   A    No.

11   Q    Okay.  Fair to say these statements that we've just talked

12   about, if you had said them, would be untrue?

13   A    I would say so, yes.

14   Q    Okay.  And you did know you were talking to special agents

15   then, correct?

16   A    I did.  Yes.

17   Q    And this would not -- October the 7th, had you made these

18   statements, that would not be the first time that you lied to a

19   federal agency, correct?

20   A    I wouldn't know about that.

21   Q    Okay.  You remember going onto that trip to the Vac Shack

22   on June the 20th, correct?

23   A    It was around there.  Yes.

24   Q    Okay.  And you remember riding with Dan Chappel, correct?

25   A    Right.

1    Q    And you guys were talking in the vehicle, correct?

2    A    Right.

3    Q    Okay.  You remember telling him about you had previously

4    had an FFL?  Do you recall that conversation?

5    A    Not that part.  No.

6    Q    What's a FFL?

7    A    A Federal Firearms License.

8    Q    Okay.  Did you have previously have an FFL prior to June

9    the 20th?

10   A    I did not.  No.

11   Q    You did not?

12   A    No.

13   Q    So when you told Dan Chappel that you had an FFL you were

14   lying at that point?

15        THE COURT:  Well, Dan Chappel is not a federal agent,

16   so that's improper, and for that purpose it seems to me you

17   need to just ignore the line of questioning we just had if

18   that's the point.

19        MS. KELLY:  That wasn't the point, Your Honor.  There

20   was -- there was additional statements made by this witness

21   about his prior FFL license that he held.

22        THE COURT:  Well, not -- I don't care if it was to Dan

23   Chappel.  If the point is -- your premise was, well, it's not

24   the first time you lied to a federal agent, and all we've heard

25   so far is about a conversation he had with somebody who is not

1    a federal agent.

2            MS. KELLY:  And I am just trying to lay the foundation

3    of the conversation.

4            THE COURT:  You are going to have to get more direct

5    than that.  None of that matters and it's improper impeachment.

6    BY MS. KELLY:

7    Q    Had you ever applied for an FFL, Mr. Garbin?

8    A    Yes.

9    Q    Yes?

10   A    Yes.  I have.

11   Q    Okay.  Was that in 2020?

12   A    It was.  Yes.

13   Q    Okay.  Prior to 2020, had you possessed an FFL?

14   A    No.

15   Q    Okay.  You were turned down for that FFL in 2020, correct?

16   A    I was.  Yes.

17   Q    Okay.  Now, Mr. Garbin, you testified that you joined the

18   Wolverine Watchmen January of 2020, approximately, correct?

19   A    It was some time in February going into March in that area.

20   Q    Okay.  February going into March now.  Okay.  And you

21   identified as a libertarian, correct?

22   A    Correct.

23   Q    And as a supporter of unregulated Second Amendment rights,

24   correct?

25   A    Correct.

Q    All right.  And you supported the Boogaloo movement,

correct?

A    I did.  Yes.

Q    And you identified that as kind of a civil war, correct?

A    Correct.

Q    Okay.  And so you joined the Wolverine Watchmen and Joe

suggested that you join the Watchmen, is that right?

A    He had posted a link to the Watchmen's FaceBook page, and

one of the comment groups we are in has an invitation, so I

joined the FaceBook page.  We talked on the FaceBook page and

then he later added me to the encrypted Wire chat.

Q    Okay.  And as part of the encrypted Wire chat, you were

having communication with other members of the Watchmen, right?

A    That's correct.

Q    All right.  And you testified that when you joined you were

vetted, correct?

A    That's correct.

Q    And you were asked if you were okay with being labeled a

domestic terrorist, correct?

A    Correct.

Q    Okay.  You were eventually put into the administration by

Joe, right?

A    That's correct.

Q    All right.  And part of your duties was also to vet new

members, correct?

