1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4      UNITED STATES OF AMERICA,

5              Plaintiff,          No:  1:20cr183-1/2/5/6

6       vs.

7      ADAM DEAN FOX,
       BARRY GORDON CROFT, JR.,
8      DANIEL JOSEPH HARRIS and
       BRANDON MICHAEL-RAY CASERTA,
9
               Defendants.
10

11

       Before:
12
                     THE HONORABLE ROBERT J. JONKER
13                        U.S. DISTRICT Judge
                          Grand Rapids, Michigan
14                     Thursday, March 24, 2022
                     Excerpt of Jury Trial Proceedings
15               Testimony of Ty Garbin and Kaleb Franks

16     APPEARANCES:

17              MR. ANDREW BIRGE, U.S. ATTORNEY
                By:  MR. NILS R. KESSLER
18              MR. JONATHAN C. ROTH
                The Law Building
19              333 Ionia Avenue, NW
                Grand Rapids, MI 49501-0208
20              (616) 456-2404

21                      On behalf of the Plaintiff;

22              MR. CHRISTOPHER M. GIBBONS
                MS. KAREN M. BOER
23              Dunn Gibbons PLC
                125 Ottawa Avenue, NW, Suite 230
24              Grand Rapids, MI 49503-2865
                (616) 336-0003
25
                        On behalf of Defendant Fox.

JOSHUA ADAM BLANCHARD
Blanchard Law
309 South Lafayette Street, Suite 208
P.O. 938
Greenville, MI 48838-1991

        On behalf of Defendant Croft, Jr.

JULIA ANNE KELLY
Willey & Chamberlain LLP
300 Ottawa Avenue NW Suite 810
Grand Rapids, MI 49503-2314
(616) 458-2212

        On behalf of Defendant Harris.

MICHAEL DARRAGH HILLS
Hills at Law PC
425 South Westnedge Avenue
Kalamazoo, MI 49007-5051
(269) 373-5430

        On behalf of Defendant Caserta.


REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

1                         03/24/2022

2                   (Proceedings, 8:30 a.m.)

3                   LAW CLERK:  All rise, please.

4                   (Jury in, 8:30 a.m.)

5                   LAW CLERK:  The United States District court for the

6       Western District of Michigan is now in session.  The Honorable

7       Robert J. Jonker, chief judge, presiding.

8                   THE COURT:  Thank you.  Good morning everyone.

9       Welcome back.  We are now on our fourth consecutive day, which

10      is a new record for us and good news because we are rolling

11      along.  We'll hope for that to continue tomorrow with our fifth

12      consecutive day, and you can see how things build, and if you

13      are able to hear day after day it's a better process for

14      everyone.  So I am really glad that we have been able to go

15      consecutive this week.

16                  When we broke yesterday we had Ty Garbin on the stand.

17      He is still here and we are going to continue with his exam.

18      Ms. Kelly was doing the cross exam and that's where we'll pick

19      up to begin.  Ms. Kelly.

20                  MS. KELLY:  Thank you, Your Honor.

21                       CROSS EXAMINATION(Continuing)

22        BY MS. KELLY:

23      Q    Good morning, Mr. Garbin.

24      A    Good morning.

25      Q    We left off yesterday we were starting talk about the trip

1    to Cambria, okay?

2    A    Okay.

3    Q    And you rode to Cambria, Wisconsin, with Dan Chapel,

4    Brandon Caserta, Paul Bellar, Daniel Harris and Kaleb Franks,

5    correct?

6    A    Correct.

7    Q    And those gentlemen that I just mentioned picked you up at

8    your house, is that correct?

9    A    That's correct.

10   Q    And your house is located at ███████████████?

11   A    Correct.

12   Q    If we could pull up Defense Exhibit 5208, which I believe

13   has been previously admitted?

14            THE COURT:  All right.

15   BY MS. KELLY:

16   Q    Mr. Garbin, do you see this map of Michigan and Wisconsin?

17   A    Yes.

18   Q    Okay.  And do you see where it says Ty Garbin with an

19   address underneath?

20   A    Yes.

21   Q    Is that a fair and accurate representation of where you

22   were residing?

23   A    Yes.

24   Q    In July of 2020?

25   A    Yes.

Q    Okay.  Would this be the route that you took to Cambria,
Wisconsin?

A    I don't know if it's the exact route, no.

Q    Okay.  Now, yesterday -- and you can take that down.  Thank
you.  Yesterday you testified or you listened to a clip about
you and Paul Bellar and others talking on the ride to Cambria,
Wisconsin, correct?  You remember that?

A    Yes.

Q    Okay.  And Paul Bellar was talking about we are all going
to be felons.  Do you remember that conversation?

A    Yes.

Q    Can you explain to the jury what was going on in that
conversation?

A    During that conversation we were talking about going
through Chicago with firearms.  Chicago has strict firearm
laws, so we were under the impression that going through
Chicago with the firearms that we had we would become felons.

Q    Was it that the amount of firearms that you guys had?

A    This was the hand guns, the magazine capacity and the SBR
in the back.

Q    So you guys were all concerned about that, is that right?

A    That's right.

Q    Okay.  So when you -- when Dan Chappel arrives to your
house with the gentlemen that we've talked about, you load your
stuff into that big Suburban, right?

1    A    Right.  We had to unload everything first and then repack

2    everything.

3    Q    Okay.  And we've heard some testimony that you guys weren't

4    sure if you were going to be camping or staying in a hotel,

5    correct?

6    A    Correct.

7    Q    So there was a whole bunch of camping gear there, right?

8    A    Correct.

9    Q    So your testimony is that when they got to your house,

10   everything was unloaded, is that right?

11   A    That's right.

12   Q    In order for you to put your stuff in?

13   A    Yes.

14   Q    Okay.  And your testimony yesterday was that Daniel

15   Harris's gun bag was unzipped?

16   A    Correct.

17   Q    Okay.  And that's how you could see into it?

18   A    Yes.

19   Q    Okay.  And that's a detail that you remember, correct?

20   A    Correct.

21   Q    Okay.  You made it to the property in Cambria on Saturday

22   morning, is that fair?

23   A    That sounds right.

24   Q    Okay.  And you talked a little bit yesterday about the

25   shoot house.  Do you remember that?

1    A    Yes.

2    Q    Okay.  And I believe that you said that you, as well as the

3    other gentlemen that you went with, helped assemble the shoot

4    house, is that right?

5    A    That's right.

6    Q    Would that have been on Saturday afternoon?

7    A    I believe it was Saturday.

8    Q    Okay.  And the piece -- the plywood was kind of in a pile,

9    is that right?

10   A    That's right.

11   Q    Okay.  And you assembled that with Adam Fox?

12   A    Yes.

13   Q    And Steve Robeson?

14   A    Yes.

15   Q    And Dan Chappel?

16   A    Yes.

17   Q    Daniel Harris?

18   A    Yes.

19   Q    Brandon Caserta?

20   A    Yes.

21   Q    Okay.  And other Wisconsin folks that you were meeting for

22   the first time, is that right?

23   A    That's right.

24   Q    Okay.  And your testimony yesterday was that Adam Fox was

25   saying, we're building this in order to simulate a room in the

1    Capitol or a room inside of the governor's house?  Is that your

2    testimony?

3    A    Not the governor's house specifically but we were trying to

4    simulate some sort of room.

5    Q    Just some sort of room?

6    A    Pertaining to the Capitol or the kidnapping plot.

7    Q    Okay.  That's your testimony that Adam Fox said that while

8    you guys are assembling a shoot house?

9    A    Correct.

10   Q    Okay.  And it's your understanding that the Wisconsin group

11   used that plywood and would build the shoot house for their

12   regular trainings, is that correct?

13   A    Correct.  That's what they told us.

14   Q    Did you also help assemble a shoot house on Sunday?

15   A    The same shoot house that we assembled on Saturday stayed

16   up.  No one took it down.

17   Q    No differences?

18   A    No differences.

19   Q    Okay.  If we could show Government's Exhibit 105.1?  It's a

20   video.  I don't believe that we have to play it.  If we could

21   pull that up?  I guess maybe we have to so we can see it.

22        Okay.  So this has been previously admitted.  You see

23   the shoot house.  Is this a fair and accurate representation of

24   the shoot house in Cambria, Wisconsin?

25   A    Yes.

Q    Okay.  And you recognize the people that are in this shot, is that correct?

A    Yes.

Q    Okay.  If we could load Government's Exhibit 103?

Do you see now there are some words spray painted on the door there?

A    Yes.

Q    Okay.  Do you know who wrote those words on the door?

A    Dan Harris.

Q    Okay.  Do you know what those words say?

A    It says safe, safety No. 1.

Q    Okay.  Would that have been on Sunday that he would have spray painted those words on the door?

A    It would have been Saturday or Sunday.

Q    Okay.  You didn't see those on the first picture that we just showed, right?

A    Right.

Q    Okay.  And you are just saying you don't know which day was which, is that right?

A    No.

Q    You testified yesterday that Daniel Harris was mostly or was at the medical tent in Cambria, right?

A    Right.

Q    We saw him on the video, the training video, the two of you in the shooting barrels, right?

1   A   Right.

2   Q   And we see him at least going through one of these videos

3   in the shoot house, right?

4   A   Right.

5   Q   But he was at the medical tent doing tourniquets, correct?

6   A   Correct.

7   Q   Just like the tourniquet that we saw in your kit, right?

8   A   Correct.

9   Q   Now, that barrel drill or breaking contact drill, had you

10   ever done that before Cambria?

11   A   No.

12   Q   Okay.  And you were involved in a three gun competition?

13   A   Yes.

14   Q   Okay.  And the three gun competition you are kind of

15   running around shooting guns, is that right?

16   A   That's right.

17   Q   Okay.  But you had never done one of these with the

18   barrels, is that right?

19   A   Not that specific type, no.

20   Q   Okay.  Those barrels were at the property at Cambria when

21   you guys arrived, correct?

22   A   Correct.

23   Q   It wasn't something that you guys brought, right?

24   A   No.

25   Q   After the training on Saturday you went back to the hotel

1    and had dinner, right?

2    A    Right.

3    Q    Okay.  And you all stayed at the hotel that night, correct?

4    A    That's correct.

5    Q    Did you pay for the hotel room?

6    A    I did not.  No.

7    Q    Okay.  Do you know who paid for the hotel room?

8    A    Kaleb Franks paid for the first night.  I don't recall who

9    paid for the second night.

10   Q    Okay.  Did you receive some militia discount for staying at

11   that hotel?

12   A    Croft had informed us of it but I don't think we used it.

13   Q    Okay.  After dinner, fair to say that you and some of the

14   younger guys just went out in the parking lot and had some

15   beers and hung out?

16   A    We went to dinner with Steve Robeson and Barry Croft, had

17   some drinks there, and we were outside in the parking lot

18   having cigarettes before we came back in.

19   Q    Okay.  And then went to bed?

20   A    Correct.

21   Q    And went back and did another day of training?

22   A    Correct.

23   Q    Okay.  The video that we watched yesterday, 98.2, of you

24   putting duck tape on an item, do you remember that video?

25   A    Yes.

Q    Okay.  And that was the video that you were assisting
trying to build some sort of explosive device, right?

A    Right.

Q    Okay.  And you are putting duck tape on it because you knew
it needed compression, correct?

A    Correct.

Q    Because the first one didn't work, right?

A    Right.

Q    And so you are putting the duck tape on because you know it
needs some sort of compression, right?

A    Right.

Q    And you say in the video that you had built fireworks
previously, right?

A    Right.

Q    And that's what you saw yourself doing at that point,
right?

A    Correct.

Q    You testified yesterday that during Cambria there were
calls for a plan of action, right?

A    Right.

Q    Okay.  And you knew that the Capitol was not feasible,
correct?

A    Correct.

Q    Okay.  And you were also played a clip of Daniel Harris
talking about if shit hits the fan.  Do you remember that clip?

1    A    Not exactly.

2    Q    Okay.  If we could pull up 93T?  And you can blow up the

3    from CHS Dan.  Do you recall hearing this clip yesterday?

4    A    I do.  Yes.

5    Q    Okay.  And you recall Daniel Harris saying, I have no

6    worries in my mind that if shit hits the fan we'll be able to

7    back anybody if need be, correct?

8    A    Correct.

9    Q    Okay.  Thank you.  The next meeting that I have you at is

10   in Peebles, Ohio on July 18th.  You recall that meeting?

11   A    Yes.

12   Q    Okay.  And you actually drove to that meeting, correct?

13   A    Correct.

14   Q    All right.  And several attendees at that meeting?

15   A    Yes.

16   Q    People are floating out different ideas at that meeting?

17   A    Yes.

18   Q    One of them was Frank Butler, right?

19   A    Right.

20   Q    The guy from Virginia?

21   A    Correct.

22   Q    Okay.  He drew a map of a CIA building, is that right?

23             THE COURT:  Okay.  Go ahead.

24             THE WITNESS:  Yes.

25   BY MS. KELLY:

```
1    Q    Okay.  You took a picture of that map, right?

2    A    I did.  Yes.

3    Q    You took a picture of that map because you thought it was

4    funny, right?

5    A    Right.

6    Q    If we could show the witness Defense Proposed Exhibit 4127?

7              MR. KESSLER:  Relevance, Your Honor.

8              THE COURT:  Yeah.  I am not sure either what the

9    relevance is but maybe we'll have more when I look at it

10   because I don't think I've seen it.  4027?

11             MS. KELLY:  4127.

12             THE COURT:  4127.

13             MR. KESSLER:  I object to relevance, Your Honor.

14   Frank Butler is not part of this case.

15             THE COURT:  Let's see -- she said he took a picture of

16   it and let's see if this is the picture and we'll see if there

17   is anything more to it than that.

18   BY MS. KELLY:

19   Q    Have you had an opportunity to review that photograph?

20   A    I have.  Yes.

21   Q    Okay.  Is that the photograph of the map that Frank Butler

22   drew?

23   A    Yes.

24   Q    Okay.  And you took that picture and you sent that out to

25   the QRF or bonfire chat, is that right?
```

1    A    I believe so.  Yes.

2    Q    Okay.  Because you heard the ideas that Frank Butler was

3    talking about and you thought they were silly, right?

4            MR. KESSLER:  Your Honor, regard --

5            THE COURT:  That's different, right.  So I mean, if

6    you want to ask -- and I think he already said he took it

7    because he thought it was funny.  So if the question is limited

8    to the picture, I think it's admissible for whatever limited

9    relevance it may have, and I think it's quite limited.

10   Anything beyond that is either hearsay or 403 exclusion or

11   both.  So I am prepared to admit 4127 and then we'll have to

12   move onto something else.

13   BY MS. KELLY:

14   Q    Do you recall having a conversation on July the 23rd about

15   this photograph with the folks that were at Daniel Harris's

16   house?

17   A    Not exactly.

18   Q    Okay.  Do you recall telling the other members of that

19   group that Frank Butler had asked you to --

20           THE COURT:  You can't do that.  I mean, when you are

21   putting words from Frank Butler into the form of the question,

22   we already know that we can't go any further.

23           MS. KELLY:  Okay.

24           THE COURT:  So I think you need to move onto another

25   topic.

1          MS. KELLY:  Thank you, Your Honor.

2    BY MS. KELLY:

3    Q    On July the 18th you proposed ideas to the group, correct?

4    A    Yes.

5    Q    Okay.  Dan Chappel proposed ideas to the group, correct?

6    A    Not that I recall.

7    Q    Do you recall Daniel Harris proposing ideas to the group?

8    A    Not pertaining to any sort of plot.

9    Q    Okay.  You guys left that meeting and you drove to

10   Kentucky, correct?

11   A    Yes.

12   Q    Okay.  And you rented a hotel room in Kentucky, right?

13   A    Right.

14   Q    Okay.  And you testified yesterday that on that drive you

15   made a suggestion of putting a bullet through the governor's

16   house?

17   A    Yes.

18   Q    Okay.  Do you also recall on that drive that telling the

19   boys that you guys were your first line of defense?

20   A    I remember the topic of being a spearhead being mentioned,

21   but that's about it.

22   Q    Do you recall saying you just wanted to go to the hotel and

23   drink?

24   A    Not exactly.  No.

25   Q    Is that what you did; you went to the hotel and drank?

```
1    A    Yes.

2    Q    Would it refresh your recollection as to statements that

3    you made in the vehicle on the way to the hotel if you looked

4    at a transcript about being the first line of defense?

5    A    Yes.

6              MS. KELLY:  May I approach the witness, Your Honor?

7              THE COURT:  Sure.

8    BY MS. KELLY:

9    Q    Have you had a chance to review that transcript?

10   A    I have.  Yes.

11   Q    Okay.  Does that refresh your recollection of you telling

12   the guys that you were going to be your own first line of

13   defense?

14   A    It does.  Yes.

15   Q    Okay.  On July 23rd, then you went to Daniel Harris's

16   house, correct?

17   A    Correct.

18   Q    Okay.  And that's his parent's house, right?

19   A    Right.

20   Q    Okay.  Had you been there before?

21   A    Yes.

22   Q    Okay.  Several times?

23   A    Yes.

24   Q    Were you aware if his parents were there on July the 23rd?

25             MR. KESSLER:  Relevance.
```

1    THE WITNESS:  I didn't see them.  No.

2    BY MS. KELLY:

3    Q    Okay.  You guys talked outside at a bonfire, right?

4    A    We did.  Yes.

5    Q    Also spent some time inside the house, right?

6    A    Right.

7    Q    Okay.  And the purpose, I believe you testified yesterday,

8    was to bring everybody else up to speed?

9    A    Correct.

10   Q    And you would agree that during that meeting you said that

11   the idea shared of the plan for storming the Capitol or

12   kidnapping were just ideas thrown out there, right?

13   A    I don't recall that exactly.  No.

14   Q    Okay.  Would it refresh your recollection to review a

15   transcript of that?

16   A    Yes.

17       MS. KELLY:  May I approach the witness, Your Honor?

18       THE COURT:  Sure.

19   BY MS. KELLY:

20   Q    Have you had a chance to review that transcript?

21   A    I have.  Yes.

22   Q    Okay.  And does that refresh your recollection?  People

23   were talking about these plans that they had no clue --

24       THE COURT:  It's his statement that you can refresh

25   him on, not other people's statements.

1          MS. KELLY:  Okay.

2    BY MS. KELLY:

3    Q    Do you recall saying at the time, we keep falling back on

4    the same plan of either we kidnap politicians --

5          MR. KESSLER:  She can't read from it, Your Honor.

6          THE COURT:  I think that's right.  It's not time to

7    read from a transcript.  The question was -- before was whether

8    he recalled making statements about storming the Capitol or

9    kidnapping as just ideas thrown out there.

10   BY MS. KELLY:

11   Q    Okay.  Do you recall after you have reviewed this

12   transcript you saying that storming the Capitol and kidnapping

13   were just ideas thrown out there?

14   A    Yes.

15   Q    Okay.  Do you recall in the same conversation talking about

16   we should just sit back and drink beer and watch it happen?

17   A    Not in that conversation.  No.

18   Q    Okay.  Would it refresh your recollection to look at a

19   statement from the transcript?

20   A    Yes.

21   Q    If you could flip to page 15 of 18?  I believe I tabbed it

22   for you.  Have you had a chance to review that?

23   A    Yes.

24   Q    Okay.  And does that refresh your recollection that you

25   said, we should just sit back and drink beer and watch it

1    happen?

2    A    Yes.

3    Q    Okay.  You testified that there was some paranoia about

4    being infiltrated by a federal agent, right?

5    A    Right.

6    Q    And you also testified yesterday at this meeting Daniel

7    Harris brought up some explosives contact, is that correct?

8    A    Correct.

9    Q    Okay.  You never met that person, correct?

10   A    I never met them.  No.

11   Q    Didn't have any contact information for that person, right?

12   A    Right.

13   Q    Okay.  So some time after Cambria and into August you start

14   preparing Luther for this FTX, correct?

15   A    Correct.

16   Q    Okay.  And Daniel Harris helped with you that, right?

17   A    Right.

18   Q    Okay.  And so the first thing that we saw, we saw you with

19   your backhoe and you were building a berm, right?

20   A    Right.

21   Q    Okay.  And also building that plywood wall, right?

22   A    Right.

23   Q    Okay.  And Daniel Harris and Kaleb Franks helped you with

24   that, correct?

25   A    Correct.

1    Q    So they came up to your property, right?

2    A    Right.

3    Q    And were helping you to make that wall and make that berm,

4    correct?

5    A    That's correct.

6    Q    Would that have been that first weekend of August?  Does

7    that sound right?

8    A    That sounds about right.  Yes.

9    Q    Okay.  Is your family up there?

10   A    Yes.

11   Q    Your grandfather was up there?

12   A    Yes.

13   Q    Grandmother?

14   A    Yes.

15   Q    And the property is yours or it's your grandfather's?

16   A    It's mine --

17   Q    It's mine -- it's yours.

18        Okay.  So Daniel got to meet your grandma and grandpa,

19   right?

20   A    Right.

21   Q    And you guys did work on the property and you also hung out

22   and had some fun, right?

23   A    Right.

24   Q    One of those things that you did is you were driving around

25   your property, right?

1    A    Right.

2    Q    On your side-by-side?

3    A    That's correct.

4    Q    If we could show just the witness Defense Exhibit 4086 on

5    mute, please?

6         Is that a fair and accurate representation of you

7    riding around that weekend on your side-by-side with Daniel and

8    Kaleb?

9    A    Yes.

10        MS. KELLY:  Okay.  I'd move for admission for 4086?

11        MR. KESSLER:  No objection, Your Honor.

12        THE COURT:  All right.  It's admitted.

13        (Video started, 8:54 a.m.)

14        (Video stopped, 8:54 a.m.)

15   BY MS. KELLY:

16   Q    So this was you guys just driving around having fun, right?

17   A    Right.

18   Q    Okay.  We also saw a picture of a confederate flag that was

19   hanging in your trailer.  You are familiar with that flag?

20   A    Yes.

21   Q    Okay.  If we could show Exhibit 287, Government's Exhibit?

22        Is this the flag that would have been hanging in your

23   trailer?

24   A    Yes.

25   Q    Okay.  And is it true that this flag once belonged to your

1    grandfather?

2    A    No.

3    Q    Okay.  This is your flag?

4    A    It's not mine exactly.  It came with the trailer when I

5    bought it.

6    Q    Okay.  And we heard some discussion about the signatures on

7    this flag, right?

8    A    Right.

9    Q    Okay.  And could you blow up that top right portion?

10   Perfect.

11         Now, along that top white line I see your name kind of

12   written all the way down, is that right?

13   A    That's right.

14   Q    And those are different dates underneath your name?

15   A    That's right.

16   Q    Okay.  What does that signify?

17   A    The date and -- well, there was a buck or dough that I had

18   shot on my property hunting.

19   Q    Okay.  So it has a date and then you write if it's a buck

20   or a dough?

21   A    Right.  So like one of the ones towards the bottom it says

22   Ty, 11-27-18, and it says two point, which is a two point buck.

23   Q    Okay.  So that was just your way of kind of cataloging the

24   deer that you had shot, right?

25   A    Right.

1    Q    Okay.  And I guess I see on that second line there is a

2    Kyle with a date and a dough, is that right?

3    A    Correct.

4    Q    So that's another person that was at your property who also

5    got a dough on that date?

6    A    Yes.

7    Q    Was this kind of a thing that you did is have people sign

8    this flag when they came to visit?

9    A    Yes.

10   Q    And you had Daniel Harris sign the flag, right?

11   A    Right.

12   Q    Okay.  And Adam Fox signed the flag, right?

13   A    Right.

14   Q    Okay.  Do you know if Daniel signed that flag back in that

15   early August when you were up there with Kaleb?

16   A    I don't recall if it was at that time.  It would have been

17   then or it would have been some time between then and when the

18   actual training happened.

19   Q    When you guys did the tires?

20   A    Yes.

21   Q    Okay.  And that's my next question.  Before I get there, I

22   suppose, could we pull up Government Exhibit 462, please?

23         You recall seeing this photograph yesterday?

24   A    I do.  Yes.

25   Q    Okay.  The woods look a little bit different than the woods

1    we saw in the video of you riding in your side-by-side.  Is

2    this your property or do you think this is somewhere else?

3    A    This isn't my property.  It could be on state land.

4    Q    Okay.  Is it possible that it was in Lake Orion?

5    A    That could be possible as well.

6    Q    Okay.  Fair enough.  But you took this photograph you

7    think?

8    A    Yes.  I took this photograph.

9    Q    Okay.  Okay.  So the other weekend that you spent kind of

10   preparing for Luther was building the tire wall, right?

11   A    That's right.

12   Q    Okay.  And Kaleb Franks had some guy in Pontiac, the

13   Pontiac area that owned some business with a bunch of tires,

14   right?

15   A    That's right.

16   Q    Okay.  And so you rented a U-Haul, right?

17   A    A U-Haul trailer, yes.

18   Q    A U-Haul trailer?

19   A    Yes.

20   Q    And Daniel Harris met you at the tire place or at your

21   house?

22   A    If I remember right I think I picked him up from his house.

23   Q    Okay.  And you guys go and you load up tires, right?

24   A    Right.

25   Q    And you drive all the way up to Luther, right?

1   A    Right.

2   Q    How long of a drive is that?

3   A    Depending on how I drive usually two hours, two and-a-half

4   hours.

5   Q    Okay.  Solomon Clark meets you at your property, right?

6   A    Later that night, yes.

7   Q    Later that night.  And you are unloading those tires and

8   filling them with sand and stacking them up, right?

9   A    Right.

10  Q    Okay.  It wasn't just that one trip that you had to do that

11  weekend, right?

12  A    No.  We did two, maybe three on Saturday and then one on

13  Sunday.

14  Q    So four trips.  How many tires per trip did you take?

15  A    Somewhere around a hundred.  I think total we had right

16  around 300 tires.

17  Q    Okay.  So two hours each way spending with Daniel Harris

18  and Solomon Clark, right?

19  A    Right.

20  Q    Except for that first trip, it was just you and Daniel

21  Harris?

22  A    Right.

23  Q    Got it.  Okay.  And I believe yesterday you testified you

24  were doing all these things because you were concerned for

25  safety, right?

1    A    That's right.

2    Q    Okay.  Because you didn't want stray bullets to be going

3    anywhere else, right?

4    A    That's correct.

5    Q    It's your property.  You are talking it seriously, right?

6    A    Right.

7    Q    Okay.  The next time that you get together with the group

8    is on August the 9th in Munith then, right?

9    A    Right.

10   Q    And you testified yesterday that you voiced skepticism

11   about a plan to kidnap, right?

12   A    Right.

13   Q    Okay.  You thought it was a bad idea, right?

14   A    Not necessarily a bad idea.  I just thought it would be as

15   bad as storming the Capitol.

16   Q    You thought both storming the Capitol and kidnapping, it

17   was a suicide mission, right?

18   A    The Capitol more of a suicide mission.  I figured there was

19   a higher chance of us surviving a kidnapping.

20   Q    Okay.  You thought they were both bad ideas, though?

21        MR. KESSLER:  Asked and answered, Your Honor.

22        THE COURT:  It has been multiple times.

23   BY MS. KELLY:

24   Q    Did you give a different idea to the group that day?

25   A    Not that I recall exactly.

1    Q    Do you recall offering your property in Luther as a bug out

2    place?

3    A    I do.  Yes.

4    Q    Okay.  The training happens as we've talked about, right?

5    A    Right.

6    Q    And then you go out to BWWs with Daniel Harris and Dan

7    Chappel, right?

8    A    I don't exactly recall.  No.

9    Q    Okay.  Would it refresh your recollection to review a

10   transcript --

11   A    Yes.

12        MS. KELLY:  Okay.  May I approach the witness, Your

13   Honor?

14        THE COURT:  All right.

15   BY MS. KELLY:

16   Q    Have you had an opportunity to review that transcript?

17   A    I have.  Yes.

18   Q    Okay.  Does that refresh your recollection at all of

19   whether or not you went to BWWs after the training in Munith?

20   A    Not quite.  No.

21   Q    Okay.  Fair enough.  You were asked some questions about

22   the text message or that message that Daniel Harris sent out in

23   the early morning hours of August the 10th.  Do you recall that

24   message?

25   A    Not exactly what it said.  No.

1    Q    Okay.  Laying in bed, craziest idea.  You recall that

2    message?

3    A    That message, yes.

4    Q    Okay.  You testified that you talked to Mr. Harris about

5    that message?

6    A    Not that I recall.

7    Q    You don't remember talking to him about it?

8    A    No.  I just remember reading the message in the group chat.

9    Q    Okay.  So you had no conversation with him after that

10   message about it?

11   A    Not that I remember.

12   Q    Okay.  So August 23rd comes.  You are back at Daniel

13   Harris's house, right?

14   A    Right.

15   Q    Okay.  And that's when there is a switch to Threema,

16   correct?

17   A    Correct.

18   Q    Okay.  A couple days later there is a vote to leave the

19   Wolverine Watchmen, correct?

20   A    Correct.

21   Q    And then on August the 27th you created a training schedule

22   for Luther, right?

23   A    That's right.

24   Q    Okay.  Daniel Harris didn't help you with that, right?

25   A    No.

Q    Okay.  August the 29th you were up at your property in Luther and did not go on the day trip up north, right?

A    Not with Fox, no.

