```
 1                   IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE WESTERN DISTRICT OF MICHIGAN

 3                            SOUTHERN DIVISION

 4       UNITED STATES OF AMERICA,

 5                   Plaintiff,           No:  1:20cr183-1/2/5/6

 6         vs.

 7       ADAM DEAN FOX,
         BARRY GORDON CROFT, JR.,
 8       DANIEL JOSEPH HARRIS and
         BRANDON MICHAEL-RAY CASERTA,
 9
                     Defendants.
10

11
         Before:
12
                         THE HONORABLE ROBERT J. JONKER
13                            U.S. DISTRICT Judge
                              Grand Rapids, Michigan
14                            Wednesday, March 9, 2022
                              Excerpt Jury Trial Proceedings
15                            Testimony of Todd Reineck

16       APPEARANCES:

17                       MR. ANDREW BIRGE, U.S. ATTORNEY
                         By:  MR. NILS R. KESSLER
18                       MR. JONATHAN C. ROTH
                         The Law Building
19                       333 Ionia Avenue, NW
                         Grand Rapids, MI 49501-0208
20                       (616) 456-2404

21                             On behalf of the Plaintiff;

22                       MR. CHRISTOPHER M. GIBBONS
                         MS. KAREN M. BOER
23                       Dunn Gibbons PLC
                         125 Ottawa Avenue, NW, Suite 230
24                       Grand Rapids, MI 49503-2865
                         (616) 336-0003
25
                               On behalf of Defendant Fox.
```

```
 1                        JOSHUA ADAM BLANCHARD
                         Blanchard Law
 2                       309 South Lafayette Street, Suite 208
                         P.O. 938
 3                       Greenville, MI 48838-1991

 4
                                  On behalf of Defendant Croft, Jr.
 5
                         JULIA ANNE KELLY
 6                       Willey & Chamberlain LLP
                         300 Ottawa Avenue NW Suite 810
 7                       Grand Rapids, MI 49503-2314
                         (616) 458-2212
 8
                                  On behalf of Defendant Harris.
 9
                         MICHAEL DARRAGH HILLS
10                       Hills at Law PC
                         425 South Westnedge Avenue
11                       Kalamazoo, MI 49007-5051
                         (269) 373-5430
12
                                  On behalf of Defendant Caserta.
13

14      REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

```
1        *************************************************************
2                      TODD REINECK, GOVERNMENT
3                      having been first duly sworn, testified as follows:
4               (Witness sworn, 12:23 p.m.)
5                           DIRECT EXAMINATION
6        BY MR. KESSLER:
7        Q    Good afternoon, Agent Reineck.
8        A    Good afternoon.
9        Q    You are a special agent with the FBI, correct?
10       A    That's correct.
11       Q    How long have you been working with the FBI?
12       A    For 16 years.
13       Q    And you work in the Ann Arbor residence agency, is that
14       correct?
15       A    That's correct.
16       Q    How long you been there?
17       A    Just a little over two.
18       Q    And before you worked for the FBI you were a mechanical
19       engineer for Ford Motor Company, correct?
20       A    That's correct.
21       Q    What are your current duties?
22            THE COURT:  And you can avoid getting a crick in your
23       neck because you are going to get that if you keep jerking
24       towards the microphone.  Pull the microphone closer in front of
25       you and you'll be able to go home without aches and pains.
```

1          THE WITNESS:  Thank you.

2     BY MR. KESSLER:

3     Q    What are current duties?

4     A    So when I -- so right now I am assigned to violent crime

5     and violent gangs.

6     Q    At the time of this investigation back in 2020, around that

7     time what were you doing back then?

8     A    At that point I was assigned to the counter terrorism

9     program working domestic terrorism cases and international

10    terrorism cases.

11    Q    So both domestic and international?

12    A    Correct.

13    Q    Let's talk a little bit about the kinds of cases the FBI

14    handles.  You have five major branches, is that right?

15    A    That's correct.

16    Q    What do they do?

17    A    So we have a criminal.  We have a counter-terrorism.  We

18    have counter-intelligence, cyber, and I'm blanking now, but we

19    have an intelligence group as well.

20    Q    Okay.  Now, specifically on the terrorism one that you were

21    assigned to for a while, can you just very briefly tell the

22    jury what the difference is between the international terrorism

23    and domestic terrorism cases?

24    A    Sure.  International terrorism cases are cases where a

25    subject has some kind of connection to a designated terrorist

1    organization for, from overseas outside of our country.

2    Q    Would that be something like ISIS or al-Qaeda?

3    A    Correct.  Yes.

4    Q    Okay.

5    A    And domestic terrorism is from within the United States.

6    Q    And you did that for about six years, is that right,

7    domestic terrorism cases?

8    A    Yeah.  I think I was assigned somewhere around 2014 or

9    2015.

10   Q    We've already heard a little bit in this courtroom about

11   the militia movement.  Has that been part of your purview,

12   looking into domestic terrorism cases?

13   A    Yes.

14   Q    And how long has the militia movement been going on?  Is it

15   a new thing?

16   A    No.  It's not a new thing.

17   Q    Okay.  Most of these militias that the FBI might look at,

18   are they under any kind of official control or are they like

19   the National Guard, that kind of thing?

20   A    No.

21   Q    Okay.  So these entirely are private organizations?

22   A    Correct.

23   Q    And I want to get something out of the way.  It's not

24   illegal in order to belong to a militia, is that correct?

25   A    That's correct.  It's not.

1    Q    The government doesn't just open cases against militias

2    just for people being part of one?

3    A    No.  We do not.

4    Q    All right.  What kinds of criteria do you look at when you

5    decide when the FBI is going to open a case?

6    A    We have to look at a few factors.  One of them is the

7    potential use of force or violence in furtherance of an

8    ideology or belief system.  And it has to involve a potential

9    federal violation, a federal law.

10   Q    Okay.  So if it was a state violation you wouldn't be

11   looking at that?

12   A    Correct.

13   Q    Okay.  Let's go back to early 2020.  Were you assigned to

14   be specifically investigating Ty Garbin?  The jury has heard

15   his name already.

16   A    Yes.

17   Q    Okay.  He is one of the two Defendants from this conspiracy

18   who pled guilty earlier, correct?

19   A    That's correct.

20   Q    Were there other agents assigned to other Defendants?

21   A    Yes.

22   Q    Okay.  But you all worked together, right?

23   A    Correct.  We all coordinate.

24   Q    What makes the FBI decide to start looking -- you talked a

25   little bit about the things you were looking at, but what makes

1   you start looking at a particular person or group?

2   A    Well, I mean, the information has to come into the bureau

3   first, and so then we -- that gets assigned to somebody to look

4   at it, and we kind of do an assessment, and if we feel that

5   there is enough justification to open a case on somebody then

6   we would open a case on them.

7   Q    All right.  And let me ask you about what would justify

8   that, because we just heard from one of my colleagues the

9   notion that the FBI opened a case on somebody because he said

10  mean words about the FBI on the Internet.  Would that qualify

11  for the FBI to open a case on someone?

12  A    No.  It would not.

13  Q    Okay.  You don't take that personally, right?

14  A    No.

15  Q    Okay.  Do you open a case often because you get a tip from

16  the outside?

17  A    Yes.

18  Q    And what kinds of people or organizations might bring a tip

19  or a case to the FBI's attention?

20  A    So we get tips in a lot of different ways.  It can be

21  anybody in the public can walk in or call in or e-mail into tip

22  lines.  We get tips in from our law enforcement partners.  We

23  get tips from confidential informants that we already have

24  working.  And we also gather information on other

25  investigations that run into, you know, additional information.

1    Q    Okay.  In this particular case, going back to early 2020,

2    did you all get a tip from a member of the public?

3    A    Yes.  We did.

4    Q    And how did that happen?

5    A    It was a walk in I believe.  They came into our Flint

6    resident agency.

7         MR. KESSLER:  Okay.  And Your Honor, I just want to

8    make sure, because this is the first time we are doing exhibits

9    here.  I can ask him to look in the book at the exhibit before

10   I publish anything or if the Court wants me to try we can try

11   with the system.  We can show it to the witness only first.

12        THE COURT:  Well, start with the book.  I guess we can

13   try the projection.  The problem with --

14        MR. KESSLER:  I just want to make sure I don't publish

15   anything for the jury.

16        THE COURT:  Put something on your connection just so I

17   can try.  Not the exhibit.  Just something.

18        MR. KESSLER:  And Your Honor, this is a good one to

19   test it with.  It's just a driver's license photo.

20        THE COURT:  Try something on it.

21        MR. KESSLER:  Let's start 423, please.

22        THE COURT:  It's not showing up.  There we go.  All

23   right.  All right.  Is it showing up on your screens, Counsel?

