IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,          No:  1:20cr183-1/2/5/6

          vs.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
DANIEL JOSEPH HARRIS and
BRANDON MICHAEL-RAY CASERTA,

                    Defendants.


          Before:

                         THE HONORABLE ROBERT J. JONKER
                              U.S. DISTRICT Judge
                              Grand Rapids, Michigan
                              Thursday, March 17, 2022
                         Excerpt Jury Trial Proceedings
                    Testimony of Kristopher Long and Mark Schweers

          APPEARANCES:

                    MR. ANDREW BIRGE, U.S. ATTORNEY
                    By:  MR. NILS R. KESSLER
                    MR. JONATHAN C. ROTH
                    The Law Building
                    333 Ionia Avenue, NW
                    Grand Rapids, MI 49501-0208
                    (616) 456-2404

                         On behalf of the Plaintiff;

                    MR. CHRISTOPHER M. GIBBONS
                    MS. KAREN M. BOER
                    Dunn Gibbons PLC
                    125 Ottawa Avenue, NW, Suite 230
                    Grand Rapids, MI 49503-2865
                    (616) 336-0003

                         On behalf of Defendant Fox.

```
 1                    JOSHUA ADAM BLANCHARD
                      Blanchard Law
 2                    309 South Lafayette Street, Suite 208
                      P.O. 938
 3                    Greenville, MI 48838-1991

 4
                             On behalf of Defendant Croft, Jr.
 5
                      JULIA ANNE KELLY
 6                    Willey & Chamberlain LLP
                      300 Ottawa Avenue NW Suite 810
 7                    Grand Rapids, MI 49503-2314
                      (616) 458-2212
 8
                             On behalf of Defendant Harris.
 9
                      MICHAEL DARRAGH HILLS
10                    Hills at Law PC
                      425 South Westnedge Avenue
11                    Kalamazoo, MI 49007-5051
                      (269) 373-5430
12
                             On behalf of Defendant Caserta.
13

14        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

1    **********************************************************

2                 (Excerpt started, 9:04 a.m.)

3                      CROSS EXAMINATION

4    BY MR. BLANCHARD:

5    Q    Good morning, Agent Long.

6    A    Good morning, sir.

7    Q    I understand you have written some reports about this case,

8    correct?

9    A    That is correct.

10   Q    And you've sent some text messages?

11   A    That is correct.  I have sent text messages with the

12   co-case and CHSs that I've worked.

13   Q    When you say co-case you mean John Penrod?

14   A    Yes.  That is correct.  He is the co-case in this

15   investigation.

16   Q    Have you provided those text messages to the government?

17   A    Yes.  I have.

18   Q    Have you texted anyone else about this case?

19   A    I have texted the CHS that we worked with closely on this.

20   Q    And you are talking about the CHS from Tennessee, correct?

21   A    The CHS 99802.

22   Q    Are we talking about Jennifer Plunk?

23   A    The -- the name that we associate with that -- we don't

24   typically discuss the name of the actual source.  So we provide

25   a number that's associated to that individual so that number is

1       99802.

2    Q    The number 99802 is assigned to Jenny Plunk, correct?

3    A    It is assigned to a CHS.

4    Q    Is it assigned to Jenny Plunk?

5    A    Yes.  It is.

6    Q    Have you e-mailed with anyone about this case?

7    A    I have -- I have e-mailed the co-case, John Penrod,

8    regarding the investigation.  Yes.

9    Q    And have you provided those e-mails to the government?

10   A    Yes.  I have.

11   Q    Now, I understand the FBI has a tracking system on your

12   cell phones to track your text messages, correct?

13   A    That is correct.  We do have the ability to retroactively

14   provide information to the court system regarding text

15   messages, phone calls and e-mails.

16   Q    And so your text messages with TFO Penrod would have been

17   captured by that system, correct?

18   A    Through his bureau phone.  Yes.  That's correct.

19   Q    And did you provide that capture to the government?

20   A    Yes.  We did.

21          MR. BLANCHARD:  Your Honor, may I have one moment?

22          THE COURT:  All right.

23          MR. BLANCHARD:  Judge, I move for an order of

24   production under 26.2 for the text messages between Agent

25   Penrod and --

1        THE COURT:  Well, it should have been provided in

2   discovery, and if it hasn't been we'll have to deal with it

3   later but we can't take a break and deal with it now.

4        MR. BLANCHARD:  I understand that, but it was not

5   provided as best as I can tell.

6        THE COURT:  Then it's going to be something we'll

7   fight with later.  Obviously any prior statement of a witness

8   needs to be turned over, and I take it, Mr. Kessler, you

9   believe you've done that?

10       MR. KESSLER:  I believe I have, Your Honor, but this

11  was not identified to me as an issue beforehand and we could

12  have dealt with it.

13       THE COURT:  Let's proceed now.

14       MR. BLANCHARD:  Didn't know it existed but I'll move

15  forward.

16  BY MR. BLANCHARD:

17  Q    So you talked on direct examination about your work on

18  something you called cat 1 cases, right?

19  A    I do not recall a cat 1, category A or a cat A situation, I

20  do recall that.

21  Q    Category A cases.  And those were cases that involved

22  nuclear, biological or chemical weapons, correct?

23  A    A nuclear bomb in the United States would be considered a

24  category A incident, that is correct.

25  Q    Or a biological weapon?

1    A    That is correct.  A biological weapon would also be

2    considered a cat A incident.  Yes.

3    Q    Where those kinds of devices are attached to a human is

4    considered a cat A case, correct?

5    A    That is also correct.  An explosive device attached to a

6    human being or what is known as a VBID, which is a vehicle born

7    explosive device similar to the one that happened down in

8    Tennessee this past December if you recall.

9    Q    So this case doesn't include allegations of nuclear

10   weapons?

11   A    That is correct.  This --

12   Q    This --

13   A    This investigation did not involve nuclear weapons.  No.

14   It did not.

15   Q    This case does not involve chemical weapons, true?

16         MR. KESSLER:  Relevance, Your Honor.  Nobody is

17   charged with any of these things.

18         THE COURT:  It's the definition of weapons of mass

19   destruction.  You can proceed.

20         MR. BLANCHARD:  Thank you.

21   BY MR. BLANCHARD:

22   Q    This case does not include chemical weapons, true?

23   A    As a chemical agent that is correct.  This case did not

24   involve an investigation of chemical weapons.  No.

25   Q    Now, you testified on direct examination that Mr. Croft had

1    been on the radar of government for some period of time,

2    correct?

3    A    That is correct.  We were monitoring his communications for

4    a short period of time.

5    Q    Okay.  And so your office had been monitoring Mr. Croft

6    since 2019, true?

7    A    I believe it was October of 2019.  Yes.  The very end of

8    the year.

9    Q    And when I say your office, I mean the FBI.  The FBI had

10   been monitoring Mr. Croft since 2019, correct?

11   A    That is correct.

12   Q    And your -- you in particular had been monitoring Mr. Croft

13   since at least May of 2019, correct?

14   A    I do not recall the specific date on which the original

15   complaint came in, sir.

16   Q    So when the FBI starts an assessment, a form 1057 is

17   created, correct?

18   A    I cannot guarantee that a 1057 -- a 1057 is an electronic

19   communication that is put to a file.  There are a multitude of

20   ways to initiate a case.  Typically at this timeframe there

21   would have been a complaint or a guardian that comes in

22   through --

23   Q    Let me interrupt you for a moment, Agent.  My question

24   was -- and it really is just a yes or no question.  It doesn't

25   require much explanation.  When you open an assessment do you

1    create a form 1057?

2    A    There would be a 1057 but I cannot guarantee that that was

3    what was initiating the investigation.

4    Q    Okay.

5    A    That's not necessarily a 1057 that is used to create an

6    investigation.

7         MR. BLANCHARD:  Okay.  May I approach the witness,

8    Your Honor?

9         THE COURT:  All right.

10   BY MR. BLANCHARD:

11   Q    I'm going to show you a form 1057.  Do you recognize that

12   document?

13        THE COURT:  Is it just a blank form?

14        MR. BLANCHARD:  No.  It's one he created.

15        THE COURT:  Well, is it in the exhibit list?  What's

16   your purpose of presenting it to him?

17        MR. BLANCHARD:  To deal with the -- he said the case

18   opened in October.  It opened in May.  His form says it opened

19   in May.

20        MR. KESSLER:  Your Honor, I am going to object to him

21   testifying from the stand.

22        THE COURT:  Right.  You are going to ask him if it

23   refreshes his recollection as to when he started?  All right.

24        THE WITNESS:  I do recognize this form.

25   BY MR. BLANCHARD:

1    Q    Okay.  So my question then is would you agree that the

2    assessment was opened in May of 2019?

3    A    So according to this document, yes, the assessment would

4    have, but the full investigation --

5         THE COURT:  Well, hold on.  Don't read the document

6    because the document isn't evidence.  If it doesn't jog your

7    memory just tell us that.

8         THE WITNESS:  So I do recall having an assessment

9    early on before October.  The full investigation was actually

10   initiated in October.

11   BY MR. BLANCHARD:

12   Q    My question is, was the assessment opened in May of 2019?

13        THE COURT:  And he just answered that.  He said he

14   created the form earlier and he opened it in October, and both

15   sides can make their arguments about what that means.

16        MR. BLANCHARD:  Thank you.

17   BY MR. BLANCHARD:

18   Q    And you were aware -- well, as part of your investigation

19   you looked into other contacts with law enforcement that

20   Mr. Croft had, correct?

21   A    Could you repeat the question?

22   Q    As part of your investigation, you looked into other

23   contacts Mr. Croft had with law enforcement, correct?

24   A    That is correct.

25   Q    And you learned that there had been a tip about him in

1    2017, correct?

2    A    That is correct.

3    Q    To the Delaware Information Assessment Center, correct?

4    A    That is correct.

5    Q    That he had been on a radio show, correct?

6    A    So --

7    Q    Is that part of the tip, that he had been on a radio show?

8    A    That tip was actually prior to that.  So that tip I believe

9    would have been -- that came in from our, like, other partner

10   fusion centers.  So a lot of times investigations occur or

11   assessments occur based off of tips from individuals in the

12   public, and if it's not founded that the individual is breaking

13   the law, we don't investigate.  It's just an assessment to

14   determine whether that individual is, in fact, violating the

15   law.  So a lot of that goes to just an information only.  It's

16   similar to if you have a contact with a local law enforcement

17   individual they have to file some form of report stating that

18   they had contact with you, and that's our system of doing that.

19   Q    So my question is, you are aware that there was a tip in

20   April of 2017 that was made to the Delaware Information

21   Analysis Center, correct?

22   A    I was not aware or made aware of that tip until in 2019.

23   So that tip would have been made in 2017, but we were not made

24   aware of that until 2019.

25   Q    Right.  My question is, you are aware of it now, right?

1    A    That is correct.  We are aware of the report.

2    Q    Because when you open your investigation you look for other

3    contacts with law enforcement, correct?

4    A    That is correct.

5    Q    And so you are aware that back in 2017 there had been a tip

6    made about Mr. Croft being on a radio show, correct?

7    A    That is correct.

8    Q    Thank you.  That tip also included an allegation that

9    Mr. Croft smoked marijuana?

10   A    I don't recall the tip --

11        MR. KESSLER:  Calls for hearsay, too, Your Honor.

12        THE COURT:  He is asking about it as a tip and the

13   content of the tip.  It's okay I guess for that purpose, and

14   the witness has said he doesn't recall that in any event.

15   BY MR. BLANCHARD:

16   Q    If I understand correctly, the Wolverine Watchmen

17   investigation began in 2020, is that your understanding?

18   A    I am not the case agent for the Wolverine Watchmen.  I

19   don't know when that case was opened.  I don't know that much

20   about the Wolverine Watchmen.

21   Q    So you are saying you were the handling agent for

22   Mr. Robeson or a handling agent for Robeson, correct?

23   A    That is not correct.  I was not a handling agent for

24   Robeson.

25   Q    You were an agent in contact with Mr. Robeson, correct?

| | |
|---|---|
| 1 | A    I had one contact to provide a recording device to a CHS, |
| 2 | that is correct. |
| 3 | Q    And he was involved in the investigation of the Wolverine |
| 4 | Watchmen, correct? |
| 5 | A    So at the time he was not involved with the Wolverine |
| 6 | Watchmen.  He was involved with the Barry Croft/other |
| 7 | individuals that we had yet to identify in this case. |
| 8 | Q    So you are saying that throughout this investigation you |
| 9 | never learned when the investigation into the Wolverine |
| 10 | Watchmen started? |
| 11 | A    I do not know when the Wolverine Watchmen case was |
| 12 | initiated, sir. |
| 13 | Q    You were monitoring Mr. Croft prior to 2020, though, right? |
| 14 | A    That is correct.  We started -- the full investigation was |
| 15 | October of 2019. |
| 16 | Q    And the assessment started in April of 2019, correct? |
| 17 | A    Like I said, I don't remember exactly when, but yes.  That |
| 18 | is approximately when it would have started.  May or June of |
| 19 | 2019. |
| 20 | Q    Well, you have -- would it refresh your recollection to |
| 21 | look at your report about the initial assessment? |
| 22 | A    Yes.  It would. |
| 23 | Q    Okay.  Well, it's sitting in front of you.  Why don't you |
| 24 | take a look at it. |
| 25 | A    Okay. |

1   Q    Is your recollection refreshed on when the assessment

2   started?

3   A    Yes.  It is.

4   Q    Was it on April -- or in April of 2019?

5   A    This says it's set for May of 2019.  Not April.

6   Q    Did you get a tip from the Dallas field office that started

7   it off?

8   A    That is correct.

9   Q    Was that in April of 2019, the tip?

10  A    That is correct.  Yes.

11  Q    Okay.  So you got a tip from the Dallas field office that

12  started your investigation into Mr. Croft in April of 2019,

13  correct?

14  A    So that's not entirely accurate.  So the tip came to us.

15  It may have been that the Dallas division knew of Mr. Croft,

16  but we did not know of Mr. Croft until basically May of that

17  year.

18  Q    And the tip that came to you from the Dallas field office

19  was in relation to a gentleman named Casey Massey, correct?

20  A    That is correct.

21  Q    The Casey Massey was a leader of a militia in Texas,

22  correct?

23  A    I do not know.

24       MR. KESSLER:  Relevance, Your Honor.

25       MR. BLANCHARD:  Yeah.  It shows the government's

1    motive for targeting Mr. Croft because he was associated with

2    someone they were quite angry with and he communicated with

3    him.

4            THE COURT:  Well, that I have a hard time with

5    relevance, and to the extent there is any relevance it's a 403

6    problem because we are not going to litigate every grievance

7    that anybody might have had with any form of government

8    throughout the course of our nation's history.  So if that's

9    the relevance I sustain the objection and you should move to

10   something else.

11   BY MR. BLANCHARD:

12   Q   Mr. Croft posted things on FaceBook related to Mr. Massey,

13   correct?

14           MR. KESSLER:  Well, hearsay.

15           THE COURT:  Well, if there is no new relevance I don't

16   even see the relevance on it, and there is also a hearsay

17   problem if we are talking about your client's own statement.

18   BY MR. BLANCHARD:

19   Q   So this case, as we've talked about, started as a

20   preliminary investigation, true?

21   A   That is correct.

22   Q   Excuse me, an assessment it started, correct?

23   A   That's correct.

24   Q   And after that it was converted to what's called a

25   preliminary investigation, correct?

1    A    That is correct.  That's the normal progression of the

2    case.

3    Q    The next step after a preliminary investigation is a full

4    investigation, right?

5    A    That is correct.

6    Q    This case was converted to a preliminary investigation in

7    2019, correct?

8    A    Say that again.  I'm sorry.

9    Q    In July of 2019 this case was converted to a preliminary

10   investigation, true?

11   A    That sounds about the right time.

12   Q    And when you converted this to a preliminary investigation,

13   it was predicated on Mr. Croft expressing what you called

14   antigovernment views, correct?

15   A    So to be more clear about what I'm saying by antigovernment

16   and anti-law enforcement, the comments that Mr. Croft had been

17   making were direct threats to law enforcement.  Very violent

18   comments that he was stating that he wanted to burn police

19   officers out of their house and catch them as they were jumping

20   out of their second floor windows and have a people's trial and

21   hang them from the nearest tree.

22   Q    So the comments were antigovernment, is that fair?

23   A    They are very violent threats towards government officials

24   and law enforcement members.

25   Q    Okay.  And so you -- they were things he said, correct?

A    They were things that he had said.

Q    And they were things that he had said publicly on FaceBook, correct?

A    So some of them may have been public on FaceBook.  At that time that's all we had the ability to monitor.

Q    Right.  And when you opened your preliminary investigation it was because he had been very vocal on social media about his antigovernment views, correct?

A    That is correct.

Q    Okay.  And --

A    But to be fair it wasn't just these statements.  It was the wholistic view of the fact that we have this individual who is stating and espousing violent attacks and violent threats against police and government officials, and there was this connection to weapons and at that time he was a --

        MR. BLANCHARD:  Your Honor, I object.

        THE COURT:  Well, the answer isn't directly responsive and so I'll sustain that.  Mr. Kessler will have a chance to deal with issues on redirect if he wants further explanation, but at this point Mr. Blanchard should be able to get a direct answer, if you can, to the questions he poses.  It doesn't mean you have to accept his words, but if you don't then the answer is simply no, I don't agree, and you don't need to give a full explanation.

        Go ahead, Mr. Blanchard.

```
1              MR. BLANCHARD:  Thank you, Your Honor.
2    BY MR. BLANCHARD:
3    Q    So the predication for the preliminary investigation was
4    that he had been very vocal on social media and communicating
5    with Casey Massey, correct?
6    A    I would say that that is two of the three reasons why we
7    were using or that was the predication, two of the three
8    reasons why we investigated him.
9    Q    Okay.  Now, I think we've covered you're responsible for
10   investigating Mr. Croft, correct?
11   A    That is correct.  I was one of two agents.
12   Q    Along with John Penrod, correct?
13   A    That is correct.  John Penrod was the second.
14   Q    And you were not responsible, I think you've testified, for
15   the Wolverine Watchmen, correct?
16   A    That is correct.  I was not involved in the Wolverine
17   Watchmen case.
18   Q    Can you just say yes or no if it's yes or no?
19             MR. KESSLER:  Your Honor, I don't think that was --
20             THE COURT:  A simple declarative answer is fine, but
21   let's try to move through it in general.  If you think
22   Mr. Blanchard's question has captured everything germane and
23   you can accept it you say yes.  If you think that you can't you
24   can say no or that's incomplete or something like that and rely
25   on Mr. Kessler to tease out any additional explanation.
```

1           Go ahead, Mr. Blanchard.

2           MR. BLANCHARD:  Thank you.

3    BY MR. BLANCHARD:

4    Q    There came a time where the Wolverine Watchmen

5    investigation and your investigation into Mr. Croft merged or

6    collided, correct?

7    A    Yes.

8    Q    And you know what the FBI refers to as a TEI or terrorism

9    enterprise investigation, right?

10   A    Yes.  I am aware of that.

11   Q    That is a large complex investigation into terrorism,

12   right?

13   A    Yes.  It is.

14   Q    And it provides additional resources to agents over an

15   average investigation, fair?

16   A    Yes.  I would say that that provides a lot more.  Yes.

17   Q    And it requires approval from management, true?

18   A    Yes.  It goes to executive management at headquarters.

19   Q    An agent in the field can't open a TEI, true?

20   A    They are the ones that initiate it, so yes, they open it.

21   Q    That's fair.  They can't approve a TEI, correct?

22   A    No.  They cannot approve it without legal -- legal

23   background.

24   Q    And you didn't have a TEI open on Mr. Croft, correct?

25   A    We did not.  No.

1    Q    And you didn't have any say in whether the Wolverine

2    Watchmen investigation became a TEI, is that fair?

3    A    That is fair.  Yes.

4    Q    Okay.  So we've talked both with you and other witnesses

5    about a man named Steve Robeson.  You are familiar with him,

6    correct?

7    A    Yes.  I am familiar with Steve Robeson.

8    Q    And you were not his handler, true?

9    A    Yes.  I was not his handler.

10   Q    That was initially Special Agent Rubal, true?

11   A    I think that is his last name.  His first name was Doug.  I

12   don't remember his last name off the top of my head.

13   Q    And later it became a Whorshizer and Bazala, correct?

14   A    I don't remember the first name.  I do remember the second

15   name.

16   Q    And that second name, Bazala, he is an agent out of

17   Milwaukee, correct?

18   A    He was at the time of this investigation.  Yes.

19   Q    Now, you were the handler for Jenny Plunk, correct?

20   A    Yes.  I was the handler for 99802.

21   Q    And so we've talked about how confidential sources -- with

22   other witnesses we've talked about how confidential sources are

23   on-boarded.  You are familiar with that process, correct?

24   A    I'm sorry.  Say that again?

25   Q    You are familiar with how confidential sources are

1    recruited or on-boarded with the FBI, correct?

2    A    That is correct.  I am familiar with that.

3    Q    And there is a process where you go through and you give

4    them admonitions, correct?

5    A    That is correct.  We have to admonish all of our sources.

6    Q    And the admonitions are really rules about what they can

7    and can't do, right?

8    A    Yes.  They are -- I would say that that's an accurate

9    statement.  They are rules that they should not do and we can't

10   control them, though.

11   Q    So they are rules on what they should and shouldn't do,

12   yes?

13   A    Yes.  That is correct.

14   Q    Okay.  And when you on-boarded or recruited Ms. Plunk, she

15   was provided with admonitions, correct?

16   A    That is correct.

17   Q    And you provided them to her personally?

18   A    That is correct.

19   Q    Okay.  One of those admonitions or rules is that a

20   confidential source is not to break the law, correct?

21   A    That is correct, unless they are given an OIA.

22   Q    And you never gave Ms. Plunk an OIA, correct?

23   A    That is correct.

24   Q    During the course of the investigation you learned that

25   Ms. Plunk had purchased a Taurus nine millimeter pistol,

1    correct?

2    A    That is correct.

3    Q    And you learned that that pistol was found at Mr. Robeson's

4    house, correct?

5    A    That is correct.

6    Q    And you learned that she sold it to Mr. Robeson, correct?

7    A    That is correct.

8    Q    You knew that Mr. Robeson was a felon?

9    A    We knew that Mr. Robeson was a felon, correct.

10   Q    You don't authorize confidential sources to traffic in

11   firearms, correct?

12   A    No.  We do not.

13   Q    And you did not give her authorization to sell a firearm to

14   a felon, correct?

15   A    That is correct.  We did not give her authorization to sell

16   a firearm to a person that would not legally be allowed to have

17   that weapon.

18   Q    And Mr. Robeson was not legally allowed to have the weapon,

19   correct?

20            MR. KESSLER:  Your Honor, relevance.

21            THE COURT:  Well, I think it's the general relevance,

22   but you can articulate it if you want on the efforts of the FBI

23   in the investigation and entrapment theory, but if you want to

24   articulate it yourself, go ahead.

25            MR. BLANCHARD:  I don't have anything more to say.

1      THE COURT:  Go ahead.

2 BY MR. BLANCHARD:

3 Q The firearm that she sold, she didn't tell you guys about

4 that, right?

5 A That is correct.  She believed that --

6 Q You learned about the sale as the investigation was

7 investigating Mr. Robeson for another crime, correct?

8 A So that is not entirely accurate.

9 Q She eventually told you about it, right?

10 A No.  That is not correct.

11     MR. KESSLER:  I think Mr. Blanchard said he was done.

12     THE COURT:  Now we are going on deeper, and the

13 relevance that I articulated for you and that you adopted I

14 think does have an ending point and we're there or beyond it

15 seems to me from a 403 perspective.

16 BY MR. BLANCHARD:

17 Q All right.  So Ms. Plunk was tasked to have contact with

18 Mr. Croft, correct?

19 A That is correct.

20 Q And to watch him?

21 A That is correct.

22 Q And to record him?

23 A That is correct.

24 Q And you paid her to do this?

25 A We provided expenses.  We did not pay her for working.  We

1    basically repaid her for her time and travel and gas and things

2    like that.

3    Q    How much was she paid?

4    A    I don't know the exact number but it was close to $8,000.

5    Q    You paid her approximately $8,000 over the time period from

6    what, May to October?

7    A    That sounds correct.  Yes.

8    Q    And there is a process at the FBI when you want to have

9    someone targeted for investigation, right?  There is an

10   approval process?

11   A    Could you clarify the question, please?

12   Q    Sure.  The FBI has a procedure to target people through

13   on-line contacts, correct?

14   A    I still don't understand your question, sir.

15   Q    You are familiar with something called group one on-line

16   UCO, correct?

17   A    I am familiar with that.  Yes.

18   Q    And this is an on-line sort of undercover activity where

19   the FBI will target citizens and make contact with them on-line

20   using on-line covert employees, correct?

21   A    If they are predicated subjects, yes.

22   Q    And there is a process in order to get approval to target

23   someone on-line, correct?

24   A    I would assume so.  I am not an undercover -- on-line

25   undercover employee.

