```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF MICHIGAN

 3                        SOUTHERN DIVISION

 4      UNITED STATES OF AMERICA,

 5              Plaintiff,          No:  1:20cr183-1/2/5/6

 6       vs.

 7      ADAM DEAN FOX,
        BARRY GORDON CROFT, JR.,
 8      DANIEL JOSEPH HARRIS and
        BRANDON MICHAEL-RAY CASERTA,
 9
                Defendants.
10


11      Before:

12                    THE HONORABLE ROBERT J. JONKER
13                        U.S. DISTRICT Judge
                          Grand Rapids, Michigan
14                        Friday, March 18, 2022
                      Excerpt of Jury Trial Proceedings
15                       Testimony of Mark Schweers

16      APPEARANCES:

17                    MR. ANDREW BIRGE, U.S. ATTORNEY
                      By:  MR. NILS R. KESSLER
18                    MR. JONATHAN C. ROTH
                      The Law Building
19                    333 Ionia Avenue, NW
                      Grand Rapids, MI 49501-0208
20                    (616) 456-2404

21                          On behalf of the Plaintiff;

22                    MR. CHRISTOPHER M. GIBBONS
                      MS. KAREN M. BOER
23                    Dunn Gibbons PLC
                      125 Ottawa Avenue, NW, Suite 230
24                    Grand Rapids, MI 49503-2865
                      (616) 336-0003
25
                            On behalf of Defendant Fox.
```

```
 1                    JOSHUA ADAM BLANCHARD
                      Blanchard Law
 2                    309 South Lafayette Street, Suite 208
                      P.O. 938
 3                    Greenville, MI 48838-1991

 4                            On behalf of Defendant Croft, Jr.

 5
                      JULIA ANNE KELLY
 6                    Willey & Chamberlain LLP
                      300 Ottawa Avenue NW Suite 810
 7                    Grand Rapids, MI 49503-2314
                      (616) 458-2212
 8
                              On behalf of Defendant Harris.
 9
                      MICHAEL DARRAGH HILLS
10                    Hills at Law PC
                      425 South Westnedge Avenue
11                    Kalamazoo, MI 49007-5051
                      (269) 373-5430
12
                              On behalf of Defendant Caserta.
13

14        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

```
1      ************************************************************

2                      (Excerpt started, 8:33 a.m.)

3                      CROSS EXAMINATION(Continuing)

4      BY MS. KELLY:

5      Q    Good morning, Agent.

6      A    Good morning.

7      Q    We left off yesterday we were talking about the time that

8      you might have left the campsite.  You recall that

9      conversation?

10     A    I do.

11     Q    Okay.  And you had previously testified that you had

12     thought you left the campsite approximately five o'clock to go

13     to Loggers Landing, correct?

14     A    Approximately, yes, ma'am.

15     Q    Approximately.  Okay.  And what I wanted to do is kind of

16     walk you through that to try to define that time of when you

17     might have left.

18     A    Sure.

19     Q    Okay.

20     A    Yes, ma'am.

21     Q    And just to refresh the jury's memory, we talked yesterday

22     about the vehicle that you were driving that weekend was a dark

23     colored Chevy Avalanche, correct?

