```
 1                  IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF MICHIGAN

 3                         SOUTHERN DIVISION

 4        UNITED STATES OF AMERICA,

 5                 Plaintiff,          No:  1:20cr183-1/2/5/6

 6         vs.

 7        ADAM DEAN FOX,
          BARRY GORDON CROFT, JR.,
 8        DANIEL JOSEPH HARRIS and
          BRANDON MICHAEL-RAY CASERTA,
 9
                   Defendants.
10

11
          Before:
12
                        THE HONORABLE ROBERT J. JONKER
13                           U.S. DISTRICT Judge
                             Grand Rapids, Michigan
14                        Wednesday, March 23, 2022
                       Excerpt of Jury Trial Proceedings
15                       Testimony of Matthew Keepers

16        APPEARANCES:

17                      MR. ANDREW BIRGE, U.S. ATTORNEY
                        By:  MR. NILS R. KESSLER
18                      MR. JONATHAN C. ROTH
                        The Law Building
19                      333 Ionia Avenue, NW
                        Grand Rapids, MI 49501-0208
20                      (616) 456-2404

21                             On behalf of the Plaintiff;

22                      MR. CHRISTOPHER M. GIBBONS
                        MS. KAREN M. BOER
23                      Dunn Gibbons PLC
                        125 Ottawa Avenue, NW, Suite 230
24                      Grand Rapids, MI 49503-2865
                        (616) 336-0003
25
                               On behalf of Defendant Fox.
```

```
                    JOSHUA ADAM BLANCHARD
                    Blanchard Law
                    309 South Lafayette Street, Suite 208
                    P.O. 938
                    Greenville, MI 48838-1991

                              On behalf of Defendant Croft, Jr.

                    JULIA ANNE KELLY
                    Willey & Chamberlain LLP
                    300 Ottawa Avenue NW Suite 810
                    Grand Rapids, MI 49503-2314
                    (616) 458-2212

                              On behalf of Defendant Harris.

                    MICHAEL DARRAGH HILLS
                    Hills at Law PC
                    425 South Westnedge Avenue
                    Kalamazoo, MI 49007-5051
                    (269) 373-5430

                              On behalf of Defendant Caserta.


          REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
```

```
1          ************************************************************
2                         (Excerpt started, 8:33 a.m.)
3                         MATTHEW KEEPERS, GOVERNMENT
4                   having been first duly sworn, testified as follows:
5                   (Witness sworn, 8:33 a.m.)
6                   THE COURT:  All right.  And please step up.  Put the
7          microphone in front of you if you would and then we'll begin.
8                              DIRECT EXAMINATION
9            BY MR. ROTH:
10         Q    Good morning, sir.
11         A    Good morning.
12         Q    Could I have you start by stating and spelling your
13         complete name, please?
14         A    Matthew Keepers, M-a-t-t-h-e-w, K-e-e-p-e-r-s.
15         Q    Thank you, sir.  How old are you?
16         A    Thirty-three years old.
17         Q    Where do you live?
18         A    Alpena, Michigan.
19         Q    How are you employed?
20         A    I work for Verizon.
21         Q    Do you know a person by the name of Adam Fox?
22         A    Yes.
23         Q    Do you see him in the courtroom today?
24         A    Yes.
25         Q    Could you please point him out and identify an article of
```

1    clothing?

2    A    He is the gentleman in the blue shirt with the black tie.

3    Q    Thank you.  About when is it that you met Adam Fox?

4    A    It was approximately 2017, 2018.

5    Q    How did you meet him?

6    A    I met him through the Michigan Home Guard.

7    Q    What is the Michigan Home Guard?

8    A    The Michigan Home Guard is a militia of sorts.  They

9    don't -- they don't describe themselves as a militia.  They are

10   a prepper/civil defense/militia organization.

11   Q    Were you both members of the Michigan Home Guard at that

12   time?

13   A    Yes.

14   Q    Did you both leave the Michigan Home Guard around the same

15   time?

16   A    Yes.

17   Q    In speaking to Mr. Fox after you left, did the

18   circumstances in which you left make him think that you two

19   were close?

20   A    I wouldn't say the circumstances in which we left the Home

21   Guard made him believe we were close.  There were a few other

22   instances that may have made him believe that we were close.

23   Q    All right.  But fair to say at the time that you leave the

24   Home Guard or shortly --

25             MR. GIBBONS:  Objection, leading, Your Honor, I think.

1    THE COURT: Well, let him at least phrase the question

2    first. Go ahead, Mr. Roth.

