1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF MICHIGAN

3                       SOUTHERN DIVISION

4     UNITED STATES OF AMERICA,

5              Plaintiff,         No:  1:20cr183-1/2/5/6

6       vs.

7     ADAM DEAN FOX,
      BARRY GORDON CROFT, JR.,
8     DANIEL JOSEPH HARRIS and
      BRANDON MICHAEL-RAY CASERTA,
9
               Defendants.
10

11
      Before:
12
                    THE HONORABLE ROBERT J. JONKER
13                       U.S. DISTRICT Judge
                         Grand Rapids, Michigan
14                       Friday, March 25, 2022
                       Excerpt Jury Trial Proceedings
15              Testimony of Brian Clark & Joshua Miller

16    APPEARANCES:

17                 MR. ANDREW BIRGE, U.S. ATTORNEY
                   By:  MR. NILS R. KESSLER
18                 MR. JONATHAN C. ROTH
                   The Law Building
19                 333 Ionia Avenue, NW
                   Grand Rapids, MI 49501-0208
20                 (616) 456-2404

21                      On behalf of the Plaintiff;

22                 MR. CHRISTOPHER M. GIBBONS
                   MS. KAREN M. BOER
23                 Dunn Gibbons PLC
                   125 Ottawa Avenue, NW, Suite 230
24                 Grand Rapids, MI 49503-2865
                   (616) 336-0003
25
                        On behalf of Defendant Fox.

```
1              JOSHUA ADAM BLANCHARD
               Blanchard Law
2              309 South Lafayette Street, Suite 208
               P.O. 938
3              Greenville, MI 48838-1991

4
                        On behalf of Defendant Croft, Jr.
5
               JULIA ANNE KELLY
6              Willey & Chamberlain LLP
               300 Ottawa Avenue NW Suite 810
7              Grand Rapids, MI 49503-2314
               (616) 458-2212
8
                        On behalf of Defendant Harris.
9
               MICHAEL DARRAGH HILLS
10             Hills at Law PC
               425 South Westnedge Avenue
11             Kalamazoo, MI 49007-5051
               (269) 373-5430
12
                        On behalf of Defendant Caserta.
13

14     REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
```

1    ************************************************************

2              (Excerpt started, 12:14 p.m.)

3              BRIAN CLARK, GOVERNMENT

4              having been first duly sworn, testified as follows:

5         (Witness sworn, 12:14 p.m.)

6         THE COURT:  All right.

7                   DIRECT EXAMINATION

8    BY MR. ROTH:

9    Q    Good afternoon.

10   A    Good afternoon.

11   Q    Could I have you start by stating and spelling your

12   complete name, please?

13   A    Brian Clark, C-l-a-r-k.

14   Q    Where are you employed?

15   A    With the Federal Bureau of Investigation.

16   Q    In what capacity?

17   A    I am a special agent.

18   Q    How long have you been with the FBI?

19   A    Just over 19 years.

20   Q    On October 7th, 2020, did you execute a search warrant on a

21   business located at 3601 South Division Street?

22   A    Yes.

23   Q    What's the name of that business?

24   A    The Vac Shack.

25   Q    And did you find evidence that somebody had been living in

1    the downstairs area of that business?

2    A    Yes.

3    Q    Could you please explain the layout of the Vac Shack?

4    A    Yes.  The top floor is like a sales floor with a work area.

5    You can see a cash register and there's also a room that has a

6    bathroom right there.  That's the top floor.

7    Q    Go ahead.  And the downstairs?

8    A    The downstairs there is a door that it kind of looks like a

9    door that opens from the floor.  It's not really a trap door

10   but it's a full size door.  Opens up.  You go down the stairs

11   and it's a storage area underneath, and down there we found a

12   bed that was like a bedroom that was cordoned off with sheets,

13   and then the rest of the area was storage for old vacuums.

14   Q    Do you have up there Proposed Exhibits 367 through 369, 373

15   through 375, 377 and 380?

16   A    Would they be the book?

17   Q    The physical items that you brought up with you.

18   A    Yes.

19   Q    You have reviewed each of those items?

20   A    I have.

21   Q    Each were secured and seized during your search of the Vac

22   Shack?

23   A    Yes.

24   Q    And have you also previously reviewed Proposed Exhibits,

25   and these are the pictures, 370 through 372, 376, 378, 379, 381

1   and 383 through 387?

2   A   Yes.

3   Q   So with that -- and each of those are fair and accurate

4   pictures of things you observed during that search?

5   A   Yes.

6          MR. ROTH:  With that I would move for the admission of

7   Proposed Exhibits 267 through 381 as well as 383 through 387?

8          THE COURT:  Are there any Defense objections?

9          MR. BLANCHARD:  Can we get an identification of what

10   the physical exhibits are?  He just said they were seized.

11          THE COURT:  Well, I mean, they are on the exhibit

12   list.

13          MR. BLANCHARD:  I am trying to catch up with the

14   numbers.

15          MR. ROTH:  We certainly can go item by item.

16          THE COURT:  You are just trying to accelerate.  I

17   know.  So 367 is a Taurus pistol.  368 is an AR-15 rifle, not

18   an ARPA.  Hawaiian shirt.  And then we are into pictures and

19   then it looks like there is a helmet, a vest and currency,

20   notes, belt.  Those would be the items.

21          MR. BLANCHARD:  I don't have any objection to those.

22   Thank you.

23          THE COURT:  Those are admitted.

24          MR. ROTH:  Thank you, Your Honor.

25   BY MR. ROTH:

1  Q    Can we start with physical item 368?  That would be the

2  long box.  What is that item?

3  A    This box is containing a rifle.

4  Q    I apologize.  That was not on the list of what I had

5  just -- it was.  I apologize.  It was.  Could you please open

6  that item and show it to the jury?  What kind of rifle is that?

7  A    It's a Palmetto rifle.

8  Q    Where was it found?

9  A    It was found in the basement bedroom.

10 Q    What caliber is it?

11 A    It's a 5.56.

12 Q    Was it loaded when it was found?

13 A    There was a magazine inserted that was -- had cartridges in

14 it but there was not a round chambered.

