1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4    UNITED STATES OF AMERICA,

5              Plaintiff,          No: 1:20cr183-1/2/5/6

6    vs.                           VOLUME XI

7    ADAM DEAN FOX,
     BARRY GORDON CROFT, JR.,
8    DANIEL JOSEPH HARRIS and
     BRANDON MICHAEL-RAY CASERTA,
9
               Defendants.
10

11

12   Before:

13                   THE HONORABLE ROBERT J. JONKER
                          U.S. DISTRICT Judge
                         Grand Rapids, Michigan
14                       Monday, March 28, 2022
                         Jury Trial Proceedings
15
     APPEARANCES:
16
                     MR. ANDREW BIRGE, U.S. ATTORNEY
17                   By:  MR. NILS R. KESSLER
                     MR. JONATHAN C. ROTH
18                   The Law Building
                     333 Ionia Avenue, NW
19                   Grand Rapids, MI 49501-0208
                     (616) 456-2404
20
                          On behalf of the Plaintiff;
21
                     MR. CHRISTOPHER M. GIBBONS
22                   MS. KAREN M. BOER
                     Dunn Gibbons PLC
23                   125 Ottawa Avenue, NW, Suite 230
                     Grand Rapids, MI 49503-2865
24                   (616) 336-0003

25                        On behalf of Defendant Fox.

```
 1                    JOSHUA ADAM BLANCHARD
                     Blanchard Law
 2                   309 South Lafayette Street, Suite 208
                     P.O. 938
 3                   Greenville, MI 48838-1991

 4                            On behalf of Defendant Croft, Jr.

 5                   JULIA ANNE KELLY
                     Willey & Chamberlain LLP
 6                   300 Ottawa Avenue NW Suite 810
                     Grand Rapids, MI 49503-2314
 7                   (616) 458-2212

 8                            On behalf of Defendant Harris.

 9                   MICHAEL DARRAGH HILLS
                     Hills at Law PC
10                   425 South Westnedge Avenue
                     Kalamazoo, MI 49007-5051
11                   (269) 373-5430

12                            On behalf of Defendant Caserta.

13
          REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
14

15

16

17

18

19

20

21

22

23

24

25
```

1          03/28/2022

2          (Proceedings, 8:22 a.m.)

3          LAW CLERK:  The United States District Court for the

4     Western District of Michigan is now in session.  The Honorable

5     Robert J. Jonker, chief judge, presiding.

6          THE COURT:  Good morning.  Welcome back everyone.

7     Hope it was a good weekend.  I wanted to start before we bring

8     in the jury because I have an item and maybe the lawyers do,

9     too.  We did get a call early this morning about 7:15 from

10    Juror No. 154, who is in seat 17.  She indicated she'd been

11    exposed to a family member who just tested positive for COVID

12    and she was herself experiencing a headache this morning, runny

13    nose, sore throat.  Didn't think she could safely come in.

14    Didn't feel up to it.  I wanted to give you all that

15    information.  My recommendation is that we excuse her and

16    proceed without her.  It cuts one of our alternates down, but

17    we still have three left, and I don't think waiting around is

18    really going to help us much, particularly because we'd have to

19    wait out a COVID testing regimen and all the rest.  So let me

20    see if the parties have any different view.  Otherwise, my

21    impression would be we should excuse her and proceed.

22          MR. KESSLER:  No objection, Your Honor.

23          MR. GIBBONS:  No objection.

24          MS. KELLY:  No objection.

25          MR. HILLS:  No objection, Judge.  My only suggestion

1     is when she was exposed if other jurors have been exposed.

2              THE COURT:  So far we have not.

3              Okay.  Is there anything else?  I notice there was a

4     motion from Mr. Gibbons on what I think will probably be the

5     government's next exhibit.  Do either of you want to be further

6     heard on that?

7              MR. ROTH:  Briefly, Your Honor.  So the underlying

8     data that is being referenced has been provided to Defense

9     counsel in two forms.  The first is the voluminous chats that

10    were, in fact, counted and made into the pie charts that are

11    referenced, and then second is the chart which is what is

12    actually summarized in the pie charts, and that's the data that

13    I provided to the Court and to each counsel this morning.

14    Counsel should have previously had it also during the process

15    of discovery but just because of the objection I provided new

16    copies.  This is something that the government provided

17    substantial notice on and briefed in our trial brief.  There

18    was no objection at the time.  There is not a lot to add.  It

19    is a voluminous amount of data, and while the content of the

20    chats itself is inadmissible, that is not what is being

21    summarized.  It is the use of the chats that is summarized

22    which is otherwise admissible.  We believe that the pie charts

23    provide some probative value to the jury and would be helpful

24    in making their decision.

25              If the Court has no other questions I think that it is

1   admissible as a primary summary under the relevant -- excuse

2   me, Rule of Evidence and case law.

3          THE COURT:  All right.

4          MR. ROTH:  Thank you.

5          THE COURT:  Mr. Gibbons, anything further?

6          MR. GIBBONS:  Thank you, Your Honor.

7          Just as we stated in the objection, the evidence, the

8   chats, are inadmissible.  This seems to me that the summary of

9   inadmissible evidence should likely not be put before the jury.

10  It's confusing, it's misleading, and it holds the Defendants

11  accountable to evidence that is not before them.

12         THE COURT:  All right.

13         MR. GIBBONS:  So I would finish with that.

14         THE COURT:  Any other counsel want to be heard?

15         MR. BLANCHARD:  I would just join in the objection.

16         MR. HILLS:  Likewise.

17         MS. KELLY:  Also join.  Thank you.

18         THE COURT:  All right.  Well, this is an objection to

19  Proposed Exhibit 422, which is a summary of toll records.  It's

20  really, I think, similar in evidentiary presentation value and

21  limits to what we routinely see in drug conspiracy cases where

22  as part of the government's proofs there is an effort simply to

23  count the number of times various devices, be they cell phones,

24  computers, whatever else, make contact with each other.  There

25  is no claim in the evidence that any of the content of the

underlying contacts is being admitted or proffered and nor is

there any attempt to quantify the materiality of what a given

individual said in a contact, for example.  A seven-page

manifesto of views would count as one contact as would somebody

saying no anchovies on my pizza if they were talking about

ordering pizza.

With that understanding I don't think there is any

basis for exclusion here.  The 1006 summary rule is in play

because there are many things you can glean from the underlying

records.  You certainly could glean content, but that's not

what this is offered for.  It's simply a raw numbers count for

whatever value it may or may not have.  I think Mr. Gibbons'

point is well taken that there is limited probative value.

It's not as though the fact that somebody shows up more than

another automatically means that person is a leader or feeding

particular content to the group because we are not going to

look at the content other than as separate exhibits admitted

along the way.  And we are certainly not going to look at all

the content, but that can be clear even in the foundational

presentation the government makes or if not clear enough there,

in cross from any of the Defendants.

The change that I see in this particular proffer from

the more traditional presentation is normally we see a

presentation that begins and ends with something more like what

Mr. Roth handed out today, a spreadsheet with names and

1    summaries of numbers and dates.  422 converts it into pie

2    charts, which are more visually expressive, but I think in some

3    respects that actually improves the data presentation.  It

4    certainly doesn't make it, in my view, misleading.  Both sides

5    are still able to make the arguments they need to make, which

6    from the government's perspective will be showing the relative

7    contacts, not the relative culpabilities, which I think

8    Mr. Gibbons' brief focuses on and the Defense will be able to

9    point that out that all this shows is people having contact and

10   we have no idea if they were disputing what goes on a pizza top

11   or whether they are talking about substantive issues.  So I'll

12   overrule the objection, deny the motion to exclude, and

13   assuming the government lays the proper foundation I'll be

14   prepared to admit 422.

15            Any other preliminary matters that we should take up?

16            MR. ROTH:  No, Your Honor.  Thank you.

17            THE COURT:  Counsel?

18            MR. GIBBONS:  No, Your Honor.  Thank you.

19            THE COURT:  All right.  So let's bring in the jury.

20            LAW CLERK:  All rise.

21            (Jury in, 8:31 a.m.)

22            THE COURT:  All right.  Welcome back everybody to

23   Monday morning the 11th day of trial.  We are here today with

24   all the jurors we left with on Friday except for one.  You can

25   see that seat 17 is empty this morning and that's because the

1    juror in that seat, No. 154, called in this morning reporting

2    that she was having symptoms that are consistent with lots of

3    potential problems, one of which could be COVID, and she had

4    been exposed to somebody in the family who just tested positive

5    for COVID, but more importantly, or maybe equally importantly,

6    she was not feeling up to coming today in any event, and so

7    after talking with the lawyers I am going to excuse her.  It

8    means we are down one alternate because that's what she was

9    sitting in was an alternate chair, but we are going to proceed

10   with the group we have, three remaining alternates, and hope

11   and pray that we can continue to be getting through the case

12   with the group we need at the end to decide it.  We have a full

13   complement of jurors plus the three alternates, and I think and

14   hope that we will be able to complete the case with that group,

15   but I wanted you all to understand why the juror in seat 17

16   won't be joining us any further.

17          Beyond that, hopefully you had a chance over the

18   weekend to decompress a little bit at least from the jury box.

19   Most lawyers don't decompress much when they are in trial.  It

20   doesn't really matter if it's a weekend day or not, but there

21   was plenty to do, plenty to watch between interesting academy

22   awards and interesting NCAA basketball on both sides of the

23   bracket, mens and womens.  Michigan women are still alive so

24   there is something for Michigan fans to root for.  Just so none

25   of the Michigan State people feel left out, I did wear a tie

1     this morning that is both green and blue so I am an equal

2     opportunity presenter this morning.

3              We're here at 8:30, just a couple minutes after, ready

4     to go, and I think it's in all of our interests to keep moving

5     as expeditiously as we can.  I know the parties want that.  I

6     know the jury wants that, and I certainly want that.  So we'll

7     turn it over to Mr. Roth to call the government's first witness

8     of the day.

9              MR. ROTH:  Thank you, Your Honor.  We call Brandie

10    Bowman.

11             THE COURT:  We'll have you sworn in, Ms. Bowman.

12             BRANDIE BOWMAN, GOVERNMENT

13             having been first duly sworn, testified as follows:

14             (Witness sworn, 8:34 a.m.)

15             THE COURT:  All right.  Then please step up and we'll

16    get you situated and turn it over to Mr. Roth for direct.

17                       DIRECT EXAMINATION

18      BY MR. ROTH:

19    Q    Good morning.

20    A    Good morning.

21    Q    Could I have you start by stating and spelling your

22    complete name, please?

23    A    My name is Brandie Bowman.  B-r-a-n-d-i-e, B-o-w-m-a-n.

24    Q    Thank you.  Where are you employed?

25    A    The FBI.

1     Q     In what capacity?

2     A     I am a tactical specialist.

3     Q     How long have you been with the FBI?

4     A     Thirteen years.

5     Q     What are your responsibilities in your position?

6     A     I provide research and analysis for different types of

7     records.

8     Q     Were you provided with a series of chat conversations from

9     this investigation?

10    A     Yes.  I was.

11    Q     Could you please describe what those were?

12    A     They were the chat sessions provided in a Word document

13    format.

14    Q     Were they from different applications?

15    A     Yes.  They were.

16    Q     What applications were those from?

17    A     Wire and Threema.

18    Q     Were the chat transcripts themselves quite voluminous?

19    A     Yes.  They were.

20    Q     Were you able to sort and summarize those chats into

21    charts?

22    A     Yes.  I was.

23    Q     Have you reviewed Proposed Exhibit 422?

24    A     Yes.

25    Q     Do those charts summarize the individual user's messaging

1    frequency in each chat group by month?

2    A    Yes.  It does.

3    Q    What counted as a message for your accounting?

4    A    I counted when the individuals made actual messages, not

5    when they were added or deleted from a group or when they were

6    mentioned by another user.

7    Q    Was there any differentiation made in your counting for

8    whether somebody said something long or short?

9    A    No.

10   Q    Whether somebody said something relevant to the

11   investigation or not?

12   A    No.

13          MR. ROTH:  All right.  With that, Your Honor, I'd move

14   for the admission of Proposed Exhibit 442?

15          THE COURT:  All right.  Ask her, if you would, just to

16   give us some understanding of what voluminous means to her.

17          MR. ROTH:  Certainly, Your Honor.

18   BY MR. ROTH:

19   Q    Could you estimate for the Court and for the jury how many

20   pages of records you were provided with?

21   A    I would say hundreds.

22   Q    And how long did it take you to go through and count all of

23   this data?

24   A    I'd say approximately three weeks.

25          MR. ROTH:  Very good.

1        THE COURT:  All right.  Objections?

2        MR. GIBBONS:  Other than what's been made on the

3   record, Your Honor, no.

4        THE COURT:  Very good.  So based on my ruling earlier,

5   I will admit 422 as a Rule 1006 summary.

6        MR. ROTH:  Thank you, Your Honor.

7   BY MR. ROTH:

8   Q    Could we take a look at Exhibit 422, please?  Page 2,

9   please.

10       So before we get into the data itself, let's talk

11  about what we are looking at.  What do we see on the right side

12  of each of these charts?

13       THE COURT:  Not much if you are asking me.

14       MR. ROTH:  Could we zoom in on that?  I apologize.

15       THE WITNESS:  Those are the names of the users that

16  participated during that month in that chat.

17  BY MR. ROTH:

18  Q    Thank you.  And those are their real names or their user

19  names?

20  A    Those would be their real names.

21  Q    Very good.  And we can clear that, please.

22       What do we have up at the top here?

23  A    That is the name of the chat group in the application and

24  the month for which it was counted.

25  Q    All right.  So for this one in particular, QRF is the name

1   of the group.  Wire is the name of the application, and then

2   May 2020 is the month we are discussing in this particular

3   slide?

4   A    That is correct.

5   Q    And finally the pie chart itself.  What is summarized here?

6   A    That is the percentage the users commented during that

7   month.

8   Q    So we talked about this before, but now that we are able to

9   look at the chart itself, tell the jury again what counted as a

10  message and what did not?

11  A    So what counted as a message is when the user made a

12  comment.  I did not count when another individual tagged them

13  or spoke about them in their message, and I did not count when

14  a user was added or deleted to a group.

15  Q    Thank you.  So with this background let's talk about the

16  specific data that you found here.  In May 2020, who was using

17  the Wire QRF chat?

18  A    It would be Paul Bellar, CHS Dan, Ty Garbin, Tyler, whose

19  last name we did not identify, and Alex Davidson.

20  Q    What percent of all of the Wire QRF messages that month

21  were by the CHS?

22  A    Twenty-seven percent.

23  Q    What percent were by Ty Garbin?

24  A    Twenty percent.

25  Q    And what percent were by Paul Bellar?

1    A    Thirty percent.

2    Q    Page 3, please.

3         Could we zoom in here, please?  In June 2020 were

4    there new users?

5    A    Yes.  There was.

6    Q    Notably, Kaleb Franks, Daniel Harris and Brandon Caserta?

7    A    That's correct.

8    Q    Did the CHS chat percentage drop as the new people joined?

9    A    Yes.  It did.

10   Q    Could we back out of that message and look at the chart

11   itself?  And what is the CHS's percentage that month?

12        THE COURT:  Again, it's hard to read if you don't blow

13   it up.

14        MR. ROTH:  Thank you.

15        THE WITNESS:  Eighteen percent.

16   BY MR. ROTH:

17   Q    Page 4, please.

18        Did the CHS's percentage continue to drop so now we

19   are looking at July 2020?

20   A    Yes.  It did.

21   Q    All right.  Is Paul Bellar out of the group now?

22   A    No.  He is not.

23   Q    All right.  But his percentage is down?

24   A    Yes.  To four percent.

25   Q    Who is the most active user in July 2020?

1    A    Daniel Harris.

2    Q    Followed by Kaleb Franks?

3    A    That is correct.

4    Q    What was Kaleb Franks' percentage?

5    A    Twenty-two percent.

6    Q    And what was Brandon Caserta's percentage that month?

7    A    Seven percent.

8    Q    Page five, please?

9         In July 2020, was a group called FAFO or fuck around

10   and find out, started on the Wire application?

11   A    Yes.  It was.

12   Q    Who was the dominant user in that group that month?

13   A    Adam Fox.

14   Q    Followed by Daniel Harris at 16 percent?

15   A    That is correct.

16   Q    Then Sean Fix, Ty Garbin and Kaleb Franks?

17   A    Yes.

18   Q    We have CHS.  Is that still CHS Dan?

19   A    Yes.  It is.

20   Q    And UCE, is that UCE Mark?

21   A    Yes.  It is.

22   Q    And they are two of the three least active users?

23   A    That is correct.

24   Q    Page 6, please.

25        We are looking at August 2020 now?

1    A    Yes.

2    Q    And did Fox remain the most dominant user in that group?

3    A    Yes.  He did.

4    Q    Page 7, please.

5         So this is August 2020 again, but what's different in

6    this one?  Can we back out of the zooms for a second?  So

7    what's different from this slide as the one we saw before?

8    A    Daniel Harris is the most common user.

9    Q    Did it also migrate applications?

10   A    This is the Bonfire chat.

11   Q    I apologize.  They opened a new group?

12   A    Yes.

13   Q    And had this been previously under a different name?

14   A    Yes.  It had.

15   Q    What was the previous name of this group?

16   A    I believe this is the QRF chat.

17   Q    So QRF became Bonfire and that's in August 2020?

18   A    Yes.

19   Q    And who is the dominant user here?

20   A    Daniel Harris.

21   Q    Page 8, please.

22        Before we zoom, did FAFO chat migrate from Wire to

23   Threema in August of 2020.

24   A    Yes.  It did.

25   Q    And who was the -- and who was the dominant user there?

1    A    Adam Fox.

2    Q    At what percent?

3    A    Fifty-five.

4    Q    All right.  Could we zoom on this area, please?  Thank you.

5         Could you tell us the other users' percentages,

6    please?

7    A    Ty Garbin 16 percent, CHS Dan 16 percent, Daniel Harris

8    seven percent, and Brandon Caserta, six percent.

9    Q    Thank you.  Page 9, please.

10        Was there also a chat started in Threema in August

11   2020 called Brick 2?

12   A    Yes.  There was.

13   Q    Was there a dominant user there?

14   A    Yes.  There was.

15   Q    Who was that?

16   A    Daniel Harris.

17   Q    Can we zoom out just a little bit so we can get that top

18   name?  What were the other users' percentages?

19   A    CHS Dan was 25 percent, Ty Garbin was 24 percent, and Kaleb

20   Franks was five percent.

21   Q    Thank you.  Page 10, please.

22        Did -- going to September 2020, did Fox remain the

23   dominant user in FAFO?

24   A    Yes.  He did.

25   Q    To the extent we can, can we try and get this area?  Thank

1    you.

2             Who was next?

3    A    That would be Brandon Caserta at 14 percent.

4    Q    What percent was Daniel Harris?

5    A    Eleven percent.

6    Q    And what about CHS Dan?

7    A    Two percent.

8    Q    Page 11, please.

9             What were the percentages in the Threema Brick 2 chat,

10   September 2020?

11   A    That would be Ty Garbin at 40 percent, Daniel Harris at 29

12   percent, CHS Dan at 24 percent, and Kaleb Franks at seven

13   percent.

14   Q    And the data for the following month, October 2020, was

15   very small because of the arrests early in the month?

16   A    That is correct.

17             MR. ROTH:  I have nothing further, Your Honor.  Thank

18   you.

19             THE COURT:  All right.  Mr. Gibbons?

20             MR. GIBBONS:  Thank you, Your Honor.

21                      CROSS EXAMINATION

22     BY MR. GIBBONS:

23   Q    Good modern, ma'am.

24   A    Good morning.

25   Q    I have in front of me a document that the U.S. Attorney

1     handed me this morning.

2              MR. GIBBONS:  May I approach, Your Honor?

3              THE COURT:  I guess but for what purpose?

4              MR. GIBBONS:  These, I think, purport to be the

5     numbers that support the pie chart.  So they would be the

6     numbers that the percentages are based upon.

7              THE COURT:  Oh, I see.  Well, maybe she knows without

8     that, but if you want to, do you have any objection to her

9     using the chart?

10             MR. ROTH:  I don't, but I also do want to clarify this

11    is data that counsel has had well in advance of this morning.

12             THE COURT:  I understand.  You can bring it up.

13             MR. GIBBONS:  Thank you.

14    BY MR. GIBBONS:

15    Q    Have you had a chance to look at what I have handed you?

16    A    Yes.

17    Q    Have you seen this before?

18    A    Yes.

19    Q    Did you prepare this?

20    A    I did.

21    Q    Okay.  Good.  And maybe you could tell me what this

22    document is?

23    A    So this document is what the pie charts is based on.  So

24    the document has the individual users for each chat by month

25    and then the counts per month, and then the total counts at the

1    end.

2    Q    Okay.  So let's just take, for example, if we look at FAFO

3    for August, right?

4              THE COURT:  Which FAFO?

5              MR. GIBBONS:  FAFO Wire.

6              THE COURT:  Okay.

7    BY MR. GIBBONS:

8    Q    Through August, correct?  It has counts there.  It's the

9    first box on your page at the top.  Do you know how many chats

10   are there for the total made for those two months, July and

11   August?

12   A    How many -- how many between all the users for both?

13   Q    Yes.  For both months the total number of text messages

14   made in FAFO chat for Wire for the months of July and August?

15   A    I would have to add them.

16   Q    Do you have a calculator?

17   A    I do not.

18   Q    Does somebody have a calculator?

19             THE COURT:  Let me ask this.  Does anybody have

20   objections to simply admitting the chart?

21             MR. ROTH:  No, Your Honor.

22             MR. GIBBONS:  No, Your Honor.  I was actually going to

23   propose it at some point.

24             THE COURT:  All right.  Good.

25             MS. KELLY:  No, Your Honor.

1          MR. GIBBONS:  As 2303.

2          THE COURT:  All right.  Any objections?

3          MR. ROTH:  No.

4          THE COURT:  We'll admit 2303.  Do you have it on the

5    system?  If not, you can use the projector or if the government

6    has it in the system we can use that.  Pull out the protector

7    on the side so that we can all see what you are looking at.

8    It's still not old school because this is a digital setup, but

9    we're getting closer.  It makes me feel at home.  You are going

10   to get that up there in a second hopefully.  You have to move

11   the camera to look down toward the thing you want to project.

12         MR. GIBBONS:  It should be there, Your Honor.  It's

13   showing on our little screen here.

14         THE COURT:  Is it?

15         MR. GIBBONS:  Yes.

16         THE COURT:  I am not sure why it's not showing on

17   here.  All right.  Well, it's not coming up.  Check the plug.

18   Just make sure the thing is plugged into the system.

19         MR. GIBBONS:  It appears to be, Your Honor.

20         THE COURT:  All right.  Let's do this.  Maja, can you

21   grab that, ask Yvonne to scan it in and e-mail it to me?

22         And see if you can do anything until we get that done.

23   Once I get it e-mailed I'll put it up on mine.

24         MR. GIBBONS:  Very good.  It's double sided.

25   BY MR. GIBBONS:

1    Q    In any event, the sheet that we're talking about that just

2    left the room, that is a sum -- that is the actual summary of

3    the data per person in each chat per month, correct?

4    A    Correct.

5    Q    Okay.  And so when you see a -- so when we see a percentage

6    reflected on the pie chart as we have this morning, that

7    percentage is based against the number of chats any individual

8    made, correct?

9    A    Correct.

10   Q    And then that's measured against the total number of chats

11   everyone made in the group for that time period, true?

12   A    Correct.

13   Q    I was interested in, Pam, 422 slide 8.

14        There was a Threema chat that started with regard to

15   FAFO, correct?

16   A    Yes.

17   Q    And we are looking at that now, true?

18   A    Yes.

19   Q    You would agree that the Threema FAFO chat was created at

20   the end of August, was it not?

21   A    I believe it was mid to late August.

22   Q    Wasn't it just about two days, August 29th, August 28th?

23   A    I don't know.

24   Q    Okay.  If you look at your sheet that you made, would you

25   agree that this pie chart represents a grand total of 43 chats

1    between everyone involved here?

2    A    That appears correct.

3    Q    Okay.

4              THE COURT:  I have it whenever you are ready.

5              MR. GIBBONS:  Perfect, Your Honor.

6              THE COURT:  You ready?

7              MR. GIBBONS:  Yes.

8              THE COURT:  I'll try to blow it up but I make no

9    representations on my ability to do that well.  It's got to be

10   a zoom here somewhere, right?  So I don't know if that gets you

11   what you need.  I probably went too far.

12             MR. GIBBONS:  Actually, Your Honor, that will work for

13   me right now for my purposes.

14             THE COURT:  All right.

15   BY MR. GIBBONS:

16   Q    Ma'am, this is the FAFO wire chat, correct?

17   A    Yes.

18   Q    And this is -- and then on the first line there, user name,

19   those are all of the users that are included in that FAFO Wire

20   chat?

21   A    Yes.

22   Q    And all of the numbers that you have advanced and the

23   percentages you have advanced are based upon these numbers

24   right here, correct?

25   A    Yeah.

1    Q    So Adam Fox is in the first line 5, 45 chats and 343 chats,

2    correct?

3    A    Correct.

4    Q    And then so forth down until you get to Barricade at the

5    bottom, correct?

6    A    Correct.

7              MR. GIBBONS:  All right.  Pam, can I have 141?

8              THE COURT:  What do you need?

9              MR. GIBBONS:  141, and I think Pam has that.

10             THE COURT:  All right.

11   BY MR. GIBBONS:

12   Q    This is the fuck around find out chat, right, on Wire?

13   A    Yes.

14   Q    And this is Tex, correct?

15   A    Yes.

16   Q    Do you know who Tex is?

17   A    I believe that is -- sorry, Sean Fix.

18   Q    All right.

19             MR. GIBBONS:  And Your Honor, if we can go back to

20   where we were on your screen?

21             THE COURT:  I now have it marked.  Actually, I can go

22   back to the other one if you want.

23             MR. GIBBONS:  There we go.  Perfect.

24   BY MR. GIBBONS:

25   Q    You would agree that text was in the fuck around find out

1   chat on Wire, correct?  You would agree that text was there

2   present on a screen shot for fuck around find out?

3   A   Yes.

4   Q   And that was in August?

5   A   I don't know.

6   Q   Okay.  In any event, that was the fuck around find out on

7   Wire, true?

8   A   It appears so.  Yes.

9   Q   Okay.  And would you agree that Sean Fix doesn't show up as

10  one of the users that you have on your chart, correct?

11  A   That appears correct.

12  Q   Okay.  So if he is missing the numbers are off, are they

13  not?

14  A   They would appear so.  Yes.

15  Q   So we just saw a chat that he made.  Actually, there was a

16  couple on that screen.  Those chats are not included in your

17  numbers, correct?

18  A   They are not.

19  Q   There were a number of private chats that CHS Dan had with

20  each individual Defendant or a number of the Defendants, are

21  you aware of that?

22  A   Yes.

23  Q   Okay.  And did you do any analysis with respect to, say,

24  the chat percentages and the numbers between Adam Fox and CHS

25  Dan over the months?

1    A    I was not requested to do that.

2    Q    Okay.  So you did not do that analysis, correct?

3    A    No.

4    Q    And again, so we're clear, the percentage of participation

5    is really just that, whether somebody is paying attention or

6    not paying attention to chats, as something we could glean from

7    this evidence, is that true?

8    A    I'm sorry.  Can you repeat that?

9    Q    We don't -- you don't know what people said in these chats,

10   correct?

11   A    I did not read all the chats.  No.

12           MR. GIBBONS:  Your Honor, if we can have the exhibit

13   again?

14           THE COURT:  All right.  It's going to be in a version

15   that's now marked, but it'll be the same content.

16   BY MR. GIBBONS:

17   Q    I added up the numbers there for the counts and you have it

18   in front of you.  I come up with 764 total chats for the FAFO

19   Wire in box one.  Does that seem to be a fair number?

20   A    I didn't count but it appears to be a fair number.

21   Q    I guess what I am saying is if you want I can get you a

22   calculator and you can add it up, but if you want to accept 764

23   I think that's fine, too.

24   A    That appears approximate.

25           MR. GIBBONS:  Your Honor, if we could scroll down just

1    a touch so we could see --

2    BY MR. GIBBONS:

3    Q    Okay.  Now, in this box, this is another group?  This is

4    the Wolverine Watchmen QRF Bonfire chat, correct?

5    A    Correct.

6    Q    Adam Fox is not a member of that group, is he?

7    A    No.

8    Q    And this is for the same time period but going back a

9    little earlier in the spring because the other one didn't

10   exist, correct?

11   A    Correct.

12   Q    But the total number of chats there, I added them up, was

13   3,097.  Does that look like it could be an accurate number?

14   A    It does.

15   Q    Okay.  And then in the FAFO Wire Adam Fox is in that one,

16   correct, at the top, the first box we talked about?

17   A    Yes.

18   Q    Okay.  And that was about 764 chats, true?

19   A    Yes.

20        MR. GIBBONS:  Thank you.

21        Your Honor, if you could scroll up to the Brick Squad?

22   I think it's on the second page.

23        THE COURT:  I think this is it.  Is that it?

24        MR. GIBBONS:  It is, Your Honor.  Thank you.

25   BY MR. GIBBONS:

1  Q    The Brick Squad, do you see that in the second box?

2  A    Yes.

3  Q    Threema?

4  A    Yes.

5  Q    Okay.  You have that there are four members in the Brick

6  Squad?

7  A    Yes.

8  Q    And so the totality of the chats that you analyzed and

9  incorporated into the chart then are reflected here with these

10  four members, correct?

11  A    Yes.

12  Q    And the percentages are based on this total number, true?

13  A    Yes.

14  Q    Can I get Government's 170?

15        The Boys and Brick Squad, are those the similar chats?

16  Didn't they just change the name?

17        MR. ROTH:  Your Honor, I am going to object.  Counsel

18  is misstating the evidence.  The prior summary was for Brick

19  Squad 2, which is different than Brick Squad.

20        THE COURT:  We'll find out if this witness knows one

21  way or the other.

22  BY MR. GIBBONS:

23  Q    There was The Boys, correct; you are aware of that chat?

24  A    I did not review that chat.

25        MR. GIBBONS:  Okay.  Your Honor, if we could go back

1      one screen to the other screen?

2              I am finished.

3              THE COURT:  You are finished?

4              MR. GIBBONS:  Yes.  I am finished.

5              THE COURT:  We'll go to Ms. Kelly.

6              MS. KELLY:  Thank you, Your Honor.

7                       CROSS EXAMINATION

8       BY MS. KELLY:

9      Q    Good morning, Special Agent.  A couple of questions in

10     following up with my colleague, Mr. Gibbons.  Looking at the

11     chat groups you were not asked to analyze any content of the

12     chats, correct?

13     A    Correct.

14     Q    Okay.  And in looking at -- if we could, Your Honor, look

15     at 2303, please?

16             THE COURT:  2303 is on yours.  I don't have that.

17             MS. KELLY:  Sorry.  What was just admitted?  I must

18     have the wrong number.  I apologize.

19             THE COURT:  You are probably right.  I am probably not

20     paying attention.  Okay.

21             MS. KELLY:  Thank you.

22     BY MS. KELLY:

23     Q    So in looking at the QRF/August Bonfire party chat, that's

24     that second box we have here, and Beaker Immature Boot is

25     listed first, correct?

1    A    Correct.

2    Q    Okay.  And the total count -- and that would be Daniel

3    Harris, correct?

4    A    Correct.

5    Q    Okay.  The total count -- the number says 831 for the total

6    amount of times that Mr. Harris was sending a message, is that

7    right?

8    A    Correct.

9    Q    Okay.  And in looking at the different months, it looks

10   like his most active month there is July, is that correct?

