IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,          No: 1:20cr183-1/2/5/6

  vs.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
DANIEL JOSEPH HARRIS and
BRANDON MICHAEL-RAY CASERTA,

          Defendants.

Before:

                 THE HONORABLE ROBERT J. JONKER
                     U.S. DISTRICT Judge
                     Grand Rapids, Michigan
                 Tuesday, March 29, 2022
              Excerpt of Jury Trial Proceedings
            Testimony of Adam Ayriss, Thomas Szymanski,
   Chris Carter, Anthony Resendez, Devin Phelps, Adam Cowan,
              Chelsea Williams & Greg Mrozek

APPEARANCES:

             MR. ANDREW BIRGE, U.S. ATTORNEY
             By: MR. NILS R. KESSLER
             MR. JONATHAN C. ROTH
             The Law Building
             333 Ionia Avenue, NW
             Grand Rapids, MI 49501-0208
             (616) 456-2404

                On behalf of the Plaintiff;

```
 1                        MR. CHRISTOPHER M. GIBBONS
                          MS. KAREN M. BOER
 2                        Dunn Gibbons PLC
                          125 Ottawa Avenue, NW, Suite 230
 3                        Grand Rapids, MI 49503-2865
                          (616) 336-0003
 4
                                   On behalf of Defendant Fox.
 5
                          JOSHUA ADAM BLANCHARD
 6                        Blanchard Law
                          309 South Lafayette Street, Suite 208
 7                        P.O. 938
                          Greenville, MI 48838-1991
 8
                                   On behalf of Defendant Croft, Jr.
 9
                          JULIA ANNE KELLY
10                        Willey & Chamberlain LLP
                          300 Ottawa Avenue NW Suite 810
11                        Grand Rapids, MI 49503-2314
                          (616) 458-2212
12
                                   On behalf of Defendant Harris.
13
                          MICHAEL DARRAGH HILLS
14                        Hills at Law PC
                          425 South Westnedge Avenue
15                        Kalamazoo, MI 49007-5051
                          (269) 373-5430
16
                                   On behalf of Defendant Caserta.
17

18        REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

19

20

21

22

23

24

25
```

1        03/29/2022

2        (Proceedings, 8:27 a.m.)

3        LAW CLERK: The United States District Court for the

4    Western District of Michigan is now in session. The Honorable

5    Robert J. Jonker, chief judge, presiding.

6        THE COURT: All right. We're here without the jury.

7    Mr. Roth asked for a chance to present some more foundational

8    proffer on Proposed Government's Exhibit 407. Go ahead.

9        MR. ROTH: Thank you, Your Honor.

10        In the May 1st text messages, and these are Exhibits 9

11    and 10 that have already been admitted, Daniel Harris

12    references making things go boom and saying he has the

13    algorithm for det cord in his office. That was during the 2020

14    charged -- excuse me, immediately preceding the 2020 charged

15    conspiracy and is a reference to the notebooks in this

16    particular location and an item found within these notebooks.

17    So I think that's one thing that ties this to the conspiracy.

18        More directly, though, is that written in at least one

19    of the notebooks is a training schedule dated May 29th, 2020,

20    for a June 2020 Wolverine Watchmen training session or FTX.

21    And so these notebooks were not merely, you know, as the Court

22    had compared them to notes from law school many years ago, this

23    is something that is being used immediately.

24        THE COURT: Where is the reference to May 29 in TX

25    407?

1          MR. ROTH:  It is not in one of the excerpted pages but

2     it's just to tie the notebooks.

3          THE COURT:  How do you know it has anything to do with

4     the May 29 training?

5          MR. ROTH:  I can have the witness who is on the stand

6     explain that a little bit better than I can.

7          THE COURT:  All right.  Well, I am still not going to

8     admit it I think.  I looked at 407 last night.  Certainly 407

9     all by itself doesn't have a date reference that I saw.  It

10    does have some descriptions of training protocols for room

11    clearing and the like.  It does certainly have some information

12    about explosives.  But to me it's not enough of a foundation

13    even with what Mr. Roth has referenced to support significant

14    probative value, and I think we open the door to tremendous

15    distraction and 403 kind of concerns if we put just these few

16    pages in and then leave open the possibility of whatever the

17    Defense may need to do in response.  We are talking about 15

18    books after all.  And there may be things that would be

19    similarly important on the Defense side.  I just don't know and

20    I haven't had a chance to go through all 15.  I didn't hear or

21    see or hear in Mr. Roth's proffer today anything that, you

22    know, directly shows, for example, that Mr. Harris had one of

23    these books at a training.  That he referenced it.  I didn't

24    see anything in the electronic evidence indicating, for

25    example, that these were pictures on his phone.  Nothing that

1    to me ties these 10 pages concretely enough to actually use

2    during the course of the trainings or conspiracies in a way

3    that I would find it comfortable to have significant probative

4    value, and I think anything that is there is substantially

5    outweighed.  So even with that added proffer I would still

6    exclude 407 on that basis.

7                   MR. ROTH:  Thank you, Your Honor.

8                   THE COURT:  Okay.  Anything else on that issue?

9                   MR. ROTH:  No, Your Honor.

10                  THE COURT:  Go ahead.

11                  MR. HILLS:  I do have -- sorry go.  Ahead.

12                  MR. GIBBONS:  No.  Go ahead.

13                  MR. HILLS:  I would like to flag another issue I think

14   that's going to come in later on today.

15                  THE COURT:  Later on is fine.  We'll worry about it

16   later on.  It's not with this witness, right?

17                  MR. HILLS:  No.

18                  THE COURT:  Okay.  Later on.

19                  MR. GIBBONS:  Your Honor, I just wanted to just note

20   that I did submit 2304, which was admitted yesterday in

21   redacted form, produced to the government and I believe to the

22   Court this morning.  So I just want to make that on the record.

23                  THE COURT:  All right.  So the redacted version of

24   2304 can be added to the exhibit list.  2304?

25                  MR. GIBBONS:  2304, Your Honor.

1    THE COURT:  All right.  Oh, yes.  Okay.  Fair enough.

2    Thank you.

3    MR. GIBBONS:  Thank you.

4    THE COURT:  Okay.  And what I think we are in the

5    middle -- the last thing I have is admission of Exhibits 19,

6    119, 408, 416, 431 and 432, is that correct?

7    MR. ROTH:  It is, Your Honor.

8    MS. KELLY:  And Your Honor, I believe on -- there is

9    one text message I would like to lodge a hearsay objection for

10   the record.

11   THE COURT:  Okay.  Which one?

12   MS. KELLY:  I think that is 408.

13   THE COURT:  408?

14   MR. ROTH:  I can tell you in just one second.

15   MS. KELLY:  Is that right?

16   MR. ROTH:  408.

17   MS. KELLY:  408.  I apologize.

18   THE COURT:  Sorry, ma'am.  My brother is being an ass.

19   He hasn't seen my text about today in a response it's all --

20   MS. KELLY:  Sorry, Your Honor.  It's 119.

21   THE COURT:  119.  What's the hearsay objection?

22   MS. KELLY:  Non-testifying witness statements.

23   THE COURT:  Yeah, but it's Beaker, right, at least

24   according to the text?

25   MS. KELLY:  Correct.  It would be the other speaker.

1          THE COURT:  So it's not a hearsay problem; it's a

2     party admission?

3          MR. ROTH:  Yes, Your Honor.

4          THE COURT:  Okay.  Anything else?

5          MR. ROTH:  No, Your Honor.

6          THE COURT:  All right.  Let's bring in the jury.

7          LAW CLERK:  All rise.

8          (Jury in, 8:34 a.m.)

9          LAW CLERK:  The United States District Court for the

10    Western District of Michigan is now in session.  The Honorable

11    Robert J. Jonker, chief judge, presiding.

12          THE COURT:  All right.  Welcome back everybody.  When

13    we broke yesterday we were in the middle of Mr. Roth's direct

14    exam of Special Agent Ayriss and we'll pick that up.

15          After you left yesterday, members of the jury, we did

16    talk with the lawyers and parties about where the government is

17    in its case.  They are closing in on the end of their case in

18    chief.  If everything really goes swimmingly, it could even be

19    today.  If that doesn't happen it would almost certainly be

20    some time tomorrow.  And I just put that in your planning

21    because when any party rests in a case and says, I am done with

22    my case in chief, then the lawyers and the Court have somewhat

23    I call housekeeping matters that we have to tend to.  So you'd

24    have a longer break if it happens tomorrow.  Not enough to go

25    anywhere but a longer break.  If it happens today toward the

1    end of the day then that gives the lawyers and me time to do

2    our housekeeping when you wouldn't be here anyway.  So if we

3    get close -- I did ask Ms. Bourque to check with you, and we'll

4    see.  We'll know more after the first break.  If we get close I

5    might see if it's possible to add a few minutes to the day

6    today if it would allow us to finish.  So we'll keep you posted

7    on that.  But if not we'll just go until our two o'clock and

8    have the government finish tomorrow and we'll give Mr. Roth a

9    chance to start the engines right now.

10                MR. ROTH:  Thank you, Your Honor.

11                      DIRECT EXAMINATION(Continuing)

12     BY MR. ROTH:

13   Q    Good morning, Agent Ayriss.

14   A    Good morning.

15   Q    We left off yesterday we spoke about Daniel Harris's

16   statement to you on October 7th, and we were going to move into

17   some electronic evidence.  Before we do that I do want to touch

18   on one of the physical items found in Daniel Harris's house,

19   the ghillie suit.  You are familiar with a ghillie suit?

20   A    I am.

21   Q    And have you looked at this particular ghillie suit that

22   was found in Daniel Harris's house?

23   A    Yes.  I have.

24   Q    Was it military issue?

25   A    It was not.

1    Q    How can you tell?

2    A    So military issued ghillie suits are from a foundational

3    perspective built off of our utility or camouflage utility

4    uniform, and this did not have that base to it, so it wasn't as

5    durable as a military ghillie suit to be.

6    Q    And in the military what are ghillie suits used for?

7    A    It's a concealment garment used by our sniper elements.

8    Q    Thank you.  The Court admitted some electronic exhibits

9    that I want to take a look at.  Can we please start at Exhibit

10   19?  Where was this item found?

11   A    This is a meme that was sent to Daniel Harris on his

12   FaceBook account.

13   Q    When?

14   A    On May 16th of 2020.

15   Q    By whom?

16   A    It was an account belonging to known Wolverine Watchmen

17   associate Joseph Morrison.

18   Q    And what was Daniel Harris's status with the Wolverine

19   Watchmen at that time?

20   A    At that time he was a member of the Wolverine Watchmen.

21   Q    All right.  And generally speaking, could you start by

22   describing what the three panes we see on this image are?

23   A    Sure.  So the top image is the aftermath of the Oklahoma

24   City bombing in 1995.  The middle photograph is Waco Texas, the

25   Branch Davidian compound, and the bottom image is an aerial

1   photograph of the Weaver family residence in Ruby Ridge, Idaho?

2   Q    And just not in great detail but a very broad description,

3   what was the Oklahoma City bombing?

4   A    The Oklahoma City bombing was a deadly domestic terrorist

5   attack on April 19th, 1995, committed by Timothy McVey, where

6   he used an pneumonium nitrite based vehicle born improvised

7   explosive device to attack the federal building.

8   Q    And could you please read the language that is written on

9   this image?

10       MR. GIBBONS:  Your Honor, I am going to object.  I am

11  not sure what the relevance is of this meme to the charged

12  conspiracy in this case.  These are not facts or circumstances

13  even remotely related to the Watchmen.

14       THE COURT:  I mean, I think there is some limited

15  relevance, but let's move through it as rapidly as we possibly

16  can, and then if we get into too many of the weeds it

17  definitely is beyond significant probative value and certainly

18  outweighed by 403, so let's move through it quickly.

19       MR. ROTH:  This is my last question.  It's just to

20  read the text.

21       MR. BLANCHARD:  If I could, while we are -- our

22  monitors don't have the evidence display up.  We've got some

23  video conferencing on two of our monitors here.  I don't know

24  if the Court can --

25       THE COURT:  On all of your --

1          MR. BLANCHARD:  Just the two at my table.

2          THE COURT:  All right.

3          MR. BLANCHARD:  I am not sure.

4          THE COURT:  We are not trying to pick on you.  They

5     are on.

6          MR. BLANCHARD:  They are on and they have --

7          THE COURT:  They are not showing evidence.  Yeah.  I

8     am not sure what that is.  That's a cabling problem.  Hopefully

9     Brad is listening.  Brad came last night and fixed the document

10    camera.  So if there is anything you want to use with that we

11    are set to go.  Other than that, we'll have to proceed forward

12    as best we can.  Sorry about that.

13         MR. BLANCHARD:  Thank you.

14         THE COURT:  Did other Defense counsel right now have

15    the image up?

16         MR. BLANCHARD:  Yeah.  Just my table.

17         THE COURT:  All right.  Go ahead.

18         MR. ROTH:  Thank you, Your Honor.

19    BY MR. ROTH:

20    Q    And so the last question on this issue, could you please

21    read the text of the images?

22    A    Sure.  It says this wasn't a random attack.  It was a

23    response to this and to this.

24    Q    Thank you.  Can you take that down?  We heard testimony

25    about some of the people involved making weapons, handling

1    videos of themselves.  Did you find examples of that on Daniel

2    Harris's phone?

3    A    I did.

4         MR. ROTH:  Could we please play Exhibit 431?

5         (Video started, 8:41 a.m.)

6         (Video stopped, 8:41 a.m.)

7         MR. ROTH:  Could we try that again?  I don't think

8    that worked.

9         (Video started, 8:41 a.m.)

10        (Video stopped, 8:42 a.m.)

11   BY MR. ROTH:

12   Q    Thank you.  When is this video from?

13   A    It was from August 12th, 2020.

14   Q    What kind of shirt was Daniel Harris wearing?

15   A    A Hawaiian shirt.

16   Q    And what kind of weapon was he using?

17   A    He had an AR-15 style carbine and a semiautomatic pistol.

18   Q    What did he do with the weapons?

19   A    He was conducting what's called a magazine reload drill

20   where he is simulating firing from one magazine and that goes

21   empty.  He reloads with a new magazine that has rounds in it,

22   and at the end he did what's called a weapons transition drill

23   where he transitioned from his what's called a long gun, his

24   rifle, to his pistol.

25        MR. ROTH:  Thank you.  Could we please play Exhibit

1    432?

2              (Video started, 8:42 a.m.)

3              (Video stopped, 8:43 a.m.)

4    BY MR. ROTH:

5    Q    When is this video from?

6    A    The same day.

7    Q    What kind of shirt was Mr. Harris wearing?

8    A    A Hawaiian shirt.

9    Q    And the holster, what was the pattern on there?

10   A    It was a Hawaiian themed holster.

11   Q    What kind of weapon was he using in this video?

12   A    It appears to be his FN-509 that was recovered during his

13   arrest.

14   Q    And what did he do with the pistol?

15   A    He drew the pistol, sighted in as attempting to fire, and

16   then did a magazine reload drill with it.

17   Q    Thank you.  Have you looked at Proposed Exhibit 151?

18   A    I have.

19   Q    Who are the participants in that conversation?  Do you need

20   to look at it on the screen?

21   A    I can't see it.

22        MR. ROTH:  Okay.  Could we put 151 on the screen just

23   for the witness?  It should just be a text conversation.

24        THE WITNESS:  Okay.

25   BY MR. ROTH:

1   Q    Who are the participants in that conversation?

2   A    It is Barry Croft and Daniel Harris.

3   Q    When is it from?

4   A    It was from July 19th of 2020.

5        MR. ROTH:  Your Honor, I'd move for the admission of

6   Proposed Exhibit 151?

7        MR. BLANCHARD:  Object as to foundation.  I don't

8   think he has laid a foundation for the participants.  He just

9   stated a conclusion.

10       THE COURT:  Anything else?  All right.  I'll admit it.

11  Certainly the foundation for the Harris side of it is the

12  reality that this is the Harris phone, and its foundation for

13  the other is inferential, but croft2167croft is enough for

14  purposes of admission.

15       MR. ROTH:  Thank you, Your Honor.

16  BY MR. ROTH:

17  Q    So now that we can all see it --

18       THE COURT:  Well, can you blow it up anymore?  I guess

19  the case has been going on long enough that my eyes are

20  deteriorating more.

21       MR. ROTH:  We don't need to do the text at this

22  moment.  We just want to do some foundational stuff before we

23  get into specific texts.

24  BY MR. ROTH:

25  Q    When is this from?

1    A    July 19th, 2020.

2    Q    What application is it from?

3    A    It's on the Signal application.

4    Q    What is Signal?

5    A    Signal is an encrypted direct messaging platform.

6    Q    So direct messaging, what does that mean?

7    A    It's like sending a text, but it's through a third-party

8    application that has end-to-end encryption.

9    Q    So these were not group messages; these are person to

10   person?

11   A    This is an individual message between two people.  Yes.

12   Q    Where was this found?

13   A    This was found on Daniel Harris's cell phone.

14   Q    So which side of these texts or these messages are from the

15   Daniel Harris phone; the gray or the blue?

16   A    So the gray boxes are what Daniel Harris typed on his

17   phone.  The blue boxes are the responses from Barry Croft.

18   Q    You said they are from Barry Croft.  What is the name of

19   the account that these were sent to?

20   A    It -- it was just on his Signal, so the croft2167croft was

21   the other party in the conversation.

22   Q    All right.  You said these were sent on July 19th, 2020.

23   For some context, what were the other relevant events or

24   meetings around that time?

25   A    So Daniel Harris attended the Cambria FTX July 11, 12 and

1   13 timeframe.  It was just where he met Barry Croft and then he

2   was in Peebles, Ohio with Barry Croft on July 18th, so the day

3   before these text messages or these direct messages, and then

4   this week -- on the 23rd Daniel Harris hosted a get-together of

5   his associates at his house in Lake Orion.

6   Q    And when you refer to his associates, these are the

7   Wolverine Watchmen, right?

8   A    Yes.

9   Q    All right.  Can we please zoom in here to read?

10  A    So Barry Croft says, all over it brother.  Daniel Harris,

11  problem is everyone wants to argue over something they agree

12  on.  We go around in circles and we aren't going to get shit

13  done if we continue doing what we are doing as a whole in my

14  opinion.  Barry Croft responds, I agree with you good sir.

15  Daniel Harris, you think we could swing maybe a four-day FTX,

16  everyone bring their heavy hitters and hard chargers so

17  everyone -- or show each other where we are at and then spend

18  the next day or two talking.  Barry Croft, I want to come up

19  for a week or two.  Daniel Harris, we could probably swing

20  something down the road.

21  Q    Thank you.  You can take that down.

22        Did you also review audio recordings that involved

23  Daniel Harris?

24  A    I did.

25  Q    Did that include Exhibit 80?

1    A    Yes.  It did.

2              MR. ROTH:  Could we please play Exhibit 80?

3              (Audio started, 8:48 a.m.)

4              (Audio stopped, 8:48 a.m.)

5    BY MR. ROTH:

6    Q    Thank you.  What date and event was that recording from?

7    A    So it was a recording from July 7th at a meeting at Paul

8    Bellar's house, who was another Wolverine Watchmen associate.

9    Q    Were you able to name identify the bomb maker that Daniel

10   Harris was referring to?

11   A    Yes.  I was.

12   Q    Who was that?

13   A    His name was Adam Cowan.

14   Q    How was he connected to Daniel Harris?

15   A    Adam Cowan's sister was dating Daniel Harris's best friend.

16   Q    Who was?

17   A    His best friend was Devin Phelps.

18   Q    Thank you.  And what's the name of the girlfriend in

19   between?

20   A    Lindsay Cowan.

21   Q    Could we please take a look at 119?  When are these

22   messages from?

23   A    This was posted on the Wire application on July 19th.

24   Q    Beaker is Daniel Harris?

25   A    It is.

1    Q    Who did Daniel Harris post these messages to?

2    A    So it was in a QRF chat which included Ty Garbin, Kaleb

3    Franks, Brandon Caserta, Jerad Beauchesne, Solomon Clark, Alex

4    Davidson and Paul Bellar.

5    Q    Could you please read for the jury what it is that Daniel

6    Harris said here?

7    A    So for Thursday I'm having my buddy you all have met, he

8    was vetted in the main group a while back, sit down and give

9    his views from the outside.  Also his girlfriend's bother who

10   is a boom professional.  We can get an estimate and maybe some

11   shit off him for down the road.  This shit is better than

12   Grandpa's shit.  So I have yet the meet the guy but I know he

13   is prior marine against the lizard people and shit.  If we get

14   a bad vibe we'll have him leave.

15   Q    Thank you.  Could we take a look at 408, please?

16        What date is this message from?

17   A    July 23rd.

18   Q    And where was this found?

19   A    On Daniel Harris's phone.

20   Q    Who is the contact in the white bubble?

21   A    It's Lindsay Cowan.

22   Q    So that's the girlfriend in between Daniel Harris and the

23   bomb maker?

24   A    It is.

25   Q    Could you please read what Lindsay Cowan writes?

1     MS. KELLY:  I am going to object to hearsay.

2     THE COURT:  All right.  I think it's the same ruling

3  as earlier.  It's a contextual one in this case for what we

4  hear in the blue box later.  Go ahead.

5     MR. ROTH:  Thank you, Your Honor.

6  BY MR. ROTH:

7  Q    What is it that Lindsay Cowan writes?

8  A    Sorry man.  My brother is being an ass.  He hasn't seen my

9  text about today.

10  Q    And how does Daniel Harris respond?

11  A    It's all kosher.

12  Q    And did you locate and contact Adam Cowan?

13  A    I did.

14  Q    Was he, in fact, missing fingers on one hand from an

15  explosion?

16  A    Yes.  He is.

17  Q    Was he cooperative with you and investigators?

18  A    Yes.  He was.

19  Q    I want to talk about another item that was found on Daniel

20  Harris's cell phone.  Could we please take a look at 416?

21     MS. KELLY:  Your Honor, I'll be placing a hearsay

22  objection on this one.  Thank you.

23     THE COURT:  Say that again.

24     MS. KELLY:  I'm objecting to hearsay to this exhibit.

25     THE COURT:  All right.  Well, I think it'll be the

1    same ruling.  Is there anything more to it than that?

2              MR. ROTH:  No, Your Honor, and the Court has already

3    ruled on this particular objection.

4              THE COURT:  All right.  Go ahead.

5    BY MR. ROTH:

6    Q    So before we get into the text, what application is this

7    from?

8    A    It's on the Threema application.

9    Q    Where was it found?

10   A    On Daniel Harris's phone.

11   Q    Okay.  Is this a group chat or a private message?

12   A    This is a private message.

13   Q    Between whom?

14   A    Between Daniel Harris and Trevon Brown.

15   Q    Who is Trevon Brown?

16   A    Trevon Brown is a friend of Daniel Harris's whom he had

17   served with in the Marine Corps.

18   Q    And for -- to help follow, who are the gray messages and

19   who are the green messages in the bubbles?

20   A    The green messages are Daniel Harris and the gray messages

21   are Trevon Brown.

22   Q    What date are these messages from?

23   A    They are from August 28th, 2020.

24   Q    And if we could zoom in here and we'll split this in half.

25   Thank you.

1          Could you please read the exchange between the two?

2     A    Daniel Harris asks, what are you doing tomorrow?  Trevon,

3     nothing.  Why?  Daniel, couple of guys are going to check the

4     governor's properties tomorrow.  I can't make it but was

5     wondering if you wanted my spot.  Trevon, I definitely have not

6     been briefed on that.  Also, I don't really have a car because

7     it's old and has problems.  Daniel, they can grab you if you

8     are cool with it.  Ty is up at his property right now I guess.

9     Q    Will you scroll down, please?  Go on.

10    A    Trevon, are these prior military guys?  Daniel, Ty is not

11    but you wouldn't know.  Dan is prior army.  JTag.  Ran with

12    10th Group in Sadr City.  Trevon, I'll pass for now.  I am not

13    trying to do that with people I don't know.  Daniel, I figured

14    but thought I'd offer.  I'd go but I have.

15    Q    Thank you.  So they talk about going to check the

16    governor's properties the next day.  What happens the next day?

17    A    On August 29th, the day after these text messages, is the

18    day of the day surveillance of Governor Whitmer's vacation home

19    on Birch Lake.

20    Q    By whom?

21    A    By Adam Fox and our source and another indicted individual

22    on the state side.

23              MR. ROTH:  I have nothing else, Your Honor.  Thank

24    you.

25              THE COURT:  All right.  We'll go to Defense cross

1    starting with Mr. Gibbons.

2              MR. GIBBONS:  No questions Your Honor.

3              THE COURT:  All right.  Ms. Kelly?

4              MS. KELLY:  Thank you, Your Honor.

5                    CROSS EXAMINATION

6      BY MS. KELLY:

7    Q    Good morning, sir.

8    A    Good morning.

9    Q    You talked a bit yesterday about an interview that you

10   conducted of Daniel Harris, is that right?

11   A    Yes.

12   Q    That was on October the 7th?

13   A    Yes.  It was.

14   Q    You had been involved in the investigation throughout the

15   summer, is that fair?

16   A    I was involved.  Yes.

17   Q    Okay.  Was Daniel Harris assigned to you?  Were you, like,

18   watching him through the summer?

19   A    I was an assistant to the investigation throughout the

20   summer.  The primary case agent had left our office and moved

21   to a different office after the arrest so then I became the

22   primary case agent for that.

23   Q    For Mr. Harris?

24   A    Correct.

25   Q    So you were watching when he was -- you were paying

1    attention to where he was going during the summer of 2020, is

2    that right?

3    A    I was paying attention to everyone.  Yes.

4    Q    Okay.  And so you testified that you interviewed him on

5    October the 7th.  He was also cooperative during that

6    interview, correct?

7    A    He was.

8    Q    And he answered all of your questions, correct?

9    A    He did.

10   Q    Okay.  He provided his pass code to his phone to you,

11   correct?

12   A    Yes.  He did.

13   Q    Okay.  And you mentioned yesterday about one of the

14   comments he made about Big Dan.  Do you remember testifying

15   about that yesterday?

16   A    I do.

17   Q    Big Dan was brought up multiple times during that

18   conversation, was he not?

19   A    He was.

20   Q    Okay.  And talked today about this ghillie suit that was

21   found at Daniel's house, right?

22   A    Yes.

23   Q    Okay.  And do you know when he purchased that ghillie suit?

24   A    I don't.

25   Q    Okay.  And you would agree with me that there is no

1    evidence that Daniel ever brought this ghillie suit to any of

2    these trainings, correct?

3    A    Not to my knowledge.

4    Q    Okay.  And you looked through his phone, right?

5    A    I did.

6    Q    No evidence of him sending out the message that he has this

7    ghillie suit, correct?

8              MR. ROTH:  Your Honor, I object to the hearsay.

9              THE COURT:  It is hearsay.  It's sustained.

10   BY MS. KELLY:

11   Q    Did you see any photographs of a ghillie suit on Daniel

12   Harris's phone?

13   A    Not to my recollection.

14   Q    Okay.  Now, this meme that you were asked about in Exhibit

15   19, you testified that that was a message from Joe Morrison to

16   Daniel Harris, correct?

17   A    Yes.

18   Q    Okay.  And that was on FaceBook, correct?

19   A    Correct.

20   Q    Okay.  And that was part of a larger message to Daniel

21   Harris, right?  There were many memes?

22   A    It was a total of 30.  Yes.

23   Q    There were a total of 30.  Okay.  So photographs that were

24   sent to him, right?

25   A    Correct.

Q    Okay.  And you had the capability when you are looking at Daniel Harris's FaceBook to see if he liked something or if he sends it onto another person, correct?

A    Correct.

Q    Okay.  And nothing in the evidence that you reviewed on Exhibit 19 showed that Daniel Harris liked it, thumbs up or sent it on, correct?

A    On that particular image?

Q    Correct.

A    Correct.

Q    Okay.  So this is just something that was sent to him, right?

A    Correct.

Q    Okay.  Did you have an opportunity to review any other reports as part of your investigation into Daniel Harris in the summer of 2020?

A    I reviewed some reports.  Yes.

Q    Okay.  And specifically about some of the trainings that he was attending is what I'm asking?

A    Yes.

Q    Okay.  And you are aware that Daniel Harris was not present at a training in Munith on June the 28th, correct?

A    I am.

Q    Okay.  These training videos that we watched, there is nothing illegal about doing trainings in your house, the speed

1     reloads, right?

2     A     That is correct.

3     Q     Okay.  Nothing illegal about doing weapon transition drills

4     in your own house, correct?

5     A     Correct.

6     Q     Okay.  And in Exhibit 151 where there is a signal message

7     between Barry Croft and Daniel Harris, you would agree that

8     that's the only message that was between Daniel Croft, or

9     excuse me, Daniel Harris and Barry Croft, correct?

10    A     Daniel Harris on that Signal application called Barry

11    Croft.  You could see that it says outgoing call just prior to

12    the conversation that they had, and then there was a string of

13    conversation all connected.  I think it was a total of two

14    pages where we looked at one, but it was all similar content.

15    Q     So there was more content after the exhibit that we just

16    saw, is that fair to say?

17    A     I think it was prior to that.

18    Q     Okay.  Is it all on the same day?

19    A     I believe that it was.

20    Q     Okay.  So July 19th we have a Signal phone call and then

21    some text messages between the two of them, is that right?

22    A     Correct.

23    Q     Okay.  And there was -- you would agree there was never any

24    four-day FTX held, correct?

25    A     There was not.

1    Q    And to your knowledge, Barry Croft never came to the State

2    of Michigan for a two-week period of time, correct?

3    A    Not to my knowledge.

4    Q    Okay.  And moving into July, in those exhibits that you

5    looked at, July the 7th, Daniel Harris makes a statement about,

6    I know an explosives guy, right?

7    A    Yes.  He does.

8    Q    If shit hits the fan, right?

9    A    I don't recall if that was part of the statement.

10   Q    Okay.  Would it refresh your recollection to look at

11   page 8 -- or Exhibit 80?

12   A    Yes.  It would.

13            MS. KELLY:  May we show the witness Exhibit 80?

14            THE COURT:  Is it on your system?

15            MS. KELLY:  Yes.

16            THE COURT:  Okay.  Go ahead.

17   BY MS. KELLY:

18   Q    Sorry.  So if we could blow up the third Daniel Harris

19   statement?  Thank you.

20            Have you had a chance to look at that transcript?

21   A    Yes.

22   Q    And does that refresh your recollection about Daniel Harris

23   saying, I could reach out to him if shit hits the fan?

24   A    Yes.  It does.

25   Q    Okay.  You can take that down.  Thank you.

1          And then on July 19th we saw some messages between

2   Daniel Harris and Lindsay Cowan, correct?

3   A    Correct.

4   Q    And --

5   A    It was July 23rd.

6   Q    Excuse me.  Sorry, July 23rd.  It looked like there was

7   some photographs above those text messages, is that right?

8   A    Yes.

9   Q    Okay.  And Lindsay Cowan says, my brother is not

10  responding, correct?

