IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,          No: 1:20cr183-1/2/5/6

  vs.

ADAM DEAN FOX,
BARRY GORDON CROFT, JR.,
DANIEL JOSEPH HARRIS and
BRANDON MICHAEL-RAY CASERTA,

              Defendants.


Before:

                 THE HONORABLE ROBERT J. JONKER
                     U.S. DISTRICT Judge
                     Grand Rapids, Michigan
                 Thursday, March 31, 2022
              Excerpt of Jury Trial Proceedings
        Testimony of Daniel Harris and Jayson Chambers

APPEARANCES:

              MR. ANDREW BIRGE, U.S. ATTORNEY
              By: MR. NILS R. KESSLER
              MR. JONATHAN C. ROTH
              The Law Building
              333 Ionia Avenue, NW
              Grand Rapids, MI 49501-0208
              (616) 456-2404

                     On behalf of the Plaintiff;

              MR. CHRISTOPHER M. GIBBONS
              MS. KAREN M. BOER
              Dunn Gibbons PLC
              125 Ottawa Avenue, NW, Suite 230
              Grand Rapids, MI 49503-2865
              (616) 336-0003

                     On behalf of Defendant Fox.

```
                    JOSHUA ADAM BLANCHARD
                    Blanchard Law
                    309 South Lafayette Street, Suite 208
                    P.O. 938
                    Greenville, MI 48838-1991

                              On behalf of Defendant Croft, Jr.

                    JULIA ANNE KELLY
                    Willey & Chamberlain LLP
                    300 Ottawa Avenue NW Suite 810
                    Grand Rapids, MI 49503-2314
                    (616) 458-2212

                              On behalf of Defendant Harris.

                    MICHAEL DARRAGH HILLS
                    Hills at Law PC
                    425 South Westnedge Avenue
                    Kalamazoo, MI 49007-5051
                    (269) 373-5430

                              On behalf of Defendant Caserta.


         REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
```

```
1              03/31/2022

2     ****************************************************************

3              DANIEL JOSEPH HARRIS, DEFENSE

4              having been first duly sworn, testified as follows:

5              (Witness sworn, 8:37 a.m.)

6              THE COURT:  All right.  You have been here all along,

7     so you know, you just need to get settled, Mr. Harris, and get

8     that microphone in front of you and we'll get started with your

9     questions, Ms. Kelly.

10                        DIRECT EXAMINATION

11     BY MS. KELLY:

12     Q    Good morning, Daniel.

13     A    Good morning, Ms. Julia.

14     Q    I poured some water for you if you need it.

15     A    I saw that.  Thanks.

16     Q    Can you, for the record, just state and spell your name?

17     A    Sure.  Daniel Joseph Harris.  D-a-n-i-e-l, J-o-s-e-p-h,

18     H-a-r-r-i-s.

19     Q    And how old are you?

20     A    I am 24 years old.

21     Q    Okay.  Where did you grow up?

22     A    Lake Orion, Michigan.

23     Q    Okay.  And in 2020, who were you living with?

24     A    My parents, Robert and Penny Harris.

25     Q    Do you share a close relationship with your parents?
```

1    A    Absolutely.

2    Q    What year did you graduate from high school?

3    A    2015.

4    Q    And what school was that?

5    A    Lake Orion Baptist School.  I am not Catholic.

6    Q    And did you enlist in the delayed entry program?

7    A    I did.  I had enlisted in the Marine Corps delayed entry

8    program at the age of 17.  I needed parental consent for it.

9    That would have been August of 2014.

10   Q    Okay.  Do you have other veterans in your family?

11   A    Yes.  Grandparents, my dad, brother, cousins, uncles,

12   aunts.

13   Q    Anyone in law enforcement in your family?

14   A    My grandfather.

15   Q    Did you have a close relationship with your grandfather?

16   A    Up until he passed away in 2007 we were considered best

17   friends.

18   Q    And so you joined the Marine Corps.  Why did you choose the

19   Marine Corps?

20   A    Well, dad was a sailor.  I didn't really want to join the

21   navy, so that was kind of the closest thing he was going to let

22   me join outside of the navy.  They were also the first ones to

23   approach me.

24   Q    Okay.  And when did you enter boot camp?

25   A    Almost a month to the day I turned 18, so June 14th, 2015.

Q     Okay.  And were you deployed?

A     Yes.  I was deployed in the south eastern region of Asia.

Q     Did you see any combat?

A     No.

Q     Okay.  And what was your position within the Marine Corps?

A     I held various positions, but my official title was O-311 infantry man.  I was a rifleman specifically.  Within that we were jack of all trades.  So I held medical positions, radio operator positions, designated marksman positions and squad automatic gunner positions.

Q     Okay.  And did you get any nicknames while you were in the Marine Corps?

A     Yes.  Beaker was the first one I got in the infantry. Quickly followed by Toucan Sam.

Q     And when did you return back from southeast Asia?

A     February 28th, 2017.

Q     And what positions did you hold when you returned?

A     I was the battalion body composition program NCO, noncommissioned officer.  I was in charge of maintaining physical programs, marines staying in shape, so their height and weight standards, the physical fitness and combat fitness tests.  On top of that I was also in charge of battle tracking for our unit.

Q     Okay.  And what was the last rank that you received?

A     I received the rank of corporal two weeks before I went

home.

Q    And when were you discharged?

A    June 14th, 2019.

Q    And were you in the inactive reserve program?

A    Yes.  So if you just sign up for four years you have to do four years of what's called the inactive reserve program. Basically it is they can recall you if they need to.  Typically it's like the last stuff they do before they enact the draft.

Q    Okay.  When you were discharged where did you do?  Where did you go to live?

A    When I was discharged I moved right back home, started living in the basement for a short time.

Q    What type of discharge did you receive?

A    Honorable.

Q    And did you keep a lot of your military equipment?

A    For the most part equipment wise we had to give back, but I had a lot of extras that I was allowed to keep.  Also my uniforms are mine.  They have my name on it.  They are tailored to me.  I bought them with my own money.

Q    Okay.

A    So yes.

Q    I am going to ask that the witness be shown Exhibit 4002.

         Have you had an opportunity to review that photograph?

A    Yes.  I have.

Q    Okay.  And is this a fair and accurate representation of

1      some of the military gear that you were talking about?

2      A    Yeah.  A lot of it is pretty old stuff.

3      Q    Okay.

4           MS. KELLY:  I would move for admission of 4002?

5           MR. ROTH:  I would object only as to the relevance,

6      Your Honor.

7           THE COURT:  Well, I think it can come in just for

8      painting the overall picture of what he is talking about.

9      BY MS. KELLY:

10     Q    And so Daniel, can you walk us through what this gear is

11     that we are looking at?

12     A    Sure.  So right here with my last name on it is actually my

13     dad's jacket from when he was in the navy.  If you flip it over

14     it'll have like his -- his -- I think his oceanic warfare

15     defense triangle on it.

16          THE COURT:  If the premise of the foundation was this

17     is the military equipment that he kept or retained, then that's

18     what we should be seeing here, not what other people did, and

19     we surely shouldn't be talking about stuff that we can't see.

20     BY MS. KELLY:

21     Q    Understood.  Is any of this your equipment, Daniel?

22     A    Yes.  The C-bag right here you can actually see my

23     deployment tags on it along with my name.  Everything else is

24     not directly related to the military.

25     Q    So this middle bag with the name Harris on it is yours

1  personally, is that right?

2  A   Yup.

3  Q   Okay.  Thank you.  Okay.  And we can take that down.  Thank

4  you.

5      You moved back home to your parents' house.  How was

6  that transition when you came home?

7  A   It was pretty rough cause I just didn't have my friends

8  with me.  I was essentially on my own for four years doing my

9  own thing, and it was coming back to a world where my parents

10 essentially was treating me like I was in high school again.

11 Q   Okay.

12 A   So it was kind of a rough start trying to find people that

13 I could actually work with that understood me.

14 Q   Did you maintain contact with your friends from the

15 military?

16 A   For the most part, yes.

17 Q   How were you maintaining contact?

18 A   It would either be through social media like Snapchat or

19 FaceBook.  Other times it's encrypted chats like Threema,

20 Signal, WhatsApp, regular text messaging.

21 Q   Okay.  And did you start working in a security position?

22 A   Yes.  Yes.  So two weeks after coming home I had started

23 working for Garda Security Services.  That was kind of a short

24 stay.  Their work ethic didn't really match mine.  The pay

25 wasn't really all that it was.  So DK Security actually came

1    and reached out to me.  Their work ethic matched me a little

2    bit better, and I mean, I had already known a lot of the

3    co-workers I was about to have, so I just felt like the right

4    match.

5    Q    Okay.  If we could show Exhibit 4158 which has already been

6    admitted?

7         I know it's in the bag.  Is that your security badge

8    from DK Security?

9    A    Yes.  Ms. Crystal, our very nice HR lady, took that

10   picture.

11   Q    Okay.  Thank you.

12        Daniel, it's true that you own firearms, right?

13   A    Oh, absolutely.

14   Q    Does your whole family own firearms?

15   A    Yeah.

16   Q    Okay.  And you have an -- in 2020 you had a valid CPL, is

17   that correct?

18   A    Yeah.  Shortly after coming home me and Devin took a CPL

19   class at Accurate Firearms.  Took about two weeks for us to get

20   our CPLs in the mail.

21   Q    Okay.  And you also have other tactical gear, is that

22   right?

23   A    Yes.

24   Q    Other equipment?

25   A    Yes.

1    Q    Okay.  You have ammunition at home?

2    A    Oh, absolutely.

3    Q    If we could show the witness, show Daniel 4157, which has

4    been admitted?  Can you zoom in on the top with the date?

5         Daniel, this was an item that was located in your

6    vehicle.  Is this the Accurate Firearms that you were just

7    talking about?

8    A    Yes.  It is.

9    Q    Okay.  I see the date on there is 2-21-20.  Do you see that

10   date?

11   A    I do.  Yes.

12   Q    Why would you have kept this receipt in your vehicle?

13   A    So Accurate Firearms were pretty cool people.  Whenever you

14   bought something from them, because they had a store up front

15   and they had a range in back they would give you an hour of

16   free range time.  So I would save my receipts personally so I

17   could accumulate range time, or if, you know, my parents wanted

18   to spend time at the range but money was a little tight I could

19   flip that to them and they could use it, too.

20   Q    Did essentially --

21        Thank you.

22        Did you eventually start working on getting a federal

23   contract with Garda Services?

24   A    Yes.  So I was looking into more of a website, not a

25   company, called Shooter Jobs.  They focus on blanket contracts

for like -- and I was reaching out.  Nobody was really reaching

out.  And I was pointed in the direction by Paul Bellar and my

friend Trevon Brown from the Marine Corps.  They introduced me

to Garda Federal Services.  They gave me a recruiter's e-mail

and from there I reached out to her.

Q    And was that position that you were seeking, was that going

to be abroad?

A    Yes.  I was going to initially maintain a security position

at the Kabul International Airport in Afghanistan where our

coalition forces at the time were using as a main headquarters,

and from there through Trevon's experience and base of people

that he knew I was going to push out into the Kandahar province

and provide security for our coalition special forces.

Q    So that's what you were applying for in 2020?

A    Yes.

Q    Okay.  Okay.  So let's turn now to the Watchmen.  Why don't

you -- why don't you tell the jury how you first found out

about this group on-line?

A    So when Corona happened I was still working for DK

Security.  We were allowed -- they were relaxing the rules of

having our phones at work because our buildings were closed, so

it was just to kind of help pass the time.  I was scrolling

around on FaceBook and I was on a Motor City Boogaloo page that

one of my friends had actually started after he also came home,

and you know, I post some things, sometimes more or less funny,

1    and I had a man by the name on FaceBook was George Bunion,

2    later turned out to be Joe Morrison.  He asked, hey, if you

3    want to train and stuff like that, you know, join this FaceBook

4    group.

5              MR. ROTH:  I want to object to the hearsay.

6              THE COURT:  Well, we're getting into that, and

7    inevitably if we go narrative.  Certainly he has indicated that

8    he got connected to the Wolverine Watchmen through social

9    media.  In terms of the details of what he was reading, what

10   was out there, we have to be cautious not to --

11             MS. KELLY:  Absolutely, Your Honor.

12             THE COURT:  So maybe start breaking up the questions

13   and get him more focused.

14             MS. KELLY:  Sure.

15   BY MS. KELLY:

16   Q    Were you interested in the training aspect?

17   A    Absolutely.

18   Q    Okay.  And why were you interested in the training aspect?

19   A    Well, primarily if I was going back into the world of the

20   infantry it's a very perishable skill set.  It's -- we have the

21   saying, if you don't use it you lose it.  And you can lose it

22   really fast.  So that training, it was really for me to kind of

23   keep what I already had my skill set, my abilities.  On top of

24   that, state run ranges kind of hinder you with certain rules

25   like magazine capacity, how many times you can shoot, how many

1    rounds, you know, like one round per three seconds.  The state

2    rules --

3              MR. ROTH:  Your Honor, I am going to object.  I think

4    this is non-responsive to the question.

5              THE COURT:  Well, he said the training appealed and he

6    is giving some reasons why.  I do think structuring the direct

7    in a little bit more focus will avoid either narrative answers

8    or other wandering into things that may be either not relevant

9    or hearsay.  So maybe you can break it down.

10             MS. KELLY:  Absolutely, Your Honor.

11   BY MS. KELLY:

12   Q   Is perishable skill set, that's the skills that you learned

13   in the Marine Corps?

14   A   Yes.

15   Q   Related to firearms, is that correct?

16   A   Firearms, infantry tactics.

17   Q   Okay.  And did you download -- did you already have Wire on

18   your phone or did you have to download that in order to

19   communicate with the Watchmen?

20   A   I had to download it.

21   Q   Okay.

22   A   I did not have it yet.

23   Q   Were you vetted into the group?

24   A   I was.

25   Q   Okay.  And were you asked questions about your background?

1    A    Yes.

2    Q    Okay.  And we saw a slide a long time ago about you saying

3    you know how to make things go boom, and you have a det cord

4    algorithm somewhere.  Do you remember that slide?

5    A    I do.

6    Q    Was that in a discussion on the Wolverine Watchmen --

7    A    Yes.  On our -- on our main chat for the Wire.

8    Q    Okay.  And what did you mean by, I can make things go boom?

9    A    Being in the infantry I get to have fun with things like

10   rocket launchers and grenades.  Not making them obviously, but

11   getting to shoot them.  I took great pride in the fact I never

12   dropped a rocket shot.  Never missed a grenade throw.

13   Q    Okay.

14   A    So that's what I meant.

15   Q    Okay.  And then the det cord algorithm?

16   A    So I had taken, we call them hip pocket classes, just real

17   quick class on your desk where our assault men were teaching

18   how to time det cord which you can use for various charges.

19   Q    Okay.  Did you take a lot of courses while in the Marine

20   Corps?

21   A    More than I can count.

22   Q    Okay.  Did anyone ask you to look at this det cord

23   algorithm?

24   A    No.

25   Q    Did you ever post it on social media?

1    A    No.  Absolutely not.

2    Q    Okay.  We've heard about people come into your house at

3    various times during the summer of 2020.  Did you ever show

4    anyone?

5    A    No.

6    Q    Okay.  And did you start attending some protests in

7    Lansing?

8    A    Yes.  Around May I want to say.

9    Q    Okay.  And May 14th, does that sound right?

10   A    Rainy day duck parade, correct.

11   Q    Correct.

12   A    Correct.  May 14.

13   Q    Can you tell the jury why you call it the rainy day duck

14   parade?

15   A    There was somebody that had two ducks there, actual pet

16   ducks, and there was this white duck that they called Fro.  I

17   think they should have called him Lenny Quackits.  He quite

18   literally had a Fro on his head.

19   Q    Is that where you first met the Wolverine Watchmen in

20   person?

21   A    Some of them, yes.

22   Q    Okay.  Who do you remember -- who did you go to the protest

23   with?

24   A    I went with my best friend, Devin Phelps.

25   Q    Okay.  And you met Paul Bellar there?

1    A    We met Paul Bellar, his first girlfriend.  I don't remember

2    her name.

3    Q    Okay.

4    A    Dan Chappel, Pete Musico and Joe Morrison.

5    Q    Okay.  And that's how you knew Dan Chappel as Dan Chappel?

6    A    Yeah.

7    Q    Okay.  And did you have a discussion with Dan that first

8    day?

9    A    We did.  Went to go smoke a cigarette and we just talked

10   about military backgrounds.

11   Q    Okay.  Okay.  And then May 17th you went to Pete and Joe's

12   house, is that right, in Munith?

13   A    Yup.  That was my first training with the Wolverine

14   Watchmen.

15   Q    Okay.  What kind of training was it?

16   A    Really, really basic training.  Like, I could have done it

17   with my eyes closed.  Contact situations.  So somebody was

18   screaming out contact left, right, front, rear, and it was just

19   you turning to wherever there would be an assailant.  They

20   wanted to do patrol formations, which I didn't see them really

21   knowing how to do any of that, so I didn't really participate

22   in it.  And on top of that, we call it a tape house.  It's a

23   really rudimentary shoot house, just without the walls.  You

24   just mark down on the ground.

25   Q    Had you been through a shoot house before?

1    A    Hundreds of times.

2    Q    Okay.  Just in the military or outside of the military?

3    A    In the military and with military law enforcement.

4    Q    Okay.  Did you go inside of the house at Munith?

5    A    Yes.

6    Q    Okay.  Anything happen in there?

7    A    Yeah.  So going inside they had food for everybody, like

8    burgers and stuff.  Pete Musico decided to throw what at the

9    time I perceived an explosive to where I would say there was a

10   pucker effect as in my body tensed up.  And then immediately

11   after that he said, do you want to meet my squirrels?

12   Q    Is that the last time you went inside the house?

13   A    That is the absolute last time I walked into that house.

14   Q    Okay.  And did you all have firearms there?

15   A    Yes.

16   Q    Was Dan Chappel there?

17   A    Yes.  He was.

18   Q    What kind of gear did he have?

19   A    From what I could remember I only saw him carrying a rifle

20   and a pistol that day.  I don't remember seeing him have a

21   plate carrier or anything like that.

22   Q    Okay.  Did it seem like he had good gear or good firearms?

23   A    Oh, absolutely.

24   Q    Did you have the impression that he knew what he was

25   talking about?

1    A    Absolutely.  More than me.

2    Q    More than you?

3    A    More than me.

4    Q    Okay.  Did he show you any videos that day?

5    A    Yeah.  When we were inside of the house I -- they had like

6    one of the smart TVs that can play YouTube on.  He had shown us

7    a video that he said one of his buddies had shot while in

8    either Sadr City or East Bagdad.  It was them dropping a bomb

9    on an apartment complex there.

10   Q    Okay.  On May the 17th, did agree to conspire to kidnap the

11   governor?

12   A    Absolutely not.

13   Q    These conversations in the chat groups, there are things

14   being sent around, memes?  Are you familiar with that?

15   A    Oh, yeah.

16   Q    Okay.  We saw at least one of them the other day being

17   brought up of a meme that was sent to you or a picture that was

18   sent to you, right?

19   A    Right.

20   Q    Okay.  Is that a pretty common thing?

21   A    Yeah.  It was so common that they ended up creating a meme

22   chat separate to the main chat in Wire, and so if you wanted to

23   send memes there you could send memes there.

24   Q    Okay.  Is it fair to say you didn't look at all of them?

25   A    Fair to say.

1    Q    Okay.  So we're at the end of May and you attend a couple

2    of QRFs, right?

3    A    Yes.  I attended one for two of Paul Bellar's friends that

4    were in the Detroit protest.  They turned riots.  And I think

5    two days later the next day later one in Flint.

6    Q    Okay.  What's the general purpose of a QRF?

7    A    A QRF stands for quick response force.  Usually in the

8    military we have those set up in a combat environment, so if

9    you get into a pretty bad situation guys are ready to come get

10   you out, and yeah, it was just a matter of making sure

11   everybody comes home safely.

12   Q    Okay.  And what was going on if you can -- if you can

13   remember, around May the 30th, May the 31st throughout the

14   country?

15   A    America was on fire.  I am pretty sure George Floyd had

16   just died, and you know, people were pretty angry about the

17   whole police brutality, the whole I can't breathe thing, BLM

18   movement, and America just was on fire.

19   Q    Okay.  And we heard that you had attended a BLM rally in

20   your hometown of Lake Orion, right?

21   A    Yes.

22   Q    Okay.  We saw a photograph of that.  Do you remember that

23   photograph?

24   A    Yes.

25   Q    Okay.  Did you take that photograph?

1    A    I did.

2    Q    Okay.  And that's where you met Kaleb Franks?

3    A    Yes.

4    Q    Okay.  So these QRFs that you had just described, are they

5    more offensive or defensive in nature?

6    A    More defensive.  I can't really say a QRF.  It's a response

7    force.  It has the word response in its name.  You can't really

8    call it an offensive.

9    Q    Okay.  On June the 3rd you went to Ty Garbin's house,

10   correct?

11   A    Correct.

12   Q    Okay.  And by this time you and Ty had formed a friendship,

13   is that fair to say?

14   A    Yeah.  We had formed a pretty decent friendship at this

15   point.  I was cleaning guns that I had no clue about from my

16   neighbor.  I was using him as a catalyst to kind of help me

17   find missing parts and how to take them apart and put them back

18   together.

19   Q    Okay.  We heard an audio clip of you discussing arty sims.

20   Do you remember that audio clip?

21   A    Yes.

22   Q    Okay.  Can you tell the jury what an arty sim is?

23   A    So artillery simunition rounds are training rounds that we

24   use in the military.  Primarily what you do is when you either

25   pull them or smack the bottom of them they'll have kind of like

a sparkler effect to them coming out, and they make a really
loud whistle and they'll just pop.  The smaller ones that we
dealt with were probably about that big.  So the size of, like,
a little smoke grenade that you could buy at the fireworks
store.  Practically harmless.

Q    Okay.  And there was also the audio clip of you offering to
do an IED class.  Do you remember that audio clip from June the
3rd?

A    Yes.  So IED class --

            THE COURT:  So he remembers.  Now let's get to the
next question.

BY MS. KELLY:

Q    Okay.  Did you offer to do an IED class?

A    I did.  Yes.

Q    Did you ever do an IED class?

A    I did not.

Q    Okay.  There was another clip from June the 3rd about you
talking about when an MRAP rolls up.  Do you remember that
clip?

A    Vaguely.

Q    Okay.  Would it refresh your recollection to look at a
transcript of that?

A    Yes, ma'am.

            THE COURT:  What's the exhibit, I mean, if it's in
evidence?

1       MS. KELLY:  It is.  I don't know if I have the number

2    of it.  Sorry.

