1          IN THE UNITED STATES DISTRICT COURT.

2        FOR THE WESTERN DISTRICT OF MICHIGAN

3               SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,

5          Plaintiff,        No:  1:20cr183-1/2/5/6

6    vs.

7   ADAM DEAN FOX,
    BARRY GORDON CROFT, JR.,
8   DANIEL JOSEPH HARRIS and
    BRANDON MICHAEL-RAY CASERTA,
9
            Defendants.
10

11
    Before:
12
                    THE HONORABLE ROBERT J. JONKER
13                      U.S. DISTRICT Judge
                        Grand Rapids, Michigan
14                     Wednesday, March 30, 2022
                   Excerpt of Jury Trial Proceedings
15   Testimony of Katherine Martinez, Chasity Knight, Timothy John
      Hunt, Robert Gillette, Kelly Van Arsdale, Colleen Kuester,
16                 Lindsay Cowan and Megan Cooley

17   APPEARANCES:

18              MR. ANDREW BIRGE, U.S. ATTORNEY
                By:  MR. NILS R. KESSLER
19              MR. JONATHAN C. ROTH
                The Law Building
20              333 Ionia Avenue, NW
                Grand Rapids, MI 49501-0208
21              (616) 456-2404

22                  On behalf of the Plaintiff;

23

24

25

```
 1                    MR. CHRISTOPHER M. GIBBONS
                      MS. KAREN M. BOER
 2                    Dunn Gibbons PLC
                      125 Ottawa Avenue, NW, Suite 230
 3                    Grand Rapids, MI 49503-2865
                      (616) 336-0003
 4
                              On behalf of Defendant Fox.
 5
                      JOSHUA ADAM BLANCHARD
 6                    Blanchard Law
                      309 South Lafayette Street, Suite 208
 7                    P.O. 938
                      Greenville, MI 48838-1991
 8
                              On behalf of Defendant Croft, Jr.
 9
                      JULIA ANNE KELLY
10                    Willey & Chamberlain LLP
                      300 Ottawa Avenue NW Suite 810
11                    Grand Rapids, MI 49503-2314
                      (616) 458-2212
12
                              On behalf of Defendant Harris.
13
                      MICHAEL DARRAGH HILLS
14                    Hills at Law PC
                      425 South Westnedge Avenue
15                    Kalamazoo, MI 49007-5051
                      (269) 373-5430
16
                              On behalf of Defendant Caserta.
17

18         REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR

19

20

21

22

23

24

25
```

1                    03/30/2022

2                    (Proceedings, 8:28 a.m.)

3                    LAW CLERK:  All rise, please.

4                    (Jury in, 8:28 a.m.)

5                    LAW CLERK:  The United States District Court for the

6       Western District of Michigan is now in session.  The Honorable

7       Robert J. Jonker, chief judge, presiding.

8                    THE COURT:  All right.  Good morning everyone.

9       Welcome.  It's good to see you.  Some day I hope that people

10      recognize how incredibly prompt this jury is, because we've

11      been able to start most mornings at least a couple minutes

12      before the start time, at least the official start time of

13      8:30, and that's a true tribute to the lawyers and the parties

14      in getting here on time but also and especially to all of you

15      in the box, and we appreciate your ongoing attentiveness to

16      that responsibility.

17                   We're here this morning to pick up with the

18      government's case and the government's next witness, and we'll

19      get started right away so we stay on track.  Mr. Kessler?

20                   MR. KESSLER:  Thank you, Your Honor.  We'll start this

21      morning with Special Agent Katherine Martinez.

22                   THE COURT:  All right.

23                   KATHERINE MARTINEZ, GOVERNMENT

24                   having been first duly sworn, testified as follows:

25                   (Witness sworn, 8:30 a.m.)

```
DIRECT EXAMINATION
```

BY MR. KESSLER:

Q    Good morning, Agent Martinez.

A    Good morning.

Q    You are a special agent with the FBI, correct?

A    That's correct.

Q    And are you currently assigned to the Baltimore field
office?

A    Yes.

Q    Can you tell the jury what part of that field office you
are assigned to?

A    So I am assigned to the Wilmington Delaware agency.  I work
for a white collar squad.

Q    How long have you been with the FBI?

A    I joined the FBI in July of 2019.

Q    Let me take you back to October 8th of 2020.  Did you
assist in a search of a tractor-trailer that day?

A    Yes.  I did.

Q    Whose tractor-trailer was that?

         THE COURT:  Can I ask you to slide the microphone a
little closer to you?  Go ahead.

BY MR. KESSLER:

Q    Whose tractor-trailer was it that you helped to search?

A    Barry Croft.

Q    Let's focus specifically on the time around midnight to

1  1:00 a.m.  Where were you staged at that time?

2  A    So we were staged at originally Troop 2, which is the

3  Delaware State Police troop where we were meeting, and then I

4  responded to a Wawa in New Jersey.

5  Q    Where is Troop 2 in Delaware?

6  A    Newark.

7  Q    Did you know exactly where you were going to be sent that

8  night?

9  A    No.

10  Q    So you said that you were sent to a Wawa in New Jersey.

11  Here in Michigan I don't know if everybody is familiar with

12  Wawa.  What is a Wawa?

13  A    So Wawa is a convenience store gas station.

14  Q    Okay.  And why exactly did you go there?

15  A    So I was told that there was a tractor-trailer at that

16  location that we needed to search, and I happened to have a

17  camera with me so I was going to be the photographer for the

18  search.

19  Q    Okay.  You are not a -- being a photographer is not your

20  specialty in the FBI, right?

21  A    Not at all.

22  Q    You had one that was charged though?

23  A    Yes.  I happened to have one charged with me that day.

24  Q    All right.  So let's talk about what happened when you got

25  there.  You mentioned it was in New Jersey.  Do you remember

1  around what city that convenience stop was?

2  A    I believe Swedesboro.

3  Q    Any other agents accompany you there?

4  A    Yes.  I was with Special Agent Jeff Rising, and there was a

5  task force officer with the Wilmington Police Department.  He

6  was there as well.

7  Q    And when you arrived at the Wawa did you see the truck

8  there?

9  A    Yes.

10  Q    Was Mr. Croft there at the time?

11  A    No.

12  Q    Okay.  And so he had already been taken into custody?

13  A    As far as I know, yes.

14  Q    Did you take photos in place before you actually seized any

15  physical evidence?

16  A    Yes.

17  Q    All right.  Have you had a chance to look at the photos you

18  took since that time?

19  A    Yes.  I have.

20  Q    And are those all accurate representations of what you saw?

21  A    Yes.

22  Q    All right.  Same pictures that you took, right?

23  A    Yes.

24        MR. KESSLER:  Your Honor, I would offer at this time

25  Government Exhibits 349 and 350.

1    THE COURT:  Maybe we should see if she can identify

2    those are the pictures she took unless the Defense has no

3    objection.  Any objections?

4         MR. BLANCHARD:  No.  I don't.

5         THE COURT:  All right.  So 349 and 350 can come in.

6    BY MR. KESSLER:

7    Q    Let's take a look at 349 first.  Agent Martinez, what are

8    we looking at here?

9    A    So that's a backpack with a knife on it that's in the truck

10   cab between the driver's area in the front sort of at the top

11   of the photo and then the bottom half of the photo is the

12   living area in the tractor.

13   Q    And let me just have you explain that to the jury for

14   anybody who is not familiar with how a long haul truck cab

15   might be constructed.  What are the parts of that truck cab?

16   A    So I didn't know either, but when I went into the truck

17   there is a driver's seat, passenger seat, and then in between

18   them you can go into a little area in the back where there is a

19   small living area.  It's sort of like a day bed.  You can set

20   it up as a couch or a bed.

21   Q    So in between there is where you found this bag?

22   A    Yes.  I think the bag had been leaning on the floor right

23   there between the cab area and the living area.

24   Q    All right.  And let's bring up Exhibit 350, please.  What

25   are we looking at here?

1    A    That's a firearm.

2    Q    And do you know what kind of firearm?

3    A    A Glock.  I don't know a lot about firearms, so...

4    Q    A Glock semiautomatic handgun?

5    A    Yes.

6    Q    And what are these here?

7    A    Magazines.

8    Q    And specifically, can you see at the end here, were they

9    loaded?

10    A    Yes.  They were.

11    Q    Okay.  And we see it sitting here on the passenger seat

12    with the magazine sitting out like that.  Did you find it

13    exactly like that?

14    A    No.

15    Q    How did you find it?

16    A    There was a stack of some things on the passenger seat, and

17    it was tucked within the things on the passenger seat.  That

18    smaller magazine was also loaded in the firearm.

19    Q    So it was in the handle here?

20    A    Correct.

21    Q    Okay.  And have you had a chance to look at Exhibit 366,

22    which is in front of you?

23    A    Yes.

24    Q    Okay.  And is that the actual physical Glock handgun?

25    A    In the box in front of me, yes, that's correct.

1        MR. KESSLER:  I'd offer that into evidence if there is

2    no objections?

3        THE COURT:  So 366 is now --

4        MR. KESSLER:  I'm sorry, 336.  My apologies.

5        THE COURT:  336.  Any objections?  All right.  Hearing

6    none, 336 is admitted

7    BY MR. KESSLER:

8    Q    Agent Martinez, can you briefly just take that out and show

9    it to the jury, please?

10   A    So it's got zip ties and it's locked.  It's got an attached

11   flashlight.

12   Q    Okay.  Thank you very much, Agent.

13       I'd like to show you a couple more photographs.  I am

14   going to talk to you about what's been marked for

15   identification as Exhibits 351, 352, 353, 354, 355 and 356.

16       We can go through them one at a time or if there is no

17   objections I'd offer them now?

18       THE COURT:  All right.  351 to 356, any objections?

19       MR. BLANCHARD:  If those are all photos you took I

20   have no objection.

21   BY MR. KESSLER:

22   Q    Are these photos you took, Agent Martinez?

23   A    Yes.  I was the only photographer.

24       THE COURT:  They are admitted.  Go ahead.

25   BY MR. KESSLER:

1  Q    Let's start with Exhibit 351.  What are we looking at here,

2  Agent Martinez?

3  A    That's sort of the day bed couch area as I was describing

4  it.  There is a Hawaiian male shirt on the day bed area.

5  Q    Let me clear these dots here.  Is that where you found them

6  or were they moved to take the picture?

7  A    So my recollection is that the shirt was on the day bed

8  area but I think we spread it out for the picture.

9  Q    Okay.  Can we show Exhibit 352, please?

10        And we have something redacted here because it has

11 personal information but what are we looking at here?

12 A    So that is the driver's seat of the truck.  It's a

13 tri-corner hat.  There were two camouflage neck scarves and

14 then his wallet with his driver's license, Barry Croft's

15 driver's license.

16 Q    And it wasn't found propped up in the hat like that?

17 A    No.  It was not found that way.  We placed it that way in

18 order to take the photo.

19 Q    All right.  Can we bring up Exhibit 353, please?

20        What do we have here?

21 A    So that's the backpack from the first picture that we've

22 opened up and propped on the day bed in the back to take

23 pictures of the items inside the backpack.

24 Q    And let me ask you about what a few of those items are

25 here.  This thing that says life straw here, what's that?

1    A    So that's a device you can use, at least my understanding

2    is that you can drink from various water sources and it makes

3    it safe for you to drink the water.

4    Q    Exhibit 354, please?

5         All right.  Did you open the bag?

6    A    Yup.  That's just the larger pocket of the backpack.  There

7    is some clothing in there.

8    Q    What kind of clothing was in there?

9    A    It looks like camouflage camping type clothing.

10   Q    All right.  Let's look at Exhibit 355, please.

11        What's in the pocket of the bag over here?

12   A    So those are two additional magazines.

13   Q    Same caliber as the handgun?

14   A    Yes.

15   Q    Exhibit 356, please?

16        And do you know what these things are here?

17   A    I don't remember what they are.  I remembered that when we

18   cataloged the backpack it was -- we deemed it sort of

19   survivalist camping type gear.

20   Q    All right.  And we saw a picture of the tri-corn hat.  Have

21   you had a chance to look at Exhibit 333?

22   A    Yes.

23   Q    All right.  Is that there in front of you?

24   A    Yes.

25   Q    Is that the physical object?

1    A    Yes.

2            MR. KESSLER:  I'd offer that into evidence, Your

3    Honor?

4            THE COURT:  Hearing no objections it's admitted.

5    BY MR. KESSLER:

6    Q    Can you pick that up and show the jury, please?  Thank you.

7    A    So these are the bandanas that you can see in the picture.

8    This is the tri-corner hat.

9    Q    Can you hold it up so everyone can see it?  Okay.  Thank

10   you.

11   A    It's gotten a little smushed over time.

12   Q    Exhibit 344, is that the physical backpack?

13   A    Yes.

14           MR. KESSLER:  I'd offer that into evidence, Your

15   Honor.  I'm sorry, 334.  I keep messing up my numbers this

16   morning.

17           THE COURT:  Hearing no objections, 334 is admitted.

18   BY MR. KESSLER:

19   Q    And can you show the jury that, please?  Thank you.

20           All right.  And finally, Exhibit 335.  Is that the

21   physical Hawaiian shirt?

22   A    Yes.

23           MR. KESSLER:  I'd offer that into evidence?

24           THE COURT:  Hearing no objections it's admitted.

25   BY MR. KESSLER:

1     Q    Can you bring that one out and show the jury, please?  All

2     right.

3                    Thank you very much, Agent Martinez.

4                    I have nothing further, Your Honor.

5                    THE COURT:  All right.  Mr. Gibbons?

6                    MR. GIBBONS:  No questions, Your Honor.

7                    THE COURT:  Ms. Kelly?

8                    MS. KELLY:  None, Your Honor.  Thank you.

9                    THE COURT:  Mr. Hills?

10                   MR. HILLS:  No, Your Honor.

11                   THE COURT:  Mr. Blanchard?

12                   MR. BLANCHARD:  Thank you.

13                         CROSS EXAMINATION

14      BY MR. BLANCHARD:

15    Q    Good morning, Agent Martinez.

16    A    Good morning.

17    Q    So you responded to this Wawa to do a search, right?

18    A    Yes.

19    Q    And the search was done based on Mr. Croft's consent,

20    right?

21    A    Yes.  That was the information I had.

22    Q    Yeah.  He gave you permission to search, right?

23    A    Yes.

24    Q    Didn't make you get a search warrant?

25    A    Correct.

Q    Didn't fight with you?

A    He wasn't even there when I got there.

Q    Fair enough.  When you go the search, you said the items that were in, like, 356, that's the backpack, right?

A    Yes.

Q    You described those as --

A    The backpack is 334.

Q    I'm sorry.  The photo of the backpack is 356, right?

A    Okay.

Q    And 334 was the backpack, right?

A    Yes.

Q    You described those as survivalist or camping gear, correct?

A    Yes.

Q    So like the life straw is a water filter that you, you know, in a pinch can drink out of a puddle or a lake, right?

A    Yes.

Q    And then there was, like, rope and that sort of thing, correct?

A    I don't remember everything that was in it.  I can open it right now and pull it out if you'd like.

Q    Camping gear is legal, right?

A    Yes.  True.

Q    Water filters are legal, right?

A    Yes.

1    Q    Okay.  Sort of like prepper stuff, is that fair?

2    A    Sure.  Yes.

3    Q    Okay.  You also found marijuana in the truck, right?

4    A    We found a green leafy substance, yes, that I think I

5    characterized in my 302 as marijuana, but we never tested it.

6    Q    Right.  You are an FBI special agent, right?

7    A    Yes.

8    Q    You have encountered marijuana a time or two, right?

9    A    Yes.

10   Q    You believed it was marijuana, right?

11   A    Yes.  We did.

12   Q    Okay.  And you saw marijuana smoking tools, right?

13   A    Yes.

14   Q    Paraphernalia?

15   A    Correct.

16            MR. BLANCHARD:  Okay.  I have nothing else.

17            THE COURT:  All right.  Any redirect?

18            MR. KESSLER:  No, Your Honor.  Thank you.

19            THE COURT:  All right.  Thank you.

20            (Witness excused, 8:42 a.m.)

21            THE COURT:  You might be the record for the shortest

22   stay, or close.  We'll go to the government's next witness.

23            MR. KESSLER:  The government calls Chasity Knight,

24   Your Honor.

25            THE COURT:  We'll have you sworn in before you take

1    the stand, Ms. Knight.

2              CHASITY NIGHT, GOVERNMENT

3              having been first duly sworn, testified as follows:

4              (Witness sworn, 8:43 a.m.)

5              THE COURT:  All right.  And please step up and get

6    comfortable and we'll turn it over to Mr. Kessler for direct.