1    A    That's correct.

2    Q    Okay.  And you were part of the vetting group for Dan

3    Chappel, correct?

4    A    Correct.

5    Q    Okay.  And you were also part of the vetting team for

6    Daniel Harris, correct?

7    A    That's correct.

8    Q    Okay.  And you asked him questions, correct?

9    A    Correct.

10   Q    Okay.  You never asked him if he was okay being labeled a

11   domestic terrorist, correct?

12   A    Not that I recall, but the question was always asked by

13   somebody.

14   Q    Okay.  Would it refresh your recollection to look at

15   Mr. Harris's vetting page to see if that question was asked of

16   him?

17   A    Yes.

18          MS. KELLY:  If we could pull up --

19          MR. KESSLER:  Unless it was asked by him it's going to

20   be hearsay, Your Honor.

21          THE COURT:  Right.  Well, I mean, he said everybody

22   was asked.  I don't know that this will really provide

23   impeachment unless it reminds him that he asked.  He has

24   said -- I think he said he didn't ask it, didn't he?

25          MS. KELLY:  He said he didn't but it's always asked.

1          THE COURT:  Right.  But I don't know how it's going

2     to -- that's a broad statement in some ways.  I am not sure he

3     is even in a position to say it's always asked or he can talk,

4     I guess, about what the policy was, but showing him -- what is

5     it going to be, a chat or a FaceBook page involving your

6     client?

7          MS. KELLY:  I was just going to show it to this

8     witness to refresh his recollection.  If we could pull it up on

9     his screen and if this witness has said that it's always

10    asked --

11         MR. KESSLER:  Is it something he said?

12         THE COURT:  So is it refreshing his recollection about

13    what or wasn't asked at least in that forum?

14         MS. KELLY:  That it was not asked, correct.

15         THE COURT:  Well, what I don't understand is how

16    showing him one page is going to even potentially refresh his

17    recollection of it.  There's all kinds of ways to ask somebody

18    something either on a document, in person, and I don't think

19    anything he said from the witness stand rules it out or says it

20    only happened within a particular thing you are showing him.

21    So it doesn't -- I don't understand the connection between the

22    answer and where you are going next.

23         MS. KELLY:  Your Honor, there are -- there are vetting

24    questions that are asked of Mr. Harris and then there are

25    continuing questions.  I was going to --

1          THE COURT:  But my point is, there is no foundation

2     that that's the only way information was gleaned from any

3     particular applicant.  So you should go to something else and

4     then maybe you can clarify things for me later, but let's go to

5     something else in the time you have left.

6          MS. KELLY:  Thank you, Your Honor.

7     BY MS. KELLY:

8     Q    Your roommate Alex Davidson joined the Wolverine Watchmen

9     the same time you did, is that correct?

10    A    That's correct.

11    Q    Okay.  And you continued to reside with Alex Davidson until

12    your arrest, correct?

13    A    Correct.

14    Q    Okay.  Alex Davidson also worked at Detroit Metro, is that

15    correct?

16    A    That's correct.

17    Q    I believe you went to one protest with the Watchmen, is

18    that right?

19    A    It was just the one.  Yes.

20    Q    Okay.  That was the Second Amendment rally in June, June of

21    18?

22    A    Correct.

23    Q    Prior to that date, it's true that you believed the role of

24    the Watchmen was a defensive group, is that true?

25    A    Yes.

1    Q    Okay.  You did not go on any QRFs, correct?

2    A    I did go on one.

3    Q    That was on May the 30th?

4    A    I don't remember the exact date.  It was one of the protest

5    days.  Paul Bellar had brought some people back to his house.

6    He said that if I didn't hear from him within an hour, hour

7    and-a-half, that something is wrong.  So I didn't hear from him

8    and I went to his house but everything was fine.

9    Q    Okay.  That was Paul Bellar's somewhere in the Detroit

10   area, is that right?

11   A    He lived in Milford.

12   Q    Milford.  Okay.  And so that was the one QRF that you

13   attended?

14   A    Correct.

15   Q    Okay.  On June the 3rd, some of the Watchmen came to your

16   house, correct?

17   A    Correct.

18   Q    Okay.  And that included Daniel Harris, right?

19   A    It might have.  I had Watchmen come to my house on two or

20   three occasions, so...