Q    Okay.  And then two days later after that, August the 31st, there is a second FAFO Threema thread started.  Does that sound about right?

A    That sounds about right.  Yes.

Q    Okay.  And then we get into Luther.  Is it true that Dan Chappel was in charge of coordinating the out-of-state attendees?

A    Yes.

Q    Okay.  And you were in charge of telling the Michigan people the information that they needed?

A    Yes.

Q    Okay.  And you got up there Friday night before everybody else, right?

A    That's right.

Q    Okay.  And other people arrived at your property, right?

A    That's right.

Q    Some people stayed in that trailer, right?

A    That's right.

Q    Some people put up tents, right?

A    Right.

Q    Okay.  True that Daniel Harris arrived in the early morning hours of Saturday, if you recall?

1    A    I don't recall exactly when he arrived.

2    Q    Okay.  He came with two of his friends, right?

3    A    That's right.

4    Q    Devin Phelps, correct?

5    A    Correct.

6    Q    And Casey Mayan?

7    A    Yes.

8    Q    And you knew Casey previously, right?

9    A    That's right.

10   Q    And he had his dog Ollie with him?

11   A    Yes.

12   Q    And folks woke up on -- let me back up.  You build that

13   shoot house with the tarps on Friday, correct?

14   A    Correct.

15   Q    That was built some time on Saturday?

16   A    Yes.  Saturday morning.

17   Q    Okay.  So Saturday morning folks are waking up.  You went

18   out and got some breakfast?

19   A    I didn't leave anywhere to go get breakfast.

20   Q    You didn't leave anywhere that day?

21   A    No.

22   Q    Except at nighttime?

23   A    That's correct.

24   Q    And so you were one of those people that were building this

25   tarp house or shoot house, right?

1    A    Correct.

2    Q    Okay.  And you testified yesterday that you were

3    ballparking the setup.  Do you remember saying that?

4    A    I do.  Yes.

5    Q    Okay.  You didn't have schematics of a house, right?

6    A    That's right.

7    Q    You didn't have an app on your phone that showed the

8    governor's house, right?

9    A    That's right.

10    Q    Okay.  You were kind of just building a room with a

11    hallway, right?

12    A    That's right.

13    Q    Okay.  And you were building that with Daniel Harris?

14    A    Yes.

15    Q    And Kaleb Franks?

16    A    Yes.

17    Q    And Max Wyckoff?

18    A    Yes.

19    Q    And Jerad?

20    A    Yes.

21    Q    Okay.  And you didn't have posts; you were using stakes for

22    that house, correct?

23    A    Correct.

24    Q    And those stakes were brought by Daniel Harris, correct?

25    A    Correct.

1    Q    And the tarps were brought by Daniel Harris, correct?

2    A    The tarps were mine.

3    Q    Those blue tarps were yours?

4    A    Yes.

5    Q    Okay.  And where were those tarps from?

6    A    I bought them at Harbor Freight the day before we went up.

7    Q    Okay.  Was -- is it your testimony that Adam Fox also

8    helped build this house?

9    A    Not that I recall.

10   Q    Okay.  And what about Dan Chappel?

11   A    No.  Dan Chappel did not help either.

12   Q    Okay.  Anyone else that we missed that was helping build

13   this house?

14   A    Not that I recall.

15   Q    Okay.  And so the dry fire is going on on Saturday, right,

16   through that shoot house, correct?

17   A    That's right.

18   Q    Medical tent is set up, right?

19   A    Right.

20   Q    And we know where Daniel Harris is; he is at that medical

21   tent, right?

22   A    That's right.

23   Q    And then there is a weapons manipulation tent.  That's

24   Kaleb Franks, right?

25   A    That's right.

1    Q    Okay.  And at some point you are pulled aside by Dan

2    Chappel, right?

3    A    That's right.

4    Q    And he tells you --

5         MR. KESSLER:  Hearsay.

6         THE COURT:  Sounds like it is.  That's right unless

7    it's already in evidence through some other source.

8    BY MS. KELLY:

9    Q    You testified yesterday that Dan Chappel gave you some

10   information about a night ride-along, is that right?

11   A    That's right.

12   Q    And you also on Saturday evening were shown some videos,

13   right?

14   A    That's right.

15   Q    And that was by Red, right?

16   A    That's right.

17   Q    Was that on a cell phone, a computer?

18   A    A cell phone.

19   Q    And you were standing with Jenny Plunk, right?

20   A    I don't recall if she was there.

21   Q    Okay.  Steve Robeson, correct?

22   A    I don't recall if Steve was there.

23   Q    Dan Chappel?

24   A    Dan Chappel was there.

25   Q    Okay.  Is that around six o'clock at night?

1    A    It was late afternoon as it was getting dark.

2    Q    Okay.  And then you get into a truck with -- who do you

3    leave the property with?

4    A    Dan Chappel, Red and Kaleb Franks.

5    Q    Okay.  And that was at approximately eight o'clock?

6    A    It was dark when we left.

7    Q    Okay.  Now, yesterday you testified that you talked to

8    Daniel Harris after you were provided this information.  You

9    remember saying that yesterday?

10   A    Yes.

11   Q    Okay.  And you testified that Daniel Harris was so drunk

12   that he could not stand up.  You remember saying that?

13   A    That's correct.

14   Q    Okay.  But your testimony yesterday was that you told him

15   you were going on a ride up north, right?

16   A    I said we were going to go on a nighttime surveillance.

17   Q    Nighttime surveillance.  Okay.  And your testimony

18   yesterday was that he said back to you, I'm not feeling it, is

19   that right?

20   A    That's right.

21   Q    Okay.  And you recall testifying previously at the grand

22   jury, correct?

23   A    Correct.

24   Q    Okay.  And you recall testifying on December the 15th of

25   2020, correct?

1    A    That sounds right.

2    Q    Okay.  And you swore to tell the truth and the whole truth

3    and nothing but the truth, right?

4    A    That's right.

5    Q    Okay.  And that was three months after the incident, right?

6    A    That's right.

7    Q    Okay.  And you were asked under oath about Daniel Harris

8    not going on the nighttime recon, right?

9    A    As I recall.  Yes.

10   Q    Okay.  And do you recall testifying under oath --

11        THE COURT:  You'll have to give him a reference so he

12   can look at it first.

13        MR. KESSLER:  And more importantly I'd object to

14   trying to use -- this is the procedure to do a prior

15   inconsistent statement.  We haven't set up any statement that

16   this is supposed to be inconsistent to yet.

17        THE COURT:  Presumably it's going to be in her view

18   inconsistent with what he just said about Mr. Harris being too

19   drunk or not feeling it or words to that effect.

20        MS. KELLY:  Yes.

21        THE COURT:  So then let's show him what you think is

22   inconsistent so he can see it.  He needs to see that.

23        MS. KELLY:  If we could show the witness --

24        THE COURT:  No.  Not the witness, the lawyer.

25   Mr. Kessler needs to see it.

1          MR. KESSLER:  I have the transcripts.

2          MS. KELLY:  It's on page 75, line 7 to 14.

3          MR. KESSLER:  Of which one?

4          MR. GIBBONS:  December the 15th, 2020.

5          MR. KESSLER:  I'm sorry.  What was the page?

6          MS. KELLY:  75.

7          MR. KESSLER:  Okay.  I don't think it's truly

8     inconsistent.

9          THE COURT:  All right.  Go ahead you can present and

10    it'll be up for the jury's consideration whether it's

11    consistent, inconsistent or some combination.  Go ahead.  You

12    can present the statement to the witness as you were about to

13    do.

14          MS. KELLY:  Can we pull up --

15          THE COURT:  Pull it up or just read it to him.  It

16    doesn't come into evidence in any event.

17          MR. KESSLER:  Actually, it shouldn't be up, Your

18    Honor.

19          MS. KELLY:  Just for the witness.  Sorry.

20          THE COURT:  Just go ahead and ask him.

21    BY MS. KELLY:

22    Q    Do you remember saying -- when you were asked why Daniel

23    Harris didn't go with you, do you remember saying, I don't know

24    why.  We just couldn't find them when we were looking for

25    people to go.  When we were getting in the vehicles we didn't

1    feel like looking for them so we just left them behind.  Do you

2    remember testifying to that?

3    A    Not specifically.  No.

4    Q    Would it refresh your recollection to look at a transcript

5    of you under oath?

6    A    Yes.

7         THE COURT:  I think the impeachment is complete at

8    this point.  He didn't remember it.  You've read it and the

9    jury can draw whatever conclusion it wants about whether it's

10   consistent, and if so meaningfully inconsistent then you should

11   move onto whatever is next.

12   BY MS. KELLY:

13   Q    When you testified in December you were telling the truth,

14   right?

15   A    That's right.

16   Q    And you are also telling the truth today, right?

17   A    That's right.

18   Q    Okay.  And you also recall being involved in proffer

19   statements, right?  We talked about that yesterday?

20   A    Yes.

21   Q    Okay.  And you recall on December the 4th you said a

22   similar thing?  Do you recall that, about Mr. Harris not being

23   able to be located?

24   A    No.

25   Q    You don't recall that?

1   A    No.

2   Q    Would it refresh your recollection to look at a report of

3   your proffer interview?

4   A    It would.

5          MS. KELLY:  May I approach the witness?

6          THE COURT:  Sure.

7   BY MS. KELLY:

8   Q    Have you had a chance to review that report of your proffer

9   interview?

10  A    I have.  Yes.

11  Q    Does that refresh your recollection that you also said

12  Harris was left behind because he could not be located and

13  didn't feel like looking for him?

14  A    It's hard for me to remember everything I spoke about

15  during that proffer.

16  Q    Okay.  Now, your testimony yesterday is that you went on

17  this nighttime ride-along and you came back to the property,

18  right?

19  A    That's right.

20  Q    Okay.  Is it true you were gone for about five hours?

21  A    We left when it was dark and we came back it was early

22  morning so that sounds about right.

23  Q    Okay.  And so your testimony -- well, let me ask this.

24  When you got back, people were still awake on your property,

25  right?

```
1    A    That's right.

2    Q    Still a campfire going, right?

3    A    That's right.

4    Q    Okay.  And so your testimony yesterday was that Mr. Harris

5    was so drunk he couldn't stand up when you left, right?

6    A    That's right.

7    Q    But when you got back he said he wished he would have gone

8    with you, is that your testimony?

9    A    That's right.

10   Q    Okay.  The next morning, you testified, some time in the

11   later morning there was another meeting with Red involved, is

12   that right?

13   A    That's right.

14   Q    And your testimony is that Red showed those videos again?

15   A    That's right.

16   Q    Was he passing his phone around?

17   A    No.

18   Q    Okay.  Was Steve Robeson there?

19   A    He was.  Yes.

20   Q    Dan Chappel was there?

21   A    Yes.

22   Q    Or Chappel.  Excuse me.  And obviously Red was there

23   because he was showing the videos, right?

24   A    That's right.

25   Q    Everybody leaves your property, pick up, and you are done
```

1    for the day on Sunday, right?

2    A    That's right.

3    Q    Okay.  And you testified yesterday about these personally

4    manufactured firearms that you and Kaleb were making, right?

5    A    That's right.

6    Q    You called them ghost guns, right?

7    A    That's right.

8    Q    Okay.  And you said it was Kaleb's idea, correct?

9    A    That's right.

10   Q    And you were going to be making these personally

11   manufactured firearms, right?

12   A    That's right.

13   Q    Okay.  And you said Daniel was going to provide security?

14   A    That's right.

15   Q    Okay.  The money for this you said was just for extra cash,

16   right?

17   A    That's right.

18   Q    Nothing to do with buying explosives, right?

19   A    That's right.

20   Q    Okay.  This statement -- this text message that Daniel

21   Harris sent about this Maine cop, you remember that statement?

22   A    Yes.

23   Q    The cop in Maine, right?  You had a conversation with

24   Daniel Harris after he sent out that message?

25   A    That's right.

1    Q    Okay.  And you said that he seemed serious?

2    A    That's right.

3    Q    Okay.  Did he buy a plane ticket to Maine?

4    A    He did not.

5    Q    Did he pack his bags for Maine?

6              MR. KESSLER:  Speculation, Your Honor.

7              THE COURT:  I am not sure how he would know that, but

8    if he does he can answer.

9    BY MS. KELLY:

10   Q    Did he tell you when he was traveling to Maine?

11             THE COURT:  You can't say what he told him because

12   that's definitely not admissible on your side of the case.

13   BY MS. KELLY:

14   Q    Did you see him pack suitcases for Maine?

15   A    I did not see them.

16   Q    You said you were not going to do anything with him in

17   Maine, is that right?

18   A    That's right.

19   Q    And you testified yesterday that you thought he seemed

20   serious because at this point you guys didn't really care about

21   what was going on, right?

22   A    That's right.

23   Q    Okay.  Didn't care about breaking the law, right?

24   A    That's right.

25   Q    But you weren't willing to go to Maine with him, right?

1    A    That's right.

2    Q    And even on October the 4th you weren't willing to conduct

3    an unconstitutional citizen's arrest, correct?

4    A    I just said that it was unconstitutional.  I didn't say I

5    wasn't willing to do it.

6    Q    Okay.  This group cash idea that you guys had in the Brick

7    Squad, right?

8    A    That's right.

9    Q    Okay.  It was just for Brick Squad, correct?

10   A    Correct.

11   Q    Okay.  And that was you guys would pool money for

12   ammunition, right?

13   A    That's right.

14   Q    Now, ammunition in the summer of 2020 was very expensive,

15   correct?

16   A    Yes.  It started to get expensive.

17   Q    It was starting to get expensive?

18   A    Yes.

19   Q    So you could pool your money and buy in bulk, that's the

20   idea?

21   A    That's the idea.

22   Q    Daniel Harris said, hey, I'll be the administrator of it,

23   right?

24   A    Right.

25   Q    Throw in 20 bucks every now and then, right?

1    A    Right.

2    Q    Okay.  Did you have any conversations with Daniel Harris

3    about the group cash for explosives?

4    A    I did.

5    Q    When was that?

6    A    There was a conversation before we got arrested.  I don't

7    remember the exact date, and then we spoke about it again on

8    the ride to Ypsilanti.

9    Q    You spoke about it on the ride with Dan Chappel in the car?

10   A    Yes.

11   Q    Okay.  And is that when Daniel Harris said --

12               MR. KESSLER:  Hearsay.

13   BY MS. KELLY:

14   Q    You testified yesterday that Mr. Harris wanted to get

15   permission to use the group cash, correct?

16   A    Correct.

17   Q    Okay.  With your information had he received permission to

18   use the group cash?

19               MR. KESSLER:  Hearsay.

20               THE COURT:  Well, I think if it doesn't go any further

21   than that, I think it just closes out a loop that we've already

22   opened, so you can answer if he knows.

23               THE WITNESS:  I don't know if he asked anybody about

24   it or if he received a response.

25   BY MS. KELLY:

Q    Okay.  Fair enough.  Your knowledge about that trip to
Ypsilanti was for gear, right?

A    That's right.

Q    And beer at BWWs, right?

A    That's right.

            MS. KELLY:  Thank you.  I have nothing further.

            THE COURT:  All right.  Go to Mr. Hills.

                    CROSS EXAMINATION

  BY MR. HILLS:

Q    Good morning, Mr. Garbin.

A    Good morning.

Q    All right.  Just kind of want to go through a few things
really quick.  The arrest happened October 7th, 2020, correct?

A    Correct.

Q    As you have discussed your interview a little bit, you had
an interview with the police at that time, correct?

A    That's correct.

Q    And you have had four proffers I believe with the
government, is that right?

A    I don't know the exact number but I've had several.

Q    You have had multiple proffers with the government, is that
right?

A    That's right.

Q    And your lawyers were present for those?

A    They were.  Yes.

1    Q    And you have also been to the grand jury a couple of times,

2    is that right?

3    A    That's right.

4    Q    And --

5         THE COURT:  I know it's hard to avoid redundancy and

6    you need to set things up, but this is exactly the way

7    Ms. Kelly started out yesterday.

8         MR. HILLS:  No.  She started out with going through

9    everyone, the date and the zoom, and I am trying to --

10        THE COURT:  So do -- the fastest way is just to say,

11   you remember going through that list and then move onto

12   whatever you need to do.  Let's just keep moving.

13        MR. HILLS:  I'm sorry, Your Honor, but I am trying.  I

14   knew I would draw something from you so I'm trying to go fast

15   through this.

16        THE COURT:  But do we need to go through it at all?

17   That's the point.  I mean, we have all heard it and you can

18   just reference us all back to it without going through the list

19   even in shorthand, but let's just move forward as fast as we

20   can through stuff we've already covered.

21        MR. HILLS:  I'm trying, Your Honor.

22   BY MR. HILLS:

23   Q    You pled guilty and that plea was on January 26 -- or you

24   signed the plea agreement January 26, 2021, is that correct?

25   A    That sounds right.

Q    And you were the first one to plead guilty in this -- on
this charge, correct?

A    Correct.

Q    And Mr. Franks eventually pled guilty?  You know that,
correct?

A    I do.  Yes.

Q    And that was roughly a year later, is that right?

A    That's right.

Q    So when you are doing your proffers and you are doing your
grand jury testimony, that's before Mr. Franks had pled guilty,
correct?

A    Correct.

Q    Okay.  Now, with regard to the arrest, you are transferred
and you are in an interview room with officers, correct?

A    Correct.

Q    And do you remember giving -- them giving you a Miranda?

A    I do.  Yes.

Q    And you cooperated with the police, is that right?

A    That's right.

Q    You gave them statements, is that right?

A    I did.  Yes.

Q    Do you remember giving them, for example, the combo to your
safe?

A    I do remember that.  Yes.

Q    Okay.  Do you remember telling them that the Wolverine

1    Watchmen broke off from the Watchmen and created another group?

2    A    No.  I don't remember that.

3    Q    Do you remember telling them about Luther, about the event

4    at Luther?

5    A    I don't remember that.

6    Q    Do you remember telling them that there were multiple

7    ideas, storming the Capitol, kidnapping the governor, et

8    cetera?  You remember telling them that?

9    A    I don't remember that.

10   Q    Do you remember telling them there was no official plan?

11   A    No.

12   Q    Do you remember telling them you went with these other

13   people to go look at the governor's property?

14   A    No.

15   Q    Do you remember telling them you went to Wisconsin?

16   A    No.

17   Q    Do you remember telling them that Brandon Caserta went to

18   Wisconsin?

19   A    No.

20   Q    Do you remember telling them that --

21        MR. KESSLER:  Your Honor, I am going to object to the

22   form of the questioning.  He is trying to testify for him.

23        MR. HILLS:  Well --

24        THE COURT:  I thought you might object earlier.  We're

25   talking about the initial police interview.  He established

1    yesterday he didn't remember a lot about that.  If you have

2    statements he made during his testimony that you think he made

3    inconsistent statements at that interview, I guess you can go

4    through a normal impeachment process, but other than that, we

5    can't really have you be a mouthpiece for all the things he

6    didn't remember he said that you say he did say.  So I don't

7    know where you're going with it if it isn't --

8    BY MR. HILLS:

9    Q    Do you remember telling the officers --

10           THE COURT:  Same problem, right.  I mean, set up an

11   impeachment, okay.  But other than that, it can't be a vehicle

12   to just read in stuff that doesn't otherwise have a place.

13   BY MR. HILLS:

14   Q    You testified that Brandon Caserta was involved with this

15   conspiracy, correct?

16   A    Yes.

17   Q    Do you remember telling the officers back --

18           MR. KESSLER:  Same objection, Your Honor.

19           THE COURT:  Well, I mean, now if he has an

20   inconsistent statement or whatever he can present them.

21   BY MR. HILLS:

22   Q    Do you remember telling the police officers back on October

23   7th that Mr. Caserta had no real role?

24   A    No.

25   Q    Would it help refresh your recollection if you looked at

1    the transcript?

2    A    It might.  Yes.

3            MR. KESSLER:  He's going to have to have a chance to

4    explain because what I'm seeing there is no context.  You have

5    to go pages and pages back.

6            THE COURT:  At this point he's asked him if it

7    refreshes his recollection.  He hasn't really formally

8    approached impeachment yet.  So you can show him and see if it

9    refreshes a recollection.

10   BY MR. HILLS:

11   Q    Did that refresh your recollection?

12   A    Not exactly.  No.

13   Q    That you told the officers that Brandon Caserta had no real

14   role?

15   A    No.  I don't recall it.

16   Q    The first time you met Mr. Caserta was June of 2020?

17   A    That sounds right.  Yes.

18   Q    The June 14th training at Munith, would that be about

19   right?

20   A    That's right.

21   Q    And I don't think we've seen the picture.  Can we get the

22   picture 5123.4 just for the witness if we can?  Do you see

23   that?

24   A    Yep.

25   Q    Is that an accurate picture of the Munith property?

1    A    Yes.

2    Q    Can we show him 5123.5?

3          MR. KESSLER: .4.

4          MR. HILLS:  Yeah.  I'm moving on.

5          THE COURT:  He is just laying foundation for others.

6          MR. KESSLER:  Got it.

7          MR. HILLS:  51 -- yup.

8    BY MR. HILLS:

9    Q   Is this the -- an accurate representation of the inside of

10   the trailer that you've been in at the Munith property?

11   A    Yes.

12   Q   And 5123.6.  Is this, I think, the other direction of the

13   inside of the same trailer?

14   A    Yes.

15   Q   And that's an accurate reflection of the inside of the

16   trailer that you've been in?

17   A   It is.  Yes.

18         MR. HILLS:  Okay.  Thank you.

19         I'd move to admit all three?

20         THE COURT:  Any objections?

21         MR. KESSLER:  No, Your Honor.

22         THE COURT:  They are admitted.

23   BY MR. HILLS:

24   Q   I'd ask to publish 5123.4?

25         Okay.  So this is the trailer on the property at

1    Munith that we've talked about?

2    A    Yes.

3    Q    Okay.  And I take it is there a spot to park right there

4    somewhere?

5    A    This is a view of the backside of the house, so the parking

6    space would have been out front to the left.

7    Q    Okay.  And let's just go to the next one, 5123.5.  And for

8    the jury, this is the inside of the trailer that you have been

9    in?

10   A    That's correct.

11   Q    And 5123.6, same thing?

12   A    Same thing.  Yes.

13   Q    Okay.  All right.  Thank you.

14         Now, at this FTX on June 14th, Mr. Chappel is there

15   and there are a lot of other individuals there; there is some

16   training going on; dry fire type thing?

17   A    Correct.

18   Q    Okay.  And then moving to June 28th, all right, there is a

19   second FTX and Mr. Caserta is there, is that right?

20   A    That's right.

21   Q    And at this FTX this would be the second time that you've

22   met Mr. Caserta, is that correct?

23   A    That sounds right.  Yes.

24   Q    And at this FTX there had been some discussions about

25   Mr. Fox and bringing Mr. Fox into this -- into this FTX, is

1   that right?

2   A    That's right.

3   Q    And you and I believe Mr. Chappel, maybe one other person,

4   eventually at this FTX left the Munith compound, if you will,

5   went out and got Mr. Fox and others and brought them back, is

6   that right?

7   A    That's right.

8   Q    You did some training with them, is that right?

9   A    That's right.

10  Q    All right.  And again, some dry fire manipulation I think,

11  some other things in that training, took a couple hours?

12  A    That's right.

13  Q    And after that training, I believe you indicated this was

14  when there was some meeting?  The group gathered round, is that

15  right?

16  A    That's right.

17  Q    And in this group there were quite a bit -- quite a few

18  people it sounds like, right?  You've got Dan Chappel there, is

19  that right?

20  A    That's right.

21  Q    Adam Fox, Sean Fix?

22  A    That's right.

23  Q    And then Amanda Keller and Amanda Baker, Sean Fix's

24  whatever she is to him?

25  A    That sounds right.  Yes.

```
 1    Q    Mike Notso, do you remember him?

 2    A    I remember Mike being there.

 3    Q    A Mike.  Some other Mike that came with Mr. Fox?

 4    A    That's right.

 5    Q    Joe Morrison and Pete Musico, obviously they were there,

 6    right?

 7    A    Right.

 8    Q    And you were there.  Paul Bellar was there?

 9    A    Yes.

10    Q    Solomon Clark?

11    A    Yes.

12    Q    Max Wyckoff?

13    A    Yes.

14    Q    Jerad Beauchesne.  But you call him something different?

15    A    I thought it was Beauchesne.

16    Q    Okay.  And of course Mr. Caserta was there, right?

17    A    That's correct.

18    Q    And now, with all these people there, Mr. Fox is talking

19    about storming the Capitol and -- is that right?

20    A    That's right.

21    Q    And Mr. Musico is talking about other things in this

22    meeting, correct?

23              MR. KESSLER:  Hearsay.  I am not going to object to

24    things that have already come into evidence, but --

25              MR. HILLS:  I thought that already came in.
```

```
1              THE COURT:  Some of it did.  Some of it didn't.  So
2       why don't you get to the point you want to get to and if
3       it's --
4       BY MR. HILLS:
5       Q    All right.  In any event, these two individuals are
6       basically the speakers at this meeting, correct?
7       A    Correct.
8       Q    And you testified that you noticed that Mr. Caserta was
9       nodding at this time, correct?
10      A    Correct.
11      Q    And you noticed at this time Mr. Franks was nodding?
12      A    Correct.
13      Q    And you noticed Mr. Harris, did you say was nodding?
14      A    Correct.
15      Q    All right.  And all these people -- this is a year
16      and-a-half some time ago, you were watching these three
17      individuals and watching their mannerisms, correct?
18      A    Along with the other people surrounding them.  Yes.
19      Q    And everyone was nodding?
20      A    Not everyone.  No.
21      Q    Most of the people were nodding?
22      A    Not most.
23      Q    Just these three people were nodding?
24      A    Not just those three.  I would say maybe a couple other
25      people.
```

1    Q    Okay.  And you specifically marked out these three people

2    that these are the three that you remember anyway nodding,

3    correct?

4    A    Correct.

5    Q    Okay.  And back in your proffer, I think it was the

6    December 7th proffer, didn't you tell the agents that you

7    didn't tell them anything about nodding, did you?

8              MR. KESSLER:  Your Honor, same objection as before.

9              THE COURT:  Well, I mean --

10             MR. KESSLER:  He has to lay some foundation.

11             THE COURT:  It's an impeachment at this point.  If he

12   is saying there is nothing in the proffer, he doesn't have

13   anything he can show you other than reference to the proffer

14   and we'll see if the witness remembers that one way or the

15   other.

16   BY MR. HILLS:

17   Q    Do you remember telling the agents that -- nothing about

18   nodding?

19   A    I don't recall mentioning anything pertaining to nodding.

20   Q    At the proffer?

21   A    At the proffer, no.

22   Q    Okay.  I just want to be clear, you agree that you didn't

23   tell them anything about anybody's head bobbing or nodding at

24   that first proffer?

25   A    I don't exactly recall what I said at my first proffer.

Q    Okay.  Would it help refresh your recollection if you
reviewed the proffer?

A    It would.

        MR. KESSLER:  I think this is going to take a long
time, Your Honor.  We're talking about something -- it's going
to take a long time for him to read this whole thing and see
whether he said it or not, and actually, this isn't anything he
said or wrote.  This is somebody he's report.

        THE COURT:  Well, the question is whether he remembers
saying anything.  He says he doesn't.  I am not sure how much
more value we are going to gain by having him review the entire
note of somebody else to see whether it happened.  I think you
probably have as much as you can get already.

        MR. HILLS:  I've got it tabbed right.  He doesn't have
to read the whole thing if he doesn't want to.  He can of
course.

        MR. KESSLER:  But it's someone else's report.

        THE COURT:  He said he doesn't remember, so you have
the basis for your argument that this is all coming up late and
not early, and you know, unless the government goes in on
redirect and has him -- presents him with some prior consistent
statement, I think we're just going to waste a lot of time by
getting, you know, one nanometer closer to the line you want to
get to.  He's already given you the main thing.  He doesn't
remember saying it.

BY MR. HILLS:

Q    Okay.  Okay.  Let's move onto Wisconsin, right?

A    Right.

Q    Now, you have testified that you drove to Wisconsin with
Dan.  My client was in the vehicle, is that right?

A    That's right.

Q    You stayed overnight.  The next morning this would have
been the 11th, July 11th, is that correct?

A    That sounds right.

Q    All right.  Breakfast in the morning, that's the first time
you met Mr. Croft?

A    Yes.

Q    And I think you testified that my client was in the area of
the -- when you met Mr. Croft?

A    Yes.  We were all at the breakfast table together.

Q    All right.  And there was an exhibit played with, I think,
Mr. Croft talking and Mr. Harris talking?

A    Yes.

Q    All right.  My client wasn't talking at that time, correct?

A    I don't recall him speaking.  No.

Q    All right.  And when you created the shoot house, this is
when, on Saturday, and we have all the individuals there that
you discussed, correct?

A    Correct.

Q    Including Mr. Caserta, is that right?

1   A   Correct.

2   Q   Now, did you know who UCE, the undercover Mark was at that

3   time?

4   A   No.

5   Q   All right.  Do you remember a guy there bald with a long

6   beard?

7   A   That sounds familiar.

8   Q   Okay.  Do you remember him helping you out build the -- or

9   set up, I guess, the shoot house?

10  A   He may have.  There were a few Wisconsin members that

11  helped us assemble the shoot house.