24        MR. BLANCHARD:  It was for a moment and it

25   disappeared.

1      THE COURT:  It disappeared.  All right.  So this is

2  queueing everything.  So let's go with the book for now and

3  let's see if we can figure this out later.

4  BY MR. KESSLER:

5  Q    One of them says transcripts.  That's not the one we are

6  looking for right now.  The other one we are looking for is

7  Exhibit 423, and let me know when you found it.

8  A    What was the number again?

9  Q    423.

10  A    Okay.

11  Q    Okay.  So as long as you have it open let's take a look at

12  423 through 428.  It's a series of photographs.

13  A    Okay.

14  Q    Okay.  Do you recognize those photographs?

15  A    Yes.  I do.

16  Q    Okay.  Did you pull those photographs yourself?

17  A    I did not pull them myself.

18  Q    But they are from an official government database?

19  A    That's correct.

20  Q    Driver's license photos?

21  A    Correct.

22      MR. KESSLER:  I'd like to offer those, Your Honor?

23      THE COURT:  Any objections 423 to 428?

24      MR. HILLS:  None, Your Honor.

25      MS. KELLY:  No.

1          MR. BLANCHARD:  No.

2          MR. GIBBONS:  No.

3          THE COURT:  They are all admitted then.

4    BY MR. KESSLER:

5    Q    Let's take 423 first.

6          THE COURT:  I really did it, didn't I?  It's not

7    showing up on anybody's screen right now, is it?  Starts back

8    to what I said in the voir dire.  When I was trying cases all I

9    needed was an extra light bulb for my overhead projector and

10   that was it.  You know, it would almost invariably blow.  That

11   was then an easy fix, and now when you get all the fancy

12   equipment and put this in the hands of somebody old like me,

13   things just stop working when you most want them to go.  So

14   hopefully either Brad, if he is listening, or Mitch, will hear

15   it.  So we didn't even need Brad or Mitch because Mr. Brandell

16   is young enough to do this on his own.  Thank you.  Sorry for

17   that delay.  Go ahead.

18   BY MR. KESSLER:

19   Q    Okay.  I just want to walk through the Defendants and let

20   everybody get familiar with them.  Who are he looking at here,

21   Agent Reineck?

22   A    It's Ty Garbin.

23   Q    Okay.  Let's go to 424.

24   A    Brandon Caserta.

25   Q    Okay.  425, please?

1    A    Barry Croft.

2    Q    Okay.  426?

3    A    Adam Fox.

4    Q    427?

5    A    Kaleb Franks.

6    Q    Okay.  And 428?

7    A    Dan Harris.

8    Q    Okay.  Thank you.  All right.  Let me talk a little bit

9    with you about the tools that you use to investigate a case.

10   First off we've already heard a little bit in opening

11   statements about confidential human sources or CHS.  Is that

12   the same thing as what people might hear on TV like a CI,

13   confidential informant?

14   A    Yes.

15   Q    How might someone like that come to work for the FBI?

16   A    Well, it can be somebody that comes in to provide

17   information that agrees to work with us.  It could be somebody

18   that we look for and target in an organization and try to

19   recruit.

20   Q    Okay.  Do they have different motives?

21   A    Yes.

22   Q    All right.  So you mentioned some of them just come in and

23   want to help.  Sometimes people are in trouble?

24   A    Correct.

25   Q    So somebody might be charged with a crime and wants to kind

1    of work it off?

2    A    Correct.

3    Q    And sometimes people do it for money, right?

4    A    Correct.

5    Q    Okay.  Let's talk about what happens when you are signing

6    up a confidential human source.  Do you give them what's called

7    admonishments?

8    A    Yes.

9    Q    And what are those?

10   A    Basically they are rules that the source would have to

11   agree to to continue a relationship with an FBI handler.

12   Q    Okay.  What are some of the main rules that they have to

13   agree to?

14   A    That they have to be truthful with the handling agent.

15   That their cooperation is completely voluntary.  That they

16   can't take independent action on behalf of the government.

17   They take, you know, taskings and directions from the handling

18   agents.

19   Q    They can't commit crimes while they are working?

20   A    Correct.  They cannot commit crimes.

21   Q    And they are supposed to report things back to you, right?

22   A    Correct.

23   Q    All right.  Now, we mentioned that sometimes people do it

24   for money.  Are there people who don't do it more money but

25   they also get reimbursed?

1    A    Yes.

2    Q    Are there sometimes expenses that are required as part of

3    being a confidential human source?

4    A    Yes.

5    Q    What kinds of things might the FBI reimburse a source for?

6    A    So a source could be reimbursed for gas if they have to

7    drive, you know, to go somewhere that we task them to go.  That

8    could include a hotel stay.  It could be for meals that they

9    might have to incur while they are doing things that we asked

10   them to do.

11   Q    And if you asked them to do something while they would

12   otherwise be working, can they get reimbursed for lost wages?

13   A    I don't know if we pay them directly back for lost wages.

14   Q    Okay.  So it might not be penny for penny, but some kind of

15   compensation for that?

16   A    Correct.  Yes.

17   Q    Okay.  Do they also sometimes have to be given tools for

18   their job like recording devices?

19   A    Yes.

20   Q    Okay.  How about cell phones?

21   A    Yes.

22   Q    Laptops?

23   A    Possibly, yes.

24   Q    Okay.  So those things all can be covered?

25   A    Correct.

1    Q    And then they can actually also be paid like actual

2    compensation for their time, right?

3    A    That's correct.  Yes.

4    Q    I want to ask about the primary duties of a confidential

5    source.  Would you say collecting information is one of their

6    primary duties?

7    A    Yes.

8    Q    And what sorts of tools would they use to do that?

9    A    That a source would use?

10   Q    To make recordings for example.

11   A    Yeah.  So I mean, if we ask a source to record information,

12   record a meeting, we would provide them with some type of a

13   recording device.

14   Q    And is there only one kind or do you have multiple kinds?

15   A    No.  We have many different kinds.

16   Q    Okay.  In order for somebody to be effective as a

17   confidential human source they have to earn people's trust,

18   don't they?

19   A    Yes.

20   Q    Does that mean they sometimes have to pretend to be

21   criminals?

22   A    Yes.

23   Q    And have to pretend to agree with the aims of criminals?

24   A    That's correct.

25   Q    But they would be pretending, right?

```
1    A    Yes.  They would have to be in an acting role to fit in.
2    Q    Okay.  If somebody was supposed to be a source and giving
3    you information on what's going on, it wouldn't last very long
4    if they said stop, guys, that's not cool, right?
5    A    Correct.
6    Q    What's an undercover employee or an UCE?  Is that
7    different?
8    A    It is different.  An undercover employee is an actual
9    employee of the federal government or of the FBI.  It's usually
10   a special agent that is -- that has more advanced training for
11   that undercover.  We have a very stringent and difficult
12   undercover school that they have to pass.
13   Q    Okay.  So somebody who has been qualified to be an
14   undercover, they can't just walk up to an organization all the
15   time, right?
16   A    No.  Not always.  No.
17   Q    Sometimes they can, right?
18   A    Sometimes.
19   Q    And how might that work?  Could somebody just sign up on
20   the Internet for a militia or something or try?
21   A    I mean, if you could do that you would then -- an
22   undercover would be able to do that, but if not, then they
23   wouldn't gain access that way.
24   Q    All right.  And if that wasn't going to work how would they
25   normally gain access?
```

1  A    A lot of times it's to be invited in through somebody

2  that's already a vetted member of that organization.

3  Q    Okay.  So somebody who is already on the inside would

4  introduce them as a friend or something?

5  A    Correct.

6  Q    And vouch for them?

7  A    Correct.

8  Q    Okay.  Now, what would be the purpose -- if you already

9  have a confidential human source working inside an

10  organization, what would be the purpose of bringing in an

11  undercover FBI agent?

12  A    Well, an undercover -- an undercover agent, we already know

13  what their motivations are for sure, whereas in a source

14  sometimes, you know, you -- their motivations may change.  It

15  may not.  So there is some risk verse reward with sources.  So

16  it's a common practice when we have a source to have them

17  introduce an undercover employee.

18  Q    Okay.  Because you don't want to necessarily pick the

19  sources, right?  Sometimes they come to you?

20  A    That's correct.

21  Q    With their own baggage?

22  A    That's correct.

23  Q    Okay.  Now, you mentioned that the undercover -- undercover

24  agents have got more training.  They've got that stringent

25  training.  Would you also introduce them to control a

1    potentially dangerous situation?