```
1    Q    You are not familiar with the process of targeting someone
2    on-line?
3    A    I have not gone through undercover training so I don't know
4    what that process consists of.
5    Q    Are you familiar with a process of obtaining approval to
6    target someone on-line?
7    A    Through an on-line undercover?  No.  I am not familiar with
8    that because I haven't gone through that training.
9    Q    Are you familiar with the process of obtaining approval to
10   have non-sworn agents working for the FBI contact someone
11   on-line for target?
12   A    Could you clarify that question?
13   Q    Well, the FBI employees are sworn agents like yourself,
14   right?
15   A    Some of them are sworn agents and some of them are other
16   individuals similar to like SOSs and things like that.
17   Q    Agent, I'm trying to break it down for you.  There are
18   sworn agents that work for the FBI, correct?
19   A    There are some that are sworn agents.  Yes, sir.
20   Q    Yes.  There are sworn agents that work for the FBI, true?
21   A    Yes.  There are sworn agents that work for the FBI.
22   Q    The FBI also employs non-sworn employees who do
23   investigative tasks, correct?
24   A    That is true.
25   Q    And they employ those folks in on-line capacities, correct?
```

1   A    Sometimes.  Yes.

2   Q    And there is a process to have these non-sworn employees

3   target citizens, correct?

4   A    There is, but I don't know what that process is.

5   Q    Okay.  Are you aware of whether approval was sought to

6   target Mr. Croft on-line?

7   A    I am not aware of that.

8   Q    Okay.  So you were the case agent in charge of

9   investigating Mr. Croft, true?

10  A    I was.  Yes.

11  Q    And you don't know whether or not approval was sought to

12  target Mr. Croft on-line?

13  A    Not through an on-line undercover platform, no.

14  Q    Was there any approval sought to target Mr. Croft on-line

15  using any platform?

16  A    So through a CHS contact, yes.  We have approval for CHSs

17  to target individuals, and if you are referring to undercover

18  platforms we did have approval for him to be targeted by the

19  undercover platform out of the Detroit division.

20  Q    Okay.  So you are aware of on-line targeting of Mr. Croft?

21  A    But it's not just on-line.  We did not have the

22  undercover -- the on-line undercover individual target

23  Mr. Croft.  That was a physical undercover that we were

24  utilizing for that investigation.

25  Q    Who is Thomas Szymanski?

1     A    He is an agent out of my division.

2     Q    Was he also working on Mr. Croft's investigation?

3     A    He assisted in this investigation.  Yes.

4     Q    Okay.  Did he have -- do you know if he ever asked for

5  on-line targeting of Mr. Croft?

6     A    I cannot recall, sir.

7     Q    Okay.  I believe you testified, it's been a week ago now,

8  that Mr. Robeson came to your attention in May of 2020, is that

9  right?

10    A    I don't recall the exact date.

11    Q    Okay.  When is your best recollection of when Mr. Croft --

12 or Mr. Robeson came to your attention?

13    A    April or May, at some point in that timeframe.  Yes.

14    Q    How did you first learn of Mr. Robeson?

15    A    We got a conference call from an agent out of the Norfolk

16 division who was utilizing Mr. Robeson for her case that was

17 down in, I think it was North Carolina or South Carolina, and

18 that individual stated that the CHS that was working on her

19 case was going to be possibly meeting with our subject,

20 Mr. Croft.

21    Q    And what was the agent's name in Norfolk?

22    A    Her name was Agent Maldonado.

23    Q    And so you have an agent out of the Norfolk office who says

24 she is working with CHS Robeson, correct?

25    A    That is correct.  She was working with him regarding her

1     subject.

2     Q    And that subject was a Frank Butler, correct?

3     A    I do not know if that was the case that he was working on.

4     Q    Okay.  So an agent out of Virginia is working a case with

5     Mr. Robeson, correct?

6     A    That is correct.

7     Q    Mr. Robeson is being handled by a Doug Rubal out of

8     Wisconsin initially, right?

9     A    That is correct.

10    Q    And then it gets transferred to a Matt Bazala in Wisconsin

11    for handling, right?

12    A    That is correct.

13    Q    And then we also have an Agent Maldonado in Virginia who is

14    handling Robeson, correct?

15    A    I cannot confirm that she was a handler of Mr. Robeson.

16    Q    Working with?

17    A    I'm sorry?

18    Q    Working with?

19    A    Working with, yes, but I don't know if she was a handler.

20    There is official approvals that have to be for her to be an

21    actual handling agent.

22    Q    She knew his identity, correct?

23    A    That is correct.

24    Q    And then she reached out to you and shared his identity,

25    correct?

1    A    That is correct.

2    Q    It's FBI policy that agents keep the identities of CHSs

3    confidential, right?

4    A    So that is correct to a certain extent.

5    Q    And so it's the normal procedure that only the handling

6    agent and cohandling agent and supervisors will know the true

7    identity of a confidential source, correct?

8    A    That is not entirely correct.

9    Q    Okay.  So if another special agent like Reineck had

10   testified to that he would be wrong?

11   A    I cannot say in -- there are other individuals within that

12   field office that have the ability to know the true identity

13   because they have access to the specific system regarding the

14   confidential side of what they have to do for their case work.

15   Q    You said within the field office.  You mean within the

16   field office that's handling the confidential source, correct?

17   A    That is correct.

18   Q    And in this case that would be Milwaukee, right?

19   A    That is correct.

20   Q    But you weren't in Milwaukee, right?

21   A    That is correct.

22   Q    And neither was Special Agent Maldonado, correct?

23   A    That is correct.

24   Q    Are you aware of any other field offices with which Robeson

25   worked?

1    A    I am -- I cannot think, I mean, outside of the Michigan

2    area that he was working on this case with us.

3    Q    Do you know, did the Michigan agents know Steve Robeson's

4    role as a CHS?

5    A    Yes.

6    Q    And they knew his identity, his true identity?

7    A    That is correct.

8    Q    So outside of the office that was handling we had Michigan,

9    Virginia, Baltimore.  Any other offices?

10   A    To be honest with you I can't think of anybody that would

11   know his true identity at this time.  I don't know.

12   Q    Okay.  Now, you testified on direct examination that

13   Mr. Croft and Mr. Robeson had contact in North Carolina.  Do

14   you recall testifying to that?

15   A    Either North Carolina or South Carolina.

16   Q    You would agree that it could have been South Carolina,

17   right?

18   A    Yeah.  I am not sure where they actually met.  If I recall

19   I think it was Myrtle Beach but I could be wrong.  I don't

20   know.  It was at the beach somewhere either in North Carolina

21   or South Carolina.

22   Q    We can agree that Myrtle Beach is in South Carolina, right?

23   A    That is correct.

24   Q    Okay.  And you have sworn out a number of search warrants

25   related to Mr. Croft, correct?

1    A    That is correct.

2    Q    And when you swear out a search warrant you have to tell

3    the court the facts that you think justify a search warrant,

4    true?

5    A    That is correct.

6    Q    And you would agree that you swore out a search warrant for

7    a telephone on September 11, 2020, correct?

8    A    I do not recall.

9    Q    Would it refresh your recollection to review your search

10   warrant application?

11   A    Yes.  It would.

12            MR. KESSLER:  I am not sure what the relevancy of this

13   is either?

14            THE COURT:  I am not either.  What is it?

15            MR. BLANCHARD:  One of the allegations in there

16   clarifies where they met.

17            THE COURT:  Do we really care whether it's North or

18   South Carolina?

19            MR. BLANCHARD:  I think it does matter for the case,

20   yeah.

21            THE COURT:  Why?  I mean, he said Myrtle Beach and we

22   all agree it's South Carolina.  And what's the -- the jury will

23   have to recall the direct exam and whether he said anything

24   different than that.

25   BY MR. BLANCHARD:

1    Q    So you would agree that wherever they were was on the

2    beach, correct?

3    A    Yes.  I remember seeing a picture of them at the beach at

4    this meeting.  Yes.

5    Q    And you are aware that your confidential source invited

6    Mr. Croft to wherever this beach location was, correct?

7    A    I cannot say that the CHS invited him or if it was a mutual

8    let's meet up while we are there together.  I cannot tell you

9    that he actually invited him there.

10   Q    Would you agree that the meeting was on May 11 of 2020?

11   A    I do not recall the date specifically.  Like I said, I

12   remember it being either in late April, beginning of May, but I

13   do not remember.

14   Q    Would it refresh your recollection to look at your search

15   warrant affidavit where you discuss the matter?

16   A    Yes.

17             THE COURT:  I mean, okay, but does it really matter?

18             MR. BLANCHARD:  The date does matter.

19             THE COURT:  Why?

20             MR. BLANCHARD:  Because later there is a report about

21   Dublin on the same day and so the date matters.

22             THE COURT:  All right.  Go ahead.

23   BY MR. BLANCHARD:

24   Q    I am handing you your September 11 search warrant

25   affidavit.

1    A    Thank you, sir.

2    Q    You can look at anything, but I think paragraph 17 will

3    help you.

4    A    It does say May 11.

5    Q    It says May 11.  And that was your sworn statement,

6    correct?

7    A    It does say May 11th.

8    Q    And it was your sworn statement, correct?

9    A    That is correct.  Yes.

10   Q    So you believe that May 11 is true, correct?

11   A    To the best of my knowledge at this time, yes.

12   Q    Now, I want to turn your attention back to spring of 2020,

13   okay?  Yes?

14   A    The spring of 2020.  Yes.

15   Q    And you remember that there were protests going on around

16   the country in the spring of 2020, correct?

17   A    There were lots of protests and civil unrest through the

18   country, yes.

19   Q    In fact, you are aware that there were protests and riots

20   in Columbus, Ohio in 2020, correct?

21   A    I am aware of them.  Yes.

22   Q    Okay.  You are aware that there were protests and riots in

23   Columbus on the weekend of the Dublin meeting, correct?

24   A    So I do not recall there actually being riots that weekend.

25   I remember that they had -- the national guard was set up to

1    prevent such things but the weekend prior to there were.

2    Q    Okay.  So the weekend prior to you recall riots, yes?

3    A    I was informed of riots, yes.

4    Q    And on the weekend of the Dublin meeting the national guard

5    was set up to prevent riots, correct?

6    A    That's what I was informed, yes.

7    Q    And at the Dublin meeting Mr. Robeson was your

8    responsibility, correct?

9    A    That is not correct.  No.

10   Q    You provided him with a recording device, right?

11   A    That is correct.  I provided him a recording device.

12   Q    Was there another agent there monitoring him?

13   A    Yes.  His handling agent, Matt Bazala, was at the meeting

14   as well.

15   Q    Okay.  And you surveilled Mr. Robeson while you were there,

16   correct?

17   A    I did not.

18   Q    You were with Agent Bazala when he did, correct?

19   A    We were not co-located in the same vehicle.

20   Q    Okay.  You were in communication with Agent Bazala, fair?

21   A    That is correct.

22   Q    And you were aware of what was going on with Mr. Robeson,

23   fair?

24   A    Maybe not exactly what was going on at that time but

25   definitely afterwards.

Q    In part because you've listened to audio recordings?

A    That and with regards to actually having conversations while we are doing surveillance.

Q    You are aware that CHS Steve attempted to take Mr. Croft and others to the scene of the riots in Columbus, correct?

A    We were informed afterwards that they were going to be driving around the city.  That's all we were informed.

MR. BLANCHARD:  Okay.  If I could have 35T, please?

THE COURT:  Is this already in?

MR. BLANCHARD:  I believe so.

THE COURT:  Go ahead.

MR. BLANCHARD:  And if I could have a call out on the third paragraph?

BY MR. BLANCHARD:

Q    This was a recording that was put in from the Dublin meeting, correct?

A    That is -- I am assuming so.  Yes.

Q    And Mr. Croft speaks in that about the riots, correct?

A    He does, in fact, speak about riots but it's not specific to Columbus.

Q    Sure.  He doesn't say Columbus but he says they are rioting and shit, right?

A    That is correct.  He does say that.

Q    Okay.  And then, if I could have 41T as well?  Page 3.  The last paragraph, the Fox, please.

1          This is another exhibit that came in last week where

2     Fox is talking about rioting, correct, but in Grand Rapids,

3     true?

4     A    Yes.  He does talk about rioting going on in Grand Rapids.

5     Q    Thank you.  You can take that down.  And in each of -- in

6     each of these transcripts there was talk about violent reaction

7     by Mr. Croft or Mr. Fox, correct?

8     A    I'm sorry.  Could you repeat the question?

9     Q    There was talk of violence by Mr. Croft or Mr. Fox in those

10    transcripts, right?

11    A    There was violent -- violent talk about that.  Yes.

12    Q    And it was in the same conversation where they were talking

13    about the riots that were going on, correct?

14    A    They did discuss riots and they were discussing violence at

15    the same time.  Yes.

16    Q    Now, at the Dublin meeting on June 6 we have established

17    that Steve Robeson was there as a confidential source, correct?

18    A    That is correct.

19    Q    We also had Jennifer Plunk there, right?

20    A    99802 was there.  Yes.

21    Q    Okay.  99802 is Jennifer Plunk, right?

22    A    Yes.

23    Q    Okay.  So Jennifer Plunk was there, right?

24    A    Yes.

25    Q    Okay.  And you were her handling agent, correct?

1    A    I was 99802's handling agent.  Yes.

2    Q    You never gave her permission to engage in otherwise

3    illegal activity, correct?

4         THE COURT:  Well, that's been asked and answered at

5    least three times.

6    BY MR. BLANCHARD:

7    Q    You never gave CHS Steve permission to engage in otherwise

8    illegal activity in Dublin, correct?

9         THE COURT:  There is no foundation for that.  He has

10   already testified that was not his responsibility, that

11   individual.

12        MR. BLANCHARD:  Well, I understand that he wasn't his

13   handling agent.  I just want to be clear that he didn't give

14   him the okay.  We are going to talk to his handling agent

15   later.

16        THE COURT:  Right.  So let's wait for his handling

17   agent.

18        MR. BLANCHARD:  I just don't want to be in a situation

19   where the handling agent said, I don't know.  Maybe --

20        THE COURT:  Did you give him permission to commit

21   illegal acts?

22        THE WITNESS:  I did not give Steve Robeson any

23   permission to commit any illegal acts personally myself.  No.

24   BY MR. BLANCHARD:

25   Q    Thank you.  But you did -- you knew that the participants

1    at Dublin were smoking marijuana, correct?

2    A    I knew that the individuals that were attending this

3    meeting did, in fact, smoke marijuana at times.

4    Q    And those individuals included Steve Robeson?

5    A    Steve Robeson was in attendance in that meeting.  Yes.

6    Q    And someone who smoked marijuana, correct?

7    A    That is correct.

8    Q    Jenny Plunk was in attendance at that meeting, correct?

9    A    That is correct.

10   Q    And smoked marijuana, correct?

11   A    Can you clarify that question?

12   Q    Jenny Plunk smoked marijuana at the Dublin meeting,

13   correct?

14   A    I cannot say that because I do not know if she smoked

15   marijuana at the Dublin meeting.

16            MR. BLANCHARD:  Could I have 34T, please?

17            THE COURT:  I am not sure that's in yet, is it?

18            MR. BLANCHARD:  I thought it was.

19            THE COURT:  314?

20            MR. BLANCHARD:  34.

21            THE COURT:  34.  I'm sorry.  Go ahead.

22   BY MR. BLANCHARD:

23   Q    34T is another exhibit -- another recording from Dublin,

24   correct?

25   A    I mean, the date on that -- I don't know the date of that.

1    Q    Yeah.  Look at what it says for Mr. Croft in the first

2    paragraph.

3           THE COURT:  It should be right there in the book if

4    you want to see the whole thing.

5           THE WITNESS:  Thank you, sir.

6           Could you repeat your question again, please?

7    BY MR. BLANCHARD:

8    Q    34T, if you just review the transcript perhaps, would you

9    agree that that was from the Dublin meeting?

10   A    Yes.  That's a transcript from the Dublin meeting.

11   Q    Thank you.  How long was the Dublin meeting?

12   A    I don't know off the top of my head.  There were

13   multiple -- multiple times where individuals were kind of

14   meeting and having discussions.  So there wasn't really, like,

15   an official start time and an official end time.

16   Q    How long were the recordings from the Dublin meeting?

17   A    I don't know that off the top of my head.  The number of

18   hours I don't know.

19   Q    More than two?

20   A    Yes.  It would be more than two hours, correct.

21   Q    More than five?

22   A    Yes.  I would say it was more than five.

23   Q    More than ten?

24   A    I don't know if it was more than 10.  Possibly 11 at most.

25   I don't know off the top of my head, sir.

Q    So you think around maybe 10 or 11 hours of recording from

Dublin?

A    Yes, sir.  I would say that's probably close to that

number.

Q    And this clip in 34T is what, about 14, 15 minutes?

A    I don't know the time length of this clip, sir.

Q    You would agree that Mr. Croft did not plan the Cambria,

Wisconsin meeting, correct?

A    I'm sorry.  Could you say that question again?

Q    Sure.  Would you agree that Mr. Croft did not plan the

Cambria --

          MR. KESSLER:  Objection, Your Honor.  Hearsay,

speculation.

          THE COURT:  I mean, he can address it if he knows.

The reality is he doesn't have a lot of foundation to talk

about it, but if he wants to probe it a little bit I think

we'll let him go.

BY MR. BLANCHARD:

Q    You would agree that Mr. Croft did not plan the Cambria,

Wisconsin meeting, correct?

A    So I would not agree with that.  To our knowledge Mr. Croft

was the one who planned and organized this meeting.

Q    Okay.  You -- I think we have covered this but I want to

make clear.  You swore to a search warrant affidavit for

Mr. Croft's phone, correct?

1    A    That is correct.

2    Q    And you told the truth in that search warrant affidavit,

3    correct?

4    A    To the best of my ability, yes.

5    Q    And when you swore to that search warrant affidavit you

6    wrote that during the June 6, 2020 meeting in Ohio, Croft

7    learned about a firearms and militia training planned to take

8    place in Wisconsin on July 11 and 12, 2020.  Croft indicated he

9    planned to attend.  Correct?

10   A    That is correct.  Could -- could you repeat that question

11   again?

12   Q    You wrote in the search warrant affidavit dated September

13   11, 2020, that during the June 6, 2020 meeting in Ohio, Croft

14   learned about a firearms and militia training planned to take

15   place in Wisconsin on July 11 and 12, 2020, correct?

16   A    So yes.  That was a normal militia meeting that was going

17   to occur in Cambria that Steve Robeson, because he was the head

18   of their militia group, he had that planned as a normal militia

19   completely legal event that was going to occur.

20   Q    Okay.  So what you are saying is when Mr. Croft is in

21   Dublin there is a -- there just happens to be a training

22   already planned in Cambria for July 11 and 12, correct?

23   A    So that is correct.

24   Q    And Mr. Croft did not plan that July 11 and 12 meeting that

25   you describe as perfectly legal in Cambria, correct?

1   A    So I would not -- I would not articulate it that way.  I

2   would state that it's a nuance of the meeting that occurred

3   amongst the group of people that were in Dublin that were going

4   to then meet in Cambria because there were a lot of other

5   individuals that were legally there for just militia training.

6   Q    Okay.

7   A    And there was a subgroup of those individuals that were

8   there for the same meeting purposes that they were there for in

9   Dublin.

10  Q    So I just want to be clear here.  So when we are in

11  Dublin -- when Mr. Croft is in Dublin there already exists a

12  plan to have a meeting on July 11 in Cambria, Wisconsin,

13  correct?

14  A    So I don't necessarily know that there was an actual

15  official, like, we are going to be here for a meeting until

16  Dublin occurred.

17  Q    Well -- okay.  You wrote that during the meeting Croft

18  learned about training planned to take place in Wisconsin on

19  July 11 and 12, right?

20  A    That is correct, because he learned that there was a

21  militia training event that was going to occur in Cambria.

22  Q    So maybe Robeson came up with the idea while he was in

23  Dublin, is what you are saying?

24            MR. KESSLER:  Objection.

25            THE COURT:  That's argumentative.  It's not what he's

1    saying, and you can argue that that's what he means or should

2    mean or what inference the jury should draw, but that's for

3    them to draw.  Go ahead.

4    BY MR. BLANCHARD:

5    Q    So at the time that Mr. Croft was at the June 6 meeting in

6    Ohio, someone else had planned a July 11 meeting in Cambria, is

7    that fair?

8    A    So there was a regular militia meeting that had been

9    planned.  For how long I do not know.  That could have been a

10   year out for all I know that that regular militia meeting was

11   going to occur because it's a training event that militias do

12   within their own organization.

13   Q    Okay.  And that training, whoever planned it, whenever it

14   was planned, was not Mr. Croft, correct?

15              MR. KESSLER:  Objection, Your Honor.

16              THE COURT:  Well --

17              MR. KESSLER:  He said he didn't know.

18              THE COURT:  You can answer if you are able, but go

19   ahead.

20              THE WITNESS:  I do not know who organized that

21   training.

22   BY MR. BLANCHARD:

23   Q    Well, if Mr. Croft had organized it you wouldn't have

24   written that he learned about it at the Dublin meeting?

25              THE COURT:  That's argumentative.  That's prior

1    inconsistent statement from your perspective, and I think it's

2    clear enough from what we've gone around on this what his

3    position is and what your position is, and ultimately the jury

4    will have to sort it out.  I don't think we are really gaining

5    any ground at this point.

6              MR. BLANCHARD:  Okay.

7    BY MR. BLANCHARD:

8    Q    Mr. Robeson also had a recording device at the Cambria

9    meeting, true?

10   A    Yes.  Yes.  He did.

11   Q    And he used it?

12   A    Yes.  He used his recording device.

13   Q    You know what it means to be high in ordinary parlance,

14   right?

15   A    I have never used drugs, so I don't know what it's like to

16   be high if that's what you are referring to there.

17   Q    I think -- I meant to ask, maybe I didn't, you know what it

18   means to be high, correct?

19   A    I know of what it is to be high.

20   Q    When somebody says they are high you know what they are

21   talking about, right?

22   A    That is correct.

23   Q    And if we could publish 84T, please?  The next page.  I

24   think one more page, please.  One more.  If you call out where

25   it says Kim, the second instance from the bottom, please?

1          You remember this recording that was played for the

2     jury, correct?

3     A    I do.  Yes.

4     Q    And this is a recording from Steve Robeson's house near

5     Cambria, Wisconsin, correct?

6     A    I don't know where this physical location was.

7     Q    It's the day before the FTX in Cambria, correct?

8     A    Yes.  But the residence of Mr. Robeson was not where the

9     actual FTX was.

10    Q    I understand that.  That's why I said near.  But he lives

11    in a different town, right?

12    A    I don't know where Mr. Robeson lives.

13    Q    Okay.  You are aware that the recording was made in his

14    residence, right?

15    A    I have -- I am not a hundred percent aware that that's

16    exactly where it was.

17    Q    Okay.  So this is -- where it says Kim, that's

18    Mr. Robeson's wife, correct?

19    A    Kim is Mr. Robeson's wife, yes.

20    Q    And she says, what, to high to stand?  Is that correct?

21    A    That is what she says.  Yes.

22    Q    And you understand when she asked that question she is

23    asking if one of the participants in that conversation is too

24    high to stand up and function, right?

25          MR. KESSLER:  Asking for speculation.

1      THE COURT:  I think now you are asking him to

2  interpret it and that's a job for the jury.  The evidence is

3  the -- not even the transcript.  The evidence is the recording.

4  So at this point, you know, I'd sustain Mr. Kessler's objection

5  to having him interpret.

6  BY MR. BLANCHARD:

7  Q   Are you familiar with something -- are you familiar with

8  drug terms?

9  A   I am not.  I do not work drugs.

10  Q   Okay.  So when somebody talks about juice or being juiced

11  up, you don't know what that means?

12  A   I --

13      THE COURT:  Well, here is the problem with that whole

14  line of questioning.  It's not what he thinks it means, it's

15  what the speaker says it means, and the speaker is not here to

16  talk about it.  So all of this is just trying to have a witness

17  who wasn't there interpret what other people meant when they

18  said things, and I don't think that's fair.  So I sustain the

19  objection to that line of questioning whether it's juice, high

20  or anything else.

21  BY MR. BLANCHARD:

22  Q   You are aware that marijuana was also used at Cambria,

23  Wisconsin, correct?

24  A   I actually do not know that marijuana was used.  I am

25  assuming that it was but I was not physically there, so I don't

1      know if people did use marijuana.

2      Q    Okay.  There has been talk about something called a shoot

3      house.  Are you familiar with what a shoot house is?

4      A    Yes.  I do know what a shoot house is.

5      Q    Sometimes witnesses have referred to it as a kill house.

6      Is that the same thing?

7      A    I guess that could be a different terminology for it.  Yes.

8      Q    These are sort of fake room structures that are used for

9      training purposes, right?

10     A    Yes.  That would be a way to describe it.

11     Q    And people train entering the rooms with guns, correct?

12     A    They can train lots of things, but yes, that is one of the

13     things that they can train.

14     Q    The first one that you are aware of in this case was at

15     Cambria, Wisconsin, correct?

16     A    During this investigation?

17     Q    Yes.

18     A    Yes.  That's the first time we had seen or heard of a shoot

19     house.

20     Q    And the one in Cambria was made of plywood, correct?

21     A    I can't guarantee that it was only plywood, but there was

22     plywood involved.  Yes.

23     Q    I mean, you've seen photos of it, right?

24     A    I have.  Yes.

25     Q    And the majority of it was plywood, yes?

A     The exterior walls.  I believe there was an earthen berm as well.

Q     It appeared it had been assembled before?

A     Say that again.

Q     It appeared as though that it had been assembled before, right?

A     Did you say symbol or assembled?

Q     Assembled.  Put together.

A     Yes.

Q     It appeared as though it had been put together before, right?

A     Yes.  Correct.  It was not erected that day.

Q     And you know that Robeson had used these shoot houses to train before these guys ever got together, right?

A     Yes.  He had discussed utilizing shoot houses for normal militia training.

Q     Right.  In fact, in one of the exhibits you played last week he said that, we train in the fucking kill houses.  That's what we do.  Right?

A     Yes.  He said that.

Q     If I could have 108T, the last paragraph, please?  The next page.  Last paragraph of the last page.  There you go.

        This is an excerpt from 108T where Mr. Croft is talking, right?

A     Yes.  Mr. Croft is talking.

1    Q    And it just sort of ends kind of mid-sentence, right?

2    A    Yeah.  The recording device was not able to actually

3    audibly understand what was being said afterwards.

4    Q    That's because Mr. Robeson walked away, correct?

5         MR. KESSLER:  Objection.  Speculation.

6         THE COURT:  You'd have to lay foundation.  I don't

7    know how he would know that.

8    BY MR. BLANCHARD:

9    Q    You've listened to the audio recording, correct?

10   A    I have listened to the audio recording.

11   Q    And when you listen to the audio recording you hear

12   Mr. Croft speaking, right?

13   A    That is correct.

14   Q    And then you hear Mr. Croft's voice fade away, correct?

15   A    That is correct.

16   Q    And then you hear Mr. Robeson in the bathroom, correct?

17   A    I don't recall him being in the bathroom.  I could be

18   wrong.

19   Q    But you hear him walk away, correct?

20   A    I hear him walking.  I don't know if he is walking away.

21   Q    So this clip here, this 108T, is -- it purports to be

22   Mr. Croft talking about shooting people with infrared scopes,

23   right?

24   A    So FLIRs are not just infrared, but that is one if that's

25   what you are referring to the FLIR, that that is a type of

1    scope that doesn't just do infrared.  It does other things as

2    well.

3    Q    They are talking about shooting people.  Mr. Croft is

4    purportedly talking about shooting people.  Right?

5    A    In this instance, yes, it appears so.

6    Q    And this is what Mr. Robeson was tasked to record, right?

7    A    He was tasked to record the event.  Yes.

8    Q    And then he just gets up and walks away?

9    A    I cannot say that he walked away from the conversation.  He

10   may have walked to the other side.  I don't know where he

11   walked to.