24     A    Correct.

25              MS. KELLY:  Okay.  And if we could pull up Defense
```

1    Proposed Exhibit 4151 for the witness?

2          THE COURT:  I think what we learned yesterday is it

3    might not show up on the witness screen so we probably should

4    give him a hard copy to look at.  Is it on your screen?

5          THE WITNESS:  It is not, Your Honor.

6          THE COURT:  So we are going to have to have it --

7          MS. KELLY:  May I approach the witness, Your Honor?

8          THE COURT:  Sure.

9          THE WITNESS:  Thank you, ma'am.

10   BY MS. KELLY:

11   Q    Have you had the opportunity to look at that exhibit?

12   A    I have.  Yes, ma'am.

13   Q    Okay.  And does that exhibit show the Chevy Avalanche that

14   you were driving that weekend?

15   A    It appears to be.  Yes, ma'am.

16         MS. KELLY:  Okay.  And I would move for its admission,

17   Your Honor, at this point?

18         THE COURT:  Objections?

19         MR. ROTH:  None, Your Honor.  Thank you.

20         THE COURT:  All right.  It's admitted.

21   BY MS. KELLY:

22   Q    If we could display that?

23         This would have been the Chevy Avalanche near the

24   campsite property, correct?

25   A    Correct.

Q    Okay.

A    Yes.

Q    And we see a timestamp there at 7:09 p.m., is that correct?

A    Yes, ma'am.

Q    Okay.  And I know that you testified yesterday that you left, you went to Loggers Landing, you came back, and then you left again.  So to kind of clear up if this is the first or the second time, are you aware if this was the first or second time that you left the property?

A    I am not, and if I could add to that?

Q    Sure.

A    The road at that site was rough, and there were several people that would have to park away from the campsite itself. I had driven a couple people from that kind of smoother parking area down into the campsite, so this could also be that, as well.

Q    Okay.  Fair enough.  And let's talk about -- and maybe this could help us, too.  You talked yesterday about being at that Walmart parking lot in Cadillac that evening with the Null brothers and Adam Fox.  Do you recall that?

A    I do.

Q    Okay.  And I believe you testified that that was at approximately 10:00 p.m.?

A    In the 10:00 o'clock hour, yes, ma'am.  I believe so. Approximately.

1    Q    Okay.  And true that from the campsite to that Walmart

2    Cadillac parking lot about half an hour?

3    A    Approximately.  Sure.  Yes, ma'am.  That sounds right.

4    Q    Okay.  Do you know approximately how long you were waiting

5    in that Walmart parking lot that evening before the other

6    vehicles arrived?

7    A    I don't know.  I am not wearing a watch.  I am not taking

8    notes obviously, so it would just be my best estimate.

9    Q    Sure.  And I can understand that.  And we talked yesterday,

10   too, about some of the reports that you wrote --

11   A    Yes, ma'am.

12   Q    -- as part of this investigation, right?

13   A    Yes, ma'am.

14   Q    And there were times where you would attach chats, part of

15   the group, is that right?

16   A    Correct.

17   Q    Okay.  And would it refresh your recollection as to the

18   timing of when you are waiting in the parking lot in Walmart to

19   the time that you might have -- that the other cars might have

20   arrived?

21   A    It could.

22        MS. KELLY:  Okay.  May I approach the witness, Your

23   Honor?

24        THE COURT:  Sure.

25        THE WITNESS:  Thank you, ma'am.

THE CLERK:  You are welcome.

BY MS. KELLY:

Q    And Special Agent, you can review that report.  That's the
report that you wrote in relation to this investigation,
correct?

A    It is.

Q    And you can review whatever might help refresh your
recollection.  I kind of highlighted a time on the Saturday
night for you.  Do you see that?

A    I do.

Q    Does that refresh your recollection as to what time you
might have been in contact with the other individuals?

A    We certainly would have left the Walmart parking lot before
10:31 p.m., because this is a text that I would have sent
Mr. Fox as we were traveling towards Elk Rapids, I believe,
shortly after we left.

Q    Okay.  So 10:31 you would have been in a different vehicle
than Adam Fox, is that right?

A    Correct.

Q    Okay.  And so working back from there, approximately 10:00
o'clock you were arriving at the parking lot?

A    Approximately.  Sure.

Q    We see your vehicle at seven o'clock leaving the property
and you are just not sure whether that was the first, second
time or if it is you coming or going and dropping someone off?

1    A    True.

2    Q    All right.  Fair enough.  When you came back to the

3    campsite after Loggers Landing, sir, you picked up the Null

4    brothers.  They got in your vehicle, correct?

5    A    Yes, ma'am.

6    Q    You didn't stay very long at the campsite?

7    A    No, ma'am.

8    Q    Okay.  And then you went directly to the Walmart parking

9    lot?

10   A    Not directly.  No.  I think we may have driven around a

11   little bit deciding where we were going to meet those other

12   vehicles.  I know we stopped for a period of time kind of on

13   the side of the road while I believe Mr. Fox was in

14   communication with somebody else about where they were in

15   relation to where we were at that time and you know, should we

16   go somewhere else or should we go to the Walmart or what have

17   you.

18   Q    Okay.  So you are waiting for some direction from someone

19   else in a different vehicle?

20   A    Waiting for some consensus about where the vehicles were

21   meeting.

22   Q    And that consensus eventually was the Walmart in Cadillac?

23   A    Correct.

24   Q    Okay.  And you testified about the different individuals in

25   the different cars, and I know you said Dan, and I just want to

1    make sure that's the confidential human source Dan, not Daniel

2    Harris, correct?

3    A    Correct.

4    Q    He was not on that ride that evening, correct?

5    A    Mr. Harris was not there.  No, ma'am.

6    Q    Okay.  And the Null brothers were in your vehicle until

7    after you left the Elk Rapids area, is that correct?

8    A    Correct.  Until after the reconnaissance that we performed

9    and then we rallied back.  We got back to that AmVets post and

10   they jumped out, jumped in another vehicle.

11   Q    Okay.  Do you know what vehicle they jumped in?

12   A    I -- I don't.

13        MS. KELLY:  I have nothing further.  Thank you, Your

14   Honor.

15        THE COURT:  All right.  Thank you.  We'll go to

16   Mr. Hills.

17                         CROSS EXAMINATION

18     BY MR. HILLS:

19   Q    Good morning, Special Agent.

20   A    Good morning, sir.

21   Q    I just want to go through a couple of meetings that you

22   mentioned.  You mentioned July 3rd at the Vac Shack, correct?

23   A    Yes, sir.

24   Q    And that was a meeting with Mr. Fox?

25   A    Yes, sir.

Q    Mr. Caserta was not there?

A    He was not.

Q    August 1, Belleville meeting with Mr. Fox, Mr. Fix, I think Amanda Keller, Amanda Fix, or Baker I believe, and some other people eventually showed up as you were leaving?

A    Correct.

Q    None of those people were Mr. Caserta?

A    No, sir.

Q    All right.  The first time you met Mr. Caserta then was, I believe, July 11th, is that correct?

A    Yes, sir.

Q    That was at Cambria, Wisconsin?

A    Yes, sir.

Q    And at Cambria, Wisconsin it sounds like you were -- you stayed as much as possible with Mr. Fox, is that correct?

A    That would be correct.  He was my primary point of contact.

Q    And in that day the shoot house was put up kind of in the middle of the yard, correct?

A    Towards -- back towards where the range area had been, but in the yard there at the house.

Q    All right.  And it wasn't -- it didn't have to be put together from scratch; it was already kind of preassembled and you set it up; is that about how it went?

A    I don't know if preassembled is the word I would use.  Kind of pieces of wood laying around.  Sure.

1   Q    So they had pieces of wood laying around that you had to

2   kind of stack up in a square?

3   A    Correct.  Yes, sir.

4   Q    Okay.  And you may have helped with that?

5   A    I may have.  Yes, sir.

6   Q    And Mr. Fox may have helped with that?

7   A    Yes.

8   Q    Because you were with him?

9   A    Yup.

10  Q    And you can't remember if Mr. Caserta was there or not?

11  A    I can't remember if he was there during the actual

12  construction of the kill house.

13  Q    Okay.  And you mentioned that I believe the Luther shoot

14  house was set up better than the one in Cambria, correct?