3    BY MR. ROTH:

4    Q    Just to close that issue, you were under the impression

5    that he thought that you two were close?

6    A    At one point, yes.

7    MR. ROTH: Could we please play Exhibit 66?

8    THE COURT: You have to reboot the audio it sounds

9    like.

10    (Audio started, 8:36 a.m.)

11    (Audio stopped, 8:37 a.m.)

12    BY MR. ROTH:

13    Q    All right. So that recording is from June 20th, 2020. At

14    the beginning you heard Mr. Fox refer to you as Keepers?

15    A    Yes.

16    Q    Was there a time after you both left the Michigan Home

17    Guard in which Adam Fox got back in touch with you?

18    A    Yes.

19    Q    Was that over FaceBook Messenger?

20    A    Yes. Initially.

21    Q    And if you look at the binder in front of you, the page

22    that is open, Proposed Exhibit 444, is that a fair and accurate

23    copy of some of those FaceBook messages?

24    A    Looks like it. Yes.

25    Q    And those are messages between you and Adam Fox?

1    A    Yes.

2            MR. ROTH:  Your Honor, I'd move for the admission of

3    Proposed Exhibit 444?

4            MR. BLANCHARD:  Object on the basis of hearsay as to

5    Mr. Keepers' statements.

6            THE COURT:  As to Mr. Keepers' statements?

7            MR. BLANCHARD:  Yes.

8            THE COURT:  I'll overrule and it can be admitted.

9            MR. ROTH:  Thank you, Your Honor.

10   BY MR. ROTH:

11   Q    If we can put that on the screen, please?  Thank you.  And

12   if we could start with the first box?  Thank you.

13           So these messages are from June 23rd, 2020, three days

14   after the recording we just heard?

15   A    Yes.

16   Q    And this first message Fox tells you, we are a militia

17   group.  There is mission statement but won't be no egos or

18   bullshit like MHG.  No disciplinary issues.  No fucking drama.

19   If we argue we argue.  We'll always work shit out.  End of the

20   day we're going to be a family bro.  When the time comes we'll

21   all fight together.

22           MHG, is that Michigan Home Guard?

23   A    Yes.

24   Q    Could we move to the second message, please?  The second

25   box.

1      Mr. Fox sent you, and anything is up for discussion,

2  lol, but we need keep things secure especially when we want to

3  talk crazy.  This unit is being built with the sole purpose of

4  taking action.

5      Did you understand what Mr. Fox meant when he said

6  when we want to talk crazy?

7  A    I had an idea.

8  Q    All right.  And when he talked about keeping things secure,

9  in your experience what does secure mean?

10     MR. BLANCHARD:  I would object as to speculation.

11  It's not for this witness to interpret Mr. Fox's statements.

12  That's for the jury.

13     THE COURT:  You may want to add more foundation if

14  that was something they did, for example, in the Home Guard

15  together or otherwise, because I think Mr. Blanchard's point is

16  well taken otherwise.

17  BY MR. ROTH:

18  Q    Is message security something that was the issue in the

19  Michigan Home Guard when you were there with Mr. Fox?

20  A    It was discussed with a few members of moving things over

21  to Signal, which is a secure point-to-point encrypted text

22  messaging app as opposed to using FaceBook because anyone can

23  be FaceBook messages.

24  Q    So generally speaking, when we talk about moving things to

25  encrypted chats or encrypted apps, what does secure mean?

1    A    Secure means the only people who can read it are the people

2    it's intended for.

3    Q    Thank you.  If we could move to the next box, please?

4          Adam Fox sent you, we gonna have some fun, live

5    dangerously and do some cowboy shit.  And then he asked, you

6    game?  What did you understand him to mean when he asked if you

7    are game?

8          MR. BLANCHARD:  I would object as to speculation.

9          THE COURT:  I think what the witness can say is what

10   he interpreted, because he had -- if he drew a conclusion, and

11   you can add that foundation if you want, Mr. Roth.

12         MR. ROTH:  I think, Your Honor, based on the fact that

13   it's conversation between the two of them, a question asked by

14   the Defendant, he can testify with this foundation as to how he

15   received that question.

16         THE COURT:  How he interpreted it at the time.  I

17   think if he had an interpretation he can answer that.

18         MR. ROTH:  Thank you, Your Honor.

19   BY MR. ROTH:

20   Q    Did you understand what Mr. Fox was asking you?

21   A    He was asking me if I was on board to have fun.  To try to

22   join his group to see what was going on.