15 Q    Cartridges are what would commonly be called bullets?

16 A    Correct.

17 Q    So when you say a round was not chambered, could you give a

18 little explanation of what it means?

19 A    You couldn't have picked it up and fired it.  You would

20 have had to chamber a round, which means pulling the charger

21 lever back and letting a round be chambered before you could

22 fire it.

23 Q    Was there anything on that rifle that appeared to be added

24 after market?

25 A    There is a red dot sighting device that's on the top as

1    well as a flashlight on the side.

2    Q    Could we look at 383, please?  Is the rifle shown again

3    there?

4    A    Yes.

5    Q    Okay.  Could we switch to 58 for a moment?  Could we switch

6    to Exhibit 58 on the screen for a moment?

7              Does that appear to be the same rifle that Mr. Fox is

8    shown holding there?

9    A    It appears to be.

10   Q    Thank you.  We can go back to 383.  Is there another gun

11   shown at the top of the screen here?

12   A    There is.

13   Q    Where was that found?

14   A    That was in the basement in a plastic case, the hard case

15   that you see in the picture there.

16   Q    What kind of firearm was that?

17   A    It's a rifle.

18   Q    What caliber?

19   A    .30-30.

20   Q    Was it loaded?

21   A    It did not have any cartridges in it, but there was a spent

22   cartridge case that was in the chamber.

23   Q    Could you explain what that means?

24   A    That means that there was a cartridge case that didn't have

25   the bullet.  The primer had already been fired but it was in

1    the chamber so either somebody put it in there after it had

2    been fired or it had been fired and never removed.

3    Q     Thank you.  Could we please look at 370?  Where were these

4    shelves?

5    A     That's in the top floor of the Vac Shack or the first floor

6    and it's behind the work bench area.

7    Q     Is that sort of out of the way of where the public shoppers

8    would be?

9    A     They could see it but they wouldn't normally go back there.

10   There was no reason for a customer to go back there.

11   Q     Did you find a number of relevant items there?

12   A     Yes.

13   Q     Could we please take a look at 371?  Are several of those

14   items laid out here?

15   A     Yes.

16   Q     We are going to start on the far left.  What is this item?

17   A     That is a vest with knee pads.

18   Q     What kind of vest?

19   A     It's a tactical vest.

20   Q     What is a tactical vest?

21   A     This one didn't have the ballistics inserted in it, so it's

22   just like a cloth case.  It can be put over something else if

23   you want to carry extra equipment or a vest could be inserted

24   in there to make a ballistic vest.

25   Q     What do we see next to that?

1   A    Tactical helmet.

2   Q    Exhibit 373 up there, is that the helmet itself?

3   A    I believe it is.

4   Q    Could you please open that up and show the jury?

5   A    Sure.  Let me move this one back.

6   Q    Certainly.  Are you able to read the manufacturer or a

7   brand on that helmet?

8   A    Yeah.  It says Hard Head Veteran.  There is a patch on the

9   side.

10  Q    Could we look at page 3 of Exhibit 468 for a moment?

11       Does it appear to be the same brand helmet as we see

12  on this receipt in this exhibit?

13  A    It appears to be.

14  Q    If we go to page 4 of the same exhibit, please?

15       So this is a receipt for the same exhibit for what

16  I'll call a bucket of Boat ammunition.  Did you find this item

17  as well in the Vac Shack?

18  A    Yes.  We found a similar item to this that's listed on this

19  receipt.

20  Q    And where was that?

21  A    That was on the shelf.  I believe it was on the bottom

22  shelf.

23  Q    Thank you.  Could we go back to 371, please?

24       What is this item in the middle?

25  A    That's a gun box with a gun lock and U.S. currency.

1    Q    Is Exhibit 375 the currency itself?

2    A    It is.

3    Q    How much money was in the gun box?

4    A    $600.

5    Q    Exact?

6    A    Yes.  25 $20 bills and one $100 bill.

7    Q    Thank you.  What is next to the gun box with cash?

8    A    Smoke cannisters.

9    Q    What is a smoke canister?

10   A    They are meant to create smoke once you activate them.

11   Q    How many were there there?

12   A    I believe there were only two.

13   Q    And skipping a few items, what do we have over here?

14   A    That is the box for the red dot site.

15   Q    And did you find the site itself?

16   A    I believe that's the site that's on the rifle.

17   Q    The one we looked at at the beginning?

18   A    Yes.

19   Q    What's below the rifle sight box?

20   A    That's another rifle.

21   Q    What kind?

22   A    Smith & Wesson.

23   Q    What caliber was it?

24   A    5.56.

25   Q    Was it loaded?

1    A    It was.

2    Q    Was a round chambered?

3    A    There was.

4    Q    What do we see in the middle here?

5    A    That's a plate carrier vest with a number of other items

6    attached to it.

7    Q    Did this particular plate carrier have the bullet proof or

8    ballistic plates inside?

9    A    It did.

10   Q    What else was inside?

11   A    There were side panels as plates as well.

12   Q    Could we take a look at 372, please?

13        Is that the plate carrier shown closer up?

14   A    Yes.

15   Q    And what did you find in the pouches or pockets of the

16   plate carrier?

17   A    In the front are six rifle magazines that were loaded with

18   5.56 cartridges.

19   Q    Do you know approximately what the capacity of each of the

20   magazines was?

21   A    I believe it's 30.

22   Q    And there were six loaded approximately 30-round magazines?

23   A    Yes.  I don't believe they were completely loaded though.

24   Q    Very good.  Go ahead.  Was there anything else located in

25   the pouches?

1    A    Not in those pouches but on the side is a med kit.

2    Q    All right.  Was there also another smoke canister?

3    A    I don't remember a smoke canister being in that one.

4    Q    Could we look at 379, please?

5         Where was this backpack found?

6    A    That was on the bottom shelf.

7    Q    And did you look through its contents?

8    A    I did.

9    Q    And are those contents all in the bucket labeled Exhibit

10   380?

11   A    Yes.

12   Q    Could we look at 385, please?

13        Do we see the front of the backpack here closer up and

14   some of its contents?

15   A    Yes.

16   Q    All right.  Let's start with item 386.  Could you find the

17   physical item for 386 from the backpack?  The backpack itself.