11   A    Correct.

12   Q    Okay.  And that's 556?

13   A    Yes.

14   Q    Okay.  And then in August it goes down to 260, correct?

15   A    Correct.

16   Q    Okay.  And then again if we could, Your Honor, if we could

17   scroll down to the last box of Brick Squad 2 chat under

18   Threema?

19        In looking at that one, again, we see Beaker is listed

20   in the top chat, correct?

21   A    Correct.

22   Q    With a total count of 76?

23   A    Correct.

24   Q    Okay.  And the most active month is August, correct, at 59?

25   A    Correct.

1   Q    All right.  And then in September drops to 17, correct?

2   A    Yes.

3   Q    All right.  And in that QRF/August Bonfire chat, is that

4   just for August or is that to show when it transfers from the

5   QRF to the bonfire chat?

6   A    That is correct.  To show when it transfers.

7   Q    Okay.  So it's combined both of those chats together, is

8   that right?

9   A    Correct.

10   Q    All right.  Gotcha.  In looking at the FAFO chat for Wire,

11   at the top there, looking at Beaker, with a total count of 74,

12   he is just behind CHS Dan, is that right?

13   A    Correct.

14   Q    Okay.  And there was some questions about when the FAFO

15   chat Threema started.  Does August the 31st sound correct in

16   the date that that was started?

17   A    I don't know the exact date.

18   Q    Okay.  And it looks like in that FAFO chat Threema, Beaker

19   or Daniel Harris is about the middle of the pack on that one,

20   is that right?

21   A    Correct.

22   Q    Okay.  For a total of 134?

23   A    Correct.

24   Q    Okay.  Did you do any sort of analysis between CHS Dan and

25   Daniel Harris with the amount of contact between the two of

1    them?

2    A    No.

3            MS. KELLY:  Okay.  Thank you.  I have nothing further.

4            THE COURT:  All right.  Mr. Hills?

5                    CROSS EXAMINATION

6     BY MR. HILLS:

7    Q    Good morning.

8    A    Good morning.

9    Q    If we can start with, I think let's -- nope.  Let me back

10   up.  If we can put 422-5 up?

11           THE COURT:  Do you have it from your side?  Okay.

12   BY MR. HILLS:

13   Q    Okay.  And this is a FAFO Wire chat July, correct?

14   A    Correct.

15   Q    And if we can highlight on the ride-hand side?

16           So in this FAFO chat Mr. Caserta is not there, is that

17   right?

18   A    Correct.

19   Q    Okay.  422 -- well, let me hang on.  422-6?  If you can

20   highlight the right side when you get there?

21           So this, again, is FAFO Wire?

22   A    Correct.

23   Q    And there is a difference between FAFO Wire and FAFO

24   Threema, correct?

25   A    Correct.

Q    All right.  Now, in this FAFO Wire chat August, we don't have Caserta, is that correct?

A    Correct.

Q    We've got -- I'll just run through them -- Fox, Fix, Morais, CHS -- that's CHS Dan, correct?

A    Correct.

Q    Harris, Garbin, Franks -- that's UCE Mark, is that right?

A    Correct.

Q    And Molitor, is that right?

A    Yes.

Q    Okay.  And there were a lot of chats that particular month. That was August I think, 2020, correct?  Do you have that chart in front of you?

A    Yes.

Q    Okay.  700 or so chats?

A    For just the month of August.

Q    Yup.  Without your calculator I understand.

A    I believe it was 700 for the total.  I would say about approximately 500 or so for August.

Q    Okay.  And if we go to 422-07?

        Okay.  This is Bonfire Wire, correct?

A    Correct.

Q    And Mr. Caserta is in there, is that right?

A    Correct.

Q    The one percent?

1    A    Correct.

2    Q    Mr. Fox is not in that one?

3    A    Correct.

4    Q    Okay.  And then we go to 422-08.  Now, we change to FAFO

5    Threema, correct?

6    A    Yes.

7    Q    And this is the one where CHS Dan is the administrator,

8    correct?

9    A    I don't know.

10   Q    Okay.  And I think you didn't -- if I understand correctly,

11   you are not sure when it was created.  Do you know if it was

12   created on August 31st?

13   A    I don't know.

14   Q    Okay.  But in any event, if you go to the numbers, very few

15   numbers from FAFO Threema in August, correct?

16   A    Correct.

17   Q    Okay.  Let's walk to the next one, 422-09.  Brick 2,

18   Threema.  Mr. Caserta is not on that one?

19   A    Correct.

20   Q    Okay.  I think the final one, FAFO Threema, my client is on

21   that one, again, with Mr. Fox and others, correct?

22   A    Correct.

23            MR. HILLS:  All right.  Thank you.

24            THE COURT:  All right.  Mr. Blanchard?

25                     CROSS EXAMINATION

```
1      BY MR. BLANCHARD:

2      Q    Good morning.

3      A    Good morning.

4      Q    So I suppose your purpose in creating this chart was to

5      show the interaction between the charged Defendants, is that

6      right?

7      A    Yes.  I was requested to show the different counts and the

8      interactions.  Yes.

9      Q    Okay.  To try and show that there weren't any, like,

10     passive participants, is that the idea?

11          THE COURT:  Well, I don't know that she knows one way

12     or the other.  That may be what Mr. Roth and Mr. Kessler will

13     argue.

14     BY MR. BLANCHARD:

15     Q    Can I have 422-1, please?

16          Now, you said that there were, did you say hundreds of

17     pages of chats?

18     A    Yes.

19     Q    How many hundreds?

20     A    I don't know.

21     Q    Well, you summarized them, right?

22     A    Yes.

23     Q    I mean, more than a hundred pages?

24     A    I would say roughly around a hundred.

25     Q    Okay.
```

1    A    I don't recall.

2    Q    So we are talking about a hundred pages of chats if we

3    wanted to look at all of them, correct?

4    A    Yes.

5    Q    Okay.  And we've got -- this is Exhibit 422?

6    A    Yes.

7    Q    Okay.  So we've got 422 pages in roughly, right?

8    A    Yes.

9    Q    Okay.  All right.  Can --

10            MR. ROTH:  Your Honor, I am going to object.  I don't

11   understand what that was.

12            THE COURT:  I don't either.  The identification number

13   is 422.  I don't know that there is any basis to suggest that

14   has anything to do with the number of pages.

15            MR. BLANCHARD:  So --

16            THE COURT:  If you want to address that you can.

17   BY MR. BLANCHARD:

18   Q    No.  I am good.  Thank you.  This page 2 here talks about

19   the QRF Wire chat in May of 2020, right?

20   A    Yes.

21   Q    What percentage of the messages in the QRF Wire chat in May

22   of 2020 were sent by Mr. Croft?

23   A    Zero.

24   Q    Okay.  Could I have page 3, please?

25            And this reflects the QRF Wire chat from June of 2020?

1   A    Yes.

2   Q    What percentage were sent by Mr. Croft?

3   A    Zero.

4   Q    And how about in July of 2020?

5   A    Zero.

6   Q    How about the FAFO Wire chat in July of 2020?

7   A    Zero.

8   Q    Zero percent?

9   A    Yup.

10  Q    Okay.  And then we have the FAFO wire chat in August of

11  2020.  What percentage were sent by Mr. Croft?

12  A    Zero.

13  Q    I see.  And what percentage of the messages did Mr. Croft

14  send in the Bonfire Wire chat in August of 2020?

15  A    Zero.

16  Q    How about the FAFO Threema chat in August of 2020; what

17  percentage did Mr. Croft send there?

18  A    Zero.

19  Q    And then the Brick 2 Threema chat in August of 2020, what

20  percentage did Mr. Croft send?

21  A    Zero.

22  Q    He wasn't involved in any of these chats?

23  A    Fair.

24       MR. BLANCHARD:  Pass the witness.

25       THE COURT:  Any redirect?

```
1              MR. ROTH:  None, Your Honor.  Thank you.

2              THE COURT:  All right.  Thank you.  You may be

3     excused.

4              (Witness excused, 9:13 a.m.)

5              THE COURT:  We'll go to the government's next witness.

6              MR. KESSLER:  Government calls Special Agent Timothy

7     Bates.

8              THE COURT:  All right.

9              TIMOTHY BATES, GOVERNMENT

10             having been first duly sworn, testified as follows:

11             (Witness sworn, 9:13 a.m.)

12             THE COURT:  All right.

13                    DIRECT EXAMINATION

14       BY MR. KESSLER:

15     Q    Good morning, Special Agent Bates.

16     A    Good morning.

17     Q    Now, you are a special agent with the FBI, correct?

18     A    Yes, sir.

19     Q    How long have you worked for the FBI?

20     A    Since 2009.

21     Q    Okay.  So about 13 years?

22     A    Yes, sir.

23     Q    What did you do before that?

24     A    Before that I was a strength and conditioning coach.

25     Q    And before that?
```

```
 1    A    I was with the military.

 2    Q    Which branch?

 3    A    The army.

 4    Q    And what did you do in the army?

 5    A    I was in the infantry.

 6    Q    I'd like to take you back to 2020.  Were you an undercover

 7    agent in this case?

 8    A    Yes.  I was.

 9    Q    What was your mission?

10    A    I was tasked with being an individual that had access to

11    explosives.

12    Q    Can you tell the jury why you were tasked with that?

13    A    Yes, sir.  I was tasked with that role because the

14    government felt that the individuals that were taking part in

15    the plot against the Governor were looking for explosives and

16    they needed someone to step in and basically control the

17    timeline is what it came down to.

18    Q    Now, by control the timeline, let's explore that for a

19    minute.  If you were the person inserted to be the purveyor of

20    explosives, how would that help?

21    A    It would allow us to be able to dictate when -- when

22    procurement might be able to take place so that the individuals

23    in question couldn't go out on their own and find explosives on

24    their own from someone else.

25    Q    Okay.  And if it really came to it would you give them real
```

1      explosives?

2      A    No, sir.

3      Q    Okay.  So in order to get introduced to this group, what do

4      you have to do?

5      A    I was introduced through an FBI confidential human source.

6      Q    Why was it done that way?

7      A    He had good access to the group, and therefore, his access

8      would allow me to come in and pose as a friend of his earning

9      trust amongst the group.

10     Q    Okay.  And who was the confidential human source, the

11     insider in this case?

12     A    Dan.

13     Q    And we've already heard from Dan.  Did you know him before

14     this investigation?

15     A    No, sir.

16     Q    When did you first meet Dan?

17     A    I met him it was probably July or August of 2020.

18     Q    And can you tell the jury why you met him before you were

19     inserted into the group?

20     A    It allowed us to establish a bit of a relationship so that

21     we could appear as though we had known each other.

22     Q    Okay.  Because he was introducing you as a friend?

23     A    Yes, sir.

24     Q    You mentioned a minute ago that you were introduced as

25     someone who had access to explosives.  Can you tell the jury

1   what your story was about how you had access to explosives?

2   A    My story was that I knew an individual in the mining

3   industry, so that individual would have access to high grade

4   explosives.

5   Q    All right.  Let's go back to Saturday, September 12th.  Did

6   you attend a field training exercise in Luther, Michigan?

7   A    Yes.  I did.

8   Q    And did you meet Dan before that?

9   A    I did.  Yes, sir.

10  Q    Where did you meet him that day?

11  A    We met at a Walmart parking lot in Cadillac, Michigan.

12  Q    Where did you go from there?

13  A    From there we went to the FTX site in Luther.

14  Q    Did you know there was another undercover FBI agent

15  inserted into the group already?

16  A    Yes.  I did.

17  Q    All right.  And was that Mark, UCE Mark?

18  A    Yes.  It was.

19  Q    Did you know him before this investigation?

20  A    Yes.  I did.

21  Q    Did you drive to Cadillac separately from Mark?

22  A    I did.

23  Q    All right.  Now, you mentioned that you went to this

24  Walmart and you met Dan there first.  Did you meet anybody else

25  at the Walmart?

1    A    Yes.  I met Dan.  I met Mark, and then I met Mr. Fox as

2    well.

3    Q    Adam Fox, who is sitting right here to my right?

4    A    Yes, sir.

5    Q    When you met Mr. Fox, how did you act towards Mark?  Did

6    you act like you knew each other already?

7    A    No.  We introduced each other as though we had never met.

8    Q    All right.  And when you actually got to Luther, to the

9    field training exercise site, did you meet some other people?

10   A    Yes.

11   Q    Who introduced you around?

12   A    Dan did most of the introduction.

13   Q    Did he introduce you to Ty Garbin?

14   A    Yes, sir.

15   Q    And what was he introduced to you as?

16   A    He was the landowner of the site.

17   Q    And you didn't know a lot of these people's real names at

18   the time, right?

19   A    Correct.  I didn't know any of them.

20   Q    Did you meet anybody who went by Beaker?

21   A    I did.

22   Q    Do you recognize him in the courtroom today?

23   A    Yes, sir.

24   Q    And what's he wearing and where is he?

25   A    Blue suit, second row, glasses.

1    Q    All right.  And what did you learn about Beaker?  What did

2    he tell you he was?

3    A    That he was a member of the militia and that he was a

4    former marine.

5    Q    And did you meet Barry Croft?

6    A    Yes.  I did.

7    Q    Do you recognize him in the courtroom?

8    A    Yes, sir.

9    Q    And where is he sitting and what's he wearing?

10   A    Second row, gray suit jacket.

11   Q    There's also Mr. Hills in a gray suit jacket.

12   A    I'm sorry.  To the left there.

13   Q    Okay.  With the beard?

14   A    Yes.

15   Q    Did he have any significant or distinctive clothing that

16   day?

17   A    At the -- at the FTX he was wearing, like, military

18   fatigues, like BDUs, battle dress uniform.

19   Q    Do you remember his hat at all?

20   A    He had a three-point hat on.

21   Q    Did you meet someone who went by Brandon?

22   A    I'm sorry?

23   Q    Did you meet someone who went by Brandon?

24   A    Yes.

25   Q    Do you recognize him in the courtroom today?

1    A    Yes.

2    Q    Where is he and what is he wearing?

3    A    Second row glasses, plaid shirt.

4    Q    Plaid shirt did you say?

5    A    Yes, sir.

6    Q    So you met all of them individually you mentioned.  Did you

7    guys have an all-hands meeting that day?

8    A    We did.

9    Q    And what was discussed there?

10   A    At the original all-hands meeting it was a meeting

11   regarding security of the group.  A few things were talked

12   about.  Mr. Croft talked about minting a silver dollar.  I

13   believe he was calling it the bit or a bit.  Procuring silver

14   for that.

15   Q    When you say security of the group, what do you mean?  What

16   were they talking about?

17   A    They were talking about informants and things like that and

18   being careful with what was said.

19   Q    And where was that meeting?

20   A    There at the FTX site.

21   Q    Anywhere in particular, like right where you parked or was

22   it somewhere further out?

23   A    No.  It would have been up the hill, and then they had

24   built a, like, a live fire shoot house, and it was off to sort

25   of the right of that where you were looking at the shoot house.

1    Q    All right.  Have you reviewed a video of the shoot house

2    training that you saw that day?

3    A    Say that again?

4    Q    Have you -- since then have you reviewed a video of the

5    shoot house training that was going on that day?

6    A    Yes.

7    Q    And it is an accurate representation of the training you

8    did?

9    A    Yes, sir.

10        MR. KESSLER:  I'd like to offer Government Exhibit

11   240, Your Honor?

12        THE COURT:  240.  Any objections?  It's admitted.

13        (Video started, 9:20 a.m.)

14        (Video stopped, 9:21 a.m.)

15   BY MR. KESSLER:

16   Q    Did you recognize that individual with the hooded

17   sweatshirt on?

18   A    Yes, sir.

19   Q    Who was that?

20   A    Brandon.

21   Q    And who was the first one who went through?  We can replay

22   it.

23   A    If you could replay it.  I believe it was Mr. Fox, but --

24        (Video started, 9:21 a.m.)

25   BY MR. KESSLER:

```
1    Q    That's fine.  Can you tell from this?

2    A    Yes.  Mr. Fox.

3    Q    All right.

4              (Video stopped, 9:21 a.m.)

5    BY MR. KESSLER:

6    Q    Did you meet with a smaller group of attendees at that

7    meeting privately after that?

8    A    Yes, sir.

9    Q    What was the purpose of that meeting?

10   A    That meeting was to discuss explosives specifically.

11   Q    And did you show them something?

12   A    Yes, sir.  I showed them videos.

13   Q    Can you tell the jury what the nature of the videos was?

14   A    There were several videos.  One in particular demonstrated

15   some explosives blowing up a SUV, like, a black Tahoe that they

16   viewed.

17   Q    All right.  Can you tell the jury where those videos came

18   from?

19   A    Those videos were supplied to me by an FBI bomb tech.

20   Q    All right.  So those were actually made by the FBI?

21   A    Yes, sir.

22   Q    Okay.  And where were they made?  I don't mean the exact

23   specific place.  What kind of place?

24   A    They were made on a range.

25   Q    Okay.  And if asked, what were you going to tell the
```

1    Defendants that range was?

2    A    That that was a range I had access to.

3    Q    Okay.  And have you reviewed -- I am going to show you two

4    videos, 224 and 225.  Have you reviewed those videos before you

5    came into Court today?

6    A    Yes, sir.

7    Q    Are those the same videos that you showed the Defendants on

8    September 12th?

9    A    Yes, sir.

10            MR. KESSLER:  I'd like to play 224 and 225, Your

11   Honor?

12            THE COURT:  Objections?

13            MR. BLANCHARD:  Are they coming in with or without

14   sound?

15            MR. KESSLER:  There is sound.

16            MR. BLANCHARD:  No objection.

17            THE COURT:  All right.  They are admitted.

18            (Video started, 9:23 a.m.)

19   BY MR. KESSLER:

20   Q    Now, you mentioned you were going to say that this is a

21   range you had access to.  This building that we see over here,

22   if asked, what were you going to say that was?

23   A    That that would have been part of a CQB or close quarters

24   battle shoot house that we had access to on the range as well.

25            MR. KESSLER:  Let's go ahead and play 225, please.

1             (Video stopped, 9:23 a.m.)

2             (Video started, 9:23 a.m.)

3             (Video stopped, 9:24 a.m.)

4    BY MR. KESSLER:

5    Q    All right.  So we hear somebody, you are going to have to

6    let your boys know in Michigan.  This video -- you weren't

7    going to say in here there was an FBI video, correct?

8    A    Correct.

9    Q    I want to ask you about their reactions.  First Mr. Fox.

10   What was his reaction when you showed him this video?

11   A    Mr. Fox was excited about what he saw in the video.

12   Q    Did he ask to see it again?

13   A    Yes, sir.

14   Q    How about Mr. Croft, what was his reaction?

15   A    He was also excited.

16   Q    Did they discuss it in your hearing while you were showing

17   them the video?

18   A    Yes.  They did.

19   Q    And have you had a chance to listen to a recording of those

20   discussions since this happened?

21   A    Yes.  I have.

22   Q    And seeing the transcripts?

23   A    Yes, sir.

24   Q    Are those accurate renditions of what their reactions were?

25   A    Yes, sir.

1        MR. KESSLER:  I'd like to play Government Exhibit 226,

2   Your Honor?

3        THE COURT:  All right.  Hearing no objections, 226 is

4   admitted.

5        (Audio started, 9:25 a.m.)

6        (Audio stopped, 9:29 a.m.)

7   BY MR. KESSLER:

8   Q    All right.  Agent Bates, I want to ask you a couple of

9   questions there.  We heard Mr. Fox earlier in the recording ask

10  you if that was C-4.  Can you tell the jury what C-4 is?

11  A    It's a high grade explosive.

12  Q    And he asked if that was detonated off a wire.  What in

13  your experience would that be?

14  A    Using det cord to detonate the C-4.

15  Q    And det cord is detonation cord?

16  A    Yes, sir.

17  Q    He asked about what the price tag is and says, for that

18  right there.  Can you tell the jury what he was referring to?

19  A    He was referring to the amount of explosive used to

20  detonate the bomb inside the SUV.

21  Q    So to get an explosion just like what we saw?

22  A    Yes, sir.

23  Q    Okay.  And he asked if you were going with him tonight on a

24  ride.  Did you go for a ride with him that night?

25  A    Yes, sir.

1    Q    Do you remember where you went?

2    A    Yes.  We went to Elk River to the governor's private

3    vacation home.

4    Q    All right.  Did you also listen to a recording of Mr. Croft

5    talking about explosives after showing him that video?

6    A    Yes.

7    Q    All right.  That's Exhibit 227.  And is that an accurate

8    audio and the transcript accurate as well?

9    A    Yes.  It is.

10        MR. KESSLER:  I'd like to play that, Your Honor.

11        THE COURT:  Hearing no objections it's admitted.

12        (Audio started, 9:31 a.m.)

13        (Audio stopped, 9:34 a.m.)

14   BY MR. KESSLER:

15   Q    Agent Bates, I want to cover one or two little things here.

16   We heard Mr. Croft talking about blowing up a propane tank and

17   you said that's an improvised claymore.  What's a claymore?

18   A    A claymore is a military explosive.

19   Q    And we also heard Mr. Croft talking about hosing down the

20   governor's house or someone's house with napalm.  What's

21   napalm?

22   A    Napalm is a military grade chemical used to burn things.

23   Q    So you mentioned a minute ago that you did go for a ride

24   with them that night up to the governor 's house.  So I want to

25   focus your attention on around 8:00 o'clock that night.  Do you

1    recall when you departed Luther?

2    A    We departed Luther probably around 8:30 that evening.

3    Q    And before you left, did Mr. Fox give you any instructions

4    on how to dress?

5    A    Yes, sir.  Just dress down.  We were dressed in military

6    uniforms and the like.  So he asked us to dress down so we

7    would be less conspicuous.

8    Q    You say dress down.  I don't think most people think of

9    military fatigues as being -- military fatigues as being

10   particularly formal.  What did he mean -- what did you

11   understand him to mean by dress down?

12   A    Jeans, T-shirts, things like that.

13   Q    And you said to be less obtrusive.  What do you mean by

14   that?

15   A    Just that we didn't stand out.  We were going to be going

16   into town and he didn't want any suspicion raised.

17   Q    Where did you go first from Luther?

18   A    First we stopped back in Cadillac at a Walmart where we met

19   up with a few other individuals.  After that we went to --

20   excuse me.  I think first we went to Big Rapids and then from

21   Big Rapids we went back to Cadillac.

22   Q    And from there where did you go?

23   A    Up to Elk River.

24   Q    Did Mr. Fox tell you where you were going?

25   A    He did.

1    Q    What did he say?

2    A    He said we were going to be going to look at the governor's

3    house.

4    Q    Did he tell you why?

5    A    To kidnap her.

6    Q    That night?

7    A    No, sir.

8    Q    Okay.  Did Mr. Croft make remarks along the way?

9    A    He did.

10   Q    And what did he tell you?

11   A    He believed that we potentially were going to be carrying

12   out the kidnapping that night.

13   Q    All right.  What did he do, if anything, that made you

14   think he believed that?

15   A    He made a statement regarding the fact that he needed to

16   take a nap.  If he was going to be doing that that night to

17   ensure he had energy to do it.

18   Q    And who had actually told him that you all weren't doing it

19   that night?

20   A    I did.

21   Q    So when you got to Elk Rapids, how long did that take to

22   get there?

23   A    About an hour.

24        MR. KESSLER:  Okay.  And Your Honor, I'd like to just

25   hand out some transcripts of something we are adding here.

1    They have had this for a long time but the transcripts I don't
2    think are in the books yet.
3            THE COURT:  Transcripts of a recording?
4            MR. KESSLER:  I am not sure if I have an extra copy
5    for Your Honor.  May I approach?
6            THE COURT:  Sure.
7    BY MR. KESSLER:
8    Q    So you mentioned it was about an hour long drive.  Was
9    there a recording device on during that drive?
10   A    Yes, sir.
11   Q    Have you had a chance to review the audio recording that
12   was made during the drive?
13   A    Yes.  I have.
14   Q    And are that and the transcript accurate representations of
15   the conversation you heard that night?
16   A    Yes, sir.
17           MR. KESSLER:  I'd like to play Government Exhibit 477,
18   Your Honor.
19           THE COURT:  Any objections?  Hearing none.  477 --
20           MR. GIBBONS:  Your Honor, I want to make a record.  I
21   do have an objection.  The transcripts that have been handed
22   today, in my materials I do not have this particular clip of
23   audio.  So I think it is disclosed as the witness is
24   testifying.  So I want to make a record and objection to
25   timeliness, Your Honor.  Thank you.

1          THE COURT:  All right.

2          MR. KESSLER:  And just for the record, Your Honor, the

3     audio recording was disclosed I think a year ago.

4          THE COURT:  All right.

5          MR. GIBBONS:  Well, if I may, Your Honor, respond?  I

6     have had over a thousand hours of audio disclosed.

7          THE COURT:  I'll admit it.  I've said before I am

8     grateful to both sides that we're not listening to every

9     possible minute of taped messaging that we could have, but I am

10    satisfied that everybody has had mutual access to the

11    information.  It's true that sometimes snippets from one side

12    or the other come in in the course of what's being presented at

13    trial, but I think that at this stage it's appropriate to

14    proceed and allow the parties to address it on cross exam.  So

15    you can go ahead and present it.

16         (Audio started, 9:38 a.m.)

17         (Audio stopped, 9:38 a.m.)

18    BY MR. KESSLER:

19    Q    There is no audio, and while she is cuing back up again,

20    just in case this wasn't abundantly clear, where it says UCE

21    Red, is that you?

22    A    Yes, sir.

23         (Audio started, 9:39 a.m.)

24         (Audio stopped, 9:39 a.m.)

25    BY MR. KESSLER:

Q    All right.  We heard Mr. Fox saying we are going -- we've
been here once.  Now we are going to get eyes on it at night.
Was it getting dark by this time?

A    Yes, sir.

Q    Did Mr. Fox say he wanted to stop somewhere along the way?

A    We had to stop in Elk River to -- there were three vehicles
involved, so we had to stop in Elk River, and I think the
thought was they needed to come up with their plan as to what
each vehicle was going to do.

Q    The vehicle you were in, who was with you?

A    Dan, Mr. Croft, Mr. Fox and Steve Robertson.

Q    Now, from Elk River up to the governor's house is still a
little ways from there, right?

A    Yes.

Q    Did your car stop somewhere between Elk River and the
governor's house?

A    It did.  We stopped at a bridge.

Q    And did Mr. Fox tell you what the purpose of that stop was?

A    We were to look at the bridge to survey it to see what type
of explosive might be appropriate to take the bridge out.

Q    Did Mr. Fox tell you why he wanted to take the bridge out?

A    Yes, sir.  He said he wanted to take the bridge out to slow
police response to the kidnapping.

Q    Did he explain his plan any further?

A    At that point we didn't discuss too much more of the plan.

1     That was saved for the boat launch I believe.

2     Q    All right.  So a boat launch is where you were going next,

3     is that right?

4     A    Yes, sir.

5     Q    In Elk Rapids where did you stage up?  You mentioned

6     everybody.  You were in three cars and you staged up to go to

7     the next step.  Where was that?

8     A    It was at a VFW.

9     Q    Okay.  So did your car leave first or did one of the other

10    cars leave first?

11    A    From the VFW the car I was in left first.

12    Q    Did you hear Mr. Fox saying what the other cars were

13    supposed to do?

14    A    They were supposed to hang back and then watch for police.

15    Q    Okay.  Now, let's talk about what happened when you

16    actually got to that bridge.  Do you recall that?

17    A    Yes, sir.

18    Q    Okay.  What happened when you got there?

19    A    As we approached the bridge Mr. Fox and I got out.  We

20    walked down a sidewalk which led directly underneath the

21    bridge.  We looked at the underside of the bridge.  Some photos

22    were taken and then we returned back to the video.

23    Q    I want to show you a couple pictures and show them to the

24    jury so I am straight what happened here.  Have you looked at a

25    chamber of commerce photo of the bridge just we can see what it

1    looks like in the daytime?

2    A    Yes.

3         MR. KESSLER:  I'd like to put up Exhibit 232, Your

4    Honor?

5         THE COURT:  All right.  Any objections.

6         MR. BLANCHARD:  Is that in already?

7         THE COURT:  I didn't hear any objections.  Go ahead.

8    BY MR. KESSLER:

9    Q    And what are we looking at here, Agent?

10   A    That is the bridge that we -- that we walked underneath.

11   Q    And can you tell the jury which side of it you stopped on?

12   A    So to the right of the photo, on the right side of the

13   photo you see another road that heads away from the bridge back

14   towards the lake there.  We stopped just about at the corner of

15   that road and I believe this is 31 if I am not mistaken.  We

16   stopped there.  Like I said, Mr. Fox and I exited the vehicle.

17   We walked down what is the opposite side of the bridge that you

18   are looking at here.  You can see the walkway that goes

19   underneath the bridge, and then there is a concrete embankment

20   that goes up underneath there, which is to your right as you

21   are looking at this.  We walked up onto that embankment

22   underneath the bridge.

23   Q    Now, we've already heard some testimony from an FBI

24   technician who created three dimensional scans.  Have you seen

25   a three dimensional scan of this bridge since you've been

there?

A    Yes.

Q    Was that an accurate rendition as we fly around it sort of what we were looking at?

A    Yep.  It is.

        MR. KESSLER:  I'd like to play Government Exhibit 231, Your Honor?

        THE COURT:  All right.  It's already in.

        (Video started, 9:44 a.m.)

BY MR. KESSLER:

Q    Is this the walkway you were referring to here?

A    Yes, sir.

Q    And is this underneath here the embankment you were talking about?

A    Yes.  It is.

Q    Who walked along that walkway to the embankment?

A    Myself and Mr. Fox.

        (Video stopped, 9:44 a.m.)

BY MR. KESSLER:

Q    And you went under here with Mr. Fox?

A    Yes, sir.

Q    Did you take a picture with Mr. Fox?

A    Yes, sir.

Q    And is that an accurate rendition of what you saw that night?

1    A    Yes.  It is.

2              MR. KESSLER:  I'd like to put up Government Exhibit

3    230.

4              THE COURT:  All right.  Hearing no objections, it's

5    admitted.

6    BY MR. KESSLER:

7    Q    So again you took this picture?

8    A    Yes.  I did.

9    Q    And this is the same embankment underneath that we just saw

10   in the three dimensional video?

11   A    Yes, sir.

12   Q    And who is this?

13   A    That's Mr. Fox.

14   Q    What did he say when you came back?

15   A    He made comments about it looking good or looking like

16   there would be appropriate places to place explosives.  Things

17   along those lines.

18   Q    And did Mr. Fox tell you that he took a picture under the

19   bridge as well?

20   A    I don't recall him saying he took a photo.  No, sir.

21   Q    Did you see it later though?

22   A    I did.

23   Q    And was that an accurate rendition also of what you saw

24   that night?

25   A    Yes.

```
1              MR. KESSLER:  I'd like to put up Government's Exhibit
2     233?
3              THE COURT:  I show it as already in.
4              MR. KESSLER:  Okay.  I'll put that up then, 233,
5     please.  Thank you, Your Honor.
6     BY MR. KESSLER:
7     Q    All right.  And that looks like a close-up of the same
8     thing, correct?
9     A    Yes.  It does.
10    Q    Did Mr. Croft go under the bridge?
11    A    No, sir.
12    Q    Was this discussion about going under the bridge to plant
13    explosives in front of Mr. Croft?
14    A    Yes.  It was.
15    Q    Did you hear Mr. Croft talk about blowing anything else up
16    during the ride?
17    A    Yes, sir.
18    Q    What was that?
19    A    Mainly telephone poles or the power line poles along the
20    side of the road or the large trees that were also on the side
21    of the road.
22    Q    Did he say what the purpose would be of blowing up trees
23    and power lines or power poles along the road?
24    A    Yes.  He did, sir.  He commented that it would again slow
25    down law enforcement response.
```

Q    Now, did you tell Mr. Fox that there was another bridge you
could drive across if this one was blown up?