11  A    Correct.

12  Q    Something along those lines, right?

13  A    Correct.

14  Q    And Daniel says, it's all kosher, right?

15  A    Right.

16  Q    Okay.  And in review of Daniel Harris's phone, you'd agree

17  that Daniel Harris never reached out to Adam Cowan personally,

18  correct?

19  A    That's correct.

20  Q    Okay.  Didn't reach out to him on FaceBook, correct?

21  A    Correct.

22  Q    Didn't reach out to him on any of these encrypted chats,

23  correct?

24  A    Correct.

25  Q    Okay.  And on July the 23rd it's true that Devin Phelps

1     didn't show up at Daniel Harris's house, correct?

2     A     That is correct.

3     Q     Okay.  And the last message that you talked about was 416,

4     which is a message between Trevon Brown and Daniel Harris,

5     right?

6     A     Correct.

7     Q     And you said that you learned that Trevon Brown was in the

8     military with Daniel Harris, is that right?

9     A     That is correct.

10    Q     Okay.  And Trevon didn't go on the daytime surveillance?

11    A     No.  He turned down the offer.

12    Q     And Daniel turned down the offer as well, correct?

13    A     I don't know if he turned down the offer.  He said he had

14    to work.

15    Q     Okay.  So he didn't go?

16    A     He did not go.

17              MS. KELLY:  I have nothing further.  Thank you.

18              THE COURT:  Mr. Hills?

19              MR. HILLS:  Nothing, Your Honor.

20              THE COURT:  Mr. Blanchard?

21              MR. BLANCHARD:  Thank you.

22                   CROSS EXAMINATION

23      BY MR. BLANCHARD:

24    Q     Good morning.

25    A     Good morning.

1    Q    So Exhibit 151, that was the Signal chat between Mr. Harris

2    and Mr. Croft, is that right?

3    A    I believe that it was.

4    Q    Okay.  And in that Mr. Croft said three things, right?

5         Can we have Exhibit 151, please?

6         Mr. Croft is in the blue boxes?

7    A    Yes, sir.

8    Q    He said three things, right?

9    A    On this page, yes.  He did.

10   Q    He said, all over it brother, right?

11   A    Correct.

12   Q    He said, I agree with you good sir?

13   A    He did.

14   Q    And he said, I want to come up for a week or two, right?

15   A    Yes.  He did.

16   Q    Mr. Croft said nothing about Governor Whitmer, correct?

17   A    Not on this page.  No.

18   Q    Okay.  He said nothing about kidnapping?

19   A    Not on this page.  No.

20   Q    He said nothing about a plot, correct?

21   A    Correct.

22   Q    Similarly, Mr. Harris said nothing about Governor Whitmer?

23   A    He did not.

24   Q    Said nothing about kidnapping?

25   A    No.  He did not.

1    Q    Said nothing about a plot, correct?

2    A    Correct.

3    Q    Said -- Mr. Croft said he wanted to spend a day or two

4    talking, though, right -- excuse me.  He said he wanted to come

5    up in response to spending a day or two talking, correct?

6    A    He did.

7    Q    Nothing illegal about spending a day or two talking, right?

8    A    I guess it depends on what you are talking about.

9    Q    And Exhibit 119, that was the chat involving the lizard

10   people, right?

11   A    That sounds right.

12   Q    Okay.  Mr. Croft wasn't involved in lizard people talk,

13   right?

14   A    Not to my knowledge.

15   Q    As far as you know there are no such things as lizard

16   people, right?

17   A    Not to my knowledge.

18   Q    You leave room for the possibility that there are lizard

19   people?

20   A    I just have no knowledge about it.

21        MR. BLANCHARD:  I'll pass the witness.

22        THE COURT:  All right.  Any redirect?

23        MR. ROTH:  No, Your Honor.  Thank you.

24        THE COURT:  All right.  Thank you.  You may be

25   excused.

1          (Witness excused, 9:06 a.m.)

2          THE COURT:  We'll go to the government's next witness.

3          MR. ROTH:  Thank you, Your Honor.  We call Special

4     Agent Thomas Szymanski.

5          THE COURT:  All right.  We'll have you sworn in before

6     you take the stand.

7          THOMAS MAREK SZYMANSKI, GOVERNMENT

8          having been first duly sworn, testified as follows:

9          (Witness sworn, 9:06 a.m.)

10          DIRECT EXAMINATION

11     BY MR. ROTH:

12     Q    Good morning.

13     A    Good morning, sir.

14     Q    Could I have you start by stating and spelling your

15     complete name, please?

16     A    Thomas, T-h-o-m-a-s, Marek, M-a-r-e-k, Szymanski,

17     S-z-y-m-a-n-s-k-i.

18     Q    Thank you, sir.  Where are you employed?

19     A    Federal Bureau of Investigation.

20     Q    In what capacity?

21     A    I am a special agent.

22     Q    How long have you been with the FBI?

23     A    Been with the FBI since March 2020.

24     Q    And where are you assigned?

25     A    Currently assigned to the Baltimore division.

1    Q    Were you involved in the investigation of Barry Croft?

2    A    I was.

3    Q    Did you work with another agent in that investigation?

4    A    Yes.  I did.

5    Q    Who is that?

6    A    Kristopher Long.

7    Q    Could we please take a look at 3053?  Are you familiar with

8    this text message?

9    A    Yes.  I am.

10   Q    Were you aware of and following the relevant meetings at

11   that time?

12   A    Yes.  I was.

13   Q    All right.  So in this message Special Agent Long talks to

14   the informant about convincing the group that Barry Croft has

15   good ideas; summary, right?

16   A    Correct.

17   Q    And are you aware of who the group that is referenced here

18   was?

19   A    Yes.  I am.

20   Q    Who was in that group?

21   A    Other co-conspirators unindicted from states other than

22   Michigan.

23   Q    All right.  None of these Defendants?

24   A    None of the Defendants.

25   Q    None of the Wolverine Watchmen?

1    A    None of the Wolverine Watchmen.

2    Q    Do you recall the names of the other people?

3    A    I do.

4    Q    What are they?

5    A    James Kawasaki, Paul Crass and Frank Butler.

6    Q    All people from other states?

7    A    That's correct.

8    Q    Where was the group meeting at that time?

9    A    That meeting was in Peebles, Ohio.

10   Q    Thank you.  Can we take that down, please?

11            Did you execute a search warrant at 511 Daniels Court

12   in Bear, Delaware on October 7th, 2020?

13   A    Yesterday.  I did.

14   Q    Who lived at that address?

15   A    Barry Croft.

16   Q    Was anybody present at that address at the time you

17   executed the search warrant?

18   A    They were.

19   Q    Who?

20   A    There were three adult females.  Two female relatives of

21   Mr. Croft, Chasity Knight, Croft's girlfriend, and two of

22   Croft's children.

23   Q    Could you please describe the general layout of the home?

24   A    Sure.  It's a single story single family home with an

25   attached garage, a basement.  There is a porch area in the back

1    of the house, small backyard and a shed.

2    Q    Thank you.  I want to discuss several of the things found

3    in the home.  Have you reviewed physical items Proposed

4    Exhibits 337 through 339?

5    A    Yes.  I have.

6    Q    Are each of those items seized from the home and secured in

7    evidence?

8    A    Yes.

9    Q    Have you also reviewed Proposed Exhibits 341 through 348,

10   439 and 478?

11   A    Yes.

12   Q    Are each of those fair and accurate pictures of things

13   found in Barry Croft's home that day?

14   A    They are.

15        MR. ROTH:  Your Honor, I would move for admission of

16   Proposed Exhibits 337 through 339, 341 through 348 as well as

17   439 and 478?

18        THE COURT:  Any objections?

19        MR. BLANCHARD:  One moment.  I'm sorry.  I don't

20   appear to have 478.

21        MR. ROTH:  That's the one I gave you this morning.

22        MR. BLANCHARD:  Yeah.  No objection, Your Honor.

23        THE COURT:  All right.  They are all admitted.

24        MR. ROTH:  Thank you, Your Honor.

25   BY MR. ROTH:

1    Q    Could we please take a look at 341?  What is this item?

2    A    This is a bag that contained a number of items including

3    black smokeless powder, smokeless propellant that we found in

4    the garage of Mr. Croft's home.

5    Q    And did you open that bag up?

6    A    Yes.  We did.

7    Q    Could we look at 342, please?  Do we see the contents of

8    the bag and the bag itself in this Exhibit 342?

9    A    Yes.  We do.

10   Q    And do you have 339 up there with you?

11   A    Yes.

12   Q    Could you please open that up and show the jury?  So start

13   by telling us what is the bag itself?

14   A    Can you repeat that?

15   Q    What is the bag itself?

16   A    It's a red bag, cloth bag.  It says, Fincantieri Bay

17   Shipbuilding.

18   Q    And with a couple of exceptions are the contents of that

19   bag still in there?

20   A    They are.

21   Q    Let's start by telling the jury what are the exceptions;

22   what has been removed from the bag?

23   A    So for safety purposes we've removed anything with

24   potentially explosive properties.  That includes a hobby fuse.

25   That includes smokeless powder, and that also includes

1    smokeless propellant.  We have removed all those things from

2    the bag you see in front of you.

3    Q    So with that in mind, can you tell us -- can you show the

4    jury each of the remaining items in the bag?

5    A    Certainly.  Start with we've got Crosman BBs.  On the label

6    there is a warning here.  It says air guns are not toys.

7    Misuse or careless use may cause serious jury or death.  That

8    was in the bag.

9            There is a black funnel that was also in the bag.

10   Open duck tape appeared to be used also in the bag.  We also

11   have a package of flame retardant professional grade electrical

12   tape that was in the bag.  There is a package of balloons and

13   some loose balloons, punch balloons specifically that appear to

14   be one of which appears to be cut.  There were four what can be

15   described as clear travel size plastic containers.

16   Q    Those are empty?

17   A    These are empty.

18   Q    Very good.

19   A    There is also a different size, different style container

20   appearing to be empty as well.  And last but not least here we

21   have a blue plastic tool.

22   Q    Could you describe the tool for the jury?

23   A    The tool is a hook shaped tool that looks like it has a

24   notch here for opening.  It also has a hand grip with some

25   grooves for secure holding.

1    Q    Thank you.  So let's go back to the items that were

2    removed.  I'll give you a moment to put those items back in the

3    bag.  Could we take a look at 345, please?  What do we see

4    here?

5    A    So as noted, that's one of the items that we removed from

6    the bag, brought into the room today.  That is smokeless

7    powder.

8    Q    How many bottles or cannisters of smokeless powder were

9    there?

10   A    There were two.

11   Q    Could we look at 347, please?  What is that item?

12   A    So this is double base smokeless propellant, also removed

13   from the bag.

14   Q    How many cannisters of smokeless propellant were there?

15   A    There were three.

16   Q    Could we please look at 348?  What is this item?

17   A    That is Dr. Atomics Exploding Targets, which we also

18   removed from the bag.

19   Q    How many cannisters of this were there?

20   A    There was one.

21   Q    And could you please describe the label on it?

22   A    Sure.  We have a white label.  The manufacturer is

23   Dr. Atomics Exploding Targets.  There is then a picture in the

24   center of what appears to be a mushroom cloud nuclear explosion

25   with writing underneath that says, mix with catalyst bags

1    provided, shake until all is gray, and in all caps below that

2    it's stand back at least 100 yards with an explanation mark,

3    and then there is a contact information for the manufacturer

4    down below.

5    Q    Thank you.  Could we please look at 344?  What room is

6    this?

7    A    This is room J, which was the garage of Mr. Croft's

8    residence.

9    Q    What did you find in there?

10   A    So in the garage we found a number of fireworks.  We also

11   found the shotgun that you see hanging in that picture.  We

12   found drug paraphernalia.  We found gun cleaning supplies.  We

13   found shotgun rounds.  We found other types of ammunition in

14   there.  We found something called a micro conversion kit, and

15   of course, we found the red bag just previously shown to you as

16   well as propane cannisters.

17   Q    Thank you.  What kind of fireworks do we see here?

18   A    So we see boxes and loose fireworks of different brand

19   names, all of which were cylindrical in nature, various

20   diameters and various lengths of those cylindrical fireworks.

21   Q    Cylindrical fireworks, are those mortar fireworks?

22   A    That's correct.

23   Q    Do you have 338 up there with you?

24   A    Yes.

25   Q    All right.  Could you please open that up and show the

1    jury?  All right.  That's 338?

2              MR. BLANCHARD:  That's not what I show.

3              THE COURT:  That's not what I show either.

4    BY MR. ROTH:

5    Q    The tag on it says 338?

6    A    Or I'm sorry, that's 337.  I do not have 338 up here.

7    Q    Was 338 a firework that was located there?

8    A    Yes.

9    Q    All right.  But you do not have it with you up there?

10   A    That's correct.

11   Q    Okay.  We will follow up on that.

12             So now can we look at 337, the gun that you just

13   lifted up?

14             If we can go back to 344 on the screen, please?

15             Is that the same gun we see hanging in the garage?

16   A    It is.

17   Q    What kind of gun is that?

18   A    This is a DP-12, 12-gauge shotgun.

19   Q    Was it loaded?

20   A    No.  It was not.

21   Q    And is there anything that appears added aftermarket to

22   that gun?

23   A    Yes.  There is.

24   Q    Could you please explain that to the jury?

25   A    Certainly.  So when we look at the DP-12 shotgun here you

1    can notice these protruding points at the ends of both barrels.

2    So this is not a standard piece that comes with this shotgun.

3    Now, what these are, and I'll remove them for you, are pieces

4    called chokes.  This specific choke is called a stiletto choke,

5    and per the manufacturer website this choke is meant to be used

6    to concentrate buckshot, breaching rounds, and slugs.  So as I

7    remove it what you can see is as I point the shotgun towards

8    you is that the check is inserted into the barrel, and

9    essentially what it then does when the weapon is fired is

10   concentrate the fire power of the shot, the slug, the breaching

11   round and also increase the accuracy of that round.

12   Q    All right.  So in the breaching context what does that

13   mean?

14   A    In the breaching context if you were breaching a door for

15   example, it would be a concentration of fire power, shot or

16   slug directed towards whatever you are trying to open.

17   Q    And would you put that as you call it the stiletto into the

18   door before firing?

19        MR. BLANCHARD:  Object to the leading nature.

20        THE COURT:  It's leading, and I am not sure there is

21   much foundation for it.  He said he's been an FBI special agent

22   since March of 2020, and I have no idea what, if any, training

23   he has on that sort of thing.

24        MR. ROTH:  I can leave that alone, Your Honor.  Thank

25   you.

BY MR. ROTH:

Q    All right.  Was there anything else added to that particular gun?

A    Besides these stiletto chokes nothing appeared to be added to the firearm.

Q    Very good.  And you can return that to the box, please. While he does that, could we please look at 478?

What do we see in Exhibit 478?

A    This is a piece of equipment called a micro conversion kit, also known as a Mini Roni or Micro Roni.

Q    Where was this found?

A    This was also found in the garage.

Q    Now, are you familiar with what this item is and does?

A    Yes.  I am.

Q    All right.  Could you please describe that for the jury?

A    So what this item does is essentially allow the user to insert a pistol into this device and then allows the user to have more accuracy and control over where those rounds are sent once the weapon is fired.  Per the manufacturer's website --

MR. BLANCHARD:  Object as to foundation for stuff he read on a website.  I think it's hearsay.

THE COURT:  It is.  It's also hearsay.

MR. ROTH:  That's fine, Your Honor.

BY MR. ROTH:

Q    So we can leave the part from the website out.  Where in

1    this item -- you said it's a conversion kit.  Does something go

2    into this item?  Because it's not a gun itself, right?

3    A    Correct.

4    Q    So does a gun go into this item?

5    A    Yes.

6    Q    Could you please explain that to the jury?

7    A    So the gun is -- there is an open part kind of in that

8    middle opening area where the gun is inserted to, which then

9    allows the user to hold onto that handle of the handgun and

10   then use the front stock to support the rest of that firing

11   platform.

12   Q    You said it increases accuracy.  Does it change the firing

13   speed at all?

14        MR. BLANCHARD:  Object as to foundation.

15   BY MR. ROTH:

16   Q    If you know?

17   A    I don't know.

18   Q    Very good.  We can take that down.  Thank you.

19        Could we take a look at 343, please?

20        What is this item here?

21   A    So that item is a sheet of paper that appeared to have a

22   cipher on it.

23   Q    What do you mean by cipher?

24   A    A cipher, essentially a secret code or code format

25   basically that used various letters associated with numbers.

1   There were also symbols on there that could be used to

2   communicate covert messages.

3   Q    Where was it found?

4   A    That was found in the bedroom used by Barry Croft.

5   Q    Were there additional firearm related evidence found in the

6   home?

7   A    Yes.  There was.

8   Q    Could you please tell the jury what kind?

9   A    There was an empty Glock case.  There was a 25-round 10

10  millimeter magazine that was fully loaded.  There were gun

11  cleaning kits.  There were gun cleaning tools.  There was a

12  shotgun bandalere.  There was also a box that contained optics,

13  a laser, flashlight specifically designed to fit onto firearms,

14  various rounds that I mentioned earlier, shotgun rounds as

15  well.  I think that's significantly what we found during the

16  search.

17  Q    Could you give an estimate as to the amount of ammunition

18  that was found in the home just roughly?

19  A    The best estimate is I would say there were several,

20  probably up to five ziplock bags of rifle rounds, and then

21  shotgun rounds.

22  Q    You also referred to a shotgun bandalere.  What is a

23  shotgun bandalere?

24  A    So a shotgun bandalere is something that is designed to be

25  worn by the user and can hold the rounds in it for easy access

1    and reloading purposes.

2    Q    Were there other weapon related items in the home?

3    A    Yes.  There were.

4    Q    What were those?

5    A    There was a knife.  There was a hatchet.  There were two

6    swords.  There was also a gas mask and associated cannisters

7    for that gas mask.

8    Q    Are you familiar with III% or Boogaloo paraphernalia or

9    items?

10   A    Yes.  I am.

11   Q    Did you find any related items in the home?

12   A    Yes.  We did.

13   Q    What were those?

14   A    So we found a package of patches, patches that had the

15   American Dixie flag on half of it and a flag used by III%er

16   movement on the other half of it.  We also found a rendition of

17   the Delaware state flag that had Hawaiian patterns and other

18   images often used by the Boogaloo movement.

19   Q    Could we please take a look at Exhibit 91?

20        Does this appear to be the flag that you found?

21   A    Yes.  That appears to be the flag we found.

22   Q    You refer to this as a rendition of the Delaware flag.  Are

23   you familiar with the Delaware flag as it normally is?

24   A    Generally speaking, yes.

25   Q    What's the difference between that and what we see here?

A    So the first difference is there is not the Hawaiian

pattern in the blue portion of the flag.  Additionally, there

is -- in the center piece what you can see there is you have

two individuals facing each other, both of whom are wearing

Hawaiian garb and holding various modern day weapons, various

modern day rifles.  That's not on the Delaware state flag.

There is also you see in the top part of the crest two guns,

handguns.  Not part of the Delaware state flag.  Above that

there is a modern picture -- a depiction of a modern rifle.

That's not part of the Delaware state flag.  And then also in

the white part of the center part of the flag there is an igloo

which most certainly is not part of the Delaware state flag.

Q    Thank you.  You can take that down.

          Exhibits 429 and 454 were previously admitted.  They

were cell phones taken from Barry Croft.  Did you extract the

contents of those phones?

A    Yes.  I did.

Q    And did your CART team provide detailed instructions on how

to do so?

A    Yes.  They did.

Q    And did you follow those instructions?

A    I did.

          THE COURT:  So just before you go further, I show 454

in.  429 might be but it's not in on my list.

          MR. BLANCHARD:  I'm sorry, 42 --

1          THE COURT:  429.  I have 454 in.  And I might have

2     missed 429.

3          MR. ROTH:  I show 429 coming in.

4          THE COURT:  Through which witness?

5          MR. ROTH:  With Special Agent Long.  I believe our

6     third witness.

7          MR. BLANCHARD:  We are showing 429 in.

8          THE COURT:  You show it in.  All right.  I'll assume

9     that I missed it.  We'll assume it's in.  Go ahead.

10         MR. ROTH:  Thank you, Your Honor.

11    BY MR. ROTH:

12    Q    So following those instructions were you able to

13    successfully extract the contents of those two cell phones?

14    A    Yes.  I was.

15    Q    And did investigators identify digital items from those

16    extractions that were relevant to the investigation?

17    A    They did.

18    Q    Did you go back and confirm each of those items in your

19    extraction?

20    A    Yes.

21    Q    All right.  Have you reviewed Proposed Exhibits 4, 357,

22    358, 359, 360, 361 and 362?

23    A    Yes.

24    Q    Are each of those items digital items that you found in the

25    extracted contents of Barry Croft's cell phones?

1    A    Yes.  They are.

2            MR. ROTH:  I'd move for the admission of Proposed

3    Exhibits 4 and 357 through 362?

4            MR. BLANCHARD:  I'd object to 359 on 403 grounds.  You

5    know, without more I don't see how it's relevant here.

6            THE COURT:  All right.  Well, in looking at it, we've

7    seen and heard some things about the III% group and the tattoo

8    shows.  I think it's in the context of the overall case.

9            MR. BLANCHARD:  I am not sure we are talking about the

10   same.

11           THE COURT:  359.

12           MR. BLANCHARD:  One moment.  Okay.  Yeah.  It's the

13   knives.

14           THE COURT:  We'll go ahead and admit it and the others

15   as well.  Go ahead.

16           MR. ROTH:  Thank you, Your Honor.

17   BY MR. ROTH:

18   Q    Could we please take a look at Exhibit 4?

19           Is this a FaceBook post?

20   A    Yes.  It is.

21   Q    From what date?

22   A    That is from April the 18th, 2020.

23   Q    From what account?

24   A    That account is bgcroftjr.

25   Q    And do you know whose account that is?

1   A    Yes.  I do.

2   Q    Whose?

3   A    That's Barry Croft's account.

4   Q    Could you please read what Barry Croft posted here?

5   A    Certainly.  I believe all it's going to take is one state

6   to burn out and hang a governor and those dominos will start

7   falling.

8   Q    Are you familiar with the three exclamation points and

9   percent that he included at the end?

10  A    I am.

11  Q    What do those refer to?

12  A    The three exclamation points and percent at the end is a

13  reference to the III% movement.

14  Q    Thank you.  Could we look at 357, please?

15       Is this a meme?

16  A    It is.

17  Q    What application in the phone was it found in?

18  A    FaceBook.

19  Q    What is pictured here?

20  A    A rifle magazine loaded with rounds.

21  Q    Please read what it says?

22  A    Oh look.  It's 30 votes that count.

23  Q    How many rounds does a rifle magazine like this typically

24  hold?

25  A    Typically a rifle magazine like this holds 30 rounds.

1    Q    Thank you.  Could we please look at 358?

2         Is this a photograph?

3    A    It is.

4    Q    From what date?

5    A    June 18th, 2020.

6    Q    What is pictured here?

7    A    The same DP-12 shotgun that was found at Croft's residence.

8    Q    All right.  The one that you held up earlier?

9    A    That's correct.

10   Q    Was there any GPS information associated with this picture?

11   A    There was in fact.

12   Q    What did it indicate?

13        MR. BLANCHARD:  I object as to foundation.  I mean,

14   it's not in dispute that he had the gun at his house.  I don't

15   know what we're doing here.

16        THE COURT:  Well, the phone extraction would certainly

17   typically support GPS, and there is evidence that the phone

18   extraction happened, so you can go ahead and answer if you

19   know.

20        MR. ROTH:  Thank you, Your Honor.

21        THE WITNESS:  The GPS information on the extraction

22   indicated the photo was taken at 511 Daniels Court in Bear,

23   Delaware.

24   BY MR. ROTH:

25   Q    Barry Croft's residence?

1    A    That's correct.

2    Q    Thank you.  Could we look at 349, please?  359.  I

3    apologize.

4         Is this another photograph?

5    A    It is.

6    Q    From what date?

7    A    This is from August the 29th, 2020.

8    Q    Who's pictured here?

9    A    That is Mr. Barry Croft.

10   Q    What is he holding?

11   A    He is holding two curved knives.

12   Q    What do we see on his right hand?

13   A    That's a tattoo that appears to be a combination of the

14   alpha and the omega symbols.

15   Q    Are you familiar with that sort of icon or tattoo?

16   A    Not particularly.

17   Q    All right.  What about the one on the other hand; is that

18   one you are familiar with?

19   A    Yes.

20   Q    What do we see there?

21   A    That's a symbol associated with the III% movement.

22   Q    Could we look at 360, please?

23        Is this another FaceBook post?

24        THE COURT:  So 360 I might have missed that in the

25   list.  Is that in?

1          MR. ROTH:  It was in the list at least identified.

2          THE COURT:  Okay.  Go head.

3          MR. ROTH:  Thank you, Your Honor.

4          THE COURT:  It's the same extraction, right?

5          MR. ROTH:  It is.

6          THE COURT:  Okay.

7   BY MR. ROTH:

8   Q    Is this another FaceBook post?

9   A    It is.

10  Q    From what date?

11  A    That is from May 25th, 2020, which was Memorial Day.

12  Q    From what account?

13  A    That is lastcroft.

14  Q    Do you know whose account that is?

15  A    I do.

16  Q    Whose?

17  A    Barry Croft's.

18  Q    Could you please read what Barry Croft posted here?

19  A    Certainly.  Which governor is going to end up dragged off

20  and hung for treason first?  It's really a spin the bottle

21  match at this point.  And I'm sure a few mayors are in the

22  running.  III%.  God bless the constitutional republic.  Again,

23  III%.

24  Q    All right.  Let's talk about a couple of the pictures

25  underneath.  What do we see here?

1    A    That's a noose.

2    Q    What do we see written -- and we can zoom in on that real

3    quick.  What do we see written in that mirror?

4    A    In the mirror it says, 1776.2, and below that it says,

5    objects in mirror are closer than they appear.

6    Q    Do you know what 1776.2 is a reference to?

7    A    Yes.  I do.

8    Q    What is that?

9    A    A second American revolution or a second iteration of the

10   Declaration of Independence.

11   Q    All right.  If we could zoom out, please?

12           Bottom left, what is written here?

13   A    Although not all the letters are there it appears to say,

14   fuck around and find out.

15   Q    And last picture I want to talk about here.  Bottom right.

16   What do we see?

17   A    So there is a white engraved background, Hawaiian

18   background with a palm tree and an igloo.  On the top is an

19   appeal to heaven, and below the igloo and palm tree in

20   parentheses, before we Boogaloo.

21   Q    Thank you.  Could we look at 361, please?

22           Is this another FaceBook post?

23   A    It is.

24   Q    From what date?

25   A    That is May 30th, 2020.

```
1    Q    From what account?

2    A    Lastcroft.

3    Q    Could you please read what Barry Croft posted here in the

4    text and then in the image?

5    A    Certainly.  Take those capitals.  They can't fuck we the

6    people if we the people hold those capitals.  Three exclamation

7    points percent.

8    Q    And then it says it again?

9    A    It does.

10   Q    All right.  And finally, 362, please?

11              Is this another FaceBook post?

12   A    Yes.  It is.

13   Q    From what date?

14   A    That is from May 31st, 2020.

15   Q    Again, from Barry Croft's account?

16   A    Yes.  The lastcroft account.

17   Q    And can you please read what he wrote there?

18   A    Start putting these tyrants' addresses out here for

19   rioters.

20   Q    Could we zoom in here, please?  Who looked at that post?

21   A    Adam Dean Fox and 13 others.

22              MR. ROTH:  Thank you.  I have nothing else.

23              THE COURT:  All right.  We'll go to cross starting

24   with Mr. Gibbons.

25              MR. GIBBONS:  No questions, Your Honor.
```

1    THE COURT:  All right.  Then we'll go to Ms. Kelly.

2    MS. KELLY:  I have nothing, Your Honor.

3    MR. HILLS:  Nothing, Your Honor.

4    THE COURT:  And we'll go to Mr. Blanchard.

5    MR. BLANCHARD:  Thank you.

6    CROSS EXAMINATION

7    BY MR. BLANCHARD:

8    Q    Good morning.

9    A    Good morning, sir.

10   Q    So you talked about this red bag that was depicted in

11   Government's Exhibit 341, right?

12   A    Correct.

13   Q    And that contained some smokeless powder, right?

14   A    Among other things, yes.

15   Q    Yeah.  I am going to break it down.  It contained smokeless

16   powder, right?

17   A    It did.

18   Q    Okay.  And smokeless powder is legal to buy?

19   A    Yes.  It is.

20   Q    You can buy it at Walmart?

21   A    I believe so.

22   Q    Yeah.  It had balloons in it?

23   A    Yes.

24   Q    I think in America we can still own balloons, right?

25   A    Yes.

1    Q    Okay.  And BBs?

2    A    Yes.

3    Q    Children can buy BBs, right?

4    A    I am not sure of age requirements of purchasing BBs.

5    Q    FBI doesn't prosecute a lot of kids with BB guns, right?

6    A    No.

7    Q    And then you talked about Dr. Atomics Exploding Targets,

8    right?

9    A    I mentioned it.  Yes.

10    Q    There was one cannister of that?

11    A    Yes.

12    Q    And you talked about how there was a nuclear bomb on the

13    label, right?

14    A    I noted that there was a picture that appeared to be a

15    mushroom cloud associated with nuclear explosions.  Yes.

16    Q    You are not here to say that a Dr. Atomics Exploding Target

17    is a nuclear bomb, are you?

18    A    I don't think I ever suggested that.

19    Q    Good.  We are just on the same page.  There is nothing

20    nuclear about a Dr. Atomics Exploding Target, right?

21    A    Except for the fact that there is a picture of it on the

22    front there is nothing nuclear about it.  No.

23    Q    It's an off brand of Tannerite, right?

24    A    I am not sure of the chemical components of Dr. Atomics

25    Exploding Targets.

1    Q    Okay.  You understand the purpose is that you put it down

2    range and shoot at it and it goes boom and it's kind of fun,

3    right?

4    A    Again, I think there are many uses of how you can use an

5    exploding target.

6    Q    Have you ever used an exploding target?

7    A    No.  I haven't.

8    Q    Okay.  So you just -- you are not sure how they are

9    supposed to be used?

10   A    I stated that there are many uses.

11         MR. ROTH:  It's argumentative.

12         THE COURT:  He said there are multiple ways to use it,

13   which seems self-evident.  So let's go to something that's

14   controversial and new.

15   BY MR. BLANCHARD:

16   Q    You had talked about a text message I think from Exhibit

17   3053 that your colleague sent to a confidential source.  Do you

18   remember that?

19   A    Yes.  I do.

20   Q    That confidential source was Jennifer Plunk, right?

21   A    Yes.

22   Q    And you are familiar with Ms. Plunk?

23   A    Yes.  I am.

24   Q    She was working as a source in this case?

25   A    Yes.

Q    At what point did she come to the attention of the FBI?

A    I don't remember the specific date.

Q    How was it that she came to the attention of the FBI?

        MR. ROTH:  Your Honor, I am going to object to lack of foundation.  We don't know if this witness knows that.

        THE COURT:  If he knows, and I'm sure he will say he doesn't know.

        THE WITNESS:  I don't know.

BY MR. BLANCHARD:

Q    You don't know when or why or how she came to the attention of the FBI?