3       THE COURT:  All right.  And I think we are looking at

4    Exhibit 30.

5       MS. KELLY:  Exhibit 30.  Thank you, Your Honor.

6    BY MS. KELLY:

7    Q    Daniel, have you had an opportunity to review that?

8    A    Yes.  I have.

9    Q    Okay.  And so you see at the bottom about, that way when a

10   MRAP rolls up we can just blow it the fuck up, do you see that?

11   A    I do.

12   Q    And you are talking about, again, this idea of an IED

13   training?

14   A    Correct.

15   Q    Okay.  And then you say, well, blow up its tire, is that

16   right?

17   A    Right.  MRAPs are typically designed to take --

18       MR. ROTH:  Objection.  This is non-responsive.  She

19   just said, is that right?

20   BY MS. KELLY:

21   Q    What's a MRAP?

22   A    A MRAP is basically a really big Tonka truck that the

23   military uses.  They are designed in some capacity to take

24   straight on rocket shots, IED blasts, things like that, so like

25   really only harm that you can do is besides tipping it over

1    with a big enough blast is pop its tires.

2    Q    Were MRAP vehicles involved in any of these riots that you

3    had just talked about?

4    A    Not that I saw.  I tried to stay out of the riots as much

5    as I could.

6    Q    Okay.  And again, you never did an IED training, correct?

7    A    Correct.

8    Q    Okay.  Thank you.

9          There was also a discussion on June the 3rd about rank

10   structure.  Do you remember that?

11   A    Yes.

12   Q    Okay.  And you made a suggestion about rank structure,

13   right?

14   A    I did.  I was kind of along the lines of, keep it simple

15   stupid, which is just like captain or lieutenant and sergeants,

16   minimize the ranks if we wanted to go that route.

17   Q    Did you guys really follow a rank structure in the

18   Watchmen?

19   A    No.

20   Q    Okay.  On June the 3rd did you agree to kidnap the

21   governor?

22   A    Absolutely not.

23   Q    And there was also a discussion about this meeting coming

24   up in Dublin, correct?

25   A    Correct.

1    Q    Okay.  And you guys decided not to go to Dublin, right?

2    A    Correct.  We decided not to go to Dublin.

3    Q    Okay.  Okay.  The next date that I have is June the 14th of

4    2020, back in Munith, right?

5    A    Back in Munith.

6    Q    Okay.  If we could show Exhibit 4016?

7         And this is you and Dan Chappel, correct?

8    A    Correct.

9    Q    Okay.  And explain what you guys are doing with this piece

10   of equipment?

11   A    So another member of the Wolverine Watchmen, his name is

12   Curtis, decided that he wanted to buy this model 1919, which

13   was primarily used during World War II.  It's a semiautomatic

14   variant of it of course.  We just wanted to shoot it and have a

15   fun time.

16   Q    Okay.  So he let you guys all take a shot at it?

17   A    Yes.

18   Q    Okay.  Is there something significant about June 14th,

19   2020?

20   A    June 14th, 2020, I had found out that one of my closest

21   friends was brutally murdered.

22   Q    Did you find that out after the training?

23   A    Yeah.

24   Q    Okay.  Okay.  You guys did some training that day?

25   A    We did.

Q    Okay.  And what types of training did you do?

A    Dan and Ty had led a vehicle maneuvering, vehicle tactics training section of the FTX area, and then me and Paul Bellar did medical training for everybody.

Q    On June the 14th, did you agree to kidnap the governor of Michigan?

A    Absolutely not.

Q    Do you recall -- without saying what the words were and the conversation, do you recall talking to Adam Fox on June the 14th?

A    Kind of.  Not really.

Q    Okay.

A    I wasn't really paying too much attention.

Q    You did go to another rally on June the 18th, correct?

A    Yes.

Q    Okay.  And what was that rally for?

A    We were told that it was a Second Amendment rally.

Q    Okay.  We saw a photograph of you at that rally.  You didn't have any of your gear on, correct?

A    Correct.

Q    Okay.  You had your camera with you that day?

A    I did.

Q    Okay.  Were you taking photographs of other people at the rally that day?

A    Yes.  I was taking pictures of every angle for everybody.

1    Q    Okay.  You weren't taking photographs of the Capitol in

2    order to storm the Capitol, correct?

3    A    No.  Absolutely not.

4    Q    Okay.  If we could show the witness only Defense Proposed

5    Exhibit 4009?

6          Have you had an opportunity to review this photograph?

7    A    I have.  Yes.

8    Q    Is this a photograph that you took?

9    A    I did.

10   Q    On June the 18th of 2020?

11   A    I did.  Yes.

12         MS. KELLY:  I'd move for its admission?

13         THE COURT:  Any objection?

14         MR. ROTH:  As to relevance, Your Honor.

15         THE COURT:  All right.  Well, I think it's simply to

16   put some visual on what he's describing for that purpose.  I

17   think it's okay.  He didn't specifically say it's a fair and

18   accurate representation of what he saw, but I take it it is, is

19   that right?  That's a fair and accurate representation of what

20   you saw that day?

21         THE WITNESS:  Yes.

22         THE COURT:  It can be admitted.

23         MS. KELLY:  Thank you, Your Honor.

24   BY MS. KELLY:

25   Q    Do you remember meeting Adam on June the 18th?

A    Kind of.  To me it was more in passing.  I decided to deal
more with just taking pictures.

Q    Okay.  On June the 18th did you agree to kidnap the
governor?

A    No.

Q    Did you agree to storm the Capitol?

A    No.

Q    Were you aware that there was a meeting --

          Thank you.

          -- that was going to be held in the basement of a
vacuum shack on June the 20th?

A    Yes.

Q    Were you invited to that meeting?

A    I was.

Q    Did you go to that meeting?

A    No.

Q    Why didn't you want to go to that meeting?

A    Everything in my head that my parents taught me as a child
is don't get in cars with strangers was kind of going off.  I
was told to come to a basement of a stranger, and I'm good.

Q    Okay.  We heard from Devin about a trip to Tennessee.  Do
you remember going to Tennessee after, in late June?

A    Yes.

Q    Okay.  And that was about a week long trip, is that right?

A    Yeah.  About a week long.

1    Q    There was another training on June the 28th, 2020, in

2    Munith.  Did you attend that training?

3    A    No.

4    Q    Do you know what you did that day?

5    A    I would have been on, like, a lunch/range day with Devin

6    and his at the time girlfriend, Lindsay.

7    Q    That was the Lindsay that we met yesterday?

8    A    Yes.

9    Q    Same Lindsay from July the 4th, 2020?

10   A    Yes.

11   Q    That took that lovely photo of you?

12   A    Multiple lovely photos of me.  Yes.

13   Q    Okay.  And you were lighting off fireworks that day?

14   A    Lighting off fireworks, drinking beer.

15   Q    You liked to light off fireworks?

16   A    I love fireworks.

17   Q    Okay.  You went to Paul Bellar's house on July the 7th,

18   correct?

19   A    Correct.

20   Q    And topic of conversation was Cambria, is that right?

21   A    Yes.

22   Q    Okay.  Did you have information that Paul was leaving the

23   Wolverine Watchmen?

24   A    Yeah.  At the time him and Joe were going through --

25            MR. ROTH:  I am going to object to the hearsay.

1    THE COURT:  It could be.  We've heard something about

2    the departure in any event, and what this witness has said is

3    he had some notice or information on it.  As long as we don't

4    get additional information that would be hearsay I don't think

5    it's a problem.  Go ahead.

6    THE WITNESS:  Just issues.

7    BY MS. KELLY:

8    Q    What was that?

9    A    Just issues.

10   Q    They were having issues, is that what you said?

11   A    Yeah.

12   Q    And we've heard from the government that there was

13   discussion about black bagging politicians at that date.  Do

14   you remember hearing about that testimony?

15   A    Not on July 7th.  No.

16   Q    Not on July 7th?

17   A    Not to my recollection.

18   Q    Okay.  Did you agree to black bag politicians on July the

19   7th?

20   A    No.

21   Q    Did you agree to kidnap the governor on July the 7th?

22   A    Absolutely not.

23   Q    We saw some transcripts from you on July the 7th where you

24   are talking about someone that you know that can make pressure

25   cookers.  Do you remember that transcript?

1    A    I do.  Yes.

2    Q    Okay.  And preface it with, if shit hits the fan I know

3    someone, correct?

4    A    Correct.

5    Q    Tell us what that means?

6    A    Shit hits the fan is a general term that I use.  Basically

7    if the world as we know it is no more, America as we know it is

8    no more, there is no government and everybody is coming at us

9    like Red Dawn.

10   Q    In your mind by saying if shit hits the fan did that mean

11   after we kidnap the governor?

12   A    No.

13   Q    And this was something that you thought about, about if

14   shit hits the fan, is that true?

15   A    Correct.

16   Q    Okay.  Throughout the entire summer of 2020?

17   A    Longer than that, but yeah.

18   Q    Okay.  We heard testimony about you guys were asked to keep

19   an open mind.  Do you remember hearing testimony about that?

20   A    I do.  Yes.

21   Q    Okay.  And what was your impression about keeping an open

22   mind in relation to going to Cambria?

23   A    We didn't really have a lot of information on what we were

24   walking into.  We didn't know who we were going to be dealing

25   with.  We didn't know if we were going to be camping or staying

1    in a hotel, what kind of training there would be.  So it was

2    really just keep an open mind, be open to anything that we

3    might be doing.

4    Q    Okay.  And so then you go to Cambria on July 11th, right?

5    A    Yes.

6    Q    Okay.  And you met at the park and ride near Brighton?

7    A    Yes.

8    Q    Okay.  And it was Dan that rented that --

9    A    The Suburban.

10   Q    The Suburban for you guys?

11   A    Correct.

12   Q    Threw all the stuff in the back?

13   A    Threw all the stuff in the back.

14   Q    And so at the park and ride it was Dan, you, Kaleb?

15   A    And Paul.

16   Q    Paul.  Okay.  Was Brandon at the park and ride?

17   A    I want to say he was at Ty's house.

18   Q    Okay.

19   A    To my recollection.

20   Q    Okay.  And you brought your firearms with you?

21   A    Yes.

22   Q    Okay.  Let's talk about that.

23   A    All right.

24   Q    All right.  You brought an AK-47?

25   A    Yes.

Q    You brought your pistol?

A    Yes.  My FN-509.

Q    Okay.  You brought a rifle?

A    Yes.

Q    Okay.  That's the rifle that we saw in court, right?

A    Correct.

Q    Where did you buy that AM?

A    Well, so it was actually two rifles that I bought.  The actual Anderson Manufacturing rifle I had bought from my brother-in-law, but the upper and the low that it came with, that I bought from Kaleb Franks.

Q    Okay.  And speaking of Cambria, how long had you had that from Kaleb?

A    Two weeks.

Q    Okay.  And you didn't put a stamp on it, right?

A    No.  I was too lazy.

Q    You knew that it was 10 and-a-half inches, right?

A    Yeah.

Q    Okay.  And there was sometimes that you would put a pistol brace on it, right?

          MR. ROTH:  I am going to object to the leading nature of the questions.  I haven't objected for the foundational ones but they have moved into purely leading now.

          THE COURT:  They are leading, so it should be an open-ended, particularly while we are on this topic.

1        MS. KELLY:  Sure.  Okay.

2   BY MS. KELLY:

3   Q    Are there different parts of that rifle that you could

4   attach?

5   A    Yes.

6   Q    Can you tell us about that?

7   A    So I had a pistol brace for it to keep it within legal

8   parameters whenever I did transport it completely put together,

9   which was rare.  And for the range on private properties I had

10  a butt stock for it.

11  Q    What's the difference when you are using it between --

12  like, how does it feel?  Like, why do you put a butt stock on

13  it?

14  A    I am 90 percent disabled by the VA.  I have arthritis

15  throughout my entire body, and even though it's a smaller round

16  and there is not a lot of recoil, the configuration for that

17  rifle there was for my body.  So I could feel it in my

18  shoulders pretty bad, so as a matter of disbursing the weight

19  and the feel of the rounds actually going off.  Just a comfort

20  for my shoulders.

21  Q    Okay.  And when you would -- how would you travel with

22  that?

23  A    So I had only one rifle bag I could use and it could only

24  fit one rifle, like, one and-a-half rifles.  So my lower

25  receiver, along with the bullet carrier group and the charging

1   handle for the AR would go into a backpack.  The upper receiver

2   would go into the bag with my AK.

3   Q    Okay.  So it was your practice when carrying that rifle was

4   to disassemble it or trans --

5            MR. ROTH:  Objection, leading.

6            THE COURT:  It is leading.

7   BY MS. KELLY:

8   Q    When you would transport that rifle was it assembled or

9   disassembled?

10            MR. ROTH:  Objection.  Asked and answered.

11            THE COURT:  Now he can answer.  Go ahead.

12            THE WITNESS:  It was disassembled.

13   BY MS. KELLY:

14   Q    When you went to Cambria would it have been disassembled,

15   the rifle?

16   A    Yes.  It would have been disassembled until we made it to

17   the property.

18   Q    Okay.  And we heard you talk about, hey, I have an illegal

19   SBR in the car, right?

20   A    Correct.

21   Q    And that was a discussion when you guys were going through

22   Chicago?

23   A    Yeah.  Chicago has pretty dumb gun laws.

24   Q    Okay.  But you said it, right?

25   A    Yeah.  I said it.

1    Q    And you knew because you didn't have that stamp on it that

2    it was a problem, right?

3    A    Yeah.

4    Q    Okay.  And you brought ammunition with you to Cambria?

5    A    Yes.  7.62 by 39, 223 and nine millimeter.

6    Q    Everybody else brought firearms?

7    A    Yes.

8    Q    Okay.  Then you went to Ty's house and picked up Ty?

9    A    Yeah.  We picked up Ty at his house with Brandon Caserta I

10   am pretty sure.

11   Q    Okay.  Is that the first time that you had met Brandon

12   Caserta?

13   A    Not the first time technically.  I met him at the mandatory

14   FTX in Munith on June 14th, but this is, like, the first actual

15   interaction we had.

16   Q    Okay.  What was your impression of him?

17   A    A very passionate person.

18   Q    Okay.  Do you remember the route that you took to Cambria?

19   A    For the most part, yeah.

20   Q    Okay.

21   A    We took 94 to Chicago.  After that I can kind of tell you

22   we rode the coast.

23   Q    Okay.  You arrived in a hotel some time?

24   A    Yeah.  Early morning.

25   Q    Adam was there, right?

A    My recollection at the time I didn't know who else was there.  I thought we just got to a hotel.

Q    Okay.

A    But later I did find out that Adam Fox was there.

Q    Okay.  And in the morning did you meet Barry Croft for the first time?

A    We had passed Barry Croft in the lobby.

Q    What was your first impression of Barry Croft?

A    Stoner pirate kind of whack nut looking dude.

Q    Okay.  And you guys all convoy over to a property to do some training, is that right?

A    Correct.

Q    All right.  And tell me about that training when you got there?

A    So rolling onto the property you have to make a J hook or a left turn on the driveway, so you don't really get to see the property until you are on the property.  My initial concerns was we don't know who we are walking up on, so I am taking a defensive posture in the car with my pistol because these guys could be dangerous.  And then we see an upside down American flag and a Trump flag and we just realized we were dealing with regular old guys for the most part.

Q    Okay.  And you saw the photograph of everybody at Cambria, right?

A    Correct.

```
1    Q    Okay.  And so there is quite a few people there, is that
2    right?
3    A    Yeah.  Families.
4    Q    Okay.  And was there training going on on Saturday that you
5    recall.
6    A    Yeah.  There was barrel drills and a makeshift shoot house
7    that the Wisconsin people had built.
8    Q    Okay.  You didn't help build that one?
9    A    No.  Not that one.
10   Q    Did you see them building it?
11   A    Kind a.  A little bit.  I was over by the cars eating I am
12   pretty sure.
13   Q    Okay.  And we saw a video of you and Ty going through the
14   barrel drills, right?
15   A    Yup.
16   Q    And we've heard about this balloon in the oven, right?
17   A    Yup.
18   Q    Okay.  And do you recall if that was on Saturday or Sunday?
19   A    I want to say that was on Sunday.
20   Q    Okay.  Not sure?
21   A    Yeah.  I am not -- I am not sure.
22   Q    Okay.  Were you called over at some point?
23   A    Yeah.  Dan called me over and introduced me to Barry.
24   Q    Okay.  And you poured BBs in a balloon, is that right?
25            MR. ROTH:  Objection, leading.
```

```
1              THE COURT:  It is leading, but --
2      BY MS. KELLY:
3      Q    What did you do when you -- where did Dan call you over?
4      A    To the back of somebody's truck.  I assumed it was Barry's
5      at the time.
6      Q    And we saw the video of that.  Was that the truck on the
7      video that you are talking about?
8      A    Yup.
9      Q    Saw the picture of it, right?
10     A    Correct.
11     Q    And what did you do over at that truck?
12     A    I told him how I'm inept at building explosives around
13     professionals, and I was putting BBs and a little bit of gun
14     powder into this balloon.  Then we were going to go blow up a
15     stove or at least try to.
16     Q    Okay.  And you and Barry walked over and put it in a stove?
17     A    Yeah.  We put it in a stove.  We lit the fuse and we ran.
18     Q    Anything happen?
19     A    No.
20     Q    Okay.
21     A    Failed.
22     Q    And we then saw a video of Ty Garbin putting tape on
23     something.  Do you remember that video?
24     A    Yes.
25     Q    Okay.  Do you know what he was doing in that video?
```

1    A    So he was helping us construct the second attempted bomb.

2    He was saying that -- he was just putting the tape on there.

3    Q    Okay.  And you went and put it back in the oven?

4    A    Yup.

5    Q    Anything happen?

6    A    No.

7    Q    Okay.  I think there was a transcript that was entered by

8    the government where you were talking to Barry Croft about

9    bangalores.  Do you remember that conversation?

10   A    Yes.

11   Q    What's a bangalore?

12   A    So a bangalore, whether field expedient or made in a

13   factory, military uses primarily or combat engineers, it's two

14   sticks.  You can either clear a lane if there is mines or IEDs,

15   and you can clear a lane for yourself.  It'll blow up and shoot

16   the stakes out in two different directions, make it safe for

17   you to walk or you come across C wire entrapments.  So single,

18   triple or double strands.  It'll blow them up in the air and

19   you can walk straight through.  You see it in the Normandy

20   scene of Saving Private Ryan.

21   Q    Okay.  You also talked to Barry about someone that you know

22   in the marines that was missing fingers.  You remember having

23   that conversation with Barry?

24   A    Vaguely, but yes.

25   Q    Okay.  And you never met that person, right?

```
 1     A     No.

 2     Q     Okay.  Kaleb Franks testified about some group meeting or

 3     group discussion in a garage?

 4     A     Correct.

 5     Q     Do you remember that testimony?

 6     A     I do.

 7     Q     Okay.  And do you recall being in a garage?

 8     A     I walked into, like, this larger garage throughout the

 9     weekend.  That's where they had the water, and it was really

10     hot.  But towards the end I was -- I was showing to Steve and a

11     couple other people, like, ways that they can better their

12     training and be better -- or be more safe about how they were

13     going about things.

14            MR. ROTH:  Object.  This is non-responsive and

15     narrative.

16            THE COURT:  It is narrative.  Maybe you can start to

17     break it down.

18     BY MS. KELLY:

19     Q     Sure.  Do you recall that discussion being held on Saturday

20     or Sunday?

21     A     Sunday.

22     Q     Okay.  And I believe you said you were providing some

23     insight into how to --

24     A     Yeah.  Uniformity, safety.

25     Q     Those were important to you?
```

1    A    Yeah.

2    Q    Okay.  Did you have safety concerns about the range in

3    Cambria?

4    A    Oh, yeah.

5    Q    What were some of those concerns?

6    A    Medical tent.  They are teaching you how to improperly use

7    your individual first aid kit.  Their shoot house construction

8    was extremely dangerous.  Nobody really practiced the weapon

9    safety rules that much.

10   Q    Okay.

11   A    That was enough to make my heart stop.

12   Q    Let me show you if we could pull up 4025?

13        THE COURT:  Is it already in?

14        MS. KELLY:  I believe so.

15        THE COURT:  All right.

16   BY MS. KELLY:

17   Q    Daniel, is this a photograph of Cambria?

18   A    Correct.

19   Q    Okay.  Do you see the garage that you were just talking

20   about in this photograph?

21   A    Yeah.  That would be right here.

22   Q    Okay.  So this is the garage that you walked into and there

23   was some sort of discussion, is that right?

24   A    Correct.

25   Q    Thank you.

```
 1              In that discussion did you agree to kidnap the
 2    governor of Michigan.
 3    A    Absolutely not.
 4    Q    Did you agree to storm the Capitol of Michigan?
 5    A    No.
 6    Q    Okay.  And if we could pull up 105.1?  We don't have to
 7    play it, but just so we can get it on the screen.  Maybe we do
 8    have to play it.  That's perfect.  Thank you.
 9              Is this the shoot house?
10    A    Yes.  This is the first Cambria shoot house.
11    Q    Okay.  So this would have been the one that was the
12    Wisconsin guys built on Saturday?
13    A    Correct.
14    Q    And then 105.2.
15              May I have a moment, Your Honor?
16              THE COURT:  Sure.
17              MS. KELLY:  Sorry, Your Honor.  Let's try 4028.  4028,
18    please.  That's not it.  I'll move on.  I apologize.
19    BY MS. KELLY:
20    Q    You said you constructed another shoot house on Sunday, is
21    that right?
22    A    Correct.
23    Q    Okay.  And you helped this time, is that right?
24    A    Yes.
25    Q    Okay.  And did you -- did you use spray paint to do
```

1    something to that shoot house?

2    A    I did.

3         MR. ROTH:  Objection, leading.

4         THE COURT:  Well, it is but I think she's setting up

5    foundation so go ahead.

6         THE WITNESS:  I did.

7    BY MS. KELLY:

8    Q    Okay.  Tell us what you did?

9    A    So I -- I had spray painted right next to the front door,

10   safe safety No. 1.  I also went through the interior and the

11   exterior marking do not cross lines.  The exterior for people

12   that wanted to watch, you know, hey, don't cross here.

13   Interior, like, hey, don't cross here so you don't shoot your

14   buddy.  And I also spray painted the targets.

15   Q    Okay.  The smiley faces?

16   A    The smiley faces.

17   Q    Okay.  I believe we are ready at 103, Your Honor.

18        THE COURT:  All right.

19   BY MS. KELLY:

20   Q    And if we could just pause it?

21        The safe safety there, can you circle that for the

22   jury?

23   A    Yup.

24   Q    And then I see -- do you see the lines that you were just

25   talking about about not crossing?

1    A    Yeah.  So that would be right here on the exterior.

2    Q    Okay.  And I guess in this photograph I see some frowny

3    faces?