7              MR. KESSLER:  Thank you, Your Honor.

8                     DIRECT EXAMINATION

9       BY MR. KESSLER:

10   Q    Good morning, Ms. Knight.

11   A    Good morning.

12   Q    I know you are a little nervous so take your time here.

13   A    Okay.

14   Q    How old are you?

15   A    Forty.

16   Q    All right.  And where do you live?

17   A    I reside --

18   Q    I don't need your home address.

19   A    During the week I reside in Delaware.

20   Q    Where in Delaware?  What city?

21   A    Bear, Delaware.

22   Q    And you said that's during the week.  Do you reside

23   somewhere else on weekends?

24   A    Every other weekend at my sister's in northeast.

25   Q    When you say in northeast, we are here in Michigan?

1    A    Maryland.

2    Q    Northeast Maryland.  Okay.  What do you do for a living?

3    A    I take care of Barry's three girls.

4    Q    That's a full-time occupation for you?

5    A    Yes.

6    Q    Where were you from originally?

7    A    Maryland.

8    Q    Okay.  What's your relationship with Mr. Croft?

9    A    I am his girlfriend.

10   Q    How long have the two of you been together?

11   A    Since 2011.

12   Q    Were you at one point engaged to be married?

13   A    Yes.

14   Q    And during all this time since 2011, have you been living

15   with Mr. Croft?

16   A    I was staying at his address, yes, and he stayed at mine in

17   Maryland.

18   Q    Okay.  And when you were staying with him at his address,

19   was that the house in Bear, Delaware?

20   A    Yes.

21   Q    So you have known Mr. Croft for a long time, right?

22   A    Yes.

23   Q    Can you tell the jury what his attitude toward the

24   government has been all that time?

25   A    He was -- he didn't like the government.  He was

antigovernment.

Q    What kinds of things did he say about it?

A    He just thought the government is not for him.  That the government doesn't help the people out.  They like to line their own pockets.

Q    Has he been talking like this since 2020 or longer?

A    I don't exactly recall the exact date.  I just know he's never really been fond of government.

Q    All right.  Now, I am going to try and -- I am going to put up a couple of exhibits and we are going to go over those real quick, okay?

A    Yes.

Q    Can we bring up Exhibit 48, please?

     All right.  I am showing you a picture of Barry Croft. You recognize him, right?

A    Yes.

Q    This tattoo we can read, it says, expect us, and then underneath that, second continental Delaware regiment?

A    Yes.

Q    Do you remember that tattoo?

A    I do.

Q    Do you remember when he got it?

A    No.

Q    All right.  Now, do you remember talking to us a week or two ago about this?

1    A    Yes.

2    Q    All right.  Do you remember you said you have been with him

3    since 2011?  Did you at any point break up for a while with

4    Mr. Croft?

5    A    I did.

6    Q    Do you remember about when that was?

7    A    I broke up with him 2017ish.

8    Q    Okay.  And did you actually leave the Delaware area for a

9    while?

10    A    I did.

11    Q    All right.  Where did you go?

12    A    Florida.

13    Q    So it was around 2017ish.  Do you remember if Barry Croft

14    had this tattoo on his arm before you left for Florida?

15    A    Yes.  He did.

16    Q    So he had it already in 2017?

17    A    Yes.

18    Q    And on the other arm he's got a tattoo that says, we the

19    people.  Have you seen that?

20    A    Yes.

21    Q    Did he also have that one on his arm before you left in

22    2017?

23    A    Yes.

24    Q    On one of his hands he has a tattoo that's the roman

25    numeral three surrounded by stars.  Do you remember that?

1    A    Yes.

2    Q    Do you remember when he got that?

3    A    No.

4    Q    Was that also before you left for Florida?

5    A    Yes.

6    Q    Can we put up Exhibit 332, please?

7         Do you recall seeing these at your house?

8    A    Yes.

9    Q    What are they?

10   A    They are patches.

11   Q    All right.  Do you know who ordered those?

12   A    Barry Croft.

13   Q    All right.  Can we just blow up the package itself, the

14   box?

15        All right.  And it says here, ship to Chasity Knight.

16   That's you, right?

17   A    That's correct.

18   Q    Why were they shipped to you?

19   A    Cause that's the address I was living at and that's where I

20   was living, so we had them shipped to me to receive them

21   because he is an over-the-road truck driver.

22   Q    He is an over-the-road truck driver.  Okay.  Was he with

23   you then?  Was he living with you at the time?

24   A    Yes.

25   Q    And let's blow up just this part of it right here if you

1      would.

2            It says that this package was mailed to you on June

3      23rd, 2017.  Is that when you recall receiving those patches?

4      A    I don't recall when I received them.

5      Q    Okay.  But it was before you went to Florida?

6      A    Yes.

7      Q    Do you recall Barry Croft doing a podcast from your house?

8      A    Yes.

9      Q    What was the name of the podcast?

10     A    We the people, and it had something at the end of it.

11     Q    What was that podcast about?

12     A    It was about different things we followed.  The trial of

13     Lloyd Finnigan.  We talked about constitutional rights, safety

14     of committees.

15     Q    Safety committees you said?

16     A    Yes.

17     Q    What is that?

18     A    It's how to put people come together I think in your --

19     where you live at your communities.

20     Q    To do what?

21     A    I am not sure.

22     Q    Do you recall Barry Croft talking about a second American

23     revolution?

24     A    No.

25     Q    Do you recall him talking about using force against the

1     government?

2     A     No.

3     Q     Do you remember when we talked about this about two weeks

4     ago?  We talked about voting, do you remember that?

5     A     Yes.

6     Q     What was the nature of that conversation?  Did you talk

7     with Barry Croft about voting?

8     A     I told him -- we had a lot of --

9           MR. BLANCHARD:  I am going to object as to hearsay for

10    the things that she told Mr. Croft.

11          THE COURT:  I think at this point we can hear what she

12    has to say in the same fashion that we did with some of the

13    other witnesses who were on the stand.  Go ahead if you are

14    able, and if you want to reframe the question or take a minute

15    you can do that, Mr. Kessler.

16    BY MR. KESSLER:

17    Q     So what I'm looking for is what Barry Croft said to you

18    about this.  So did you talk with him about voting?

19    A     I have talked to him about voting, how I felt about the

20    voting.

21    Q     Okay.  And this will help us understand his response to

22    you.  What did you tell him about voting?

23    A     I think that we should vote in order to get things to

24    change.

25    Q     And what did Barry Croft say to you?

1    A    He doesn't vote.

2    Q    All right.  But besides voting how did he say that he --

3    that you should get things to change?

4    A    I don't recall.

5    Q    Do you recall telling me it was with guns?

6    A    No.  I don't.

7    Q    Did you agree to disagree?

8         MR. BLANCHARD:  Objection, Your Honor.  She says she

9    doesn't recall the conversation.  I think this is improper

10   impeachment.

11        THE COURT:  Well, she didn't recall the specific word

12   or specific phrase.  She can answer the new question, which is

13   broader, if she's able.

14   BY MR. KESSLER:

15   Q    When you said that you told Barry you should vote to change

16   things, did he agree with you?

17   A    I don't recall.

18   Q    Do you recall saying that you agreed to disagree with

19   Barry?

20   A    I do.

21   Q    Okay.  And I want to ask you specifically about September

22   11th, 12th and 13th.  Did you go with Mr. Croft to a field

23   training exercise in Luther, Michigan?

24   A    I did.

25   Q    And do you remember how long of a drive it was?

1    A    A long drive.  It was over 11 hours.

2    Q    All right.  Do you remember an explosive device being

3    detonated there in Luther, Michigan?

4    A    I can't recall what device it was.

5    Q    What do you recall about it?

6    A    I just recall a big boom.

7    Q    A big boom?

8    A    Correct.

9    Q    And before you heard that big boom, what did you see Barry

10   Croft doing?

11   A    He was walking away from where I was over a hill.

12   Q    And what about Daniel Harris; do you recognize Daniel

13   Harris in the courtroom today?

14   A    I don't see him.

15   Q    All right.  Look around you.

16   A    I see him.

17   Q    All right.  Can you tell us where he is and what he is

18   wearing?

19   A    He is with the glasses in the second seat.

20   Q    Second seat in the back row here?

21   A    Yes.  Next to the lady.

22   Q    Okay.  Did you see Daniel Harris, too?

23   A    Yes.

24   Q    What did you see Daniel Harris doing right before the

25   explosion that you heard?

```
1    A    Just walking away with Barry.

2    Q    And then you heard the boom?

3    A    Yes.

4    Q    You remember October 8th, the day that Barry Croft was

5    arrested?

6    A    Yes.

7    Q    Okay.  You told the jury a couple minutes ago that you have

8    been taking care of his kids ever since, right?

9    A    I have, yes.  And I have taken care of them before then,

10   yes.

11   Q    And how old are they?

12   A    Right now they are 12 and 14.

13   Q    So at the time they would have been around 10 and 12?

14   A    When the arrest, correct.

15   Q    Can we play Exhibit 94, please?  Let's try that again.  Is

16   our audio not hooked up?

17         Is it possible it's one of the settings between the

18   computers and there?

19         THE COURT:  I don't think so.

20   BY MR. KESSLER:

21   Q    Do you recall hearing that audio?

22   A    I do.

23         MR. KESSLER:  Can we just put the transcript up then?

24         THE COURT:  Hit the arrow.  That's usually an

25   indication.  No luck.  Sorry.
```

BY MR. KESSLER:

Q   All right.  I'll read it to you.  It says, daughter, daddy?
Croft, what honey?  Daughter, do you want a Dorito?  Croft
says, honey, I am making explosives.  Can you get away from me,
please?  Daughter, oh, okay.  Croft says, yeah, thank you.  I
love you.  Get out of here.  Some things you just can't do with
pop, you know what I mean?  Do you recall hearing that
conversation?

A   I do.

Q   Did you recognize Mr. Croft's voice?

A   I did.

Q   Did you recognize which one of the daughters it was?

A   I did.

Q   Which one was it?

A   It was Amber.

Q   How old is Amber?

A   She was 12 at the time.

MR. KESSLER:  I have nothing further, Your Honor.

THE COURT:  All right.  Do you need a little break or
are you okay, Ms. Knight?

THE WITNESS:  I am okay.

THE COURT:  All right.  Would you like any water?

THE WITNESS:  I am okay.  Thank you.  Yes.

THE COURT:  Then we'll go to any cross from
Mr. Gibbons first?

1          MR. GIBBONS:  Your Honor, this is relevant to

2     Mr. Croft primarily.  I would like to reserve in any event I

3     have questions.

4          THE COURT:  Ms. Kelly?

5                    CROSS EXAMINATION

6       BY MS. KELLY:

7     Q    Good morning, ma'am.

8     A    Good morning.

9     Q    My name is Julia Kelly.  I represent Daniel Harris who you

10    just identified.  You talked about him kind of walking away

11    from you at the training in Luther, do you remember that?

12    A    Yes.

13    Q    Okay.  Did you see anything in his hands?

14    A    No.

15         MS. KELLY:  Okay.  I have nothing further.

16         THE COURT:  Mr. Hills?

17         MR. HILLS:  No, Your Honor.  Thank you.

18         THE COURT:  Mr. Blanchard?

19         MR. BLANCHARD:  Thank you.

20                    CROSS EXAMINATION

21      BY MR. BLANCHARD:

22    Q    Good morning.

23    A    Good morning.

24    Q    We've talked on the phone before, right?

25    A    Correct.  Yes.

1    Q    I guess we haven't really met in person.  I represent

2    Mr. Croft.  You know that, right?

3    A    Yes.

4    Q    Okay.  So I understand that a few years ago you had to have

5    some brain surgery, right?

6    A    Correct.

7    Q    And that has impacted you, right?

8    A    Correct.

9    Q    It impacts your memory in some respects, right?

10   A    Correct.

11   Q    Okay.  I just wanted the jury to understand why some of the

12   things you didn't recall might be the case.

13        You know Mr. Croft, right?

14   A    Yes.

15   Q    You have been in a relationship for quite a while, true?

16   A    Yes.

17   Q    Throughout that time I think you said Mr. Croft doesn't

18   like the government, right?

19   A    Yes.

20   Q    Fair to say he has been vocal about that?

21   A    Yes.

22   Q    Even had a podcast about it?

23   A    Correct.

24   Q    And the FBI has asked you about that podcast?

25   A    Yes.

1    Q    They seemed bothered by it, fair?

2              MR. KESSLER:  Hearsay.

3              THE COURT:  She can answer if she had formed an

4    opinion at the time about whether they were bothered or not.

5    It doesn't necessarily require words.

6              THE WITNESS:  I don't think they were bothered by it.

7    They just asked questions.

8    BY MR. BLANCHARD:

9    Q    Okay.  Throughout the time you've known Mr. Croft he's used

10   marijuana?

11   A    Yes.

12   Q    Frequently?

13   A    Yes.

14   Q    Daily?

15   A    Yes.

16   Q    About how much marijuana do you think he uses on an average

17   day?

18   A    I have no clue.

19   Q    Okay.  Would he smoke more than once a day?

20   A    Yes.

21   Q    More than twice a day?

22   A    Yes.

23   Q    Sort of a constant thing, is that fair?

24   A    Well, yes.

25   Q    Okay.  Does he use marijuana more when he is, you know,

1    around friends?

2    A    Yes.

3    Q    Okay.  And this podcast that you talked about, did you say

4    that was around 2017?

5    A    I believe so.

6    Q    Okay.  And what sorts of topics were on the podcast?

7    A    We followed a trial.  We did -- talked about constitutional

8    rights, safety of committees.

9    Q    When you say constitutional rights, what do you mean?

10   A    How to restore them, teach younger generations your

11   constitutional rights that have lost, what your constitution

12   means.

13   Q    Okay.  And when you say teach younger people, what do you

14   mean by that?

15   A    So they can learn your constitution that hasn't learned it

16   yet.

17   Q    Was that something that was important to Mr. Croft?

18   A    Yes.

19   Q    How long has teaching younger people about the constitution

20   been important to Mr. Croft?

21   A    For a while.  For a few years.

22   Q    We had heard some testimony about Mr. Croft and wanting to

23   make silver coins from another witness.  Are you familiar with

24   that?

25   A    Yes.

1    Q    What do you know about Mr. Croft and silver?

2         MR. KESSLER:  I am going to object to hearsay if this

3    is coming from Mr. Croft.

4         THE COURT:  Yeah.  If it -- you know, I think you need

5    to lay a little bit more foundation so it just doesn't recycle

6    words from Mr. Croft, but if there is another basis for

7    knowledge or what she observed you can certainly do that.

8    BY MR. BLANCHARD:

9    Q    Was there silver in the house?

10   A    Yes.

11   Q    What kind of silver was in the house?

12   A    A silver bar.

13   Q    Okay.  And I think we have seen a picture of that

14   previously.  Give me one moment here.  Do you know what the

15   purpose of the silver bar was?

16        MR. KESSLER:  Same objection.

17        MR. BLANCHARD:  I just asked if she knew what the

18   purpose was right now.  I didn't ask what it was.

19        THE COURT:  Well, I mean, if the purpose -- the silver

20   bar itself doesn't have a purpose.  It just is.  So it's got to

21   be a human being's purpose, and the only human being we know of

22   other than the witness on the stand right now is Mr. Croft

23   related to that.  So if you want her to express what her

24   purpose was, that's one thing.  If you want Mr. Croft 's

25   purpose, I don't see how that comes in without Mr. Croft's

1    words, and that's a hearsay problem.

2              MR. BLANCHARD:  Well, could I show the witness -- I

3    guess I don't recall if 3004 was admitted or just

4    provisionally, so subject to linking up.

5              MR. ROTH:  We show it as referenced but not admitted,

6    Your Honor.

7              THE COURT:  All right.  I see the same thing.

8              MR. BLANCHARD:  Can I show just the witness 3004,

9    please?

10             THE COURT:  It'll come up on your screen, Ms. Knight.

11             THE WITNESS:  Okay.

12   BY MR. BLANCHARD:

13   Q    Do you recognize this, ma'am?

14   A    Yes.

15   Q    What is it?

16   A    It's a silver bar.

17             MR. KESSLER:  I think he's just going to go ahead and

18   testify to something.

19             THE COURT:  He hasn't got there yet.  Let him do what

20   he is allowed to do and she can identify that is a silver bar.

21   Go ahead.

22   BY MR. BLANCHARD:

23   Q    Where was this at?

24   A    At Barry's residence in the kitchen.

25   Q    Okay.  So did you have a purpose with Mr. Croft with the

1    silver bar?

2    A    No.  I did not.

3    Q    Okay.  You can take that down.

4           But that bar was seized from Mr. Croft's residence,

5    correct?