21   Q    Okay.  Let's see if we can narrow it down.  So on June the

22   3rd, some Watchmen came, and this was where you talked about

23   this rank structure, do you recall that?

24   A    I do.  Yes.

25   Q    Okay.  Does that refresh your recollection about the date?

1    A    Yes.

2    Q    Okay.  And Daniel Harris was there --

3    A    Yes.

4    Q    -- correct?  And Dan Chappel was there, right?

5    A    Yes.

6    Q    You said you talked about the rank structure but never

7    really came to fruition, correct?

8    A    Correct.

9    Q    And do you recall Chappel agreeing to be the ops guy at

10   that meeting?

11   A    I don't recall him agreeing to anything.

12          MR. KESSLER:  Calls for hearsay anyway, Your Honor.

13          THE COURT:  I think we've covered it with him

14   directly, so I am not sure it's new information.

15   BY MS. KELLY:

16   Q    Was June the 14th the first time that you went to Munith?

17   A    No.

18   Q    When did you previously go to Munith?

19   A    I don't remember the date.  The only reason I remember is

20   because it was right after Koby Bryant had died.  That was the

21   first time I was in Munith.

22   Q    Okay.  And you talked with Mr. Gibbons about some of the

23   rudimentary training that was going on in Munith, is that

24   right?

25   A    With who?

Q    Some of the kind of basic, you weren't sure if you would even call it training, that was going on in Munith early on with the Watchmen, right?

A    Right.

Q    Okay.  I believe you said sometimes you guys would go into Joe and Pete's trailer, is that right?

A    Yeah.  We did it a few times.

Q    Okay.  And there was some PVC pipes that you talked about, right?

A    Right.

Q    Okay.  And were you at the training in Munith on May the 17th when Daniel Harris first came to a training at Munith?

A    Yes.

Q    Okay.  And Dan Chappel had already been a Watchmen already, right?

A    Yes.

Q    Is it fair to say -- and I think you said you would be assisting Dan with the training, is that right?

A    He was assisting me.

Q    He was assisting you?

A    Yes.

Q    Okay.  And you knew that about his military background, right?

A    I did.  Yes.

Q    Okay.  And there were vehicles that were used in Munith as

1    part of training, correct?

2    A    Later on.  Yes.

3    Q    Okay.  You testified on direct examination that some of you

4    guys would call Dan Chappel dad, right?

5    A    Right.

6    Q    Okay.  And sometimes that was done sarcastically, correct?

7    A    It was all done sarcastically as a joke.

8    Q    Always done sarcastically as a joke?

9    A    Yes.

10   Q    Okay.  And that was because he was older than you guys,

11   correct?

12   A    Older, yes.

13   Q    Okay.  And sometimes would say things that made him sound

14   like a dad, right?

15   A    Correct.

16   Q    And you are 26 now, correct?

17   A    That's correct.

18   Q    Okay.  So you were like a year or two older than Daniel

19   Harris, correct?

20   A    Correct.

21   Q    All right.  And you testified on direct examination that

22   you knew that it was always sarcasm because you could see

23   Daniel Harris, if he was using the term dad you could see his

24   reaction, correct?

25   A    Correct.

```
1    Q   Is it true that Daniel Harris would also call Dan Chappel
2    dad --
3              MR. KESSLER:  Hearsay.
4              THE COURT:  Yeah.  I mean, it is.  I am not sure if
5    it's going to be a premise then in terms of his words we're
6    right where you can't be.  If he has other behavioral ticks or
7    other things that you want to call to the witness's attention
8    it may be proper.
9    BY MS. KELLY:
10   Q   Did anyone call --
11             THE COURT:  Same problem if it's anyone other than
12   this witness.
13             MS. KELLY:  Oh, over messages.
14             THE COURT:  Same problem.
15   BY MS. KELLY:
16   Q   So your testimony today is any time that you heard someone
17   call dad it was in person, is that right?
18   A   I've seen it a few times in the group messages.
19   Q   You have seen it in the group messages as well?
20   A   Yes.
21   Q   Okay.  So fair to say you wouldn't see someone's reaction
22   over a group message, correct?
23   A   Correct.
24   Q   Going forward to June the 28th, you recall testifying about
25   that training in Munith?
```

1    A    I do.  Yes.

2    Q    Okay.  And you talked about some of the people that were

3    there, right?