12  Q   All right.  And I think you indicated that on direct and on

13  cross that Mr. Fox was talking about the reasons for using the

14  shoot house, is that right?

15  A   That's right.

16  Q   And then I think you testified that my client was nodding,

17  correct?

18  A   I don't believe I said he was nodding.

19  Q   He wasn't saying anything?

20  A   He wasn't saying anything.

21  Q   Okay.  So there would be no recording, obviously, if my

22  client wasn't saying anything?

23  A   Right.

24  Q   All right.  Now, moving forward to August 9th, 2020, you

25  indicated that there was an FTX at Munith again, is that right?

1    A    That's right.

2    Q    And you testified that at this time Mr. Fox came to this

3    FTX, is that right?

4    A    That's right.

5    Q    And at this time you indicate that my client was there, is

6    that right?

7    A    That's right.

8    Q    And you indicate that my client was quite vocal at that

9    time, is that right?  Is that what you said or did you say he

10   was nodding at this time?

11   A    I don't recall saying he was vocal or nodding.

12   Q    I'm sorry, what?

13   A    I said I don't recall saying he was vocal or that he was

14   nodding.

15   Q    All right.  Was my client saying anything?

16        MR. KESSLER:  Hearsay.

17        THE COURT:  Yeah.  The content is -- I guess he can --

18   if he remembers he can say whether Mr. Caserta was using any

19   words.

20        THE WITNESS:  I don't recall hearing him say anything.

21   BY MR. HILLS:

22   Q    Okay.  Do you recall testifying at the grand jury that my

23   client was very vocal?

24   A    No.

25   Q    Would it help refresh your recollection?

1    A    It might.  Yes.

2         MR. KESSLER:  This isn't inconsistent.  He just said

3    he didn't remember, Your Honor.

4         THE COURT:  Why don't you show Mr. Kessler what you

5    are going to rephrase and/or to present him with and we'll go

6    from there.  He just said now he doesn't recall Mr. Caserta

7    saying anything, and go ahead.  I am not sure which one is more

8    helpful for Mr. Caserta, but go ahead.  You might want to take

9    a bird in the hand and move on.

10   BY MR. HILLS:

11   Q    It starts right here and you'll have to keep going for a

12   few pages.

13   A    Okay.

14   Q    Did you get the chunk I'm talking about?

15   A    I didn't see anything in there referring to Brandon Caserta

16   being vocal.

17   Q    That part?

18   A    Correct.

19   Q    Did that refresh your recollection?

20   A    Yes.  I have read it and I did not see anything in there

21   mentioning Brandon Caserta being vocal.

22   Q    Being more on board with kidnapping and carrying out --

23        THE COURT:  Wait a minute.  Don't read that, because

24   the question was vocal.  He said he didn't see it.  He doesn't

25   remember it.  So now you are just reading something else, which

1      is different than what the premise of the question was.

2      BY MR. HILLS:

3      Q    Okay.  In there you are interpreting what my client was

4      thinking then, is that what you are doing?

5      A    I was just attempting to read body language.

6      Q    Okay.  Read body language.  So he was not talking at all?

7      A    No.

8      Q    Okay.  So --

9            THE COURT:  And then we had that five minutes ago.  He

10     said he didn't remember it.  Let's try to stay focused.

11           MR. HILLS:  I am focused on body language.

12     BY MR. HILLS:

13     Q    What body language?  Was he nodding?

14     A    Nodding.  So it was my interpretation of his body language.

15     Q    Okay.  So my client is nodding.  Again, not saying

16     anything?

17     A    Correct.

18     Q    Okay.  And you realize Mr. Chappel was there the whole

19     time, correct?

20     A    Correct.

21     Q    The whole time on August 9th, right?

22     A    Right.

23     Q    Recording everything, correct?

24     A    Right.

25     Q    And has anybody refreshed your recollection with that whole

1    recording?

2    A    I have not heard any recording with Brandon Caserta's voice

3    on it.

4    Q    Right.  So Brandon Caserta's voice is not on that whole

5    recording, correct?

6    A    I have not listened to the whole recording.  Only pieces.

7    Q    And only the pieces the government has shown you, right?

8         MR. KESSLER:  He can't speak to what's on recordings

9    he hasn't listened to, Your Honor.

10        MR. HILLS:  That's what we're getting to right now,

11   the pieces that he had listened to.

12        THE COURT:  Well, at the beginning of this whole

13   segment he said he doesn't remember Mr. Caserta saying

14   anything, and we have gotten barely a millimeter past that, and

15   we've spent a rot of time.  So you have your point to make the

16   argument.  You are points to make on credibility.  Let's get to

17   something new.

18        MR. HILLS:  Well, Your Honor, please, to me this is

19   pretty important.

20        THE COURT:  Well, it's not to me.  So at this point

21   403 trumps it.  I think the only relevant point I see is

22   potential credibility, No. 1.  You have the basis for that.

23   The other is whether your witness here, Mr. Garbin, is

24   interpreting body language, nods or otherwise or if whether he

25   is relying on words that haven't been put into evidence.  It's

1   clear he's saying body language, so move on.  I mean, you have

2   what you need for your argument.

3   BY MR. HILLS:

4   Q    August 23rd, Lake Orion, correct?

5   A    Correct.

6   Q    Okay.  Lake Orion, several people show up to Daniel

7   Harris's parent's house, is that right?

8   A    That's right.

9   Q    Including Mr. Caserta?

10  A    Correct.

11  Q    You remember Mr. Caserta showing up with a green folder?

12  A    Yes.

13  Q    All right.  And he wanted to talk about certain things,

14  correct?

15  A    Correct.

16  Q    And that happened kind of at the beginning of this meeting,

17  is that correct?

18  A    The beginning would have started with us showing --

19  Q    I get that.  I can't -- let me rephrase the question.  By

20  the beginning of the meeting, I understand people showed IDs

21  and that kind of thing, correct?

22  A    Right.

23  Q    After that I am talking about, maybe within the first half

24  hour of it?

25  A    That sounds right.

1    Q    Okay.  And then the government pieced out I think a short

2    clip about consent and accepting responsibility.  You remember

3    that?

4    A    I've heard it.  Yes.

5    Q    Okay.  And we've got that transcript.  There isn't anything

6    in that transcript that talks about Governor Whitmer, is that

7    correct?

8    A    That's correct.

9    Q    Now, also you indicated that my client said something about

10    shedding the blood, or the blood of tyrants need to be shed,

11    something like that?

12    A    Correct.

13    Q    All right.  And we didn't hear a transcript of that or hear

14    an audio of that, is that correct?

15    A    That's correct.

16    Q    That's because my client didn't say that?

17           MR. KESSLER:  Objection, Your Honor.

18           THE COURT:  Well, it's cross.  He testified that

19    that's what he remembered him saying and --

20    BY MR. HILLS:

21    Q    In that vein, my client said three distinct things, boom

22    boom, boom?

23           MR. KESSLER:  I'm sorry that I have to keep objecting.

24    I just don't know where he's going and I don't want to let the

25    question or the answer get out.

1      THE COURT:  We've already had the three distinct thing

2  issue.  I've ruled on that.  I don't think Mr. Hills will go

3  back there.  So the question was -- wasn't -- we didn't hear a

4  tape because he didn't say it.  So I don't know if the witness

5  is able to answer that or not.

6  BY MR. HILLS:

7  Q   As a matter of fact, he said something completely

8  different, didn't he?

9      MR. KESSLER:  Hearsay.

10      THE COURT:  Well, the question should stay with, I

11  mean, if this was the testimony.  Did he say it or not?  That's

12  what got set up, not to bring in other things.

13  BY MR. HILLS:

14  Q   Fowlerville.  You set up the training at Fowlerville or was

15  that Mr. Franks?

16  A   Franks.

17  Q   Mr. Caserta didn't set up any of this training, is that

18  fair to say?

19  A   Yes.

20  Q   He was not in any leadership position, is that right?

21  A   That's right.

22  Q   And at Mr. Franks', I think it's his dad's house, is that

23  right?

24  A   That's what I understood.  Yes.

25  Q   You are shooting around vehicles, and was this the -- is

1    that correct?

2    A    Yes.  Vehicles.  Yes.

3    Q    And this was the type of training that you had done in your

4    three gun shooting competition, stuff like that?

5    A    I hadn't really done anything with vehicles in three gun.

6    Q    Okay.  But in three gun you are moving and shooting?

7    A    Correct.

8    Q    And that's what you like to do?

9    A    Correct.

10    Q    So this kind of thing is fun?

11    A    I would say so.  Yes.

12    Q    All right.  And Dan Chappel is there at July 26, correct?

13    A    Yes.

14    Q    And nothing about kidnapping or anything?

15    A    Not that I recall.  No.

16    Q    Now, at Luther my client was there, yes?

17    A    That's correct.

18    Q    He stayed in a tent, is that right?

19    A    That's correct.

20    Q    Now, a bunch of people stayed in your trailer, is that

21    right?

22    A    That's right.

23    Q    You, Mr. Chappel, is that correct?

24    A    That's correct.

25    Q    Harris and Franks, correct?

1    A    Correct.

2    Q    And Puffenberger?

3    A    I believe so.  Yes.

4    Q    Okay.  My client didn't sign this flag that you have shown

5    or that you've seen?

6    A    I didn't see it on there.  No.

7    Q    Okay.  Now, when you on Saturday, do you know when my

8    client arrived?

9    A    Not exactly.  No.

10   Q    Saturday morning?

11   A    I don't remember if it was Saturday morning or the night

12   before.

13   Q    Okay.  In any event, training happens and some time in the

14   afternoon Mr. Fox brings several people aside, including my

15   client, and tells them about the ride up north, correct?

16   A    I wasn't a part of that conversation.

17   Q    You heard it?

18   A    I did not hear it.

19   Q    There was a ride-along that you went up north, correct?

20   A    Correct.

21   Q    Mr. Fox and -- do you recognize UCE Mark now at Luther?

22   A    I do.  Yes.

23   Q    And at Luther, Fox and UCE Mark left in a vehicle, is that

24   right?

25   A    I didn't see the vehicle they left in.

Q    But they left; they were gone?

A    Yeah.  They left at some point to go get some dinner.

Q    And then Steve Robeson and Croft and several others left as well, is that right?

A    That is correct.

Q    And then you were the last car to leave, is that right?

A    Correct.  But before you left Fox had left to get dinner and Robeson and Croft had left to go back to their hotel.

Q    Right.  So you were the last truck to leave?

A    That's correct.

Q    Okay.  And you testified that you get in there -- Mr. Chappel is driving, Red is in the front passenger seat, correct?

A    Correct.

Q    And you and Mr. Franks are in the back seat, is that right?

A    That's right.

Q    And you go out and you see if you can find Mr. Caserta. You can't find him; you don't see him?

A    Correct.

Q    And then you leave and you are in the vehicle and there is a call.  Do you remember a call to Mr. Fox?

A    I don't remember the exact call.  I know he was called multiple times before we met up with him.

Q    All right.  And do you recall during the call that Mr. Fox was tasked with going back to Luther to get Mr. Caserta?

1    A     No.  I don't remember that.

2    Q     Okay.  In any event, you and Mr. Chappel and Franks and Red

3    went down to Big Rapids, picked up these other folks and then

4    drove all the way back up north, correct?

5    A     Correct.

6    Q     And then when you got up north, Mr. Caserta was not with

7    this group, correct?

8    A     He was not.  No.

9    Q     All right.  You get back the next morning.  You get back

10   late, early Sunday morning, correct?

11   A     Correct.

12   Q     All right.  And you don't see Mr. Caserta, is that right?

13   A     That's right.

14   Q     And you -- the next morning you get up, there is some

15   training, correct?

16   A     Correct.

17   Q     And there is a meeting, is that right?

18   A     That's right.

19   Q     Some time 11:00, 12:00ish, correct?

20   A     That sounds about right.

21   Q     And during this meeting takes -- it's a fair bit.  38

22   minutes, 40 minutes sound about right?

23   A     That sounds right.

24   Q     All right.  And at this meeting we've got several people

25   there, is that correct?

| | | |
|---|---|---|
| 1 | A | That's correct. |
| 2 | Q | We've got Mr. Fox there, is that right? |
| 3 | A | That's right. |
| 4 | Q | And he is speaking, is that correct? |
| 5 | A | That's correct. |
| 6 | Q | We've got Steve there, is that right? |
| 7 | A | That's right. |
| 8 | Q | And he is speaking? |
| 9 | A | He does.  Yes. |
| 10 | Q | Mr. Croft is there? |
| 11 | A | Yes. |
| 12 | Q | He is speaking? |
| 13 | A | He is speaking. |
| 14 | Q | Mr. Harris is there and he is speaking, correct? |
| 15 | A | Correct. |
| 16 | Q | Red, he is speaking? |
| 17 | A | He spoke a little bit.  Yes. |
| 18 | Q | And you obviously and you are speaking? |
| 19 | A | I spoke.  Yes. |
| 20 | Q | Mr. Higgins, you remember Higgins? |
| 21 | A | I do.  Yes. |
| 22 | Q | He is there and he is speaking? |
| 23 | A | Yes. |
| 24 | Q | Kaleb Franks is there and he is speaking, right? |
| 25 | A | Right. |

1    Q    Big Dan or Dan Chappel, he is speaking, correct?

2    A    Correct.

3    Q    And Mr. Null, Bill Null, right?

4    A    I don't recall him being there.

5    Q    Okay.  And you have Mr. Caserta there, is that right?

6    A    That's right.

7    Q    And I believe you testified that this time he's nodding

8    again, right?

9    A    That's right.

10   Q    No speaking?

11   A    I don't recall hearing him say anything.

12   Q    He is bobble heading, right, again?

13   A    Right.

14   Q    This is like the fourth or fifth time he's nodding at some

15   meeting?

16   A    Right.

17   Q    Where there's audio recording?

18   A    Right.

19   Q    Where everybody else is speaking?

20   A    Correct.

21   Q    And nobody acknowledges my client?

22   A    Not that I recall.

23   Q    And my client doesn't say boo?

24   A    I don't recall him saying anything.

25   Q    Doesn't say anything?

1          MR. KESSLER:  Asked and answered, Your Honor.

2          THE COURT:  At least three or four times now.

3     BY MR. HILLS:

4     Q    Isn't it fair that my client walked up to this meeting,

5     stayed a moment, and then left?

6     A    He was --

7     Q    Isn't that true?

8     A    He was there for the entire meeting as I recall.

9     Q    And there for the entire meeting didn't say a word?

10    A    Not that I recall.

11    Q    Well, you want to check the transcript to see if he said

12    anything?

13         MR. KESSLER:  He's already answered that he didn't say

14    anything.

15         THE COURT:  It's the same point you ran into last

16    time.  You have your basis for argument.  You don't need more.

17    BY MR. HILLS:

18    Q    The government played you a clip of my client, a video

19    where my client is upset about traffic tickets he got.  Do you

20    remember that?

21    A    I do.  Yes.

22    Q    Okay.  And the police, they are the enemy, something very

23    intense, right?

24    A    Right.

25    Q    Okay.  And talked about a recon, correct?

1    A    Correct.

2    Q    And you speculated that my client was talking about a recon

3    to the governor's cabin or whatever, correct?

4    A    Correct.

5    Q    But you don't know what my client was thinking?  That's

6    just your interpretation, correct?

7    A    That's correct.

8    Q    All right.  And my client had the opportunity to go on two

9    recons to the governor's cottage and he didn't go -- he went on

10   a total of zero, right?

11   A    That's right.

12   Q    Okay.  You don't know of any recon to the governor's house

13   or otherwise that my client ever went on, correct?

14   A    No.

15   Q    You talked about a QRF that you went on, right?

16   A    That's right.

17   Q    My client didn't go on any QRF with you, right?

18   A    That's correct.

19   Q    You went on some gun deal to protect your buddy from Trent

20   Newcomb, right, May 3rd, do you remember that?

21   A    Yes.

22   Q    As a matter of fact, you were going to kill Trent Newcomb,

23   right?

24   A    No.

25   Q    If he was a felon?

1    A    No.

2    Q    Well, you brought your gun, right?

3    A    I was there to protect my friend in case he was robbed.

4    Q    To kill him in case he was robbed?

5         MR. KESSLER:  Objection, Your Honor.

6         THE COURT:  Now you are arguing with him.  He said

7    what it was and you can move onto something else.

8    BY MR. HILLS:

9    Q    My client didn't go with you, did he?

10   A    No.  He didn't.

11   Q    Okay.  I think you testified you had some leadership

12   meeting on June 3rd, right?

13   A    The date doesn't ring a bell.

14   Q    My client wasn't with you at any leadership meeting,

15   correct?

16   A    Not that I recall.

17   Q    You went to a protest June 18th, right?

18   A    That sounds right.  Yes.

19   Q    My client didn't go with you to any protest, right?

20   A    Not with myself.  No.

21   Q    All right.  As far as you know, he didn't go to the Vac

22   Shack at all ever, did he?

23   A    Not that I am aware of.

24   Q    You talked a lot about Peebles, Ohio, right?  There was a

25   lot of conversation about my client didn't go to that, did he,

1    with you?

2    A    No.  He didn't go to Peebles, Ohio with us.

3    Q    Okay.  Talked about some dinners with Dan Chappel.  My

4    client never went with you for beers at BWWs or anything like

5    that, right?

6    A    Not that I recall.

7    Q    Okay.  My client didn't enter into any agreement to sell

8    ghost guns to felons with you?

9    A    No.

10   Q    Didn't help you build the shoot house at Luther?

11   A    Not that I recall.

12   Q    Didn't pool any money, didn't give you any money, correct?

13   A    Didn't give me any money personally.  No.

14   Q    Wasn't making explosives with you?

15   A    No.

16   Q    Fireworks, correct?

17   A    That's correct.

18   Q    A couple meetings, July 7th and July 23rd, my client wasn't

19   at that with you?

20   A    I don't exactly recall.

21   Q    Okay.  My client went to trainings and was training with

22   you, correct?

23   A    He was.  Yes.

24            MR. HILLS:  Thank you.

25            THE COURT:  All right.  All right.  So we'll take our

1      morning break now and come back in 20 minutes.

2              LAW CLERK:  All rise.

3              (Jury out, 10:04 a.m.)

4              THE COURT:  So we can release Mr. Garbin for the

5      break.  I'll let you go ahead and make your record on the issue

6      I shut you down on, Mr. Hills.

7              MR. HILLS:  Which time?  I feel like you shut me down

8      a lot.

9              THE COURT:  Well, you deserved it a lot in my opinion.

10     The time that I am talking about is where you are talking about

11     the blood of tyrants, the three statements that you tried to

12     get in last time and you didn't, and the green book which is

13     going to present problems down the road.  That's the time I am

14     talking about.

15             MR. HILLS:  Okay.  I'm good with the blood of tyrants.

16     I think he answered the question.  I don't need to make a

17     record on that.

18             THE COURT:  All right.  Anything else.

19             MR. HILLS:  The green book I think is a reference to a

20     time when my client is talking.  I didn't get into what he

21     said.

22             THE COURT:  No.  You didn't.  I know the green book or

23     what appear to be excerpts of it are in your exhibit lists so I

24     am not sure where we're going with the green book eventually.

25             MR. HILLS:  I think the prosecutor has got it.  I

1     think the prosecutor is bringing it in.

2           MR. KESSLER:  We are not bringing the book in, Your

3     Honor.

4           MR. HILLS:  It's on your list, isn't it?

5           THE COURT:  Anyway.  I can't imagine much relevance to

6     the green book but it's come up multiple times so I fear that

7     we are going to get to a point where content becomes relevant,

8     and then we are going to have a major fight and I'd assume have

9     it early so you don't set up the green book seven, eight, nine

10    times and have a failed explosive device to stick with the

11    theme of the case.  So that's why.  And when the last time the

12    green book came up it was in connection with you said three

13    things boom, boom, boom.  I shut you down that last time for

14    the hearsay reasons.  So to me, when I start hearing those

15    things coalesce I figure they are related.  Now, maybe they are

16    not.

17          MR. HILLS:  Well, they are actually not related

18    really.  They just are in the same, like, the green book comes

19    in on he brings the green book with him at Lake Orion on August

20    23rd.

21          THE COURT:  But how does that change anything that's

22    important in the case?  Would it matter that he had a red book?

23          MR. HILLS:  No.

24          THE COURT:  Why are we spending any time talking about

25    it?  What's the relevance?

1      MR. HILLS:  The relevance is my client comes in.  He

2  talks about what he wants to talk about.  I think that's

3  relevant.

4      THE COURT:  But what does the green book have to do

5  with anything?

6      MR. HILLS:  It's just a reference to when my client is

7  talking.  That's it.  That's why.

8      THE COURT:  Okay.  All right.  So do you want to make

9  a record on any of the other items that you --

10      MR. HILLS:  No.

11      THE COURT:  All right.  Good.  The blood of tyrants

12  reference, I know it came in, but, well, I know I've seen it

13  because I remember the reference.  I don't remember if it came

14  in on testimony or if it was in earlier motion practice.  I

15  just don't remember.  I don't know if counsel knows.

16      MR. KESSLER:  There is one chat that came in where at

17  the end -- the first page of it is the one where he said

18  Ms. White is an order follower, and the second page he says

19  tyrants deserve the most swiftly of endings.

20      THE COURT:  It's in one of the chats that's in

21  evidence.

22      MR. KESSLER:  If that's the reference Mr. Hills is

23  talking about.

24      MR. HILLS:  It just didn't come in on August 23rd.

25      THE COURT:  All right.

1          MR. HILLS:  That's my point is when he said it came

2     in.

3          THE COURT:  Okay.  All right.  The other thing that I

4     pushed on, although I don't think I shut you down on it,

5     was the handing him the long segment on the grand jury

6     testimony.  Anything on that you want to make a record of?

7          MR. HILLS:  Which part of that was that?

8          THE COURT:  It was where he was talking about your

9     client not being vocal as opposed to nodding.

10          MR. HILLS:  You let me go on that.

11          THE COURT:  I thought you'd be happy with his

12     statement that he didn't remember anything.  Isn't that the

13     best you can hope for?

14          MR. HILLS:  No.  I wanted my client yelling and

15     screaming and doing all kinds of stuff.  He wasn't there.

16          THE COURT:  Well, I just don't understand the point

17     but if you want to make a proffer of relevance I'm willing to

18     listen.  It completely misses me.  To me if your point is my

19     client never said anything, he didn't affirmatively assent, and

20     it's all you are reading the body language and nods you can't

21     do any better than the witness saying I don't remember him

22     saying anything.

23          MR. HILLS:  No.  I want him saying, yeah, my client

24     was rah, rah, rah, kidnap the governor because my client was

25     not there.  He is lying.

1          THE COURT:  Okay.  Well, you have a basis to make the

2    argument.  All right.  Anything else?

3          MR. HILLS:  No.

4          THE COURT:  All right.

5          MR. GIBBONS:  Thank you, Your Honor.

6          THE COURT:  Twenty minutes.

7          LAW CLERK:  Court is in recess.

8          (Recess taken, 10:10 a.m.)

9          (Resume Proceeding, 10:35 a.m.)

10          LAW CLERK:  All rise, please.

11          (Jury in, 10:35 a.m.)

12          LAW CLERK:  The United States District Court for the

13    Western District of Michigan is now in session.  The Honorable

14    Robert J. Jonker, chief judge, presiding.

15          THE COURT:  All right.  Welcome back.  We are here for

16    our second segment and it will begin with Mr. Blanchard's cross

17    of Mr. Garbin.  We'll turn it over to you, Mr. Blanchard.

18          MR. BLANCHARD:  Thank you.

19                    CROSS EXAMINATION

20      BY MR. BLANCHARD:

21    Q    Good morning, Mr. Garbin.

22    A    Good morning.

23    Q    So you have prepared for your testimony today, correct?

24    A    No.

25    Q    You haven't prepared at all?

1    A    I got woken up this morning, placed in a holding tank and

2    put on a shuttle and came straight here.

3    Q    I didn't mean that you did the prep today.  Before today

4    you have prepared for your testimony, correct?

5    A    Yes.

6    Q    Yeah.  And you have done that by meeting with special

7    agents from the FBI?

8    A    Yes.

9    Q    And with lawyers for the government?

10   A    Yes.

11   Q    You have talked about the kinds of questions they would ask

12   you?

13   A    Yes.

14   Q    And the kinds of questions that the Defense would ask you?

15   A    Yes.

16   Q    And you talked about how to handle the defense attorneys?

17   A    Somewhat, yes.

18   Q    In fact, it was suggested to you that you could say, I

19   don't remember.  That could be a response?

20          MR. KESSLER:  Objection, Your Honor.

21          THE COURT:  I don't think -- that's not something you

22   can get into.

23   BY MR. BLANCHARD:

24   Q    You don't want to be in jail, fair?

25   A    Fair.

1    Q    You don't want to go to prison, fair?

2    A    Fair.

3    Q    You've been in custody for the last 18 months, is that

4    right?

5    A    That's right.

6    Q    And you know you are going to prison, right?

7    A    That's right.

8    Q    And you know you are going to prison as a snitch, right?

9    A    That's right.

10   Q    You don't want to do that?

11   A    I do what I have to do.

12   Q    You are scared about it, right?

13   A    No.  Not really.

14   Q    You want to do as little time as possible, fair?

15   A    That would be fair.

16   Q    And so you have taken some steps to minimize the amount of

17   time you'll have to do, right?

18   A    That's right.

19   Q    Part of those steps was that you struck a deal with the

20   United States Government, right?

21   A    That's right.

22   Q    And you pled guilty?

23   A    That's correct.

24   Q    And you agreed to testify?

25   A    That's correct.

1    Q    And you agreed to meet with the investigators as many times

2    as they wanted?

3    A    That's correct.

4    Q    And you agreed specifically to meet with the prosecutors

5    before your testimony, right?

6    A    That wasn't a part of my plea agreement.  No.

7    Q    That was not part of your plea agreement?

8    A    No.

9              MR. BLANCHARD:  Could I just for the witness have

10   Exhibit 3048, paragraph 7, please?

11   BY MR. BLANCHARD:

12   Q    You see the document in front of you.  Is that your plea

13   agreement?

14   A    Yes.

15   Q    If we scroll down to paragraph 7, please?  Sorry, paragraph

16   6 is really long.  Next page, please.  I'm sorry, go back up.

17             Would you read paragraph 7?  Tell me if that's an

18   accurate recitation of your obligations under the plea

19   agreement?

20             MR. KESSLER:  Your Honor, I see it's marked as a

21   Defense exhibit.  We have no objection.

22             MR. BLANCHARD:  It's marked for identification only.

23             THE COURT:  Please don't talk over each other because

24   that'll drive Mr. Brandell crazy and make a terrible

25   transcript.  So finish your point first and then we'll let

1    Mr. Blanchard respond.

2          MR. KESSLER:  Yes, Your Honor.  I see it's marked as a

3    Defense exhibit and we have no objection to putting the entire

4    document into evidence.

5          THE COURT:  I expect you don't want to.

6          MR. BLANCHARD:  It's just marked for identification.

7          THE WITNESS:  I've read it.

8    BY MR. BLANCHARD:

9    Q    That's an accurate recitation of your obligations under the

10   plea agreement, right?

11   A    It is.

12   Q    And it specifically requires that you meet with prosecutors

13   before testifying, correct?

14   A    I see that now.  Yes.

15   Q    In exchange for that your plea and the plea agreement the

16   government has given you some promises, correct?

17   A    I have been made only the promise that no further charges

18   would come up.

19   Q    So that's one of the promises, right, that no further

20   charges would be brought against you, right?

21   A    Correct.

22   Q    And that included that they would not file weapons of mass

23   destruction charges against you, right?

24   A    That's correct.

25   Q    And that they wouldn't file destructive devices charges

1     against you, correct?

2     A    That's right.

3     Q    And they wouldn't file any charges against you related to

4     the ghost guns that you talked about, right?

5     A    Correct.

6     Q    They also promised in that plea agreement that they would

7     consider filing a 5K motion, right?

8     A    Correct.

9     Q    And a 5K motion is a motion where the government comes into

10    court -- strike that.  You understand that a 5K motion is a

11    motion where the government comes into Court before sentencing

12    and asks the judge to give you a lighter sentence because you

13    cooperated, right?

14    A    I did not know it was before sentencing.

15    Q    Okay.  Well, before sentencing you got a 5K motion, right?

16    A    I saw the paperwork the day of sentencing.

17    Q    Sure.  And you saw that paperwork before the sentence was

18    imposed, right?

19    A    Correct.

20    Q    And so the government did file a 5K on your behalf, right?

21    A    That's right.

22    Q    They came in and they asked the questions to give you a

23    lighter sentence because of what you had done in this

24    agreement, right?

25    A    That's right.

1    Q    They also promised you in that agreement that they would

2    consider filing a Rule 35 motion later, right?

3    A    That's right.

4    Q    A Rule 35 motion is kind of similar to a 5K, right?

5             MR. KESSLER:  Your Honor, he doesn't know all these --

6             MR. BLANCHARD:  I'll rephrase.

7             MR. KESSLER:  And he's testified to all of this on

8    direct.

9             THE COURT:  Well, he testified to some of it, and he

10   testified to some of it on one of the crosses, but I think

11   Mr. Blanchard can have a little room to move on it even if it

12   covers some of the same territory.  And if the witness doesn't

13   know what a particular reference is to a rule or a 5K he can

14   say that.  And if you prefer to rephrase you can do that.