2    A    Yes.  For sure.

3    Q    What kind of situation do you think it would be really

4    important to have an undercover in?

5    A    So if an organization is talking about acquiring explosives

6    we can use an undercover to be that explosives person.  That

7    way real live explosives aren't put into somebody's hands.

8    Q    Okay.  So you want to make sure that if the group is trying

9    to get bombs or make bombs they are getting them from you so

10   you can make them inert, right?

11   A    Correct.  Yes.

12   Q    Okay.  You mentioned a minute ago that somebody, whether

13   they are a CHS or an UCE, they sometimes have to pretend to be

14   criminals, right?

15   A    Correct.

16   Q    Everybody is looking at you and you've got short hair and

17   you are clean shaver and you are wearing a dark suit and a

18   white shirt and a tie, which is kind of textbook FBI agent,

19   right?  Do people who are working as undercover or UCE have to

20   look different?

21   A    Yes.  They have to look like the people they are trying to

22   fit in with.

23   Q    Okay.  And the FBI gives them the permission to depart from

24   the standard look that you are sporting today, right?

25   A    That's correct.

1    Q    So we are going to see some undercover FBI agents testify

2    here.  They are not going to look like you necessarily, right?

3    A    Probably not.

4    Q    What kinds of things might they be given permission to do

5    to change there appearance to fit in?

6    A    They might have long beards, long hair, tattoos.  I mean,

7    whatever it takes to fit in.

8    Q    Okay.  So we talked about informants.  Let's talk about

9    electronic communications a little bit.  Everybody is familiar

10   with regular e-mail and SMS text messages like you have on your

11   phone, right?

12   A    Right.

13   Q    Can the FBI obtain the content of those messages from

14   service providers with a search warrant?

15   A    Yes.

16   Q    Okay.  And you did some of that in this case, correct?

17   A    Yes.

18   Q    And we've heard a little bit already about encrypted

19   messaging applications.  Now, encrypted message application,

20   what's called end-to-end encrypted, like some of the ones

21   mentioned here, Signal, Wire, Threema, does the FBI get the

22   content of those messages from a service provider?

23   A    No.

24   Q    So what's the only way to get the content of those

25   messages?

A    To actually be a party on either end of that where the

encryption is broken down so you can see the content.

Q    So the only way you can get in there is to have a human

source or an undercover agent actually become part of the

groups, right?

A    Right.

Q    Otherwise it would be dark to you and you wouldn't know

what people are planning?

A    That's correct.

Q    You mentioned a couple.  We talked about a couple of the

people you are familiar with, WhatsApp, Telegram, that kind of

thing.  We have heard Wire and Threema.  Those are similar,

correct?

A    Right.

Q    Can they do more than just text?

A    Yeah.  They can do -- they can send messages.  They can

send audio messages.  I think they can do video, audio calls.

Q    Okay.  And you can do audio and video recordings and send

those, as well?

A    Correct.

Q    Okay.  I want to get another thing out here and clear.  The

using encrypted applications also is not illegal all by itself,

right?  Lots of people use them?

A    That's correct.

Q    Okay.  It's what you do that matters, right?

1    A    Correct.

2    Q    That's what you look at?

3    A    Right.

4    Q    So you mentioned that the only way in these groups is to,

5    like, actually -- the only way in those messages is to actually

6    get somebody in.  We've heard about somebody named CHS Dan.

7    The jury will hear him testify.  Did he actually have access to

8    this group's encrypted messages?

9    A    He did.  Yes.

10   Q    Okay.  And how did you get the content then?

11   A    He came into the FBI and provided consent for us to have

12   access to that account.

13   Q    Okay.  So basically put you on the account so you could see

14   what he was doing?

15   A    Correct.

16   Q    In some cases do those messaging applications self delete

17   after a certain amount of time?

18   A    They can be set up to self delete.  Yes.

19   Q    Okay.  What would you do in a case like that to preserve

20   those messages before they actually self delete off someone's

21   phone?

22   A    So we would save those.  Then we would have to go in and

23   retrieve those on a regular basis and capture them before they

24   deleted.

25   Q    Okay.  So the jury is going to see a bunch of screen shots.

1    That's what you did basically?

2    A    Correct.

3    Q    Let's talk about search warrants.  We just mentioned --

4    touched on it briefly, that you can use a search warrant to get

5    electronic communications content from a service provider.  So

6    let's talk about that.  Everybody is familiar with FaceBook.

7    We talked about it during the jury selection.  Can you get

8    content from social media providers like FaceBook using a

9    search warrant?

10   A    Yes.  You can.

11   Q    In your experience as a domestic terrorism investigator, do

12   people and militias and potential terrorist groups use things

13   like FaceBook to recruit?

14   A    Yes.

15   Q    Okay.  Now, those are more open, right?  So is that usually

16   at the beginning part of the process?

17   A    Yes.  That's correct.

18   Q    And then people switch to the more encrypted or closed

19   applications?

20   A    Correct.

21   Q    All right.  Now, FaceBook in particular, can people do the

22   same thing there, send text messages, video and audio over

23   FaceBook?

24   A    Yes.

25   Q    All right.  And you can use search warrants to search

1   physical locations, too.  This is the old school traditional

2   thing, right?

3   A    Correct.  Residences, cars.

4   Q    So that's like what people see on TV where you are wearing

5   your windbreaker and you guys go into somebody's office or

6   whatever and come out with boxes?

7   A    Correct.

8   Q    So let's talk a little bit about how you open a case.  You

9   have talked about some of the tools that we have here.  What is

10  predication?

11  A    It's basically the information that we have that

12  articulates the need for opening a case, right?  So like, I

13  talked about in a domestic terrorism case where we need, you

14  know, some use of force or violence for an ideology and a

15  potential federal violation.  So the predication for the

16  opening would be the facts that substantiate those pieces of

17  that.

18  Q    Okay.  So it can't be just on -- based on a feeling like

19  you don't like somebody, right?

20  A    No.  The cases going up through multiple levels of

21  management for approval and reviews of that are to make sure

22  that that's there.

23  Q    So you have to have a factual basis to believe that a crime

24  or a national security threat exists?

25  A    That's correct.

Q    Once you have a case predicated and approved through all those levels, does that authorize the use of the tools we were talking about for the last couple minutes?

A    That's correct.  Yes.

Q    So that's confidential human sources, undercovers, and search warrants, right?

A    Correct.

Q    All right.  Let's talk about this case specifically.  You opened this back in the spring of 2020, is that right?

A    Correct.

Q    And did the FBI execute search warrants on FaceBook accounts owned by or operated by the Defendants in this case?

A    Yes.  We did.

        MR. KESSLER:  Okay.  I'd like to start getting into those now, Your Honor.  I don't know if the Court wants us to introduce the certifications of authenticity or if we are not going to have objections we can just move right into them.

        THE COURT:  What are the exhibit numbers you are looking for?

        MR. KESSLER:  I am going to start with Exhibit 435.  We have quite a few, Your Honor, and everything I'm going to cover with this witness for pretty much the rest of this examination is going to come from FaceBook.

        THE COURT:  All right.  So what numbers did you say you are starting with?

1          MR. KESSLER:  435, 437 and 438.

2          MR. BLANCHARD:  I don't have a 435 in my book.

3          MR. KESSLER:  That's a video, Your Honor.

4          THE COURT:  It is.  435 is a video you are trying to

5     get.  Not the certification itself but the actual FaceBook

6     content?

7          MR. KESSLER:  I have the certifications marked as

8     Exhibit 1 if the Court wants them or if everybody is satisfied.

9          THE COURT:  So let's start with 435.  Do you stipulate

10    to that admission, Mr. Gibbons, or do you want a foundation

11    from the government and a ruling?

12         MR. GIBBONS:  435, Your Honor?

13         THE COURT:  Right.  Why don't we do this.  While you

14    are looking at it why don't you go to the certification,

15    Exhibit 1.  Is there any objection from the Defense to the

16    admission of the FaceBook certification?

17         MR. BLANCHARD:  I don't think the certification

18    complies with 28 USC 1746 because it has qualifying language at

19    the end that I think renders it nonapplicable.

20         THE COURT:  We'll look at this.  Subject to that any

21    other objections?

22         MR. HILLS:  No other objections.

23         MS. KELLY:  No other objections.

24         MR. GIBBONS:  No other objections.

25         THE COURT:  Go ahead if you want publish the

1    certifications so you can explain what it says.  And that's the

2    basis for your proposed admission of 435, is that it?