12   Q    He walked somewhere that we could no longer pick up the

13   conversation, right?

14   A    That is correct.

15   Q    Okay.  If I could have 82T, please?

16        This is another recording of Mr. Croft, correct?

17   A    Mr. Croft is involved in this recording.  Yes.

18   Q    And if I could have, I think it's on the second

19   paragraph -- excuse me, third page, third to last paragraph.

20        This is where Mr. Croft, he says, it's going -- he is

21   talking about the explosive, right?

22   A    Yes.  He is talking about an explosive device that they

23   constructed.

24   Q    And he says, it's going to be absolutely stupid, right?

25   A    Yes.  That is what he said.

Q    And this is the device that you say they tried to blow up
the next day at Cambria, correct?

A    I am not aware whether this device -- because they made
multiple devices, I don't know if this specific device is the
one that they detonated or attempted to detonate or explode.  I
do not know the answer to that question.

Q    It's the same kind of device, right, because this
transcript talks about a balloon, fair?

A    This transcript does, yes, but there were multiple ways in
which they could have created this device.

Q    Okay.  So he says it's going to be absolutely stupid when
it goes off, right?

A    He does say that.  Yes.

Q    They weren't able to set it off, right?

A    I do not know whether it exploded or not, sir.  It was not
captured by the audio recording.

Q    So your job was to watch Mr. Croft and you don't know
whether the explosive went off?

A    I was not at the actual venue.  No, sir.

Q    Okay.  So when he says, it's going to be absolutely stupid,
you understood that to mean it's going to be big?

            THE COURT:  Same objection.  Same ruling.  This is not
an occasion for him to interpret what everybody on the tape
meant when they said things.

BY MR. BLANCHARD:

Q    331, please.  I am going to show Exhibit 331.  If I could

have a call out on the very top of the white receipt?  Thank

you.

Exhibit 331 look familiar to you?

A    Yes.  That's the receipt for fireworks.

Q    These are the fireworks that Mr. Croft purchased, correct?

A    That is correct.

Q    And what date were they purchased on?

A    July 1st, 2021, or I'm sorry, 2020.

Q    Just before the July 4th holiday?

A    That is correct.  It was before July 4th.

Q    Take it down.

It's not unusual for people to buy fireworks in the

days leading up to July 4th, right?

A    I would say if you are going to buy fireworks, before the

4th of July would be a good time to buy them.

Q    Okay.  Now, the kinds of fireworks we are talking about

were mortars, true?

A    That is the style of fireworks that they are.  Yes.

Q    And mortar is a firework that has a propellant charge and

then an explosive charge that gives us the colors we see,

correct?

A    That is correct.

Q    So the propellant charge lifts it up into the air, yes?

A    That is correct.

Q And it blows up when it's in the air?
A That is correct.
Q And it's a form of a rocket, correct?
A So that -- the nuances of what a rocket is versus a mortar, they are -- from an explosive ordinance disposal aspect of it they are not one in the same because a rocket has a set of venturis on the back that allow it to be propelled. It doesn't need a mortar tube to be contained to have it lift off. So a mortar is something that you have a tube that sits on the ground. You drop the propellant and the actual explosive into the actual tube and the propellant launches it out of the tube, versus a rocket is something that is -- it's got like an actual propelling rocket motor that's contained and then it burns out the back propelling it forward and at different directions. So I cannot say that they are one in the same.
Q And my question wasn't are they one in the same. My question was a mortar is a kind of rocket?
A I would say no. They are not the same for that reason.

MR. BLANCHARD: Can I have Exhibit 3004, please?

THE COURT: I don't think this one is in yet.

MR. BLANCHARD: This should only be displayed to the -- or you have an exhibit book there. If you would grab behind you. I'm sorry, behind you, Agent. Behind you against the wall. Volume 3.

THE COURT: Do you have an objection to this?

1          MR. KESSLER:  Yeah.  Relevance, Your Honor.

2          THE COURT:  All right.

3          THE WITNESS:  I don't know which one you are looking

4     for, sir?

5          MR. BLANCHARD:  3004, please.

6          THE COURT:  All right.  What's the foundation and

7     what's the relevance?

8          MR. BLANCHARD:  It's an item that was seized from

9     Mr. Croft by the government pursuant to their search warrant.

10         THE COURT:  All right.

11         MR. BLANCHARD:  And the relevance is he intended to

12    make silver bits as currency and that was his goal.

13         THE COURT:  We don't know what his intentions are.

14         MR. BLANCHARD:  I understand.

15         THE COURT:  We have -- so what's the relevance right

16    now?

17         MR. BLANCHARD:  Well, I need to lay the foundation

18    that it was seized from Mr. Croft.  Whether we admit it now

19    fully or conditionally I'll have to tie up later.  That's the

20    goal, but I need the testimony from the agent.

21         THE COURT:  You can certainly find out if he knows

22    whether this was seized from Mr. Croft's home as part of the

23    search.

24    BY MR. BLANCHARD:

25    Q    Do you recognize that?

1    A    This is a piece of evidence that was seized by the search

2    warrant team.

3    Q    Okay.  And it was seized from Mr. Croft, correct?

4    A    It was seized from his house.

5    Q    All right.  In Bear, Delaware, correct?

6    A    That's correct.

7    Q    And this depicts the silver bar that was taken from him?

8         THE COURT:  Don't go into the content until we hear

9    what the further objection is.

10        This was seized and does it fairly and accurately

11   represent what it looked like when it was seized, if you know?

12        THE WITNESS:  I wasn't actually at the seizure, but

13   this is what I saw after the search was conducted and this was

14   the evidence that was brought back to the office.

15        THE COURT:  All right.  Do you need more from this

16   witness on this exhibit?

17        MR. BLANCHARD:  No.

18        THE COURT:  All right.

19   BY MR. BLANCHARD:

20   Q    Turn your attention in that book to Exhibit 3053.

21   A    I'm sorry, what number again?

22   Q    3053.  Do you recognize that document?

23   A    I do recognize this text message.  Yes.

24   Q    And that is a text message between you and your

25   confidential source, Jenny Plunk, correct?

1    A    That is a text message with 99802.

2    Q    Who is also known as Jenny Plunk, right?

3    A    Yes.

4    Q    And you are the person identified as Shorty Long, correct?

5    A    That is my phone number.  Yes.

6    Q    And then the other person there named Old Dweeb, is that

7    Penrod?

8    A    That is John.  Yes.

9    Q    Okay.  Does this fairly depict the text message that you

10   sent on August 10, 2020?

11   A    It's a screen shot of the text message, yes.

12            MR. BLANCHARD:  Move the admission of 3053?

13            THE COURT:  It can be admitted.

14            MR. BLANCHARD:  Can we publish 3053 to the jury,

15   please?  If you can do a call out just on the body, please?

16   BY MR. BLANCHARD:

17   Q    So this is a message where you are giving direction to

18   Ms. Plunk, correct?

19   A    Yes.  We were providing some instructions on how to discuss

20   things with individuals.

21   Q    You are instructing her to try to keep the group together,

22   correct?

23   A    That is correct.

24   Q    And that to show the group that Croft brought them

25   together, correct?

1    A    So this is a little bit out of context.  So the text

2    messages and conversations that we had with 99802 prior to

3    involved the events of post-Dublin.  So Mr. Croft had a group

4    of individuals that he had been communicating with from various

5    states, Virginia, Ohio and things like that, and the

6    information that we were provided by 99802 was that Mr. Croft

7    had all of these great ideas and was the one who brought them

8    altogether in the first place.  And after the Peebles, Ohio

9    meeting there was a lot of individuals that were in that

10   meeting that were really, really upset with how things were

11   basically presented at that time.

12   Q    So let's break this down.  You are telling her to show

13   these people that they were brought together by Croft, correct?

14   A    Correct.  We were trying to help her to remind her that

15   Mr. Croft was the one who basically started this conversation

16   with this group of people.

17   Q    And you wanted her to remind this group that Mr. Croft had

18   good ideas, right?

19   A    Good ideas in the sense of the group, yes.

20   Q    Okay.  And you encouraged her to have them find a common

21   ground?

22   A    That is correct.

23   Q    And to show them the good ideas Croft brought, right?

24   A    That is correct.

25   Q    Okay.  Now, and to compromise?

1    A    Compromising meaning in the sense of, like -- essentially

2    what was provided to us was after the Peebles, Ohio meeting.

3    This group of individuals from those various states that I

4    previously mentioned were trying to vote out Mr. Croft from

5    this group because they believed that he was way more violent

6    than what they wanted to at that time.  They all wanted to do

7    violence, but Mr. Croft was ready to do it right now, and their

8    concern was that he was going to get them locked up or arrested

9    before their timeline was actually set in stone.

10   Q    So we're talking about people in Peebles, Ohio, correct,

11   that are upset?

12   A    No.  That was where the meeting was.  The meeting -- this

13   was post-Peebles, Ohio.

14   Q    That's what I mean.  So where people got upset with

15   Mr. Croft was at Peebles, Ohio, correct?

16   A    That is correct.  They were upset with the --

17   Q    Let's take this one at a time.  If you can answer my

18   question, just answer my question, please.

19   A    Yes, sir.  I am trying to.

20   Q    So Mr. Croft goes to Peebles, Ohio, correct?

21   A    Yes.  Mr. Croft did go to Peebles.

22   Q    Just yes or no.  Did he go to Peebles, Ohio?

23   A    Yes.

24   Q    Okay.  And at Peebles, Ohio, people got upset with him,

25   correct?

1   A    Yes.

2   Q    And this message to Jenny Plunk is in response at least in

3   part to that upset from Peebles, Ohio, correct?

4   A    Yes.

5   Q    Because Peebles, Ohio wanted to kick Mr. Croft out of the

6   group, correct?

7   A    Yes, because he was more violent.

8   Q    And Mr. Croft left Peebles, Ohio before the meeting was

9   over, correct?

10  A    That is correct.

11  Q    And when people wanted to kick Mr. Croft out of this group

12  that you said everyone wanted to do violence, you encouraged

13  her to try to keep him in, correct?

14  A    Yes.  That was so that we had access to these individuals,

15  because if Mr. Croft was going to attack someone on his own, we

16  may not have the ability to monitor what he was saying.

17  Q    Well, hang on.  Let's talk about that.  So Mr. Croft was in

18  communication with Ms. Plunk, right?

19  A    Yes.

20  Q    If Mr. Croft got kicked out of the Peebles group, Ms. Plunk

21  could still talk to him, right?

22  A    So Mr. Croft had a unique ability that if he did not feel

23  like you were on his side he would distance himself and stop

24  talking to you, so --

25  Q    Okay.  But you didn't direct Ms. Plunk, hey, make sure you

1   stay in touch with Mr. Croft, right?  That's not what you said?

2   A    No.  Because our concern was --

3   Q    You told Ms. Plunk that she needs to solve the differences

4   within the group, right?

5   A    Only because we were trying to make sure that we had access

6   to as many of these individuals who were all espousing violent

7   attacks against law enforcement and government officials.

8   Q    Your goal at the FBI is to break up violent action, right?

9   A    That is correct.  We are --

10  Q    If the group is dissolving on its own, that would break up

11  the violent action, right?

12  A    To be fair, the group wasn't dissolving in the sense of

13  going away and never wanting to conduct an attack.  The issue

14  was that they were going to go off, and the concern was that

15  they were going to have a lone wolf attack and we weren't going

16  to have access to the specific individuals at that time to be

17  able to tell whether they were going to conduct an attack by

18  themselves or not.

19  Q    So you directed Ms. Plunk to try and keep Mr. Croft in a

20  group with people that you thought were violent?

21  A    Say that again.

22  Q    You directed Ms. Plunk to try to keep Mr. Croft in a group

23  with people you thought were violent, correct?

24  A    The entire group was violent.  Mr. Croft was violent as

25  well.

Q   I am going to ask the question again.  You directed

Ms. Plunk to try to keep Mr. Croft in a group with people that

you believed to be violent, correct?

A   That is correct.

Q   We talked about some of the ways you communicated with

Ms. Plunk.  You also communicated with her via something called

ProtonMail, correct?

A   So 99802 provided us with her notes regarding

conversations.

Q   Hang on.  My question is, did you communicate with her

using something called ProtonMail?

A   We did not task her.  We did not tell her to do anything.

She provided us information through ProtonMail.  Yes.

Q   My question is, did you communicate with her through

ProtonMail?

A   We received information from her on ProtonMail.  Yes.

Q   Thank you.

A   In a draft form.

Q   And we're going to talk about that.  ProtonMail is an

e-mail provider out of Switzerland, right?

A   That is correct.

Q   And they tout themselves as being outside of the reach of

domestic law enforcement, correct?

          MR. KESSLER:  Objection, Your Honor.  How would he

know this?

1    THE COURT:  I don't know if he knows or not, but he

2    can answer if he does or doesn't.

3    THE WITNESS:  I do not know that.

4    BY MR. BLANCHARD:

5    Q   Okay.  So the way that you communicated with Ms. Plunk

6    through ProtonMail wasn't that she was sending you e-mails,

7    correct?

8    A   That is correct.

9    Q   What she would do is she would go into her ProtonMail

10   account, right?  She'd log into it?

11   A   That is correct.  She would log into the ProtonMail

12   account.

13   Q   And ProtonMail is a web based e-mail kind of like gmail,

14   right?

15   A   To my knowledge, yes.

16   Q   Okay.  And so she would log into ProtonMail and she would

17   prepare a draft e-mail, correct?

18   A   That is correct.  She would prepare a draft.

19   Q   She wouldn't send it to you?

20   A   That is correct.

21   Q   What she would do is she'd leave it in draft status, right?

22   A   That is correct.

23   Q   And then you or Mr. Penrod would log into her ProtonMail

24   account?

25   A   That is correct.  We'd have access to that ProtonMail

account.

Q    Using her password?

A    To be fair I created that account.  It was not her that created it.  So it was, in fact, my ProtonMail account that she was utilizing.

Q    Okay.  So when -- let's back up a second here.  So you said a minute ago that you didn't task her with using ProtonMail, correct?

A    To communicate or send e-mails through ProtonMail, correct.

Q    Okay.  But you did task her with using ProtonMail?

A    That is fair.  Yes.

Q    And you set up the ProtonMail account?

A    That is correct.  I did.

Q    And you told her how to use it?

A    I informed her of the password and user name.  Yes.

Q    And the way that you told her to use it was to log into ProtonMail?

A    That is correct.

Q    And to draft an e-mail?

A    That is correct.

Q    And to save the draft in the drafts' folder, right?

A    That is correct.

Q    But not to send it to you?

A    That is correct.

Q    So there is no record of these drafts ever being sent to

1    you, correct?

2    A    So they wouldn't be sent to anyone.

3    Q    Right.  And you would read the draft, correct?

4    A    That is correct.

5    Q    And sometimes you would save the drafts?

6    A    So we saved the drafts every single time.  Those drafts are

7    then provided in 1023s, so we provided all that information to

8    the AUSAs.

9    Q    How many times did you communicate with Ms. Plunk through

10   this draft procedure?

11   A    I don't know off the top of my head the number of times

12   that I communicated or received information from her.

13   Q    More than five?

14   A    I don't know.  It was not a lot, because most of the

15   interactions that we had with 99802 was in person after these

16   meetings that we would do a debrief afterwards.

17   Q    And you would delete the drafts from the ProtonMail

18   account, correct?

19   A    After they were saved, yes.

20   Q    Okay.  And so when they were saved you would copy the body

21   of the draft, correct?

22   A    That is correct.

23   Q    But there aren't e-mail headers, right, because the e-mail

24   wasn't sent?

25   A    There was no e-mail address attached to it.

Q    So things like the time the draft was created, that's lost, correct?

A    That is true, because the issue with the draft system, especially with Proton, is every time you access that e-mail it gives you a new timestamp on when it was, you know, viewed.  So it doesn't just give you -- because you never actually physically sent it anywhere it doesn't give you a, hey, this is when it was actually created the first time, and that timestamp stays to my knowledge.

Q    So the ProtonMail system, you could have had her just e-mail you?

A    I could have but the issue with that was that I didn't want my e-mail address on her personal phone because if she was in close proximity to one of the individuals that we have an interest in and we are investigating, if by chance my contact information pops up on her phone then she would be compromised, and it's very dangerous in that situation for that individual.

Q    You could have had her e-mail herself at ProtonMail, right?

          MR. KESSLER:  Your Honor, I am going to object.

          THE COURT:  I mean, he can answer if he is able.  Lots of things are possible I guess, but he's already explained why he did it this way.

BY MR. BLANCHARD:

Q    You could have had her e-mail herself, right?

A    I could have but that's not what I thought about at the

1     time.

2     Q    You and your partner had a nickname for Mr. Croft, right?

3     A    I did not have a nickname for Mr. Croft.

4     Q    You referred to him as something other than Barry or Barry

5     Croft, right?

6     A    It's a possibility I did.

7     Q    You referred to him as BH, right?

8     A    So I did not necessarily directly call him BH.

9     Q    Okay.  Your partner referred to him as BH, correct?

10    A    I do not understand why you are asking me a question about

11    what my partner may have called him.

12    Q    Because I'm curious.  Did your partner call him BH?

13             MR. KESSLER:  What is the relevance?

14             THE COURT:  Well, we'll probably find out if we know

15    what BH means, but you know, if his partner -- if he heard his

16    partner use the term, okay, you can go a little bit on it if

17    you know.  Maybe he doesn't.

18             THE WITNESS:  It could have been any number of names.

19    It could have been bonehead.

20    BY MR. BLANCHARD:

21    Q    My question was -- go ahead.  It could have been bonehead.

22    What else could it have been?

23             THE COURT:  Well --

24             THE WITNESS:  It could have been anything.

25             THE COURT:  Now, unless he knows, it really is

1   speculative.  So all we've had so far is his partner referred

2   to Mr. Croft as BH, and I don't know, we don't have an answer

3   to that yet.

4   BY MR. BLANCHARD:

5   Q    Okay.  Let's do this.  Can I direct your attention in that

6   book to 3056, please?

7   A    Okay.

8            MR. KESSLER:  I don't have a 3056 in our book, Your

9   Honor.  May I see your copy?

10           MR. BLANCHARD:  We gave it to you.  One second.

11           THE COURT:  Are you seeking to admit it or something

12   to refresh his recollection?

13           MR. BLANCHARD:  I intend to put it in.

14           THE COURT:  Who other than his statements are part of

15   this?

16           MR. BLANCHARD:  What's that?

17           THE COURT:  Who is speaking in the green box?

18           MR. BLANCHARD:  That is Ms. Plunk I believe.

19           THE COURT:  Then that's going to be a hearsay problem.

20   The only thing that this picks up is your BH reference.  If you

21   want to see if it refreshes his recollection and finish what

22   you are going to talk about on BH, let's do it.

23           MR. KESSLER:  Is he talking about 3055?

24           THE COURT:  No.  3056.

25   BY MR. BLANCHARD:

1    Q    Would you agree that you sent a text message on August 14,

2    2020 --

3            THE COURT:  Well, let's ask him if it refreshes his

4    recollection about his use of the term BH?

5            MR. BLANCHARD:  Okay.

6            THE WITNESS:  I do not recall using BH in a derogatory

7    term towards Mr. Croft.

8    BY MR. BLANCHARD:

9    Q    I didn't ask you whether it was derogatory.  You testified

10   initially that you had never used the term BH, correct?

11           MR. KESSLER:  Your Honor, I am not sure what the

12   relevance is.

13           THE COURT:  Let him finish.  Let him finish and then

14   we'll go on.

15           THE WITNESS:  I do not recall using it.  I apologize.

16   BY MR. BLANCHARD:

17   Q    Okay.  Would you agree that you did use the term BH?

18   A    Yep.  I did.

19   Q    Okay.  And you are aware what BH means in this context,

20   right?

21   A    I believe in my context this was referring to Barry Croft.

22   Q    And it was referring to the nickname of bonehead, correct?

23   A    I cannot say that that's what that was.  It could have been

24   me just missing a finger.  A lot of times what I'll do is

25   instead of using the full name it's a, you know, first initial

1    of each name, and it very well could have been because I don't

2    recall using BH.

3    Q    So you are saying this was a typo and you didn't --

4    A    It very well could have been.  I don't recall typing BH,

5    specifically to type BH.

6    Q    Throughout the investigation your confidential source

7    referred to Mr. Croft using that term, right?

8    A    Using the term BH?

9    Q    Bonehead?

10   A    That is correct.

11   Q    And your partner, Mr. Penrod, also referred to Mr. Croft as

12   BH, correct?

13   A    That is correct.  He did use the term BH.

14   Q    So Ms. Plunk referred to Mr. Croft as bonehead, Penrod

15   referred to him as BH, but you think it was a typo when you

16   did?

17   A    I do not recall specifically typing BH because it's

18   associated to a nickname.  If I did it wasn't because I was

19   trying to be arrogant or belittling him.

20   Q    Do you think Ms. Plunk's use of the term bonehead was --

21        MR. KESSLER:  Objection.

22        THE COURT:  That's the same ruling we've had multiple

23   times.  So we will have to hear from her or find out what she

24   thinks.  It's not for this witness to speculate.

25        MR. BLANCHARD:  One moment, please.  I'll pass the

1    witness.

2            THE COURT:  Do you have any redirect, Mr. Kessler?

3            MR. KESSLER:  Briefly, Your Honor.  Thank you.

4            THE COURT:  It'd be nice if we could finish with this

5    witness before the break.

6            MR. KESSLER:  Yes, Your Honor.

7                    REDIRECT EXAMINATION

8    Q    All right.  You were asked by my colleague here whether

9    this case involved nuclear or chemical weapons and it did not

10   is what you said, right?

11   A    That is correct.  It did not.

12   Q    Are explosive devices or destructive devices as they are

13   called, are they considered weapons of mass destruction?

14   A    They are.  Yes.

15   Q    The Boston Marathon bombing, did that involve --

16           MR. BLANCHARD:  I am going to object to the relevance.

17           THE COURT:  You brought it up and opened the door so

18   you are going to have to hear it go through what's on it.  Go

19   ahead.

20   BY MR. KESSLER:

21   Q    Did the Boston Marathon bombing involve nuclear or chemical

22   weapons?

23   A    No.  It did not.

24   Q    What kind of device did the Defendants in that case use?

25   A    So they used an explosive device inside a pressure cooker.

1    Q    So legally available explosives and shrapnel?

2    A    That is correct.

3    Q    Okay.  Now, you were asked about what caused you and when

4    to open an assessment on this case, and Mr. -- I'm blanking on

5    his name now.  My colleague over here asked you about a radio

6    show back in 2017, right?

7    A    That is correct.  He was asking about a podcast.

8    Q    Okay.  And the government did not open a case against

9    Mr. Croft in 2017 based on his talk on a radio show, did it?

10   A    No.  They did not.

11   Q    You were asked about threats he made to kill the police.

12   Is there a difference between just generally saying you are not

13   satisfied with your government and threatening to kill the

14   police in terms of whether you'd open an investigation?

15   A    Absolutely.  You know, the FBI takes threat against life

16   very, very seriously no matter who that individual is, whether

17   it's a regular individual or an individual member of law

18   enforcement or a member of government.

19   Q    There was a point you were answering one of Mr. Blanchard's

20   questions -- I remembered his name now -- where you said those

21   were two out of the three reasons why you might open a case.

22   What -- do you remember what all three reasons would be?

23   A    So refresh my memory on what were the two that he stated in

24   his --

25   Q    I don't recall exactly, but it seemed like you wanted to

1    say there were more reasons than just somebody talking,

2    correct?

3    A    Correct.  So we don't open -- we don't open cases solely on

4    the fact that they have First Amendment protected speech.  It's

5    when you add everything altogether.  It's the totality of the

6    situation.  So when you have an individual who has a violent

7    threat style of communications with individuals, and you add in

8    he has access to weapons, which we had a complainant who had

9    stated that he was shooting guns in Elkton, Maryland, and we

10   knew him to be essentially at that time was an individual who

11   was not legally -- he was a felon at the time.  He was not

12   allowed to have guns.  So when you add that altogether with the

13   violent threats against law enforcement and government

14   officials, and the fact that he was a person who was not

15   legally allowed to have a gun, those do not fall under First

16   Amendment protected speech.

17   Q    All right.  Agent Long, you were also asked about whether

18   the informant who you referred to by her number, whether she

19   broke the law by having a firearm.  Do you recall that?

20   A    So I do.  She did, in fact, have a gun.  Yes.

21   Q    Okay.  And as you mentioned, you can't control what people

22   do, right?  You give them admonishments but you can't control

23   everything they do?

24   A    That is correct.

25   Q    Now, you said you gave her a recording device to record

1    Mr. Croft, right?

2    A    That is correct.  We did.

3    Q    Why would you give somebody a recording device rather than

4    just saying, tell me what they said?

5    A    So a lot of times because people are -- you know, 99802 was

6    a militia member.  They have normal things that they do going

7    through their normal day.  So they may not necessarily hear or

8    see something that is going on because they are actively

9    engaging in the normal militia activity.  And so the recording

10   device, even though the CHS has the ability to say, I heard him

11   say this, the recording might also say, well, there is other

12   stuff that wasn't heard, or in fact, that individual may not be

13   able to hear stuff because they weren't there for whatever

14   reason.

15   Q    All right.  Now, if somebody broke the law for example, by

16   having a firearm that you didn't let them have, would that

17   change what was on the recording?

18   A    No.  That would not change what was on the recording.

19   Q    You were shown a couple of transcripts here about Mr. Croft

20   talking about the riots in Grand Rapids and the riots in

21   Columbus.  I'd like to play what we've marked as Government

22   Exhibit 441.  Before we play that, do you recall when we talked

23   last week about the June 6th meeting in Dublin, Ohio?

24   A    I do recall that.  Yes.

25   Q    And you testified that there was a recording made of that

1    that you listened to and you recognize the voices, correct?

2    A    That is correct.  I do remember that.

3         MR. KESSLER:  I offer 441, Your Honor.  It's a

4    recording of Mr. Croft.

5         THE COURT:  Any objection?

6         MR. BLANCHARD:  Nothing other than what we raised the

7    other day.

8         THE COURT:  All right.  Same ruling then.  And you are

9    going to have to tell me if I've got your machine hooked up or

10   if I've got the wrong -- there we go.  Okay.

11        (Audio started, 10:33 a.m.)

12        (Audio stopped, 10:34 a.m.)

13   BY MR. KESSLER:

14   Q    All right.  So you were asked about these riots and about

15   whether the government targets -- whether the FBI targets

16   citizens for engaging in First Amendment protected conduct.  Is

17   making pipe bombs first amended protected speech?

18        MR. GIBBONS:  Objection, Your Honor.

19        THE COURT:  This isn't the witness to talk about that.

20   We are not really here to debate the law with this witness or

21   anybody else right now.

22   BY MR. KESSLER:

23   Q    You were also asked if it's unusual for somebody to buy

24   fireworks before July 4th and you said it's not, right?

25   A    I would say yes to that.  Yes.

Q    Okay.  If you attach BBs to them or pennies to them as
shrapnel, does that change their nature?

A    It absolutely does.

Q    Is that a typical July 4th celebration kind of thing to do?

A    That is not a typical event to do on July 4th.

Q    And we heard Mr. Croft talking last week when we heard the
transcripts about how they'll get so hot and go so fast that
they'll go right through your skin, correct?

A    That is correct.

Q    Okay.  And finally, on Exhibit 3053, we saw a text you sent
about keeping the group together, and you were continually
reminded to just give yes or no answers.  I'd like to explore