15  A    True.

16  Q    Now, the one in Cambria, you mentioned that there was a

17  berm behind it, an earthen berm I think?

18  A    I think I said the one in Cambria I wasn't sure.  I know

19  there were some woods and I don't remember whether there was an

20  earthen berm.  I was presuming there was because of the way the

21  range was set up.

22  Q    Okay.  And the shoot house, it was back away from where

23  that -- well, where the range was -- let me stop.  Back up.

24  Where the range was, where the targets were, right, there were

25  steel targets there, correct?

1    A    Yes.

2    Q    Okay.  And you indicated you presume that there was some

3    sort of berm there.  So where the targets were you presumed

4    that there was a berm?

5    A    Yes.

6    Q    All right.  Now, backing up from that, the kill house, or

7    the shoot house, was 30, 40 yards back?

8    A    In that area.  Sure.  30 yards.

9    Q    Okay.  In other words, there was not a berm around the

10   shoot house at Cambria?

11   A    That's correct.  Yes, sir.

12   Q    Okay.  And then we move to Luther and they had put tires up

13   in kind of a berm around it, closer in?

14   A    It was more evidently a better backstopped.  Yes, sir.

15   Q    Better backstopped?

16   A    Yes, sir.

17   Q    Okay.  And then at Luther -- well, let's just put up for

18   the witness if we can.  This is going to be 5202.  And mute so

19   there is no sound.

20        You won't find it in the book.  It's a video.

21   A    Okay.

22        THE COURT:  Well, is there a government objection to

23   this or not?

24        MR. ROTH:  It's my understanding that it will be

25   admitted and played without audio.  We have no objection.

1          THE COURT:  All right.  So you are just going to play

2      it?

3          MR. HILLS:  That's correct.

4          THE COURT:  All right.  Fair enough.

5          MR. HILLS:  So let's play it if we can.

6          (Video started, 8:45 a.m.)

7          (Video stopped, 8:45 a.m.)

8      BY MR. HILLS:

9      Q    All right.  So is this the shoot house at Luther that you

10     are talking about?

11     A    It is.

12     Q    Okay.  We can stop it.  I am going to play it again in a

13     second.

14          So in this -- in this shoot house there are no

15     exterior doors to go through, correct, like there is a space in

16     between the tarps that you walk through.  There is no door?

17     A    No.  No.  There is no physical door that you would either

18     breach or open or what have you.

19     Q    Yeah.  That's what I mean.

20     A    Then yes.

21     Q    Okay.  And then on the interior I think yesterday you

22     said --

23          THE COURT:  You got to stay by a microphone,

24     Mr. Hills.

25          MR. HILLS:  Sorry.

BY MR. HILLS:

Q    Yesterday I believe you indicated that there was another room in there or something or a hallway, correct?

A    Correct.

Q    So on the interior also there isn't any door, correct?

A    There are doorways, but no, there are no doors.

Q    There is no physical obstruction to get through the doorway?

A    Fair.

        MR. HILLS:  All right.  And let's play it and I am going to ask you to stop it if I can.

            (Video started, 8:47 a.m.)

            (Video stopped, 8:47 a.m.)

BY MR. HILLS:

Q    All right.  Stop.  That's good.  All right.  So -- sorry.  This area is the range area, correct?  There is the backstop on the tires, correct?

A    Correct.

Q    Now, you've been to ranges before, is that right?

A    I have.

Q    And at ranges are there staging areas to make guns safe?

A    Yes.

Q    All right.  In other words, where the staging area is to make guns safe the guns are unloaded, the chamber is usually open, the bolt is pulled back, correct?

1    A    Correct.

2    Q    And then once you get up to the firing line you can load

3    your weapon and you shoot at a target, correct?

4    A    Correct.

5    Q    All right.  Now, at Cambria -- or at Luther there wasn't

6    any staging area for weapons, correct?

7    A    Not that I recall.  No, sir.

8    Q    All right.  Now, this that we just watched was a dry fire

9    run, is that correct?

10   A    They don't appear to be firing from what I can see.

11   Q    All right.  And on a dry fire run your gun should be made

12   safe, correct?

13   A    Correct.

14   Q    And especially in this one we saw that -- we see that there

15   is a cameraman or woman inside taking a video, correct?

16   A    Yes.

17   Q    And at the end of it we saw somebody in plaid that's kind

18   of inside of it, right?

19   A    Yes.

20   Q    And these fellas are coming into the shoot house with their

21   guns pointing in different directions as they go through,

22   correct?

23   A    Correct.  Yes.

24   Q    Now, I am going to point to this.

25   A    Yes, sir.

1    Q    This person I just circled, he has his magazine in his gun,

2    correct?

3    A    He does.

4    Q    All right.  And you treat that -- you treat all guns as

5    loaded, right?

6    A    That's correct.

7    Q    Okay.  And then this particular gun even more so because

8    it's got a magazine in it, correct?

9    A    Correct.

10   Q    Okay.  Let's move -- let me see how I get rid of this and

11   then move forward.

12                 (Video started, 8:49 a.m.)

13                 (Video stopped, 8:49 a.m.)

14   BY MR. HILLS:

15   Q    Okay.  So stop.  A little bit further.  That's good.  Well,

16   I don't know.  You can't see it right there.

17                 Did this guy have his magazine in his gun as well?

18                 MR. ROTH:  I am going to object to the relevance.

19   These are not charged people.

20                 THE COURT:  I am not sure it's particularly relevant

21   or helpful but I am willing to let Mr. Hills go ahead with it

22   for a while.

23                 MR. HILLS:  Okay.  Thank you.

24   BY MR. HILLS:

25   Q    In any event, there was no staging area, as far as you can

1   remember, regarding the weapons as you come in?

2   A   Correct.

3   Q   No one was in charge of, as far as you could tell, of

4   making sure people were safe?

5   A   They would have assigned a safety officer but I don't

6   recall who that person was.

7   Q   Okay.  All right.  Now -- all right.  You can take that

8   down.  That's fine.

9            Into the afternoon of Luther -- this is on Saturday

10  the 12th, correct?

11  A   Yes, sir.

12  Q   Mr. -- you follow Mr. Fox or Mr. Fox calls you and a couple

13  other people aside, is that correct?

14  A   Correct.

15  Q   Including my client, is that right?

16  A   Yes, sir.

17  Q   Mr. Caserta?

18  A   Mr. Caserta.  Yes, sir.

19  Q   And then Mr. Fox is -- talks for a while.  We saw the

20  exhibit.  I think it's Exhibit 223, where Mr. Fox talks for a

21  while, goes through a plan, is that correct?

22  A   Yes.

23  Q   And then at the end of it you say something to him, is that

24  correct?

25  A   Yes.

1   Q   All right.  So let's put that up, 223, if we can?  Page 3.

2   And if you can call out where Mark says, yeah, yeah, yeah, as

3   well as all of -- nope.  Down a little lower.  Yup.  Right

4   there, and then what Mr. Caserta says.  Keep going down.  Let's

5   do it a little bit bigger.  There you go.

6           All right.  So after Mr. Fox goes through his stuff,

7   goes through this plan, at the end of that you respond to

8   Mr. Fox and say, yeah, yeah, yeah, yeah, I'm in, correct?

9   A   Yes.

10  Q   All right.  And then after that Mr. Caserta does not say

11  that.  He does not say, I am in, does he?

12  A   He does not say, I am in, no.

13  Q   Okay.  He goes on and says that it could be very possible

14  in the near future that, you know, a plan like that would

15  actually be totally justified, you know?

16  A   Yes.

17  Q   Okay.  So in other words not now, some time in the future?

18           MR. ROTH:  Objection.  This would be an interpretation

19  of his client's statement.

20           THE COURT:  It is, but it's cross exam and this

21  witness can say either he knows how to interpret it or doesn't

22  know how to interpret it.

23  BY MR. HILLS:

24  Q   Okay.  So in other words, not now, in the future, correct?

25  That's what he's talking about?

1    A    Yes.

2    Q    And then Mr. Caserta says, shit is moving forward.  Tyranny

3    is coming harder and harder down on the people.  It's only a

4    matter of time before the state does something absolutely

5    immoral, you know what I'm saying, and just totally destroys

6    freedom.  So then it's kind of a condition precedent.  Correct?

7    There is a condition that has to happen and then it might be