23   Q    So shortly to join his group or his new militia?

24   A    Yes.

25   Q    All right.  He goes on.  Excuse me.  And then how do you

1    reply at that time?

2    A    I replied, yeah, I'm game.

3    Q    Adam Fox went onto say, I promise you this will not be a

4    social club.  We don't back the blue or any alphabet agencies

5    or any political parties.  We are patriots and our only concern

6    is upholding the constitution, bro.  Are you familiar with the

7    term back the blue?

8    A    Yes.

9    Q    What does that mean?

10   A    It means support law enforcement.

11   Q    And he said that his group does not do that?

12   A    Correct.

13   Q    Are you familiar with the term alphabet agencies?

14   A    Yes.

15   Q    What does that mean?

16   A    It's any government agency that traditionally uses three

17   letter acronyms.  NSA, DIA, CIA, FBI, et cetera.

18   Q    All right.  So additionally you indicate, yeah, I'm game.

19   Did you ever end up joining his militia?

20   A    No.

21   Q    Did you sort of blow him off after this?

22   A    Yes.  I let him know that due to time constraints and

23   distance constraints it wasn't something that I would be able

24   to commit to.

25   Q    After that did Fox ever contact you and ask for something?

1  A    Shortly after.

2         MR. ROTH:  We can take that exhibit down.

3  BY MR. ROTH:

4  Q    The further communication, was that on-line or by phone?

5  A    Via phone.

6  Q    And what did he ask you for when he called?

7  A    After a while he asked me if I could either procure him

8  explosives, build him explosives or teach him how to build

9  explosives.

10  Q    And you said shortly after the June 23d message on FaceBook

11  that we just looked at?

12  A    Correct.

13  Q    In that recording that we heard, at the beginning there was

14  talk about bakers and cupcakes and things like that.  Are you

15  familiar with that terminology?

16  A    Yes.

17  Q    Did you have some, excuse me, background or experience in

18  making explosives?

19  A    Yes.

20  Q    Could you describe that for the jury, please?

21  A    I've worked with various explosives experts throughout

22  civilian fields.  I was trying to get into La Farge, which is a

23  quarry, as a blaster.  That didn't work out so now I work for

24  Verizon.

25  Q    Did Adam Fox know that you had experience with explosives?

1 A Most people in MHG did.  Yes.

2 Q Is that something that you had talked about with Fox

3 before?

4 A Not necessarily Adam Fox specifically but it was something

5 that had been discussed.

6 Q Tell us what you mean by that?

7 A So there was a large discussion chat that was open to all

8 members of the MHG for a period of time that everything was

9 discussed from gear setup --

10   MR. BLANCHARD:  I would object as to hearsay what was

11 discussed in a large chat in another militia group.

12   THE COURT:  Yeah.  I think that's right.  Do you have

13 another foundation to go for that?  Otherwise, I think we are

14 getting far afield.

15   MR. ROTH:  I can ask a foundational question, Your

16 Honor.

17 BY MR. ROTH:

18 Q Was Adam Fox a member of that chat group at the time these

19 things were discussed?

20 A Yes.

21 Q So he would have knowledge of the things that you

22 discussed?

23 A Yes.

24 Q All right.  So with that, let me ask more specifically, did

25 you talk on that chat group in which Adam Fox was a member

1    about your experience and knowledge with explosives?

2    A    Yes.

3    Q    In that group and otherwise, did you use code words for

4    explosives?

5    A    Yes.

6    Q    What code words did you use for explosives?

7          MR. BLANCHARD:  Object as to hearsay.  It's an

8    out-of-court statement.

9          THE COURT:  I think the background of the witness

10   allows him to talk about it, and he has already laid foundation

11   for the discussions he was having.  He is now asked to recount

12   them.  Go ahead.

13         MR. ROTH:  Thank you, Your Honor.

14   BY MR. ROTH:

15   Q    What code words were used in that chat room in which Adam

16   Fox was a member to discuss explosives?

17   A    The phrase cupcakes was used for mentioning of explosives.

18   Q    And was there a code word mentioned for who -- a person who

19   makes explosives?

20   A    By nature of cupcakes the baker became the cup -- the

21   explosives maker.

22   Q    In June of 2020 or thereabouts when he -- when Adam Fox

23   contacts you and asks for explosives for you to either make

24   them or procure them for him, did he tell you what he needed

25   them for?

1    A    No.

2    Q    All right.  How did you respond when he asked you for an

3    explosive?