18   A    I believe so.  Okay.  Sure it's not 380?

19   Q    I'm wrong.  386 is another picture.  I apologize.  You can

20   have a seat.

21   A    All right.

22   Q    There we go.  All right.  So we are going to go through

23   these one by one and we will match them up with the physical

24   items there.  What's on the top left here?

25   A    Those are flex cuffs.

1    Q    Do you have the physical items up there?

2    A    They are in the bag.

3    Q    Could you pull those out and show them to the jury, please?

4    A    Sure.  It may be easier to dump everything out and hold

5    them up one at a time.

6    Q    That will be fine.  That's why we brought the bucket.

7    A    Actually, they are going to be in this bag.

8    Q    And you may have covered this but there were two sets?

9    A    Two sets.

10   Q    You can have a seat and hold those up.  That way the

11   microphone will pick you up.  What are flex cuffs?

12   A    They are used as handcuffs that can be cut off when they

13   are done.

14   Q    So we see below, what is this item?

15   A    That's a bag of zip ties.

16   Q    Could you explain generally what is the difference between

17   zip ties and flex cuffs?

18   A    Well, flex cuffs are set up for to use as handcuffs because

19   you can slip somebody's hand through there and immediately

20   ratchet them down to secure them and detain them.  The zip ties

21   you could use them for the same thing but you'd have to go

22   through the process of setting them up.  These are already set

23   up.

24   Q    Thank you.  What's next to the zip ties?

25   A    It's a water bladder.

1    Q    What is a water bladder?

2    A    It's just a device that holds water and you can see the

3    cord on it, you can take drinks from there.  It had water in it

4    at the time, but we emptied it before we secured it for

5    evidence.

6    Q    What is this item on the bottom left?

7    A    That's 550 cord.

8    Q    What is 550 cord?

9    A    It's basically rope.

10   Q    What is this item here?

11   A    That's a knife.

12   Q    And next to the knife?

13   A    First aid kit.

14   Q    Could we go back to 385, please, and talk about more of the

15   items here?  What's on -- what is this item?

16   A    A navigation compass.

17   Q    What are these items here?

18   A    The one on the left, the green one is a knife with a cord

19   wrapped around the handle and the one on the right is three

20   flat bladed knives in a sheath.

21   Q    What's below the knives?

22   A    Called Pyro Putty and two Bic lighters.

23   Q    What is Pyro Putty?

24   A    Pyro Putty is just a substance to help you start a fire.

25   Like if you were in a wet environment or a difficult

1    environment and you wanted to start a campfire you could use

2    the Pyro Putty to help you along.

3    Q    Help you light things when it's wet?

4    A    Yes.

5    Q    And finally could we look at 384?  Start up here.  What is

6    this item?

7    A    It's a gas mask.

8    Q    Could you take that item out, please?  Could you hold that

9    up for the jury?  Generally speaking what is a gas mask.

10   A    Well, this without the cartridge it would still let stuff

11   in but it's meant to filter out chemical agents and other

12   things so you don't breathe them.

13   Q    And was there a cartridge with it?

14   A    Yes.

15   Q    And do we see that on the screen?

16   A    Yeah.  It's right below the gas mask.  It's that tan item

17   with the black cover.

18   Q    Right here?

19   A    Yes.

20   Q    Very good.  What's next to the gas mask?

21   A    Binoculars.

22   Q    And next to that?

23   A    Radio ear piece.

24   Q    What kind of radio ear piece?

25   A    One that you could plug into a radio so you can plug it

1    into your ear, if you look closely on there you see a clear

2    plastic piece that actually goes into your ear so it's more of

3    a low profile one.

4    Q    What is next?

5    A    Three pairs of tactical gloves.

6    Q    What are tactical gloves?

7    A    They are meant more for protection of your hands rather

8    than keep your hands warm.  You can actually still shoot

9    through them normally because they are not too thick.

10   Q    And what are the pouches that we see?

11   A    The green and tan ones are part of a package called a meal

12   ready to eat, also known as a MRE, and the other ones are tuna

13   packages.

14   Q    What is this green item here?

15   A    Flashlight.

16   Q    Is there a difference between this flashlight or this type

17   of flashlight and what you might normally have at home, a

18   household flashlight?

19   A    Yeah.  This one was typically issued to military folks.  It

20   goes all the way back to World War II.  You can see the red

21   lens on there.  You can set it up as a signal device or you can

22   turn it on and it has a clip on the back so you can clip it on

23   your vest and it would shine straight out.

24   Q    What is this item beneath the flashlight?

25   A    Rifle sling and a head lamp.

1    Q    What is a head lamp?

2    A    It's just a flashlight that has a strap on it so you can

3    secure it to your head.  That way the light is on wherever you

4    look.

5    Q    Thank you.  Take that down.  Did you also search a work

6    bench on that main floor?

7    A    Yes.

8    Q    Could you please describe the work bench?

9    A    It was covered with a lot of things, but there was a pistol

10   on there, some knives, a lot of water bottles, some other food.

11   Q    Could we look at 387 on the screen, please?

12        What is this item?

13   A    A Hawaiian shirt.

14   Q    Where was it found?

15   A    That was in the basement.

16   Q    Is Exhibit 369 the shirt itself?

17   A    Yes.  It is.

18   Q    All right.  Could you open that up and show the jury?

19   What's the pattern on that Hawaiian shirt?

20   A    It's got flowers, leaves and skulls.

21   Q    Thank you.  You can put that away.  Thank you.

22        Could we look at 376, please?

23        We are going to go back to the work bench.  Are these

24   items that you found in and around the work bench?

25   A    Yes.

1    Q    Starting with the left, what are these items?

2    A    Handwritten notes.

3    Q    Are those Exhibit 377?

4    A    Yes.  They are.

5    Q    All right.  What's next over here?

6    A    Three knives.

7    Q    Next to the knives who do we see?

8    A    A pistol.

9    Q    Is that Exhibit 367?  Could you please take that item out

10   and show the jury?

11   A    It is 367.

12   Q    What kind of gun is that?

13   A    It is a Taurus.

14   Q    What caliber?

15   A    Nine millimeter.

16   Q    Was it loaded?

17   A    It was.  It had cartridges in the magazine and there was

18   one round in the chamber.