A    I did.

Q    What did he say?

A    That that would need to be destroyed as well.

Q    You mentioned that you were going to the boat launch.  That
was your destination, correct?

A    Yes, sir.

Q    When you got there what did you do?

A    We got to the boat launch.  Our vehicle, along with one
additional vehicle, made its way to that site.  When we got out
there -- a night vision device had been supplied to Mr. Fox and
the group.  We were to identify where from that location the
location of the governor's house.

Q    Do you know where that night vision device came from?

A    I believe his name was Barry from Wisconsin.  That's -- he
was there that night and handed the night vision device to us.

Q    All right.  But it wasn't an FBI provided device?

A    No.  It wasn't.

Q    What were you using it to look for?

A    The -- one of the other cars had been instructed to flash
their high beams as it approached and then eventually drove
past the governor's house.  The flash of the high beams was, of
course, to designate where the house was, and using the night
vision to identify that flash of the high beam so that we could

1    determine the angle of approach to the governor's house from

2    the boat lunch.

3    Q    So your group with Mr. Fox and Mr. Croft had the night

4    vision device, correct?

5    A    That's correct.

6    Q    Did you hear Mr. Fox talking on the phone?

7    A    Yes.

8    Q    And could you tell who he was talking to?

9    A    He was talking to one of the other vehicles.

10   Q    On the other side of the lake?

11   A    Yes, sir.

12   Q    What did he say to them?

13   A    To flash the lights.  Those were the instructions that he

14   was giving them was to flash the lights when they had

15   approached the house that they believed to be the governor.

16   Q    And did you hear him say anything else after the flash

17   happened?

18   A    That he was telling them that we had it identified and that

19   to not drive by anymore.

20   Q    Did Mr. Croft take a turn with that night vision device?

21   A    Yes, sir.

22   Q    Did you hear him talking about seeing a landmark?

23   A    Yes.

24   Q    And have you had a chance to hear a recording of that

25   conversation since that night?

1    A    Yes, sir.

2    Q    Is that an accurate rendition of what you heard and is the

3    transcript also accurate?

4    A    Yes.  It is.

5         MR. KESSLER:  I'd like to play Government's Exhibit

6    248, Your Honor.

7         THE COURT:  Okay.  I show it as in.

8         MR. KESSLER:  I'm sorry.  Let's go ahead and play that

9    then.

10        (Audio started, 9:48 a.m.)

11        (Audio stopped, 9:49 a.m.)

12   BY MR. KESSLER:

13   Q    Where did you all go from there?

14   A    Following the boat launch we went back across 31 to look

15   for another site that had access to Lake Michigan.

16   Q    And what did Mr. Fox say, if anything, about the purpose of

17   going to look at Lake Michigan?

18   A    Following the abduction of the governor on, I believe

19   that's Birch Lake there, the group would then take the governor

20   by vehicle back across to Lake Michigan where another boat

21   would be waiting to put her on the boat and take her out to the

22   middle of the lake.

23   Q    And just to put this into context, I'd like to bring up

24   Exhibit 238 that is already admitted.  I am going to show you a

25   map.  All right.  And let's take a look at the next page.

1    Let's make sure I get the right one.  Here we go.  So is this

2    about an accurate representation of where the boat launch was

3    that you were at?

4    A    Yes, sir.

5    Q    And you can actually touch the screen there.  Can you show

6    us where you went next?

7    A    Yes, sir.  We went right in here.  So this was then

8    identified as sort of beach access to Lake Michigan.  We ended

9    up driving down this road a little bit but then turned back

10   around after identifying where that pin is dropped there as

11   being the most appropriate spot.

12   Q    Now, we see it's a pretty short hop across this piece of

13   land right here from Birch Lake to Lake Michigan.  Did you hear

14   Mr. Croft talking about that hop?

15   A    Yes, sir.

16   Q    Have you listened to the recording?

17   A    Yes, sir.

18         MR. KESSLER:  Let me check with Your Honor and make

19   sure I didn't already put it in, Exhibit 245.

20         THE COURT:  I do not show that as in.

21   BY MR. KESSLER:

22   Q    Okay.  So is that recording an accurate rendition of what

23   you heard that night?

24   A    Yes, sir.

25   Q    And the transcript is accurate?

1    A    Yes, sir.

2              MR. KESSLER:  I'd like to play Government's Exhibit

3    245, Your Honor?

4              THE COURT:  Hearing no objection it's admitted.

5              (Audio started, 9:51 a.m.)

6              (Audio stopped, 9:51 a.m.)

7    BY MR. KESSLER:

8    Q    After you left that area what did you do?

9    A    We went back to the Luther site.

10   Q    Did you guys all gather up to discuss what you had seen?

11   A    Not that night.  No, sir.

12   Q    When was that?

13   A    That occurred the next day.

14   Q    And did Mr. Fox talk about the explosives that had been

15   offered?

16   A    Yes, sir.

17   Q    And have you listened to a recording of that?

18   A    Yes.  I have.

19   Q    Was that recording accurate and the transcript accurate as

20   well?

21   A    Yes, sir.

22              MR. KESSLER:  I'd like to play Government's Exhibit

23   252, Your Honor?

24              THE COURT:  All right.  Any objections?  Hearing none

25   it's admitted.

1        (Audio started, 9:52 a.m.)

2        (Audio stopped, 9:52 a.m.)

3    BY MR. KESSLER:

4    Q    Now, we hear Mr. Fox and Mr. Croft talking when Mr. Fox

5    says, the ticket is going to be four grand.  Do you remember

6    who else was there with you?

7    A    Yes, sir.

8    Q    Who else was there?

9    A    Brandon was there.  Mr. Harris was there.  Dan was there.

10   Mr. Garbin was there.  Mr. Franks was there.

11   Q    All right.  When Mr. Fox said the ticket is going to be

12   four grand?

13   A    Yes, sir.

14   Q    So did you guys -- we are at the next day now, September

15   13th.  Did you do some training at that live shoot house?

16   A    We did.

17   Q    Did you participate in that?

18   A    Yes, sir.

19   Q    And was there another meeting?

20   A    There was.  Following the training at the shoot house there

21   was another meeting.

22   Q    Do you remember who attended that meeting?

23   A    The individuals that I just stated were at that meeting.

24   Q    All those same people?

25   A    Yup.

```
1    Q    Did Mr. Fox ask everyone if they were committed?

2    A    He did.

3    Q    Did anyone leave?

4    A    No, sir.

5         MR. KESSLER:  I'd like to play Government's Exhibit

6    264 again, Your Honor?

7              THE COURT:  All right.

8              (Audio started, 9:54 a.m.)

9              (Audio stopped, 9:54 a.m.)

10   BY MR. KESSLER:

11   Q    So we heard Mr. Fox talking about how telling that group

12   that the price tag would be $4,000, and how everyone would have

13   to pitch in.  Did you tell him there was a specific deadline by

14   which they needed to give you the money or anything?

15   A    No, sir.

16   Q    We heard him talking about doing a recon.  Did Mr. Fox

17   explain to you why he would need -- the group would need to do

18   additional reconnaissance trips?

19   A    Yes, sir.  He talked about just being able to fit in with

20   the area, and again, intel or intelligence as to what was going

21   on in the area, things along those lines.

22   Q    All right.  And did Mr. Fox actually place an order with

23   you for explosives that night?

24   A    Yes, sir.

25   Q    Have you listened to a recording of him doing that?
```

1    A     Yes.

2    Q     And is that accurate and the transcript is accurate?

3    A     Yes.  It is.

4          MR. KESSLER:  I'd like to play Government's Exhibit

5    258, Your Honor?

6          THE COURT:  All right.  Hearing no objections it's

7    admitted.

8               (Audio started, 9:55 a.m.)

9               (Audio stopped, 9:57 a.m.)

10   BY MR. KESSLER:

11   Q     So we heard Mr. Fox saying we need this stuff and he asks

12   if you'll take an IOU.  What did you understand that to mean?

13   A     I understood that to be that the $4,000 potentially could

14   not be raised in time and that asked if basically they could

15   have it on credit.

16   Q     And he also asked we heard him here about getting flash

17   bangs.  Can you tell the jury what flash bangs are?

18   A     A flash bang is sometimes otherwise referred to as a

19   concussion grenade.  It's a loud noise and a loud flash of

20   light that is used by military and law enforcement.

21   Q     What are they used for?

22   A     Diversionary devices.

23   Q     And he said he wanted 20 of those, is that right?

24   A     Yes, sir.

25   Q     And when did you agree to meet next to deliver the

1     explosives?

2     A     In late October.

3     Q     And where was that?

4     A     At a location in Wisconsin.

5             MR. KESSLER:  I have nothing further, Your Honor.

6             THE COURT:  All right.  Well, we're almost at our

7     normal break time for the morning, and rather than just get

8     started with a few minutes of cross, we will take our morning

9     break now and then come back with a second segment in about 20

10    minutes.  Thank you.

11            LAW CLERK:  All rise.

12            (Jury out, 9:58 a.m.)

13            THE COURT:  All right.  We'll see you in 20 minutes.

14            LAW CLERK:  Court is in recess.

15            (Recess taken, 9:58 a.m.)

16            (Resume Proceeding, 10:24 a.m.)

17            LAW CLERK:  All rise, please.

18            (Jury in, 10:24 a.m.)

19            LAW CLERK:  Court is in session.

20            THE COURT:  Welcome back everyone.  We'll get our

21    witness back on the stand and we'll begin with the Defense

22    cross examination starting with Mr. Gibbons.

23            MR. GIBBONS:  Thank you, Your Honor.

24                        CROSS EXAMINATION

25     BY MR. GIBBONS:

Q    Good morning.  And I am just going to refer to you as Tim, is that okay?

A    Sure.

Q    All right.  Tim, you work for the FBI, correct?

A    Yes.

Q    And part of that job sometimes entails growing a beard, true?

A    True.

Q    And putting on plaid and quasi military outfits and moving to Michigan, right?

A    Yes.

Q    And in the fall of 2020 you had such a task, true?

A    Yes.

Q    And when you arrived in Michigan you went to Luther, correct?

A    I'm sorry.  Say that again.

Q    In the fall, September 12th, you ended up in Luther?

A    Yes.

Q    That was a destination point for you, correct?

A    That's correct.

Q    You don't look anything like you look today, true?

A    True.

Q    Very good.  Your role in -- at Luther was to be CHS Dan's army buddy, is that correct?

A    That's correct.

1    Q    Okay.  And it was made known that you had had some

2    experience in the military, correct?

3    A    Yes.

4    Q    To the group?

5    A    Yes, sir.

6    Q    Okay.  Did you claim prior military service overseas

7    participating in the conflicts?

8    A    Yes, sir.

9    Q    All right.  And you arrived, I think you testified, on

10   Saturday?

11   A    Yes, sir.

12   Q    You weren't there on Friday?

13   A    Correct.

14   Q    Saturday you arrived there about noon, is that about right?

15   A    We arrived in Luther after that time.  I arrived in

16   Cadillac around noon.

17   Q    Okay.  So it was mid-afternoon by the time you get to camp?

18   A    Early afternoon, something.  Yes.

19   Q    You participated in the drills that afternoon?

20   A    Yes, sir.

21   Q    You participated in, what was it, an all-hands meeting I

22   think you called it?

23   A    Yes, sir.

24   Q    Okay.  You were introduced to the members of the Wolverine

25   Watchmen, correct, that were associated with Dan?

1    A    Yes, sir.

2    Q    So Adam Fox, he is not a Watchmen, but you were introduced

3    to him, right?

4    A    Yes, sir.

5    Q    And then a couple of the gentlemen here in the second row,

6    true?

7    A    Yes, sir.

8    Q    And then Barry Croft?

9    A    Yes, sir.

10   Q    All right.  And others, correct?

11   A    Correct.

12   Q    Fast forward kind of now into the evening hours.  You are

13   preparing to go for a ride, correct?

14   A    Yes.

15   Q    You are with Dan because he is your hook up, right?

16   A    Amongst others, but yes, sir.

17   Q    He is your friend so you are kind of palling around with

18   Dan within the context of the group, right?

19   A    Yes, sir.

20   Q    All right.  It is true that a number of individuals had

21   left previously to you getting ready to go, is that true?

22   A    Yes.

23   Q    Like CHS Steve and CHS Jenny, you are aware that Jenny was

24   there was a CHS?

25   A    Yes, sir.

Q    And Mark, the UCE, I think you testified you were aware he
was there, right?

A    Yes, sir.

Q    And Adam Fox was there, right?

A    Correct.

Q    He doesn't work for the government, true?

A    True.

Q    Okay.  All of these individuals had vacated the property
prior to you leaving with Dan, right?

A    Yes, sir.

Q    Okay.  I want to turn your attention to a point in time
when you were getting ready to leave.  You rode with Dan, is
that correct?

A    Yes, sir.

Q    Okay.  And there was a point in time when you and Dan were
alone in the truck.  Do you recall what I'm talking about?
About 8:00 in the evening?

A    I don't remember that, but that's very possible.

Q    Okay.  Do you recall having had a conversation with Dan
wherein you would have asked him, are these folks aware of
where we're going?  Meaning the participants that were going to
go on the ride.  Do you recall having that conversation?

A    I don't recall that.  No.

Q    I have transcript.  Do you mind if I refresh?

          MR. GIBBONS:  May I approach, Your Honor?

1          THE COURT:  Sure.  Is this for refreshing or for some

2     other reason?

3          MR. GIBBONS:  This is for refreshing.

4          THE COURT:  Thank you.

5     BY MR. GIBBONS:

6     Q    Have you had a chance to look at that?  It's two sided,

7     too.  There is a little continuation that might help jog your

8     memory.

9     A    Yes, sir.

10    Q    Okay.  Do you recall this conversation in the truck now?

11    A    Yes, sir.

12    Q    Okay.  Would you agree that you did ask --

13          MR. KESSLER:  We are --

14          THE COURT:  Hold on.  Don't talk over each other,

15    No. 1, and if the question is what he said it's not hearsay

16    based on the other ruling because it's an agent statement.  Go

17    ahead.

18    BY MR. GIBBONS:

19    Q    Did you say words to the effect, so are these -- when we

20    leave are these folks aware of what is going?

21    A    I don't know as if I said those exact words, but -- as it

22    reflects in the transcript here, but yes, I said something to

23    that effect.

24    Q    Would you agree, at that point in time looking back, that

25    there was a question in your mind whether people knew exactly

1    why they were going on the ride?

2              MR. KESSLER:  Speculation, and it's based on hearsay.

3              THE COURT:  He can ask this witness what, if anything,

4    was in his own mind about it.

5              THE WITNESS:  Can you repeat the question?

6    BY MR. GIBBONS:

7    Q   Yes.  As indicated here, was there a question in your mind

8    as to whether the folks who were going on the ride knew why

9    they were going on the ride?

10   A   I don't think I had -- I don't think I had an idea one way

11   or the other.  I think it's important to recognize that I was

12   kind of brought in towards the tail end of this, and I didn't

13   really know who the players were or what their level of

14   involvement was at the time.

15   Q   Okay.  You would agree that you again asked, they are,

16   question mark, correct?

17   A   Yes, sir.

18   Q   That would be in reference to the participants, true?

19   A   Yes.  That would be in reference --

20   Q   That would be like Mr. Franks, Mr. -- who else went?

21   Mr. Garbin went, correct, Mr. Croft?  So it would be in

22   reference to those individuals, true?

23   A   Yes, sir.

24   Q   All right.  When you -- you then traveled to Big Rapids,

25   correct?

1    A    Yes, sir.

2    Q    Okay.  And you went to a Super 8 motel to catch up with the

3    people who had left early or at least some of them, correct?

4    A    That is correct.

5    Q    And the people that were in Big Rapids at the Super 8 were

6    CHS Robeson, Steve, right?

7    A    Yes.

8    Q    Jenny Plunk?

9    A    Yes.

10   Q    And then another individual associated with Mr. Robeson,

11   Mr. Higgins, Brian; do you remember that guy?

12   A    I don't remember a Brian, but I don't recall that.

13   Q    Mr. Croft was down in at the Super 8 motel, correct?

14   A    For a period of time he was also getting food for a period

15   of time as well.

16   Q    So he was kind of gone and then he came back?

17   A    Correct.

18   Q    And then when everyone is altogether the caravan leaves for

19   Cadillac, correct?

20   A    Yes.

21   Q    North.  Two trucks, correct?

22   A    From there two trucks.  Yes, sir.

23   Q    Okay.  You are in the truck, one of the trucks, with CHS

24   Dan, correct?

25   A    Yes, sir.

1    Q    What seat did you sit in?

2    A    The passenger seat.  Front passenger seat.

3    Q    Okay.  So in the front seat it's CHS Dan and you, correct?

4    A    Yes.

5    Q    And then in the back seat CHS Steve?

6    A    Yes.

7    Q    And then also Mr. Croft, correct?

8    A    Along with Mr. Fox.  Yes.

9    Q    Mr. Fox was in the truck with you from Big Rapids to

10   Cadillac?

11   A    Oh, not to Cadillac.  No.  Correct.  That was Mr. Croft.

12   Yeah.  We picked up Mr. Fox in Cadillac.

13   Q    Okay.  At some point during all of this moving and

14   reconnoitering and rallying, for lack of a better word,

15   everyone meets up in -- at the Walmart, true?

16   A    Yes.

17   Q    And at that point in time you provided two-way radios for

18   the group, did you not?

19   A    Yes, sir.

20   Q    Okay.  And you explained to them how to use them, did you

21   not?

22   A    Yes, sir.

23   Q    And you assigned channels to use, is that right?

24   A    I don't recall assigning channels but it's possible.

25   Q    Do you recall coming up with a backup plan for channels?

```
1     A     No, sir.
2               MR. GIBBONS:  Okay.  May I approach, Your Honor?
3               THE COURT:  All right.  Another refresher?
4               MR. GIBBONS:  Another refresher.
5               THE WITNESS:  Thank you.
6     BY MR. GIBBONS:
7     Q     You are welcome, sir.
8     A     Yes, sir.
9     Q     Okay.  So now has this -- you have had a chance to read
10    both sides of this?
11    A     Yes, sir.
12    Q     Okay.  Has this refreshed your recollection about this
13    point in the evening?
14    A     Yes.
15    Q     Okay.  So I don't want to know what anyone else said.  Just
16    you.  You would agree that you established channel 1?  You
17    confirmed that as being the primary channel that the radios
18    would be run on?
19    A     Yes.
20    Q     And would you agree that you also established a fail-safe
21    that if there was an interruption in communication everyone
22    could just move to channel 5?
23    A     Yes.
24    Q     And then you also determined a code word for that to
25    happen, correct?
```

1   A   Yes.

2   Q   Alternate I think it was?

3   A   Yup.

4   Q   So if somebody hears the word alternate everyone is

5   supposed to coordinate their radios on channel 5, right?

6   A   Yes.

7   Q   Because the way two-way radios work, if you are not on the

8   same channel you are not talking to each other, right?

9   A   Correct.

10  Q   No one else brought radios except for you, true?

11  A   To my knowledge that's correct.

12  Q   Okay.  You would agree no one asked you to bring the

13  radios, correct?

14  A   Correct.

15  Q   Well, I take that back.  Probably the people you work with

16  at the FBI asked you to do that?

17  A   Those radios were not supplied for that purpose.

18  Q   Where did you get the radios?

19  A   From the FBI.

20  Q   That's what I mean.

21  A   Yes.

22  Q   So the FBI would have asked you to use the radios, correct?

23  A   Yes.

24  Q   You were in Dan's truck headed north to Elk Rapids, true?

25  A   Yes.

1    Q    You are aware that there were attempts to use the radios,

2    correct?

3    A    Yes, sir.

4    Q    But it's fair to say that the attempts by the group to use

5    the radios failed?

6    A    Yes.  That's fair.

7    Q    And the whole point of the radios, right, was OPSEC, is

8    that the idea?

9    A    I think the point of the radios was that we could

10   communicate in a more easy fashion than using phones I believe

11   is what the plan was.

12   Q    Right.  Phones leave footprints, right, digital footprints,

13   true?

14   A    Yes, sir.

15   Q    So the two-way radios would be a way to avoid having to

16   have your phone on, true?

17   A    It would be.

18   Q    So at the end of the month Google doesn't send you a report

19   saying, look, you drove to Elk Rapids, right?

20   A    Yes, sir.

21   Q    But the radios failed and people ended up using their

22   phones anyway, right?

23   A    I believe so.  Yes.

24   Q    Yes.  I think you testified that they did at the boat

25   launch, right?

1    A    At the boat launch they did.  Yes, sir.

2    Q    And I want to be clear about this.  You did not provide the

3    illuminator type light?

4    A    The illuminator?

5    Q    The monocular.  Wasn't there a night vision?

6    A    Yes.  I did not provide.

7    Q    You did not provide that.  You did give instruction to the

8    group on how to use it, though, did you not.

9    A    I don't recall but potentially.  Yes, sir.

10   Q    Okay.  I can refresh his recollection.  I think that was in

11   there.  May I approach, Your Honor?

12            THE COURT:  Sure.

13            THE WITNESS:  Thank you.

14   BY MR. GIBBONS:

15   Q    You are welcome, sir.

16   A    Yes, sir.

17   Q    Okay.  You did give instruction to members of the group on

18   how to operate this device, correct?

19   A    Yes, sir.

20   Q    Okay.  So while you may not have provided it, you did hand

21   it to somebody at some point because it was in your hands,

22   right?

23   A    It was.

24   Q    Okay.  So you then proceed -- I am going to take you -- you

25   are at Walmart.  Everybody is back in the trucks.  Everybody

1    has instructions.  The caravan is moving north, true?

2    A    Yes.

3    Q    To Elk Rapids.  The occupants -- you are still in Dan's

4    truck, right?

5    A    Yes, sir.

6    Q    Adam Fox joins your mix, true?

7    A    Yes.

8    Q    Okay.  You arrive at Elk Rapids.  There is a planning --

9    kind of everybody gets together at an AmVets I guess?

10   A    Yes.

11   Q    In a parking lot?

12   A    Yup.

13   Q    You proceed with Steve Robeson, Adam Fox and Barry Croft to

14   a bridge, right?

15   A    Yes, sir.

16   Q    Okay.  So I want you to think about that for just a second.

17   Kind of -- kind of think about how that happened, and I guess

18   you parked on Dexter Street?

19   A    Yes.

20   Q    Okay.  The way that it was supposed to work, and correct me

21   if I'm wrong, that Dan pulled up on Dexter close to the corner

22   by 31, right?

23   A    Yes, sir.

24   Q    And then you and Adam were going to get out, is that true?

25   A    Yes, sir.

1   Q    And -- the purpose would be to inspect the bridge, correct?

2   A    Yes, sir.

3   Q    One of the things that you wanted to have happen is you

4   wanted Adam to take a picture when he was under the bridge, did

5   you not?

6   A    Yes.

7   Q    Okay.  Do you recall as you exited the vehicle you made

8   sure -- you said to Adam Fox, make sure to bring your phone so

9   you can take a picture?

10  A    Yes.

11  Q    Okay.  He didn't have his phone on his person at that time,

12  did he?

13  A    I can't answer that question.  I don't know.

14  Q    Do you recall him having to go get the phone and turn it

15  on?

16  A    I don't recall that.

17  Q    Okay.  Did you give Adam permission to bring his phone and

18  turn it on?

19  A    I don't recall that either.

20  Q    I'd like to refresh.  Let me find my paper here.  I just

21  have this note.

22  A    Thank you.  Yes, sir.

23  Q    You did confirm it would be acceptable to turn the phone on

24  and use it, correct?

25  A    Yes.  He asked if it was okay and I said yeah.

1    Q    Okay.  You would agree that then you left the vehicle to go

2    inspect the bridge, right?

3    A    Yes.

4    Q    That's a public sidewalk that you took to get to the

5    bridge, true?

6    A    True.

7    Q    There is no trespassing signs there, is there?

8    A    No, sir.

9    Q    And underneath the bridge that's all accessible to the

10   public, is it not?

11   A    Yes, sir.

12   Q    Anybody can run up under that bridge any time they want?

13   A    Yes, sir.

14   Q    There is no sign saying stay off, do not approach or do not

15   enter, correct?

16   A    Nothing that I saw.

17   Q    It looks like the city of Elk Rapids or the village of Elk

18   Rapids and the State of Michigan put quite a bit of money into

19   that walkway, true?

20   A    I can't speak to the amount of money.

21   Q    It's nice posts and a solid deck, correct?

22   A    Yes.

23   Q    Safe for people to walk?

24   A    Very safe.

25   Q    It's not like you had to crawl over rocks and skimmy over a

1       board to get under there, true?

2       A    True.

3       Q    Let's move forward to Sunday.  You testified that the two

4       meetings that you had, group meetings, correct?

5       A    Yes, sir.

6       Q    So there was one and then there was some training and then

7       another meeting is how you remembered it, right?

8       A    Yes.  I remember one meeting being on Saturday and another

9       meeting being on Sunday, if those are the two you were

10      referring to.

11      Q    Okay.  Do you recall having a one-on-one kind of

12      conversation with Adam Fox prior to the meeting starting?

13      A    I do recall.

14      Q    Okay.  And do you recall offering him -- do you recall

15      saying to him something, words to the effect, I've got a

16      six-hour ride back; I am not going to be here all day?

17      A    Yes.

18      Q    And then do you recall saying, as long as I know we're good

19      I'll start working and just an IOU?  Do you remember offering

20      him that?

21      A    I don't remember that specific conversation and that

22      specific line but I know an IOU was offered or requested.

23      Yeah.

24            MR. KESSLER:  And Your Honor, I'll just lodge a

25      pre-emptive hearsay objection because this happened last time.

1    Counsel didn't retrieve the transcript from him and he read a

2    bit of hearsay right off.  So he could bring it back when he is

3    done and I'll lodge my hearsay objection preemptively.

4              MR. GIBBONS:  They are agent statements, Your Honor.

5              THE COURT:  He is talking about the statement that the

6    witness put in your own client's mouth, but it's fair enough.

7    But let's -- if you keep your questions focused on what he

8    remembers himself saying I think we'll be okay.

9              MR. GIBBONS:  Yes.

10   BY MR. GIBBONS:

11   Q    Sir, to be very clear, I don't want to hear what anyone

12   else had to say other than you.  And you would agree that you

13   said, as long as I know we're good I'll start working and just

14   an IOU, you know, correct?

15   A    Yes.

16   Q    Thank you.  And this is before the two meetings you've

17   already testified to, correct?

18   A    I don't recall that meeting happening before the two

19   meetings.  No, sir.

20   Q    Okay.  I thought you testified you did remember talking to

21   Adam first?

22   A    I think I talked to Adam before the second meeting but I

23   don't recall talking to Adam prior to the first meeting because

24   they happened on two separate days.

25   Q    The two meetings happened on two separate days?

1    A    As I just said, sir, the first one happened on Saturday and

2    the second meeting happened on Sunday, if those are the two

3    that you are referring to.

4    Q    Okay.  Let me talk to you a little bit about your presence

5    at Luther and Adam Fox.  Before September 12, 2020, would you

6    agree that you had never talked to Adam Fox on the phone,

7    correct?

8    A    Correct.

9    Q    You would agree that you were not a member of the Threema

10   FAFO chat group on -- correct?

11   A    Correct.

12   Q    You did not have contact with Adam Fox by text message on

13   his phone, correct?

14   A    Correct.

15   Q    You didn't connect with him on Wire?

16   A    Correct.

17   Q    Signal?

18   A    No.

19   Q    FaceBook?

20   A    No.  I had not had any contact with Mr. Fox prior.

21   Q    So your presence there is accommodated and arranged both by

22   the FBI and CHS Dan, true?

23   A    True.

24   Q    You had the opportunity at some point during the weekend to

25   ask Adam Fox how he wanted to handle counts with you, is that

true?

A    True.

Q    You asked him that on at least two occasions, did you not?

A    I don't know the specific number but I do recall asking.

Yes.

Q    I'm going to refresh.  I am going to ask him to see it.

        MR. GIBBONS:  May I approach, Your Honor?

        THE COURT:  Sure.

        THE WITNESS:  Thank you.  Yes, sir.

BY MR. GIBBONS:

Q    Okay.  You have had a chance to look at the transcript?

A    Yes.

Q    And this is a transcript of you engaging with a number of

people, including Adam Fox, correct?

A    Yes.  It is.

Q    And would you agree that you asked Adam Fox on two

occasions how he wanted to handle comms, correct?

A    Yes.

Q    Yup.  Comms, that's communication, right?

A    Yes, sir.

Q    So that's communicating in some fashion probably

electronically, true, because you are going to leave and not be

in each other's presence anymore, correct?

A    Yes, sir.

Q    You would agree that after September 12th and 13th you

1    returned to wherever it is you come from back to your FBI job,

2    right?

3    A   Yes, sir.

4    Q   You didn't have Adam Fox's phone number, did you?

5    A   No.

6    Q   You never talked to Adam Fox, did you?

7    A   I did not.

8    Q   You didn't text Adam Fox, did you?

9    A   No.

10    Q   You didn't join FAFO?

11    A   No.

12    Q   You had no contact with him whatsoever, true?

13    A   Yes, sir.

14    Q   Is it true that this is the first time you've seen Adam Fox

15    since you left the property in Luther on September 13th, 2020?

16    A   Yes.  It is.

17    Q   I just want to go over a few of the things that were

18    touched on in direct and then I'll conclude.  Can I have

19    Government's Exhibit 225, the transcript, Pam?  225T?

20          MR. BLANCHARD:  I think that's 226 maybe.  25 is the

21    video.

22          MR. GIBBONS:  Okay.  226.  I'm sorry.

23    BY MR. GIBBONS:

24    Q   Do you see that transcript?

25    A   Yes, sir.

1    Q    And you are familiar with this conversation, correct?

2    A    Yes.

3    Q    And you would agree that it's a correct identification of

4    the individuals that were identified up at the top there?  Can

5    you blow that up for us?

6    A    Yes.

7    Q    Okay.  So UCE Red, that's you?

8    A    Yes.

9    Q    CHS Dan.  He works for the government.  Steve Robeson,

10   right?

11   A    Yes.

12   Q    Jenny Plunk, correct?

13   A    Yes.

14   Q    And then two individuals, Adam Fox and Ty Garbin, right?

15   A    Yes, sir.

16   Q    So that's each Defendant there gets two undercovers,

17   correct?  The ratio, two to one?

18   A    Yes.

19   Q    Okay.  You can take that down.  Can you pull up the

20   transcript for what was 477?  Second page.  Blow up Adam's

21   statement.  There we go.

22        Adam Fox here in that second sentence says, she is not

23   there right now, correct?

24   A    Yes.

25   Q    And she would be referring to the governor, correct?

1   A    Yes.

2   Q    So he's clearly contemplating that she is not there and

3   there's not going to be a kidnapping that night, correct?

4   A    I can't speculate as to what he is referring to.

5   Q    Okay.  You can remove that.  Can I have Government's

6   Exhibit 230?

7        You testified that you were asked to change your

8   clothes by Adam Fox for this ride up north.

9   A    Yes.

10  Q    You were supposed to get in civies for lack of a better

11  word?

12  A    Yes.  Yes, sir.

13  Q    Can you pull up just the lower portion of Adam Fox, just

14  the lower portion of Adam Fox?

15       That was Adam Fox.  You took that picture, correct?

16  A    I did.

17  Q    What kind of pants does it look like he's wearing?

18  A    It looks like BDUs.

19  Q    Military pants?

20  A    Yes.

21  Q    So it does not appear he is in civilian clothes, correct?

22  A    Not his pants.  No, sir.

23  Q    Does it look like he is wearing tennis shoes to you?

24  A    I can't make out his shoes, sir.  I don't know what kind of

25  shoes he is wearing.