A    The particular details I don't -- I don't specifically remember.

Q    Was she working on other cases for the FBI?

A    Not to my knowledge.

Q    So you knew what that conversation was about but you don't know when or why or how she started working for the FBI, correct?

A    Can you repeat the question?

Q    You said you knew what the -- you were familiar with her and you knew what they were talking about in Exhibit 3053, but you don't know when or why or how she started working for the FBI, is that fair?

A    No.  I don't think that's fair.

Q    Okay.  Then let's break it down.  Do you know any of those

1    when or why or how questions?

2    A    I know the why.

3    Q    Okay.  Was she recruited by the FBI?

4    A    I don't believe that she was recruited by the FBI.

5    Q    Did she reach out to the FBI?

6    A    The specifics I don't remember.  I know that she was

7    working at the time of that conversation.

8    Q    Okay.  You said that you were involved in the search of

9    Mr. Croft's house, correct?

10   A    That's correct.

11   Q    And in addition to this red bag with the balloons in it,

12   you said you found some drug paraphernalia, correct?

13   A    Correct.

14   Q    That was drug paraphernalia related to marijuana, correct?

15   A    That's correct.

16   Q    Like smoking devices for marijuana?

17   A    Scales, smoking devices.  Yes.

18   Q    Stuff that people who smoke marijuana use, right?

19   A    I assume so.

20   Q    And in Exhibit 337, I think that's our shotgun, right, or

21   DP-12, is that correct?

22   A    Yes.

23   Q    Okay.  And that's a legal shotgun, right?

24   A    To my knowledge it is.

25   Q    Okay.  And you don't have -- you haven't seen any videos of

1    Mr. Croft or anyone else using that shotgun to breach a door,

2    correct?

3    A    I have not seen any of those videos.

4    Q    Okay.  And you said that there is a choke tube on the end

5    of it that you unscrewed for the jury, right?

6    A    There are two chokes on the end of each of the barrels.

7    Q    Sure.  Wait.  Wait.  There is two on each barrel?

8    A    There is -- there are two barrels and there are two chokes.

9    Q    So there is two choke tubes, right?

10   A    Correct.

11   Q    And you said they are kind of pokey at the end or pointy at

12   the end, is that right?

13   A    Yes.

14   Q    Okay.  Those choke tubes are legal, right?

15   A    Yes.

16   Q    And we heard an ATF agent yesterday say sometimes these

17   things that go on the ends of barrels are there to look cool.

18   Are you familiar with that?

19   A    I didn't hear any testimony from the ATF agent.

20   Q    Okay.  You said you found some loaded magazines or a loaded

21   magazine at Mr. Croft's house, correct?

22   A    Correct.

23   Q    If you want to put it back in the box so it's not pointing

24   at the marshal that's fine.  We don't need that out anymore.

25           The -- you are allowed to have in America loaded

1    magazines, right?

2    A    Sure.

3    Q    Okay.  And we talked about I think was it Exhibit 338 that

4    is a firework that you don't have here?

5    A    Exhibit 338 wasn't brought in because of its explosive

6    nature.

7    Q    It's a firework, right?

8    A    Yes.

9    Q    Like a firework you can go to the firework store and buy,

10    right?

11    A    A firework which explodes which you could go to the store

12    and buy.

13    Q    Well, I mean, there aren't non-exploding fireworks as far

14    as you know, right?

15    A    As far as I know all fireworks explode.

16    Q    Okay.  So it's like a single firework that you could buy at

17    a roadside stand?

18    A    I am not sure where you can buy these fireworks.

19    Q    It's fair to say it's maybe two inches in diameter?

20    A    I would have to take a look at it and measure.  I couldn't

21    tell you how wide the diameter is.

22    Q    Well, you seized it, right?

23    A    We seized a number of fireworks.  Yes.

24    Q    Okay.  And you looked at it before you came here to

25    testify, right?

1    A    Certainly.

2    Q    Do you think it's about two inches in diameter?

3    A    Again, I mean, I would have to measure it.  I haven't

4    measured it.

5    Q    Okay.  Exhibit 4 was a FaceBook post that Mr. Croft made,

6    right?

7    A    Yes.

8    Q    Okay.  Publicly on his FaceBook wall?

9    A    Yes.

10   Q    For the world to see?

11   A    I don't know what settings he had on his account at that

12   time, but it was a FaceBook post.  Yes.

13   Q    Well, it had 38 likes, right?

14   A    Yes.

15   Q    It had 16 comments?

16   A    Yes.

17   Q    Had seven shares?

18   A    Correct.

19   Q    So he was engaging in conversation with other people in the

20   world?

21   A    If that's indicative of conversation, then yes.

22   Q    And 357.  Can we have 357 up on the screen, please?

23        It's a meme, right?

24   A    It is.

25   Q    Memes are meant to funny, right?

1    A    Memes I think are meant to convey certain sorts of

2    messages, sometimes funny, sometimes serious, sometimes tongue

3    in cheek.  There is a lot of different conversation that goes

4    on or expression that happens with memes.

5    Q    Sure.  And this one is a picture of it looks to me like an

6    AR magazine.  Is that fair?

7    A    Looks like a rifle magazine.

8    Q    It says, oh, look, it's 30 votes that count, right?

9    A    Yes.

10   Q    Fair to say that's a little tongue in cheek?

11        MR. ROTH:  I am going to object to the speculation.

12        THE COURT:  He can answer if he has his own view, but

13   his own view isn't particularly relevant.

14        THE WITNESS:  I don't think it's tongue in cheek.

15   BY MR. BLANCHARD:

16   Q    A little bit funny?

17   A    I didn't laugh when I saw this meme.

18   Q    Okay.  357 was that picture of Mr. Croft where he was

19   sitting in the chair.  You recall that?  He's got you can see

20   his tattoos you talked about?

21   A    Yes.

22   Q    Yeah.  You talked about GPS data for the exhibit before

23   that.  Did you pull GPS data on this photo of Mr. Croft sitting

24   in a chair?

25   A    Yes.

1    Q    That was also at his house, right?

2    A    Correct.

3    Q    Exhibit 360 was another FaceBook post, right?

4    A    Can you pull 360 up?

5    Q    Sure.  Can we have 360, please?

6    A    Yes.

7    Q    We can't see from this how many people interacted with it,

8    right?

9    A    Correct.

10   Q    But we can see that it was shared on a public page called

11   Open New Jersey Now, right?

12   A    It looks like it was posted to Open New Jersey Now.

13   Q    Did you look into what Open New Jersey Now is?

14   A    No.

15   Q    Why not?

16   A    I mean, we were -- we were taking a look at this account.

17   This account, as you noted before, interacted with other

18   accounts, so we were focusing on this specific account.

19   Q    But this specific account that you say is Mr. Croft's

20   posted something that you found concerning enough to bring into

21   a federal trial to Open New Jersey Now.  Why didn't you look

22   into Open New Jersey Now?

23             MR. ROTH:  One, argumentative.  Two, asked and

24   answered.  Three, this witness didn't choose the exhibit.  The

25   government did.

1     THE COURT:  He can say if he had a reason for not

2  pursuing it or if he didn't, and if he didn't or he can't

3  recall one then we don't really go any further and it's just a

4  matter of argument.

5     THE WITNESS:  So I was not the lead case agent on this

6  so I cannot tell you why or why not Open New Jersey Now was

7  taken a look at.

8  BY MR. BLANCHARD:

9  Q   So back in -- you said this was from May of 2020, right?

10  A   Memorial Day.  Yes.

11  Q   Around May of 2020 around the country there were a lot of

12  lockdowns going on, correct?

13  A   Yes.

14  Q   There were stay-at-home orders in a lot of states?

15  A   I am not familiar with all the orders but certainly this

16  was in the middle of the pandemic time.

17  Q   And you -- you were aware that around the country there

18  were a number of groups that were opposed to these lockdowns,

19  correct?

20  A   There was wide publication about a number of groups.

21  Certainly.

22  Q   A lot of them had, you know, open up or unlock in the name,

23  right?

24  A   I can't -- I couldn't rightly say what they were called

25  across the country.

1    Q    You are allowed in America to express your political

2    beliefs about your leaders, right?

3    A    That's one of the rights granted to us in the constitution.

4    Q    You are allowed to do that on FaceBook, right?

5    A    Again, I think that you can express certain views.  I am

6    not going to say all views, but certainly you can express

7    certain political views on FaceBook.

8    Q    So there are certain political views that you are not

9    allowed to express in America?

10             MR. ROTH:  I am going to object as to the relevance.

11   This witness's understanding of what the law is are not

12   pertinent.

13             THE COURT:  I think it's true he is not here to

14   describe the First Amendment and its limits and when something

15   may or may not cross from fair political expression to

16   actionable conduct or evidence of actionable conduct, and I

17   don't know how far -- much further you want to go, but I think

18   more of that is going to be argumentative than things that this

19   witness can address.

20             MR. BLANCHARD:  Thank you.

21   BY MR. BLANCHARD:

22   Q    Exhibit 361, can I have that up, please?

23             This is another FaceBook post, right?

24   A    That is.

25   Q    Put out there in the public?

1    A    Put on Croft's FaceBook account.

2    Q    Could we blow up right there, please?

3         Do you know what that little globe logo means on

4    FaceBook?

5    A    No.

6    Q    You don't know whether that means it's publicly available

7    or not?

8         MR. ROTH:  Objection.  Asked and answered.  The

9    witness says he doesn't know.

10        THE COURT:  He says he doesn't know.  That's true.

11   BY MR. BLANCHARD:

12   Q    Okay.  And then could I have 362 as well?

13        And another FaceBook post, right?

14   A    Yes.

15   Q    I suppose you can't tell us whether this one was publicly

16   available or not either, right?

17   A    Correct.

18   Q    But you can see that it was liked by 14 people?

19   A    Yes.  Adam Fox and 13 others.

20   Q    And shared by four people?

21   A    Yes.

22   Q    Okay.  You all with the FBI, you executed some search

23   warrants on Mr. Croft's various FaceBook accounts, right?

24   A    Yes.

25   Q    And so you could have looked back and found these posts in

1    the FaceBook returns, right?

2    A    Yes.

3    Q    And you are aware that when you do that, you could look up

4    whether posts are publicly available or not, right?

5    A    Perhaps.

6    Q    Well, are you aware of that or not?

7    A    Certainly.

8    Q    Okay.  You didn't do that here?

9    A    Again, I wasn't the lead investigator on this case.

10   Q    But you are the investigator that's here testifying about

11   FaceBook, right?

12   A    I am testifying about images that were found from the

13   extraction of two phones from Barry Croft seized during his

14   arrest.

15   Q    And then I just want to go back for one moment.  Exhibit

16   3053 is a text message we talked about, right?  The one

17   involving your confidential source, Ms. Plunk.  Do you remember

18   that?

19   A    I do.

20   Q    You said that that meeting that they were trying to get her

21   to hold people together for was a meeting in Peebles, Ohio,

22   yes?

23   A    Yes.  I did.

24   Q    The meeting in Peebles, Ohio on July 18?

25   A    I don't recall the specific date.

1  Q    You are only aware of one meeting in Peebles, Ohio,

2  correct?

3  A    Correct.

4          MR. BLANCHARD:  I'll pass the witness.

5          THE COURT:  All right.  Any redirect?

6          MR. ROTH:  Briefly, Your Honor.

7                      REDIRECT EXAMINATION

8    BY MR. ROTH:

9  Q    So just as to that last point about the meeting in Peebles,

10  Ohio.  What specific group of people was that message referring

11  to?

12          MR. BLANCHARD:  Objection.  Asked and answered.  We

13  did this on direct.

14          THE COURT:  We did, but it's now been reopened because

15  of your cross, so he can clarify.  Go ahead.

16          THE WITNESS:  So again, that specific group of people

17  are unindicted coconspirators from other states other than

18  Michigan, which include James Kawasaki, Frank Butler and also

19  Paul Crass.

20  BY MR. ROTH:

21  Q    Had nothing to do with the Defendants in this case?

22          MR. BLANCHARD:  Objection, leading.

23          THE COURT:  That is leading.

24  BY MR. ROTH:

25  Q    Did it have anything to do with the people in this room?

1    A    It had nothing to do with any of the people that I see in

2    this room here today.

3              MR. ROTH:  Thank you, Your Honor.

4              I have one housekeeping matter before we excuse the

5    witness, which is that I would like to strike what we had

6    previously or tentatively admitted as 338, the firework.  The

7    witness's testimony reminded me that we did not admit it or did

8    not intend to admit it because it was explosive.

9              MR. BLANCHARD:  I'd like it brought in.  He can't

10   testify to the size and I think it's relevant to what we are

11   doing here.  I tried to get him to estimate the size and he

12   fought me on that.  I'd like to bring it in.

13             THE COURT:  It was moved and admitted so I think it is

14   in evidence.  We'll have to deal with how if at all it is

15   presented at this point.

16             MR. ROTH:  Thank you, Your Honor.

17             THE COURT:  Any further recross from Mr. Gibbons?

18             MR. GIBBONS:  Yes, Your Honor.  Just very quickly.

19             THE COURT:  It has to be related to the redirect.

20             MR. GIBBONS:  Absolutely.  I understand.

21                      RECROSS EXAMINATION

22     BY MR. GIBBONS:

23   Q    You discussed it was brought up again, this meeting in

24   Peebles, Ohio?

25   A    Good morning, sir.

1    Q    Good morning.

2    A    Yes.  I did.

3    Q    All right.  Perfect.  There were members from Michigan at

4    the Peebles, Ohio meeting, correct?

5    A    I am not aware of the full attendance of the participants

6    in that meeting.

7    Q    Okay.  So it could very well be that many of the issues

8    that Ms. Plunk was attempting to remedy may have involved

9    people at the Peebles meeting, correct?

10             MR. ROTH:  Objection.  Lack of foundation.  He says he

11   does not know who was there.

12             MR. GIBBONS:  I didn't ask him who was there, Your

13   Honor.

14             THE COURT:  He can answer if he is able.  He said he

15   didn't know the full group.

16             THE WITNESS:  Can you repeat the question, please,

17   sir?

18   BY MR. GIBBONS:

19   Q    Well, there was an issue at the Peebles meeting, was there

20   not?

21   A    An issue?

22   Q    Yes.  That Ms. Plunk was attempting to address, true?

23   A    There was a -- yeah.  I suppose you could say it was an

24   issue.  Sure.

25   Q    Because she was directed to try to keep the group together,

1    correct?

2    A    The source was advised to maintain access, as I had

3    previously stated, to other unindicted co-conspirators

4    specifically who are not affiliated with any of the individuals

5    we see in this room here whose names I can reiterate again, but

6    all of whom reside outside of the State of Michigan.

7    Q    Sir, I asked you a very simple question, and the question

8    is this.  At the Peebles meeting there was issues concerning

9    people not agreeing with Barry Croft's ideas, correct?

10   A    There were issues with the individuals that I stated

11   before --

12   Q    That's kind of yes or no.

13   A    Well, it's more complicated than a yes or no answer.

14             THE COURT:  I think it's argumentative in this sense,

15   and the jury now has the information from both.  No. 1, this

16   witness's testimony is that the text of 3053, the agent's

17   comments or statements directly to Plunk, were concerned with

18   people other than these Defendants.  There is other testimony,

19   and he hasn't denied it, that perhaps one or more of these

20   Defendants was at the Peebles, Ohio meeting.  That you now have

21   the ability to argue that whatever direction the agent gave to

22   Ms. Plunk that you think helps your Defense was, in fact,

23   extended to the other people, or the jury may disbelieve this

24   witness's interpretation of 3053, but ultimately it's going to

25   be an argument both sides have to make to the jury.  So if you

think you need something more specific to make your argument we
can try to probe it, but right now I'm just going around
because the two of you don't agree.

        MR. GIBBONS:  No.  I can get off that circle, Your
Honor.  I just have a little follow up.
BY MR. GIBBONS:
Q    Sir, would you agree that Jenny Plunk had contact with Adam
Fox in the summer of 2020?
A    I am not aware of specifically any conversations that any
of our sources would have had with Mr. Fox.
Q    Okay.  You are aware that Jenny Plunk had contact with CHS
Dan in the summer of 2020, is that correct?

        MR. ROTH:  Your Honor, I am going to object.  I think
it's outside the scope of redirect.

        THE COURT:  Well, the problem is the redirect tried to
reiterate the government and this witness's interpretation of
who it was targeted to, and what recross is trying to establish
is that there may be another interpretation that's broader.  So
if he knows I think he can answer.  If he doesn't he can tell
us.

        THE WITNESS:  Can you repeat the question, sir?
BY MR. GIBBONS:
Q    Correct.  Ms. Plunk did have contact with CHS Dan here in
Michigan, did she not, in the summer of 2020?
A    I am not aware.

1    Q    And as a case agent you were assigned to this case in some

2    fashion, correct?

3    A    I assisted on this case.  Yes.  I did.

4    Q    And you are not the primary agent?

5    A    I am not the primary agent on this case.  No.

6    Q    All right.  But at the FBI there is a program or is there

7    not where reports are all fed into the system on the computer,

8    is that right?

9    A    Whenever we write reports there is a computer repository of

10   the reports.

11   Q    And that's available to you at any time if you are assigned

12   to an investigation, true?

13   A    No.  It's not true.  You need to be -- you need to have

14   certain levels of access.  You can't just pull it up on your

15   phone.

16   Q    Okay.  Well, if you are in your office on a computer that's

17   sanctioned and provided to you by the FBI, do you have access

18   to the reports that are being filed on the case you are

19   assigned to?

20   A    Again, I was assisting on this case.  I was not the lead

21   investigator on this case.  I had access to the case file.

22   Q    Did you access the case file?

23   A    I did access the case file for matters relevant to the

24   tasks that were given to me to assist in the investigation.

25   Q    So you would have reviewed some of the things in the file

1    but not others, correct?

2    A    I would have reviewed the things in the file that were

3    relevant to the tasks that were given to me by the lead case

4    agent.

5              MR. GIBBONS:  I have no further questions, Your Honor.

6              THE COURT:  All right.  Anything else, Ms. Kelly?

7              MS. KELLY:  No, Your Honor.

8              THE COURT:  Mr. Hills?  Mr. Blanchard?

9              MR. BLANCHARD:  I think I'll pass.

10             THE COURT:  Fair enough.  Then we can excuse this

11   witness.

12             (Witness excused, 9:59 a.m.)

13             THE COURT:  And we'll probably -- you don't have a

14   two-minute witness, right?

15             MR. ROTH:  I do not, Your Honor.

16             THE COURT:  All right.  So let's take our morning

17   break and come back in 20 minutes.

18             LAW CLERK:  All rise.

19             (Jury out, 9:59 a.m.)

20             THE COURT:  All right.  You had something, Mr. Hills,

21   you wanted to flag?

22             MR. HILLS:  Not that I wanted to play but I wanted to

23   foreshadow an objection if I can.  I filed two objections in

24   writing relating to videos on relevancy grounds, 403 grounds,

25   and I wanted to make -- wanted to lodge the same objection.

1    The government, I think, is going to introduce several

2    FaceBook --

3             THE COURT:  What are the exhibit numbers?

4             MR. HILLS:  457, 458, 459, 460, 461 and 463.  Many of

5    them -- most of them frankly are out of the timeframe of the

6    conspiracy.  They don't have anything -- they are not talking

7    about a plot to kidnap the governor, and they are, you know,

8    frankly mean talk I would say.  And it's highly prejudicial and

9    I would ask the Court to exclude it.

10            THE COURT:  All right.  Well, it sounds like in your

11   perspective it's the same kind of evidence that I addressed in

12   the earlier orders?

13            MR. HILLS:  It's the same kind of evidence.  This

14   only -- but this also reaches back outside of the timeframe of

15   the conspiracy.  I believe there is one post that is within the

16   timeframe.  The rest of them, they start like in January of

17   2020.  I think there is some in May.

18            THE COURT:  All right.  So I'll look at it on break.

19   For planning purposes I would expect to adhere to the earlier

20   ruling unless it gets far far afield because predisposition is

21   an issue in the case, which opens the door I think to some

22   things that are outside the specific timeframe, but I'll double

23   check those exhibits on the break, and if it's anything

24   different I'll let you know and make a formal ruling.

25            The other housekeeping matter, I looked ahead at the

1    government's witness list and I think Chasity Knight is

2    Mr. Croft's girlfriend, right?

3            MR. KESSLER:  That's right, Your Honor.

4            THE COURT:  So I did enter an order that would appoint

5    counsel for her to discuss any Fifth Amendment issues if you

6    intend to call her.  Is that right?

7            MR. KESSLER:  We do intend to call her.

8            THE COURT:  And you haven't immunized her?

9            MR. KESSLER:  No.  I don't think she actually has any

10   criminal exposure.

11           THE COURT:  That's up to her to -- at least in the

12   first instance.  If she asserts the Fifth Amendment after

13   talking with counsel and decides -- and I decide it's in good

14   faith, does the government intend to seek immunity or is that a

15   bridge you are going to cross if we get to it?

16           MR. KESSLER:  If we get to it.  I don't think we

17   could, Your Honor.

18           THE COURT:  All right.  Very good.  So I know at the

19   first break it's sometimes hard to tell, but is there still a

20   realistic shot you end today if we extend a little beyond 2:00

21   if need be or do you think you are really into Wednesday for

22   sure?

23           MR. ROTH:  It depends on pacing but I'd say it's less

24   than 50 percent likely.

25           THE COURT:  Fair enough.  We'll check it at second

1    break and then I'll let the jury know one way or the other.

2                   MR. ROTH:  Thank you, Your Honor.

3                   THE COURT:  All right.  Thank you.  Twenty minutes.

4                   LAW CLERK:  Court is in recess.

5                   (Recess taken, 10:03 a.m.)

6                   (Resume Proceeding, 10:27 a.m.)

7                   LAW CLERK:  All rise, please.

8                   (Jury in, 10:27 a.m.)

9                   LAW CLERK:  Court is in session.

10                  THE COURT:  All right.  Welcome back everyone.  Please

11   be seated and we will go to the government's next witness.

12                  MR. ROTH:  Thank you, Your Honor.  We call Special

13   Agent Joel Kelso.

14                  THE COURT:  All right.

15                  JOEL KELSO, GOVERNMENT

16                  having been first duly sworn, testified as follows:

17                  (Witness sworn, 10:27 a.m.)

18                       DIRECT EXAMINATION

19    BY MR. ROTH:

20   Q    Good morning.

21   A    Good morning.

22   Q    Could I have you start by stating and spelling your

23   complete name, please?

24   A    MY name is Joel Kelso, J-o-e-l.  K-e-l-s-o.

25   Q    Thank you.  Where are you employed?

1    A    With the FBI.

2    Q    In what capacity?

3    A    I am a special agent.

4    Q    How long have you been a special agent with the FBI?

5    A    Twelve years.

6    Q    Did you execute a search warrant at 41058 Heathmore Court,

7    Apartment 15, in Canton, Michigan, on October 7, 2020?

8    A    Yes.

9    Q    Who lived at that address?

10   A    Brandon Caserta.

11   Q    Could you please describe the layout of that residence?

12   A    Yes.  When you walk in the front door it opens up to a

13   living room.  Past the living room there is like an island bar

14   and the kitchen on the other side.  Off to the right -- as you

15   go through the living room off to the right there is a bedroom,

16   a bathroom and a closet, and then off the kitchen kind of in

17   the back corner of the apartment was like the utility room.

18   Q    Thank you.  I should have mentioned it.  You did.  This is

19   an apartment?

20   A    It's an apartment, correct.

21   Q    Very good.  I want to discuss several of the things found

22   in Brandon Caserta's apartment.  Have you reviewed Proposed

23   Exhibits 316, 317, 325 through 327?

24   A    Yes, sir.

25   Q    Were each of them items found in Brandon Caserta's home and

1    secured in evidence?

2    A    Yes.

3    Q    Have you reviewed Proposed Exhibits 306, 307, 309 through

4    322 as well as 328?

5    A    Yes.

6    Q    Are each fair and accurate pictures taken in Brandon

7    Caserta's apartment that day?

8    A    Yes.  They are.

9             MR. ROTH:  I apologize.  Not 310.  Let me say this

10   differently.  So with that I would move the admission of

11   Proposed Exhibits 306, 307, 309 through 322 and 325 through

12   328?

13            THE COURT:  All right.  Any objections?

14            MR. HILLS:  No, Your Honor.

15            THE COURT:  All right.  They are admitted.

16   BY MR. ROTH:

17   Q    Before we get into those, could we take a look at Exhibit

18   5036, Defense Exhibit, please?

19            So the Defense previously admitted this as a picture

20   of Brandon Caserta's living room.  Is that accurate?

21   A    It is his living room but there is a flag that's missing

22   off the wall.

23   Q    All right.  Where is it missing from on this picture?

24   A    On the right-hand side next to the State of Michigan map on

25   the right of that map there was a black flag with a red A and a

1    circle on it.

2    Q    Could we look at 318, please?

3         All right.  Is that how it actually looked?

4    A    That was how it was hanging on the wall.  Yes.

5    Q    Is Exhibit 327 the flag itself?

6    A    Yes.

7    Q    Could you please open that up and show the jury?

8    A    Yes.

9    Q    Thank you.  Could you tell the jury, please, what was on

10   that flag.

11   A    It's a red A with a red circle around it.

12   Q    Are you familiar with that symbol?

13   A    I am.  It's an anarchy symbol.

14   Q    And it was hanging directly next to this map of Michigan we

15   see here?

16   A    Just like it is in the photo.  Yes.

17   Q    Could we look at 311, please?

18        What do we see here?

19   A    Those were books that were found in the bedroom.

20   Q    So this is not how they were found.  They were laid out

21   like this for the picture?

22   A    Yes.  We laid them out for the picture to properly document

23   which books were taken.

24   Q    And the ones visible -- and we could zoom in.  Let's zoom

25   in on pieces.

1          Could you please read the titles of the books where

2    visible?

3    A     The Most Dangerous Superstition, The Chase Against the

4    State.

5    Q     The Case Against the State?

6    A     The Case Against the State, War is a Racket, None Dare Call

7    It Conspiracy, Jack Boot This, Practical Anarchy, The Freedom

8    of the Future.

9    Q     All right.  And up here, what is this item?  That's all

10   right.  What was this item?

11   A     That is a Glock handgun manual.

12   Q     Thank you.  Let's go to the other half.  What items do we

13   see there?

14   A     In the Minds of Murderers, The Law, Watch Officers Guide,

15   Behind the Green Mask, You and Agenda 21, and We the People, No

16   Treason, the Constitution of No Authority.

17   Q     Thank you.  Could we look at 306, please?  Where was this?

18   A     This was hanging on the living room wall.

19   Q     And it's a white board?

20   A     It's a white board.  Yes.

21   Q     What was written on it?

22   A     Do video explaining how modern police are violent

23   criminals.

24   Q     Thank you.  Could we look at 319, please?

25          Where in the apartment were these items found?

1    A    In the kitchen.

2    Q    Generally what is the nature of the things on the list?

3    A    Outdoor survival gear, tents, tarps, that kind of stuff.

4    Q    What's this item here on the left?

5    A    It's a cipher.

6    Q    What is a cipher?

7    A    It's a way to covertly communicate without law enforcement

8    being able to determine what you are saying.

9    Q    What are the pouches on the bottom left?

10   A    They are magazine pouches.

11   Q    Was anything in them?

12   A    No.

13   Q    What's the pamphlet next to them?  We can zoom in if you

14   need.

15   A    Please.  Citizens Rule Book.

16   Q    And the red cord next to it?

17   A    That is a gun lock.

18   Q    Still in the bag?

19   A    Yes.

20   Q    All right.  Could we take a look at 309, please?

21        What area of the apartment is this?

22   A    It's in the living room.

23   Q    And directing your attention to this black bin here on the

24   floor, did you examine the contents?

25   A    Yes.

1    Q    Do we see those laid out in Exhibit 310?

2    A    Yes.

3    Q    All right.  Could you please tell the jury what items you

4    found in that black bin?

5    A    Among those items there is a shovel, a machete, a saw,

6    tarps, a water bladder and a small game trap.

7    Q    There is some other knives as well?

8    A    Yes.  There is -- yup.  Smaller knife next to the machete,

9    some hearing protection, some magazine pouches.

10   Q    Very good.  Could we take a look at -- I'm sorry.  What is

11   this item here?

12   A    That is a butt stock for a rifle.

13   Q    What does that mean?  What is a butt stock for a rifle?

14   A    It's the part of the rifle that goes up against your

15   shoulder.

16   Q    Very good.  Could we look at 307, please?

17        Where in the apartment was this closet?

18   A    It was across from the bedroom door next to the bathroom

19   and just off to the right from the living room and kitchen

20   area.

21   Q    Looking at the top left, what is this item?

22   A    It's a tactical vest.

23   Q    Could we look at 321, please?

24        Is that the vest closer up and opened up?

25   A    Yes.  Those plates -- those ballistic plates were inside

1       the vest.

2       Q    Is 325 the vest itself?

3       A    Yes.

4       Q    Could you please open that up and show the jury?

5       A    Yes.

6       Q    Thank you.

7            What are the plates that we see in the middle here?

8       A    Those are ballistic plates.  They'll stop bullets.

9       Q    And they were inside the plate when you found them?

10      A    They were inside the vest.  Yes.

11      Q    Inside the vest.  I apologize.  And what else did you find

12      in the pockets or pouches of the plate carrier?

13      A    There was a knife that you see next to the ballistic

14      plates.

15      Q    Right here?

16      A    Yes.

17      Q    Thank you.

18           Could we go back to 307, please?

19           So back in that same closet, what's the item we see on

20      the top right?

21      A    It's a tactical belt.

22      Q    Do we see that closer in 328, please?

23           Do you have that belt itself, Exhibit 326?

24      A    Yes.

25      Q    Could you please hold that up for the jury?  Thank you.

1    Could you tell the jury what you found in the tactical

2    belt?

3    A    It has a pistol holder on the right side.  It has a med kit

4    on the back and it has two AR magazines and one pistol magazine

5    on it as well.

6    Q    Were any of those magazines loaded?

7    A    No.

8    Q    Did you also find firearms in the apartment?

9    A    Yes.

10   Q    Could we look at 312, please?

11        What is this item?

12   A    It's an AR pistol.

13   Q    Where in the apartment was it found?

14   A    In the closet in the bedroom.

15   Q    Is 316 that firearm?

16   A    Yes.

17   Q    Could you please show that to the jury?

18   A    Yes.

19   Q    All right.  I'm going to ask you to point to some things on

20   that.  So we pick you up with the microphone could you have a

21   seat?  You referred to it as an AR pistol.  Very generally

22   speaking what does that mean?

23   A    It means it's not classified as a rifle.  It's classified

24   as a pistol.

25   Q    What caliber was it?

1    A    556.

2    Q    Was it loaded?

3    A    No.

4    Q    Was it equipped with -- excuse me.  Did it appear to be

5    equipped with anything aftermarket?