4    A    Yeah.  I guess frowny faces.

5    Q    Did you do that?

6    A    I don't recall but probably.

7    Q    Okay.  And again, the purpose of doing all this was to

8    what?

9    A    Learn how to protect yourself, clear your own house, you

10   know, and just added fun.  Shoot houses are fun.

11   Q    Okay.  Thank you.

12          After the training on Saturday ends, you go back to

13   this hotel, right?

14   A    Correct.

15   Q    Okay.  And we've heard about a dinner that was held at the

16   hotel, correct?

17   A    I'm sorry, what?

18   Q    We heard about a dinner at the hotel?

19   A    Yes.  A dinner.

20   Q    Okay.  And again, there was a statement that was introduced

21   of you about we have a tank.  Do you remember that statement?

22   A    Yes.  I do.

23   Q    Okay.  And do you recall the context of that statement?

24   A    Of the I am a tank statement or the statement as a whole?

25   Q    The statement as a whole.

1    A    Yeah.  I was just trying to -- it was one of those if the

2    shit hits the fans situations again.  We now have you guys.  My

3    perception is how can we use you in the future for -- if you

4    know, there is government collapse, if it is a Red Dawn

5    situation?  That's really all that was.

6    Q    Did you agree to kidnap the governor of Michigan in

7    Cambria?

8    A    Absolutely not.

9    Q    Did you agree to storm the Capitol of Michigan?

10   A    No.

11   Q    Okay.  And that night after dinner what did you do?

12   A    That night we decided to start drinking and play video

13   games in the arcade.

14   Q    Okay.  The shoot house, either on Saturday or Sunday, did

15   you believe that was a mock-up of the governor's house?

16   A    No.

17   Q    Did you believe it was a mock-up of a room in the Capitol?

18   A    No.

19   Q    The training ends and you drive back to Michigan, right?

20   A    Right.

21   Q    July 18th, you guys drive down to Peebles?

22   A    Correct.  Dan, Ty, Kaleb and myself.

23   Q    Okay.  And when you arrive in the area, where do you go?

24   A    So we get to this hotel that everybody that we were meeting

25   was staying at, and from there we were going to go to this

1    meeting area.

2    Q    Who was at the hotel?

3    A    Steve Robeson, Barry Croft, I think Chasity Knight.  I

4    can't remember his name, but he was one of Steve's friends.

5    Q    From Wisconsin?

6    A    Yeah.

7    Q    Okay.  Was Jenny Plunk there?

8    A    Yes.

9    Q    Okay.  Did you have an opportunity to observe those people

10   that you just mentioned when you first arrived at the hotel?

11   A    Oh, yeah.

12   Q    What did you observe?

13   A    They were higher than kites.  Their eyes were redder than

14   rubies.

15   Q    Okay.  That meeting that took place at Peebles, it didn't

16   take place at the hotel; you had to go to a different location,

17   is that right?

18   A    Correct.  I think we went -- think the hotel was outside of

19   Peebles and the place that we went, this garage was like in

20   downtown, so we all had to, like, convoy over there.

21   Q    Okay.  Is there, like, an extra room in that garage?

22   A    Yeah.  Somebody had made, like, a plywood conference wall

23   area, conference room wall with some tables and some chairs.

24   Q    Did you have to leave your phones in the car?

25   A    They asked us to leave our phones with them.  I am not

going to leave my phone with a stranger so I put my phone in

the truck.

Q    Okay.  And were you asked to clear your weapons?

A    Yes.  They wanted us to be condition three at the least.

Q    Okay.

A    Which is magazine inserted, no round in the chamber.

Q    You didn't have any weird feelings about that?

A    I did.  At the time I always -- if I open carried, which

with a full size pistol I am going to have to open carry, I

also conceal carried.  At the time I had a Smith & Wesson MMP

Shield.  That's a compact.  They did not know I had it on me.

And when I went -- I acted like I went to the bathroom about

five minutes into the meeting, rechambered a round in my FN,

walked back into the meeting.

Q    And in the meeting people are talking about various ideas,

correct?

A    Correct.

Q    Okay.  And did you meet a guy named Frank Butler?

A    Oh, yeah.

Q    Okay.  What was your impression of Frank Butler?

A    Absolutely lunatic.

Q    Did you share an idea with the group?

A    I did, which I -- may I explain the idea?

Q    I assume I am going to get an objection if you try to.

          MR. ROTH:  I would object to the hearsay.

BY MS. KELLY:

Q    Did you agree to kidnap the governor of Michigan at that meeting?

A    Absolutely not.

Q    Did you agree to storm the Capitol of Michigan?

A    No.

Q    Okay.  How long was that meeting do you think?

A    I want to say around five hours.  Maybe more.

Q    Okay.  Okay.  Did Barry Croft stay for the whole meeting?

A    No.  He left probably halfway through.

Q    Was Adam there?

A    Yeah.  He had gotten there as Barry was leaving.  They crossed paths, talked for maybe five minutes, and left.

Q    Okay.  Now, we also saw some Signal messages between you and Barry around that Peebles meeting.  Do you remember seeing those?

A    Yes.

Q    Okay.  And you were talking about a future FTX?

A    Yeah.  We hadn't solidified any plans for FTXes yet, but me and him wanted to kind of --

MR. ROTH:  Your Honor, I am going to object.  This is non-responsive to the question.  It's just a narrative.

THE COURT:  Yeah.  Let's stay on track so we avoid hearsay and stay focused, and I think we were talking about something about the Signal message, right?  And --

```
1              MS. KELLY:  Correct, and a future FTX.
2              THE COURT:  Okay.
3              MS. KELLY:  Thank you.
4              THE WITNESS:  My bad.
5     BY MS. KELLY:
6     Q    Did you agree to try to get weapons of mass destruction at
7     Peebles?
8     A    No.
9     Q    And eventually the folks that you drove down there with,
10    you guys left the meeting, is that right?
11    A    Correct.  We ended up going to Kentucky.
12    Q    Stayed at a hotel down in Kentucky?
13    A    Yes.
14    Q    Had a fun guys night?
15    A    Fun guys night through and through.
16    Q    Drank a little beer?
17    A    More like a lot.
18    Q    Okay.  And at that hotel you didn't agree to kidnap the
19    governor of Michigan, right?
20    A    No.
21    Q    Okay.  July 23rd happens and we're back at your parents'
22    house, right?
23    A    Yes.
24    Q    Okay.  Are your friends allowed to bring booze to your
25    house, Daniel?
```

```
 1    A    If the parents aren't home they can.  If they are home,
 2    yeah, it's a no go.  It's a dry household.
 3    Q    Were your parents home that night?
 4    A    No.
 5    Q    Okay.  So there was people drinking?
 6    A    There was a lot of people drinking.
 7    Q    Okay.  And there was an actual bonfire, right?
 8    A    Yeah.
 9    Q    And we saw a photograph of your backyard.  That was the
10    backyard where the bonfire was happening, right?
11    A    Yup.  That was the backyard.
12    Q    Okay.  And we saw that list of code words, right?
13    A    Right.
14    Q    Okay.  And those code words were made when?
15    A    Those would have been made July 7th at Paul's house.
16    Q    Okay.  And did you pass out code words on July the 23rd?
17    A    I did.  I went to go grab cigarettes out of the car, saw
18    that they were in there, forgot that I had to pass them out.
19    So I passed them out.
20    Q    Okay.  And then people burned them in the campfire?
21    A    Yeah.
22    Q    Okay.  Did you use those code words?
23    A    No.
24    Q    Was there a general discussion about the various trainings
25    and meetings that you guys had been to?
```

1    A    Yeah.  It was kind of just a recap, like, Wisconsin, Ohio

2    for everybody.

3    Q    Okay.  And were most of the people there, were they in the

4    Watchmen group or the bonfire chat group?

5    A    Yes.  For the most part.

6    Q    Adam wasn't there?

7    A    No.

8    Q    Barry wasn't there?

9    A    No.

10   Q    Was Brandon there?

11   A    No.

12   Q    Okay.  Did you invite other people that were not in the

13   Watchmen to your bonfire?

14   A    I did.

15   Q    Okay.  And who did you invite?

16   A    Devin Phelps, at the time girlfriend, Lindsay Cowan, her

17   brother, Adam, another one of my friends from work, Courtney

18   VanHuley.

19   Q    None of them showed up, right?

20   A    No.

21   Q    Now, July the 23rd you didn't agree to kidnap the governor

22   of Michigan, right?

23   A    No.

24   Q    A chat group starts right after that on July the 29th

25   called fuck around and find out, right?

1    A    Correct.

2    Q    And you were part of that chat group?

3    A    Yes.

4    Q    Okay.  And Adam and Brandon were part of that chat group?

5    No, Brandon was not.  Adam was?

6    A    Adam was.  Brandon was not.

7    Q    Okay.  Did you have Adam's phone number?

8    A    No.

9    Q    Did you ever -- did you ever text him just the two of you?

10   A    Private messages?  No.

11   Q    Okay.  Did you ever go to his vacuum shack?

12   A    Oh, absolutely not.

13   Q    Okay.  Did he ever come to your house?

14   A    He is not allowed at my house.

15   Q    Beginning of August, I think it's August the 1st, do you,

16   Kaleb and Ty start doing something on Ty's property?

17   A    Yeah.  We had started getting a backstop ready for the

18   range that we were going to put on Ty's property.

19   Q    Okay.  Was that the first time that you had been to Ty's

20   property?

21   A    Yes.

22   Q    Okay.  Did you guys spend the night there?

23   A    We did, with Ty's grandparents.

24   Q    Okay.  It looked like it was some significant work.  There

25   was moving the dirt, right?

1   A    Moving the dirt.  Luckily the wood that we used for the

2   backstop was already chopped up, but putting the stakes in,

3   nailing it, making a wall, and then that took all day at least.

4   Q    And then we saw the videos of you guys tearing around on

5   the side-by-side and shooting guns, right?

6   A    Yup.

7   Q    Okay.  A fun weekend?

8   A    Yeah.  Fun weekend.

9   Q    Okay.  You didn't agree to kidnap the governor that

10  weekend, right?

11  A    No.

12  Q    Now, Kaleb Franks testified about a hike you took.  Do you

13  remember him testifying about that?

14  A    Yes.  I do.

15  Q    Okay.  And I think I asked, it was -- there was a hiking

16  path near your house in Lake Orion, is that right?

17  A    Correct.  The Pontiac trail.

18  Q    That's a place that you frequent, right?

19  A    Yeah.  For the most part.

20  Q    You go with your parents, your friends?

21       MR. ROTH:  I object to the leading.

22       THE COURT:  It is, but I think it's foundational at

23  this point.  Let's see if we can get to the point.

24       MS. KELLY:  Sure.

25       THE WITNESS:  Parents, friends, my dog, myself.

BY MS. KELLY:

Q    Do you recall -- do you recall a hike that you took with just Kaleb and Ty?

A    Just Kaleb and Ty?  No.

Q    Okay.  Even if it was just the three of you, would you have agreed to kidnap the governor of Michigan on a hike?

A    No.

Q    Okay.  So the three musketeers idea that I presented didn't happen?

A    Yeah.  I am not French.  I wouldn't ever call myself a three musketeer or a candy bar.

Q    So the three of you didn't agree that day --

A    Never agreed.

Q    -- to kidnap the governor?

A    No agreement whatsoever.

Q    Okay.  But you guys that were in this bonfire chat, you and Ty and Kaleb and Jerad, you guys would hang out outside of these meetings or trainings, right?

A    Oh, all the time.

Q    All the time?

A    Yeah.

Q    Go fishing?

A    Fishing, house parties, bar, dinner.

Q    Okay.  The next meeting you had was on August the 9th at Munith, right?

1   A    Right.

2   Q    Or training I guess it was?

3   A    Correct.

4   Q    And normal training that we've talked about, right?

5   A    Yeah.  Average -- average day.

6   Q    Okay.  And Adam was there?

7   A    He was.

8   Q    Okay.  And was Brandon there?  And if you don't know, don't

9   guess.

10   A    Yeah.  I don't recall if Brandon was there.

11   Q    Okay.  Did you agree to kidnap the governor of Michigan on

12   that day?

13   A    No.  I actually disagreed.

14   Q    Did you do something -- did you have a physical reaction?

15   A    I did.  I threw my hat at somebody.

16   Q    Okay.  Where did you go after the training?

17   A    Dan, Ty and myself ended up going to Buffalo Wild Wings in

18   Brighton.

19   Q    Have some food?

20   A    Wings and beer.

21   Q    Okay.  You didn't agree to kidnap the governor at Buffalo

22   Wild Wings, right?

23   A    No.

24   Q    And then you split ways with Dan and Ty?

25   A    Yup.  I went home, downloaded all my stuff, took a shower,

went to the bar.

Q    What bar did you go to?

A    CJ's, the Sandbar.

Q    That's in Lake Orion?

A    Yes.

Q    Okay.  So then we have Exhibit 141, right; August the 10th?

A    Yup.

Q    Okay.  And that's the one where you are talking about laying a bed, craziest idea?

A    Dumber, yup.

Q    Explain to the jury.

A    I'm seeing all these texts.  I'm seeing all these conversations.  I've already just disagreed with you that we are not going to do that and you are still bringing it up. Granted, the conversation had stopped by the time I made the comment, but it was really one of those situations where it's, like, do it.  I know you are not going to, but give me your stuff before you do it.  Off yourselves so you don't cause me anymore problems.  I am tired of hearing you talk about it. Just be done really, because I know you are not going to go just kill somebody and then kill yourself.  So it was really calling them out on it, and if they are not going to move on it, which I was a hundred percent hoping they didn't, then you know, stop talking about it.

Q    And there was one response, which was an lol, is that

right?

A    Correct.  From Sean Fix.

Q    Ty Garbin said he talked to you about that.  Do you
remember talking to him about that?

A    No.  No.

Q    Did you talk to Kaleb Franks about that text?

A    No.

Q    Dan Chappel said he didn't talk to you about it later,
right?

A    Yeah.  We didn't talk about it.

Q    Okay.  All right.  So then in August you spent some more
time up at Ty's property, right?

A    Correct.  We were getting the range further prepared for
the FTX that was going to happen in September, so we took,
like, two, three weekends getting the tires from Pontiac over
to Luther, filling the sand, finish the range itself, weapon
stands and things like that.

Q    Was that over one weekend or was that over several
weekends?

A    Two or three weekends.

Q    And you were getting the tires in Pontiac and driving them
up to Luther?

A    Correct.

Q    That's about a two and-a-half drive each way?

A    With the way me and Ty drive it's about yeah, two

1      and-a-half hours.

2      Q    Okay.  And during those couple of weekends you didn't agree

3      to kidnap the governor of Michigan, right?

4      A    No.

5      Q    You didn't agree to try to get weapons of mass destruction,

6      right?

7      A    No agreement.  No.

8      Q    Okay.  August the 23rd we are back at your house?

9      A    Yes.

10     Q    Okay.  And your mom is there this time?

11     A    For the start of it her and dad are at church.

12     Q    Okay.

13     A    But they later show up as people are showing up, yes.

14     Q    Okay.  And were you guys outside in the backyard again?

15     A    Part of it was in the backyard, like, in my driveway area,

16     and then the rest was in my living room mom and dad's living

17     room.  However you want to put it in.

18     Q    The upstairs living room or downstairs?

19     A    Downstairs, so in the basement.

20     Q    Okay.

21          Can we show the witness 4033?  No, I'm sorry, 4055.

22          Daniel, have you had an opportunity to review this

23     photograph?

24     A    I have.  Yes.

25     Q    Okay.  Is that a fair and accurate representation of the

1    living room on the downstairs floor at your house?

2    A    It looks like Ollie got a new dog bed, but yeah, other than

3    that nothing has changed.

4            MS. KELLY:  I'd move for admission of 4005.

5            MR. ROTH:  No objection.

6            THE COURT:  4003 or 5?

7            MS. KELLY:  4005.

8    BY MS. KELLY:

9    Q    So Daniel, this is where some of the meeting on August 23rd

10   took place?

11   A    Primarily, yes.

12   Q    Primarily inside.  Okay.  Thank you.  You suggested at that

13   meeting to switch to a new chat app, is that right?

14   A    Yes.  I suggested we switch over from Wire to Threema.

15   Q    And why did you suggest that?

16   A    Am I allowed to say Paul Bellar?  So Paul had moved to

17   South Carolina.  There was talk that feds had raided their

18   house, and naturally everybody had started to freak out.  Wire

19   was also a terrible, terrible app to use.  It malfunctioned

20   more ways than you could count.  So I had suggested Threema

21   because it was just an overall better app.  I was already using

22   it.  I was trying to mitigate how many apps I had to use to

23   talk to somebody.  And on top of that, like, it just seemed to

24   work better for us, what kind of a group we were.  We were just

25   kind of friends that threw ideas at each other and wanted to

```
1    shoot guns, drink beer and talk about girls.

2    Q    There was a discussion about where the server was and which

3    country it was in.  Did you have any idea?

4    A    No.

5    Q    You just thought it was a better app?

6    A    Yeah.  Better overall app.

7    Q    Okay.  And I think there was some -- did you know if the

8    messages would self delete?

9    A    Not self delete.  From my experience that I'd already had

10   with it I was told that you could hit a button and everything

11   could delete.  I don't know what that button was.

12   Q    Did you ever delete anything off your phone?

13   A    No.

14   Q    Okay.  Purple J, who we met, left the group after that

15   meeting, right?

16   A    Correct.

17   Q    Have any problems with him leaving the group?

18   A    No.

19   Q    Okay.

20   A    Free to go and come and go as he pleased.

21   Q    On August the 23rd did you agree to kidnap the governor of

22   Michigan?

23   A    No.

24   Q    So you started a new group, I think it was called The Boys

25   first, right?
```

1   A    It was initially called The Boys.  We later changed it to

2   Brick Squad.

3   Q    Okay.  And you started it, the group?  You were the

4   administrator, is that right?

5   A    Correct.

6   Q    Okay.  And would you add in members?

7   A    We primarily wanted to keep it to ourselves but I was the

8   only one that had capabilities to add people, so you had to

9   connect with me through Threema and then I could add you to the

10  group.

11  Q    Was Adam a part of that group?

12  A    No.  Absolutely not.

13  Q    Was Barry a part of that group?

14  A    No.

15  Q    Was Brandon?

16  A    He had, like, five accounts on there.  Yeah.

17  Q    Okay.  If we could show this witness 4071, just to the

18  witness, Proposed Exhibit?

19       Have you had an opportunity to review 4071?

20  A    Yes.  I have.

21  Q    Okay.  And is this a fair and accurate representation of

22  the Brick Squad members?

23  A    For the most part.  We are just missing one person.

24  Q    Who are you missing?

25  A    Mike Deikstra, also went by the name Track Star.

1          MS. KELLY:  I'd move for the admission of 4071?

2          MR. ROTH:  If I can just get clarification if this is

3   on the Threema app?

4          THE WITNESS:  Yes.

5          THE COURT:  I think that's what he's talking about.

6          MR. ROTH:  Thank you, Your Honor.  No objection.

7          THE COURT:  All right.  It's admitted.

8          MS. KELLY:  May we publish to the jury, please?  Thank

9   you.

10  BY MS. KELLY:

11  Q    So these are the members of -- with the exception of Track

12  Star?

13  A    Correct.

14  Q    -- of Brick Squad, is that right?

15  A    Correct.

16  Q    And this is in Threema?

17  A    Yup.

18  Q    Okay.  Was there a vote whether or not to let Adam into

19  Brick Squad?

20  A    There was only six people voted but it was a three-way tie

21  so three and three.

22  Q    And then is there another FAFO Threema started?

23  A    Yes.

24  Q    Did you -- were you the administrator of that group?

25  A    No.  Dan Chappel was.

Q    Okay.

A    Or Chappel, however we pronounce it.

Q    Which group were you more active in?

A    I'd like to say The Boys/Brick Squad.  Typically like to keep FAFO muted.

Q    Okay.  We've seen some chats, some messages on FAFO, right, throughout this trial, is that right?

A    Yup.

Q    Okay.  And you were a part of FAFO, right?

A    Correct.

Q    Did you see every message that was sent on FAFO?

A    No.  I'd miss, like, 500 messages at a time.

Q    Okay.

A    Give or take a few hundred.

Q    You did communicate in FAFO, though, right?

A    I did from time to time.

Q    Is it fair to say sometimes you just ignored what was going on in FAFO?

A    Yeah.

Q    All right.  So the next event is Luther, right?

A    The fun weekend with The Boys.

Q    And who did you drive up there with?

A    I drove up there with my two friends, Devin Phelps, Casey Mayhan, and of course my faithful dog Ollie.

Q    Do you recall what time you left?

```
1    A    I left Luther or left my house?

2    Q    Left your house?

3    A    Around 12:30/1:00 o'clock.  Devin had to get off work at

4    midnight, so we were taking his truck.

5    Q    Okay.  And if we could show Exhibit 4143, which has been

6    admitted?

7         This pole camera timestamp is 4:29 a.m.  Is that a --

8    is that when you arrived at Luther?

9    A    Yeah.  It took us a little bit longer because we had to

10   stop and make breaks and food and gas.

11   Q    Okay.  What did you bring to Luther?

12   A    I brought E-stakes for the tarp house, the shoot house, the

13   tarps themselves, a striker for the E-stakes, camping gear,

14   some food, my AK, my FN, plate carrier, my helmet, food for

15   Ollie, towel for Ollie, and Devin and Casey's stuff.

16   Q    Did you bring that ghillie suit that was brought to court?

17   A    No.  That was only for air soft.

18   Q    Did you bring that ghillie suite to anything, any

19   involvement with the Wolverine Watchmen or anything involved

20   with this case?

21   A    No.  That thing was a $20 ghillie suit off Amazon.

22   Q    Okay.  And you said you brought the tarps?

23   A    Yes.

24   Q    Those blue tarps that we have seen?

25   A    Yup.  We have really old tarps at my house.
```

1      MR. ROTH:  I am going to object.  This is

2  non-responsive.

3      THE COURT:  Right.  He answered that he brought it.

4  So if you want to get to the next question we can go to that.

5      MS. KELLY:  Sure.

6  BY MS. KELLY:

7  Q    Did you also bring a poop emoji hat to Luther?

8  A    I did.

9  Q    Tell me about that?

10 A    So a couple of nights prior, maybe a week or so prior,

11 Devin, Casey -- not Devin and Casey.  Devin, Solomon, Ty,

12 Kaleb, Jerad and myself were at a bar that had an arcade to it.

13 That was one of the things we could wear.  We thought it would

14 be a great idea to use that if you break one of the range

15 safety rules you have to wear that until somebody else breaks

16 it.  So we called it the shit head hat.  So it was just a fun

17 way to maintain safety.

18 Q    Okay.  So you guys get there almost at five o'clock in the

19 morning.  You slept in the trailer?