6    A    Yes.  It was.

7    Q    Okay.  Do you know a person by the name of Jennifer or

8    Jenny Plunk?

9    A    I do.

10   Q    How do you know her?

11   A    She was Barry's friend.

12   Q    When did you first meet her?

13   A    I met her in Ohio.

14   Q    Okay.  In the summer of 2020?

15   A    I don't recall the date.

16   Q    Okay.  Was that around Columbus, Ohio, in that --

17   A    I believe so.

18   Q    Dublin perhaps?

19   A    One of them I know.

20   Q    Okay.

21   A    I don't know which one.

22   Q    Did you meet her at a hotel or somewhere else?

23   A    A hotel.

24   Q    Okay.  Did Ms. Plunk ever come to Delaware?

25   A    Yes.

1    Q    About when was that?

2    A    It was the summertime.

3    Q    Was it after you met her the first time?

4    A    Correct.

5    Q    Did she come with anyone else?

6    A    Yes.

7    Q    Who did she come with?

8    A    She came with Robeson, Steve Robeson, and another gentleman

9    was there.

10   Q    Okay.  What did they do when they were there?

11   A    We went out to dinner, and then they hung out with Barry,

12   and they tried to get Barry to go back to --

13          MR. KESSLER:  Objection.  Hearsay.

14          THE COURT:  Yeah.  I mean, what we can know,

15   Ms. Knight, to the extent you are able, is what you saw these

16   people do, and what we can't know is the words they said, if

17   any, at least not at this point.  So if you are able to focus

18   on what you observed, that's okay.

19          You can go on, Mr. Blanchard.

20          MR. BLANCHARD:  Thank you.

21   BY MR. BLANCHARD:

22   Q    Did Mr. Croft go back to a hotel with them?

23   A    No.

24   Q    Okay.  Did you -- did they come to your house?

25   A    Yes.

1    Q    Okay.  Did you -- did you see any drug use?

2    A    No.

3    Q    Okay.  Was there a time -- and I don't know.  Was there a

4    time that you went to South Carolina with Mr. Croft?

5    A    I went to -- no.

6    Q    Okay.  So you have not -- you have not met with Mr. Robeson

7    in South Carolina, is that accurate?

8    A    That's correct.

9    Q    Okay.  You heard that audio recording -- or I guess you

10   didn't hear it.  Mr. Kessler read for you that transcript about

11   the Dorito, right?

12   A    Yes.

13   Q    Were you present in Cambria, Wisconsin?

14   A    No.

15   Q    Okay.  Do you know if anyone went with Mr. Croft from

16   Delaware to Cambria?

17   A    Yes.

18   Q    Who was that person?

19   A    Jenny.

20   Q    Jenny Plunk?

21   A    Yes.

22   Q    How did that come about, if you know?

23   A    I don't know.

24   Q    Okay.  And so we talked about Ms. Plunk came to Delaware

25   with Mr. Robeson some time after you met them in Ohio, right?

1    A    Yes.

2    Q    Is that the only other time you saw Mr. Robeson?

3    A    Besides the Michigan, yes.

4    Q    Okay.  There's been a lot of talk about fireworks in this

5    case.  Have you seen Mr. Croft with fireworks before?

6    A    Yes.

7    Q    Does he like fireworks?

8    A    Yes.

9    Q    Do you guys often set off fireworks at the 4th of July?

10   A    Yes.

11   Q    Is that every year you do that?

12   A    Yes.

13   Q    What kinds of fireworks do you set off?

14   A    I don't know what kind they are.  They are just fireworks.

15   Q    Well, the kind that shoot up into the air or sparklers or

16   snap pops or something else?

17   A    All of them.

18   Q    You set off all the kinds of fireworks?

19   A    Yes.

20        MR. BLANCHARD:  If I could have just one moment,

21   please?

22        THE COURT:  Sure.

23        MR. BLANCHARD:  I'm pass the witness, Your Honor.

24        THE COURT:  Mr. Gibbons?

25        MR. GIBBONS:  No questions, Your Honor.

```
 1                    THE COURT:  Redirect?

 2                    MR. KESSLER:  No redirect.

 3                    THE COURT:  Thank you, Ms. Knight.  You may be

 4         excused.

 5                    (Witness excused, 9:06 a.m.)

 6                    THE COURT:  We'll go to the government's next witness.

 7         There are people in the back of the gallery sometimes making a

 8         sign that would look to me like they are looking, hey, I can't

 9         quite hear.  If anybody is having trouble hearing we do have

10         hearing assists.  So if you want that let me know.  And the

11         problem is, of course, you probably can't hear me.  So if

12         anybody needs hearing assist and wants it, we can give you, and

13         I don't know even know what they call it, but an ability to get

14         the direct feed from the microphone.  Just raise your hand and

15         we'll make sure you get it.  All right.  Go ahead, Mr. Roth.

16                    MR. ROTH:  Thank you, Your Honor.  We call Special

17         Agent Timothy Hunt.

18                    THE COURT:  All right.

19                    TIMOTHY JOHN HUNT, GOVERNMENT

20                    having been first duly sworn, testified as follows:

21                    (Witness sworn, 9:07 a.m.)

22                         DIRECT EXAMINATION

23           BY MR. ROTH:

24         Q    Good morning.

25         A    Good morning.
```

1    Q    Could I have you start by stating and spelling your

2    complete name?

3    A    Certainly.  My name is Timothy John Hunt.  T-i-m-o-t-h-y,

4    J-o-h-n, H-u-n-t.

5    Q    Thank you.  Where are you employed?

6    A    I am employed by the Bureau of Alcohol, Tobacco, Firearms

7    and Explosives here in Grand Rapids, Michigan.

8    Q    In what capacity?

9    A    I am a senior special agent as well as a certified

10   explosives specialist and bomb technician.

11   Q    How long have you been employed by the ATF?

12   A    I have been employed by the ATF since 2001.

13   Q    Are people required under law to register destructive

14   devices with the ATF?

15   A    They are.

16   Q    Is that information stored in a data base with the ATF?

17   A    Yes.  It's called the National Firearms Registration and

18   Transfer Registry.

19   Q    Did you check that database to see if two of the Defendants

20   in this case have ever registered destructive devices with the

21   ATF?

22   A    I did.  And I said registry, but the record is the National

23   Firearms Transfer and -- National Firearms Registration and

24   Transfer Record.

25             THE COURT:  Sometimes the court reporter has harder

```
 1    questions than the lawyers.
 2              THE WITNESS:  Sorry.
 3    BY MR. ROTH:
 4    Q    Has Barry Gordon Croft, Sr., ever registered a destructive
 5    device with the ATF?
 6    A    I found no record of registration for Mr. Croft.
 7    Q    Has Daniel Joseph Harris ever registered any destructive
 8    devices with the ATF?
 9    A    I found no registration records for Mr. Croft or for
10    Mr. Harris.
11              MR. ROTH:  Thank you.  I have nothing else, Your
12    Honor.
13              THE COURT:  Mr. Gibbons?
14              MR. GIBBONS:  Nothing, Your Honor.
15              THE COURT:  Ms. Kelly?
16              MS. KELLY:  I have no questions, Your Honor.
17              THE COURT:  Mr. Hills?
18              MR. HILLS:  No, Your Honor.
19              THE COURT:  Mr. Blanchard?
20              MR. BLANCHARD:  Pass.
21              THE COURT:  All right.  You do have the record for the
22    shortest stay, so thank you.
23              (Witness excused, 9:08 a.m.)
24              THE COURT:  We'll go to the government's next witness.
25              MR. ROTH:  Thank you, Your Honor.  We call Robert
```

```
1    Gillette.
2              ROBERT GILLETTE, GOVERNMENT
3              having been first duly sworn, testified as follows:
4              (Witness sworn, 9:09 a.m.)
5                    DIRECT EXAMINATION
6      BY MR. ROTH:
7    Q    Good morning.
8    A    Good morning.
9    Q    Could I have you start by stating and spelling your
10   complete name, please?
11   A    My name is Robert, R-o-b-e-r-t, Gillette, G-i-l-l-e-t-t-e.
12   Q    Thank you.  Where are you employed?
13   A    I am employed by the Federal Bureau of Investigation,
14   specifically at the laboratory divisions explosives unit.
15   Q    And what is your title there?
16   A    My job title is chemist forensic examiner.
17   Q    What are your responsibilities in that position?
18   A    My primary responsibilities include the examination of
19   evidence for the presence of explosives or the residues of
20   explosives as well as instruction on evidence collection for
21   explosives investigations, and I also manage the proficiency
22   testing within my unit.
23   Q    How long have you worked at the FBI?
24   A    I have worked for the FBI since 2012.
25   Q    Have you held other positions there during that time?
```

1    A    Yes.  I was a chemist within the explosives unit from April

2    2012 until December of 2012 when I got my current position.

3    Q    Thank you.  And can you please briefly describe the

4    training that you received to work as a chemist at the FBI?

5    A    To become a qualified chemist within the explosives unit I

6    underwent a training program that included instruction on the

7    different standing -- standard operating procedures that we

8    have as well as an amount of information concerning explosives

9    and explosives chemistry.  And I also had to complete a number

10   of competency tests, one per standard procedure, to be

11   qualified as a chemist.  And then after that, to become a

12   qualified chemistry -- chemist forensic examiner I had to

13   successfully complete multiple oral boards of examination as

14   well as moot courts to become a qualified chemist forensic

15   examiner.

16   Q    Thank you.  Were you provided with some of the remnants of

17   the explosion that were recovered by investigators at the

18   Luther site in this case?

19   A    Yes.  That would have been a submission out of the Detroit

20   field office to the laboratory division.

21   Q    What items were you provided with?

22   A    I believe the item numbers within the FBI laboratory were

23   items 3 and 4, and those would have been, if I remember

24   correctly, either pieces of paper or cardboard.  I believe

25   there is also tape, foil and a rubber band as well.

Q    What condition were they in?

A    They were dry when I received them.  They were -- they just looked like bits and scraps of paper and cardboard and miscellaneous material.

Q    Did you attempt to analyze those items?

A    I did analyze those items for explosives residues.

Q    Are there environmental issues that can compromise or limit your ability to do that analysis?

A    There can be.  Yes.

Q    What are some examples?

A    Some environmental examples could be simply just weathering effects depending upon when the explosion happened, when the evidence was collected, if it rained, how long it had been exposed to different types of temperatures, other varying weather that could potentially affect my ability to detect residues on evidence.

Q    So if those items were left outside between, let's say, September and October, would that compromise your ability to effectively do your analysis?

A    That could compromise my ability.  Yes.

Q    In what way?

A    It could either reduce the amount of residues that are potentially on that evidence to a level that I can't detect it. It could reduce it to -- could remove those residues completely.  It could.  Yes.

1  Q   All right.  And in this case were you able to find any

2  evidence of explosive material in those small items you were

3  provided?

4  A   From the items from the submission from the Detroit field

5  office I was unable to detect any explosives residue.

6  Q   Were you also provided several items that were recovered

7  from Barry Croft's residence?

8  A   Yes.  That was a submission from the Baltimore field office

9  to the laboratory division.

10         MR. ROTH:  Could we look at 439, please?

11         THE COURT:  This one is in already?

12         MR. ROTH:  I believe so, Your Honor.  I'll double

13  check.

14         THE COURT:  Yes.  It is.  Okay.

15  BY MR. ROTH:

16  Q   Okay.  Are these the items that you were provided?

17  A   These appear to be some of the items that I was provided.

18  Q   Are there additional items that you were provided?

19  A   No.  I just did not receive all of these.

20  Q   Understood.  So it's the opposite that you didn't receive

21  all of these items?

22  A   Correct.

23  Q   Which of these items did you receive for analysis?

24  A   I believe it was the roll of green hobby fuse, the

25  container of exploding target, and one container of smokeless

1    powder.

2    Q    What analysis did you perform on those items?

3    A    I performed what would have been considered bulk

4    examinations.  So these weren't the residues of explosives but

5    these were bulk intact material.  So I examined all of those

6    that we specifically -- the techniques that I used fell under

7    either spectroscopy -- so that's you have an unknown, put an

8    amount of energy into that.  The way that energy is changed

9    after interacting with that unknown can be indicative of either

10   the elements present within it or the bonds between the

11   elements and that allows us to identify it that way.  I did

12   also use chromatographic techniques, chromatography, as a means

13   of separating out a mixture into its individual components to

14   ideally identify each individual component.

15   Q    And through those processes you are examining these items

16   for whether or not there is any explosive material present?

17   A    Correct.  Either explosives or chemicals that could be used

18   to make explosives.

19   Q    So with that in mind, what were your findings as to the

20   fuse?

21   A    The core material that I removed from that green hobby fuse

22   was identified as the low explosive black powder.

23   Q    What about the smokeless powder?

24   A    The smokeless powder was or what appears to be smokeless

25   powder in an open container of smokeless powder I identified as

1     a rod shaped single base smokeless powder.

2     Q    What does that mean?

3     A    The rod shape is just the shape of the smokeless powder.

4     So depending upon the type of firearm it's used in that shape

5     will determine its burn rate.  And then a single base smokeless

6     powder just means the energetic component in it is only

7     nitrocellulose, as opposed to a double base which also includes

8     nitroglycerin and a triple base which would also include

9     nitroquinoline.

10    Q    Is that also an explosive material?

11    A    Yes.  All three of those are explosives.

12    Q    And then the final item that you examined was the exploding

13    targets.  What did you find with that item?

14    A    So inside that item there was a white powder, which was

15    identified as the oxidizers ammonium perchlorate and ammonium

16    nitrate, and inside that container as well is a small ziplock

17    bag that had a green colored powder, which inside there was the

18    oxidizer potassium dichromate and sulfur and aluminum.

19    Q    And did you find evidence of explosive material in that as

20    well?

21    A    So in order -- so I'd have to take a step back and kind of

22    explain what explosives are.  So an explosive, a chemical

23    explosive is either a single pure substance or a mixture of two

24    or more substances that when you put the proper energy into it

25    will explode.  So that explosion is a chemical reaction, and

1    that chemical reaction is typically a rapid release of energy.

2    That's the explosion.

3           So in order to produce an explosive you need either --

4    you need a fuel and an oxidizer.  So in a single pure substance

5    like nitrocellulose those are bound together molecularly on

6    that single molecule.  For two or more mixtures -- for two or

7    more things to be mixed together you need those fuels and

8    oxidizers mixed intermittently so -- and at the right

9    proportion so that when you put the proper energy into it that

10   chemical reaction, that explosion happens.  So in this

11   exploding target I identified both oxidizers and fuels.  So it

12   wasn't -- in the state that I received it wasn't an explosive,

13   but if it would have been mixed properly and at the right

14   ratios it could potentially produce an explosive composition.

15   Q   Did you notice anything else about the exploding target and

16   the cannister?

17   A   I didn't recognize it.  Not that I know every single

18   exploding target that's out there, but in that little ziplock

19   bag, within it it's usually from all the ones I have seen

20   either through my job or the literature it's usually only fuels

21   in there.  But there was an oxidizer as well which was a little

22   bit disconcerting.  Disconcerting because it makes it

23   relatively unsafe because you have an actual mixture of fuels

24   and oxidizers.  And I tested what we call a thermal

25   susceptibility test, which is simply a burn test.  Take a small

1    amount of it, introduce a flame into it, because that heat is

2    often times the energy you need to cause that explosion to

3    happen, and it burned sort of like a sparkler would have

4    burned.  So it was technically an energetic composition within

5    it.

6    Q   All right.  So the surprising thing was that the two

7    materials that when combined would combust were kept in the

8    same container do I understand?

9    A   Yeah.  What's typically considered a fuel packet in

10   exploding targets.  They are -- usually the way they are

11   marketed and sold they are separate and they are not explosives

12   until you mix them and then shoot them.

13   Q   And did the -- you referred to the testing, and I apologize

14   I forget the name, where you burn a little bit of it?

15   A   Technical term is a thermal susceptibility test or a burn

16   test.

17   Q   The burn test.  Did that perform any differently than you

18   would expect normal exploding targets to perform?

19   A   Well, for what I anticipated it being simply a fuel, I

20   didn't expect it to have any reaction.  But since there was a

21   small amount of an oxidizer mixed into it, it did react.

22            MR. ROTH:  Very good.  I have nothing else, Your

23   Honor.  Thank you.

24            THE COURT:  All right.  Mr. Gibbons?

25            MR. GIBBONS:  Again, this material I think is most

1    relevant to Mr. Croft.  I would reserve and pass the witness.

2            THE COURT:  All right.  Go ahead, Ms. Kelly.

3            MS. KELLY:  Thank you, Your Honor.

4                      CROSS EXAMINATION

5      BY MS. KELLY:

6    Q    Good morning, sir.

7    A    Good morning.

8    Q    I want to talk and ask you a couple of questions of what

9    you were just talking about, and this is item 2-3-19, small

10   zipper lock bag of powder, is that correct?

11   A    Yes.

12   Q    Okay.  That's the one that you thermal tested and there was

13   some reaction, is that right?

14   A    That is correct.

15   Q    Okay.  Do you see that small zipper lock bag of powder in

16   this photograph?

17   A    Not in this photograph.  It's within that container.

18   Q    It's within that container.  Can you circle the container

19   that you are referring to on the screen?