4    A    Right.

5    Q    Okay.  And you talked about some of the things that were

6    said, right?

7    A    Right.

8    Q    Okay.  And you said it a lot on direct examination about

9    this nodding in agreement.  Do you remember saying that?

10   A    Yes.

11   Q    Okay.  And you testified on June the 28th that Daniel

12   Harris was present at Munith, right?

13   A    Right.

14   Q    And you testified that he was nodding in acquiescence or an

15   agreement about the idea to storm a Capitol or to kidnap, is

16   that right?

17   A    That's right.

18   Q    Was it both those things or was it one or the other?

19   A    It was the entire time he'd be nodding in agreement.

20   Q    But was it to storming the Capitol or kidnapping the

21   governor?

22   A    It was during both conversations.

23   Q    So both of those conversations were held on June the 28th?

24   A    Storm the Capitol was talked about and kidnapping the

25   governor was talked about.

1    Q    Okay.  And you said that Daniel Harris was nodding,

2    correct?

3    A    Correct.

4    Q    Okay.  Is it possible that you have the information wrong;

5    that Daniel Harris was not present on June the 28th?

6    A    I wouldn't think so if the 28th was when the meetings --

7    Adam Fox was there.  Harris was present for both meetings with

8    Adam Fox.

9    Q    What was the other meeting that Daniel Harris was present

10   for with Adam Fox?

11   A    The one in August.

12   Q    August the 9th?

13   A    Yeah.

14   Q    Okay.  He wasn't there on June the 20th with Adam Fox,

15   correct?

16   A    Like I said, I am fairly certain he was there for both of

17   them.

18   Q    Is it possible that you are wrong?

19   A    I don't know.

20   Q    Okay.  The two of you had a pretty close relationship,

21   right?

22   A    We did.  Yes.

23   Q    Yeah.  And you testified that you had previously talked to

24   him about him being down for whatever kind of plan, right?

25   A    Right.

1   Q    Okay.  And no matter what it was, right?

2   A    Right.

3   Q    And you recall a meeting on July the 7th at Paul Bellar's

4   house?

5   A    Yes.

6   Q    Okay.  And you recall there being some kind of separation

7   from the Wolverine Watchmen in that discussion on July the 7th?

8   A    Paul Bellar had separated around that time.  Yes.

9   Q    Okay.  Because Paul wanted to bring girls to the training,

10  right?

11  A    Correct.

12  Q    And Joe was having marital issues, right?

13  A    Correct.

14  Q    And so Paul wants to start a separate group, right?

15  A    Correct.

16  Q    Okay.  And there's also a discussion about things that

17  occurred on June the 28th.  Do you recall that?

18  A    No.

19  Q    You don't recall the group talking about what had happened

20  at the last training?

21  A    No.

22  Q    Okay.  You remember there were code words made, right?

23  A    I remember the code words.  Yes.

24  Q    Okay.  And is it your testimony that on July the 7th

25  Mr. Harris was down for the kidnapping plan?

1    A    I don't think the kidnapping plan was mentioned on that

2    date.

3    Q    Okay.  Okay.  Not mentioned one bit?

4    A    I don't know about one bit, but I don't recall it being

5    mentioned.

6    Q    Okay.  You testified a little bit about wanting to be

7    the -- you know, starting the Boog and kicking off the civil

8    war and Michigan being first.  You recall that conversation,

9    that testimony that you testified?

10   A    I recall saying that we wanted to be the first to kick it

11   off.  Yes.

12   Q    Okay.  Is it your testimony today that Mr. Harris on July

13   the 7th wanted to kick it off just like you?

14        MR. KESSLER:  Hearsay.  I think we are getting very

15   close to a pretrial ruling the Court has made.