15            MR. BLANCHARD:  Thank you.

16   BY MR. BLANCHARD:

17   Q    You understood that a Rule 35 motion is one where the

18   government comes in later after you have been sentenced and

19   asks you to -- asks the Court to reduce your sentence, right?

20   A    Yes.  I understood that.

21   Q    Okay.  And the government has promised to consider doing

22   one of those after you testified here, right?

23   A    They haven't promised that it will be done.

24   Q    Right.  They have promised to consider doing it, right?

25   A    To consider it.  Yes.

1    Q    And you expect that they will if the jury believes your

2    testimony, right?

3    A    I hope so.  Yes.

4    Q    Yeah.  Because if they do that means less time in prison

5    for you, right?

6    A    That would mean so.  Yes.

7    Q    I want to go back to the charges that you avoided, right?

8    You said you avoided by the deal being charged with a weapons

9    of mass destruction count, right?

10   A    Correct.

11   Q    You knew that was a felony, right?

12   A    That's correct.

13   Q    And you knew it was a felony punishable by up to life in

14   prison, right?

15   A    Yes.

16   Q    And you understand that in federal Court a life sentence

17   means life, right?

18   A    That's correct.

19   Q    You understand that if you get a life sentence in federal

20   court that means you die in a cage, right?

21   A    That's right.

22   Q    And --

23        MR. KESSLER:  He is misstating the law here, too.  I

24   mean, that's not a life sentence.  It's not a guaranteed life

25   sentence.

1          THE COURT:  We are not going to turn this into a

2     complete tutorial on how federal sentencing law works.  What is

3     important for I think the Defense to draw out is what

4     Mr. Garbin's incentive is to testify and that's fine.  And if

5     either side gets too much in the weeds on what the sentencing

6     is then I'll step back and explain how sentencing works, but I

7     don't think that's necessary or that it helps anybody.  And

8     from your point of view, Mr. Kessler, if you want to explain

9     the range of possibilities for the conviction he did plead to,

10    you can do that on redirect, and if Mr. Blanchard misrepresents

11    something from your perspective you can object again.  Let's

12    proceed on and let everybody make their point.

13          MR. BLANCHARD:  Thank you.

14    BY MR. BLANCHARD:

15    Q    You also avoided being charged with a destructive device

16    count, right?

17    A    Right.

18    Q    And you understand that that's punishable by up to 10 years

19    in prison, right?

20    A    Right.

21    Q    And then you did plead guilty to this kidnapping count,

22    right?

23    A    That's correct.

24    Q    And you have some understanding of how sentencing works in

25    federal court, right?

1   A    I do.  Yes.

2   Q    Okay.  And you understood that there was a potential

3   sentencing enhancement for terrorism, correct?

4   A    That's correct.

5   Q    And you understood that if the terrorism enhancement was

6   applied to you, it would result in your guideline sentence

7   recommending a life sentence, right?

8   A    That's correct.

9   Q    And by pleading guilty, you avoided that terrorism

10  enhancement, right?

11  A    It was not promised to me.  No.

12  Q    It wasn't promised, but you expected by your plea that you

13  would avoid that, correct?

14  A    I had some concern, as did my attorneys.

15  Q    I think you testified you received a 75-month sentence, is

16  that right?

17  A    That's right.  Yes.

18  Q    And you have testified here that you believe or you hope

19  that you are going to get a Rule 35 reduction later?

20  A    That's right.

21  Q    How much of a reduction are you hoping for?

22  A    I have no idea.

23  Q    You don't know how much you are hoping for?

24  A    No.

25  Q    Looking to cut your time in half?

1    A    If it's possible it's possible.  I was told at the start of

2    this by my legal team to not count my eggs before they hatch.

3    So that's something, you know, I haven't done.

4    Q    Your legal team, and you are referring to your lawyers,

5    right?

6    A    My lawyers.  Yes.

7    Q    And you have a few lawyers, right?

8    A    I do.  Yes.

9    Q    You have a lawyer from Detroit, Mr. Satawa?

10    A    Yes.

11    Q    You've got a lawyer here from Grand Rapids,

12    Mr. Springstead?

13    A    Mr. Springstead is not here currently.  Another lawyer from

14    his firm is here to represent me.

15    Q    Right.  Ms. Muir is here in the courtroom for you today,

16    right?

17    A    Yes.

18    Q    You were part of the Wolverine Watchmen leadership,

19    correct?

20    A    That's correct.

21    Q    And you were responsible for vetting new members in that

22    role, correct?

23    A    I was.  Yes.

24    Q    And you therefore vetted Mr. Croft, correct?

25    A    I did not.

1    Q    Because he was never a part of the Wolverine Watchmen,
2    true?
3    A    That's true.
4    Q    In fact, the first time you met Mr. Croft was at Cambria,
5    Wisconsin, true?
6    A    That's true.
7    Q    And then I think if I understand correctly, Mr. Fox had his
8    own group, right?
9    A    He did.  Yes.
10   Q    There was a training in Munith on June 28th, is that right?
11   A    That's right.
12   Q    And that was supposed to be a dual training, is that
13   correct?
14   A    That's correct.
15   Q    A training between Wolverine Watchmen, right?
16   A    Right.
17   Q    Which is your group?
18   A    Which is my group.  Yes.
19   Q    And then Mr. Fox's group, right?
20   A    Correct.
21   Q    And from Adam or Mr. Fox's group he brought himself, that
22   was one person, right?
23   A    That's right.
24   Q    And he brought Sean Fix?
25   A    Yes.

1    Q    He -- they each brought their girlfriends?

2    A    Yes.

3    Q    The two Amandas?

4    A    Yes.

5    Q    That was the entirety of Mr. Fox's group, right?

6    A    There was one other person there with him as well, but I am

7    not sure if he was a member of Fox's group or not.

8    Q    Who was that person?

9    A    His name is Mike I believe.

10   Q    And then the Wolverine Watchmen had 12 or 13 people there?

11   A    That sounds about right.

12   Q    Mr. Croft wasn't at that Munith training, correct?

13   A    He was not.

14   Q    And there's been some testimony about code words.  Do you

15   remember that?

16   A    I do.  Yes.

17   Q    Code words like bonfire and can opener?

18   A    Yes.

19   Q    Okay.  Those were created by Mr. Bellar?

20   A    That's correct.

21   Q    And he was a Watchmen?

22   A    He was and then he left the group.

23   Q    Okay.  So he was a Watchmen?

24   A    He was.  Yes.

25   Q    And those were distributed at a meeting at Mr. Bellar's

1      house?

2      A    They were.  Yes.

3      Q    A meeting at Mr. Bellar's house that Mr. Croft wasn't at?

4      A    He was not there.  No.

5      Q    As far as you know, Mr. Croft never got the code words?

6      A    As far as I know he did not get them.

7      Q    As -- when we are talking about Cambria, right, that's an

8      event that happened in Wisconsin, right?

9      A    That's right.

10     Q    In July?

11     A    That sounds right.  Yes.

12     Q    And the Wolverine Watchmen were invited, correct?

13     A    They were.  Yes.

14     Q    Do you -- do you know who made the initial invite for the

15     Wolverine Watchmen to come to Cambria?

16     A    I remember hearing about it during the July 7th meeting at

17     Paul Bellar's house.

18     Q    My question is do you remember who made the initial invite?

19     A    No.

20     Q    Okay.  You testified at a grand jury in this case, correct?

21     A    Correct.

22     Q    You testified at a grand jury in this case on December 15

23     of 2020, correct?

24     A    That sounds right.

25     Q    And at that time you were under oath, right?

1    A    That's correct.

2    Q    And you told the truth?

3    A    That's correct.

4           MR. KESSLER:  Your Honor, if he wants to refresh him

5    he can just refresh him, but he wasn't said anything other than

6    I don't remember that would trigger.

7           THE COURT:  I think the first step would be refresh

8    unless what you are going to present him with his --

9           MR. BLANCHARD:  I understand.

10   BY MR. BLANCHARD:

11   Q    Would it refresh your recollection to look at your grand

12   jury testimony?

13   A    It would.

14          MR. BLANCHARD:  May I approach?

15          THE COURT:  Sure.

16   BY MR. BLANCHARD:

17   Q    I am showing you your grand jury testimony from December 15

18   of 2020.  Feel free to look at any of it but I think page 35

19   would be helpful.  The middle of the page.  Let me retrieve

20   that from you.

21          Is your recollection now refreshed as to who invited

22   you guys to Cambria?

23   A    Yes.

24   Q    Who invited you to Cambria?

25   A    Steve Robeson.

Q    Now, you said that you first met Mr. Croft at breakfast at
Cambria, right?

A    That's right.

Q    And then after breakfast you all drove out to the place
where the FTX occurred, right?

A    That's right.

Q    Do you recall, did you ride with Mr. Croft out?

A    I did not.  No.

Q    Do you recall if anyone rode with Mr. Croft?

A    I didn't see anybody in the vehicle with him.

Q    You agree that you testified at the grand jury in February
of 2021, right?

A    Yes.

Q    Might it refresh your recollection to review your grand
jury testimony regarding that point?

A    Yes.

        MR. KESSLER:  February?

        MR. BLANCHARD:  Yeah.  Page 23, lines 1 through 6.

        MR. KESSLER:  Okay.

        MR. BLANCHARD:  May I approach?

        THE COURT:  Sure.

BY MR. BLANCHARD:

Q    I am showing you your February 2021 grand jury testimony,
page 23.  Feel free to look at any part but I think the first
six lines might be helpful.

Having reviewed your grand jury testimony is your
recollection now refreshed as to who rode with Mr. Croft?

A    Yes.

Q    And who rode with Mr. Croft?

A    I said I thought one other person may have ridden with him
and it may have been his wife.

Q    So you believed that Mr. Croft's wife rode with him from
the restaurant out to the field training exercise, correct?

A    That's what I said then.  Yes.

Q    Okay.  You believed that the Cambria event was going to be
a family friendly event, correct?

A    Family members were invited.  Yes.

Q    But -- I understand they were invited, but my question is,
did you expect that it would be a family friendly event?

A    I guess I could say that.  Yes.

Q    Okay.  Now, there's been some testimony about some sort of
explosive or kind of thing that happened at Cambria.  You are
aware of that, right?

A    Yes.

Q    Okay.  You would agree that this thing, whatever it was,
didn't successfully detonate, correct?

A    Correct.

Q    It just made a poof noise, right?

A    Correct.

Q    And made some smoke?

1    A    Yes.

2    Q    You were the one that recognized that it needed compression

3    in order to be something, right?

4    A    Well, initially I had recognized that Barry Croft had put

5    shrapnel inside the first explosive.  So when I went to make

6    the second one, I made sure that we were not putting any

7    shrapnel inside of it.

8    Q    And you were the one that recognized that it needed

9    compression in order to do something, right?

10   A    Correct.

11   Q    And that's why you wrapped duck tape around something,

12   right?

13   A    I did.  Yes.

14   Q    And that also didn't go off, right?

15   A    No.

16   Q    It just made some smoke, right?

17   A    Right.

18   Q    It was kind of like a smoke bomb, fair?

19   A    Right.

20   Q    There was this shoot house at Cambria, correct?

21   A    Correct.

22   Q    It was made out of plywood?

23   A    It was.  Yes.

24   Q    The parts were supplied by the Wisconsin participants,

25   correct?

```
 1    A    Yes.

 2    Q    And it was one room?

 3    A    It was one room.  Yes.

 4    Q    So if you walked in the door of it it was just a square,

 5    right?

 6    A    That's right.

 7    Q    There weren't any subjects like people inside to kidnap,

 8    right?

 9    A    We did have targets representing humans inside.

10    Q    Were there people inside?

11    A    There were not people inside.

12    Q    Okay.  Now, you don't think the Michigan Capitol is just

13    one room, do you?

14    A    No.

15    Q    And you don't think Governor Whitmer lives in a one-room

16    house, do you?

17    A    No.

18    Q    As of Cambria, it's your opinion that the plan, whatever it

19    was, was up in the air, right?

20    A    Yes.

21    Q    And it's your opinion that as of Cambria this discussion

22    about storming the Capitol was still on the table, right?

23    A    It was.  Yes.

24    Q    There was after Cambria an event in Peebles, Ohio, true?

25    A    This is true.
```

1    Q    And that was around July 18?

2    A    That sounds right.

3    Q    You believed that was a followup on the Dublin and the

4    Cambria meetings, correct?

5    A    That's what was told to me.  Yes.

6    Q    And you thought it would be attended by somewhere between

7    10 and 13 states, true?

8    A    True.

9    Q    And it was hosted by Robeson and some Ohio militia members,

10   correct?

11   A    Correct.

12   Q    There was some talk, I believe yesterday, when you were

13   testifying, about Mr. Croft at the Peebles meeting, correct?

14   A    Correct.

15   Q    Where he proposed doing some damage to Michigan State

16   Police cars, correct?

17   A    Correct.

18   Q    That was his suggestion at the Peebles meeting, right?

19   A    It was.  Yes.

20   Q    You surely didn't reach agreement with Mr. Croft to blow up

21   police cars, right?

22   A    No.

23   Q    Fair to say that as of -- there was training in Munith on

24   August 9, right?

25   A    Yes.

Q    And fair to say, as of August 9 in Munith, it's your
opinion that Adam Fox was still stuck on the Capitol idea?

A    Somewhat, yes.

Q    And when I say the Capitol idea, I'm talking about this
idea that you could storm the Capitol and accomplish something,
right?

A    That's right.

Q    And then when we turn to September there is this event in
Luther, correct?

A    Correct.

Q    And that was at your property, correct?

A    It was.  Yes.

Q    Dan Chappel was responsible for inviting the Wisconsin
people, correct?

A    He was.  Yes.

Q    And he was also responsible for inviting Mr. Croft,
correct?

A    Correct.

Q    And at this Luther event there was also a shoot house,
true?

A    True.

Q    And the purpose of that was to simulate a home, a room or
whatever you could use it for, right?

A    That's right.

Q    And that's how you characterized, whatever we could use it

1      for, right?

2      A    That's right.

3      Q    To put it another way, that room wasn't meant to symbolize

4      a particular structure that exists somewhere, correct?

5      A    No.  It wasn't based off of an already existing structure.

6      Q    And you say that there was some sort of plan to kidnap the

7      governor, right?

8      A    Right.

9      Q    And to take her out on Lake Michigan?

10     A    That's correct.

11     Q    And drop a boat motor?

12     A    That's correct.

13     Q    And leave her stranded there?

14     A    Yes.

15     Q    And the purpose of this was to be a massive inconvenience,

16     right?

17     A    Yes.

18     Q    That's how you believed it was the purpose, correct,

19     massive inconvenience?

20     A    Correct.

21     Q    Because she'd just get picked up on the lake, right?

22     A    At some point, yes.

23     Q    Okay.  So this boat that she was going to be left on in the

24     middle of the lake with the motor dropped, whose boat is that?

25     A    It wasn't decided.

1    Q    Okay.  Did you offer a boat?

2    A    Not for that.

3    Q    Did you have a boat?

4    A    I did.

5    Q    Okay.  So you offered your boat but not to go out on the

6    big lake?

7    A    That's correct.

8    Q    What kind of boat did you have?

9    A    A small 14-foot row boat.

10   Q    So you offered a row boat for the kidnapping plot?

11   A    To do a night surveillance on the small lake.

12   Q    Okay.  No engine on that boat?

13   A    It doesn't work.

14   Q    Engine on your boat doesn't work?

15   A    Right.

16   Q    So if we are going to use this boat in your plot we got to

17   row?

18   A    Right.

19   Q    But you are confident your boat was never involved in any

20   plan on the big lake, correct?

21   A    Correct.

22   Q    Was there a boat for the big lake?

23   A    We hadn't picked a specific boat.

24   Q    Okay.  So if there wasn't a specific boat picked to go on

25   the big lake, but you are saying there was a plan to take some

1    nonspecific boat out into the middle of the big lake?

2    A    Correct.

3    Q    And drop the nonspecific motor into the lake?

4    A    Correct.

5    Q    How were you going to drop this nonspecific motor from this

6    nonspecific boat into the middle of the lake?

7    A    We could steal a boat.  We could buy a boat.  We could find

8    somebody that had a boat.  There are plenty of ways to locate a

9    boat to use.

10   Q    And so this boat was going to be waiting on the shoreline,

11   is that the idea?

12   A    It wasn't gone into that much detail.

13   Q    There wasn't a plan on where the boat would be waiting?

14   A    Right.

15   Q    Just somehow you'd get into a boat, right?

16   A    Correct.

17   Q    But you are not sure if that's at a marina, a shoreline, or

18   if you'd have to swim out to it?

19   A    Correct.

20   Q    Okay.  When you get this boat to the middle of the lake and

21   you drop the motor, how are the guys on the boat getting off?

22   A    That wasn't figured out.

23   Q    Were they -- just no idea?

24   A    No idea.  It wasn't discussed.

25   Q    Surely if you are going to drop the motor in the middle of

1       the lake the boat wouldn't go anywhere, right?

2       A    That's right.

3       Q    So somebody would have to come to those people, correct?

4       A    Correct.

5       Q    How was it that this boat with the dropped motor was going

6       to be found in the middle of the lake?

7       A    That wasn't discussed.

8       Q    So just sort of a vague idea of we could drop the motor in

9       the middle of the lake?

10      A    I would say so.

11      Q    So I understand there is this trip up north on September

12      12, correct?

13      A    Correct.

14      Q    And Mr. Caserta and Mr. Harris didn't go, right?

15      A    That's right.

16      Q    Because you couldn't find them when you went to leave,

17      right?

18      A    I had talked to Harris.  I couldn't find Caserta.

19      Q    You -- your testimony here today is that you talked to

20      Mr. Harris?

21      A    Yes.

22      Q    Was there anyone else you were looking for?

23      A    We were looking for Caserta as well.

24      Q    Other than those two, anyone else?

25      A    No.

1    Q    So your testimony is you talked to Mr. Harris and you

2    couldn't find Caserta, correct?

3    A    That's correct.

4    Q    Okay.  And you testified at the grand jury again on

5    December 15, 2020, correct?

6    A    Correct.

7    Q    You told the truth when you testified at the grand jury,

8    correct?

9    A    Correct.

10        MR. BLANCHARD:  May I approach?

11        THE COURT:  Sure.

12   BY MR. BLANCHARD:

13   Q    You would agree that you were asked at the grand jury why

14   Mr. Caserta and Mr. Harris didn't go on the night ride,

15   correct?

16   A    I'm still reading.

17   Q    Yeah.  Look at line 10.

18   A    I see it.

19   Q    Your answer was --

20        MR. KESSLER:  Hold on, Your Honor.

21        THE COURT:  Well, I expect he is going to say it's

22   inconsistent with what he just said because it's the same

23   impeachment that Ms. Kelly already did.

24        MR. KESSLER:  Yes.  And Mr. Hills.

25        THE COURT:  Okay.  Go ahead.  You can complete it.

BY MR. BLANCHARD:

Q    You testified at the grand jury, we couldn't find them.  We were looking for people to go when we were getting in the vehicles.  We didn't feel like looking for them so we just left them behind, correct?

A    Correct.  But it doesn't refresh my memory.

Q    I appreciate it.  I didn't ask that question, though.  You agree that was your testimony, though?

A    That is my testimony.

Q    And it was true at the time?

A    Yes.

Q    So when you -- now, if I understand the timeline on September 12 correctly for the night trip, you went from Luther down to Big Rapids, correct?

A    Correct.

Q    And when you got there, Mr. Croft wasn't immediately present, right?

A    Correct.

Q    Because he had gone to Wendy's to get some food?

A    He did.  Yes.

Q    And then he came back, right?

A    Yes.

Q    And then from there the vehicles traveled from Big Rapids to Cadillac, right?

A    Correct.

1    Q    Met in a parking lot in Cadillac?

2    A    Correct.

3    Q    Then people got into assigned cars, correct?

4    A    Correct.

5    Q    Do you remember who was driving the car you were in?

6    A    Brian Higgins.

7    Q    Okay.  Do you remember who was driving the car Mr. Croft

8    was in?

9    A    Not that I recall.  No.

10   Q    Okay.  And I guess I want to be clear.  Do you know who was

11   in the car with him if you don't know who was driving?

12   A    I do.  Yes.

13   Q    Who was in the car with him?

14   A    Dan Chappel, Red, Adam Fox and Steve Robeson.

15   Q    And was that on the way from Big Rapids to Cadillac or from

16   Cadillac up to Elk Rapids?

17   A    It was from Big Rapids to Cadillac.  It was Chappel, Red,

18   Fox and Croft -- or not Fox.  Just Robeson and Croft.

19   Q    Right.

20   A    Croft entered the vehicle in Cadillac -- or Fox entered the

21   vehicle in Cadillac.

22   Q    Okay.  I think we're on the same page.  I want to make sure

23   I understood it because there were a couple of corrections

24   there, right?

25   A    Right.

Q    So the trip from the Super 8 in Big Rapids up to the
Walmart in Cadillac in Mr. Croft's vehicle was Chappel, Red,
Robeson and Croft, correct?

A    Correct.

Q    Mr. Fox entered the vehicles at Walmart, correct?

A    That's correct.

Q    And then the vehicle went up to Elk Rapids, right?

A    Correct.

Q    And then it was up in Elk Rapids there was a stop at
something that maybe looked like a church, maybe looked like an
AmVets, is that right?

A    That's right.

Q    And that's where the purpose of the assigned cars was
explained, correct?

A    Correct.

Q    After this night ride the vehicles all left the Elk Rapids
area, correct?

A    Correct.

Q    Some of the vehicles went back to your Luther property,
right?

A    Correct.

Q    Some of the vehicles didn't, correct?

A    Correct.

Q    After this ride, Mr. Croft didn't ride back with Dan
Chappel, correct?

1    A    That's correct.

2    Q    He got out of that car, right?

3    A    Yes.

4    Q    He got in a different car?

5    A    He did.

6    Q    He got in the car driven by Mr. Higgins, right?

7    A    That's right.

8    Q    That car didn't go back to your property?

9    A    No.

10   Q    It was decided before they left that it wasn't going back

11   to your property, right?

12   A    That's right.

13   Q    It went back to the hotel?

14   A    It did.  Yes.

15   Q    Mr. Croft didn't go back to your property?

16   A    That's right.

17   Q    There has been -- could I have 244T, please -- some talk

18   about this Exhibit 244.  Do you recall that -- if you could

19   maybe blow up just the -- thank you.  Do you recall that clip

20   that was played?

21   A    I believe so.  Yes.

22   Q    Okay.  This did not happen back at your Luther property

23   that evening, correct?

24   A    Correct.

25   Q    It had to have happened some time earlier, right?

1    A    Before it.  Yes.

2    Q    Because Mr. Croft didn't go back to your property, right?

3    A    That's right.

4    Q    Take it down.  Thank you.

5         The shoot house, that tarp shoot house in Luther,

6    Mr. Croft wasn't involved in setting that up, correct?

7    A    Correct.

8    Q    And then there was some talk about a firework that was set

9    off on state land kind of over the hill from your Luther

10   property.  You remember that?

11   A    That's correct.

12   Q    It was exploded on the other side of the hill, right?

13   A    That's right.

14   Q    So you weren't able to see the explosion, correct?

15   A    I saw the top of the explosion from the other side of the

16   hill.

17   Q    It was green and purple?

18   A    And some smoke.

19   Q    And some smoke.  So green and purple like a firework,

20   right?

21   A    Right.

22   Q    And then some smoke?

23   A    Right.

24   Q    Okay.  And there was I believe some testimony about a

25   shooting at a propane tank.  Do you recall that?

1    A    That was from Cambria.

2    Q    Okay.  So back at Cambria there was some shooting at a

3    propane tank, right?

4    A    Right.

5    Q    Would you characterize that as being just for fun, right?

6    A    I think we were just trying to get it to blow up.

7    Q    For fun though, right?

8    A    Right.

9    Q    I mean, blowing stuff up is kind of fun, right?

10    A    Yes.

11    Q    I am going to turn your attention to the June 14 mandatory

12    FTX.  Do you remember that?

13    A    Yes.

14    Q    Mr. Croft was not present at that, right?

15    A    He was not.

16    Q    Turn your attention to the June 18 Second Amendment rally

17    at the Capitol.  Was Mr. Croft present for that?

18    A    No.

19    Q    How about the June 20th meeting at the Vac Shack?

20    A    He was not there as well.

21    Q    What about the June 28 FTX in Munith?

22    A    He was not there.

23    Q    There was a meeting at Paul Bellar's house, right?

24    A    Right.

25    Q    I think maybe that's where the code words were?

1    A    Correct.

2    Q    Did you already say he wasn't present for that?

3    A    Yes.  He wasn't present.

4    Q    Okay.  The government had played Exhibit 87, which was an

5    audio recording from the trip to Cambria where there was a

6    discussion about the short-barreled rifle, correct?

7    A    Correct.

8    Q    Mr. Croft was not in the car for that discussion, true?

9    A    That's true.

10   Q    And then there was Exhibit 146, which was a picture of a

11   short-barreled shotgun, right?

12   A    That's right.

13   Q    That was exchanged in a chat?

14   A    Yes.

15   Q    Mr. Croft wasn't on that chat, correct?

16   A    He was not.

17   Q    There was talk about a July 23rd Lake Orion meeting at, I

18   think, Mr. Harris's parent's house, right?

19   A    That's right.

20   Q    I think you described that as being for more committed

21   members, right?

22   A    The purpose of the nighttime one was to bring some other

23   people up to speed on the two prior events we had in Peebles

24   and Cambria.

25   Q    Did you testify before that more committed members attended

1    it?

2    A    I don't exactly recall the more committed members part.

3    Q    Okay.  In any case, Mr. Croft wasn't present, was he?

4    A    That's correct.

5    Q    There was a July 26 FTX in Fowlerville, that's right?

6    A    That's right.

7    Q    Is that where we saw the videos of people shooting around

8    the PT Cruiser?

9    A    That's correct.

10   Q    We didn't see any videos of Mr. Croft shooting around a PT

11   Cruiser, right?

12   A    That's right.

13   Q    Because he was not there?

14   A    He was not there.

15        MR. BLANCHARD:  If I could have Exhibit 125, please,

16   the video.  If you play it, please?

17             (Video started, 11:12 a.m.)

18             (Video stopped, 11:12 a.m.)

19   BY MR. BLANCHARD:

20   Q    Did you just hear the voice keep moving?

21   A    Yes.

22   Q    Whose voice was that?

23   A    Dan Chappel.

24   Q    Dan Chappel is giving instruction on how to do this

25   training, correct?

1    A    He was assisting.  Yes.

2    Q    He was giving instruction to keep moving, right?

3    A    At this time.  Yes.

4    Q    He is also the person filming this from the back seat,

5    right?

6    A    That's right.

7    Q    After that there was an August 9 FTX in Munith, correct?

8    A    Correct.

9    Q    Also Mr. Croft not present, right?

10   A    He was not.

11   Q    There was the discussion that you all had regarding

12   security concerns on August 18, correct?

13   A    That sounds right.

14   Q    Mr. Croft was not involved in that conversation, correct?

15   A    He was not.

16   Q    After that conversation about security concerns you had a

17   security meeting on August 23rd, right?

18   A    That's correct.

19   Q    That was the one where you all brought your driver's

20   licenses or whatever?

21   A    Yes.

22   Q    Mr. Croft didn't bring a driver's license, right?

23   A    Right.

24   Q    Because he wasn't there?

25   A    He was not there.

Q    And then you learned about the August 29 daytime trip up to

Elk Rapids, right?

A    That's right.

Q    You have no reason to believe Mr. Croft was on that, right?

A    Not that I knew.

Q    Now, there were different chat groups that different people

were involved in, correct?

A    That's correct.

Q    And you were involved in some, right?

A    Yes.

Q    It was sort of the primary way that you all communicated,

true?

A    True.

Q    And those chats I think we've heard occurred on two

different apps, Wire and Threema, right?

A    Right.

Q    And Wire there was a Wolverine Watchmen vetting chat, is

that right?

A    That's right.

Q    And you were on that, right?

A    That's right.

Q    Because you vetted people in the Wolverine Watchmen, right?

A    I did.  Yes.

Q    Mr. Croft was not on the Wolverine Watchmen vetting chat,

right?

1    A    He was not.

2    Q    There was the Wolverine Watchmen main chat, correct?

3    A    Correct.

4    Q    Mr. Croft was not ever on the Wolverine Watchmen main chat,

5    correct?

6    A    Correct.  He was not.

7    Q    There was something called the QRF chat, right?  Quick

8    reaction force chat?

9    A    Yes.

10   Q    Mr. Croft was not on the QRF chat, correct?

11   A    That's correct.

12   Q    There was the bonfire chat, right?

13   A    That's right.

14   Q    Mr. Croft was not on the bonfire chat, right?

15   A    That's right.

16   Q    Because as far as you know, Mr. Croft didn't have the Wire

17   app, right?

18   A    Not that I knew.

19   Q    And you never communicated with Mr. Croft on Wire, right?

20   A    Not on Wire.  No.

21   Q    Then over on the Threema app there was something called the

22   Brick Squad chat, true?

23   A    That's true.

24   Q    Mr. Croft wasn't on Brick Squad, right?

25   A    He was not.

1    Q    And there was the FAFO chat, right?

2    A    That's right.

3    Q    Mr. Croft was not on FAFO, right?

4    A    He was not.

5    Q    As far as you know, Mr. Croft didn't have Threema either?

6    A    Not that I knew.

7    Q    I am going to turn your attention to October 7.  You

8    remember that day, right?