3           MR. KESSLER:  Actually for everything I'm going to

4    cover with this witness, Your Honor.

5           THE COURT:  Let's go to 435 next.  If the

6    certification is in are there any other objections to the

7    admission of 435, Mr. Gibbons?

8           MR. GIBBONS:  No, Your Honor, other than the

9    certification.

10          THE COURT:  All right.  Go ahead.  I'll admit 435.

11   We'll look at the certification, and that's in at least

12   provisionally and I'll let the government know if it needs to

13   do more to lay that foundation.  Go ahead.

14          MR. KESSLER:  Did you want me to put up the

15   certification itself?

16          THE COURT:  That's up to you.

17          MR. KESSLER:  It's a pile of paperwork.

18          THE COURT:  All right.  435 and 1 are in

19   provisionally, and if there is an issue with the certification

20   I'll deal with it later.  Go ahead.

21   BY MR. KESSLER:

22   Q    All right.  So Exhibit 435, you are familiar with that

23   video?

24   A    Am I familiar with?

25   Q    You have reviewed all the exhibits that we are covering

1    here today?

2    A    I have.  I just don't see which one it is.

3         MR. GIBBONS:  Your Honor, these were disclosed last

4    night.  I have not had a chance to review them.

5         THE COURT:  Were they part of the discovery?

6         MR. KESSLER:  Yes, Your Honor.  These have been out

7    for a long time.  They weren't disclosed last night.  The

8    Defense asked for a marked copy of all of our exhibits last

9    night, but these exhibits have been in the Defense's hands for

10   a long time.

11        THE COURT:  Right.  Okay.  Well, I'm going to admit

12   it.  I do think we certainly had access to these things before,

13   so go ahead.

14        MR. KESSLER:  With your permission I'd like to publish

15   435?

16        THE COURT:  All right.

17   BY MR. KESSLER:

18   Q    Is this Mr. Fox?

19   A    It is.

20   Q    And was this a video that was captured from his FaceBook

21   page?

22   A    Yes.  It was.

23             (Video started, 12:49 p.m.)

24             (Video stopped, 12:51 p.m.)

25   BY MR. KESSLER:

1   Q    Agent Reineck, what is the Boogaloo?  Have you heard of

2   that before?

3   A    Yes.  It is a reference to a second civil war.

4   Q    And have you heard it referred to other things like the Big

5   Igloo and the Big Luau?

6   A    Yes.

7   Q    Can you tell us how those names came about?

8   A    Yeah.  So FaceBook started shutting down accounts, Boogaloo

9   accounts because of the references to violence, and so in an

10  effort to be able to open accounts back up, instead of using

11  the term Boogaloo they would use these code words of Big Igloo

12  or Big Luau to hide from being shut down from social media.

13  Q    All right.  Let's take those one at a time.  The Big Igloo,

14  do you see anything as part of the iconography as part of these

15  groups?

16  A    Yes.

17  Q    The Big Luau, do Hawaiian shirts and Hawaiian patterns

18  figure in those a lot?

19  A    Yes.

20  Q    Let's take a look at Exhibit 437.

21       THE COURT:  Same issue.  Any independent objection

22  beyond the certification, Counsel, make sure you let me know,

23  otherwise you can proceed.  Any objections to 437 independent

24  of the certification?

25       MR. GIBBONS:  None, Your Honor.

1    THE COURT:  I hear none.  Go ahead.

2    BY MR. KESSLER:

3    Q    Thank you.  Bring up 437, please.

4         So is this the kind of image that we are talking

5    about?

6    A    Yes.

7    Q    So it says, for the record, Boogaloo 2020, because fuck you

8    that's why, and it has a picture of an igloo on a guillotine?

9    A    Correct.

10   Q    I'm only going to do one more of these, 438.

11        THE COURT:  It's admitted subject to the same issue.

12   BY MR. KESSLER:

13   Q    Okay.  Where did you get this one from?  Mr. Fox's account?

14   A    That's correct.  Yes.

15   Q    I'll read this one into the record.  It says, when tyranny

16   becomes law rebellion is duty, 1776.  So these groups that

17   you've looked at that talk about a second civil war or the

18   Boogaloo, do you see the 1776 theme come up a lot?

19   A    Yes.

20   Q    And other things associated with the American revolution,

21   like the Betsy Ross flag?

22   A    That's correct.

23   Q    And this yellow bandana around the skull, do you see that

24   kind of theme a lot as well?

25   A    Yes.

1   Q    We see on the forehead it has the roman numeral III

2   surrounded by 13 stars like in the Betsy Ross flag that's in

3   the emblem?

4   A    The III%ers.

5   Q    What are the III%ers?

6   A    It's another militia extremist group.

7   Q    Do they share a lot of common goals with people who are

8   into the Boogaloo?

9   A    They do.  Yes.

10  Q    All right.  I want to focus your attention on March 28th of

11  2020.  Another video.

12          Actually, we may as well keep it not too bright, Your

13  Honor.

14          THE COURT:  All right.

15  BY MR. KESSLER:

16  Q    Exhibit 3 is another video from Mr. Fox's account.  Give

17  everyone a chance to take a look.

18          THE COURT:  March 2020, same issue, any independent

19  objection?  None.  Go ahead.

20          MR. KESSLER:  Exhibit 3, please.

21          (Video started, 12:54 p.m.)

22          (Video stopped, 12:54 p.m.)

23  BY MR. KESSLER:

24  Q    All right.  And on April 30th, did you see some video that

25  Mr. Fox posted from the Capitol, Michigan State Capitol?

1    A    Yes.

2    Q    So Exhibit 6?

3            (Video started, 12:54 p.m.)

4            (Video stopped, 12:54 p.m.)

5            MR. KESSLER:  All right.  And let's not play it until

6    we make sure it's -- can I consider that one admitted, Your

7    Honor?

8            THE COURT:  Any independent objection?

9            MR. GIBBONS:  None, Your Honor.

10           THE COURT:  All right.

11   BY MR. KESSLER:

12   Q    So when we just looked at that, who do we see in the

13   foreground?

14   A    That was Adam Fox.

15   Q    Okay.  What was he wearing over -- he was wearing a

16   Hawaiian shirt, correct?

17   A    Correct.

18   Q    What was he wearing over the top of it?

19   A    A ballistic vest.

20   Q    You familiar with those in your line of work?

21   A    Yes.

22   Q    What's that for?

23   A    To stop bullets.

24   Q    Okay.  On May 2nd, did -- you also did search warrants for

25   Mr. Croft's account, correct?

1    A    Correct.

2    Q    We also have the certifications for those as part of

3    Exhibit 1.  Did Mr. Croft post things about the governor on his

4    FaceBook page?

5    A    He did.  Yes.

6    Q    Exhibit 11?

7         THE COURT:  And this is the same issue with the

8    certification?

9         MR. BLANCHARD:  I'm sorry?

10        THE COURT:  So Exhibit 11 is from the FaceBook chat

11   that's subject to the certification in Exhibit 1.  Any

12   independent objection?

13        MR. BLANCHARD:  Just the authenticity.

14        THE COURT:  Go ahead.  You can admit it then.

15        MR. KESSLER:  Bring up 11, please.

16   BY MR. KESSLER:

17   Q    Okay.  Let's see if we can blow up see if I can see it.

18   Okay.  Let's blow up this second paragraph right here if we

19   can.  And I'm going to read this text here.  It says, user

20   Gordon Croft.  Text, in Michigan police stood in front of the

21   people.  These governors need arrested.  I'll go.  Send me.  Do

22   you recall that?

23   A    Yes.

24   Q    Okay.  And let's see if I can get rid of that.  Can we put

25   it back up?  Okay.  And if you can blow up the last paragraph?

1    If you can -- can I get that green off of here?

2         THE COURT:  So the place you are used to clearing

3    isn't there anymore.  You have to do a menu.  Maybe I can do it

4    quicker here.

5         MR. KESSLER:  I had my younger colleague help me.

6         THE COURT:  All right.

7    BY MR. KESSLER:

8    Q    Posted 2020-05-03.  So that's May 3rd, 2020, he posted the

9    lock up your governor challenge.  Which of the beautiful

10   colonies is going to be the first to snatch a criminal bastard.

11   Do you recall that one?

12   A    Yes.  I do.

13   Q    Okay.  All right.  Let's take a look, go forward two days

14   to May 4th, Exhibit 12.

15        THE COURT:  Same issue?

16        MR. BLANCHARD:  Also, I think it contains hearsay that

17   is otherwise not admissible.