that a little more with you.  When you told -- when you told
the confidential source to try and keep this group together you
mentioned something about access.  Can you tell the jury a
little bit more what you mean by that?

A    Absolutely.  So because we have multitude of individuals
that we were concerned about we didn't necessarily know who was
going to be leading this group at any one point in time.  We
knew that Mr. Croft at the beginning of this Dublin, Ohio
meeting had kind of led the charge in with regards to how
things were progressing.  As it went to different meetings you
could clearly show that each individual had their own ideas and
own plans and some of those individuals may, I would say,
splinter off from that main group.  So our thought was to try

1    to attempt to figure a way to keep as many of those individuals

2    in a group so that we could have access to all of them to

3    determine whether certain individuals were going to be more

4    violent or conduct an attack versus if one individual, like, at

5    this specific instance, if they kicked -- this group kicked

6    Mr. Croft out because he was so violent, that he was going to

7    get them locked up or prematurely arrested, that he was going

8    to go off and do his own thing irregardless of whether it was

9    us or the group was designing this attack or if it was just

10   Mr. Croft doing his lone wolf attack.

11   Q    And if he went off on his own it's possible the informant

12   wouldn't have access to him anyone, right?

13   A    That is correct.

14   Q    And then you wouldn't know what he was up to?

15   A    That is correct.

16        MR. GIBBONS:  Objection, leading, Your Honor.

17        MR. KESSLER:  That's all I have, Your Honor.

18        THE COURT:  All right.  So we can go to Mr. Gibbons if

19   there is any redirect -- or recross rather.

20        MR. GIBBONS:  Thank you, Your Honor.

21        THE COURT:  Just within the scope.

22                    RECROSS EXAMINATION

23   BY MR. GIBBONS:

24   Q    With respect to this idea of maintaining access and

25   directing Ms. Plunk to try to keep the group together and to

1    keep Mr. Croft in the group, you indicated that your concern

2    was, is that if the group kept moving in the direction it

3    seemed to be going, that Mr. Croft would be out.  Is that true?

4    A    So the way it was described to us by 99802 was that this

5    group of individuals were concerned that Mr. Croft was going to

6    get them arrested before their plans -- their attack plans were

7    going to come to fruition.

8    Q    Okay.  And that concern generally means is that Barry was

9    not going to be included in the group anymore, correct?

10   A    Yes.  The group was essentially going to kick Mr. Croft out

11   of the group.

12   Q    And you wanted to make sure -- because Mr. Croft has an

13   informant attached to him, CHS Jenny, correct?

14   A    So I can't say that he was -- he had a CHS physically

15   attached to him solely.  Like, the CHS was there to investigate

16   and assist us in our investigation into all of them.

17   Q    Let me make sure that we are clear.  By saying attached, I

18   don't mean that he is carrying around piggyback.  I mean, she's

19   tasked with investigating Mr. Croft, correct?

20   A    Not just him.  So when we task a source to investigate a

21   group of individuals, in that tasking it basically allows us to

22   say that if the -- if the individual --

23            MR. GIBBONS:  Your Honor, he is not being responsive

24   to my question.  It was a simple question.

25            THE COURT:  And then he says not just him.  So he

1    wants to be complete, and you can go ahead and try to follow up

2    and drill down more specifically to what you are looking for.

3    BY MR. GIBBONS:

4    Q    Without regard to other things that Ms. Plunk may have been

5    asked to do or not do by the FBI, one of the things she was

6    asked to do was to investigate the activities of Mr. Croft,

7    correct?

8    A    That is correct.

9    Q    And in that context she was going to these meetings that

10   were being held in Ohio, true, with the III%ers?

11   A    That was one of the locations that they were meeting, yes,

12   was Ohio.

13   Q    Because we talked about there is Dublin in early June,

14   correct?

15   A    That's correct.  Dublin was early June.

16   Q    And there was a second meeting in Peebles, Ohio, true?

17   A    That is correct.

18   Q    And then there was a Cambria, Wisconsin FTX in Wisconsin,

19   correct?

20   A    Yes.

21   Q    And Ms. Plunk was at all three of those events, true?

22   A    That is correct.

23        MR. KESSLER:  Your Honor, we are getting outside of

24   the scope of redirect.

25        THE COURT:  We are getting close, so you got to bring

1       it home soon.

2              MR. GIBBONS:  Yes.  I'll wrap it up, Your Honor.

3       BY MR. GIBBONS:

4       Q    And Mr. Croft was at all of those events, correct?

5       A    That is correct.  He was at all of those events.

6       Q    And CHS Steve Robeson was at all three of these events?

7              MR. KESSLER:  Your Honor.

8              THE COURT:  It is beyond the scope.

9              MR. GIBBONS:  Your Honor, my point is that there are

10      multiple informants collectively at these events, and the idea

11      that Mr. Croft --

12             THE COURT:  The only thing -- the only thing that came

13      up on redirect with respect to this issue was tied to trial

14      Exhibit 3053 and his statement about trying to keep the group

15      together.  And you know, you can go into that, but I don't see

16      that we need to go back over all the other ground.  That's not

17      redirect or recross.

18             MR. GIBBONS:  I will back up, Your Honor.

19      BY MR. GIBBONS:

20      Q    You indicated that your basic concern is that if Mr. Croft

21      leaves the group you will lose access to Mr. Croft and/or the

22      group, correct?

23      A    Yes.  That is correct.

24      Q    Isn't it true that there were multiple informants at these

25      events working for the FBI --

1    MR. KESSLER:  Your Honor --

2    BY MR. GIBBONS:

3    Q    -- allowing you to maintain access?

4    MR. KESSLER:  -- I understand that these are questions

5    that he might have wished he had asked the first time.

6    THE COURT:  Well, that's a legitimate response to the

7    access point.  If he is worried about losing access, if there

8    is other avenues that's fair if he doesn't get into too much

9    detail.  Otherwise, we are never going to finish with the

10   witness.  Go ahead.  You can answer if you are able.

11   THE WITNESS:  So I would say the issue isn't

12   necessarily directly related to the direct access to one

13   specific person.  The fact of the matter is, is that some CHSs

14   have the ability to record from one side of the room versus the

15   other, so there may be content that is just quite literally

16   missed.  With regards to Mr. Croft, 99802 had a better direct

17   access to that individual versus the other individuals in the

18   group.

19   BY MR. GIBBONS:

20   Q    What individual are you speaking of?

21   A    99802.

22   Q    Right.  Had access to which individual?  You said --

23   A    To Mr. Croft.

24   Q    Mr. Croft?

25   A    Yes, sir.

1    Q    It is entirely conceivable that she could have quit the

2    group, too, and moved forward with Mr. Croft and maintained all

3    of her access with Mr. Croft?

4         MR. KESSLER:  I am going to object that anything that

5    begins with it is entirely --

6         THE COURT:  It is speculative at that point, and now

7    we are really into the argument that both of you are going to

8    make.  It would be nice to get more evidence so you can both

9    make your argument.  I think it's clear to each side and the

10   jury more importantly what the position was.  Your agent was

11   worried about access.  Your point is there were other ways to

12   get access.  I don't think we need to beat it to death.

13        MR. GIBBONS:  Very good.  Thank you, Your Honor.

14        THE COURT:  Anything on recross, Ms. Kelly?

15        MS. KELLY:  Thank you, Your Honor.

16                    RECROSS EXAMINATION

17   BY MS. KELLY:

18   Q    Good morning again.

19   A    Good morning, ma'am.

20   Q    I just want to make sure it's clear for the record on the

21   Exhibit 3053, the message that you've sent to Ms. Plunk, and

22   you can refresh your recollection, the date on that is August

23   the 10th of 2020, correct?

24   A    What was that number again?

25   Q    3053?

1    A    And that question was?

2    Q    The date that you sent that message to keep the group

3    together?

4    A    August 10th.

5    Q    August 10th of 2020, is that right?

6    A    That's what this says.  Yes.

7    Q    Okay.  And just for the jury's information, that meeting in

8    Peebles, Ohio, that was July the 18th of 2020, correct?

9    A    I don't recall the exact date of the Peebles.

10   Q    Do you recall if it was at the end of July, beginning of

11   July?  Do you know?

12   A    I remember it being at least in the middle towards the end

13   of July.  I don't remember it -- it was after the 4th of July

14   meeting for sure.

15   Q    Okay.  So the best of your recollection, middle or end of

16   July after the 4th of July, correct?

17   A    Yeah.  Yes.

18   Q    Okay.  And the message that you sent to keep the group

19   together was the following month, August the 10th, 2020,

20   correct?

21   A    That's correct.

22        MS. KELLY:  Thank you.  I have nothing further.

23        THE COURT:  All right.  Mr. Hills?

24                   CROSS EXAMINATION

25   BY MR. HILLS:

1    Q    I just want to clarify.  Dublin, Ohio, June 6th, Peebles,

2    Ohio, end of July.  I think you have just testified Mr. Caserta

3    was not at either one of those?

4    A    I can't tell you whether he was at those.  I don't know.

5    He wasn't captured on any of our recording devices.

6    Q    All right.  You have no information that he was there at

7    all?

8    A    I do not.  No, sir.

9    Q    All right.  And South Carolina, same thing, you don't have

10   any information that he was in South Carolina?

11   A    No, sir.  I have no information that he was in South

12   Carolina either.

13   Q    Okay.  That you testified earlier about South Carolina.

14   That's what I'm asking about.

15   A    Oh, yes, sir.  I understand now.  Yes.

16            MR. HILLS:  All right.  Thank you.

17            THE COURT:  All right.  Go ahead, Mr. Blanchard.

18                      RECROSS EXAMINATION

19    BY MR. BLANCHARD:

20   Q    You said that there was a point in time where Mr. Croft

21   wasn't eligible to possess a firearm, correct?

22   A    Yeah.  After he became a felon.

23   Q    Yeah.  You are aware he received a pardon for that,

24   correct?

25   A    I am aware that he received a pardon well after we started

1   our investigation into Mr. Croft.

2   Q    Wait, well after?  So --

3   A    It would have been March of 2021.

4   Q    You are sure it's not April of 2019?

5   A    Not to my knowledge.

6   Q    So you think he got a pardon while this case was pending?

7   A    That was my knowledge that --

8   Q    You believe that the governor of Delaware --

9             MR. KESSLER:  Your Honor, objection.

10            THE COURT:  I don't remember this coming up on

11  redirect.

12            MR. BLANCHARD:  It did.

13            THE COURT:  Where was the context?  I don't remember

14  it to tell you the truth.

15            MR. KESSLER:  So this pardon bit did not come up.

16            THE COURT:  Well, I know it didn't, but how did it

17  come up the --

18            MR. BLANCHARD:  The agent non-responsively threw out

19  that Mr. Croft had a felony conviction.

20            THE COURT:  All right.  Well, I think you get to clean

21  that up then if you want to, and if he doesn't know about the

22  pardon or when the pardon happened we'll have to deal with that

23  at some other point.

24  BY MR. BLANCHARD:

25  Q    Sure.  Just to be clear, this case started --

1          THE COURT:  We've been through that so many times.

2    BY MR. BLANCHARD:

3    Q    I mean, the criminal case in the court started October

4    2020, correct?

5    A    The full investigation started, yes, in October of 2020.

6    Q    That's when people were arrested, right?

7    A    Correct.

8    Q    And your testimony is you believe he received a pardon

9    after that?

10   A    Oh, no.  No, sir.  I apologize.

11   Q    So -- okay.

12   A    So when we initiated the investigation --

13   Q    Let me see if --

14        MR. KESSLER:  He won't let him answer the question,

15   Your Honor.

16        THE COURT:  You know, the pardon issue, if that's

17   going to become an issue, will be the subject of proof.  It'll

18   be obvious what the document says and when it happened.  So you

19   know, tie this closely to what as you said yourself was a

20   non-responsive answer, otherwise --

21        MR. BLANCHARD:  Right.  I was just trying to clear up

22   that because he testified that it was '21.  I think we fixed

23   that.

24        THE COURT:  You cleared it up.

25   BY MR. BLANCHARD:

1    Q    Yeah.  You would agree that he did receive a pardon and was

2    eligible to possess firearms, correct?

3    A    Yes.  He did receive a pardon.  Yes.

4              MR. BLANCHARD:  Pass the witness.

5              THE COURT:  All right.  So that's it.  We can take our

6    break.  We can thank and excuse you from the witness chair and

7    we'll come get you in about 20 minutes.

8              THE WITNESS:  Thank you, sir.

9              (Witness excused, 10:47 a.m.)

10             LAW CLERK:  All rise.

11             (Jury out, 10:47 a.m.)

12             THE COURT:  Okay.  We'll shoot for 20 minutes.  We'll

13   see you back.

14             LAW CLERK:  Court is in recess.

15             (Recess taken, 10:48 a.m.)

16             (Resume Proceeding, 11:11 a.m.)

17             (Jury in, 11:11 a.m.)

18             LAW CLERK:  Court is in session.

19             THE COURT:  All right.  Please be seated everyone.  So

20   I wanted to just let everybody know that we were able to make

21   contact with Juror No. 162.  That's the good news.  And she is

22   okay but she is sick.  Not with a COVID, but she is sick.  She

23   was apparently coming down with stuff earlier in the week, was

24   hoping that she would recover and just didn't, and the person

25   from our jury office who talked with her said she sounded

1    rough.  So we hope she is okay and she is getting better, but I

2    am glad we were able to proceed.  And I just wanted to add that

3    information so everybody knows what happened with Juror No.

4    162.  And we obviously wish her well and full recovery but

5    let's turn to our next witness, then, for our case, and it

6    looks like that's going to be Mr. Roth.

7              MR. ROTH:  Thank you, Your Honor.

8              THE COURT:  Not the witness.  The caller.  Go ahead.

9              MR. ROTH:  Thank you, Your Honor.  We call Special

10   Agent Mark Schweers.

11             THE COURT:  All right.

12             MARK SCHWEERS, GOVERNMENT

13             having been first duly sworn, testified as follows:

14             (Witness sworn, 11:12 a.m.)

15                  DIRECT EXAMINATION

16     BY MR. ROTH:

17   Q    Good morning.

18   A    Good morning.

19   Q    Could I have you start by stating and spelling your

20   complete name, please?

21   A    Sure.  Mark, M-a-r-k, Schweers, S-c-h-w-e-e-r-s.

22   Q    Thank you.  Where are you employed?

23   A    I am a special agent with the FBI.

24   Q    How long have you been with the FBI?

25   A    Since 2009.

Q     How are you currently assigned?

A     I am currently assigned to our Washington field office.

Q     In 2020, how were you assigned?

A     I was assigned to our Los Angeles field office.

Q     In what capacity?

A     I was involved in undercover operations as one of my collateral or secondary duties away from regular investigative responsibilities.  I was an undercover employee or UC for the FBI.

Q     Very generally speaking what are your responsibilities when you are in an undercover responsibility?

A     You are generally responsible for gathering evidence, meeting with subjects of investigations, and gathering evidence to support allegations or to determine that the allegations that underlie the investigation are not warranted.

Q     And you pose as a civilian, somebody other than yourself?

A     That's correct.

Q     Were you specifically assigned in 2020 to contact a person in Michigan in an undercover capacity?

A     I was.

Q     Is there a process by which agents must obtain authorization to reach out and engage a suspect on-line or in person?

A     There is.

Q     And was that done in this particular case?

1    A    It was.  Yes, sir.

2    Q    And who was the person that you were to reach out and

3    contact?

4    A    Adam Fox.

5    Q    Were you provided with some background information that

6    shaped how you communicated with Mr. Fox?

7    A    Yes, sir.

8    Q    And what was that information?

9    A    I was told that Mr. Fox had made statements about wanting

10   to commit some direct violent action, specifically targeting

11   the Michigan State Legislature.  I would have also have been

12   given some brief biographical information on Fox as well as

13   where the investigation stood at the time.

14   Q    Thank you.  And what was your undercover identity?

15   A    I was essentially a like-minded person.  Somebody that was

16   interested in the same things Fox was interested in from the

17   upper peninsula of Michigan.

18   Q    What was the name that you used?

19   A    Mark.

20   Q    Did you have a different last name?

21   A    I did.

22   Q    And what was that?

23   A    Woods.

24   Q    Did you, in fact, make contact with Adam Fox?

25   A    I did.

1    Q    How did you first make contact with him?

2    A    It would have been through essentially text message.  It

3    was using a text messaging application called Wire, and that's

4    where I would have first contacted him.

5    Q    What is Wire?

6    A    It's an encrypted messaging application like WhatsApp or

7    Signal or something along those lines.  You can text back and

8    forth on it.

9    Q    What does encrypted mean in the context of a messaging

10   application?

11   A    It means it can't be read by some outside party.  So it's a

12   one to one.  If I am texting you then just you can read it.  If

13   you are texting me then just I can just read it.

14   Q    And could you tell us what it was or how it was that you

15   first made contact with him on Wire?

16   A    Sure.  I would have been introduced by someone posing as my

17   girlfriend.  She would have, in turn, contacted Mr. Fox's

18   girlfriend at the time, expressed interest in the things he was

19   saying on-line and would have asked if there could be a meeting

20   between myself and Fox.

21   Q    When we talk about or when you refer to the things that

22   Mr. Fox was saying on-line, is that specifically to the threats

23   about the Michigan legislature and generally against the

24   government?

25   A    Yeah.  The antigovernment rhetoric Mr. Fox was talking

1    about on-line.

2    Q    And you give us a brief glimpse into what your undercover

3    persona was, but how did you describe yourself to Mr. Fox on

4    Wire when you two were speaking?

5    A    Just as somebody that was interested in the, again, the

6    things he was saying, interested in learning more about it,

7    interested in joining his cause if he was looking for people.

8    Q    And once you first made contact with him, how often did you

9    remain in contact with him?

10   A    It would have varied, but essentially averaging weekly.

11   Q    Was that on the phone, on-line or in person?

12   A    It would have been several times in person but primarily

13   through whatever messaging app we were using, so text.

14   Essentially text messaging.

15   Q    In general, when you were undercover, what guided how you

16   spoke with Mr. Fox?

17   A    Generally I would be reacting to the things he wanted to

18   talk about.  So whatever topics he wanted to put on the table I

19   would be discussing those with him.

20   Q    And would you disagree with him, agree with him, something

21   else?

22   A    Generally agree.  I would generally agree with him.  I

23   might ask questions about why he was saying certain things, but

24   generally my persona was of a like-minded person.  So it

25   wouldn't have made sense for me to disagree with him all the

1    time.

2    Q   In your undercover capacity, did Adam Fox invite you to the

3    Vac Shack on July 3rd, 2020?

4    A   He did.  Yes, sir.

5    Q   If you look in the binder in front of you are Proposed

6    Exhibits 60 and 61.

7    A   I am there, sir.

8    Q   Are those fair and accurate pictures of the Vac Shack?

9    A   They are.

10         MR. ROTH:  Your Honor, I move for the admission of

11    Exhibits 60 and 61?

12         THE COURT:  Any objection?

13         MR. GIBBONS:  No objection, Your Honor.

14         THE COURT:  Admitted.

15         MR. ROTH:  Thank you, Your Honor.

16    BY MR. ROTH:

17    Q   If we could look at 60, please?

18    A   Yes, sir.

19    Q   I apologize.  It's going to come up on the screen but not

20    through your doing.  Thank you.  So what is the Vac Shack?

21    A   It's a vacuum repair and sales store.

22    Q   Did Adam Fox work there?

23    A   He did.

24    Q   Did he also live there?

25    A   He did.

1    Q    Where is the Vac Shack located?

2    A    On South Division.  I believe it's technically in Wyoming

3    but essentially the greater Grand Rapids area.

4    Q    Thank you.  Was July 3rd, 2020, your first time meeting

5    Adam Fox in person?

6    A    It was.

7    Q    Do you see him in the courtroom today?

8    A    I do.

9    Q    Could you please point him out and identify him for the

10   record?

11   A    Yes, sir.  He is the gentleman in the purple shirt with the

12   goatee and slicked back hair.

13        MR. ROTH:  I would ask that the record reflect the

14   witness has identified the Defendant Fox?

15        THE COURT:  All right.  Yes.  It may.

16        MR. ROTH:  Thank you, Your Honor.

17   BY MR. ROTH:

18   Q    Was anyone else present during that first meeting with him

19   at the Vac Shack?

20   A    There would have been several customers when I first

21   arrived, but the meeting that we had together, no.  There was

22   no one else present.

23   Q    Where in the Vac Shack was that meeting when it was just

24   you and him together?

25   A    The basement.

1   Q    Looking at 61, please.

2   A    Yes, sir.

3        THE COURT:  I think 61 has already been admitted.

4   BY MR. ROTH:

5   Q    What part of the Vac Shack do we see here?

6   A    That's the main floor leading into that basement.

7   Q    Is that how it appeared that day or was there anything over

8   it?

9   A    As you can see in the right of the picture towards the door

10  there would have been a trap door.  The floor essentially

11  covering that hole at the time, he would have lifted it and we

12  would have went down into it.

13  Q    And can you please describe for the jury the downstairs

14  area in the Vac Shack?

15  A    It's a cellar.  If you have been in a cellar in the midwest

16  it roughly replicated that.  There were places to sit.  There

17  was clothing.  There was a bed.

18  Q    And that was the area in the Vac Shack where it appeared he

19  was living?

20  A    Yes, sir.

21  Q    Did you see any weapons?

22  A    I did.

23  Q    What kind?

24  A    I saw a semiautomatic handgun.

25  Q    Anything else?

1    A    Not at the time.  No, sir.

2    Q    And where was the pistol?

3    A    It was behind the counter where the person who was working

4    at the Vac Shack would be located.

5    Q    And as you and Fox spoke that day, what was his demeanor?

6    A    I would say excited and attempting to convey a note of

7    seriousness.

8    Q    What did you and Mr. Fox discuss that day?

9    A    Generally his plans as they related to the Michigan State

10   Legislature, who he was working with, and the next steps or

11   planned next steps he was planning or going to take.

12   Q    Thank you.  Were you carrying a recording device?

13   A    I was.

14   Q    What kind?

15   A    An audio recording device.

16   Q    Have you reviewed Proposed Exhibits 72 through 77?  Those

17   are not pictures.  Those are audio.

18   A    Yes.  I have.

19   Q    And are each fair and accurate recordings of that meeting

20   that day?

21   A    They were.

22   Q    And the corresponding transcripts are accurate as well?

23   A    They are.

24          MR. ROTH:  Your Honor, I move for the admission of

25   Exhibits 72 through 77?

95

1          THE COURT:  Any objections?

2          MR. GIBBONS:  No, Your Honor.

3          THE COURT:  All right.  They are admitted.

4          MR. ROTH:  Thank you, Your Honor.

5     BY MR. ROTH:

6     Q    Did he tell you that he was planning something?

7     A    He did.

8          MR. ROTH:  With that, could we please play Exhibit 72?

9          (Audio started, 11:22 a.m.)

10         (Audio stopped, 11:23 a.m.)

11    BY MR. ROTH:

12    Q    Did he tell you who he was working with in making this

13    plan -- in making and executing this plan?

14    A    He did.

15         MR. ROTH:  With that, could we please play Exhibit 73?

16         (Audio started, 11:24 a.m.)

17         (Audio stopped, 11:24 a.m.)

18    BY MR. ROTH:

19    Q    Did Adam Fox tell you about operational security?

20    A    He did.

21         MR. ROTH:  Could we please play Exhibit 74?

22         (Audio started, 11:24 a.m.)

23         (Audio stopped, 11:25 a.m.)

24    BY MR. ROTH:

25    Q    Did he talk about why he was planning to attack the

1    Michigan Capitol?

2    A    He did.  Yes, sir.

3              MR. ROTH:  Could we please play Exhibit 75?

4              (Audio started, 11:25 a.m.)

5              (Audio stopped, 11:26 a.m.)

6    BY MR. ROTH:

7    Q    Did he go into more detail about his plans?

8    A    He did.

9              MR. ROTH:  Could we please play Exhibit 76?

10             (Audio started, 11:26 a.m.)

11             (Audio stopped, 11:27 a.m.)

12   BY MR. ROTH:

13   Q    We hear him reference her several times there.  Did he talk

14   specifically about the governor as being his target?

15   A    He did.  Yes, sir.

16             MR. ROTH:  Could we please play Exhibit 77?

17             (Audio started, 11:27 a.m.)

18             (Audio stopped, 11:28 a.m.)

19             MR. ROTH:  Thank you.

20   BY MR. ROTH:

21   Q    After that July 3rd meeting, did you remain in contact with

22   Fox?

23   A    I did.  Yes, sir.

24   Q    Did you meet with him again in person about a week later on

25   July 11th, 2020?

1   A    I did.  Pardon me.  I did.  In Cambria, Wisconsin, which is

2   about an hour outside of Madison, Wisconsin.

3   Q    Who invited you to Cambria?

4   A    Fox.

5   Q    Was there an event there that weekend?

6   A    There was.

7   Q    What was it?

8   A    It was a gathering of militia members from various places,

9   primarily from Michigan and Wisconsin.

10  Q    What did Fox call it?

11  A    An FTX, which would be short for field training exercise.

12  Q    How long were you there?

13  A    I was there for one day.

14  Q    Was Fox at the FTX?

15  A    He was.

16  Q    Was Barry Croft at that FTX?

17  A    He was.

18  Q    Had you met Barry Croft before that FTX?

19  A    I had not.

20  Q    All right.  Do you see Mr. Croft in the courtroom today?

21  A    I do.

22  Q    All right.  Could you please point him out and identify him

23  for the record?

24  A    Yes, sir.  He is the gentleman in the second row wearing

25  the orange shirt and tie.

1    Q    Did he look quite a bit different back then?

2    A    Yes, sir.

3    Q    In what way?

4    A    He had a much longer beard.  Yeah.  Much longer beard.

5    Q    Head was shaved?

6    A    Yes, sir.

7    Q    And obviously the clothing was different?

8    A    Yes, sir.

9    Q    Was Brandon Caserta at that FTX?

10   A    He was.

11   Q    Do you see him in the courtroom today?

12   A    I do.

13   Q    Could you please point him out and identify him for the

14   record?

15   A    He is the gentleman with the beard and the purple checked

16   flannel shirt.

17   Q    Was Daniel Harris at that FTX?

18   A    He was.

19   Q    Do you see him in the courtroom today?

20   A    I do.

21   Q    Could you please point him out and identify him for the

22   record?

23   A    He is the gentleman in the gray shirt -- I'm sorry.  Blue

24   shirt, gray suit with glasses.  Yes, sir.  With glasses sitting

25   in the second row.

1      MR. ROTH:  Thank you.

2      Your Honor, I ask that the record reflect the witness

3 has identified Defendants Croft, Caserta and Harris

4 respectively?

5      THE COURT:  It may.

6      MR. ROTH:  Thank you.

7 BY MR. ROTH:

8 Q    And had you ever met Caserta or Daniel Harris before that

9 weekend?

10 A    I had not.

11 Q    Throughout that FTX did you spend time with them?

12 A    I would have met them, shaken their hand or said hi, spent

13 varying degrees of time with each of them, but my primary point

14 of contact so to speak would have been Fox, so that was the

15 person that I spent the most time with.

16 Q    Were you carrying a recording device again?

17 A    I was.

18 Q    Have you reviewed Proposed Exhibits 94, 96 and 102, each of

19 them audio?

20 A    I have.  Yes, sir.

21 Q    And are each fair and accurate recordings made during that

22 FTX?

23 A    They are.

24 Q    Are the corresponding transcripts accurate, as well?

25 A    Yes, sir.

1   MR. ROTH:  Your Honor, I move for the admission of
2   Proposed Exhibits 94, 96 and 102?
3       THE COURT:  Objections?
4       MR. GIBBONS:  No objection, Your Honor.
5       MR. BLANCHARD:  Just the ones I have raised
6   previously.
7       THE COURT:  All right.  They are admitted.  Same
8   rulings.
9       MR. ROTH:  Thank you, Your Honor.
10  BY MR. ROTH:
11  Q   So before we play them, could you tell the jury, just to
12  give them some background and context, what was going on around
13  this time?
14  A   Around this time this would have been towards the end of
15  the first day of the FTX.  It would have been towards the end
16  of my time there, and Mr. Croft and Mr. Harris were building an
17  improvised explosive device.
18  Q   Have you reviewed a picture marked as Proposed Exhibit 97?
19  A   Yes, sir.
20  Q   Is that a fair and accurate picture of Daniel Harris and
21  Barry Croft at the time?
22  A   Yes, sir.
23      MR. ROTH:  Your Honor, I move for the admission of
24  Proposed Exhibit 97?
25      THE COURT:  Objections?  Admitted.