8    justified, correct?

9    A    I don't know if I agree with that either, sir.

10   Q    All right.  Well, in any event, he is not talking about

11   now; he is talking about in the future, correct?

12   A    I mean, he is not talking about today, correct.

13   Q    Okay.  So then let's go down further.

14   A    Sure.

15   Q    No.  I'll tell you where.  I'll point it out.

16        If you can get rid of that one.  Oh, I'm sorry.  It's

17   on the next page.  My bad.  Yup.

18        And then Mr. Caserta goes onto hypothesize about the

19   new flu season and influenza shutting things down again,

20   correct?

21   A    He does.

22   Q    Okay.  And that's fine.  Thank you very much.

23        He also talks about -- Mr. Fox also talks about a

24   video, a bomb video, correct?

25   A    Yes.

1  Q    And you went and watched that, correct?

2  A    I did.

3  Q    And Mr. Caserta was not with you?

4  A    I don't recall one way or the other, sir.

5  Q    Okay.  Well, right now you don't recall that he was with

6  you?

7  A    Correct.

8  Q    All right.  So then you leave for Loggers Landing after

9  this conversation, correct?

10  A    Some time after that conversation.  Yes, sir.

11  Q    And Mr. Caserta does not go with you to Loggers Landing?

12  A    No, sir.  That's correct.

13  Q    You go with Mr. Fox to Loggers Landing.  You guys have some

14  food and then head -- head out from Loggers Landing, correct?

15  A    Correct.

16  Q    And at some point while you are leaving you realize that

17  other people have left Luther as well, correct?

18  A    Correct.

19  Q    So you learn that Dan, CHS Dan, and Red, UCE Red, as well

20  as Franks and Garbin have left in a car?

21  A    I am not sure whether I realized they had left in the -- I

22  don't know at what point I realized they had left.  I don't

23  know whether they were at the campsite or -- I did not see them

24  until they showed up at the Walmart.

25  Q    Okay.  All right.  But you understood that they had left

1   Luther, correct?

2   A    Correct.

3   Q    Okay.  You understood that CHS Steve had left Luther as

4   well as Mr. Croft and others, correct?

5   A    Yes.

6   Q    And you came to find out that Mr. Caserta didn't go with

7   any of them?

8   A    Correct.  I knew it at some point in that evening.  Yes.

9   Q    All right.  Then you were driving away from Loggers Landing

10  and there were some calls that you talked about yesterday,

11  correct?

12  A    Yes, sir.  Yes.

13  Q    And after -- I'm sorry?

14  A    Yes.

15  Q    Okay.  After those calls then you went back to Luther, is

16  that right?

17  A    Correct.  We went back to the Garbin property, the

18  campsite, yes.

19  Q    With the specific intent, if will you, to pick up people?

20  A    Correct.  Yes.

21  Q    To include Mr. Caserta and the Null brothers, correct?

22  A    Yes, sir.

23  Q    And when you got back to Luther you ran into Mr. Caserta,

24  is that correct?

25  A    I did.

Q    All right.  And he talked to you?

A    Briefly.  Yes, sir.

Q    All right.  And he asked you a question?

A    There were -- yes.  I think so.

Q    All right.  And you responded to that question?

A    Yes.

Q    Okay.  And you indicated that you are headed up there now, meaning the governor's cottage, correct?

A    I believe so.  Yes.

Q    And indicated that you are going to meet Dan and all them because they already left, correct?

A    Yes.

Q    All right.  And then after that Mr. Fox called out to Mr. Caserta, correct?

A    Correct.

Q    And you could understand Mr. Caserta?

A    I could understand when he was talking to me, but I think by that time he had moved away from where I was.

Q    So after these conversations and after Mr. Fox called out, Mr. Caserta turned and went the other way?

A    I -- he was away from my vehicle when Mr. Fox called out for him.

Q    Okay.  So he is closer to your vehicle when you talked to him, and it was like a minute later or so now he is further away?

1   A    Correct.

2   Q    Going the opposite direction?

3   A    Away from the vehicle.  Yes.

4   Q    All right.  And you had -- you are driving your Avalanche,

5   correct?

6   A    Yes.

7   Q    Avalanche is a full size truck?

8   A    Yes.  Yes.

9   Q    It's got room for five?

10   A    Tight, but yes.  Yeah.  Tight -- four or five adults would

11   be tight, but yes.  Yeah.

12   Q    Okay.  And when I say full size, it's got -- it's a

13   four-door?

14   A    It's a four-door.  Yes.

15   Q    Okay.  And the Null brothers got into the vehicle and you,

16   the Nulls and Mr. Fox left?

17   A    Correct.

18        MR. HILLS:  Okay.  Thank you.

19        THE COURT:  All right.  Mr. Blanchard?

20        MR. BLANCHARD:  Thank you, Your Honor.

21                    CROSS EXAMINATION

22   BY MR. BLANCHARD:

23   Q    Good morning.

24   A    Good morning, sir.

25   Q    So I understand you first had contact with Mr. Fox in July

1    of 2020?

2    A    It would have been June.  The first in-person meeting would

3    have been July 2020.  Yes, sir.

4    Q    You first had in-person contact in July of 2020?

5    A    Correct.

6    Q    On July 3rd of 2020, correct?

7    A    Yes, sir.

8    Q    And you had been brought in because you are an undercover

9    agent?

10   A    Correct.

11   Q    Or you were at the time?

12   A    I am still.

13   Q    Okay.  And that first contact occurred at the Vac Shack?

14   A    Yes.

15   Q    And you were reaching out because it had been reported to

16   you or your colleagues that Mr. Fox had expressed

17   antigovernment leanings, correct?

18   A    I think the primary concern that he had expressed some

19   plans to commit violent direct action in furtherance of his

20   antigovernment leanings.

21   Q    Okay.  You said on direct examination that he had

22   antigovernment leanings, right?

23   A    I did say that, but the primary --

24   Q    It's --

25   A    Sir, if you let me finish?  The reason that I would have

1    been tasked to go meet with Mr. Fox was that he had talked

2    about committing violent acts.

3    Q    Sure.  And so let's break that down.  All right.  So

4    antigovernment leanings.  That's okay, right?

5    A    Of course.

6    Q    You can express antigovernment leanings; not criminal,

7    right?

8    A    Correct.

9    Q    You can say, I hate the government?

10   A    Absolutely.

11   Q    You can say, I hope all politicians die?

12   A    Yes, sir.

13   Q    That's protected speech, right?

14   A    Correct.

15   Q    And then you said you had some concerns about direct

16   violent action, right?

17   A    Correct.

18   Q    And those concerns were related to the legislature,

19   correct?

20   A    Yes, sir.

21   Q    Storm the Capitol, right?

22   A    At that time, yes, sir.

23   Q    Okay.  And so your concern was that at that time that

24   Mr. Fox and 200 men were going to storm the Capitol, correct?

25            MR. ROTH:  Objection, hearsay.

1    THE COURT:  I mean, that bakes in things that we

2    haven't put in and can't come in without violating the hearsay

3    rules, so I am not going to allow him to answer that.  You are

4    going to have to rephrase the question.

5    MR. BLANCHARD:  I thought that was in evidence from

6    another witness.  My apologies.

7    BY MR. BLANCHARD:

8    Q    Your concerns were storming the Capitol, correct?

9    A    I don't know if I would phrase it as my concern, sir.  I

10   was tasked to go meet with Mr. Fox to determine whether he was

11   saying these things and whether he was doing things in

12   furtherance of them.

13   Q    And so the way in which you did that was through this ruse

14   we talked about where you made contact through FaceBook,

15   correct?

16   A    Yes.

17   Q    Okay.  And then you went in an undercover capacity, right?

18   A    Correct.

19   Q    You didn't go knock on his door and say, hi, I am with the

20   FBI?

21   A    No, sir.  I did not.

22   Q    Okay.  And so we heard two transcripts yesterday, 73T and

23   75T from the Vac Shack meeting on 7-3.  Do you recall those?

24   A    I do.

25   Q    Okay.  Those two exhibits were excerpts from a recording

1   you made, correct?

2   A    Correct.

3   Q    And you made them on the same day, right?

4   A    Yes.

5   Q    And that was from the recording device you wore, correct?

6   A    Yes.

7   Q    That meeting at the Vac Shack lasted what, like, four

8   hours?

9   A    No.  An hour, maybe hour and-a-half.

10  Q    Okay.  And at the beginning -- well, in 73T -- and you

11  should have the transcript in the book if you need to refresh

12  your recollection.  But that's where Mr. Fox told you he was