4    A    I told him that there was no way that was possible due to

5    travel constraints, time constraints, and whatever he was

6    planning just seemed like a really bad idea that I didn't want

7    to be involved in.

8    Q    All right.  Have you been involved in other militias and

9    such groups going back?

10   A    Only the Michigan Home Guard.

11   Q    In your time with the Michigan Home Guard were you familiar

12   with a person by the name of Barry Croft?

13   A    The name has popped up multiple times throughout my time

14   with the Michigan Home Guard.

15   Q    And is that something that you were familiar with, his

16   website or his FaceBook page on-line?

17   A    No.  Just the name.

18   Q    And was that in the context of III% groups?

19   A    Yes.

20   Q    What do you know the III% groups to be?

21   A    So I understand III%er groups are the new -- the new -- I

22   am going to not say extremists, but the new patriot movement.

23   The thought being in the American revolution III% of the

24   Americans fought the British and won.

25   Q    Was Barry Croft a local person or national person?

1    A    National.

2              MR. ROTH:  I have nothing else, Your Honor.  Thank

3    you.

4              THE COURT:  All right.  Go to Mr. Gibbons.

5              MR. GIBBONS:  Thank you, Your Honor.

6                        CROSS EXAMINATION

7     BY MR. GIBBONS:

8    Q    Good morning, Mr. Keepers.

9    A    Good morning, sir.

10   Q    Let me explore a little bit of your relationship with Adam

11   Fox in the Home Guard.  The Home Guard I think you said was a

12   prepper outfit?

13   A    It was an undefined organization.  It was based primarily

14   as a prepper organization/militia/civil defense group.

15   Q    Okay.  And the prepping would be for a social breakdown, is

16   that the deal?

17   A    The prepping was for any sort of disaster that could

18   happen, whether it be socioeconomic breakdown, natural

19   disaster, large scale power outage.  It wasn't a defined if

20   this then this.  It was a, hey, we are going to teach you how

21   to can your own food, basic medical, how to set up and build

22   fires in different situations, things of that nature.

23   Q    Okay.  With respect to the Home Guard, is it fair to say

24   that the majority of the social contact people enjoyed as Home

25   Guard members -- and I understand it's a loose affiliation,

1    mostly done on-line with FaceBook and chat groups?

2    A    The vast majority of it to an extent.

3    Q    Yes.  And then occasionally there would be social

4    gatherings, true?

5    A    Yes.

6    Q    But those were not regular and consistent, true?

7    A    It kind of depended on the area you were in.  Some areas

8    were more active in their social and their actual physical

9    meet-ups than the on-line, but the majority of people

10   interacted on-line, yes.

11   Q    Correct.  And then I probably suppose it's like any other

12   organization, when there are meet-ups you kind of have a core

13   group that tend to go?

14          MR. ROTH:  Your Honor, I am going to object to the

15   relevance.  I think we are getting beyond the foundation that's

16   necessary with this witness.

17          THE COURT:  Well, I'll let him go a little ways since

18   he met -- he testified that he met Mr. Fox through the Home

19   Guard and you asked him questions about that, so I think we'll

20   go a little ways.  Go ahead.

21   BY MR. GIBBONS:

22   Q    But there are quite a few people in the Home Guard?

23   A    Yes.

24   Q    And the vast majority are probably just keyboard warriors,

25   correct?

1      MR. ROTH:  Your Honor, I object to speculation.

2      THE COURT:  He was there and at some point we'll have

3  to get more foundation if we go into any kind of detail, but as

4  a generic matter I'm not sure it's anything different from what

5  we heard on direct.  Go ahead.

6  BY MR. GIBBONS:

7  Q    Moving forward with Adam Fox, he left the Home Guard at

8  about the same time you did, true?

9  A    Yes.

10 Q    Okay.  Adam Fox next reaches out to you on FaceBook

11 Messenger, correct?

12 A    Yes.

13 Q    Do you consider FaceBook Messenger to be secure?

14 A    No.

15 Q    Okay.  Were you on Signal with Adam Fox?

16 A    I do not believe he was on Signal.  I'm -- all of my text

17 messages are routed through Signal, so if he was using Signal

18 at that time then yes.  If not then no.

19 Q    But you didn't communicate with him on Signal, did you?

20 A    No.

21 Q    And you did not communicate with him on Wire?

22 A    No.

23 Q    Jim Macintosh was at the Vac Shack meeting where your name

24 came up.