19   Q    Thank you.  You can return that to the box.  Below the

20   knives and the guns what do we see in this bag?

21   A    More Hawaiian shirts.

22   Q    Was there additional ammunition in the Vac Shack?

23   A    Yes.  There was.

24   Q    Approximately how much?

25   A    Found several hundred rounds of 5.56, and I would say at

1    least a hundred rounds of nine millimeter.

2    Q    Thank you.  You can take that one down.  Did investigators

3    also find Adam Fox's car in the parking lot there?

4    A    Yes.

5    Q    Did you also have and execute a search warrant for that

6    car?

7    A    Yes.

8    Q    What kind of car was it?

9    A    It was a silver Chevrolet Impala I believe.

10   Q    And do you have exhibit -- Proposed Exhibit 452 up there

11   with you?  It should be a small one.

12   A    Yeah.  I do not see 452.

13   Q    All right.  Could you tell us what the item is that you

14   found in the car?

15   A    A business card.

16   Q    Whose name was on it?

17   A    It was -- I believe it was Fox.

18   Q    And what else was on the card?

19   A    It was for a militia I believe.

20   Q    Did you find similar business cards elsewhere?

21   A    Yes.

22   Q    Where?

23   A    In the Vac Shack.

24   Q    Where in the Vac Shack were they?

25   A    They were in the tray on the counter where the cash

1    register was.

2    Q    Where in the car were they?

3    A    In the driver's door on a little pocket next to the door

4    handle.

5    Q    And we are going to find Proposed Exhibit 452, and that is

6    an item -- it's not up there as you said, but that is an item

7    that you had seized from the Vac Shack that day?  I'm sorry,

8    from the car?

9    A    Yes.

10          MR. ROTH:  Very good.  Once we find that we'll move

11   for the admission then.  With that I have nothing further of

12   this witness.

13          THE COURT:  All right.  We'll go to Mr. Gibbons.

14          MR. GIBBONS:  Thank you, Your Honor.

15                    CROSS EXAMINATION

16    BY MR. GIBBONS:

17   Q    I had a question about the cash, the $600 in cash --

18   A    Yes, sir.

19   Q    -- that you located.  Was that in a box?

20   A    It was in a gun box.

21   Q    And where was that gun box located?

22   A    It was on the shelf.

23   Q    Up on the -- in the upstairs?

24   A    Correct.

25   Q    All right.  Was there any money located downstairs?

```
1    A    No.  I don't believe there was.
2    Q    Okay.  You mentioned there was a photograph of some little
3    notes that were torn off of a pad of paper, correct?
4    A    Yes.
5    Q    Where were those located exactly?
6    A    They were on the work bench.
7    Q    They were on the bench?
8    A    On the bench.
9    Q    All right.  And then lastly, the business cards, that said
10   Adam Fox's name on it?
11   A    I don't think it had his first name.  I think it had his
12   last name.
13   Q    Okay.  Fox was on this and then it has -- you have seen it,
14   correct?
15   A    I have seen it.
16   Q    So it has the little III%er logo on it?
17   A    Correct.
18   Q    And that's something I guess that he would hand out to
19   people?
20   A    As a business card I would assume he would hand a business
21   card out to people.
22   Q    Where were they found in the Vac Shack?
23   A    They were in a little case or a little -- I don't want to
24   say a display case, but they were on the counter where the cash
25   register is and there was a stack of them so anybody could come
```

1      up there and take one.

2      Q    Yeah.  So maybe like the little stand for business cards?

3      A    A little holder.  Yeah.  Correct.

4      Q    There is probably some Vac Shack ones there, correct?

5      A    I don't remember seeing any Vac Shack ones.

6      Q    But if there were Vac Shack cards they would be probably

7      logically be there?

8           MR. ROTH:  I am going to object to the lack of

9      foundation.

10          THE COURT:  I think there is a lack of foundation for

11     that.

12     BY MR. GIBBONS:

13     Q    All right.  And then you found some of those, like, cards

14     in the car?

15     A    Yes.

16     Q    Did you find anything else in the car of significance or

17     no?

18     A    We took two other items from the car.  I believe they were

19     not headphones, but ear protection, like shooting ear

20     protection.

21     Q    Okay.

22     A    And a notebook.

23          MR. GIBBONS:  Okay.  Very good.  Thank you.

24          THE COURT:  Ms. Kelly?

25          MS. KELLY:  I have no questions.

1      THE COURT:  Mr. Hills?

2      MR. HILLS:  None, Your Honor.

3      THE COURT:  Thank you.  Mr. Gibbons?

4      MR. BLANCHARD:  Again you called me Mr. Gibbons.

5      THE COURT:  I'm sorry, Mr. Blanchard.  Must be the end

6  of the week.

7                    CROSS EXAMINATION

8    BY MR. BLANCHARD:

9    Q    You said you found a hundred rounds of nine millimeter?

10   A    Yes.  I believe so.

11   Q    That's commonly sold in boxes of 50, right?

12   A    Absolutely.

13   Q    So he had two boxes?

14   A    I believe it was one box with a hundred rounds in it.

15   Q    Okay.  One box?

16   A    Yeah.

17   Q    One purchase of ammunition for nine millimeter?

18   A    It could have been.

19      MR. BLANCHARD:  Okay.  Pass the witness.

20      THE COURT:  All right.

21      MR. ROTH:  No redirect, Your Honor.

22      THE COURT:  All right.  Where is 452?

23      MR. ROTH:  Probably on the fourth floor.

24      THE COURT:  Okay.  So we'll hold that for now.

25  Because he testified to content on the card we definitely need

1    to get that if you are going to have it admitted.

2           MR. GIBBONS:  Your Honor, if it's helpful I'll

3    stipulate to that coming in.  It's been testified to.

4           THE COURT:  All right.  So we'll consider it admitted

5    but obviously need to get it.

6           MR. ROTH:  Certainly, Your Honor.  Thank you.  And I

7    apologize for that.

8           THE COURT:  Thank you.

9           And thank you.  Why don't we excuse you.  I don't know

10   if you came with all this stuff.

11          THE WITNESS:  I'll need a minute to gather.

12          (Witness excused, 12:41 p.m.)