1    Q    Okay.  But you definitely believe and would agree with me

2    that's camo?

3    A    I would agree.

4    Q    You can take that down.

5         You are aware that the gentlemen that were in the

6    truck driving up and down Timberlake Trail, you are aware that

7    they never found the residence, aren't you?

8    A    I am not aware of that at all.

9    Q    Okay.  Is it your belief that they did identify the

10   governor's cottage that night?  They located it?

11   A    That is my belief, yes, sir.

12   Q    And because they located it they were able to flash their

13   lights so that you could see them?

14   A    Yes, sir.

15   Q    From the road, true?

16   A    Well, what are you referring to?

17   Q    Well, the truck would have had to have been on the road,

18   correct?

19   A    Sure.  It was on the road.

20   Q    And they would have had to flash their lights from the road

21   and you say you could see it from the governor's house to the

22   boat launch, right?

23   A    Yes.

24   Q    Can I have 238.2?  Yeah.  I think that's fine.

25        All right.  You see this exhibit that's in front of

1     you?  You testified to it?

2     A    Yes, sir.

3     Q    This is the boat launch right up at the top?

4     A    Yes.

5     Q    And you were there with Dan, Adam and a few of the guys,

6     Mr. Croft.  Who else was in that truck?  Roby, Steve, and you

7     four guys are there, right?

8     A    Yes, sir.

9     Q    The truck with the Null brothers and Mark, that truck

10    wasn't at the boat launch or was it, do you recall?

11    A    I don't believe they were there.  I don't recall

12    specifically but I don't think so.

13    Q    Okay.  Would you agree that everybody got back in the truck

14    at the boat launch after you saw the flashing lights from the

15    truck, correct, once you were able to mark the governor's

16    cottage?

17    A    Yeah.  There were other things that transpired after that

18    at the boat launch but we -- a few people looked through the

19    night vision --

20    Q    Yup.

21    A    -- to confirm it.  I think the truck that was to mark using

22    the lights drove the road a few times, so yes.

23    Q    So they were able to pick up the illuminator, is that what

24    it's called?  Didn't they have a special flashlight that would

25    shine a certain kind of light that would show up really bright

1    in the monocular?

2    A    I don't recall a flashlight being used.

3    Q    Okay.  So you left the boat launch and you came out this

4    way, right?

5    A    Yes.

6    Q    Because that's the only way you can go, right?

7    A    Right.

8    Q    And you came up this road, right?

9    A    I think we took a right at that intersection.

10   Q    Oh, a right this way, down this way?

11   A    Yes, sir.

12   Q    You came all the way around, right?  And then you went

13   here.  You stopped at 31.  I think you kind of had to stop

14   there, right?

15   A    Yup.

16   Q    It's a highway.  And then you went -- did you go down

17   that -- did you go across the highway then or did you turn?

18   A    We went across the highway.

19   Q    You went across the highway.  Perfect.  And then there was

20   a little turn, right?  Did you stop there?

21   A    Briefly.  Yes, sir.

22   Q    Okay.  This is kind of a land hop, isn't it, where you

23   would get out of the truck and go down the path to the lake?

24   A    I don't know the definition of a land hop, sir.

25   Q    You don't?

```
1    A    It's -- I don't know what you are trying to refer to here.

2    Q    I wasn't there.  So I mean, I don't really know anymore

3    than you do.  The plan, I guess, would be that there would be a

4    boat waiting here on -- if they kidnapped the governor, the

5    plan would be there would be a boat down here --

6    A    Yes, sir.

7    Q    -- waiting for them?  And then your understanding is the

8    boat would go out into the lake --

9    A    Yes, sir.

10   Q    -- with the governor in it?  And then the motor would be

11   dropped or disabled?

12             MR. KESSLER:  Objection.  Asking him to speculate.  He

13   couldn't possibly know any of this without hearsay from the

14   Defendants.

15             THE COURT:  I am not sure there is any foundation that

16   he was brought into any -- anything beyond getting to what you

17   called the land hop.  So if you want to see if there is

18   foundation, if he has knowledge and the basis of it is either

19   already admitted exhibits or otherwise admissible information

20   we can go there.  Otherwise, I don't think we can.

21             MR. GIBBONS:  No.  I'm satisfied, Your Honor.  I think

22   Agent Tim has done a nice job today and I am concluded with my

23   cross examination.

24             THE COURT:  All right.  Thank you.  We'll go to

25   Ms. Kelly.
```

1      MS. KELLY:  Thank you, Your Honor.

2                CROSS EXAMINATION

3   BY MS. KELLY:

4   Q    Good morning, Special Agent.

5   A    Good morning, ma'am.

6   Q    You wrote a 302 report about your time in Luther, is that

7   fair?

8   A    Yes, ma'am.

9   Q    And that was soon after the weekend in Luther, is that

10  right?

11  A    It was.

12  Q    Okay.  Information was fresh in your mind at that time?

13  A    Yes.

14  Q    Okay.  You testified that part of your back story that you

15  were going to be telling these guys is that you were the

16  explosives contact, is that right?

17  A    Yes.

18  Q    Okay.  Also part of your back story is that you would --

19  you provided some CQB training, is that right?

20  A    Yes.

21  Q    So you'd go from city to city and you had the knowledge

22  about tactical training, correct?

23  A    Yes.

24  Q    Okay.  You also talked about your military experience, is

25  that right?

1    A    Yes.

2    Q    Okay.  And you said you had been in combat, correct?

3    A    Yes.

4    Q    Okay.  And so when you arrive in Luther, you said Saturday

5    morning, or Saturday midday, correct?

6    A    Yes, ma'am.

7    Q    Okay.  And there was already a tarp house set up, is that

8    right, when you arrived at the property?

9    A    That's correct.

10   Q    Okay.  And there were different stations set up throughout

11   the property for different kinds of trainings, correct?

12   A    Yes, ma'am.

13   Q    Okay.  And you were introduced to Daniel Harris, correct?

14   A    I was.

15   Q    Okay.  And the information that you had was that he was a

16   marine, correct?

17   A    Yes.

18   Q    Okay.  And there was some welcome remarks made, correct?

19   A    That's correct.

20   Q    All right.  And then the training started, fair?

21   A    Yes.

22   Q    Okay.  And you went to the tarp house, right?

23   A    I did.

24   Q    Because that was kind of your back story is that you know

25   how to do the tactical training, right?

1    A    Yes, ma'am.

2    Q    And CHS Dan was also with you at the tarp house, correct?

3    A    That's correct.

4    Q    So you guys were kind of leading that training throughout

5    the day, is that fair to say?

6    A    Yes.

7    Q    Okay.  And different -- different members or different

8    people that were there would kind of spend about an hour at

9    each training station and then move to a new station, is that

10   right?

11   A    That's correct.

12   Q    Okay.  So different groups would be coming to you and to

13   CHS Dan and you'd be leading them in training, fair?

14   A    Dan was leading the training but I was there with him.

15   Yes.

16   Q    Okay.  And then at -- when the training is kind of winding

17   up for the day, CHS Dan kind of pulled you aside and said

18   you're going to be showing these videos that you have, right?

19   A    Yes.  That's correct.

20   Q    Okay.  And this was to a small group of people, correct?

21   A    That is correct.

22   Q    And you kind of went away from those training stations,

23   correct?

24   A    Yes.

25   Q    Okay.  That was around 5:00 p.m., does that -- is that

1    about right?

2    A    Approximately.

3    Q    Okay.  And we listened to that audio.  Mr. Gibbons just

4    pulled up the transcript again of 226 of you showing the

5    videos.  Do you remember that --

6    A    Yes, ma'am.

7    Q    -- transcript.  Okay.  Are these videos, are they on a cell

8    phone?  Are they on a computer?

9    A    They were on a cell phone.

10   Q    That was the cell phone that you brought to the property?

11   A    Yes, ma'am.

12   Q    Okay.  And the folks that were identified in that

13   transcript were Adam Fox, correct?

14   A    Yes.

15   Q    Barry Croft, correct?

16   A    Yes.

17   Q    Jenny Plunk?

18   A    Yes.

19   Q    Ty Garbin?

20   A    Correct.

21   Q    Steve Robeson?

22   A    Yes.

23   Q    And CHS Dan, correct?

24   A    Yes.

25   Q    Okay.  And you showed these videos, correct?

1    A    Yes.

2    Q    All right.  And then do you eat at the barbecue after these

3    videos have been shown?

4    A    No.

5    Q    Did you eat at all after these videos?

6    A    I think that I had brought food and I ate.  Yes.

7    Q    Okay.  And then eventually around 8:00 you guys are getting

8    into your trucks to leave, is that right?

9    A    Yes.

10   Q    And in the truck with you was CHS Dan, correct?

11   A    Yes.

12   Q    All right.  And Ty Garbin?

13   A    Yes.

14   Q    And Kaleb Franks, correct?

15   A    Correct.

16   Q    Okay.  And it was getting dark outside by the time you guys

17   were leaving, correct?

18   A    It was.

19   Q    All right.  Going on the trip up north.  You testified that

20   you came back to the property at Luther, is that right?

21   A    Yes, ma'am.

22   Q    Probably that you had to get your truck?

23   A    I stayed there that night.

24   Q    You stayed there that night.  Did you have a tent?

25   A    I slept in the truck.

Q    You slept in your truck.  Okay.  And then just so I am

clear, on Sunday, then, there is some live fire training,

correct?

A    Yes.

Q    Okay.  Is that meeting on Sunday, is that before the live

fire or after the live fire?

A    After.

Q    After the live fire.  Okay.  And we heard some of those

clips that were played for you.  You never showed those videos

again on your cell phone again, correct?

A    No, ma'am.

Q    Okay.  You never had a conversation either on Saturday or

Sunday with Daniel Harris about explosives, correct?  Just the

two of you?

A    Not the two of us.  No, ma'am.

Q    Okay.  Daniel Harris didn't watch the videos with you on

Saturday, correct?

A    Correct.

Q    Daniel Harris didn't request the price of explosives from

you, correct?

A    Correct.

Q    Daniel Harris didn't go on the ride up north, right?

A    No.  He didn't.

Q    Okay.  He didn't talk with you when you came back from the

property -- when you came back from up north, correct?

1    A    That evening?

2    Q    Correct.

3    A    Correct.

4    Q    Okay.  On the clips that were played for you on that

5    meeting on Sunday you didn't hear Daniel Harris talking,

6    correct?

7    A    Correct.

8    Q    And Daniel Harris never requested -- never put in a -- he

9    never made a purchase from you, correct?

10   A    Correct.

11   Q    Okay.  You were not present on October the 7th in

12   Ypsilanti, correct?

13   A    Correct.

14        MS. KELLY:  Okay.  I have nothing further.  Thank you.

15        THE COURT:  All right.  We'll go to Mr. Hills.

16                    CROSS EXAMINATION

17    BY MR. HILLS:

18   Q    The cross examinations get shorter as we go down the line

19   because things have been covered.  So I'll just start out with

20   this meeting where you are showing -- on Saturday at Luther

21   where you are showing the video on your phone, correct?

22   A    Yes, sir.

23   Q    All right.  And Brandon Caserta was not there for that?

24   A    No.  He was not.

25   Q    Okay.  Some time after that you got in, I think, CHS Dan's

1    truck with Kaleb Franks and Ty Garbin and left the property,

2    right?

3    A    That is correct.

4    Q    And I believe you said on either direct or cross that it

5    was -- took you about an hour to get up to the governor's

6    house?

7    A    After the couple of stops that were made.  Yes, sir.  It

8    took about an hour.

9    Q    Okay.  So that doesn't include you left and you went south,

10   right, to Big Rapids?

11   A    Correct.  And then we ended up in Cadillac.

12   Q    That's about what, 45 minutes, an hour south?

13   A    I am not familiar with the route that we took.  I am not

14   certain how long that took.

15   Q    Okay.  Do you remember the direction, like you went -- do

16   you remember if Big Rapids is south from Luther?

17   A    I don't.

18   Q    Okay.  All right.  So the hour that you are talking about

19   isn't from Big Rapids to the cottage; it's basically from

20   Luther to the cottage, is that right?

21   A    Cadillac.  We left from Cadillac to go to Elk River.

22   Q    All right.  So it doesn't include going all the way to Big

23   Rapids and coming back to Cadillac and then going up; it's a

24   lot longer, correct?

25   A    Yes.

Q    Okay.  So in any event, you come back to Luther, sleep in your truck, and then the next morning, that Sunday, September 13th, right?

A    Yes.

Q    And Sunday, September 13th, there is some training, live fire, and I think you said that this meeting that you talked about was after the live fire?

A    Correct.

Q    And there were several people in that meeting, is that right?

A    Yes, sir.

Q    And let me stop here.  I thought I heard you on direct state that there were two meetings that day.  There was just one that you talked about, correct?

A    The group meeting was -- there was one on Sunday.

Q    Okay.  I just wanted to be clear in my mind.  All right. So at that meeting there were several people, is that right?

A    Yes, sir.

Q    Mr. Fox, is that right?

A    Yes.

Q    Steve Robeson?

A    Yes, sir.

Q    Mr. Croft?

A    Yes, sir.

Q    Harris?

1    A    Yes, sir.

2    Q    Red, you?

3    A    Yes, sir.

4    Q    Mr. Garbin?

5    A    Yes, sir.

6    Q    Higgins.  Do you remember Brian Higgins?

7    A    I don't remember him, sir.

8    Q    Mr. Franks?

9    A    Yes.

10   Q    CHS Dan?

11   A    Yes.

12   Q    Mr. Null, is that correct?

13   A    Yes.

14   Q    All right.  And you indicated Mr. Harris was there, or I'm

15   sorry, Mr. Caserta was there?

16   A    Yes, sir.

17   Q    All right.  And we heard some clips of that meeting, is

18   that right?

19   A    Yes.

20   Q    And none of those clips Mr. Caserta is talking, is that

21   right?

22   A    That's right.

23   Q    Now, is it possible -- well, let me ask you this.  During

24   this meeting you were doing quite a bit of talking, is that

25   right?

1    A    Yes, sir.

2    Q    And asking questions, people answering you, is that right?

3    A    Yes, sir.

4    Q    Okay.  And these people were offering verbal responses to

5    you?

6    A    Yes.

7              MR. KESSLER:  Objection.  Hearsay.

8              THE COURT:  Well, he was just asking there were verbal

9    responses, not what the content was.

10             MR. KESSLER:  Just trying to get ahead of it, Your

11   Honor.

12             THE COURT:  Okay.

13   BY MR. HILLS:

14   Q    And you can't point to anywhere in that meeting where

15   Mr. Caserta may have said something, correct?

16   A    No, sir.

17   Q    Okay.  And since you are focused in this discussion with

18   other people, is it -- is it possible that Mr. Caserta came

19   into the meeting at some point and then left?

20   A    No.  I don't believe he left, sir.

21   Q    Okay.  Were you focused on Mr. Caserta the whole time?

22   A    Everybody was standing in front of me, so I was able to see

23   everybody that was there.

24   Q    Okay.  And you had a recording device on, is that right?

25   A    Yes, sir.

1    Q    CHS Dan had a recording device on, is that right?

2    A    Yes, sir.

3    Q    Did you know if Mr. Robeson had his device on or not?

4    A    I have no clue, sir.

5    Q    Okay.  But you know now that he was there and he was

6    working for the government?

7    A    Yes.  I do.

8    Q    And you can't point to anywhere in that conversation where

9    you acknowledged Mr. Caserta?

10   A    Correct.

11   Q    Or asked him a question, is that correct?

12   A    Correct.

13   Q    Okay.  Can we give this just to the witness?  I am going to

14   show you a photograph if I can.

15            THE COURT:  What's the identification number?

16            MR. HILLS:  5220.

17            THE COURT:  All right.

18   BY MR. HILLS:

19   Q    Do you see this photograph?

20   A    Yes, sir.

21   Q    Does it appear to be taken at Luther?

22   A    It does.

23   Q    The person in the photograph, can you identify him?

24   A    It's Dan.

25   Q    Okay.  CHS Dan?

1    A    Yes, sir.

2    Q    And does this picture accurately reflect as he looked at

3    that time?

4    A    Yes, sir.

5            MR. HILLS:  All right.  I move for the admission of

6    5220?

7            MR. KESSLER:  Other than relevance, Your Honor, no

8    objection.

9            THE COURT:  I am not sure of the relevance either but

10   we'll admit it.

11           MR. HILLS:  Thank you.  Nothing further.

12           THE COURT:  All right.  Mr. Blanchard?

13           MR. BLANCHARD:  Thank you.

14                      CROSS EXAMINATION

15     BY MR. BLANCHARD:

16   Q    Good morning, Agent.

17   A    Good morning.

18   Q    Can't promise I'll get quicker like Mr. Hills but I'll try.

19           Do I understand correctly that when you were working

20   as an undercover agent in Luther you wore a wire?

21   A    Yes, sir.

22   Q    Or a recording device?

23   A    Yes, sir.

24   Q    The entire time?

25   A    As long as the batteries lasted.  Yes, sir.

1   Q    And they lasted the whole time?

2   A    That I don't know.

3   Q    You haven't gone back to listen?

4   A    Sir, there was -- I used multiple recording devices so I

5   don't know when batteries ran out and when they didn't.

6   Q    So you had more than one wire on?

7   A    Yes, sir.

8   Q    Do you believe you captured all the statements?

9   A    All the statements in my immediate proximity?

10  Q    Yes.

11  A    Potentially.

12  Q    Potentially or you believe you did?

13  A    I don't know.

14  Q    You haven't gone back to listen to see if anything is

15  missing?

16  A    I have listened but I have not compared them to other notes

17  or things like that.

18  Q    Okay.  Do you remember Government's Exhibit 477?

19  A    Not without seeing it.

20  Q    Could we pull up 477T, please?

21       Do you remember this?

22  A    Yes.  I do.

23  Q    Okay.  Do you know whose wire this was from?

24  A    No, sir.

25  Q    Okay.  On the break I had you listen to what's been marked

1    for identification as Defendants' Exhibit 3062.  Do you recall

2    that?

3    A    Yes.

4    Q    Is that also a recording of the same thing as 477T?

5    A    Yes.  As far as I know.

6    Q    Just from a different wire?

7    A    Yes.

8              MR. BLANCHARD:  I'd move the admission of Defendants

9    3262.

10             THE COURT:  Well, I haven't seen it so I'd like to see

11   it.  I don't know what else -- are you listening -- do you have

12   a transcript?

13             MR. BLANCHARD:  We don't.  We didn't have 477 before

14   this morning and so we clipped 3062 this morning.  It's a

15   subset of the same thing from a different angle.

16             THE COURT:  Well, so it's the same individuals?

17             MR. BLANCHARD:  Same individuals, same words, except

18   you can hear some of them more clearly.

19             THE COURT:  So it's actually the very same context but

20   you think you can hear some of it better?

21             MR. BLANCHARD:  Correct.  I don't know if it goes

22   quite as far as 477.

23             THE COURT:  Fair enough.

24             MR. BLANCHARD:  Otherwise the same.

25             THE COURT:  Any objections?

1      MR. KESSLER:  No, Your Honor, but I'd just like the

2  record to reflect it sounded like he wasn't sure where this

3  came from.  I think he is repeating what Mr. Blanchard told him

4  while he was playing the recording.  Maybe we could go over

5  that again, I mean, see if he actually knows where this one is

6  from.

7      MR. BLANCHARD:  I don't know if it matters where it's

8  from frankly.

9      THE COURT:  I guess we'll all listen and compare it to

10  what's involved in 477, but I think based on what the witness

11  said and what Mr. Blanchard has proffered we can go ahead and

12  listen.

13      (Audio started, 11:15 a.m.)

14      (Audio stopped, 11:15 a.m.)

15      THE COURT:  My ears probably are deteriorating with

16  age, too.

17      MR. BLANCHARD:  I don't know if the Court has the

18  ability to turn up the courtroom audio.  We had it maxed out.

19      THE COURT:  I've got the courtroom at the same level

20  its been all morning.  I'll try one up.  If I go too much

21  further I go into the red line, but if you want to try it

22  again.

23      (Audio started, 11:16 a.m.)

24      (Audio stopped, 11:16 a.m.)

25  BY MR. BLANCHARD:

1   Q    Could you hear Mr. Croft's voice there?

2   A    I couldn't discern any particular voice.

3   Q    Sure.  Do you remember -- can I have 477T again, please?

4   And if you could highlight Mr. Croft's statements there?

5          MR. KESSLER:  And I am going to preemptively object to

6   hearsay again if he's going to try and put other words in

7   Mr. Croft's mouth here.

8          MR. BLANCHARD:  I'm only putting in what's in the

9   recording.  This is a transcript the government has proposed.

10  It's unintelligible and I want to ask the witness if he heard

11  what he said, but it's only what's in the recording.

12         THE COURT:  Right.  I mean, the recording is what it

13  is, so I don't know what you are going to ask him.  He can't

14  make up words from it.

15  BY MR. BLANCHARD:

16  Q    Sure.  Could you hear the word that came out destination?

17         THE COURT:  That's not for this witness to talk about.

18  That's whether the jury heard anything.  And if you want to

19  play 477 again we can all listen.

20         MR. BLANCHARD:  Well, it's -- yeah.  Let's have 3062

21  one more time, please.

22             (Audio started, 11:17 a.m.)

23             (Audio stopped, 11:17 a.m.)

24  BY MR. BLANCHARD:

25  Q    You testified on direct examination about Mr. Croft and

1   silver.  Do you recall that?

2   A    Yes.

3   Q    What was the silver plan you talked about?

4   A    He planned to mint a coin.

5   Q    This was like a currency that he planned?

6   A    Yes, sir.

7   Q    And this was, like, for his new constitutional society?

8           THE COURT:  Well, that's going into additional

9   language that came from Mr. Croft and I don't think that's

10  legitimate.

11  BY MR. BLANCHARD:

12  Q    Exhibits 224 and 225, those were the bomb videos that you

13  produced, correct?

14  A    Yes.

15  Q    Where you were blowing up that old Suburban?

16  A    Yes.

17  Q    Okay.  You testified that if you had been asked where those

18  were taken you would have told them it was at a range you had

19  access to, right?

20  A    Yes.

21  Q    If they asked about that building you would have told them

22  this was for close quarters combat training?

23  A    Yes.

24  Q    You were never asked those questions, right?

25  A    I was not.

1    Q    Then I think you told the jury that Exhibit 226 was the

2    recording from perhaps your wire of when those videos were

3    being played for everyone, right?

4    A    Yes.

5    Q    And that you testified that Adam and Barry were very

6    interested?

7    A    Yes, sir.

8    Q    And that they both asked to see it again?

9    A    Yes, sir.

10   Q    Multiple times?

11   A    I think I played it twice if I recall correctly.

12   Q    But they asked to see it several times, correct?

13   A    Again, I think I played it twice for them which would have

14   been at the request of them to see it again.

15   Q    And when you say them, you mean Barry and Adam?

16   A    Yes.

17   Q    Okay.  Can we have 226T, please?  Can you pull up the names

18   of the people that are involved in the transcript?  I think you

19   testified with Mr. Gibbons that this was an accurate list of

20   the people who speak on the video, correct, or on the audio

21   recording?

22   A    Yes.

23   Q    Is Mr. Croft's name there?

24   A    No.

25   Q    Does he speak?

1    A    Not according to the audio.

2    Q    Well.  Not according to the -- can we play 226, please?

3         Tell me to stop when you hear Mr. Croft's voice,

4    please.

5         MR. KESSLER:  Your Honor, all this means is he didn't

6    speak during this recording.

7         THE COURT:  We've already listened to it.  He's

8    already said there's nothing recorded from him.  It's wasted

9    time to just listen to it again and just determine that

10   Mr. Croft's voice doesn't appear.

11   BY MR. BLANCHARD:

12   Q    You agree that he didn't, on that audio when you were

13   playing it, ask you to play it again, right?

14   A    Not on that clip.  No, sir.

15   Q    Regarding this supposed bomb that you are selling, nobody

16   ever actually gave you money, right?

17   A    Correct.

18   Q    Nobody ever shook your hand and said, we got a deal, right?

19   A    Correct.

20   Q    Now, you've said you met Dan Chapel before you went up to

21   Luther, correct?

22   A    Prior to the 12th?  Is that what you are referring to?

23   Q    Correct.

24   A    Yes, sir.

25   Q    And so you knew he was a confidential source, right?

1    A    I did.

2    Q    He knew you were an undercover FBI agent, right?

3    A    Yes.

4    Q    You also knew the identities of the other confidential

5    sources, right?

6    A    I had been told who Steve was and I had been told that

7    there was a woman that would be there who was also a source.

8    Q    And you were given their names?

9    A    I believe I was -- I can't recall if I was -- if I was

10   given the name of the female or not, but I was given the name

11   of the male.

12   Q    Well, when you were playing this video, Steve was present,

13   right?

14   A    Yes, sir.

15   Q    And Ms. Plunk was present, right?

16   A    Yes.

17   Q    And Dan was present?

18   A    Yes.

19   Q    You knew they were all working for the government, right?

20   A    By that time, yes, sir.

21   Q    And at least one of them knew you were working for the

22   government?

23               MR. KESSLER:  Speculation.

24               THE WITNESS:  Yes.

25               MR. KESSLER:  Withdrawn.

1          THE COURT:  He's already said he met with CHS Dan.

2    BY MR. BLANCHARD:

3    Q    The government played a clip for you of Mr. Croft talking

4    about propane tanks, right?

5    A    Yes.

6    Q    I think that's what you referred to as an improvised

7    claymore?

8    A    Yes, sir.

9    Q    You never saw Mr. Croft with a propane tank, right?

10   A    No.  I did not.

11   Q    You never saw him try to build a bomb with a propane tank?

12   A    No, sir.

13   Q    You never saw him with napalm?

14   A    Correct.

15   Q    You never saw him try to build something with napalm,

16   right?

17   A    Right.

18   Q    And you are aware that in Wisconsin he was unable to

19   detonate some black powder?

20          MR. KESSLER:  Now it's speculation.

21          THE COURT:  That's speculation and it's not something

22   that this witness said he was there for or otherwise so I'll

23   sustain that objection.

24   BY MR. BLANCHARD:

25   Q    Could we have Exhibit 232, please?

1         This is the bridge that you talked about, right?

2    A   Yes, sir.

3    Q   And is this photo looking to the west?

4    A   Yes.  I believe it is looking to the west.

5    Q   And you can see in the background right there.  If we blow

6    that up, please, there is another bridge, right?

7    A   Yes, sir.

8    Q   That can be seen from this bridge on 31, right?

9    A   That's correct.

10    Q   So there is just another bridge to go around this one that

11    you are trying to help people blow up, right?

12    A   Yes, sir.

13    Q   Now, Mr. Croft didn't get out of his vehicle and go on this

14    nice boardwalk to inspect the bridge, did he?

15    A   Correct.

16    Q   And this vehicle that took you to the nice boardwalk to go

17    look under the bridge, that was driven by someone working for

18    the government, right?

19    A   Yes, sir.

20    Q   Okay.  And you testified that Mr. Croft threw out some

21    alternate ideas, right?

22         MR. KESSLER:  I object to the mischaracterization.  He

23    didn't say alternate.

24         THE COURT:  Are we talking about the tape we listened

25    to?

1       MR. BLANCHARD:  Yes.

2       THE COURT:  T227.  So the witness can answer if he is

3  able or he doesn't have to accept your characterization.

4  BY MR. BLANCHARD:

5  Q    Threw out some other ideas?

6  A    I think they were additional ideas in response to law

7  enforcement in a way to slow them down.

8  Q    So there had been talk about the bridge, right?

9  A    Yes.

10  Q    And then after that Mr. Croft talked about, I think you

11  said, blowing up trees; was that your testimony?

12  A    I think the -- that conversation happened prior to stopping

13  at the -- at the bridge if that's the one you are referring to.

14  Q    Did he talk about blowing up trees?

15  A    Cutting them down I think is --

16  Q    Cutting them down?

17  A    Yeah.

18  Q    It would be hard to blow up a tree, right?

19  A    No.  I don't believe so, sir.

20  Q    Okay.  But you think he talked about cutting down trees?

21  A    Cutting them down either with -- if I recall correctly

22  there was det cord conversation regarding det cord and how to

23  use them to cut down trees, but I think cutting down trees was

24  also discussed with a chain saw.

25  Q    Okay.  Do you think there was talk about cutting down trees

with det cord?

A    Yes, sir.

Q    Okay.  And then cutting down telephone poles?

A    Cutting down telephone poles.

Q    Also with det cord?

A    I don't recall if it was -- if det cord was involved.

Q    Or maybe just the chain saw?

A    Maybe just a chain saw.

Q    Okay.  I am going to turn your attention to when you are under the bridge with Mr. Fox, okay?

A    Yes, sir.

Q    You remember telling Mr. Gibbons that you wanted to get a picture under there, right?

A    Yes.

Q    And after that picture was taken he didn't send it to you, right?

A    No.  He did not.

Q    And didn't send it to you to analyze how to blow up a bridge?

A    Correct.

Q    Or how much explosive would be required?

A    Correct.

Q    Okay.  But you were the bomb maker in this scenario, right?

A    Yes, sir.

Q    It's a fictional scenario, right?  You weren't really going

1    to make a bomb, fair?

2    A    I am not sure what you are trying to imply there.

3    Q    You are not really a bomb maker, are you?

4    A    I am not a bomb maker.  No.

5    Q    Okay.  What was the point of taking the picture?

6    A    To assess what the underside of the bridge looked like.

7    Q    For who to assess it?

8    A    For me.

9    Q    But you have never got the picture?

10   A    I also took photos.

11   Q    So you took some photos for you to assess?

12   A    Um-hum.

13   Q    Is that a yes?

14   A    Yes.

15   Q    What was the point of Adam's picture?

16   A    Just additional photos.

17   Q    Well, you directed him to take the photo, right?

18   A    Yes, sir.

19   Q    And he took the photo?

20   A    He did.

21   Q    But you never got it?

22   A    Correct.

23   Q    The point of directing him to take the photo was there

24   would be a photo found on his phone, isn't that true?

25   A    That was not the plot.

1    Q    That was not the plot you said?

2    A    No.  I said that was not the thought.

3    Q    The thought?

4    A    Yes.

5    Q    Now, you talked about a night vision goggle, right?

6    A    Yes.

7    Q    And you said you thought it came from someone from

8    Wisconsin, correct?

9    A    Correct.

10   Q    You don't know that person's name?

11   A    I believe his first name is Barry.

12   Q    You are not talking about Barry Croft here, right?

13   A    No.

14   Q    Can we have 5220, please?  And can you blow up the face of

15   the gentleman in the back?  Is that the person who supplied the

16   night vision goggle?

17   A    Yes.

18   Q    Okay.  And you don't know his name?

19   A    I guess I believe his first name is Barry.  I don't know

20   his last name.

21   Q    Do you know if he is affiliated with Mr. Robeson or not?

22   A    I have no clue.

23   Q    Okay.  And you testified that you were unaware of an IR

24   illuminator being used, is that right?

25   A    That's correct.

Q    So there was never anyone that took a device that emitted
an infrared light and tried to shine it across the lake at you,
correct?

A    I can't speak to that.

Q    You are not aware of that ever happening?

A    I am not aware of that happening.

Q    Have you ever seen a video of the government recreating an
IR illuminator shooting across the lake?

A    No.  I have not.

Q    So if that happened you don't know about it?

A    Correct.

Q    Okay.  And I think similarly you testified you are not
aware of whether the people in the car looking for the
governor's house ever found it, is that right?

A    I am unaware.

Q    In fact, I think you testified you thought they did find
it, right?