6    A    Yep.  It has a tactical optic on top.

7    Q    Tactical optic on top?

8    A    An optic.

9    Q    Thank you.  Thank you.  You can return that to the box.

10         Could we put 315 up, please?

11         Where in the apartment was this item found?

12   A    On the dresser in the bedroom.

13   Q    Is 317 the gun itself?

14   A    Yes.

15   Q    Could you please hold that up for the jury?

16   A    Yes.

17   Q    And again, if you can have a seat so the microphone will

18   pick you up?

19   A    Okay.

20   Q    What kind of gun is that?

21   A    It's a Glock 17.

22   Q    A pistol?

23   A    Yes.

24   Q    What caliber is it?

25   A    Nine millimeter.

1    Q    Was it loaded?

2    A    Yes.

3    Q    Did it appear to be equipped with anything aftermarket?

4    A    It had a flashlight that was attached to the front of it.

5    Q    All right.  Could you show that to the jury?  Hold that up.

6    A    Yes.

7    Q    And in the picture here we see it's still attached?

8    A    Correct.

9    Q    Very good.  Thank you.  You can return that to the box.

10        Could we look at 313, please?

11        What kind of gun is this that we see in 313.

12   A    It's an AR rifle.

13   Q    This is different than the other AR rifle that we looked

14   at?

15   A    The other one was classified as an AR pistol.

16   Q    I apologize.  I misspoke.  This was an AR rifle; the other

17   was an AR pistol?

18   A    Correct.

19   Q    Very good.  Where was this one found?

20   A    In the closet in the bedroom.

21   Q    What caliber was this?

22   A    556.

23   Q    Was it loaded?

24   A    No.

25   Q    Did it appear to be equipped with anything aftermarket?

1    A    It has an optic on the top of it.

2    Q    Thank you.  314, please?

3         What do we see here?

4    A    That's the same gun that was in the previous photo and it

5    shows a flashlight attached to the front of it.

6    Q    Was there anything else that it was equipped with?

7    A    It's got that green hand guard and I think that's it.

8    Q    Thank you.  You can take that down.

9         Was there also ammunition in the apartment?

10   A    Yes.

11   Q    Could we look at 320, please?

12        Where were these items found?

13   A    Those were found in the closet.

14   Q    The main one we looked at before?

15   A    Yes.

16   Q    All right.  And that was off of the main room as opposed to

17   a bedroom?

18   A    It was -- yes.

19   Q    Approximately how many magazines were found here?

20   A    16 rifle magazines and eight pistol magazines.

21   Q    Rifle on the top, pistol on the bottom?

22   A    Correct.

23   Q    Were any of them extended magazines?

24   A    Yes.

25   Q    What are extended magazines?

1    A    They hold more rounds than your standard magazine.

2    Q    All right.  If you press the screen it'll make a mark.

3    Could you show the jury which ones appear to be extended

4    magazines?

5    A    This one and this one.

6    Q    For a pistol extended magazine approximately how many

7    rounds does that allow you to hold at once?

8    A    That one is probably about 30.

9    Q    And what about an extended rifle magazine?

10   A    That would look to be around 40 rounds.

11        MR. HILLS:  I am going to object if he doesn't know.

12   He says it looks to be.

13        THE COURT:  Well, he can answer if he is able, and if

14   he doesn't believe he has the ability he can say so, but he's

15   indicated he has been a special agent for 12 years and may have

16   a basis to say one way or the other.

17        MR. ROTH:  Thank you, Your Honor.

18   BY MR. ROTH:

19   Q    Is it uncommon to find this number of magazines in a home?

20   A    Yes.

21   Q    Were any of these magazines loaded?

22   A    No.

23   Q    Did you also find ammunition itself in the home?

24   A    Yes.

25   Q    Could we look at 322, please?

1        What do we see here?

2    A    Four ammunition cans holding 556 rounds.

3    Q    Where was this found?

4    A    In the closet.

5    Q    Approximately how many rounds of ammunition were here?

6    A    Approximately 2,000.

7    Q    Was there additional ammunition in the apartment?

8    A    Yes.

9    Q    All right.  What kind?

10   A    556.

11   Q    Outside of these buckets?

12   A    Yes.

13   Q    And where was that?

14   A    In the closet.

15   Q    Approximately how much was there?

16   A    I don't recall.

17   Q    Smaller amounts?

18   A    Yes.  This was the largest amount.

19   Q    And there was a nine millimeter pistol.  Was there any

20   ammunition for that?

21   A    I don't recall.  I know it was loaded.

22        MR. ROTH:  I have nothing else, Your Honor.  Thank

23   you.

24        THE COURT:  All right.  Mr. Gibbons?

25        MR. GIBBONS:  Thank you, Your Honor.  What I would

1    like to do is defer to Mr. Hills because this focus is solely

2    on his client for the most part and reserve the right to maybe

3    inquire if I think something comes up.  I do not anticipate a

4    cross.

5              THE COURT:  All right.  Ms. Kelly?

6              MS. KELLY:  I have no questions, Your Honor.

7              THE COURT:  Mr. Hills?

8              MR. HILLS:  Thank you.

9                         CROSS EXAMINATION

10    BY MR. HILLS:

11    Q    If we can just start right back out with 5036 if we can?

12    If we can put that one up?

13          All right.  This photograph was taken by your crew, is

14    that right?

15    A    Yes.

16    Q    It wasn't taken by the Defense, correct?

17    A    Correct.

18    Q    All right.  So you would have taken the flag down and then

19    took the picture?

20    A    This would be an exit photo, yes, after we collected the

21    evidence.

22    Q    Okay.  And then if we can go to 318?

23          All right.  And I am looking, there is a map of

24    Michigan on there?

25    A    Yes.

Q    And it looks like kind of a plastic map?

A    Yes.

Q    All right.  There are no markings on that map like from a
dry erase marker or some sort of a marker?

A    No.

Q    No, like, I guess I would call it aftermarket markings on
there, is that right?

A    Correct.

Q    Okay.  And then the anarchy flag.  That -- there is nothing
illegal about hanging political flags, is there?

A    No.

Q    Okay.  I believe the government pointed you to government
311.  Can we pull that one up?

        And the government, I believe, went through all of
these.  Let's just take the one right in the middle.

        If we can highlight War is a Racket?

        You see General Butler authored that book, correct?

A    Correct.

Q    And General Butler, you know he is a two-time medal of
honor winner?

A    I did not know.

Q    Okay.  Medal of honor is the highest award you can win in
the military?

A    Correct.

Q    Okay.  Did you know he was a marine general?

1    A    I did not.

2    Q    Okay.  Highly decorated obviously.  Did not know that?

3    A    I did not.

4    Q    Did you read that book?

5    A    No.

6    Q    Did you read any of them?

7    A    No.

8    Q    All right.  So I guess we are judging books by their cover

9    apparently, is that right?

10            MR. ROTH:  Objection.  Argumentative.

11            THE COURT:  It is argumentative.  Go ahead.  Next

12    topic.

13    BY MR. HILLS:

14    Q    It's not illegal to have any of these books?

15    A    No.

16    Q    Okay.  Are any of these books on a federal ban book list?

17    A    Not to my knowledge.

18    Q    Okay.  If you check one of these books out at the library

19    do they have to call the feds?

20    A    No.

21    Q    Okay.  Go to 319.  I'm sorry.  Go back to 311.  Sorry about

22    that.  Can you highlight on the left there?  There is a

23    notebook.

24            You see the black and white notebook there?

25    A    Yes.

1    Q    Did you seize that?

2    A    Yes.

3    Q    And had a lot of writing in it?

4    A    I don't know.  I did not look inside that book.

5    Q    You didn't look inside it?

6    A    I did not.  No.

7    Q    But you took it and preserved it?

8    A    Yes.  The other agents that were searching that location

9    determined it fell in with the scope of the search warrant and

10   took it.

11   Q    Okay.  All right.  Now, 319 if we can?  All right.

12          The upper left, this cipher?

13   A    Yes.

14   Q    Do you see it?  Okay.  Now, you don't have any information

15   that this cipher was used?

16   A    No.

17   Q    At all?

18   A    I do not.  No.

19   Q    Okay.  All right.  And if we can go to 310?  All right.

20   Now, I want to point out a couple of things in here.  If we

21   can, if we can go to the middle right about there?

22          You see the silver thing in the middle?

23   A    Yes.

24   Q    All right.  And that is like a heater for food or you cook

25   with it?

1    A    It could be.

2    Q    All right.  You didn't -- you didn't take a look at that,

3    inspect that at all?

4    A    I did not examine every item in that tub.

5    Q    Okay.  Let's go -- if you can back out a little bit?  All

6    right.

7         I think you testified there is a water bladder in

8    there, correct?

9    A    The CamelBak one in the left, it has a blue lid.

10   Q    Right.  There is a small saw, green, with the green and

11   black handle?

12   A    Yes.

13   Q    Okay.  Some knives?

14   A    Yes.

15   Q    Okay.  And I believe if we can go here, is that a shovel?

16   A    Yes.

17   Q    It looks like here there is a bag full of, like, liters and

18   miscellaneous things?

19   A    Correct.

20   Q    For camping maybe?

21   A    That's what it looks like.  Yes.

22   Q    Okay.  All right.  If we can in that vein, I think, can we

23   put up for the witness 5070 just for the witness?

24        Is this one of the photographs that you took that day

25   or that -- is this one of the items you seized that day I

1     should say?

2     A    I don't recall off the top of my head.

3     Q    Okay.  Do you recognize the backpack in the back of that

4     photograph?

5     A    I do not recognize it.  No.

6     Q    Okay.  If we can go back to -- let me see.  All right.

7     Let's go to 307.

8            All right.  So this is the closet where -- and you see

9     in this closet I believe --

10           THE COURT:  Wait a minute.  Yeah.  No.  Go ahead.

11    It's in.  My bad.

12    BY MR. HILLS:

13    Q    In this closet we've got down here basically meals.  Are

14    those meals ready to go?

15    A    Yes.

16    Q    All right.  And they are big tubs of this, correct?

17    A    Correct.

18    Q    There are also a couple of other meals ready to go back

19    there, right?

20    A    Yes.

21    Q    And this is how you found everything in this closet, neat

22    and orderly, is that right?

23    A    Yes.  Just as it's showed in the photo.

24    Q    Okay.  And that's when you pulled these cannisters out of

25    ammunition, is that right, with the ammunition in it?

1    A    Yes.

2    Q    Those were stacked neatly in the closet?

3    A    Yes.

4    Q    And there was nothing illegal about any of the ammunition

5    that was found?

6    A    No.

7    Q    You talked about --

8              Let's put up 312 if we can.

9              This is the one you described as an AR pistol?

10   A    Correct.

11   Q    And it's in the proper configuration for an AR pistol?

12   A    Yes.

13   Q    Nothing illegal about that?

14   A    No.

15   Q    It was unloaded?

16   A    Yes.

17   Q    Aftermarket optic that was put on it?

18   A    Yes.

19   Q    Okay.  The Glock 19, nothing -- or Glock -- it was a Glock

20   17 I believe actually.  Glock 17 that he had.  Nothing -- it

21   was properly configured?

22   A    Correct.

23   Q    Nothing illegal about that?

24   A    No.

25   Q    The AR rifle that you saw, or that we displayed to the

1    jury, properly configured?

2    A    Yes.

3    Q    Nothing illegal about that?

4    A    No.

5    Q    Unloaded?

6    A    Yes.

7    Q    Safely stored?

8    A    Yes.

9    Q    Okay.  Can we put up just for the witness -- well, no.

10   We'll put up 306 if we can?

11            This is a white board that's hanging kind of just

12   outside the kitchen, is that right?

13   A    In the living room.  Yes.

14   Q    All right.  And it says, do video explaining how modern

15   police are violent criminals, correct?

16   A    Yes.

17   Q    All right.  Can we put up just for the witness 5031?  Okay.

18   We can see the white board, is that correct?

19   A    Correct.

20   Q    There was also a package, is that right, in the -- in the

21   apartment when you arrived?

22   A    Yes.

23   Q    And I just kind of circled it.  Is that it?

24   A    That's the package.  Yes.

25   Q    Okay.  And does this picture accurately reflect how you

1    found the apartment when you arrived?

2    A    Yes.

3         MR. HILLS:  Okay.  I'd move the admission of 5031.

4         THE COURT:  What's the relevance of the package?

5         MR. HILLS:  The package relates to the video.  There

6    is a video and I believe inside the package there is something

7    that may relate to the video.

8         THE COURT:  All right.  And I don't know if the

9    government has any objection or not.  We are not at the video

10   yet.  Is that it?

11        MR. ROTH:  That's correct.

12        MR. HILLS:  Well, they -- yeah.  That's correct.

13        MR. ROTH:  I have no objection to the admission of

14   5031.

15        THE COURT:  All right.  It's admitted.

16   BY MR. HILLS:

17   Q    Okay.  All right.  And let's go to 5067 just for the

18   witness.

19        THE COURT:  Is it the same thing or is it already in?

20        MR. HILLS:  I'm sorry?

21        THE COURT:  So 5067 is for the witness only?

22        MR. HILLS:  Yeah.  Yeah.

23   BY MR. HILLS:

24   Q    You opened the box?

25   A    I did not.  No.  Somebody on the search team did.

Q    Okay.  Does this accurately reflect what was inside the box?

A    Yes.

MR. HILLS:  Okay.  Move for the admission of 5067?

THE COURT:  Any objection?

MR. ROTH:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

BY MR. HILLS:

Q    Okay.  5031 for the jury if we can?

THE COURT:  Well, let's cut through it.  Do you have an objection to this one, Mr. Roth?

MR. HILLS:  I am going back.

THE COURT:  Sorry.  Go ahead.

BY MR. HILLS:

Q    That's all right.  We are cutting to it right now.  So this is the picture with the box, correct?

A    Yes.

Q    Okay.  Going to 5067.  Okay.  And inside the box was a light, circular light?

A    Yes.

Q    All right.  Could provide good lighting for videos, correct?

A    Correct.

Q    All right.  Now, just for the witness, 5043.

This is a picture of my -- of the bedroom as you saw

```
1    it?

2    A    Yes.

3    Q    Accurately reflected as you saw it?

4    A    Yes.

5              MR. HILLS:  All right.  Can we put for the witness

6    5042?

7              THE COURT:  5042 or 5043?

8              MR. HILLS:  42.

9              THE COURT:  Sorry.  Any objections, Mr. Roth?

10             MR. ROTH:  No, Your Honor.

11             THE COURT:  It's admitted.

12   BY MR. HILLS:

13   Q    And 5051 just for the witness.

14             THE COURT:  Okay.  Any objection?

15             MR. ROTH:  I don't.  I just want to clarify, just

16   admitted were 5042, 5043 and now 5051?

17             MR. HILLS:  Correct.

18             MR. ROTH:  No objection.

19             THE COURT:  All right.  It's admitted.

20   BY MR. HILLS:

21   Q    All right.  If we can, 5043 for the jury.

22             This is my client's bedroom, is that right?

23   A    Yes.

24   Q    Okay.  Going to 5042.  Okay.  Again, another as we pan

25   around the bedroom, correct?
```

1    A    Correct.

2    Q    There is no bed in there?

3    A    No.

4    Q    A couch?

5    A    Yes.

6    Q    Okay.  5051.  Okay.  Now, this is kind of panning back --

7    kind of panning back around in my client's bedroom, is that

8    right?

9    A    All right.

10   Q    And there is my client's closet, correct?

11   A    Yes.

12   Q    Kind of neatly kept, is that right?

13   A    Yes.

14   Q    Down below here is this where you found the pistol -- the

15   AR pistol and the AR rifle?

16   A    Yes.

17   Q    Okay.  Kept in their cases?

18   A    It's a bag but it could be considered a case.

19   Q    Well, that's what I meant.

20   A    Yup.

21   Q    Okay.  And up here on the top it's a gun rest, is that

22   right?

23   A    Yes.

24   Q    Sighting a new rifle?

25   A    Yes.

1    Q    You mentioned, I believe, that there was a back -- you can

2    put that down.  So it's a small one-bedroom apartment, one

3    bath, correct?

4    A    Correct.

5    Q    And then there is like a storage room in the back, is that

6    right?

7    A    Yes.

8    Q    You looked through that storage room?

9    A    Yes.

10   Q    You looked up, there is, like, kind of a little storage

11   attic kind of?

12   A    Yes.

13   Q    Looked all through that?

14   A    Yes.

15   Q    I won't bore everybody with the pictures of it, but there

16   was nothing found up there of evidentiary value?

17   A    No evidence was taken from the attic or the utility room.

18   Q    Okay.  Found no explosives?

19   A    No.

20   Q    No fireworks?

21   A    No.

22   Q    There was some testimony about cutting down trees and phone

23   poles.  There is no chain saws in there?

24   A    No chain saw.

25   Q    There was some testimony about shooting down airships.  No

1    missiles or rockets?

2    A    No.

3    Q    No maps involving Governor Whitmer's house?

4    A    Not that I saw.  No.

5    Q    Okay.  No writings or plots involving Governor Whitmer?

6    A    I don't know if there was some in that notebook that we

7    talked about that was on the desk, but I did not go through it,

8    but nothing that I saw.

9    Q    Nothing that you saw.  Okay.  Now, I want to show you

10   one -- I am not sure if you were there for this.

11          So I want to, if we can, just show the witness 5065?

12          Did you -- were you around for any of this?

13   A    I do not know what that is.

14   Q    You don't recognize this information?

15   A    No.

16          MR. HILLS:  Okay.  All right.  Thank you.

17          THE WITNESS:  Thank you.

18          THE COURT:  Mr. Blanchard?

19          MR. BLANCHARD:  Thank you.

20                      CROSS EXAMINATION

21    BY MR. BLANCHARD:

22   Q    Good afternoon I think.  Morning.  Sorry.  Good morning.

23   A    Good morning.

24   Q    You talked a little bit to Mr. Hills about the books,

25   right?

1   A   A little bit.  Yes.

2   Q   In America we are allowed to read what we want, right?

3   A   Yes.  We are.

4   Q   Does the FBI maintain a banned book list?

5   A   No.

6   Q   Does it maintain an approved reading list for its citizens?

7   A   No.

8   Q   How about a suspicious book list?

9   A   Not to my knowledge.

10   Q   But you laid out all of Mr. Caserta's books anyway?

11   A   To show every book that we took.  Yes.

12   Q   And you took his books as well?

13   A   Yes.

14   Q   In -- could we have Exhibit 310, please?  And can we blow

15   up right there?

16          What's the item with the kind of light green handle?

17   A   It's a saw.

18   Q   About how long is the blade on that saw?

19   A   Approximately nine inches.

20   Q   Okay.  We heard in Exhibit 106 about Mr. Croft's plan to

21   cut down all of the trees along the Ohio border.  Did you think

22   the saw was involved in that plan?

23   A   I didn't know anything about that plan.

24   Q   Why did you take a picture of the saw?

25   A   Because it was in the tub.

1          MR. BLANCHARD:  Pass the witness.

2          THE COURT:  All right.  Mr. Gibbons, anything you want

3     to ask?

4          MR. GIBBONS:  I'm satisfied, Your Honor.

5          THE COURT:  All right.  Any redirect?

6          MR. ROTH:  Just one moment, Your Honor.  No redirect,

7     Your Honor.

8          THE COURT:  All right.  Thank you.  Then we'll excuse

9     the witness.

10          (Witness excused, 11:03 a.m.)

11          THE COURT:  And go to the government's next witness.

12          MR. ROTH:  Call Special Agent Chris Carter.

13          THE COURT:  Are your monitors working now,

14     Mr. Blanchard?

15          MR. BLANCHARD:  They started working the last session

16     magically.  Thank you.

17          THE COURT:  It's not magic.  It's Brad.

18          MR. BLANCHARD:  Thank you, Brad.

19          THE COURT:  Thank you.

20          CHRIS CARTER, GOVERNMENT

21          having been first duly sworn, testified as follows:

22          (Witness sworn, 11:03 a.m.)

23                  DIRECT EXAMINATION

24     BY MR. ROTH:

25     Q    Good morning.

1    A    Good morning.

2    Q    Could I have you start by stating and spelling your

3    complete name, please?

4    A    Yes.  Christopher Carter.  C-h-r-i-s-t-o-p-h-e-r,

5    C-a-r-t-e-r.

6    Q    Thank you.  Where are you employed?

7    A    I am employed with the FBI.

8    Q    How long have you been employed with the FBI?

9    A    About five years.

10   Q    And what is your position with the FBI?

11   A    I am a special agent.

12   Q    On October 7th, 2020, did you execute a search warrant on a

13   1999 Chrysler LHS?

14   A    Yes.

15   Q    Who did that car belong to?

16   A    It belonged to Mr. Brandon Caserta.

17   Q    Where was the car when you found it?

18   A    It was at his place of employment.

19   Q    Where was that?

20   A    I don't recall the address.

21   Q    Do you recall just the city?  The east side of Michigan?

22   A    Yes.

23   Q    Very good.  Have you reviewed Proposed Exhibits 415 and

24   4 -- 414 and 415?

25   A    Yes.

Q    All right.  Are those fair and accurate pictures of an item
you found in his car?

A    Yes.

Q    And is 451 the item itself?

A    I am not seeing a --

Q    Is 451 the box you brought in?

A    Yes.  Yes.

Q    All right.  And that was again seized from Mr. Caserta's
car?

A    Yes.

        MR. ROTH:  Your Honor, I'd move for the admission of
Proposed Exhibits 414, 415 and 451?

        THE COURT:  Any objections?

        MR. HILLS:  No.

        THE COURT:  All right.  They are admitted.

BY MR. ROTH:

Q    Could we look at 414, please?

        Did you find a firearm in Mr. Caserta's car?

A    Yes.

Q    Was it in the bag that we see here?

A    Yes.

Q    What kind of bag was that?

A    It was a black backpack.

Q    Where in the car was the backpack?

A    It was located in the trunk.

1    Q    And 451 is the gun itself?

2    A    Yes.

3    Q    All right.  Could you please open that up and show the

4    jury?  All right.  If you could take it out of the box and just

5    hold it up?  What kind of pistol is that?

6    A    It is a Glock handgun.

7    Q    What caliber?

8    A    10 millimeter.

9    Q    Was it loaded?

10   A    Yes.

11   Q    How many rounds?

12   A    Eleven rounds.

13        MR. ROTH:  I have nothing else, Your Honor.  Thank

14   you.

15        THE COURT:  All right.  Mr. Gibbons?

16        MR. GIBBONS:  No questions, Your Honor.

17        THE COURT:  Ms. Kelly?

18        MS. KELLY:  No, Your Honor.  Thank you.

19        THE COURT:  Mr. Hills?

20                  CROSS EXAMINATION

21     BY MR. HILLS:

22   Q    Can I put up for the witness 5023?

23        In your search you also found a wallet, is that

24   correct?

25   A    Yes.

1    Q    All right.  Mr. Caserta's wallet?

2    A    Yes.

3    Q    All right.  And 5023, is that a picture of the wallet?

4    A    Yes.

5    Q    And it's accurate?

6    A    Yes.

7    Q    If we can put up for the witness 5024?

8         THE COURT:  Well, maybe we can short circuit.  How

9    many are you going through?

10        MR. HILLS:  Right now just two.

11        THE COURT:  All right.  Do you have any objections to

12   either of them at the government table, Mr. Roth?

13        MR. ROTH:  I do not, Your Honor.

14        THE COURT:  5023 and 24 are -- and 5024 are admitted.

15        MR. HILLS:  Okay.  5023 if we can.

16   BY MR. HILLS:

17   Q    All right.  This is the wallet for the jury, correct?

18   A    Correct.

19   Q    All right.  5024?

20        Okay.  And in here we can see Mr. Caserta's driver's

21   license, correct?

22   A    Correct.

23   Q    That was in good order, correct?

24   A    I am not sure what you mean by good order.

25   Q    Valid license?

1    A    Yes.

2    Q    Okay.  Registration, correct?

3    A    I am not -- I don't see a registration.

4    Q    Michigan registration?

5    A    Yes.

6    Q    Good order?

7    A    Yes.

8    Q    Okay.  If we can blow up here -- no.  Just down here in the

9    corner if we can -- right here.  Okay.

10            Michigan concealed pistol license, is that right?

11   A    Correct.

12   Q    That's in good order?

13   A    Yes.

14   Q    And Michigan concealed pistol license, you need to go

15   through a background check to get that, is that right?

16   A    I don't know the rules and laws here in Michigan.  I am

17   from Little Rock.

18   Q    You are from Arkansas?

19   A    Yes.

20   Q    Okay.  All right.  But anyway, he had a concealed pistol

21   license apparently?

22   A    Yes.

23   Q    Okay.  If we can have just for the witness 5065?

24            THE COURT:  Let's do this.  Is it just going to be

25   more pictures of the automobile search?

1          MR. HILLS:  Well, yeah, this one is.  Yes.

2          THE COURT:  Let's find out if the government has any

3     objections to 5065.  And what other one do you have?

4          MR. HILLS:  I think that's the last one I have.

5          THE COURT:  All right.  Any objections to that?

6          MR. ROTH:  I would object to 5065, Your Honor.  I

7     don't believe it has any relevance.

8          THE COURT:  All right.  Well, let's see if there is

9     foundation first.  Then we'll go through it.  Go ahead.  You

10    can put it up for the witness.

11    BY MR. HILLS:

12    Q    This is -- these are traffic citations that were found in

13    the vehicle, is that correct?

14    A    Yes.

15    Q    All right.  And insurance documents related to the vehicle,

16    is that correct?

17    A    Yes.

18    Q    Okay.  And then again we have the Michigan registration

19    that was added to this photograph that is -- that was

20    already -- you already testified to, correct?

21    A    Correct.

22    Q    Okay.

23         MR. HILLS:  I would move for the admission of it ties

24    in a previous video that was shown?

25         THE COURT:  I think it's admissible.  Go ahead.

1    MR. HILLS:  Okay.

2    BY MR. HILLS:

3    Q    All right.  5065, if we can take a close look right here?

4    Pull that out.

5         Okay.  This is a traffic citation that was issued on

6    9-19-20, is that correct.

7    A    Yes.

8    Q    Okay.  And if you looked at that, that was for no proof of

9    insurance, is that right?

10   A    I would need to see the -- see it again.

11   Q    There you go.

12   A    Yes.

13   Q    Okay.  Thank you.  Go back out.  We can highlight that.

14        All right.  On 9-21, about three days later, effective

15   date of the insurance for my client's car, is that right?

16   A    Yes.

17   Q    Okay.  We can go back.

18        And then the latest one, if we can zoom in on this

19   one?  10-7, 2020, is that correct?

20   A    Yes.

21   Q    I don't know if we can see it in that one.  This one is for

22   not using a blinker, is that correct?

23   A    Yes.

24   Q    Okay.  I believe you testified that my client's vehicle was

25   a 1999 model?

1     A     Yes.

2     Q     At the time that would have been a 21 year old vehicle?

3     A     Correct.

4           MR. HILLS:  Okay.  No.  That's it.  Thank you, Your

5     Honor.

6           THE COURT:  All right.  Mr. Blanchard?

7                     CROSS EXAMINATION

8      BY MR. BLANCHARD:

9     Q     I just want to close the circle on one thing.  You said you

10    found that pistol in the trunk, right?

11    A     It was in a backpack located in the trunk.

12    Q     In the trunk, right?

13    A     Yes.

14    Q     And a concealed pistol license would allow you to carry a

15    gun in a trunk, right?

16    A     It depends on the state laws but in most my experience I

17    would say yes.

18          MR. BLANCHARD:  Okay.  Pass the witness.

19          THE COURT:  Any redirect?

20          MR. ROTH:  Very, very briefly.

21                   REDIRECT EXAMINATION

22     BY MR. ROTH:

23    Q     Could you give us just a brief explanation of how it is as

24    an agent in Arkansas you came to assist in the search warrant

25    on 10-7-20?

1    A    Yes.  I am an alternate team leader on our evidence

2    response team in Little Rock, Arkansas.  Because of a lot of

3    times it's not uncommon when officers need help that we are

4    summoned to come assist in an investigation, and we were asked

5    to come help to investigate and do an ERT in Michigan.

6    Q    What is ERT?

7    A    Evidence response team.

8            MR. ROTH:  Nothing else, Your Honor.  Thank you.

9            THE COURT:  Anything else for this witness?

10           MR. HILLS:  No, Your Honor.

11           THE COURT:  All right.  Thank you.  You may be

12   excused.

13           (Witness excused, 11:14 a.m.)

14           THE COURT:  And we'll go to the government's next

15   witness.

16           MR. KESSLER:  Government calls Special Agent Anthony

17   Resendez, Your Honor.

18           THE COURT:  All right.

19           ANTHONY RESENDEZ, GOVERNMENT

20           having been first duly sworn, testified as follows:

21           (Witness sworn, 11:14 a.m.)

22                   DIRECT EXAMINATION

23     BY MR. KESSLER:

24   Q    Good morning, Agent Resendez.

25   A    Good morning.

1    Q    You are a special agent with the FBI, correct?

2    A    That's correct.

3    Q    And you are currently assigned to the Detroit field office?

4    A    Correct.

5    Q    How long have you been with the FBI?

6    A    Since August of 2019.

7    Q    And were you involved in the investigation of the

8    conspiracy to kidnap Governor Whitmer?

9    A    I was.

10   Q    Were you the case agent for any particular Defendant who is

11   here in the courtroom today?

12   A    Yes.  I was.

13   Q    Who is that?

14   A    Mr. Brandon Caserta.

15   Q    And as part of your investigation, did you obtain a search

16   warrant and execute that on FaceBook for his FaceBook records?

17   A    Yes.  I did.

18   Q    And have you reviewed those before we came into court

19   today?

20   A    Yes.  I have.

21   Q    And are the exhibits that you reviewed all accurate

22   representations of the FaceBook records that you received from

23   that search warrant?

24   A    Yes.  They are.

25            MR. KESSLER:  Your Honor, I'd like to move into

evidence Exhibits 457 through 61, 463 and 273?

THE COURT:  All right.  These are the ones you object to, Mr. Hills?

MR. HILLS:  Yes, Your Honor.

MR. BLANCHARD:  I also have my prior hearsay objection on FaceBook, the foundational objection.

THE COURT:  All right.  Okay.  So I'll adhere to the earlier ruling on related items and note that I have reviewed these as well on the break and find that they are admissible and will overrule the Defense objections.  The only one I didn't know was offered was 273 so I'll look at that, but go ahead with the others.

MR. HILLS:  I'm sorry, Mr. Kessler.  What were the numbers again?

MR. KESSLER:  457 to 61, 463, and 273.

MR. HILLS:  Thank you.

BY MR. KESSLER:

Q    All right.  So Agent Resendez, I'd like to go back all the way to the beginning of 2020.  January 20th of 2020.  Did you review a message where Mr. Caserta was talking about the purpose of the Second Amendment?

A    Yes.  I did.

Q    Can we put up 461, please?  And let's blow up the first block on the left side.

The date is 2020, 01-20, and the summary part says,

1    Brandon Caserta replied to your comment on a post from January

2    17th, 2020.  He says, the 2A -- have you seen that is shorthand

3    for the Second Amendment before?