20 A    Yes.  I slept on the floor.  Devin in his truck.  Casey was

21 also on the floor and Ollie was jumping around from bed to bed.

22 Q    Okay.

23 A    Because he is an attention whore.

24 Q    In the morning, on Saturday morning, do you go get some

25 food?

```
1    A    Yes.  So I left Alex Davidson with Ollie, and Max, myself

2    and Devin went to McDonald's in Cadillac.  I want to say it was

3    for breakfast.

4    Q    When you got back, did you start setting up that shoot

5    house?

6    A    Yes.

7    Q    Okay.  And that was on the range that you guys had kind of

8    flattened out with the walls?

9    A    Correct.

10   Q    Okay.  Did you have a photograph of the governor's house

11   when you were building that shoot house?

12   A    No.

13   Q    Did you have a realtor app that you were looking at when

14   you were building the shoot house?

15   A    No.

16   Q    Did you build that shoot house with the governor's house in

17   mind?

18   A    No.

19   Q    Who was helping you build that shoot house?

20   A    Ty, Kaleb, some other people.  I think Casey might have

21   helped me.  Because it's one of those things like all hands on

22   deck, but then you have really idle hands because it really

23   only takes, like, three people to do.

24   Q    Okay.

25   A    So maybe Ty and Kaleb to do.
```

Q    Okay.  And did the training start right away or were you

waiting for someone?

A    We had to wait for the Wisconsin people primarily that were

at a hotel.  Barry, too.

Q    Anyone else that wasn't on the property at that time?

A    Not that I recall.

Q    Okay.  Were there other stations set up that day?

A    Yes.  So we had a shoot house primarily set up.  We had a

medical tent that I was running to do classes, and also if you

got a boo boo or an owey we could help you out.  And weapons

manipulation skills.

Q    Okay.  Did you bring any map gear?

A    I did.  I was told that we were going to be doing

navigation in the area.  We had an actual professionally done

topographic map of Ty's property.  So it's one of those skills

that --

        MR. ROTH:  I am going to object again.  This is

narrative and non-responsive.

        MS. KELLY:  I can move onto my next question.

        THE COURT:  All right.

BY MS. KELLY:

Q    You said, we had it made.  Who had it made?

A    I think Dan Chappel was the one that had it made and gave

it to Ty.

Q    Okay.  So you didn't have a topographical map of Elk

1    Rapids?

2    A    No.  Just Ty's property.

3    Q    And you met Red?

4    A    Yes.

5    Q    Okay.  What information did you have about Red?

6    A    Friend of Dan's.  I think he was, like, a prior ranger in

7    the army, which they are kind of cool I guess.  That was about

8    it.

9    Q    Did you primarily stay at the medical tent on Saturday?

10   A    I did.

11   Q    Okay.  Did you participate at all in the dry fire through

12   the shoot house?

13   A    No.  I didn't participate in the shoot house or weapons

14   manipulation.

15   Q    On that Saturday you never saw Red's videos, right?

16   A    No.

17   Q    Okay.  And never had a conversation with Red?

18        MR. ROTH:  Object to the leading nature.

19        MS. KELLY:  I can ask it in a different way.

20   BY MS. KELLY:

21   Q    Did you have any discussions with Red on Saturday?

22   A    No.

23   Q    Okay.  Eventually you and -- the training ends, right?

24   A    Yup.  The training ends.

25   Q    Do you break all the tents down?

1   A     No.  We left the tents standing.  We took the medical tent

2   and we dragged it down to where Ty's trailer was, right next to

3   the fire pit, and lovingly called it the beer tent.

4   Q     Okay.  So the medical tent became the beer tent?

5   A     The medical tent becomes the beer tent.

6   Q     Okay.  And did you go anywhere with Jerad and Max?

7   A     Yes.  Jerad and Max went, and I went to, first to Jerad's

8   dad's property to get an extra tiny little Foreman grill to

9   help with cooking up the food, and then on the way back we ran

10  into Jerad's girlfriend, Megan.  We were going to the Bristol

11  store, which is the tiny little corner store, to get booze and

12  a little bit of extra cigarettes.

13  Q     Okay.  What kind of car did you ride in?

14  A     Max was driving his 2010 GMC.

15  Q     Do you know what color?

16  A     Gray.

17  Q     Okay.  Can we show Exhibit 4144, please?  Excuse me, sorry,

18  4147.

19  A     That would be the one.

20  Q     You've identified 4147 as being Max's truck?

21  A     Correct.

22  Q     Okay.  And the timestamp is 6:27:30.  Does that sound about

23  right from what you remember?

24  A     Yeah.  Sounds about right.

25  Q     Okay.  And if we could show 4148?  Is that also Max's

1    truck?

2    A    By the looks of it, yeah.

3    Q    Okay.

4    A    It's a little blurry but those tires scream Max's truck and

5    the tonto cover as well.

6    Q    And coming back at about 7:10:40, does that sound about

7    right?

8    A    Yeah.  Sounds about right.

9    Q    So you guys were gone over a little over half an hour?

10   A    A little bit.

11   Q    Okay.  Thank you.  And just to close that loop, I suppose

12   if we could go to 4144 again?  We showed this earlier.

13          Are you aware what kind of truck was Ty driving at

14   Luther weekend?

15   A    A 2019/2020 Red F150 crew cab.

16   Q    Okay.  Was that a new truck?

17   A    Brand new.

18   Q    When did he buy it?

19   A    A couple of weeks prior.  Can't put an exact date on it.

20   No.

21   Q    Did he have -- did he -- did he used to have a different

22   truck?

23   A    Yeah.  He had a black F150.  It was a lease.

24   Q    Okay.  So if we could show 4144, please?

25          Okay.  Daniel, do you recognize that Ford red truck as

1    being Ty's truck?

2    A    I recognize both of them.  The one in the back is Ty's.

3    The one in the front would be Gary Landgraff.

4    Q    Garry Landgraff is from Wisconsin?

5    A    Correct.

6    Q    And if we could show 4145?

7         You recognize that truck?

8    A    Yup.  Still Ty's truck.

9    Q    That's Ty's truck coming back to the property?

10   A    Yup.

11   Q    And that would be on September the 12th at -- September the

12   12th at 11:51?

13   A    Correct.

14   Q    Okay.  Thank you.  All right.  So back to this beer run.

15   You go to the Bristol store.  We saw a picture of it yesterday,

16   right?

17   A    Correct.

18   Q    That was the store that you went to?

19   A    Same exact store.

20   Q    But first you go to Jerad's dad's property?

21   A    Yup.

22   Q    Get a George Foreman grill?

23   A    I can't say it's a George Foreman grill, but it's a George

24   Foreman like grill.

25   Q    Okay.  And then you go to the Bristol store?

1    A    Yup.

2    Q    What did you get at the Bristol store?

3    A    $200 worth of beer -- cheap beer, some Jägermeister and

4    various packs of cigarettes.

5    Q    Okay.  Because you were going to go back to the camp and do

6    what?

7    A    Get wasted.

8    Q    Okay.  When you got back just after 7:10 p.m., did you see

9    Adam there?

10   A    No.  I did not.

11   Q    Okay.  Were you familiar with who we've been calling UCE

12   Mark?

13   A    Honestly I can't say I ever really paid that much attention

14   to him.  I might have known what he looked like.

15   Q    And so what do you do for the rest of the night?

16   A    Put the guns away, start drinking till the cows come home.

17   Q    There is like a barrel fire?

18   A    Yeah.

19   Q    Okay.

20   A    A hobo barrel fire if you want to call it that.

21   Q    Music playing?

22   A    Yes.

23   Q    Anybody else have liquor that they brought?

24   A    I know Solomon had what he lovingly called his, like, rum

25   bucket I think.  Ty had some booze lying around the trailer but

1    since he wasn't there I didn't take them.

2    Q    Okay.  Somebody is cooking this food, right?

3    A    Yeah.  I am pretty sure it was Jenny Plunk and Taya

4    Plummer.

5    Q    Okay.  Did you eventually notice that some people had left?

6    A    Around midnight.  Yeah.

7    Q    Okay.  That's when you -- that's when you noticed they had

8    gone?

9    A    I want to say it was around midnight that we noticed that

10   they were gone.  I just kind of figured that they were around

11   talking to other people.  Then come to find out everybody was

12   condensed in the same area and we were missing people.

13   Q    Okay.  Did you have to put Brandon to sleep that night?

14   A    Yeah.  He was getting a little too -- a little too wasted.

15   So me, Brian Puffenberger, and Holly went and took him up to

16   his tent.

17   Q    Where were the tents?

18   A    So they would be past the range, probably 150 meters

19   from -- from it, and you had Ty's base of a cabin that he was

20   building for the property, and the tents would all be right

21   there.  So 200ish meters away from the range.  500ish meters

22   away from the fire, beer tent and trailer.

23   Q    Okay.  Did you have to put Max to sleep?

24   A    I did.

25   Q    Where did you put him to sleep?

1    A    I put him at the trailer.  He had passed out in his chair

2    and was getting rained on.

3    Q    Okay.  Did you go to sleep before folks returned back to

4    the property?

5    A    Yes.

6    Q    And again, where were you sleeping?

7    A    So I had finally gotten off the floor and I was -- that

8    little couch where they showed the picture of the confederate

9    flag, me and Casey and Ollie had shared that as a bed.  So

10   right in front of the door.

11   Q    You and Casey and Ollie shared that couch?

12   A    Me and Casey and Ollie.

13   Q    Okay.  And were you -- did you wake up when they arrived

14   back at the camp?

15   A    I did.  Voices were pretty loud.  There was definitely some

16   anger in the air.

17   Q    Okay.  Did you go outside?

18   A    I did.  I smoked a cigarette.

19   Q    Okay.  Were you aware of where they had gone?

20   A    I assumed that they went to a strip club or a bar.

21        MR. ROTH:  Your Honor, I am going to object.  This is

22   non-responsive.

23        THE COURT:  Yes.  It is non-responsive.  It also risks

24   opening a door that you don't want to open.

25        MS. KELLY:  Thank you, Your Honor.

BY MS. KELLY:

Q    You then went back to bed?

A    Yup.

Q    Okay.  And Sunday morning you wake up, right?

A    Yup.  On Sunday.

Q    And that's what I understand to be the live fire?

A    Correct.  That work the day that we actually started doing live fire drills in the shoot house.

Q    What was your duty that day?

A    I was the range safety officer primarily.

Q    So no medical tent on Sunday?

A    Not really, because I am going to be right next to you if you get hurt, so...

Q    Were sets of people going through the shoot house and that live fire as you were the range safety officer?

A    Yeah.  It was -- so just for safety sake I only had two people go in at a time with me included behind them.

Q    Who was going through this shoot house when you were the range safety officer?

A    I had Brandon and Adam go together.  I had Red and -- UCE Red and Dan Chappel go together.  I think I had two more groups, but I am not too positive --

Q    Okay.

A    -- who it was.

Q    Did you get called down to a different area?

1    A   I did.  Ollie was acting up a little bit and at the time

2    they were also calling me back down towards Ty's trailer.

3    Q   Okay.  And there was a group of people talking, right?

4    A   Yup.

5    Q   Okay.  We saw a transcript of something that was said.  Do

6    you recall that transcript?

7    A   Vaguely.

8    Q   About a purchase of explosives?

9    A   Oh, yes.

10    Q   Okay.  Did you know what they were talking about?

11    A   No.

12    Q   Okay.  Did you agree to purchase explosives?

13    A   No.

14    Q   We also saw a transcript of you talking with Barry Croft

15    about a security detail.  Do you remember that conversation?

16    A   Correct.

17    Q   Okay.  And give the jury some context about that

18    conversation?

19          THE COURT:  That calls for narrative and invites

20    hearsay.  You are going to have to frame that a little

21    differently.  You can ask him what he meant by his words or

22    things like that.

23          MS. KELLY:  Thank you, Your Honor.

24    BY MS. KELLY:

25    Q   What did you mean by those words?

1        THE COURT:  And you are going to have to refresh what

2    the words are because we don't know what you are talking about.

3    BY MS. KELLY:

4    Q    Daniel, do you remember a transcript where you said, if we

5    are to do anything that hinders their movement they are going

6    to stop and fight their way out?

7    A    Yes.

8    Q    Okay.  And Barry Croft said, sure, and you said, they are

9    going to get out and hit us head on, and Barry Croft said,

10   right.

11   A    Yup.

12   Q    Okay.  What did you mean by those words?

13   A    So primarily in the military when you come across an

14   ambush, the way they teach you how to get out of it is beat it

15   with speed and violence.  It's one of the things that they are

16   not going to make it out alive because you are pushing so hard

17   back.  So it's me trying to get Barry to stop focusing on

18   security details and ambushes and things like that because it's

19   just an easy way to get yourself killed without doing what you

20   wanted to do.

21   Q    Okay.  Fair to say it's a discouraging statement?

22   A    Discouraging --

23        MR. ROTH:  Objection, leading.

24        THE COURT:  It is.

25   BY MS. KELLY:

```
1    Q    Was that a discouraging or encouraging statement?

2    A    Discouraging.

3    Q    Thank you.  At that Sunday morning group discussion, did

4    you agree to kidnap the governor?

5    A    No.  No.

6    Q    Did you agree to possess weapons of mass destruction in

7    order to harm her security detail?

8    A    Absolutely not.

9    Q    The idea of blowing up a bridge, did you have any idea

10   about blowing up a bridge?

11   A    I didn't even know about a bridge.  Nobody had told me.

12   Q    Sunday afternoon there is a firework, right?

13   A    Yup.

14        MR. ROTH:  Objection, leading.

15        THE COURT:  Well, I think she is trying to set the

16   foundation.  So go ahead and then move to your substance.

17   BY MS. KELLY:

18   Q    Were you called over to talk about a firework?

19   A    Yeah.  Barry had called me over.

20   Q    Okay.  And you saw that firework?

21   A    I did.

22   Q    Okay.  Was it the shell of the firework?

23   A    It was --

24        MR. ROTH:  Objection, leading.

25        THE COURT:  It is continually leading, and so you are
```

1    going to have to ask him what he saw or how he described it or

2    something like that.

3              MS. KELLY:  Sure.

4    BY MS. KELLY:

5    Q    What did you see?

6    A    A cylindrical mass, probably about yay big wrapped in

7    electrical tape.  Couldn't tell that there were pennies at the

8    time, but I was told that there were at the bottom of the

9    firework.

10   Q    What did you do with that?

11   A    I was asked if I wanted to blow it up and I said

12   absolutely.

13   Q    Okay.

14   A    So we went and there was a down tree behind the range that

15   we had built.  It was snapped in half.  We figured that would

16   be a good place to put it.  It fell.  Blew up on the ground.

17   Q    Okay.  Was someone else other than you putting up targets?

18   A    Yeah.  There was probably, like, six or eight of us that

19   all went over there, but I think we only put up, like, two

20   targets.

21   Q    Okay.  Were these the targets from the range?

22   A    Yeah.  They are the only ones we had.

23   Q    Only ones that you had?

24   A    Yup.

25   Q    Okay.  The last topic I want to talk to you about is Kaleb

1      and Ty talked to you about these personally manufactured

2      firearms, right?

3      A    Correct.  Right.

4      Q    Okay.  And that was after Luther?

5      A    I want to say no.  It would have been the same night that

6      we got the poop emoji hat.

7      Q    So that's at the bar?

8      A    Yeah.

9      Q    And this idea is broached with you?

10     A    I mean, I am not in the immediate area.

11     Q    Okay.

12     A    But they asked to use my house, address for the delivery of

13     the parts.  I said sure.  Gave it to them.

14            MR. ROTH:  Objection, hearsay.

15            THE COURT:  It is hearsay.

16     BY MS. KELLY:

17     Q    You gave them your address?

18     A    I gave them my address.  Yes.

19     Q    Prestige Worldwide?

20     A    Prestige Worldwide.

21     Q    Okay.  And when the parts arrived who did you give them to?

22     A    I had given them to Ty.

23     Q    Okay.  And we saw the transcript of a drive on September

24     the 19th, right?

25     A    Yup.

1    Q    Okay.  And you were provided information that -- of what

2    was going on, right?  You knew what was going on?

3    A    Yup.

4    Q    Okay.  And you went?

5    A    Yup.

6    Q    Voluntarily?

7    A    Voluntarily.  I would like my friends to be safe.

8    Q    Okay.

9    A    I'll speak a little bit closer.  I'm sorry.

10   Q    October the 7th you were arrested?

11   A    Yes.

12   Q    Was that the first time you were ever arrested?

13   A    Yes.

14   Q    Okay.  And what was your understanding of where you were

15   going on October the 7th?

16   A    I thought we were going to BWWs to meet Red.  I was told

17   that he had free gear for us.  I was also told about exploding

18   targets, which again, blowing stuff up is fun.

19   Q    Okay.  You didn't go to BWWs that night?

20   A    Nope.

21   Q    Okay.

22   A    And I have been craving it ever since.

23   Q    There were a lot of things said, right?  We've heard a lot

24   of statements.  We've heard a -- we've seen a lot of chats,

25   right?

1    A    Correct.

2    Q    Okay.  And you were involved in some of these chats, right?

3    A    Correct.

4    Q    Okay.  You never agreed to kidnap the governor of Michigan,

5    correct?

6    A    Not one time.

7    Q    Okay.  And you never agreed to possess weapons of mass

8    destruction to blow up a bridge or mess with her security

9    detail, correct?

10   A    Absolutely not.  No agreement.

11   Q    In looking at this group of guys, would you consider Adam

12   the leader of the group?

13   A    No.

14   Q    Okay.  Who would you consider the leader of the group of

15   guys that you were spending time with in summer of 2020?

16   A    Dan Chappel.

17        MS. KELLY:  Thank you.  I have nothing further.

18        THE COURT:  All right.  So we've been going about two

19   hours.  It's definitely time for a break.  We'll give you 20

20   minutes and come back and pick up the other questions from the

21   other lawyers.

22        LAW CLERK:  All rise.

23        (Jury out, 10:29 a.m.)

24        THE COURT:  All right.  20 minutes.  Do other Defense

25   lawyers have questions for Mr. Harris?

1      MR. HILLS:  Maybe.  I might have a few.

2      THE COURT:  All right.  So we'll go in order and see

3      if anybody does and then obviously the government will have

4      cross.

5      MR. BLANCHARD:  Judge, we've got one witness that I

6      think intends to invoke.  Just flagging it for the Court.

7      THE COURT:  Thank you.

8      MR. BLANCHARD:  I am not sure if he is here or his

9      lawyer is here.

10     THE COURT:  All right.  Good.  We'll keep tabs on it.

11     Thank you.

12     LAW CLERK:  Court is in recess.

13     (Recess taken, 10:30 a.m.)

14     (Resume proceedings, 10:56 a.m.)

15     LAW CLERK:  All rise.

16     (Jury in, 10:56 a.m.)

17     LAW CLERK:  The United States District Court for the

18     Western District of Michigan is now in session.  The Honorable

19     Robert J. Jonker, chief judge, presiding.

20     THE COURT:  All right.  We broke when Ms. Kelly ended

21     her direct examination of Mr. Harris, and now the other lawyers

22     will have a chance starting with Mr. Hills.

23     MR. HILLS:  I went back through my notes.  I don't

24     have any questions for Mr. Harris.  Thank you.

25     THE COURT:  Thank you.

1        MR. BLANCHARD:  I'll pass, Your Honor.

2        THE COURT:  And Mr. Gibbons?

3        MR. GIBBONS:  I have no questions, Your Honor.

4        THE COURT:  All right.  Then we'll go right to

5   Mr. Roth for the government's cross.

6        MR. ROTH:  Thank you, Your Honor.

7                    CROSS EXAMINATION

8    BY MR. ROTH:

9   Q    Good morning, sir.

10  A    Hello.

11  Q    I'm sorry?

12  A    Hello.

13  Q    Hello.  My name is Jonathan Roth.  I have a series of

14  questions for you this morning.  If at any point you can't hear

15  me, don't understand me, please let me know.  I'll be happy to

16  rephrase, okay?

17  A    Okay.

18  Q    Thank you, sir.

19  A    I'll do the same.

20  Q    So as I hear your testimony this morning, at these two

21  FTX's in Cambria and Luther you were primarily concerned with

22  health and safety?

23  A    Correct.

24  Q    Yet you twice built and detonated explosives or attempted

25  to detonate explosives that had shrapnel attached to them?

1    A    The first one, yes.  Are you talking about all three in

2    total?

3    Q    We'll go through the paces.  At the first Cambria FTX you

4    helped build and helped to try and detonate an explosive that

5    had metal attached to the outside or inside of it, correct?

6    A    Inside.  Yes.

7    Q    Yup.  And that's shrapnel, right?

8    A    Sure.

9    Q    And then when we go to the Luther FTX you helped detonate a

10   firework that has metal attached to it, correct?

11   A    Correct.

12   Q    A metal you know on an IED would be shrapnel, right?

13   A    Yeah.

14   Q    But your primary concern at those FTXs is health and

15   safety?

16   A    Yeah.  I had everybody get behind the wall.

17   Q    All right, sir.  You testified that you didn't like all

18   these chats because they kept talking about kidnapping the

19   governor too much, is that right, sir?

20            MS. KELLY:  I think it misstates the testimony.

21            THE COURT:  Go ahead and state your objection,

22   Ms. Kelly.

23            MS. KELLY:  Just misstating the testimony about his --

24   the reason for him not liking the chats.

25            THE COURT:  All right.  Well, if Mr. Roth's premise is

1    not correct I'm sure the witness will say it, but you can frame

2    the cross.  Go ahead.

3              MR. ROTH:  Thank you, Your Honor.

4    BY MR. ROTH:

5    Q    Sir, you testified that the reason you made the comments

6    about killing the governor is because you didn't like these

7    chats; they were just talking about kidnapping her too much,

8    right?

9    A    Not really just kidnapping.  It was just talk in general

10   about things like everybody --

11   Q    Sir, it is a yes or no question.  Is it your testimony that

12   the reason that you put in the chat, just go kill her, is

13   because they were talking about her and kidnapping her too

14   much?

15   A    I don't want to say just that, no.

16   Q    All right.  But you migrated all of these people or the

17   relevant people in these chats to a new platform that was safer

18   and easier for you to use and stay in contact with these same

19   people?

20   A    Just --

21   Q    Is that a yes or no, sir?

22   A    Just Wolverine Watchmen.

23   Q    That's a yes, sir, you migrated to a new chat so you could

24   speak to these people more conveniently and more securely?

25   A    Yeah.

Q    You testified that you didn't like all the old guys at the
Cambria FTX, is that correct, sir?

A    Yeah.

MR. HILLS:  I object.  That's not what he said.  He
didn't say that he didn't like them.  He said that they were
old.