20   A    Is it a touch screen?

21            THE COURT:  It should work if you touch it firmly

22   enough.

23            MS. KELLY:  Thank you.

24            THE WITNESS:  As I received that container it was

25   within it.

BY MS. KELLY:

Q    Okay.  So you receive a container and there is a small zipper like a sandwich bag zipper bag in there?

A    It's a very, very small zipper lock bag, yes.

Q    And how much are we talking about that was in that -- within that bag within that container?

A    I didn't -- I didn't weigh it, but I would have guessed maybe an ounce at most.

Q    Okay.  And did you say you are not familiar with this brand of exploding targets?

A    Yes.  That is correct.  I had never seen this brand before.

Q    Okay.  And you would agree that these exploding targets are commercially available, correct?

A    Yes.  They are.

Q    Okay.  As well as the smokeless powder that you received and tested, is that correct?

A    Yes.  It is.

Q    Okay.  As well as the hobby fuse that you tested, is that correct?

A    Yes.  It is.

Q    The smokeless powders that you tested, you found those to be low explosives, is that right?

A    Yes.  All smokeless powders are low explosives.

Q    Can you explain what low explosives mean?

A    So explosives are categorized based upon how they are

1    designed to be used.  A low explosive is designed to deflagrate

2    and a high explosive is designed to detonate.  A deflagration

3    and a detonation just defines the rate of that chemical

4    reaction, that explosion.  So a deflagration means that rate is

5    proceeding through the explosive lower than the speed of sound,

6    and a detonation means that reaction is occurring through the

7    explosive at a rate greater than the speed of sound.

8    Q    Okay.  And so it was when you tested that smokeless powder

9    and the results came back that it was low explosives that was

10   what you were expecting to find, is that correct?

11   A    Yes.  I expected that low -- excuse me.  What -- what's the

12   question?  I apologize.

13   Q    When you tested the smokeless powder, item 2.21, 2-1 in

14   your report, you were expecting it to come back with a low

15   explosive, is that correct?

16   A    No.  Not exactly.  So the item that appeared to be a

17   smokeless powder within that open smokeless powder container,

18   it looked like a smokeless powder, so I used the smokeless

19   powder standard operating procedure.  I identified it was a rod

20   shaped single based smokeless powder.  So the fact that it is a

21   smokeless powder means it is a low explosive.

22   Q    Got it.  So what you were expecting to be in that container

23   was in that container, is that right?  You were expecting to

24   find a smokeless powder in that container, is that right?

25   A    No.  When I receive a container and I open it up I don't

1    know what to expect, right?  So that's why it's coming to me

2    because we don't know what it is.  When the material I removed

3    from it based upon my education and my experience visually

4    appears to be a smokeless powder, then I'll treat it as a

5    smokeless powder.  I don't identify it as a smokeless powder

6    until I complete all of my examinations.

7    Q    And that's what you did, is that right?

8    A    Correct.

9    Q    Okay.  So the smokeless powder is in the smokeless powder

10   container, correct?

11   A    Correct.

12   Q    Okay.  Now, your findings regarding these items after your

13   testing have a lot of ifs and ares.  So if the items in item

14   2-3, so the exploding targets, correct, are properly mixed with

15   a smokeless powder that we just talked about in the correct

16   proportions, then an explosive composition could be produced,

17   is that right?  Do we have that right?

18   A    No.  With respect to the exploding target, so it's only

19   those oxidizers, the ammonium perchlorate and ammonium nitrate

20   mixed with that fuel packet.  So the exploding target by itself

21   mixed with nothing else.  If it's mixed together properly in

22   the right proportion it could produce an explosive composition.

23   Q    Okay.  So it has to be properly mixed, right?

24   A    Correct.

25   Q    Okay.  At the right proportions, correct?

1    A    Correct.

2    Q    Then it could have an explosive composition, is that right?

3    A    Then it could produce an explosive composition.

4    Q    Okay.  Now, with the other tests that you testified, you

5    received little bits of paper from the Detroit field office, is

6    that right?

7    A    Yes.  The submission from the Detroit field office included

8    what appeared to be paper, cardboard.  I believe also foil and

9    rubber band.

10   Q    Okay.  And you didn't talk a whole lot about this, but what

11   sort of analysis did you conduct with those little pieces of

12   paper and cardboard?

13   A    So my first analysis was actually visual examination,

14   looking at it to determine how to proceed with my examinations.

15   Q    Okay.  And then what was your next system?

16   A    After that I performed a vacuum extraction.  So it's as

17   simple as having a standard vacuum cleaner with a special

18   attachment on the end of it that has a small amount of -- a

19   small filter in it, filter paper, and I vacuumed the evidence

20   in an attempt to pull up any explosives residue, capture it on

21   that filter.  So that filter was then cut in half and extracted

22   with water and the other half with acetone.  And those extracts

23   were analyzed using two different chromatograph techniques.

24   Again, chromatography separates ideally a mixture into its

25   individual components and then ideally identifies each

1   component within that mixture.

2   Q    And this is -- was there another set that you took after

3   that or was the testing complete at that point?

4   A    So for the acetone extract I used gas chromatography with

5   electron capture detection.  There was potential indication of

6   a high explosive nitroglycerin.  So I had performed a

7   confirmatory technique using liquid chromatography with mass

8   spectrometric detection, and that did not detect nitroglycerin.

9   So the nitroglycerin was not present.

10  Q    Okay.  And so this is all standard operating procedures

11  that you follow, is that correct?

12  A    Yes.  That's correct.

13  Q    Okay.  And the results of that is that you were unable to

14  determine any explosives material, is that correct?

15  A    That is correct.  I did not detect any explosives residues.

16          MS. KELLY:  Thank you.  I have nothing further.

17          THE COURT:  Mr. Hills?

18          MR. HILLS:  Nothing, Your Honor.  Thank you.

19          THE COURT:  Mr. Blanchard?

20          MR. BLANCHARD:  Thank you.

21                  CROSS EXAMINATION

22    BY MR. BLANCHARD:

23  Q    Good morning.

24  A    Good morning.

25  Q    So we saw yesterday an exhibit, little cardboard pieces, I

1    think maybe some tape.  Is that what was sent to you to test?

2    A    I can't say what you saw yesterday with respect to what I

3    received.

4    Q    Okay.  You received some small cardboard pieces and maybe

5    some tape, correct?

6    A    The items that I received in the laboratory division from

7    the Detroit field office and examined were pieces of what

8    appeared to be paper, cardboard, foil and rubber band.

9    Q    Okay.  And you said you tested these using gas

10   chromatography initially, right?

11   A    That was one of the techniques.  Yes.

12   Q    And then after that you used liquid chromatography with

13   mass spectrometry to verify, is that fair?

14   A    Yes.  I had an initial, through my initial screening an

15   indication of a potential presence of an explosive, and in

16   order to confirm that I had to use a second technique, that

17   liquid chromatographic technique, which did not detect the

18   nitroglycerin, so it was not present.

19   Q    And so liquid chromatography is sort of the gold standard,

20   is that fair?

21   A    I wouldn't say that.  It really depends upon your analytes,

22   what you are analyzing and its amenabilities.  So it's how well

23   it works with the specific instrument.  So it depends upon what

24   you are analyzing what will be a gold standard or not.

25   Q    For what you were doing here it was the appropriate test,

1  correct?

2  A    For what I was doing using my standard operating procedure,

3  yes.

4  Q    Okay.  And you are confident in your analysis, true?

5  A    I am.  Yes.

6  Q    Okay.  Regarding -- Exhibit 439 up, please?

7        Regarding 439, we had some smokeless powder in two

8  different containers, right, is that correct?

9  A    I see what appear to be smokeless powder containers.  I

10  don't know what's in them.

11  Q    Okay.  And you did testing on these items, correct?

12  A    I tested one -- I tested the contents of one open

13  container.

14  Q    Right.  And so you tested an open container that was

15  labeled smokeless powder, correct?

16  A    That's correct.

17  Q    And your findings led you to believe that the container of

18  smokeless powder was smokeless powder, correct?

19  A    What I examined within that one container was a smokeless

20  powder.  Yes.

21  Q    To be clear, what you examined in the container that was

22  labeled smokeless powder was actually smokeless powder,

23  correct?

24  A    Yes.

25  Q    Okay.  And then you examined what appeared to you to be

1    hobby fuse, correct?

2    A    That is correct.

3    Q    And your examination had you conclude that the hobby fuse

4    was hobby fuse, correct?

5    A    No.  That is not correct.

6    Q    Your examination led you to believe that the core of what

7    appeared to be hobby fuse was black powder, is that right?

8    A    Yes.  The material that I removed from the core of that

9    hobby fuse I identified as black powder.

10   Q    And that's what's normally in the core of hobby fuse,

11   correct?

12   A    No.  What's normally in the core of hobby fuse is a low

13   explosive.  It doesn't have to always be black powder.

14   Q    Okay.  But commonly is, right?  You have seen hobby fuse

15   with black powder core before, right?

16   A    Yes.  I have.

17   Q    Okay.  And then you also examined what was in that -- you

18   also examined what was within the exploding target container,

19   correct?

20   A    Yes.  I did.

21   Q    And you've talked about other exploding targets that you

22   have encountered before, correct?

23   A    Yes.

24   Q    The most commonly known one is Tannerite, correct?

25   A    Yes.  I believe so.

1   Q    And these are meant -- they are marketed as something that

2   you take out on a gun range and shoot at, right?

3   A    Yes.  They are marketed to be mixed and shot to explode.

4   Q    And so you shoot at them with a rifle, and if you hit it

5   you get a little explosion, right?

6   A    Yes.  That's how they are designed to be used.

7   Q    And as far as you know they are legal, correct?

8   A    As far as I am aware, yes.

9   Q    You can buy them at Walmart, right?

10  A    I am not certain that you can buy them from Walmart.

11  Q    Okay.  And smokeless powder, as far as you know, it's legal

12  to possess, correct?

13  A    Right.  I don't know the state laws or regulations, but my

14  understanding is you can purchase them.

15  Q    Okay.  Maybe at Walmart?

16  A    It's possible.

17  Q    Okay.  And hobby fuse, as far as you know, it's legal to

18  possess, right?

19  A    I can't say what the legal -- you know, in terms of

20  legality to possess it, but I believe it is.

21  Q    And then I just want to go back for one moment to the

22  exploding target that you said you've never seen this brand

23  before, right?

24  A    That specific brand, no.

25  Q    And so you did what you called a heat susceptibility test,

1    right?

2    A    A thermal susceptibility test on one portion of it.  Yes.

3    Q    And that's where you tried to burn it?

4    A    Yeah.  Simply stated.  Yes.

5    Q    Yeah.  And when you tried to burn it it burned like a

6    sparkler?

7    A    That small portion.  Yes.  It did.

8              MR. BLANCHARD:  I'll pass the witness.

9              THE COURT:  All right.  Mr. Gibbons?

10             MR. GIBBONS:  I have no further questions, Your Honor.

11             THE COURT:  Any redirect?

12             MR. ROTH:  No, Your Honor.  Thank you.

13             THE COURT:  All right.  Thank you.  You may be

14   excused.

15             (Witness excused, 9:35 a.m.)

16             THE COURT:  All right.  We will go to the government

17   for your next witness.

18             MR. ROTH:  Thank you, Your Honor.  We call Kelly Van

19   Arsdale.

20             KELLY VAN ARSDALE, GOVERNMENT

21             having been first duly sworn, testified as follows:

22             (Witness sworn, 9:35 a.m.)

23             THE COURT:  Get situated, and once you are set up

24   there we'll turn it over to Mr. Roth for direct.

25             MR. ROTH:  Thank you, Your Honor.

<pre>
1                    DIRECT EXAMINATION

2       BY MR. ROTH:

3       Q    Good morning.

4       A    Good morning.

5       Q    Could I have you start by stating and spelling your

6       complete name?

7       A    Kelly Van Arnsdale.  K-e-l-l-y.  Last name is V-a-n

8       A-r-s-d-a-l-e.

9       Q    Thank you.  Where are you employed?

10      A    I am employed at the FBI laboratory in Quantico, Virginia,

11      in the explosives unit.

12      Q    What's your title there?

13      A    I am a supervisory special agent, explosives and hazardous

14      device examiner.

15      Q    What are your responsibilities in that position?

16      A    As a device examiner in the unit I am responsible for any

17      sort of explosive device, hooks device, anything bomb related

18      that is submitted as forensic evidence coming into the

19      laboratory.  Making sure that it's safe.  Inventoring that

20      evidence, accounting for everything, taking pictures, notes,

21      and making a determination as to whether or not I have the

22      components of an IED, an improvised explosive device, or a

23      bomb, and whether or not it is a destructive device as well.  I

24      am a certified special agent bomb technician.  So I am

25      responsible for render safe operations as well.  So I am a
</pre>

1   field responding personnel, go out to crime scenes, assist on

2   crime scenes with the collection of evidence and then bring

3   that back to the lab to analyze.

4   Q    Thank you.  How long have you worked at the FBI?

5   A    I have been with the FBI for a little over 24 years now.

6   Q    Have you had prior assignments or positions within the FBI

7   during that time?

8   A    Yes.  I have.  In the late 1990s I was in the trace

9   evidence unit at the FBI lab.  That unit analyzes hairs and

10  fibers.  I was a physical signs technician at the time.  And

11  then in 1999 I moved over to the explosives unit, held that

12  same type of position, the physical science technician

13  position.  We were responsible for receiving all the evidence,

14  inventoring it, photoing it, note taking, transferring it

15  around to the different units at the laboratory for the

16  different exams like latents or documents or DNA, and then it

17  would come back to our unit where I would compare notes for a

18  qualified examiner in the unit.

19           Once I completed that I moved onto new agents class.

20  I accepted a position at the FBI academy and became an FBI

21  agent.  Was there for about 17 years, and was assigned to the

22  FBI's Washington field office in Washington D.C.  I was at the

23  Washington field office for about 10 years.  I was assigned to

24  the Amerithrax task force, and then a health care fraud squad

25  where I worked drug diversion cases.  I was a member of the

1   hazmat team as well as a bomb tech when I was out in the field.

2   In 2013 I came back down to the FBI laboratories

3   explosives unit and became certified as an explosive and

4   hazardous device examiner, which is what I currently am in that

5   position right now.

6   Q    Could you please briefly describe the training that you

7   received for that position?

8   A    So I am a certified bomb technician, which means I go

9   through Redstone Arsenal, Huntsville, Alabama, where all the

10  other state and -- I attended the hazardous devices school in

11  Redstone Arsenal in Huntsville, Alabama.  That's where I became

12  certified as a bomb technician, much like the state and local

13  bomb technicians go through the same training.

14  Once I completed that I came back to the field and did

15  my time as a field.  In order to become an explosive and

16  hazardous device examiner at the FBI laboratory we have a

17  regimented training program where I have to undergo working

18  with qualified examiners on case work, receiving evidence,

19  inventoring evidence, taking notes on it and making

20  determinations as to whether or not I have the components of an

21  IED.  That training consists of moot courts where we have cases

22  that we are presented with that we work from start to finish

23  and we present our findings in a courtroom type setting.  We

24  have oral boards, which consists of explosive oral boards as

25  well as administrative oral boards for the laboratory's quality

1    assurance system, and we also are required to complete certain

2    range operations and administrative duties while we are in that

3    training program.

4    Q    Thank you.  Did investigators in this case ask you to

5    examine several of the items that they recovered from Barry

6    Croft's residence?

7    A    Yes.  They did.

8    Q    Could we take a look at 439, please?

9         Are these those items?

10   A    Yes, sir.  They are.

11   Q    All right.  I want to talk about what some of these items

12   are.  Which ones are smokeless powder?

13   A    So in the middle of the screen up at the top there are

14   three black containers.  Those three are containers of

15   smokeless powder.  Below there are two containers that are

16   black with orange labels.  Those were also labeled smokeless

17   powder.

18   Q    Different brands but both smokeless powder?

19   A    That is correct.  Yes.

20   Q    And what is smokeless powder?

21   A    Smokeless powder is a low explosive.  It's a commercially

22   available product.  It's designed to burn.  So if I were to lay

23   it out flat, light it with a match it would burn, but it's a

24   rapid burn.  It's called a deflagration.  That low explosive

25   can be confined and in that case it could actually explode.

Q    What does the phrase low explosive mean?

A    Explosives are categorized based on what they are sensitive
to and how they are initiated.  So there is high explosives.
There is low explosives.  Low explosives are initiated with a
little bit of heat, little bit of shock, little bit of
sensitivity, and you can initiate that low explosive powder.
The difference is the rate at which that reaction occurs once
that material is initiated.  So a low explosive is designed to
burn.  It's designed to deflagrate through the material.
Technically they say a speed -- at a speed slower than the
speed of sound through that material.

          If we are talking about high explosives, those are
traditionally the materials like we see in the movies that
explode, and those are the materials that detonate.  They just
require a bit of a shock impetus or a little bit of input in
order for them to detonate.