16        THE COURT:  I think we are, too, but it's an

17   out-of-court statement offered on your side from your client

18   and that's not something that you can put in through this

19   witness on your side of the case.  So if you have something

20   else or some other way to get to it, okay, but I don't think

21   you can get to it that way.

22   BY MS. KELLY:

23   Q    Did you talk about kicking the Boog off on July the 7th?

24   A    Not that I recall.

25   Q    Okay.  So no conversation about kidnapping or starting

1    everything off on July the 7th?

2    A    I just remember the code words being discussed.

3    Q    And you testified that the purpose of those code words was

4    to avoid detection from law enforcement, correct?

5    A    Correct.

6    Q    Okay.  The group that was made, you testified, was a QRF

7    chat, is that right?

8    A    Correct.

9    Q    All right.  And some of the code words that were made that

10   evening, Ski-Doo, spaghettios, those kinds of things, did you

11   ever use those code words?

12   A    We used them a little bit but it wasn't super common.

13   Q    Not super common.  Okay.

14          THE COURT:  If you are about to move to a new topic

15   this is probably a good time to break.

16          MS. KELLY:  Thank you, Your Honor.

17   ****************************************************************

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2
             Government Witnesses:                    Page
 3
             TY GARBIN
 4
               Direct Examination by Mr. Kessler        3
 5             Cross Examination by Mr. Gibbons        125
               Cross Examination by Ms. Kelly          178
 6

 7           Exhibits:                              Admitted

 8           Government's Exhibit 87                   26
               (Audio, July 10)
 9           Government's Exhibit 98.1                 39
               (Video, Explosive Making)
10           Government's Exhibit 98.2                 39
               (Video, Explosive Making)
11           Government's Exhibit 104                  34
               (Video, Garbin & Harris)
12           Government's Exhibit 124                  48
               (Video, Training, July 26)
13           Government's Exhibit 125                  48
               (Video, Training, July 26)
14           Government's Exhibit 126                  48
               (Video, Training, July 26)
15           Government's Exhibit 130                  51
               (Video, Luther Site Building)
16           Government's Exhibit 134                  83
               (Photographs, Luther Property)
17           Government's Exhibit 135                  53
               (Photograph, Luther Range)
18           Government's Exhibit 136                  53
               (Photograph, Luther Range)
19           Government's Exhibit 146                  29
               (Chat, SBR)
20           Government's Exhibit 167                  61
               (Audio August 23)
21           Government's Exhibit 242                  74
               (Video, Dash Cam)
22           Government's Exhibit 243                  74
               (Video, Dash Cam)
23           Government's Exhibit 244                  79
               (Audio, September 12)
24           Government's Exhibit 285                 103
               (Video, Caserta)
25           Government's Exhibit 296                 108
               (Garbin AR-15)
```

1    Government's Exhibit 297                          97
        (Ghost Guns)
2    Government's Exhibit 299                         115
        (Garbin Night Vision Binoculars)
3    Government's Exhibit 300                         111
        (Garbin Vest)
4    Government's Exhibit 301                         114
        (Garbin Helmet)
5    Government's Exhibit 455                         110
        (Garbin Glock)
6    Government's Exhibit 462                          52
        (Photograph, Garbin & Harris Hike)
7    Government's Exhibit 465                         117
        (Chat, Garbin & Fox)
8    Government's Exhibit 466                         119
        (Chat, Garbin & Fox)
9    Government's Exhibit 467                         119
        (Chat, Garbin & Fox)
10   Government's Exhibit 468                         121
        (Text, Garbin & Fox)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


     I, Paul G. Brandell, CSR-4552, Official Court Reporter

for the United States District Court for the Western District

of Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of an excerpt

from the proceedings had in the within entitled and numbered

cause on the date hereinbefore set forth; and I do further

certify that the foregoing transcript has been prepared by me

or under my direction.



                         /s/ Paul G. Brandell

                         Paul G. Brandell, CSR-4552, RPR, CRR

                         U.S. District Court Reporter

                         399 Federal Building

                              Grand Rapids, Michigan  49503