9    A    Yes.  I remember that day.

10   Q    You went to Ypsilanti that day, correct?

11   A    Correct.

12   Q    You were under the impression that you were going to get

13   some free stuff?

14   A    Correct.

15   Q    And then after you got the free stuff you were going to get

16   some Wild Wings?

17   A    Yes.

18   Q    And some beer?

19   A    Yes.

20   Q    You never intended to give money to Red that day?

21   A    I did not.

22   Q    You did not intend to make a down payment on a bomb that

23   day?

24   A    I did not.

25   Q    And Mr. Croft was not present that day, correct?

1    A    He was not there.  No.

2           MR. BLANCHARD:  If I could have one moment, Your

3    Honor?

4           THE COURT:  Sure.

5           MR. BLANCHARD:  I'll pass the witness, Your Honor.

6           THE COURT:  All right.  Thank you.  Any redirect,

7    Mr. Kessler?

8           MR. KESSLER:  Yes, Your Honor.  Thank you.

9                    REDIRECT EXAMINATION

10     BY MR. KESSLER:

11   Q    Good morning, Mr. Garbin.

12   A    Good morning.

13   Q    All right.  Let's just start with yesterday.  You were

14   questioned first by Mr. Gibbons, who is representing Mr. Fox?

15   A    Correct.

16   Q    He asked you if you'd just suggested cutting down trees or

17   putting a bullet through the governor's house.  Do you recall

18   that?

19   A    I do.  Yes.

20   Q    And from your discussions with Mr. Fox, do you recall if he

21   was satisfied with that plan?

22   A    Fox did not hear the one about the bullet through her

23   vacation home.  I wasn't really looking at body language when I

24   mentioned the cutting down of trees.

25   Q    From your discussions with him, though, did he want to do

1    more than that?

2    A    Yes.

3    Q    What did he want to do?

4    A    We wanted --

5             MR. GIBBONS:  Objection, Your Honor.  Speculation.

6             MR. KESSLER:  I asked what he said he wanted to do.

7             MR. GIBBONS:  I don't think that's what the question

8    was.

9             THE COURT:  The question before it was, but if you

10   want to ask him specifically now join the two questions

11   together what did Mr. Fox say he wanted to do, I think that's a

12   proper question.

13            MR. KESSLER:  I'll do that, Your Honor.

14   BY MR. KESSLER:

15   Q    Mr. Garbin, what did Mr. Fox say he wanted to do?

16   A    Kidnap the governor.

17   Q    You were also asked if Mr. Fox suggested getting a

18   constitutional sheriff or judge to do a citizen's arrest?

19            MR. GIBBONS:  Your Honor, if we may get a context for

20   that answer?  Mr. Fox wanted to kidnap the governor.  It's

21   inconsistent with his testimony.

22            THE COURT:  You'll have a chance on recross.

23            MR. GIBBONS:  Thank you.

24            THE COURT:  I mean, that's the whole risk when the

25   government does redirect, it opens everything up so we have to

1    go over it all again, but that's their right.  So go ahead.

2    BY MR. KESSLER:

3    Q    So you were also asked, Mr. Garbin, if Mr. Fox suggested

4    getting a constitutional sheriff or judge and doing a citizen's

5    arrest?

6    A    That's correct.

7    Q    Do you recall that?  Okay.  And when you were asked that

8    question you answered, that's what fueled the plot to kidnap

9    the governor.  You were stopped then, but I'd like you to go

10   ahead and explain what you meant?

11   A    We had started with the constitutional sheriff, judge and

12   attorney idea, but down the road after doing some research and

13   talking to other people we realized that a citizen's arrest and

14   a citizen's court is protected by the constitution, so

15   basically it just turned into kidnapping her and we'd just hold

16   our own court anyway.

17   Q    So you realized at some point that wasn't legal?

18   A    Right.

19   Q    Okay.  And you said that that wouldn't -- you just

20   testified today that that didn't mean you wouldn't do it

21   anyway, right?

22   A    Right.

23   Q    Can we bring up Exhibit 164, please?  And we've already

24   seen this discussion where that came up.  Let's just get this

25   part, please, if we can blow that up.

1      So that idea is broached with Mr. Fox.  It says, we

2  need to research legalities of Whitmer's action.  Nessal's too.

3  They need to be arrested and we need a damn good reason when we

4  hand them over to federal courts.  And Alpha Fox is Mr. Fox,

5  right?

6  A    Correct.

7  Q    And he stated, I agree.  The problem is the legal route

8  will never succeed?

9  A    Right.

10 Q    All right.  You can take that down.  Thank you.  You were

11 also asked by I think all of counsel here if Dan Chappel was

12 the XO of the Wolverine Watchmen or of your group.  Do you

13 recall that?

14 A    I do.

15 Q    All right.  And what did XO mean?

16 A    Chief officer.

17 Q    Okay.  And was that a serious rank structure in your

18 opinion?

19 A    We talked about forming the serious rank structure but we

20 never -- we never did.

21 Q    All right.  So was Mr. Chappel empowered to give you orders

22 that you had to follow?

23 A    He was not.  No.

24 Q    Did you consider him to be somebody that you had to obey if

25 he made a suggestion?

1    A    No.

2    Q    Okay.  We saw and you were asked a bunch of questions

3    yesterday about a chat about you calling Mr. Fox saying Mr. Fox

4    looked like a special needs kid.  Do you recall that?

5    A    I do.

6    Q    And were you making fun of him behind his back?

7    A    At times.  Yes.

8    Q    Okay.  But in this occasion do you recall that chat?

9    A    I do.  Yes.

10    Q    Can you bring up 471 for just the witness first, please?

11    Let me clear this.  Do you recognize this chat?

12    A    I do.  Yes.

13    Q    All right.  And you were part of this?

14    A    I was.

15    Q    Is this the actual chat that we were talking about

16    yesterday that you were asked about?

17    A    Yes.

18         MR. KESSLER:  I'd like to put 471 into evidence, Your

19    Honor?

20         MR. GIBBONS:  No objection.

21         MR. BLANCHARD:  Sorry.  One moment.  I've got the

22    same, you know, hearsay and Enright issue on some of it.

23         THE COURT:  It's admitted.  Same ruling.

24         MR. GIBBONS:  No objection, Your Honor.

25    BY MR. KESSLER:

1    Q    Okay.  So is this the picture that everybody was asking you

2    about yesterday?

3    A    That is the picture.  Yes.

4    Q    And that's Mr. Fox wearing the helmet?

5    A    Correct.

6    Q    It looks like he has a baseball cap underneath it?

7    A    Yes.

8    Q    Let's go to the second page, please.  All right.  And let's

9    get to the part where you talk about it.  Here.  This is you,

10   right, Gunny?

11   A    That's correct.

12   Q    You say, you look like a f-ing special needs kid LMAO?  Is

13   that laughing my ass off?

14   A    Yes.

15   Q    Okay.  And how does Mr. Fox respond?

16   A    With laughing emojies.

17   Q    So Mr. Fox is -- you are not making fun of Mr. Fox behind

18   his back?

19   A    Not at this time.

20   Q    Okay.  So the two of you are kidding around together?

21   A    Right.

22   Q    Take a look at the third page again.  Okay.  And Mr. Fox

23   goes onto say, I feel like a special needs kid with it on,

24   correct?

25   A    Correct.

```
1     Q    So just joking around among friends?

2     A    Correct.

3     Q    You can take it down.  Thank you.

4          You've been asked by a number of my colleagues here

5     about October 7th about whether you could remember exactly what

6     you said to the FBI?

7     A    Right.

8     Q    That was the day you were arrested, right?

9     A    It was.  Yes.

10    Q    All right.  Fair to say you were frightened when you were

11    arrested?

12    A    Yes.

13    Q    Didn't have a lawyer sitting there with you or anything?

14    A    I did not.

15    Q    Also fair to say you did not admit to the plot to kidnap

16    the governor right then?

17    A    I did not.

18    Q    Okay.  And you've seen some of the testimony about how the

19    discussion was if nobody talks everybody walks?

20    A    I've seen it.  Yes.

21    Q    Okay.  Fair to say you didn't admit to the whole thing that

22    day?

23         MR. BLANCHARD:  I am going to object to this whole

24    line is leading.

25    BY MR. KESSLER:
```

1    Q    Did you admit to the whole thing that day?

2    A    I did not.

3    Q    Okay.  Did you later admit everything you did?

4    A    I did.  Yes.

5    Q    Okay.  You were actually asked by Ms. Kelly if you pled

6    early on in the process here.  Did you agree to cooperate

7    before you had seen most of the discovery?

8    A    I did.  Yes.

9    Q    All right.  So were you waiting to see if the government

10   could prove you were guilty before you came in and admitted

11   what you did?

12   A    I was not.

13   Q    Why did you plead guilty?

14   A    I felt I needed to own up for my actions.

15   Q    You were asked by a couple of my colleagues, also, about

16   the plea agreement which agreed not to charge you with weapons

17   of mass destruction, correct?

18   A    Correct.

19   Q    I think everybody said you could get up to life for that,

20   right?

21   A    Correct.

22   Q    Was it your understanding that you would automatically get

23   life if you were charged with weapons of mass destructive?

24   A    I did not believe I would get automatic life.

25   Q    So up to life means anything from nothing to life, right?

1   A    Correct.

2   Q    You actually pled guilty to conspiring to kidnap Governor

3   Whitmer, correct?

4   A    I did.  Yes.

5   Q    And it's right there in your plea agreement, and you

6   understood that you could get up to life for kidnapping

7   Governor Whitmer, right?

8   A    Yes.

9   Q    No guarantee that you would get life.  You understood it

10   was up to the Court, right?

11   A    I did.  Yes.

12   Q    Did anybody make you any promises as to what your sentence

13   would be?

14   A    No.

15   Q    You were also asked about a terrorism enhancement that

16   might apply if you had been charged with a weapons of mass

17   destruction offense.  Do you recall that?

18   A    I do.  Yes.

19   Q    And your response to that question was you were concerned

20   about that and your lawyers were concerned about it, right?

21   A    Right.

22   Q    Because did anyone promise you that you would avoid the

23   terrorism enhancement if you pled guilty and cooperated?

24   A    No.

25   Q    All right.  A couple of times you were asked about that

1      early on.  You said a raid on the Capitol was a bad idea,

2      right?

3      A    Right.

4      Q    Okay.  Did you think it was feasible at the time that that

5      was raised?

6      A    No.

7      Q    Okay.  And early on, you said that kidnapping the governor

8      might have been a bad idea, too, right?

9      A    Right.

10     Q    When it was first raised to you, did you think it was

11     feasible?

12     A    Not quite.

13     Q    Did you change your mind later?

14     A    I did later on.

15     Q    Why did you change your mind?

16     A    We started training with other groups and our skill set

17     became more refined.

18     Q    You started believing you could pull it off?

19     A    Yes.

20     Q    One specific thing you were asked by Ms. Kelly is on the

21     trip to Cambria where you had the -- Daniel Harris had the SBR

22     in the trunk?

23     A    Right.

24     Q    You were asked whether you knew the exact route that you

25     took to Cambria and you said you weren't sure?

1    A    Right.

2    Q    Do you remember going through Grand Rapids?

3    A    I do remember going through Grand Rapids.

4    Q    All right.  So here in the Western District of Michigan,

5    right?

6    A    Yes.

7    Q    And that SBR or illegal short-barreled rifle was in the

8    trunk at the time?

9    A    Yes.

10   Q    You were asked about everyone referred to the explosive

11   device as fireworks, right?  And we saw a video where you said

12   you had made one like this back in college.  Do you recall

13   that?

14   A    Yes.

15   Q    Was there anything different about the one you made back in

16   college?

17   A    The one I made in college I used maybe one or two teaspoons

18   full of gun powder and a very small container, and all it did

19   was flash and make smoke.

20   Q    Did you include shrapnel in the one you made back in

21   college for fun?

22   A    I did not.

23   Q    Shrapnel this time, though, right?

24   A    Yes.

25   Q    All right.  And you were just asked briefly shortly ago by

1   Mr. Blanchard whether you had picked out a boat for the taking

2   the governor out to the lake, right?

3   A    Right.

4   Q    And you testified you did not recall or you did not have a

5   particular boat picked out.  Do you remember?

6   A    I remember.  Yes.

7        MR. KESSLER:  Can we put up 227T, the transcript,

8   please?  Can we go up a little.  If it's easier just go ahead

9   and play it and I'll have you stop it when we get to the

10  important part.

11       (Audio started, 11:28 a.m.)

12       (Audio stopped, 11:28 a.m.)

13  BY MR. KESSLER:

14  Q    So Mr. Fox actually said in there that you would steal a

15  boat?

16  A    Yes.

17  Q    Why did Mr. Fox --

18       MR. BLANCHARD:  I'd object as to speculation.  He

19  wasn't even present for this conversation.  He can't opine on

20  why Mr. Fox said something.

21       MR. KESSLER:  I didn't ask him why he said it.

22       THE COURT:  We didn't get the full question out.  So

23  why don't you ask the question and then we'll see if there is a

24  foundation for it or not.

25  BY MR. KESSLER:

Q    Why would you want to steal a boat instead of using one

that you actually owned?

          MR. BLANCHARD:  I object as to -- I mean, it's not

relevant why he would want to steal one versus using one.  We

are here about a particular plan.

          THE COURT:  If this witness had thought about that in

his own mind he can ask about it, and it's certainly not asking

him to interpret what was in Mr. Fox's mind.  So if he had an

understanding or an idea he can answer.

BY MR. KESSLER:

Q    Why would you want to steal a boat?

A    If we used a personal boat it could be traced back to us.

If we stole a boat it wouldn't be able to be traced back to us.

Q    Okay.  And you were asked specifically a number of times by

Mr. Blanchard about did you have an exact plan for how to drop

the motor or for exactly where the boat would be placed, and

you said you didn't, right?

A    Right.

Q    You hadn't worked that out yet?

A    Not yet.

Q    What was the agreement?  What did you agree with the

Defendants to do?

A    Kidnap the governor.

Q    To take her from her home?

A    From the vacation home.

Q    Using guns?

     MR. BLANCHARD:  I'm going to object to the leading nature, Your Honor.

     THE COURT:  It is leading.  If you want to --

     MR. KESSLER:  Okay.

     THE COURT:  -- ask him how he would describe it that's a much more proper redirect.

BY MR. KESSLER:

Q    Where were you going to take her from?

A    The plan was to take her from her vacation home by force.

Q    Okay.  You were also asked by Mr. Blanchard if blowing up stuff was fun, right?

A    Right.

Q    Okay.  And fireworks specifically.  So lots of people blow up fireworks for fun, right?

A    Right.

Q    Have you ever used shrapnel before this plot?

A    No.

Q    Do you recall the Defendants hanging human silhouette targets around that explosive device at Luther?

A    I do.  Yes.

Q    What was the purpose of that?

A    To see what kind of damage the shrapnel could inflict.

Q    On people?

A    On people.  Yes.

Q    You were asked about a number of times that various people

weren't at this or that.  Particularly you were asked a lot

about all the different times of the different local meetings

where Mr. Croft didn't show up.  Did you know where Mr. Croft

lived?

A    He lives somewhere on the east coast.  Delaware I think.

Q    So the Wolverine Watchmen, you said he wasn't a member,

right?

A    Right.

Q    So it wouldn't have been his local militia, right?

        MR. BLANCHARD:  Object to the leading nature.

        THE COURT:  That is leading at this point.

BY MR. KESSLER:

Q    Okay.  Delaware is not local to you?

        MR. BLANCHARD:  Objection, leading.

        THE COURT:  It is leading.  I mean, the point I think

is here in evidence and you can make your argument about it.  I

think it's a more argumentative issue than anything else.

BY MR. KESSLER:

Q    I want to ask about two times Mr. Croft did show up that

you recall.  Do you remember him coming to Cambria, Wisconsin?

A    I do.  Yes.

Q    And you remember the conversation that we put up on the

screen during your direct testimony where he said some eggs

were going to need to get broken?

1    A    Yes.

2    Q    He came all the way from Delaware for that?

3    A    Yes.

4    Q    And do you remember him coming all the way from Delaware to

5    your property in Luther to case the governor's house at night?

6    A    Yes.

7    Q    You never said he was part of the Wolverine Watchmen, did

8    you?

9    A    No.

10   Q    What was his role in this plot?

11   A    Croft I would say would be one of the leaders.

12          MR. KESSLER:  I have nothing further, Your Honor.

13          THE COURT:  All right.  We'll go to recross starting

14   with Mr. Gibbons.

15          MR. GIBBONS:  Thank you, Your Honor.

16                    RECROSS EXAMINATION

17    BY MR. GIBBONS:

18   Q    Can I have the transcript for 229?  And if you could give

19   us that whole first big long paragraph there by Mr. Fox?  Thank

20   you.

21          Mr. Garbin, you did not ride in a truck with Mr. Fox

22   and Special Agent Mark, correct?

23   A    I did not.

24   Q    Okay.  And this conversation here appears to have been

25   outside of your presence, is that true?

1    A    That is true.

2    Q    Nobody -- so when this conversation, we're stealing a boat,

3    is brought up, you were not present to hear that, correct?

4    A    I was not present.

5         MR. GIBBONS:  Thank you very much.

6         THE COURT:  All right.  Ms. Kelly?

7                    RECROSS EXAMINATION

8    BY MS. KELLY:

9    Q    Hi again, Mr. Garbin.  You were just asked about the rank

10   structure within the Wolverine Watchmen, and it wasn't a

11   serious thing, is that right?

12   A    That's right.

13   Q    Okay.  So Mr. Chappel was never placed in a high rank

14   structure within the Wolverine Watchmen, is that your

15   testimony?

16   A    It was talked about but it was never done.

17   Q    Okay.  You'd agree that Mr. Chappel was a respected person

18   within the group, correct?

19   A    Yes.

20   Q    He had nice gear, right?

21   A    He did.  Yes.

22   Q    He knew what he was talking about, right?

23   A    Yes.

24   Q    He had military experience, correct?

25   A    He did.  Yes.

1    Q    Okay.  Mr. Kessler also just asked you about fireworks and

2    your experiences with building homemade fireworks, correct?

3    A    Correct.

4    Q    Okay.  And you talked about it on the video about how you

5    used to make fireworks in college, correct?

6    A    Correct.

7    Q    Okay.  And you recall telling a story about building those

8    fireworks in college to Mr. Chappel?

9    A    Not to Chappel directly.

10   Q    Okay.  Do you remember that ride to the Vac Shack with

11   Mr. Chappel?

12   A    I do.  Yes.

13   Q    Okay.  You remember telling him that you put shrapnel in

14   your fireworks in college and the police were called?

15   A    I didn't say I put shrapnel in the fireworks, but I do

16   believe I said the police were called for a noise complaint.

17   Q    Okay.  Do you remember saying to Mr. Chappel that you saw a

18   giant red flash, you heard metal clanging and --

19            MR. KESSLER:  Hearsay, Your Honor.

20            THE WITNESS:  The metal clanking would be --

21            MR. KESSLER:  Hold on.

22            THE COURT:  I think what she's done is set up a prior

23   inconsistent statement, and so for that purpose she can

24   confront him with the statement.  She should give you a chance

25   to see it first.

1       MS. KELLY:  May I approach the witness, Your Honor?

2       THE COURT:  Sure.

3   BY MS. KELLY:

4   Q    Did you have an opportunity to review that document?

5   A    Yes.

6   Q    Okay.  And does that refresh your recollection about those

7   fireworks that you made in college including shrapnel?

8   A    I didn't place shrapnel inside the fireworks.  The metal

9   clanking is a result of a container being used to hold the gun

10  powder clanging on the ground.

11  Q    That you refer to as shrapnel, correct?

12  A    Yes.  I called it shrapnel.

13      MS. KELLY:  Thank you.  Nothing further.

14      THE COURT:  All right.  Mr. Hills?

15                  RECROSS EXAMINATION

16   BY MR. HILLS:

17  Q    Just one point, Mr. Garbin.  You indicated that they went

18  down and hung silhouettes.  Mr. Caserta didn't go down and hang

19  any silhouettes, is that correct?

20  A    I didn't see him.  No.

21      MR. HILLS:  Okay.  Thank you.

22      THE COURT:  And we'll go to Mr. Blanchard.

23      MR. BLANCHARD:  I'll pass, Your Honor.

24      THE COURT:  All right.  Thank you.  So that completes

25  the questioning of Mr. Garbin.  We can excuse you.

1          (Witness excused, 11:37 a.m.)

2          THE COURT:  And who is your next witness?

3          MR. ROTH:  Kaleb Franks, Your Honor.

4          THE COURT:  Also in custody?

5          MR. ROTH:  Yes, Your Honor.

6          THE COURT:  So it's a little early, but let's do our

7    break now and come back with Mr. Franks on the stand in 20

8    minutes and then we'll just prep for a little longer, a third

9    section today, so be ready for about a two-hour block.  Thank

10   you.

11         LAW CLERK:  All rise.

12         (Jury out, 11:37 a.m.)

13         THE COURT:  Okay.  20 minutes.  Thank you.

14         LAW CLERK:  Court is in recess.

15         (Recess taken, 11:37 a.m.)

16         (Resume Proceeding, 12:02 p.m.)

17         LAW CLERK:  All rise, please.

18         (Jury in, 12:03 p.m.)

19         LAW CLERK:  Court is in session.

20         THE COURT:  Be seated everyone.  Welcome back.  Before

21   the break Mr. Roth indicated that the government's next witness

22   is Kaleb Franks I believe.

23         MR. ROTH:  That's correct, Your Honor.

24         THE COURT:  And I see Mr. Franks sitting in the

25   witness box.  You can see he is in custody so when we swear him

1    in I am just going to ask him to stay seated and do the best he

2    can to raise his right hand all things considered in what he's

3    wearing right now.  So if you could please swear him in,

4    Mr. Schmidt.

5                    KALEB FRANKS, GOVERNMENT

6                    having been first duly sworn, testified as follows:

7                    (Witness sworn, 12:03 p.m.)

8                    THE COURT:  Turn to over to you, Mr. Roth.

9                    MR. ROTH:  Thank you, Your Honor.

10                        DIRECT EXAMINATION

11   BY MR. ROTH:

12   Q    Good afternoon, sir.

13   A    Good afternoon.

14   Q    Could I have you start by stating and spelling your

15   complete name, please?

16   A    Kaleb, K-a-l-e-b.  Middle name is James, J-a-m-e-s.  Last

17   name Franks, F-r-a-n-k-s.

18   Q    Thank you, sir.  How old are you?

19   A    Twenty-seven.

20   Q    Where did you grow up?

21   A    Brighton, Michigan.

22   Q    Were you arrested on October 7th, 2020?

23   A    Yes.  I was.

24   Q    You have been in custody since then?

25   A    Yes.

1    Q    Before you were arrested were you employed?

2    A    Yes.

3    Q    What did you do for a living, sir?

4    A    I was a peer recovery couch.

5    Q    What is that?

6    A    Inpatient drug and alcohol rehab.

7    Q    Could you explain what exactly that means, sir?

8    A    So I would help people find recovery plans that worked for

9    them when they were in the process of getting off drugs and

10   alcohol.  I would run groups, see people for one-on-one

11   sessions, help figure out housing, after care, therapy, things

12   like that.  And then with that I also worked for the circuit

13   court where I would help probationers and people coming out of

14   jail or prison find those same resources in the community and

15   offer them support.

16   Q    Thank you.  Have you ever served in the military?

17   A    No.  I have not.

18   Q    Where were you living before you were charged?

19   A    Waterford, Michigan.

20   Q    With whom?

21   A    My girlfriend.

22   Q    When you were arrested on October 7th, 2020, did

23   investigators ask you about your involvement in a plot to

24   kidnap the governor of Michigan?

25   A    Yes.  They did.

1    Q    And what did you tell them about your involvement?

2    A    I told them that I didn't have any involvement in it at

3    all.

4    Q    Was that the truth?

5    A    No.  It wasn't.

6    Q    Why did you lie about that?

7    A    Because I didn't want to go to jail.

8    Q    After that were you charged?

9    A    Yes.  I was.

10   Q    What were you charged with, sir?

11   A    Conspiracy to commit kidnapping.

12   Q    Did the Court appoint an attorney to represent you?

13   A    Yes.  He did.

14   Q    Is that Scott Graham, who is present in the courtroom

15   today?

16   A    Yes.  It is.

17   Q    Later after being charged did you decide to cooperate with

18   investigators?

19   A    Yes.  I did.

20   Q    Why was that?

21   A    Because I wanted to tell the truth.

22   Q    All right.  Once you decided to cooperate did you do

23   another interview with investigators?

24   A    Yes.  I did.

25   Q    Was that about a month and-a-half ago?

1    A    Yes.  It was.

2    Q    After that did you plead guilty?

3    A    Yes.  I did.

4    Q    What did you plead guilty to?

5    A    Conspiracy to commit kidnapping.

6    Q    The same thing you were charged with?

7    A    Yes.

8    Q    Were any charges reduced or dismissed?

9    A    No.

10   Q    As part of your agreement, did the government agree not to

11   charge you with additional weapons or explosive charges?

12   A    No.

13   Q    Yes they did agree or no they did not?

14   A    Yes.  Yes to the weapons but no to the explosives.

15   Q    Very good.  And the maximum penalty for those offenses

16   would have been the same or lower than the penalty for what you

17   did plead guilty to, conspiracy to commit kidnapping, correct?

18   A    Yes.

19   Q    And is your continued truthful cooperation a condition of

20   that plea agreement?

21   A    Yes.  It is.

22   Q    Did you and I meet a few weeks ago in preparation for your

23   testimony at trial?

24   A    Yes.  We did.

25   Q    And that was the first time you and I had met?

1    A    Yes.

2    Q    About how long do you think that meeting was?

3    A    Two hours.

4    Q    And during that meeting we played for you the recordings

5    and showed you the exhibits that you would be discussing in

6    court today?

7    A    Yes.  You did.

8    Q    Did we meet again earlier this week?

9    A    Yes.

10   Q    Was that meeting much shorter?

11   A    Yes.  It was.

12   Q    Certainly less than half an hour?

13   A    Yes.

14   Q    Again, mostly just playing recordings that would come up

15   during your testimony?

16   A    Yes.

17   Q    Have you been sentenced yet?

18   A    No.  I have not.

19   Q    And do you hope to gain anything from your testimony --

20   excuse me.  Do you hope to gain anything from testifying here

21   at trial?

22   A    The lowest sentence possible.

23   Q    And there's no guarantee that you will receive that,

24   correct?

25   A    None at all.

1    Q    Nobody has promised you any reduction in sentence based on

2    your cooperation?

3            MR. BLANCHARD:  I am going to object to the leading

4    nature.

5            THE COURT:  It is leading.

6            MR. ROTH:  I can ask otherwise.  Thank you, Your

7    Honor.

8    BY MR. ROTH:

9    Q    Has anybody promised you anything for your testimony?

10   A    No.  They haven't.

11   Q    And whether you receive something or not for your

12   testimony, is that dependent on whether or not the Defendants

13   are convicted?

14   A    No.

15   Q    And your sentence will ultimately be decided by the Court,

16   Judge Jonker?

17           MR. BLANCHARD:  I would object to the leading nature,

18   Your Honor.

19           THE COURT:  It is leading on that one.  It's fairly

20   foundational, but to the extent we can stay open-ended I think

21   we are better on direct for all of us.

22           MR. ROTH:  Thank you, Your Honor.

23   BY MR. ROTH:

24   Q    Who will ultimately decide your sentence?

25   A    The Judge.

1    Q    When you pled guilty did you have to tell the court what it

2    was that made you guilty of conspiracy to commit kidnapping?

3    A    Yes.

4    Q    And what was it that --

5         MR. BLANCHARD:  Objection, hearsay if it's not a

6    statement in furtherance of the conspiracy.

7         THE COURT:  Well, he can say what he believes makes

8    him guilty of the charge, and I think that's what Mr. Roth

9    wants to hear, and if the witness can characterize that in his

10   own words I think that's fine.

11        MR. ROTH:  That was as I remember what I asked, Your

12   Honor.  So I can ask again, sir.

13   BY MR. ROTH:

14   Q    What is it that makes you guilty of conspiracy to commit

15   kidnapping?

16   A    Planning and participating in overt acts that I committed

17   to kidnap the governor.

18   Q    Which governor?

19   A    The governor of Michigan.

20   Q    Who else was involved in that conspiracy?

21   A    Ty Garbin, Daniel Harris, Adam Fox, Brandon Caserta, Barry

22   Croft.

23   Q    Why did you get involved in that conspiracy, sir?

24   A    I got involved in the conspiracy -- you mean -- I am just

25   asking for clarification.  Are you asking why I decided to join

1    the conspiracy or what brought me to the group of people?

2    Q    We'll talk later about the group of people more generally.

3    A    Okay.

4    Q    What I want to hear specifically about the conspiracy, why

5    is it that you agreed with these men to kidnap the governor of

6    Michigan?

7    A    I was hoping that I would be killed in the process.

8    Q    Why?  Why was that your goal, sir?

9    A    Because I no longer wanted to live.

10   Q    What was going on that led you to that?

11   A    A large portion of my family had died.  I was struggling

12   financially and just wasn't happy.