18        THE COURT:  Pardon me?

19        MR. KESSLER:  As to the hearsay objection, Your Honor,

20   it's admission of a party opponent under 801(d)(2).

21        MR. BLANCHARD:  I am talking about the other people

22   that are included Mr. Renner.

23        MR. KESSLER:  First off, we are not putting in anybody

24   else's statement for the truth of the matter asserted.  It's

25   all context.  We are only putting in the admissions of the

1     party opponent, Mr. Croft and Mr. Fox.

2               THE COURT:  I don't see any problem on a hearsay

3     front, so go ahead.

4     BY MR. KESSLER:

5     Q    Exhibit 12.  Okay.  And let's take a look at the parties

6     that are in the box just so everybody can see.  It says

7     FaceBook business record.  Can you blow up just under that

8     where it says page 1010, and then we can see whose account it

9     is?

10              The very first paragraph.  Maybe I can do it here.

11    This part.  So this is the account of Gordon Croft?

12    A    Correct.

13    Q    Let's clear that, and let's blow up that first box.

14              He says, on May 4th, 2020, I'll die in defense of the

15    constitution?

16    A    Correct.

17    Q    Let's clear that.  And then the second paragraph we can

18    blow that up, please.

19              I'll be in Columbia, South Carolina, on Friday.  They

20    say they want their governor in custody?

21    A    Correct.

22    Q    And the third paragraph, May 4th, 2020, I want to grab them

23    all and hold trial, a people's trial.  I don't trust the system

24    for justice.

25              Okay.  Now, let's talk about, you mentioned how they

1    can start communicating with each other over FaceBook, too.  So

2    they can talk to each other on FaceBook, right?

3    A    That's correct.

4    Q    On May 7th is there a text where Mr. Croft talks to

5    Mr. Fox?

6    A    Yes.

7         MR. KESSLER:  Can we bring up Exhibit 13 unless there

8    is objections?

9         THE COURT:  Any independent issue?  Any independent

10   issue?

11        MR. BLANCHARD:  Nothing new.

12        THE COURT:  Go ahead.

13   BY MR. KESSLER:

14   Q    And can we blow up the box there, please?

15        So we see the participants are who?

16   A    Adam Fox and Barry Croft.

17   Q    And what does Gordon Croft say there on May 7th, 2020 where

18   it says body?

19   A    Might I request a good call, sir.  (302) 300-0405.

20   Q    Let me just get those words in the exact right order.  I

21   think you said, may I request a call good sir, right?  I think

22   you said good call sir?

23   A    Might I request a call good sir, (302) 300-0405.

24   Q    Whose phone number is that?

25        MR. BLANCHARD:  Object to foundation.

1      THE COURT:  If you want to lay some foundation -- I

2  think you have established this individual has worked on the

3  investigation, but if you want to probe that further go ahead.

4  BY MR. KESSLER:

5  Q    As part of the investigation did you have to find out what

6  everybody's phone numbers are?

7  A    Yes.

8  Q    And you can do that through their service providers?

9  A    That's correct.

10  Q    And that was his phone number?

11      MR. BLANCHARD:  Object as to foundation again.

12      THE COURT:  It's admitted.  Go ahead.  That's

13  perfectly sufficient for foundation on something like that.

14  BY MR. KESSLER:

15  Q    Thank you.  Okay.  So he's given his him phone number at

16  this point.  Let's take a look at Exhibit 15.

17      THE COURT:  Any independent objection?

18      MR. BLANCHARD:  I don't have a 15 in my binder.

19      THE COURT:  It's a voice?

20      MR. KESSLER:  I'm sorry.  It is.

21      MR. BLANCHARD:  We got these again in the middle of

22  the night last night.

23      MR. KESSLER:  And again, Your Honor --

24      THE COURT:  You know, none of us want to hear you

25  sniping with each other.  That's not the point of this in

1    either direction.  Make it to facilitate to the extent you

2    preserve your individual objections.  Present the evidence you

3    need to do and we'll move through this quickly and then you can

4    snipe with each other at night when we're gone.  So what

5    exhibit are we talking about, 15?

6              MR. KESSLER:  15 Your Honor.

7              THE COURT:  Other than the Exhibit 1 issue any

8    objection?

9              MR. BLANCHARD:  I don't have anything else other than

10   I don't know what it is.

11             THE COURT:  Go ahead.  You can proceed.

12   BY MR. KESSLER:

13   Q    Did you get a voice message from that day, May 7th?

14   A    Yes.

15   Q    Okay.

16   A    I didn't get the voice message.

17   Q    Right.  There was one from FaceBook?

18   A    Correct.

19             (Recording started, 1:02 p.m.)

20             (Recording stopped, 1:02 p.m.)

21   BY MR. KESSLER:

22   Q    Okay.  Let me ask you about that.  Have you spent a lot of

23   time listening to recordings in this case?

24   A    Yes.

25   Q    And recordings specifically of these Defendants talking?

1    A    Yes.

2    Q    Do you recognize whose voice that was?

3    A    Yes.

4    Q    And whose was it?

5    A    Barry Croft.

6    Q    Now, he is talking about setting up a meeting and doing

7    things like having a random location that won't be disclosed

8    until the last minute.  Have you seen that sort of thing

9    before?

10   A    Yes.

11   Q    What is that?  What's going on?

12   A    Basically they are doing what's called operational security

13   to prevent being identified by law enforcement.

14   Q    Okay.  And does operational security also get called OPSEC

15   sometimes?

16   A    Yes.

17   Q    The short version of that?

18   A    Correct.

19   Q    Another -- let me take a look at a message in Exhibit 16.

20        THE COURT:  Any independent issue?  Go ahead.  Same

21   issue.

22   BY MR. KESSLER:

23   Q    16, please.  Okay.  So we just heard them talking about

24   operational security and they were planning a meeting

25   somewhere, right?

1    A    Yes.

2    Q    Can we blow that paragraph up, please?  Okay.  Someone

3    asks, are you coming to Ohio brother?  And Gordon Croft answers

4    what?

5    A    Yes.  Many are.

6    Q    And what does he say next?

7    A    Calling everyone who'll serve in.  We will be discussing

8    the patriot constitutional offensive.  We will be going in

9    soon.

10   Q    Okay.  So was there, in fact, a meeting planned for Ohio?

11   A    Yes.  There was.

12   Q    Okay.  And let's take a look at Exhibit 440.  There is a

13   message regarding that, correct?

14            THE COURT:  Is this the same FaceBook post or

15   FaceBook --

16            MR. KESSLER:  Yes, Your Honor.  All of it is.

17            THE COURT:  All right.  Any independent issue?

18            MR. GIBBONS:  The number again, Your Honor?

19            THE COURT:  440.

20            MR. GIBBONS:  Thank you.  None.

21            THE COURT:  Okay.  Go ahead.

22            MR. KESSLER:  Can we blow that up?

23            THE COURT:  Yup.

24   BY MR. KESSLER:

25   Q    Okay.  So this is May 7th of 2020.  Okay.  And Mr. Croft

says reply to a comment, yeah, be using it to huge meet in

Ohio.  Bringing all my rowdy friends.  Random location to be

determined.  No electronic devices.  Straight up men from 11

states talking about the ball tip.  Now, do you have any idea

what the ball tip is?

A    To me it sounds like the start of a basketball game or the

start of an operation.

Q    Okay.  And no electronic devices.  You just talked about

OPSEC.  Why would somebody be concerned about electronic

devices?

A    So that -- so that electronic devices couldn't be used to

record the conversation or other information that could be

gleaned from a phone or other electronic device.

Q    Okay.  So that's typical OPSEC.  No cell phones, that sort

of thing?

A    Correct.

Q    As a matter of fact, you and the FBI use the same thing,

right, whether you have to talk about classified materials

there is no phones allowed in a secured compartmentalized

facility, right?

A    That is correct.

Q    Okay.  Down below, same day, couple minutes actually it's

before it looks like, it says, Gordon Croft replies to a

comment, long time no see.  Got both accounts taken out for

talking about coming to Ohio and hanging DeWine.  Who is

1    DeWine?

2    A    I believe he is the governor.

3    Q    The governor of Ohio at the time?

4    A    Correct.  Yes.  Ohio.

5    Q    And so they were talking about hanging a different governor

6    back then in May?

7    A    Yes.

8    Q    Okay.  And after DeWine it says three explanation points

9    and a percentage sign.  Have you seen that in the text messages

10   before?