```
1              MR. BLANCHARD:  No.

2              MR. ROTH:  Could we please look at 97?

3    BY MR. ROTH:

4    Q    Which one is Croft?

5    A    Mr. Croft is the gentleman on the right with the long

6    beard.

7    Q    Which one is Harris?

8    A    Mr. Harris is the person in the middle with the headband

9    and sunglasses looking down at his hands.

10   Q    And who is the person on the left, the third person there?

11   A    Ty Garbin.

12   Q    And were you able to see what they were building at this

13   time?

14   A    I did.  Yes, sir.

15   Q    Please describe it?

16   A    So they were taking black powder, rifle powder that is

17   actually pictured in the bottom center of the picture.  They

18   were filling a balloon with that, and BBs.  They then took

19   fuse, which you can kind of make out the green coil towards

20   Mr. Croft there, into the device, into the balloon, and then

21   wrapping it in duck tape.

22   Q    I am going to go back on a couple of things here.  Is this

23   the green coil you are referring to?

24   A    It is.

25   Q    Very good.  And you refer to they doing this.  They with
```

1    the balloon and they filling it.  Who is they?

2    A    Mr. Croft and Mr. Harris.

3    Q    Did someone approach Barry Croft while he was building this

4    explosive?

5    A    Yes, sir.

6    Q    Who was that?

7    A    His daughter.

8    Q    Approximately how old was she?

9    A    Approximately 10 years old.

10            MR. ROTH:  Could we please play Exhibit 94?

11            (Audio started, 11:33 a.m.)

12            (Audio stopped, 11:33 a.m.)

13   BY MR. ROTH:

14   Q    Did Croft and Harris also discuss some of their experience

15   with explosives?

16   A    They did.

17            MR. ROTH:  Could we please play Exhibit 96?

18            (Audio started, 11:33 a.m.)

19            (Audio stopped, 11:36 a.m.)

20   BY MR. ROTH:

21   Q    Did we hear tape in the background there?

22   A    Yes, sir.

23   Q    What was that?

24   A    That was the duck tape that I referenced that they were

25   wrapping the device in.

1    Q    And was Exhibit 102 recorded later in that conversation?

2    A    Yes, sir.

3              MR. ROTH:  Can we please play 102?

4              (Audio started, 11:36 a.m.)

5              (Audio stopped, 11:37 a.m.)

6    BY MR. ROTH:

7    Q    What happened with the explosive that Croft and Harris were

8    making that day?

9    A    It failed to detonate.

10   Q    What did they do with it?

11   A    Mr. Croft put it in a piece of kitchen equipment that was

12   out on the lawn in the -- where we were having the FTX, at the

13   house we were having the FTX, and I think it smoldered and

14   didn't detonate.

15   Q    Somebody tried to detonate it?

16   A    Yes, sir.

17   Q    Who was that?

18   A    Mr. Croft.

19   Q    He lit the fuse?

20   A    Yes, sir.

21   Q    Do you recall how many times he tried to detonate it?

22   A    There were -- it was twice.  It was either they took that

23   device back and made repairs to it, for lack of a better term,

24   and then tried again, but it did not detonate.

25   Q    And this second round when they are trying to make, as you

1    said, repairs to it, is it again Harris and Croft working on it

2    together?

3    A    Harris and Croft working on it together.  Yes, sir.

4    Q    But again, at that time they were not able to detonate it

5    still?

6    A    Correct.

7    Q    Did you participate in a breaching exercise at the Cambria

8    FTX?

9    A    I did.

10   Q    What does breaching mean?

11   A    Breaching would be essentially taking a door by force and

12   then moving into a room -- a room to secure it.  It would be

13   also known as assaulting a room or assaulting a building.

14   Q    Was there something built there for you to practice that?

15   A    There was.

16   Q    Could you please describe that?

17   A    Sure.  It was a series of plywood boards that were

18   fashioned to look like a doorway and into a room, and then you

19   would engage targets in that first room and then you would flow

20   out into a second place to engage targets.

21   Q    What was it called at the FTX?

22   A    They referred to it as the kill house.

23   Q    Who else participated in the kill house?

24   A    Almost everyone present at the FTX.

25   Q    How many times did you go through it?

1    A    At least twice.

2    Q    The other Defendants here, I want to go through them.   Did

3    Adam Fox go through it?

4    A    He did.

5    Q    Do you recall approximately how many times he went through

6    it?

7    A    He would have gone through it at least twice because he

8    went through it with me.

9    Q    So are there teams as you go through it?

10   A    There were.

11   Q    Who else was on the team with you?

12   A    I think during one of the iterations it would have been

13   myself, Fox, a person named Sean Fix, and maybe one other

14   individual who I can't recall at this moment.

15   Q    All right.   Barry Croft, did he go through it?

16   A    I don't recall seeing Mr. Croft go through it.

17   Q    Brandon Caserta, did he go through it?

18   A    Yes, sir.

19   Q    Do you recall approximately how many times he went through

20   it?

21   A    It would have been more than me, so two, two or more.

22   Q    Do you recall who was on his team through it?

23   A    Other members of the Wolverine Watchmen.

24   Q    And finally, Daniel Harris, did he go through the kill

25   house?

1    A    He did.  Yes, sir.

2    Q    Do you recall approximately how many times he went through?

3    A    Again, more than me.  Two or more.

4    Q    And who was on his team as he went through?

5    A    Other members of the Wolverine Watchmen.

6    Q    Thank you.  Were you invited to another meeting on August

7    1st, 2020?

8    A    I was.

9    Q    By whom?

10   A    Fox.

11   Q    And where was that meeting held?

12   A    Belleville, Michigan, which is just outside of Detroit.

13   Q    What was the purpose of that meeting?

14   A    A meet and greet among the people that Mr. Fox was

15   gathering, but also to talk about plans moving forward.

16   Q    Who was present for that meeting while you were there?

17   A    While I was there Mr. Fox, Mr. Fox's girlfriend at the

18   time, the person I referenced just a minute ago, Sean Fix, a

19   lady that was introduced to me as Mr. Fix's wife, and then I

20   was -- as I was leaving a person who went by the name Mike

21   Notso would have showed up kind of in the last five to ten

22   minutes that I was there.  He was accompanied by, I think, a

23   brother and a friend.  There were also some children but they

24   weren't present at the meeting.

25   Q    Approximately how long were you at the meeting?

1   A   Several hours.

2   Q   And it kept going after you left as far as you could tell?

3   A   As far as I could tell, yes, sir.

4   Q   Did the others drink alcohol or use drugs that day?

5   A   Yes, sir.

6   Q   Did you use any drugs or alcohol that day?

7   A   Not drugs but I had a beer or I had two or three beers.

8   Yes, sir.

9   Q   Okay.  Was that permitted under FBI undercover protocol?

10  A   It is.

11  Q   And why is that?

12  A   When you go to a -- when you are operating undercover and

13  you go to a place where people are drinking, whether it's a bar

14  or a restaurant or in this case a barbecue, to maintain bona

15  fides, to make it less suspicious, the FBI permits you to drink

16  alcohol.

17  Q   Were you ever under the influence that day?

18  A   I was not.

19  Q   Were you carrying a recording device that day?

20  A   I was.

21  Q   Have you reviewed Proposed Exhibit 131?

22  A   I have.

23  Q   Is it a fair and accurate recording from that meeting?

24  A   Yes, sir.

25  Q   Is the corresponding transcript accurate as well?

1    A    It is.

2           MR. ROTH:  Your Honor, I move for the admission of

3    Proposed Exhibit 131?

4           THE COURT:  Objections?

5           MR. GIBBONS:  No objection, Your Honor.

6           THE COURT:  It's admitted.

7           MR. ROTH:  Thank you, Your Honor.

8    BY MR. ROTH:

9    Q    Who was present for this conversation?

10   A    Mr. Fox and myself certainly, and then Mr. Fix would have

11   been present during the first part of it.

12   Q    Where did it take place?

13   A    Fix's property.

14   Q    Did Fox discuss the governor?

15   A    He did.

16   Q    Specifically did he discuss needing to do recon?

17   A    He did.

18   Q    What did you understand him to mean by recon?

19   A    Reconnaissance.  Surveillance of the various locations that

20   were being talked about to kidnap the governor from to

21   ascertain to make sure to see which one would be the best fit.

22   What was the softest target essentially.

23   Q    You gave us a couple terms that I want to go into.  First

24   of all were the locations.  What were the locations that Fox

25   was considering for this kidnapping?

1    A    There were three:  The governor's mansion in Lansing, a

2    private residence that I understand is somehow associated with

3    the governor, whether she owns it or they referred to it as her

4    house in the Traverse City area, and then the governor's

5    official summer house on Mackinaw Island.

6    Q    You also talked about Adam Fox wanting to find the softest

7    target.  What does that mean?

8    A    The target that would afford the best opportunity to

9    conduct what he called a snatch and grab operation or

10   kidnapping of the governor.  The one with the least physical

11   security, least body guards.

12          MR. ROTH:  All right.  With that could we please play

13   Exhibit 131?

14          (Audio started, 11:44 a.m.)

15          (Audio stopped, 11:44 a.m.)

16          MR. ROTH:  Thank you.

17   BY MR. ROTH:

18   Q    Did Adam Fox assign you to recon one of those locations?

19   A    He did.  Yes, sir.

20   Q    Which location?

21   A    The Mackinaw Island location.

22   Q    Did that have a number associated with it?

23   A    No. 3.

24   Q    1 and 2 being the other locations you discussed?

25   A    Correct.

1    Q    Did he talk about sending the governor anything?

2    A    He did.

3    Q    What was that?

4    A    He referred to it as cupcakes.

5    Q    Did you understand what he meant by cupcakes?

6    A    I did.  It was explosives.

7    Q    Was he specific as to which location he wanted to send

8    explosives to?

9    A    The governor's office.  The Capitol.

10   Q    In Lansing?

11   A    Yes, sir.

12   Q    After that meeting did you have pictures taken of the

13   governor's home on Mackinaw Island as Fox requested?

14   A    I did.

15   Q    What did you do with those pictures?

16   A    I provided them to -- or they were provided to Fox.

17   Q    Was he pleased with your reconnaissance work?

18   A    He was.  He sent them to the rest of the group we were in a

19   text chain with, and he told me that I had done well.

20   Q    Did you attend another FTX in Luther, Michigan on September

21   12th and 13th of 2020?

22   A    I did.

23   Q    Who invited you to that FTX?

24   A    Fox.

25   Q    How long were you there?

1    A    Two days.

2    Q    Were you carrying a recording device again?

3    A    I was.

4    Q    Was Adam Fox there?

5    A    He was.

6    Q    Was Barry Croft there?

7    A    Yes, sir.

8    Q    Brandon Caserta?

9    A    Yes, sir.

10   Q    Daniel Harris?

11   A    Yes, sir.

12   Q    And again, did you spend time, even if in passing, with

13   each of them?

14   A    Yes.

15   Q    That day did you meet somebody called Red?

16   A    I did.

17   Q    When was that?

18   A    It would have been when I first met Fox that day in the

19   Walmart parking lot there in Cadillac.

20   Q    Who introduced you to Red?

21   A    It would have been Mr. Fox or Dan, the confidential human

22   source, or both of them.

23   Q    And do you recall Fox ever telling you who Red was?

24   A    Yes.

25   Q    What did Fox tell you about Red?

1    A    He was a person that Dan knew that could get explosives.

2    Q    And was Red actually an undercover FBI agent?

3    A    He was.

4    Q    Did you know that at the time?

5    A    I did.

6    Q    Did you hear any conversations between Red and Fox that

7    day?

8    A    I did.

9    Q    When was that?

10   A    It would have been later in the afternoon.  Probably two,

11   three o'clock hour approximately.

12   Q    We will hear more from Red about that.  Could you tell us

13   the general nature of those conversations?

14   A    The general nature was what explosives could be obtained

15   and the prices for the explosives.

16   Q    And specifically Adam Fox inquiring about what explosives

17   and at what prices from Red?

18   A    Correct.

19   Q    Have you reviewed Proposed Exhibit 223, an audio recording?

20   A    I have.

21   Q    Is it a fair and accurate recording of a conversation with

22   Fox on September 12th, 2020?

23   A    It is.

24   Q    And the corresponding transcript is accurate as well?

25   A    Yes, sir.

1          MR. ROTH:  Your Honor, I'd move for the admission of

2     Proposed Exhibit 223?

3          THE COURT:  Objections?

4          MR. BLANCHARD:  I've got the Enright objection.

5          THE COURT:  All right.  Same ruling.  You can admit

6     223.

7          MR. ROTH:  Thank you, Your Honor.

8     BY MR. ROTH:

9     Q    Around what time was that particular conversation?

10    A    Again, in the later part of the afternoon or in the, yeah,

11    mid-afternoon to later afternoon.

12    Q    Do you recall who was present?

13    A    I do.  It would have been myself, Fox, Caserta and William

14    Null, N-u-l-l.

15    Q    Broadly speaking, who was William Null in the context of

16    the Wolverine Watchmen and this FTX?

17    A    He was a member of another militia based in Michigan that

18    was there to train.

19    Q    And where was this conversation?

20    A    It would have been at the campsite where we were doing the

21    training.

22         MR. ROTH:  Could we please play Exhibit 223?

23         (Audio started, 11:48 a.m.)

24         (Audio stopped, 11:54 a.m.)

25         MR. ROTH:  Thank you.

BY MR. ROTH:

Q    We heard a lot of steps throughout that audio.  What was going on at the time?

A    Yes, sir.  So the recording device would have been concealed on my body so as it moves my clothing are rustling. So we are walking away from some of the training activities that are going on so that we can have some privacy.

Q    Adam Fox several times referred to a menu.  Did you understand what he meant by menu?

A    I did.

Q    What was that?

A    The menu of explosives that he could obtain from the other undercover.

Q    And in that recording what did you understand Adam Fox was asking you?

A    To participate in the surveillance of the governor's residence in the Traverse City area.

Q    That night?

A    That night.  Yes, sir.

Q    How did you respond?

A    I said I would do it.

Q    How did Brandon Caserta respond?

A    He said he would go.

Q    How did William Null respond?

A    He said he would go.

1    Q    Did you, in fact, meet with Fox later that night?

2    A    I did.

3    Q    Where?

4    A    I would have been around the campsite.  Maybe not next to

5    Fox the entire time but around him.  At some point around 5:00

6    p.m. he and I left the campsite together to go get food in

7    Luther.  We would have then, after a meal, we would have

8    returned to the campsite.

9    Q    So you guys went out to dinner at a restaurant?

10   A    Yes.  We did.

11   Q    Did anybody go with you and Adam Fox?

12   A    No, sir.

13   Q    After dinner you returned to the Luther campsite?

14   A    Correct.  Yes, sir.

15   Q    What happened then?

16   A    The Null brothers got in my truck.

17   Q    We spoke about one of the Nulls before.  There are, in

18   fact, two Nulls?

19   A    Yes, sir.

20   Q    And they are brothers?

21   A    I believe they are twins, but yes, they are brothers for

22   sure.

23   Q    Both were members of one of the militia there?

24   A    Yes, sir.

25   Q    Were you waiting for anybody else to get in the car?

1    A    Yes, sir.

2    Q    Who?

3    A    Mr. Caserta.

4    Q    Did Brandon Caserta show up?

5    A    He did not.

6    Q    Did Adam Fox say why not?

7    A    He said because he was either getting high or had gotten

8    high.

9    Q    So once Adam Fox tells you that did you guys leave?

10   A    Shortly thereafter, yes.

11   Q    At the time who was in the car?

12   A    Myself, Fox and the two Nulls.

13   Q    At that time did you know where your destination was?

14   A    The eventual destination would have been the governor's

15   residence in Elk Rapids.

16   Q    Were you going someone else in the interim?

17   A    We were.  We were going to meet -- we were going to meet

18   with the other people conducting the surveillance that night.

19   Q    And who is giving you directions about where to go to meet?

20   A    Fox.

21   Q    While you were in the car, did Adam Fox tell you about his

22   plans?

23   A    He did.

24   Q    And did you still have the digital recorder with you?

25   A    I did.

1    Q    Have you reviewed Proposed Exhibits 228 and 229?

2    A    I have.

3    Q    Are each fair and accurate recordings?

4    A    Yes, sir.

5    Q    And the corresponding transcripts are accurate, as well?

6    A    Yes, sir.

7         MR. ROTH:  Your Honor, I would move for the admission

8    of Proposed Exhibits 228 and 229?

9         THE COURT:  All right.  Objections?

10        MR. GIBBONS:  None.

11        THE COURT:  Okay.  They are admitted.

12        MR. ROTH:  In fact, could we please play Exhibit 228?

13        (Audio started, 11:57 a.m.)

14        (Audio stopped, 11:57 a.m.)

15   BY MR. ROTH:

16   Q    Did Adam Fox continue?

17   A    He did.

18        MR. ROTH:  Could we please play 229?

19        (Audio started, 11:57 a.m.)

20        (Audio stopped, 12:00 p.m.)

21        MR. ROTH:  Could we pause on that screen?  Thank you.

22   BY MR. ROTH:

23   Q    So at the top here he says we could be sitting on a fucking

24   boat with silencers, ping, ping.  What did you understand the

25   pings were?

A    Gunshots.

Q    From a silenced rifle?

A    Correct.

Q    Were there other cars traveling in tandem with you to do reconnaissance at the governor's house that evening?

A    Yes, sir.

Q    Do you know how many?

A    Two other vehicles.

Q    Was someone in each of the cars carrying a two-way radio?

A    Yes.

Q    Where did those radios come from?

A    From the other undercover.

Q    What was the purpose of those radios?

A    The purpose was undercover safety.  We were given those radios because the place we were going in the Luther/Cadillac area had limited cell reception, and there was some concern that if something went bad we would be unable to reach agents monitoring us.

Q    So obviously you couldn't tell the other people you were with that that was the purpose of the radio.  Was there a guise that was told to others for why these radios were issued?

A    For communication between the vehicles.

Q    In addition to the people in the cars that had the two-way radios, did somebody else outside the FBI have one of those radios?

1    A    Members of the case team.  Yes, sir.

2    Q    And what was their role that evening?

3    A    Monitoring us.  Our safety.

4    Q    Were they in the area and able to respond if necessary and

5    told through the radio?

6    A    Yes, sir.

7    Q    Did your car meet up with the two other cars?

8    A    It did.

9    Q    Where was the first place you met up?

10   A    The Walmart in Cadillac, the place I had initially met Fox

11   and Dan that afternoon or that morning.

12   Q    Do you know approximately what time that was?

13   A    In the 10:00 hour.  10:00 p.m. sometime.

14   Q    Who did you meet with there?

15   A    It would have been Fox and the Null brothers in my vehicle

16   and then two other cars -- two other trucks showed up.  One

17   truck contained the other undercover Dan, Croft, Steve Robeson.

18   And the other vehicle contained -- the other car contained one

19   of Robeson's friends named Brian, whose last name I can't

20   recall, Kaleb Franks and Ty Garbin.

21   Q    Thank you.  What happened in the Walmart parking lot?

22   A    We had a meeting essentially about the logistics of the

23   surveillance we were going to conduct.

24   Q    And did your car have a specific assignment?

25   A    We did.

1    Q    What was the assignment for your car?

2    A    We were to do generalized surveillance of the area

3    surrounding the governor's neighborhood.

4    Q    Where were the other cars supposed to go?

5    A    One was going to go down to that public boat launch that

6    you heard Mr. Fox reference in the recording, and the other was

7    actually going to go past the governor's residence.

8    Q    How long was this meeting in the Walmart parking lot?

9    A    Approximately a half an hour.

10    Q    After that you continued driving?

11    A    Yes, sir.

12    Q    And who was in your car then?

13    A    Just myself and the Null brothers.

14    Q    Who was giving you directions?

15    A    I'd be getting the directions from Fox.

16    Q    In what way?

17    A    He would have provided them by -- I think verbally, and

18    then perhaps through the messaging application we were using as

19    well.

20    Q    All right.  So verbally before he got out of the car and

21    then after he is in a different car he is messaging somehow?

22    A    Yes, sir.  The radios didn't work so we were -- he and I

23    were messaging as we drove towards Elk Raids.

24    Q    About what time did you get to Elk Rapids?

25    A    It's about an hour drive, so a little before midnight.

Q    Could you please describe for us what happened once you

arrived in Elk Rapids?

A    Sure.  We had a shorter, smaller -- not smaller, but a

shorter meeting, shorter in length, in the parking lot of an

AmVets near in the Elk Rapids area.  The other two vehicles --

the other two cars left out to do their assignments.  The Null

brothers and I were sitting there.  We talked about how it

looked suspicious that we were sitting in a parking lot at

midnight so we decided to drive around until a predetermined

signal was given us to come in closer.

Q    You said an AmVets parking lot.  What is AmVets?

A    American veterans, like a VFW post.

Q    And then you said you guys were waiting for a signal before

proceeding.  Who was giving the signal?

A    Fox.

Q    What was the signal?

A    Message over the radio or sound over the radio.

Q    And did he eventually provide that signal?

A    Yes.

Q    What did you do after the Defendant Fox's signalling?

A    Drove the area that was in the immediate vicinity close to

the governor's home.

Q    What does that mean in the general vicinity?  On her

street?

A    No.  Kind of -- as I remember it the home was down a

1    cul-de-sac or down a road into a subdevelopment.  We would have

2    gone past the subdevelopment and in kind of the general area of

3    that subdevelopment.

4    Q    About how long did that go on for?

5    A    The whole thing probably lasted approximately an hour.

6    Q    What happened then?

7    A    We returned to that same AmVet VFW post and kind of

8    reconfigured vehicles.  The Null brothers left my vehicle.

9    Q    Why was that?

10   A    I told them that I was not headed back to the campsite that

11   night.

12   Q    Where did you go to that evening?

13   A    To the hotel that I was staying at.

14   Q    Did you drive back alone?

15   A    I did.

16   Q    Did you return to the Luther campsite?

17   A    I did.

18   Q    When was that?

19   A    Approximately 10:00 a.m. that next morning.

20   Q    Did you meet with people that day, Sunday the 13th?

21   A    I did.

22   Q    What did you do that Sunday at the Luther site?

23   A    The day before there had been a number of stations,

24   training stations.  One of those stations was a dry fire shoot

25   house or kill house.  So basically doing walkthroughs but not

1    actually firing weapons.  On Sunday morning we did live fire

2    through that same shoot house.

3    Q    I don't think we've covered this before.  What's the

4    difference between dry fire and live fire?

5    A    Actually, dry fire would be actually shooting bullets.

6    Live fire would be rounds going through the weapon, hitting

7    targets.

8    Q    I think you might have inverted those.  Could you say that

9    again?

10   A    I'm sorry.  Live fire is shooting.

11   Q    And what is dry fire?

12   A    Dry fire is essentially a walkthrough.

13   Q    You are not using live rounds and you are not pulling the

14   trigger?

15   A    Correct.

16   Q    And so on that Sunday you did one with live fire?

17   A    Correct.

18   Q    How was that kill house set up?

19   A    It was, I would say, more professionalized than the one

20   that had existed in Wisconsin.  It -- closer -- it was a closer

21   replication of a shoot house that law enforcement or the

22   military would use.

23   Q    In what way?

24   A    It was better backstop, better -- you know, had more

25   defined hallways.  It looked more like a structure than just