13  working with the Wolverine Watchmen, correct?

14  A    He told me he was working with the Wolverine Watchmen.

15  Yes, sir.

16  Q    Okay.  And as far as you know, Mr. Croft is not part of the

17  Wolverine Watchmen, correct?

18  A    As far as I know.

19  Q    Now, you had referenced some of Mr. Fox's other men

20  yesterday during your testimony, right?

21  A    Yes, sir.

22  Q    And you talked about them having been in a group chat,

23  correct?

24  A    Correct.

25  Q    And the people that we're talking about in the group chat

1    were Wolverine Watchmen, right?

2    A    No, sir.  Well, there were several different group chats.

3    Among them there was one with Wolverine Watchmen.

4    Q    Okay.  The people -- for example, Mr. Harris and

5    Mr. Caserta, you consider them part of the Wolverine Watchmen,

6    right?

7    A    Yes, sir.

8    Q    Same with Mr. Garbin?

9    A    Yes, sir.

10   Q    And Mr. Franks, right?

11   A    Yes, sir.

12   Q    So in 75T, Mr. Fox referenced what he tries to tell all of

13   his men, correct?

14   A    Yes.

15   Q    And you said that those men were people that were in the

16   group chat?

17   A    Those -- yes.

18   Q    Okay.  And so people that were part of the Wolverine

19   Watchmen?

20   A    No, sir.  That wasn't my understanding.  There was a

21   separate group chat of people that Mr. Fox was his people.

22   Q    Okay.  So the people that you think he was referring to

23   when he says, my men, are people that aren't charged here?

24        MR. ROTH:  Objection, speculation.

25        THE COURT:  It is perhaps, but if the witness knows he

1    can answer, and if he doesn't he can say that, and I think on

2    cross it's at least a fair inquiry.

3             THE WITNESS:  I don't know.

4    BY MR. BLANCHARD:

5    Q    So frankly, when Mr. Fox said, my men, you don't know what

6    he was talking about?

7    A    I couldn't name everyone that he was talking about at the

8    time.  No, sir.

9    Q    You haven't named any he was talking about, right?

10   A    Because I didn't know at the time.  No, sir.

11   Q    Right.  In fact, at the time you didn't know if he had men,

12   right?

13   A    No, sir.  I know he had participated in meetings, but no.

14   Q    And the only people that you know that took an oath in his

15   militia are yourself for one, right?

16   A    Yes, sir.

17   Q    And Sean Fix?

18   A    He said he did.

19   Q    Okay.  And Sean Fix's girlfriend?

20   A    I don't recall one way or the other whether she did.

21   Q    Mr. Fox's girlfriend?

22   A    I believe she did.

23   Q    That's the entirety of the people that you know that took

24   an oath, right?

25   A    That I am aware of that said they made -- took an oath to

1    me.  Yes.  I don't know whether the other people in the group

2    chat would have or whether they didn't.

3    Q    And so I just want to look at an overview of the events you

4    were involved in.  You were involved in the July 3rd Vac Shack

5    meeting, right?

6    A    True.

7    Q    And you made recordings of that, right?

8    A    I did.  Yes, sir.

9    Q    The next event you were involved in was in Cambria,

10   Wisconsin, right?

11   A    Correct.

12   Q    And that was this FTX thing we've been talking about,

13   right?

14   A    Yes.

15   Q    And you made recordings of that, right?

16   A    I did.

17   Q    And that was over more than one day?

18   A    No, sir.  I was there for one day.

19   Q    But the event was over more than one day?

20   A    True.

21   Q    And you were there for one day of it?

22   A    Correct.

23   Q    And you recorded all of your interactions there, right?

24   A    Yes.

25   Q    And then after that the next event you were at was the

1    August 1st barbecue, is that right?

2    A    Yes.

3    Q    And that was at Mr. Fix's house?

4    A    Yes.

5    Q    In Belleville?

6    A    Yes.

7    Q    And then from there you went to the Luther event, correct?

8    A    Yes, sir.

9    Q    And you made recordings of that as well?

10   A    I did.

11   Q    Were there any other in-person events that you were at?

12   A    No, sir.

13   Q    Okay.  And so when we are talking about Cambria, Wisconsin,

14   there was some training that happened there, right?

15   A    There was.

16   Q    And you talked about a shoot house, right?

17   A    I did.

18   Q    You said that people went through that shoot house?

19   A    They did.

20   Q    People that are charged?

21   A    Yes, sir.

22   Q    People that are not charged?

23   A    Yes, sir.

24   Q    There were lots of people at that event?

25   A    Yes, sir.

1    Q    There were people who were charged?

2    A    Yes, sir.

3    Q    And people who were not charged?

4    A    True.

5    Q    There were adults?

6    A    Yes, sir.

7    Q    There were children?

8    A    Yes, sir.

9    Q    It had sort of a family event type atmosphere to it, fair?

10   A    No.

11   Q    There were kids running around, right?

12   A    There were.

13   Q    There was a swimming pool?

14   A    There was.

15   Q    There were kids swimming in the swimming pool?

16   A    There were.

17   Q    There were kids playing games?

18   A    Sure.

19   Q    Regarding the shoot house that we talked about at Cambria,

20   Mr. Croft, as far as you know, didn't go through that, correct?

21   A    As far as I know.

22   Q    And then turning your attention to the barbecue at

23   Mr. Fix's house.  Was Mr. Croft there?

24   A    No.

25   Q    Mr. Croft get called on the telephone while you were there?

1    A    Not while I was there.

2    Q    Did he zoom in?

3    A    No, sir.

4    Q    As far as you know he wasn't involved at all in that?

5    A    As far as I know.

6    Q    How long was the barbecue?

7    A    Several hours.

8    Q    What does that mean?  Several mean three, six?

9    A    Showed up around noon, left around 4:00 or 5:00.

10   Q    So four to five hours?

11   A    Sure.

12   Q    And you recorded the whole thing?

13   A    Yes.

14   Q    Put in a couple short clips in that?

15   A    Yes.

16   Q    A lot more recording?

17   A    Yes.

18   Q    And those recordings, I mean, you had contact with more

19   than just Mr. Fox at the August 1st barbecue, right?

20   A    Yes.

21   Q    You had contact with Mr. Fix?

22   A    Yes.

23   Q    His girlfriend?

24   A    Yes.

25   Q    Mr. Fox's girlfriend?

1    A    Yes.

2    Q    I got a little out of order here.  Let's go back to the Vac

3    Shack meeting on July 3rd.

4    A    Okay.

5    Q    That's in the basement of the Vac Shack, right?

6    A    Yes.

7    Q    You were present?

8    A    I was.

9    Q    Mr. Fox was present?

10   A    He was.

11   Q    Mr. Croft was not present?

12   A    He was not.

13   Q    As far as you know you didn't call him on the phone, right?

14   A    No.

15   Q    He didn't zoom in?

16   A    He did not.

17   Q    He didn't send you a letter?

18   A    No.

19   Q    There was then the event at Luther, right?  Yes?

20   A    Yes.

21   Q    The event at Luther also had that shoot house?

22   A    It did.

23   Q    This was the one with the blue tarps, right?

24   A    Yes, sir.

25   Q    Some people who were charged went through that?

1    A    Yes.

2    Q    Some people who were not charged went through it?

3    A    Yes.

4    Q    Mr. Croft, as far as you know, didn't go through it?

5    A    True.

6    Q    So when you were introduced to the group, I think you

7    testified you were brought in and someone made an introduction,

8    right?

9    A    On-line.

10   Q    When you first showed up at -- in person, right?

11   A    Yes.

12   Q    You were introduced at Cambria, correct?

13   A    Yes.

14   Q    And you were introduced by Mr. Chappel, by Dan?

15   A    No.

16   Q    Who introduced you?

17   A    Either Mr. Fox or I introduced myself to people.

18   Q    Okay.  So Mr. Fox introduces you.  You knew that there was

19   another undercover involved, correct?

20   A    Not at that --

21   Q    I'm sorry.  You knew that confidential sources were

22   involved, correct?

23   A    I did.

24   Q    And you knew which ones were confidential sources, correct?

25   A    I did.

Q    Because as an agent you get to know that, right?

A    That was part of the preoperational briefing.  Yes, sir.

Q    Sure.  To your knowledge, at Cambria did any of the confidential sources know that you were an undercover?

A    No, sir.  They did not.

Q    To your knowledge, at Luther did any of the confidential sources know you were an undercover?