25 A    Okay.

1    Q    Do you know that guy?

2    A    Yes.

3    Q    And how do you know that guy?

4    A    I met him through the Home Guard.

5    Q    Okay.  And he is familiar with your background, true?

6    A    Yes.

7    Q    And he knows that you had experience with explosives?

8    A    Yes.

9    Q    Did you have the opportunity to come to the Vac Shack in

10   June of 2020?

11   A    No.

12   Q    So you weren't at the June 20th meeting, correct?

13   A    Correct.

14   Q    Because you were talked about at the meeting, true?

15   A    Correct.

16   Q    And you didn't come a few days later on a Monday for a

17   meeting with Adam Fox, did you?

18   A    No.

19   Q    And you could have had an opportunity to maybe have dinner

20   with Adam and his girlfriend at one point, is that right?

21   A    Yes.

22   Q    And you declined that invitation?

23   A    Correct.

24   Q    You did not meet with him?

25   A    Correct.

1    Q    You did not talk with him?

2    A    Correct.

3    Q    Did you ever talk with Adam Fox on the phone?

4    A    Yes.

5    Q    How many times?

6    A    Approximately 10.

7    Q    Okay.  In those phone calls did you agree to give Adam Fox

8    or provide him with explosives?

9    A    No.

10   Q    In fact, isn't it true you never agreed to give -- provide

11   Adam Fox with explosives, correct?

12   A    Correct.

13   Q    Have you ever been to the Wolverine Watchmen trainings in

14   Munith, Michigan?

15   A    No.

16   Q    Have you been to any events involving the III%ers in

17   Wisconsin or Ohio?

18   A    No.

19   Q    Is it true that in your communications with Adam Fox you

20   didn't hear anything about kidnapping the Governor?

21          MR. ROTH:  Objection.

22          THE COURT:  I'll sustain that, yes, definitely.

23          MR. GIBBONS:  I have no further questions, Your Honor.

24          THE COURT:  Okay.  Ms. Kelly?

25                 CROSS EXAMINATION

1       BY MS. KELLY:

2       Q    Good morning, sir.

3       A    Good morning.

4       Q    You've testified that you met Adam Fox, right?

5       A    Yes.

6       Q    And you heard about Barry Croft on line, correct?

7       A    Yes.

8       Q    You never heard about Daniel Harris, correct?

9       A    No.

10      Q    You don't know Daniel Harris?

11      A    No.

12              MS. KELLY:  I have nothing further.  Thank you.

13              THE COURT:  All right.  Mr. Hills?

14              MR. HILLS:  No questions.  Thank you.

15              THE COURT:  Mr. Blanchard?

16              MR. BLANCHARD:  Thank you.

17                      CROSS EXAMINATION

18      BY MR. BLANCHARD:

19      Q    Good morning.

20      A    Good morning.

21      Q    So we have this June 23rd FaceBook conversation with

22      Mr. Fox, right?

23      A    Yes.

24      Q    Mr. Croft wasn't involved in that, right?

25      A    Correct.

```
1    Q    You never talked to Mr. Croft on FaceBook?

2    A    No.

3    Q    Never via FaceBook Messenger?

4    A    No.

5    Q    Never via Signal?

6    A    No.

7    Q    Never via Wire?

8    A    No.

9    Q    Never via Threema?

10   A    No.

11   Q    Never via text message?

12   A    I have never talked to him at all.

13   Q    Not in any way?

14   A    In any way.

15   Q    And you never met him in person?

16   A    Correct.

17   Q    First time you have seen Mr. Croft in your life is in this

18   courtroom?

19   A    Yes.

20            MR. BLANCHARD:  Pass the witness.

21            THE COURT:  Any redirect?

22            MR. ROTH:  None, Your Honor.  Thank you.

23            THE COURT:  All right.  Thank you.

24            (Witness excused, 8:52 a.m.)

25   ***************************************************************
```

```
 1                            INDEX

 2
        Government Witnesses:                    Page
 3
        MATTHEW KEEPERS
 4
         Direct Examination by Mr. Roth            3
 5       Cross Examination by Mr. Gibbons         14
         Cross Examination by Ms. Kelly           19
 6       Cross Examination by Mr. Blanchard       19

 7

 8      Exhibits:                             Admitted

 9      Government Exhibit 444                      6
          (FaceBook Message, Fox/Keepers)
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE

        I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.


                        /s/ Paul G. Brandell
                        Paul G. Brandell, CSR-4552, RPR, CRR
                        U.S. District Court Reporter
                        399 Federal Building
                            Grand Rapids, Michigan  49503