13          THE COURT:  Who is your next witness?

14          MR. ROTH:  Joshua Miller.  If I may approach and help

15   the witness?

16          THE COURT:  Sure.  Absolutely.  Please do.

17          Mr. Roth, we did admit some exhibits we didn't look

18   at.  Is that -- is that right?

19          MR. ROTH:  That's correct, Your Honor.

20          THE COURT:  Okay.  Very good.  And your next witness

21   is Joshua Miller?

22          MR. ROTH:  That's correct, Your Honor.

23          THE COURT:  All right.  Please come on up to the box.

24   Before you sit down we'll have you sworn in.

25                  JOSHUA MILLER, GOVERNMENT

1           having been first duly sworn, testified as follows:

2           (Witness sworn, 12:43 p.m.)

3           THE COURT:  All right.  And please take the stand.

4   Get that microphone situated in front of you, and we'll go to

5   Mr. Roth for direct whenever everybody is ready.

6                     DIRECT EXAMINATION

7     BY MR. ROTH:

8   Q   Good afternoon, sir.

9   A   Good afternoon.

10  Q   Could I have you start by stating and spelling your

11  complete name?

12  A   Joshua Miller, J-o-s-h-u-a, M-i-l-l-e-r.

13  Q   Thank you.  How old are you, sir?

14  A   Twenty-four.

15  Q   Where do you live?

16  A   West Bloomfield.

17  Q   Are you employed?

18  A   Yes, sir.

19  Q   How are you employed?

20  A   I am a carpenter.

21  Q   Were you previously a member of the Wolverine Watchmen?

22  A   Yes.  I was.

23  Q   When?

24  A   That would be summer of 2020, '21.

25  Q   Two summers ago?

1    A    Yeah.  Two summers ago.

2    Q    All right.  And you joined that summer and left that

3    summer?

4    A    Yes.  I did.

5    Q    Had you ever been in another militia?

6    A    No.

7    Q    Not before?

8    A    No.

9    Q    Any after?

10   A    No, sir.

11   Q    How did you get connected with the Wolverine Watchmen?

12   A    I had a friend at work tell me about it.

13   Q    And who was your friend at work?

14   A    Max Wyckoff.

15   Q    Why did you personally join the Wolverine Watchmen?

16   A    I was just looking for a group of friends that I could

17   better my abilities to defend myself basically.  Just kind of

18   wanted to hang out with guys, and you know, become more

19   comfortable with firearms just to protect myself in case of

20   anything.

21   Q    Did you have a nickname within the group?

22   A    Yeah.

23   Q    What was that?

24   A    Purple J.

25   Q    Did you go to any in-person events with the Wolverine

```
1     Watchmen?

2     A    Yeah.  I went to two.

3     Q    Was the first one on July 23rd in Fowlerville?

4          MR. GIBBONS:  Objection.  Leading, Your Honor.

5          THE COURT:  It is, but it's foundational.  I think if

6     we limit it to that it's okay.

7          MR. ROTH:  Thank you, Your Honor.

8     BY MR. ROTH:

9     Q    Was the first one on July 23rd in Fowlerville?

10    A    I don't remember the exact date, but the first -- the first

11    one I went to was a bonfire in Ortonville I think it was.

12    Q    Do you recall whose house that was?

13    A    Daniel Harris.

14    Q    Did he have a nickname within the group?

15    A    Yes.  I can't remember it right now, though.

16    Q    Okay.

17    A    I'm sure if I heard it I would remember it.

18    Q    That's okay.  Do you remember a discussion that night?

19    A    Some of it.  Yeah.

20    Q    All right.  Do you remember talking about feds?

21    A    Yeah.

22    Q    Who was saying that?  Who was talking about feds?

23    A    It was, I would say, a group of guys.

24    Q    What was the nature of the conversation?

25         MR. BLANCHARD:  I'd object as to hearsay.
```

1    THE COURT:  Maybe we can find out who was there first.

2    MR. ROTH:  We can, Your Honor.

3    BY MR. ROTH:

4    Q    Was a person by the name of Daniel Harris there?

5    A    Yes, sir.

6    Q    All right.  And so the entire group, including Mr. Harris,

7    was discussing this?

8    MR. BLANCHARD:  Objection, leading.

9    THE COURT:  It is but it's foundational to address

10   your objection.  Go ahead.

11   MR. ROTH:  Thank you, Your Honor.

12   BY MR. ROTH:

13   Q    So Daniel Harris was included in the group that was

14   discussing this?

15   A    As far as I can remember.

16   Q    All right.  And what was the nature of the discussion about

17   feds?

18   A    The -- from what I remember I don't remember any -- any

19   specific about -- about feds I would say, but I know it was a

20   topic of discussion at times when I was with them.

21   Q    Could we please play Exhibit 121?

22   THE COURT:  This is something already in evidence?

23   MR. ROTH:  It is, Your Honor.

24   Do we not have the audio?

25   THE COURT:  So for our witness who wasn't here you'll

1    listen to an audio.  The transcript can help you follow along,

2    to help interpret it.

3              MR. ROTH:  You don't have the audio.  We need to swap

4    the audio is that --

5              MR. KESSLER:  This is the Defense's screen.  The court

6    needs to switch it.

7              MR. ROTH:  I apologize.  I didn't understand either.

8              (Audio started, 12:48 p.m.)

9              (Audio stopped, 12:49 p.m.)

10   BY MR. ROTH:

11   Q    Do you recall hearing that conversation that night?

12   A    Bits and pieces.

13   Q    Do you recall a discussion about bombs that night or

14   explosives?

15   A    Not clearly.  It was a long time ago.

16   Q    Did you attend another meeting in Fowlerville or another

17   location a few days later on July 26, 2020?