A    To my knowledge they found it because the -- again, the
plan for them to use their high beams to signal when the --
when they had located the house was followed through on.  The
lights were flashed.  So I would assume that they found the
video, or excuse me, found the --

Q    So if they had the wrong address and never found a house
you just -- you don't know, is that fair?

A    I don't know.

1    Q    Okay.  After this drive around Northern Michigan, I think

2    you said that you returned to Luther, is that right?

3    A    Yes, sir.

4    Q    Not everyone went back to Luther, true?

5    A    True.

6    Q    Some people went back to the hotel?

7    A    Correct.

8    Q    Mr. Croft did not return to Luther, correct?

9    A    Correct.

10   Q    You were describing on direct examination for the

11   government this plan to kidnap the governor.  Do you remember

12   that?

13   A    Yes.

14   Q    And you referred to there would be another boat waiting at

15   Lake Michigan, right?

16   A    Yes.

17   Q    What kind of boat did you understand would be waiting at

18   Lake Michigan?

19   A    I didn't understand any particular type of boat.

20   Q    Whose boat did you understand it would be?

21          MR. KESSLER:  Objection, speculation.  Again, couldn't

22   know it without hearsay from the Defendants.

23          THE COURT:  Well, it's the same issue that I had with

24   Mr. Gibbons at the end of his exam.  I don't think there is any

25   foundation that this witness had any basis to know that apart

1    from inadmissible evidence.

2    BY MR. BLANCHARD:

3    Q    If you know, how many boats were involved in this plan?

4         MR. KESSLER:  Same objection, Your Honor.

5         THE COURT:  Well --

6         MR. KESSLER:  If he knows he knows from hearsay.

7         THE COURT:  I think that's the point.  You are going

8    to have to create foundation that would put information

9    potentially available to him apart from hearsay statements and

10   I am not sure -- I'm sure there hasn't been that foundation.  I

11   am not sure you can lay that.

12        MR. BLANCHARD:  Sure.  I'm trying to explore the

13   statement another boat.  You said another boat.

14        THE COURT:  But the point is, if you can't create

15   foundation that he knows from some admissible source then it's

16   pointless.

17        MR. BLANCHARD:  Sure.

18   BY MR. BLANCHARD:

19   Q    Why did you say another boat when you testified another

20   boat on direct examination.  What was the source of that?

21        MR. KESSLER:  Same objection, Your Honor.

22        MR. BLANCHARD:  I'm just asking the source, Your

23   Honor.

24        MR. KESSLER:  I know he's just asking but he is asking

25   for inadmissible evidence.

1          MR. BLANCHARD:  We don't know that.

2          THE COURT:  I think we are at the point that it's not

3     advancing the ball to anybody, so we'll tell you to move to

4     something else under 403.

5     BY MR. BLANCHARD:

6     Q    You are aware that training was offered at Luther, correct?

7     A    Yes.

8     Q    And you are aware that there was training and medical?

9     A    Yes.

10    Q    And I don't know, maybe close quarters combat?

11    A    Yes.

12    Q    And some sort of, like, code talking?

13    A    I wouldn't call that training.  There was some discussion

14    about that.  Yes, sir.

15    Q    There was a guy with, like, a cypher or something, right?

16    A    Something along those lines.

17    Q    And there was land navigation training offered?

18    A    Yes.

19    Q    In fact, nighttime land navigation training?

20    A    I am unaware of nighttime nav taking place.

21    Q    And could I have 258T, please?

22         This is a clip that was played for the jury where you

23    are talking about not making money off of this supposed

24    explosive, right?

25    A    Yes.

1    Q    Okay.  Nowhere in this clip do you ever mention the bridge,

2    right?

3    A    No.

4    Q    And the flash bang wouldn't be used to blow up a bridge,

5    right?

6    A    No.  It would not.

7              MR. BLANCHARD:  I'll pass the witness.

8              THE COURT:  Redirect?

9              MR. KESSLER:  Just briefly, Your Honor.

10                      REDIRECT EXAMINATION

11     BY MR. KESSLER:

12   Q    So Mr. Gibbons asked you earlier if you told Mr. Fox an IOU

13   would be okay and showed you this transcript to refresh your

14   recollection, right?

15   A    Yes, sir.

16   Q    Do you remember exactly what Mr. Fox said to you?

17   A    Not verbatim.  No.  I don't, sir.

18             MR. KESSLER:  All right.  If I can approach I'd like

19   to refresh him with the same transcript.

20             THE COURT:  All right.

21   BY MR. KESSLER:

22   Q    Mr. Gibbons, and just an IOU, you know, highlighted.  Just

23   read what comes after that to yourself.

24   A    Yes, sir.

25   Q    I'll take that back from you.  Does that refresh your

1    recollection?

2    A    Yes.

3    Q    Do you remember what Mr. Fox said to that?

4    A    Yes.  He indicated that the funds would be raised.

5    Q    By whom?

6    A    By the group.

7    Q    And do you recall whether he said he wanted flash bangs?

8    A    Yes.

9    Q    Mr. Blanchard just asked you if you could use those to blow

10    up a bridge.  What would you use those for?

11    A    You could use those to -- basically flash bangs are used

12    to, often times to initiate an assault is what it comes down

13    to.

14    Q    All right.  I don't need to bring it up again, but --

15    unless you can't remember, but Mr. Gibbons asked you if Mr. Fox

16    was still wearing camouflage pants?

17    A    Yes.

18    Q    Do you remember he specifically said only show the lower

19    half of his body?

20    A    Yes.

21    Q    Did you see the upper half of his body?

22    A    I did, sir.

23    Q    What was he wearing?

24    A    A hooded sweatshirt.

25    Q    Is a hooded sweatshirt military camouflage gear?

1    A    No.  It's not.

2    Q    Both Mr. Harris's counsel and Mr. Caserta's counsel asked

3    you if they were present for the meeting on Saturday, right?

4    A    Yes.

5    Q    And you said they weren't, right?

6    A    Correct.

7    Q    Were they both present the next day when Mr. Fox said we

8    need to raise $4,000 for the explosives?

9    A    Yes.  They were.

10   Q    And Mr. Caserta in particular was there the whole time;

11   that's what you said, right?

12   A    Yes, sir.

13   Q    Didn't walk away?

14   A    Correct.

15   Q    We had the picture Mr. Blanchard just showed you of the

16   bridge and he said there is another little bridge over to the

17   side.  Do you remember that?

18   A    Yes.  I did.

19   Q    What -- remind the jury what did Mr. Fox say you'd have to

20   do with that bridge?

21   A    That that bridge would also need to be blown up.

22   Q    Mr. Blanchard asked you if Mr. Croft had alternate ideas

23   about dropping trees and telephone poles.  Did you understand

24   that to be a plan other than kidnapping the governor?

25   A    No, sir.

1    Q    Explain to the jury how you understood that?

2    A    That it was simply -- in addition to the bridge, that the

3    bridge would be taken out to slow law enforcement, and then in

4    addition to that trees or telephone poles would be dropped to

5    impede law enforcement response as well.

6    Q    So same plan?

7    A    Same plan.

8    Q    And in Defense Exhibit 5220, we just saw a picture of Dan

9    and there was another person behind him that you said was the

10   same guy who had brought the night vision goggles.

11   A    Yes, sir.

12   Q    That person is not an FBI agent, correct?

13   A    That's correct.

14   Q    Or an FBI informant?

15   A    Correct.

16            MR. KESSLER:  Nothing further, Your Honor.

17            THE COURT:  All right.  Mr. Gibbons?

18            MR. GIBBONS:  Thank you, Your Honor.

19                        RECROSS EXAMINATION

20     BY MR. GIBBONS:

21   Q    Sir, do you have that transcript in front of you that I

22   handed you earlier that we just talked about with the IOU

23   highlighted?

24   A    Do I have it in front of me?

25   Q    Yes.

1    A    Potentially.  I don't believe I have that particular one.

2    Wait.

3    Q    It's got a Bates stamp 1065.

4    A    I do have it.

5    Q    You do have that?

6    A    Yes, sir.

7    Q    Okay.  Your testimony is, is that you indicated just an

8    IOU, you know, and your testimony is that Adam Fox made an

9    unqualified --

10            MR. KESSLER:  Hearsay.

11   BY MR. GIBBONS:

12   Q    -- acceptance of that offer, is that your testimony?

13            MR. KESSLER:  That's speculation.

14            THE COURT:  What he addressed is words that you

15   invited him to say about funds to be raised.  I think since

16   that's in there we'll let Mr. Gibbons at least cross a little

17   bit.  Go ahead.

18   BY MR. GIBBONS:

19   Q    Is it your testimony that Adam Fox made an unqualified

20   acceptance of the IOU offer?  Is that your testimony?

21   A    I believe -- my belief is that he felt that he wouldn't be

22   able to raise all the money and that an IOU may need to stand

23   in place for a portion of funds.

24   Q    Did he accept your offer?  Yes or no without qualification.

25            MR. KESSLER:  Rather than have him speculate as to

1    whether it was qualified, I'd rather he just go ahead and read

2    that next paragraph.

3              MR. GIBBONS:  That will be just fine, Your Honor.

4              THE COURT:  If the government has no objection you can

5    go ahead and read the response that Mr. Fox made.

6              THE WITNESS:  So you are talking the paragraph just

7    below where I say, and just IOU you know?

8              MR. GIBBONS:  Right.  How about line 7 and conclude at

9    line 10?

10             MR. KESSLER:  Line 12, Your Honor.

11             THE COURT:  I think if you are going to read it you

12   are going to have to read the whole statement.

13             MR. GIBBONS:  That's fine.

14             THE WITNESS:  Mr. Fox responds, okay.  Yeah, let's

15   just make sure, yeah, everything is good.  Everyone is on

16   board.  And if everyone is good then I think, yeah, we can

17   definitely raise that for sure.  I respond with okay.  Mr. Fox

18   responds, yeah.

19             MR. GIBBONS:  I have no further questions, Your Honor.

20   I would like, however, like to redact this portion of this

21   transcript and offer it after redacted as evidence because it's

22   all been testified to and I think it should be admitted.

23             THE COURT:  Well, the part he read surely can be added

24   because he read it, so I have no problem with that.

25             MR. GIBBONS:  All right.

1          THE COURT:  If there is more then you'll have to work

2    it out with the government.

3          MR. GIBBONS:  No.  Just what was read and I will

4    proffer that later as an exhibit.

5          THE COURT:  Ms. Kelly?

6          MS. KELLY:  I have nothing further.  Thank you, Your

7    Honor.

8          THE COURT:  All right.  Mr. Hills?

9                RECROSS EXAMINATION

10    BY MR. HILLS:

11   Q    The government on redirect mentioned the bomb video, a bomb

12   video that was on your phone, right?

13   A    Yes, sir.

14   Q    And nobody else had that video on their phones or

15   computers?

16   A    Not to my knowledge.  No, sir.

17   Q    And I think you indicated that Mr. Caserta was not there on

18   Saturday when that was played, correct?

19   A    Correct.

20   Q    And then the next day you didn't play that video again?

21   A    I don't recall playing that video again the next day.

22   Q    Okay.  And Mr. Caserta never gave you a dime for any bomb

23   or explosive?

24   A    Correct.  I didn't receive any money.

25   Q    He never gave you an IOU for any bomb or explosive?

1    A    Correct.

2    Q    Okay.  And never said anything about it, correct, during

3    this whole meeting?

4    A    Correct.

5    Q    Zero.

6              THE COURT:  Mr. Blanchard?

7              MR. BLANCHARD:  No.  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.  Thank you.  You

9    may be excused.

10             (Witness excused, 11:40 a.m.)

11             THE COURT:  We'll go to the government's next witness.

12             MR. ROTH:  Thank you, Your Honor.  We call Special

13   Agent Jeremy Jaskulski.

14             THE COURT:  All right.  We'll have you sworn in and

15   then we'll go from there.

16             JEREMY JASKULSKI, GOVERNMENT

17             having been first duly sworn, testified as follows:

18             (Witness sworn, 11:40 a.m.)

19                   DIRECT EXAMINATION

20     BY MR. ROTH:

21   Q    Good morning.

22   A    Good morning, sir.

23   Q    Could I have you start by stating and spelling your

24   complete name, please?

25   A    Jeremy Jaskulski.  First name is J-e-r-e-m-y.  Last name is

1    J-a-s-k-u-l-s-k-i.

2    Q    Thank you, sir.  Where are you employed?

3    A    The FBI Detroit field office.

4    Q    In what capacity?

5    A    I am assigned to the southeast Michigan Trafficking and

6    Exploitation Crimes Task Force, but prior to yesterday I was

7    assigned to the joint terrorism task force.

8    Q    As a special agent?

9    A    That is correct.

10   Q    How long have you been a special agent with the FBI?

11   A    Since March of 2018.

12   Q    And did you have a previous position with the FBI?

13   A    I did.  From September 2010 through July 2015 I was

14   investigative specialist, and from July 2015 through March 2018

15   I was an intelligence analyst.

16   Q    Thank you.  Did you assist investigators in this case on

17   October 7th, 2020?

18   A    I did.

19   Q    Was that at 1140 James L. Hart Parkway, Ypsilanti,

20   Michigan?

21   A    It was, sir.

22   Q    What is at that location?

23   A    An industrial property.

24   Q    And why were you there that day?

25   A    I was there to assist with the transport of evidence

1    following an arrest operation by FBI's hostage rescue team.

2    Q    When you arrived was everybody already in custody?

3    A    They were.

4    Q    Did you collect personal property?

5    A    I did.

6    Q    I want to talk person by person about the things that were

7    found starting with Adam Fox.  Do you have up there Proposed

8    Exhibits 365, 366 and 433?

9    A    I do.

10   Q    Did each of those items belong to Adam Fox?

11   A    They did.

12   Q    Were they all seized and secured in evidence?

13   A    They were.

14            MR. ROTH:  Your Honor, I would move for the admission

15   of Proposed Exhibits 365, 366 and 433?

16            THE COURT:  All right.  Let me just confirm, when he

17   says they belong to Adam Fox, is he drawing that conclusion

18   because he found them on his person or in some other way?

19            MR. ROTH:  I can lay foundation as to that, Your

20   Honor.

21            THE COURT:  All right.  And if there is objection --

22   it's fine if everybody is content to have it in.  Any

23   objections?

24            MR. GIBBONS:  No, Your Honor.

25            THE COURT:  Then we'll shorten it and just admit it.

1    Go ahead.

2              MR. ROTH:  Thank you, Your Honor.

3    BY MR. ROTH:

4    Q    All right.  So with that, can we start by talking about

5    366?  What is that item?

6    A    366 is a taser.

7    Q    Could we please put 283 on the screen?

8              Does it appear to be the same taser that we see Adam

9    Fox holding and flashing in that video?

10   A    It does appear to be the same.

11   Q    Next can we please look at 365?  What is that item?

12   A    365 is an apple iPhone.

13   Q    And finally with Mr. Fox, 433, what is that item?

14   A    433 is U.S. currency.

15   Q    How much?

16   A    275 in paper bills, $1.17 in loose change.

17   Q    And what denomination was the paper bills?

18   A    There were 13 $20 bills, one $10 bill and one $1 bill.

19   Q    Thank you.  Turning next to Daniel Harris.  Proposed

20   Exhibits 403, 405 and 430.  Were these all seized from

21   Mr. Harris's person?

22   A    They were.

23   Q    And then secured in evidence?

24   A    Yes, sir.

25              MR. ROTH:  Your Honor, I'd move for the admission of

1    403, 405 and 430?

2         THE COURT:  Hearing no objections they are admitted.

3         MR. ROTH:  Thank you.

4    BY MR. ROTH:

5    Q    Starting with 405, what is that item?

6    A    405 is a black Samsung Galaxy cell phone.

7    Q    Thank you.

8    A    With case.

9    Q    What is 403?

10   A    403 is U.S. currency, paper bills.

11   Q    How much?

12   A    $366.

13   Q    In what denominations?

14   A    17 $20 bills, four $5 bills, and one single.

15   Q    Thank you.

16        And our final item with Mr. Harris, Exhibit 430.  What

17   is that?

18   A    430 is an FN 509 pistol.

19   Q    What caliber is that?

20   A    Nine millimeter.

21   Q    Was it loaded?

22   A    It was.

23   Q    Was there anything added to that gun after market?

24   A    Yes.  There is an aftermarket optic placed on the firearm.

25   Q    What is an optic?

1    A    An optic is an enhanced sight.  It's purpose is to allow

2    the shooter increased ability to hit a target.

3    Q    Thank you.

4         And finally, Kaleb Franks, Exhibit 393, which is

5    already admitted.  Do you have that item up there?

6    A    I do, sir.

7    Q    What is that?

8    A    It is a Glock 19 nine millimeter pistol.

9    Q    And that was seized from Mr. Franks?

10   A    It was.

11   Q    Was it loaded?

12   A    It was.

13   Q    Was there anything added to that gun aftermarket?

14   A    There was.  There is also -- with this firearm there is

15   also an optic added as well as a flashlight.

16              MR. ROTH:  Thank you.

17              Your Honor, I have nothing further of this witness.

18              THE COURT:  All right.  Mr. Gibbons?

19              MR. GIBBONS:  Thank you, Your Honor.

20                        CROSS EXAMINATION

21     BY MR. GIBBONS:

22   Q    The taser that belonged to Adam Fox, is that -- what number

23   was that again?

24              THE COURT:  365 -- or 366.

25   BY MR. GIBBONS:

1   Q    366.  Can you remove that from the --

2   A    Yes, sir.

3   Q    Were you intending to publish these exhibits to the jury,

4   Jonathan?

5        Does that appear to take -- is that battery powered or

6   is it rechargeable?  How does that work?

7   A    Yes, sir.  It's battery operated.

8   Q    What does it look like for batteries?

9   A    Well, there is no batteries in the device currently.

10  Q    And if you were going to put batteries in it, what kind of

11  batteries would you use?

12  A    I am not seeing a label that has the exact battery size.

13  Q    Does it look like AAA?

14  A    Most likely AA.

15  Q    And how many receptacles are there for batteries?

16  A    One, sir.

17  Q    So it takes one battery?

18  A    I believe so.

19  Q    And it appears to be a AA?

20  A    Yes, sir.

21  Q    Okay.  For a taser, a -- you are in law enforcement, right?

22  A    Yes, sir.

23  Q    So a taser can be as much as like a thing that shoots a

24  Dart to people with wires on it, right?

25  A    I believe there are tasers that do operate that way, sir.

Q    Okay.  And those are -- that law enforcement would use to
interrupt somebody like right now, correct?

A    Well, the FBI does not or trained in the use of tasers.  We
are not issued them.

Q    Okay.  So you are not familiar with them then really?

A    No, sir.

Q    All right.  You don't know anymore than a regular civilian
would know about tasers?

A    Correct, sir.

Q    Okay.  This is a hand-held variety powered by a battery,
correct?

A    Correct, sir.

Q    Readily available?

A    I would assume so.

Q    Okay.  Not illegal, is it?

A    I have no knowledge on the legality of possessing a taser.

Q    No.  Amongst the things that were removed that you
collected, you did not retrieve a pistol or a firearm that you
could attribute to Mr. Fox, correct?

A    No, sir.

Q    You were present when the arrest occurred?

A    No, sir.

Q    You appeared after the arrest occurred?

A    Correct, sir.

         MR. GIBBONS:  Okay.  Thank you.

```
1            THE COURT:  All right.  Ms. Kelly?

2            MS. KELLY:  Thank you, Your Honor.

3                    CROSS EXAMINATION

4      BY MS. KELLY:

5      Q    Good morning, sir.

6      A    Good morning, ma'am.

7      Q    On behalf of Daniel Harris you collected items; you

8      transported them, correct?

9      A    Yes, ma'am.

10     Q    Okay.  Part of that evidence that you collected was a brown

11     wallet, correct?

12     A    I received that in a larger box of property.  I personally

13     did not collect that.

14     Q    Okay.  You wrote a report about the evidence that was

15     seized from Mr. Harris?

16     A    Yes, ma'am.

17     Q    And part of that included a brown wallet, is that right?

18     A    That's correct.

19     Q    With several items that were inside of that wallet?

20     A    Yes, ma'am.

21     Q    Okay.  And if I were to show you a photograph of the wallet

22     and the items inside of the wallet, would you be able to tell

23     the jury if this is a fair and accurate representation of those

24     items as listed in your report?

25     A    Yes, ma'am.
```

1          MS. KELLY:  May I approach the witness, Your Honor?

2          THE COURT:  Sure.

3      BY MS. KELLY:

4      Q    Have you had a chance to review that photograph?

5      A    Yes, ma'am.

6      Q    Okay.  And is that a fair and accurate representation of

7      the brown wallet and the items located inside of the wallet

8      seized from Mr. Harris on October the 7th?

9      A    It is.

10          MS. KELLY:  Your Honor, with the -- I will be

11      redacting a social security number, but I would move for this

12      piece of evidence.

13          THE COURT:  What's the number?

14          MS. KELLY:  This would be 4156.

15          THE COURT:  All right.  Does the government have any

16      objections?

17          MR. ROTH:  None, Your Honor.

18          THE COURT:  All right.  So we'll make sure the number

19      gets redacted in 4156 can be admitted.

20          MS. KELLY:  Thank you, Your Honor.  I have nothing

21      further.

22          THE COURT:  All right.  Do you want to publish it or

23      not?  Not with the social security number on it.

24          MS. KELLY:  Right.

25          THE COURT:  Fair enough.

```
 1                    MS. KELLY:  Thank you.

 2                    THE COURT:  Go ahead, Mr. Hills.

 3                    MR. HILLS:  No questions.

 4                    THE COURT:  Mr. Blanchard?

 5                    MR. BLANCHARD:  Could I approach the witness?  I

 6       wanted to look at one exhibit.

 7                    THE COURT:  One that's in evidence?

 8                    MR. BLANCHARD:  Yes.  The 366.  I don't have any

 9       questions.

10                    THE COURT:  All right.  Any redirect?

11                        REDIRECT EXAMINATION

12         BY MR. ROTH:

13       Q    You mentioned that there are no batteries in the taser now.

14       Were there batteries when it was seized?

15       A    There were.

16                    MR. ROTH:  Nothing else, Your Honor.  Thank you.

17                    THE COURT:  All right.  Anything else, Mr. Gibbons?

18                    MR. GIBBONS:  Just briefly.

19                        RECROSS EXAMINATION

20         BY MR. GIBBONS:

21       Q    There was one battery in the unit, correct?

22       A    Yes, sir.

23       Q    Because that's all it takes, right?

24       A    Yes, sir.

25                    MR. GIBBONS:  Thank you.
```

 1              THE COURT:  Anything else?

 2              MS. KELLY:  No, Your Honor.

 3              MR. HILLS:  No, Your Honor.

 4              THE COURT:  Thank you.  You may be excused.

 5         (Witness excused, 11:53 a.m.)

 6              THE COURT:  And we still have a little time.  Who is

 7    your next witness?

 8              MR. ROTH:  We call Special Agent Mailin Chuy-Horn.

 9              THE COURT:  Similar length.

10              MR. ROTH:  Yes, Your Honor.

11              THE COURT:  All right.  Let's go ahead.  Once you get

12    that set we'll have you sworn in.

13              MAILIN CHUY-HORN, GOVERNMENT

14              having been first duly sworn, testified as follows:

15         (Witness sworn, 11:53 a.m.)

16                   DIRECT EXAMINATION

17      BY MR. ROTH:

18    Q    Good morning.

19    A    Good morning.

20    Q    Could I have you start by stating and spelling your

21    complete name, please?

22    A    Yes.  Mailin Chuy-Horn.  That's M-a-i-l-i-n.  Last name C,

23    Charley, h-u-y H-o-r-n.

24    Q    Thank you.  Where are you employed?

25    A    I am employed with the Federal Bureau of Investigation.

1    Q    In what capacity?

2    A    I am a special agent.

3    Q    How long have you been a special agent with the FBI?

4    A    I have been a special agent for 21 years.

5    Q    Did you assist in executing a search warrant at Ty Garbin's

6    property in Luther, Michigan on October 7th, 2020?

7    A    Yes.  I did.

8    Q    Could you please describe that property for the jury?

9    A    Yes.  The property was kind of divided into two.  One area

10   had two sheds and a trailer.  Next to the trailer there was a

11   range that had -- was covered with, like, tires, and then

12   behind the range there was an area that we would consider,

13   like, a post-blast area.  The other side was, we call it a

14   compound.  It was consistent of, like, as you walked in there

15   was a cabin and a shed.  Then we had three more sheds, and I'm

16   sorry, trailers.  We had a trailer.  We had three more trailers

17   and a shed in the back.

18   Q    Thank you.  Could you give us an estimate as to the size of

19   the property?

20   A    On the size, I am not sure exactly the size.  They were

21   pretty big so I had to divide my team into two.

22   Q    Very good.  Thank you.  I want to discuss several of the

23   things seized at that property.  288, 289, 291 through 294.  Do

24   you have each of those items up there?

25   A    Yes.  I do, sir.

1    Q    Where on the property were they seized from?

2    A    They were properly seized from the Luther property.

3    Q    Were they in a specific location?

4    A    Yes.

5    Q    Where was that?

6    A    The evidence was seized from the trailer.  Some of the

7    evidence was seized from the post-blast location.

8    Q    Thank you.  Each of them were seized and secured in

9    evidence?

10   A    Yes.  They were.

11   Q    Thank you.

12        MR. ROTH:  Your Honor, I'd move for the admission of

13   Proposed Exhibits 288, 289, 291 through 294?

14        THE COURT:  Objections?  All right.  They are

15   admitted.

16        MR. ROTH:  Thank you, Your Honor.

17   BY MR. ROTH:

18   Q    Let's first talk about the items found in the trailer.

19   Could you please show the jury Exhibit 288?

20   A    Would you like me to open it?

21   Q    That's fine.  What is that item?

22   A    This is a confederate flag that has been signed and dated

23   with several individuals.

24   Q    Where in the trailer was that?

25   A    This was over the couch to the right of the entrance.

1   Q    Thank you.

2        What is Exhibit 289?

3   A    289 is what seems like a code -- like a hybrid code ledger

4   that has the letters with certain symbols to communicate.

5   Q    Thank you.

6   A    You are welcome.

7   Q    Where was that found?

8   A    This was found inside an ammo box on the entrance on a

9   table to the left.

10  Q    298, what is that item?

11       THE COURT:  298 I may have missed.  I don't think --

12       MR. ROTH:  I apologize.  I think I have that

13  misnumbered.  Let's see.  It's probably 291.  One moment.

14  BY MR. ROTH:

15  Q    295, which I believe I missed.  295 do you have up there?

16       THE COURT:  All right.  Let's establish the foundation

17  unless there is an objection?

18       THE WITNESS:  That's not on my property.

19       THE COURT:  Do you have 298 up there?

20       THE WITNESS:  I have 298, yes.

21  BY MR. ROTH:

22  Q    All right.  I think I just overlooked it before.  Let's

23  give a foundation for 298.  What is that item?

24  A    298 is a fireworks.

25       THE COURT:  Is there any objection to this or not?

1          MR. BLANCHARD:  I am not sure.

2          MR. ROTH:  I was going to lay a foundation before

3     having her open it or anything.

4          THE COURT:  Well, okay.  So before she describes what

5     it is, let's just lay the foundation that she got it at the

6     Luther search if that's what happened.

7          MR. ROTH:  Thank you, Your Honor.

8     BY MR. ROTH:

9     Q    Where did you find that item?

10    A    This was found in the shed next to the trailer.

11         MR. ROTH:  All right.  With that I would move for the

12    admission of Proposed Exhibit 295?

13         MR. BLANCHARD:  I thought we were 298.

14         THE COURT:  I think we are confused now.  We were

15    talking 298.

16         THE WITNESS:  Yes.

17         MR. ROTH:  298.  I apologize.

18         THE COURT:  I am looking at 298.  She says she got it

19    in the shed next to the trailer.  Any objections?

20         MR. BLANCHARD:  Is this -- just because we've gone

21    back and forth, is this the mortar launcher?  Is that --

22         MR. ROTH:  I believe so.

23         MR. BLANCHARD:  No objection.

24         THE COURT:  All right.  It's admitted.

25    BY MR. ROTH:

1    Q    What is that item?

2    A    This is a fireworks mortar launcher labeled commander and

3    chief.

4    Q    Could you open that up and show the jury?

5    A    Yes.

6    Q    And you said that there is a brand on it?

7    A    Yes.

8    Q    What is the brand?

9    A    The commander and chief.

10   Q    Could you show the jury where it says that?  Thank you.

11        Where was that shed relative to the trailer.

12   A    That was exactly on the south side of the trailer right

13   next to it.

14   Q    Thank you.

15        You also referred to a post-blast site, is that

16   correct?

17   A    That is correct.

18   Q    And where was that located relative to the trailer?

19   A    That was located kind of like the southwest of the trailer

20   almost behind the range.

21   Q    And why do you describe it as a post-blast site.  What did

22   you observe there?

23   A    We had observed that something had exploded.  So we saw in

24   the dirt like black that's normally used when something is with

25   fire or exploded there.  Those are the same things you see.

1    Q    Thank you.  Let's start with Exhibit 291.  What is that

2    item?

3    A    291 was we call it copper circles, but actually they are

4    pennies that we found all over the ground close to what we call

5    the post-blast.

6         MR. ROTH:  Your Honor, could we try the document

7    camera again and see if that would work?

8         THE COURT:  Sure.

9         MR. ROTH:  May be the easiest way for everybody to see

10   that.  May I approach?

11        THE COURT:  Sure.  I am not optimistic so far, though,

12   because we are not getting any -- we are not getting any input.

13        MR. ROTH:  All right.

14        THE COURT:  You can try the plugs or you can try -- I

15   think that's another thing they left after the upgrade.  So

16   usually whenever I get an upgrade everything breaks for a

17   while.

18        MR. ROTH:  I am not going to know how to make that

19   work.  I am only going to make that worse.

20        THE COURT:  We'll check it on the break and if other

21   people want to use it they can.

22        MR. ROTH:  If I can just hold it up for the jury?

23        THE COURT:  Sure.

24   BY MR. ROTH:

25   Q    All right.  What is it that we are seeing here?

1      THE COURT:  You can pass it through if you want to.

2      MR. ROTH:  That will be fine, Judge.

3  BY MR. ROTH:

4  Q    Generally speaking what is it?  That bag?

5  A    There is pennies in the bag.

6  Q    Approximately how many?

7  A    I don't have that paper.

8  Q    In the neighborhood?

9  A    There were approximately, like, 10 or 12 pennies.

10  Q    Thank you.  In what condition were they in?

11  A    They were in perfect condition.

12  Q    The pennies were in perfect condition?

13  A    Well, they had some dark on it from the fire, but yes.

14  Q    Maybe charring?

15  A    Correct.

16  Q    Thank you.  We'll wait for that to finish passing and we'll

17  do the next item.

18      THE COURT:  You can go.  People can concentrate on

19  more than one thing at once.

20  BY MR. ROTH:

21  Q    What is Exhibit 293?

22  A    293 is black electrical tape.

23  Q    Where was that found?

24  A    That was found also in the ground of the post-blast scene.

25  Q    What condition was that tape in?

1    A    They were destroyed so they were little pieces of the tape

2    connected to it seemed like white paper or maybe wrappings.

3              MR. ROTH:  May have I pass that as well?

4              THE COURT:  Sure.

5              MR. BLANCHARD:  Can I see that, Jon?  Okay.

6    BY MR. ROTH:

7    Q    What is Exhibit 294?

8    A    Exhibit 294 are pieces of paper, cardboard and rubber

9    bands.

10   Q    Where were they found?

11   A    They were also found on the ground of the post-blast scene.

12   Q    Was there anything visible on those, any charring?

13   A    Yes.

14   Q    Approximately how many of those little pieces did you find

15   in there?