4    A    Yes.  I have.

5    Q    The 2A has nothing to do with a collective

6    state/organization.  It has to do specifically with an

7    individual's ability to require --

8              And let's blow up the remainder of it.

9              -- anything and everything necessary to protect their

10   sovereignty, liberty and individual rights.  The Second

11   Amendment has everything to do with individuals protecting

12   themselves and their family from not only common criminals but

13   specifically criminals operating under the guise of authority.

14   The Second Amendment was never created to protect liberty from

15   street thugs.  It was fundamentally created to secure a free

16   state, a freeway of life from government encroachment.  To be

17   plain and harsh, the Second Amendment is there to secure the

18   ability to kill agents of the government when they become

19   tyrannical.  But of course, no one will say -- will actually

20   say that because they are cowards who wish to serve the

21   government at the expense of everyone else.

22              In March did Mr. Caserta talk on his FaceBook -- on

23   FaceBook about building a gun?

24   A    Yes.  He did.

25   Q    I'd like to put up Exhibit 457, please.  Blow up the first

1    block.

2              So on March 16th, 2020, Mr. Caserta wrote, we are all

3    we got.  If we can calmly work together and have the correct

4    knowledge as to what is actually happening then we will be able

5    to prevent this tyranny.  There are way more of us than there

6    are of them.  No one shuts down the economy for the flu.  Why

7    do it for something that is way less harmful.  There is an

8    agenda.

9              And then let's look at the second part.  And I'll let

10   you read it.  Would you go ahead and read what Mr. Caserta said

11   the same day, March 16th, 2020?

12   A    Yes.  He says, I knew something like this was going to

13   happen, which is why I started busting my butt to get this gun

14   together and train to be good enough to get a rifleman

15   position.  That is my goal.  I have the skills to do it.  I am

16   just not in it yet.

17   Q    And the term rifleman is typically used for an infantry man

18   in the army, correct?

19              MR. BLANCHARD:  Object to the leading.

20              THE COURT:  It is leading.  There is no foundation.

21   You have to rephrase if you want to go there.

22   BY MR. KESSLER:

23   Q    Agent Resendez, are you familiar with the term rifleman?

24   A    Yes.  I am.

25   Q    And who uses that?

A    Usually the military.

Q    To refer to what kind of soldier?

A    A soldier who carries a weapon.  Primarily a rifle.

Q    And are you aware from your being the case agent on
Mr. Caserta all this time whether he served in the military?

A    He did not.

Q    And we see him saying, I have the skills to do it.  I am
not just -- I am just not in it yet.  Are you aware of him
applying to be in the military or anything like that?

A    I am not aware.

Q    Let's go forward a few days to March 27th.  Did Mr. Caserta
post something about his motivation?

A    Yes.  He did.

Q    Can we pull up Exhibit 458, please?  And if we can blow up
the block?  And Agent Caserta, I'll ask you to read what
Mr. Caserta said on March 29th?

A    They themselves prove that this virus is weak.  The
government has stolen enough from me.  My entire life they have
threatened, coerced, extorted, kidnapped and caged me and my
brothers for nothing.  They have claimed ownership over my body
and my property.  Now they take away my place to live and
source of income because of this.  Fuck this man.  And then
below that he writes, it's about to be fucking on.

Q    On May 1st does he talk about Governor Whitmer
specifically?

1    A    Yes.  He does.

2    Q    Can we put up Exhibit 459, please?  If we can blow up the

3    block?  And what does Mr. Caserta write on May 1st, 2020?

4    A    He writes, sure would.  That bitch is a psychopath

5    literally.  I think it's about time Americans used 2A for its

6    intended purpose.

7    Q    2A being the Second Amendment again?

8          MR. BLANCHARD:  Objection, leading.

9          THE COURT:  It is, but it's foundational and already

10   in evidence.  Go ahead.

11         THE WITNESS:  Correct.

12   BY MR. KESSLER:

13   Q    Two days later did he discuss his willingness to die?

14   A    Yes.  He did.

15   Q    Can we bring up Exhibit 460, please, and blow up the block,

16   please?

17         What does Mr. Caserta write on May 3rd, 2020?

18   A    He writes, look at what is going on around you.  Look at

19   the massive amount of control and tyranny.  Then look at all

20   the brainwashed order following slaves obeying whatever the

21   government tells them.  This is their move, dude, and it's

22   going to end three different ways.  Either the people wake up

23   and realize what is going on by simply not complying and

24   relinquishing their faith in the entirety of government or

25   people totally comply and accept slavery with open arms or

1    people get fed up and have a bloody revolution because they are

2    not allowed to survive unless they accept a chip and get

3    vaccinated/tested.  I will not comply with any of them.  I am

4    taking measure to preserve my life, but I might not survive.  I

5    may kill dozens of agents but eventually die in the process or

6    I might starve to death, but I will not be chipped and I will

7    not be vaccinated even if that means losing everything I have.

8    Q    Fast forwarding a little to August of 2020, did Mr. Caserta

9    write what he wanted to do with tyrants?

10   A    Yes.  He did.

11   Q    Can we bring up Exhibit 463, please?  And blow up the block

12   if you can.

13        And what did Mr. Caserta write on August 12th, 2020?

14   A    He wrote, I would be the consequences for their actions.  I

15   would be the karma for their wrongdoings without hesitation.  I

16   wouldn't just shoot them first though.  They need to understand

17   before I decide to kill them.  I'd most likely beat them with

18   my hands and feet.  That's the best way.  I'm sure they would

19   beg and I'd let the tyrant beg.  Then I'd let the tyrant beg

20   'til they couldn't beg anymore because their mouth is so full

21   of blood they are choking and gargling.  Then I'd wait until I

22   saw the look of cowardess, fear, regret and desperation, the

23   look that all tyrants get before they die.  Then I'd shoot the

24   bastard.  There is no remorse nor immoral cowards.  Empathy is

25   only reserved for the good.

Q    We heard some testimony about a field training exercise the Defendants all attended in Luther, Michigan, on September 12th and 13th.  Did Mr. Caserta write about his future after that in September?

A    Yes.  He did.

Q    I'd like to put up Government's Exhibit 273?

THE COURT:  All right.  And this falls within the same ruling.  Go ahead.

MR. KESSLER:  Okay.

THE COURT:  I've had a chance now to look at it.

BY MR. KESSLER:

Q    And can we blow up what Mr. Caserta said at the bottom?

So on September 21st what did Mr. Caserta write?

A    He writes, the next time I get accosted I am honestly considering just taking them out man.  I would be in the right and I have the skills.

Q    And if we can go to the second page, please, and blow that up?

What does he continue?

A    He continues, the only thing that's stopping me is I feel like I'm needed for a bigger battle in the near future.

Q    Now, Agent Resendez, Brandon Caserta and some of the other Defendants were arrested on October 7th, correct?

A    Correct.

Q    Were you involved in executing a search warrant at his

1    workplace?

2    A    Yes.  I was.

3    Q    Okay.  Do you remember what city that was in or part of the

4    state?

5    A    That was in Plymouth, Michigan.

6    Q    I'm sorry, what?

7    A    Plymouth.

8    Q    On the east side of the state?

9    A    Yes.

10   Q    Okay.  And if we can put up just for the witness Exhibit

11   329?  Do you recognize that photograph, Agent Resendez?

12   A    Yes.  I do.

13   Q    Is that an accurate rendition of what you saw during that

14   search warrant?

15   A    Yes.  It is.

16             MR. KESSLER:  I'll put up Government Exhibit 329 if

17   there are no objections.

18             THE COURT:  Any objections?  Hearing none it's

19   admitted.

20   BY MR. KESSLER:

21   Q    What are we looking at here, Agent?

22   A    So this is his work locker at his place of employment.

23   Q    All right.  And what do we see in there basically?

24   A    So inside there is a set of camo cargo shorts, what looks

25   like a T-shirt in the middle there, and then a Hawaiian themed

1    shirt on the right.

2    Q    All right.  Do you have Exhibit 303 there with you?

3    A    Yes.  I do.

4    Q    Okay.  And what is Exhibit 303?

5    A    It is the Hawaiian themed shirt.

6        MR. KESSLER:  All right.  If there are no objections

7    I'd offer that into evidence?

8        MR. HILLS:  No objection.

9        THE COURT:  All right.  It's admitted.

10   BY MR. KESSLER:

11   Q    Can you pull that out and show it to the jury, please?

12   A    Sure.

13   Q    All right.  Thank you.

14       Now, after Mr. Caserta was arrested, was he lodged at

15   the Newago County Jail?

16   A    Yes.  He was.

17   Q    And to your knowledge did they record calls there?

18   A    Yes.  They do.

19   Q    All right.  And have you been, as part of your job as the

20   case agent assigned to Mr. Caserta, monitoring his phone calls

21   from the jail?

22   A    Yes.  I have.

23   Q    Was he interviewed by a reporter for BuzzFeed news?

24   A    Yes.  He was.

25   Q    And I'd focus your attention on August 30th of 2021.

1    Specifically was he asked questions about entrapment, whether

2    he was entrapped?

3    A    Yes.  He was.

4    Q    All right.  I'd offer -- first off, have you listened to

5    the recording of that particular discussion from August 30th of

6    2021?

7    A    Yes.  I have.

8    Q    And was that with a reporter by the name of Jessica

9    Garrison?

10   A    Yes.  It was.

11   Q    Is she a reporter for BuzzFeed news?

12   A    Not currently but she was at the time.

13              MR. KESSLER:  Okay.  I'd like to play Government's

14   Exhibit 144, Your Honor?

15              THE COURT:  You say August.  Is that what it's from?

16              MR. KESSLER:  Yes --

17              THE COURT:  As a jail call?

18              MR. KESSLER:  If I said 2020, then I misspoke.  2021.

19              THE COURT:  I'm sorry.  You may have said it right and

20   I overlooked it because we've been so focused on 2020.  So the

21   date is tell me once again, please?

22              MR. KESSLER:  August 30th, 2021, Your Honor.

23              THE COURT:  And it's exhibit?

24              MR. KESSLER:  144.

25              THE COURT:  All right.  Any objections from the

1    Defense?

2            MR. BLANCHARD:  Hearsay.

3            THE COURT:  All right.  Well, I'll overrule that since

4    it's the words of Mr. Caserta that the government is focusing

5    on.  So go ahead.  You can play it.

6            (Audio started, 11:27 a.m.)

7            (Audio stopped, 11:28 a.m.)

8            MR. KESSLER:  I have nothing further, Your Honor.

9            THE COURT:  All right.  Mr. Gibbons?

10           MR. GIBBONS:  Again, Your Honor, I would defer to

11   Mr. Hills because it is focused on his client but would like to

12   reserve the opportunity.

13           THE COURT:  All right.  Ms. Kelly?

14           MS. KELLY:  I have nothing, Your Honor.  Thank you.

15           THE COURT:  Go ahead then, Mr. Hills.

16                      CROSS EXAMINATION

17    BY MR. HILLS:

18   Q   I want to start with the FaceBook posts in reverse order if

19   we can.  You put up, I believe, or the government put up a

20   FaceBook post from 9-21, is that correct?

21   A   Yeah.  That's correct.

22   Q   My client was upset about being pulled over for traffic

23   tickets?

24           MR. KESSLER:  Speculation.  He doesn't know what he

25   was upset about.

1          THE COURT:  That's certainly your argument and you

2     have evidence to make that argument, but I don't know whether

3     this witness knows that one way or another.

4     BY MR. HILLS:

5     Q    Sure.  Let's put up 273 if we can.

6          Okay.  So this was on -- this text was on 9-21, is

7     that correct?

8     A    Yes.  That's correct.

9     Q    Okay.  And if we can put up 5065?  And highlight -- let's

10    go down here.  Well, no.  That's good.  No.  You are in the

11    right spot.

12         Okay.  You are aware that my client got a traffic

13    ticket on 9-19, is that correct?

14    A    Yes.  That's correct.

15    Q    And this is that citation; you have seen that before?

16    A    Yes.  I have.

17    Q    Okay.  And then if we can back out and hit where I have --

18    there.

19         Okay.  And then on 9-21, the same date at that last

20    FaceBook post my client had purchased insurance for his

21    vehicle, correct?

22    A    Correct.

23    Q    Okay.  All right.  Now, backing out of that for a moment,

24    you were assigned to this case -- you, I believe, were assigned

25    to two people, is that right?

1    A    That's correct.  Yeah.

2    Q    All right.  And one of those was Mr. Caserta?

3    A    Yes.

4    Q    You were assigned on August 4th, 2020 to Mr. Caserta, is

5    that right?

6    A    Yeah.  That sounds right.

7    Q    Okay.  And when you are assigned to that individual, it

8    sounds like you do a background on them?

9    A    Yes.

10   Q    And you -- in this particular case you would see where they

11   have been, in other words, where the events that they had been

12   to that are relative to this investigation, is that fair?

13   A    Yes.  That was reviewed as part of the ongoing

14   investigation.

15   Q    For, like, Munith, for, like, an FTX, is that correct?

16   A    Correct.

17   Q    So you would have known that he would have gone to the June

18   14th one, is that right?

19   A    Yes.

20   Q    And the June 28th one?

21   A    Yes.

22   Q    And then after that you knew he went to Wisconsin, is that

23   right?

24   A    Yes.

25   Q    That's July 11th and 12th?

1    A    I believe that sounds correct.

2    Q    And then Fowlerville on July 26th?

3    A    Yes.

4    Q    Okay.  And then there was, what I call it the Dan date, but

5    August 16th when CHS Dan went to my client's apartment?

6    A    Correct.

7    Q    And then August 23rd was a meeting at Lake Orion?

8    A    Correct.

9    Q    Okay.  And then finally, Luther on September 12th and 13th?

10   A    Yes.  That's correct.

11   Q    All right.  That's the sum total of the events that my

12   client went to, is that right?

13   A    Yes.

14   Q    I am not going to ask you all the events my client

15   didn't -- did not go to, but I am going to mention a couple.

16   Okay?

17   A    All right.

18   Q    August 9th there was an FTX or a -- in Munith, is that

19   correct?

20   A    Correct.

21   Q    And Mr. Fox was there?

22   A    Yes.

23   Q    Mr. Caserta was not there?

24   A    Correct.

25   Q    Okay.  And July 7th there was a meeting, Paul Bellar --

1    with Paul Bellar and others?

2    A    Correct.

3    Q    Mr. Caserta was not there?

4    A    Correct.

5    Q    July 23rd Mr. Caserta was not there?

6    A    Correct.

7    Q    Okay.  And he was not at any protests?

8    A    Not to my knowledge.

9    Q    Not to your knowledge.  No quick response teams?

10   A    Correct.  Not to my knowledge.

11   Q    All right.  Didn't go on any recons that you know about?

12   A    Correct.

13   Q    Didn't go to any Ohio meetings?

14   A    Correct.  He did not go.

15   Q    As part of your investigation you did some spot checks, is

16   that right?

17   A    Yes.

18   Q    So you would have gone to Mr. Caserta's apartment?

19   A    Yes.

20   Q    And I have August 11th, is that right?  That sound about

21   right?

22   A    Yeah.  It would have been around that time.

23   Q    All right.  And there were no noted disturbances at that

24   time?

25   A    Not that I recall.

1    Q    All right.  And his Chrysler sedan was there?

2    A    Yes.

3    Q    Did another spot-check at Master Mechanic; that's where he

4    worked, right?

5    A    Yes.

6    Q    His vehicle was there in the employee parking lot?

7    A    That sounds right.

8    Q    Okay.  No disturbances there?

9    A    No.

10        MR. KESSLER:  I am not sure of the relevance of

11   individual dates where nothing happened.

12        MR. HILLS:  Right.  I'm just walking through his

13   investigation.

14        THE COURT:  I mean, I think he can go to some extent.

15   Certainly the thrust of the direct was to highlight the

16   statements that Mr. Caserta made that the government will argue

17   show predisposition and other things, and I think the Defense

18   has some room to create a broader picture of what Mr. Caserta's

19   day-to-day life was like to the extent this witness knows.  Go

20   ahead.

21   BY MR. HILLS:

22   Q    All right.  You created -- you did create the preservation

23   request for FaceBook, is that right?  Was that you or somebody

24   else?

25   A    I believe it was somebody else.

1    Q    All right.  Did you do the one for TikTok?

2    A    Yes.  I did.

3    Q    And for Kinetic Truth?

4    A    Yes.

5    Q    And that was a TikTok that my client did, right?

6    A    Correct.

7    Q    And you reviewed videos, is that right?

8    A    Yes.

9    Q    A lot of them?

10   A    I don't remember the exact -- the exact number of videos.

11   Q    But there were several that you watched, correct?

12   A    Yes.

13   Q    Okay.  And there was -- one of those videos was played in

14   court.  It was posted October 7th.  Do you remember that video?

15   A    I don't know what videos have been played.

16   Q    Okay.  I'm sorry.  There was a video posted on October 7th,

17   is that right?

18   A    Yes.

19   Q    It's the one where my client says they are the enemy,

20   period.  He is fairly upset.  Do you remember that one?

21   A    Yes.  I remember that one.

22   Q    And you have reviewed those, and they related to some

23   traffic stops, is that right?

24   A    Correct.

25   Q    All right.  The traffic stop on September 19th in Canton,

1    is that right?

2    A    I believe that video was about the traffic stop on October

3    7.

4    Q    Okay.  Well, there are two, right?

5    A    Correct.

6    Q    Okay.  September 19th he was stopped, is that right?

7    A    Yes.

8    Q    Okay.  And October 7th he was stopped as well, correct?

9    A    Correct.

10   Q    And I take it you have reviewed those instances, is that

11   right?

12   A    Yes.

13   Q    All right.  And there were videos of that, the stops, is

14   that right?

15   A    Yes, sir.

16   Q    And you reviewed those, is that correct?

17   A    Yes.

18   Q    And they were peaceful encounters, is that right?

19   A    Yes.

20   Q    And Mr. Caserta was armed at the time, correct?

21   A    Yes.  He was.

22   Q    Legally armed, is that right?

23   A    Yes.

24   Q    Both times?

25   A    Yes.

1    Q    He had a CPL?

2    A    Yes.

3    Q    Correct.  And that CPL was in good order?

4    A    Yes.

5    Q    And a CPL, to get one in Michigan the state issues you a

6    card, is that right?

7    A    That is correct.

8    Q    And you have to have a background check when you apply for

9    a CPL, is that right?

10   A    That's correct.

11   Q    And some training before you get a CPL, is that right?

12   A    Yes.

13   Q    And so if the state does a background check and you check

14   out and you do the training and you get a card and it allows

15   you to do certain things with your pistol, is that right?

16   A    Yes.

17   Q    For instance, if you do not have a CPL and you carry your

18   gun inside of your vehicle, that would be carrying a concealed

19   weapon; that would be illegal, correct?

20   A    Correct.

21   Q    But if you have your CPL you can carry it inside the cabin

22   of your car, correct?

23   A    Correct.

24   Q    But if you are pulled over there are certain requirements

25   that you have to do with your CPL.  You have to tell the

1    officer that you have your gun, correct?

2    A    Correct.

3    Q    You have to give the CPL over?

4         MR. KESSLER:  Relevance.

5         THE COURT:  Well, I mean, we are certainly getting a

6    CPL lesson.  I think the point you made is already made and you

7    have the basis to argue.  We don't necessarily need to go down

8    every conceivable rat hole to tie it altogether.  I don't

9    understand the added relevance.

10        MR. HILLS:  Okay.

11   BY MR. HILLS:

12   Q    Well, let's just tie it up.  He complied with all the rules

13   for the CPL at these stops, correct?

14   A    Yes.

15   Q    Okay.  And you saw the -- you saw the pictures of inside of

16   the house after they did the search warrant, correct?

17   A    Yes.  I did.

18   Q    Okay.  And if we can put up just for the witness 306

19   because I want to make sure it's the right one that I am

20   thinking about?  Okay.  Yeah, that's the right one.  So it's

21   been admitted.  Can we put 306 up?

22        You indicated you'd seen a lot of videos that he had

23   created, correct?

24   A    Yes.  I did.

25   Q    And inside his apartment on the white board it was, do a

1    video explaining how modern police are violent criminals,

2    correct?

3    A    Yes.

4    Q    So apparently we could look forward to another video, fair?

5    A    Fair.

6    Q    Okay.  And there is nothing illegal about making these

7    videos, is that correct?

8    A    Correct.

9    Q    All right.  And in your review of the evidence you didn't

10   come across any evidence that he did any recons on these

11   officers at all?

12   A    No.

13   Q    Okay.  And there were -- I'm sorry, there were two

14   different police officers for each of these stops?

15   A    Yes.

16   Q    Okay.  Now, the FaceBook posts.  Throughout these posts, as

17   I look at them there are -- first of all, this is FaceBook.

18   It's not some sort of encrypted chat, correct?

19   A    That's correct.

20   Q    Okay.  And so there are several other people mentioned in

21   here.  I see Jayson Masaco.  Does that sound familiar?

22   A    The name sounds familiar from my review.

23   Q    Okay.  Adrian Martino, correct?

24   A    Without seeing it that sounds right.

25   Q    460.  That's on 460.

1    A    I'm sorry.  Can you say that again?

2    Q    I was going to put up 460 so you can refresh your

3    recollection?

4    A    Yeah.  This is from May 3rd.

5    Q    Okay.  Joel Kingen Smith, does that sound familiar?

6    A    Yes.  It does.

7    Q    Joel Dale?

8    A    That one doesn't ring a bell.

9    Q    463?

10   A    I see the name on the page but I don't know that it's

11   associated with that -- with the box --

12   Q    Larken Rose at the bottom?

13   A    Yes.  I see that there.

14   Q    Okay.  In any event, there are lots of different people in

15   these conversations, correct?

16   A    Correct.

17   Q    And a lot of these things he's making comments on other

18   people's posts, correct?

19   A    Correct.

20   Q    Okay.  So this is kind of the public conversation that he's

21   having, correct?

22   A    Correct.

23   Q    All right.  And can you put up, I believe -- let me go

24   back.  273.  Yeah.

25            There is a Mandy Christian?

1    A    Yes.

2    Q    All right.  Thank you.  So lots of other people on the

3    FaceBook that we can see, correct?

4    A    Correct.

5    Q    None of them are Mr. Fox, is that right?

6    A    That's right.

7    Q    Not Mr. Harris?

8    A    That's correct.

9    Q    Not Mr. Croft, Mr. Franks or Mr. Garbin?

10   A    That's correct.

11   Q    All right.  None of it talks about kidnapping the governor

12   of Michigan, correct?

13   A    Correct.

14   Q    Okay.  When the FBI seizes guns, there is a process that

15   you go through with these guns, is that correct?

16   A    Yes.

17   Q    All right.  You do background checks on the guns, correct?

18   A    Correct.

19   Q    To see if they are registered?

20   A    Correct.

21   Q    Or if they are stolen?

22   A    Correct.

23   Q    If there is something that's configured incorrectly,

24   correct?

25   A    Correct.

1    Q    And those procedures were went through with Mr. Caserta's

2    guns, correct?

3    A    Yes.

4    Q    Okay.  And they were all in good order?

5    A    Correct.

6    Q    And there were four total?

7    A    That sounds right.

8    Q    An AR pistol, an AR rifle and two pistols, correct?

9    A    Correct.

10   Q    Okay.  I looked in the search warrants and things you were

11   looking for.  You were looking for maps, notes, plans related

12   to this investigation, correct?

13   A    Correct.

14   Q    And you didn't find any of that in Mr. Caserta's residence?

15   A    Correct.

16   Q    But you did find a couple of his notebooks?

17   A    Yes.  That's correct.

18   Q    Okay.  We saw one green notebook and one black and white

19   notebook, correct?

20   A    Correct.

21   Q    The -- you were up at Luther for September 12th and 13th,

22   is that right?

23   A    That's right.

24   Q    And you were one of many agents kind of circling around

25   following things, checking on things, listening in, is that

1     correct?

2     A    That's correct.

3     Q    And during the evening of September 12th, you were aware

4     that there were certain individuals were heading up to the

5     governor's cottage, correct?

6     A    Correct.

7     Q    And you were interested in if Mr. Caserta got in the truck,

8     is that right?

9     A    Yes.  I was.

10    Q    All right.  And as a matter of fact, if I can put up

11    5182.1?

12              THE COURT:  Is it in already?

13              MR. HILLS:  I don't think so.

14              THE COURT:  Any objection.

15              MR. KESSLER:  No objection, Your Honor.

16              THE COURT:  All right.  It's admitted.

17    BY MR. HILLS:

18    Q    All right.  This is a text messages between you and other

19    agents, is that right?

20    A    Yes.  It is.

21    Q    All right.  So at 9:21 you are asking, any indication that

22    they actually picked up Caserta and Nulls, is that right?

23    A    That's right.

24    Q    So you had information that Mr. Fox and Mr. -- well, I call

25    him UCE Mark, were headed back to Luther after they were at

1    Loggers Landing, is that correct?

2    A    That's correct.  Yes.

3    Q    And you knew that they were prompted to get Mr. Caserta as

4    well as the Nulls, correct?

5    A    Well, I had heard that Mr. Caserta was interested in going

6    and so --

7    Q    That's not what I asked you.  I asked you if they were

8    prompted to go back to Luther to get --

9    A    I don't know if they were prompted to go back and --

10   Q    Okay.  You apparently knew they went back to Luther to pick

11   them up, correct?

12   A    Correct.

13   Q    All right.  And you were interested if they did pick them

14   up, correct?

15   A    Correct.

16   Q    And you found out later that Mr. Caserta did not go,

17   correct?

18   A    That's correct.

19   Q    Mr. Caserta was -- Mr. Caserta did not go with the other

20   individuals when I think Mr. Harris, Mr. Fox, Mr. Garbin and

21   Mr. Franks were arrested.  You remember that?

22   A    Yes.

23   Q    You knew that they were trying to get everybody to go to

24   arrest them at the same time, is that right?

25   A    That's right.

1    Q    Mr. Caserta did not go?

2    A    He did not.

3    Q    He was at work, is that right, at Master Mechanic?

4    A    Yes.

5    Q    And that's where he was arrested?

6    A    Yes.

7    Q    Arrested by I think Pittsburgh SWAT?

8    A    That sounds right.

9    Q    All right.  And then he was taken to Washtenaw Sheriff's

10   Department?

11   A    Yes.

12   Q    And that's where you interviewed him?

13   A    Yes.

14   Q    You read him his Miranda Rights?

15   A    Yes.

16   Q    And he waived those?

17   A    Yes.

18   Q    And talked to you?

19   A    Yes.

20   Q    Okay.  For an hour and-a-halfish?

21   A    That sounds right.

22   Q    Answered your questions?

23   A    Yup.

24   Q    Now, we talked about a CPL.  The gun or the backpack that

25   he had in his car with the gun in it, you know that one I am

1    talking about?

2    A    Yeah.

3    Q    That was found in the trunk.  Are you aware of that?

4    A    Yes.

5    Q    Okay.  You don't even have to have a CPL to keep the gun in

6    the trunk, is that right?

7    A    Not to my knowledge.

8    Q    Okay.  Just kind of a safe place to keep it?

9    A    Correct.

10   Q    Okay.  There are several pictures -- well, there is a

11   picture of a cipher, you know, piece of paper with a cipher on

12   it?

13   A    Yes.

14   Q    Like words or symbols I guess?

15   A    Yeah.

16   Q    Okay.  It was found at Mr. Caserta's house?

17   A    Yes.

18   Q    All right.  Several other people's houses?

19   A    Yes.

20   Q    And was that one -- was that cipher handed out by Tim Sayer

21   at the FTX in Luther do you know?

22   A    I don't know.

23   Q    All right.  Do you have any information that those symbols

24   were ever used by Mr. Caserta?

25   A    Not to my knowledge.

1    Q    I don't know if -- it's been a long trial, but I am not

2    sure if this has been asked.  COVID-19, there was a -- there is

3    a vaccination for that, correct?

4    A    Correct.

5    Q    All right.  But that vaccination had not come out in the

6    summer of 2020, correct?

7    A    Correct.

8    Q    It was, like, I want to say late December, January of 2021?

9    A    That sounds right.

10            MR. HILLS:  Okay.  If I can have a moment, Your Honor?

11            THE COURT:  Sure.

12            MR. HILLS:  Thank you.  Nothing further.

13            THE COURT:  All right.  Thank you.  Mr. Blanchard?

14            MR. BLANCHARD:  Can I have 5182.1, please?

15                      CROSS EXAMINATION

16      BY MR. BLANCHARD:

17    Q    This message was sent on the Luther weekend, correct?

18    A    That's correct.

19    Q    This is a group chat between FBI agents, right?

20    A    Yes.

21    Q    There is a discussion here about pole cameras?

22    A    Yes.

23    Q    It's referring to pole cameras that the FBI set up at the

24    governor's house?

25    A    That's correct.

1    Q    We haven't seen any pictures from pole cameras at the

2    governor's house.  Do you know why?

3    A    I wasn't involved in setting them up or collecting that so

4    I couldn't tell you.

5    Q    Okay.  You guys expected that CHS Dan or someone was going

6    to drive these guys up to the governor's house that weekend, is

7    that right?

8    A    I am aware that they had talked about going.

9    Q    And so in advance you went and installed -- you being the

10   FBI, went and installed those pole cameras?

11   A    Yeah.  They were installed by the FBI.

12   Q    As far as you know the pole cameras didn't capture any of

13   these guys, is that fair?

14   A    I don't know what they captured.  I didn't review them.

15            MR. BLANCHARD:  I'll pass the witness.

16            THE COURT:  Mr. Gibbons?

17            MR. GIBBONS:  Thank you, Your Honor.

18            Can I have 461?

19                         CROSS EXAMINATION

20     BY MR. GIBBONS:

21   Q    Almost afternoon.  It's still morning.  Good morning.

22   A    Good morning.

23   Q    Just briefly.  The reference here on this 461, that's to

24   the 2A, that's a reference to the Second Amendment, correct?

25   A    Correct.

1   Q    And that's the Second Amendment of the United States

2   Constitution?

3   A    Yes.

4   Q    And the United States Constitution via the Second Amendment

5   assures the citizens of our country the right to bear arms, is

6   that correct?

7   A    Yes.

8   Q    Own firearms?

9   A    Yes.

10  Q    Own magazines?

11  A    Yes.

12  Q    Own ammunition, true?

13  A    True.

14  Q    There is also a First Amendment to the constitution,

15  correct?

16  A    Correct.

17  Q    And that is a right to free speech, correct?

18  A    Correct.

19         MR. KESSLER:  Your Honor, same objection we had

20  earlier.  Having a constitutional discussion with the agent

21  is --

22         THE COURT:  As long as it doesn't get too deep I think

23  we all know what the First Amendment protects and the Second

24  Amendment in a general way, but if you want to go further we'll

25  go a little ways.

BY MR. GIBBONS:

Q    You would agree that the First Amendment allows us the

right to have political opinions as part of our speech?

A    Yes.  I would agree.

Q    And then I would ask you this.  You searched the vehicle of

Mr. Caserta, correct?

A    No.  I did not.

Q    Okay.  Are you familiar with the items seized from his

vehicle?

A    Yes.

Q    Okay.  You would agree that books were not seized from his

vehicle, correct?

A    Correct.

Q    And books were not taken from his workplace?

A    Correct.

Q    Books, do you know, were taken from his home?

A    Yes.  They were.