THE COURT:  Again, in cross I think you have some
latitude to present the premise, and everybody heard the
testimony, and the jury will draw its conclusion whether it's a
fair premise or not.  And in the first instance Mr. Harris can
accept it or not accept it as he has already done to some
extent on the question regarding who migrated to the new chat
platform.

MR. ROTH:  Thank you, Your Honor.

BY MR. ROTH:

Q    But you invited all of these same guys over to train with
you at Ty's property in Luther, correct, sir?

A    Not I.  No.

Q    You testified that you were careful to travel with your
legal SBR, your short-barrel rifle, disassembled, correct, sir?

A    Correct.

Q    But you bragged to the other people in your chat group
about cutting your shotgun so it would also be short-barreled
as well, correct, sir?

A    Yup.

Q    You testified this morning that Barry Croft struck you as a
stoned whacked out pirate, is that right?

A    A stoned crazy pirate.  Yeah.

Q    But you contacted him after that meeting where you met him
and invited him to Michigan to train with you, correct, sir?

A    I did not invite him to Michigan.  No.

Q    You testified this morning that you had nothing to do with
a conspiracy to kidnap the governor, is that correct, sir?

A    One hundred percent correct.

Q    But the two people you were in the group you were closest
with were Kaleb Franks, is that right, sir?

A    Sort of kind a, yeah.

Q    And Ty Garbin, is that correct?

A    Ty, yeah.

Q    The two people who have plead guilty and admitted their
role in the same conspiracy, sir?

A    They didn't agree with me.

Q    How old are you, sir?

A    Twenty-four years old.

Q    You go by the name Beaker?

A    The nickname, yes.

Q    Are there any other nicknames or street names that you have
used within the Wolverine Watchmen?

A    Just Beaker, Dan, Daniel.

Q    When did you join the Wolverine Watchmen?

1    A    Around May.

2    Q    2020?

3    A    2020.

4    Q    Could we please look at Exhibit 19, please?

5            In the process of joining, Joe Morrison, one of the

6    leaders in the Wolverine Watchmen, sent you this item?

7    A    I guess.  Yeah.

8    Q    Not I guess.  He sent this to you right, sir?

9    A    I have no recollection of the actual text chain.

10   Q    This is a pretty jarring item, isn't it?

11   A    No.

12   Q    Sir, a lot of people died in these events, right?

13   A    A lot of innocent people, yeah.

14   Q    This isn't jarring to you?

15   A    No.

16   Q    You are saying maybe you saw this before, maybe you didn't,

17   but you have -- it wouldn't strike you either way, sir?

18   A    No.

19   Q    But you know that, in fact, based on the examination of

20   your FaceBook account, this was sent to you by the leader of

21   the Wolverine Watchmen, right?

22   A    Yeah.

23   Q    You know what the Oklahoma City bombing was, right?

24   A    Correct.

25   Q    In 1995 --

1    MS. KELLY:  I'm going to object to relevance.

2    THE COURT:  Well, I think he can articulate it in your

3    own words if you want to.

4    MR. ROTH:  Thank you, Your Honor.  The testimony both

5    previously to this witness and from this witness is that this

6    was sent to him by the leader of the Wolverine Watchmen during

7    the beginning period of his joining the group.  The fact that

8    he receives this item and stays with the group is incredibly

9    relevant to what he knows this group is about and his reasons

10   in staying there.

11   THE COURT:  All right.  Yeah.  I think there is

12   relevance here particularly given his direct testimony.  I

13   think the government needs to have a fair opportunity to

14   present its picture.  Go ahead.

15   MR. ROTH:  Thank you, Your Honor.

16   BY MR. ROTH:

17   Q    So we're talking about you are familiar with the Oklahoma

18   City bombing, correct, sir?

19   A    Vaguely.  I wasn't even born yet.

20   Q    In 1995 a member of a Michigan militia built a bomb out of

21   totally legal materials and like fuel --

22   MR. HILLS:  I am going to object.

23   MR. BLANCHARD:  These facts aren't in evidence.  He's

24   just testifying.

25   MR. ROTH:  I'm asking if he is aware of these things.

1    MS. KELLY:  And I think he just said he wasn't even

2  born yet.

3    THE WITNESS:  I was born in 1997.

4    THE COURT:  We can all learn things after we are born

5  thank goodness, but I do think that the point value from the

6  relevance value from your point of view needs to stay within

7  the confines of what's in evidence, and now we are adding a lot

8  of information in the form of your question that hasn't been

9  testified to, won't be testified to.  So you know, he's said it

10  doesn't jar him either way.  I am not sure how much more detail

11  we can reasonably get into.

12    MR. ROTH:  Thank you, Your Honor.

13  BY MR. ROTH:

14  Q    Suffice it to say, when you received this meme you did not

15  say, this group is not for me, correct?

16  A    Correct.

17  Q    You heard testimony from Purple J that he was so bothered

18  by the things that went on at Wolverine Watchmen meetings that

19  he walked out, took -- and he quit, correct?

20  A    To my recollection, sure.

21  Q    And you never did that, right?

22  A    No.

23  Q    You heard testimony that Dan Chappel, he is so bothered by

24  the things that are going on in the chats he immediately calls

25  the police?

1    A    Well, he is a bitch.  Yes.

2    Q    Sir -- I'm sorry, what was that?

3    A    He is a bitch.

4    Q    Tell me about that, sir?

5    A    Next question.

6    Q    Nope.  Tell me about it.  Why is Dan Chappel a bitch?

7    A    You get scared by memes.  People that --

8    Q    What kind of memes?

9    A    Just memes.  I don't know what memes they were sending.  I

10   wasn't in the group yet, correct?

11   Q    Sir, you just told me that he is a bitch for being scared

12   of these memes.  Tell me what was going on with these memes

13   that he shouldn't be afraid of them?

14   A    How am I supposed to know if I am not in the group.  He was

15   in the group before me, correct?

16   Q    Sir, you told me that he is a bitch.  Tell me why he is a

17   bitch?

18   A    You are scared by words but yet you say that you saved

19   Chris Kyle.  You went to Iraq, came out, right, hurt, but words

20   hurt you?  Words scare you?  You are a bitch.  Words are words.

21   Q    There is testimony, and you know that leaders even in the

22   Wolverine Watchmen like Joe Morrison and Pete Musico stopped

23   coming to all the trainings with the Wolverine Watchmen; they

24   weren't as serious about it, right?

25   A    No.  We broke up with them.

1   Q    Because they weren't serious enough about it, right?

2   A    I don't want to say serious.  They had their own marital

3   issues and things like that getting in the way of us coming to

4   their houses and shooting guns.

5   Q    So they weren't as serious as you were about it, right?

6   A    Sure.

7   Q    You are so serious about it that you go to almost every

8   meeting and almost every training, correct?

9   A    Trainings, yeah.  Meetings, yeah, kind a.

10  Q    And you quickly rose into leadership in this group,

11  correct?

12  A    The first training, yes.  Much like Dan.

13  Q    You stayed in this group with two of your very close

14  friends, Ty Garbin and Kaleb Franks, is that right?

15  A    That's where I met them.  That's how I met them.

16  Q    All right.  The three of you have a relationship within the

17  group that is closer than your relationship to anybody else in

18  that group, correct?

19  A    No.  Jerad, Max, Solomon.

20  Q    You heard Ty Garbin testify that the conspiracy to kidnap

21  the governor grew out of discussion about doing a citizens

22  arrest on her, correct?

23  A    Correct.

24  Q    Could we look at Exhibit 9, please?  Could we please zoom

25  in on that area?

1          Here we see Grandpa saying, can't we intercept her and

2    arrest her for treason?  Who is Grandpa?

3    A    Pete Musico.

4    Q    All right.  And then we see you down a little bit lower.

5    So you were involved in these early conversations about

6    arresting her, correct?

7    A    By the looks of it, yeah.

8    Q    And you don't say no when he proposes this, correct?

9    A    No.

10   Q    You propose doing it at her office, correct?

11   A    Yup.

12   Q    Other people said that it was a bad idea because of the

13   media coverage, and you said you shouldn't let that stop you

14   from doing what you think is right, correct?

15   A    Correct.

16   Q    Could we look at Exhibit 10, please?

17          On the very same day you told the same group, you can

18   make things go boom, is that correct, sir?

19   A    Correct.

20   Q    You went onto say that the founding fathers would support

21   killing the governor, correct?

22          MS. KELLY:  I am going to object.  Stating facts not

23   in evidence.

24          THE COURT:  All right.  Well, we all have the exhibit

25   in front of us and Mr. Roth can characterize it one way, and if

1    the witness accepts it, okay, and if the witness doesn't, okay,

2    and then the jury gets to make the call.

3    BY MR. ROTH:

4    Q    All right.  So we can talk about that in some detail, sir.

5    You say at the bottom of this -- or excuse me, the middle, we

6    started out that way.  Pretty sure if the founding fathers saw

7    how shit was being run they'd be looking at us like WTF, kill

8    them, right?

9    A    Yup.

10   Q    Them being leaders, politicians?

11   A    Tyrants.

12   Q    Tyrants.  Is Governor Whitmer a tyrant?

13   A    Not really.  She is just a governor to me.

14   Q    Just a nice woman doing her job to you, sir?

15   A    Very poorly, yeah.

16   Q    All right.  You have never considered her a tyrant?

17   A    No.

18   Q    Never said she was a tyrant?

19   A    Not to my recollection, no.

20   Q    Could we look at 141, please?  Can we zoom in on that area,

21   please?

22          Here is where you suggest different ways of killing

23   her, correct?

24   A    Yeah.

25   Q    And to be clear, even though her name isn't there, you are

1    speaking of Governor Whitmer, correct?

2    A    Yes.

3    Q    You first propose doming her when she is coming to and from

4    work, correct?

5    A    Correct.

6    Q    Doming here meaning to shoot her in the head?

7    A    Correct.

8    Q    Later on you say, or pretending to be pizza delivery person

9    and kill her at home when she answers the door?  I'm sorry,

10   yup.  At the bottom there.

11   A    Mugging the pizza guy and taking the shirt.  Not going up

12   to her door.  Not going into her house.

13   Q    But you would take the pizza guy's uniform so you could

14   pose as the pizza guy and then go to her house and ring the

15   doorbell, right?

16   A    If she has a doorbell, sure.

17   Q    She's got a door.  You'd knock on the door pretending to be

18   the pizza man, right?

19   A    Sure.

20   Q    She answers the door and you shoot it says three rounds

21   with your pistol into her?

22   A    Yup.

23   Q    You can take that down, please.

24        On May 17th, 2020, you attended an FTX in Munith,

25   Michigan, is that correct?

1    A    By the sounds of it, yes.

2    Q    And there Pete Musico again talked about getting a federal

3    judge to issue an arrest warrant for the governor?

4    A    Not that I recollect.

5    Q    You again at that meeting volunteered that you knew a guy

6    that would build explosives for you?

7    A    Not to my recollection.

8    Q    You also knew how to build explosives yourself, correct?

9    A    Not really.  Professional military grade already

10   preprepared explosives, sure.

11   Q    Sir, you had detailed notes in your office area in your

12   basement about how to build a number of different explosives,

13   correct?

14   A    Shape charges, yes.

15   Q    Improvised claymores?

16   A    Not claymores, no.  Not to my recollection.  You are also

17   talking about notes from 2015, 2016.

18   Q    Well, I understand that, sir.  But are you telling me you

19   don't have those notes or you don't remember those notes

20   because a minute ago it sounded like you didn't have them?

21   A    Don't remember.

22   Q    So now you may have them?

23   A    I may.  I know that I've taken explosive charges and

24   breaching charges through assault men and combat engineers,

25   just a thing we did.  Cross training is what we called it.

1    Q    And you took many notes about how to make those explosives,

2    correct?

3    A    Kind of, yeah.  I was a private.  I was told to take notes.

4    Q    Kept those notes, correct?

5    A    Because I was told to, yes.

6    Q    Had those notes in the basement at your home, correct?

7    A    In the closet of my office, yes.

8    Q    And in those same notebooks you also had notes about the

9    Wolverine Watchmen and schedules and trainings for the

10   Wolverine Watchmen, correct?

11   A    I don't think schedules and trainings.  No.  And I can't

12   say I had notes.  I kept a log of the money that people gave me

13   for bulk ammo buys.

14   Q    In those same notebooks, correct, sir?

15   A    No.  Different notebooks.

16   Q    In those notebooks where you have notes or may have notes

17   about how to build explosives you also have notes about

18   vulnerable targets that you could attack, correct?  Strategic

19   targets?

20   A    In what context?

21   Q    There are notes in there about strategic targets, and

22   bridges are listed, is that correct, sir?

23   A    I'd have to see them.  But again, you are probably pulling

24   from notes from 2015, 2016 following the Marine Corps in the

25   infantry.

1  Q   I understand that, sir.  I am just having trouble
2  understanding is it that you don't have these notes or you
3  don't remember these notes?
4  A   I don't remember these notes because I wouldn't have pulled
5  them out in the last three, four years now.  Five years even.
6  Q   You are part of a Wolverine Watchmen leadership conference
7  call on May 31st, 2020, correct?
8  A   Possibly.
9  Q   During that call Joe Morrison said that he had national
10 contacts, correct?
11 A   Yes.
12 Q   And one of those national contacts turned out to be Barry
13 Croft, right?
14 A   I would think so.
15 Q   Sometimes called Boogaloo Barry?
16 A   I never called him Boogaloo Barry.
17 Q   All right.  But Barry Croft was one of Joe Morrison's
18 national contacts, correct?
19 A   I think Adam Fox was.  I don't know about Barry.
20 Q   A moment ago you said you thought that Barry Croft was one
21 of those national contacts.  Not anymore?
22 A   That Joe referred to him as a national contact?
23 Q   Yes.
24 A   I thought that he only referred to Adam as a national
25 contact.

Q     You were aware of Barry Croft because he was a nationally

known leader in the III% movement?

A     No.  I have met this dude at Wisconsin.

Q     And Joe Morrison went onto talk about meeting Barry Croft

and others at a national militia leadership meeting in Dublin,

Ohio, correct?

A     He just -- a national meeting in Wisconsin -- or Dublin,

Ohio.  I'm sorry.

Q     Going to national militia meetings was a big change in

circumstance for the Wolverine Watchmen, wasn't it?

          MS. KELLY:  I am going to object.  I don't think the

Wolverine Watchmen were at the meeting in Dublin, so I would

object to this line of questioning.

          THE COURT:  Well, if you want to lay more foundation,

I am not sure that the only national militia meeting is the one

in that particular location in Dublin, but he did testify on

direct that I think he said they didn't go, they being the

Watchmen.

          MR. ROTH:  Very good.

BY MR. ROTH:

Q     And I can lay further foundation on that, but to this point

in the Wolverine Watchmen's existence it's just some guys doing

a little bit of light training in some backyards, right?

A     Yeah.  I mean, we were also --

Q     Yes?  It's a yes or no question.  That's basically what the

1    Wolverine Watchmen are at this point?

2              MR. HILLS:  I would object.  He is trying to explain

3    it wasn't a yes or no question.

4              THE COURT:  The witness does not have to accept the

5    characterization, just as the witness didn't have to accept

6    your characterizations.  But the way they reject it is by

7    saying no, not by explaining their entire reasons for it.

8    That's your opportunity to redirect if you wish.  Go ahead,

9    Mr. Roth.

10             MR. ROTH:  Thank you, Your Honor.

11   BY MR. ROTH:

12   Q    To this point --

13             THE COURT:  But please, don't talk over each other

14   while you are doing it, okay?  Let's give Mr. Brandell a chance

15   of going home without a headache.

16             MR. ROTH:  Thank you, Your Honor.

17   BY MR. ROTH:

18   Q    To this point the Wolverine Watchmen, some guys, small

19   group, training a little bit lightly in some backyards, right?

20   A    Not entirely.  No.

21   Q    And then they get invited to a national militia convention

22   in Ohio, correct?

23   A    Yeah.

24   Q    And as a member of their leadership you knew that was a big

25   change for the Wolverine Watchmen, wasn't it?

1    A    Not really.  No.

2    Q    Around that time you suggested changing the leadership

3    structure of the Wolverine Watchmen, correct?

4    A    Sure.

5    Q    Could we play Exhibit 27, please?

6            (Audio started, 11:17 a.m.)

7            (Audio stopped, 11:17 a.m.)

8    BY MR. ROTH:

9    Q    All right.  Here you articulated your concerns about going

10   to this national meeting for militias, is that right, sir?

11   A    Correct.

12   Q    Your attorney asked you about a statement you made about

13   MRAPS on June 3rd, 2020.  Tell me, what were you making the

14   simulated explosives for for the MRAPS?

15   A    The simulated explosives?

16   Q    Or the small explosives.

17   A    They would be simulated for the IED course.

18   Q    But you were going to make some MRAP explosives with the

19   Wolverine Watchmen, right?

20   A    If the world imploded on itself, yeah.  But until then I'm

21   using baby powder, a little tiny Co2, and a balloon and PVC

22   pipe.

23   Q    Could we play Exhibit 32, please?

24           (Audio started, 11:18 a.m.)

25           (Audio stopped, 11:19 a.m.)

BY MR. ROTH:

Q    So you talked about not only making these but figuring out
where to hide them, correct, sir?

A    Correct.

Q    After the Dublin national militia meeting Barry Croft
connected Adam Fox to the Wolverine Watchmen leadership, is
that right, sir?

A    Not to my knowledge.

Q    Could we play Exhibit 52, please?

          (Audio started, 11:19 a.m.)

          (Audio stopped, 11:19 a.m.)

BY MR. ROTH:

Q    You were in the leadership ranks of the Wolverine Watchmen
at that time, right?

A    Correct, but --

Q    Sir, it's a yes or no question.  Yes, you were a member of
the leadership of the Wolverine Watchmen, right?

A    Yes.

Q    And the people from Michigan that Barry Croft referenced in
that recording were the Wolverine Watchmen, correct?

A    I'd have to hear it again.

Q    Could we play it again?

          MR. BLANCHARD:  I'd object as to speculation as to
what my client meant by his statements.  That's for the jury to
decide.

1          THE COURT:  Well, we can play it again and see if

2     it --

3               (Audio started, 11:20 a.m.)

4               (Audio stopped, 11:20 a.m.)

5     BY MR. ROTH:

6     Q    Sir, I'll ask one more time then.  Yes or no.  The

7     person -- excuse me.  The group that Barry Croft was

8     referencing, the people from Michigan, those were the Wolverine

9     Watchmen, correct?

10              MR. BLANCHARD:  Same objection.

11              THE WITNESS:  Not to my knowledge.  It's not my phone

12    call.

13    BY MR. ROTH:

14    Q    Around this time you were made aware that Adam Fox had been

15    in contact with the Wolverine Watchmen, correct?

16    A    In June?

17    Q    Yes, sir.

18    A    Yes.

19    Q    And he was in contact through various leaders within the

20    Wolverine Watchmen, correct?

21    A    I think just Joe until we actually officially met him.

22    Q    And Joe told the other members of the leadership like

23    yourself, correct?

24    A    Yeah.

25    Q    You were very conscious of OPSEC, operational security,

1    correct?

2    A    I don't think operational security, no.

3    Q    I'm sorry?

4    A    Are you talking about communication wise or are you talking

5    about in person?

6    Q    In general, you find operational security to be important

7    to you?

8    A    In an official capacity, yeah.

9    Q    And with the Wolverine Watchmen you find operational

10   security to be important, sir?

11   A    Not really, no.

12   Q    You saw all the videos that we watched about Adam Fox and

13   what he posted on FaceBook around that time, correct?

14   A    Yeah.

15   Q    And before Adam Fox met with the Wolverine Watchmen, you

16   looked at his on-line and social media profiles, correct?

17   A    I personally did not.

18   Q    You were present when other people did, sir?

19   A    Not to my recollection.

20   Q    In Cambria, Wisconsin, in July 2020, you met with Adam Fox

21   and Barry Croft?

22   A    Correct.

23   Q    You road to Cambria with Dan Chappel, Ty Garbin, Kaleb

24   Franks, Paul Bellar and Brandon Caserta, is that correct?

25   A    Correct.

1    Q    And you brought with you a short-barreled rifle, is that

2    correct, sir?

3    A    Completely disassembled, but yes.

4    Q    Sir, you brought with you a short-barreled rifle, correct,

5    sir?

6    A    Disassembled.  Yes.

7    Q    And while you were there you went out to eat with Barry

8    Croft?

9    A    Like I myself personally went with Barry to go eat?

10   Q    Were you a human that was in a place with food with Barry

11   Croft?

12   A    Yeah.  There was a diner at the hotel.

13   Q    Could we please play Exhibit 93?

14                (Audio started, 11:23 a.m.)

15                (Audio stopped, 11:24 a.m.)

16   BY MR. ROTH:

17   Q    Sir, throughout that weekend Barry Croft repeatedly talked

18   about different groups and different states that he was in

19   contact with, right?  Yes or no, sir?

20   A    I mean, I guess.

21   Q    Sir, you were there.  We just listened to a recording.

22   A    But that's not throughout the week.  That's just at dinner.

23   So I don't know if it was throughout the week.  I wasn't around

24   him throughout the week.

25   Q    In your time with Barry Croft that weekend he talked about

1    this more than once, right, groups that he was in contact with

2    in other states?

3    A    Twice maybe.

4    Q    And it was in the context of these groups overthrowing

5    their governments of their states, correct?

6    A    If the need arrived, yeah.

7    Q    And if we could put that transcript back up?  We don't have

8    to play it but just pause it?

9         He talks about killing people, right?  That's what

10   he's talking about with breaking a few eggs?

11   A    I don't know.  I am not the one that said it.

12   Q    He says, I don't like seeing anybody get killed either but

13   you don't make an omelet without breaking a few eggs.  You had

14   no earthly idea what he meant; none?

15   A    I guess he could have meant killing somebody.

16   Q    Sir, your perception of the moment -- I don't want you to

17   speculate.  I want to talk about what you thought in the

18   moment.  He was talking about killing people, wasn't he?

19   A    Sure.

20   Q    And when this man talks to you at a diner about killing

21   people you don't stand up and walk out, do you, sir?

22   A    No.

23   Q    You don't say, this group is not for me, do you, sir?

24   A    No.

25   Q    You say, are there more groups that are going to help us,

1    right?

2    A    If shit hits the fan.  Yes.

3    Q    That weekend you also built a bomb with Barry Croft,

4    correct, sir?

5    A    Two.

6    Q    You referred to it as a -- maybe your attorney referred to

7    it as a balloon, and I don't recall which one, but we are

8    talking about what you hoped to be a bomb, correct?

9    A    An explosive, yeah.

10   Q    Well, we can call it an explosive.  Is there a difference

11   in your mind between an explosive and a bomb, sir?