Q    You have used the term IED a few times.  Could you please
tell the jury what that means?

A    Absolutely.  IED stands for improvised explosive device.
An improvised explosive device is a nonmilitary, noncommercial
explosive device designed by the bomber with available
knowledge and materials.

Q    Noncommercial, what does that mean?

A    It means it's something that you can't just pull off the
shelf.  It's something that's constructed with materials that

1    you can purchase, but it has to be assembled by somebody to

2    make an improvised explosive device.  An improvised explosive

3    device is also commonly referred to as a homemade bomb.

4    Q    Can IEDs be built from everyday items available legally to

5    be purchased in America?

6    A    Yes.  Absolutely.

7    Q    Can you give us some examples?

8    A    So for example a pipe bomb.  If you go to a Home Depot or

9    Lowe's you can purchase a pipe nipple that's got the threading

10   on the ends.  You can purchase the end caps.  Both of those

11   items can be purchased legally.  If I go to Cabella's, if I go

12   to any of the other sporting good stores, even if I go to

13   Walmart, I can purchase containers of smokeless powder.  Often

14   purchased by people that like to reload their own ammunition.

15          So again, I can purchase that totally legally.  Most

16   of the time it's without any sort of proof of identification or

17   anything like that.  It's honestly easier to purchase that than

18   it is to purchase Sudafed over-the-counter at a pharmacy.  And

19   then if you want to put any other components on it, such as

20   tape or any sort of fragmentation, I can buy BBs.  I can buy

21   nails.  I can buy screws.  All of that is perfectly legal.  So

22   there is nothing that I actually have to go through any sort of

23   process to acquire when I am making a homemade bomb.

24   Q    And the example that you gave of a homemade pipe bomb, you

25   referenced smokeless powder.  That would be the explosive put

1     in there?

2     A     Yes, sir.  So when we talk about a homemade bomb we talk

3     about three components that make up an IED.  You've got an

4     explosive main charge.  So that's the filler that's inside.

5     You've got typically a container that that is put inside, and

6     that container is used either for confinement of the material

7     inside or for concealment purposes.  And then you've got some

8     sort of a fusing system, something that is going to be used to

9     set that material off that's inside that material container.

10    Q     The components that we are looking at here in 439 that were

11    recovered from Barry Croft's home, could those components be

12    used to make an IED?

13    A     Absolutely they could.

14    Q     Could you please describe for the jury what that would look

15    like?

16    A     So as we discussed, an IED consists of an explosive main

17    charge, a fusing system, and sometimes a concealment or a

18    confinement container.  In this particular case the explosive

19    main charge, if you look at the photograph, there were the five

20    containers of smokeless powder.  That would be considered

21    material that could be used as an explosive main charge inside

22    a particular device, a fusing system.  Over on the right-hand

23    side of the screen there is a roll of green colored fuse that's

24    got two pieces of yellow tape on it.  That's called hobby fuse.

25    Hobby fuse is an externally burning piece of fuse.  It kind of

1    looks like a shoelace, only thinner.  You light it at one end

2    and it burns down at a set rate until it reaches the other end

3    of the fuse, and the other end it spits out a little bit of

4    flame.  Typically that other end where that flame spits out,

5    that's what's embedded inside the low explosive or the

6    explosive material to set that material off.  Remember that we

7    talked about low explosives, that they are designed to burn.

8    With that little bit of impetus from that heat from that flame

9    source from the fuse, it would initiate that smokeless powder

10   or whatever that powder was that was in that material.

11        When we are talking about containers, low explosives

12   require some sort of a confinement container in order to

13   explode.  In this particular case down at the lower kind of

14   center of the screen there were five travel size containers,

15   and those were plastic containers that the material could be

16   put inside, and once that material is put inside you could just

17   put a hole in the top of the container, in the side of the

18   container, insert the fuse and you could make an IED out of

19   those materials very easily.

20        In addition to that you see there is a container of

21   BBs and it's in the upper left-hand corner of the screen

22   referred to as ball bearings or medical -- sorry.  Metal

23   spheres.  These are a typical example of some sort of a

24   fragmentation that can be used in an improvised explosive

25   device.  Fragmentation is often added to an explosive device to

enhance the effects when the explosion occurs.  So you not only

have the pressure, the effects of the explosion going off, but

you also have all this fragmentation going out with that

pressure wave as well.  So ball bearings, nails, shards of

glass, screws, all those types of materials can be affixed to

the outside or inside of a container and used as added

fragmentation to cause additional personal injury and/or death

or damage to the property surrounding.

Q    That fragmentation could be called shrapnel?

A    Yes, sir.  It can.

Q    All right.  You talked about how it increases the effect of

the explosion, and you touched on it, but I just want to focus

on that for a moment.  What part of the effect does it

increase?

A    So when an explosion occurs you've got a thermal effect

that stays fairly close in to where the initial explosion

occurs.  Then you've got a pressure, pressure wave that's

generated.  This pressure from the explosion kind of pushes out

and creates almost like a wall coming towards whatever it's

affecting.  So this pressure wave pushes out what are the

effects of the explosion.  When that pressure wave pushes out,

that fragmentation, whether it's ball bearings, screws, nails,

whatever that fragmentation is, it gets pushed out along with

that pressure wave.  So that fragmentation not only hits you

with the effect of that pressure, but it also will penetrate

1    anything that it hits or you know, hit anything that it runs

2    into.  So it causes additional property damage, can cause

3    additional injuries, can cause death because of that velocity

4    that those objects are being propelled out at.

5    Q    You mentioned that the fragmentation could be inside the

6    container or outside.  If it's on the outside what are some

7    ways that it could be affixed?

8    A    So most commonly we see fragmentation added to a device

9    either with hot glue, tape.  That tape can either be masking

10   tape, duck tape, electrical tape.  Those are what we most

11   commonly see to affix the fragmentation to the outside of the

12   device.

13   Q    And were you provided tape that was found in Barry Croft's

14   kit here?

15   A    I was provided with electrical tape as well.

16   Q    Was there also some duck tape?

17   A    There is.  Yes, sir.

18   Q    Both of those would be sufficient ways to attach

19   fragmentation to the outside of an IED?

20   A    Yes.  Both of those could be used to attach that

21   fragmentation.

22   Q    For purposes of a reconstruction, were you provided with a

23   description of an IED and its components that were detonated at

24   the Luther FTX site on September 13th, 2020?

25   A    Yes, sir.  I was.

1    Q    And what was that description?

2          MR. BLANCHARD:  I'd object as to hearsay and

3    foundation.

4          THE COURT:  Well, what's the concern?

5          MR. BLANCHARD:  I don't know where -- we haven't had

6    testimony about what specifically was from anyone who knew what

7    happened at Luther.

8          THE COURT:  You want to refresh the foundation?  I

9    think it goes back quite a ways in the case.  Right.

10          MR. ROTH:  That's certainly true, Your Honor.  An

11    agent early on testified --

12          THE COURT:  Maybe you want to cover one of our first

13    agents.

14          MR. ROTH:  I think it was the third or second, but

15    very early on testified to an interview that he did with the

16    Defendant, and in that interview he described the process of

17    the way in which he affixed pennies to a modified firework.

18          THE COURT:  All right.  Yeah.  I think there is

19    sufficient foundation for the witness to answer.  If you want

20    to lay any further you can do that.

21          MR. ROTH:  Thank you, Your Honor.

22    BY MR. ROTH:

23    Q    I can't exactly remember where we left off, so could you

24    please tell the jury what description you were provided of that

25    IED or excuse me of that item for reconstruction?

A     Absolutely.  So when evidence comes into the laboratory, we received an incoming communication, something that kind of provides us with some details or information about the case. In the electronic communication that we received in this case with the items that were received, we received information stating that there was a device that was hung from a tree.  It consisted of a tube that was approximately one inch by four inch, had pennies attached to it, and then it detailed the listing of evidence that was being submitted for examination.

Q     Did that include some of the remnants of the detonation from that Luther FTX site?

A     Yes.  It did contain remnants from the explosion that occurred.

Q     And were those consistent with the description of the IED that you were provided?

A     Yes.  It was.

Q     You mentioned earlier that one of your responsibilities deals with classifying destructive devices.  What is a destructive device?

A     So a destructive device is an improvised explosive device or an incendiary device that's designed or characterized with components consistent with weaponization of that device.

Q     And if something is a destructive device it's then within the ATF purview of registration?

A     Yes.  That's ATF's responsibility to register that device.

Q    The description that you were provided of the IED, the
modified firework with pennies, was this a destructive device?

A    Yes.  It was.

Q    Why?

A    So the pieces of the device that I received, I received
pieces of cardboard that were visually consistent with a mortar
type shell, mortar 2.  In addition to that I received pennies
that had electrical tape on it, and that electrical tape, penny
and cardboard combination, those were all in some pieces
attached together, and so when an explosion occurred those
items were forced away from that cardboard tube all attached
together.  So I had evidence in front of me that showed that I
had a cardboard tube with electrical tape and pennies that were
at one time altogether.  In addition, I received little
fragments of silver colored paper that were visually consistent
with the wrappings of a mortar type shell.

Q    Were you able to obtain the items necessary to reconstruct
that IED?

A    Yes.  I was.

Q    All right.  Have you reviewed Proposed Exhibit 261, the
picture of the firework that you used in your reconstruction?

A    Yes, sir.  I did.

Q    All right.  Is that a fair and accurate picture of that
firework?

A    I don't have it up in front of me but what I reviewed is

1    accurate.  Yes.

2    Q    Just to be clear, we can show just the witness 261, please.

3    A    Yep.  That is an accurate picture.

4         MR. ROTH:  Your Honor, I move for the admission of

5    Proposed Exhibit 261?

6         THE COURT:  Any objections?

7         MR. BLANCHARD:  No.

8         THE COURT:  Hearing none it's admitted.

9         MR. ROTH:  Thank you, Your Honor.

10   BY MR. ROTH:

11   Q    So first of all, what is this item?

12   A    It is a commercial mortar tube and mortar round set

13   consisting of a tube and 24 mortar shells inside.

14   Q    What brand?

15   A    It's Commander in Chief.

16   Q    And like the Judge says, this is going to take us way back

17   in the trial, but who provided you with this firework?

18   A    Special Agent Kristopher Long.

19   Q    You describe this as a mortar style firework.  What is a

20   mortar style firework?

21   A    A mortar style firework is commercially available.  It's

22   typically sold in a set where there is some sort of a tube with

23   a mounting base, and then it's sold with individual mortar

24   shells that you can drop down inside the tube.  You would light

25   something similar to what we described before as hobby fuse.

1    So you would light the fuse on the outside that would burn

2    down, and the shell that was inside the tube would build up

3    gasses and pressures inside the tube and then launch outward

4    from the tube into the air for a visual or audio effect.

5    Q    Can a mortar be converted into an improvised explosive

6    device?

7    A    Yes.  A mortar shell can be converted.

8    Q    Can you please explain the process of doing that?

9    A    So in the beginning of my conversation we talked about an

10   IED.  We talked about an IED being an explosive material

11   container and a fuse.  So that mortar shell is consistent with

12   that sort of terminology.  You've got a cardboard tube that has

13   explosive material inside, and it's got a piece of fuse hanging

14   out.  As it is -- by itself it is a commercial pyrotechnic.

15   However, when you modify it, when you start adding something

16   like fragmentation to it with tape, glue, any sort of

17   modification to that to weaponize that, and then it becomes an

18   improvised explosive device and a destructive device.

19   Q    When you did your reconstruction, did you affix

20   fragmentation like pennies or BBs or anything else to it?

21   A    No.  I didn't.

22   Q    Why not?

23   A    So I was provided some information regarding the device.

24   However, I didn't know how many pennies.  I didn't know where

25   those pennies were affixed.  So I thought in order to best

1   demonstrate the effects of what an IED consisting of a mortar

2   round could do I demonstrated the effects of solely the mortar

3   round out on the range so we could see the type of

4   fragmentation and pressure effects that that generated.

5   Q   Did you videotape that detonation?

6   A   So the FBI laboratory has an operational projects unit that

7   is responsible for photographing and videotaping any sort of

8   demonstrative evidence that we need either for court or for

9   other purposes.  I had them out at the range when we did the

10  demonstration to do the video and the photography.

11  Q   And have you reviewed 446.1 and 446.2, the videos of that

12  reconstruction?

13  A   Yes.  I have.

14  Q   And 447 and 448, pictures taken during that reconstruction?

15  A   Yes, sir.  I have.

16      MR. ROTH:  Your Honor I'd move for the admission of

17  Proposed Exhibits 446.1, 446.2, 447 and 448?

18      THE COURT:  All right.  Objections?  Hearing none.

19  They are admitted.

20      MR. ROTH:  Thank you, Your Honor.

21  BY MR. ROTH:

22  Q   Could we take a look at 447, please?

23      What do we see here?

24  A   So we've got one of those mortar shells or mortar rounds

25  that we discussed.  There is a piece of fuse that's underneath

1    the tape that's taped down along the side of that mortar shell.

2    When that fuse is brought down underneath it we attached a wire

3    to it so we could remotely initiate it versus me sticking a

4    match to the end of that hobby fuse and the hobby fuse starting

5    to burn.  We had an additional wire attached to it so we could

6    do it from further away to remotely initiate that fuse.

7    Q    Why?

8    A    So that we didn't have to be close to the device if the

9    device were to go off.

10   Q    All right.  So even with a normal modified firework without

11   anything attached, still dangerous?

12   A    It is.  Yes.

13   Q    Very good.  Go ahead.

14   A    So what you see there, behind it, is a cardboard silhouette

15   target.  It was placed about two feet away from that mortar

16   shell.  And again, there were no modifications to that mortar

17   shell other than the fact that I removed the lift charge.  When

18   we talk about a mortar shell you've got some explosive filler

19   on the inside, but there is also some other material, explosive

20   as well, that's down towards the bottom of that that's designed

21   to help produce more gasses to lift that out of the mortar tube

22   when it explodes.  I removed that so that mortar would stay

23   instead of launching into the air so that it would stay closer

24   to in front of the target when the effects occurred.

25   Q    And why did you hang it as opposed to putting it on a

1    surface?

2    A    So when we demonstrate explosive effects, obviously that

3    pressure wave goes out in almost like a 360-degree direction.

4    So it's going to pick up anything, be kind of disformed by

5    anything that it's up against.  So typically when we do our

6    demonstrations we want to get the full effect of the mortar

7    shell or anything else that we are hanging out there so that it

8    has the opportunity to expand out in that 360 degree radius so

9    we can see the full effects of the device.

10   Q    And did you take the video or somebody else take the video

11   at two different speeds?

12   A    So the operational projects unit is capable of doing high

13   speed video as well as regular video and they did both for this

14   particular demonstration.

15   Q    So let's start with the regular one.  Could we please play

16   446.2?

17              (Video started, 9:59 a.m.)

18              (Video stopped, 9:59 a.m.)

19              MR. ROTH:  You still don't have sound?

20              (Video started, 10:00 a.m.)

21              (Video stopped, 10:00 a.m.)

22   BY MR. ROTH:

23   Q    All right.  Could we take a look at 446.1, the slower

24   version.  I apologize it's still running.  And 446.1, please.

25              (Video started, 10:00 a.m.)

1      (Video stopped, 10:00 a.m.)

2    BY MR. ROTH:

3    Q    Thank you.  Could we look at 448, please?

4         You mentioned this earlier but about how far away was

5    the target silhouette from the mortar when it was detonated?

6    A    The silhouette target was approximately two feet away from

7    the hanging device.

8    Q    And even without shrapnel or fragmentation attached, what

9    effect did the mortar have on the silhouette?

10   A    When the pressure went out from the explosion you have --

11   sometimes have unconsumed material.

12   Q    Go ahead.  Unconsumed material?

13   A    Or material itself.  It picks up fragmentation from

14   sometimes the ground or area around it.  It forced all of that

15   pressure and all of that material outwards towards the target

16   in all other directions.  The effect that it had on the target

17   you can see that it impacted the target as well as penetrated

18   the target.  And that was just the mortar shell alone without

19   anything attached to the outside of it.

20   Q    And if there had been fragmentation, if there had been

21   pennies on that IED, what effect would it have?

22   A    So typically additional fragmentation you are going to get

23   that going out with the explosion as well.  So most likely you

24   would see additional penetration when we do experiments as a

25   bomb tech.  And doing experiments for cases that I've worked

1    it's been my experience that that fragmentation ends up going

2    out to the target and beyond and through the target because of

3    the types of material that are attached.  So if there is

4    something that's got heavier weight to the metals and something

5    like that versus the cardboard, you are going to end up getting

6    additional penetration most likely through anything that's

7    around it.