13   Q    What time are we talking about?

14   A    The summer of 2020.

15   Q    All right.  And you said that a large portion of your

16   family had died around then.  What family members are we

17   referring to?

18            MR. BLANCHARD:  Object as to relevance.

19            THE COURT:  I think the relevance is to understand the

20   nature of his mental state and I think it's fair for that.  Go

21   ahead.

22            MR. ROTH:  Thank you, Your Honor.

23   BY MR. ROTH:

24   Q    Go ahead, sir.

25   A    My mother, my stepfather and my stepbrother.

1   Q    These are all separate incidents?

2   A    Yes.

3   Q    Around that time?

4   A    Yes.

5   Q    And why was it that you believed that this plan, this

6   conspiracy would lead to you dying?

7   A    I felt that it was a very risky choice and with cameras and

8   just, I mean, getting in a shootout with the police --

9   Q    I'm sorry, you said something after a shootout with police?

10  A    Yeah.  You would -- in my opinion, you would be bound to

11  die.

12  Q    All right.  So now let's go to the beginning, and this is

13  the other thing that you had mentioned.  I want to talk about

14  the Wolverine Watchmen.  Go all the way back.  Did you join the

15  Wolverine Watchmen in 2020?

16  A    Yes.  I did.

17  Q    Do you have an estimate of when exactly that was that you

18  joined?

19  A    Early June of 2020.

20  Q    Why did you join the Wolverine Watchmen?

21  A    Because I wanted to train with firearms.

22  Q    What was the process of joining the Wolverine Watchmen?

23  A    I was invited to an encrypted group chat on an application

24  called Wire, and I had to answer questions that the leadership

25  people in the leadership position asked me, and then I was

1     accepted into the group and put on the chat.

2     Q    Did you consider the Wolverine Watchmen to be what's called

3     a Boogaloo group?

4     A    Yes.

5     Q    Were you ever a leader in the Wolverine Watchmen?

6     A    No.

7     Q    Did you have a nickname or code name within the Wolverine

8     Watchmen?

9     A    Yes.  I did.

10    Q    What was that?

11    A    Red Hot.

12    Q    Why was that?

13    A    Because my last name is Franks.

14    Q    Like a hot dog?

15    A    Or the hot sauce, yes.

16    Q    Or the hot sauce.  How did the Wolverine Watchmen

17    communicate?

18    A    Through the encrypted group chat.

19    Q    Who was it that told you to use that application?

20    A    Daniel Harris.

21    Q    Did Daniel Harris tell you why that application was used?

22    A    Because it was encrypted and protected.

23    Q    Did you also meet a person named Dan Chappel in the

24    Wolverine Watchmen?

25    A    Yes.  I did.

1    Q    How would you describe his role in the group?

2    A    He was -- he did a lot of the training.

3    Q    What about with dynamics?  Was he polarizing?  Was he far

4    out there?

5    A    Can you -- can you use a different description?

6    Q    I can.  And we can come back to that issue a little bit

7    later.

8              How did the Wolverine Watchmen as a group feel about

9    the government generally?

10   A    They feel that the government is too intrusive,

11   overreaching.

12   Q    And back in spring of 2020, was there complaining within

13   the group about the governor?

14   A    Yes.

15   Q    Some generalized threats?

16   A    Yes.

17   Q    Was there any plan at that time to take action in the early

18   days when you joined the Wolverine Watchmen?

19   A    No.

20   Q    And any real movement towards acting on those threats at

21   that time?

22   A    No.

23   Q    June 14th, 2020, did you attend a field training exercise

24   in Munith, Michigan?

25   A    Yes.  I did.

Q    Was that the first in-person Wolverine Watchmen event that you went to?

A    Yes.  It was.

Q    What was the training portion of that FTX that day?

A    It was what they called dry fire training.  So you are not actually shooting any rounds.  You just are doing the movements and practicing without shooting.

Q    What Wolverine Watchmen members do you recall being at that meeting that day?

A    Ty Garbin, Daniel Harris, Dan Chappel, Brandon Puffenberger, Jerad Beauchesne, Brandon Caserta, Max Wyckoff, Joe Morrison, Pete Musico.

Q    Okay.

A    And that's it.

Q    Was the next event that you attended two weeks later at the same Munith FTX location?

A    Yes.  It was.

Q    What kind of event was that?

A    The same thing.

Q    What people do you recall being at that event?

A    All of the people that I just named.

Q    What sort of training was done at that event?

A    The same thing.  Dry fire training.

Q    Did you meet anybody new at this meeting?

A    Yeah.  Adam Fox.

1    Q    How did Adam Fox get there that day?

2    A    He was driven by -- he was picked up and driven by Ty

3    Garbin, Dan Chappel and Daniel Harris.

4    Q    Was the method by which he arrived and was picked up by

5    them of some discussion within the group?

6    A    Yes.

7    Q    Were certain precautions taken about how he was brought to

8    the site?

9    A    Yeah.  They discussed putting a bag over his head so that

10   he wouldn't know the location of where we were at.

11   Q    And did they ultimately decide not to do that?

12   A    I believe so.  Yes.

13   Q    But they did transport him there separately?

14   A    Yes.

15   Q    Did you interact with Adam Fox very much at that event?

16   A    No.

17   Q    Why is that?

18   A    I was leaving.

19   Q    Shortly after he arrived you left?

20   A    Yes.

21   Q    Was that because he left or -- because he arrived or you

22   had separate plans?

23   A    I had separate plans.

24   Q    After this June 28th, 2020 FTX, did Adam Fox start having

25   regular communication and training with the Wolverine Watchmen?

1    A    Yes.

2    Q    So you said before that the group, while complaining about

3    the governor and having some generalized threats, didn't have a

4    plan at that time.  Did that change after Adam Fox was

5    introduced to the group?

6    A    Yes.

7    Q    How so?

8    A    There were more discussions about it, a lot more talks

9    about the governor and the issues that they saw with her, a lot

10   more meetings, and a lot more training.

11   Q    Who pushed those issues?

12   A    Adam Fox and the rest of the group being Daniel Harris,

13   Brandon Caserta, Barry Croft.

14   Q    What was Dan Chappel's role when these things came up?

15   A    He was always there present.  Never spoke against it but

16   also never brought up his own ideas.

17   Q    All right.  Down the middle?

18   A    Yes.

19   Q    Was there another meeting on July 7th, 2020?

20   A    Yes.

21   Q    And was that at Paul Bellar's house?

22   A    Yes.  It was.

23   Q    What kind of meeting was that?

24   A    It was a -- just a general -- general meeting.  Just

25   getting together and kind of having discussions about what

1    we've been doing and the group and everything like that.

2    Q    And who was present for that meeting?

3    A    Paul Bellar, myself, Daniel Harris, Ty Garbin, Max Wyckoff,

4    Jerad Beauchesne.

5    Q    Just Jerad is fine.

6    A    Okay.

7    Q    Was Brandon Caserta present at that meeting?

8    A    No.  He was not.

9    Q    So we're going to talk about a lot of events.  You went to

10   a lot of events with the Watchmen, is that right?

11   A    Yes.

12   Q    Do you remember all the dates in your head and necessarily

13   who was present at each one?

14   A    No.  I don't.

15   Q    All right.  Was something distributed at this meeting?

16   A    Yes.

17   Q    What was -- or I'm sorry, discussed at this meeting.  What

18   was discussed at this meeting?

19   A    Code words.

20   Q    What was the nature of the code words?

21   A    To hide discussions about illegal activity.

22   Q    Did somebody mention black bagging politicians at that

23   meeting?

24   A    Yes.

25   Q    Who brought that up?

1     A     Jerad.

2     Q     Did you know what the term black bagging meant?

3     A     Yes.

4     Q     What did it mean?

5     A     Kidnapping.

6     Q     At that meeting did Daniel Harris discuss a contact that he

7     had for making explosives?

8     A     Yes.

9     Q     So I say contact.  A person that he knew?

10    A     Yes.

11          MR. ROTH:  All right.  Could we please play Exhibit

12    80?

13          THE COURT:  Which exhibit number, I'm sorry?

14          MR. ROTH:  80, it should already be admitted, Your

15    Honor.

16          (Audio started, 12:21 p.m.)

17          (Audio stopped, 12:21 p.m.)

18    BY MR. ROTH:

19    Q     Thank you.  Throughout the time that you knew Daniel

20    Harris, did he speak about explosives often?

21    A     Yes.

22    Q     And did he explain to you what he knew about explosives?

23    A     Yes.  He said that he had experience from the military.

24    Q     What kind of experience?

25    A     Just experience in setting off explosives.

1    Q    All right.  Did it appear to be something that he was

2    interested in?

3    A    Yes.

4    Q    So at that time, back in July of 2020, how did you feel

5    about the plan for kidnapping the governor?

6    A    I was not interested.

7    Q    Why was that?

8    A    I didn't think it was a good idea.

9    Q    Did that change over time?

10   A    Yes.

11   Q    Did you attend another training that weekend in Cambria,

12   Wisconsin?

13   A    Yes.  I did.

14   Q    How did you get there?

15   A    I was drove.

16   Q    By whom?

17   A    Dan Chappel.

18   Q    Who else was in the car with you, sir?

19   A    Brandon Caserta, Daniel Harris, Ty Garbin and Paul Bellar.

20   Q    Did you bring a weapon with you?

21   A    Yes.  I did.

22   Q    What kind?

23   A    A rifle and a pistol.

24   Q    Did Daniel Harris have a weapon with him?

25   A    Yes.  He did.

1    Q    How did you know?

2    A    He told us.

3    Q    What kind of gun or guns did he tell you he had?

4    A    He had a short-barreled rifle and a pistol.

5    Q    Did he describe it as a short-barreled rifle?

6    A    Yes.  He did.

7    Q    Did you ultimately see that short-barreled rifle once you

8    got to Wisconsin?

9    A    Yes.

10   Q    How long did it take you to get to the FTX in Wisconsin?

11   A    Around eight hours.

12   Q    And when you first arrived there, where did you go?

13   A    To a hotel not far from where the FTX was.

14   Q    And did you stay at that hotel for the weekend?

15   A    Yes.

16   Q    Who else stayed at the hotel with you?

17   A    Brandon Caserta, Daniel Harris, Paul Bellar, Dan Chappel,

18   Ty Garbin, Barry Croft and Adam Fox.

19   Q    And did you stay in a hotel room with other people?

20   A    Yes.

21   Q    Who else was in the room with you?

22   A    Everybody I just mentioned besides Barry Croft and Adam

23   Fox.

24   Q    At some point did Mr. Caserta change rooms?

25   A    Yes.

1    Q    Tell me about that?

2    A    In the middle of the night he said he got up and went and

3    got his own hotel room.

4    Q    When did you actually go to the FTX?

5    A    The next morning.  The morning of the 12th I want to say.

6    Q    Could we look at 89, please?

7         All right.  We are looking at Exhibit 89.  Is this a

8    picture of people who attended the FTX that weekend?

9              MR. GIBBONS:  Objection, leading, Your Honor.

10             THE COURT:  Well, it is, but it's already in evidence

11   so I don't think it's really harming anyone.

12             MR. ROTH:  Thank you, Your Honor.

13   BY MR. ROTH:

14   Q    Is this a picture of people who attended the FTX in

15   Cambria?

16   A    Yes.  It is.

17   Q    Are you here?

18   A    Yes.  I am.

19   Q    Are you able to reach and press the screen where you are?

20   Thank you.  And I'll try not to have you do that too much more.

21   I apologize.

22             Was Adam Fox there that weekend?

23   A    Yes.  He was.

24   Q    And is that him below this mark?

25   A    Yes.  It is.

1   Q    Daniel Harris below this mark?

2        MR. BLANCHARD:  Object to the leading nature.

3        THE COURT:  It is leading but it's repetitive as well,

4   so I'm not sure we're gaining a lot of ground or hurting anyone

5   with this.

6        MR. ROTH:  Thank you, Your Honor.  I'll move on.

7   BY MR. ROTH:

8   Q    Was a person named Barry Croft there?

9   A    Yes.  He was.

10  Q    Had you ever met Barry Croft before?

11  A    No.  I had not.

12  Q    How was Barry Croft dressed when you met him?

13  A    He was wearing cutoff shorts, cutoff T-shirt and a pirate

14  hat.

15  Q    What you thought to be a pirate hat?

16  A    Yes.

17  Q    Describe that hat for me?

18  A    It had three points on it and it looked old.

19  Q    What color was it?

20  A    Black.

21  Q    Did you talk to Barry Croft that weekend?

22  A    Yes.  I did.

23  Q    When?

24  A    Throughout the day of the FTX.

25  Q    What did you guys talk about?

1    A    We talked about the trainings.  We talked about a lot of

2    discussions about the constitution and our rights, some other

3    discussions about weapons.

4    Q    Did he have a weapon with him?

5    A    Yes.  He did.

6    Q    Did he show it to you?

7    A    Yes.  He did.

8    Q    Could you describe the weapon that he showed you?

9    A    Yes.

10   Q    Please do.

11   A    It was an AR-15 that I was -- he told me was chambered in

12   300 blackout.  It had a homemade silencer on the end of it and

13   a 37 millimeter grenade launcher on the bottom of it.

14   Q    You said 300 blackout.  What does that mean?

15   A    That's a caliber.

16   Q    For the rifle itself?

17   A    Yes.

18   Q    And then separately you said there is a 37 millimeter

19   grenade launcher that was attached to it?

20   A    Yes.

21   Q    And did he tell you if he had put that on there or somebody

22   else?

23   A    He said he did.

24   Q    What was going on; why did he show you his gun?

25   A    Because we were shooting guns at the time.

Q    Did you see him with any other weapons?

A    No.

Q    So we talked a little bit about the Wolverine Watchmen being a Boogaloo group.  Are you also familiar with the term III%er or III% group?

A    Yes.  I am.

Q    Did Barry Croft have any III% or Boogaloo items that you saw that weekend?

A    Yes.  He had a III% tattoo on his hand, and there were flags and like, different items around that were Boogaloo items or militia items.

Q    Did you see Barry Croft in possession -- you talked about his tattoo.  You said there were flags.  Did Barry Croft have a flag?

A    I can't recall.

Q    All right.  Could we look at Exhibit 91, please?  Do you recall seeing this flag that weekend?

A    Yes.

Q    Where was this flag?

A    In Wisconsin.

Q    All right.  But do you recall where at the campsite you saw it?

A    Just hanging up around.

Q    Very good.  And you recognize that as Barry Croft in the picture?

1    A    Yes.  I do.

2    Q    Thank you.  Thank you.  You can take that down.

3         Could you please describe the training exercises that

4    you did that weekend?

5    A    We started with a shooting drill where you would start up a

6    certain distance away from the target, shoot the target, and

7    then run to a further distance, stop and then shoot at the

8    target again from the further distance.  That was the first

9    exercise.

10   Q    And what was that called?  Is there a name for that

11   exercise?

12   A    No, or not that I am aware of.

13   Q    Go ahead.  What other exercises?

14   A    There were medical trainings, applying tourniquets and

15   other, like, combat wounds I guess that you would have to

16   address if you were in that situation.

17   Q    Very good.  What else?

18   A    Then there was a shoot house, which is where you just

19   practice entering a room or a front door and clearing it.

20   Q    Is this the first shoot house that you had done?

21   A    Yes.  It was.

22   Q    And in your mind as you are going through the shoot house

23   that weekend, is it modeling anything specific?

24   A    No.

25   Q    Did you see any explosives that weekend in Cambria?

1    A    Yes.  I did.

2    Q    Where?

3    A    You mean like where on the property?

4    Q    Yes.

5    A    The driveway at the back of a truck.

6    Q    Who had them?

7    A    Barry Croft.

8    Q    Anyone else there with him?

9    A    Daniel Harris.

10   Q    What were Daniel Harris and Barry Croft doing?

11   A    They were messing with a device that was wrapped in duck

12   tape.  They were putting what looked to be copper BBs inside of

13   it.

14   Q    You said messing with it.  Then you sort of described a

15   device very generally.  As best as possible, can you please

16   describe for the jury what it was you saw them doing and

17   possessing?

18   A    So it was like I said, it was a -- it was a medium sized

19   object that was wrapped in duck tape.  I wasn't close enough to

20   see what was wrapped in duck tape, but I was told that it

21   was -- I was told by Barry Croft and Daniel Harris that it was

22   pieces of mortar that were wrapped inside of it, and then I saw

23   them putting BBs or it looked like copper -- copper pellets

24   inside of the device.

25   Q    The device being inside the mortar?

1    A    Inside of the duck tape.

2    Q    This is what Barry Croft told you.  What was Barry Croft

3    physically doing?  Is he doing the taping?

4    A    He is holding it.

5    Q    And what is Daniel Harris doing?

6    A    He is pouring the BBs inside of it.

7    Q    Barry Croft told you that he was adding the BBs.  Did he

8    tell you why?

9    A    Because that would be shrapnel.

10   Q    What did they do with this device once they taped the BBs

11   into it?

12   A    They took it down to the end of the gun range, placed it

13   inside of an -- it was either a washing machine or an oven, I

14   believe, and then lit it.

15   Q    Where were you when they lit it?

16   A    I was hiding.

17   Q    Why were you hiding?

18   A    Because there was shrapnel in the device.

19   Q    You mentioned earlier that one of the reasons you got

20   involved in this plot is because you didn't want to be alive

21   anymore.  Why hide from this explosive?

22   A    Well, because that would -- that may not kill you but it

23   would definitely damage you.

24   Q    What happened when they tried to detonate it?

25   A    It didn't go off.

Q     What happened then?

A     They went back to the tailgate of the truck.  Tried again.
This time Ty Garbin was helping them.  Same thing.  I was kind
of staying far away.  I saw pretty much the exact same thing.
Then they went back out and tried lighting it again.

Q     Did it work the second time?

A     No.  It did not.

Q     And you said this time you are not nearly as close?

A     No.

Q     While they are working on it once Ty Garbin gets involved?

A     Yes.  No.  I was not.

Q     And again, the second time it did not detonate?

A     No.

Q     What did they do next?

A     That was it.

Q     Did they try other ways to detonate it?

A     Yes.

Q     Tell me about that?

A     Then they shot at it.

Q     Who shot at it?

A     I wasn't close enough to see.

Q     Was there a time that weekend when people gathered in a
garage on the FTX property?

A     Yes.  There was.

Q     When was that?

1    A    I want to say the second day.

2    Q    Who was there?

3    A    Myself, Brandon Caserta, Barry Croft, Adam Fox, Daniel

4    Harris, Ty Garbin, Dan Chappel and Steve Robeson.

5    Q    And is everybody inside the garage?

6    A    Yes.

7    Q    And where specifically are you?

8    A    I am over right by the door.

9    Q    Is anybody with you?

10   A    Brandon Caserta.

11   Q    Where is the rest of the group?

12   A    Inside of the garage.

13   Q    Why are you and Brandon Caserta separate from the group?

14   A    We weren't really invited into a lot of the private

15   leadership discussions.

16   Q    Were you able to hear this leadership discussion going on

17   from where you were?

18   A    Yes.  I could overhear some of what was said.

19   Q    And Brandon Caserta is about the same distance away as you?

20   A    Yes.

21   Q    What did you hear from where you were?

22   A    I heard them talking about -- I heard Adam Fox say or

23   suggest ideas of storming the Capitol.

24   Q    Go ahead.

25   A    In Michigan.

1    Q    What else did you hear?

2    A    I heard them talking about the governor and getting her at

3    the Capitol.

4    Q    Did you understand them to mean the governor of Michigan?

5    A    I assumed.  Yes.

6    Q    And how did you feel about this plan as you overhear it?

7    A    I think it's a bad idea.

8    Q    How long were you at the Cambria FTX?

9    A    Two days.

10   Q    Did you attend another meeting in Peebles, Ohio on July

11   17th and 18th, 2020?

12   A    Yes.  I did.

13   Q    What was that meeting?

14   A    That was a meeting -- it was described to me as a meeting

15   of the people that were in Wisconsin and some other people from

16   out of state.

17   Q    Did you know what the purpose was going to be for that

18   meeting?

19   A    At the time, no.

20   Q    Who did you go with?

21   A    I went with Ty Garbin, Daniel Harris and Dan Chappel.

22   Q    Did you meet up with anybody there?

23   A    Yes.

24   Q    Who?

25   A    Adam Fox, Barry Croft, Steve Robeson, and a lot of people

1    from other states.

2    Q    Where was the actual meeting held?

3    A    It was held in a garage.

4    Q    I'm sorry?

5    A    It was held in a garage.

6    Q    Did Croft address the group?

7    A    Yes.  He did.

8    Q    Do you recall what he said?

9    A    He spoke a lot again about the constitution and our rights,

10   and that he said things needed to be done.  He suggested

11   placing bombs outside of State Police posts, blowing up the

12   cars.

13   Q    Did Fox also address the group?

14   A    Yes.  He did.

15   Q    What did he say?

16   A    He discussed storming the Capitol, needing 200 people and

17   kidnapping the governor.

18   Q    And did you feel that was a good plan?

19   A    No.

20   Q    At this point were you becoming more amenable if there was

21   a good plan?

22   A    Yes.

23   Q    Why?

24   A    Like I said, my life was slowly or quickly going downhill.

25   Q    And it's right around this time in the summer?

1    A    Yes.

2    Q    Was there another nighttime meeting on July 23rd, 2020 at

3    Daniel Harris's house?

4    A    Yes.  There was.

5    Q    What was the purpose of that meeting?

6    A    To discuss what was said in Ohio.

7    Q    Do you recall who attended that meeting?

8    A    Myself, Ty Garbin, Daniel Harris, Dan Chappel, Max and

9    Jerad and a gentleman went by the name Schleme.

10   Q    Do you remember somebody named Joshua Miller being there?

11   A    Yes.  Joshua Miller was also there.

12   Q    Did Joshua Miller have a nickname with the group?

13   A    Purple J.

14   Q    Was there discussion at this meeting about being

15   infiltrated by feds?

16   A    No.

17   Q    All right.  Not that you recall?

18   A    No.  Not that I recall.

19   Q    Was there another FTX on July 26th, 2020 in Fowlerville,

20   Michigan?

21   A    Yes.  There was.

22   Q    Whose property was that?

23   A    That was my dad's.

24   Q    And who was present at that FTX?

25   A    Myself, Daniel Harris, Ty Garbin, Dan Chappel, Jerad, Paul

1   Bellar.

2   Q     What sort of exercises were conducted at that training?

3   A     Moving in and out of a vehicle and shooting.

4             MR. ROTH:  Could we please play Exhibit 124?

5             (Video started, 12:39 p.m.)

6             (Video stopped, 12:40 p.m.)

7   BY MR. ROTH:

8   Q     Whose car are we seeing there?

9   A     Mine.

10  Q     And who do we see in this picture?

11  A     Ty Garbin and myself.

12  Q     What color shirt are you wearing in the picture?

13  A     Gray shirt.

14  Q     What color is Ty wearing?

15  A     Green.

16  Q     What's the purpose of the exercise we saw here?

17  A     To understand how to shoot and move from a vehicle.

18  Q     Around this time is this sort of exercise a component of

19  the kidnapping plan?

20  A     No.

21  Q     Is the plan still being developed?

22  A     Yes.  It is.

23  Q     All right.  And if you had to assess when there is this FTX

24  at your house, how committed are you to the plan?

25  A     Not very committed yet.

1    Q    And when does that change?

2    A    Maybe a week after this.

3    Q    What is it that changes your mind a week later?

4    A    The plan is being discussed a little bit more seriously, I

5    guess feedback from other people that were involved in the

6    conspiracy, and I ultimately made the decision.

7    Q    How long was the FTX at your house?

8    A    Maybe two hours.

9    Q    You mentioned Purple J.  Did he ever come to another

10   meeting with the Wolverine Watchmen?

11   A    Not after that.

12   Q    How did you feel about him quitting the group?

13   A    I didn't care.

14   Q    In front of you is a pack of paper.  If you could look at

15   the top page?  Proposed Exhibit 129.  Is that a conversation

16   that you had with Brandon Caserta on July 28, 2020?

17   A    Yes.

18        MR. ROTH:  Your Honor, I'd move for the admission of

19   Proposed Exhibit 129?

20        THE COURT:  Any objection.

21        MR. HILLS:  No objection.

22        THE COURT:  129 is admitted.

23        MR. ROTH:  Thank you.

24   BY MR. ROTH:

25   Q    If we could take a look at that, please?  Thank you.  For

1    now no need to box anything.

2           What application is this?

3    A    FaceBook.

4    Q    And if we can box the top part, please?  I'll read Brandon

5    Caserta's part if when we move down you can read yours, is that

6    okay, sir?

7    A    Yes.

8    Q    All right.

9           THE COURT:  Keep that microphone.

10          THE WITNESS:  Sorry.

11          THE COURT:  That's all right.  If you need to lean

12   forward the microphone can move.

13          THE WITNESS:  Okay.

14          THE COURT:  Just move it for yourself.

15   BY MR. ROTH:

16   Q    Brandon Caserta said, I wanted to say too that I understand

17   we have certain plans that have be talked about but I wanted to

18   bring up another aspect.  When shit hits the fan there are

19   going to be so many talented and important people not

20   necessarily famous that are going to need help.  These people

21   could offer a great service to us if we also offered them a

22   service.  There are thousands of individuals that have valuable

23   skills that we do not have.  People that don't want the state

24   controlling them.  These people will have expensive property

25   and family that they love dearly.  They are going to want to

1    preserve these things.  I think we could offer a great service

2    to them by assisting them in protecting their property in

3    posterity.  Yes there will be battles, but I don't think it's

4    going to be like it shows us in the movies.  Yes we need to

5    fight against tyranny, but we also need to offer our fellows

6    some value.  Maybe there's farmer that wants to keep his cattle

7    in cornfields but the Boog kicked off and now the state is

8    trying to forcibly remove him.  Unfortunately he doesn't have

9    weaponry skills nor the manpower to implement them.  That's

10   where we come in.  We can protect.

11        And before we move down I want to ask one question

12   about this.  When he says we have certain plans, what did you

13   understand him to be referring to?

14   A    The kidnappings that were being discussed.

15   Q    Did you say multiple kidnappings?

16   A    Or I'm sorry, the kidnapping that was being discussed.

17   Q    Very good.  Can we move to the next page, please?  And we

18   can box here.  Thank you.

19        Mr. Caserta went onto say, you and you can give us

20   food that's just a basic example, you know where I'm coming

21   from?

22        And how did you respond, sir?

23   A    That's a good point.  I feel like you should mention that

24   on the 9th.  That seems to be meeting to discuss all this

25   stuff.

1    Q    So this conversation is occurring on July 29th, 2020, is

2    that right?

3    A    Yes.

4    Q    What's the meeting on the 9th that you are referring to?

5    A    It was just a regular -- well, we called a bonfire.  What

6    was just a regular meeting.

7    Q    All right.  Brandon Caserta went onto say, will do.  We

8    having a bonfire or just a regular fire.  How did you respond?

9    A    Bonfire.  Bring schmores.

10   Q    Brandon Caserta said, copy.

11        When he says bonfire or just regular fire, are those

12   terms that were used within the Wolverine Watchmen?

13   A    Yes.

14   Q    Are they code words?

15   A    Yes.

16   Q    What did they mean?

17   A    I believe a -- I might have been mixing them up, but I

18   believe a bonfire was just a meeting, and a regular fire would

19   have been a training.

20   Q    We'll look at the words in just one moment.  And then he

21   goes on and you tell him bring schmores, correct?

22   A    Yes.

23   Q    Could we look at 78, please?  What's a bonfire?

24   A    Training.

25   Q    And what are schmores?

1    A    Weapons, ammo.

2              MR. BLANCHARD:  I would object to the leading nature.

3    I am not sure he testified he didn't know and now we are

4    showing an exhibit and we are not refreshing his recollection.

5    I don't know what's going on.

6              THE COURT:  You can back up with further foundation if

7    you want but the exhibit is already in and I think he did say

8    that Wolverine Watchmen talked about these things.  So if you

9    want further foundation you can lay it.

10             MR. ROTH:  Thank you, Your Honor.

11   BY MR. ROTH:

12   Q    Were these terms that the Wolverine Watchmen had decided

13   on?

14   A    Yes.

15   Q    And this particular piece of paper, is this something that

16   was distributed among the group?

17   A    Yes.

18   Q    So whether or not you remembered it a few minutes ago, do

19   you remember seeing this paper when it was distributed?

20   A    Yes.  I do.

21   Q    And that's how you know what those terms that you and

22   Mr. Caserta used meant?

23   A    Yes.

24   Q    We can take that down, please.  Thank you.

25             On August 5th, 2020, did you go on a hike?

1     A     Yes.  I did.

2     Q     With whom?

3     A     Daniel Harris and Ty Garbin.

4     Q     If we could look at 461, please?  I apologize.  That's the

5     wrong one.  You can take that down.  462.

6              Do you recognize that picture?

7     A     Yes.  I do.

8     Q     Was that taken on that hike?

9     A     Yes.  It was.

10    Q     Who is shown here?

11    A     Daniel Harris.

12    Q     And where did you guys go hiking?

13    A     Lake Orion.

14    Q     Did you guys bring anything with you on the hike?

15    A     Backpacks that were -- had gear in them.

16    Q     Who lived in Lake Orion?

17    A     Daniel Harris.

18    Q     About how long did you guys go hiking that day?

19    A     Hour and-a-half, two hours.

20    Q     While the three of you were hiking, did the discussions

21    about a plan to kidnap the governor come up?