11   A    Yes.  A reference to III%.  III%ers.

12   Q    All right.  Let's fast forward then to May 12th.  I'd like

13   to show the video Exhibit 17.

14        THE COURT:  Any independent objections?  It's from the

15   Fox FaceBook?

16        MR. KESSLER:  Yes, Your Honor.

17        MR. GIBBONS:  No, Your Honor.

18        THE COURT:  All right.  Go ahead.

19        (Video started, 1:07 p.m.)

20        (Video stopped, 1:07 p.m.)

21   BY MR. KESSLER:

22   Q    And two days later did Mr. Fox post a photograph of some of

23   his belongings?

24   A    He did.  Yes.

25   Q    Okay.  That would be Exhibit 18, Your Honor.

```
 1              THE COURT:  Independent objections?
 2              MR. GIBBONS:  None, Your Honor.
 3              THE COURT:  Admitted.
 4    BY MR. KESSLER:
 5    Q    Do you recognize that photograph?
 6    A    Yes.  I do.
 7    Q    Okay.  Agent Reineck, you are familiar with the things in
 8    it, too, correct, from your work?
 9    A    Correct.  Yes.
10    Q    Can you tell us what we are looking at?
11    A    Yes.  There are two assault style rifles, some magazines
12    for those rifles, and body armor plates.
13    Q    Let's just take those one at a time.  This rifle right here
14    that I just put a dot on --
15    A    Correct.
16    Q    -- does that appear to be the same rifle that Mr. Fox was
17    holding in that first video we showed to the jury?
18    A    It does.  Yes.
19    Q    Okay.  And then this is a similar AR-15 style rifle?
20    A    Correct.
21    Q    All these mags can be used to load ammunition into these
22    rifles, correct?
23    A    That's correct.
24    Q    And about how many rounds does a typical AR-15 magazine
25    like these hold?
```

1    A    Thirty.

2    Q    Thirty rounds.  Okay.  And these things that you said are

3    armor, they look like plates, right?

4    A    Correct.

5    Q    What are they made of?

6    A    They can be made of various materials from high strength

7    steels to ceramics to things, but they are designed to stop

8    high velocity rounds.

9    Q    And are those the things that would be inserted in the vest

10    that we saw Mr. Fox wearing at the State Capitol?

11    A    Yes.

12    Q    And that's what's called a plate carrier?

13    A    Correct.

14    Q    Because it carries these plates, right?

15    A    That's correct.

16    Q    Let's go to May 19th, a couple days later, and this would

17    be a voice message, Exhibit 20.  This is Mr. Fox talking about

18    governors again?

19    A    Yes.

20          THE COURT:  Independent objection?  All right.  Go

21    ahead.  It's admitted.

22          (Audio started, 1:09 p.m.)

23          (Audio stopped, 1:10 p.m.)

24    BY MR. KESSLER:

25    Q    Now, do you recognize the voice there?

1    A    Yes.

2    Q    And whose voice is that?

3    A    Adam Fox.

4    Q    And you know who he is talking to in that recording, right?

5    A    Yes.

6    Q    Okay.  And that is not an informant who is working for the

7    government, was it?

8    A    It is not, no.

9    Q    So he was talking to somebody independent on his own about

10   kidnapping and arresting a governor?

11   A    That is correct.

12   Q    January 17th.  We're moving forward a little bit.  I just

13   did 20, right?  January 17th, did you see a photo on his

14   account from all the way back on January 17th?

15   A    Yes.

16   Q    Exhibit 2.

17          THE COURT:  All right.  If there is no independent

18   objection it can be admitted then as part of the Exhibit 1

19   certification.

20   BY MR. KESSLER:

21   Q    Okay.  We are going back a couple of months but this is

22   pertinent to the arrest theme.  We heard him talking --

23          MR. GIBBONS:  Your Honor, I would like to pose an

24   objection to that exhibit.  It is a FaceBook post from January

25   of '20, which I think in time predates --

1          THE COURT:  Well, I mean, predisposition is in the

2    case.  So go ahead.

3          MR. GIBBONS:  Thank you, Your Honor.

4    BY MR. KESSLER:

5    Q    So going back a couple of months, right, we just heard all

6    this argument in opening about how the government informants

7    had talked them into doing this, right, but we just heard him

8    talking about arresting a governor and doing a citizens arrest.

9    This was from all the way back from January of 2020.  What did

10   Mr. Fox post on his account?

11   A    It's an image of a flex cuff.

12   Q    And what's a flex cuff?

13   A    Basically it's a device used to restrain people.  Like

14   handcuffs.

15   Q    So this is not for plumbing or something like that?  Are

16   you familiar with these from your law enforcement work?

17   A    Correct.  We carry them as well.

18   Q    Okay.  So those are handcuffs.  And then looking through

19   the loop of the handcuff on the left there, what are we talking

20   about?

21   A    It looks like a vacuum cleaner.

22   Q    And I believe we heard Defense counsel bring up in opening

23   that Mr. Fox lived in a vacuum shop, correct?

24   A    That's correct.

25   Q    All right.  May 29th, Exhibit 22.  This is a video.

1          THE COURT:  Which exhibit, I'm sorry?

2          MR. KESSLER:  22, Your Honor.

3          THE COURT:  Thank you.  Any objections independent?

4          MR. BLANCHARD:  Do I have a standing objection, is

5     that --

6          THE COURT:  Everybody right now has an objection on

7     the certification.  It's all admitted subject to that.

8          MR. BLANCHARD:  Thank you.

9          THE COURT:  Anything independent, Mr. Gibbons?

10         MR. GIBBONS:  No, Your Honor.

11         THE COURT:  All right.  Go ahead.  It's admitted.

12         (Video started, 1:12 p.m.)

13         (Video stopped, 1:12 p.m.)

14    BY MR. KESSLER:

15    Q    And Agent Reineck, do you recognize the inside of that

16    building where he is?

17    A    I think that's the Vac Shack.

18    Q    Okay.  Same place where the vacuum cleaner is in the last

19    photograph?

20    A    That's correct.

21    Q    Exhibit 23 is a voice message.

22         THE COURT:  Okay.  No independent objection it's

23    admitted.

24    BY MR. KESSLER:

25    Q    Okay.  And you mentioned you recognized Mr. Croft's voice,

1    right?

2    A    That is correct.

3    Q    Is this message to Mr. Fox?

4    A    Yes.

5              (Audio started, 1:13 p.m.)

6              (Audio stopped, 1:13 p.m.)

7    BY MR. KESSLER:

8    Q    Did he send him another similar message the next day?

9    A    He did.  Yes.

10   Q    Exhibit 24.

11             THE COURT:  Go ahead.  No independent objections I'm

12   hearing.

13             MR. KESSLER:  Apparently we need to restart.

14             THE COURT:  Why don't we do this.  You know, it's an

15   awkward time for a break because we are getting to the end of

16   the day.

17             MR. KESSLER:  I think it's up.  I'm sorry.

18             THE COURT:  Go ahead.  Let's keep going if we can.

19             (Video started, 1:15 p.m.)

20             (Video stopped, 1:15 p.m.)

21   BY MR. KESSLER:

22   Q    All right.  And did he send him a similar message on June

23   2nd, two days later?

24   A    He did.  Yes.

25   Q    Exhibit 25, and keep my fingers crossed.

1          (Audio started, 1:16 p.m.)

2          (Audio stopped, 1:16 p.m.)

3     BY MR. KESSLER:

4     Q    And Mr. Croft was talking to Mr. Fox there, correct, his

5     direct message?

6     A    That's correct.

7     Q    All right.  Two days later on June 4th, Mr. Fox sent a

8     video, correct?

9     A    Yes.

10    Q    All right.  And we heard some talk in the openings about

11    how they were just talking on line or letting off steam.  Does

12    he talk about that here?

13    A    Yes.

14    Q    Okay.  Exhibit 31.

15          (Video started, 1:17 p.m.)

16          (Video stopped, 1:17 p.m.)

17    BY MR. KESSLER:

18    Q    I think we also saw a tattoo that Mr. Croft has on his arm

19    that says Second Delaware Continental Regimen.  Did Mr. Fox and

20    Mr. Croft message each other about that on FaceBook?

21    A    Yes.

22    Q    Exhibit 32.

23          THE COURT:  It's admitted.

24    BY MR. KESSLER:

25    Q    All right.  You recognize that?

1    A    Yes.

2    Q    So this is it says, Last Croft --

3              MR. BLANCHARD:  Object, Your Honor.  This is a screen

4    shot, not from a FaceBook business record.