```
1    plywood boards plunked together.

2    Q    What do you mean by backstopped?

3    A    So there was -- so if a bullet goes astray or even if it

4    doesn't go astray goes through the target and continues on it

5    eventually hits something, a backstopping to stop that bullet

6    from traveling somewhere else and hitting something

7    inadvertently.

8    Q    How many times did you go through the kill house in Luther

9    on Sunday?

10   A    At least twice.

11   Q    Who went through with you?

12   A    Fox.

13   Q    Did you see other people go through the kill house that

14   day?

15   A    I did.

16   Q    Did you see Barry Croft go through the kill house?

17   A    I don't recall Mr. --

18   Q    Did you see Brandon Caserta go through the kill house?

19   A    Not during the live fire exercise.  I don't recall if he

20   was or was not during the live fire exercise.

21   Q    Did you see him go through it during the dry fire exercise?

22   A    I did.

23   Q    And Daniel Harris, did he go through it with the live fire?

24   A    I don't.

25   Q    You said you went through it, Adam Fox.  Did Adam Fox go
```

1    through just with you or did he go through with others as well?

2    A    He went through with others I believe.

3    Q    Approximately what time did you leave the FTX that day?

4    A    Approximately noon.

5         MR. ROTH:  Thank you, Your Honor.  I have nothing

6    else.

7         THE COURT:  All right.  Before we go to cross it might

8    be a decent time for a break.  We've been about an hour at it.

9    It's a little quicker than usual but I think it'll work out

10   better with the segments and give everybody a chance to

11   prepare.  So we'll take our 20-minute break now and come back

12   20 minutes from now.

13        LAW CLERK:  All rise, please.

14        (Jury out, 12:09 p.m.)

15        THE COURT:  Okay.  20 minutes.  Thanks.

16        LAW CLERK:  Court is in recess.

17        (Recess taken, 12:09 p.m.)

18        (Resume Proceeding, 12:32 p.m.)

19        LAW CLERK:  All rise, please.

20        (Jury in, 12:32 p.m.)

21        LAW CLERK:  Court is in session.

22        THE COURT:  All right.  Thank you.  So we will go to

23   cross exams now starting with Mr. Gibbons, and I know there

24   will be some pretrial rulings that probably come into play if

25   you want to play it when it hits you can do that but go ahead

1    and you can get started.

2              MR. GIBBONS:  Yes, Your Honor.  There was two exhibits

3    that we had talked about.  2250, 2251.

4              THE COURT:  All right.

5              MR. GIBBONS:  2250 we resolved prior to starting court

6    today.  2251 is the same type of evidence and character.  I

7    would like to at least move, Your Honor, for a decision on its

8    admissibility.  I think it's the same as --

9              THE COURT:  I'll incorporate my earlier rulings and

10   comments and I am excluding that exhibit.  Did you say 2250 you

11   have worked out an agreement?

12             MR. ROTH:  2250 the Court has ruled earlier.

13             THE COURT:  That's what I thought.  Right.  So that's

14   out.

15             MR. GIBBONS:  Yeah.  I am not going to do that.

16             THE COURT:  Fair enough.  So go ahead whenever you are

17   ready.

18                        CROSS EXAMINATION

19     BY MR. GIBBONS:

20   Q    Good afternoon, Agent Schweers.

21   A    Good afternoon, sir.

22   Q    I am going to direct you to a Proposed Exhibit.  It should

23   be up in the Defense book.

24   A    Which volume, sir?

25   Q    It's 2276, so probably the second or third volume.  It's

1    Volume II, Agent Schweers.

2    A    226?

3    Q    2276.

4         THE COURT:  Do you have it on the Defense system,

5    because that'll show up on his, and I've got it muted?  It's

6    almost easier than sorting through the books.

7         THE WITNESS:  Bear with me, sir.  The tabs don't match

8    the exhibit number.

9         THE COURT:  It should now be on the screen in front of

10   you.  If you do want to use the whole one I'll find it for you.

11        MR. ROTH:  Your Honor, may I approach?  I have a copy.

12        THE COURT:  Say again?

13        MR. ROTH:  I have an extra copy.

14        THE COURT:  Okay.  Fair enough.  2276.

15        THE WITNESS:  Okay.  Thank you.  Gotcha.  Thanks.

16        THE COURT:  And you have it in front of you now, the

17   full document.

18        THE WITNESS:  Thank you.

19        THE COURT:  All right.

20        THE WITNESS:  Okay.  Sir, yes, sir.

21   BY MR. GIBBONS:

22   Q    All right.  Very good.  You testified that you operated out

23   of Los Angeles, California, is that correct?

24   A    Yes, sir.

25   Q    And in the early summer of 2020 you were handed an

1  assignment regarding an individual named Adam Fox, is that

2  correct?

3  A    Correct.

4  Q    What types of things did you do when you learned that you

5  had a new subject to investigate?

6  A    I would have talked with the case agents, maybe read or at

7  least obtained some information on the investigation to date.

8  Q    You would have communicated with the agents here in

9  Michigan?

10  A    Correct.

11  Q    That were working the case already?

12  A    Correct.

13  Q    So those people would have been familiar with Mr. Fox,

14  correct?

15  A    Correct.

16  Q    And they would have been familiar with his activities,

17  true?

18  A    Yes, sir.  As far as I know.

19  Q    And what types of things did they say that Adam Fox had

20  engaged in that was of concern such that your presence was

21  warranted as an informant?

22  A    That he had made comments to a confidential human source

23  about taking violent direct action.  That's what I would have

24  been told.

25  Q    Okay.

1    A    As it relates to his antigovernment leanings.

2    Q    And those antigovernment leanings would have been expressed

3    on-line in part?

4    A    In part.  Yes.

5    Q    And then in person to other persons, correct?

6    A    Correct.

7    Q    And did you review any materials pertaining to those types

8    of statements or things that Mr. Fox had been saying?

9    A    Not that I recall.  No, sir.

10   Q    Okay.  Did you at any point do an on-line search of your

11   own to see what maybe Mr. Fox's FaceBook page looked like?

12   A    No, sir.

13   Q    Okay.  And when you got to the Vac Shack on July 3rd I

14   guess is when you first met with Mr. Fox?

15   A    In person.  Yes, sir.

16   Q    Okay.  Were you aware that he had a militia?

17   A    I was aware that he was part of the militia movement.  Yes,

18   sir.

19   Q    Okay.  And you were aware that he was Michigan's guy?  The

20   Patriot III% group was his, correct?

21   A    I don't remember if I recall the exact name of the group

22   but I was aware and that we would have discussed the fact that

23   he had a militia during that July 3rd.

24   Q    And part of this meeting in part would be because you were

25   being recruited by Mr. Fox, correct?

1     A    Correct.

2     Q    And I take it from direct exam the things that Adam Fox

3     were talking about involved an assault or some type of activity

4     directed against the legislature in Lansing?

5     A    The State Capitol.  Yes, sir.

6     Q    The State Capitol.  Did he -- or did you have an

7     understanding about the Michigan III% militia, how long Adam

8     Fox had had that militia?

9     A    No, sir.

10    Q    Okay.  Were you aware of any other members of his militia?

11    A    Not at the time.  No, sir.

12    Q    And at this meeting it was just you showed up.  He talked

13    about his antigovernment sentiments, and he was upset with the

14    legislature?

15    A    He talked about taking the legislature by force,

16    potentially killing officers in that -- the course of that.

17    Talked about taking legislators hostage and putting them on

18    trial or ransoming the governor or the legislators that were

19    being held hostage.

20    Q    How much was that effort supposed to cost?

21    A    I don't -- I don't know if we discussed -- I do remember

22    there was some discussion of money but I don't remember a

23    specific amount.

24    Q    Okay.  Was that effort supposed to take about 300 men?

25              MR. ROTH:  Your Honor, I am going to object.  This

1    would be calling for hearsay.

2         THE COURT:  I think it does, right, because you are

3    linking it up with things that have been subject to the

4    pretrial exclusion.  So unless there's something else that's

5    sustained.

6         MR. GIBBONS:  All right.

7    BY MR. GIBBONS:

8    Q    When you left the meeting at the Vac Shack, you continued

9    to have contact with Adam Fox?

10   A    Yes.

11   Q    Via messaging?

12   A    Yes, sir.

13   Q    After July 3rd of 2020, did you have any other meetings

14   with Adam Fox at that Vac Shack?

15   A    No, sir.

16   Q    Okay.  You had meetings -- you had a meeting and -- or at

17   least a training at Cambria, Wisconsin, true?

18   A    Correct.

19   Q    And Adam Fox was there?

20   A    He was.

21   Q    And then you had -- you went to this residence in

22   Belleville?

23   A    Correct.

24   Q    It was a barbecue, correct?

25   A    Yes, sir.

1    Q    And Sean -- and Adam Fox was there?

2    A    He was.

3    Q    And then your last contact physically with Adam Fox in your

4    presence would be in Luther in September?

5    A    Correct.  Yes, sir.

6    Q    The meeting at the Vac Shack, that occurred in the

7    basement?

8    A    Yes, sir.

9    Q    That basement is where Adam Fox lives, correct?

10   A    Yes, sir.

11   Q    To the best of your knowledge?

12   A    To the best of my knowledge, yes, sir.

13   Q    The walls -- there was a bedroom down there?

14   A    There was a bed.

15   Q    A bed.  Were there blankets hung up to distinguish a

16   sleeping area from, say, a more common area in that basement?

17   A    That's my recollection.  Yes, sir.

18   Q    So that would be, like, Adam's spot?

19   A    How do you mean, sir?

20   Q    Well, the bedroom?

21   A    Yes.

22   Q    So he could at least have a place to keep his things,

23   correct?

24   A    That's where he was staying.

25   Q    It would be free of the other employees?

1        THE COURT:  Wait for each other to finish.

2        MR. ROTH:  I am going to object to the foundation

3    anyway.  This seems speculative if not irrelevant.

4        THE COURT:  You know, this witness said he was there.

5    You can ask him if that's how he remembers it, things like

6    that.  And I think in the overall different scheme that each

7    side has here of who is responsible for what it's at least

8    generally relevant for this purpose.  Go ahead.

9    BY MR. GIBBONS:

10   Q    If I can have Exhibit 72, please?  The transcript.

11        Adam Fox generally talked to you about taking the

12   Capitol by force?

13   A    True.

14   Q    Did you at that point have any knowledge or information

15   about how many people were in his militia?

16   A    I -- I don't recall whether I knew how many other folks

17   were in his militia or not, sir.

18   Q    Okay.  He indicates here that you swear an oath -- that he

19   swore an oath, correct?

20   A    Yes, sir.

21   Q    And that an oath is required to get in his militia, is that

22   true?

23   A    Yes.  Well, yes.

24   Q    Following the Vac Shack you didn't try to raise any money,

25   did you?

1    A    No.

2    Q    Following the Vac Shack meeting you did not move to acquire

3    weapons to help participate in any effort to take the Capitol,

4    did you?

5    A    I agreed to participate in the field training exercise that

6    would have been held the next week.

7    Q    Right.  But I am talking specifically.  Like, if someone

8    hypothetically were going to storm the Capitol, they would

9    probably need weapons?

10           THE COURT:  If we are starting to talk about

11   hypotheticals that's a pretty good clue that it's not going to

12   be an admissible question or answer because it's speculative.

13   Let's stick with the real thing.

14   BY MR. GIBBONS:

15   Q    Exhibit 73, please.

16           Looking at the top that first paragraph, Adam Fox uses

17   the collective we.  We are operating?

18   A    Yes.

19   Q    With a group called the Wolverine Watchmen?

20   A    Yes.

21   Q    Who is the XO for the Wolverine Watchmen?

22   A    He was introduced to me as Sean Fix.

23   Q    Well -- you believe that Sean Fix is the XO for the

24   Wolverine Watchmen?

25   A    That's how he was introduced to me in Wisconsin.  Yes, sir.

1    I'm sorry, through the Wolverine Watchmen. I apologize. That
2    was for Mr. Fox's group. I apologize. For the Wolverine
3    Watchmen. I can't remember their rank structure.
4    Q    Okay. So you do know now, as we sit here today -- and
5    let's just maybe move away from July 3rd. Let's just say here
6    today you investigated this case all summer last year, correct?
7    A    Well, I wasn't the investigator, sir.
8    Q    Well, you were an undercover conducting an investigation,
9    correct?
10   A    Correct.
11   Q    And you learned a number of things, true?
12   A    I did.
13   Q    Okay. And you would have learned over the course of the
14   summer that Adam Fox was, in fact, the CO of the Michigan III%
15   Patriot Militia, correct?
16   A    I don't recall whether I learned that or not.
17   Q    Okay. You did take an oath to join his militia, correct?
18   A    I did.
19   Q    Did you enjoy a position of authority with his militia?
20   A    I believe he said he was going to make me in charge of
21   Northern Michigan.
22   Q    Right. You had a title, did you not?
23   A    He may have used the title warden of the north from Game of
24   Thrones.
25   Q    Okay. And that's because you are from the U.P., correct?

1    A    Correct.

2    Q    Sean Fix, you just mentioned him?

3    A    Yes, sir.

4    Q    He was the XO for Adam's militia, correct?

5    A    For Adam's, yes, sir.

6    Q    So Sean Fix was in the militia?

7    A    Yes, sir.

8    Q    And on August 1st you took an oath and joined the militia,

9    correct?

10   A    Yes, sir.

11   Q    Are you aware of any other person that summer that took an

12   oath to join Adam's militia?

13   A    Amanda Keller had talked about taking an oath, and I know

14   there were other members of his militia that were in a text

15   thread, but I don't know whether they took an oath.

16   Q    Okay.  You would agree that the only persons you are aware

17   of was yourself and Mr. Fix, correct?

18   A    And Keller.

19   Q    And Ms. Keller.  She did take the oath?

20   A    That's what I understood.  She had the oath on her

21   telephone.

22   Q    Okay.  And Adam and Ms. Keller, they were a couple?

23   A    They were.

24   Q    And at some point in time in August they ceased to be a

25   couple, is that correct?

1    A    I don't know that.

2    Q    You don't know that?

3    A    No, sir.

4    Q    Okay.

5    A    I'm sorry.  Yeah.  They did, and then -- yes.  They did.

6    They did.  I remember hearing about it.

7    Q    You remember hearing about it?

8    A    Yes, sir.

9    Q    Okay.  When you went to Cambria and the FTX, you were

10   paying attention to what's going on, who is there?

11   A    Generally, yes, sir.

12   Q    What they are doing?

13   A    Generally, yes, sir.

14   Q    Your job is to come back and report, right?

15   A    Well, yes.

16   Q    So you want to make sure that you do a good job keeping

17   track of things that are interesting or different, too, right?

18   A    That's true, but I can't be everywhere at once and that's

19   also why I'm wearing a recording device.

20   Q    Okay.  When you got to Cambria was the XO for the Watchmen,

21   Dan Chappel, there?

22        MR. ROTH:  Objection.  Facts not in evidence.  To the

23   contrary this witness says he does not know this information.

24        THE COURT:  I think that's true.  If you want to try

25   to lay more foundation you can.

BY MR. GIBBONS:

Q    Okay.  When you got to Cambria were there Watchmen there?

A    There were.

Q    Was Dan Chappel there?

A    I don't know Dan Chappel.  I don't know -- Chappel is not a last name I am familiar with, sir.

Q    Okay.  Chappel?

A    I assume, sir, you are referring to the confidential human source known as Dan?

Q    Yes.

A    That's how I knew him.

Q    Okay.  You just knew him as Dan?

A    Correct.

Q    I see.  All right.  And you met Dan at Cambria, correct?

A    I did.

Q    Turning to Exhibit 75.  Adam Fox was talking to you at this meeting on July 3rd about all of his men, is that correct, at the top?

A    Correct.

Q    At that point in time you don't have any idea who he was talking about, is that correct?

A    Correct.

Q    But by the end of the summer you understood that the only people -- the only men in his militia was Sean Fix, his girlfriend and yourself, true?

1    A    No.

2    Q    Well, who else was in the Michigan Patriot III% Militia?

3    A    My understanding is the other folks that were in the text

4    thread with us were members of his militia and he had talked

5    about other people that he was either recruiting or had

6    recruited.

7    Q    And that was in -- and that was on Threema, the chats that

8    you were in, the text thread you were talking about?

9    A    That would have been on Wire initially, and I don't believe

10    his -- I know members of his group would have moved over to

11    Threema but I don't remember if the entire group that was in

12    Wire would have moved over to Threema as well.

13    Q    Okay.  And you were initially into that, and what was the

14    name of -- that was fuck around find out?

15    A    No.  That would have been one of the Threema chats later in

16    the course of the investigation I think.  As I sit her right

17    now I don't recall the name of the text thread.

18    Q    Okay.  You went to the barbecue at Belleville, correct?

19    A    Yes.

20    Q    You had a recorder on you the whole time?

21    A    Yes.

22    Q    Okay.  The meeting lasted about four hours, is that

23    correct, maybe a little more?

24    A    That sounds about right.  Yes, sir.

25    Q    The Fixes are there?  It was their residence, correct?

1    A    Correct.

2    Q    Adam Fox and Amanda Keller came shortly after you arrived,

3    true?

4    A    True.

5    Q    And there is the five of you?

6    A    Correct.

7    Q    Almost the duration of your stay it's just the five of you,

8    correct?

9    A    True.

10   Q    And as you were leaving Mikey Notso arrives?

11   A    Yes.  With two other individuals.  Yes, sir.

12   Q    And you left, correct?

13   A    Yes.

14   Q    You didn't stay to record anything that occurred after that

15   point in time?

16   A    I did not.

17   Q    During the meeting at some point there was this talk --

18         And if I can have Exhibit 131?

19         Adam Fox talks about the need to perform

20   reconnaissance on these three locations associated with the

21   governor, correct?

22   A    Correct.

23   Q    And one of those is Mackinaw Island, right?

24   A    Correct.

25   Q    During the meeting it comes to pass that Adam Fox, I think

1      you testified, asked you to go to Mackinaw Island and take some

2      pictures, correct?

3      A    Yes, sir.

4      Q    And you agreed that you would do that, true?

5      A    I did.

6      Q    If you look at Exhibit 2276 that we talked about earlier,

7      those FaceBook posts.

8      A    Yes, sir.

9      Q    Messages.

10     A    Yes, sir.

11     Q    It should be right there in front of you.

12     A    Yes, sir.

13     Q    If you look at starting on page 16.

14     A    Yes, sir.

15     Q    Okay.  And let's go back and maybe we can talk about this

16     exhibit a little bit.  Aloha --

17            THE COURT:  Before you get into the content, what's

18     the government's position on the admission?  We talked about

19     things earlier.  There are some things that are I think okay in

20     my view and then there is some things that aren't, and it's 29

21     pages altogether.  So where are we on that?

22            MR. ROTH:  We have no objection to its admission, Your

23     Honor.

24            THE COURT:  To any of it?

25            MR. ROTH:  No, Your Honor.

1          THE COURT:  Very good.  Then it's admitted.  Thank

2     you.  Sorry.

3     BY MR. GIBBONS:

4     Q    If you look at page 1 of the exhibit.

5     A    Yes, sir.

6     Q    There we go.  Up at the top.  Hey brother, this is Mark.

7     Do you see that?

8     A    I do.

9     Q    Okay.  Using my girlfriend's account, Elise, true?

10    A    Yes.  That's what it says.  Yes, sir.

11    Q    Okay.  And let me ask you this.  Tell me, what is the

12    strategy here with this text?  Who is Elise?

13    A    Elise was emotionally my girlfriend.  Mark's persona's

14    girlfriend.

15    Q    And this is how you first contacted Adam Fox?

16    A    This would have been the on-line undercover, but yes.  This

17    would have been how I was eventually introduced to Mr. Fox.

18    Q    Okay.  So the testimony you offered on direct that you

19    contacted the first time on Wire was actually this on FaceBook,

20    correct?

21    A    I contacted him first on Wire.  He was contacted on-line

22    prior to my involvement or at least my --

23    Q    Okay.

24    A    -- texting.

25    Q    I just wanted to make sure I understood that.  Aloha, is

1    there a -- that means, like, hello in Hawaiian?

2    A    It does.

3    Q    And that's kind of a tricky spelling for that?

4    A    Yes.

5    Q    All right.  And that's a reference to the Boogaloo?

6    A    Yes.

7    Q    With the Hawaiian shirt?

8    A    Yes.

9    Q    Okay.  And moving forward if we can go to page 16?

10   A    Yes, sir.  I am there, sir.

11   Q    Aloha.  On the second entry, hey friend?

12   A    Yes, sir.

13   Q    This is -- this is the other persona Elise?

14   A    Correct.

15   Q    Reaching out to Adam Fox, correct?

16   A    Correct.

17   Q    Initiating contact, true?

18   A    I mean, yes.

19   Q    And then Elise ostensibly provides to Adam Fox via FaceBook

20   these photographs of Mackinaw Island, correct?

21   A    Correct.

22   Q    You didn't take these photographs, true?

23   A    I did not.

24   Q    Somebody at the FBI provided them?

25   A    Correct.

```
1    Q    Do you know how they obtained these photographs?

2    A    I don't, sir.

3    Q    Okay.  They appear to all be taken from public places, is

4    that right?

5    A    Yes, sir.

6              MR. GIBBONS:  And then if I can have that redacted,

7    2254?

8              THE COURT:  Is there agreement on this one?

9              MR. ROTH:  We are going to agree to admit the portion

10   that is -- we are going to agree to admit the portion that is

11   the map identified on 2254 and only the map.

12             THE COURT:  The map, and that's what you've got set

13   up?