A    I think by that time Mr. -- Dan knew I was a -- I'm sorry. Dan the CHS knew I was an FBI agent.  Yes, sir.

Q    Anyone else?

A    Not that I am aware of.  No, sir.

Q    And how did he learn that, if you know?

A    I think he would have been told by the case agents.  Again, there was a concern for operational security at that particular venue given the lack of cell coverage and the fact that it was in, frankly, the middle of nowhere.  So if things went bad I think the case agents made the determination that he should know.

Q    Okay.  There had been some testimony -- I think you identified each of the gentlemen here on your direct examination.  You recall that?

A    I do.

Q    And when you were asked about Mr. Croft, I believe the government asked you if he looked different today than before, right?

1    A    He does.

2    Q    There is nothing wrong with cleaning up for court, right?

3    A    No.

4    Q    In fact, you did it, right?

5    A    I did.

6    Q    You used to have a beard?

7    A    I did.

8    Q    So you were not suggesting there is anything wrong with

9    shaving or anything like that, right?

10   A    No.

11   Q    Okay.  On September, the Luther event, there were a number

12   of vehicles that went on this field trip ride that night,

13   correct?

14   A    The surveillance?

15   Q    The ride up north to Elk Rapids.

16   A    Yes.

17   Q    Okay.  Now, if I understand correctly, from the Luther area

18   Adam rode with you and eventually got to Walmart, is that fair?

19   A    Yes.

20   Q    Okay.  And the Null brothers were in your vehicle as well?

21   A    Correct.

22   Q    And that's where you guys met in a Walmart parking lot,

23   correct?

24   A    Yes.

25   Q    Mr. Croft was not in your vehicle, right?

1   A    He was not.  He was not.

2   Q    Okay.  So the conversations we heard from that ride up, he

3   didn't hear those, correct?

4   A    He would not have been in my vehicle.

5   Q    He wasn't on the phone either, right?

6   A    No.

7   Q    Okay.  Mr. Croft was in a vehicle, a different vehicle,

8   right?

9   A    Yes.

10  Q    And he wasn't driving as far as you know, right?

11  A    As far as I know, sir.

12  Q    He was in a vehicle that was being driven by CHS Dan,

13  correct?

14  A    That's my recollection when he arrived.

15  Q    And also in that vehicle when he arrived was CHS Steve?

16  A    I believe so.  Yes, sir.

17  Q    And an FBI agent that was undercover named Red?

18  A    Correct.

19  Q    And as far as you know that's all the people in the

20  vehicle, right?

21  A    Yes.

22  Q    So when Mr. Croft made it from either Luther or Big Rapids

23  up to Walmart, he was in a vehicle with three government

24  agents, right?

25  A    Two confidential human sources and one undercover, yes,

1    sir.

2    Q    Three people working for the government, right?

3    A    Correct.

4    Q    So it was three FBI cooperators and Mr. Croft, right?

5    A    Again, two sources and an undercover and Mr. Croft.

6    Q    Yeah.  Right.  Okay.  And he wasn't driving the vehicle?

7    A    Again, not that I know of.  He was not when they arrived.

8    Q    Do you remember yesterday talking about, it was Exhibit

9    229T, where Mr. Fox talked about the boat plan and he said it

10   was a two-boat plan?  Do you remember that conversation?

11   A    Yes.

12   Q    Okay.  As I understand it, in that conversation Mr. Fox

13   said they'd steal a boat, right?

14   A    Yes.

15   Q    You don't know where that boat was to be stolen from,

16   right?

17   A    No.

18   Q    You do not know what kind of boat, right?

19   A    No, sir.

20   Q    And then there was -- if this plan was to go, they would

21   then steal the governor's car?

22   A    That's, I believe, what Mr. Fox said.  Yes.

23   Q    Who was going to steal the car?

24   A    I think the idea was that at that time they would have

25   access to the vehicle because they had either -- well, they had

1    kidnapped the governor and killed her security detail.

2    Q    You don't know who was going to steal the car, right?

3    A    I mean, it would have been whoever got their hands on the

4    keys.

5    Q    So you think it was going to involve keys?

6    A    Yes.  I think that was what I understood the plan to be.

7    Q    Okay.  And then while somebody steals the car they are

8    going to exfiltrate here in a boat back across Birch Lake,

9    right?

10   A    No.  That was not my understanding.

11   Q    So can I have 229T, please, second paragraph?

12         So it said that, we're going to launch that fucking

13   boat or we take a boat or we go steal, excuse me, steal a boat,

14   right?  So that's the first step --

15   A    Sir, can you help me better direct into the transcript.

16   Q    Sure.  It's the fifth -- fourth line down.

17   A    Of the first paragraph?

18   Q    Yes.

19   A    Yup.  Gotcha.

20   Q    So launch that fucking boat or we take a fucking boat or we

21   go steal, excuse me, steal a boat.  Right?  That's step one?

22   A    Yes.

23   Q    Okay.  And then we say, launch that fucker, go get the

24   bitch, bring her back, right?

25   A    Yes.

1    Q    So first step is steal a boat to go across the lake, right?

2    A    Yup.

3    Q    Second step, according to this plan, would be go get the

4    bitch, bring her back, leave that fucking boat, right?

5    A    Right.

6    Q    Bring her back means bring her back across the lake?

7    A    No.

8    Q    Where does it plan to bring her back to?

9    A    Wherever.

10   Q    Just wherever?  You don't know where it means?

11   A    True.  I mean, the general vicinity of the vehicle as would

12   have been evident from the --

13   Q    Well, bring her back means you've been there before, right?

14   You are bringing her back to someplace that you've been, right?

15   A    Or it means bring the person back --

16        THE COURT:  Well, we are getting pretty argumentative

17   now over words that weren't his.  And some inquiry on cross is

18   fair, but most of it's argument for each side to make what they

19   will of it.  For you to say, you know, that's what it means or

20   that's the inference they should draw and it wasn't very

21   credible, and for the government to say whatever it's going to

22   say but arguing with a witness other than the speaker about the

23   meaning that the speaker had is kind of counter-productive

24   after a certain point.  I mean, you can try a little bit if you

25   want, but unless the -- unless he knows more all he can do is

1    look at the words and say what he thinks they meant if he ever

2    thought about it.

3    BY MR. BLANCHARD:

4    Q    So let's talk about where we get to the two-boat system.

5    You testified about that yesterday, right?

6    A    Yes.

7    Q    And you said the two-boat system meant a two-boat system

8    out on Lake Michigan, is that right?

9    A    That's what I understood.  Yes, sir.

10   Q    So you believe that there were going to be two boats that

11   go out onto Lake Michigan, right?

12   A    That's what I understood.  Yes, sir.

13   Q    And in one of these boats -- well, what kind of boats were

14   they supposed to be?

15   A    It's not clear from what Mr. Fox was saying.

16   Q    Where were the boats supposed to come from?

17   A    I think stolen again was what I understood.

18   Q    Okay.  So you don't know, right?

19   A    Stolen again was what I understood, sir.

20   Q    Okay.  So we've got these two boats on Lake Michigan.  Are

21   they both coming to the shore?

22   A    I'm sorry, sir?

23   Q    The governor in this plan has somehow got to get into one

24   of these boats, right?

25   A    Yes.

Q    So are both boats coming to the shore in this plan or just one?

A    Sir, my understanding was that both boats would be ashore at the time.

Q    Okay.  Where were these boats supposed to be, if you know?

A    I don't know.

Q    Okay.  So both of the boats would come ashore.  The governor would get on somehow and then they would go out?

A    Correct.

Q    Where were they going to go to?

A    The middle of the lake.

Q    How were they going to determine when they were in the middle of the lake?

A    I think away from shore was what was intended by that.

Q    What kind of boats were these going to be?

         THE COURT:  Asked and answered.  He said he didn't know.

BY MR. BLANCHARD:

Q    What kind of engines were these boats supposed to have?

A    Don't know, sir.

Q    So we were going to drop the motors on these boats as part of the plan, right?

A    I assume that means one of them would have had an outboard motor.

Q    Okay.  How was this outboard motor going to be removed?