18   A    I think that was the date it was a -- yeah.  It was in

19   Fowlerville.  I went to one in Fowlerville.

20   Q    Whose property was that?

21   A    Kaleb Franks.

22   Q    What kind of meeting was that?

23   A    It was a training event.

24   Q    What kind of training or exercises were done there?

25   A    It was weapons handling and in cars.

```
1    Q    Did you meet a person by the name of --
2              MR. HILLS:  I am going to object to leading, Your
3    Honor.
4              THE COURT:  I think he is setting foundation right
5    now, but go ahead.
6    BY MR. ROTH:
7    Q    Did you meet a person by the name of Brandon Caserta at
8    that meeting?
9    A    Yes.  I did.
10   Q    Where was it at the meeting, or excuse me, at the FTX that
11   you met him?
12   A    It was in Fowlerville.
13   Q    Yup.  Where during the FTX was it during at Fowlerville?
14   A    I'm sorry.  I don't understand the question.
15   Q    Sure.  I apologize.  I'm asking it poorly.  What were you
16   guys doing when you met Brandon Caserta?
17   A    Oh, we were doing the training.  So we were shooting guns.
18   Q    And did he say anything that concerned you?
19   A    Yeah.  A little bit.
20   Q    Tell me about that?
21   A    I don't have any clear recollection on the conversation but
22   I remember just kind of being put off and not wanting to be a
23   part of the group anymore is all I could really say.
24   Q    After speaking to Brandon Caserta?
25   A    Yeah.
```

1    Q    But you don't remember what it was he said?

2              MR. HILLS:  Asked and answered, Your Honor.

3              THE COURT:  I think he did say he didn't have a very

4    clear understanding, and so if you get too much more focused on

5    it it's really just leading.

6              MR. ROTH:  One moment, Your Honor.

7    BY MR. ROTH:

8    Q    Do you remember speaking to an investigator about your

9    conversation with Brandon Caserta?

10   A    Yes.

11   Q    And would looking at his report about that conversation

12   refresh your memory?

13   A    Yeah.

14             MR. ROTH:  May I approach the witness, Your Honor?

15             THE COURT:  Right.  Let's make sure Mr. Hills gets a

16   copy.

17   BY MR. ROTH:

18   Q    If you can read this bracketed part silently to yourself

19   and look up when you are done?  Did that help refresh your

20   memory?

21   A    Yeah.

22   Q    With that, could you please describe for us the nature of

23   your conversation with Brandon Caserta?

24   A    I would say he sounded very violent and just, I guess,

25   disturbed about what was going on.

1   Q    How long do you think you were at that event that day?

2   A    Probably only a couple hours.  It wasn't very long.

3   Q    Was there also a list handed out while you were there?

4   A    Yeah.

5   Q    Could we look at Exhibit 78, please?  Is this the list that

6   was handed out?

7   A    Yes, sir.

8   Q    Did you know why or did they tell you why they needed code

9   words for feds and illegal guns, things like that?

10  A    It was in case someone was in trouble with the law I think.

11  Q    All right.  So you have had discussion of feds and bombs,

12  illegal guns.  What was your feeling as you leave this second

13  event with the Wolverine Watchmen?

14  A    It wasn't something I wanted to be a part of and a little

15  worried I guess.

16  Q    Did you ever go to anymore Wolverine Watchmen events?

17  A    No.  I did not.

18  Q    Did you just stop talking to them or did you tell them that

19  you were quitting?

20  A    It was -- it took me a little while to leave because I

21  didn't know how to leave without -- I mean, I didn't know what

22  they were like in terms of people leaving.  So I took my time

23  to try and get out and then I told them I was leaving and tried

24  to end on good terms.

25  Q    What did that mean, I didn't know how they were like with

people leaving?

A    It was -- it was uncertainty to me because I hadn't seen anybody else leave the group really.

Q    Were you scared?

A    Yeah.  I would say.

Q    And you said it took you some time.  How long did you think about how to go about quitting this group?

A    Well, I -- the last event I went to was in July and I think I left in, what was it, August.  So probably a month.

Q    And how did you end up quitting ultimately?

A    They were worried about a fed being in the group, and that to me was a perfect time for me to just say this isn't what I thought it was going to be, and I am not -- I got different beliefs, and it's time for me to go my own way basically.

Q    And did you tell them or just stop going?

A    I sent it in a message in the group chat.

Q    And who received the group chat?  Who was on the group chat?

A    It was a good amount of people I would say.

Q    Was it all the members of the Wolverine Watchmen?

         MR. BLANCHARD:  Object to the leading nature.

         THE COURT:  If he knows he can answer.

         THE WITNESS:  It was to the -- I think it was called the bonfire chat.  So it was a little bit smaller of a group.

BY MR. ROTH:

1    Q    Was Brandon Caserta a member of that group?

2    A    I am pretty sure but not positive.

3    Q    Was Daniel Harris a member of that group?

4    A    Yes.

5    Q    Could you please describe for the jury generally how it was

6    or what it is you told them when you quit?

7    A    I said I didn't have of --

8             MR. BLANCHARD:  Object as to hearsay for the things he

9    said.

10            THE COURT:  Well, I mean, this addresses foundational

11   issues that were lacking when I made the ruling earlier.  I

12   actually think there is a foundation to let 472 in at this

13   point.  So if you want to do that, I would admit 472 over your

14   objection, Mr. Blanchard.

15            MR. ROTH:  Thank you, Your Honor.

16   BY MR. ROTH:

17   Q    Could we show the witness only 472?

18            Is this the message that you sent to the bonfire chat

19   including Daniel Harris and as you said, likely Mr. Caserta,

20   when you quit?

21   A    Yes.  It is.

22            MR. ROTH:  I'd move for the admission of Proposed

23   Exhibit 472?

24            THE COURT:  All right.  And I'll overrule

25   Mr. Blanchard's objection.  Go ahead.

BY MR. ROTH:

Q    So with that on the screen, could you please read that for the jury?

A    In light of what happened yesterday and some prior things I have decided to leave.  I don't think I am as committed as y'all.  I'm pretty busy and have a little bit different opinion on some stuff.  You are a great group of guys and it was a pleasure getting to know all of you.  I'd like to remain in contact.  Most of you know where to reach me or if you need anything @LeRoyJenkins is always able to reach me.  If you want proof of my background so you know I'm clean I can get it to you.  I'll be -- I'll just be gone this weekend and nothing against any of you.

Q    Who was Leroy Jenkins?

A    Max Wyckoff.

Q    Why did you offer, as you said, proof of your background to show that you were, quote, clean?