16   A    We found --

17   Q    Again, just an estimate.

18   A    Probably like 10 or 12.  There were parts of, like, round

19   cardboard, like a top or something and then a lot of the pieces

20   around the cardboard and small pieces and tape.

21   Q    I am going to retrieve that and pass that.

22              And our final item, 292.

23   A    Yes.  These are metal staples that were found on the tree.

24   Q    So they were still in the tree when they were found?

25   A    Yes.  Of the post-blast.

Q    What condition were they in?

A    Some of them were charred and some of them had pieces of paper.

Q    The paper was too small to be able to tell what was on it?

A    That's correct.

Q    And we don't need to pass those.

     Where were all these items located relative to each other?  How close of an area?

A    They were pretty close.  They were probably, like, two to three feet circumference around a tree.

Q    When I say that, not just the staples, but all the items we just talked about, the staples, the pennies, all of that was together?

A    That's correct.  They were altogether.

     MR. ROTH:  Very good.

     I have nothing further, Your Honor.

     THE COURT:  Mr. Gibbons?

     MR. GIBBONS:  Pass the witness, Your Honor.

     THE COURT:  Ms. Kelly?

                CROSS EXAMINATION

Q    Good morning.

A    Good morning.

Q    I guess it's good afternoon.

     The search of the property that you conducted, that was on October the 8th, is that correct?

1   A    That was on -- let me refresh my memory.  Sorry.  October

2   the 8th, correct.

3   Q    Okay.  And this last question I just want to make sure that

4   I heard you right.  You said everything that you found, all

5   these items that we've just passed around, they were within two

6   to three feet, is that right?

7   A    They were in circumference from the post-blast two three

8   feet.

9   Q    Okay.

10  A    Maybe a little bit more but approximately.

11          MS. KELLY:  Okay.  I have nothing further.  Thank you.

12          THE COURT:  All right.  Mr. Hills?

13              CROSS EXAMINATION

14    BY MR. HILLS:

15  Q    And the tube that you have there, that's the kind of tube

16  that you drop a firework in and the wick comes all the way out

17  the top and you light the wick.  Is that the purpose of that

18  for?

19  A    I'm sorry.  I don't know.  I never used it.

20  Q    All right.  And the pennies that were found I take it were

21  just right around that tree?

22  A    They were around the tree.  They may have been further than

23  three feet but pretty much that area.

24  Q    Kind of dropped down right below where you found the

25  staples, is that right?

1    A    Around it.

2    Q    Okay.  And when you said they were in perfect condition,

3    the pennies weren't even damaged like --

4    A    No.  They were black and charred but the circular was still

5    almost whole.

6    Q    And you can see the impressions on the pennies as well?

7    A    Most of them.  Yes.

8              MR. HILLS:  All right.  Thank you.

9              THE COURT:  Mr. Blanchard?

10             MR. BLANCHARD:  I hate to disappoint but I don't have

11   any questions.

12             THE COURT:  Any redirect?

13             MR. ROTH:  No, Your Honor.  Thank you.

14             THE COURT:  All right.  Thank you.  You may be

15   excused.

16             (Witness excused, 12:07 p.m.)

17             THE COURT:  So this isn't a bad time for a break

18   unless you have a three-minute witness.

19             MR. ROTH:  We can certainly do more witnesses if you

20   like.

21             THE COURT:  No.  No.  How long is your next witness?

22             MR. ROTH:  It would be a very similar length.

23             THE COURT:  Why don't we do this.  Let's take our

24   break now and then we'll have about an hour and-a-half segment

25   to finish.  So we'll take our 20 minutes now.

1            LAW CLERK:  All rise.

2            (Jury out, 12:08 p.m.)

3            THE COURT:  Okay.  Twenty minutes.

4            LAW CLERK:  Court is in recess.

5            (Recess taken, 12:08 p.m.)

6            (Resume proceedings, 12:31 p.m.)

7            LAW CLERK:  All rise, please.

8            (Jury in, 12:31 p.m.)

9            LAW CLERK:  The United States District Court for the

10    Western District of Michigan is now in session.  The Honorable

11    Robert J. Jonker, chief judge, presiding.

12            THE COURT:  All right.  Thank you and welcome back.

13    We are here for the third segment of our day and we'll go to

14    Mr. Roth for the government's next witness.

15            MR. ROTH:  Thank you, Your Honor.  We call Special

16    Agent Eli Bowers.

17            ELI BOWERS, GOVERNMENT

18            having been first duly sworn, testified as follows:

19            (Witness sworn, 12:32 p.m.)

20                    DIRECT EXAMINATION

21      BY MR. ROTH:

22    Q    You can have a seat.  Could I have you start by stating and

23    spelling your complete name, please?

24    A    Sure.  My name is Eli Bowers.  B-o-w-e-r-s is the last

25    name.  First name is E-l-i.

1    Q    Thank you.  Where are you employed?

2    A    I am employed by the FBI in Detroit, Michigan.

3    Q    In what capacity?

4    A    I am a special agent with the child exploitation task

5    force.

6    Q    How long have you been with the FBI?

7    A    It has been almost seven years.

8    Q    Did you assist in executing a search warrant on a red Mazda

9    car on/or about October 7th, 2020?

10   A    Yes.  I did.

11   Q    Where was that car at the time that you searched it?

12   A    It was at 1662 Lansing, and that was in Hartland, Michigan.

13   Q    Whose house was that?

14   A    That was Ty Garbin's house.

15   Q    Whose red Mazda was that?

16   A    Belonged to Dan Harris.

17   Q    Have you reviewed Proposed Exhibits 406, 409 through 411

18   and 473 through 476?

19   A    Yes.

20   Q    Are 406 and 409 through 411 fair and accurate pictures of

21   what you found in Daniel Harris's car?

22   A    Yes.

23   Q    And are 473 through 476 items that were seized from Daniel

24   Harris's car?

25   A    Yes.

1        MR. ROTH:  With that I would move for the admission of

2   Proposed Exhibits 406, 409 through 411 and 473 through 476?

3        THE COURT:  Any objections?

4        MS. KELLY:  No.

5        THE COURT:  All right.  They are admitted.

6        MR. ROTH:  Thank you, Your Honor.

7   BY MR. ROTH:

8   Q   Could you please find Exhibit 40 -- let's put 406 on the

9   screen first.  And while we have that coming up would you mind

10  finding and showing the jury Exhibit 475?

11  A   Sure.

12  Q   All right.  You can have a seat with that.  What is that

13  item?

14  A   This appears to be a ballistic helmet.

15  Q   Where was it found?

16  A   It was found in the red Mazda on the floorboard behind the

17  driver's seat I believe.

18  Q   Could you please describe for the jury the helmet and the

19  items that are attached to it?

20  A   Sure.  So this is a ballistic helmet.  I am not sure what

21  its rating is as far as what kind of rounds it could take or

22  anything.  Obviously with some sort of camouflage canvas

23  covering on it.  It appears to be a mount for -- typically used

24  for, like, night vision scope or something like that on the

25  front.  And then there is also this hearing protection and

1    communication equipment on the outside.  I say communication

2    equipment because these can be used for when -- around when

3    shooting firearms.  Just because it's so loud you want to

4    protect your ears, but then also there is cables and things

5    that you can hook up to these.  I am not sure if this is one of

6    them.  Yeah.  This has got a little radio input on there so you

7    can communicate via radio with something like this.

8    Q    Thank you.  And you can put that back in the bag.

9         While he does that, can we put 409 on the screen,

10   please?

11        And if you can find 476 while you are up?  What item

12   do you see on the screen.

13   A    This is -- I don't know the exhibit.

14   Q    What is the item?

15   A    This is a plate carrier, and by that I mean this is an --

16   essentially a vest that carries ballistic plates, and in this

17   case there are level 4 ceramic ballistic plates in here.

18   Q    So the item we see on the screen, that vest is what you are

19   holding in your hands?

20   A    Yes.  That's correct.

21   Q    Where was this found?

22   A    This was found in the trunk of the Mazda.

23   Q    And were there, in fact, plates in the carrier?

24   A    Yes.  And they are in there now.

25   Q    You describe them as level 4.  What does that mean?

A    There are different levels of ballistic protection.
Typically with level 4 that means that they would stop a rifle
round.  Obviously there are rifles that could penetrate, but
most of the rifles.

Q    Was anything else found in the pockets of the vest?

A    There were three magazines for an AR style rifle and they
were loaded.

Q    What caliber ammunition?

A    .223 caliber.

Q    Do you know approximately how many rounds per magazine?

A    I don't know.  They were 30-round magazines.  I am not sure
how far they were loaded.

Q    But each magazine was approximately 30 capacity?

A    Yeah.

Q    Thank you.  And you can return the vest to its bag as well.

     And if you could find 473 for us?

A    Which one was that?  Oh, I got it.

Q    Could we look at 410, please?

     What do we see on the screen?

A    Are you looking for the belt?

Q    This is the backpack.

A    The backpack.  I see it.  Okay.

Q    Okay.  And you have the backpack itself?

A    I do have the backpack.  Yes.

Q    And then what's the black item that's with it?

1    A    This is a thigh holster for a pistol.

2    Q    Were those together?

3    A    Yes.

4    Q    All right.  So where was the backpack found?

5    A    It was also in the trunk.

6    Q    Where was the holster?

7    A    I don't know if it was right on top or right inside of the

8    backpack.

9    Q    And what did you find inside of the backpack?

10   A    In addition to this holster there were a few rolls of

11   paracord.  It's parachute cord typically used in military type

12   operations as well as chem lights, which are essentially glow

13   sticks used in certain military operations or just to mark

14   things outside in the dark.

15   Q    Parachute cord could be used for things other than

16   parachutes?

17   A    I would say primarily it's used for other things.

18   Q    It's very high quality rope?

19   A    Correct.  And small.

20   Q    Anything else in the backpack?

21   A    No.

22   Q    And you said the thigh holster.  What is a thigh holster?

23   A    A thigh holster is -- your typical holster you think would

24   be mounted on the hip, where on a thigh holster it's down

25   further on the thigh, and these typically are so you can wear

1    more equipment up top and be able to clear the pistol when you

2    are pulling it out around a tactical vest.

3    Q    Very good.  And you can return that item, please.  And

4    while you are looking we'll take 474 next.

5    A    474?

6    Q    Could we look at 411, please?

7         What is that item?

8    A    This is an equipment belt.

9    Q    Do we see that on the screen?

10   A    Yes.

11   Q    So explain what you mean by equipment belt?

12   A    Well, this is something that would be typically worn in

13   conjunction with, like, that plate carrier I showed earlier.

14   And this is to carry -- as you noticed, it's a very wide belt,

15   and it's padded because you carry a lot of other gear on there,

16   and not your holster in this case.  You'd be wearing a thigh

17   holster, but you can carry other magazines, a medical kit, and

18   then these are suspenders to kind of keep the weight even

19   further off of your hips.

20   Q    Where did you find this belt?

21   A    This was also in the trunk of the Mazda.

22   Q    Were there more magazines in this belt?

23   A    Yes.  There were five magazines in this belt and they were

24   all loaded.

25   Q    Were they rifle magazines or pistol magazines?

1    A    They were rifle magazines, similar to the ones that were

2    found in the plate area for an AR still rifle.

3    Q    What caliber?

4    A    .223.

5    Q    And again, 30-round capacity?

6    A    Yes.

7    Q    Did you find anything else in this belt?

8    A    I mean, there was this med kit and I am not sure if there

9    is anything else.

10   Q    Thank you.  You can return that to the bag.

11            Was there another car present at the same location, Ty

12   Garbin's house, that day?

13   A    Yes.  There was.

14   Q    What kind of car was that?

15   A    It was an F150.

16   Q    Who did that belong to?

17   A    Which belonged to Ty Garbin.

18   Q    I believe you have Exhibit 296 up there?

19   A    Yes.

20   Q    It should be the rifle.  Was that found in Ty Garbin's

21   F150?

22   A    Yes.  It was.

23   Q    Where?

24   A    I am not sure.  I was primarily towards the back of the

25   vehicle doing packaging and things like that.

1    Q    Do you know if that rifle was loaded?

2    A    I don't know.

3    Q    Very good.  And was there also a Glock pistol 455 found

4    there?

5    A    Yes.  There was.

6    Q    Could you show that to the jury, please?

7    A    Sure.

8              THE COURT:  Number for identification?

9              MR. ROTH:  455, Your Honor.  I apologize.

10             THE COURT:  Thank you.

11   BY MR. ROTH:

12   Q    That was also found in Ty Garbin's car?

13   A    Yes.  It was.

14   Q    And again, you don't recall where?

15   A    I do not.  No.

16   Q    Very good.  Were there other firearms found in Ty Garbin's

17   car?

18   A    Yes.  There were.

19   Q    What kind?

20   A    There was a Mossberg 410 shotgun, as well as a 22 caliber

21   rifle.

22   Q    Any other firearm related items found in Ty Garbin's car?

23   A    Yes.  There were -- there was a box of 410 shotgun shells,

24   and 410 is just a caliber essentially of shotgun shell.  There

25   was also a loaded magazine of nine millimeter ammunition.

1   There were two silencers or suppressers or whatever you like to

2   call them, and then there was at least a holster.  And other

3   than that, there was a night vision scope that was found.

4   Q    A night vision scope?

5   A    Yes.

6        MR. ROTH:  Very good.

7        I have nothing else of this witness, Your Honor.

8   Thank you.

9        THE COURT:  All right.  Go to Mr. Gibbons.

10        MR. GIBBONS:  No questions, Your Honor.

11        THE COURT:  Ms. Kelly?

12        MS. KELLY:  Thank you, Your Honor.

13                    CROSS EXAMINATION

14   BY MS. KELLY:

15   Q    Good afternoon, Special Agent.

16   A    Good afternoon.

17   Q    With respect to Daniel Harris's red Mazda?

18   A    Yes.

19   Q    Most of the items that you have just shown us, those were

20   located in the trunk of his car, is that right?

21   A    Most of them.  Yes.

22   Q    Except for the helmet that you found behind his driver's

23   seat, right?

24   A    Correct.

25   Q    And there were a couple of other little items, and I

1    believe they have been placed up on the table there for you.  I

2    am going to first direct your attention, did you locate a

3    receipt in the center consul of Daniel Harris's car?

4    A    Yes.

5    Q    Okay.  Is that receipt up there for you for identification

6    purposes?

7    A    Yes.  That's the one.

8    Q    Okay.  And can you tell, is that -- that is the receipt

9    that you found in his vehicle, correct?

10   A    I mean, I was there when it was found when I was searching

11   the car.  It was recovered by a different agent in here but

12   yes.

13   Q    Okay.  And you made a report reflecting that this receipt

14   was located in the car?

15   A    I did not make the report.  No.

16   Q    Okay.  Have you reviewed a report of the search of the car?

17   A    Yes.

18   Q    Okay.  Would you agree that this receipt was found in

19   Daniel Harris's car during the search of the -- during the

20   search of the car?

21   A    Yes.

22   Q    Okay.  And is that receipt, that's from Accurate Firearms,

23   is that right?

24   A    That's correct.

25            THE COURT:  Do you have any objection to this exhibit?

1          MR. ROTH:  No, Your Honor.  Thank you.

2          THE COURT:  What's the number?

3          MS. KELLY:  So this would be 4157.

4          THE COURT:  All right.  So 4157 can be admitted.

5          MS. KELLY:  Thank you, Your Honor.

6    BY MS. KELLY:

7    Q    Do you see a date on that receipt?

8    A    Yes.  I do.

9    Q    Okay.  And that's February of 2020, is that right?

10   A    February 21st, 2020.  Yes.

11   Q    Okay.  Thank you.  The other item that's up there that I

12   would mark as Defense Proposed Exhibit 4158, that's a security

13   badge, is that right?

14   A    Yes.

15   Q    That was also located in the center console of Daniel

16   Harris's car?

17   A    Yes.

18   Q    Okay.  Is that that -- that was the security badge that was

19   found during the search of the car, correct?

20   A    Yes.

21         MS. KELLY:  I'd move for admission of 4158?

22         THE COURT:  Any objections?

23         MR. ROTH:  None, Your Honor.  Thank you.

24         THE COURT:  Admitted.

25   BY MS. KELLY:

1    Q    Okay.  On that security badge there is a photograph of

2    Daniel Harris, is that right?

3    A    Yes.

4    Q    Okay.  And could you -- could you tell the jury where that

5    security badge is from or the words that are on it?

6    A    Sure.  There is a picture that's labeled Daniel Harris.

7    Has his title as security officer, and the company appears to

8    be DK Security.  I am not familiar with the company, but...

9              MS. KELLY:  Thank you.  I have nothing further, Your

10   Honor.

11             THE COURT:  All right.  Mr. Hills?

12             MR. HILLS:  Nothing.

13             THE COURT:  Mr. Blanchard?

14             MR. BLANCHARD:  I don't have any questions.

15             THE COURT:  All right.  Any redirect?

16             MR. ROTH:  No, Your Honor.  Thank you.

17             THE COURT:  All right.  Thank you.  Then you may be

18   excused.

19             THE WITNESS:  Thank you.

20             (Witness excused, 12:47 p.m.)

21             THE COURT:  We'll go to the government's next witness.

22             MR. ROTH:  We call Special Agent Rebecca Huizinga.

23             THE COURT:  We'll have you sworn in before you take

24   your seat.

25             REBECCA HUIZINGA, GOVERNMENT

1    having been first duly sworn, testified as follows:

2    (Witness sworn, 12:48 p.m.)

3    DIRECT EXAMINATION

4    BY MR. ROTH:

5    Q    Good afternoon.

6    A    Hi.

7    Q    Could I have you start by stating and spelling your

8    complete name, please?

9    A    Rebecca Huizinga.  R-e-b-e-c-c-a.  Huizinga,

10   H-u-i-z-i-n-g-a.

11   Q    Thank you.  Where are you employed?

12   A    With the FBI.

13   Q    In what capacity?

14   A    I am a special agent there.

15   Q    How long have you been a special agent with the FBI?

16   A    Fifteen years.

17   Q    Did you assist in executing a search warrant at 1262 Beach

18   Drive in Lake Orion on October 7th, 2020?

19   A    I did.

20   Q    Who lived at that address?

21   A    Dan Harris.

22   Q    Were there other family members who lived at the house as

23   well?

24   A    Yes.  There is a Robert Harris as well.

25   Q    Was there a portion of the house that Daniel Harris

1    specifically lived in?

2    A    In the basement.

3    Q    That was his sort of exclusive area?

4    A    Yes.

5    Q    Could you please describe the layout of the basement?

6    A    Yes.  The basement had, when you first walked in, a living

7    room area.  Directly to your right is a kitchen.  Off that is a

8    small pantry.  If you were to walk forward into the next room

9    it was set up as an office with some storage to the right on

10   the far right wall.  Those were rooms C and E.  That room

11   additionally had a closet in it as well that would have been

12   room D.  If you step back out into the living room and looked

13   to -- over to your left down the hallway the first door on the

14   right would have been a laundry room and storage area.  The

15   next room beyond that on the right was a bedroom but not set up

16   as that.  It just had, like, a dresser and a hutch in there but

17   no bed.  Further down the hallway to the right would have been

18   a second office.  That was room I.  Across the hallway from

19   that was a bedroom.  That's room H.  There is a half bath

20   associated with that, and then at the end of the hallway was a

21   full bathroom.

22   Q    You referred to some room letters.  Those were not, like,

23   on the door or anything, right?

24   A    We put those up when we walk in.

25   Q    And that was what I was meaning to ask.  I apologize.  It's

1    not that these rooms were prelabeled by the homeowners; this

2    was something that you guys did to help identify what came from

3    where?

4    A    Correct.

5    Q    Very good.  And did you limit the search to the basement

6    area?

7    A    Yes.

8    Q    I want to discuss several of the things found in the

9    basement.  Have you reviewed Proposed Exhibits 149, 400, 401,

10   404, 412, 413, 450 and 453?

11   A    I have.

12   Q    Are 149, 400, 401, 404 and 453 items that were seized from

13   the basement and secured in evidence?

14   A    They are.

15   Q    And are Proposed Exhibits 412, 413 and 450 fair and

16   accurate pictures taken inside the basement?

17   A    They are.

18        MR. ROTH:  At this time I would then move for the

19   admission of Proposed Exhibits 149, 400, 401, 404, 412, 413,

20   450 and 453?

21        THE COURT:  All right.  Any objection?

22        MS. KELLY:  No, Your Honor.  Thank you.

23        THE COURT:  They are admitted.

24        MR. ROTH:  Thank you.

25   BY MR. ROTH:

1    Q    So before we get into the admitted exhibits I want to talk

2    about one that is just labeled for identification purposes only

3    and that is what is marked as 402.  Is that an item found in

4    the basement?

5    A    Yes.

6    Q    What is that item?

7    A    402 --

8    Q    Was there a series of notebooks?

9    A    Yes.  Sorry.  Just making sure.

10   Q    No problem?

11   A    402 was a series of notebooks.

12   Q    Where are they located?

13   A    Those were located in room I.

14   Q    And just for some context, what was the nature of the room

15   I?

16   A    Room I was set up as an office.  There was a desk in there

17   and some book shelves.

18   Q    Approximately how many notebooks was it?

19   A    Fifteen.

20   Q    All right.  So now move onto the admitted exhibits.  What

21   is 404?

22   A    404 I believe is a holster.

23   Q    Could you please take that out and show the jury?

24   A    Absolutely.

25   Q    And you can hold that up for the jury.  So what is that

1      item?

2      A    This is a holster.

3      Q    For a firearm, a pistol?

4      A    Yes, sir.

5      Q    And what is the pattern on it?

6      A    It's a topical floral pattern.

7      Q    Where was that item found?

8      A    This was found in the bedroom room H.

9      Q    Thank you.

10          We are going to move next to 149.  What is that item?

11     A    This is a gun barrel.

12     Q    So explain what you mean by that?

13     A    It is the end of a firearm barrel.  It is sawed off on one

14     end and would have the remainder of the sights on the other.

15     Q    What do you see on it that leads you to believe it was

16     sawed off?

17     A    Jagged markings on this far end.

18     Q    Thank you.  Where was it found?

19     A    This was found in room I.

20     Q    That was the office room?

21     A    The office.  Yes, sir.

22     Q    Could we look at 146 on the screen, please?

23          Does this appear to be consistent with the barrel that

24     you are holding that you found in the office?

25     A    Yes, sir.

Q    And just for reference, that's the rifle shown in Exhibit

146.  About how long is the barrel portion that you found there

approximately?

A    Ten inches.

Q    Thank you.  You can take that down.

        Could you find Exhibit 400, please?  400 would be the

suit I think.  What is that item?

A    This is a ghillie suit.

Q    What is a ghillie suit?

A    A ghillie suit is an item of clothing used to camouflage or

conceal the wearer to their environment.  It can come in a

variety of different forms.  In this case foilage or grass.  In

other cases it could conceal you in sand or snow.

Q    Where was it found?

A    It was found in Room I, which is, again, the office.

Q    And it looked like there was multiple parts.  What are the

two parts that you had there?

A    This is the pants and then there is a jacket that goes

above and there is additionally a face covering as well.

Q    Thank you.  And you can return those to the bag.

        Could you find Exhibit 4 -- I'm sorry, 412 is a

picture.

        Could we take a look at 412, please?

        What room are we looking at here.

A    This is room H, the bedroom.

1    Q    What do we see in that area?

2    A    There is a weapon and the tropical print holster on the

3    floor there.

4    Q    The holster is right here on the floor?

5    A    Yes, sir.

6    Q    And what is the weapon leaning against?

7    A    The weapon is leaning against the nightstand.

8    Q    Do we see that closer in Exhibit 413?

9    A    You do.

10    Q    Can we switch it to 413?  Thank you.  All right.  And what

11    kind of firearm is that?

12    A    That's a Anderson Manufacturing AM-15.

13    Q    Is Exhibit 401 the rifle itself?

14    A    Yes, sir.

15    Q    Could you please take that out and show the jury?

16    A    Yes, sir.

17    Q    You said it was an Anderson Manufacturing rifle?

18    A    Yes, sir.

19    Q    What caliber?

20    A    This is a multical.

21    Q    Meaning it can take different caliber ammunition?

22    A    Yes, sir.

23    Q    Was it loaded when it was found?

24    A    No, sir.

25    Q    And is there anything that appears to be added after market

1    to it?

2    A    Yes, sir.  The scope has definitely been added and the

3    flashlight would have been added.

4    Q    Thank you.  You can return that to the box.

5         Could we please look at 450?  What room is this?

6    A    This is same bedroom, Room H.

7    Q    And could you please show the jury Exhibit 453?

8    A    Yes, sir.

9    Q    Is that the rifle itself?

10   A    Yes, sir.

11   Q    What kind of rifle is that?

12   A    This is a Century Arms RAS-47.

13   Q    Was it loaded?

14   A    Yes, sir.  It was.

15   Q    What caliber?

16   A    Thirty-nine.

17   Q    Was anything apparently added after market to this rifle?

18   A    Yes, sir.  The scope as well.

19   Q    Thank you.  And you said this was in the same bedroom that

20   we just saw?

21   A    Yes, sir.

22   Q    Very good.  Also leaning against the wall?

23   A    Yes, sir.

24   Q    Thank you.  You can return that to the box.

25        Did you find any other guns in the basement.

1   A   Yes, sir.  There was a total of eight guns in the basement.

2   Q   So the two that we saw plus six additional?

3   A   Yes, sir.

4   Q   What kind generally?

5   A   Two revolvers, a pistol and the rest were rifles.

6   Q   Two revolvers, one semiautomatic pistol and three rifles?

7   A   There is outside of these two.

8   Q   Outside of the two we spoke of?

9   A   Yes, sir.

10  Q   Very good.  I apologize.  Where were those guns, the other

11  six?

12  A   There was a rifle in Room A, which is the living room.

13  There was a revolver in Room F, which would have been the

14  laundry room storage area.  There was a second revolver in Room

15  I, which was the office.  There were two rifles in the office.

16  And then there were additionally these two rifles in the

17  bedroom.

18  Q   Were any of them loaded?

19  A   Yes, sir.  Two weapons were loaded.

20  Q   Do you recall generally which two?

21  A   Yes, sir.  The Century Arms RAS-47 was loaded and there was

22  an M 1938 Russian rifle and that was found in Room I that was

23  loaded.

24  Q   A Russian rifle?

25  A   Yes.  It's called an M 1938 Russian.

1    Q    Thank you.  Was there additional ammunition in the

2    basement?

3    A    Yes, sir.

4    Q    How much?

5    A    I counted 1,042 single rounds.  In addition to that there

6    was boxed ammo, and there were four ammo cans with loose rounds

7    in those, and those can carry hundreds of rounds depending on

8    the size of the ammunition.

9    Q    So you said there was 1,042 rounds, and it sounded like

10   separate from boxed ammunition, and I can't recall what the

11   phrase you used.  A bucket?

12   A    Yeah.  So there is ammo cans.

13   Q    Ammo cans, is that right?

14   A    And those hold -- you can put obviously boxed rounds in

15   those, but those were full of loose ammunition.

16   Q    Very good.  And were there magazines?

17   A    Yes.

18   Q    Were any of the rounds loaded into magazines?

19   A    Yes.  There was 16 magazines.  Seven were loaded.

20           MR. ROTH:  Thank you.  I have nothing else, Your

21   Honor.

22           THE COURT:  All right.  Mr. Gibbons?

23           MR. GIBBONS:  No questions, Your Honor.

24           THE COURT:  Ms. Kelly?

25           MS. KELLY:  Thank you, Your Honor.

CROSS EXAMINATION

BY MS. KELLY:

Q    Good afternoon, Special Agent.

A    Hi.

Q    You were asked a little bit about these notebooks that are identified in Exhibit 402.  Do you remember talking about those?

A    Yes, ma'am.

Q    Those are 15 or so notebooks, is that right?

A    Yes, ma'am.

Q    And you have those here today?

A    Yes, ma'am.

Q    Okay.  And those were found in an office, is that right?

A    Yes, ma'am.  They were found in Room I, which is set up as an office.

Q    Okay.  They were in a closet?

A    No.  They were on the floor.

Q    Okay.  All 15 of them were found on the floor?

A    Yes, ma'am.

Q    Okay.  Could you tell what those notebooks contained?

A    I did not review the notebooks myself.

Q    Okay.  And those notebooks, in which -- which item are they in?

A    I'm sorry.

Q    You have a bunch up there?

1    A    Would you like me to take them out?

2    Q    If you could, please.  Thank you.  Is there anything on the

3    outside of those notebooks, any words on those?

4         THE COURT:  Well, they haven't been admitted yet so I

5    don't know where we're going with it.  I don't know --

6         MR. ROTH:  We do not intend to seek their admission,

7    Your Honor.  In terms of if counsel is asking if there's like a

8    brand name on the notebooks I have no objection to that, but if

9    we are talking about what's written on them or inside of them,

10   that would be hearsay and we would object to that.

11        THE COURT:  Right.  I agree.  Go ahead.

12   BY MS. KELLY:

13   Q    I am asking for a brand name, if there is one on those

14   green ones in particular?

15   A    These are listed as Federal Supply Service.  This green one

16   is All Weather Tactical, Right in the Rain.  This is an

17   additional Right in the Rain, All Weather Tactical, and this

18   says All Weather Field Book.

19   Q    Okay.  And these are all the notebooks that you located

20   during the search of Mr. Harris's office, is that right?

21   A    There are, I think, two other notebooks that were found as

22   well that were entered separately.

23   Q    Okay.  But these are the notebooks that you found in

24   Mr. Harris's office --

25   A    Yes.

1    Q    -- is that right?

2         MS. KELLY:  Okay.  Your Honor, I suppose at this time

3    I'm going to make a motion to move these into evidence?

4         THE COURT:  All right.  What would be the basis?  You

5    can't get into the contents unless there is a hearsay exception

6    and I don't know what that would be.

7         MS. KELLY:  I do believe that portions of these

8    notebooks may be introduced at a later time.

9         THE COURT:  Then we'll have to get to it by portion,

10   but there is certainly no exception that I can think of that

11   would allow generic admission of the notebooks on the current

12   foundation.

13        MS. KELLY:  Thank you, Your Honor.

14   BY MS. KELLY:

15   Q    As part of your search of the house and the basement in

16   particular you located certain documents, medical documents,

17   passport documents, is that correct?

18   A    An application for a passport was found.  Yes, ma'am.

19   Q    Okay.  And may we show this witness Defense Proposed

20   Exhibit 4014?

21        Have you had a chance to review the documents in this

22   photograph?

23   A    As in I reviewed the photo of them, yes.

24   Q    Okay.  Is this a fair and accurate representation of items

25   that you located during the search of Mr. Harris's home?

1    A    These items were located at the residence.  Yes.

2            MS. KELLY:  Okay.  I'd move for admission of 4014?

3            THE COURT:  Well, they are in the same bailiwick, I

4    mean, as to content.  I don't know what the relevance is,

5    No. 1, and I don't understand what the basis for content would

6    be.

7            MR. ROTH:  I would have the same objection, Your

8    Honor.

9            MS. KELLY:  These are items located within the house,

10   Your Honor.

11           THE COURT:  Right.  I know they are located there, but

12   that doesn't make them admissible.  If there is content in it

13   that needs to come in through a hearsay exception.

14           MS. KELLY:  I believe there has been additional

15   testimony that Mr. Harris was making these applications and

16   that the medic pocket guides --

17           THE COURT:  Well, I mean, that's -- if there is a way

18   to get that in it has to be on your side of the case through a

19   witness who can be subject to cross examination, and it doesn't

20   just come in because somebody found it at the house.  So if

21   that's the only basis I'll exclude it and sustain the objection

22   for now.

23           MR. ROTH:  Thank you, Your Honor.

24   BY MS. KELLY:

25   Q    The item that you showed under Exhibit 401 that was located

1    in the bedroom, you recall that item that was standing up on

2    the night stand?