        MR. GIBBONS:  Thank you.

        THE COURT:  All right.  Any redirect?

        MR. KESSLER:  Just briefly, Your Honor.

                REDIRECT EXAMINATION

  BY MR. KESSLER:

Q    I'll touch on something that you were just asked.  The

Second Amendment protects the right to carry arms, but we saw

Mr. Caserta said that his true intention was to kill agents?

1          THE COURT:  So if that's the redirect forget about it.

2     Let's go and have argument.  There is no point in either side

3     wading through their preliminary arguments in the form of a

4     witness.  So if you have some other redirect, go ahead.

5          MR. KESSLER:  I have one other question.

6          THE COURT:  All right.

7     BY MR. KESSLER:

8     Q    You were asked by Mr. Hills if you had noted any

9     disturbances on particular dates or if Mr. Caserta had fought

10    with the cops even though he had a gun.  Do you recall that

11    question?

12    A    Yes.  I do.

13    Q    Can we put up Exhibit 273?  The second page, please?  And

14    if you can blow up that square?

15          What did Mr. Caserta say after that?

16    A    The only thing that's stopping me is I feel like I am

17    needed for a bigger battle in the near future.

18          MR. KESSLER:  I have nothing further, Your Honor.

19          THE COURT:  All right.  Any recross?

20          MR. GIBBONS:  If I could, Your Honor?

21          THE COURT:  All right.  Go ahead.  It's what happens

22    when you do redirect and you already have it in evidence.  Go

23    ahead.

24          MR. GIBBONS:  What exhibit was that, Nils?

25          MR. KESSLER:  273.

1              MR. GIBBONS:  Can I have that back up?

2                    RECROSS EXAMINATION

3       BY MR. GIBBONS:

4       Q    You were assigned to Mr. Caserta and followed him

5       throughout the summer, is that correct?

6       A    Correct.

7       Q    You were familiar with the Boog and things like that, is

8       that true?

9       A    Yes.

10      Q    And that is a situation --

11             THE COURT:  How does this relate to what was the

12      limited redirect?

13             MR. GIBBONS:  Potentially the bigger battle, Your

14      Honor.  I think the implication is the governor.

15             THE COURT:  All right.  Go ahead.  You can go a little

16      ways.

17      BY MR. GIBBONS:

18      Q    Okay.  This was posted in September, correct?

19      A    Correct.

20      Q    And would you agree that the presidential election was

21      looming, coming up the first week of November, true?

22      A    Yes.

23      Q    And many people at that time thought that that would be a

24      time that might spur civil unrest, is that true?

25      A    True.

1        MR. GIBBONS:  Thank you.  I have no further questions.

2        THE COURT:  All right.  Anything else for this

3   witness?  Okay.

4        MR. HILLS:  Good.

5        THE COURT:  You may be excused.  What?

6        MR. HILLS:  I was going to say I couldn't have done

7   better myself.

8        THE COURT:  So you may be excused and we'll take our

9   next break.  Thank you.

10        (Witness excused, 11:56 a.m.)

11        LAW CLERK:  All rise, please.

12        (Jury out, 11:57 a.m.)

13        THE COURT:  I just confirm, but from my count there is

14   not any realistic shot we'll finish by 2:00, right?

15        MR. KESSLER:  No, Your Honor.

16        THE COURT:  Okay.  All right.  We'll come back in 20.

17        LAW CLERK:  Court is in recess.

18        (Recess taken, 11:57 a.m.)

19        (Resume Proceeding, 12:26 p.m.)

20        LAW CLERK:  All rise, please.

21        (Jury in, 12:26 p.m.)

22        LAW CLERK:  Court is in session.

23        THE COURT:  All right.  Welcome back everyone for our

24   third segment.  You know, I got my own hopes up, I guess, that

25   maybe our pacing would be enough to get to the close of the

1   government case today, and I just don't think we are going to

2   make it today.  So plan on a regular dismissal at two o'clock.

3   We'll just finish up tomorrow and then if we need to take a

4   little longer break to do all of the house keeping we'll do it.

5   Sometimes, you know, the best laid plans and fondest hopes of a

6   judge don't quite come to fruition, and that's okay.  So we'll

7   go for the last segment of the day for the next hour and-a-half

8   starting with the government's next witness, and Mr. Roth, if

9   you would please call that person.

10          MR. ROTH:  Thank you, Your Honor.  We call Devin

11   Phelps.

12          THE COURT:  All right.  We'll have you sworn in.

13          DEVIN PHELPS, GOVERNMENT.

14          having been first duly sworn, testified as follows:

15          (Witness sworn, 12:27 p.m.)

16          THE COURT:  Please be seated and we'll get started.

17                  DIRECT EXAMINATION

18    BY MR. ROTH:

19   Q    Good afternoon, sir.  Could I have you start by stating and

20   spelling your complete name, please?

21   A    First name Devin, D-e-v-i-n.  Last name Phelps,

22   P-h-e-l-p-s.

23   Q    Thank you, sir.  How old are you?

24   A    I am 24.

25   Q    How are you employed?

1    A    I am a security guard at Oakland County Circuit Court

2    House.

3    Q    Did you previously serve in the military, sir?

4    A    I did.

5    Q    In what branch?

6    A    Marines.

7    Q    From when to when?

8    A    2015 to 2019.

9    Q    Do you know a person by the name of Daniel Harris?

10   A    I do.

11   Q    How do you know Daniel Harris?

12   A    I served with him.

13   Q    In the marines?

14   A    In the marines.

15   Q    In the summer of 2020, did Daniel Harris introduce you to a

16   militia that he was a member of?

17   A    He introduced me to a group of people.

18   Q    Approximately when was that?

19   A    I cannot recall exactly.

20   Q    In 2020?

21   A    Springtime 2020.  I couldn't give you an exact month.

22   Q    That's fine.  Thank you.  And you said it's a group of

23   people.  Did this group of people have a name?

24   A    I believe they went by the Wolverine Watchmen.

25   Q    Did Daniel Harris tell you that he had a specific role in

1       the group?

2       A    No.

3       Q    All right.  Did he tell you about leadership of the group?

4       A    No.

5       Q    Did you ever join the Wolverine Watchmen?

6       A    They invited me to their -- it's like a -- it's like an

7       encrypted messaging app.  I forget what it's called.  And there

8       wasn't very much activity on it, though, so I didn't stay on it

9       for long.  I actually just ended up deleting the app and asking

10      Daniel if he would just keep me posted if something interesting

11      happened.

12      Q    Do you recall what the name of the chat was that you said

13      didn't have much activity?

14      A    I can't remember.  No.

15      Q    Would you ever have considered yourself a member of the

16      Wolverine Watchmen?

17      A    No.

18      Q    Was there a time around then that you bought a gun from

19      Daniel Harris?

20      A    Not around then.  No.

21      Q    When was it?

22      A    I bought -- well, I think it was actually a few days before

23      the arrests.

24      Q    So fall 2020?

25      A    I think that's correct.

1    Q    Could you please describe that gun?

2    A    A Benelli SuperNova shotgun, 12 gauge, pump action, two and

3    three quarter inch shot shells, and I believe it came with a

4    slug barrel that appeared to be short.

5    Q    You gave us a lot of information.  I want to go through

6    some of it in some detail, but first, how did it happen that

7    Daniel Harris sold you the gun?  Did you ask him?  Did he offer

8    it to you?

9    A    I believe he offered it to me.  He knew I didn't have a

10   shotgun at the time so I was interested.

11   Q    You said that it had -- I believe you referred to it as a

12   slug barrel.  What does that mean?

13   A    So a slug barrel means that it has rifling on the inside of

14   the barrel so it's meant for a single solid projectile, and

15   they are called slugs, and it's more ideal for accuracy in

16   longer range shooting.

17   Q    Did it appear to be shorter than legally permitted?

18   A    It appeared to be short.  At the time I did not know the

19   legal parameters for how short a shotgun barrel has to be, but

20   it did appear to be shorter than what I anticipated.

21   Q    Could we please look at Exhibit 146?  Does this appear to

22   be the short-barreled shotgun that you bought from Daniel

23   Harris?

24   A    That does look like it.

25   Q    How much did you pay Daniel Harris for this short-barreled

1    shotgun?

2    A    $400.

3    Q    And did you have anything done once you purchased it from

4    Daniel Harris?

5    A    I refitted it with a shot barrel.  Would you like me to

6    explain what a shot barrel is?

7    Q    Sure.

8    A    A shot barrel is not meant for a single projectile.  It

9    does not have any rifling on the inside.  So it is meant to

10   fire something called a shot, which could be buckshot, bird

11   shot, just basically a shot that includes many, many particles.

12   So...

13   Q    And did that extend the barrel of the shotgun?

14   A    I'm sorry?

15   Q    Did that or something else that you did to it extend the

16   barrel of the shotgun?

17   A    The shot barrel I believe was 18 inches.

18   Q    Very good.  Making it a legal length?

19   A    Yes.

20   Q    Do you know a person by the name of Adam Cowan?

21   A    I think it's Cowan.

22   Q    Cowan.  I apologize.

23   A    That's all right.

24   Q    Do you know the person I am referring to?

25   A    Yes.  That would be my ex-girlfriend's brother.

1    Q    What's your ex-girlfriend's name?

2    A    Lindsay Cowan.

3    Q    What did you know about Adam Cowan?

4    A    I knew he served.  I believe he was in the marines as well.

5    I did meet him one time and we talked about it for -- I met

6    him -- when we met it was, like, for a solid 45 seconds.  We

7    introduced ourselves.  Asked what he did.  He asked what I did.

8    We told each other.  We shook hands and we left.

9    Q    Either by way of your direct contact with him or through

10   your girlfriend, his sister, did you have an understanding

11   about Mr. Cowan's explosive knowledge?

12   A    Yes.

13            MR. BLANCHARD:  Object as to foundation and hearsay.

14            THE COURT:  He's asked for an understanding so we can

15   have it for that purpose.  Go ahead.

16            MR. ROTH:  Thank you, Your Honor.  Go ahead, sir.

17            THE WITNESS:  So Lindsay told me just out of

18   conversation that her brother had been arrested for crafting

19   homemade explosives.

20   BY MR. ROTH:

21   Q    At any point did you tell that to Daniel Harris?

22   A    I did.  I mentioned it in conversation.

23   Q    Do you remember approximately when that was?

24   A    I have no idea.

25   Q    Before the fall of 2020?

1    A    I think so.

2    Q    Just by way of a reference point, before you bought the

3    shotgun from him?

4    A    Oh, yeah.

5    Q    Does that sound right?

6    A    Yeah.  Well before.

7    Q    Did you ever attend any Wolverine Watchmen events, sir?

8    A    They had a training on, I might screw up the date, I think

9    it was September 12th, 13th.

10   Q    Is that in 2020?

11   A    Yes.

12   Q    Is that the only Wolverine Watchmen event that you

13   attended?

14   A    Yes.

15   Q    Do you recall where that was?

16   A    I believe it was in Luther.  I know it was Ty Garbin's

17   property.

18   Q    What kind of event was it?

19   A    Just like a training.  Basic gun knowledge.  Basic medical.

20   Stuff like that.

21   Q    How long were you there, sir?

22   A    I think it was two days.  It was -- it was a weekend thing.

23   Q    Do you recall meeting a person there by the name of Barry

24   Croft?

25   A    That sounds familiar.

1   Q    Could we look at Exhibit 95, please?  Do you remember this

2   man, sir?

3   A    Yes.  I do.

4   Q    Do you recall what his name was?

5   A    Barry Croft.

6   Q    All right.  How was he dressed --

7            We can take that down.

8            -- when you met him in Luther?

9   A    The only thing that stands out was some kind of colonial

10  hat, like you'd see on Jack Sparrow or something.

11  Q    Did you ever hear Barry Croft talk about explosives that

12  weekend?

13  A    I know he mentioned something about explosives.  Yeah.

14  Q    When during the weekend was that?

15  A    I think it was the first day.

16  Q    So the Saturday?

17  A    Yes.

18  Q    Do you recall where you were when you had that conversation

19  with him?

20  A    It was -- it was on the property.  It wasn't really so much

21  as a conversation so much as I just heard it get mentioned.

22  Q    Could you please tell the jury what it was that you heard

23  Barry Croft mention?

24  A    So he mentioned a design for some kind of a pipe bomb,

25  which I can only use my own knowledge regarding homemade

1    explosives as far as what that is, and that would be a bomb

2    containing --

3        MR. BLANCHARD:  Object as to foundation and

4    speculation as to what Mr. Croft meant.

5        THE COURT:  Well, he said he heard -- the question was

6    what he heard Mr. Croft say about it, and at least have some

7    information about that.  Why don't you clarify going forward,

8    Mr. Roth, if what we are hearing is what Mr. Croft said or

9    other things or if there is some other foundation.

10       MR. ROTH:  I will, Your Honor.  Thank you.

11   BY MR. ROTH:

12   Q    So I want to start by talking strictly at first about what

13   it is that you heard Barry Croft say about the explosive and

14   then we'll talk later about what that meant to you?

15   A    The only thing that I can recall is that it would have been

16   some kind of a pipe bomb.

17   Q    Did he say anything about what components would be

18   involved?

19   A    He probably did.  I can't remember.

20   Q    Do you remember him using the word pipe bomb or the phrases

21   pipe bomb or is that sort of how you classify it in your head?

22   A    I think I heard him say it.

23   Q    And you don't recall him saying anything about what would

24   be involved?

25       MR. BLANCHARD:  Objection, asked and answered.

1    THE COURT:  It is asked and answered.

2    MR. ROTH:  All right.

3    BY MR. ROTH:

4    Q    Did you ever see Barry Croft with an explosive that

5    weekend?

6    A    I don't recall that.  No.

7    Q    That Saturday night, so later that evening, what did you

8    do?

9    A    Well, we locked up the guns, some in our vehicles, some in

10   some kind of a shed that was next to the camper that was there,

11   and, well, I proceeded to get really drunk.

12   Q    What's really drunk, sir?

13   A    Well, I can't even remember what I drank or how much I

14   drank, so that drunk.

15   Q    All right.  About what time did you start drinking?

16   A    No idea.  It was -- it was past sunset.  So I -- from there

17   you'll just have to take a guess.

18   Q    How many people going into the weekend did you know that

19   were at the Luther campsite?

20   A    Did I know personally?

21   Q    Yes.

22   A    So I have known Daniel obviously for the longest time.  I

23   met Ty Garbin a few times before the event.  Everybody else,

24   though, it was really just a first time thing.

25   Q    Who did you go to the FTX with?

A    I had -- I had Daniel in my truck.  There was someone else, too.

Q    But Daniel Harris was in your truck?

A    He was in my truck, yeah, with his dog Ollie, which, by the way, all of his hair is still in the back seat of my truck.

Q    All right.  And did you spend most of your time that weekend with Daniel Harris?

A    I spent all of my time with Daniel Harris that week.

Q    Including the time that you were drinking?

A    I didn't see him leave or go anywhere, so...

Q    You did not take any trip up north that weekend or that Saturday night?

         MR. BLANCHARD:  Objection, leading.

         MR. ROTH:  It doesn't suggest an answer, Your Honor.

         THE COURT:  It is, I think, leading, but go ahead. You can see if he left.  He has already told us that he started drinking after sunset and got so drunk he doesn't remember it, so even if he went up north he probably doesn't remember it.

BY MR. ROTH:

Q    Do you recall leaving the campsite at all that night?

A    No.

Q    Were you invited at any point to leave the campsite that night?

A    I don't remember.

Q    You don't recall anybody ever asking you to leave the

1    campsite is what you are saying?

2    A    No.

3            MR. ROTH:  I have nothing else, Your Honor.  Thank

4    you.

5            THE COURT:  All right.  Go around the horn.

6    Mr. Gibbons?

7            MR. GIBBONS:  Your Honor, as this appears to be a

8    witness most relevant to Mr. Harris, I would defer to

9    Ms. Kelly, reserving the right to cross exam at the end.

10            THE COURT:  All right.  We'll start with Ms. Kelly.

11                    CROSS EXAMINATION

12    BY MS. KELLY:

13    Q    Good afternoon, Mr. Phelps.

14    A    What's up?

15    Q    My name is Julia Kelly.  I represent Daniel Harris.  I'm

16    going to follow up with some questions for you, okay?

17    A    Cool.

18    Q    You met Daniel when you guys were seniors in high school,

19    is that right?

20    A    I think I actually met Daniel in between senior and junior

21    years.  We were in the delayed entry program together.

22    Q    Can you tell the jury what the delayed entry program is?

23    A    So it's like a prep program.  I am not sure if it's just a

24    Marine Corps thing or like something for all the armed service

25    branches, but it's like a prep program that high schoolers can

1    get involved in.  The recruiters basically do PT with you.

2    They test you on knowledge, just basic Marine Corps stuff that

3    you are going to be asked when you were in boot camp.  And it's

4    basically just there so that way you have a way to prep with

5    the rest of the time you have left in high school.

6    Q    Okay.  So were you 17 when you signed up for that program?

7    A    I was 17.  I needed parental consent, but yeah.

8    Q    Okay.  Okay.  So you and Daniel were both in this program

9    together.  Were you in the same high school or different high

10   schools?

11   A    No.  We were in different high schools.  I don't remember

12   Daniel's high school.  I believe it was some kind of a Catholic

13   high school.

14   Q    Okay.

15   A    I went to -- I was going to Waterford Kettering at the

16   time.

17   Q    Okay.  And you spent time with Daniel's family, right?

18   A    Yup.

19   Q    You have been over to his house before, right?

20   A    Quite a few times.  Yeah.

21   Q    Okay.  And you guys both get into the Marine Corps.  You go

22   to boot camp.  Were you serving together or were you separate

23   from each other?

24   A    So we went to Paris Island in June of 2015, and we

25   graduated together.  We were in separate platoons, but we

1    were -- we were part of the same company.  After we graduated

2    boot camp on 9-11 of 2015, we both went to infantry training

3    battalion in Camp Geiger, North Carolina.  And there we both --

4    we both did our training as 311s.  That's infantry rifleman

5    MLS.  And then after we completed infantry training battalion

6    we were split up and we went to two different units.  I went to

7    third battalion 7th Marines in 29 Palms California.  God I hate

8    that place.  And he went to third battalion 2nd Marines in Camp

9    LeJeune.  So he stayed in North Carolina while I went to the

10   other side of the country.

11   Q    Did you guys stay in contact during your time in the

12   service?

13   A    From time to time.  It was -- it wasn't really that often

14   that we would talk, but every once in a while we would just

15   shoot each other the occasional what's up.

16   Q    Okay.  And when did you say you were discharged from the

17   Marine Corps?

18   A    I ended my active service on June 14th of 2019, but I got

19   to leave early because I had leave days saved up, so I took a

20   terminal leave and I left the base May 22nd of 2019.

21   Q    Okay.  And then did you move back to where you grew up?

22   A    To Waterford.  Yes.

23   Q    Okay.  And then eventually Daniel was also back in town, is

24   that right, in Lake Orion?

25   A    Yes.

Q     Okay.  And so you guys connect again as friends?

A     Um-hum.

Q     Is that a yes?

A     Yes.  Sorry.

Q     No.  That's okay.  So taking you to 2020, when you and Daniel would communicate, were you using regular text messages? Were you using some sort of an app?

A     Sometimes it was text.  Eventually I got an encrypted messaging app called Signal, I think.

Q     Okay.  And so that's how you and Daniel would mostly communicate, is that right?

A     Excuse me.  That's how a lot of me and my vet buddies stay in touch was with Signal.

Q     Okay.  So Daniel introduced you to a group of guys or I think you said he told you he was hanging out with a group of guys, is that right?

A     That sounds right.

Q     Okay.  And did you go to a protest and meet some of these guys?

A     We went to a few protests.  I think two of them were at the Capitol in Lansing.

Q     Okay.

A     And one of them was -- we went to some barber shop.  I don't even remember the name of the town.  But yeah, we did a couple of protests.

1    Q    Okay.  And when you say we, it was you and Daniel?

2    A    Me and Daniel.  Yes.

3    Q    Okay.  Did he introduce you to this group of guys that he

4    was hanging out with?

5    A    I think he did, but this was at the time at the very start

6    of the pandemic, so everybody was wearing masks.  It was

7    impossible to know who was who.

8    Q    Sure.  Okay.  All right.  And was the first time then that

9    you really met these guys in Luther, then?

10   A    I would say that.  Yeah.

11   Q    Okay.

12   A    Nothing about them really seems to stand out regarding the

13   protests, so I would say the first time I truly did meet them

14   would be at the property in Luther.

15   Q    Okay.  And what was your overall impression about this --

16   these group of guys?

17   A    I mean, some of them kind of creeped me out.  But I mean, I

18   am the kind of guy that doesn't really judge a book by its

19   cover.

20   Q    Okay.  All right.  So you and Daniel drove in your truck,

21   right --

22   A    Yeah.

23   Q    -- to the Luther property and with Casey Mahan.  Does that

24   sound right?

25   A    I think so.  Right.

1    Q    And Ollie is in the back seat shedding all over your seat,

2    right?

3    A    Yes.

4    Q    And let me back up a little bit, because you talked a

5    little bit about your ex-girlfriend, Lindsay Cowan, right?

6    A    Yes.

7    Q    And you were dating her for some portion of 2020, right?

8    A    Almost all of 2020 actually.

9    Q    Almost all of 2020.  Okay.  And do you recall on the 4th of

10   July spending some time with Daniel and Lindsay of 2020?

11   A    That sounds about right.  I think we were together.  Yeah.

12   That -- 2020's 4th of July and 2019's.

13   Q    Okay.  You and Daniel liked to light off fireworks

14   together?

15   A    Yeah.

16   Q    Okay.  And if we could show only to the witness if we could

17   show Defense Proposed marked 4149?  Have you had a chance to

18   look at that exhibit?

19   A    Yeah.  I see it.

20   Q    Okay.  Does this accurately reflect you and Daniel Harris

21   lighting off smoke bombs on July 4th of 2020?

22   A    That's us.

23            MS. KELLY:  Okay.  I'd move for its admission?

24            THE COURT:  Any objections?

25            MR. ROTH:  I would object only to the relevance, Your

1   Honor.

2            THE COURT:  Yeah.  I think we'll just allow it and

3   whatever value it has it has.

4   BY MS. KELLY:

5   Q    Okay.  So looking at Exhibit 4149, who is the one wearing

6   the horse mask?

7   A    That's Danny.

8   Q    Okay.  And then that's you on the left side of the picture,

9   is that right?

10  A    Yes.  It is.

11  Q    Okay.  And you guys are lighting off smoke bombs, right?

12  A    Yup.

13  Q    Okay.  Do you know -- do you know where this picture was

14  taken?

15  A    That was I think in my backyard.

16  Q    Okay.  And you recall that Lindsay, your girlfriend at the

17  time, was the one that took this picture?

18  A    I think so.  It was either her or my mother.

19  Q    Okay.

20  A    I didn't realize my gut looked like that.

21  Q    Okay.  So something -- something like we just saw in this

22  photograph would not be unusual for Daniel Harris, right?

23  A    No way.

24  Q    Okay.  And I am not sure if you remember.  Do you remember

25  also in the summer of 2020 taking a trip with Daniel's family

1    in the end of June to Tennessee?

2    A    We did.  Yeah.  We went to Pigeon Forge, Tennessee.

3    Q    Do you happen to know the dates of that trip?

4    A    Well, we were there for his mother's birthday and so that

5    would be some time around June 24th, and that was actually how

6    we found out that we have very close birthdays cause we found

7    out that mine was the 25th of June.  So we celebrated two

8    birthdays in Pigeon Forge.

9    Q    Okay.  All right.  So getting back to this trip you took up

10   to Luther.  You said you had met Ty Garbin prior to going up to

11   his property, is that right?

12   A    A couple times.  Usually alcohol was involved.

13   Q    Okay.  Would those be like local bars or you guys just

14   hanging out at each other's houses?

15   A    Both actually.  I remember -- I remember drinking with him

16   at Danny's as well as just local bars.

17   Q    Okay.  And I'm sorry I am jumping around with you a lot.

18   The 4th of July, the conversation about Lindsay's brother,

19   could that have been on the 4th of July in those photographs

20   that we saw, in that photograph we saw?

21   A    It could have been.  But still I honestly don't know when

22   she bought it up with me.

23   Q    Okay.  And you said you met Lindsay's brother one time for

24   45 seconds?

25   A    I've seen him once in the flesh and that was just to

1    introduce myself.

2    Q    Okay.  Was there ever a time that you were asked to talk to

3    Adam Cowan and to obtain explosives?

4    A    No.

5    Q    Okay.  All right.  Luther.  Were you working in the summer

6    of 2020 into the fall?

7    A    I think so.  I do -- I do part-time work at the courthouse,

8    so it's -- it's not really clear when I was working, but I

9    think I was.  Yeah.

10   Q    Okay.  Does it sound right if you arrived at the property

11   in Luther really early in the morning on Saturday, like around

12   four o'clock in the morning?

13   A    That sounds about right.  I remember getting there and it

14   was really dark and everyone was already asleep so we just

15   crashed.

16   Q    Okay.  And when you crashed you guys slept in that trailer

17   on Ty's property, right?

18   A    I tried to.  It was so cramped I went back to my truck.

19   Q    Okay.  There were a lot of guys in there.  We have heard

20   about it.  And Ollie was in there, too, right?

21   A    Yeah.  He made it impossible.

22   Q    And you woke up the next day on Saturday.  Did you help

23   build this tarp house or shoot house on Saturday morning?

24   A    I don't think I helped.  I remember helping as, like, a

25   range safety officer at one point, but I don't remember

1    actually assisting in the construction.

2    Q    Okay.  And the range safety officer probably because of

3    your military experience, is that -- is that fair?

4    A    That would be a fair statement.  Yeah.

5    Q    Okay.  Had you -- we heard about you buying a shotgun.  Are

6    you a pro Second Amendment gun owning citizen?

7    A    Oh, yeah.  I am actually hoping to become a gunsmith some

8    time this fall.

9    Q    Okay.  And you had a -- you brought a firearm with you to

10   the property in Luther?

11   A    I brought a couple.  I can tell you exactly what.

12   Q    Okay.

13   A    AR-15 suppressed, an AK-47, a 1911, chambered in 45 cal,

14   and I think I had just gotten a new Ruger 57, which is a 5.7x28

15   millimeter handgun.  So I think that's -- I think that's all I

16   had on the property.

17   Q    Okay.  So you were planning on doing some shooting that

18   weekend?

19   A    Oh, yeah.

20   Q    Okay.  And did you go through the different stations that

21   were set up on the property in Luther?

22   A    Yes.

23   Q    Okay.  So you did the dry fire shoot house on Saturday,

24   right?

25   A    It's vital that you always practice dry before you actually

1      load the weapons.

2      Q    Okay.  Sunday was the live fire, right?

3      A    I think so.

4      Q    Okay.

5      A    I don't think we did any shooting on Saturday.

6      Q    Okay.  If you recall, did it seem like someone was in

7      charge of that shoot house on Saturday going through the dry

8      fire, going through the motions?

9      A    Well, whoever the range safety officer is is usually in

10     charge because he's got to make sure that nobody gets shot by

11     accident.

12     Q    Do you know who that was?

13     A    It was -- it changed out.  Sometimes it was me.  Sometimes

14     it was Daniel.  Sometimes it was one of the others.  I can't

15     really name names.  I only met these guys once.

16     Q    Sure.  Okay.  And if we could for the witness only 4143?  I

17     don't know if you are going to be able to determine what this

18     is.  We are going to see.  Do you recognize --

19               THE COURT:  4143 I show already in.

20               MS. KELLY:  Okay.

21               THE COURT:  Does anybody have it different?

22               MS. KELLY:  I wasn't sure that this one got in.

23               MR. ROTH:  I show it admitted as well.

24               THE COURT:  So it's admitted.  Go ahead.

25     BY MS. KELLY:

Q    Mr. Phelps, do you recognize this as being your truck

arriving to the property in Luther at 4:29 a.m.?

A    It looks roughly.

Q    I know it's difficult to tell.  I wonder if can we zoom in

on the --

A    I can't really make out that plate.

Q    Okay.

A    But the back of the truck does look like a Chevy Silverado,

so it very well could be my truck.  Yeah.

Q    What color Chevy Silverado did you have?

A    Dark gray.  Almost black but not quite.

Q    And then if we could show the witness only Defense Proposed

Exhibit 4095?  Mr. Phelps, do you recognize anyone in that

photograph?

A    I remember seeing them there, but I don't -- I don't know

their names.

Q    You don't know anyone in that photograph?

A    I feel like the one in the middle might be Casey Mahan, but

it's kind of hard to see with that gun in his face.

Q    Okay.  Okay.  Fair enough.  We can take it down.

     So after the training is happening you are saying it's

getting to sunset.  You all put your guns away.  You lock them

away, is that right?

A    Yeah.

Q    Okay.  And you guys start drinking beer, right, or drinking

1    something?

2    A    Yeah.  Whatever I had it worked.

3    Q    Okay.  And there is no -- nothing that you hear about

4    people leaving on a trip or going on a drive or anything like

5    that, right?

6    A    It's -- it's all a blur.  Your guess is as good as mine.

7    Q    Okay.  All right.  Did you sleep in your truck again that

8    night on Saturday?

9    A    There was no going back to that camper.

10   Q    Okay.

11   A    Yes.  I stayed in the truck.

12   Q    Okay.  And then you participated the next day in the live

13   fire, is that right?

14   A    Yes.

15   Q    Okay.  And at the end of the day you drove home again with

16   Daniel and Casey and Ollie, right?

17   A    Yes.  I don't even -- I don't remember Casey being in the

18   truck on the way home.  He might have been, but Danny and Ollie

19   definitely were.

20   Q    Okay.  And as you call him Danny, we've seen him with a

21   horse mask on.  He's got kind of a funny sense of humor, would

22   you agree with that?

23   A    Yeah.

24   Q    Do you have an opinion as to character for truthfulness?

25                THE COURT:  That's not really germane or relevant

1    unless and until he becomes a witness.

2              MS. KELLY:  Okay.

3    BY MS. KELLY:

4    Q    And on -- you mentioned that you bought a Binelli from

5    Daniel on -- before he was arrested, is that right?

6    A    That's correct.

7    Q    Okay.  And that was for $400, right?

8    A    I believe so.

9    Q    Okay.  Did that also include some ammunition or shotguns?

10   A    There was ammunition.  Yeah.  It was just like a giant

11   cardboard box that he kind of just threw it all in there.

12   Q    Okay.  And the day that he was arrested, you remember that

13   day?

14   A    I woke up to seeing the news report.

15   Q    Okay.  Prior to seeing the news report, did you ask Daniel

16   to get some gear for you?

17   A    I did.  I think I asked for a belt specifically a -- some

18   kind of a tactical belt with Molly weaving.  So Molly is like

19   it's a system on a belt or a plate carrier that would allow you

20   to attach pouches and stuff like that to hold more gear.  I

21   didn't have a belt and I kind of wanted one so I asked him if

22   he could pick one up.

23   Q    Okay.  Was that the last conversation you had with him

24   prior to his arrest?