12   A    Yeah.  Bombs hurt people.  Bombs are made to hurt people.

13   Q    Could we play Exhibit 97, please?  I'm sorry, look at 97.

14   A    Yup.

15   Q    Are you shown in that picture, sir?

16   A    Yup.  I am right here.

17   Q    Who is this, sir?

18   A    That would be Barry Gordon Croft.

19   Q    I'm sorry?

20   A    Barry Croft.

21   Q    Did you say his middle name?

22   A    Barry Gordon Croft, Jr.

23   Q    He brought components to build an explosive with him to the

24   FTX, correct?  Yes or no, sir?

25   A    By the looks of it, yes.

```
1    Q    We can take the picture down.

2              Sir, I don't want you to look at the picture.  You

3    were there, sir.  He brought components to build an explosive

4    with him, didn't he?

5    A    By the looks of it, yes.

6    Q    The looks of the picture or the looks of what was going on

7    that day?

8    A    Both.  I don't know what he brought.  I wasn't in the car

9    with him.

10   Q    The things that you were using that day to build that

11   explosive were items that Barry Croft brought to you, correct?

12             MR. GIBBONS:  Objection.  I think he just answered the

13   question he didn't know what he came to the FTX with, Your

14   Honor.

15             THE COURT:  Yeah.  I think he did say he didn't know.

16   BY MR. ROTH:

17   Q    Where did the items that you were using for the explosive

18   come from?

19   A    I saw them sitting on a truck tailgate.

20   Q    Who was there?

21   A    At the FTX in general?

22   Q    No.  Who was right there with the explosive components?

23   A    Dan --

24             MR. GIBBONS:  Asked and answered, Your Honor.  I think

25   he has already identified the people in the photograph.
```

1          THE COURT:  He is breaking it down now to get around

2     the thing he did answer.  Go ahead.

3     BY MR. ROTH:

4     Q    Who was the one using those components, sir?

5     A    Now it's using?  Me, Ty and Barry.

6     Q    No.  When you first go up who is the one using the

7     components, sir?

8     A    No one was using them yet.  They are just there.

9     Q    Were they in a red bag, sir?

10    A    I don't remember a red bag.

11    Q    All right.  So the first explosive that you and Barry work

12    on there, let's talk about what that is.  You are going to put

13    explosive powder in something, right?

14    A    In a balloon.

15    Q    In a balloon.  Do you use the balloon the way it is or do

16    you cut the balloon?

17    A    I think just the way it was.

18    Q    Who is holding the balloon?

19    A    I couldn't tell you.

20    Q    Who is holding the explosive powder?

21    A    Couldn't tell you.

22    Q    You or Barry though, right?

23    A    Or Ty.

24    Q    Right.  But the first one wasn't Ty you told us, right;

25    that's the second one, right?

1    A    Yes.  That is the second one.

2    Q    So let's talk about the first one.  Who is holding the

3    balloon, sir?

4    A    Again, I can't remember.

5    Q    You or Barry, sir?  It's one of the two, right?

6    A    One of the two.

7    Q    And the other one is using the explosive powder, right,

8    sir?

9    A    Yeah.

10    Q    And then there are BBs, right?

11    A    Yup.

12    Q    Put in the same balloon?

13    A    Yes.  Yes.

14    Q    You know what BBs are, right, sir?

15    A    Yup.  Had a BB gun as a kid.

16    Q    Small metal pellets, right?

17    A    Practically harmless, yeah.

18    Q    Practically harmless.  Sir, you have at least equivocally

19    testified that you have training in explosives.  You know that

20    BBs put into an explosive are extremely dangerous, sir,

21    correct?

22    A    Yeah.  An explosive by itself is dangerous.

23    Q    Yeah.  But you put metal shrapnel, BBs into an explosive,

24    it becomes lethal, right, sir?

25    A    If somebody is standing next to it, yeah.

Q    If somebody is standing near it near the blast radius?

A    If you were not observing safety protocols, yeah, it could become lethal.  Potentially an inch of water could be lethal in a bucket.

Q    Sir, is it your testimony that you were playing with an inch of water or an explosive?

A    An explosive.

Q    So you have in this balloon -- you've got explosive powder, you've got BBs in it now, right, and do you put a fuse in it?

A    Black powder, BBs -- or smokeless black powder, BBs, the balloon, and yeah, a hobby fuse.

Q    Hobby fuse.  Where did the BBs come from?

A    The tailgate of the truck.

Q    And the fuse?

A    The tailgate of the truck.

Q    You saw the picture of the explosive components found in Barry Croft's house, right?

A    Yes.

Q    Those are the same items you were using that day, right?

A    By the looks of it kind of.

Q    And you knew that if that balloon detonated those BBs would fly off, right?

A    I figured the oven was going to catch them.

Q    But you knew that they were on there to fly off as shrapnel, right?

1    A    Add extra weight to the thing.

2    Q    I'm sorry?

3    A    I wasn't really thinking they were going to be shrapnel.  I

4    just wanted to blow something up because I was asked if I

5    wanted to blow something up.

6    Q    But you knew -- I mean, the BBs weren't going to detonate.

7    You didn't think BBs were explosive, did you?

8    A    No.

9    Q    You knew that BBs could be caught by the explosion and

10   propelled outwards?

11   A    Into the stove, right.

12   Q    And that's shrapnel.  You know that, right?

13   A    Right.

14   Q    You liked Barry Croft?

15   A    Kind a.

16   Q    Sure.  I mean, you testified that building explosives is

17   fun, right?

18   A    Yeah.

19   Q    Detonating explosives is fun, right?

20   A    Extremely fun.

21   Q    You enjoyed your time with Barry Croft, right, sir?

22   A    Our times?  Yeah.

23   Q    You like the things that he was saying to you that weekend,

24   right, sir?

25   A    The little bit that I paid attention to, yeah.

1    Q    Your attorney asked you a little bit about the garage

2    meeting at the Cambria FTX.  You attended that as a member of

3    the Wolverine Watchmen leadership, correct?

4    A    Correct.

5    Q    So moving on from Cambria, you knew that Barry Croft would

6    be in Peebles, Ohio the next weekend, correct, sir?

7    A    Not to my recollection.  No.

8    Q    You went to Peebles, Ohio, correct?

9    A    Yes.

10   Q    Barry Croft was there?

11   A    Yes.

12   Q    Adam Fox was there?

13   A    After Barry left, yes.

14   Q    I'm sorry?

15   A    After Barry had left, yes.

16   Q    Brandon Caserta was there?

17   A    No.

18   Q    Ty Garbin was there?

19   A    Yes.

20   Q    Kaleb Franks was there?

21   A    Yes.

22   Q    Barry Croft spoke at that meeting, correct?

23   A    For a little bit, yeah.

24   Q    And again, he called for violence, correct?  Yes or no,

25   sir?

1    A    Not to my recollection.

2    Q    Yes or no, sir, he called for bombings, right, sir?

3    A    Not to my recollection.

4    Q    Yes or no he called for murder?

5    A    Not that I know of.  Not that I can remember.

6    Q    And he mentioned Michigan specifically?

7    A    Not to my recollection.

8    Q    Adam Fox spoke as well, correct?

9    A    A little bit.

10   Q    And he revealed to the group that you were in that he was

11   working on a plan to kidnap the governor of Michigan, correct?

12   A    Not to my recollection.  No.

13   Q    Could we please play Exhibit 113, please?

14          (Audio started, 11:33 a.m.)

15          MR. GIBBONS:  Your Honor, I am going to object.  This

16   recording was not part of the meeting.  This occurred in a

17   hotel room with Steve Robeson.

18          (Audio stopped, 11:33 a.m.)

19          MR. ROTH:  Then the witness can say he didn't hear it.

20          THE COURT:  Yeah.  It's already in evidence.

21          MR. GIBBONS:  I think he already did and this is your

22   attempt to impeach him with a statement recorded in a hotel

23   room.

24          THE COURT:  It's already in evidence so it's not an

25   impeachment issue.  We can listen to it and we can see if there

1    is anything germane that comes from this witness after he hears

2    it.

3                    (Audio started, 11:34 a.m.)

4                    (Audio stopped, 11:35 a.m.)

5    BY MR. ROTH:

6    Q    All right.  You were not present for that particular

7    conversation, correct?

8    A    I was in another state.  Yes.

9    Q    All right.  Steve Robeson was there for that, correct?

10   A    By the looks of it.

11   Q    And Adam Fox?

12   A    By the looks of it.

13   Q    And is it your testimony that you didn't hear Adam Fox say

14   anything like that the whole time that you and he were there?

15   A    Well, if I wasn't at the hotel.

16   Q    Sir, is it your testimony you never heard Adam Fox say

17   anything like that during the meeting that weekend?

18   A    Not that I can remember.  No.  I didn't really pay

19   attention.

20   Q    Sir, it was a yes or no question.  You have answered it.  I

21   appreciate it.

22   A    All right.

23   Q    And you spoke up at that meeting and talked about

24   operational security, correct?

25   A    Do we have a transcript?

Q    We do, sir.

Could we please play 116?

(Audio started, 11:36 a.m.)

(Audio stopped, 11:37 a.m.)

BY MR. ROTH:

Q    Sir, you spoke up and addressed the group about operational security, correct?

A    It looks like it.  Yes.

Q    And yes or no, sir, you were telling people that if they were going to disclose their plans to somebody else they should not do it on social media?  Is that correct, sir?

A    Plans?

Q    Sensitive material, they should not put it on social media, correct, sir?

A    Yeah.  If you don't want to get kicked off.

Q    Yes or no, sir?

A    Sure.

Q    And if they are going to disclose those sensitive plans to somebody else they should put it in the mail and mail it to them, is that correct, sir?

A    Photos, yes.

Q    Sir, are you aware that the things that were being disclosed on-line that you were concerned about, those were plans, correct, sir?  Yes or no.

A    Photos.

Q    Photos, sir.  No plans.  This had nothing to do with plans
that you were telling people don't put it on-line, mail it?
Photos?

A    Photos.

Q    Thank you.  And that afternoon on July 18th, 2020 from the
hotel you called Barry Croft directly, correct, sir?

A    Yes.

Q    And in that call you told him that you supported his cause,
correct?

A    Not that I recall.  No.  I honestly don't remember the
phone call.

Q    Could we look at 151, please?

     You even remained in contact with Barry Croft after
you left that meeting, is that correct, sir?

A    I think just the one text chain.

Q    Sir, yes or no, you remained in contact with Barry Croft
after you left that meeting?

A    Sure.

Q    So this man that on direct examination you said was a
stoned whacked out pirate, you felt you needed to remain in
contact with, is that correct, sir?

A    The first time I met him, yes, stoned whacked out pirate.
After that --

Q    Sir, yes or no, that's the person that you said you needed
to remain in contact with, correct?

1    A    Not need to stay in contact with.

2    Q    The person you wanted to stay in contact with, right, sir?

3    A    Not even wanted.  Just --

4    Q    Sir, did somebody make you contact Barry Croft here?

5    A    Dan Chappel.

6    Q    All right.  And here it is where you -- this is a

7    one-on-one message, right?

8    A    Yup.

9    Q    All right.  And this one-on-one message with Barry Croft

10   you invite Barry Croft to Michigan for an FTX, correct?

11   A    No.  Not yet.

12   Q    We could probably swing something -- excuse me.  You think

13   you could swing maybe a four-day FTX, everyone bring their

14   heavy hitters and hard chargers, show each other where we're at

15   and spend the next day or two talking?  That's what you said,

16   right sir?

17   A    Yeah.  That's not inviting him to Michigan, though.

18   Q    And above that you say, the problem is everyone wants to

19   argue over something they agree on.  We go around in circles

20   and we aren't going to get shit done if we continue doing what

21   we are doing as a whole in my opinion.  You said that to Barry

22   Croft, right?

23   A    Yup.

24   Q    And what you were saying to Barry Croft, what you were

25   referencing is the plans to attack politicians, correct?

1    A    No.

2    Q    It was plans to attack governments, correct, sir?

3    A    No.

4    Q    Barry Croft says he wants to come up for a week or two, and

5    he is referring to Michigan, correct?

6    A    By the looks of it, yeah.

7    Q    And you say, we could probably swing something down the

8    road, correct?

9    A    Yup.

10   Q    And in fact, down the road Barry Croft did come up to train

11   with you and your group, correct?

12   A    Sure did.

13   Q    You said the training was only going to be for hard hitters

14   and hard chargers, right?

15   A    Not only.  Just bring them.

16   Q    And you were a hard hitter and hard charger, right?

17   A    A hard charger, sure.

18   Q    Ty Garbin, hard hitter, hard charger?

19   A    Sure.

20   Q    Kaleb Franks, hard hitter, hard charger, right?

21   A    Sure.

22   Q    Brandon Caserta, hard hitter, hard charger, right?

23   A    Getting there.

24   Q    Well, he wasn't well tactically trained, right?

25   A    He was getting there.  He had --

1    Q    You were training him up, right?

2    A    Not me personally.  No.

3    Q    You testified on direct examination, I think the word you

4    used to describe him was passionate, is that right?

5    A    Yeah.

6    Q    And his passion when he would express that to you in words

7    came out in threats of violence, right?

8    A    I don't really call it --

9    Q    Sir, yes or no, threats of violence, right?

10   A    No.  Not threats.

11   Q    You have talked to Brandon Caserta many times, correct?

12   A    Not really.

13   Q    On-line?

14   A    Not really.

15   Q    In person?

16   A    Once or twice.

17   Q    Sir, you traveled in a car with him from Michigan to

18   Wisconsin.  You've talked to him in person once or twice?

19   A    Well, if I am in the car from Wisconsin then wouldn't that

20   constitute as once that whole trip?

21   Q    Okay.  Once or twice you have spoke to Brandon Caserta in

22   person?  That's your testimony today?

23   A    Yeah.  Just about once or twice.

24   Q    And in your conversations with Brandon Caserta, he

25   expressed to you that he was very angry with the government,

1    correct?

2    A    Well, everybody was.

3    Q    Sir, he expressed to you that he was very angry with the

4    government, didn't he?

5    A    Yeah.

6    Q    And he expressed to you that he was very angry with the

7    governor of Michigan, correct, sir?

8    A    Not to my recollection, no, not her specifically.

9    Q    He talked about shooting people?

10   A    Sure.

11   Q    Sure?

12   A    Sure.

13   Q    Sure.

14   A    I don't remember these conversations.

15   Q    I'm concerned about that, sir.  Somebody talks to you about

16   shooting somebody and you don't remember it?

17   A    I mean, with my mind-set with the military we make those

18   kinds of jokes all the time.

19   Q    Sir, Brandon Caserta -- you have watched these videos,

20   haven't you?

21   A    In court, yes.

22   Q    Yes.  You have met Brandon Caserta, correct?

23   A    Yeah.

24   Q    And when you described Brandon Caserta on direct

25   examination you didn't say that he is a funny guy, right?

1     A     No.

2     Q     You said that he is a passionate guy, right?

3     A     Yeah.  He speaks passionately.

4     Q     So those things he said about shooting people are not out

5     of humor, they are out passion, correct, sir?

6     A     Sure.  I mean, I --

7     Q     Could we please look at 156?  Can we zoom in on the box,

8     please?

9            And here there is talk going on, sharpen the spikes on

10    your bats.  And it's Wayward.  That's Brandon Caserta, right?

11    A     Correct.

12    Q     And he tells you, come to the meeting next time and we can

13    focus this aggression into a legitimate plan instead of waiting

14    around for someone else or for the state to enact slavery 2.0,

15    correct?  Is that correct, sir?

16    A     Yup.

17    Q     So he doesn't want to wait around, right; that's what he

18    said to you?

19    A     I don't think anybody wanted to wait around.

20    Q     Sir, he said he didn't want to wait around, right?

21    A     Correct.

22    Q     He said he wanted to plan, right?

23    A     Well, yeah.  He is a planner.

24    Q     Sir, yes or no, he said he wanted to plan, correct?

25    A     Yes.  He is a planner.

1   Q    And he would come to a meeting with you to plan, correct?

2   A    Sure.  Yeah.

3   Q    All right.  Same with Adam Fox.  He was not --

4        You can take that down.

5        He wasn't particularly well trained either, right?

6   A    No.

7   Q    His gear wasn't as nice?

8   A    Terrible.

9   Q    But he was Barry Croft's guy in Michigan, right?

10  A    I guess.

11  Q    And you have heard Adam Fox repeatedly talk about his plans

12  to kidnap the governor, correct?

13  A    Not a whole lot but a few times, yes.

14       MR. ROTH:  Your Honor, I believe we are going to

15  stipulate to admitted Proposed Exhibit 479, a call that the

16  Defendant placed on October 27th, 2020, from the, I believe,

17  Newago County Jail.

18       MR. BLANCHARD:  Have you produced that to me?

19       MS. KELLY:  I listened to it.

20       MR. BLANCHARD:  I haven't.

21       MR. GIBBONS:  I don't know what the hell it is.

22       MR. BLANCHARD:  I am pretty sure I am a party to the

23  case.

24       THE COURT:  All right.  Well, you have a call that

25  from your perspective, Ms. Kelly, is admissible?

MS. KELLY:  It's a call from my client to his father at jail.

THE COURT:  All right.  And who, if any, of the other Defendants are addressed in it?

MR. ROTH:  Adam Fox, Your Honor.

THE COURT:  All right.  Well, certainly Mr. Gibbons ought to see it first.

MR. ROTH:  Certainly, and I believe it was produced in discovery.

THE COURT:  All right.  Maybe you can -- do you have a transcript that you can put up?

MR. ROTH:  We do not because we pulled it during direct examination.  It was otherwise not relevant.

THE COURT:  All right.  Before --

MR. ROTH:  We can leave it for now.

THE COURT:  We'll have to give the other lawyers a chance to hear it.

MR. ROTH:  Certainly, Your Honor.

BY MR. ROTH:

Q    You had previously heard Barry Croft talk about needing explosives for his plan, correct?

A    For his plan?

Q    For his plans?

A    I don't recall.  No.

Q    It strikes me, sir, that on direct examination I didn't

1    hear you say I don't recall very much.

2              MS. KELLY:  I am going to object.  Is this a question?

3              THE COURT:  Yeah.  I mean, that's more argumentative I

4    think, right?  We've all heard the testimony in both direct and

5    cross and you can all argue what it means to the jury and they

6    should be the ones to make that decision.

7    BY MR. ROTH:

8    Q    All right.  It's your testimony today that maybe Barry

9    Croft asked -- talked about needing explosives, maybe he

10   didn't, you don't remember, right, sir?

11   A    Correct.

12   Q    Regardless, you were going around trying to find an

13   explosive, a better explosive than you could make, correct?

14   A    No.  Not exactly.  Not actively.

15   Q    Could we please play Exhibit 121?

16              (Audio started, 11:47 a.m.)

17              (Audio stopped, 11:47 a.m.)

18   BY MR. ROTH:

19   Q    You were trying to find a bomb maker, correct, sir?

20   A    Dan wanted me to, yes.

21   Q    Sir, you were trying to find a bomb maker, correct, sir?

22   A    At the direction of Dan Chappel, yes.

23   Q    Sir, you were trying to find a bomb maker?

24              MR. BLANCHARD:  Objection, ask and answered.

25              MR. ROTH:  Then I would ask to strike the answer as

non-responsive.

THE COURT:  Well, you know, everybody can take it down a notch.  All right.  I mean, we are adults.  We listen, we hear, and so let's get the direct answer.  Were you or were you not trying to find a bomb maker?

THE WITNESS:  Yes.

BY MR. ROTH:

Q   Bomb maker that you had identified was Adam Cowan, correct, sir?

A   The government identified him as Adam Cowan.

Q   Sir, the person that you knew as Adam Cowan?

A   I didn't even know his name until after my arrest.

Q   Sir, you were familiar with this person -- whether by name or otherwise, you were familiar with his bomb making abilities, correct?

A   His sister.

Q   By way of his sister you were aware of his bomb making abilities, correct, sir?

A   What I was told by her.  Yes.

Q   Sir, what we just saw and heard in that transcript, you were talking about his bomb making abilities, correct, sir?

A   Yes.

Q   You said he can make bombs from pressure cookers, right, sir?

A   Yes.

1    Q    You said he can make hand grenades, right, sir?

2    A    Yes.

3    Q    Can we look at Exhibit 119, please?

4         You tried to get this person, whose name you say you

5    do not know, you tried to get him to come to a Wolverine

6    Watchmen meeting, correct, sir?

7    A    This would be --

8    Q    Sir, yes or no?

9    A    Yes.

10   Q    You tried to get him to come to a meeting with the

11   Wolverine Watchmen, correct?

12   A    Yeah.

13   Q    Could we please look at Exhibit 408?

14        And you reached out to his sister to do so, correct?

15   A    Yes.

16   Q    Yes or no?

17   A    Yeah.

18   Q    But you could not get a hold of him, correct?

19   A    She couldn't, no.

20   Q    Sir, you could not get a hold of him, correct?

21   A    She attempted for me, so no.

22   Q    At the meeting on July 23rd, there was a sheet handed out

23   with code words, correct?

24   A    July 23rd is at my house?

25   Q    I believe so.

1   A    Fire?

2   Q    Yes.

3   A    Yeah.  Code words.  Yes.

4   Q    And those code words had words for different illegal things

5   and some legal things, too, correct?

6   A    Correct.

7   Q    But there were things that were going to be used in illegal

8   ways, which is why you needed code words for them, correct?

9   A    I guess.

10   Q    Yes or no?  Yes?

11   A    Sure.

12   Q    I want to talk about the hike.

13   A    Which one?

14   Q    On August 5th, 2020.  Do you recall taking a hike with just

15   Ty Garbin and Kaleb Franks?

16   A    No.

17   Q    All right.  Would looking at the chat transcript of that

18   day help refresh your memory?

19   A    Yes.  It would.

20   Q    So the date is on the cover page, which is 45.  I am going

21   to direct his attention to 54, 55 and 60.

22           May I approach, Your Honor?

23           THE COURT:  Sure.

24   BY MR. ROTH:

25   Q    So we'll look at the cover page.  That's where the date is.

1    A    Okay.

2    Q    If you can read this silently to yourself?  Look up when

3    you are done.  You can --

4         MR. GIBBONS:  Your Honor, may I see what the item is

5    that's being used to refresh apparently?

6         THE COURT:  I think he just referenced it.  Maybe

7    Ms. Kelly has it.

8         MS. KELLY:  I do.

9    BY MR. ROTH:

10   Q    Did you read that?

11   A    Yes.

12   Q    I'll flip the page.  All right.  Let me know when you are

13   finished?

14   A    Can you go back?

15   Q    Sure.

16   A    Can I?

17   Q    Yeah.

18   A    Okay.  Can you turn the page?

19   Q    Sure.  This is the second -- so now we're looking at 132.

20   Did that refresh your memory, sir?

21   A    It did.  Yes.

22   Q    So yes, on August 5th, 2020, you, Ty Garbin, Kaleb Franks,

23   the three of you went on a hike together, correct?