8              MR. ROTH:  Thank you, Your Honor.  Nothing further.

9              THE COURT:  All right.  So what we'll do is take our

10   morning break now before going to cross and then you can get a

11   chance to work with your own tech to see if you can get your

12   sound working.  And if Brad is listening, our miracle worker on

13   tech can maybe help with that as well, and if you get it reset

14   you can play it as you intended it and then we'd go to cross.

15   So 20 minutes and we'll be back.

16             LAW CLERK:  All rise.

17             (Jury out, 10:03 a.m.)

18             THE COURT:  Okay.  20 minutes.

19             LAW CLERK:  Court is in recess.

20             (Recess taken, 10:03 a.m.)

21             (Resume Proceeding, 10:28 a.m.)

22             LAW CLERK:  All rise, please.

23             (Jury in, 10:28 a.m.)

24             LAW CLERK:  Court is in session.

25             THE COURT:  Welcome back.  Before the break we were

1    getting to the end of the government's direct exam.  Brad did

2    come in and work his magic, so my understanding is we have not

3    only video but audio working.  Do you want to address those

4    last couple of exhibits that didn't have the audio?

5            MR. ROTH:  I think the easiest thing is just to play

6    Exhibit 446.2, Your Honor.

7            THE COURT:  All right.  Very good.

8            (Video started, 10:29 a.m.)

9            (Video stopped, 10:29 a.m.)

10           (Video started, 10:30 a.m.)

11           (Video stopped, 10:30 a.m.)

12           MR. ROTH:  Thank you, Your Honor.

13           THE COURT:  All right.  Then we'll go to cross

14   starting with Mr. Gibbons.

15           MR. GIBBONS:  Thank you, Your Honor.

16                     CROSS EXAMINATION

17     BY MR. GIBBONS:

18   Q    Good morning, ma'am.

19   A    Good morning, sir.

20   Q    I just want to confirm, the video we just saw, was that an

21   attempt to replicate what could have been put together at this

22   Luther FTX?

23   A    The demonstration that you just saw was a mortar round next

24   to a cardboard target.

25   Q    Correct.  And was the intention to replicate what may have

1    occurred in Luther, Michigan on September 12 or 13?

2    A    The information that was provided me with the additional

3    materials I did not add to the mortar shell because I was not

4    sure how many or how it was affixed to the mortar shell.  So my

5    demonstration was of the mortar shell by itself without any

6    additional items.

7    Q    Okay.  So it was not an attempt to replicate what had

8    occurred at Luther, Michigan, is that correct?

9    A    It was to demonstrate the effects of a mortar shell.

10   Q    Okay.  Let me ask you this question.  The mortar shell, I

11   think you said it was a commercial firework?

12   A    Yes, sir.  So mortar tubes and mortar shells are sold as

13   commercially available sets.

14   Q    Okay.

15   A    They are sold as pyrotechnics.  However, when they become

16   modified in any sort of way, that's when they go from being a

17   commercial pyrotechnic to an IED.

18   Q    All right.  And by commercial you mean that they are

19   readily available in the marketplace?

20   A    They are readily available to the common public.  Yes, sir.

21   Q    And that would be purchased by consumers, correct?

22   A    Yes, sir.  It would be.

23   Q    And would it also be fair to call these consumer grade

24   fireworks?

25   A    I haven't referred to them or heard them referred to as

1    consumer grade but commercial fireworks is typically what we

2    call them.

3    Q    Okay.  And like the fireworks that you use to make this

4    demonstration, they were purchased at a store, correct?

5    A    I don't know where they were purchased.  They were provided

6    to me by Special Agent bomb tech Kristopher Long.

7    Q    And were they entitled something like Master and Commander

8    or Commander in Chief?

9    A    The title on the mortar set that I used was Commander and

10   Chief.

11   Q    And that's probably a reference maybe to the president?

12   A    I don't know, sir.

13   Q    4th of July?

14   A    I don't know, sir.

15   Q    Okay.  When you detonated the firework in the video, did

16   purple or green smoke appear there to you?

17   A    I don't recall what color smoke came off of it, sir.

18   Q    Let me ask you this question.  Does smokeless powder --

19   that can burn, correct?

20   A    Smokeless powder is a low explosive powder that's designed

21   to burn.  However, when confined that's when you get that

22   explosive effect.

23   Q    Right.  And when it burns it makes smoke, true?

24   A    It does make smoke.  Yes, sir.

25   Q    Is that smoke purple or green generally, do you know?

1    A    No.  Typically the smoke that comes off of smokeless powder

2    is kind of a grayish color.  However, with pyrotechnics they

3    can add effects so you get the sparkles and the stars and the

4    color and that sort of thing.

5    Q    Okay.  With regard to the recreation that you were involved

6    in here with the firework that we just saw in the video, you

7    would agree that there wasn't anything preventing you from

8    taping a half dozen pennies to it, correct?

9    A    No.  There was nothing preventing me from doing so.

10   Q    And you would agree that you could have done a series of

11   tests, true, so you could have had three pennies, six pennies,

12   12 pennies, correct?

13   A    I could have.  However, because I didn't know that

14   information -- I knew that pennies had been adhered to the

15   device that was recovered and provided to me, but I didn't know

16   how many or even in what configuration, how much tape or

17   anything.  So to demonstrate the effects of the mortar by

18   itself without adding that additional fragmentation I decided

19   that it was best to demonstrate it with just the mortar shell.

20   Q    Right.  And I think the point is, is you wanted to make

21   sure that you knew what you were replicating that you had a

22   basis in fact for it, correct?

23   A    I don't think that's true, sir.  In my experience as a bomb

24   tech I have blown up a number of different things with

25   fragmentation attached to it.  When we try to demonstrate what

1    may or may not have happened in a particular case we try to

2    take into account the facts that we know.  So in this

3    particular case, because I didn't know how many pennies, I

4    didn't know if it was underneath, on the side, in order to

5    demonstrate the effect of that pressure wave coming off of the

6    explosion I thought it was best to just demonstrate what I

7    knew.

8    Q    Right.  And avoid speculation, correct?  That is the enemy

9    of science I suppose?

10   A    I was just demonstrating what I knew, sir.

11          MR. GIBBONS:  Thank you.  I have no further questions,

12   Your Honor.

13          THE COURT:  All right.  Ms. Kelly.

14                    CROSS EXAMINATION

15     BY MS. KELLY:

16   Q    Good morning, ma'am.

17   A    Good morning.  How are you?

18   Q    Fine.  Thank you.  How are you?

19   A    Good.  Thank you.

20   Q    I believe that you testified that you were provided

21   information that included there was a device hanging from a

22   tree.  It was a tube and pennies were attached, is that

23   correct?

24   A    That is correct, ma'am.

25   Q    Okay.  And I also thought I heard you say that in your test

1    you were hanging it to see the full effects, is that right?

2    A    Yes, ma'am.

3    Q    Okay.  So the fact that you were told that it was hanging

4    from a tree, you would have still hung it up either way, is

5    that right, in your test?

6    A    Correct.  When we do our test at a range we've got a

7    demolition range that's clear of trees, clear of grass as much

8    as possible to avoid any of that additional fragmentation from

9    occurring.  So the safest way for us to demonstrate an

10   explosive effect is to hang it from a line so that we can see

11   the effects in all directions.

12   Q    Okay.  And so you were not provided information that the

13   firework in Luther was actually was -- it was set off on the

14   ground, is that true?

15   A    I was not provided that information.

16   Q    Okay.  And you also testified that you removed the lift

17   charge before you did your test?

18   A    Yes, ma'am.  I did.

19   Q    Okay.  You weren't provided that information that the lift

20   charge was removed, is that correct?

21   A    I don't recall if -- I was provided some information from

22   some of the 302s that were written by some of the agents as

23   well.  I don't recall if that was in there.  It was discussed I

24   believe that it had stayed on the ground or close to the

25   ground.  And so in order for something like that to do that,

removing the lift charge would allow that device to maintain

its proximity closer to the ground.

Q    Okay.  And just so I understand it correctly, so if an

artillery shell is on the ground, it's not going to move --

it's not going to go up, is that right, if it's not in that

mortar tube?

A    That's not correct.

Q    Okay.

A    When a mortar shell is placed on the ground you are still

going to get those effects that come of 360 degrees.  However,

it will not probably launch like it was designed to in the tube

further up into the air because there is not as much gas that

gets built up underneath it to push it up into the air.  So I

am not saying it wouldn't launch into the air.  I think even in

the video you saw it go up a bit and you saw obviously the

smoke up above that.  It wasn't going to prevent it from going

off.  It just was going to allow us to capture more of the

effects on the video and closer in where it occurred.

Q    Okay.  So by you removing that lift charge was -- was in

some way demonstrating how it would go off if it had the lift

charge on the ground?  Am I understanding that correctly?

A    I mean, you can secure an item that's got a lift charge, I

presume, and try to prevent it from going off.  You know, for

us it was removing a lift charge which actually removed some of

the explosive material that was in there.  So that wasn't even

1    the full mortar shell with that material removed.

2    Q    Okay.  So the point is, you removed something and it was

3    different than what the information you had from the 302

4    reports, is that correct?

5    A    Like I mentioned, I believe somewhere in those 302s there

6    was mention of removal of something from the bottom of it, but

7    I don't recall specifically.

8    Q    And you have made mention of artillery shell, the tube.

9    Are we talking about the same thing, the artillery shell in a

10   tube?

11   A    Artillery is typically more of a military type term.  So a

12   commercial mortar shell or mortar round is more appropriate for

13   a pyrotechnic type device.

14   Q    Can you tell me what pyrotechnic means?

15   A    Pyrotechnic is kind of a fancy word for fireworks.

16   Q    Okay.  And this shell that you tested, it was approximately

17   four and-a-half inches in length by one and-a-half inch width,

18   is that right?

19   A    That sounds about right.  I believe it was one by four.

20   Q    One by four.  Okay.  For the jury, can you estimate your

21   best estimate of the size of it with your -- with your hands?

22   A    The one that I tested?

23   Q    Correct.

24   A    The one that I tested was probably approximately this long.

25   Q    And that was the one by four; is that approximately one by

1    four?

2    A    Yeah.  That's -- that's the four.  You know, the one is

3    approximately that diameter.

4    Q    Sorry.  So I can see it, too?

5    A    Approximately like that diameter.

6    Q    Okay.  Thank you.

7         You talked about with IEDs and changing commercial

8    product into an IED when it's made to weaponize something.  Do

9    you remember talking about that?

10   A    I do.

11   Q    So that's the important piece is weaponizing it, is that

12   correct?

13   A    So any time you take something, you know, a commercial

14   object or something like that, something from home and you

15   create those components of an IED, you have got the explosive

16   main charges.  You have got a fusing system.  You've got a

17   container.  If you compile all those components, whether you

18   purchase them, make them, find them, if you assemble them so

19   that you've got that main charge fusing system in a container

20   you have an IED.

21   Q    And --

22   A    And an IED can be without fragmentation.

23   Q    Okay.  And you also testified in order to weaponize it,

24   correct?

25   A    In some cases the IED itself would have weaponization

1  characteristics.  In this particular case a commercial firework

2  was modified by adding fragmentation to it to make those

3  weaponization characteristics part of the device.

4  Q    And the target that you used was cardboard, correct?

5  A    Yes, ma'am.  It was.

6  Q    Were you provided information that the targets were

7  cardboard?

8  A    I had pieces of cardboard that were recovered and provided

9  to me for examination that did not appear to be part of the

10 mortar shell.  I don't recall specifically if it said anywhere

11 in the documents I was provided about a cardboard target.

12 Q    Okay.

13 A    A cardboard target is something we traditionally use out on

14 the range as a demonstrative target for our devices.

15 Q    And would you agree that range that we saw in the video,

16 it's a flat ground with gravel on the ground, correct?

17 A    It's mostly dirt.

18 Q    Mostly dirt.

19 A    There is grass.  There is taller grass depending if it gets

20 mowed before we get out there, but there is not -- at least up

21 in the front area where we did work it's for the most part flat

22 and there is no trees or anything like that around where we're

23 going to conduct our explosive demonstrations.

24 Q    No trees is important for the demonstration purposes?

25 A    We don't want to catch stuff on fire.

1    Q    Sure.

2    A    And everything to get caught up in the trees.  So we like

3    to have -- we share that range with the marines.  So you know,

4    it's up to their specifications as well.

5              MS. KELLY:  Okay.  I have nothing further.  Thank you.

6              THE COURT:  All right.  Mr. Hills?

7              MR. HILLS:  No, Your Honor.  Thank you.

8              THE COURT:  Mr. Blanchard?

9              MR. BLANCHARD:  Thank you.

10                  CROSS EXAMINATION

11   Q    Good morning.

12   A    Good morning, sir.

13   Q    So you talked about the items that I think were in Exhibit

14   436, the smokeless powder and the hobby fuse and that sort of

15   stuff.  Do you remember that?

16   A    Yes, sir.  I do.

17   Q    And if I understand correctly, your conclusion is that

18   those items could be assembled into an IED, is that right?

19   A    Correct.  Readily assembled.

20   Q    Readily assembled.  It could be, right?

21   A    The terminology I used was readily assembled because they

22   were all in the same container, all in the same bag as

23   received.

24   Q    My question is your conclusion is they could be assembled,

25   correct?

1    A    They could be, correct.

2    Q    They were not assembled into an IED -- they were not

3    assembled as an IED in the way they came to you, correct?

4    A    No, sir.

5    Q    And in order to assemble them, I think you said an IED has

6    a container, a fusing system, and an explosive charge, is that

7    right?

8    A    That is correct.  Yes.

9    Q    And so you would need to know that you need those things in

10   order to build an IED, right?

11   A    Yes.  You would.

12   Q    Okay.  Did they send you any reports to review on Cambria,

13   Wisconsin?

14   A    No, sir.

15   Q    Okay.  If you don't know how to build an IED you might fail

16   at that, correct?

17   A    Yes.  You could fail at constructing an IED.

18   Q    And it might do something like go poof or just burn and

19   make smoke, right?

20   A    Potentially depending on how its assembled.

21        MR. BLANCHARD:  I'll pass the witness.

22        THE COURT:  Any redirect?

23        MR. ROTH:  None, Your Honor.

24        THE COURT:  All right.  Thank you.  You may be

25   excused.

1          THE WITNESS:  Thank you, sir.

2          (Witness excused, 10:45 a.m.)

3     ****************************************************************

4          MS. KELLY:  Thank you, Your Honor.  On behalf of

5     Mr. Harris we'll call Colleen Kuester.

6          THE COURT:  All right.  All right.  Ms. Kuester, you

7     can come all the way down here and we'll have you sworn in and

8     once you are sworn in you can walk over and take the witness

9     stand.

10          COLLEEN KUESTER, DEFENSE

11          having been first duly sworn, testified as follows:

12          (Witness sworn, 12:00 p.m.)

13          THE COURT:  All right.  Please take that stand.  Get

14     comfortable, and once you are settled Ms. Kelly will start

15     things up.

16                    DIRECT EXAMINATION

17      BY MS. KELLY:

18     Q    Good afternoon.

19     A    Hello.

20     Q    Can you state and spell your name for the record?

21     A    My name is Colleen Kuester.  C-o-l-l-e-e-n, K-u-e-s-t-e-r.

22     Q    Okay.  Where do you currently reside?

23     A    In Baraboo, Wisconsin.

24     Q    And who do you live with in Baraboo, Wisconsin?

25     A    I live with my husband and my two children.  I have two

1    children that live with me.

2    Q    How old are your children?

3    A    The ones that live with us are 16 and 18.

4    Q    What do you do for a living?

5    A    I am a stay-at-home mom and wife and I home school those

6    children.

7    Q    Okay.  I want to draw your attention to July of 2020.  Did

8    you happen to attend some get together in Cambria, Wisconsin?

9    A    Yes.

10   Q    Okay.  How was it that you were invited to that get

11   together?

12   A    We were invited by Steve Robeson to a family fun day.

13        MR. ROTH:  Your Honor, I am going to object to the

14   hearsay.  I understand the question didn't call for it but it

15   appears --

16        THE WITNESS:  We were invited --

17        THE COURT:  What you can answer and did answer is how

18   you got the invitation.  It's from Mr. Robeson.  What he said

19   about the nature of the event, if anything, is definitely

20   hearsay, so you'll have to go around that some other way.

21   BY MS. KELLY:

22   Q    How do you know Steve Robeson?

23   A    He was a customer at our business that we had until 2020.

24   Q    Okay.  How long had you known him prior to being invited?

25   A    We didn't.  We knew him very briefly.  It's kind of a long

1   story, but we didn't know him very well at all.

2   Q    Okay.  Did you get invited in person or over social media?

3   A    In person.

4   Q    Okay.  And you decided to go to that event, is that right?

5   A    Yes.  Yes.

6   Q    Who did you go with?

7   A    With my husband and my youngest son.

8   Q    How old is your -- how old was your youngest son in 2020?

9   A    He was 14.

10  Q    I am going to show you -- so up on that computer screen

11  that's right in front of you, if we could pull up Exhibit 89?