22    A     Yes.  It did.

23    Q     And what did Daniel Harris say about those plans that --

24    those discussions during the hike?

25    A     He said that he wouldn't want to do anything without each

1    other, meaning Ty and myself.

2    Q    And in your discussions that day, did the three of you

3    discuss that and whether or not you guys were in?

4    A    Yes.  We said that when it happened that we would only want

5    to operate with each other because we were confident in each

6    other's capabilities.

7    Q    And based on that, how did you feel about the plan?

8    A    I was in.

9    Q    You were in?

10   A    Yes.

11   Q    And Ty Garbin, how did he say he felt at that point?

12   A    He was also in.

13   Q    And Daniel Harris?

14   A    He was also in.

15   Q    And you joined because these other two said they would be

16   with you in it?

17   A    Yes.

18   Q    How was the relationship between the three of you within

19   the group?

20   A    We were good friends.

21   Q    You can take that down.

22        Did you attend another FTX on August 9th, 2020 in

23   Munith, Michigan?

24   A    Yes.

25   Q    Who was present?

1    A    Adam Fox, Daniel Harris, Ty Garbin, myself, Dan Chappel,

2    Sean Fix.

3    Q    Brandon Caserta was not at this one, correct?

4    A    No.

5    Q    What sort of exercises were conducted at this training?

6    A    Manipulation techniques.  So changing your magazine,

7    shouldering your rifle, things like that.

8    Q    Now that you are in on this plan, do you approach these

9    exercises differently?

10              MR. GIBBONS:  Objection, Your Honor.  Leading.

11              MR. ROTH:  It doesn't suggest an answer, Your Honor.

12              THE COURT:  Just say how if at all did it change your

13   approach to training?

14   BY MR. ROTH:

15   Q    How if at all did now being in on this plan to kidnap the

16   governor change your approach to these changes or these

17   exercises?

18   A    They had a more serious feel to them.

19   Q    In what way?

20   A    That they were for a purpose.

21   Q    How long was that FTX?

22   A    About an hour to an hour or two.

23   Q    Could we look at Exhibit 142, please?

24              We see up at the top here, this is a chat message and

25   it says, Wolverine Watchmen.  Is this the general Wolverine

1    Watchmen chat group?

2    A    Yes.  I believe so.

3    Q    Were you a member of that group?

4    A    Yes.  I was.

5    Q    Who is Wayward?

6    A    Brandon Caserta.

7    Q    Could we box this, please?

8         So this message is from August 10th.  Brandon Caserta

9    says he wants to do a vibe check on some medical fascists.

10   What is a vibe check?

11   A    It would be shooting someone.

12   Q    Shooting someone?

13   A    Yes.

14        THE COURT:  Did you misspeak?  I don't -- if you are

15   just receiving that line under Wayward, you didn't mean to

16   suggest that was Mr. Caserta's statement, did you?

17        MR. ROTH:  I believe it is.

18        THE COURT:  I thought he just identified Wayward as Ty

19   Garbin.

20        MR. ROTH:  Well, I should check then.  I apologize.

21   BY MR. ROTH:

22   Q    Who is Wayward?

23   A    Brandon Caserta.

24        THE COURT:  I'm sorry.  I may have misheard it.

25        MR. ROTH:  And I may have misheard it as well.  I

```
1    apologize.

2    BY MR. ROTH:

3    Q    So the meetings, the trainings, are they getting more

4    frequent, more common around this time?

5    A    Yes.

6    Q    Was there a reason for that?

7    A    Things had taken on that serious tone that I discussed

8    earlier.

9    Q    Why?

10   A    Because we had been discussing the plot to kidnap.

11   Q    And is membership in the group changing as well?

12   A    Yes.

13   Q    Tell me about that?

14   A    People started not showing up to things and not wanting to

15   participate in the trainings or anything like that.

16   Q    Is there separation between these people who are not

17   showing up and the others?

18   A    Yes.

19   Q    Tell me about that?

20   A    It seemed that some people were intimidated or just not

21   into the ideas that were being thrown around so that they then

22   separated themselves from us.

23   Q    What sort of ideas were being thrown around?

24   A    Kidnapping the governor.

25   Q    And who is in this the group of people that stay with it?
```

1   Who is in that group?

2   A    Myself, Brandon Caserta, Daniel Harris, Dan Chappel, Ty

3   Garbin.

4   Q    Are there others that sometimes appear as well?

5   A    Yes.

6   Q    Was there a name for this sort of new group?

7   A    There was when we switched over to the Threema chat, yes.

8   It was the bonfire group.

9   Q    So at least there was a name used in the chat rooms if not

10  in day-to-day practice?

11  A    Yes.

12         THE COURT:  Before you move on, I apologize.  My 146

13  does not include any chat.  It just includes a single page of

14  pictures.

15         MR. ROTH:  One moment, Your Honor.

16         MR. BLANCHARD:  My 146 has chats.

17         THE COURT:  Yours does?  Maybe mine is incomplete.

18  This is my 146.  It's in.  I remember when it came in.  It's

19  just pictures.

20         MR. BLANCHARD:  There is chat at the top I think.

21         THE COURT:  Right, but not the chat we looked at under

22  146.

23         MR. BLANCHARD:  I think that was 142.

24         MR. HILLS:  That was 142.

25         MR. ROTH:  I apologize.

1    MR. BLANCHARD:  I think we actually looked at 142.

2    THE COURT:  Let's make sure we actually know what we

3    looked at.  I apologize for the troubles.

4    MR. ROTH:  I apologize.  142.

5    THE COURT:  It is.  I'm sorry.  So it's 142 and it is

6    in.  All right.  Thank you.  Sorry for the confusion.

7    MR. ROTH:  Yes.  And if I misspoke I apologize.  I did

8    say 142 in my notes.

9    THE COURT:  I may have misheard.

10   BY MR. ROTH:

11   Q   All right.  The paper that's in front of you, if you can

12   turn to the second page, please?  And that's Proposed Exhibit

13   145.  A chat conversation from August 10th.  Were you a part of

14   that conversation?

15   A   Yes.  I was.

16   Q   Were Adam Fox and Daniel Harris also involved in that

17   conversation?

18   A   Yes.  They were.

19   MR. ROTH:  Your Honor, I'd move for the admission of

20   Proposed Exhibit 145?

21   THE COURT:  Objections?  Hearing none, 145 is

22   admitted.

23   MR. ROTH:  Thank you, Your Honor.

24   BY MR. ROTH:

25   Q   Could we look at 145?  Thank you.

```
1              What application is this on if you know?

2    A    It's -- it's either Wire or Threema.  I can't say for sure.

3    Q    What group is this?

4    A    This is the chat with the name fuck around and find out.

5    Q    Who is in that group?

6    A    Adam, myself, Brandon Caserta, Daniel Harris, Dan Chappel,

7    Ty Garbin, Sean Fix.

8    Q    Is there a purpose behind this group?  Is this strictly one

9    militia group?

10   A    No.  This is multiple.

11   Q    All right.  So what brings this group together?

12   A    The idea of kidnapping.

13   Q    What was your user name here?

14   A    Red Hot.

15   Q    All right.  With that, could we please box Mr. Franks'

16   message here?

17              Could you please read what you wrote there?

18   A    Even if we plan it's highly likely that we are either

19   isolated due to being identified or just taken out in the

20   mission.  I don't want anyone to downplay the camera footprint

21   that is everywhere.  Even if we covered our faces we will be

22   found in a day or two.

23   Q    What did you mean by mission?

24   A    The kidnapping.

25   Q    What were you saying here?
```

A    I was saying that either way it's going to end up with being arrested or being killed.

Q    You talked about the camera footprint.  What did you mean by that?

A    Just that there are cameras everywhere.

Q    Thank you.  You can unbox that.  If you can put the chat back up now?  If you can box this, please?  Thank you.

         Deanzy responds.  Who is Deanzy?

A    Adam Fox.

Q    Adam Fox says, well this is why we organize the puzzle, put it together, tear it apart, out back together tear apart again, and we do this until we can't tear it apart anymore.

         What did you understand that Adam Fox was telling you in the group at that time?

A    To plan.  Plan and train and then continue to do that over and over again.

Q    Then Beaker responded.  Who is Beaker?

A    Daniel Harris.

Q    Daniel Harris then says, train like they did in Den of Thieves.  What's Den of Thieves?

A    A movie.

Q    What's that movie about?

A    Bank robbery.

Q    A group of men who did a bank robbery?

A    Yes.

1    Q    Adam Fox then responds, our survival depends on our ability

2    to fight together as one cohesive unit.  Say what you want but

3    when we done we will be ready.  We have some amazing leadership

4    and training guys.  Get focused and stay focused.  We aren't

5    running a suicide mission.

6              That last part about not running a suicide mission.

7    How did that affect how you represented to the group given how

8    you were feeling at the time?

9    A    I wasn't as open, and I said things to make sure that it

10   would be apparent that I was into surviving.

11   Q    Did you not want to tell them that you were hoping to die?

12   A    No.

13   Q    We can back out and box the rest.

14             Then you go onto say this.  Would you read your part?

15   A    Finding the routes without cameras and cover would be the

16   most important or cutting power to shit.

17   Q    Were you actually concerned about cameras?

18   A    No.

19   Q    Why did you say that?

20   A    Just to go along with what was already being said.

21   Q    And Adam Fox responded, we going into this to bring

22   everyone back home.  See problems.  Simply require solution.

23   We could also alter facial features as well, change eye color

24   with contacts.  Our jobs now is to put puzzles together and

25   tear them apart until we can't tear one apart.

1        You can take that down.

2        Was there another meeting on August 23rd, 2020, at

3   Daniel Harris's house.

4   A   Yes.

5   Q   What prompted that meeting?

6   A   Somebody had mentioned that Dan Chappel and Paul Bellar

7   were FBI agents or FBI informants.

8   Q   Who attended that meeting?

9   A   Myself, Daniel Harris, Ty Garbin, Brandon Caserta, Jerad,

10  Dan Chappel, and I believe that's it.

11  Q   And I don't recall if I heard you say, was Brandon Caserta

12  there?

13  A   Yes.  He was.

14  Q   So believing that there could be two federal agents in the

15  group, what was the -- what was the level of concern as to

16  operational security then?

17  A   Very high.  Everybody had to bring something to identify

18  who they were.

19  Q   Did anybody give instructions about the group's chat

20  application or chat practices?

21  A   Yes.  Daniel Harris switched everybody over to a new

22  encrypted group chat application called Threema.  I think it

23  was like 99 cents, but it deleted everything that you said

24  after you sent it, and it was supposed to be better than Wire.

25  Q   Did Daniel Harris tell you these things?

1    A    Yes.  He did.

2    Q    Did Brandon Caserta also make statements to the group that

3    day?

4    A    Yes.  He did.

5    Q    Have you listened to those recordings marked as Proposed

6    Exhibits 165 and 166?

7    A    Yes.  I have.

8    Q    Are they accurate recordings from that conversation?

9    A    Yes, they are.

10   Q    And the transcripts are accurate as well?

11   A    Yes.

12       MR. ROTH:  Your Honor, I'd move for the admission of

13   Proposed Exhibits 165 and 166?

14       MR. BLANCHARD:  As to 166 I object to the same Enright

15   hearsay issue.

16       THE COURT:  All right.  Same ruling.  We'll admit 165

17   and 166.

18       MR. ROTH:  Thank you, Your Honor.

19   BY MR. ROTH:

20   Q    Did Brandon Caserta talk about murder and under what

21   circumstances he would kill people?

22   A    Yes.

23       MR. ROTH:  Could we please play Exhibit 165?

24       (Audio started, 1:02 p.m.)

25       (Audio stopped, 1:02 p.m.)

BY MR. ROTH:

Q    We talked earlier about Joshua Miller and other people that had recently left the group.  Was Brandon Caserta upset about that?

A    Yes.  He was.

Q    Did he talk about that at that meeting?

A    Yes.  He did.

MR. ROTH:  Could we please play 166?

(Audio started, 1:03 p.m.)

(Audio stopped, 1:04 p.m.)

BY MR. ROTH:

Q    We can go back up to the top.  Is that possible without playing it?  Thank you.

So Brandon Caserta said to you some people that have joined this group say they are about it until some little thing happens then they fucking skedaddle.  What did you understand him to be telling you?

A    That people tend to leave the group once we start talking about doing something serious.

Q    What was the something serious that had been being discussed?

A    Kidnapping.

Q    You followed up by telling him, we start talking about offing people then they are like, whoa, and Brandon Caserta said, right right.

```
1              What did you mean by offing people?

2     A    Killing people.

3     Q    Did the group, including Brandon Caserta, discuss what to

4     do if you are caught in your plans to kidnap the governor?

5     A    Yes.

6              MR. ROTH:  Could we please play Exhibit 167?

7              (Audio started, 1:05 p.m.)

8              (Audio stopped, 1:06 p.m.)

9     BY MR. ROTH:

10    Q    You remember that conversation?

11    A    Yes.

12    Q    What were you guys discussing that that came up?

13    A    The plans to kidnap.

14    Q    Nobody talks everybody walks.  What does that mean to you?

15    A    If you don't say anything then you would get off.

16    Q    Cooperating with police, testifying today, is that contrary

17    to what was being discussed that day?

18    A    Yes.  It is.

19    Q    Around this time were you invited on a reconnaissance

20    mission?

21    A    Yes.  I was.

22    Q    By whom?

23    A    Adam Fox and Dan Chappel.

24    Q    Were you able to go?

25    A    No.  I was not.
```

Q     Why not?

A     I had other things to do.

Q     Was one of those work?

A     Yes.

Q     If you didn't have to work, would you have gone on the recon mission?

A     Yeah.  Probably.

Q     Do you know if Fox went?

A     Yes.  He did.

Q     How do you know that?

A     He posted pictures in the group chat later on.

Q     I want to go forward to September of 2020.  What is a ghost gun?

A     A ghost gun is a firearm that you manufacture that's not serialized.  It doesn't exist in any database.  You don't pass a background check for it.  You make it yourself.

Q     When you say not serialized, that's just a matter of tracking?

A     Yes, and registering it.  Yeah.

Q     Where do you get them from?

A     On-line.

Q     In September of 2020, did you decide to build and sell several ghost guns?

A     Yes.  I did.

Q     To whom?

1    A    A friend of mine in Pontiac.

2    Q    Was he prohibited from possessing guns?

3    A    Yes.  He was.

4    Q    Why was that?

5    A    He was a felon.

6    Q    Can you ask other people to help you?

7    A    Yes.  I did.

8    Q    Who did you ask to help?

9    A    Ty Garbin and Daniel Harris.

10   Q    Why them?

11   A    I was very close to them.

12   Q    And shortly before -- let me ask it this way.  Where were

13   you guys when you asked them to help?

14   A    Overtime Bar in Waterford.

15   Q    Shortly before you asked them are other people there with

16   you guys?

17   A    Yes.  They are.

18   Q    Do you ask them to leave?

19   A    Yes.

20   Q    The other people that you asked to leave, were they members

21   of the Wolverine Watchmen group or the group that broke off

22   from the Wolverine Watchmen?

23   A    Yes.

24   Q    But even from them your more private group that you are

25   comfortable with and trust is Dan Harris and Ty Garbin?

1      A     Yes.

2      Q     And in that conversation with Daniel Harris and Ty Garbin

3      that evening, did you tell them that these guns would be sold

4      to somebody who is not --

5                  MR. GIBBONS:  Objection, leading, Your Honor.

6                  THE COURT:  It is leading but maybe you can rephrase

7      it.

8                  MR. ROTH:  Thank you, Your Honor.

9      BY MR. ROTH:

10     Q     What did you tell them about the transaction that you were

11     planning, the sale that you were planning?

12     A     I told them that I knew this person from being incarcerated

13     with him and that he was a felon, so he was not able to

14     purchase guns legally.

15     Q     Was Ty Garbin willing to help you?

16     A     Yes.  He was.

17     Q     What was he going to do to help?

18     A     He was going to make the guns.

19     Q     Was Daniel Harris willing to help you?

20     A     Yes.  He was.

21     Q     What was he going to do to help?

22     A     He was going to look out for me while I made the sale.

23     Q     What do you mean by look out for?

24     A     He was going to watch my back.

25     Q     Were you going to make money from this sale?

1    A    Yes.  I was.

2    Q    Were you going to share that with them?

3    A    Very little of it.

4    Q    Later in September did you check out the area where the

5    deal was going to happen?

6    A    Yes.  We did.

7    Q    Who went with you?

8    A    Daniel Harris, Ty Garbin and Dan Chappel.

9    Q    Have you reviewed Proposed Exhibits 270 and 271, recordings

10   from that trip?

11   A    Yes.  I have.

12         MR. ROTH:  Your Honor, I would move for the

13   admission -- I apologize I didn't ask the next part.

14   BY MR. ROTH:

15   Q    Are they accurate recordings?

16   A    Yes.  They are.

17   Q    And are the transcripts that go along with them accurate as

18   well?

19   A    Yes.  They are.

20         MR. ROTH:  Your Honor, I'd move for admission of

21   Proposed Exhibits 270 and 271?

22         MR. BLANCHARD:  I would object on the basis of

23   relevance.  We are doing an awful lot on these ghost guns that

24   really have nothing to do with the charges here.

25         THE COURT:  Well, you can summarize the relevance.  I

1    think I know what it is but go ahead.

2              MR. ROTH:  Sure.  The Court has already made a ruling

3    on this issue, and the Defendants, specifically Daniel Harris's

4    willingness to participate in this criminal activity concurrent

5    with the plot to kidnap the governor with two other members of

6    this plan to kidnap the governor certainly rebuts any claim

7    that he was entrapped into committing that crime because it was

8    otherwise not law abiding activity.

9              THE COURT:  All right.  It can be admitted.

10             MR. ROTH:  Thank you, Your Honor.

11   BY MR. ROTH:

12   Q    Where were the four of you when these recordings were made?

13   A    Pontiac.

14   Q    And what was the purpose of the trip to Pontiac?

15   A    To look at where this person lived and where I would be

16   selling the guns.

17   Q    This person being the person you would sell the guns to?

18   A    Yes.

19             MR. ROTH:  Could we please play Exhibit 270?

20             (Audio started, 1:11 p.m.)

21             (Audio stopped, 1:14 p.m.)

22             MR. ROTH:  Thank you.

23   BY MR. ROTH:

24   Q    Harris said he knew where all the cameras were.  Where was

25   that?

1    A    The parking garage off Woodward.

2    Q    Is that where the deal was going to specifically happen?

3    A    No.

4    Q    All right.  Why were you looking at that location?

5    A    It was just on the way and he mentioned it.

6    Q    Were you guys paying attention for cameras that day?

7    A    No.

8         MR. ROTH:  Could we please play Exhibit 271?

9         (Audio started, 1:14 p.m.)

10        (Audio stopped, 1:15 p.m.)

11        MR. ROTH:  Thank you.

12   BY MR. ROTH:

13   Q    Was there another FTX in September of 2020?

14   A    Yes.  There was.

15   Q    Was that on the 12th and 13th of September?

16   A    Yes.  It was.

17   Q    Where was it?

18   A    Luther, Michigan.

19   Q    Whose property was that?

20   A    Ty Garbin's.

21   Q    Did you do anything at Ty Garbin's property to help it get

22   ready?

23   A    Yeah.  I had a friend that worked at a tire shop, and we

24   needed a backstop for the gun range so that bullets wouldn't go

25   through it and just for safety.  So we got the tires, brought

1    them up there and set them all up.

2    Q    Did anybody else help you do that?

3    A    Dan Harris, Ty Garbin and somebody who went by the name

4    Solomon.

5    Q    Solomon?

6    A    Yes.

7    Q    Did you, Ty Garbin, and Daniel Harris do some shooting

8    while you were preparing the Luther property?

9    A    Yes.  We did.

10   Q    Have you watched Proposed Exhibit 221?

11   A    Yes.

12   Q    Is it a fair and accurate video OF THAT shooting?

13   A    Yes.

14           MR. ROTH:  Your Honor, I'd move for the admission of

15   Proposed Exhibit 221?

16           MR. BLANCHARD:  I have --

17           MS. KELLY:  No objection.

18           THE COURT:  All right.  221 is admitted.

19           MR. ROTH:  Thank you, Your Honor.

20           Can we please play 221?

21           (Video started, 1:16 p.m.)

22           (Video stopped, 1:17 p.m.)

23           MR. ROTH:  Thank you.

24   BY MR. ROTH:

25   Q    When was this?

1    A    During the day.  I don't know the exact date.

2    Q    Was it days before the Luther FTX, weeks before?

3    A    Maybe a week.

4    Q    Who was shown in that video?

5    A    Ty Garbin was driving, Daniel Harris was shooting, and I

6    was in the back videotaping it.

7    Q    And is that on Ty Garbin's Luther property?

8    A    Yes.  It is.

9    Q    What kind of vehicle were you guys in?

10   A    It's referred to as a side-by-side.

11   Q    Whose side-by-side was that?

12   A    Ty Garbin's.

13   Q    Whose gun was Daniel Harris shooting in that video?

14   A    Mine.

15   Q    What kind of gun was it?

16   A    It was an AR-15.

17   Q    Was it equipped with anything after market?

18   A    Yeah.  He had a silencer, a red dot site, a flashlight.

19   Q    Thank you.

20        When did people start arriving for the Luther FTX?

21   A    The morning of September 12th.

22   Q    Is that a Saturday?

23   A    Yes.  It was.

24   Q    Who attended that training?

25   A    Myself, Dan Harris, Adam Fox, Brandon Caserta, Barry Croft,

1    Ty Garbin, Dan Chappel, Steve Robeson, Jerad, Max, a lot of

2    people from Wisconsin, a lot of people that I never met before.

3    Q    Did Adam Fox bring an RF detector with him?

4    A    Yes.  He did.

5    Q    What is an RF detector?

6    A    I was told that it would pick up, like, certain radio

7    frequencies that listening devices gave off.

8    Q    Did Adam Fox use that RF detector?

9    A    Yes.  He did.

10   Q    What did he do with it?

11   A    He walked past me and Dan Chappel and moved it around us.

12   Q    With it on?

13   A    Yes.

14   Q    Did you see him checking anybody else?

15   A    He was walking around with it.  I did not see him actually

16   go up to anybody else.

17   Q    What exercises were held at this training?

18   A    There was a shoot house, medical, and weapons manipulation.

19   Q    What is weapons manipulation?

20   A    Mag changes, transitioning from rifle to pistol or pistol

21   to rifle, certain things like that.

22   Q    Were these exercises relevant for the ongoing plans?

23   A    Yes.  They were.

24   Q    In what way?

25   A    Well, they were -- we were planning on going into their

1    house or into their house, and we knew that there would be some

2    sort of resistance so we wanted to train for that.

3    Q    What about medical?

4    A    Medical training was also a part of that.

5    Q    How was that relevant to the planning?

6    A    If somebody was injured you would want to be able to take

7    care of them.

8    Q    What about weapons manipulation?

9    A    You would want to be able to handle your weapon

10   proficiently.

11   Q    What do you mean by efficiently?

12   A    You would want to handle your weapon just as well as

13   anybody that she had with her or better.

14   Q    Was the shoot house in Luther different than the one in

15   Cambria?

16   A    Yes.

17   Q    In what way?

18   A    It was a hallway -- had two hallways and two doors instead

19   of just one single door.

20   Q    Did you go through the shoot house?

21   A    Yes.  I did.

22   Q    And in your mind what was it practicing for?

23   A    The kidnapping.

24   Q    Did you hear other people talk about that?

25   A    Yes.

1    Q    Who did you hear talking about that?

2    A    Adam Fox, Barry Croft.

3    Q    Can you tell me about that conversation?

4    A    That the shoot house would be training for the kidnapping.

5    Q    When did you hear that?

6    A    The first day.

7    Q    So Saturday?

8    A    Yes.

9    Q    And where were they when they said it?

10   A    We were all standing around by the shoot house.

11   Q    Who is the we all were standing around?

12   A    Myself, Barry Croft, Adam Fox.

13   Q    Anybody else?

14   A    Some other people were walking around.  There is a lot of

15   people there, but I don't specifically remember.

16   Q    And was it Adam Fox or Barry Croft or both that talked

17   about the house at Luther, the shoot house at Luther

18   representing the governor's house?

19   A    It was Adam Fox.

20   Q    And he said it to Barry Croft?

21   A    Yes.

22   Q    And do you recall Barry Croft's reaction?

23   A    No.

24   Q    On that night, Saturday, September 12, 2020, did you go on

25   a reconnaissance trip to the governor's house in Elk Rapids?

1    A    Yes.  I did.

2    Q    What did you wear on that night recon?

3    A    Jeans and a T-shirt.

4    Q    Was that what you had been wearing throughout the day?

5    A    Yes.

6    Q    Did other people change their clothes before going?

7    A    Yes.

8    Q    Who?

9    A    Adam Fox, Barry Croft.

10   Q    Did they say why?

11   A    Because they wanted to blend in more.

12   Q    Who said that?

13   A    Adam Fox.

14   Q    What were they wearing during the day?

15   A    Camouflage, fatigues, plate carriers.

16   Q    What did they change into?

17   A    Jeans and a T-shirt.

18   Q    And Adam Fox told you that he did that so he would blend

19   in.  When would that matter?

20   A    When would it matter?

21   Q    I asked that poorly.  I apologize.  Blend in to whom?

22   A    Everybody else.  And --

23   Q    Was that in case of anything?

24   A    If we got pulled over.

25   Q    Was Barry Croft there when Adam talked about changing in

1   case they got pulled over they would blend?

2   A    Yes.

3   Q    Around what time did you leave the Luther campsite that

4   day?

5   A    Around nine o'clock at night.

6   Q    Did you bring a gun with you?

7   A    Yes.  I did.

8   Q    What kind?

9   A    A Glock 19.

10  Q    Is that a pistol?

11  A    Yep.  It is.

12  Q    Who else went with you when you left?

13  A    Ty Garbin, Dan Chappel, and somebody that went by the name

14  of Red.

15  Q    Did Brandon Caserta -- Brandon Caserta or Daniel Harris go?

16  A    No.  They did not.

17  Q    Did you see either of them before you left?

18  A    Yes.  I did.

19  Q    Where?

20  A    At right in front of the camper that we stayed in.

21  Q    Did you see one of them there or both?

22  A    Both.

23  Q    What were they doing?

24  A    Drinking.

25  Q    What condition did they appear to be in?

1    A    Highly intoxicated.

2    Q    Whose car did you take when you left the campsite?

3    A    I don't recall.

4    Q    Were you driving?

5    A    No.  I was not.

6    Q    Did the car you were in stop anywhere on the way after

7    leaving the FTX site?

8    A    Yes.  It stopped at a hotel.  I am not sure of the location

9    of the hotel.

10   Q    Why did it stop at the hotel?

11   A    We had to meet up with Barry Croft and Adam Fox.

12   Q    What happened at the hotel?

13   A    We met up with Adam Fox, Barry Croft, some other people

14   from Wisconsin, and discussed that we would be leaving and

15   meeting at a Walmart in -- I am not -- again, I am not positive

16   of the city it was in, but we all got together initially at the

17   hotel.

18   Q    Was there a delay at the hotel?

19   A    Yes.

20   Q    About how long do you think you were there?

21   A    Maybe 30 minutes, 45 minutes.

22   Q    Did everybody leave the hotel around the same time?

23   A    I believe so.  Yes.

24   Q    Did you see Barry Croft leave the hotel?

25   A    Yes.

Q    Did you hear him say anything as he left?

A    Yes.

Q    What did he say?

A    So before we left everybody gathered in the parking lot and was walking around their trucks getting ready to leave.  People were just killing time kind of smoking, getting ready to leave.  I wanted to talk to Barry about something unrelated to what was going on, so I pulled him aside.  We were discussing things.  Somebody said, hey, let's go or we got to get moving, something to that effect.  He asked me if I knew what I was doing?  I said no -- or if he knew where I was going.  I said no.  He said that he was going to get eyes on the bridge.

Q    When you said you didn't know you were going, did you know you were going up to where the governor lived?

A    Yes.

Q    And then he said that he was going to get eyes on the bridge?

A    Yes.

Q    Where did you go after leaving the hotel?

A    A Walmart.

Q    When you go from the hotel to the Walmart, are you in the same car as you were before?

A    No.

Q    Who is in the car with you now?

A    Ty Garbin and somebody from Wisconsin.  I can't recall his

1    name.

2    Q    What happened at Walmart?

3    A    We parked there, and Steve Robeson, Adam Fox, Barry Croft,

4    Dan Chappel, the person that went by the name Red, and the Null

5    brothers all pulled up in separate trucks.  Not individually

6    but two other trucks pulled up containing all of these people,

7    and from there we left.

8    Q    Where did you go from there?

9    A    I believe it was a VFW hall.  Again, I am not sure what

10   city.

11   Q    Okay.  Could we look at 235, please?

12        Is this the VFW hall you remember going to?

13   A    Yes.  It was.

14   Q    About how long of a drive was it from the Walmart to the

15   VFW hall roughly?

16   A    Somewhere in between 30 minutes and an hour.

17        MR. BLANCHARD:  Judge, I don't show 235 in.

18        THE COURT:  I don't show it in.  Is there an objection

19   to it?