5              THE COURT:  All right.

6              MR. BLANCHARD:  The foundation was a business record.

7              THE COURT:  Then the exhibit says 32 from the

8    FaceBook.

9              MR. KESSLER:  It came from FaceBook, correct.

10             THE WITNESS:  I did see it on FaceBook.

11             MR. KESSLER:  They produced the actual text in a

12   different format but this is an actual picture that they had.

13             THE COURT:  All right.

14             MR. BLANCHARD:  There is no foundation that says that.

15             THE COURT:  Say it again.

16             MR. BLANCHARD:  There is no foundation to establish

17   that this clearly is a screen shot.  Somebody took a screen

18   shot.

19             THE COURT:  Is this what you got from FaceBook or is

20   this a screen shot of what you got from FaceBook?

21   BY MR. KESSLER:

22   Q    Agent Reineck --

23             I probably shouldn't testify.

24             Agent Reineck?

25   A    So I saw this exact statement on a FaceBook record on the

1    Last Croft account.

2              THE COURT:  All right.  Does it fairly and accurately

3    represent what you saw in the FaceBook account?

4              THE WITNESS:  Yes.  In the FaceBook account the way it

5    does the text you can't see the, like, the emojies or the arms.

6    They are like symbols, but it's the same text.

7              THE COURT:  All right.  Well, can we -- you want the

8    text not the images, right?

9              MR. KESSLER:  Yes, Your Honor.

10             THE COURT:  All right.  So let's admit the text and

11   eliminate the images if that's what he took unless there is an

12   independent foundation for how the screen shot came to be.

13             MR. KESSLER:  That's fine, Your Honor.  And we can do

14   that later through one of the phone witnesses.  I'll read the

15   text and we can take it down.

16   BY MR. KESSLER:

17   Q    It says second continental regimen, weak ones need not

18   apply, correct?

19   A    Correct.

20   Q    Okay.  And in Exhibit 33, June 5th, does Mr. Croft message

21   something about Red coat?

22   A    About what?

23   Q    Red coats.

24   A    Yes.

25   Q    Look at 33, please.  I'll read the text.  This is the same

1    text you saw in the business record?

2    A    Correct.

3    Q    Going to rallies --

4         MR. BLANCHARD:  Same objection.

5         THE COURT:  All right.  Well, if -- if the text is all

6    there is -- there is no added information from the

7    blackboarder, so this is okay I think seems to me unless you

8    are telling me that -- let me ask you, Agent, when you got the

9    FaceBook record, did you see the text like that or did you have

10   to fill in in some other way?

11        THE WITNESS:  Yes.  I saw the text like that.

12        THE COURT:  This is okay.

13   BY MR. KESSLER:

14   Q    Can you read it, please?

15   A    Going to rallies didn't make George Washington a patriot.

16   Shooting red coats did.

17   Q    And that's also followed by the III%ers sign?

18   A    Correct.

19   Q    That brings us into June 5th here, so that brings us to the

20   day before Dublin, Ohio.  Did some of the Defendants meet in

21   Dublin, Ohio on June 6th?

22   A    Yes.

23   Q    And that's the same meeting they were referring to the

24   OPSEC where they had to make sure to disclose the actual

25   location at the last minute kind of thing?

1    A    That's correct.

2    Q    What was the general tenor of that meeting?  Not asking you

3    to say what anybody said there.  What was it about?

4    A    The meeting was about uniting the militias.

5    Q    Okay.  Did Mr. Fox and Mr. Croft attend?

6    A    Yes.  They did.

7    Q    Okay.  And after the meeting did Mr. Fox start recruiting

8    in Michigan?

9    A    He did.  Yes.

10    Q    You've heard I believe from one or two of my colleagues on

11    the Defense side here about someone named Joe Morrison.  What

12    was he as part of the Wolverine Watchmen?

13    A    So Joe Morrison was the founder and the leader of the

14    Wolverine Watchmen.

15         MR. BLANCHARD:  I'm going to object as to foundation

16    under 602.  We don't have any basis to know how he has come to

17    these conclusions.

18         THE COURT:  You can expand the foundation if you want,

19    but it's clear I think he had six years in domestic terrorism

20    and I expect in the course of that you come to understand

21    different things about operators.  So if you want to expand

22    that foundation go ahead, but I think the basics are there.

23         MR. KESSLER:  Thank you, Your Honor.

24    BY MR. KESSLER:

25    Q    What is the Wolverine Watchmen?

1    A    It's a -- it's a militia that was centered out of Munith,

2    Michigan.

3    Q    Okay.  And who is Pete Musico?

4    A    Pete Musico is also one of the original Wolverine Watchmen

5    members.

6    Q    Was he related to Joe Morrison?

7    A    Yes.  He is Joe Morrison's father-in-law and lives in the

8    same residence.

9    Q    Okay.  And this was all kind of prelude to getting into the

10   FaceBook messages again.  Did Mr. Fox exchange messages talking

11   with the Wolverine Watchmen folks over the next few days on

12   FaceBook?

13   A    He did.  Yes.

14   Q    And you reviewed those messages?

15   A    I have.

16   Q    Okay.  Let's go to June 8th, which would be a couple of

17   days after he's gone to Dublin, Ohio.  Exhibit 43.  These are

18   some messages?

19            THE COURT:  Is this a text message?

20            MR. KESSLER:  Yes, Your Honor.

21            THE COURT:  All right.  Any objection independent to

22   the certification?

23            MR. GIBBONS:  No, Your Honor.

24            THE COURT:  Okay.  Go ahead.

25            MR. KESSLER:  43.

1    BY MR. KESSLER:

2    Q    Okay.  And let's blow up the first box.

3         Are you familiar with, from monitoring the Wolverine

4    Watchmen, who George Bunion is?

5    A    I am.

6    Q    And who is that?

7    A    That's Joe Morrison.

8    Q    And the one that says author, Last Croft, you familiar with

9    whose account that is?

10   A    That is Barry Croft's account.

11   Q    And what does he say?

12   A    What does Barry Croft say?  (302) 300-0405 call me.

13   Q    Is that the same number we saw earlier?

14   A    It is.

15   Q    Okay.  Let's go to the next box, please.  Okay.  And what

16   does the Last Croft say this time, also June 8th, 2020?

17   A    Yes.  Get with Adam Dean Fox.  We are going to as we had

18   historically.  Second Continental Michigan Regimen is forming

19   as a constitutional defense apparatus.

20   Q    Okay.  Do they exchange a voice message?  Does Fox send

21   Morrison a voice message the same day?

22   A    He does.  Yes.

23   Q    Exhibit 44.

24        THE COURT:  If there is no independent objection you

25   can go ahead and play.

1          (Audio started, 1:24 p.m.)

2          (Audio stopped, 1:24 p.m.)

3     BY MR. KESSLER:

4     Q    Does he talk about their goals in the next recording?

5     A    He does.  Yes.

6     Q    Exhibit 45, please.

7          THE COURT:  Go ahead and play that unless there is an

8     independent objection.

9          (Audio started, 1:24 p.m.)

10         (Audio stopped, 1:24 p.m.)

11    BY MR. KESSLER:

12    Q    So Adam Fox is telling Joe Morrison that Barry said we have

13    a common goal and we need to talk?

14    A    That's correct.

15    Q    And Barry, that's Mr. Croft's first name, correct?

16    A    That is correct.

17    Q    Okay.  We talked about OPSEC.  I'd like to play Exhibit 46,

18    if there is no objection?

19         THE COURT:  Okay.  Any independent objection?  Hearing

20    none you can go ahead.

21         (Audio started, 1:25 p.m.)

22         (Audio stopped, 1:25 p.m.)

23    BY MR. KESSLER:

24    Q    He is asking for credentials to screen him?

25    A    Um-hum.

Q    Is that what you referred to earlier as vetting?

A    Vetting, yes.

Q    And what is vetting exactly?

A    It's basically proving who you are and making sure that you are somebody that he wants to deal with, not law enforcement.

Q    Okay.  And did Mr. Fox post a video about their goals?

A    Yes.

Q    Exhibit 47.

        THE COURT:  Without an independent objection you can go ahead and play that.

            (Video started, 1:25 p.m.)

            (Video stopped, 1:26 p.m.)

BY MR. KESSLER:

Q    Okay.  You mentioned that you can post photographs that aren't videos, right?  Just photos on FaceBook.  Did Mr. Croft post a photo the same day?

A    Yes.

Q    Exhibit 48.

        THE COURT:  Without an independent objection you can go ahead and publish.