14             MR. GIBBONS:  Yes, Your Honor.

15             THE COURT:  All right.  So that portion of 2254 is

16   admitted.

17   BY MR. GIBBONS:

18   Q    This is showing a map.  You have seen this before, have you

19   not?

20   A    I have.

21   Q    Okay.  And in this ruse with Elise Marie that we just

22   talked about, where these photographs of Mackinaw Island were

23   shared, Adam Fox asked if you could do an overview and draw

24   some ins and outs, is that correct?

25   A    Yes.
```

1    Q    And this is supposed to be Mackinaw Island?

2    A    It was Mackinaw Island.

3    Q    And this is the governor's -- the state park governor's

4    mansion?

5    A    Correct.

6    Q    You do know the governor doesn't live there, correct?

7    A    She does not live there.  No, sir.

8    Q    Okay.  And you put those lines on the map, correct?  Well,

9    not you, but somebody at the FBI did?

10   A    Someone did.  Yes.

11   Q    But in your persona as an undercover as Mark Woods, warden

12   of the north, you put those lines on there, right?

13   A    I am not sure I agree with your phrasing, but someone at

14   the FBI put those lines on there.

15   Q    And it was furnished to Adam Fox, correct?

16   A    It was.

17   Q    How did you know what lines to draw?

18   A    You would have to ask the person that drew them, sir.

19   Q    Okay.  Did it look -- this did look like the plan, though,

20   that you talked about with Adam Fox, did it not?

21   A    Yes.

22   Q    And this represents -- would have represented your effort

23   in trying to put together a piece of the plan that you were

24   aware of, correct?

25   A    This would have represented my effort to comply with what

1    Mr. Fox asked me to do.

2    Q    Right.  And what he asked you to do was based on the

3    understanding you had of the plan, design this piece, correct?

4    A    Correct.

5    Q    Okay.  The plan -- there was a plan -- where did you learn

6    about the plan, at the barbecue?

7    A    Which plan specifically are you referring to, sir?

8    Q    The plan to -- well, let's just go back.  What are these

9    lines supposed to represent as far as you understood?

10   A    An exfiltration -- a way to get out of the area.

11   Q    And is the arrow taking you to the water?

12   A    I believe so.

13   Q    Was there supposed to be a boat involved in the plan?

14   A    I believe there was.

15   Q    Was there supposed to be an arrival by boat?

16   A    Yes, sir.

17   Q    So -- and then the lines would be, like, how to get around

18   on the island if you wanted to get from the boat to the -- to

19   the state park where the mansion is, correct?

20   A    Yes.

21   Q    And then how to get back out to the water, correct?

22   A    Right.

23   Q    Once the governor -- so what would happen is the plan, once

24   the governor is retrieved or acquired, she would be put into a

25   boat, correct?

1        MR. ROTH:  Objection.  This is getting into hearsay.

2        THE COURT:  Yeah.  It seems to me you are really

3    plugging the holes or using the premise of the question with

4    material that is excluded in the pretrial rulings.  I don't

5    believe you can get much farther into it than that.  If you

6    have some other pathway you can let me know.

7        MR. GIBBONS:  I don't, Your Honor.

8    BY MR. GIBBONS:

9    Q    Moving forward to Luther.  If I can have Exhibit 223?  It's

10   a transcript.  Okay.  This is different -- Pam, can you go to

11   the next page?  If you can highlight the third paragraph,

12   please?  Fourth paragraph?  Yup.

13       When you went up to Elk Rapids, you went up there on

14   the 12th of September, correct?

15   A    Yes, sir.  It would have been the 12th into the 13th.  Yes.

16   Q    Okay.  Are you familiar with Elk Rapids, where it's at in

17   Michigan?  You drove there?

18   A    Only -- only been the one time.

19   Q    Okay.  Did you park by the AmVets when you got to Elk

20   Rapids?

21   A    Correct.

22   Q    Downtown?

23   A    I am not familiar with Elk Rapids whether that was the

24   downtown or not, but at the AmVets there in Elk Rapids.  Yes,

25   sir.

1    Q    Okay.  Adam Fox here says essentially that there is --

2    there is a bridge in Elk Rapids, and if you blow that bridge

3    you agree here it would create a delay, correct?

4    A    That is what he is saying.  Yes.

5    Q    Okay.  And if I can have -- he continues after that.  If I

6    can have that paragraph that says -- on the last towards the

7    end.  Page 3.  Same exhibit.  223, page 3.  If you can

8    highlight down at the bottom?

9         Mr. Fox says that we're just larping.  Do you know

10   what larping is?

11   A    I do.

12   Q    What is larping?

13   A    Live action role playing.

14   Q    Okay.  And that's where you pretend that you are things

15   that you are not, correct?

16   A    That's correct.

17   Q    It's make believe for adults, true?

18   A    That is true.  Yes.

19   Q    Okay.  There are other things that happened in the summer

20   of 2020 where people were being things or pretending to be

21   things they weren't, correct?

22        MR. ROTH:  Objection.  Lack of foundation.  Relevance.

23        THE COURT:  I think there is.  That's an incredibly

24   wide open question and I don't think it really bears on what we

25   are talking about.

BY MR. GIBBONS:

Q    Well, with respect to the individuals that you were encountering in this investigation in this militia?

        THE COURT:  That's narrower, but I am still not sure what you mean in terms of who?

BY MR. GIBBONS:

Q    Well, Sean Fix.  Let's take him for example.

A    Okay.

Q    Sean Fix.  He is the XO for Adam's III% Patriot Militia, correct?

A    Correct.

Q    He had military experience, did he not?

        MR. ROTH:  Objection, hearsay.

        THE COURT:  Unless there is a foundation that gets the knowledge to this witness apart from something people told him, I think there is not a proper foundation, so I don't know where you go with that or if you have some pathway for that.

        MR. GIBBONS:  No, Your Honor.  I am fine.

        Bring up Exhibit 229, please.

        THE COURT:  I'm sorry.  I didn't hear that.

        MR. GIBBONS:  229.

        THE COURT:  Thank you.

BY MR. GIBBONS:

Q    And if you can highlight paragraph 2?

        You were present in the truck with the Null brothers?

1   A    Correct.

2   Q    And Mr. Fox, true?

3   A    Correct.

4   Q    And you hear -- and this is the recording of what you

5   experienced in the truck, correct?

6   A    Yes.

7   Q    All right.  This is Adam's idea of the plan to kidnap the

8   governor, correct?

9   A    One of them.  Yes, sir.

10  Q    Okay.  He had multiple plans, did he not?

11  A    Yes.

12  Q    Okay.  And this particular version the plan was start at

13  the boat launch, is that right?

14  A    Correct.

15  Q    You would launch a boat with a trailer into Birch Lake

16  where the governor resides, correct?

17  A    I believe so.  I don't know if that was the name of the

18  body of water, but yes.

19  Q    And then Adam and his crew would then take the boat across

20  the lake to the cottage, correct?

21  A    That's what he is saying.  Yes, sir.

22  Q    And then the plan would be that the governor would be taken

23  from her cottage and put back in the boat, true?

24  A    Taken by force and kidnapped.  Yes, sir.

25  Q    And put back in the boat?

1    A    Correct.

2    Q    Taken back to the boat launch?

3    A    No.  I don't believe so.

4    Q    Well, it says here bring her back.  That would be back to

5    the boat launch, wouldn't it?

6    A    Yes.

7    Q    And then leave the boat there?

8    A    Yes.

9    Q    Because they would have stolen the boat that the governor

10   has been put into and used to extract her, correct?

11   A    Correct.

12   Q    Then what would have happened is they would have taken her

13   vehicle out of there, correct?

14   A    Correct.

15   Q    So that contemplates using her truck or her car or her

16   automobile, true?

17   A    It says what it says.  Yes, sir.

18   Q    Okay.  And that's from the boat launch, so it would have to

19   be stolen and brought there for her to be put in it, correct?

20   A    Yes.

21   Q    Then from the boat launch she'd have to be driven to Lake

22   Michigan?

23   A    Yes.

24   Q    Okay.  Once she's brought to Lake Michigan she would be put

25   in another boat, a two-boat system is what it says here, right?

1    A    That is what it says.  Yes, sir.

2    Q    Okay.  So once she's in the boat and taken out into the

3    middle of Lake Michigan, the crew would then drop the motor on

4    the boat, correct?

5    A    Correct.

6    Q    And that would leave the governor stranded?

7    A    That's what he says.  Yes, sir.

8    Q    Okay.  And then I am not sure exactly what, but that's the

9    end of this plan, correct?  So they are all sitting in the boat

10    with the governor with no motor in the middle of the lake,

11    true?

12    A    No, sir.  That wasn't my understanding.  My understanding

13    was that they would have left a -- the governor in a boat

14    without a motor in the middle of the lake while they left in a

15    separate boat.

16    Q    But that would then be a three-boat plan, right?

17    A    No.  I don't think so.

18    Q    Well, you'd have one boat from the launch to the cottage

19    back to the launch?

20    A    Well, that's an, I think he is saying a two-boat system,

21    sir, after Lake Michigan.

22    Q    Oh, so they'd need a third boat?

23    A    Well, I think that he is saying the two boat system is the

24    Lake Michigan aspect of the plan.

25    Q    I see.  So there would be another boat would then have to

1    rally with the disabled boat where the militia members are with

2    the governor?

3    A    That was as I understood the plan.  Yes, sir.

4    Q    Adam Fox doesn't have a boat, does he?

5    A    I don't know one way or the other.

6    Q    Okay.  You know that he lives in the Vac Shack?

7    A    I do.

8    Q    You know that he's been without income for many months,

9    correct?

10           MR. ROTH:  Objection, hearsay.

11           THE COURT:  I'll sustain that objection.

12   BY MR. GIBBONS:

13   Q    The Null brothers were in the truck when this audio

14   recording was captured, correct?

15   A    Correct.

16   Q    The Null brothers were not in the Wire/Threema chats that

17   you were involved in, correct?

18   A    Correct.

19   Q    The Null brothers had their own militia, true?

20   A    True.

21   Q    They are not Adam's guys?

22   A    They had their own militia.

23   Q    You testified that -- well, and I guess shortly after this

24   audio was captured -- this was in the truck, correct?

25   A    Yes.

1    Q    And so this was on the way from Luther to the Walmart where

2    everyone was going to rally to then head north with the three

3    trucks, correct?

4    A    Correct.

5    Q    And you said, I think you testified on direct, that Adam

6    Fox was telling you where to go?

7    A    Correct.

8    Q    True?

9    A    True.

10   Q    Was Dan, the Wolverine Watchman, telling Adam what to do

11   and then Adam was passing those instructions on to you?

12              MR. ROTH:  Objection.  Lack of foundation.

13              THE COURT:  It is, I think, a foundation problem and

14   beyond that subject to the pretrial ruling.

15   BY MR. GIBBONS:

16   Q    Well, let's make this abundantly clear then.  We are just

17   going to step through this.  You left Luther in the afternoon,

18   in the early evening, to go get dinner with Adam, correct?

19   A    Correct.

20   Q    You had dinner, true?

21   A    True.

22   Q    And that was at Loggers Landing?

23   A    That's yes.  Correct.

24   Q    Right.  Who paid for the dinner?

25   A    I did.

1    Q    Who drove Adam to Loggers Landing?

2    A    I did.

3    Q    Did Adam have -- he didn't have a vehicle in Luther, did

4    he?

5    A    I don't recall how he got out there.

6    Q    Okay.  When you left Loggers Landing you headed in the

7    direction of Big Rapids to meet with the other members of the

8    party in Big Rapids, true?

9    A    I think we headed -- we returned to the campsite.

10   Q    I have a transcript and maybe this will refresh your

11   recollection if you want to look at this.

12   A    Sure.

13        MR. GIBBONS:  May I approach, Your Honor?

14        THE COURT:  Sure.

15   BY MR. GIBBONS:

16   Q    I am showing you a brief snippet from the recording when

17   you were in the truck that evening.

18   A    Thanks.  Well, this is a conversation between Dan and Adam.

19   Q    Correct.  And Adam was in your truck, true?

20   A    Correct.  And there was some talk about --

21        THE COURT:  Hold on.  Wait for the question.  He's

22   asking -- giving that to you to refresh recollection if it

23   does, and if it doesn't say so.

24   BY MR. GIBBONS:

25   Q    Having read this, do you recall now this particular point

1    in the venture?

2    A    Yes.

3    Q    You have left Loggers Landing, right?

4    A    Yes.

5    Q    You were in the truck with Adam.  It's just you and Adam?

6    A    Correct.

7    Q    Phone rings, true?

8    A    Yes.

9    Q    Adam takes a call --

10   A    Yes.

11   Q    -- on his phone?  After having had that phone call Adam

12   directs you to head to the Super 8 in Big Rapids, correct?

13   A    I think there was some talk of heading down towards Big

14   Rapids but we never actually went towards Big Rapids.

15   Q    Who was he talking to?

16   A    In this phone call, sir?

17   Q    Yes.

18        MR. ROTH:  Objection.  I want to be clear if he has

19   any foundation for this question.

20        THE COURT:  I don't know if the witness knows or not

21   apart from whatever he is reading there.  You can check that

22   out first.  If he knows.  Maybe he does.

23        THE WITNESS:  Other than what's reflected in the

24   transcript I don't know.

25   BY MR. GIBBONS:

Q    Okay.  After this phone rings you don't go to the camp, you
start heading to Big Rapids after this phone call, correct?
Adam Fox diverts you to Big Rapids, correct?

A    I don't know how far we would have got towards Big Rapids,
but we eventually went -- the next place we went was the
campsite.

Q    Correct.  And before that happened, before you turned
around to go to the campsite, Adam Fox got another phone call,
did he not?

A    I don't have a specific recollection of him getting another
phone call.

Q    Okay.  I have another transcript that...

        MR. GIBBONS:  May I approach, Your Honor?

        THE COURT:  All right.  Are you trying to refresh his
recollection once again?

        MR. GIBBONS:  Yes, Your Honor.

        THE WITNESS:  Thank you, sir.

        MR. GIBBONS:  If you could take a look at this
transcript.

        THE COURT:  So don't tell us what it says.  The
question is, does it refresh your recollection about another
phone call that Adam Fox received?

        THE WITNESS:  Yes, Your Honor.  Okay.

BY MR. GIBBONS:

Q    Does that refresh your recollection?

1    A    Specifically about the phone call, sir?

2    Q    Yes.

3    A    No.

4    Q    Not about the phone call, just about that point in time in

5    the event do you recall that happening?

6    A    We would have redirected --

7         MR. ROTH:  Your Honor, I am going to object.  The

8    specific line of questioning was do you recall the second phone

9    call, and the answer is it wasn't refreshed.  Then that issue

10   is --

11        THE COURT:  I think the answer did say it didn't

12   refresh his recollection about a phone call, and I think if

13   there is anything else that it refreshed him on you can get to

14   that topic, but I don't think we're there yet.

15   BY MR. GIBBONS:

16   Q    Did reading the exhibit refresh your recollection with

17   respect to that portion of the ride that is in that?  That ring

18   a bell for you, sir?

19   A    Yes, sir.

20   Q    Okay.  And did Adam Fox receive a phone call prior to

21   turning around and heading to Luther?

22        THE COURT:  Well, that's what he said he doesn't have

23   a specific memory of.  So I mean, if that's the point, he has

24   already answered it.

25        MR. GIBBONS:  I'm sorry.  I misunderstood, Your Honor.

1    I thought he said he did recall.

2         THE COURT:  He said in a generic way it refreshed his

3    recollection about something that evening, but he had

4    previously said it wasn't a phone call.  So if you want to find

5    out something else we can go there, but I think the record will

6    show the one thing you asked him specifically about he said it

7    didn't refresh him on.

8    BY MR. GIBBONS:

9    Q    In any event, you get to the Walmart in Cadillac

10   eventually, correct?

11   A    True.

12   Q    Because you went back to the camp, true?

13   A    Correct.

14   Q    And the Null brothers were retrieved along with Brandon

15   Caserta, correct?

16   A    Yes, sir -- no, sir.  Mr. Caserta was not retrieved.

17   Q    He was not retrieved?

18   A    No, sir.

19   Q    Just the Null brothers?

20   A    Correct.

21   Q    So you bring the Null brothers with Adam Fox back to

22   Cadillac to the Walmart, correct?

23   A    Yes.

24   Q    When you get to Cadillac, was there -- was anyone else

25   there to the best of your knowledge?

1    A    Initially?

2    Q    Yes.

3    A    No.

4    Q    You are the first ones there?

5    A    Yes.

6    Q    Other people then began to arrive, correct?

7    A    Correct.

8    Q    Dan Chappel or Dan from the Wolverine Watchmen arrives in a

9    truck, correct?

10   A    True.

11   Q    And he has Steve Robeson and Barry Croft with him?

12   A    Yes.

13   Q    And Red?

14   A    Yes.

15   Q    Red is a fellow special agent, correct?

16   A    He is.

17   Q    Steve Robeson is a CHS, undercover informant?

18   A    He is a confidential human source.

19   Q    And Dan is a confidential human source?

20   A    Yes.

21   Q    A second truck arrives and that's Brian Higgins, correct?

22   A    Yes.

23   Q    And Brian comes -- he is in Luther ostensibly with Steve

24   Robeson, correct?

25   A    That was my understanding.  Yes, sir.

1   Q   He is an associate of Mr. Robeson's?

2   A   Yes.

3   Q   And he has Mr. Franks and Mr. Garbin in his truck?

4   A   Yes.

5   Q   Eric Molitor arrived.  Is that true?

6   A   He was there in the parking lot at some point.  Yes, sir.

7   Q   Did -- and Adam Fox joined him for a minute at his car,

8   correct?

9   A   He did.

10  Q   Adam Fox and Eric Molitor proceeded to smoke marijuana, did

11  they not?

12  A   I believe so.

13  Q   Okay.  Throughout the weekend Adam Fox was smoking

14  marijuana, was he not?

15  A   I don't know.

16  Q   When you were at the Vac Shack meeting on July 3rd he

17  smoked marijuana while he was meeting with you, did he not --

18  A   He did.

19  Q   -- in the basement?  He smoked marijuana in Cambria,

20  Wisconsin, did he not?

21  A   Not that I observed, sir.

22  Q   Not that you observed.  Going back to the Sean Fix

23  barbecue, there was marijuana being used by the participants,

24  correct?

25  A   That's what I recall.  Yes, sir.

Q     Okay.  The participants in that four hours had engaged, or
like Mr. Fox, smoked marijuana more than once during that
meeting, were they not?

A     That I couldn't recall.  I know people smoked marijuana.  I
don't recall much or -- it would have been social.

Q     Moving forward.  So were you at -- you were assigned to
take the Null brothers up from this Walmart to Elk Rapids,
correct?

A     Yes.

Q     Okay.  You had never met the -- had you met the Null
brothers before?

A     Yes, sir.  They were both in Cambria at the Wisconsin FTX.

Q     So you had that one day with them?

A     Yes, sir.

Q     You didn't have social media connections with them, did
you?

A     No, sir.

Q     You didn't text message them?

A     No, sir.

Q     You didn't have phone calls with them?

A     No, sir.

Q     You had no contact with them after Cambria?

A     Other than Luther?

Q     Correct.

A     Correct.

1    Q    And they are in your truck?

2    A    They are.

3    Q    What was the weather like that night?  Was it raining?

4    A    I think it had rained -- it had rained as we were leaving

5    the restaurant but by the time we were meeting in the Walmart

6    parking lot it was clear.

7    Q    And then it did start raining on the way back up to Elk

8    Rapids, did it not?

9    A    It may have been spitting.

10   Q    It was a dark night, wasn't it?  Cloudy, overcast?

11   A    It was dark.  It was almost midnight.

12   Q    On the way up you suggested -- the conversation wasn't too

13   heavy going up, was it?

14   A    I'm sorry, sir?

15   Q    The conversation wasn't too much going up with the Nulls?

16   It was a little quiet in the truck, true?

17   A    True.

18   Q    In fact, you suggested to the Null brothers --

19              MR. ROTH:  Objection, hearsay.

20              MR. GIBBONS:  He is an agent, Your Honor.

21              THE COURT:  The question is asking what this witness

22   said, so I don't know that that's necessarily a problem.  Let's

23   have the question first.

24   BY MR. GIBBONS:

25   Q    You suggested to the Null brothers that they could take a

1    nap, catch a few Z's, and you'd wake them up when you got to

2    Elk Rapids, right?

3    A    Probably.  I don't have a specific recollection of that but

4    it wouldn't be out of the question.

5    Q    And then you got to Elk Rapids and you went to the AmVets

6    parking lot?

7    A    Correct.

8    Q    When you got to the AmVets parking lot, Adam Fox is the one

9    that approached your vehicle, is that how that worked or did

10   you get out of your truck?

11   A    We got out of the vehicles.  Yes, sir.

12   Q    And you are wearing a recorder the whole time, correct?

13   A    I am carrying a recorder.  Yes, sir.

14   Q    And you have had the opportunity to review the recordings?

15   A    I have.

16   Q    There were no problems with the recordings, were there?

17   A    No.  None that I am aware of.

18   Q    There were no gaps?

19   A    None that I am aware of.

20   Q    You did a good job, right?

21   A    The recordings are what the recordings are, sir.

22   Q    Okay.  And they are accurate?

23   A    Yes, sir.

24   Q    Did you receive directions from anyone else other than

25   Adam?

1    A    I don't recall.

2    Q    Okay.  You waited, I think your testimony was, in the

3    parking lot for a little bit after everyone left, is that

4    correct?

5    A    The two other trucks left out of the parking lot and we

6    waited there.  Yes, sir.

7    Q    Because you didn't have a specific assignment per se,

8    correct?

9    A    They were going to -- they were going to get in position

10   and signal us in.

11   Q    Okay.  And signalling you in means that you would drive up

12   the road and kind of around?

13   A    Correct.

14   Q    You never drove on Timberlake Drive near the governor's

15   residence, did you?

16   A    If that's her street, no, sir, I did not.

17   Q    That is her street.

18   A    No, sir.

19   Q    You did not ever leave a public roadway with your truck,

20   did you?

21   A    Other than to perhaps turn around in a parking lot or

22   something like that, no, sir.

23   Q    And that would have been a place generally accessible to

24   the public?

25   A    Correct.

1   Q    I guess what I'm meaning is there was no trespassing

2   involved with your truck anyway, correct?

3   A    No, sir.

4   Q    And no trespassing involved with any other truck to the

5   best of your knowledge?

6   A    That I don't know, sir.

7   Q    Okay.  Once you left the AmVets -- you were prompted to do

8   that, is that your testimony?

9   A    Yes, sir.

10   Q    Okay.  Did -- where did you go?

11   A    The -- I believe the governor's residence was in a

12   subdivision down at that road.  We would have gone around the

13   general vicinity within, you know, driving past the subdivision

14   but not down into it.

15   Q    So you would have driven on 31?

16   A    I am not from up there, sir.  I don't know the specific

17   roads.

18   Q    Would you have driven on the highway or were these on all

19   residential streets?

20   A    I wouldn't say highway and I wouldn't say -- two-lane.

21   Q    County roads?

22   A    Perhaps, sir.

23   Q    Okay.  You never parked your truck in the governor's

24   driveway?

25   A    No.

1    Q    You didn't go to the boat launch?

2    A    I did not.

3            MR. GIBBONS:  Okay.  Can I have Exhibit 264, please?

4            THE COURT:  264 I don't show as in yet.

5            MR. GIBBONS:  That's not in yet.

6            THE COURT:  Do you have any objection, Mr. Roth?

7            MR. ROTH:  I apologize, Your Honor.  Let me review the

8    exhibit.  I do have an objection in that I don't think it's

9    something that this witness was aware of or present for.

10           MR. GIBBONS:  That's fine, then, Your Honor.  The

11   indication here looked to me like he had testified to it.

12           THE COURT:  All right.  So we'll wait with that then.

13   BY MR. GIBBONS:

14   Q    You participated in the shoot house?

15   A    I did.

16   Q    And did you go through the live fire exercises on Sunday

17   morning?

18   A    Yes, sir.

19   Q    Were those concluded before you left, do you know?

20   A    I think they were ongoing when I left.

21   Q    Okay.  You would agree at no time during the live fire when

22   you were there did anyone practice extracting a target or a

23   person out of the shoot house under force, true?

24   A    Are you asking me if someone specifically pretended to

25   kidnap someone?

1    Q    Yes.

2    A    No.

3    Q    Okay.  So like, there could be an exercise where we would

4    practice extracting a target from a residence.  That didn't

5    happen, true?

6    A    I mean, we could have.  Sure.

7    Q    Right.  But that did not happen?

8    A    Not while I was present.  No.

9    Q    There was no one playing like they are going to be the

10   subject of a kidnapping and they are actually flex cuffed and

11   hauled out of the shoot house?

12   A    That would be incredibly dangerous with live fire, sir.

13   Q    Right.  One way or the other it didn't happen, correct?

14   A    It didn't.  No.

15   Q    And were you present during the dry fire exercises on

16   Saturday?

17   A    Yes, sir.

18   Q    And there wasn't any extraction or practicing extracting

19   targets under flex cuffs on Saturday either, was there?

20   A    Not that I saw.  No, sir.

21   Q    Okay.  There wasn't anybody there performing skill

22   assessments for the participants, making notes, and looking and

23   making judgments about their capabilities, correct?

24   A    Not that I saw, sir.

25   Q    No one ever evaluated your skill level and gave you tips

1    about things you could work on, things you were good at and you
2    had under control?
3    A    The weapons manipulations station there would have been
4    critiquing of things but --
5    Q    Okay.  But with respect to the training going through the
6    shoot house, the tactical training?
7    A    Correct.  No one ever --
8    Q    No skill assessment was performed for you?
9    A    No.
10   Q    You suggested in July at that meeting in the basement that
11   burner phones would be a good thing for people to get to
12   communicate, correct?
13   A    True.  Yes.  Mr. Fox seemed concerned about operational
14   security.
15   Q    Right.  He never got a burner phone, did he, to the best of
16   your knowledge?
17   A    I don't know.
18   Q    You never contacted him on a different burner phone phone
19   number, true?
20   A    No.  I think he felt safe once we had moved to Threema as
21   a...
22   Q    Adam Fox didn't send you a copy of a map, did he?
23   A    A map, sir?
24   Q    Correct.  Any type of, like, planning maps, he never sent
25   any of that to you, true?

1    A    Not that I recall, sir.

2    Q    You never received -- let me put it this way.  You didn't

3    ever raise money for Adam's militia during the summer of 2020,

4    did you?

5    A    True.  I did not.

6    Q    Okay.  You didn't reach out to CHS Steve --

7    A    No.

8    Q    -- for funding for whatever these purposes would be,

9    correct?

10   A    I did not.

11   Q    You were never asked to provide ammunition for any of

12   these -- for this militia in bulk or otherwise, correct?

13   A    Not that I recall.  No.

14   Q    You were never asked if you had a boat that could be used?

15           MR. ROTH:  Objection, hearsay.

16           THE COURT:  Well, it conceivably could be something

17   that's not offered for truth, but some of this stuff we've gone

18   over before.  Not the boat in particular, but certainly the

19   dollars and ammunition.  So you can wrap it up with this line

20   of questioning on the boat if you want.

21           MR. GIBBONS:  Very good, Your Honor.  I have no

22   further questions.

23           THE COURT:  All right.  Ms. Kelly?

24           MS. KELLY:  Thank you, Your Honor.

25                   CROSS EXAMINATION

1      BY MS. KELLY:

2      Q    Good afternoon, Agent Schweers.

3      A    Good afternoon, ma'am.

4      Q    On July 3rd of 2020, let me take you back, you are in that

5      basement meeting with Mr. Fox.  We heard audio and saw a

6      transcript, Exhibit No. 73, where Mr. Fox is saying, I am

7      working with the Wolverine Watchmen.  You remember that audio

8      and that transcript?

9      A    I do.

10     Q    Okay.  Was that the first time you had heard that about the

11     Wolverine Watchmen?

12     A    I don't recall if I would have been provided with some

13     indication of who they were prior to, but yes, I believe it

14     would have been probably the first time I'd heard of them.

15     Q    Okay.  And did you do any searches or any kind of

16     informational requests about the Wolverine Watchmen after you'd

17     heard about them on July the 3rd?

18     A    No.

19     Q    So July 11th you traveled to Cambria, Wisconsin, correct?

20     A    Yes.

21     Q    Okay.  And I believe you said on direct examination Mr. Fox

22     said this was an FTX training, is that right?

23     A    Correct.

24     Q    Okay.  Were you aware that children would be at this

25     training?

1    A    I don't know whether I was aware or I wasn't.

2    Q    Okay.  Did you happen to see any FaceBook invitation for

3    this training?

4    A    No.

5    Q    Okay.  So you arrived and you only stayed on that Saturday

6    for the FTX, is that right?

7    A    Correct.

8    Q    Okay.  So you arrive at this property in Cambria,

9    Wisconsin, right?

10   A    Yes, ma'am.

11   Q    Okay.  And you saw Mr. Fox there?

12   A    I did.

13   Q    You saw Ms. Keller there, correct?

14   A    Yes, ma'am.

15   Q    Sean Fix as well?

16   A    He arrived later but he arrived.

17   Q    Okay.  A female companion of Sean Fix, correct?

18   A    Yes.

19   Q    And two teenage children, correct?

20   A    Yes.

21   Q    And you saw other children that were on the property,

22   correct?

23   A    I did.

24   Q    There were a lot of attendees at this training, is that

25   fair to say?

1    A    Twenty plus.

2    Q    Twenty plus?

3    A    Sure.  Approximately.

4    Q    Sorry.  What was that?

5    A    Approximately.

6    Q    Approximately.  Okay.  And in your involvement in this case

7    you wrote reports about your involvement in different events

8    that you went to, is that fair?

9    A    Yes, ma'am.

10   Q    Okay.  And you wrote those when the information was fresh

11   in your mind, is that right?

12   A    Tried to.  Yes, ma'am.

13   Q    Okay.  And you reviewed audio that you recorded as well, is

14   that right?

15   A    I would have.  Yes, ma'am.

16        MS. KELLY:  Okay.  So if we could show the witness

17   Exhibit 4025, please?

18        THE COURT:  Want to lay your foundation while they

19   look for it?

20   BY MS. KELLY:

21   Q    So if you were to see a photograph of the property in

22   Cambria, would you recognize that photograph?

23   A    I believe so.  Yes, ma'am.

24   Q    Okay.  In looking at Exhibit 4025, does this fairly and

25   accurately depict the property in Cambria, Wisconsin?