```
 1     A    I don't know, sir.
 2     Q    What was the plan for people to get from one boat to the
 3   other when they were going to leave the governor?
 4     A    I would assume you just go from one boat to the next.
 5     Q    Just hop over in your plate carrier?
 6     A    Yes.
 7     Q    Do these boats have lights on them?
 8     A    I don't know about the -- no.  I don't know one way or the
 9   other.
10     Q    What about navigation systems?
11     A    Don't know one way or the other, sir.
12     Q    Who was supposed to pilot these boats?
13     A    Not me.
14     Q    Now, this conversation on about the two-boat plan, that
15   happened on September 12, correct?
16     A    Correct.
17     Q    And the people that were present for that were you, the
18   Nulls and Mr. Fox, correct?
19     A    Correct.
20     Q    Mr. Croft wasn't present for that, correct?
21     A    He was not.
22          MR. BLANCHARD:  I pass the witness.
23          THE COURT:  All right.  Redirect?
24                   REDIRECT EXAMINATION
25     BY MR. ROTH:
```

1    Q    Good morning.

2    A    Good morning, sir.

3    Q    Several of the Defense counsel have asked you questions

4    about what you did and did not investigate in this case.  Could

5    you explain for the jury the difference between the case agent

6    and your responsibility as an undercover?

7    A    Yes, sir.  So the case agent has the primary investigative

8    responsibility.  They are driving the case.  They are doing the

9    background things like obtaining subpoenas, looking at phone

10   records, putting up -- you know, making sure pole cams go up.

11   My -- my job as an undercover is to interact with the subjects

12   and those in the sphere of the subjects or subject to, again,

13   determine whether the allegations that formed the predication

14   for the case are true or weren't -- you know, the investigation

15   was further warranted or whether they are not.

16   Q    Your responsibilities and your knowledge of the

17   investigation are considerably more limited than the primary

18   investigators?

19   A    Yes, sir.  Absolutely.

20   Q    Mr. Gibbons asked you if you were recruited by Fox at the

21   July 3rd meeting at the Vac Shack and you said yes.  What was

22   it that Fox recruited you to do?

23   A    Be a member of his group.

24   Q    For what purpose?

25   A    He needed people who were willing to go to his cause.

Q    And that cause was as he explained it?

A    Taking -- being willing to participate in violence against the Capitol.

Q    And Mr. Gibbons asked you if Fox said that he was working with the Wolverine Watchmen.  Did Mr. Fox say, I'm working with the Wolverine Watchmen or we are working with the Wolverine Watchmen?

A    We are.

Q    Mr. Gibbons asked you if you helped Fox prepare after he told you his plain to kidnap the governor and you replied that you started going to FTXes.  From your conversations with Fox, what did you understand the purpose of these FTXes to be for those involved in the plan?

A    Preparing for the eventual execution of the plan.

Q    That included the exercises and trainings that were there, like the kill houses, the weapons handlings, bomb making, leaping, bounding, and the medical station?

A    Correct.

Q    You testified that Daniel Harris ran the medical station at least at one point.  Was this treatment for sprained ankles, cuts and bruises?

A    No.  Mostly how to apply a tourniquet, those types of things.

Q    All right.  Gunshot wounds, battle field treatment?

A    Correct.

1   Q    You mentioned that you may have moved some of the wood used

2   in the kill house in Cambria.  Was that someone telling you

3   what to do with it and how to build it?

4   A    There was somebody directing how to configure it.  Yes.

5   Q    And you said that was, you felt, the property owner?

6   A    I believe so.  Yes, sir.

7   Q    It was not Steve Robeson?

8   A    It was not.  No.

9   Q    Mr. Blanchard asked you if the Cambria FTX was a family

10  event and you said it was not.  Why is that?

11  A    While there were children there, they were kind of

12  sectioned off.  There was live fire taking place.  There was an

13  explosive being made.  It was something that I wouldn't

14  characterize as a family event.

15  Q    Mr. Gibbons referred to the governor's residence on

16  Mackinaw Island as a state park.  What is actually located

17  there?

18  A    There is an official --

19          MR. GIBBONS:  Objection, foundation, Your Honor.

20          THE COURT:  You think you didn't refer to it that way

21  or what?

22          MR. GIBBONS:  I think I did, and I think he didn't

23  know yesterday and he hasn't testified he's been there.  I

24  don't know how he would know, so maybe we could have a little

25  foundation.

1      THE COURT:  You can lay some foundation if you need to

2  additionally, Mr. Roth.

3      MR. ROTH:  Thank you, Your Honor.

4  BY MR. ROTH:

5  Q    Do you know what is at the Mackinaw Island governor's

6  residence?

7  A    I do.

8  Q    All right.  And so with that, could you explain what is

9  there?

10  A    There is an official governor's residence located on the

11  island.

12  Q    Does she -- she specifically, this governor, but do the

13  governors of Michigan frequent that residence?

14  A    Yes, sir.  That's my understanding.

15  Q    As well as other government dignitaries?

16  A    Yes, sir.

17  Q    Mr. Gibbons asked about Fox mentions larping or live action

18  role playing.  Was Fox larping in your experience with him?

19  A    No, sir.

20  Q    Was larping used as a form of OPSEC or operational

21  security?

22  A    Yes, sir.

23  Q    How so?

24  A    It was what Fox would refer to if we were stopped by law

25  enforcement or some other interested party that didn't need to

1    know what we were doing we would just say we were out there

2    role playing.

3    Q    Did Fox ever tell you what he thought about people who were

4    actually larping or pretending or not as serious as he was?

5    A    Yes, sir.  That they are posers.

6    Q    Mr. Gibbons asked you about Fox's marijuana use and you

7    described it as social.  What did that mean?

8    A    Similar to -- pardon me -- drinking socially.  Not -- I

9    would analogize it to drinking not to get drunk but just in a

10   social setting.  Same with his marijuana use.  It was --

11   Q    Did Fox smoke marijuana around the time he handled weapons

12   at the various times you were with him?

13   A    Let me think.  Not that I recall.  No.

14   Q    Did he smoke marijuana around the time that he talked about

15   bombs or making bombs or obtaining bombs I suppose?

16   A    No.  Not that I recall.

17   Q    And did he smoke marijuana around the time that he talked

18   about kidnapping the Governor?

19   A    He may have smoked marijuana.  I mean, that was an ongoing

20   conversation.  So yes, I think he probably did.

21   Q    Did his social use of marijuana in the time that you were

22   with him undermine his seriousness about this topic?

23   A    No, sir.

24   Q    Ms. Kelly asked you about Daniel Harris being a marine.

25   What was the context in which you learned that he was formerly

1    a marine?

2    A    I would have learned either in the preoperational briefing

3    before I went to Cambria or I would have learned through a

4    conversation or something he said during that FTX in Cambria

5    that day.

6    Q    And as we heard the context in which he is discussing it at

7    the FTX is how he knows how to build bombs?