A    Because they were worried about a fed being in the group.

Q    So what did you mean by clean?

A    That I am not a fed.

         MR. ROTH:  I have nothing else, Your Honor.  Thank you.

         THE COURT:  All right.  Mr. Gibbons?

                CROSS EXAMINATION

   BY MR. GIBBONS:

1   Q   Good afternoon, sir.

2   A   Good afternoon.

3   Q   You do not know who Adam Fox is personally, correct?

4   A   No, sir.

5   Q   You have never met him, true?

6   A   I have never met him.

7   Q   Never talked to him on the phone?

8   A   No.

9   Q   You have never had a chat conversation with him, text

10  messages back and forth, correct?

11  A   Not that I am aware of.

12  Q   Okay.  You never been to his house?

13  A   No.

14  Q   He's never been to your house?

15  A   No.

16  Q   You've never trained with him?

17  A   No.

18  Q   Never had a social occasion, drinks or dinner?

19  A   No.

20  Q   Go out to the bar, correct?

21  A   Correct.

22          MR. GIBBONS:  Thank you.

23          THE COURT:  Ms. Kelly?

24          MS. KELLY:  Thank you, Your Honor.

25                  CROSS EXAMINATION

BY MS. KELLY:

Q    Good afternoon, Mr. Miller.

A    Good afternoon.

Q    You joined the Wolverine Watchmen at the suggestion of Max Wyckoff, correct?

A    Yes.

Q    Okay.  And you wanted to learn some skills and firearm handling, correct?

A    Yes.

Q    You own your own firearms?

A    Yes.

Q    You wanted to join a group of guys so you could shoot outside, right?

A    Yeah.

Q    And become more proficient, right?

A    Yup.

Q    Okay.  And you went to -- so you did join the on-line group and that was the bonfire chat, or the -- that text message that we just saw, that was the group that you joined, right?

A    Well, in the chat -- in the -- in the messages there was a Wolverine Watchmen and then there was the bonfire chat as I remember it called.

Q    Okay.  Were you involved in both of those chats?

A    Yes.

Q    Okay.  Did you go through some questions on-line?

```
1    A    Yeah.

2    Q    Okay.  Did anyone ask you if you were okay with being

3    labeled a domestic terrorist?

4              MR. ROTH:  Object to the hearsay.

5              THE COURT:  Yeah.  I think that's sustained.

6    BY MS. KELLY:

7    Q    Were you asked questions about yourself before you were

8    allowed to join the group?

9    A    Yeah.

10   Q    Okay.  And the first event that you went to was in late

11   July, July 23rd, is that right, at Mr. Harris's house?

12   A    I don't remember the exact date.

13   Q    Okay.  Was the first one that was the one with the bonfire,

14   right?

15   A    Yeah.

16   Q    Okay.  And lots of discussion was happening, is that

17   correct?

18   A    Yeah.

19   Q    Okay.  And you felt comfortable enough to go to this

20   training in Fowlerville, right?

21   A    I wouldn't say I was comfortable after the bonfire, but I

22   guess I just wanted to see what training would be like.

23   Q    Okay.  Because the first one was just a bonfire, right?

24   A    Yeah.

25   Q    And then the second one was everyone brought their firearms
```

1    and you are actually shooting at targets, right?

2    A    Yes.

3    Q    Okay.  And there was a vehicle setup, right?

4    A    Yes.

5    Q    Okay.  You then left the group after a few weeks after --

6    in mid-August, correct?

7    A    Some time around there.

8    Q    Okay.  And we saw the statement that you made and you said,

9    I'm leaving.  I'm not as committed as you all, correct?

10   A    Yeah.

11   Q    And you are a good group of guys but I'm just not into

12   this, right?

13   A    Yeah.

14   Q    And you said something about if you need to see my forms of

15   ID I can show you that, right?

16   A    Yeah.

17   Q    You never showed any forms of ID, correct?

18   A    No.  I did not.

19   Q    You didn't go back to Daniel Harris's house to show him

20   your ID, correct?

21   A    No.

22        MS. KELLY:  Thank you.  I have nothing further.

23        THE COURT:  Mr. Hills?

24                    CROSS EXAMINATION

25     BY MR. HILLS:

1    Q    The first meeting you mentioned was the bonfire.  That's
2    where these code words were passed out?
3    A    No.  The code words were passed out at the training.
4    Q    At the training where you had where -- where there was a PT
5    Cruiser.  Does that ring a bell?
6    A    Yes.
7    Q    All right.  And at this training with the PT Cruiser you
8    were shooting around the PT Cruiser, is that right?
9    A    Yeah.
10   Q    Getting into the PT Cruiser and then shooting outside of
11   the PT Cruiser?
12   A    Yes, sir.
13   Q    Kind of fun training, correct?
14   A    Yeah.
15   Q    And that was what you were looking for, is that correct?
16   A    Yeah.
17   Q    Nothing illegal going on there, right?
18   A    Not that I was aware of.
19   Q    You said you didn't like Mr. Caserta's words; you didn't
20   like what he was saying?
21   A    Yes.
22   Q    You are not saying that he threatened you in any manner,
23   right?
24   A    No.  He did not threaten me.
25   Q    Okay.  You just didn't like the words that he was saying,

1   correct?

2   A    Yes.  They were all friendly to me.

3   Q    All right.  Yeah.  Very friendly to you.  All right.  And

4   then some time in August you indicated, I believe, that you

5   separated via chat, is that right?

6   A    Yes.

7   Q    And on that chat you said, feel free to contact me, is that

8   right?

9   A    Yeah.

10  Q    And -- well, any of them -- none of them reached out to you

11  after that, is that right?

12  A    No.  They did not.

13  Q    None of them came to your house, is that right?

14  A    No.

15  Q    Okay.  They left you alone?

16  A    Yeah.

17  Q    Okay.  So at the Fowlerville and at the bonfire they are

18  friendly to you, right?