3    A    You are talking about the Anderson Manufacturing AM-15?

4    Q    Correct.

5    A    Okay.

6    Q    I believe you said that was not loaded, is that right?

7    A    Correct.  That was not loaded.

8                MR. KELLY:  Okay.  I have nothing further.  Thank you.

9                THE COURT:  All right.  Mr. Hills?

10               MR. HILLS:  Nothing, Your Honor.

11               THE COURT:  Mr. Blanchard?

12               MR. BLANCHARD:  Just briefly.

13                        CROSS EXAMINATION

14     BY MR. BLANCHARD:

15   Q    Can I have Exhibit 146, please?

16               Ma'am, you testified regarding this and maybe you

17   misspoke, but did you refer to this as a rifle?

18   A    I did refer to 146 as a rifle.

19   Q    The item depicted there is a rifle?

20   A    No.

21   Q    Okay.  You'd agree that's a shotgun, right?

22   A    I am not a weapons expert so I couldn't tell you, like, for

23   sure.  There is two different photos.

24   Q    Let's look at the one on the right.

25   A    Okay.

1    Q    Is that a shotgun?

2    A    I couldn't tell you that.

3            MR. BLANCHARD:  Okay.  I'll pass the witness.

4            THE COURT:  Any redirect?

5            MR. ROTH:  None, Your Honor.  Thank you.

6            THE COURT:  Thank you.  You may be excused.

7            (Witness excused, 1:09 p.m.)

8            THE COURT:  We'll go to your next witness.

9            MR. KESSLER:  The government calls Special Agent Mike

10   Jacobs.

11           THE COURT:  All right.  We'll have you sworn in first

12   and then you can take the stand.

13           MIKE JACOBS, GOVERNMENT

14           having been first duly sworn, testified as follows:

15           (Witness sworn, 1:10 p.m.)

16                    DIRECT EXAMINATION

17    BY MR. KESSLER:

18   Q    Good afternoon, Agent Jacobs.

19   A    Good afternoon.

20   Q    You are a Special Agent with the Bureau of Alcohol,

21   Tobacco, Firearms and Explosives, correct?

22   A    Correct.

23   Q    That's what people commonly refer to as ATF?

24   A    That's right.

25   Q    How long have you been a special agent with ATF?

1    A    Six years with the ATF.

2    Q    Before that what did you do?

3    A    I was a police officer with the Wayne State University

4    Police Department in Detroit, Michigan for approximately eight

5    years.

6    Q    And are you stationed at the ATF Detroit field office now?

7    A    Yes.

8    Q    All right.  What kind of crimes do you normally

9    investigate?  We've heard from a lot of FBI agents, but you are

10   ATF.  If you could tell the jury?

11   A    Yes, sir.  The ATF's primary function is to investigate

12   violations of firearms laws, federal firearms laws, and

13   especially those violations that include violent crimes.

14   That's the main mandate of the ATF, but we also investigate

15   crimes that involve explosives and arson.

16   Q    Are you more on the firearms or the explosives side of the

17   house?

18   A    I am pretty much on the violent crime firearm side.

19   Q    Do you have any specialized expertise beyond what normal

20   ATF agents have?

21   A    Yes.  I am what the ATF refers to as a nexus agent.  Nexus

22   agents receive additional training in the identification of

23   firearms the manufacturing processes as it relates to firearms,

24   and in making determinations based on those things.

25   Q    Okay.  And let me ask you specifically about some of the

1    things that you are asked to look at with firearms.

2    A    Sure.

3    Q    Do you sometimes have to determine what the origin of a

4    firearm is?

5    A    Correct.

6    Q    What's the purpose of that?

7    A    So for the federal government to have a jurisdiction over

8    crimes involving firearms there has to be an interstate -- a

9    nexus between the interstate commerce.

10   Q    Okay.

11   A    That's what the purpose in identifying the origin is.

12   Q    That's not for all firearms crimes, right?

13   A    If -- well, no.  Not for all firearms crimes.  Correct.

14   Q    So there is some firearms crimes that don't even matter

15   where the gun is manufactured, correct?

16   A    Yes.

17   Q    We'll get to one of those in a moment.  Do you sometimes

18   have to look at whether the firearm was functioning properly

19   the way it was designed?

20   A    Yes.

21   Q    And how do you test that?

22   A    You can function test a firearm just by handling it,

23   cycling the firearm, pulling the trigger, those types of

24   things.  You can also actually take the firearm and test fire

25   it at a facility.

Q    So let me ask you a little bit about the training you

received to become a nexus agent.  Is there a special school

for that?

A    Yes.

Q    Tell the jury just very briefly what that involves?

A    So you go down to the ATF academy and you spend a week just

learning about multiple different types of firearms, how to

identify firearms, the history of firearms, and you know, how

to research firearms, who to contact when researching firearms,

those kinds of things.  And then I have been to advance

training also under the nexus branch, which is several more

weeks of training where we've done a lot of tours of firearm

manufacturing facilities.

Q    Do you do continuing education as well?

A    Yes.

Q    What does that involve?

A    Usually, typically that is just staying apprised of new

firearms that are being manufactured, variance -- variances in

firearms, the firearms laws and how they change, because

sometimes they change a little bit.  And then in that I stay --

I continually research all different firearms, and I keep a

catalog of magazines and books and I am always on the Internet

reading about firearms almost every day.

Q    Okay.  And you mentioned touring firearms manufacturers.

Do you continue to do that?

1    A    Yes.

2    Q    Okay.  About how many hours do you think you've trained on

3    firearms legality and these specialized aspects of firearms?

4    A    I could -- a lot.  Hundreds.

5    Q    Okay.  Have you examined many firearms in your career?

6    A    Yes.  Probably over a thousand.

7            MR. KESSLER:  I'd like to tender Special Agent Jacobs

8    as an expert -- as an ATF nexus expert, Your Honor?

9            THE COURT:  Any objections from the Defense?

10           MR. HILLS:  No.

11           THE COURT:  All right.  So members of the jury, what

12   that means is that this witness, based on training and

13   experience, can give you his opinions, if he's asked, about

14   things within the scope of his study and experience,

15   specifically the nexus issues he's talked about.  And you can

16   accept it or reject it in total or in part, whatever you think

17   is appropriate after the group of you discuss it in

18   deliberations, but that's the purpose where we'll go from here

19   with Mr. Kessler first.

20           MR. KESSLER:  Thank you.

21   BY MR. KESSLER:

22   Q    So Agent Jacobs, are there certain kinds of firearms that

23   are subject to special regulations?

24   A    Yes.

25   Q    All right.  Let me ask you about three categories of those.

```
 1      A     Yeah.

 2      Q     Machine guns.  Are there special things that need to be

 3      done before you can legally possess a machine gun?

 4      A     Yes.

 5      Q     Tell the jury about that.

 6      A     So a machine gun in general for the public is an illegal

 7      thing to own.

 8      Q     First off, if you could tell them what defines what is a

 9      machine gun?

10      A     So the National Firearms Act and the Gun Control Act both

11      have definitions of what a machine gun is.  Those are two laws

12      that were put into place by the federal government.  One, the

13      National Firearms Act in 1934, and the Gun Control Act in 1968.

14      The National Firearms Act of 1934 was enacted -- basically at

15      that time there was a lot of --

16            THE COURT:  Let me cut you off a minute and ask you to

17      focus on his question, because the jury is going to have to

18      listen to me on what the law is.  The law that you talk about

19      can only be context for the question which was what's a machine

20      gun?

21            THE WITNESS:  Okay.  I'm sorry.

22      BY MR. KESSLER:

23      Q     Let's just start with what is a machine gun?

24      A     A machine gun is a weapon that can shoot -- can shoot -- r.

25            As designed to shoot or can be readily converted to
```

1    shoot more than one projectile by the act of an explosion with

2    a single pull of a trigger.

3    Q    Okay.  And do you require special permits or is there

4    special regulation to own a silencer?

5    A    Yes.

6    Q    And briefly just tell the jury what a silencer is?

7    A    A silencer is a device that is used to muffle the sound of

8    a firearm to make it quieter.

9    Q    Okay.  So both of those things it could be legal to possess

10   them if you have the appropriate permits?

11   A    Correct.

12   Q    And then finally, what is a short-barreled rifle or

13   shotgun?

14   A    Short-barreled rifle is a rifle that has a barrel length

15   shorter than 16 inches.  A short-barreled shotgun is a shotgun

16   that has a barrel length less than 18 inches.

17   Q    Okay.  Are those also illegal to possess unless you have

18   appropriately registered those with the government?

19   A    Yes.

20   Q    Now, we've all seen pistols here during the course of this

21   trial and they are obviously shorter than 10 -- barrels are

22   shorter than 10, or I mean, 16 or 18 inches.

23   A    Yes.

24   Q    Do those regulations, do those apply to pistols as well or

25   no?

1    A    No.  Not the short-barreled rifle regulation doesn't.

2    Q    All right.  Let's just very briefly talk about what the

3    requirements would be to register a short-barreled rifle or

4    shotgun.

5    A    Okay.

6    Q    Very briefly.  Just tell the jury.

7    A    So you'd have to fill out a -- one of -- a form through the

8    ATF, send that form in asking for approval to get a tax stamp

9    to own one of these firearms.  So you would send the

10   information in.  The ATF would do a background check and do

11   certain things, and then if you are approved you pay $200 and

12   you would receive the tax stamp to possess it.

13   Q    Okay.  And let's explain a little bit about what kind of

14   people get approved.  Are certain people prohibited from owning

15   firearms at all?

16   A    Yes.

17   Q    All right.  Let's just take one example most people have

18   heard of.  Felons.  Someone convicted of a felony.

19   A    Yes.  Felons can't.

20   Q    So if someone applied for permission to possess one of

21   these firearms and they are a felon what would the ATF do?

22   A    They would not approve it.

23   Q    Okay.  You say they also have to pay a tax to get a tax

24   stamp, is that right?

25   A    Yes.

1    Q    How much does that cost?

2    A    $200.

3    Q    So if someone is not a prohibited person and they go

4    through all of those steps it would be legal to have a

5    short-barreled rifle?

6    A    Yes.

7    Q    Does it matter in the case of possession of short-barreled

8    rifles whether or not the rifle traveled across state lines or

9    whether there was interstate nexus?

10   A    No.

11   Q    Okay.  Were you asked to examine a firearm in this case?

12   A    Yes.

13   Q    All right.  And what you have on the floor in front of you

14   has already been admitted as Government's Exhibit 401.  Would

15   you mind picking that up and just holding it?

16   A    Yes.

17   Q    Agent Jacobs, what kind of a weapon are you holding here?

18   A    This is an Anderson Manufacturing model AM-15, and I think

19   it's in the 556/223 configuration.  The lower receiver on this

20   firearm is a multicaliber.  So depending on what the upper

21   receiver is on this firearm you can change the caliber that it

22   fires.

23   Q    And I want to have you explain something to the jury

24   because we've heard some witnesses refer to firearms as 556 and

25   some of them refer to it as 223?

A     Yes.

Q     Are those the same caliber?

A     They are very similar.  556 is the metric -- basically the metric conversion to 223 is the standard -- standard conversion.

Q     When you say standard, like, based off of inches?

A     Yeah.  Like off of inches.  There is a, like a very, very slight difference.  If a firearm is chambered to fire 556 it can also fire 223.  If a firearm is solely chambered to fire 223 it will not be able to fire a 556 without damaging the firearm.

Q     We've looked at this rifle already and several others like it, but this particular one is charged in a count in the indictment so I'd like you to find the serial number for us and read that if you would?

A     Yeah.  The serial number on this one is 16012390.

Q     Okay.  Now, we've heard some of these type of rifles referred to as an AR platform rifle.  Can you tell the jury what that is?

A     So the AR -- if it's an AR-15 platformed or AR-15 style rifle, the AR-15 is one of the most popular rifle systems in the United States.  I think there is -- it's estimated that there's between five and ten million that are owned in the United States.  They are extremely popular.  They are very versatile, and they are based off of a design that was produced

1    by ArmaLite in the 1950s, and then it was primarily converted

2    to military use in around the Vietnam era and then from there

3    they gained popularity.

4    Q    So similar to the U.S. military's M-16?

5    A    Well, this is closer to an M-4.  Yeah.  It started as an

6    M-16 and then as design changes were made this would be closer

7    to an M-4.

8    Q    Now, you mentioned earlier that some guns are fully

9    automatic machine guns.  What's a semiautomatic rifle?

10   A    A semiautomatic rifle is a rifle that fires a single

11   projectile for every pull of the trigger.

12   Q    Okay.  Now, this particular -- that you would refer to this

13   as an AR platform rifle?

14   A    Yes.

15   Q    This particular one we've also heard refer to as an AM-15?

16   A    Correct.

17   Q    What's the difference in the designation?

18   A    So AR-15 is the original manufactured designation by

19   ArmaLite.  So that's like a model that ArmaLite created.

20   Everything else is like in that style of design of the AR-15

21   design.  So the AM-15 is the model designation by Anderson

22   Manufacturing for this particular firearm.

23   Q    So let me ask you about Anderson Manufacturing.  Where are

24   they located?

25   A    They are located in Hebron, Kentucky.

Q    How do you know that?

A    I've been there to Anderson Manufacturing.

Q    So did you actually tour the Anderson Manufacturing factory in preparation for this case?

A    I did.

Q    All right.  And do you remember when it was that you went there?

A    It was the third week of February, 2022.

Q    Have you watched Anderson Manufacturing make rifles like this?

A    Yup.  I watched them make almost exactly this -- this firearm right here.

Q    Are you familiar with all the parts and how that rifle is put together?

A    Yes.

Q    Would you say that this one is stock the way it comes from the factory or has it been modified?

A    Well, this one has been pretty heavily modified I would say.

Q    Can you tell the jury just what the major modifications are?

A    So first off, obviously, I'll -- so in my research of this particular firearm I was able to determine that the receiver was manufactured by Anderson Manufacturing as what they call a stripped lower receiver.  So that means that just this bottom

1    piece here that houses the trigger and the firing mechanism

2    was, like, by itself.  And then from there you can buy a parts

3    kit that goes inside of it to place the trigger and the other

4    parts that you need to make it into a fully functional lower

5    receiver.  This grip was added.  The barrel was added.  The

6    hand guard was added.  The hand stop was added.  The front and

7    rear sights were added.  The muzzle device was added.  The

8    flashlight was added.  The stock was added at a later date.

9    And then the upper receiver was also added later on.  So when

10   this was originally manufactured it was just this bottom piece

11   and then everything else was put together later.

12   Q    Okay.  Now, I want to focus on one particular part of it.

13   You mentioned a muzzle device.  Can you tell the jury what a

14   muzzle break is?

15   A    So a muzzle break is a device that is attached to the front

16   of a barrel to allow for -- a muzzle break is supposed to

17   lesson recoil on a firearm by expelling the gas that comes from

18   the front of the barrel, like pushing the gas out a little bit

19   further, so giving you less recoil when you pull the trigger.

20   Q    You now, in a gun that can fire as fast as you can pull the

21   trigger, can you explain to the jury how a muzzle break

22   lessening the recoil would be useful?

23   A    Yeah.  So if you are quickly pulling the trigger on a

24   firearm you are going to have a little bit of recoil, and that

25   will raise the barrel of the firearm when you are shooting

1    every time.  It'll kick itself up.  So when you lesson the

2    recoil it helps you stay on target and be more accurate when

3    you are shooting.  Plus it looks cool.  A lot of people think

4    that they look cool.

5    Q    Okay.  Can you tell the jury what a flash suppresser is?

6    A    A flash suppresser is a device that is attached to the

7    front of a barrel that does basically what it says.  It lessons

8    the flash at night.  So if you are firing the -- one of these

9    at night it has a pretty bright flash that comes out of the

10   front of it, and if you put a flash compressor on the front it

11   will make the flash look much much less.

12   Q    Does that make it harder for somebody to see where you are

13   shooting from?

14   A    That's right.  Yeah.

15   Q    The device that's on Exhibit 401, is that both a muzzle

16   break and a flash suppresser?

17   A    I believe it is.  It's a flash can it's called.  So it's

18   according to what I was able to determine from researching it,

19   it is supposed to lesson recoil and then expel the gas out

20   further from the front of the barrel.  And it's -- you know,

21   it's kind of a mix between a flash suppresser and a muzzle

22   break.

23   Q    So you mentioned earlier in your testimony that

24   short-barreled rifles are regulated, and then you can't legally

25   own one unless you file the application and pay the tax,

1    correct?

2    A    Correct.

3    Q    And what was the minimum legal length again for the barrel

4    on a rifle like this?

5    A    Sixteen inches.

6    Q    Okay.  And what do you count in deciding where the 16

7    inches begin and end?

8    A    So to determine the length of the barrel, I measure the

9    barrel with the bolt closed.  This is -- this is the bolt here.

10   So if you open it up you get a few more inches.  It goes back.

11   So the ATF procedure is to have the bolt closed, to push a

12   dowel rod down into the barrel, and then measure the furthest

13   part of the barrel that is -- the further part of the barrel to

14   get the length.  Now, a muzzle device is only counted as part

15   of the barrel if it is permanently attached to the barrel.  And

16   permanent -- permanently attached means it's welded on or

17   pinned on or soldered on.

18   Q    And in this particular rifle, Exhibit 401, is the muzzle

19   device permanently affixed to the barrel?

20   A    It is not.  It has a threaded barrel, so it's screwed on,

21   so if you take a wrench you can unscrew it.

22   Q    Did you do that to measure the barrel on this gun?

23   A    Yes.  I did.

24   Q    And you inserted the dowel down the barrel to the closed

25   bolt?

1    A    Yes.

2    Q    And what's the length of the barrel?

3    A    It's approximately 10 and-a-half inches.

4    Q    So five and-a-half inches shorter than the minimum legal

5    length?

6    A    Yes.

7    Q    As a matter of fact, even with the muzzle device on is it a

8    16-inch barrel?

9    A    No.  With the muzzle device on I think it was a little over

10   13 inches.

11   Q    So still too short?

12   A    Yes.

13   Q    Now, you mentioned the shoulder stock being something that

14   was custom added.  Can you hold it up a little so everyone in

15   the jury can see the shoulder stock?  All right.  Now, you

16   mentioned that these regulations on the minimum length of a

17   barrel don't apply to a pistol, right?

18   A    That's right.

19   Q    If that shoulder stock wasn't on there, is there a

20   modification like that that would make this a pistol?

21   A    Yes.  So a few years ago the ATF determined -- well, first

22   off, a rifle is designed to be fired from the shoulder.  A

23   pistol is designed to be fired with one -- with a single hand.

24   So there is -- there is a design where you can put a -- what

25   they call a brace, a pistol brace on the back of the AR-15 or

1    this AR-15 style weapon, and it would make it to where you
2    could strap this to one arm and you could fire it with one
3    hand.  It would be pretty difficult but still possible and
4    plausible.  If you had the brace on here that would change the
5    configuration and design of this so that it's not designed to
6    be fired from the shoulder, and then it would be considered a
7    pistol at that point.
8    Q    In your training and experience have you run across both
9    configurations?
10   A    Yes.
11   Q    And in your training and experience, why do people switch
12   out the shoulder stock for a pistol brace?
13   A    If somebody was switching it out, that would be so that
14   they could make it a legal firearm to possess.  So if you were
15   to put a pistol brace on this, it would make it legal with the
16   shorter -- with the shorter barrel.
17   Q    But in this configuration is it legal or illegal to have a
18   10 and-a-half inch barrel?
19   A    It is illegal to be in this configuration because it is
20   designed to be fired from the shoulder with this stock that is
21   attached to it.
22   Q    You mentioned that if somebody wants to apply to possess
23   this legally they have to file the application and pay the tax,
24   correct?
25   A    Correct.

1    Q    Does the ATF keep records of all registered weapons where

2    someone has done it right like that?

3    A    Yes.

4    Q    Have you actually searched for this particular rifle with

5    that serial number in the ATF's records?

6    A    I did.

7    Q    And did you find that it was registered to Daniel Harris?

8    A    No.

9    Q    Did you find that that gun was registered to anyone?

10   A    No.

11   Q    So that gun is illegal to possess under the National

12   Firearms Act as you see it, correct?

13   A    Yes.

14           MR. KESSLER:  I have nothing further, Your Honor.

15           THE COURT:  All right.  Mr. Gibbons?

16           MR. GIBBONS:  Thank you, Your Honor.

17                     CROSS EXAMINATION

18     BY MR. GIBBONS:

19   Q    Just a couple questions to follow up.  You talked about the

20   AR designation with respect to the rifle.

21   A    Yes.

22   Q    And what that stands for is ArmaLite Rifle, is that

23   correct?

24   A    Yes.

25   Q    So people often times think that means assault rifle?

1    A    Correct.  That's incorrect.

2    Q    That would be an incorrect assumption, correct?

3    A    Yes.

4    Q    All right.  The muzzle break, is that something that's

5    legal to put on a rifle?

6    A    Yes.

7    Q    And is the flash suppresser something that's legal to put

8    on a rifle?

9    A    It is.

10   Q    All right.  And then if I could have exhibit --

11   Government's Exhibit 58, please?  And Pam, if you could zoom in

12   on the upper and the lower there of Adam's rifle?

13          Do you see this rifle?

14   A    Yes.

15   Q    Is there any way to tell whether there is a round in the

16   chamber of that rifle from this photograph?

17   A    No.

18          MR. GIBBONS:  Okay.  Thank you.

19          THE COURT:  Ms. Kelly?

20          MS. KELLY:  Thank you, Your Honor.

21                    CROSS EXAMINATION

22    BY MS. KELLY:

23   Q    Good afternoon, sir.

24   A    Good afternoon.

25   Q    You testified a little bit about you did this research on

1    this particular rifle, right?

2    A    Yes.

3    Q    You have access to databases and can look up the

4    information, is that right?

5    A    Yeah.

6    Q    To look up that serial number, and you can find out all

7    sorts of information about this rifle, right?

8    A    Yes.

9    Q    Normal people like myself would not have access to that, is

10   that correct?

11   A    No.

12   Q    Okay.  And the lower receiver and the upper receiver, those

13   are made by different companies, is that right?

14   A    Yes.

15   Q    Okay.  So the lower receiver is an ArmaLite, right?

16   A    No.  The lower receiver is an Anderson Manufacturing.

17   Q    Anderson Manufacturing.  And what's the upper receiver?

18   A    So the upper was forged by a company called Cardinal Forge.

19   I can't tell you who milled it because there is no markings on

20   who milled the upper receiver, but I can tell you that it was

21   forged.  So the aluminum block that it's made out of was made

22   at that metal forge.  So it was forged at a place called

23   Cardinal Forge.

24   Q    Okay.  And I believe you said that it was -- this

25   particular rifle was never registered to anyone, is that right?

A    Not in the NFA it wasn't.

Q    Okay.  And it's true that people can sell guns or firearms to each other, correct?

A    Yes.

Q    Okay.  And so if you were to buy a firearm and you wanted to see if it was properly registered before you bought it, how does one go about that?

A    So if you were -- if you were buying a short-barreled rifle for example, which is an NFA firearm, you would probably -- if you know about firearms you would know that the barrel is short.  You would want -- if you are educated and you know the barrel is -- obviously if you look at this you can see that it barely -- even with the muzzle device it barely comes out past the hand guard.  So the only way you'd be able to tell if it was actually registered would be someone would give you a copy of it, the registration information and the tax stamp.  It actually has a stamp that goes with it if it's legally registered.

Q    So if someone called the ATF and said, I want to see if this is properly registered, ATF is not going to give that information over the phone, correct?

A    No.  But if somebody had the proper identification and they were trying to see if it was registered to them we could look it up for them.

Q    If it was not registered to them and you were going to buy

1    a rifle and you called the ATF and said, I want to know if this

2    was properly registered, you wouldn't give that over the phone,

3    right?

4    A    We might.  We wouldn't give who it was registered to but we

5    might give the information that it is actually legally

6    registered.

7    Q    The policy of the ATF is to provide that information over

8    the phone, is that what your testimony is?

9    A    I don't know what ATF policy is on that.

10   Q    Okay.

11   A    I probably -- I don't know if I would -- I'd have to ask a

12   lawyer at the ATF.

13   Q    Fair enough.  And you talked about the flash suppresser and

14   the flash can and you said you believed it was a flash can.

15   You are not certain, is that right?

16   A    No.  It's a flash can, but the function of it is --

17   honestly, the function of it is to look cool.  This one in

18   particular, I don't think -- I read a lot of reviews on it.  So

19   the reviews -- people were reviewing it and saying it didn't

20   really do what it was designed to do.  What it's designed to do

21   is push the gas out further away from the front of the barrel,

22   and the reason to push the gas out further is to lesson the

23   recoil, and the way that this one is designed and the way it

24   looks like to me is to suppress the flash as well.  So it's

25   kind of -- historically it was either a muzzle break or a flash

1    suppresser.  And recently they have been designing things that

2    are supposed to do both.  So when I say I think it does that, I

3    have never fired this.

4    Q   Okay.

5    A   So I couldn't tell you, but from the reviews I read it

6    doesn't really work that well.  It just looks cool.

7    Q   It doesn't do what it is supposed to do; it just looks

8    cool?

9    A   Right, but that's just off the reviews I read.  I didn't

10   try it.

11   Q   Okay.  And Mr. Gibbons talked to you a bit about assault

12   rifles and the definition.  The assault rifle -- an assault

13   rifle is not defined anywhere in the NFA, correct?

14   A   No.

15   Q   Okay.  And you talked a bit about these stocks and braces.

16   So to make sure that I understand correctly, if there was a

17   pistol brace that was attached to this rifle it would be

18   completely legal, is that correct?

19   A   Yes.

20   Q   And what would that look like at the end of that with a

21   pistol brace?  Can you describe that for the jury?

22   A   The back part of the stock would have an opening like a

23   flap that you could slide your arm into, and then it would have

24   a strap that could go and strap around your arm.  So it was,

25   like, you could slide your arm right into the plastic and you'd

1    have two pieces of polymer around your wrist and then you'd

2    strap it in with a strap.

3    Q    Okay.  And that would make -- that would make it in a

4    pistol configuration, correct?

5    A    Yes.

6    Q    And completely legal, correct?

7    A    Yes.  Under current law.

8    Q    Okay.  And the process I believe you said was you fill out

9    an application, right, for a short-barreled rifle, right?

10   A    Yeah.  There is ATF forms depending on whether you are

11   manufacturing a short-barreled rifle yourself or if you are

12   just transferring one that's already previously been

13   manufactured by somebody else.

14   Q    And it's a $200 --

15   A    Fee.

16   Q    -- fee?  Okay.  And then the ATF would review and provide

17   that tax stamp, is that right?

18   A    Yes.

19              MS. KELLY:  I have nothing further.  Thank you.

20              THE COURT:  All right.  Mr. Hills?

21                     CROSS EXAMINATION

22     BY MR. HILLS:

23   Q    I believe you indicated that this is one of the most or

24   maybe the most popular style gun that's sold?

25   A    Yeah.  One of.  Yeah.

Q     Okay.  Five to ten million of them sold?

A     Five to ten million in circulation but it's hard to tell.

Q     Okay.  All right.  And you indicated it's a versatile gun?

A     Yes.

Q     Like the one you are talking about it sounds -- from my ears it sounds like it's a build your own.  You buy the lower receiver and then you can pick different parts to put onto the gun?

A     Yes.

Q     And that's one of the reasons it's versatile?

A     That's one of the reasons.  And then depending on the configuration it can be used for different things.

Q     All right.  Self-defense type stuff?

A     Yeah.  Mainly.

Q     Mainly.  Okay.  And you are holding onto the barrel but you are not holding directly onto the barrel, correct?

A     Yes.

Q     There is I think you called it a hand guard?

A     Hand stop.  This is a hand stop.  This is the hand guard here.  Yeah.  You are right if you are talking about this part.

Q     Yeah.  And on the end of it there is like, is it called a rail where you attach different things?

A     Yes.

Q     And so the barrel, most of them come with that rail, is that right, something around it where you can attach different

1    stuff to it?

2    A    No.  The hand guard is what has the rail attachments on it.

3    So you see the hand guard is a separate piece that you buy.  It

4    slides over the top of the barrel.  And the reason for that is

5    the barrel gets really hot when you are shooting it, and when

6    you got the guard around it stops it from burning your hand.

7    Q    But on the hand guard at the end of the gun, things are

8    attached to it, correct?

9    A    Yes.

10   Q    All right.  And the barrel or the guard around the barrel

11   comes so that you can attach things to it?

12   A    You can -- you can buy certain hand guards that have the

13   ability to place attachments onto it.  Yes.

14   Q    Okay.  And then there are lots of different kinds of

15   attachments that you can attach to it, correct?

16   A    Yes.

17   Q    That's another reason it's versatile?

18   A    Correct.  Yeah.

19   Q    Okay.  So that one has a flashlight but you can attach

20   other things to it?

21   A    Sure.

22   Q    Like lasers and things like that?

23   A    Yes.

24   Q    All right.  And the muzzle break?

25   A    Yes.

1    Q    You indicated that when you have a muzzle break it lessons

2    recoil?

3    A    Yes.

4    Q    From -- when I hear that I hear it doesn't hurt my shoulder

5    as much, is that an effect as well?

6    A    Yes.

7    Q    So if you are shooting a lot of rounds it lessons the blow

8    to your shoulder, is that correct?

9    A    Yeah.  But in general, this platform doesn't have much

10   recoil.

11   Q    Okay.

12   A    The recoil is -- the recoil -- if you want to lesson the

13   recoil on this, in my opinion, it is to make it more accurate

14   so that it accurate -- it fires more accurately.

15   Q    All right.  So not as much recoil, but it does soften the

16   blow on your shoulder?

17   A    Yes.

18   Q    But it also helps from not going up?

19   A    Every time you pull the trigger on a firearm it's going to

20   raise the firearm just slightly.  I mean, you mitigate that by

21   the way that you hold it and the way that you shoot it, but any

22   way that you can mitigate the recoil will help your accuracy.

23   Q    Help your aim?

24   A    Yes.

25             MR. HILLS:  Okay.  Thank you.

```
 1                   THE COURT:  Mr. Blanchard?

 2                   MR. BLANCHARD:  Thank you.

 3                       CROSS EXAMINATION

 4     BY MR. BLANCHARD:

 5     Q    I think we established that muzzle breaks, even if they are

 6     just meant to look cool, are legal, right?

 7     A    Yes.

 8     Q    Okay.  In America we don't have any laws that prohibit you

 9     from having 30-round magazines, right?

10     A    No.  Not currently.

11     Q    In America we don't have any laws that prevent you from

12     having lots of 30-round magazines, correct?

13     A    No.

14     Q    And in America we don't have any laws that prevent you from

15     having lots of loaded 30-round magazines, correct?

16     A    Correct.

17     Q    Okay.  And in America we don't have limits on how much

18     ammunition you can have, true?

19     A    No.  That's true.

20     Q    In fact, you've encountered a gun enthusiast or two in your

21     day, right?

22     A    Right.

23     Q    You've encountered a lot of gun enthusiasts?

24     A    Correct.  Yes.

25     Q    And you have encountered a lot of gun enthusiasts who
```

1    possess lots of ammunition, correct?

2    A    I wouldn't -- I mean, a lot -- I've encountered a few

3    that -- well, your definition of a lot of ammunition might be

4    different than my definition of a lot of ammunition.

5    Q    It's not uncommon for you to encounter someone who has a

6    few thousand rounds of ammunition, correct?

7    A    A few thousand rounds is actually quite a bit to see.

8    Q    You can buy cans of four or five hundred rounds at a time,

9    right?

10   A    Yes.  But it's fairly expensive to --

11   Q    It is?

12   A    -- to purchase ammunition.

13   Q    And in summer of 2020 there were ammunition shortages,

14   correct?