25   A    I think so.

1       MS. KELLY:  I have nothing further.  Thank you.

2       THE COURT:  All right.  Mr. Hills?

3                   CROSS EXAMINATION

4    BY MR. HILLS:

5    Q    You have a vest with plate carrier or plates in it?

6    A    I do.

7    Q    All right.  Helmet?

8    A    Yes.  I do.

9    Q    It sounds like extra magazines for your guns?

10   A    Oh, yeah.  I got lots of magazines.

11   Q    How many magazines roughly?

12   A    Oh, boy.  I think for my for my AK I have five.  For my

13   AR-15 -- well, I've gotten -- I've gotten more since then, but

14   I think I have seven, one of those being a 60-round drum mag.

15   Q    That's a drum mag, so it's kind of a circle?

16   A    Yeah.

17   Q    All right.  Do you have extended mags?

18   A    I have a couple of 40-round magazines, so they could be

19   extended.

20   Q    Okay.  Do you have -- I'm sorry.  Go ahead.  I interrupted

21   you.

22   A    And then I think I have six or seven 20-round magazines for

23   my AR-10, and then recently I -- I'm sorry.  Do you want -- do

24   you want the kind of gear that I had?

25   Q    No.  That's okay.  We'll move on.  You got a lot of

1    magazines, right?

2    A    Yeah.  I got a lot of stuff.

3    Q    You have extended magazines.  All right.  And do you have a

4    lot of bullets for your guns?

5    A    Oh, yeah.

6    Q    How many -- about how many bullets do you have for your

7    guns?  Let me start here.  Thousands?

8    A    Oh, yeah.

9    Q    Several 1000?

10   A    Yes.  Several 1000 in varying calibers.

11   Q    Do you keep any of your magazines -- do you put any bullets

12   in your magazines?

13   A    Yes.

14   Q    And to put bullets in your magazines for, like -- let's

15   just go with one that holds 30 bullets.  Do you have to load

16   it, like, one at a time?

17   A    Yes.

18   Q    So it takes some time to load 30 bullets into a magazine?

19   A    It does.  Yeah.

20   Q    So do you have magazines -- I think you just answered this.

21   Do you have magazines that are preloaded?

22   A    I think all my magazines are preloaded actually.  I don't

23   think I have any that aren't.

24   Q    All right.  So then when you go to the range or you go to

25   an event where there is shooting, you are ready to go?

1     A     Yup.

2     Q     You don't have to sit there and load magazines?

3     A     Right.  Well, depends on the range.  Some ranges only allow

4     you to have six rounds per magazine, so I have to --

5     Q     Take some out?

6     A     Take some out while angrily mumbling to myself.

7     Q     Okay.

8     A     That's the way it is.

9               MR. HILLS:  I appreciate it.  Thank you.

10              THE COURT:  Anything?

11              MR. BLANCHARD:  Pass.

12              THE COURT:  All right.  Mr. Gibbons?

13              MR. GIBBONS:  Just briefly, Your Honor.

14                      CROSS EXAMINATION

15      BY MR. GIBBONS:

16    Q     Good afternoon, sir.

17    A     Howdy.

18    Q     Just a couple questions on a topic that came up that you

19    testified to earlier.  I think you indicated that you used an

20    encrypted chat called Signal?

21    A     Yeah.  I think that's what it's called, Signal.

22    Q     Do you still use that today?

23    A     No.  No.  I got rid of it.

24    Q     Do you have another chat platform that you use?

25    A     Honestly I don't even go on FaceBook anymore.  I just text

1    normally.

2    Q    When you were using Signal what was the point of choosing

3    an encrypted chat platform when you did that?

4    A    I don't really know.  Just seemed like that's what

5    everybody was using, especially my vet buddies.

6    Q    Okay.  So everybody else was doing it?

7    A    Yeah.

8              MR. GIBBONS:  Very good.  Thank you.

9              THE COURT:  All right.  Any redirect?

10             MR. ROTH:  None, Your Honor.  Thank you.

11             THE COURT:  All right.  Thank you.  You may be

12   excused.  Mr. Phelps, we'll let you go right now and go to the

13   government's next witness.

14             MR. KESSLER:  Thank you, Your Honor.  Government calls

15   Adam Cowan.

16             THE COURT:  All right.

17             ADAM COWAN, GOVERNMENT

18             having been first duly sworn, testified as follows:

19             (Witness sworn, 1:07 p.m.)

20                  DIRECT EXAMINATION

21    BY MR. KESSLER:

22   Q    Good afternoon, Mr. Cowan.

23   A    Good afternoon.

24   Q    All right.  Thank you for coming all this way.  We'll be

25   relatively short.  How old are you?

1    A    I am 30.

2    Q    And what do you do for a living?

3    A    Mechanic.

4    Q    What kind of things do you work on?

5    A    Like trucks.  Medium and heavy duty trucks.

6    Q    And where do you live?

7    A    Waterford.

8    Q    So on the east side of the state?

9    A    Yeah.

10   Q    Were you in the United States Marine Corps yourself?

11   A    Yes.  I was.

12   Q    What years?

13   A    2010 and 2014.

14   Q    Did you see some duty overseas?

15   A    Afghanistan in 2011.

16   Q    Okay.  How would you state your relationship is with

17   explosives?

18   A    I have a fascination with them.

19   Q    Okay.  How did you first come to be fascinated with

20   explosives?

21   A    As a teenager, reading Wikipedia, stuff like that.

22   Q    Okay.  Tell the jury, did you have some juvenile charges

23   relating to your fascination with explosives?

24   A    Yes.  Making my own pyrotechnics.

25   Q    And what happened?

1    A    If I remember correctly I was 14 and my friends parents

2    reported us blowing up M80s.

3    Q    I'm sorry?

4    A    My friend's parents reported us blowing up M80s that I

5    made.

6    Q    M80s are small explosive devices?

7    A    Yeah.

8    Q    You made them yourself?

9    A    Yes.  I did.

10   Q    Do you actually know Daniel Harris?

11   A    I do not.

12   Q    Do you know who he is, though?

13   A    I know who he is.

14   Q    What's the connection between you and Daniel Harris?

15   A    He knew my sister.

16   Q    What's your sister's name?

17   A    Lindsay Cowan.

18   Q    And how did he know your sister?

19   A    I believe through my sister's ex-boyfriend Devin.

20   Q    Is that Devin Phelps?

21   A    I believe so.

22   Q    Have you met Devin Phelps before?

23   A    I think I did once.  My memory is terrible, though.

24   Q    And where was that?

25   A    At my parents' house.

1    Q    Let me take you back to the summer of 2020.  Who, if

2    anyone, asked you to make an explosive device then?

3    A    Lindsay may have asked me to make an M80 and I blew her off

4    because I am working all the time and I am tired.  I don't feel

5    like doing it.

6    Q    Okay.  Would you make a device to hurt anybody?

7    A    No.

8    Q    Can explosive devices hurt you, though?

9    A    Yes.  They can.

10    Q    Tell the jury how you know that?

11    A    I blew up my hand.

12         MR. KESSLER:  I have nothing further, Your Honor.

13         THE COURT:  All right.  Mr. Gibbons?

14         MR. GIBBONS:  Again, this is relevant mostly to

15    Mr. Harris.  I'll pass with reservation.

16         THE COURT:  All right.  Ms. Kelly?

17         MS. KELLY:  Thank you.

18                   CROSS EXAMINATION

19     BY MS. KELLY:

20    Q    Good afternoon, Mr. Cowan.

21    A    Good afternoon.

22    Q    You said you don't know Daniel Harris, right?

23    A    I do not.

24    Q    Never texted with him?

25    A    Nope.

1    Q    He's never called you on the phone?

2    A    Nope.

3    Q    Never reached out to you on social media?

4    A    No.

5    Q    Have you seen a picture of him?

6    A    Yeah.  I know what he looks like.

7    Q    Okay.  Because of this case?

8    A    Yeah.

9    Q    Okay.  All right.  And you said your sister asked you to

10   make an M80?

11   A    Yup.

12   Q    Okay.  And you said you just blew her off?

13   A    I don't think I even texted her back.

14          MS. KELLY:  I have nothing further.  Thank you.

15          THE COURT:  Mr. Hills?

16          MR. HILLS:  Nothing.  Thank you.

17          THE COURT:  Mr. Blanchard?

18                CROSS EXAMINATION

19   BY MR. BLANCHARD:

20   Q    Blowing stuff up is fun?

21   A    Yeah.  It's fun.

22          MR. BLANCHARD:  Pass the witness.

23          MR. GIBBONS:  Two questions?

24          THE COURT:  Mr. Gibbons.

25                CROSS EXAMINATION

1    BY MR. GIBBONS:

2    Q    You are not a Wolverine Watchmen, are you?

3    A    I am not.

4    Q    Do you know what the Wolverine Watchmen are?

5    A    I have never heard of them before.  I started researching

6    this case after I heard about it.

7    Q    Okay.  You are not in any encrypted chats with Mr. Harris,

8    correct?

9    A    I am not.

10   Q    You are not on any encrypted chats with the Watchmen that

11   you don't know about?

12   A    I am not.

13         MR. GIBBONS:  Thank you.  I have no further questions,

14   Your Honor.

15         THE COURT:  Anything else?

16         MR. KESSLER:  No redirect, Your Honor.

17         THE COURT:  All right.  That was a long ride for a

18   short stay.  Thank you.

19         (Witness excused, 1:11 p.m.)

20         THE COURT:  You may be excused.  And we'll go to the

21   next witness for the government.

22         MR. ROTH:  Thank you, Your Honor.  We'd call Special

23   Agent Chelsae Williams.

24         THE COURT:  All right.

25         CHELSAE WILLIAMS, GOVERNMENT

```
1              having been first duly sworn, testified as follows:
2              (Witness sworn, 1:12 p.m.)
3                       DIRECT EXAMINATION
4      BY MR. ROTH:
5      Q    Good afternoon.
6      A    Good afternoon.
7      Q    Could I have you start by stating and spelling your
8      complete name, please?
9      A    My name is Chelsae Williams, C-h-e-l-s-e-a,
10     W-i-l-l-i-a-m-s.
11     Q    Thank you.  Where are you employed?
12     A    I work for the FBI Detroit office.
13     Q    In what capacity?
14     A    I am an agent there.
15     Q    How long have you been an agent with the FBI?
16     A    Approximately two years.
17     Q    The Defendants at times have been referred to as boys in
18     this case.  How old is Barry Croft?
19     A    Mr. Croft is 46.
20     Q    Adam Fox?
21     A    Mr. Fox is 38.
22     Q    Daniel Harris?
23     A    Mr. Harris is 24.
24     Q    And Brandon Caserta?
25     A    Mr. Caserta is 33.
```

1    Q    Have you reviewed Proposed Exhibit 42?

2    A    Yes.  I have.

3    Q    Where is it from?

4    A    This is a screen shot of a FaceBook post by Adam Fox.

5    Q    Is it a fair and accurate picture of that post?

6    A    Yes.

7             MR. ROTH:  Your Honor, I'd move for the admission of

8    Proposed Exhibit 42?

9             MR. BLANCHARD:  No objection.

10            THE COURT:  All right.  It's admitted.

11   BY MR. ROTH:

12   Q    Could we take a look at 42, please?  Who is shown here?

13   A    This is Mr. Fox on the left and Mr. Croft on the right.

14   Q    On what date?

15   A    June 7th, 2020.

16   Q    And I should say it's posted on June 7th, not necessarily

17   when it was taken, correct?

18   A    That's correct.

19   Q    And what was happening around that date?

20   A    This is around the time of the Dublin, Ohio meeting.

21   Q    When was that?

22   A    That was on June 6th, 2020.

23   Q    What do we see on Barry Croft's right hand?

24   A    It's a tattoo of an alpha and omega symbol.

25   Q    And the left hand?

1    A    That's a tattoo of the III% symbol.

2    Q    What kind of shirt is he wearing?

3    A    It's a Hawaiian shirt.

4    Q    What kind of hat?

5    A    Tri-corner hat.

6    Q    What are Barry Croft and Adam Fox doing with their hands?

7    A    They are making what I believe to be the III% symbol.

8    Q    Holding up three fingers?

9    A    Three fingers.

10   Q    There were earlier questions about Dan Chappel's efforts to

11   de-escalate Adam Fox's plans.  Have you reviewed Proposed

12   Exhibit 470?

13   A    Yes.  I have.

14   Q    Is it a fair and accurate recording?

15   A    Yes.  It is.

16   Q    Who recorded it?

17   A    Dan Chappel.

18   Q    The recorder was in working order?

19   A    Yes.  It was.

20   Q    And do you recognize his voice?

21   A    Yes.  I do.

22   Q    Who was present for that conversation?

23   A    He was speaking with Adam Fox, Joe Morrison, Mike Morais,

24   Sean Fix, Ty Garbin and others.

25   Q    Is the corresponding transcript accurate?

1    A    Yes.  It is.

2            MR. ROTH:  Your Honor, I move for the admission of

3    Proposed Exhibit 470?

4            MR. BLANCHARD:  I'm sorry.  One moment.

5            MR. ROTH:  It was the one I gave you this morning.

6            MR. BLANCHARD:  Okay.

7            THE COURT:  All right.

8            MR. GIBBONS:  It's hearsay but I am not advancing an

9    objection.

10            THE COURT:  All right.  You can go ahead and admit it.

11            MR. ROTH:  Thank you, Your Honor.

12    BY MR. ROTH:

13    Q    When did this conversation occur?

14    A    This was on August 9th, 2020 at the Munith training.

15    Q    Thank you.

16            If we can please play 470?

17            (Audio started, 1:15 p.m.)

18            (Audio stopped, 1:15 p.m.)

19    BY MR. ROTH:

20    Q    What is Tannerite?

21    A    Tannerite is the name of a commercial brand of exploding

22    target.  It's also sometimes used to refer to the compound

23    itself.  It's binary compound that when mixed if shot with a

24    high velocity bullet will explode but is otherwise stable.

25    Q    What is a binary compound?

1   A    It means it's two pieces.  There is an oxidizer and a fuel

2   and it's stable and won't ignite until it's mixed together and

3   then impact is applied.

4   Q    Thank you.  Could we look at Exhibit 238, page 3, please?

5           So there was a reference to location No. 2 in that

6   recording.  What is location No. 2.

7   A    That's the governor's residence in Elk Rapids, the vacation

8   home.

9   Q    Are each of the other labels on this map correct?

10  A    Yes.  They are.

11  Q    Where did Daniel Harris live?

12  A    Daniel Harris lived in Lake Orion.

13  Q    Kaleb Franks?

14  A    Waterford.

15  Q    Brandon Caserta?

16  A    Mr. Caserta lived in Canton.

17  Q    And Adam Fox?

18  A    Adam Fox lived outside Grand Rapids.

19  Q    What city is labeled as the governor's residence?

20  A    That's Elk Rapids, Michigan.

21  Q    Let's look at that a little bit closer in page 1 of the

22  same exhibit, please.

23          Are each of these labels correct as well?

24  A    Yes.  They are.

25  Q    What is the Lake Michigan access label?

1    A    That is a dirt track that leads to private beach access for

2    the residences in the area onto Lake Michigan.

3    Q    And finally, could we please look at page 4 of that

4    exhibit?  Are these labels accurate as well?

5    A    Yes.  They are.

6    Q    Cambria and Luther were FTX sites?

7    A    That's correct.

8    Q    Dublin and Peebles were meetings in Ohio?

9    A    That's correct.

10   Q    And what is Bear, Delaware?

11   A    That's the residence of Mr. Croft.

12   Q    Thank you.  We can take that down, please.

13        Did you assist with surveillance during the Luther FTX

14   in September 2020?

15   A    Yes.  I did.

16   Q    About --

17        THE COURT:  Just before you go, my notes show 238 as

18   admitted subject to the linkups which I take it you've just

19   done.  So if there is further objection or concern I'd hear it

20   now.  Otherwise, I would admit 238 fully.

21        MR. GIBBONS:  No.  No objection.

22        MR. BLANCHARD:  No objection.

23        THE COURT:  Go ahead.

24        MR. ROTH:  Thank you, Your Honor.

25   BY MR. ROTH:

1   Q    Did you assist with surveillance during the Luther FTX in

2   September 2020?

3   A    Yes.  I did.

4   Q    About how many agents participated or assisted in

5   surveillance that weekend?

6   A    There were approximately 10 of us.

7   Q    And what did surveillance agents do during the FTX?

8   A    We were a vehicle-based surveillance group, so in cars

9   either singly or in pairs.  We set up a very loose perimeter

10  around the FTX area.  Certain agents were also tasked with

11  monitoring the audio transmission or telephones and

12  communications from the undercovers and the sources.

13  Q    What was the purpose in doing all that?

14  A    It was security.  So we were there to be an extra layer of

15  security for the undercovers, the sources, community members

16  and other people at the FTX.

17  Q    Were there variables or factors present that weekend that

18  called for that surveillance?

19  A    Yes.  We thought it was a volatile mix.  We knew there were

20  a number of people there with weapons, live ammunition.  There

21  had been talk about explosives and anti-law enforcement

22  sentiment in the group that had been expressed.

23  Q    Did agents use radios for communication?

24  A    Yes.  We did.

25  Q    And did the FBI also provide similar radios or comparable

radios to undercover agents and informants involved in the FTX?

A    Yes.  We did.

Q    For what purpose?

A    That was a secondary communication system.  When we were driving around Luther we found that cellular coverage was very spotty.  It was difficult to connect via phone.  Sometimes the audio transmission would cut out so we wanted an extra layer of communication so we could contact our undercovers if we needed to.

Q    Did those radios work much better?

A    They did not.  They had a very limited range.

Q    Who had those radios during the time of surveillance?

A    I don't know specifically.  I know there was one in each vehicle.

Q    And what did surveillance agents do during the nighttime surveillance?

A    We did something very similar.  In our vehicles we went up north towards the governor's residence and set up a very loose perimeter around them.  Continued to monitor audio transmissions.  When we were finished for the night and everyone returned to the FTX, my colleague and I spent the night in Luther in a car about two miles from the FTX site so that if one of the undercovers or one of the sources needed to depart the area they could make their way to us, and we had the radio that night as well to monitor it.

Q    A couple times you have referred to loose perimeters.   What
does that mean?

A    We were very far back because it was such a rural area and
the subjects were very law enforcement conscious.   We didn't
want to be too close.

Q    What do you mean by law enforcement conscious?

A    They were looking for surveillance.

Q    During the nighttime surveillance were there pole cameras
installed in the area?

A    Yes.   There were.

Q    I asked that poorly.   They had previously been installed
but they were active that evening?

A    To my understanding, yes.

Q    And have you looked at some of that footage?

A    I have.

Q    How did they operate that evening?

A    They were low light cameras.   So if there was light
available, so maybe a car headlight, it would function and
capture the image.   However, the footage was very dark.
There's also a very strong rain storm that night and so it was
beaded with water so the images were not clear.

Q    Was there a search warrant executed at 1034 Holbrook in
Waterford on October 7th, 2020?

A    Yes.   There was.

Q    Who lived at that address?

1    A    That's the home of Kaleb Franks.

2    Q    What kind of residence was it?

3    A    It's a single family home, two-story with a basement.

4    Upstairs there were three bedrooms.  One was the bedroom

5    Mr. Franks shared with his girlfriend.  The other two rooms

6    appeared to be used as storage rooms for each of them

7    individually.  One room I thought of as Mr. Franks' gear room

8    because he had the majority of his firearms and ammunition in

9    that room.

10   Q    Thank you.  Could we look at Exhibit 389, please?  Is that

11   Kaleb Franks' rifle?

12   A    Yes.  It is.

13   Q    Where was that found?

14   A    This was upstairs in the bedroom that he shared with his

15   girlfriend.

16   Q    What caliber was it?

17   A    It's a 556 rifle.

18   Q    Was it loaded?

19   A    It was.

20   Q    Could we look at 391, please?  What is this item?

21   A    This is a tactical belt.

22   Q    Where was it found?

23   A    This was found in -- upstairs in the gear room, the room

24   where Mr. Franks appeared to store most of his tactical items.

25   Q    What did you find in the tactical belt?

1    A    There were two pistol magazines.  One was loaded.  One

2    empty.  A drop pouch.  A med kit as a holster.

3    Q    What is a drop pouch?

4    A    A drop pouch, it's a pouch where you drop items.  You could

5    put empty magazines.  If you take possession of a firearm or

6    something you want to have on your person you drop it there.

7    Q    Thank you.  Could we look at 390, please?

8         What do we see here?

9    A    This is a Hawaiian shirt.

10   Q    Where was it found?

11   A    This is the closet of the bedroom where Mr. Franks and his

12   girlfriend lived.

13   Q    Exhibit 395 is Kaleb Franks' plate carrier.  You have that

14   up there?

15   A    I do.

16   Q    No need to pull it out right now, but where was it found?

17   A    That was also upstairs in the gear room.

18   Q    And what did you find inside of it?

19   A    There were plates inside of it.  There was also a photocopy

20   of a handwritten cipher.

21   Q    398 is the two ghost guns.  Do you have those up there as

22   well?

23   A    I do.

24   Q    Where were those found?

25   A    Those were found in the gear room on the desk.

Q    What condition were they in?

A    They were complete, so built, oiled and ready to go.

Q    Were they loaded?

A    They were not.

Q    Did they work?

A    They did.  We had them function tested along with all the other firearms following the search.

Q    Were there other firearms found in the house?

A    Yes.

Q    How many?

A    Three additional.

Q    What kind?

A    There was an additional M-4 rifle that was found in the gear room.  It was not loaded.  There was a Sig Sauer pistol that was loaded found downstairs on the dining room table, and then there was a 1911 unloaded that was in a gun box downstairs.

Q    Could we look at 388, please?  Where was this found?

A    This was found in the gear room upstairs.

Q    What is this item?

A    It's a red bag, a tactical bag with magazines and firearm components.

Q    What other firearm components were in it?

A    So it includes bolt carrier group, two flash suppressers, an improvised suppresser, a silencer.

1    Q    What is an improvised suppressor or silencer?

2    A    So an improvised suppresser is anything you can attach to

3    your weapon that will dampen the sound of the shot.

4    Q    So what's the improvised part of it mean?

5    A    I mean, that Mr. Franks built this himself.

6    Q    And you said there was a bolt?

7    A    A bolt carrier group.

8    Q    What does that mean?

9    A    That's the item in the zip lock bag up there.  It's a

10   component that goes into the upper receiver of a rifle.

11   Q    And what does it do?

12   A    It makes the gun fire.

13   Q    There is some magazines as well?

14   A    There were.

15   Q    How many?

16   A    There were 12 rifle magazines and one pistol magazine.

17   Q    Were they loaded?

18   A    Six of the rifle magazines were loaded.  Six were empty.

19   Q    And the pistol magazine?

20   A    That was empty.

21   Q    Was there other ammunition in the house?

22   A    There was.

23   Q    Where?

24   A    The majority of it was upstairs in the gear room.  There

25   were probably 10 additional rifle magazines that were loaded.

1    There were also two large boxes of 556, meaning a thousand

2    rounds a piece.  I apologize, 500 rounds a piece.  There were

3    about five boxes of nine millimeter, five boxes of 380 and then

4    there were three boxes of 45 downstairs.

5    Q    Did you also learn that Kaleb Franks had purchased night

6    vision goggles for use during the kidnapping plot?

7    A    Yes.  I did.

8    Q    Were those items in his home at the time of the search?

9    A    They were not.

10   Q    Did you attempt to locate them?

11   A    Yes.

12   Q    How?

13   A    So after Mr. Franks' arrest I searched the contents of his

14   cell phone.  I found some e-mails from the company he had

15   purchased the night vision from informing him there had been a

16   manufacturing delay.  They weren't ultimately delivered to the

17   house until after the search.  In a later record the jail call

18   that --

19             MR. BLANCHARD:  Object as to hearsay.

20             THE COURT:  Why don't we break it down so that we make

21   sure we get proper foundation for everything going forward.

22             MR. ROTH:  I can also sort of skip to the end because

23   the middle part is not necessarily relevant.

24   BY MR. ROTH:

25   Q    But based on what you hear in those calls did you learn the

1    location of where the night vision goggles ultimately went?

2    A    I learned that the night --

3              THE COURT:  Just to address the hearsay objection,

4    let's identify who she is listening to on the jail calls.

5              MR. ROTH:  That would be fine, Your Honor.

6    BY MR. ROTH:

7    Q    Who is on those calls?

8    A    This is a jail call between Mr. Franks and his girlfriend,

9    Hanna Lewis.

10   Q    Very good.

11             THE COURT:  All right.

12   BY MR. ROTH:

13   Q    And so based on that did you learn the location or -- one

14   of the locations of the goggles?

15             MR. BLANCHARD:  I renew my objection as to hearsay.

16   It was after the arrest here.

17             MR. ROTH:  It's to show where she went to obtain them.

18             THE COURT:  All right.  What's the time date of the

19   jail call, do you know?

20             MR. ROTH:  We can ask the witness, Your Honor.

21             THE COURT:  Let's find out.

22   BY MR. ROTH:

23   Q    Roughly when were these calls?

24   A    It was approximately February 19th of 2021.

25             THE COURT:  Okay.  I mean, that presents a potential

1    hearsay problem, because the conspiracy is clearly over by that

2    time.

3            MR. ROTH:  We are not offering it for the truth of the

4    matter asserted.  We are offering it only to show where she got

5    them from.

6            THE COURT:  Where who got them from?

7            MR. ROTH:  Where -- the agent is the one who obtained

8    the goggles because they weren't in the home and so this was

9    just showing where she had to go to get them.

10           THE COURT:  All right.  Well, why don't we find out

11   where she went to get them and then if she tells us that the

12   information came from her listening to the jail call we can get

13   it that way.  That's probably not a big deal but it feels more

14   proper to me.

15           MR. ROTH:  Thank you, Your Honor.

16   BY MR. ROTH:

17   Q    Where did you ultimately get the night vision goggles from?

18   A    The pawn shop.

19   Q    Which pawn shop?

20   A    It's called Wise Buys Pawn Broker in Highland Charter

21   Township.

22   Q    And again, generally speaking, what is it that led you to

23   that location?

24   A    We knew that the night vision had been pawned and we

25   searched -- there is a database.

1       MR. BLANCHARD:  I am going to object as to hearsay.

2       THE COURT:  Let's just see.  You went to the pawn shop

3   because you learned about it after listening to jail calls, is

4   that it?

5       THE WITNESS:  We knew it had been pawned --

6       THE COURT:  You knew it had been pawned from some

7   other place or from jail calls?

8       THE WITNESS:  We knew it had been pawned from jail

9   calls.  We identified the specific pawn shop from a database.

10      THE COURT:  All right.  Let's go to the database part.

11  I think we have the track and I think that's sufficient to meet

12  the objection.  Go ahead.

13      MR. ROTH:  Thank you, Your Honor.

14  BY MR. ROTH:

15  Q   So again, we don't need to get deep into the details, but

16  there is a database that tells where things are pawned?

17  A   That's correct.

18  Q   All right.  And from that you are able to determine the

19  specific shop where these goggles were pawned?

20  A   Correct.

21  Q   All right.  Do you have Proposed Exhibit 397 up there?

22  A   I do.

23  Q   Are those the night vision goggles obtained from the pawn

24  shop?

25  A   Yes.  They are.

1          MR. ROTH:  Your Honor, I'd move for the admission of

2    Proposed Exhibit 397?

3          THE COURT:  All right.  Objection?

4          MR. BLANCHARD:  I guess I don't see how the foundation

5    ties up these goggles to Mr. Franks.

6          THE COURT:  All right.  So we'll go ahead and admit it

7    over that objection.

8          MR. BLANCHARD:  Thank you.

9          MR. ROTH:  Thank you, Your Honor.

10   BY MR. ROTH:

11   Q    Could you please take those out and show them to the jury?

12   All right.  Could you tell the jury what it is you are holding?

13   A    So I'm holding a bump helmet, and then this is the night

14   vision optic.

15   Q    What is a bump helmet?

16   A    It's a helmet that's not ballistically rated.

17   Q    Meaning not bullet proof?

18   A    Not bullet proof.

19   Q    All right.  Only helps with bumps?

20   A    Yes.

21   Q    All right.  And then what is the other item?

22   A    This is the night vision optic that would attach to the

23   helmet.

24   Q    Thank you.  You can put that back in the box.  Thank you.

25          I want to move to Adam Fox.  Did you also review

1       property seized from his home and car?

2       A    Yes.  I did.

3       Q    And do you have Exhibit 377 up there?

4       A    Yes.

5       Q    What is 377?

6       A    377 is eight handwritten notes.

7       Q    Where were they obtained from?

8       A    They were obtained from the search of the Vacuum Shack.

9       Q    Did you review those notes?

10      A    Yes.  I did.

11      Q    And did you find at least one that was pertinent to the

12      investigation?

13      A    Yes.  I did.

14      Q    Could you please take that item out and we are going to put

15      it on the document camera?

16              THE COURT:  You'll make Brad happy.

17              MR. ROTH:  May I approach, Your Honor?

18              THE COURT:  Yes.  You might want to turn that on so it

19      warms up.  Go ahead.  Let Mr. Kessler figure out how to turn it

20      on when you retrieve what you need.  We can't call Brad to turn

21      it on, okay.

22              MR. KESSLER:  It's on, Your Honor.  It's just warming

23      up.

24              THE COURT:  Okay.  Go ahead.

25              MR. ROTH:  Thank you.

1        THE COURT:  I am not confident it's on.

2        MR. KESSLER:  The green power light is on for --

3        THE COURT:  There must be another setting to hit.

4        MR. ROTH:  The screen on the document camera is

5   showing the --

6        THE COURT:  It is?

7        MR. ROTH:  It is.

8        THE COURT:  I am not -- at least yesterday we saw

9   light.

10       MR. ROTH:  I can get light.  I am confident I can

11   figure out light, something that says light.

12       MR. KESSLER:  There is a white -- it says light white

13   and that's on and you have the small screen here actually shows

14   the image.

15       THE COURT:  Let's do this.  You have something else to

16   do with this witness?

17       MR. ROTH:  I can have the witness read it.

18       THE COURT:  Either that or let's have Mr. Schmidt give

19   it to Ms. Carpenter again and she can do the same thing she did

20   for him yesterday, scan it and send it to me.  Sorry, Brad, if

21   you are listening.  Brad might have been listening.

22       MR. ROTH:  Thank you.

23       THE COURT:  All right.  I just don't think it likes

24   you, Mr. Roth.  There it is.

25       MR. ROTH:  All right.

BY MR. ROTH:

Q    Would you please read what we see on this note that was found in the Vac Shack?

A    So we -- I assessed this to read residents MI, which is circled, and I assessed to mean Michigan/TC, which --

        MR. BLANCHARD:  I would object as to her interpretation of what the words mean.

        THE COURT:  We can see what the words mean and then if you want to interpret, Mr. Roth, you can ask her, too, later, but certainly the evidence is what's on the paper.

        MR. ROTH:  Thank you, Your Honor.

BY MR. ROTH:

Q    So let's start by just reading it and then we'll go from there.

A    So it reads, residents MI/TC timing/consistency, sensors/ security, driveway, barriers, guard, et cetera, cameras.  Poss get layout.  Inside detail.