24   A    Correct.  I had my dates mixed up.  I'm sorry.

25   Q    During that hike you guys talked about how you were

1     skeptical about Adam Fox, correct?

2     A    I can't really remember what we said on the hike.

3     Q    During that hike you guys talked about having each other's

4     back, correct?

5     A    Not really.  No.

6     Q    You attended another FTX in Munith on August 9th, 2020,

7     correct?

8     A    Correct.

9     Q    Ty Garbin and Kaleb Franks were there with you, correct?

10    A    Yes.

11    Q    Adam Fox?

12    A    Yes.

13    Q    Adam Fox talked more about his plans to kidnap the governor

14    and how they were developing, correct?

15    A    Not how they were developing.  He just asked.

16    Q    He said he had someone doing recon on her vacation home,

17    correct?

18    A    Not that I recall.  No.

19    Q    He said he was working on getting cooperation from militias

20    in Ohio, Wisconsin and Illinois, correct?

21    A    Not that I recall.  No.

22    Q    And he said Barry Croft was helping, correct?

23    A    Not that I recall.

24    Q    Dan Chappel asked you if you wanted to go with Adam Fox on

25    daytime recon at the governor's vacation house in August,

1      correct?

2      A    Correct.

3      Q    And you wanted to go but couldn't make it, correct?

4      A    No.  I did not want to go.

5      Q    Could we look at 460, please?  That's the wrong exhibit.

6      We can take that down.  Let me find the right one.  No.  Just a

7      moment.  416, please.

8           These are your messages with Trevon Brown about the

9      daytime surveillance, correct, sir?

10     A    Yes.  Trevon Brown.

11     Q    Trevon.  I apologize.  And Trevon Brown is a friend you had

12     from the military, correct?

13     A    He is an old team leader in my company.  Yes.

14     Q    And you couldn't make the daytime recon or declined to go

15     on the daytime recon and instead you invited Trevon Brown,

16     correct?

17     A    Correct.

18     Q    And you told him, Trevon Brown, that you couldn't make it,

19     correct?  I can't make it but was wondering if you wanted my

20     spot.  Right, sir?

21     A    There it is.  Yes.  Thank you.  Yes.

22     Q    And you invited Trevon Brown because you wanted Trevon to

23     go, correct?

24     A    I just wanted him to meet Dan.

25     Q    And you trusted Trevon Brown, correct?

1    A    Yup.

2    Q    And you thought if Trevon Brown went on that reconnaissance

3    it would be done well, correct?

4         MS. KELLY:  I am going to object.  I don't think those

5    facts are in evidence.

6         THE WITNESS:  No.

7         MR. ROTH:  That's why I'm asking the witness them.

8         THE COURT:  And he answered no.

9         THE WITNESS:  Can you ask the question again, please?

10   BY MR. ROTH:

11   Q    You want Trevon Brown to go because you trusted Trevon

12   Brown, right?

13   A    Right.

14   Q    You know he was a good soldier, correct?

15   A    Marine, yes.

16   Q    And you knew that if he went on the reconnaissance it would

17   be done well?

18   A    No.  He wasn't supposed to --

19   Q    Sir, yes or no.  You knew if he went it would be done well?

20   A    No.

21   Q    And he said no?

22   A    Correct.

23   Q    I want to talk about the August 23rd security meeting.  Do

24   you recall that meeting?

25   A    At my house, correct?

1    Q    Yes.

2    A    Correct.

3    Q    There was discussion that night about the group possibly

4    being infiltrated by federal agents, correct?

5    A    Yes.  There was talk of that.

6    Q    And that was the meeting where you then told them to all

7    move to Threema, a different encrypted chat application, is

8    that correct, sir?

9    A    Correct.

10   Q    This is the same night that Brandon Caserta had a

11   conversation with Kaleb Franks about people quitting when they

12   discussed their serious plans about the governor?

13   A    I don't know.  I wasn't a part of that conversation.

14   Q    This is also the meeting where Jerad Beauchesne talks about

15   nobody talks, everybody walks, correct?

16   A    Correct.

17   Q    You were there for that?

18   A    Yes.  It was my house.

19   Q    The other conversation that was also at your house but you

20   said you were not there for that one, right?

21   A    For which conversation.

22   Q    The one between Kaleb Franks and Brandon Caserta?

23   A    I don't think I even heard it.  No.  There was a lot of

24   conversations that day.

25   Q    Could we please play Exhibit 165?

1          (Audio started, 11:58 a.m.)

2          (Audio stopped, 11:59 a.m.)

3     BY MR. ROTH:

4     Q    This is Brandon Caserta at your house talking about killing

5     people, right, sir?  Yes or no?

6     A    Deadly force, yeah.

7     Q    And you recall him saying this that night, sir?

8     A    Vaguely.

9     Q    Vaguely.  You vaguely recall this man coming to your house

10    and talking about killing people?

11    A    I mean, killing people is a regular conversations between

12    marines, so...

13    Q    Was Brandon Caserta a marine?

14    A    No.  Not that I know of.

15    Q    And this man who came to your house talked about killing

16    people, you continued to hang out with him?  You had other

17    meetings with him after this day, correct?

18    A    Not just him, no.

19    Q    But you continued to travel in the same group as him,

20    correct?

21    A    He was at the same places that I was, yeah.

22    Q    And you continued to be in chat groups with him, correct?

23    A    Yeah.

24    Q    Could we please play Exhibit 167?

25    A    Is this at my house, too?

1    Q    It's the conversation we talked about a moment ago.

2    A    Okay.

3              (Audio started, 12:00 p.m.)

4              (Audio stopped, 12:00 p.m.)

5              (Audio started, 12:00 p.m.)

6              (Audio stopped, 12:00 p.m.)

7              (Audio started, 12:01 p.m.)

8              (Audio stopped, 12:01 p.m.)

9    BY MR. ROTH:

10   Q    You heard that conversation when it happened, correct, sir?

11   A    I don't think so.  I think I was actually picking up my

12   dog's poop.

13   Q    A minute ago when I asked you if you were there for the

14   nobody talks, everybody walks conversation you said, yeah, it

15   was at my house, right?

16   A    Yeah.  It was at my house, but this is outside my house.

17   Q    Did you hear other people talk about nobody talks,

18   everybody walks that night?

19   A    Not that I recall.

20   Q    You agree with that nobody talks, everybody walks in

21   principle?

22   A    I guess.  I mean, I am talking right now.

23   Q    Kaleb Franks talked, right, sir?

24   A    Yeah.

25   Q    You told us how you felt about Dan Chappel.  How do you

1    feel about Kaleb Franks, sir?

2    A    Postarrest or prearrest?

3    Q    Right now, sir?

4    A    He is a liar.

5    Q    And tell us how you feel about Ty Garbin, sir?

6    A    He is a liar.

7    Q    These are the two people that you spent the most amount of

8    time with in that group, right, sir?

9    A    I think I spent more time with Jerad than I did Kaleb, but

10   you know.

11   Q    You went to the FTX site in Luther on September 12th and

12   13th, 2020?

13   A    Yes, sir.

14   Q    And you testified about that Saturday night, correct?  This

15   is when you went out and got the alcohol?

16   A    Yup.

17   Q    And before you got too drunk the Null brothers came by,

18   right?

19   A    What do you mean came by?

20   Q    You saw the Null brothers as they were about to leave?

21   A    Yeah.  So --

22   Q    Sir, yes or no?

23   A    Okay.  Yeah.

24   Q    And they mentioned doing, in your words, the surveillance

25   thing, is that right?

1    A    Not a surveillance thing, no.  They just said they had to

2    do a thing.

3    Q    Sir, I didn't want what they said.  I asked if they said

4    surveillance thing, and your answer is no?

5    A    No.

6    Q    And that night you got very, very drunk?

7    A    Oh, absolutely.

8    Q    And you stayed there with Devin Phelps, correct?

9    A    Among others, yes.

10   Q    You knew Devin Phelps was sticking with you for that

11   weekend, right?

12   A    For the most part, yeah.

13   Q    Outside of the Wolverine Watchmen, that was the person you

14   were closest to?

15   A    Yeah.

16   Q    And he didn't have a lot of other contacts there that

17   weekend?

18   A    Casey, Ty.

19   Q    But he was by far closer to you than those guys, right?

20   A    Yeah.

21   Q    All right.  So he is going to stick with you and you knew

22   he would not want to do anything associated with these other

23   guys going up north?

24        MS. KELLY:  I am going to object.  Calls for

25   speculation.

1          THE COURT:  If he knows he can say so.  If he said he

2     didn't know that, that's fine, but I think we are entitled to

3     have -- or Mr. Roth is entitled to ask the witness his view.

4     BY MR. ROTH:

5     Q     Sir, you didn't think that Devin Phelps would be into

6     anything like that, right?

7     A     No.

8     Q     The next day you built another bomb with Barry Croft,

9     correct?

10    A     At Luther?

11    Q     Yes.

12    A     No.  I did not build that.

13    Q     You were there with him while it was being built?

14    A     No.

15    Q     Did you see it being built, sir?

16    A     No.

17    Q     You know nothing about this explosive?

18    A     Other than I put it in the tree and lit the fuse.

19    Q     That's all.  How did it get in your hands, sir?

20    A     He gave it to me.

21    Q     Who gave it to you?

22    A     Barry.

23    Q     All right.  Let's take a step back.  Where was that?

24    A     By the trailer?

25    Q     Is that where it happened?  I don't know.  It sounds like

1   you're asking me if that's where it was.

2   A    No.  I'm sorry.  I would have to say by the trailer.

3   Q    Okay.  So Barry Croft says something to you as he gives you

4   an explosive?

5   A    Do you want to blow this up?

6   Q    And what he gives you is a firework, correct?

7   A    It appeared to be, yeah.

8   Q    And yes or no, sir, it was a mortar style firework, right?

9   A    Cylindrical.

10  Q    Sir, was it a mortar style firework; yes or no?

11  A    I don't know.  I couldn't read it.  I can't tell what it

12  was.  It looks cylindrical.

13  Q    You know what a mortar is, sir?

14  A    Oh, yeah.

15  Q    Did it look to be a mortar style firework, sir?

16  A    Kind a.  It was a little bit fatter at the end, so...

17  Q    And sir, the propellant, the part of the firework that

18  shoots it up into the air, you could tell that had been

19  removed, correct?

20  A    No.

21  Q    You knew later that it had been removed, correct?

22          MR. BLANCHARD:  I'd object as to foundation.

23          THE WITNESS:  No.

24          THE COURT:  He's asking and he's answering.

25  BY MR. ROTH:

1    Q    So was it your belief, sir, that when he gives it to you,

2    the propellant is on the bottom of this firework?

3    A    By the looks of it just where the fuse was.  I mean --

4    Q    You believe the propellant was on the bottom of this

5    firework?

6    A    I am not a fireworks expert.  I don't know man.

7    Q    I know, but you are a guy who told us on direct examination

8    you love fireworks, right?

9    A    I love fireworks.  I love blowing them up, and I love

10   buying them.

11   Q    So you understand what I'm saying when I say mortar style

12   firework, right?

13   A    Yeah.

14   Q    And you understand what I'm saying when I say the

15   propellant on the bottom of the mortar style firework, right,

16   sir?

17        MR. HILLS:  Your Honor, he has asked and answered this

18   several times now.

19        MR. ROTH:  Now I just want to clarify that he

20   understands what I'm asking him about this, because at some

21   point this turned into I don't know much about fireworks.

22        THE WITNESS:  No.  I think I'm just kind of lost on

23   how you are asking it.  Like the propellant --

24   BY MR. ROTH:

25   Q    Sir, stop.  Let me ask the question again.  When Barry

1    Croft puts this explosive in your hand, did you believe that

2    the propellant was still in the bottom of it?

3    A    Yeah.

4    Q    And you could tell that the firework had been altered,

5    correct, sir?

6    A    Just --

7    Q    You could tell that there was pennies taped all around it,

8    sir, correct?

9    A    Yeah.

10   Q    And you knew that --

11   A    Not all the way around.  Just the bottom.

12   Q    And you knew that pennies, like BBs, any other metal on an

13   explosive would act as shrapnel, correct, sir?

14   A    If used that way, yeah.

15   Q    And you knew that if used that way in an explosion metal

16   would shoot off of it, correct?

17   A    Yeah.

18   Q    Pennies are metal, correct, sir?

19   A    Yeah.

20   Q    And if you detonated that firework with the pennies on it

21   they would shoot off, correct, sir?

22   A    Depending on how it was situated, yeah.

23   Q    Sir, an explosive is out of your control once you light it,

24   right?  It's going in all directions, right, sir?

25   A    If it's in a mortar tube it'll just shoot straight up.

1    Q    Did you put this in a mortar tube?

2    A    No.

3    Q    So that's not relevant, right?

4    A    But if you stick it under a tree it's going to stay there.

5    Q    You thought this would detonate all around, sir, correct,

6    sir?

7    A    Yeah.

8    Q    And when you put it in a tree, you must have -- if you

9    thought the propellant was still there you wouldn't have put it

10   on a tree because then it wouldn't make any sense for it to

11   shoot up from there, right, sir?

12   A    No.  I just figured to stick it in the tree so why just

13   stick it on the ground?

14   Q    And after you get the mortars -- excuse me, the firework,

15   the modified firework or explosive from Barry Croft, where do

16   you take it?

17   A    We take it behind the range so everybody can stay behind

18   the tire stack and walls.

19   Q    You and Barry Croft walk there together, correct?

20   A    Among other people, yeah.

21   Q    You and Barry Croft walk there together, yeah?

22   A    With other people, yes.

23   Q    And as you are walking he is talking about the pennies on

24   that, correct?

25   A    Not to my recollection.  No.

Q    Sir, you are a military veteran.  You understand when you look at the metal on there that it's going to be dangerous for people, correct?

A    Yeah.  That's why you stand behind a wall.

Q    And surely when you saw shrapnel on there you were surprised?

A    I didn't think -- think of it.  I didn't think about it.

Q    In addition to the pennies that had been affixed to the firework, there had also been -- it had been opened up and then reclosed, correct, sir?

A    It didn't look like that to me, no.

Q    You could tell there was other tape on the top?

A    No.

Q    The pennies were attached to the firework with tape, correct, sir?

A    Electrical tape.  Yes.

Q    Human silhouettes were hung around the area where you placed the firework, correct, sir?

A    I think like one or two.

Q    And you lit the fuse, correct, sir?

A    Correct.

Q    Could we please play Exhibit 222?

         (Audio started, 12:10 p.m.)

         (Audio stopped, 12:12 p.m.)

BY MR. ROTH:

Q    So we heard that that modified explosive that Barry Croft

brought to you and gave to you did explode, correct, sir?

A    Yup.

Q    And the pennies were propelled off of it, correct, sir?

Whether you think it was far or not, they were propelled off of

that item, correct, sir?

A    I didn't see them launch off so I couldn't tell you.

Q    Sir, you certainly went back and looked at the firework

after the detonation, right?

A    Yeah.  One --

Q    And all the pennies weren't still all taped together,

right, sir?

A    They were on the ground.

Q    They had been scattered around the ground there, correct,

sir?  Yes or no, sir?

A    I found one, so...

Q    The next morning you went to a meeting, correct, sir?

A    When is -- are we talking Monday morning?

Q    Sunday morning.  I apologize.  Earlier that morning.  So

that was later Sunday.  I am going backwards and I apologize

for that.  We are going to go backwards on Sunday to a meeting

that you were at that morning.

A    Circle of trust meeting --

Q    Sure.

A    -- is what everybody is calling it.

1    Q    Whatever you would like to call it, sir, you remember going

2    to that meeting?

3    A    Kind a, yeah.

4    Q    Kind a?

5    A    I remember going to it.  I don't remember everything that

6    was talked about there.

7    Q    But you have a reasonably good memory of what happened and

8    what was discussed there, right, sir?

9    A    A little bit.  I was paying more attention to my dog.

10   Q    Barry Croft was there, right, sir?

11   A    Would you like me just to list everybody that's there?

12   Q    Nope.  I'm going to ask you, sir.

13   A    Yeah.

14   Q    Barry Croft was there?

15   A    Yeah.

16   Q    Adam Fox was there?

17   A    Yes.

18   Q    Ty Garbin was there?

19   A    Yes.

20   Q    Kaleb Franks was there?

21   A    I don't believe so.

22   Q    Brandon Caserta was there?

23   A    For a little bit, yes.

24   Q    Dan Chappel was there?

25   A    Yup.

1    Q    Mark was there?

2    A    I don't know about Mark.

3    Q    Red was there?  I apologize.  Red was there, not Mark?

4    A    Yes.

5    Q    Steve Robeson was there?

6    A    Yes.

7    Q    And you heard Adam Fox address the group again, correct?

8    A    Yes.

9    Q    Could we please play Exhibit 260?

10              (Audio started, 12:14 p.m.)

11              (Audio stopped, 12:15 p.m.)

12   BY MR. ROTH:

13   Q    You heard Adam Fox say that, correct, sir?

14   A    Just now, yes.  I don't --

15   Q    You don't recall hearing that then, sir?

16   A    No.  I think I might have been having another conversation.

17   Q    Can we play Exhibit 264, please?

18              (Audio started, 12:15 p.m.)

19              (Audio stopped, 12:16 p.m.)

20   BY MR. ROTH:

21   Q    You heard Adam Fox say these things that morning?

22   A    Vaguely, but yes.

23   Q    Your memory of Adam Fox discussing this kidnapping plot

24   that morning was vague, is that right?

25   A    I mean, I wasn't -- I don't know who he was referring to as

1    an asset, no.

2    Q    All right.  So he was talking about kidnapping somebody and

3    your memory of it is only vague, correct, sir; that's what you

4    said?

5    A    Correct.

6    Q    You heard Barry Croft address the group that morning as

7    well?

8    A    I did.  I don't know what he was saying.

9    Q    Could we please play Exhibit 257?

10                (Audio started, 12:16 p.m.)

11                (Audio stopped, 12:17 p.m.)

12   BY MR. ROTH:

13   Q    Could we please play Exhibit 255?  I'm sorry.  Before you

14   do that --

15                You heard that statement by Barry Croft back then?

16   A    Kind a.  Yeah.  I remember it as I listened to it.  So

17   recall the recollection.

18   Q    Could we please play Exhibit 255?

19                (Audio started, 12:17 p.m.)

20                (Audio stopped, 12:17 p.m.)

21   BY MR. ROTH:

22   Q    All right.  You testified on direct examination that you

23   intended this as a discouraging statement.  You did not get up

24   and walk away from this meeting, did you, sir?

25   A    No.  I am trying to discourage them.

Q    You did not stand up and say, guys, we can't do this, did you, sir?

A    Now if you're going to talk about --

Q    Sir, it was a yes or no question.

A    Correct.

Q    What you do is tell them that in your experience they are going to get out and fight you guys head on, right?

A    Correct.

Q    You heard Kaleb Franks testify that he was definitely planning to kidnap the governor, correct?

A    Yes.

Q    You heard Ty Garbin testify that he was definitely going to kidnap the governor, correct, sir?

A    Correct.

Q    You kept hanging out with Kaleb Franks and Ty Garbin before and after the Luther event, correct, sir?

A    Correct.

Q    You have talked about the many times or the repeated times that you heard Adam Fox talk about kidnapping the governor, correct, sir?

A    Yes.

Q    And you continued to hang out with him from when you met him way back in the summer all the way through the Luther FTX, correct, sir?

A    I --

1    Q    Sir, yes or no?

2    A    Against my will I guess?  Unbeknownst to me.

3    Q    You've heard many messages in which Brandon Caserta talked

4    about committing gruesome acts of violence against government

5    officials, politicians.  You continued to hang out with him

6    even after receiving those messages, correct, sir?

7    A    I mean, I didn't really read them, but yeah.

8    Q    The videos that he sent out to the group?

9    A    Didn't even watch those.

10   Q    You've heard countless recordings during this trial and

11   were present for numerous occasions in which Barry Croft talked

12   about violence and specifically the governor of Michigan,

13   correct, sir?

14   A    Correct.

15   Q    And you continued to hang out with him all the way back

16   from Cambria to Dublin to Luther, correct, sir?

17        MS. KELLY:  I am going to object on the Dublin.  I

18   think that was meant to be Peebles.

19        MR. ROTH:  Peebles.  I apologize.  Peebles.

20        THE WITNESS:  Cambria, Peebles and Luther.

21   BY MR. ROTH:

22   Q    Correct, sir?

23   A    I mean, I didn't really hang out with him.  I didn't have

24   him as a personal friend.

25   Q    Sir, you continued to hang out with him, build or detonate

1    explosives with him, talked to him, correct, sir?

2    A    I mean, I built the explosives with him the two times in

3    Cambria.

4    Q    In September 2020, Kaleb Franks approached you and Ty

5    Garbin about selling some ghost guns, correct?

6    A    Among other people, yes.

7    Q    He told you he wanted to build untraceable guns and sell

8    them to a guy who is a felon, correct, sir?

9    A    He didn't tell me about the felon part until the day of our

10   reconnaissance.

11   Q    He told you he needed help with it, correct, sir?

12   A    Yes.

13   Q    And Ty agreed to help build them, correct, sir?

14   A    To my knowledge, yeah.

15   Q    To your knowledge because you were there while you guys

16   discussed it, right?

17   A    I was in a separate room playing with the dogs.

18   Q    You guys were at a restaurant when this was brought up the

19   first time, right?

20   A    Yeah, coming back from the restaurant to Kaleb Franks'

21   house.

22   Q    And Kaleb talked to you about needing your help as well,

23   correct, sir?

24   A    Yes.

25   Q    He needed your help for security, correct, sir?

1    A    Yes.

2    Q    And you agreed to do this thing that you knew it was not

3    legal, right, sir?

4    A    Correct.

5    Q    All right.  But you agreed to do it because you wanted to,

6    as you said, look out for Kaleb Franks, sir?

7    A    Look out for him.  Make money.

8    Q    And you wanted to look out for Ty Garbin because you knew

9    he was going as well, correct?

10    A    Correct.

11    Q    And you cared about these guys, right?

12    A    Their safety, yeah.

13    Q    At this point with all these discussions about kidnapping

14    the governor, you believed you would be on the run soon, sir?

15    A    No.

16    Q    Could we please take a look at 272?  You messaged the group

17    and suggested killing somebody in Maine on September 21st,

18    2020, correct?

19    A    Yes.

20    Q    Can we take that down, please?

21         You heard testimony before about other members of the

22    group buying new equipment for the kidnapping, correct, sir?

23    A    I didn't know for the kidnapping, no.

24    Q    You talked -- or we heard testimony about, for example, Ty

25    Garbin getting the bullet proof plates for his vest, right,

1    sir?