12  Do you see that photograph that's in front of you?

13  A    Yes.

14          MS. KELLY:  If we could also publish it to the jury?

15          THE COURT:  I was going to say it's already in.

16          MS. KELLY:  Thank you.

17  BY MS. KELLY:

18  Q    So Ms. Kuester, you can actually touch the screen.  If you

19  could point to or make a marking, do you see anyone -- do you

20  see your son in this picture?

21  A    Yes.

22  Q    Could you make a marking on that for the jury?  Okay.  You

23  made a little X right there?

24  A    Yeah.

25  Q    There we go.  And then do you also see your husband in that

1    photograph?

2    A    Yes.  He is next to him.

3    Q    Okay.  You are not in this photograph, correct?

4    A    Nope.

5    Q    Okay.  Were you standing present when this photograph was

6    being taken?

7    A    I was there when the photograph was taken.  I was from the

8    perspective of the person taking the picture.

9    Q    Do you know who took this picture?

10   A    I do not remember who took the picture.  I didn't know

11   anybody.

12   Q    Okay.  So you are at this event.  Tell the jury what was

13   your impression of this event?

14   A    Okay.  It was supposed to be a family fun day, and when we

15   got there, there were a lot of kids, swimming pool, a barbecue,

16   and then there was target practice, which my son was interested

17   in, and that's what they were doing there.

18   Q    Tell me about the target practice?

19   A    It was in the field they are standing in right there is

20   where it was and it was going the direction that way.  So it

21   was the long way like this.

22   Q    Okay.  You are making a pointing direction?

23   A    Right.  Basically the vertical direction of the people

24   standing there is the direction of where there was target

25   practice basically.

1    Q    Okay.  Were they doing anything else other than target

2    practice?

3    A    Well, as far as -- there was a lot of things going on, so

4    there were some people talking, some people doing target

5    practice, some people by the pool, some people eating brats.

6    Q    And you saw people with firearms, right?

7    A    There were people with firearms, yup, but not everybody.

8    Q    Okay.  And you didn't know a whole lot of people when you

9    got there, is that right?

10   A    Right.  The only person we knew was the person who invited

11   us.

12   Q    Okay.  And that was Steve Robeson?

13   A    That was.  Yes.

14   Q    Okay.  And did you -- were you aware that there were some

15   guys from Michigan that came to this event?

16   A    I heard somebody say something about that, but I was not

17   introduced to them or anything like that.

18   Q    Okay.  Did the guys from Michigan, did they stand out to

19   you as one way or the other of being scary or you were nervous

20   about them?

21   A    No.  I wasn't nervous that day at all.

22   Q    Okay.  And you said your son was interested in target

23   practice, is that right?

24   A    Yes.  Yes.

25   Q    So he picked up a firearm?

1    A    Yes.  He was helped.  He didn't just pick one up.  There

2    were responsible adults with him showing him how to do it.

3    Q    Okay.

4    A    And yes.  He did shoot a 22.

5    Q    Anything in your mind about that day that caused you to

6    have concern?

7    A    No.

8    Q    Did you ever go back to that property after that day?

9    A    No.  I did not.  It's not super close to our home and there

10    was no reason to.

11            MS. KELLY:  Okay.  I have nothing further.  Thank you.

12            THE COURT:  All right.  Any other Defense questions?

13            MR. HILLS:  No.  Thank you.

14            MR. GIBBONS:  No.  Thank you, Your Honor.

15            MR. BLANCHARD:  I'll pass.

16            THE COURT:  Government?

17            MR. ROTH:  Thank you, Your Honor.

18                    CROSS EXAMINATION

19     BY MR. ROTH:

20    Q    Good afternoon.

21    A    Hi.

22    Q    My name is Jonathan Roth.  I am from the United States

23    Attorney's office.  I have just a few questions for you.

24            Did you describe this training as goofy?

25    A    I don't know.  It wasn't very serious I guess.

1    Q    All right.  Do you remember speaking to an investigator

2    about this case?

3    A    Yes.

4    Q    Do you recall what word you used to describe the training

5    to the investigator?

6    A    Yeah.  I suppose goofy a little bit.

7    Q    Could we please play Exhibit 82?

8                (Audio started, 12:07 p.m.)

9                (Audio stopped, 12:07 p.m.)

10            MR. ROTH:  There we go.

11            MS. KELLY:  Turn --

12            THE COURT:  This is Exhibit 82?

13            MS. KELLY:  I'll place an objection.  I am not sure

14   that there is any foundation for this question.

15            THE COURT:  All right.  Well, I think what we are

16   looking at, Exhibit 82 is a recording of something that

17   happened at the Wisconsin event on July 10.

18            MS. KELLY:  And again, I don't think there is

19   foundation that she was present for this event.

20            MR. ROTH:  And that's what I intend to follow up.

21            THE COURT:  All right.  Go ahead.

22               (Audio started, 12:08 p.m.)

23               (Audio stopped, 12:08 p.m.)

24   BY MR. ROTH:

25   Q    We don't need to go through the whole thing, but you heard

1    that?

2    A    (Witness nodding)

3    Q    Yes?

4    A    Yes.

5    Q    They are talking about making a bomb with BBs, right?

6    A    No one talked to me about that.

7    Q    No.  No.  But in that recording?

8    A    What's that?

9    Q    In the recording we just listened to they are talking about

10   building an explosive with BBs?

11   A    I don't know.

12   Q    What we just listened to?

13   A    Right.

14   Q    Did you hear that?

15        MR. GIBBONS:  Objection.  Asked and answered, Your

16   Honor.

17        THE COURT:  It's less important what she thinks.  If

18   your point is she didn't participate or hear it then let's get

19   to that, and the jury has already heard the entire transcript

20   and can draw -- and tape and can draw whatever conclusions they

21   want about it.

22        MR. ROTH:  Thank you, Your Honor.

23   BY MR. ROTH:

24   Q    Did you hear that conversation during the Cambria FTX?

25   A    Absolutely not.

1    Q    Can we listen to 92, please, another Cambria recording?

2              (Audio started, 12:09 p.m.)

3              (Audio stopped, 12:09 p.m.)

4    BY MR. ROTH:

5    Q    Did you hear that conversation during your time at the

6    Cambria FTX?

7    A    I did not.

8    Q    Could we look at 97 please?  Did you see these gentlemen

9    building an explosive during the Cambria FTX?

10   A    I did not.

11   Q    Can we please play 101?

12             (Audio started, 12:10 p.m.)

13             (Audio stopped, 12:10 p.m.)

14             MR. GIBBONS:  Your Honor, I am going to object.

15             THE COURT:  The objection is what?

16             MR. GIBBONS:  I believe that conversation occurred at

17   a restaurant and not in Cambria at the FTX that this woman

18   attended.

19             THE COURT:  Well, it's the same basic weekend and --

20             MR. ROTH:  It's the event.

21             THE COURT:  Yeah.  I think it's fair for the same

22   purpose, and you can develop that if you need to on redirect.

23   Go ahead.

24             MR. ROTH:  Thank you, Your Honor.  I believe we

25   finished playing that.

BY MR. ROTH:

Q    Do you recall hearing any of that during the FTX that weekend?

A    No.

Q    All right.  All of these are very different than your experience during your portion of the FTX that weekend?

A    Yes.

           MR. ROTH:  I have nothing else, Your Honor.  Thank you.

           THE COURT:  We'll start with Ms. Kelly on any redirect?

                    REDIRECT EXAMINATION

  BY MS. KELLY:

Q    Ms. Kuester, how long were you at this house in Cambria?

A    About four hours.

Q    Okay.  You didn't go out to eat with anybody else afterwards?

A    No.

Q    Okay.  You didn't engage in private conversations with anybody?

A    None of those people.

Q    Okay.  But what you saw and your impression of the event it was a family friendly event?

A    Yes.

           MS. KELLY:  Nothing further.

1          THE COURT:  Mr. Hills?

2                    RECROSS EXAMINATION

3      BY MR. HILLS:

4      Q    You didn't go over to Steve Robeson's house, did you?

5      A    When?

6      Q    That weekend?

7      A    No.

8          MR. HILLS:  Okay.  Thank you.

9          THE COURT:  Mr. Blanchard?

10         MR. BLANCHARD:  No thank you.

11         THE COURT:  Mr. Gibbons?

12         MR. GIBBONS:  No questions, Your Honor.  Thank you.

13         THE COURT:  Any recross?

14         MR. ROTH:  No, Your Honor.  Thank you.

15         THE COURT:  All right.  Thank you.  Thank you.  You

16     may be excused.

17              (Witness excused, 12:11 p.m.)

18         THE COURT:  We'll go to your next witness, Ms. Kelly.

19         MS. KELLY:  Thank you, Your Honor.  Call Lindsay

20     Cowan.

21         THE COURT:  Ms. Cowan, we'll have you come forward and

22     be sworn in right here.  Stand right in front of Mr. Schmidt

23     and be sworn in.

24              LINDSAY COWAN, DEFENSE

25              having been first duly sworn, testified as follows:

```
1              (Witness sworn, 12:12 p.m.)

2         THE COURT:  And then here is the witness stand off to

3    my right, your left.  If you just walk around here and then you

4    can get settled in.  Take a couple good deep breaths.  You need

5    water or not or are you okay?

6         THE WITNESS:  Yeah.

7         THE COURT:  I'm sure this is what you like to do every

8    day.  What you are going to need to do in response to questions

9    is use words out loud.  Okay?

10        THE WITNESS:  Um-hum.

11        THE COURT:  And not um-hum.

12        THE WITNESS:  Yes.

13        THE COURT:  Yes works perfect.

14        Go ahead, Ms. Kelly.

15                 DIRECT EXAMINATION

16    BY MS. KELLY:

17    Q    Good afternoon, Ms. Cowan.  Could you state and spell your

18    name for the record?

19    A    It's Lindsay Cowan.  L-i-n-d-s-a-y, C-o-w-a-n.

20    Q    How old are you?

21    A    Twenty-two.

22    Q    Okay.  And where do you currently reside?

23    A    In Waterford, Michigan.

24    Q    Okay.  Do you have a brother named Adam?

25    A    Yes.
```

Q    Okay.  Are you currently employed?

A    Um-hum.  Yes.  Sorry.

Q    Where do you work?

A    Oakland County Courthouse.

Q    Okay.

A    As a custodian.

Q    Okay.  I want to take you back to 2020.  Okay?  You were in a relationship with Devin Phelps, is that right?

A    Yes.

Q    Okay.  And at some point you met Daniel Harris, is that right?

A    Yes.

Q    Okay.  Is it true -- how did you first become friends or how did you first meet Daniel Harris?

A    I met him through Devin.

Q    Did you become friends on social media or in face to face?

A    Face to face.

Q    Okay.  Do you recall when that was?

A    Not the exact date.  No.

Q    Okay.  Do you remember spending time with Daniel Harris and Devin Phelps on the 4th of July of 2020?

A    Yes.

Q    Okay.  Can you tell me about that day?

A    Yes.  We were doing fireworks on the 4th of July.

Q    Okay.  Was that -- do you remember where you were?

1    A    At Devin's house.

2    Q    Okay.  Were there other people around?

3    A    Yes.

4    Q    Okay.  Family?

5    A    His friends, family.

6    Q    And you took some pictures, right?

7    A    Yes.

8    Q    Okay.  If we could pull up 4149, please?  Did you take this

9    picture?

10   A    Yes.

11   Q    Okay.  Did you take other pictures including this one?

12   A    Yes.

13   Q    Okay.  And did you also have a conversation with Daniel

14   Harris that day about your brother Adam?

15   A    Yes.

16   Q    Okay.  And what did you tell Daniel Harris?

17   A    I was talking about my brother's blown up hand.

18   Q    Okay.

19   A    And showed him a picture of that.

20   Q    Okay.

21   A    Yes.

22   Q    You actually took your phone and showed a picture to Daniel

23   Harris?

24   A    Yes.

25   Q    Okay.  And did Daniel Harris ask something of you?

1    A    Yes.

2              THE COURT:  That's a hearsay problem.

3    BY MS. KELLY:

4    Q    Okay.  You later texted Daniel Harris the pictures that you

5    took on the 4th of July, right?

6    A    Yes.

7    Q    Okay.  And you also texted Daniel Harris that your brother

8    wasn't responding to you, is that right?

9    A    Yes.

10   Q    Okay.  If we could show Government's Exhibit 408?  And if

11   we could blow it up, please?

12             Can you see that okay, Lindsay?

13   A    Yes.

14   Q    Okay.  And at the top I see the name Lindsay.  Can you

15   recognize that as being your phone?

16   A    Yes.  Not my phone.

17   Q    Not your phone.  Okay.  But these are messages that you are

18   sending to Daniel Harris?

19   A    Yes.

20   Q    Okay.  And you texted him that your brother is not

21   responding to you?

22   A    Correct.  Yup.

23   Q    And he said, it's all kosher, is that right?

24   A    Yes.

25   Q    Okay.  Do you know what kosher means?

1    A    No, but I am guessing it's all good.

2              MS. KELLY:  Okay.  I have nothing further.  Thank you.

3              THE COURT:  All right.  Mr. Hills?

4              MR. HILLS:  No, Your Honor.  Thank you.

5              MR. BLANCHARD:  I'll pass.

6              THE COURT:  Mr. Gibbons?

7              MR. GIBBONS:  I am satisfied, Your Honor.  Thank you.

8              THE COURT:  Any cross?

9              MR. ROTH:  No cross, Your Honor.

10             THE COURT:  All right.  Thank you.  You may be

11   excused.

12             THE WITNESS:  Thank you.

13             (Witness excused, 12:17 p.m.)

14             THE COURT:  Go to your next witness, Ms. Harris -- I'm

15   sorry.  I did it again.  Did it again.  It's not even late in

16   the day so I have no excuse.  I am sorry.

17             THE WITNESS:  I am single, Your Honor.  I prefer to

18   keep it that way.

19             THE COURT:  My apologies.

20             MS. KELLY:  It will be Megan Cooley.

21             THE COURT:  We'll have you sworn in here, Ms. Cooley.

22             MEGAN COOLEY, DEFENSE

23             having been first duly sworn, testified as follows:

24             (Witness sworn, 12:17 p.m.)

25             THE COURT:  The witness stand is right here to my

1    right, your left.  Get settled up there and we'll turn it over

2    to Ms. Kelly.

3                      DIRECT EXAMINATION

4     BY MS. KELLY:

5    Q    Hi, Ms. Cooley.

6    A    Hi.

7    Q    How are you today?

8    A    Good.  How are you?

9    Q    Good.  Could you state and spell your name for the record?

10   A    Megan Cooley.  M-e-g-a-n, C-o-o-l-e-y.

11   Q    How old are you?

12   A    Twenty-two.

13   Q    And where do you live?

14   A    I live in Shelby Township.

15   Q    Okay.  Are you currently employed?

16   A    I am not.  I just had a baby so right now I am staying

17   home.

18   Q    Congratulations.

19   A    Thank you.

20   Q    Are you currently in a relationship with Jerad Beauchesne?

21   A    Yes.

22   Q    Did I say that right?

23   A    Beauchesne.

24   Q    Beauchesne.  Okay.  How long have you and Jerad Beauchesne

25   been together?

1    A    Almost three years.

2    Q    Okay.  And I want to bring you back to the summer of 2020.

3    Okay?  You and Jerad were living together, is that right?

4    A    Correct.

5    Q    Okay.  And was that also in Shelby Township?

6    A    Yes, ma'am.

7    Q    Okay.  And were you aware that Jerad was involved in --

8    with a group of guys that summer?

9    A    Yes.

10   Q    Okay.  What was your understanding of that group of guys?

11   A    Just guys --

12        MR. ROTH:  I am going to object for lack of

13   foundation.  I also am not sure what exactly it's asking.

14        THE COURT:  Say that again.  Not exactly sure what?

15        MR. ROTH:  I am also not exactly sure what information

16   it calls for.

17        THE COURT:  Maybe you can lay a little bit more

18   foundation, Ms. Kelly, because if it's simply what

19   Mr. Beauchesne told her or if she heard from somebody else it

20   may not be a proper foundation for the information.  It's not

21   clear she did anything herself with them.

22   BY MS. KELLY:

23   Q    In that summer of 2020 was there times that Jerad would

24   have friends that would come over to your guys' house?

25   A    Yes.

Q    Okay.  Were there times that you understood Jerad was going
to places and shooting guns?

A    Correct.

        MR. ROTH:  I am going to have the same objection, Your
Honor.

        THE COURT:  Okay.  Well, I mean, I think that's a
fairly generic response so far and fairly generic foundation,
but if it gets too much more detailed we'll have to revisit it.
Go ahead.

        MS. KELLY:  Okay.

BY MS. KELLY:

Q    Did you have the opportunity to meet Daniel Harris in the
summer of 2020?