20        MR. ROTH:  I apologize.

21        THE COURT:  He identified it as the place they drove

22   to.  You can certainly ask him if that's what he remembers and

23   then we'll see.

24        MR. ROTH:  I can.  I apologize, Your Honor.

25   BY MR. ROTH:

1    Q    The picture that we looked at there, is that a fair and

2    accurate picture of the VFW hall you went to?

3    A    Yes.  It was.

4         MR. ROTH:  Your Honor, I'd move for the admission of

5    Proposed Exhibit 235?

6         THE COURT:  Objections?  If not it can be admitted.

7         MR. ROTH:  Thank you, Your Honor.

8    BY MR. ROTH:

9    Q    All right.  If we can put that back up.  Sorry about that.

10        What happened at the VFW hall?

11   A    We parked and decided to -- we parked as waited.  We were

12   waiting there, and then we were told that we were to drive to

13   an address that was given to the driver of the vehicle, and

14   that we were to shine lights so that somebody else who was

15   driving across the lake could see where we were shining the

16   lights from.

17   Q    Gave us a lot of information.  Let's back up just a little

18   bit.  How many cars meet up in the VFW parking lot?

19   A    I believe it was three.

20   Q    So it's everybody that met up previously at the Cadillac or

21   at the Walmart?

22   A    Yes.

23   Q    And then in the VFW parking lot did everybody get out of

24   their cars?

25   A    No.

1    Q    Did you get out of the car?

2    A    No.

3    Q    Were you able to hear what was going on?

4    A    Not really.

5    Q    You said that you guys got instructions for an address and

6    what to do there?

7    A    Yes.

8    Q    Who gave those instructions?

9    A    I believe it was Adam Fox.

10   Q    And what specifically was your car's assignment that

11   evening from Adam Fox?

12   A    To drive to the address we were given and shine lights into

13   the air so that people driving across the lake could see where

14   we're shining it from.

15   Q    Do you recall what the address was that you were given?

16   A    No.

17   Q    Fair to say it was not the accurate or the correct address?

18        MR. BLANCHARD:  Objection, leading.

19        THE COURT:  It is leading.  It is also something we

20   covered before so I don't think it does much harm to focus the

21   attention.  If you want to rephrase it you can.

22        MR. ROTH:  I can, Your Honor.

23   BY MR. ROTH:

24   Q    What do you recall about the address that you were given?

25   A    It was supposed to be the governor's, but it ended up not

1    being the correct address.

2    Q    What was wrong about the address?

3    A    I am -- I am not sure.  All I know is that we couldn't find

4    the address that we were given.

5    Q    So let's focus on that for a moment.  What happened after

6    your car left the VFW hall?

7    A    We drove to the address or the street and looked for the

8    address.

9    Q    The street was correct?

10   A    Yes.

11   Q    Tell me about looking for the specific address?

12   A    We drove -- it was a cul-de-sac at the end.  We drove all

13   the way down, turned around, came back, turned around, went all

14   the way down again, turned around and came back and then gave

15   up.

16   Q    Were you concerned while doing that?

17   A    A little bit, yeah.

18   Q    Why was that?

19   A    Cause we were just driving up and down a road.

20   Q    How did you think it looked?

21   A    Suspicious.

22   Q    And you were not ultimately able to find the matching

23   address?

24   A    No.

25   Q    What happened once you gave up looking?

1   A    Drove to a beach not far from the road that we looked for

2   the house on and met up with one of the other trucks.

3   Q    Who was in the truck that you met up with?

4   A    I believe it was Adam Fox, Dan Chappel, or Steve Robeson.

5   I can't really necessarily see too well into it, but...

6   Q    But you remember Adam Fox being there?

7   A    Yeah.  He was either there or I spoke to him on the phone.

8   I don't want to --

9   Q    And whether it was in person or over the phone, did you

10  have a conversation with Adam Fox?

11  A    Yes.

12  Q    What was the nature of that conversation?

13  A    I asked why the address wasn't correct, and I was just

14  upset.

15  Q    Why were you upset?

16  A    Because I felt like I wasted my time.

17  Q    Why was it a waste of your time?

18  A    Because we didn't find the right address.

19  Q    The governor's house?

20  A    Yes.

21  Q    What happened after the meet up at the beach?

22  A    We drove back to Luther.

23  Q    Can you give me an estimate as to how long it took you to

24  get from the area of the governor's house down to Luther?

25  A    Hour and-a-half maybe.

1    Q    What happened when you got back to Luther?

2    A    I went to sleep.

3    Q    Do you know approximately when you woke up the next

4    morning?

5    A    Maybe around 8:00 or 9:00 a.m.

6    Q    Did you talk to Daniel Harris the next morning?

7    A    Yes.  I did.

8    Q    Where was that?

9    A    Right out front of the camper.

10   Q    Could you please tell us about that conversation?

11   A    Ty Garbin and I was talking to him.  All three of us were

12   having a conversation about what happened the night before with

13   the drive to the governor's house, and he said that he wished

14   he could have joined.

15   Q    Did he say why he didn't or couldn't?

16   A    Yeah.  That he was drunk.

17   Q    Was there a meeting of the larger group that morning as

18   well?

19   A    Yes.  There was.

20   Q    Where was that?

21   A    Right outside of the camper again.

22   Q    Who was at that meeting?

23   A    Barry Croft, Adam Fox, Daniel Harris, Ty Garbin, myself,

24   Brandon Caserta, the Null brothers, Dan Chappel, Red, and Steve

25   Robeson.

1    Q    Did somebody call that meeting?

2    A    Yes.

3    Q    Who?

4    A    Adam Fox.

5    Q    What happened at that meeting?

6    A    We -- there was a discussion about the plan and that it's

7    happening.  That we needed to train a little bit more but that,

8    you know, if you weren't -- somebody said something to the

9    effect of we all know what we're doing and if you are not in

10   for it, you know, you can walk away.  Nobody walked away.

11   There was also a discussion about explosives and purchasing

12   them.

13   Q    Who is speaking most at this meeting?

14   A    Adam Fox.

15   Q    I'm sorry.  I interrupted you.  You were talking about

16   explosives.  Who was talking about explosives?

17   A    Adam Fox.

18   Q    What was he saying about explosives?

19   A    That he would need to have everybody pitch in to afford

20   them.

21   Q    Did he say how much money they needed or he needed for

22   explosives?

23   A    I do not recall.

24   Q    Did Daniel Harris address the group?

25   A    I don't recall.

```
 1              MR. ROTH:  If we can play Exhibit 255, please?
 2              (Audio started, 1:36 p.m.)
 3              (Audio stopped, 1:36 p.m.)
 4    BY MR. ROTH:
 5    Q    Do you remember that?
 6    A    Yes.
 7    Q    And when he says they are going to get out and hit us head
 8    on, who is he telling you they is in that statement?
 9    A    Her security detail.
10    Q    Have you listened to Proposed Exhibits 256 and 257 of their
11    conversations or portions of the conversations regarding that
12    morning?
13    A    Yes.
14    Q    Are they accurate recordings?
15    A    Yes.
16    Q    Are the transcripts as well accurate?
17    A    Yes.
18              MR. ROTH:  Your Honor, I'd move for the admission of
19    Proposed Exhibits 256 and 257?
20              THE COURT:  Objections?  Hearing none, they are
21    admitted.
22              MR. GIBBONS:  None, Your Honor.
23              MR. ROTH:  Thank you, Your Honor.
24    BY MR. ROTH:
25    Q    Did you talk about having to walk away from your lives
```

1    after this?

2    A    Yes.

3          MR. ROTH:  Could we please play Exhibit 256?

4          (Audio started, 1:37 p.m.)

5          (Audio stopped, 1:37 p.m.)

6    BY MR. ROTH:

7    Q    All right.  Are there two conversations going on at the

8    same time there?

9    A    Yes.

10   Q    And one of them is one we see here.  Who is the other guy

11   talking?

12   A    Sounded like Steve Robeson.

13   Q    Is anybody listening to Steve Robeson?

14   A    No.

15   Q    So you talk about in this having to walk away from your

16   lives or there is conversation about walking away from your

17   lives afterwards.  What did that mean to you?

18   A    That meant that your life would be over for something like

19   that.

20   Q    And was there discussion about what everybody would have to

21   do -- or let me ask it differently -- what kidnapping the

22   governor would prompt or cause?

23   A    Yes.

24   Q    What was that?

25   A    That you would be hunted down and looked for if you got

1    away with it.

2    Q    Was there talk about where everybody would go?

3    A    There were some discussions about that.  Yes.

4    Q    Where?

5    A    Ty offered up his property.

6    Q    And how did you feel about the prospect of walking away

7    from your life after this?

8    A    I was prepared.

9    Q    Did you anticipate living through it anyway?

10   A    No.  No.  That's what I meant.

11           MR. ROTH:  Could play Exhibit 257 as well?

12           (Audio started, 1:39 p.m.)

13           (Audio stopped, 1:39 p.m.)

14           MR. ROTH:  Thank you.

15   BY MR. ROTH:

16   Q    So during this meeting is the reconnaissance at the

17   governor's house mentioned?

18   A    Yes.

19   Q    Who talks about that?

20   A    It was discussed amongst the people that went.

21   Q    And Daniel Harris talked about fighting it out with the

22   governor's security detail?

23   A    Yes.

24   Q    Was there discussion about what the explosives were for?

25   A    Not that I recall.

1    Q    But there was conversation about needing explosives for the

2    mission?

3    A    Yes.

4    Q    So fire fight, explosives, reconnaissance.  Did anybody

5    object during this meeting?

6    A    No.

7    Q    Did anybody walk away?

8    A    No.

9    Q    Were you in?

10   A    Yes.

11   Q    And from what everybody said that morning, and from what

12   you saw everybody do that morning, was everybody else in that

13   meeting in?

14   A    Yes.  That's what I thought.

15   Q    After that meeting did you talk to Brandon Caserta?

16   A    Yes.

17   Q    Where?

18   A    Right outside of the camper.

19   Q    Was that a private conversation?

20   A    Yes.

21   Q    About how long after the meeting was that conversation?

22   A    I would say inside of 30 minutes.

23   Q    What did you two talk about?

24   A    We just talked about the trainings, and he had mentioned

25   that he felt very confident in his capabilities.  That he had

1    been training really hard.

2    Q    Did he talk about what he was confident in them related to?

3    A    Not specifically.  No.

4    Q    Okay.  What was his tone or demeanor?

5    A    Aggressive.

6    Q    Why do you say aggressive?

7    A    He was a very intense person.

8    Q    Did you also talk to Barry Croft that day after the

9    meeting?

10   A    Not much.  No.

11   Q    Do you recall a conversation with Barry Croft that day

12   about reverse engineering?

13   A    Yes.  I do.

14   Q    Did you listen to that recording?

15   A    Yes.  I did.

16   Q    That's Proposed Exhibit 253.  Is it a fair and accurate

17   recording?

18   A    Yes.  It is.

19   Q    And an accurate transcript as well?

20   A    Yes.  It is.

21        MR. ROTH:  Could we please move to admit Exhibit 253?

22        MR. BLANCHARD:  I'm sorry.  What was the number?

23        MR. ROTH:  253.

24        MR. BLANCHARD:  Thank you.

25        THE COURT:  All right.  Hearing no objections it's

1    admitted.

2            MR. ROTH:  Thank you, Your Honor.  Could we please

3    play Exhibit 253?

4            (Audio started, 1:42 p.m.)

5            (Audio stopped, 1:43 p.m.)

6    BY MR. ROTH:

7    Q    This conversation was a little bit later in the day that

8    day?

9    A    Yes.  It was.

10   Q    Do you recall where you were when you had the conversation?

11   A    Up by the shoot house.

12   Q    So you and Croft were talking about reverse engineering

13   something.  What were you talking about reverse engineering?

14   A    You could buy legal projectiles.  Most of the time they

15   were smoke for the 37 millimeter grenade launcher that he had,

16   and you could take the casing off of it and put an actual

17   explosive onto it.

18   Q    So there was a reference in there to a 37.  That was the 37

19   grenade luncher on Barry Croft's rifle that he showed you

20   earlier?

21   A    Yes.

22   Q    And what was the purpose of reverse engineering explosives

23   for that grenade launcher?

24   A    He said it would be used against her security detail.

25   Q    He said it would be used.  Is that Barry Croft?

1    A    Yes.  It is.

2    Q    And her security detail being the governor's security

3    detail?

4    A    Yes.

5    Q    Were there any explosives at this FTX?

6    A    Yes.  There was.

7    Q    When was that?

8    A    The very last day.

9    Q    So that would be the Sunday that we are talking about?

10   A    Yes.

11   Q    What kind of explosives were these?

12   A    The same kind that were in Cambria, Wisconsin.  So again, a

13   medium device wrapped in duck tape.

14   Q    When you say medium, give me an idea how big that is to

15   you?

16   A    A football.

17   Q    A football?

18   A    Yeah.

19   Q    And who built it?

20   A    Barry Croft.

21   Q    And did you see that?

22   A    Yes.  I did.

23   Q    Could you please describe what it is you saw him do with it

24   in terms of the building process?

25   A    Barry Croft took it out and said that, again, it was

1    mortars that he had taken apart and that there were pennies

2    inside of it and that was the shrapnel.

3    Q    Did you actually see him put the pennies in or that was

4    before you got there?

5    A    That was before I got there.

6    Q    Did he say what the purpose of shrapnel is?

7    A    To cause damage.

8    Q    What happened next?

9    A    It was placed over a hill on the other side of Ty Garbin's

10   property.  There were two paper targets hung up around it, and

11   it was set off.

12   Q    What was on those paper targets?

13   A    Human silhouettes.

14   Q    Who else was there?

15   A    Dan Harris, Adam Fox, Jerad, Casey Mahan.  Everybody that

16   was at the training.

17   Q    Did Dan Harris help Barry Croft with the explosive at all?

18   A    He helped place it over on the other side of the hill.

19   Yes.

20   Q    What happened then?

21   A    It was set off.

22   Q    Who set it off?

23        MR. BLANCHARD:  Object as to foundation.  He said it

24   happened on the other side of the hill.

25        MR. ROTH:  I apologize.  I can ask that differently.

```
1              THE COURT:  All right.  Please do.
2    BY MR. ROTH:
3    Q    Do you know who set it off?
4    A    No.
5    Q    Did you hear it go off?
6    A    Yes.
7    Q    Very good.  And that was the last day of the FTX?
8    A    Yes.
9    Q    Could we put Exhibit 266 on the screen, please?
10             Is this another fuck around find out chat, this one
11   from September 17th, 2020?
12   A    Yes.
13   Q    Do you recall this?
14   A    Yes.
15   Q    Who is Squach?
16   A    That would be Ty Garbin's roommate.
17   Q    Do you remember his first name?
18   A    I believe it was Alex.
19   Q    He says, our group has separated ourselves from Joe and
20   Pete for the most part.  I won't be going.  Who are Joe and
21   Pete?
22   A    They were the leaders of the Wolverine Watchmen.
23   Q    And when he said that our group has separated itself, what
24   did that mean?
25   A    Myself, Dan Harris, Ty Garbin, Alex and a few of the other
```

1    people that I mentioned before, Jerad, Brandon, Max Wycoff and

2    a few others.

3    Q    He says, I'm sorry.  Fox then says that Grandpa wants to do

4    an armed protest.  Who is Grandpa?

5    A    That would be Pete Musico.

6              THE COURT:  I think we've seen this before but if we

7    need to read it, I can't.

8              MR. ROTH:  We don't need to read it word for word.  I

9    want to give some background and then speak about a specific

10   portion for this witness where we will zoom in.

11             THE COURT:  All right.

12   BY MR. ROTH:

13   Q    Generally speaking, what was the group's response to this

14   suggestion of a protest?

15   A    Nobody wanted to go to it.

16   Q    Was the group open to peaceful protests at this point?

17   A    No.

18   Q    Could we go to the third page, please?  And we can box

19   here, please.

20             Who is Debased Tyrant?

21   A    That would be Brandon Caserta.

22   Q    All right.  This is part of the same conversation?

23   A    Yes.

24   Q    So Brandon Caserta says, when the time comes there will be

25   no need to try and strike fear through presence.  The fear will

1    be manifested through bullets.  Alpha Fuck You, that's Adam

2    Fox?

3    A    Yes.  It is.

4    Q    He says, copy that boys.  Loud and clear.  Brandon Caserta

5    says, right on brother.  Thanks for communicating.  And then is

6    the next message yours?

7    A    Yes.  It is.

8    Q    What do you say?

9    A    Hard pass on anything in the public.

10   Q    Why did you say that?

11   A    Because I wasn't interested in going to protests.

12   Q    Did you think it might compromise your other mission?

13   A    Yes.

14   Q    To kidnap the governor?

15   A    Yes.

16   Q    What was your concern with it compromising your mission to

17   kidnap the governor?

18   A    Just that we would possibly have our pictures taken, put on

19   line.  Didn't want to be notified or noticed like that.

20   Q    On October 7th, 2020, did you ride to Ypsilanti to meet

21   Red?

22   A    Yes.  I did.

23   Q    What were you told the purpose of that was meeting for?

24   A    To get gear.

25   Q    Did you go?

1      A    Yes.  I did.

2      Q    Who else went?

3      A    Daniel Harris, Adam Fox, myself, Ty Garbin and Dan Chappel.

4      Q    Did Brandon Caserta go?

5      A    No.

6      Q    Did he say why not?

7      A    He was working.

8      Q    What happened once you arrived in Ypsilanti?

9      A    I was arrested.

10     Q    Did the police search your home that day?

11     A    Yes.  They did.

12     Q    If you look in front of you in that packet again, Proposed

13     Exhibits 388 through 391.  Are those fair and accurate pictures

14     of things that were found in your home that day?

15     A    Yes.  They are.

16          MR. ROTH:  Your Honor, I'd move for the admission of

17     Proposed Exhibits 388 through 391?

18          THE COURT:  Any objections?

19          MR. BLANCHARD:  No.

20          THE COURT:  All right.  Hearing none they are

21     admitted.

22     BY MR. ROTH:

23     Q    Could we please look at 388 on the screen?

24          May have I approach the witness, Your Honor?

25          THE COURT:  Sure.  Did you want to show the other

1      pictures or not?

2              MR. ROTH:  Not all of them we'll need right now.  We

3      can take this one down for the moment.

4              THE COURT:  All right.

5      BY MR. ROTH:

6      Q    So I am going to show you what's marked as Proposed Exhibit

7      395.  What is this item?

8      A    It is a plate carrier.

9      Q    All right.  Is this yours taken from your home?

10     A    Yes.

11             MR. ROTH:  Your Honor, I'd move for the admission of

12     Proposed Exhibit 395?

13             THE COURT:  Hearing no objections, 395 is admitted /

14     BY MR. ROTH:

15     Q    What did you have in your plate carrier?

16     A    Ceramic plates.

17     Q    I will go back then.  What is the purpose of the ceramic

18     plates in your plate carrier?

19     A    To stop bullets.

20     Q    All right.  So we call this a plate carrier, but

21     essentially a bullet proof vest?

22     A    Yes.

23             MR. ROTH:  May I approach the witness, Your Honor?

24             THE COURT:  Yes.

25     BY MR. ROTH:

1   Q    I am going to show you what's marked as Proposed Exhibit

2   394.  Do you recognize this item?

3   A    Yes.

4   Q    Is this your gun?

5   A    Yes.

6        MR. ROTH:  Your Honor, I'd move for the admission of

7   Proposed Exhibit 394?

8        THE COURT:  All right.  Hearing no objections it's

9   admitted.

10  BY MR. ROTH:

11  Q    What kind of gun is this, sir?

12  A    It's an AR-15.

13  Q    When did you get this?

14  A    In the summer of 2020.  I don't -- I pieced it together

15  over time.

16  Q    Starting in the summer of 2020?

17  A    Yes.

18  Q    Is this the gun that we saw Daniel Harris firing in that

19  video?

20  A    Yes.

21  Q    Talk about pieced it together.  What after market items

22  have you added to this?

23  A    Pretty much everything.

24  Q    Tell me about that?

25  A    So I bought the lower receiver.  That is the really only

1    part of that gun that you need a background check for.  And

2    then I bought every other piece on it separately and put it

3    together.

4    Q    What is a lower receiver?

5    A    The lower receiver is -- so you have the tan grip.  You

6    have basically right where your hand is, that is the lower

7    receiver.

8    Q    Everything else you got and put together?

9    A    Yes.

10           MR. ROTH:  Very good.  May I approach, Your Honor?

11           THE COURT:  Sure.

12   BY MR. ROTH:

13   Q    I show you what's marked as Proposed Exhibit 393.  Do you

14   recognize this item?

15   A    Yes.

16   Q    What is this?

17   A    My handgun.

18   Q    All right.  Was this the gun that you had with you on the

19   7th or was this at home?

20   A    That was the one I had with me on the 7th.

21           MR. ROTH:  Your Honor, I'd move for the admission of

22   Proposed Exhibit 393?

23           THE COURT:  Hearing no objections it's admitted.

24   BY MR. ROTH:

25   Q    Could you tell the jury about this gun?

1    A    It's a Glock 19.  It has a light on the bottom of it and a

2    red dot site on top.

3    Q    Were those again things that you added?

4    A    Yes.

5              MR. ROTH:  May I approach, Your Honor?

6              THE COURT:  Yes.

7    BY MR. ROTH:

8    Q    I am going to show you Proposed Exhibits 398.  It's two

9    boxes.  Recognize that?

10   A    Yes.  I do.

11   Q    And that one as well?

12   A    Yes.  I do.

13   Q    What are those items?

14   A    Those are the ghost guns.

15             MR. ROTH:  Your Honor, I'd move for the admission of

16   Proposed Exhibits 398?

17             THE COURT:  Hearing no objections they are admitted.

18   BY MR. ROTH:

19   Q    Did you ever end up doing the deal for the ghost guns?

20   A    No.

21   Q    Why not?

22   A    I was arrested.

23   Q    What stage of completion were the ghost guns in?

24   A    A hundred percent complete.

25   Q    Who did that?

1     A    Ty Garbin.

2     Q    What kinds of guns were these?

3     A    Glock 19s.

4     Q    What caliber?

5     A    Nine millimeter.

6     Q    Were any other guns in your home?

7     A    Yes.

8     Q    What other kinds?

9     A    There was a Springfield 1911, a Sig Sauer PT 38, another

10    AR-15 rifle.  Actually, two AR-15 rifles, and I believe that's

11    it.

12            MR. ROTH:  May I approach, Your Honor?

13            THE COURT:  Sure.

14    BY MR. ROTH:

15    Q    I am going to show you what's marked as Proposed Exhibit

16    396.  Do you recognize this?

17    A    Yes.  I do.

18    Q    Is this your shirt, sir?

19    A    Yes.

20            MR. ROTH:  Move for the admission of Proposed Exhibit

21    396?

22            THE COURT:  Hearing no objections it's admitted.

23    BY MR. ROTH:

24    Q    What is this item, sir?

25    A    My shirt.

1   Q   Hawaiian shirt?

2   A   Yes.

3   Q   Did you get this after joining the Wolverine Watchmen?

4   A   Yes.

5   Q   Did you also buy night vision goggles?

6   A   Yes.  I did.

7   Q   Was that also in the summer of 2020?

8   A   Yes.  It was.

9   Q   How much did they cost?

10  A   I want to say $3600.

11  Q   About how much were you making annually from your job?

12  A   I made I want to say 16.50 an hour.

13  Q   You were working full time?

14  A   Yes.

15  Q   Throughout this time in 2020, who was it who was most

16  pushing the plan to kidnap the governor?

17  A   Adam Fox.

18  Q   And despite him pushing the plan, was your decision still

19  voluntary to agree to it?

20  A   Yes.

21  Q   And when the day came to kidnap the governor, what was your

22  role going to be?

23  A   I was going to be an operator.

24  Q   What did that mean to you?

25  A   That I would be one of the people on the front line so to

```
 1     speak using my gun.

 2     Q    The front line is her home?

 3     A    Yes.

 4     Q    What was Daniel Harris's role going to be?

 5     A    He would have been with me.

 6     Q    Brandon Caserta?

 7     A    He would have been with me.

 8     Q    Ty Garbin?

 9     A    He would have been with me.

10     Q    Adam Fox?

11     A    I was unsure.

12     Q    Barry Croft?

13     A    He discussed attacking her security detail.

14     Q    What did he say he was going to use to attack her security

15     detail while you guys were at the house?

16     A    He said he would use the grenade launcher that he had and

17     that he would -- he was discussing mounting a machine gun on

18     top of a truck.

19     Q    Do you know what the word entrapment means?

20     A    Yes.  I do.

21     Q    Is it something that you and your attorney have discussed

22     extensively during this case?

23     A    Yes.  It is.

24     Q    Were you entrapped into committing --

25               MR. GIBBONS:  Objection, Your Honor.  I think it calls
```

1      for a conclusion.

2              THE COURT:  Well, he is certainly able to explain and

3      express the view that he has, whether he was entrapped in his

4      understanding of the view.  Go ahead.

5      BY MR. ROTH:

6      Q    Were you entrapped into joining the plan to kidnap the

7      governor?

8      A    No.  I was not.

9      Q    Whose decision was it?

10     A    Mine.

11     Q    Did you see anybody else forced to join the plan?

12     A    No.  I did not.

13     Q    Did you see anybody else entrapped into joining the plan?

14             THE COURT:  I think that is something that the jury is

15     going to have to decide and I don't think that he should give

16     his opinion on that.

17             MR. ROTH:  Thank you, Your Honor.

18     BY MR. ROTH:

19     Q    During various points during the summer of 2020, have you

20     spoken to each of these Defendants individually?

21     A    Yes.

22     Q    Did you speak to each of them individually about the plan

23     to kidnap the governor?

24     A    Yes.

25     Q    How did Barry Croft feel about kidnapping the governor?

1      MR. BLANCHARD:  Objection, Your Honor.  Calls for
2   speculation.  It goes to my client's mind.
3      THE COURT:  How long are you going to be?  I know
4   you're trying --
5      MR. ROTH:  A minute and-a-half.
6      THE COURT:  Go ahead.
7   BY MR. ROTH:
8   Q   What did Barry Croft say about how he felt about kidnapping
9   the governor?
10  A   He said that he felt that we had the right to do it based
11  on what the constitution said.
12  Q   What did Brandon Caserta say about his willingness to
13  commit the -- kidnap the governor?
14  A   He also said that he felt that the constitution gave us the
15  right to do that.
16  Q   What did Daniel Harris tell you about his willingness to
17  kidnap the governor?
18  A   When we were hiking we discussed it and we made plans for
19  it.
20  Q   What did Adam Fox say to you about his willingness to
21  kidnap the governor?
22  A   He felt that the COVID restrictions were tyrannical and
23  that the constitution gave him the right to handle that.
24  Q   About how many times did Adam Fox tell you about that
25  desire to kidnap the governor?

1    A    Every time I saw him.

2              MR. ROTH:  I have nothing else, Your Honor.  Thank

3    you.

4    ***************************************************************

```
 1                              INDEX

 2
        Government Witnesses:                    Page
 3
        TY GARGIN
 4
         Cross Examination(Cont.) by Ms. Kelly      3
 5       Cross Examination by Mr. Hills            45
         Cross Examination by Mr. Blanchard        81
 6       Redirect Examination by Mr. Kessler      119
         Recross Examination by Mr. Gibbons       134
 7       Recross Examination by Ms. Kelly         135
         Recross Examination by Mr. Hills         137
 8
        KALEB FRANKS
 9
         Direct Examination by Mr. Roth           139
10

11      Exhibits:                              Admitted

12      Government's Exhibit 129                   170
          (Chat, July 28)
13      Government's Exhibit 145                   181
          (Chat, August 10)
14      Government's Exhibit 165                   186
          (Chat, August 23)
15      Government's Exhibit 166                   186
          (Chat, August 23)
16      Government's Exhibit 221                   195
          (Video, Luther Shooting)
17      Government's Exhibit 235                   205
          (Photograph, VFW Hall)
18      Government's Exhibit 253                   216
          (Audio, September 23)
19      Government's Exhibit 256                   211
          (Audio, September 13)
20      Government's Exhibit 257                   211
          (Audio, September 13)
21      Government's Exhibit 270                   193
          (Audio, Ghost Gun)
22      Government's Exhibit 271                   193
          (Audio, Ghost Gun)
23      Government's Exhibit 388                   222
          (Photograph, Franks' House)
24      Government's Exhibit 389                   222
          (Photograph, Franks' House)
25      Government's Exhibit 390                   222
          (Photograph, Franks' House)
```

1    Government's Exhibit 391              222
      (Photograph, Franks' House)
2    Government's Exhibit 393              225
      (Franks' Handgun)
3    Government's Exhibit 394              224
      (Franks' AR-15)
4    Government's Exhibit 395              223
      (Franks' Plate Carrier)
5    Government's Exhibit 396              227
      (Franks' Shirt)
6    Government's Exhibit 398              226
      (Franks' Ghost Gun)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE


    I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



                         /s/ Paul G. Brandell
                         Paul G. Brandell, CSR-4552, RPR, CRR
                         U.S. District Court Reporter
                         399 Federal Building
                             Grand Rapids, Michigan  49503