BY MR. KESSLER:

Q    All right.  So we saw this in the opening.  You recognize who that is, right?

A    Yes.

Q    And it says, expect us, on his arm, and an abbreviated form

1    of it looks like Second Continental Delaware Regimen?

2    A    Correct.

3    Q    That's the same thing basically they were trying.  He said

4    Mr. Fox and he were standing up the Second Continental of

5    Michigan Regimen, right?

6    A    Correct.

7    Q    What kind of hat is he wearing?

8    A    A tri corner hat.

9    Q    And what's that associated with?

10   A    The American revolution.

11   Q    All right.  And I'd like to show Exhibit 49.  It's another

12   photograph.  Mr. Croft posted this the same day.

13              THE COURT:  If there is no independent objection you

14   can go ahead.

15              THE WITNESS:  Yes.

16   BY MR. KESSLER:

17   Q    And that looks like a -- do you recognize that kind of

18   necklace?

19   A    Yeah.  Dog tags.

20   Q    And what are those normally used for?

21   A    The military wear them around their necks to identify who

22   they are.

23   Q    Okay.  It says Croft Junior, Barry G as a number and then

24   Second Continental Delaware Regimen, correct?

25   A    Correct.

1    Q    Mr. Croft posted that himself or it's on his --

2    A    It's on his FaceBook account.

3    Q    Okay.  The next day, June 9th, did Mr. Croft send a message

4    to Pete Musico on FaceBook?

5    A    Yes.

6         MR. KESSLER:  Can we take a look at Exhibit 50 then?

7    Can we blow that up, please?  Do we have any objection?

8         THE COURT:  I hear no independent objection so go

9    ahead.

10   BY MR. KESSLER:

11   Q    It says the Last Croft replied to your comment on a post

12   from June 7th.  I have no doubt very shortly Adam Dean Fox is

13   working on the Second Continental Michigan Regimen.

14   Constitutional defense being of the essence.  Wherever I am

15   invited I'll make haste.  Okay.  And did Mr. Fox post a video?

16   A    He did.

17   Q    Okay.  Talking about governors?

18   A    Yes.

19   Q    What is cos play?  Before we get started, what is cos play?

20   A    Basically role playing in costume.

21   Q    Okay.  Exhibit 51 is a video.

22        THE COURT:  Without an independent objection you can

23   go ahead.

24             (Video started, 1:28 p.m.)

25             (Video stopped, 1:28 p.m.)

BY MR. KESSLER:

Q    All right.  Now, Mr. Croft was not in Michigan, right?  He was in Delaware?

A    That's correct.

Q    And do you have a voice message from Mr. Croft to Mr. Fox talking about the Wolverine Watchmen?

A    Yes.

Q    All right.  Same day, June 9th?

A    Correct.

Q    Exhibit 52.

        THE COURT:  All right.  Go ahead if there is no independent objection.

            (Audio started, 1:29 p.m.)

            (Audio stopped, 1:29 p.m.)

BY MR. KESSLER:

Q    So that was Mr. Croft hooking up telling Fox that Michigan boys would be getting sent to him?

A    Correct.

        THE COURT:  We're toward a reasonable stopping point. If you would, because we've been here two hours and taking a break doesn't make sense because we just come back for three minutes, when you get to a reasonable stopping point within the next five or ten minutes we'll end for the day.

        MR. KESSLER:  I think if we go five, ten more minutes we are going to be pretty close to done.

1          THE COURT:  That would even be better.

2          MR. KESSLER:  Okay.

3    BY MR. KESSLER:

4    Q    June 10th, did he talk about -- did Mr. Fox talk in the

5    messages about -- about going a legal route?

6    A    Yes.

7    Q    All right.  Let's take a look at Exhibit 53.

8          THE COURT:  Okay.  You can play without an independent

9    objection.

10         The tech gremlins want you to end now.  All right.

11   You know, if we are going to have -- you can't get it right

12   now?

13         MR. KESSLER:  It won't be too much more tomorrow

14   morning then, Your Honor.

15         THE COURT:  Yeah.  I think what we'll do, two hours is

16   quite a bit of time to sit.  Given the way that things went

17   this morning I did need --

18         MR. KESSLER:  It's back, Your Honor, if that enters

19   into your calculations.

20         THE COURT:  The problem is we might have some of this

21   going tomorrow as well, and I think let's just let you go a

22   little early today.

23         (Excerpt concluded, 1:31 p.m.)

24   ****************************************************************

25

```
 1                             INDEX

 2
          Government Witnesses:                    Page
 3
          TODD REINECK
 4
            Direct Examination by Mr. Kessler        3
 5

 6        Exhibits:                               Admitted

 7        Government's Exhibit 1                      24
            (FaceBook Certifications)
 8        Government's Exhibit 2                       43
            (Photograph, January 17)
 9        Government's Exhibit 3                       29
            (Video, Fox, March 2020)
10        Government's Exhibit 6                       30
            (Video, Fox, April 30)
11        Government's Exhibit 11                      31
            (Post, Croft)
12        Government's Exhibit 12                      33
            (Post, May 12)
13        Government's Exhibit 13                      34
            (Text, Croft, May 7)
14        Government's Exhibit 15                      36
            (Voicemail, May 7)
15        Government's Exhibit 16                      37
            (FaceBook Message, Croft)
16        Government's Exhibit 17                      40
            (Video, May 7)
17        Government's Exhibit 18                      41
            (Photograph, Tactical Gear)
18        Government's Exhibit 20                      42
            (Voicemail, May 19)
19        Government's Exhibit 22                      45
            (Video, May 22)
20        Government's Exhibit 23                      45
            (Voicemail, Croft)
21        Government's Exhibit 24                      46
            (Voicemail, Croft)
22        Government's Exhibit 25                      46
            (FaceBook Message, Fox/Croft)
23        Government's Exhibit 31                      47
            (Video, Croft)
24        Government's Exhibit 32                      49
            (FaceBook Message, Fox/Croft)
25
```

| | | |
|---|---|---|
| 1 | Government's Exhibit 33 | 50 |
| | (FaceBook Message, Croft, June 5) | |
| 2 | Government's Exhibit 43 | 52 |
| | (Tests, June 8) | |
| 3 | Government's Exhibit 44 | 53 |
| | (Voicemail, Fox/Morrison) | |
| 4 | Government's Exhibit 45 | 54 |
| | (Voicemail, Fox/Morrison) | |
| 5 | Government's Exhibit 46 | 54 |
| | (Voicemail) | |
| 6 | Government's Exhibit 47 | 55 |
| | (Video, Fox) | |
| 7 | Government's Exhibit 48 | 55 |
| | (Photograph, Croft) | |
| 8 | Government's Exhibit 49 | 56 |
| | (Photograph, Croft) | |
| 9 | Government's Exhibit 50 | 57 |
| | (Text, Croft, June 7) | |
| 10 | Government's Exhibit 51 | 57 |
| | (Video) | |
| 11 | Government's Exhibit 52 | 58 |
| | (Voicemail, Croft/Fox) | |
| 12 | Government's Exhibit 53 | 59 |
| | (Voicemail, Fox/Croft) | |
| 13 | Government's Exhibit 423 | 10 |
| | (Photograph, Ty Garbin) | |
| 14 | Government's Exhibit 424 | 10 |
| | (Photograph, Brandon Caserta) | |
| 15 | Government's Exhibit 425 | 10 |
| | (Photograph, Barry Croft) | |
| 16 | Government's Exhibit 426 | 10 |
| | (Photograph, Adam Fox) | |
| 17 | Government's Exhibit 427 | 10 |
| | (Photograph, Kaleb Franks) | |
| 18 | Government's Exhibit 428 | 10 |
| | (Photograph, Daniel Harris) | |
| 19 | Government's Exhibit 435 | 25 |
| | (Video, FaceBook Page) | |
| 20 | Government's Exhibit 437 | 28 |
| | (Photograph, Boogaloo 2020) | |
| 21 | Government's Exhibit 438 | 28 |
| | (Photograph, Fox Tyranny) | |
| 22 | Government's Exhibit 440 | 38 |
| | (FaceBook Message, May 7) | |
| 23 | | |
| 24 | | |
| 25 | | |

REPORTER'S CERTIFICATE

      I, Paul G. Brandell, CSR-4552, Official Court Reporter
for the United States District Court for the Western District
of Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of an excerpt
from the proceedings had in the within entitled and numbered
cause on the date hereinbefore set forth; and I do further
certify that the foregoing transcript has been prepared by me
or under my direction.


                         /s/ Paul G. Brandell

                         Paul G. Brandell, CSR-4552, RPR, CRR

                         U.S. District Court Reporter

                         399 Federal Building

                              Grand Rapids, Michigan  49503