```
 1       A    Do I need to get it in the binder?
 2       Q    I'm sorry.  I thought it was on your screen?
 3                 THE COURT:  It is not.  I'm sorry.
 4                 THE WITNESS:  I have it, ma'am.
 5       BY MS. KELLY:
 6       Q    Have you had a chance to look at that photograph?
 7       A    I have.
 8       Q    Okay.  Does that fairly and accurately depict the property
 9       in Cambria, Wisconsin?
10       A    It does.
11                 MS. KELLY:  Okay.  If we could publish that to the
12       jury?
13                 THE COURT:  Any objection?
14                 MR. ROTH:  None, Your Honor.  Thank you.
15                 THE COURT:  It's admitted.
16       BY MS. KELLY:
17       Q    Okay.  So this is the property that you attended on July
18       the 11th, correct?
19       A    Yes, ma'am.
20       Q    Okay.  A number of cars are parked on the property, fair to
21       say?
22       A    Yes.
23       Q    Okay.  And you -- I believe when you arrived, you said that
24       there was some live fire training going on, is that right?
25       A    Yes, ma'am.
```

1    Q    Okay.  In looking at this photograph, would the live fire

2    training be in the direction that we're looking at or would

3    that be behind us according to the photograph?

4    A    It's -- you can see where the live fire training was taking

5    place in this photograph.

6    Q    Could you identify for the jury which area you might be

7    referring to?

8    A    Yes, ma'am.  So for ease of reference, there are two

9    gentlemen standing in the driveway.  If you look past,

10   basically straight past them towards the road that runs

11   perpendicular, that's where it was taking place.  There is a

12   barrel there that would have been one of the stations for

13   firing, and then the actual targets would have been set up

14   several yards or meters further down range.

15          THE COURT:  You should be able to mark it if you press

16   on the screen.

17          THE WITNESS:  Right about there.

18   BY MS. KELLY:

19   Q    And what you've circled, is that like a steal drum?

20   A    That would have been -- I was trying to get a little

21   further down, but yes, that would have been showing the

22   generalized area of where the live fire training was taking

23   place.  It would have taken place throughout this area, and the

24   targets themselves would have been set up down here.

25   Q    Okay.  Those are steal targets, is that right?

1    A    Yes, ma'am.

2    Q    And behind the steal targets was kind of a berm that was

3    set up, is that right?

4    A    I don't recall.

5    Q    Okay.  Fair enough.

6         So this live fire training that's happening -- and you

7    are familiar with tactical training, is that fair to say?

8    A    Yes.

9    Q    Okay.  Fair to say you probably received some tactical

10   training in the academy, is that right?

11   A    Yes, ma'am.

12   Q    Okay.  And in this live fire training that you saw that was

13   going on in Cambria, there were these blue barrels that were

14   set up, is that right?

15   A    Correct.

16   Q    Okay.  And folks were working in tandems or paired off?

17   A    Or single.

18   Q    Or single.  Okay.  And tell us about that training?

19   A    So I think that's what's referred to as leaping and

20   bounding.  So they would have been at a first station closer to

21   the targets.  They would have fired down range at those

22   targets.  If they were working in tandem with someone while

23   they were reloading or moving, the next person would be firing

24   at those targets as they moved back to another place of cover,

25   and then the other person would have moved back to cover as

1    well.

2    Q    So they are moving in a reverse direction closer to that

3    house in that picture that we just saw, is that right?

4    A    Correct.

5    Q    Okay.  Is that -- and you called it leaping and bounding,

6    is that right?

7    A    That's what I believe it's called.  Yes, ma'am.

8    Q    Okay.  Have you ever heard it referred to as breaking

9    contact?

10   A    Yes, ma'am.

11   Q    Okay.  And so the teams would kind of move back and retreat

12   away from those -- that target area, correct?

13   A    Correct.

14   Q    Okay.  Your report from this date also mentioned that there

15   was some medical training going on at Cambria, correct?

16   A    True.

17   Q    Okay.  And that was at a separate tent area?

18   A    It would have been -- yes, ma'am.  It would have been later

19   in the day that that live fire was begun, started, ended and

20   then medical training would have taken place.

21   Q    Okay.  And then there was this shoot house or kill house or

22   you know, whatever we want to call it that was also during the

23   time, is that right?

24   A    Correct.

25   Q    Okay.  And that was dry fire?

1    A    No, ma'am.

2    Q    That was live fire?

3    A    Yes, ma'am.

4    Q    Okay.  And when you arrived at the property in Cambria,

5    that shoot house was already set up, correct?

6    A    No, ma'am.

7    Q    Okay.  So you watched it being constructed?

8    A    Yes.

9    Q    Okay.  Who constructed that house?

10   A    I don't recall.  The -- I think the property owner.

11   Q    The property owner was kind of an older guy?

12   A    Yes.

13   Q    His name was Mike?

14   A    I don't know.

15   Q    So an older guy, the property owner?

16   A    I don't know who constructed it, ma'am.  I wasn't -- I may

17   have moved some boards around, but I don't remember who was in

18   charge of constructing it.

19   Q    Okay.  So you may have moved some boards around?

20   A    I may have tried to be helpful.

21   Q    Do you know if Daniel Harris moved some boards around?

22   A    I don't recall one way or the other, ma'am.

23   Q    Okay.  You described a little bit on your direct

24   examination that this kind of training is to breach a room.  Do

25   you remember saying that?

1    A    Yes, ma'am.

2    Q    Okay.  Or taking a room by force?

3    A    Correct.

4    Q    Okay.  Or assaulting a room you said?

5    A    Yes, ma'am.

6    Q    Okay.  Is that what -- is that what you and the force and

7    the agents call it when you go and assault a room?

8    A    It would be securing a room.

9    Q    So you'd call it securing a room?

10   A    Sure.

11   Q    Okay.

12   A    Yeah.

13   Q    Later in the day on Saturday is when you saw, as you've

14   testified, Mr. Croft and Mr. Harris near the end of that truck,

15   is that right?

16   A    Yes, ma'am.

17   Q    We heard the audio to that, correct?

18   A    Yes, ma'am.

19   Q    We saw -- sorry.  We saw a picture of that, correct?

20   A    Yes.

21   Q    And again, you wrote a report about this training, is that

22   right?

23   A    Yes.

24   Q    Okay.  And you wrote about this construction of an

25   improvised explosive device.  Do you recall that?

1    A    Yes.

2    Q    Okay.  And you describe the persons involved as Barry Croft

3    and someone that had advised you that he was a former marine.

4    Do you remember writing that in your report?

5    A    Yes.  I do.

6    Q    You didn't know Daniel Harris by first name, correct?

7    A    No, ma'am.

8    Q    But what you remembered when the information was fresh in

9    your mind was that Daniel Harris was a marine, is that right?

10   A    I would have been showed pictures of several of the

11   Wolverine Watchmen prior to going to the FTX, so I think I knew

12   Mr. Harris that he was associated with the Wolverine Watchmen.

13   I don't think I would have known his name or remembered his

14   name on the day of the FTX.

15   Q    Okay.  So when would you have been shown photographs of the

16   Wolverine Watchmen?

17   A    Prior -- at the briefing, operational briefing prior to

18   going to the FTX.

19   Q    How soon prior to that?

20   A    A day or so.

21   Q    Okay.  Is that like what you handled in Wisconsin and then

22   you are briefed about the training?

23   A    Essentially.  Pardon me.  Yes.

24   Q    And so you saw pictures of various Wolverine Watchmen that

25   you might encounter throughout your weekend?

1    A    Yes.

2    Q    And you saw Daniel Harris?

3    A    I believe so.  Yes, ma'am.

4    Q    Okay.  Do you recall receiving information that he was a

5    marine prior to meeting him?

6    A    I don't recall specific to Mr. Harris.  I knew some of them

7    had had service but --

8    Q    Sure.

9    A    -- I don't recall specifically whether I knew that prior to

10   actually meeting him.

11   Q    Okay.  But something in your report you recalled something

12   about him being a marine when you are writing this report,

13   right?

14   A    Yes, ma'am.

15   Q    Okay.  And we've looked at and we've listened to the audio

16   in Exhibit 96 where you hear Mr. Harris talking about courses,

17   explosives courses and bangalores?

18   A    Yes, ma'am.

19   Q    When you are hearing him talk about this, is that what kind

20   of sparked your memory of him being a marine?

21   A    Yes, ma'am.

22   Q    Okay.  And he's kind of telling and kind of talking about

23   his experiences through the Marines and his experience with

24   explosives, right?

25   A    Yes.

1    Q    Okay.  And you testified that this balloon was then put

2    into an oven, is that right?

3    A    An appliance of some kind.

4    Q    An appliance of some kind?

5    A    Yeah.

6    Q    Do you remember where that was on the property?  Do you

7    want me to pull up that picture again?

8    A    I think I could --

9    Q    If we can pull up 4025 again?  Thank you.

10            If you see it on this photograph.

11   A    Ma'am, I am sorry.  I think that tree is blocking it, but

12   it would essentially be in the yard somewhere, that general

13   area.

14   Q    Okay.  You've kind of marked this tree kind of in the

15   middle of this grassy area, and so behind that tree you think

16   is where this oven or some sort of appliance was placed?

17   A    Yes.

18   Q    Okay.  And I believe you said when it went in there it --

19   whatever it was didn't detonate, correct?

20   A    It did not detonate.  No, ma'am.

21   Q    Did smoke come out of the --

22   A    It may have smoldered.  Yes.

23   Q    Okay.  And you were standing -- in that photograph that we

24   saw with Mr. Harris and Mr. Croft, were you standing right

25   there at the end by that truck?

1    A    I was near them.  Yes.

2    Q    Okay.  So they come back to the truck, is that right?

3    A    Yes.

4    Q    Okay.  And Mr. Garbin is also standing near there, right?

5    A    Correct.

6    Q    And Mr. Garbin was the one that then started to tape with

7    the duck tape?

8    A    He then participated in the second iteration, for lack of a

9    better term, of attempting to get the thing to explode.

10   Q    And then Mr. Harris and Mr. Croft then went back down to

11   this appliance or whatever it was in the grass and put it back

12   in, is that right?

13   A    Yes.

14   Q    Okay.  And it didn't work again?

15   A    It did not.

16   Q    Okay.  And then you left the property soon thereafter, is

17   that right?

18   A    Yes.

19   Q    And you did not return the following day?

20   A    Correct.

21   Q    Okay.  Let me fast forward now to Luther, to this weekend

22   in September.

23   A    Yes, ma'am.

24   Q    Did you get a briefing just like you got a briefing prior

25   to Cambria when you flew into Michigan and before you went to

1    Luther?

2    A    Yes.  We would have met with the case agents.  Yes.

3    Q    Okay.  Okay.  And you met at the Walmart in Cadillac.  You

4    met Adam Fox and CHS Dan in the parking lot, correct?

5    A    Yes.

6    Q    And then also another undercover agent, Red?

7    A    Correct.

8    Q    Okay.  And you were driving a black or dark colored Chevy

9    Avalanche, is that correct?

10   A    Yes.

11   Q    And then you followed Mr. Fox and CHS Dan back to the

12   property at Luther, right?

13   A    Correct.

14   Q    And you referred to that property as the campsite, right?

15   A    Correct.

16   Q    You refer to that in your report?

17   A    Yes.

18   Q    And you called it that, the campsite, today, too, right?

19   A    Yes, ma'am.

20   Q    Are you a camper?

21   A    I don't -- on and off.  No.  It's not my favorite thing to

22   do.

23   Q    Not your favorite thing to do?

24   A    No, ma'am.

25   Q    So you get to this property, it's kind of back in the

```
1    woods, right?

2    A    It is.

3    Q    And there are tents set up, is that right?

4    A    There were a few tents set up.  Yes.

5    Q    And there is a trailer, also?

6    A    There is a trailer on it.  Yes, ma'am.

7    Q    Okay.  You didn't sleep on the property that night, right?

8    A    I did not.

9    Q    Okay.  You went back to the hotel?

10   A    I went back to the hotel.

11   Q    Okay.  And so again, just like Cambria, there were -- there

12   were several attendees in Luther, correct, at the campsite?

13   A    True.

14   Q    More than 20?

15   A    There were -- there were certainly less children or maybe

16   none at Luther, so I would say less than 20 at Luther.

17   Q    Okay.

18   A    Approximately.

19   Q    Approximately.  Sure.  And no children this time?

20   A    I don't recall -- may have been on the second -- I don't

21   recall, ma'am.

22   Q    Okay.

23   A    Certainly less, if any.

24   Q    And when you arrived at the property you were greeted by

25   some of the people that were already there, is that right?
```

1    A    Yes.

2    Q    Daniel Harris said hello to you because he knew you from

3    Cambria, right?

4    A    I would have said hello to him or he said hello to me,

5    maybe reintroduced myself.

6    Q    Okay.  And then eventually that day the groups kind of --

7    there were three different stations, is that right?

8    A    Correct.

9    Q    And folks kind of broke into different groups --

10   A    Correct.

11   Q    -- to go through those stations?  All right.  And you, I

12   believe, went through the stations with Adam Fox, correct?

13   A    Correct.

14   Q    And who you identified as Squach, or Alex Davidson,

15   correct?

16   A    I would have known him as Squach, being referred to as

17   Squach, yes.

18   Q    Do you now know him as Alex Davidson?

19   A    I don't know if I knew that name before you said it, ma'am.

20   Q    All right.  So you knew him as Squach.  And then your

21   report says an individual from Wisconsin?

22   A    Yes.

23   Q    Is that now Brian Higgins that you have identified?

24   A    It is.

25   Q    Okay.  So that was kind of the group that you went through

1    those stations with?

2    A    Yes.

3    Q    Okay.  And one of the stations was this, I think you called

4    it the weapons manipulation station, is that right?

5    A    Yes.

6    Q    Do you know who was kind of in charge of that station?

7    A    Kaleb Franks.

8    Q    Okay.  And there was also a medical station, correct?

9    A    Yes.

10   Q    And that was run by Daniel Harris, correct?

11   A    Yes.

12   Q    Okay.  Daniel had his dog there with him?

13   A    He did.

14   Q    Okay.  And then there was this tarp house, shoot house

15   again, whatever we want to call it, right?

16   A    Correct.

17   Q    And when you arrived at the campsite, was that tarp house

18   already -- or shoot house, was that already set up or did you

19   watch it being constructed?

20   A    It was -- it was constructed.  They may have moved items

21   around or configured it in some way, but the base, so to speak,

22   of it would have been constructed for sure.  For sure.

23   Q    And just for the jury to understand, you talked about

24   backstops.  So there was like a tire wall.  That's one

25   backstop, correct?

1    A    Yes.

2    Q    And then there is a wooden wall.  That's another backstop,

3    correct?

4    A    Yes.

5    Q    And then there is those blue tarps that were all set up

6    with stakes, correct?

7    A    Yes.

8    Q    And so you are going through this dry fire on Saturday

9    through these -- these tarps, correct, the shoot house?

10   A    I believe there was -- there is wood backing, but yes.  We

11   ran a dry fire shoot house on Saturday or --

12   Q    Okay.  And you are involved in this investigation.  You are

13   looking into domestic terrorism, correct?

14   A    Yes.

15   Q    Okay.  You are listening for certain things that people are

16   saying that you might, you know, find incriminating, correct?

17   A    I am gathering evidence.

18   Q    Okay.  So you are gathering evidence.  And you are going

19   through this shoot house with Adam Fox and Squach.  It's true

20   that at no point during either Saturday or Sunday did anyone

21   say this is supposed to be like the governor's house?

22   A    Not to me.  No.

23   Q    Okay.  Because that would have made it in your report,

24   right?

25   A    Yes.

1    Q    And at some point there is -- you testified on direct

2    examination there is kind of a private meeting where you are

3    walking away from the training on Saturday.  Do you remember

4    talking about that?

5    A    I do.

6    Q    Okay.  And so the training is still going on, but you are

7    kind of pulled aside and you are in some different meeting,

8    right?

9    A    Yes.

10   Q    Okay.  And still on the property, is that right?

11   A    Yes, ma'am.

12   Q    Okay.  But away so other people can't hear what you guys

13   are talking about?

14   A    Correct.  Yes, ma'am.

15   Q    And Mr. Harris was not pulled over to that conversation,

16   correct?

17   A    Not a part of the conversation I was a part of.  No, ma'am.

18   Q    Okay.  Did you later watch any videos from undercover agent

19   Red?

20   A    Yes.

21   Q    Okay.  And Mr. Harris did not watch those videos with you,

22   right?

23   A    I don't recall.

24   Q    Okay.  And at some point the training ended for the day on

25   Saturday, right?

1    A    Yes.

2    Q    Okay.  And you testified that you and Adam went to Loggers

3    Landing, right?

4    A    Yes.

5    Q    Okay.  And that's a little bar or restaurant in downtown

6    Luther, right?

7    A    Yes.

8    Q    Okay.  And you guys went to go eat, is that right?

9    A    Correct.

10   Q    Okay.  And you said you paid for it?

11   A    I did.

12   Q    Okay.  Did you have any alcohol that evening?

13   A    I did.

14   Q    Okay.  Did Adam have any alcohol that evening?

15   A    I don't recall.

16   Q    Okay.  And you were driving your Avalanche, correct?

17   A    I was.

18   Q    And you said it was at approximately 5:00 that you left the

19   campsite to go to Loggers Landing, is that right?

20   A    Approximately.  Yes, ma'am.

21   Q    Were you aware that there was a pole camera set up outside

22   of the property at the campsite?

23   A    I don't recall.

24   Q    Okay.  If I could -- if I could publish 4151 to the

25   witness, please?

1       THE COURT:  Which one?

2       MS. KELLY:  4151.  I'm sorry.

3    BY MS. KELLY:

4    Q    Have you had a chance to look at that photograph?

5       THE COURT:  It's not on mine, so we are going to have

6    to wait and see, because we are at two o'clock, so maybe you

7    can get me a copy and then we can see.  Does the government

8    have an objection?

9       MR. ROTH:  I would like to hear the foundation first,

10   but probably not.

11      THE COURT:  We'll start with that then.

12      (Excerpt ended, 2:00 p.m.)

13   ****************************************************************

```
 1                            INDEX

 2
          Government Witnesses:                     Page
 3
          KRISTOPHER LONG
 4
           Cross Examination by Mr. Blanchard         3
 5         Redirect Examination by Mr. Kessler       69
           Recross Examination by Mr. Gibbons        75
 6         Recross Examination by Mr. Kelly          80
           Recross Examination by Mr. Hills          81
 7         Recross Examination by Mr. Blanchard      82

 8        MARK SCHWEERS

 9         Direct Examination by Mr. Roth            86
           Cross Examination by Mr. Gibbons         126
10         Cross Examination by Ms. Kelly           171

11
          Exhibits:                               Admitted
12
          Government's Exhibit 44                    73
13          (Audio, Croft, June 6)
          Government's Exhibit 60                    91
14          (Photograph, Vac Shack)
          Government's Exhibit 61                    91
15          (Photograph, Vac Shack)
          Government's Exhibit 72                    95
16          (Audio, July 3)
          Government's Exhibit 73                    95
17          (Audio, July 3)
          Government's Exhibit 74                    95
18          (Audio, July 3)
          Government's Exhibit 75                    95
19          (Audio, July 3)
          Government's Exhibit 76                    95
20          (Audio, July 3)
          Government's Exhibit 77                    95
21          (Audio, July 3)
          Government's Exhibit 94                   100
22          (Audio, July 11)
          Government's Exhibit 96                   100
23          (Audio, July 11)
          Government's Exhibit 97                   100
24          (Photograph, Croft/Harris/Garbin)
          Government's Exhibit 102                  100
25          (Audio, July 11)
```

| | | |
|---|---|---|
| 1 | Government's Exhibit 131 | 108 |
| | (Audio, August 1) | |
| 2 | Government's Exhibit 223 | 113 |
| | (Audio, September 12) | |
| 3 | Government's Exhibit 228 | 117 |
| | (Audio, Recon, September 12) | |
| 4 | Government's Exhibit 229 | 117 |
| | (Audio, Recon, September 12) | |
| 5 | Defendant's Exhibit 2254 | 144 |
| | (Map) | |
| 6 | Defendant's Exhibit 3053 | 55 |
| | (Text, Plunk/Long, August 10) | |
| 7 | Defendant's Exhibit 4025 | 174 |
| | (Photograph, Cambria) | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

REPORTER'S CERTIFICATE


        I, Paul G. Brandell, CSR-4552, Official Court Reporter

for the United States District Court for the Western District

of Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of an excerpt

from the proceedings had in the within entitled and numbered

cause on the date hereinbefore set forth; and I do further

certify that the foregoing transcript has been prepared by me

or under my direction.



                        /s/ Paul G. Brandell

                        Paul G. Brandell, CSR-4552, RPR, CRR

                        U.S. District Court Reporter

                        399 Federal Building

                            Grand Rapids, Michigan  49503