8    A    Correct.

9    Q    You testified that Brandon Caserta was not planning to do

10   the kidnapping that day when questioned by his attorney.  Was

11   anybody planning to do the kidnapping that day or that night?

12   A    No, sir.

13   Q    That's why they were continuing to train and do recon?

14   A    Correct.

15   Q    Being there as you were discussing, or as Mr. Fox was

16   discussing this with Mr. Caserta, did Mr. Caserta appear to be

17   agreeable to this plan?

18   A    He did.

19   Q    There's been questioning from various Defense counsel.  At

20   the Luther FTX there are two undercover agents.  There are two

21   cooperators or human sources.  There's still concerns for

22   everybody's security in particularly for the agent's security.

23   Why is that even with that many people there?

24   A    Well, there is always the danger that someone is going to

25   find out that you are an undercover and that's going to be

1    upsetting for them and they might take violent action.  That's

2    one.  And then there is your dealing with live weapons, and in

3    some cases explosives.  So there's always the danger of an

4    accidental discharge, and that would result in somebody getting

5    hurt and the last thing we want is somebody to get hurt.

6              MR. ROTH:  I have nothing else, Your Honor.  Thank

7    you.

8              THE COURT:  All right.  Go to Mr. Gibbons.

9              MR. GIBBONS:  Your Honor, can we have a sidebar before

10   I start?

11             THE COURT:  No.  What do you need?  What's the

12   problem?

13             MR. GIBBONS:  With regard to larping as raised by the

14   prosecution on redirect, I believe that they've opened the door

15   on the issue of some of the things that we've been talking

16   about.

17             THE COURT:  Right.

18             MR. GIBBONS:  When they specifically say and opine

19   that my client wasn't engaged in larping and I --

20             THE COURT:  I don't think it opens the door to

21   anything on the pretrial ruling.  It's still a question of

22   hearsay, and it was something that it was used in your client's

23   words, and this witness explained his interpretation and basis

24   for it, and you can cross -- recross on that, but it doesn't

25   open the door to other things coming in.

1      MR. GIBBONS:  Very good.  I have no further questions,

2   Your Honor.

3      THE COURT:  All right.  Ms. Kelly?

4      MS. KELLY:  Thank you, Your Honor.

5                 RECROSS EXAMINATION

6   BY MS. KELLY:

7   Q   Agent, Mr. Roth was just asking you about a medical tent

8   and Mr. Harris running the medical tent at Luther, correct?

9   A   Yes, ma'am.

10  Q   Okay.  There was also a medical tent in Cambria, right?

11  A   There was.

12  Q   Okay.  And so your recollection is that Mr. Harris was

13  running the medical tent at Luther, correct?

14  A   Correct.

15  Q   Okay.  And you also talked about part of the concern for

16  your safety is if someone finds out that you are an undercover

17  agent you are out in the middle of nowhere, right, bad cell

18  service, but then you also just mentioned that if there is an

19  accidental discharge, right?

20  A   Yes.

21  Q   People have firearms, right?

22  A   Sure.

23  Q   You are doing dry fire; you are doing live fire, right?

24  A   Yes, ma'am.

25  Q   Mr. Hills showed you a picture with somebody with the

1    magazine in it even though it was dry fire, correct?

2    A    Yes, ma'am.

3    Q    That's a concern during tactical training that someone

4    might get shot accidentally, correct?

5    A    Yes.

6    Q    Okay.  And so Mr. Harris teaching people how to do

7    tourniquets in case there's some sort of accidental discharge

8    or someone gets shot, probably a good thing, right; you'd agree

9    with that?

10   A    Knowing how to treat a gunshot wound when you are handling

11   firearms is a good thing.

12   Q    It's always a good thing, right?  Okay.  And you were also

13   just asked about Mr. Harris being a marine and your

14   understanding that Mr. Harris was a marine in Cambria, correct?

15   A    Yes.

16   Q    And you and I talked about this yesterday.

17   A    We did.

18   Q    Mr. Harris telling a story that we listened to about him

19   learning how to make explosives and bangalores while in the

20   Marine Corps.  You remember that?

21   A    I do.

22   Q    Do you know what a bangalore is?

23   A    No, ma'am.

24   Q    Okay.  In this conversation that Mr. Harris that we all

25   listened to yesterday in making bangalores, he described to you

1    that he failed at it, right?

2    A    That his didn't detonate.

3    Q    Okay.  He also described that when someone asked him to

4    make a bangalore he said, I was like, oh, this sounds like fun,

5    right?

6    A    I believe so.  Yes, ma'am.

7              MS. KELLY:  Okay.  I have nothing further.  Thank you.

8              THE COURT:  All right.  Thank you.

9              Mr. Hills?

10                   RECROSS EXAMINATION

11     BY MR. HILLS:

12    Q    On redirect you indicated Mr. Caserta appeared agreeable to

13    this plan, correct?

14    A    Yes, sir.

15    Q    All right.  After he said this plan, again, you said, yeah,

16    yeah, yeah, I'm in?

17    A    Yes, sir.

18    Q    And Mr. Caserta did not say that at all, correct?

19    A    Not verbally.  No, sir.

20    Q    Right.  And he said, in the future if the government does

21    something absolutely immoral, correct?

22    A    Those were his words.  Yes.

23    Q    Thank you.  And then you went back to specifically get

24    Mr. Caserta at Luther, interacted with him, talked to him,

25    correct?

1    A    Yes, sir.

2    Q    And he walked away?

3    A    Yes, sir.  I believe he was going to get high.

4    Q    Okay.  Who told --

5    A    Adam Fox.

6    Q    Adam Fox told you that he was going to get high?

7    A    Either was or had gotten high.  Yes, sir.

8    Q    Okay.  Do you have -- can you point me to the audio where

9    he said that?

10   A    I can't.  No.  Not specifically.

11   Q    Okay.  All right.  Even if he was going to get high -- all

12   right.  Let's assume you had audio or something like that.  He

13   chose that over going on this ride along over this plan,

14   correct?

15   A    Yes.

16            THE COURT:  All right.  Mr. Blanchard?

17            MR. BLANCHARD:  I'll pass.

18            THE COURT:  All right.  Thank you.  You may be

19   excused.

20            (Witness excused, 9:32 a.m.)

21   ****************************************************************

22

23

24

25

INDEX


Government Witnesses:                          Page

MARK SCHWEERS

 Cross Examination(Continuing) by Ms. Kelly     3
 Cross Examination by Mr. Hills                 9
 Cross Examination by Mr. Blanchard            23
 Redirect Examination by Mr. Roth              45
 Redirect Examination by Ms. Kelly             52
 Redirect Examination by Mr. Hills             54

Exhibits:                                   Admitted

Defense Exhibit 4151                            4
  (Photograph, Schweers Vehicle)
Defense Exhibit 5202                           13
  (Video, Luther)

REPORTER'S CERTIFICATE


I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



                          /s/ Paul G. Brandell

                          Paul G. Brandell, CSR-4552, RPR, CRR

                          U.S. District Court Reporter

                          399 Federal Building

                               Grand Rapids, Michigan  49503