19  A    Yes.

20  Q    And then when you decided to leave they left you alone?

21  A    Yes.

22          MR. HILLS:  All right.  Thanks.

23          THE COURT:  This time I'll get it right.

24  Mr. Blanchard?

25          MR. BLANCHARD:  Thank you.

```
 1                    CROSS EXAMINATION
 2      BY MR. BLANCHARD:
 3      Q    Good afternoon.
 4      A    Good afternoon.
 5      Q    You don't know Barry Croft, correct?
 6      A    No.  I do not.
 7      Q    Never met him?
 8      A    No.
 9      Q    Couldn't identify him in this room, correct?
10      A    No.
11      Q    Okay.  You don't know if he is in this room, fair?
12      A    Yeah.  And from the pictures I've seen on-line I don't see
13      him in here.  In the news anyways.
14      Q    Sure.  The first event you went to was a bonfire, right?
15      A    Yes.
16      Q    That wasn't like a code word for something; it was just a
17      bonfire, right?
18      A    Yeah.  We hung out at a bonfire.
19      Q    It wasn't called a schmore or something; it was just like
20      it was called a bonfire and you went to a bonfire, right?
21      A    Yeah.
22      Q    Okay.  The Fowlerville training that you talked about, is
23      that the one with the PT Cruiser?
24      A    Yes.
25      Q    Who was leading the training there?
```

1    A    I wouldn't say there was a clear leader.  It was kind of --

2    everyone was kind of helping each other out I guess is what it

3    was.

4    Q    Was there anyone providing, like, weapons instruction, how

5    to manipulate a weapon or how to move, that sort of thing?

6    A    They were all giving everyone tips.

7            MR. BLANCHARD:  Okay.  I pass the witness.

8            THE COURT:  Any redirect?

9            MR. ROTH:  Briefly, Your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. ROTH:

12   Q    Mr. Hills asked you if the things that Mr. Caserta said to

13   you at that second event were friendly and you said they were

14   friendly to you.  Do you remember that?

15   A    Yes.

16   Q    Were they friendly to everybody?

17   A    No.

18   Q    Tell me about that?

19   A    Well, I mean, they were not directed at me.  I would say it

20   was more of just anger towards the government.

21   Q    Were there any threats?

22   A    No threats that I can remember, but I mean, it has been a

23   long time.

24   Q    You used the word violent before, or violence?

25   A    Yeah.

1        THE COURT:  Well, that goes all the way back to, you

2    know, the original direct, and the witness was clear then he

3    didn't remember a lot of specifics, so I don't think you can go

4    too much further down this road.

5        MR. ROTH:  Well, I want to clarify just what you said

6    on direct was --

7        THE COURT:  He was pretty clear what he said on

8    direct.  It was pretty clear what he said on cross.  I am not

9    sure we are getting anything new here unless something jarred

10    his memory and he remembers something he didn't before.

11        MR. ROTH:  No, Your Honor.  Thank you.

12        THE COURT:  All right.  Any recross?

13        MR. GIBBONS:  No, Your Honor.  Thank you.

14        MS. KELLY:  No, Your Honor.

15        MR. HILLS:  No, Your Honor.

16        THE COURT:  So you can be excused.  Thank you.

17        (Witness excused, 1:06 p.m.)

18        (Excerpt ended, 1:06 p.m.)

19    ****************************************************************

```
 1                            INDEX

 2
        Government Witnesses:                    Page
 3
        BRIAN CLARK
 4
          Direct Examination by Mr. Roth          3
 5        Cross Examination by Mr. Gibbons       20
          Cross Examination by Mr. Blanchard     23
 6
        JOSHUA MILLER
 7
          Direct Examination by Mr. Roth         25
 8        Cross Examination by Mr. Gibbons       35
          Cross Examination by Ms. Kelly         37
 9        Cross Examination by Mr. Hills         39
          Cross Examination by Mr. Blanchard     42
10        Redirect Examination by Mr. Roth       43

11
        Exhibits:                             Admitted
12
        Government's Exhibit 367                   5
13        (Taurus Pistol)
        Government's Exhibit 368                   5
14        (Palmetto Rifle)
        Government's Exhibit 369                   5
15        (Hawaiian Shirt)
        Government's Exhibit 370                   5
16        (Photograph, Vac Shack Shelves)
        Government's Exhibit 371                   5
17        (Photograph, Gear)
        Government's Exhibit 372                   5
18        (Photograph, Plate Carrier)
        Government's Exhibit 373                   5
19        (Helmet)
        Government's Exhibit 374                   5
20
        Government's Exhibit 375                   5
21        (Currency, $600)
        Government's Exhibit 376                   5
22        (Photograph of Workbench)
        Government's Exhibit 377                   5
23        (Notes)
        Government's Exhibit 378                   5
24
        Government's Exhibit 379                   5
25        (Photograph, Backpack)
```

| | | |
|---|---|---|
| 1 | Government's Exhibit 380<br>  (Bucket with Backpack Contents) | 5 |
| 2 | Government's Exhibit 381 | 5 |
| 3 | Government's Exhibit 383<br>  (Photograph, Rifle .30-30) | 5 |
| 4 | Government's Exhibit 384<br>  (Photograph, Gear) | 5 |
| 5 | Government's Exhibit 385<br>  (Photograph, Backpack) | 5 |
| 6 | Government's Exhibit 386<br>  (Photograph, Gear) | 5 |
| 7 | Government's Exhibit 387<br>  (Photograph, Hawaiian Shirt) | 5 |
| 8 | Government's Exhibit 452<br>  (Business Cards) | 24 |
| 9 | Government's Exhibit 472<br>  (Message, Miller) | 34 |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

```
 1                        REPORTER'S CERTIFICATE

 2

 3          I, Paul G. Brandell, CSR-4552, Official Court Reporter

 4     for the United States District Court for the Western District

 5     of Michigan, appointed pursuant to the provisions of Title 28,

 6     United States Code, Section 753, do hereby certify that the

 7     foregoing is a full, true and correct transcript of an excerpt

 8     from the proceedings had in the within entitled and numbered

 9     cause on the date hereinbefore set forth; and I do further

10     certify that the foregoing transcript has been prepared by me

11     or under my direction.

12

13

14                           /s/ Paul G. Brandell

15                           Paul G. Brandell, CSR-4552, RPR, CRR

16                           U.S. District Court Reporter

17                           399 Federal Building

18                               Grand Rapids, Michigan  49503

19

20

21

22

23

24

25
```