15   A    Yes.

16   Q    And ammunition prices were going up, correct?

17   A    Correct.

18   Q    And that was driven, as you understand it, in part by

19   people buying in bulk, correct?

20   A    What I know is that the major driver of the ammunition

21   shortage was the fact that a lot of the parts and things needed

22   to manufacture the ammunition come from different parts of the

23   world and we were having an issue with during the coronavirus

24   getting things from other countries.  So that was part of the

25   main reason why there was a shortage of ammunition.  Now, some

1    people may have been buying in bulk, but those usually were

2    dealers that were buying in bulk so they could sell it to the

3    general public.

4         MR. BLANCHARD:  Pass the witness.

5         THE COURT:  Redirect?

6         MR. KESSLER:  Just briefly, Your Honor,

7                   REDIRECT EXAMINATION

8    BY MR. KESSLER:

9    Q    You were asked by my colleague here if you can buy a

10   firearm like this, right?  Like, you can just buy it from

11   somebody else, not from a store, and have to check with ATF if

12   it was registered, right?

13   A    Yes.

14   Q    All right.  Have you ever heard a short-barreled rifle

15   referred to as an SBR?

16   A    Yes.

17   Q    So if someone said, I have an illegal SBR in my car, they

18   would be referring to the short-barreled --

19        THE COURT:  Well, he is not here to talk about --

20        MR. KESSLER:  Just the SBR part, Your Honor, that's

21   all.

22        THE COURT:  So he's already said he referred to that.

23   So fair enough.  Next question.

24   BY MR. KESSLER:

25   Q    Mr. Blanchard asked you, in America we don't have laws

1    prohibiting this, that and the other.  But in America we do

2    have laws prohibiting a barrel less than 16 inches on a gun

3    like this, correct?

4    A    We do.

5    Q    In the form that it's in right now?

6         MR. BLANCHARD:  I am going to object to the leading

7    nature.

8         THE COURT:  It is leading.  It's responsive, though,

9    and I think -- I mean, it's also a little incomplete, right,

10   because it's illegal if it's not registered.

11   BY MR. KESSLER:

12   Q    Correct.  So I'll close that loop.  It's illegal to own a

13   gun like this in America today if it's configured like this and

14   not registered?

15        MR. BLANCHARD:  Objection, leading.

16        THE COURT:  Well, he's asking for it --

17        THE WITNESS:  In the configuration that this rifle is

18   in, with the barrel length that it has, and the stock that's on

19   it, you have to have it registered with the ATF and have a tax

20   stamp for it.  If you do not have it registered, you do not

21   have the tax stamp, it is illegal to have this.

22   BY MR. KESSLER:

23   Q    And finally, you were asked if a gun like this can be used

24   for legal things.  It can, right?

25   A    Yeah.

1    Q    Can it also be used for illegal things?

2    A    Yes.

3             MR. KESSLER:  Thank you.

4             THE COURT:  All right.  Any further cross,

5    Mr. Gibbons, Ms. Kelly?

6             MR. GIBBONS:  No.

7             MS. KELLY:  No.

8             MR. HILLS:  No.

9             MR. BLANCHARD:  No.

10            THE COURT:  Thank you.  You may be excused.  We'll go

11   to your next witness.

12            (Witness excused, 1:47 p.m.)

13            THE COURT:  At least get started.

14            MR. ROTH:  Thank you, Your Honor.  We call Michael

15   Yauk.

16            MICHAEL YAUK, GOVERNMENT

17            having been first duly sworn, testified as follows:

18            (Witness sworn, 1:47 p.m.)

19                    DIRECT EXAMINATION

20     BY MR. ROTH:

21   Q    Good afternoon.

22   A    Hi.

23   Q    Could I have you start by stating and spelling your

24   complete name, please?

25   A    Michael Yauk.  M-i-c-h-a-e-l.  Y-a-u-k.

Q    Thank you.  Where are you employed?

A    The Federal Bureau of Investigation.

Q    In what capacity?

A    I am a senior digital forensic examiner.

Q    What are your responsibilities in that position?

A    We perform analysis on electronic evidence, like cell

phones, computers, iPads, things like that.

Q    How long have you been with the FBI?

A    Eleven years.

Q    Do you have any previous experience in that field?

A    Yeah.  I spent eight years in education training law

enforcement in digital forensics and cyber crime at Eastern

Michigan University.  And I also taught in the academic program

in the undergraduate program there.

Q    I want to focus specifically on your responsibilities with

the FBI and your analysis of cell phones.  Is there a process

by which you can analyze a cell phone and create a report that

summarizes the contents of a phone?

A    There is.

Q    Have you received training in that process?

A    Yes.

Q    Could you please describe that training?

A    So our training as a whole or all digital forensics is

approximately 400 hours to begin with, and it covers forensics

on a computer, on cell phones, on tablets.  And as you progress

1    through the training it becomes more specialized for different

2    devices like cell phones.

3    Q    And could you describe the training generally speaking that

4    you receive as to cell phones?

5    A    There is a number of weeks in our -- on our standard

6    curriculum, in our normal curriculum as you enter the FBI.  And

7    then as -- like I said, as you progress there are other

8    training courses that you are able to take either through the

9    FBI or through other public training courses.

10   Q    So with that background in mind, could you please describe

11   for the jury the process by which you can extract the contents

12   of a cell phone?

13   A    Sure.  So when we receive a request, that's how we receive

14   our authorization or our -- the request actually to begin an

15   examination.  So the case agent would submit this request to

16   us.  At that point it would get assigned to one of the

17   examiners in the field office where I work.

18          At that point it would get then assigned to someone.

19   That person would check that request, review the legal

20   authority, and then pull that item from evidence.

21          After that they'll perform essentially an inventory of

22   the device to figure out the make and model of the device, and

23   then begin the process of attempting to extract the information

24   from the device.

25          Once the information has been extracted, then we can

1    actually put it into a human readable format.  When we pull it

2    off the cell phone, normally it's not in a readable format that

3    we can then present to the case agent.  So we would then put it

4    into that readable format and let the case agent review that

5    information.

6    Q    What do you use to extract the cell phone contents from the

7    cell phone?

8    A    There is a number of tools.  Probably the biggest tool we

9    use is from a software company called Cellebrite.

10   Q    And what does that enable you to do?  How does that work?

11   A    That is an extraction and analysis tool for cell phones and

12   tablets.

13   Q    Could you please describe what kind of information from the

14   phone it allows you to obtain?

15   A    Sure.  So some straightforward information such as text

16   messages, sometimes e-mails, pictures, videos, audio

17   recordings, things like that.  Often times users also have

18   other applications installed, whether it's for Internet

19   browsing, other kinds of Internet browsing or other kinds of

20   chat messages.  Sometimes we can also get those -- those as

21   well.

22   Q    So after that initial extraction process, is there a way to

23   go in and target specific applications, third-party

24   applications that may be on the phone?

25   A    Yes.

1    Q    Could you please describe that?

2    A    Hold on just a second.

3    Q    Take your time.

4    A    So there is a number of different types of acquisitions we

5    can perform.  The first type is actually one the case agent can

6    perform utilizing our essentially a kiosk with the same

7    software that we use.  So they are able to attempt to extract

8    the phone initially and then perform their own analysis on it.

9    If for some reason that phone is not supported with that

10   particular device then it would come into our CART lab.  The

11   Computer Analysis Response Team is my job title.  And depending

12   on the phone, depending on the operating system, we can acquire

13   it in a number of different ways.

14   Q    And you said you can identify or target specific

15   applications?

16   A    Once we have pulled the entire cell phone we can then

17   determine what was on the phone by looking at that extracted

18   data.

19   Q    And did your team receive several cell phones to process in

20   this specific case?

21   A    Yes.

22   Q    And was your team able to extract their contents from those

23   phones?

24   A    Yes.

25   Q    And after did you send or did the team send the extracted

1    contents to investigators for review?

2    A    Yes.

3    Q    You mentioned that agents -- untrained agents or

4    unspecialized agents are able to use some fundamentals to do a

5    simple extraction process or at least on a basic level.  Could

6    you explain that?

7    A    It's called a Cell Phone Investigative Kiosk or CPIK, and

8    we have a self-paced training packet that was developed by

9    headquarters that's given to the case agent.  If someone has

10   never used it before we'll sit with them and walk them through

11   that, and it reads like an instruction manual.

12   Q    And even for an untrained person following those

13   instructions they can get a base level extraction done?

14   A    Yes.  It is self-paced training.

15           MR. ROTH:  I have nothing else, Your Honor.  Thank

16   you.

17           THE COURT:  All right.  Mr. Gibbons?

18           MR. GIBBONS:  No questions at this time, Your Honor.

19           THE COURT:  Ms. Kelly?

20           MS. KELLY:  I have none.

21           THE COURT:  Mr. Hills?

22           MR. HILLS:  None.

23           MR. BLANCHARD:  Pass.

24           THE COURT:  Well, that was easy.

25           (Witness excused, 1:54 p.m.)

1          THE COURT:  All right.  Nine minutes left.  You got

2    somebody we can plug in or get started with?

3          MR. ROTH:  I do.  We won't finish him but we can

4    start.

5          THE COURT:  Let's get started.

6          MR. ROTH:  We call Special Agent Adam Ayriss.

7          ADAM AYRISS, GOVERNMENT

8          having been first duly sworn, testified as follows:

9          (Witness sworn, 1:54 p.m.)

10                    DIRECT EXAMINATION

11    BY MR. ROTH:

12    Q    Good afternoon.

13    A    Good afternoon.

14    Q    Could I have you start by stating and spelling your

15    complete name, please?

16    A    Adam Ayriss.  A-d-a-m, A-y-r-i-s-s.

17    Q    Thank you.  Where are you employed?

18    A    With the Federal Bureau of Investigation.

19    Q    In what capacity?

20    A    I am a special agent.

21    Q    How long have you been a special agent with the FBI?

22    A    For four years.

23    Q    And how were you employed before that?

24    A    I spent 20 years in the Marine Corps prior to joining the

25    FBI.

1    Q    Did you interview Daniel Harris on October 7th, 2020?

2    A    I did.

3    Q    Did you advise him of his rights?

4    A    I did.

5    Q    Did he agree to speak with you?

6    A    Yes.  He did.

7    Q    Did you advise him that he was being charged with

8    conspiracy to commit kidnapping?

9    A    Yes.  I did.

10   Q    Did he tell you what Dan Chappel's role in his group was?

11   A    He did.  He said that Dan served as a middle ground for

12   everything, and he also said that he would kind of keep

13   everybody's head on straight.

14   Q    Are those quotes?

15   A    It's a paraphrase of the interview.  Yes.

16   Q    All right.  Would looking at the transcript itself refresh

17   memory as to the exact quote?

18   A    It would.

19              MR. ROTH:  May I approach, Your Honor?

20              THE COURT:  Yes.

21              MR. BLANCHARD:  Could I also see what you are showing?

22              MR. ROTH:  Sure.  I am also going to see if I have it

23   in a larger packet.  Can I approach?

24              THE COURT:  Yes.

25   BY MR. ROTH:

1  Q    If you can please read that silently to yourself and look

2  up when you are done?  Does that refresh your memory?

3  A    It does.

4  Q    How did he describe Dan Chappel's role in the group?

5  A    Would be the middle ground for everything.  Like, make sure

6  everybody's head was on straight.

7  Q    Thank you.  Did investigators obtain a warrant and search

8  Daniel Harris's house on October 7th, 2020?

9  A    Yes.  We did.

10  Q    Where was Harris's house?

11  A    Lake Orion, Michigan.

12  Q    So we've had an item identified as 402, Exhibit 402, a

13  series of notebooks.  Did you review those notebooks?

14  A    I did review those notebooks.

15  Q    And was Harris's name on/or about those notebooks?

16  A    It was either on the front cover or the inside --

17        THE COURT:  Hold on just a second.  Now we are getting

18  to content on your side and it hasn't been admitted, so I don't

19  know where you are going with it.

20        MR. ROTH:  Our intention is to admit a limited portion

21  of the notebooks.  If the Court's ruling is that that opens the

22  door to the whole issue then I'll move on.

23        THE COURT:  Yeah.  Move on and we'll deal with that

24  issue later.

25        MR. ROTH:  Thank you.

BY MR. ROTH:

Q    Did you also obtain a search warrant to examine the contents of Daniel Harris's cell phone, Exhibit 405?

A    Yep.  We did.

Q    Could you please explain the ways in which you examined the contents of the phone?

A    So I received a forensic examination report, a Cellebrite report of the contents of that phone, and I reviewed that report as well I reviewed the physical device itself.

Q    Have you reviewed Proposed Exhibits 19, 119, 408, 416, 431 and 432?

A    I have.

Q    And other than 19, are each of them items found on the phone?

A    I believe 119 was not.  19 was.

Q    I apologize.  119 was not?

A    Correct.

Q    And with regard to 119, where was that found?

A    The FBI obtained that as a screen shot of CHS Dan's Wire account.

Q    All right.  And did 119 -- and it was an item sent to Daniel Harris?

A    119 was sent from Daniel Harris over the Wire application to the QRF group chat.

Q    Very good.

1          MR. ROTH:  So with that, I would move for the

2     admission of 19, 119, 408, 416, 431 and 432?

3          THE COURT:  All right.  Any objections?

4          MS. KELLY:  Just with respect to Exhibit 19, I believe

5     that's one FaceBook message that was sent to my client, or a

6     photograph, out of a page of about 30.  So I would object to

7     that one being introduced solely.

8          THE COURT:  All right.  Well, I don't think there is a

9     necessary requirement that particularly if it's a picture that

10    it would be the entire content.  So I'd overrule that and I'll

11    admit those items, and that's probably a good place to break

12    for the day so you can start talking about them tomorrow.

13         So members of the jury, you heard a number of

14    different people today.  The pace quickens in some respects

15    when we go through those things.  More generally you got a lot

16    of information over the course now of what amounts to about 10

17    days, 11 days of trial.  Please do your best to continue

18    keeping your own mind as open as it can be of receiving this

19    information, realizing that you still haven't seen it all and

20    you can't tell for sure what's ultimately going to be most

21    important to you, and then please also resist what becomes a

22    stronger and stronger temptation to talk to other people about

23    the case.  It's really hard to sit on receipt even for a school

24    day.  We all remember how hard that was.  You've been here for

25    11 days, and I know it's hard, but it's very important that you

1    maintain that ability to talk for the first time about the case

2    when you are together as the jury.  So please stick with that,

3    and then we'll get started tomorrow at 8:30 and pick up right

4    where we left off today.  Thanks for your continuing attention.

5              LAW CLERK:  All rise.

6              (Jury out, 2:02 p.m.)

7              THE COURT:  All right.  Why don't I just get a

8    briefing on what's going on with Exhibit 402, and I guess we'll

9    get 4014 at the same time if Ms. Kelly wants to address that

10   further, but go ahead, Mr. Roth.

11             MR. ROTH:  Thank you, Your Honor.  So 402 is a series

12   of about 15 notebooks.  There are maybe 10 or so pages that we

13   intended to admit.  My understanding is that all of those

14   notebooks contain writing by Daniel Harris, and that the 10 or

15   so pages contain writings by Daniel Harris.  We believe that

16   our intention is to admit those 10 pages.  We don't believe

17   that under 106 it would trigger the admission of the balance of

18   those notebooks.

19             THE COURT:  All right.  How do you intend to establish

20   that it's Mr. Harris's statements?  I know the foundation we've

21   seen so far.  Those were in his office and that sort of thing.

22             MR. ROTH:  They are in his office.  They have his name

23   on them.  Even if there was an argument that they were not

24   personally his handwriting, the fact that he has them is

25   certainly pertinent, and the content is circumstantially proved

1    to be his because he's talked in previous recordings about

2    having the equations for det cord at home, and that is one of

3    the items found in the notebook.

4         THE COURT:  All right.  So I'd like to see the 10

5    pages you want.  I haven't seen those.  And why don't we go

6    over to Ms. Kelly, your response on the 402, and then if you

7    want to add anything on the 4014 exhibit because I don't think

8    I've seen that either.  It might be in your notebook and I'll

9    go look.

10        MS. KELLY:  Thank you, Your Honor.

11        I do believe that these notebooks contain information

12   as Mr. Harris was going through the Marine Corps and going

13   through classes during the Marine Corps.  These, you know,

14   would be his notebooks that he would be taking through the

15   classes.  And to only introduce, you know, the 10 pages that

16   are self-selected by the government I think is a misjustice and

17   not providing all of the information to the jury and only

18   limiting it to a very short portion of a class that he learned

19   while in the Marine Corps.

20        THE COURT:  All right.  And 4014?  I didn't look to

21   see what the words -- that's the passport application and some

22   related documents.

23        MS. KELLY:  Yes, Your Honor.  Again, there has been

24   testimony that my client, and I think that came from CHS Dan,

25   that he was applying for a Garda contract and that information

1    was passed to the agents.  That kind of completes the circle of

2    that Garda application with his passport which would be in the

3    exhibit.

4              THE COURT:  All right.  You want to be heard further

5    on that one, Mr. Roth?

6              MR. ROTH:  I think the testimony provided by CHS Dan

7    as to Garda was much more abbreviated than that, not

8    specifically as to the timeline that he was applying or even

9    what he is applying for.  Getting into what is written there

10   would certainly be, as the Court said before, the Defendants'

11   statements and offered for nothing other than the truth of the

12   matter asserted.  So we believe that would be hearsay.

13             THE COURT:  All right.  So if the government can get

14   me the 10 pages you want.  I am not really looking to look at

15   15 volumes to see what else is in there, but if you have

16   anything in particular, Ms. Kelly, that you think is necessary

17   for context on what amounts to a 106, or 106 objection, I'll

18   take a look at it.

19             And for planning purposes, from what I've heard so far

20   on trial Exhibit 4014 I'd adhere to my ruling excluding that.

21             On 402, I still don't think there's going to be a

22   basis to just flat out admit 15 volumes.  And I am not even

23   sure there's going to be a basis to admit the 10 pages the

24   government wants.  It sounds like we're going to have to have

25   circumstantial foundation that it's Mr. Harris's statements.

1          I am also concerned that -- I mean, you know, pack rat

2      on some things.  Not other things.  I still have all my notes

3      from law school believe it or not, and I am not sure I could

4      read them anymore, but if that's what we're talking about,

5      it's -- it is potentially quite misleading I think, and it

6      might even be a 403 exclusion in my mind if it's compared to

7      what I think would be fairly limited probative value.

8          So he's got det cord formulas.  We all know from other

9      testimony that he was in the military and he had marine

10     training.  And we can see and have heard him talk on the tape.

11     That seems to me that's much more probative, but I'll look.

12     I'll look at what you have, but for planning purposes, you

13     know, don't plan a big block of time for that.  Okay.  And I'll

14     let you know tomorrow before you start.

15         I know that Mr. Phalen, moving to a different issue,

16     filed a brief in support of his client's intended assertion of

17     the Fifth Amendment.  I don't know when it got filed.  Some

18     time over the weekend.  I don't know if you've seen it but the

19     Defense position, at least Mr. Blanchard and Mr. Gibbons, you

20     still intend to call him and would want him here to go through

21     the out of the jury's presence assertion of the Fifth?

22         MR. GIBBONS:  That is correct, Your Honor.  That would

23     be satisfactory.  We have no intention of taking that matter

24     any further than that.

25         THE COURT:  The third thing, which is related, is

1    where we are from the government's point of view after covering

2    some ground today?  Are you still thinking this week?  Do you

3    have an idea of when this week, and that will inform when we

4    need to have Mr. Robeson here.

5         MR. KESSLER:  We are going to have all our remaining

6    witnesses here tomorrow, and we are optimistic that we could

7    actually finish tomorrow.  At the very latest we'd be talking

8    Wednesday.

9         THE COURT:  And then we'd be ready to go to the

10   Defense case after a Rule 29 and other things?

11        MR. GIBBONS:  Yes.  If I can just speak to that for

12   just a second, Your Honor?  Our intention is -- I guess I'm

13   seeking the Court's permission.  What I thought might make the

14   most sense is we have witnesses that are more germane to

15   Mr. Harris at this point that relate to out-of-state witnesses.

16   We have them lined up.  We were hoping we thought given the

17   distance and the quantity of witnesses she intends to call, we

18   would start with Daniel Harris would put in his case in chief.

19   Then we would follow that with Mr. Hills, Mr. Blanchard on

20   behalf of Mr. Croft, and then we would end the Defense side

21   with Adam Fox's case in chief, Your Honor.

22        THE COURT:  All right.  Well, if all of the Defense

23   counsel are on board I don't have any problem with the order.

24   That works.  And I am seeing some nods, but anybody want to

25   object to that order?

1          MS. KELLY:  No, Your Honor.  And there have been, I

2     think, three identified potential Defense witnesses that may

3     have Fifth Amendment issues.  We may need an attorney for them

4     to be appointed.  I may -- given what the government is saying,

5     I may have them come in tomorrow or attempt to have them come

6     in tomorrow and we can address that with the court.

7          THE COURT:  All right.  They are under subpoena now?

8          MS. KELLY:  Yes.

9          THE COURT:  All right.  And I know Mr. Robeson has

10    counsel obviously.  Mr. Butler has counsel, but I think nobody

11    is planning to call him at the Defense side, right?

12         MR. GIBBONS:  Mr. Butler, no.

13         THE COURT:  Okay.  So who are the people on your side

14    that may need counsel because they'll need to have some time?

15         MR. BLANCHARD:  Some of them have counsel -- retained

16    counsel.

17         THE COURT:  Who doesn't?

18         MS. KELLY:  Casey Mayan does not, and Max Wyckoff I am

19    unsure if it he does or not.

20         MR. BLANCHARD:  I got a reply from his lawyer this

21    morning.  He was going to circle back with me on that issue.

22         THE COURT:  All right.  So you think at least Max

23    Wyckoff has counsel?

24         MR. BLANCHARD:  He did in a related state proceeding.

25         THE COURT:  I see.

1              MR. BLANCHARD:  I don't know the outer bounds of that

2     right now.

3              THE COURT:  All right.

4              MS. KELLY:  And Jerad Beauchesne does have an

5     attorney.

6              THE COURT:  All right.  All right.  And do you know at

7     least with respect to Mr. Beauchesne, who has a retained

8     attorney, what the witness's intention is on the Fifth

9     Amendment or is it an open question?

10             MS. KELLY:  I have been informed by his attorney that

11    he will be invoking.  We have not spoken to him, not spoken to

12    Mr. Beauchesne, but --

13             THE COURT:  All right.

14             MS. KELLY:  And I do know that he is out of the state

15    currently, so we'll have to do some fenagling with that.

16             THE COURT:  All right.  And then we'll try to get

17    appointments for either Mayan or Wyckoff and if Wyckoff has

18    counsel.  And you have other witnesses besides those that you

19    are calling on your side of the case, Ms. Kelly?

20             MS. KELLY:  I do believe that we will be calling

21    additional witnesses.

22             THE COURT:  Okay.  All right.  Well, good.  That's

23    good news.  You know, the academy awards are not something I

24    typically watch, although I want to go back and watch the clip

25    where Will Smith slaps the other guy.  It sounds like that will

1    be one of the more interesting pieces of academy awards in

2    recent history.  The thing, though, that I did read, and I

3    thought about sending it to all of you as follow up on my Kill

4    Your Darlings article, one thing they decided to do this year

5    to shorten it was to cut out the film editor award as that live

6    award.  So they are going to do it outside the presence of the

7    full academy and try to slot it in.  And there was an article

8    in the Wall Street Journal from somebody lamenting that -- who

9    is a movie professional saying without the film editor there is

10   no real movie.  And the example they gave was The Deer Hunter,

11   which is a while back.  A hundred plus hours of raw footage for

12   a 183-minute film.  And I do appreciate the fact that the pace

13   is moving a little quicker today.  That might happen naturally

14   anyway, but I truly believe that much like movie directors and

15   film editors, trial lawyers have to trim, and it's hard.  It's

16   so hard because you're both the investigators to some extent,

17   you are the person who knows every last detail of the case, and

18   yet you have to be the merciless editor in order to present the

19   most meaningful picture you can, and I think it's one of the

20   hardest things trial lawyers do, but I think the more effective

21   you are able to do it the better it is for your clients.

22   Certainly the better it is for me.  I know my blood pressure

23   goes down when that happens, and I think it's better for the

24   jury.  So I appreciate your continued effort on that.

25          I don't think I have anything else unless --

1           MR. KESSLER:  One quick thing, Your Honor.

2           THE COURT:  Yes.

3           MR. KESSLER:  We had raised this on Friday, and I

4    think the Defense were going to talk about it, but especially

5    in light of us wrapping up pretty soon, we'd like to know which

6    FBI agents can be cut loose.  We still have many, many agents

7    under subpoena.

8           MR. BLANCHARD:  Our witness coordinator is reaching

9    out to the FBI coordinator to cut the first tranche that we are

10   able to today.

11          THE COURT:  Good.  Okay.  If there is nothing else

12   we'll see you tomorrow at 8:30.  Thank you.

13          LAW CLERK:  Court is in recess.

14          (Proceeding concluded, 2:13 p.m.)

INDEX

Government Witnesses:                                    Page

BRANDIE BOWMAN

  Direct Examination by Mr. Roth                          9
  Cross Examination by Mr. Gibbons                        18
  Cross Examination by Ms. Kelly                          29
  Cross Examination by Mr. Hills                          32
  Cross Examination by Mr. Blanchard                      34

TIMOTHY BATES

  Direct Examination by Mr. Kessler                       38
  Cross Examination by Mr. Gibbons                        69
  Cross Examination by Ms. Kelly                          96
  Cross Examination by Mr. Hills                         102
  Cross Examination by Mr. Blanchard                     108
  Redirect Examination by Mr. Kessler                    127
  Recross Examination by Mr. Gibbons                     130
  Recross Examination by Mr. Hills                       133

JEREMY JASKULSKI

  Direct Examination by Mr. Roth                         134
  Cross Examination by Mr. Gibbons                       139
  Cross Examination by Ms. Kelly                         142
  Redirect Examination by Mr. Roth                       144
  Recross Examination by Mr. Gibbons                     144

MAILIN CHUY-HORN

  Direct Examination by Mr. Roth                         145
  Cross Examination by Ms. Kelly                         154
  Cross Examination by Mr. Hills                         155

ELI BOWERS

  Direct Examination by Mr. Roth                         157
  Cross Examination by Ms. Kelly                         166

REBECCA HUIZINGA

  Direct Examination by Mr. Roth                         169
  Cross Examination by Ms. Kelly                         179
  Cross Examination by Mr. Blanchard                     184

MIKE JACOBS

   Direct Examination by Mr. Kessler     185
   Cross Examination by Mr. Gibbons     202
   Cross Examination by Ms. Kelly     203
   Cross Examination by Mr. Hills     208
   Cross Examination by Mr. Blanchard     211
   Redirect Examination by Mr. Kessler     214

MICHAEL YAUK

   Direct Examination by Mr. Roth     216

ADAM AYRISS

   Direct Examination by Mr. Roth     222


Exhibits:     Admitted

Government's Exhibit 19     226
  (FaceBook Message)
Government's Exhibit 119     226
  (Screen shot, Wire, Harris)
Government's Exhibit 149     172
  (Gun Barrel, Harris)
Government's Exhibit 224     47
  (Video, Vehicle Explosion)
Government's Exhibit 225     47
  (Video, Vehicle Explosion)
Government's Exhibit 226     49
  (Audio, Fox & Croft @ Luther)
Government's Exhibit 227     50
  (Audio, Fox, Luther)
Government's Exhibit 230     59
  (Photograph, Fox, Bridge)
Government's Exhibit 232     57
  (Photograph, Bridge)
Government's Exhibit 240     45
  (Video, Luther Shoot House)
Government's Exhibit 245     65
  (Audio, Birch Lake)
Government's Exhibit 252     65
  (Audio, Fox, Explosives)
Government's Exhibit 258     68
  (Audio, Fox/Bates)
Government's Exhibit 288     147
  (Confederate Flag)

| | | |
|---|---|---|
| 1 | Government's Exhibit 289 | 147 |
| | (Code Ledger) | |
| 2 | Government's Exhibit 291 | 147 |
| | (Pennies) | |
| 3 | Government's Exhibit 292 | 147 |
| | (Staples) | |
| 4 | Government's Exhibit 293 | 147 |
| | (Electrical Tape) | |
| 5 | Government's Exhibit 294 | 147 |
| | (Paper, Cardboard & Rubber Bands) | |
| 6 | Government's Exhibit 298 | 149 |
| | (Fireworks) | |
| 7 | Government's Exhibit 365 | 136 |
| | (iPhone) | |
| 8 | Government's Exhibit 366 | 136 |
| | (Taser) | |
| 9 | Government's Exhibit 400 | 172 |
| | (Ghillie Suite, Harris) | |
| 10 | Government's Exhibit 401 | 172 |
| | (Anderson Rifle, Harris) | |
| 11 | Government's Exhibit 402 | |
| | (Harris, Notebooks) | |
| 12 | Government's Exhibit 403 | 137 |
| | (U.S. Currency) | |
| 13 | Government's Exhibit 404 | 172 |
| | (Holster, Harris) | |
| 14 | Government's Exhibit 405 | 137 |
| | (Samsung Galaxy Cell Phone) | |
| 15 | Government's Exhibit 406 | 159 |
| | (Photograph of Helmet, Harris) | |
| 16 | Government's Exhibit 408 | 226 |
| 17 | Government's Exhibit 409 | 159 |
| | (Photograph, Vest, Harris) | |
| 18 | Government's Exhibit 410 | 159 |
| | (Photograph, Backpack, Harris) | |
| 19 | Government's Exhibit 411 | 159 |
| | (Photograph, Equipment Belt) | |
| 20 | Government's Exhibit 412 | 172 |
| | (Photograph, Room H, Harris) | |
| 21 | Government's Exhibit 413 | 172 |
| | (Photograph) | |
| 22 | Government's Exhibit 416 | 226 |
| 23 | Government's Exhibit 430 | 137 |
| | (FN 509 Pistol) | |
| 24 | Government's Exhibit 431 | 226 |
| 25 | Government's Exhibit 432 | 226 |

```
 1              Government's Exhibit 433                136
                  (U.S. Currency)
 2              Government's Exhibit 442                 12
                  (Chat Summary)
 3              Government's Exhibit 450                172
                  (Photograph, Room H, Harris)
 4              Government's Exhibit 453                172
                  (Photograph, Rifle, Harris)
 5              Government's Exhibit 473                159
                  (Backpack, Harris)
 6              Government's Exhibit 474                159
                  (Equipment Belt, Harris)
 7              Government's Exhibit 475                159
                  (Helmet, Harris)
 8              Government's Exhibit 476                159
                  (Vest, Harris)
 9              Government's Exhibit 477                 54
                  (Audio, Ride to Elk Rapids)
10              Defendants' Exhibit 2303                20
                  (Pie Chart Summary)
11              Defendants' Exhibit 3062               111
                  (Audio, Luther)
12              Defendants' Exhibit 4156               143
                  (Photograph, Harris Wallet)
13              Defendants' Exhibit 4157               167
                  (Accurate Firearms Receipt)
14              Defendants' Exhibit 4158               168
                  (Harris Security Badge)
15              Defendants' Exhibit 5220                54
                  (Photograph, CHS Dan, Luther)
16

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE


        I, Paul G. Brandell, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of the
proceedings had in the within entitled and numbered cause on
the date hereinbefore set forth; and I do further certify that
the foregoing transcript has been prepared by me or under my
direction.



                        /s/ Paul G. Brandell
                        Paul G. Brandell, CSR-4552, RPR, CRR
                        U.S. District Court Reporter
                        399 Federal Building
                        Grand Rapids, Michigan  49503