Q    Thank you.  So there are two abbreviations at the top.  Are you familiar with the abbreviation MI?

A    Yes.  I am.

Q    What is that an abbreviation for?

A    Michigan.

Q    Are you familiar with the abbreviation TC?

A    I am.

Q    What is that an abbreviation for?

1    A    I assess that to mean Traverse City.

2    Q    Where is Traverse City relative to Elk Rapids?

3    A    It's the nearest large city.

4    Q    Thank you.

5         May I approach and return this to the exhibit bag?

6         THE COURT:  Sure.

7    BY MR. ROTH:

8    Q    Did you also review the contents of Adam Fox's cell phones?

9    A    Yes.  I did.

10   Q    Did investigators obtain a search warrant for the contents

11   of those phones?

12   A    Yes.  They did.

13   Q    And were investigators able to extract their contents?

14   A    Yes.

15   Q    Have you reviewed Proposed Exhibits 418 through 421?

16   A    Yes.  I have.

17   Q    Are each items found on Adam Fox's cell phones?

18   A    Yes.

19        MR. ROTH:  All right.  I would move for the admission

20   of Proposed Exhibits 418 through 421?

21        THE COURT:  Any objection?

22        MR. GIBBONS:  None.

23        MR. BLANCHARD:  No, Your Honor.

24        THE COURT:  Okay.  They are admitted.

25   BY MR. ROTH:

1    Q   Could we please take a look at 418?

2         Who do we see in Exhibit 418?

3    A   That's Mr. Fox.

4    Q   And do you recognize the guns that he is holding?

5    A   The tan colored one is consistent with the firearm that was

6   recovered from the Vacuum Shack.

7    Q   This was found on his cell phone?

8    A   Yes.  It was.

9    Q   Could we please move to 419?

10        What do we see here?

11    A   This is a screen shot of a digital map.

12    Q   And again, this was found on Adam Fox's cell phone?

13    A   That is correct.

14    Q   This is going to be a series of maps, is that right?

15    A   Yes.

16    Q   All right.  And this particular one, what do we see?

17    A   This is the northeast corner of Birch Lake.

18    Q   Where on the phone were they located?

19    A   They were saved as image folders or saved as image files.

20    Q   What's the blue dot we see in the middle?

21    A   That's the location of the Birch Lake public boat access.

22    Q   How close is that to the governor's home?

23    A   As the crow flies it's about eight-tenths of -- or 80

24   percent of a mile.  Less than a mile.

25    Q   Thank you.

1    A    Over road it's between two and two and-a-half miles.

2    Q    Could we look at the second page in this series, please?

3    What area do we see here?

4    A    This is also Birch Lake.  This is going to be the southwest

5    portion.

6    Q    And I am not going to see it each time, but again, this

7    whole series was found in a photo section of Adam Fox's cell

8    phone?

9    A    That's correct.

10   Q    Could we go to the next page, please?  What area do we see

11   on page 3?

12   A    This is the same area zoomed out.  You can see Birch Lake

13   and Elk Rapids.

14   Q    Page four, please.

15   A    This is zoomed in on Elk Rapids.

16   Q    And finally, page 6?

17   A    This is going to be the west corner of Birch Lake, focusing

18   on Timberline Drive.

19   Q    Where is that relative to the governor's home?

20   A    The governor's vacation residence is on Timberline Drive.

21   My apologies.  Timberlake.

22   Q    There is one more page.  I apologize.  And what area do we

23   see here on the sixth page?

24   A    This is a zoomed out image of Birch Lake.

25   Q    420, please.

1    What is this item?

2    A    This is a vista print image of a business card.

3    Q    And this was found on Adam Fox's cell phone?

4    A    Yes.  It was.

5    Q    Is it the same design as the business cards found in his

6    car and in the Vac Shack?

7    A    Yes.  It is.

8    Q    And finally, 421, please.  This is a video.

9              (Video started, 1:38 p.m.)

10             (Video stopped, 1:38 p.m.)

11   BY MR. ROTH:

12   Q    What date was that reported?

13   A    That was October 5th, 2020.  I apologize, yeah, October

14   5th, 2020.

15             MR. ROTH:  Thank you.  I have nothing further.

16             THE COURT:  All right.  We'll go to cross starting

17   with Mr. Gibbons.

18             MR. GIBBONS:  Thank you, Your Honor.

19                        CROSS EXAMINATION

20     BY MR. GIBBONS:

21   Q    Good afternoon, Agent Williams.  Just a few questions.  I

22   think you testified that Adam Fox was involved in the

23   investigation from your perspective as an agent working in the

24   summer of 2020, is that correct?

25   A    That's correct.

Q    And you had an understanding as to his age; he was 38 years

of age?

A    That's correct.

Q    You did do a little work into his background during the

summer of 2020, is that correct?

A    Not me specifically.  There were agents who looked into

Mr. Fox's background.

Q    Okay.  And you were aware of those findings, is that right?

A    That's correct.

Q    And isn't it true that through the first 38 years of Adam

Fox's life he had acquired no criminal convictions, is that

true?

A    Nothing significant.  There was one misdemeanor for

reckless driving in 2003.

Q    Short of that nothing else, correct?

A    No, sir.  Nothing else.

Q    I would like, if you can bring up the transcript for 470,

please?

        You had the opportunity to review this recording, is

that true?

A    That's correct.

Q    And this was recorded by CHS Dan, right?

A    That's correct.

Q    And did you listen to the whole meeting?

A    I listened to the majority of the meeting.

Q    Okay.  So you would have listened to things that were said

before and things that were said after this snippet, true?

A    I listened to the things that were said before.

Q    Okay.  And you would agree here there is a suggestion by

Dan to get some of this Tannerite, put a dent in the house,

true?

A    I see it raises a possibility.

Q    Right.  And that would be a reference to the governor's

house?

A    I believe so.

Q    And that would be location two, is that right, find out

No. 2?

A    Correct.

Q    And this suggestion was being made -- if you look at the

first line it says, if you don't want to kill anybody or

anything it would be made -- a suggestion made to someone who

doesn't want to kill the governor?

MR. ROTH:  Your Honor, I object as to speculation.

THE COURT:  That's argumentative.  And you can argue

the inference, but it's not a basis to get other information.

BY MR. GIBBONS:

Q    I think you testified that this was being offered to

de-escalate the notion of kidnapping the governor from her

home, is that true?

A    I believe it was being offered to show the de-escalation

1      for the thought of killing.

2      Q    Okay.  And you did listen to the recording that day,

3      correct, of that day?

4      A    Yes, up until this point.

5      Q    Right.  CHS Dan also suggested that they could ambush the

6      governor, true?

7      A    I don't recall that.

8      Q    Okay.  If he did make that suggestion that would not be a

9      de-escalation?

10           MR. ROTH:  I am going to object as to lack of

11     foundation.  There is no testimony that that happened.

12           MR. GIBBONS:  Well, there actually is.

13           THE COURT:  I am really disappointed to see the

14     government put this in because we had CHS Dan on the stand for

15     it seemed like days, and we all went around the horn on all

16     kinds of statements he made.  This naturally resurrects

17     interest in that, but the bottom line is, you know, we had him

18     here and I don't know that either side should spend much time

19     with it.

20           MR. GIBBONS:  Very good.  Thank you, Your Honor.  I

21     think I have made my point.

22     BY MR. GIBBONS:

23     Q    There was talk of Exhibit 397, goggles that belonged to, I

24     guess, Mr. Franks, is that right?

25     A    The night vision goggles?

1    Q    Correct.  When did those go to the pawn shop, do you know?

2    A    That would have been in February of 2021.

3    Q    How were they delivered to the pawn shop?  He was in jail.

4    Do you know?

5    A    Mr. Franks' girlfriend pawned them.

6    Q    So she had them?

7    A    That's --

8    Q    Is that right?

9    A    That's correct.

10   Q    When did she receive them, do you know?

11   A    They arrived at the house in late October of 2020.

12   Q    So the goggles were received by Mr. Franks' girlfriend

13   after the date of his arrest?

14   A    That is correct.

15   Q    So on October 6th, the day before his arrest, he didn't

16   have the goggles, correct?

17   A    That's correct.

18   Q    It would be impossible to use the goggles in any plan to

19   kidnap the governor as of October 6, correct?

20   A    You are correct.

21   Q    Thank you.

22   A    There was a manufacturing delay.  He originally ordered

23   them in August of 2020.

24            THE COURT:  Well, let me cut you off, because you

25   answered his question and anything after that would not be

1    responsive.  We'll see if Mr. Roth wants to get into it or not.

2    Go ahead, Mr. Gibbons.

3    BY MR. GIBBONS:

4    Q    There was these handwritten notes that you found in -- I

5    think they are in evidence.  Did you find those in the

6    wastebasket at the Vac Shack?

7    A    The agents who did the search found them on the workbench

8    of the Vac Shack.

9    Q    On the workbench.  Okay.  And then there was the two

10   letters MI, and then next to that was two letters TC, right?

11   A    That's correct.

12   Q    And TC you interpreted to be Traverse City?

13   A    That is correct.

14   Q    And then there was MI.  That could be Mackinaw Island,

15   right?

16   A    Same letters.

17   Q    That's location three, true?

18   A    That's true.

19   Q    And that one was circled, was it not?

20   A    That is correct.

21   Q    Okay.  The Traverse City was not circled, true?

22   A    That is correct.

23   Q    And then can I have 421 without audio?

24        I want to draw your attention to the lower left hand

25   portion of the video.  Do you see that there, the smoke?

1    A    Yes, sir.

2    Q    Does it appear Adam Fox is smoking while he is making this

3    video?

4    A    It appears that he is smoking.

5    Q    He wasn't a cigarette smoker, was he, do you know?

6    A    I don't know.

7    Q    Okay.  He's known to smoke a lot of marijuana, did you know

8    that?

9    A    I have heard that mentioned.

10        MR. GIBBONS:  Okay.  Thank you.  I have no further

11   questions.

12        THE COURT:  Ms. Kelly?

13        MS. KELLY:  Thank you, Your Honor.

14                   CROSS EXAMINATION

15    BY MS. KELLY:

16   Q    Good afternoon.

17   A    Good afternoon.

18   Q    A couple of followup questions for you about Luther and

19   that weekend.  You mentioned that there was a surveillance unit

20   that was kind of loosely following the folks that drove up

21   north, right?

22   A    That's correct.

23   Q    Around 10 agents, is that right?

24   A    Approximately 10.

25   Q    Okay.  And are you aware that there were several people

1    that stayed behind at the Luther property, correct?

2    A    That's correct.

3    Q    Okay.  Were there other agents in that area that stayed

4    behind?

5    A    I don't recall.

6    Q    Okay.  So for what you do recall is all the agents that you

7    have talked about went up north as well, is that right?

8    A    I believe so.  I don't recall specifically.  I know I went

9    north.

10   Q    You went up north.  Okay.  And I believe you also said that

11   in -- there were three vehicles that went up north, is that

12   right?

13   A    That's correct.

14   Q    Okay.  And did you say that each vehicle had a radio, is

15   that right?

16   A    That's correct.

17   Q    Okay.  And one of those vehicles was driven by Brian

18   Higgins, is that right?

19   A    That's correct.

20   Q    Okay.  With Ty Garbin and Kaleb Franks in the vehicle, is

21   that right?

22   A    That's correct.

23   Q    Okay.  Do you know who had the radio in that vehicle?

24   A    I don't know.

25   Q    Okay.  Were you the case agent for Kaleb Franks?

1    A    Yes.  I was.

2    Q    Okay.  So you were kind of watching him and monitoring him

3    throughout the summer of 2020, correct?

4    A    That's correct.

5    Q    Okay.  And you did workups about where he was going and you

6    were keeping an eye on him, is that fair to say?

7    A    That's fair.

8    Q    Okay.  And when he would go somewhere with another member

9    of the Wolverine Watchmen you would take note of that, is that

10    right?

11    A    Yes.

12    Q    Okay.  And you conducted -- did you conduct the interview

13    of Kaleb Franks?

14    A    Yes.  Following his arrest.

15    Q    Okay.  And I am looking at some background information that

16    you were working up in order to prepare search warrant

17    documents.  Do you recall doing that?

18    A    I do.

19    Q    Okay.  And there is mention of, you know, August the 1st

20    when Daniel Harris and Ty Garbin go up to Ty's property in

21    Luther to build the shoot house.  Do you recall that?

22    A    I don't recall the specific details that were included but

23    I do recall that happening.

24    Q    Okay.  So when -- when Kaleb Franks is spending time with

25    another Wolverine Watchmen, you are taking note of it, is that

1    fair to say?

2    A    Yes.  That's fair to say.

3    Q    Okay.  And you do not make mention of a hike that Ty Garbin

4    and Daniel Harris take in August of 2020, is that right?

5    A    I don't recall.

6    Q    Okay.  The bump helmet that you showed to the jury,

7    that's -- a bump helmet is just a type of helmet, is that

8    right?

9    A    That's correct.

10   Q    There are many different types of helmets, is that right?

11   A    To the best of my knowledge, yes.

12        MS. KELLY:  Thank you.  I have nothing further.

13        THE COURT:  All right.  Mr. Hills?

14                    CROSS EXAMINATION

15   BY MR. HILLS:

16   Q    When you were up at Luther no one was called in for any

17   emergency during that weekend?

18   A    I don't understand.  Do you mean law enforcement?

19   Q    Yeah.  You had 10 or 11 agents kind of loosely around the

20   area, is that right?

21   A    That's right.

22   Q    In case something went wrong, is that right?

23   A    That's right.

24   Q    And no one was called in or called out because something

25   went amiss, correct?

1    A    Correct.

2    Q    All right.  You mentioned a cipher that was found in Kaleb

3    Franks' home or residence.  Are you familiar that that cipher

4    was passed out by Tim Sayer at Luther?

5    A    Yes.

6    Q    Okay.  And you don't know -- you don't have any information

7    that those symbols on that cipher were used --

8         MR. ROTH:  I am going to object to the hearsay and

9    lack of foundation how she could know this.

10        THE COURT:  Yeah.  But it's in.  Too late.  You snooze

11   you lose.  Go ahead.

12   BY MR. HILLS:

13   Q    No information about the symbols being used from the

14   cipher?

15   A    I just know the cipher was passed out.  I have very little

16   knowledge of the cipher.

17   Q    Okay.  Suppresser.  You found a suppresser in Mr. Franks'

18   home?

19   A    We found three.

20   Q    Three.  Did they all have stamps?

21   A    No.

22   Q    And when you get a suppresser, do you have to get a stamp

23   with it, a tax stamp?

24   A    So you need to get an ATF tax stamp in order to make and

25   fully finish your improvised suppresser.  So one of them did

1    have a tax stamp.  One had a pending permit and the third one

2    there was no paperwork.

3    Q    Okay.  So the third one was an illegal suppresser?

4    A    To the best of my knowledge.

5              MR. HILLS:  Okay.  Thank you, ma'am.

6              THE COURT:  Mr. Blanchard?

7              MR. BLANCHARD:  Thank you.

8                     CROSS EXAMINATION

9      BY MR. BLANCHARD:

10   Q    Good afternoon.

11   A    Good afternoon.

12   Q    You work as a special agent?

13   A    Yes.

14   Q    For the FBI?

15   A    I do.

16   Q    You have been doing that for about two years?

17   A    About two years.

18   Q    You have been trained in how to investigate things?

19   A    Yes.

20   Q    And draw logical deductions from the facts, right?

21   A    Yes.

22   Q    And before that you worked for the Centers for Disease

23   Control, right?

24   A    That's correct.

25   Q    And an epidemiologist?

1    A    Yes.

2    Q    Still kind of investigative work, right?

3    A    I think so.

4    Q    Yeah.  Could I have Exhibit 42, please?  And if we could

5    just zoom in on the two guys?

6            This is Mr. Fox and Mr. Croft, right?

7    A    Yes, sir.

8    Q    And it was taken on -- well, it was posted on the weekend

9    of the Dublin meeting, correct?

10   A    Yes, sir.

11   Q    And it appears to be posted at a hotel?

12   A    I am not aware of the location.

13   Q    You have not been to the Dublin hotel?

14   A    No, sir.

15   Q    Okay.  Mr. Croft is wearing an unbuttoned shirt, correct?

16   A    He is.

17   Q    And we can see his bare chest, right?

18   A    That's correct.

19   Q    And he appears to have a towel wrapped around his waist?

20   A    Yes.  He does.

21   Q    Have you ever seen someone dressed like that before?

22   A    Ever?

23   Q    Yes.

24   A    Yes.

25   Q    In what context?

1    A    Typically at the beach I would say.

2    Q    Or a pool?

3    A    A pool.

4    Q    Okay.  Looks like they had been swimming together, right?

5    A    It looks like Mr. Croft has been swimming.  I am not clear

6    about Mr. Fox.

7    Q    Okay.  And you can see that Mr. Croft has something in his

8    left hand between his index finger and his middle finger,

9    correct?

10   A    That's correct.

11   Q    Can't really tell what that is, but it looks like something

12   to smoke, is that fair?

13   A    I would say it looks like a cigarette of some type.

14   Q    Of some type.  You can't tell me whether it's a cigarette

15   or a marijuana joint, correct?

16   A    No, sir.

17   Q    Okay.  You are aware that marijuana was smoked in Dublin,

18   correct?

19   A    I am not aware of what was smoked at Dublin.

20   Q    Fair enough.

21              MR. BLANCHARD:  Pass the witness.

22              THE COURT:  All right.  Any redirect?

23              MR. ROTH:  Briefly, Your Honor.

24                      REDIRECT EXAMINATION

25     BY MR. ROTH:

Q    There are just two issues I wanted to touch on.  You were

saying before about the goggles.  When were the night vision

goggles ordered?

A    They were ordered in August of 2020.

Q    And then something happened?

A    Yes.  There was a manufacturing delay of some kind.

Q    All right.  And then there was some questions from

Ms. Kelly about your responsibility as a case agent.  Do you

follow a subject 24 hours a day, seven days a week?

A    No.

Q    Generally speaking what do you mean by following their

movement?

A    I would say -- I would define that to be making note of any

significant instances, meetings, other activities.  I noted

whenever Mr. Franks would go to a training.

Q    All right.  Very good.  But his day-to-day movements not

necessarily seen?

A    No.

            MR. ROTH:  Nothing else.  Thank you.

            THE COURT:  All right.  Any further cross?

            MR. BLANCHARD:  No, Your Honor.

            MR. GIBBONS:  No Your Honor.

            THE COURT:  Very good.  Thank you.  You may be

excused.

            (Witness excused, 1:53 p.m.)

1          THE COURT:  We don't have much time left.  Do you have

2     anybody you can fit in in ten minutes?

3          MR. ROTH:  I do, Your Honor.

4          THE COURT:  Let's go.

5          MR. ROTH:  We call Special Agent Greg Mrozek.

6          THE COURT:  All right.

7          GREG MROZEK, GOVERNMENT

8          having been first duly sworn, testified as follows:

9          (Witness sworn, 1:53 p.m.)

10                   DIRECT EXAMINATION

11     BY MR. ROTH:

12     Q    Good afternoon.

13     A    Good afternoon.

14     Q    Could I have you start by stating and spelling your

15     complete name, please?

16     A    Greg S. Mrozek.  It's M-r-o-z as in zebra, e-k.

17     Q    Thank you.  Where are you employed?

18     A    With the FBI in Wilmington, Delaware.

19     Q    In what capacity?

20     A    I am a special agent assigned to the white collar criminal

21     squad.

22     Q    How long have you been with the FBI?

23     A    A little over 20 years.

24     Q    On October 8, 2020, did you execute a search warrant on a

25     black Dodge Durango?

1    A    Yes.  I did.

2    Q    Whose Durango was that?

3    A    It was a vehicle owned by Barry Croft.

4    Q    Where was the Durango at the time that you searched it?

5    A    It was parked in a fenced in area in a parking lot at 1280

6    Porter Road in Bear, Delaware.

7    Q    What is that location?

8    A    It's the location where Mr. Croft parked his semi

9    tractor-trailer truck.

10   Q    So leave the personal truck, get in the tractor-trailer?

11   A    Yes.

12   Q    Have you looked at Proposed Exhibit 332?

13   A    Yes.

14   Q    All right.  Is that a fair and accurate picture of one of

15   the items found in the Durango?

16   A    Is it supposed to show up on the screen here?

17   Q    We can if you like.

18        MR. BLANCHARD:  I don't have any objection to it.

19        THE COURT:  Then we treat it as admitted, 332.

20        MR. ROTH:  Thank you, Your Honor.

21        THE COURT:  That might be the second stipulation of

22   the trial.

23   BY MR. ROTH:

24   Q    Before we go to 332, then let's go to 331.  So this was an

25   item that was already testified about with Special Agent Long.

1    You know Special Agent Long?

2    A    I do.

3    Q    All right.  What is this item?

4    A    This is a receipt for the purchase of fireworks.

5    Q    Did you find this in the Durango?

6    A    I did.

7    Q    Where in the Durango was it?

8    A    In the hatchback area at the rear of the vehicle.

9    Q    And we already had some detail on it I guess but generally

10   speaking what is it a receipt for?

11   A    It's a receipt for the purchase of fireworks, $353 worth on

12   or at or from Patriots Fireworks on July 1st of 2020.

13   Q    Was this provided to Special Agent Long for followup?

14   A    It was.

15   Q    Could we look at 332 next?  Did you find this box as well?

16   A    I did.

17   Q    Where in the car was this box?

18   A    It was also located in the hatchback area at the rear of

19   the vehicle.

20   Q    What was inside the box?

21   A    Patches which display -- which appears to be half United

22   States flag half of the confederate flag with three ones

23   circled by stars in the upper left-hand corner.

24   Q    Approximately how many patches were in the box?

25   A    Six.  I believe.

1    Q    And if we could zoom in here, please?  Who is the box

2    addressed to?

3    A    Chasity Knight.

4    Q    And what address?

5    A    9 Waldon Court, Northeast, Maryland.

6         MR. ROTH:  Thank you.  I have nothing else of this

7    witness.

8         THE COURT:  All right.  Any cross, Mr. Gibbons?

9         MR. GIBBONS:  None, Your Honor.

10         THE COURT:  Ms. Harris -- I'm sorry.  Ms. Kelly.

11         MS. KELLY:  No, Your Honor.  Thank you.

12         THE COURT:  All right.

13         MR. HILLS:  Mr. Caserta has none.

14         THE COURT:  All right.  Mr. Blanchard?

15         MR. BLANCHARD:  No, Your Honor.  Thank you.

16         THE COURT:  All right.  Definitely time for me to end

17    for the day.  That's clear.  So thank you.  We will do that.

18    We are at the end.

19         (Witness excused, 1:57 p.m.)

20    ****************************************************************

1                              INDEX

2

3          Government Witnesses:                    Page

4          ADAM AYRISS

5           Direct Examination by Mr. Roth (Cont.)    8
            Cross Examination by Ms. Kelly           22
6           Cross Examination by Mr. Blanchard       29

7          THOMAS SZYMANSKI

8           Direct Examination by Mr. Roth           32
            Cross Examination by Mr. Blanchard       55
9           Redirect Examination by Mr. Roth         69
            Recross Examination by Mr. Gibbons       70

10         JOEL KELSO

11          Direct Examination by Mr. Roth           78
            Cross Examination by Mr. Hills           92
12          Cross Examination by Mr. Blanchard      105

13         CHRIS CARTER

14          Direct Examination by Mr. Roth          107
            Cross Examination by Mr. Hills          110
15          Cross Examination by Mr. Blanchard      115
            Redirect Examination by Mr. Roth        115
16
           ANTHONY RESENDEZ
17
            Direct Examination by Mr. Kessler       116
18          Cross Examination by Mr. Hills          128
            Cross Examination by Mr. Blanchard      146
19          Cross Examination by Mr. Gibbons        147
            Redirect Examination by Mr. Kessler     149
20          Recross Examination by Mr. Gibbons      151

21         DEVIN PHELPS

22          Direct Examination by Mr. Roth          153
            Cross Examination by Ms. Kelly          164
23          Cross Examination by Mr. Hills          178
            Cross Examination by Mr. Gibbons        180

24

25

```
 1      ADAM COWAN

 2        Direct Examination by Mr. Kessler         181
          Cross Examination by Ms. Kelly            184
 3        Cross Examination by Mr. Blanchard        185
          Cross Examination by Mr. Gibbons          186
 4
          CHELSAE WILLIAMS
 5
          Direct Examination by Mr. Roth            187
 6        Cross Examination by Mr. Gibbons          211
          Cross Examination by Ms. Kelly            217
 7        Cross Examination by Mr. Hills            220
          Cross Examination by Mr. Blanchard        222
 8        Redirect Examination by Mr. Roth          224

 9      GREG MROZEK

10        Direct Examination by Mr. Roth            226

11      Exhibits:                                 Admitted

12      Government's Exhibit 4                         48
          (FaceBook Post, April 18)
13      Government's Exhibit 42                       188
          (FaceBook Post, Fox)
14      Government's Exhibit 144                      128
          (Audio, Jail, Caserta, August 30)
15      Government's Exhibit 151                       14
          (Text, Croft/Harris)
16      Government's Exhibit 238                      192
          (Maps)
17      Government's Exhibit 273                      118
          (FaceBook Post, Caserta, September 21)
18      Government's Exhibit 303                      126
          (Hawaiian Shirt, Caserta)
19      Government's Exhibit 306                       80
          (Photograph, Caserta, White Board)
20      Government's Exhibit 307                       80
          (Photograph, Caserta, Closet)
21      Government's Exhibit 309                       80

22      Government's Exhibit 310                       80
         Photograph, Caserta, Items in Black Bin)
23      Government's Exhibit 311                       80
          (Photograph, Caserta, Books)
24      Government's Exhibit 312                       80
          (Photograph, Caserta, AR Pistol)
25      Government's Exhibit 313                       80
          (Photograph, Caserta, AR Rifle)
```

```
 1
            Government's Exhibit 314              80
 2            (Photograph, Caserta, AR Rifle)
            Government's Exhibit 315              80
 3            (Photograph, Caserta, Glock 17)
            Government's Exhibit 316              80
 4            (AR Pistol, Caserta)
            Government's Exhibit 317              80
 5            (Glock 17, Caserta)
            Government's Exhibit 318              80
 6
            Government's Exhibit 319              80
 7            (Photograph, Caserta, Items in Kitchen)
            Government's Exhibit 320              80
 8            (Photograph, Caserta, Ammunition)
            Government's Exhibit 321              80
 9            (Photograph, Caserta, Vest)
            Government's Exhibit 322              80
10            (Photograph, Caserta, Ammunition Cans)
            Government's Exhibit 325              80
11            (Vest, Caserta)
            Government's Exhibit 326              80
12            (Belt, Caserta)
            Government's Exhibit 327              80
13            (Flag, Caserta)
            Government's Exhibit 328              80
14            (Photograph, Caserta, Belt)
            Government's Exhibit 329             125
15            (Photograph, Work Locker, Caserta)
            Government's Exhibit 332             227
16            (Photograph, Croft Box in Durango)
            Government's Exhibit 337              35
17            (Gun, Croft Garage)
            Government's Exhibit 338              35
18            (Firework)
            Government's Exhibit 339              35
19            (Red Bag)
            Government's Exhibit 341              35
20            (Bag, Croft)
            Government's Exhibit 342              35
21            (Photograph, Bag, Croft)
            Government's Exhibit 343              35
22            (Photograph of Paper with Cipher)
            Government's Exhibit 344              35
23            (Photograph, Croft Garage)
            Government's Exhibit 345              35
24            (Smokeless Powder)
            Government's Exhibit 346              35
25
```

| | | |
|---|---|---|
| 1 | Government's Exhibit 347 | 35 |
| | (Smokeless Propellant) | |
| 2 | Government's Exhibit 348 | 35 |
| | (Exploding Targets) | |
| 3 | Government's Exhibit 357 | 48 |
| | (FaceBook Meme) | |
| 4 | Government's Exhibit 358 | 48 |
| | (Photograph, Shotgun, June 18) | |
| 5 | Government's Exhibit 359 | 48 |
| | (Photograph, Croft, August 29) | |
| 6 | Government's Exhibit 360 | 48 |
| | (FaceBook Post, Croft, May 25) | |
| 7 | Government's Exhibit 361 | 48 |
| | (FaceBook Post, Croft, May 30) | |
| 8 | Government's Exhibit 362 | 48 |
| | (FaceBook Post, Croft, May 31) | |
| 9 | Government's Exhibit 377 | |
| | (Handwritten Notes) | |
| 10 | Government's Exhibit 397 | 204 |
| | (Night Vision Goggles) | |
| 11 | Government's Exhibit 414 | 109 |
| | (Photograph, Bag, Caserta) | |
| 12 | Government's Exhibit 415 | 109 |
| | (Photograph, Caserta Car) | |
| 13 | Government's Exhibit 418 | 208 |
| | (Photograph, Fox) | |
| 14 | Government's Exhibit 419 | 208 |
| | (Photograph, Map) | |
| 15 | Government's Exhibit 420 | 208 |
| | (Photograph, Business Card) | |
| 16 | Government's Exhibit 421 | 208 |
| | (Video, October 5) | |
| 17 | Government's Exhibit 439 | 35 |
| 18 | Government's Exhibit 451 | 109 |
| | (Glock, Caserta) | |
| 19 | Government's Exhibit 457 | 118 |
| | (FaceBook Post, Caserta, March 16) | |
| 20 | Government's Exhibit 458 | 118 |
| | (FaceBook Post, Caserta, March 27) | |
| 21 | Government's Exhibit 459 | 118 |
| | (FaceBook Post, Caserta, May 1) | |
| 22 | Government's Exhibit 460 | 118 |
| | (FaceBook Post, Caserta, May 3) | |
| 23 | Government's Exhibit 461 | 118 |
| | (FaceBook Post, Caserta, January 20) | |
| 24 | Government's Exhibit 463 | |
| | (FaceBook Post, Caserta, August 12) | |
| 25 | Government's Exhibit 470 | 190 |
| | (Audio, August 9) | |

234

```
 1      Government's Exhibit 478                          35
           (Photograph, Conversion Kit)
 2      Defendant's Exhibit 2304                          5
           (Redacted Version)
 3      Defendant's Exhibit 5023                        111
           (Photograph, Caserta, Wallet)
 4      Defendant's Exhibit 5024                        111
           (Caserta, Wallet)
 5      Defendant's Exhibit 5031                        100
           (Video, Caserta)
 6      Defendant's Exhibit 5042                        102
           (Photograph, Caserta Bedroom)
 7      Defendant's Exhibit 5043                        102
           (Photograph, Caserta Bedroom)
 8      Defendant's Exhibit 5051                        102
           (Photograph, Caserta Bedroom)
 9      Defendant's Exhibit 5065                        113
           (Traffic Citation)
10      Defendant's Exhibit 5067                        101
           (Photograph, Caserta, Contents of Box)
11      Defendant's Exhibit 5182.1                      142
           (Text, Resendez)
12      Defendant's Exhibit 4149                        169
           (Photograph, Phelps and Harris)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPORTER'S CERTIFICATE


I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.



/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

     Grand Rapids, Michigan  49503