2    A    He had those before I met him.

3    Q    You heard the testimony, sir, about --

4    A    I'm sorry.  Yes.  I did hear the testimony.

5    Q    And you heard the testimony about the weapons that Adam Fox

6    was buying in early October, correct, sir?

7    A    Correct.

8    Q    And you, too, bought new equipment shortly right around

9    October 1st, 2020, correct, an M1 rifle, sir?

10   A    Oh, yes.

11   Q    I think we talked briefly about Red before.  Red is the

12   undercover from the Luther FTX.  You recall Red?

13   A    Yes.  I do.

14   Q    Did you have any contact with Red on the Saturday?

15   A    At Luther?

16   Q    Yes.

17   A    I think it was just in passing saying hi.

18   Q    And on Sunday, at what you referred to as the circle of

19   trust meeting, he was there?

20   A    He was talking.  I didn't directly talk to him.

21   Q    But from everything that happened you knew that he was

22   selling explosives to Adam Fox, correct?

23   A    By the sounds of it, but it didn't have nothing to do with

24   me as I perceived it.

25   Q    That's a good point.  You weren't buying anything from Red,

1    right?

2    A    Not on Luther, no.

3    Q    You were buying something else from him?

4    A    October 7th we were told --

5    Q    No.  No.  Were you ever going to buy something from Red?

6    A    I don't think so.

7    Q    No.  Right?  Because the guise of getting everybody there

8    was free gear, right?

9    A    Right.

10   Q    Right.  The only thing that was discussed being sold by Red

11   at the FTX was a bomb, right?

12   A    I guess.

13   Q    Yeah.  Sir, do you recall having a conversation about

14   bringing money for Red for the FTX goods?

15   A    Yes.

16   Q    All right.

17   A    Those would be exploding targets.

18   Q    A moment ago I thought the testimony was you weren't buying

19   anything from Red?

20        MR. HILLS:  No.  He was cut off, Your Honor.  He

21   wasn't allowed to answer.

22        THE COURT:  Well, the jury has heard it all and will

23   be able to rely on them to sort it out.

24   BY MR. ROTH:

25   Q    So you were going to buy exploding targets from Red, is

1    that what you are telling us today, sir?

2    A    Possibly at a later date.  I knew he was selling them.

3    Q    From what I've heard, Walmart sells them, right?

4    A    I haven't seen Walmart sell them, but I know Dunham's sells

5    various Tannerite concoctions.

6    Q    But your testimony is today is you were going to buy it

7    from a guy out of state?

8    A    If he offered it, yeah.

9    Q    Okay.  Sir, do you recall having a conversation with Dan

10   Chappel about giving Red money for goods?

11   A    Good faith money because he was giving us free stuff.  Yes.

12   Q    Would looking at the conversation refresh your memory, sir?

13   A    Yes.  Please.

14   Q    Does that refresh your memory, sir?

15   A    Yes.  It does.

16   Q    All right.  So Dan Chappel asked if you guys should throw

17   some money, not just for the free gear --

18            MR. BLANCHARD:  Objection, hearsay.

19            MR. ROTH:  It's the effect on the listener for his

20   response.

21            THE COURT:  All right.  Yeah.  You can go ahead, but,

22   you know, let's stay with something that's reasonably well

23   focused.

24            MR. ROTH:  Certainly, Your Honor.

25   BY MR. ROTH:

Q    Dan Chappel asked you if you wanted to throw some money at

him, meaning Red, not just for gear but for good faith for FTX

goods, correct, sir?

A    Correct.

Q    And you said, down, right, sir?

A    Correct.

Q    And then you offered up the group cash, correct?

A    I suggested it.  Yeah.

Q    You suggested the group cash, right?

A    Offered, suggest.

Q    Dan Chappel told you Adam is bringing a few hundred,

correct?

A    Correct.

Q    And you responded, I'll bring 200, correct?

A    Correct.

Q    And in fact, you did have a couple hundred dollars with you

when arrested on October 7th?  Yes or no, sir?

A    I did.  It was payday.

Q    You were arrested on October 7th and interviewed that day,

correct?

A    Correct.

Q    Just like Ty Garbin and Kaleb Franks, sir?

A    Despite them?

Q    Just like them?

A    Oh, just like them.  Yes.

1    Q    And like today, you repeatedly told the investigators

2    during that interview that you didn't remember very much,

3    correct?

4    A    Correct.  I have --

5    Q    Sir --

6    A    -- traumatic brain injury.

7    Q    And you minimized your involvement during that interview,

8    correct, sir?

9         MS. KELLY:  I am going to object to that line of

10   questioning, Your Honor, minimizing involvement.

11        THE COURT:  Well, I think it's fair cross.  I mean, we

12   can certainly get the witness's take on it and you can

13   rehabilitate if you need to, but I think it's okay.

14        MR. ROTH:  Thank you, Your Honor.

15   BY MR. ROTH:

16   Q    You claimed that Barry Croft made the bomb in Cambria all

17   by himself, correct?  Would you like to look at the transcript,

18   sir?

19   A    Yes, please.

20        MR. ROTH:  May I approach the witness, Your Honor?

21        THE COURT:  Sure.

22        MR. BLANCHARD:  I think the witness should be allowed

23   to read the context around it.

24        MR. ROTH:  Yeah.

25        MR. BLANCHARD:  Including the next page.

1          MR. ROTH:  Sure.

2          MR. BLANCHARD:  Are we getting the dialog between the

3     witness and the lawyer.

4          THE COURT:  I think what the witness is doing is

5     reading as Mr. Roth points to the things that he wants him to

6     refresh on if he can.

7          More the point, Mr. Roth, why are we doing this?

8     What's the point.

9          MR. ROTH:  Because like Ty Garbin and Kaleb Franks,

10    the Defendant was also not honest with the investigators on

11    that day minimizing his own involvement in the explosives and

12    other things.

13         THE COURT:  Well, it was certainly germane for Franks

14    and Garbin because when they testified they didn't minimize

15    their involvement.  But this is -- if he minimized his

16    involvement during a police interview he's done exactly what he

17    said on direct.  He said he had nothing to do with it.  So I am

18    not sure it's really worth much time.

19         MR. ROTH:  But now he has said he did help build that

20    explosive and so prior statement --

21         THE COURT:  Would you rather have him admit to

22    building the explosives or deny building the explosive?  I

23    don't understand the relevance, I guess, at that point.

24         MR. ROTH:  I can move on, Your Honor.  Thank you.

25    BY MR. ROTH:

1    Q    And when you spoke to the investigators that day, you

2    admitted that Dan Chappel was not the one who pushed you into

3    this, correct?  Yes or no?  Would you like to look at a

4    transcript, sir?

5    A    Please.

6            MR. BLANCHARD:  Can we get an answer before we start

7    refreshing recollection.

8            MR. ROTH:  I apologize.

9            MR. BLANCHARD:  Or whatever is going on here.

10           MR. ROTH:  There was an expression, and I can let the

11   witness say it out loud.

12           THE WITNESS:  I'd like to see the transcript, please.

13           MR. ROTH:  May I approach the witness, Your Honor?

14           THE COURT:  Yes.

15           MR. GIBBONS:  Your Honor, the highlighted portion that

16   counsel is indicating to doesn't really speak to the issue of

17   the question at hand whether or not Big Dan forced him into

18   doing anything.  It just talks about it doesn't say anything

19   about that at all, and his relationship to --

20           THE COURT:  The question at this point was did he

21   admit to the officers at the time of his arrest that Dan

22   Chappel was not the one who pushed him into this?  And if the

23   government thinks it has a prior inconsistent statement that's

24   one thing.  At this point I thought the effort was simply to

25   refresh the witness.

1        MR. ROTH:  That's correct, Your Honor.

2        THE COURT:  And that's perfectly proper and we'll see

3   if he is refreshed when he is done.

4        MR. ROTH:  And I can ask the question differently.  As

5   I was up there the witness asked me to repeat it.

6        THE WITNESS:  Yeah, please.

7   BY MR. ROTH:

8   Q    All right.  Dan Chappel was right down the middle with the

9   Wolverine Watchmen and you specifically, correct, sir?

10  A    Me and him were right down the middle or just him?

11  Q    No.  Dan Chappel's treatment within the Wolverine Watchmen

12  or his behavior in the Wolverine Watchmen was right down the

13  middle, right, sir?

14  A    That's how I perceived it, yes.

15  Q    He was a mediator, sir, correct?

16  A    Yeah.

17       MR. ROTH:  I have nothing else, Your Honor.  Thank

18  you.  And I can come retrieve that.

19       THE COURT:  All right.  So we've had enough time to

20  take our second break of the day.  So we'll do that now and

21  come back after 20.

22       LAW CLERK:  All rise.

23       (Jury in, 12:35 p.m.)

24       THE COURT:  All right.  Do you want to play 479 so we

25  can all hear it?

1           MR. ROTH:  I don't need to, Your Honor.

2           THE COURT:  You don't want to go to that?  Very good.

3      Then we'll take our break.  20 minutes.

4           MR. GIBBONS:  Thank you, Your Honor.

5           LAW CLERK:  Court is in recess.

6           (Recess taken, 12:36 p.m.)

7           (Resume Proceeding, 12:59 p.m.)

8           THE COURT:  Two things.  I guess the government has

9      proffered or given the Defense an opportunity to listen to 479.

10     So let me hear if there is an objection, and if so, I'll need

11     to listen.  And then the second thing I want to talk about is

12     in rough terms what I should tell the jury before they leave

13     today as in expectations for tomorrow.  So first of all, on

14     479, are there Defense objections?

15          MR. BLANCHARD:  I don't think it's relevant.

16          MR. GIBBONS:  403, yes, Your Honor.

17          THE COURT:  So let me either hear it or tell me what

18     it's about.

19          MR. ROTH:  The very short version is the Defendant

20     says, I am in here because of Adam Fox.  If the Court would

21     like to hear it it's not much longer than me saying that.

22          THE COURT:  And what's the date?

23          MR. ROTH:  It's October of 2020.  I can give you a

24     specific date in a moment.

25          THE COURT:  All right.  And your argument is it

1  suggests that he recognized, that is Mr. Harris recognized the

2  reason for his arrest was tied to Mr. Fox's plan?

3  MR. ROTH:  That's correct, Your Honor.  So first, the

4  date is 10-27-20, and second, to the Court's other question, it

5  recognizes that the witness and the Defendant knows that he is

6  in there because of the Defendants' -- excuse me Defendant

7  Fox's plan to kidnap the governor, but it also is important

8  that he's saying it's because of Adam Fox, not because of Dan

9  Chappel.

10  THE COURT:  All right.  Yeah.  I think -- I think

11  especially a short clip if that description is accurate and I

12  don't hear any quarrels about that, is germane, it's relevant.

13  I don't think it's outweighed by 403 issues, so we can use that

14  when we get the jury back in, and you can finish your cross

15  with that, Mr. Roth, and then we'll go to whatever questions

16  the Defense has.

17  ****************************************************************

18  THE COURT:  Let's bring the jury in.

19  LAW CLERK:  All rise, please.

20  (Jury in, 1:05 p.m.)

21  LAW CLERK:  Court is in session.

22  THE COURT:  All right.  Welcome back everybody.  When

23  we ended, Mr. Roth had completed his cross except for one issue

24  you may remember.  You probably don't remember numbers, but it

25  was a Proposed Exhibit 479 that Mr. Roth described as a jail

1    call involving Mr. Harris to his father.  We needed to defer so

2    that we could all listen to that and decide whether or not it's

3    something that should come in.  We've done that.  It will come

4    in.  So that we'll finish Mr. Roth's cross simply by playing

5    that call.  He'll introduce it and then we'll go forward from

6    there.  And why don't we start with that, Mr. Roth.

7            MR. ROTH:  Thank you, Your Honor.  If we can please

8    play Exhibit 479?

9            (Audio started, 1:06 p.m.)

10           (Audio stopped, 1:07 p.m.)

11           MR. ROTH:  Thank you, Your Honor.

12           THE COURT:  All right.  We'll give the Defendants an

13   opportunity for further questioning if any.  Ms. Kelly?

14           MS. KELLY:  No further questions, Your Honor.

15           THE COURT:  Mr. Hills?

16           MR. HILLS:  No, Your Honor.

17           MR. BLANCHARD:  No, Your Honor.

18           MR. GIBBONS:  No, Your Honor.  Thank you.

19           THE COURT:  All right.  And you probably figured I had

20   advance notice of that because we had Mr. Harris already

21   sitting with his lawyer, but just for our record purposes I

22   wanted to make that clear.

23           (Witness excused, 1:07 p.m.)

24           Ms. Kelly, do you have any other evidence that you

25   intend to offer?

1      MS. KELLY:  No, Your Honor.  We rest.

2      THE COURT:  All right.  So we'll go down the row, and

3   Mr. Hills on behalf of Mr. Caserta, your opportunity to make a

4   decision either way on whether to put on a case or not.

5      MR. HILLS:  Thank you.  By way of stipulation we have

6   5169, which is a business record to be entered into evidence of

7   my client's employer, Master Automatic, that relates to August

8   29th.

9      THE COURT:  All right.

10     MR. HILLS:  With --

11     THE COURT:  And the government stipulates to that?

12     MR. KESSLER:  We do, Your Honor.

13     THE COURT:  Do you want to publish it to the jury or

14  not?

15     MR. HILLS:  That's okay.  We'll just give it to them.

16     THE COURT:  It'll be in the record for you regarding

17  his work record on August 29th or lack of work record as the

18  case may be.

19     MR. HILLS:  That's correct, Your Honor.

20     THE COURT:  Anything else that you intend to offer?

21     MR. HILLS:  With that we would rest.

22     THE COURT:  Thank you.  We'll go to Mr. Blanchard.

23     MR. BLANCHARD:  Call Jayson Chambers.

24     THE COURT:  All right.  So yep.  Please come forward.

25  I don't remember if we actually released you last time or not

1    but let's just reswear you so that there is no doubt about your

2    testimony.

3           MR. BLANCHARD:  He has not testified before.

4           THE COURT:  Okay.  So fair enough.  Go ahead.

5           JAYSON CHAMBERS, DEFENSE

6           having been first duly sworn, testified as follows:

7                  DIRECT EXAMINATION

8      BY MR. BLANCHARD:

9    Q    Would you start by stating your full name, please?

10   A    Yes.  Jayson Chambers.  J-a-y-s-o-n, C-h-a-m-b-e-r-s.

11   Q    You are an FBI agent?

12   A    That is correct.

13   Q    You were one of the case agents on the Wolverine Watchmen

14   investigation, correct?

15   A    That is correct.

16          MR. BLANCHARD:  Okay.  May I approach the witness,

17   Your Honor?

18          THE COURT:  Sure.

19   BY MR. BLANCHARD:

20   Q    Agent, is it true that the FBI maintains a system to track

21   text messages sent by special agents on their official cell

22   phones?

23   A    Yes.

24   Q    Okay.  I have showed you what's been marked for

25   identification as Exhibit 3063 through 3067.  Have you reviewed

those?

A    Yes.

Q    And those were text messages that were exchanged between you and other FBI employees related to this case, correct?

A    Yes.

Q    And they are fair and accurate?

A    They are.

MR. BLANCHARD:  I'd move the admission of 3063 through 3067?

MR. KESSLER:  No objection, Your Honor.

THE COURT:  All right.  They are admitted.

BY MR. BLANCHARD:

Q    If I could show 3063, please?  If you could blow up the first -- the -- yeah.

Your phone number was the phone number ending in 6332, correct?

A    That is correct.

Q    And this message was a message that was sent to you, correct?

A    Yes.

Q    You can tell that because it says in box, right?

A    I was looking at the from but yes.

Q    Sure.  And it says, I heard DTOS denied, true?

A    Yes.

Q    DTOS stands for the domestic terrorism operation section,

1    correct?

2    A    I believe that's correct.

3    Q    That's a part of the FBI that handles investigations into

4    domestic terrorism, correct?

5    A    That is our headquarters unit that oversees domestic

6    terrorism investigations through the rest of the FBI.  They

7    have sections that cover regions of the U.S., and we have a

8    supervisor at DTOS that looks specifically at things happening

9    in Detroit.  So I think the reference here would be

10   specifically that supervisor.

11   Q    And this is a reference to the Wolverine Watchmen

12   investigation, correct?

13   A    That's my understanding.  Yes.

14   Q    Okay.  And 3064, please?

15        Your reply to that text message was slow on the uptake

16   so far, correct?

17   A    Yes.

18   Q    And you are referring to DTOS being slow on the uptake so

19   far, correct?

20   A    I am referring to an approval process that I had already

21   submitted that had not yet been moved forward.

22   Q    If I could have 3065, please?  You sent another reply that

23   said, I have pledged to beat them over the head with it until

24   they comply, correct?

25   A    Yes.

1    Q    And you are referring to when you say until they supply you

2    mean until they approve, correct?

3    A    No.

4    Q    Okay.  What are you referring to?

5    A    So I have -- at this point in time I have -- we have

6    different types of investigations in the FBI.  Normally we look

7    at individuals and so when we open an investigation it's on a

8    specific person.  We do have other types of investigations that

9    look at groups specifically.

10   Q    And those investigations are sometimes referred to as

11   terrorism enterprise investigations, is that correct?

12   A    That's correct.  When we are looking at a group that's

13   specifically for terrorism purposes we call it a terrorism

14   enterprise investigation.

15   Q    And you use an acronym for that called TEI, correct?

16   A    That is what it stands for.  Yes.

17   Q    If I could have 3066, please?

18        And then 3066 you said to this person, I'm pretty sure

19   I said something along the lines of, correct?

20   A    Yes.

21   Q    And the person that you are communicating with, do you

22   recognize the number ending in 8618?

23   A    Not off the top of my head.

24   Q    Do you remember who you were having this conversation with?

25   A    I think so.

1    Q    Was it someone with the first name of Lauren?

2    A    Yes.

3    Q    And she works for the FBI, right?

4    A    Yes.

5    Q    Okay.  And if I could have 3067?

6         And then you provide the quote on what you reference

7    in 3066 that you are pretty sure you said something along the

8    lines of, correct?

9    A    Yes.

10   Q    Would you read that quote, please?

11   A    I am going to be working this as a TEI whether you give me

12   the paperwork or not.

13   Q    Okay.  And so on April 2nd of 2020, you told this Lauren

14   that you had told someone else you were going to be working

15   this as a terrorism enterprise investigation whether you were

16   given the paperwork or not, correct?

17   A    Yes.

18   Q    And that referenced -- the TEI was a reference to Wolverine

19   Watchmen, correct?

20   A    That was reference to the group investigation on the

21   terrorism activity happening.

22        MR. BLANCHARD:  Pass the witness.

23        THE COURT:  Any other Defense questions?

24        MS. KELLY:  No, Your Honor.

25        MR. GIBBONS:  No, Your Honor.

1          THE COURT:  Any government questions?

2          MR. KESSLER:  Just briefly, Your Honor.

3                    CROSS EXAMINATION

4    BY MR. KESSLER:

5    Q    So Agent Chambers, you believe that this case was

6    appropriate for opening as a terrorism enterprise

7    investigation?

8    A    Yes.  I do.

9    Q    And because it was a group, not just an individual,

10   correct?

11   A    Yes.  And there is -- to explain the context of the

12   specific quote here, the -- at that point in time we had just

13   opened five investigations on people related to this operation.

14   So we had five individual cases that were opened and we were

15   looking at those people individually.  But at the same time

16   we've already got Mr. Chappel as an informant involved in this

17   group, the group already exists, and these five people are all

18   part of that group.  And so as we are -- we --

19          THE COURT:  Why don't you break it down, because he is

20   really getting into a narrative answer.

21   BY MR. KESSLER:

22   Q    Sure.  I only have two really quick things, but you thought

23   it was a group, right?

24   A    I did.

25   Q    And that they were involved in a terrorism enterprise?

1    A    I did.

2    Q    And did you run this approval -- this -- this case through

3    the appropriate approval process?

4    A    I did.

5    Q    And was it granted?

6    A    It was.

7              MR. KESSLER:  Nothing further, Your Honor.

8              THE COURT:  All right.

9              MR. BLANCHARD:  Just briefly?

10             THE COURT:  Sure.

11                    REDIRECT EXAMINATION

12    BY MR. BLANCHARD:

13    Q    I think we covered, these messages were sent on April 2nd,

14    right?

15    A    Yes.

16    Q    And Dan Chappel, you first made contact with him I think

17    the testimony was around March 16 or 17.  Does that sound

18    right?

19    A    It does.

20    Q    So you had had Dan Chappel for about two weeks when you

21    made these statements, correct?

22    A    Yes.

23             MR. BLANCHARD:  Pass the witness.

24             THE COURT:  Anything else?

25             MR. KESSLER:  Nothing further, Your Honor.

1          THE COURT:  All right.  Thank you.

2          (Witness excused, 1:16 p.m.)

3    *************************************************************

```
 1                              INDEX

 2
                Defendant's Witnesses:              Page
 3
                DANIEL HARRIS
 4
                 Direct Examination by Ms. Kelly      3
 5               Cross Examination by Mr. Roth        84

 6              JAYSON CHAMBERS

 7               Direct Examination by Mr. Blanchard  165
                 Cross Examination by Mr. Kessler     170
 8               Redirect Examination by Mr. Blanchard 171

 9              Exhibits:                          Admitted

10              Government's Exhibit 479              163
                  (Audio, Harris and Father)
11              Defendant's Exhibit 3063             166
                  (Text, Chambers, DTOS)
12              Defendant's Exhibit 3064             166
                  (Text, Chambers, DTOS)
13              Defendant's Exhibit 3065             166
                  (Text, Chambers, TEI)
14              Defendant's Exhibit 3066             166
                  (Text, Chambers, TEI)
15              Defendant's Exhibit 3067             166
                  (Text, Chambers, TEI)
16              Defendant's Exhibit 4005              59
                  (Photograph, Harris House, Downstairs)
17              Defendant's Exhibit 4009              26
                  Photograph, June 18)
18              Defendant's Exhibit 4042               7
                  (Harris Equipment)
19              Defendant's Exhibit 4071              62
                  (Brick Squad Member List)
20              Defendant's Exhibit 5169             164
                  (Caserta Work Record)
21

22

23

24

25
```

REPORTER'S CERTIFICATE


        I, Paul G. Brandell, CSR-4552, Official Court Reporter

for the United States District Court for the Western District

of Michigan, appointed pursuant to the provisions of Title 28,

United States Code, Section 753, do hereby certify that the

foregoing is a full, true and correct transcript of an excerpt

from the proceedings had in the within entitled and numbered

cause on the date hereinbefore set forth; and I do further

certify that the foregoing transcript has been prepared by me

or under my direction.




                        /s/ Paul G. Brandell

                        Paul G. Brandell, CSR-4552, RPR, CRR

                        U.S. District Court Reporter

                        399 Federal Building

                            Grand Rapids, Michigan  49503