A    Yes, ma'am.

Q    Okay.  And were you aware -- were you and Jerad ever
attending different protests that were going on in the summer
of 2020?

A    In the summer, no.

Q    In the springtime?

A    Yes.

Q    Okay.  That would have been in Lansing?

A    Correct.

Q    Okay.  Did Jerad have property or does Jerad's family have
property somewhere near Luther, Michigan?

A    Yes.

1   Q    Do you know what town that's in?

2   A    I believe Bristol, to my knowledge.

3   Q    Okay.  And in September of 2020, did you go up to Jerad's

4   property with him?

5   A    Yes.

6   Q    Okay.  And specifically on September the 11th, which is a

7   Friday night, did you and Jerad go over to -- let me ask you

8   this.  Did you know Ty Garbin?

9   A    Yes.

10  Q    Okay.  This is one of Jerad's friends?

11  A    Yes.

12  Q    Okay.  And on September the 11th of 2020, did you go to Ty

13  Garbin's property with Jerad?

14  A    Yes.

15  Q    Okay.  And were there other people when you arrived at the

16  property?

17  A    Yes.

18  Q    Can you tell the jury what was happening at the property?

19  What were your impressions?

20  A    It was just a bonfire.  I was the only girl for a little

21  bit, and they were talking about, like, guy stuff, porn, like

22  politicky things, but that was pretty much it.

23  Q    Did you hear any talk about kidnapping the governor?

24  A    No.

25            THE COURT:  Well, that's a problem with hearsay I

1    think.

2    BY MS. KELLY:

3    Q    Do you recall meeting anyone for the first time at Ty's

4    property?

5    A    Yes.

6    Q    Who was that?

7    A    The specific names that I remember are Dan.  Not Daniel

8    Harris but the other Dan, and Adam.

9    Q    Okay.

10   A    And then I did have small talk with other people but I

11   don't remember their names.

12   Q    Okay.  Other than these guys talking about politics or

13   pornography or other topics, anything that caused you to have

14   concern that evening?

15   A    No.

16   Q    Okay.  Did you go back to Jerad's property on Friday night?

17   A    Yes.

18   Q    All right.  And did you take Jerad back to Ty's property on

19   Saturday?

20   A    Yes.

21   Q    And you were in Jerad's truck, is that right?

22   A    Correct.

23   Q    Do you remember what kind of truck he had?

24   A    It's a 2500 Chevy, red, Sierra.

25   Q    It is a Sierra.  Okay.  If we could pull up 4146, please,

```
1    T?
2    A    That's her.
3    Q    That's her you said?
4    A    Yes.
5    Q    Okay.  So this is Jerad's truck and you recognize that,
6    right?
7    A    Yes.
8    Q    Okay.  So you are driving back onto the property on
9    Saturday.  Do you stay on the property at Ty's house that
10   Saturday?
11   A    Only for probably about 20 minutes and then I left.
12   Q    Okay.  Did you see Daniel Harris at the property that day?
13   A    He arrived right about the time that I was leaving.  I
14   think I talked to him for probably, like, five minutes.
15   Q    Okay.  And then where did you go that day?
16   A    I went back to the property.  I shot my own firearms for a
17   little bit.  I went to Cadillac.  I walked around all the
18   little mom and pop stores.  I went and saw a movie.  And then I
19   went back to the property -- or I was driving back to the
20   property.
21   Q    Okay.  When you are driving back and driving back to
22   Jerad's property, did you happen to run into Daniel Harris and
23   others in the Bristol area?
24   A    Yes.
25   Q    Okay.  And who was Daniel Harris with?
```

1    A    He was with Jerad and then another person, but I don't know

2    who that person was.

3    Q    Okay.  And where did you see them?

4    A    So there is a street -- say, you are going down this road,

5    Jerad's property is down this one.  They were coming onto that

6    main road and I was heading towards the property, and then they

7    were like, we are going to the Bristol store, and so I turned

8    around and went with them.

9    Q    Okay.  Let me show you -- this is a Defense Proposed

10   Exhibit 4094, page 1.  Just to the witness.

11   A    That's --

12   Q    Have you had an opportunity to review this photograph?

13   A    Yes.

14   Q    Okay.  And is this a fair and accurate representation of

15   the Bristol store that you just testified?

16   A    Yes.

17           MS. KELLY:  I'd move for its admission?

18           THE COURT:  Any objections?

19           MR. ROTH:  It sounds like counsel mentioned that only

20   page 1.  Understanding that 4094 is only this particular

21   picture I have no objection.

22           THE COURT:  All right.  It's admitted.

23   BY MS. KELLY:

24   Q    Okay, Megan.  So this is the Bristol store that you were

25   talking about?

1    A    Correct.

2    Q    Okay.  And you followed Jerad and Daniel and the other

3    individual back to this store, is that right?

4    A    Correct.

5    Q    And this is Saturday?

6    A    Correct.

7    Q    Okay.  Do you recall the approximate time that this was?

8    A    To my knowledge it would have to be around seven o'clock.

9    Q    Okay.  And you obviously knew Daniel Harris, right?

10   A    Correct.

11   Q    And was Jerad wearing something distinctive on the top of

12   his head when you saw him?

13   A    He had a poop emoji hat on.

14   Q    If we could show the witness only 4096?

15   A    Yes.  That's the hat.

16   Q    Have you had an opportunity to review this photograph?

17   A    Yes.

18        MR. ROTH:  I would object to its admission.  There is

19   certainly a foundation but I don't think there is any

20   relevance.

21        THE COURT:  I am not sure there is much relevance

22   either but we will allow it.  It's just one page, right?  Just

23   the photo?

24        MS. KELLY:  Yes, Your Honor.

25   BY MS. KELLY:

1    Q    So Megan, is this a fair and accurate representation of

2    what Jerad was wearing when you saw him at the Bristol store at

3    approximately seven o'clock that evening?

4    A    Yes.

5    Q    Okay.  And what was the mood that these three guys were in

6    when you saw them?

7    A    Really goofy.

8    Q    Really goofy?

9    A    Yes.

10   Q    Typical of these guys?

11   A    Yes.

12   Q    Okay.  You seen Daniel Harris drink before?

13   A    Yes.

14   Q    Okay.  In your opinion, how many times have you seen him

15   drink before?

16   A    I am not sure.

17   Q    Okay.  Have you seen him intoxicated?

18   A    No.

19   Q    Okay.  In your opinion, when you saw Daniel Harris on that

20   Saturday night at the Bristol store, was he falling down drunk?

21   A    No.

22   Q    And so --

23        And you can take that down.  Thank you.

24        Do you know what kind of car the three guys were in?

25   A    I know that it was a truck.  I don't remember make and

1   model.

2   Q    Okay.  Fair enough.  And did anyone go into that Bristol

3   store, any of the three guys?

4   A    I know Dan and Jerad did.  I am not sure about the third

5   person.  I don't remember.

6   Q    Okay.  Did you see Daniel bringing anything out of the

7   Bristol store?

8   A    I believe just beer.

9   Q    Okay.  Was it a significant amount of beer?

10  A    No.  I believe it was just one container to my knowledge.

11  Q    Okay.  After Daniel Harris comes out with beer, what did

12  the boys do?

13  A    They went back to Ty's property and I went back to Jerad's.

14  Q    Okay.  And then did you later come and pick Jerad back up

15  from Ty's property?

16  A    Yes.

17  Q    Do you know approximately what time that was?

18  A    I am not sure.  It was before 10 o'clock.

19  Q    Did you get out of your truck when you went to Ty's

20  property?

21  A    No.

22  Q    Okay.  And you didn't have any discussion about what was

23  going on in the property, right, when you were not there?

24       MR. ROTH:  I object to the hearsay.

25       THE COURT:  I think that's true if it's discussion

1    that calls for conversations that involve people who aren't

2    testifying.

3              MS. KELLY:  I have nothing further.  Thank you.

4              THE COURT:  All right.  Mr. Hills?

5              MR. HILLS:  Nothing, Your Honor.  Thank you.

6              THE COURT:  Mr. Blanchard?

7              MR. BLANCHARD:  No thank you.

8              THE COURT:  Mr. Gibbons?

9              MR. GIBBONS:  Yeah.  Just a couple questions, Your

10   Honor.

11                      CROSS EXAMINATION

12    BY MR. GIBBONS:

13   Q    You testified you were present at the property on Friday

14   evening for a few minutes, is that correct?

15   A    Correct.

16   Q    And you indicate that you remember Dan, another Dan, a

17   bigger Dan being there?

18   A    Correct.

19   Q    In addition to Daniel Harris?

20   A    Correct.

21   Q    And then you also I think said Adam was there, Adam Fox?

22   A    Correct.

23   Q    Did you smoke marijuana with Adam Fox that evening?

24   A    I did.

25   Q    Okay.  And did it look like it was a new experience for

1    him?

2         MR. ROTH:  Objection.  Lack of foundation,

3    speculation.

4         THE COURT:  Well, I mean, kind of an awkward

5    foundation to lay, but I guess if you want to establish that

6    she is familiar with people smoking marijuana and how they look

7    you can do it and if you can't lay that foundation she probably

8    doesn't have a basis to answer.

9         MR. GIBBONS:  I am satisfied, Your Honor.  Thank you.

10        THE COURT:  All right.  Mr. Roth?

11        MR. ROTH:  Thank you, Your Honor.

12                     CROSS EXAMINATION

13   BY MR. ROTH:

14   Q    I'd like to start by playing Exhibit 167, a recording from

15   August 23rd, 2020, please?

16        MS. KELLY:  I am going to object to this line of

17   questioning.  This witness was for a limited purpose of being

18   at Luther on a limited time period.

19        THE COURT:  All right.  Just outline the purpose for

20   where you want to go with it if you would.

21        MR. ROTH:  It's a statement by Jerad Beauchesne.  She

22   can recognize his voice.  And I think that speaks to her state

23   of mind in testifying today and any bias she may have.

24        THE COURT:  All right.  Well, what was the exhibit you

25   want?

1        MR. ROTH:  167, Your Honor.

2        THE COURT:  All right.  We'll permit it for that

3   purpose.  It's already in evidence in any event.

4        (Audio started, 12:31 p.m.)

5        (Audio stopped, 12:32 p.m.)

6        THE COURT:  Why don't you stop it now because it seems

7   to me we are well beyond the language of Mr. Beauchesne and

8   whether she can recognize the voice or not.

9        MR. ROTH:  That's fine, Your Honor.  Thank you.

10  BY MR. ROTH:

11  Q    Did you recognize Mr. Beauchesne's voice there?

12  A    Yes.

13  Q    You heard him say, nobody talks, everybody walks?

14       MS. KELLY:  I am going to object to relevance again,

15  Your Honor.

16       THE COURT:  He said the relevance was motive.  They'll

17  argue that the witness is motivated along the timelines and

18  it's an argument, but I think he is fairly inquiring.  Go

19  ahead.

20       MR. ROTH:  Thank you, Your Honor.

21  BY MR. ROTH:

22  Q    You heard him say that, ma'am?

23  A    Yes.

24  Q    All right.  You live with Mr. Beauchesne now?

25  A    I do.

Q    Spoke to him today?

A    Yes.

Q    Spoke to him before you came in here today?

A    Yes.

Q    And your testimony is that around 7:00 p.m. you saw Daniel Harris at the liquor -- I am sorry.  It's not a liquor store. The Bristol store with two other men?

A    Correct.

Q    They went inside.  All three came out?

A    I am not sure.

Q    How many came out?

A    I am not -- I don't know if the third one went in or not. I just remember seeing Jerad and Dan in there.

Q    How many containers of alcohol did Jerad Beauchesne have in your memory?

A    I don't remember Jerad having any, but I do remember Dan having one.

Q    And you said Dan had one.  Did you use the word container?

A    Yes.  Container.

Q    It's an odd word for a beer.  Was it a can, a case, a bottle?

A    I am not much of a drinker so I guess I just meant like a case.

Q    A case?

A    Um-hum.

Q      Okay.  That's a yes?

A      Yes.

Q      Tell me what you mean by a case of beer?

A      A case of beer.

Q      Right.  So is it the tall box of bottles that you could
tell; is it a big box of cans?

A      I do not recall.

Q      Could you give us an estimate with your hands about how big
this case of beer was that Daniel Harris was bringing back to
camp?

A      I do not recall.  I just remember seeing him carrying one.

        MR. ROTH:  Nothing else, Your Honor.  Thank you.

        THE COURT:  All right.  Go back to Ms. Kelly?

        MS. KELLY:  I have nothing Your Honor.  Thank you.

        THE COURT:  Mr. Hills?

        MR. HILLS:  I am just thinking.

                CROSS EXAMINATION

  BY MR. HILLS:

Q      The government played you a very short clip.  You
recognized Jerad in that, is that correct?

A      Yes, sir.

Q      But did anybody play you the context of that?

A      No.

Q      Like what was said before that, before the clip?

A      No.

```
1    Q    Or after it?

2    A    No.

3              MR. HILLS:  Okay.  Thank you.

4              THE COURT:  Mr. Blanchard?

5              MR. BLANCHARD:  Nothing.

6              THE COURT:  Mr. Gibbons?

7              MR. GIBBONS:  I have no questions, Your Honor.

8              THE COURT:  Anything else?

9              MR. ROTH:  No, Your Honor.  Thank you.

10             THE COURT:  All right.  Thank you.  You may be

11   excused.

12             (Witness excused, 12:35 p.m.)

13   ****************************************************************
```

1                                   INDEX

2

         Government Witnesses:                          Page
3
         KATHERINE MARTINEZ
4
           Direct Examination by Mr. Kessler              4
5          Cross Examination by Mr. Blanchard            13

6        CHASITY KNIGHT

7          Direct Examination by Mr. Kessler             16
           Cross Examination by Ms. Kelly                27
8          Cross Examination by Mr. Blanchard            27

9        TIMOTHY JOHN HUNT

10         Direct Examination by Mr. Roth                37

11       ROBERT GILLETTE

12         Direct Examination by Mr. Roth                40
           Cross Examination by Ms. Kelly                48
13         Cross Examination by Mr. Blanchard            53

14       KELLY VAN ARSDALE

15         Direct Examination by Mr. Roth                58
           Cross Examination by Mr. Gibbons              79
16         Cross Examination by Ms. Kelly                83
           Cross Examination by Mr. Blanchard            89
17
         Defense Witnesses:                          Page
18
         COLLEEN KUESTER
19
           Direct Examination by Ms. Kelly              91
20         Cross Examination by Mr. Roth                96
           Redirect Examination by Ms. Kelly           100
21         Recross Examination by Mr. Hills            100

22       LINDSAY COWAN

23         Direct Examination by Ms. Kelly             102

24

25

```
1     MEGAN COOLEY

2      Direct Examination by Ms. Kelly          107
       Cross Examination by Mr. Gibbons         117
3      Cross Examination by Mr. Roth            118
       Cross Examination by Mr. Hills           121
4
       Exhibits:                                Admitted
5
       Government's Exhibit 261                     72
6       (Photograph, Firework)
       Government's Exhibit 333                     11
7       (Tri-corner Hat)
       Government's Exhibit 334                     12
8       (Croft Back Pack)
       Government's Exhibit 335                     12
9       (Croft Hawaiian Shirt)
       Government's Exhibit 336                      9
10      (Glock, Croft)
       Government's Exhibit 349                      7
11      (Photograph, Croft, Back Pack in Truck)
       Government's Exhibit 350                      7
12      (Photograph, Croft, Firearm in Truck)
       Government's Exhibit  351                     9
13      (Photograph, Croft, Day Bed)
       Government's Exhibit  352                     9
14      (Photograph, Croft, Items on Passenger Seat)
       Government's Exhibit 353                      9
15      (Photograph, Croft, Items in Back Pack)
       Government's Exhibit 354                      9
16      (Photograph, Croft, Clothing in Back Pack)
       Government's Exhibit 355                      9
17      (Photograph, Croft, Magazines)
       Government's Exhibit 356                      9
18      (Photograph, Croft, Items in Back Pack)
       Government's Exhibit 446.1                   74
19      (Video, IED Detonation)
       Government's Exhibit 446.2                   74
20      (Video, IED Detonation)
       Government's Exhibit 447                     74
21      (Photograph, IED Detonation)
       Government's Exhibit 448                     74
22      (Photograph, IED Detonation)
       Defendant's Exhibit 4094                    113
23      (Photograph, Bristol Store)
       Defendant's Exhibit 4096                    114
24      (Photograph, Poop Emoji Hat)

25
```

REPORTER'S CERTIFICATE

I, Paul G. Brandell, CSR-4552, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a full, true and correct transcript of an excerpt from the proceedings had in the within entitled and numbered cause on the date hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my direction.

/s/ Paul G. Brandell

Paul G. Brandell, CSR-4552, RPR, CRR

U.S. District Court Reporter

399 Federal Building

Grand Rapids, Michigan  49503